## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,       :

             Plaintiff,      :

            v.          :        Civil Action No. 04-343 JJF

TATUNG CO., TATUNG COMPANY   :
OF AMERICA, INC.,         :

            Defendants.    :

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON MOTION OF LG.PHILIPS LCD CO., LTD. FOR DISCOVERY SANCTIONS AGAINST THE TATUNG DEFENDANTS:

### SANCTIONS RECOMMENDED

This matter comes before me, as Special Master, on the motion of plaintiff LG.Philips LCD Co., Ltd. ("LPL") for the imposition of sanctions against defendants Tatung Co. ("Tatung Taiwan") and the Tatung Company of America, Inc. ("Tatung America" and, together with Tatung Taiwan, "Tatung" or the "Tatung Defendants") in connection with certain jurisdictional discovery ordered by the Court.

The Special Master recommends that LPL's motion for sanctions be **GRANTED,** as set forth herein.

### BACKGROUND

This is a patent infringement case brought by LPL against, *inter alia*, the Tatung Defendants alleging infringement of United States Patent Nos. 6,498,718 and 6,501,641 that relate to assembly mountings for flat panel display monitors used in such products as liquid crystal display ("LCD") and plasma televisions, and computer monitors. D.I. 1. The complaint

asserts grounds for jurisdiction over the Tatung Defendants on the basis of actual purchases in Delaware of equipment manufactured by Tatung that allegedly infringe the patents-in-suit.  *Id.*

In lieu of answering the complaint, the Tatung Defendants jointly moved to dismiss for lack of personal jurisdiction, insufficient process and insufficient service of process and, in the alternative, to quash service.  D.I. 16-17.  Tatung's joint motion (the "Tatung Motion") was supported by the declaration of Tatung's counsel, Robert C. Weems, D.I. 19, as well as by the sworn declarations of David Shan-Juh Chang on behalf of Tatung Taiwan, D.I. 20, and Robin Tsou and Edward Chen on behalf of Tatung America, D.I. 19 at Exh. 3 and D.I. 21.

In response to the Tatung Motion, LPL moved for leave to conduct jurisdictional discovery of the Tatung Defendants.  D. I. 34-35.  On November 17, 2004 the Court granted LPL's request for jurisdictional discovery, set a 90-day deadline of February 15, 2005 for its completion, and reset the original Scheduling Order deadlines.  D.I. 88.  The Court also issued orders (i) providing that no further motions could be filed by the parties until the Court resolved the Tatung Motion, D.I. 93; and (ii) reserving the Court's decision on the Tatung Motion until after completion of the jurisdictional discovery, D.I. 94.  Shortly thereafter, LPL served jurisdictional discovery upon each of the Tatung Defendants, in the form of interrogatories, requests for production of documents, and notices of depositions.  D.I. 98, 99, 102-103.

**Jurisdictional Discovery Disputes Before the Court**

Notwithstanding the Court's order that no further motions be filed by the parties until the Court resolved the Tatung Motion, the record discloses that the parties sought the Court's attention with numerous discovery disputes following entry of that order.  For example, on December 20, 2004, Tatung America sent a letter to the Court seeking leave to file a motion for a protective order to quash deposition notices issued on December 2, 2004 by LPL for depositions

scheduled for December 22, 2004 and mid-January 2005. Tatung America refused to appear for the Rule 30(b)(6) deposition scheduled in two days, arguing that its request to file a motion for a protective order had the same effect as an actual motion and therefore excused its requirement to appear, pursuant to Local Rule 30.2. D.I. 128 at 1, n.1. A volley of letters followed, D.I. 107-108, prompting the Court to schedule *sua sponte* a date to hear what the Court deemed would be LPL's motion to compel and request for sanctions, and to require additional briefing. D.I. 126-30.

At the hearing held on January 24, 2005, the Court took steps to get the jurisdictional discovery back on track. The record of that hearing establishes that – although almost 60 days had elapsed since LPL propounded its jurisdictional discovery – the Tatung Defendants had yet to respond to outstanding interrogatory requests, had failed to produce any responsive documents whatsoever, and had refused to appear at scheduled depositions. In the words of LPL's counsel:

> [D]efendant Tatung Company of America has refused to appear for four depositions in this matter on two separate occasions. As a result of that, Your Honor, and as a result of their inadequate responses to interrogatories and document requests, **we really have no jurisdictional discovery at this point** two months after this Court ordered Tatung Company of America and Tatung Company to provide jurisdictional discovery.

D.I. 132 at 4:9-19 (emphasis added).

The tack taken by the Tatung Defendants has been to object to and seek to quash all of the jurisdictional discovery sought by LPL, arguing primarily that the scope of LPL's discovery exceeded the permissible scope of jurisdictional discovery and that neither the provisions of Local Rule 26.2 nor the protective order proposed by LPL were adequate to protect Tatung's confidential information. In the words of Tatung's counsel:

> There are two fundamental problems with plaintiff's discovery. They are: (1) plaintiff's refusal of a confidentiality order, such as the one approved by Judge Jordan [in another case] and (2)

3

> plaintiff's refusal to specify with some reasonable particularity its
> 30(b)(6) deposition categories, so that the designee(s) can be
> identified and prepared to testify [on behalf of] the company with
> answers other than an embarrassing (and potentially damaging) "I
> don't know."

D.I. 128 at pp. 1-2.

The Court first addressed and resolved the parties' impasse over the proposed terms of a protective order to protect confidential information disclosed during discovery, by obtaining LPL's agreement that it could live with the terms proposed by Tatung for the limited period of jurisdictional discovery.[1]  D.I. 132 at pp. 10-22.  The Court rejected Tatung's objections to the scope of discovery, by expressly determining that the deposition topics listed in the Rule 30(b)(6) deposition notices issued by LPL were within the permissible scope of jurisdictional discovery and were specific enough to permit Tatung to designate corporate designee(s).  D.I. 132 at 38:4-8 and 42:2-5.

The Court then directed that the noticed depositions go forward, and attempted to provide reassurance to Tatung that the deposition questioning would stay within the scope of the noticed topics by providing a mechanism for handling objections by the Tatung Defendants to any deposition questioning that may exceed the permissible scope.  D.I. 132 at 36:12-24; 37:1-24; and 38:1-3.  The Court also directed that "all the documents relative to the declarations that you

---

[1]  The impasse between the parties centered on Tatung's demand that certain of LPL's counsel be restricted from prosecuting patents during the pendency of this litigation, to avoid risk to confidential information that Tatung might disclose during discovery.  In the Special Master's view, the provisions of Local Rule 26.2 adequately address this concern prior to the entry of a tailored protective order, especially given the narrow focus of jurisdictional discovery.  Local Rule 26.2 provides as follows:

> If any documents are deemed confidential by the producing party and the parties
> have not been able to agree on an appropriate protective order, until a protective
> order is in effect, disclosure should be limited to members and employees of the
> firm of trial counsel who have entered an appearance, and, where appropriate,
> have been admitted *pro hac vice*.  **Such persons are under an obligation to
> keep such documents confidential and to use them only for the purposes of
> litigating the case.**  (Emphasis added).

Simply stated, jurisdictional discovery should not have been delayed in order to await the entry of a tailored protective order.

cited and answers to interrogatories that are incomplete ought to . . . be given over [by Tatung]

by the end of this week, the very first part of next week." D.I. 132 at 56:17-21. The Court

addressed LPL's request for sanctions with a clear cautionary note:

> I'm going to monitor what we have to do to keep this case moving.
> And at some point if I make a judgment that one side is recalcitrant
> and the other is acting in good faith, then **I [will] go all the way
> back and award fees and costs**.

D.I. 132 at 61:5-15 (emphasis added).

Following the hearing, the Court issued written orders that provided (i) for entry of the

restrictive form of protective order requested by the Tatung Defendants, but modified to limit its

duration to the jurisdictional discovery period; and (ii) that the depositions related to

jurisdictional discovery go forward, with instruction that "If [the Tatung] Defendants believe

[LPL's] examination exceeds the issues of jurisdiction, [Tatung] may object and instruct the

witness not to answer. [LPL] may then file a motion to compel on the objected-to question."

D.I. 133.

Within a few weeks, LPL found it necessary to again burden the Court when Tatung

Taiwan also refused to appear for noticed depositions. LPL moved for leave to file an expedited

motion to compel jurisdictional discovery from the Tatung Defendants and for a third extension

of the jurisdictional discovery period. D.I. 154. This prompted an additional round of letters and

email to the Court, D.I. 163-64, 166-67. The Tatung Defendants then filed a request for the

appointment of a special master, together with a motion for a protective order. D.I. 168. LPL

opposed the appointment of a special master and renewed its request for sanctions. D.I. 169.

By order dated February 17, 2005, the Court referred the pending discovery issues to the

Special Master Panel for assignment of a special master, with the Honorable Joseph J. Farnan, Jr.

noting:

> I believed that the rulings and instructions I provided to the parties at the January 24, 2005 hearing would avoid further conflict on the pending discovery matters. I apparently was wrong. As explained at the January 24 hearing, **this Court lacks the resources to manage overly contentious discovery disputes** effectively. Therefore, in the circumstances presented in this case, I find appointment of a special master pursuant to Federal Rule of Civil Procedure 53(a)(1)(c) to be warranted. Absent an appropriate finding by the master or me, the costs shall be shared equally.

D.I. 174 (emphasis added). By order dated February 25, 2005, I was appointed Special Master in this matter. D.I. 178.

## Jurisdictional Discovery Disputes Before Special Master

The additional submissions to and proceedings before the Special Master were not docketed as part of the official record in this case and, therefore, merit summarization and explication for the Court's and parties' consideration of the Special Master's Report and Recommendations.

On March 9, 2005, the Special Master conducted a teleconference with counsel for all parties, including defendant Viewsonic Corporation ("Viewsonic"), to discuss the procedural steps for bringing discovery disputes before the Special Master.[2] The teleconference then turned to the outstanding jurisdictional discovery issues, and Viewsonic was excused from the remainder of the teleconference. The Special Master continued the teleconference with LPL and Tatung to specifically discuss the outstanding jurisdictional discovery disputes. A hearing date on the discovery issues was set for March 30, 2005, and a schedule was set for written submissions by the parties prior to the hearing.

---

[2] The procedures agreed upon during the teleconference were later memorialized in the Special Master's March 11, 2005 Order for Initial Discovery Disputes.

After reviewing the parties' respective written submissions,[3] the Special Master conducted a lengthy hearing on March 30, 2005 to consider the arguments of LPL and the Tatung Defendants on the outstanding discovery disputes. At that hearing, the Special Master made rulings primarily with respect to the dispute over the counting of interrogatories.[4]

Because time constraints prevented the Special Master from fully addressing the parties' arguments as to the other categories of discovery during the March 30, 2005 hearing, the Special Master and parties agreed to continue the hearing to a later date. Following a teleconference with the parties on April 4, 2005, the Special Master set April 20, 2005 as the date for continuing the hearing and clarified that the hearing would address the remaining disputes as they related to depositions, answers to interrogatories, document production, extension of the jurisdictional discovery period, and sanctions.

On April 19, 2005, one day before the continued hearing date with the Special Master, Tatung America and Tatung Taiwan filed their respective answers to LPL's Complaint, in which each contested the jurisdiction of this Court. D.I. 186-187. One day later – at the start of the April 20, 2005 continued hearing before the Special Master – the Tatung Defendants consented by stipulation to the jurisdiction of this Court, D.I. 188, thereby mooting further consideration of Tatung's objections to the remaining jurisdictional discovery and LPL's motion to extend the period for jurisdictional discovery.

---

[3]  As a preliminary matter, the Special Master notes that the parties collectively submitted to the Special Master thousands of pages of materials on their jurisdictional discovery disputes, most without correlation to the case docket, and many as mere attachments from which the Special Master had to glean and organize the facts. In *Brown v. SAP America, Inc.*, C.A. No. 98-507 at *1 (D. Del., March 3, 2004) (Robinson, C. J.) [available as 2004 WL 502221], this Court declined to address discovery motion submissions that totaled 1939 pages as too "voluminous [a] record in connection with motions ostensibly devoid of any material issues of fact."

However, in an attempt to keep the jurisdictional discovery on track and to properly consider the parties' positions on the issue of sanctions, the Special Master has reviewed and considered the complete submissions of both parties, requiring a considerable investment of time. The Court's inclination that sanctions should "go all the way back," if appropriate, necessitated review of select docket items including D.I. 16-17, 19-21, 25, 23-40, 47, 62, 93-94, 98-99, 105, 107-09, 123-26, 128-133, 144, 154, 163-64, 168-89, 174, 178, and 186-88.

[4]  The Special Master's rulings with respect to the interrogatories are summarized *infra* at pages 19 to 28.

Accordingly, the Special Master turns to, and addresses herein, LPL's motions for sanctions.

## DISCUSSION

> *Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which [the party] who hides the ball most effectively wins the case.* Abrahamsen v. Tran-State Express, Inc., 92 F.3d 425, 428-29 (6th Cir. 1996).

I.    **Analysis – Imposition of Sanctions**

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37(d) provides, in pertinent part:

> If a party . . . or a person designated under Rule 30(b)(6) . . . to testify on behalf of a party fails (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, **and among others it may take any action [for sanctions] authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of [Rule 37] . . . In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified** or that other circumstances make an award of expenses unjust.
>
>      **The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable** unless the party failing to act has a pending motion for a protective order as provided by Rule 26(c).

Fed. R. Civ. P. 37(d) (emphasis added).

On November 17, 2004, this Court granted LPL's request for jurisdictional discovery and set a 90-day deadline for its completion. At the hearing held on January 24, 2005 on what the Court deemed to be LPL's motion to compel, the Court determined that the categories of

discovery identified by LPL in its 30(b)(6) deposition notices to the Tatung Defendants were within the permissible scope of the jurisdictional discovery previously ordered by the Court.

Based on the written submissions of the parties and the conduct of the March 30, 2005 hearing before the Special Master, the Special Master concluded then, and concludes now, that throughout the jurisdictional discovery period LPL exercised good faith and extraordinary effort in attempting to "meet and confer" to resolve Tatung's objections to the discovery sought. In this regard, the record before the Special Master discloses numerous efforts by LPL to support its positions to Tatung with relevant authority, and to address Tatung's objections – including, at times, with offers of compromise and to narrow the discovery sought – each and all vain attempts to persuade Tatung that discovery should go forward.

The record also discloses that, in contrast, the Tatung Defendants demanded capitulation instead of compromise. Tatung unilaterally blocked discovery by asserting layers of objections not supportable under relevant law. Notwithstanding the Court's express findings and prior orders, the Tatung Defendants continued to obstruct LPL from taking jurisdictional discovery through the March 30, 2005 hearing before the Special Master. Specifically, Tatung failed to appear for depositions on multiple occasions, failed to produce witnesses prepared to testify on noticed and relevant topics, and failed to respond to interrogatories and requests for production of documents on the same and/or similar topics.[5]

---

[5]  In their briefing before the Special Master, the Tatung Defendants repeatedly attempt to excuse their actions by recharacterizing the jurisdictional discovery dispute:

> Although necessarily framed as a jurisdictional issue, in practicality the entire dispute was completely avoidable by a change of venue from Delaware to California.

See, e.g., May 20, 2005 Letter Brief from Jeffrey S. Goddess, Esquire, to Special Master at p. 1. This characterization is curious given that the Tatung Defendants never filed motions to transfer venue; they filed only motions to dismiss for lack of jurisdiction. D.I. 16-17. Consequently, the Special Master finds it difficult to ascribe any other motive to the Tatung Defendants' recalcitrance other than their hope that the period set by Court order for jurisdictional discovery would expire and operate to deprive LPL of an opportunity to obtain evidence needed to support a finding of personal jurisdiction.

The Special Master therefore concludes, for the reasons discussed below, that sanctions are just and appropriate pursuant to Fed. R. Civ. P. 37 where, as here, LPL made good faith efforts to obtain the discovery without court action and where the Tatung Defendants' failed to comply with their discovery obligations without substantial justification.

## A.    **Failure to Appear for Depositions**

### 1.    **Legal Standard**

This Court's standard for deposition practice under Rule 30(b)(6) of the Federal Rules of Civil Procedure is well settled:

> The Federal Rules of Civil Procedure allow for a broad scope of discovery that is not limited to admissible evidence, but evidence that is reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Rule 30(b)(6) provides that after receiving a notice of deposition, the corporation should "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). Additionally, the deponent has a "duty of being knowledgeable on the subject matter identified as the area of inquiry." *Alexander v. Federal Bureau of Investigation*, 186 F.R.D. 148, 151 (D.D.C. 1999).

*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 162 (D.Del. 2001); *accord, Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. Civ. A. 00-083 at *3 (D.Del., Feb. 18, 2005) (Farnan, J.) [available as 2005 WL440621].

### 2.    **Tatung America's Failure to Appear**

On November 17, 2004, the Court ordered a 90-day period of jurisdictional discovery. D.I. 88. Shortly thereafter, LPL noticed a Rule 30(b)(6) deposition of Tatung America, scheduled for December 22, 2004. LPL also noticed additional depositions of Tatung America employees for mid-January. Two days before the noticed Rule 30(b)(6) deposition, Tatung America – under a Court order directed to both sides that they were not to file any motions regarding the jurisdictional discovery – sought leave to file a motion for a protective order and

refused to appear for both the Rule 30(b)(6) deposition and the depositions scheduled for mid-January. D.I. 128.

Tatung then failed to appear for properly noticed depositions, relying upon its own assumption that its request for leave to file a protective order had the same effect as an actual motion, and excused its requirement to appear at the depositions pursuant to Local Rule 30.2. D.I. 128 at p.1, n.1. The Court had previously barred both parties from filing any discovery motions until it decided Tatung's motion to dismiss on jurisdictional grounds, D.I. 93, in order to avoid the delay attendant to just such motions and permit the completion of discovery within the 90-day period allotted. In the face of this prohibition, the Special Master concludes that Tatung proceeded at its own peril and should not be permitted the benefit of the safe harbor created by Local Rule 30.2.

Moreover, a motion for a protective order is governed by Rule 26(c) which provides, in pertinent part "[u]pon motion by a party . . . **for good cause shown** . . . the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c) (emphasis added). Good cause requires a specific showing that, absent the protective order, the movant would suffer "a clearly defined and serious injury." *Glenmede Trust Company v. Thompson*, 56 F. 3d 476, 483 (3d Cir. 1995); *accord Emory v. AstraZeneca Pharmaceuticals,* Civ. A. No. 02-1466 at *1 (D. Del. Sept. 4, 2003) (Farnan, J.) [available as 2003 WL 22136301]; and *Visx Inc. v. LazerSight Inc.*, Civ. A. No. 99-789 at *1-2 (D. Del. Jan. 20, 2001) (Farnan, J.) [available as 2001 WL 34367297].

At the January 24, 2005 hearing on LPL's motion to compel, the Tatung Defendants were clearly unable to show the clearly defined and serious injury necessary to meet the requisite showing of good cause. In addressing Tatung's objections, the Court expressly determined that

all of the deposition topics noticed by LPL were within the permissible scope of jurisdictional discovery, D.I. 132 at 38:4-8, and each of them provided the requisite specificity. *Id.* at 42:2-5 ("I think the topics are specific enough that it should be readily apparent what type of person has to come as a designee.").

The Court also flatly rejected Tatung's arguments that depositions of certain of its senior management – so called "apex" depositions – should not go forward. Since an order barring a litigant from taking a deposition would constitute extraordinary relief, the party seeking such a protective order bears the burden of proving that the proposed deponent has nothing to contribute. *See, e.g., Speadmark, Inc. v. Federated Department Stores, Inc.,* 176 F. R. D. 116, 118 (S.D.N.Y. 1997). This is true even if the proposed deponent is a busy person. *Naftchi v. New York University Medical Center,* 172 F.R.D. 130, 132 (S.D.N.Y. 1997).

Tatung's argument that its executives lacked knowledge relating to jurisdiction was, in the Special Master's view, nothing short of specious in light of the fact that several of them – namely David Shan-Juh Chang on behalf of Tatung Taiwan and Robin Tsou and Edward Chen on behalf of Tatung America – had submitted sworn declarations in support of the Tatung Defendants' respective motions to dismiss on jurisdictional grounds. Accordingly, the Court directed that the depositions go forward. D.I. 132 at 56:22-23 ("these depositions ought to be rescheduled"); *See also, Scutellaro v. Walt Disney World Co., Inc.,* Civ. A. No. 92-671, *slip op.* at 6 (D.Del. July 14, 1993) (holding that if a senior executive "has knowledge of matters relevant to the instant suit, his position will not protect him from being deposed").

Following the January 24, 2005 hearing, and consistent with the Court's guidance and rulings, LPL renoticed the Rule 30(b)(6) and other depositions of Tatung America witnesses. Three depositions went forward on February 7-9, 2005. The deposition excerpts submitted to the

12

Special Master disclose, in the Special Master's view, a pattern by Tatung's counsel to disrupt, obfuscate and avoid proper discovery during those depositions.[6] The Special Master offers just a few examples:

**(a)** Tatung America failed to produce a Rule 30(b)(6) designee prepared to respond to certain information within the noticed deposition topics:

> Q: What other retail distribution centers – to what other retail distribution centers does Tatung America ship Hewlett Packard and Compaq products from Compton?
> A: Other than the fact that I can place a couple of them in Texas, **I don't know.**
> Q: You can't identify any others then?
> A. I'm **unable to identify any.**
> Q. Do you know if there are any other retail distribution centers, besides the Wal-Mart and Sam's Club?
> A. I think **it's easy to speculate that there are many others.**
> Q. But do you know whether there are additional ones that you just can't identify?
> A. Yeah **I know there are others**, sure.
> Q. Do you have any idea how many, whether it's 10, more than 10, less that 10? Can you give me any range?
> A. I'm pretty sure it's more than 10.
> Q. Do you know if it's more than 20?
> A. No, **I don't know** for sure.
> Q. Do you know in what states any of the other retail distribution centers are located, besides Texas?
> A. I'm sorry, **I don't know** any other specific locations.
> LPL COUNSEL: Mr. Weems, I assume that for information Mr. Sun is not able to provide, Tatung America will provide another witness as soon as Mr. Sun is finished testifying to provide that information.
> TATUNG COUNSEL: No, Mr. Sun has been prepared on all these topics and as to what he can remember today and what he can't remember today.
> LPL COUNSEL: Well does Tatung America intend to produce documents then that would provide this information?
> TATUNG COUNSEL: I'm not here to be interrogated, Mr. Christenson. You can spend your time asking questions of the witness.
> LPL COUNSEL: Okay. I'll take that as a "no."

---

[6] Although Tatung has designated these deposition transcripts as "Highly Confidential," the Special Master does not consider any of the information in the deposition excerpts contained herein to warrant a "confidential" designation.

13

Transcript of February 9, 2005 Deposition of Andrew Sun ("Sun Deposition") at 25:5-25 to

26:1-19 (emphasis added).

**(b)**    Tatung's counsel disrupted the flow of depositions with frequent requests for recess

(some within minutes of the start of depositions)[7] and by inserting frequent and improper

objections, such as the following:

> Q.  What is the Rancho Dominguez facility called?  Or what type
>     of facility does Tatung America have in Rancho Dominguez?
> TATUNG COUNSEL:  **Objection, vague**.
> Q.  You can answer.
> A.  It's called – we call it C plant.

Sun Deposition at 17:5-11.

> Q.  So all of the Hewlett Packard and Compaq personal computers
>     served at that facility are manufactured by Tatung Company?
> TATUNG COUNSEL:  **Objection, calls for speculation**.
> LPL COUNSEL:  I'm just trying to clarify, I think that's what he
>     said.  But you tell me.
> A.  Yeah, essentially all of them.

Sun Deposition at 18:10-17 (emphasis added).

> Q.  In 2004 were all of the computer monitors distributed out of
>     that facility LCD monitors?
> A.  No.  Some of them were CRT.
> Q.  Approximately what percentage in 2004 were LCD monitors?
> A.  I couldn't give you a good estimate.  I'd say the majority of
>     them are LCDs.
> Q.  So more than 50 percent?
> TATUNG COUNSEL:  **Objection.  Asked and answered.**
> THE DEPONENT:    Yeah, I think more than half of them are
>     LCDs.

Sun Deposition at 37:7-17 (emphasis added).

> Q.  Mr. Sun, do you agree that the distribution center in Arlington
>     distributes products?
> A.  It prepares products for distribution.

---

[7]  The "need to break" was asserted by both attorneys representing Tatung and, thus, appears to be tactical rather
than motivated by any other need.

14

> Q.  And specifically for distribution to retail distribution centers. Right?
>
> TATUNG COUNSEL: **Objection. Argumentative.**
>
> Q.  You can answer
>
> TATUNG COUNSEL: **And calls for speculation.**

Sun Deposition at 38:5-13 (emphasis added).

> Q.  What type of operation does Tatung Company have in El Paso?
>
> TATUNG COUNSEL: **Objection. Calls for speculation**.

Sun Deposition at 89:23-25 to 90:1 (emphasis added).

> Q.  For 2004 how much revenue did Tatung America derive from LCD products sold or delivered in Delaware?
>
> TATUNG COUNSEL: **Objection**.  Scope, post complaint sales **aren't relevant** for the jurisdictional inquiry.
>
> THE DEPONENT:    I'm afraid I don't know.
>
> Q.  Since January 1, 2000 how much revenue has Tatung America derived from L17AMTN monitors sold or delivered in Delaware?
>
> TATUNG COUNSEL:  **Objection**, time, and times prior to the issuance of the patent, prior to the filing of the complaint **are not relevant**.

Sun Deposition at 108:25 to 109:1-11 (emphasis added).

**(c)**    Tatung counsel also engaged in an abusive "tag team" approach, with more than one

attorney asserting objections:

> Q.  And my understanding at that time was you told me there were no such operations.  And I want to be very sure I understand whether Tatung Company has any other operations in the United States beside [t]he El Paso Texas facility that you just mentioned.
>
> TATUNG COUNSEL (#1):  Could we have the question read back?
>
> TATUNG COUNSEL (#2):  **Objection**.
>
> LPL COUNSEL:  Well, actually that wasn't a question.  I was leading up to a question.
>
> But the question is, does Tatung Company have any business locations in the United States other than El Paso Texas.
>
> TATUNG COUNSEL (#1):  Now let's have the full question read back with its pre-preamble.
>
> (Record read)

15

TATUNG COUNSEL (#2): And I **object** to the extent it mischaracterizes prior testimony. I'm going to **object** that the prior record speaks for itself. I'm going to **object** that the question is unintelligible and confused.

And subject to that, you can answer, if you can.

THE DEPONENT: Other than the El Paso warehouse, I don't know of any other Tatung Company operations in the United States.

Sun Deposition at 94:24-25 to 95:1-24 (emphasis added).

Q: Do you know whether Tatung Company has manufactured LCD products for ViewSonic Corporation since January 1, 2000.

TATUNG COUNSEL (#1): **Asked and Answered**. You can answer again, sir.

TATUNG COUNSEL (#2): And I just want to further note . . . Mr. Baum may not be aware of it, **ViewSonic counsel has specifically objected to the subpoenas issued to it**. Or actually I guess the notice or document request, something of that sort that was issued to it within the last 24, 48 hours. **So based on Viewsonic's objection, I think we have an obligation to instruct.**

TATUNG COUNSEL (#1): And we'll consider your questions as you ask them and keep that objection in mind.

So can we have the last question read back, please?

(The reporter reads back the question as follows:

"Q. Do you know whether Tatung Company has manufactured LCD products for Viewsonic Corporation since January 1, 2000?")

THE DEPONENT: I don't know.

Sun Deposition at 134:18-25 to 135:1-14 (emphasis added).

**(d)** Tatung's counsel used objections to improperly coach deponents during their testimony:

Q. If you wanted to find out where those retail distribution centers for those various companies are located, how would you do that? Are there documents that you would be able to review that would give you that information?

TATUNG COUNSEL: **Objection. Argumentative**. The witness has already testified they don't do the distribution part. They do the boxing.

LPL COUNSEL: I object to speaking objections that coach the witness. That's improper. The record will reflect whatever the testimony was. And there's a question pending.

16

Sun Deposition at 40:21-25 to 41:1-7 (emphasis added).

> Q.  Does Tatung America keep copies of the monthly sales
>     reports?
> A.  We can always get the number from the computer.
>
> **TATUNG COUNSEL:  Listen to the question, Robin.  He asked
> you if Tatung keeps copies.  He didn't ask if you can you
> always get --**

Transcript of February 7, 2005 Deposition of Robin Tsou ("Tsou Deposition") at 39:17-22.

> Q.  Does Tatung America have lists of customers, for computer
>     monitors?
> TATUNG COUNSEL:  Asked and answered.
> THE DEPONENT:  We don't have a customer list, but we can
>     trace –
> TATUNG COUNSEL:   **He asked you if you have a customer
> list.**

Tsou Deposition at 41:4-10 (emphasis added).

Finally, the Special Master notes that the February 2005 depositions of Tatung America had to be conducted without benefit of Tatung America's response to the interrogatories and document production propounded by LPL more than two months earlier.  Although the Court had directed both Tatung Defendants at the January 24, 2005 hearing that responses to the interrogatories and responsive documents should be produced before any depositions went forward, Tatung America stood on its objection to the interrogatory count and did not provide further interrogatory responses.   Tatung America produced only 46 pages of responsive documents although, as will be discussed later herein, deposition testimony disclosed that other responsive documents clearly existed.

    **3.**     **Tatung Taiwan's Failure to Appear**

On January 20, 2005, LPL noticed seven depositions of Tatung Taiwan, namely: one pursuant to Fed. R. Civ. P. 30(b)(6); one of David Shan-Juhn Chang, whose declaration supported Tatung Taiwan's jurisdictional challenge; one of Wen Yen K. Lin, President of Tatung

Taiwan and an officer of Tatung America, who had spoken publicly about Tatung's global operations; and four of other employees of Tatung Taiwan. The depositions were noticed for Taipei, Taiwan during the period of February 15-18, with four short depositions scheduled for one day.

LPL's counsel confirmed the depositions by letter dated January 21, 2005, stating:

> **These foreign depositions will require us to incur substantial pre-paid, non-refundable expense.** Already, [Taiwan America] has caused substantial inconvenience and costs to be incurred (including, for example, attorney fees and travel costs). We will ask the Court for relief at the appropriate time, including, but not limited to, full reimbursement. Similarly, we expect [Tatung Taiwan] to fulfill its obligation to attend these depositions and, if necessary, we will look to you and/or [Tatung Taiwan] to reimburse us for any expense that we incur as a result of further misconduct.

January 21, 2005 Letter from Cass W. Christenson, Esquire, to Robert C. Weems, Esquire (emphasis added). By letter dated January 27, 2005, LPL's counsel confirmed Tatung Taiwan's request for interpreters fluent in Mandarin Taiwanese for these depositions.

The record before the Special Master reflects that Tatung requested that LPL postpone the Taiwan depositions during a conversation with LPL's counsel on February 9, 2005. In a February 10, 2005 letter from LPL's counsel to Tatung's counsel, LPL declined to postpone the depositions, but suggested a compromise that might avoid the need for "apex" depositions:

> [W]e cannot accommodate your request to postpone the depositions considering Tatung's unjustified refusal to produce any documents. Additionally, we are convinced that the only way we will ever obtain the information we need (and you are required to produce) is to depose the individuals we have noticed, just like we had to do with Tatung America. As you know, these depositions have been noticed since January 20 and the document requests and interrogatories to Tatung were served at the end of November, 2004. Moreover, we have already purchased airplane tickets, contracted with a court reporter and an interpreter, and booked conference rooms and hotel rooms. All of those have strict cancellation policies. **In the spirit of cooperation, however, we**

18

> **are willing to reschedule the depositions of W.S. Lin, K.Y. Lang, and A.C. Wang [the three "apex" deponents], currently scheduled for Tuesday, February 15, to Saturday February 19, if Tatung Company agrees to produce the documents referenced in our motion to compel on Tuesday, February 15 at 9:00 a.m. at our counsel's hotel where they will be staying in Taiwan. Depending on the content of the documents and whether the deponents for the remaining depositions noticed for next week are forthright, including whether Tatung's 30(b)(6) witness is adequately prepared, we may be in a position to decide that the depositions of these three individuals are unnecessary.**

February 10, 2005 Letter from Lora A. Brzezynski, Esquire, to Robert C. Weems, Esquire (emphasis added).

Approximately 20 days after the depositions had been renoticed, counsel for the Tatung Defendants advised LPL's counsel by letter dated February 11, 2005 – the day before LPL's counsel was set to depart for Taiwan for the depositions – that Tatung Taiwan and its employees would not appear for the depositions:

> Due to the present unresolved discovery issues, [LPL's] changing position on document production, and your refusal to defer overseas deposition until such matters have been worked out, we have been compelled to move for a protective order and to ask the Court to appoint a special master. Accordingly, **we will not be producing deponents in Taiwan until such matters are resolved** either by agreement or with the involvement of the Court.[8]

February 11, 2005 Letter from Robert C. Weems, Esquire to Lora A. Brzezynski, Esquire (emphasis added). As of the date of the March 30, 2005 hearing with the Special Master, Tatung Taiwan had not made any deponents available to LPL.

The Special Master finds that, against this backdrop, the claims by the Tatung Defendants of good cause and substantial justification ring hollow, and the Special Master concludes that,

---

[8] According to counsel for LPL: "Tatung never objected to the location or dates of these depositions. Tatung also did not object to the Rule 30(b)(6) topics (the same topics that the Court had approved for Tatung America's deposition) until *after* refusing to appear for the depositions." March 18, 2005 Letter from Richard D. Kirk, Esquire, to Vincent J. Poppiti, Special Master (emphasis in original).

pursuant to Fed. R. Civ. P. 37(d), sanctions are appropriate for the repeated failure of the Tatung

Defendants to appear for depositions, and for obstructive tactics at the depositions at which they

did appear.  In this regard, the Special Master finds that Tatung wielded its unilateral and last

minute refusals to appear at depositions like the tactical weapons of delay the Special Master

determines them to be.  The Special Master therefore recommends that Tatung pay LPL's

reasonable expenses caused by its failure to appear for and its obstruction of depositions,

including attorney fees and Special Master fees.  Fed. R. Civ. P. 37(d); *Haraway v. NASCAR,*

*Inc.*, 213 F.R.D. 161, 165-66 (D.Del. 2003) (awarding defendants attorneys' fees and costs for

plaintiff's failure to appear at deposition).

**B.**    **Failure to Respond to Interrogatories**

    **1.**    **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 33(b):

> **Each interrogatory shall be answered separately and fully in**
> **writing under oath**, unless it is objected to, in which event the
> objecting party shall state the reasons for objection and shall
> answer to the extent the interrogatory is not objectionable . . .  **All**
> **grounds for and objection to an interrogatory shall be stated**
> **with specifity.  Any ground not stated in a timely objection is**
> **waived** unless the party's failure to object is excused by the court
> for good cause shown.

Fed. R. Civ. P. 33(b)(1)(4) (emphasis added).   Under Rule 37, "an evasive or incomplete

disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." Fed.

R. Civ. P. 37(a)(3).  When a party fails to comply with the provisions of Rule 33, "the court . . .

may make such orders in regard to the failure as are just."  *Woulard v. Brown*, No. Civ. A. 01-

350 JJF at *1-2 (D.Del. Feb. 24, 2004) (Farnan, J.) [available at 2004 WL 758358] (quoting Fed.

R. Civ. P. 37(d)).

## 2.    The Tatung Defendants' Failure to Respond

On November 29, 2004, LPL served twenty (20) interrogatories upon each of the Tatung Defendants. D.I. 98. Although there are a few differences between the interrogatories served on Tatung Taiwan and Tatung America, the parties agree that the sets of interrogatories propounded on each Tatung defendant are substantially similar in substance. *See*, *e.g.*, March 30, 2005 Transcript at 58:17-18 (Counsel for Tatung Defendants:  "they're almost certainly identical").

The Tatung Defendants responded respectively to the interrogatories propounded by LPL on or about January 5, 2005. D.I. 113. Their responses are noteworthy in their similarities and by their stunning lack of response.  Each Tatung Defendant objected to every interrogatory, asserting primarily boilerplate objections.  Additionally, the Tatung Defendants argued that, when subparts are counted, LPL's interrogatories exceeded the maximum of 50 interrogatories permitted under Local Rule 26.1.  Each Tatung Defendant renumbered the interrogatories posed by LPL's first four interrogatories into more than 50 subparts, and thereafter rested on its objection to count in refusing to further respond to interrogatories 5-20.  Relying upon its boilerplate objections and its objections as to count, Tatung Taiwan did not answer any interrogatories.  Tatung America partially answered only two interrogatories (Nos. 2 and 4), relying upon the selfsame objections.

At the January 24, 2005 hearing before Judge Farnan, the Court had made clear that the Tatung Defendants should respond to LPL's interrogatories before LPL's depositions of Tatung America and Tatung Taiwan – then scheduled for February 15 to 18 – took place:

> Interrogatories and documents, you're absolutely correct, should be resolved before deposition practice occurs.  And we're focused on [late] February . . . **That's material that the party seeking deposition wants to have before they start the deposition . . . if there [are] interrogatories that are properly served, they need to be responded to,** and the same with documents.

21

D.I. 132 at 49:14-19 and 50:6-11 (emphasis added).  The Court directed that "all . . . answers to interrogatories ought to . . . be given over by the end of this week, the very first part of next week."  D.I. 132 at 56:17-21.

By directing Tatung to respond to LPL's interrogatories, the Court – in the Special Master's view – impliedly rejected Tatung's argument, suggested by *Moore's Federal Practice,* that it could preserve its objections to supernumerary interrogatories by answering (or objecting) up to the numerical limit and asserting boilerplate objections to the remainder without answering.[9]  Notwithstanding the Court's direction, the Tatung Defendants did not supplement or further respond to LPL's interrogatories, and stood on their boilerplate objections and objections to count.  On February 7, 2005, LPL requested leave to file an expedited motion to compel jurisdictional discovery, D.I. 154, and the issues involving several discovery disputes – including the disputed interrogatory count – were ultimately brought before the Special Master.

In this regard, the Special Master examined the primary authority relied upon by the Tatung Defendants in challenging LPL's interrogatory count, that being *Kendall v. GES Exposition Services, Inc.,* 174 F.R.D. 684 (D. Nev. 1997).  According to the *Kendall* court:

> The Court therefore holds that **interrogatory subparts are to be counted as part of but one interrogatory for the purpose of [Local Rule 33-1(b)] if they are logically or factually subsumed within and necessarily related to the primary question** . . . [T]he more difficult question is determining whether the subparts are "logically or factually subsumed within and necessarily related to the primary question." . . . Probably the best test of whether subsequent questions, within a single interrogatory, are subsumed and related, is to **examine whether the first question is primary and subsequent questions are secondary to the primary question.**  Or, can the subsequent question stand alone?  Is it independent of the first question?  **Genuine subparts should not be counted as separate interrogatories.  However, discrete or separate   questions   should   be   counted   as   separate**

---

[9]  7 Moore's Federal Practice § 33.30[1].  *But see, id.* at § 33.171 ("Unstated grounds for objections normally are waived.").

> **interrogatories, notwithstanding that they are joined by a conjunctive word and may be related.**

174 F.R.D. at 685-86 (emphasis added).

After reviewing the interrogatory count urged by Tatung against the standard articulated in Tatung's own authority, the Special Master concluded that the position of the Tatung Defendants on the disputed interrogatory count was not supported by *Kendall*. Accordingly, at the hearing held on March 30, 2005, the Special Master ruled as follows with respect to the disputed interrogatory count:

> First interrogatory [,] I need not read it. The first is counted as two by both Tatung defendants. I consider it to be **one** seeking the identity of those individuals who assisted with the Tatung defendants' discovery responses.

March 30, 2005 Transcript at 58:22-24 and 59:1-2 (emphasis added).

> Interrogatory No. 2, Tatung counts No. 2 as 12 interrogatories. I'm satisfied that it is legitimately considered to be **one** interrogatory requesting information on products manufactured, imported into, purchased, offered for sale and/or sold by Tatung in Delaware or [,] as to the Tatung company [,] in the United States.

*Id*. at 58:17-23 (emphasis added).

> Interrogatory No. 3 Tatung counts as 12. I'm also satisfied that that is legitimately **one** seeking information on Tatung's manufacture, importation, purchase, offer for sale, and/or sale of a particular line that is visual display products in the United States.

*Id*. at 59:1 and 60:1-5 (emphasis added).

> [Interrogatory] No. 4 Tatung counts as 32 interrogatories. The Tatung defendants. I'm satisfied it is legitimately considered to be **one** seeking information on the amount of money made by the defendant[s] from the sale of its products and/or services in Delaware.

*Id*. at 60:6-10 (emphasis added).

> [Interrogatory] No. 5, I would note that No. 5 was neither answered nor counted by Tatung because the interrogatories that I

> have just discussed with you have exceeded 25 by Tatung's count. I'm satisfied No. 5 is **one** aimed at determining how much money each Tatung defendant realized from the import, sale, or shipment of products intended for the United States market.

*Id*. at 60:11-17 (emphasis added).

> [Interrogatory] No. 6, I'm satisfied that that is also legitimately **one** aimed at identifying each work location in the United States where Tatung has employed people since January the 1st 2000.

*Id*. at 60:18-21 (emphasis added).

> [Interrogatory No.] 7 is **one** requesting information for each work location identified by Tatung's response to interrogatory No. 6.

*Id*. at 60:24 and 61:1-2 (emphasis added).

> [Interrogatory No.] 8 is **one** aimed at quantifying Tatung's revenues from the United States.

*Id*. at 61:3-4 (emphasis added).

> [Interrogatory No. 9] is legitimately **one** aimed at identifying Tatung customers of visual display products in the U.S. as to Tatung America and related information.

*Id*. at 61:9-11 (emphasis added).

> [Interrogatory No.] 10 is legitimately **one** aimed at identifying shipments of Tatung visual display products to the U.S. as to Tatung America and related information.

*Id*. at 61:12-14 (emphasis added).

> [Interrogatory No.] 11 is **one** aimed at identifying, including by person as to Tatung America, Tatung's shipments and delivery of products or services in Delaware and related information.

*Id*. at 61:15-18 (emphasis added).

> [Interrogatory No.] 12 is **one** aimed at identifying Tatung's U.S. distributors.

*Id*. at 61:19-20 (emphasis added).

> [Interrogatory No.] 13 is **one** seeking the identity of Tatung's distribution network and channels through which its visual display

> products are distributed throughout the United States or to the
> United States or to Delaware.

*Id.* at 61:21-24 (emphasis added).

> Interrogatory No. 14 I consider to be **four** separate interrogatories
> seeking information concerning the chain of distribution as to four
> discrete products, all of which were offered or purchased through
> different retail channels.

*Id.* at 62:1-5 (emphasis added).

> [Interrogatory No.] 15 I consider to be **four** in that it seeks each
> step in the chain of distribution by which four separate discrete
> pieces of equipment arrived in Delaware.

*Id.* at 62:6-9 (emphasis added).

> [Interrogatory No.] 16 I consider to be **two** in that it seeks, first, all
> of Tatung's products available for purchase through the Internet
> and, second, the identity of Web site vendors authorized to sell
> Tatung's visual display products.

*Id.* at 62:10-14 (emphasis added).

> [Interrogatory No.] 17 is **one** seeking reports generated by Tatung
> with respect to the distribution, shipment, and sale of its visual
> display products in or to the United States.

*Id.* at 62:15-18 (emphasis added).

> [Interrogatory No.] 18 is **one** asking that Tatung delineate its
> contacts with Delaware.

*Id.* at 62:19-20 (emphasis added).

> [Interrogatory No.] 19 is **one** asking Tatung to identify any
> affirmative steps it's taken to prevent its products from reaching
> the Delaware market.

*Id.* at 62:21-23 (emphasis added).

> [Interrogatory No.] 20 is **one** requesting the brand names and
> related information for Tatung visual display products
> manufactured, marketed, imported, distributed and/or sold in the
> United States.

*Id.* at 62:24 and 63:103 (emphasis added).

Accordingly, the Special Master concluded that the interrogatories propounded by LPL to each Tatung Defendant totaled 27, well within the 50 interrogatories permitted under Local Rule 26.1(b). LPL then pressed for an order requiring the Tatung Defendants to respond to the interrogatories within a two-week period.

Having lost on the count issue, the Tatung Defendants requested that the Special Master proceed to consider their other objections to the interrogatories. In Tatung's view, it couldn't object with specifity to certain of the interrogatories until the primary issue of count was resolved. March 30, 2005 Transcript at 72:1-6 ("until we have a resolution of the issue of the counting, again, it's not possible because we don't know exactly where and how we have to be looking.").

LPL argued, with supporting authority, that to the extent other specific objections had not been raised in the Tatung Defendants' responses, those objections had been waived. March 30, 2005 Transcript at pp. 64-70, and 90:16-19. Tatung requested an opportunity to submit contrary authority, *Id.* at 92:2-7, and the Special Master set a schedule for written submissions. *Id.* at 96:13-22. Thereafter, the Special Master received a March 31, 2005 submission from Tatung's counsel stating he had been mistaken about the legal support for Tatung's position. On April 1, 2005, LPL renewed its request to compel the Tatung Defendants to respond to the outstanding interrogatories. However, the Special Master's further consideration of discovery issues relating to the interrogatories was mooted by the April 20, 2005 stipulation by the Tatung Defendants that, *inter alia*, consents to the jurisdiction of this Court. D.I. 188.

In turning to the issue of sanctions, the Special Master concludes that sanctions are appropriate for the unjustified failure of the Tatung Defendants to respond to interrogatories. It is undisputed that the Court ordered jurisdictional discovery on November 17, 2004 and set a 90-

day period (until February 15, 2005) for its completion. It is also undisputed that LPL

propounded jurisdictional interrogatories upon the Tatung Defendants on or about November 29,

2005. Finally, it is undisputed that the Tatung Defendants refused to respond to interrogatories

on the basis of boilerplate objections and/or their objections as to count.

Tatung participated in the January 24, 2005 hearing before the Court with the knowledge

that the Court considered it to be a hearing on a motion by LPL to compel discovery responses

from Tatung. At that hearing, the Court directed that any incomplete responses to interrogatories

should be submitted by Tatung to LPL within a week. It also cautioned Tatung that it was

subject to sanctions if it mistakenly relied upon its objections to interrogatory count:

> [T]hat rule has been around so long, lawyers ought to be able to
> count . . . but **if it's a counting problem, you better be sure
> you're going to win it** by a standard beyond a reasonable doubt,
> . . . and if you're arguing over whether [their] subparts are really
> questions, just think about that for a minute. That's even kind of a
> waste of a special master's time, **unless they're really playing
> with you. And then they're going to get sanctioned.** Not [just
> Tatung], but anybody that's fighting that kind of a thing on that
> kind of basis, you know, they're not going to do well.

D.I. 132 at 51:7-12; 52:10-24, and 53:1 (emphasis added). The Special Master concluded at the

March 30, 2005 hearing that Tatung's position – of counting the first four interrogatories

propounded by LPL as numbering in excess of 50 interrogatories – was not an argument

supported by even Tatung's own authority.

Pursuant to Rule 33, a party's answers or objections to interrogatories must be served

within 30 days. Fed. R. Civ. P. 33(b)(3). Objections to interrogatories must be stated

specifically and with particularity so that the objection can be reviewed and understood by both

the opposing party and the Court. Fed. R. Civ. P. 33(b)(4); *Josephs v. Harris Corp.*, 677 F. 2d

985, 992 (3d Cir. 1982) ("[T]he mere statement by a party that the interrogatory was 'overly

broad, burdensome, oppressive and irrelevant' is not adequate to voice a successful objection to

27

an interrogatory. On the contrary, the party resisting discovery 'must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive'") (citation omitted). *See also, Walker v. Lakewood Condo. Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all"). The Special Master concludes that the Tatung Defendants' objections to interrogatories were classic boilerplate and completely fail to meet the specificity test.

Having considered the parties' written submissions on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly respond to interrogatories was neither substantially justified nor supported by relevant authority. The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's interrogatories, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); s*ee also, Haraway,* 213 F.R.D. at 165-66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic requirement of the Rule to cooperate in discovery."); *Woulard,* 2004 WL758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to interrogatories or produce discovery).

**C.    Failure to Produce Requested Documents**

    **1.    Legal Standard**

Pursuant to Federal Rule of Civil Procedure 34(b):

> **The party upon whom the request is served shall serve a written response within 30 days after the service of the request . . . The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection**

**permitted of the remaining parts.**  The party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

**A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request**.

Fed. R. Civ. P. 34(b) (emphasis added).  Under Rule 37 "an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(3).  When a party fails to comply with the provisions of Rule 34, "the court . . . may make such orders in regard to the failure as are just."  *Woulard*, 2004 WL 758358 at *1-2 (quoting Fed. R. Civ. P. 37(d)).

## 2.   The Tatung Defendants' Failure to Produce

On November 29, 2004, LPL served requests for production of documents upon each of the Tatung Defendants.  D.I. 98.  The Tatung Defendants responded only by asserting boilerplate objections to the production requests, and failed to produce any documents when they served their objections to LPL on or about January 5, 2005.  D.I. 113.

At the January 24, 2005 hearing with the Court, counsel for LPL – emphasizing the importance of certain of those documents to scheduled depositions – urged the Court to compel the production of responsive documents:

> *LPL Counsel*:  [W]e have served interrogatories, and we also served document requests in early December.  And as of today, Your Honor, we haven't received a single document.  Obviously, it would facilitate the deposition if I had in advance some of the documents.  For example, Your Honor, one of the reasons I gave you [copies of the declarations submitted in support of Tatung's jurisdictional challenge] is that they refer in their declarations to records that they relied upon to put forth the facts, which include things like they are selling $132 million of product in the U.S. . . . that's in their own papers.  So they've put those numbers in the

29

papers.  They have also said those are based on specific records that they've reviewed, yet I don't have those records.

Your Honor, I would like to have those records before I take these depositions.

*Tatung Counsel*:  Sounds like it's something he should have. . . He should have those documents.

*The Court*:  Interrogatories and documents, you['re] absolutely correct, should be resolved before deposition practice occurs.  And we're focused on [late] February . . . That's material that the parties seeking deposition wants to have before they start the deposition . . . If there's interrogatories that are properly served, they need to be responded to, **and the same with documents. . . . You've got to give them up.**

*Tatung's Counsel*:  **We'll absolutely give them up.**

D.I. 132 at pp. 48-50 (emphasis added).  The Court concluded with the following direction to

Tatung:  "It seems to me that all the documents relative to the declarations that [LPL] cited . . .

ought to be able to be given over by the end of this week, the very first part of next week."  *Id.* at

56:17-21.

On January 27, 2005, counsel for LPL confirmed that Tatung's counsel had agreed to

forward to LPL by January 31 "all of the documents that the Tatung defendants agreed to

produce and their responses to the request for documents and all of the documents discussed at

the January 24, 2005 hearing."  January 27, 2005 letter from Cass W. Christenson, Esquire to

Robert C. Weems, Esquire.  Tatung America subsequently produced only 46 pages of

documents; Tatung Taiwan produced nothing.  By letter dated February 3, 2005, LPL's counsel

confirmed that he had been advised that counsel for Tatung was "not aware of any intention to

produce further documents."  In response, LPL advised that it would file a motion to compel

unless it received assurance that all responsive documents would be produced.  February 3, 2005

letter from Cass W. Christenson, Esquire to Robert C. Weems, Esquire.  Roadblocked again,

LPL moved on February 7, 2005 for leave to file an expedited motion to compel jurisdictional discovery from the Tatung Defendants, including a request to compel the production of documents. D.I. 154.

While LPL's second motion to compel was pending, the re-noticed depositions of Tatung America proceeded without any further document production by either of the Tatung Defendants. During those depositions, witnesses identified the existence of documents that had not been produced, and that clearly appear to be responsive to LPL's requests for production. For example:

> Q: So is it your understanding that the document marked TUS 36 and TUS 37 does not include any sales or shipments to Delaware for any time after December 31, 2003?
> A: That's how it appears to me.
> Q. And is it your testimony that you've reviewed a **sales tax report that shows sales and shipments of products to Delaware for the period that includes 2004**?
> TATUNG COUNSEL: Objection. Asked and answered.
> THE DEPONENT: Yeah, my recollection is not that clear but that's what I recall.
> LPL COUNSEL: And [addressing Tatung counsel], as I understand Tatung America's position, Tatung America does not intend to provide that document during this deposition. Is that right?
> TATUNG COUNSEL: You can ask your [next] questions, counsel.

Sun Deposition at 107:24-25 to 108:1-15 (emphasis added).

> Q. Let's talk about the records that Tatung America keeps with respect to product sales.
> Does Tatung America have documents that show how many LCD monitors it sells each month?
> A. Yes.
> Q. What are those documents called?
> A. **Mon[th]ly sales report**.
> Q. Who prepares the monthly sales report?
> A. I.T. room.
> Q. Did you say I.T. room?
> A. Yes.

Q.  And is that based on information in Tatung America's database?

A.  Yes.

Q.  Does the report then go to you, Mr. Tsou, as manager?

A.  Yes, I will have the report.

Q.  You receive the monthly sales reports?

A.  Yes.

Tsou Deposition at 38:18-25 to 39:1-11 (emphasis added).

Q.  What **information is included in the monthly sales report**?

A.  The **models** and the **customers** and the **quantity**.

Q.  Does it give a **dollar amount**?

A.  Yes.

Q.  When you say "models," would an example of a model be the L17AMTN?

A.  That's one of the models.

Q.  So from the monthly sales report can you determine how many of a particular model were sold each month?

A.  Yes.

Q.  How far back do the monthly sales reports go?

A.  I don't know.

Q.  Since the time that you have been a Sales Manager, have there always been monthly sales reports?

A.  Yes.

Tsou Deposition at 44:1-17 (emphasis added).

Q.  How can you trace customers, of monitors?

A.  Through the computer system.

Q.  Does Tatung America have documents that show where products were shipped?
Let me ask it again.  Let me ask it again, more specifically. Does Tatung America have **documents showing where computer monitors are shipped**?

A.  Yes.

Tsou Deposition at 41:17-24 (emphasis added).

Q.  Are you familiar with any documents called inventory reports?

A.  Our inventory report?

Q.  Yes, at Tatung America.

A.  Yes.

Q.  What is an inventory report?

A.  To show the products we have on hand.

Q.  Would that include computer monitor products?

A.  Yes.

> Q. So **inventory reports would show the computer monitor products that Tatung America has available in its inventory for sale**?
> A. Yes.
> Q. Who prepares inventory reports? Well, first of all, are inventory reports prepared on a regular basis at Tatung America?
> A. Yes.
> Q. How often?
> A. Every week.

Tsou Deposition at 65:19-22 to 66:1-12 (emphasis added).

As of the March 30, 2005 hearing held before the Special Master, Tatung Taiwan had still not produced any documents whatsoever. Tatung America had not produced any additional documents to supplement its 46 page production. According to counsel for LPL, although additional responsive documents were identified during depositions of Tatung America employees, these responsive documents were never produced:

> **The depositions went forward with essentially – I was essentially in the dark without documents or interrogatory responses.** [I] proceeded with the depositions which I had to do because we were unable to obtain an agreement from [Tatung's] counsel to extend our discovery period. So we had a February 22 cutoff. Again, there was a sense of urgency to try to complete all this discovery. **[Tatung] would agree neither to provide additional time for discovery, nor to provide additional discovery.**
>
> We proceeded with the depositions and during the three depositions, which were on consecutive dates, February 7th, 8th, and 9th, I repeatedly asked during those depositions when **witnesses would identify documents that were on-site,** that [could we] take a break and the witness be permitted to obtain documents. I was consistently rebuked and **no further documents were produced during those depositions**.

March 30, 2005 Transcript at 23:10-15, 20-24 and 24:1-3 (emphasis added).

LPL's counsel further represented that, while its motion to compel was pending, LPL sought to revolve the impasse by voluntarily paring down the categories of their document

33

requests from approximately 42 categories to approximately 18 categories of documents "just to get the most minimum necessary information as quickly and efficiently as we could." March 30, 2005 Transcript at p. 24.  In response to this offer, Tatung countered that it would agree only to create a special report that produced information with respect to only those models of Tatung equipment that LPL accused of infringement.  However, Tatung's counteroffer was conditional on LPL's agreement to severely restrict or forego all other jurisdictional discovery, including depositions.  The "catch 22" of Tatung's counteroffer was that, without the additional discovery from Tatung, LPL could not identify for Tatung all of the accused products necessary to permit the creation of a meaningful report.  *Id.* at pp. 27-31.  The impasse manufactured by the Tatung Defendants therefore continued unabated, with LPL counsel representing to the Special Master at the March 30, 2005 hearing:

> We are now four months into jurisdictional discovery.  We have **essentially no interrogatory answers, we have 46 pages of documents from Tatung America, zero documents from Tatung Company, and we have got no deposition testimony from Tatung Company**.

March 30, 2005 Transcript at 34:7-10 (emphasis added).

Pursuant to Rule 34, a party must produce documents for inspection within 30 days after the service of the request.  Fed. R. Civ. P. 34(b).  It is undisputed that throughout the pendency of the jurisdictional discovery period, Tatung Taiwan refused to produce any documents whatsoever responsive to LPL's document request.  Tatung America produced only 46 pages of responsive documents.  It is clear from the transcript of the parties' January 24, 2005 hearing before the Court that the Court did not expressly excuse the Tatung Defendants' duty to produce documents for inspection.  To the contrary, the Court expressly instructed Tatung:

> That's material that the party seeking deposition wants to have before they start the deposition.  So as a general matter if [there

34

are] interrogatories that are properly served, they need to be responded to, and **the same with documents**. And we all agree.

D.I. 132 at 50:6-12 ((emphasis added).

In addition to those documents the Special Master ordered produced at the March 30, 2005 hearing, it is clear to the Special Master that, at a minimum, the documents reviewed by those who submitted declarations in support of Tatung Taiwan's motion to dismiss on jurisdictional grounds would have been within a subset of documents responsive to LPL's document production requests. *See* D.I. 20. It is also clear from the Special Master's review of the transcripts of the depositions of Tatung America and its employees that certain documents reviewed by declarants – as well as other documents responsive to LPL's document requests – exist, but were not produced. *See supra* at pp. 29-31 (citing, e.g., sales tax report that shows sales and shipments of product to Delaware for period including 2004; monthly sales reports, computer shipment reports, inventory reports, and reports of transactions with third party vendors).

Therefore, having considered the parties' written submission on the issue of sanctions, the Special Master concludes that sanctions are appropriate, pursuant to Fed. R. Civ. P. 37(d), where the failure of the Tatung Defendants to properly produce documents for inspection was neither substantially justified nor supported by relevant authority.[10]  The Special Master therefore recommends that Tatung pay LPL's reasonable expenses caused by its failure to respond to LPL's document requests, including attorney fees and Special Master fees. Fed. R. Civ. P. 37(d); *Haraway*, 213 F.R.D. at 165, 66 (noting "courts have readily awarded sanctions against individuals who have in some measure complied with Rule 37(d) but have violated the basic

---

[10]  The Special Master does not pause in this regard even though several of the document requests were "fine tuned" during the course of the March 30, 2005 hearing.  The effort in this regard is something that the Tatung Defendants could have forestalled had they made a good faith effort to meet and confer.  In this regard, the Special Master concludes they did not.

requirement of the Rule to cooperate in discovery"); *Novartis Pharmaceuticals*, 203 F.R.D. at

164 (finding production of only domestic sales and marketing documents to be "inadequate to

satisfy burden under Rule 26(b) to produce all relevant, non-privileged documents); *Woulard*,

2004 WL 758358 at *1-2 (applying Rule 37(d) to sanction plaintiff who failed to respond to

interrogatories or produce discovery); and *Liafail, Inc. v. Learning 2000, Inc.*, C.A. Nos. 01-599,

01-678 at *3 (D.Del. Dec. 23, 2002) (Sleet, J.) [available as 2002 WL 31954396] ("where the

nature of the alleged breach of a discovery obligation is the non-production of evidence, the

court has brought discretion in fashioning an appropriate sanction.").

## D.    **Sanctions are Warranted**

For the foregoing reasons, the Special Master concludes that the persistent failures of the

Tatung Defendants to comply with their discovery obligations – without substantial justification

and unsupported by relevant legal authority – has unfairly burdened judicial resources, including

this Court's scheduling orders for both jurisdictional discovery and the management of this case.

Additionally, the Tatung Defendants' failures to appear at depositions, failures to respond to

interrogatories, and failures to produce documents responsive to document requests have

prejudiced LPL by forcing it to incur unnecessary attorney fees, expenses and delay.    The

Special Master therefore recommends:

**(1)**    that sanctions be assessed against the Tatung Defendants, jointly and severally,

for the unreimbursed expenses and reasonable costs, including attorney fees, incurred by LPL in

(i) preparing for any noticed deposition for which a deponent did not appear; (ii) preparing

papers in support of its motions to compel and/or for sanctions; (iii) preparing papers in

opposition to motions by the Tatung Defendants for protective orders; (iv) preparing for and

attendance at the January 24, 2005 hearing before the Court; (v) preparing papers submitted to

the Special Master on the jurisdictional discovery disputes; (vi) preparing for and attendance at

the March 30, 2005 hearing before the Special Master; (vii) preparing for and participation in the April 4, 2005 teleconference with the Special Master; (viii) preparing for and attendance at the April 20, 2005 aborted hearing before the Special Master; and (ix) upon application, such other and further costs and expenses as may be reasonable and just;

(2)    that LPL **not later than August 26, 2005** submit to the Special Master, by affidavit, a summary of the unreimbursed expenses and costs for which it seeks reimbursement pursuant to subparagraph (1) above, with detail sufficient to permit assessment of the reasonableness of such costs (detail that would implicate either the attorney-client or work product privilege may be submitted for *in camera* review);

(3)    that the Tatung Defendants, jointly and severally, pay all amounts due as sanctions to LPL within thirty (30) days of a determination by the Special Master that the amounts for which LPL seeks reimbursement are reasonable; and

(4)    that sanctions be imposed against the Tatung Defendants, jointly and severally, in the amount of LPL's *pro rata* share of the costs for the Special Master's services in connection with the jurisdictional discovery phase, so that the Tatung Defendants will pay 100% of such costs.

**These findings and recommendations will become a final order of the Court after the Special Master has ruled on the reasonableness of the amount of sanctions, unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g)(2).**

## II.    <u>Analysis – Assessment of Sanctions</u>

Having concluded that the imposition of sanctions is warranted, the Special Master turns to the issue of whether the recommended sanctions should be imposed against the Tatung Defendants, their counsel or both. Fed. R. Civ. P. 37(d). In this regard, the Special Master is mindful of the opinion issued in *Safer Display Technology, Ltd. v. Tatung Company and Tatung*

*Co. of America, Inc.*, No. Civ. A. 2:04CV154 (E.D. Va. Dec. 29, 2004) (Doumar, D. J.) [available as 2004 WL 3330838], and the underlying case record (herein after, the "Virginia Action"). LPL has referenced the Virginia Action for judicial notice in several of its motions before the Court and submissions to the Special Master.

This Court, where appropriate, has taken judicial notice of facts in the public record. *See, e.g., In re Delmarva Securities Litigation,* 794 F. Supp. 1293, 1299 (D.Del. 1992) ("this Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the parties seeking to have them considered"); *accord, PHP Liquidating, LLC v. Robbins PHP Liquidating,* 291 B.R. 592, 602 n. 7 (D.Del. 2003).

Facts of the type contained in judicial case records and opinions are particularly appropriate for judicial notice. As reasoned by Judge Stapleton of the Third Circuit: "it is not seriously questioned that that filing of documents in the case record provides competent evidence of certain facts – that a specific document was filed, that a party took a certain position, that certain judicial findings, allegations, or admissions were made." *Nantucket Investors II v. California Federal Bank (In re Indian Palms Associates, Ltd.),* 61 F. 3d 197, 205 (3d Cir. 1995). *See also, Furnari v. Warden, Allenwood Federal Correctional Institution,* 218 F. 3d 250, 255 (3d. Cir. 2000) (taking judicial notice of affidavit submitted by government attorney in an unrelated trial that described a witness as unreliable); and *Capital City & Trust v. Kroh (In re George P. Kroh),* 88 B.R. 987, 988-89 (Bankr. W. D. Mo. 1988) (taking judicial notice of findings of fact and conclusions of law entered in adversary actions against other parties by the same debtor as "highly relevant evidence of [debtor's] plan and scheme to obtain loans using false financial statements," as well as of the debtor's intent).

38

Accordingly, the Special Master takes judicial notice of certain of the findings of facts and conclusions of law made by the presiding judge in the Virginia Action on the basis that the opinion is a matter of public record that is available and verifiable in the public records of the United States District Court for the Eastern District of Virginia, as well as by computer through the Westlaw and other legal research databases. Judicial notice of the Virginia Action is taken solely for the purpose of determining against whom sanctions should properly be imposed.

In the Virginia Action, a patentee (Safer Display Technology, Ltd.) brought an infringement action against the same corporate entities referenced as Tatung Taiwan and Tatung America in the instant case. The similarities do not end there:

- In both the Virginia Action and the instant action, Tatung Taiwan filed motions to dismiss for lack of personal jurisdiction.[11]

- In both the Virginia Action and the instant case, declarations by David Shan-Juh Chang supported the motions of Tatung Taiwan to dismiss the litigations on jurisdictional grounds.[12]

- In both the Virginia Action and the instant case, declarations by Robin Tsou also supported motions to dismiss litigations on jurisdictional grounds.[13]

- In both the Virginia Action and the instant case, the Courts ordered a limited period of jurisdictional discovery.[14]

---

[11] In the Virginia Action, see 2004 WL 3330838 at *1. In the Delaware action, see D.I. 16.

[12] In the Virginia Action, see D.I. 8, 10 and 16 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, see D.I. 20.

[13] In the Virginia Action, see D.I. 105 on civil docket for case 2:04-CV-00154-RGD (E.D. Va.). In the Delaware action, see D.I. 19, Exh. 3.

[14] In the Virginia Action, see 2004 WL 3330838 at **1-2 (60-day period of jurisdictional discovery). In the Delaware action, see D.I. 88 (ordering a 90-day period of jurisdictional discovery, scheduled to end on February 15, 2005).

- In both cases, the limited periods for jurisdictional discovery were prolonged by multiple discovery objections and/or disputes.[15]

- In both cases, the "meet and confer" communications between counsel did not further resolution of the discovery disputes but, rather, served to prolong the jurisdictional discovery period.[16]

- In both cases, the patent holders were forced to file motions to compel Tatung Defendants to respond to basic discovery.[17]

- In both cases, Tatung Taiwan insisted that depositions of its employees be noticed for Taiwan, but allowed none of the noticed depositions to go forward.[18]

- In both cases, Tatung Taiwan refused to go forward with the noticed deposition of David Shan-Juh Chang, whose declaration supported its motions to dismiss on jurisdictional grounds.[19]

- In both cases, the Tatung Defendants avoided going forward with noticed depositions just days before they were scheduled, by filing motions for protective orders.[20]

- In both cases, jurisdictional discovery went nowhere as the close of the jurisdictional discovery periods approached.[21]

---

[15] In the Virginia Action, *see* 2004 WL 3330838 at *2. In the Delaware action, *see supra* at pp. 2-7.

[16] In the Virginia Action, *see* 2004 WL 3330838 at *2 ("amicability and communication between counsel for the parties has deteriorated significantly, which has also prolonged the jurisdictional discovery period"). In the Delaware action, *see infra* at p. 41.

[17] In the Virginia Action, *see* D.I. 116 *passim*. In the Delaware Action, *see supra* at pp. 3-7.

[18] In the Virginia Action, *see* D.I. 116 at pp. 12-14. In the Delaware Action, see supra at pp. 17-19.

[19] In the Virginia Action, *see* D.I. 116 at pp. 12-13. In the Delaware Action, *see supra* at pp. 17-19.

[20] In the Virginia Action, *see* D.I. 116 at pp. 13-14. In the Delaware Action, *see* pp. 2-7.

[21] In the Virginia Action, *see* D.I. 116 at p. 13. In the Delaware Action, *see* D.I. 132 at p. 4:13-19.

- In both cases – after burdening the Court and patent holders with substantial costs and delays – Tatung Taiwan belatedly agreed to consent to the jurisdiction of the courts.[22]

There is, however, at least one significant difference between the Virginia Action and the instant case. In the instant case, the Tatung Defendants are jointly represented by entirely different counsel than represented the Tatung Defendants in the Virginia Action.[23] It does not appear from the docket sheets in either action that any individual attorney appeared for the Tatung Defendants in both cases.

The marked similarity in the conduct of the Tatung Defendants during jurisdictional discovery in both cases cannot, in the Special Master's view, be attributed to advice of counsel. For that reason, the Special Master concludes that the Tatung Defendants are the architects of their own ill-conceived discovery strategy. It is particularly disappointing that the Tatung Defendants determined to follow that strategy in this case, even after similar conduct had been subject to the consideration of sanctions in the Virginia Action. As succinctly noted by the Honorable Robert G. Doumar in the Virginia Action:

> The Stalingrad Defense, in which the proponent tries to wear down the adversary until he succumbs to the depths of a longsome, frigid winter, cannot be implemented without severe costs to the proponent himself.

2004 WL 3330838 at *1. The Special Master agrees. Accordingly, the Special Master concludes that the sanctions recommended herein be assessed against – and only against – the Tatung Defendants, jointly and severally.

---

[22] In the Virginia Action, *see* D.I. 110 on docket 2:04-cv-00154 and 2004 WL 3330838 at **5-11. In the Delaware action, *see* D.I. 188.

[23] In the Virginia Action, the Tatung Defendants were represented by attorneys from various offices of the law firm of Greenberg & Traurig LLP. In the Delaware action, the Tatung Defendants are represented by lead counsel Robert C. Weems, Esquire, of the Law Offices of Baum & Weems and by Delaware co-counsel Jeffrey S. Goddess, Esquire, of the law firm Rosenthal Monhait Gross & Goddess, P.A.

## END NOTE

The Special Master would be remiss at the close of this chapter if several observations with respect to the course of jurisdictional discovery were not made.

**First**, it is clear to the Special Master that the discovery disputes between the parties were capable of reasonable resolution in accordance with controlling law and without burdening the Court's time. It is fair to say that the "meet and confer" process between counsel was an abject failure in moving issues towards resolution. Rather, the process served to further entrench the parties in their respective positions and to unnecessarily prolong jurisdictional discovery. Primary among the reasons for this failure was an abrogation of the duty to comply with the rules that govern litigation in this Court, coupled with a breakdown in the civility and professionalism in the communications between counsel.

**Second**, it is a privilege for an attorney to be admitted to practice *pro hac vice* before the Delaware District Court. In the opinion of the Special Master, it is a privilege that can and should be withdrawn if attorneys so admitted fail to comply with the applicable rules of the Court, and to conduct themselves with the civility and professionalism required of members of the Delaware bar.

**Third**, going forward – to avoid the risk of sanctions in a form beyond mere monetary sanctions – the Special Master cautions counsel to rethink their game plan and resolve not to engage in the conduct that so tainted the jurisdictional discovery in this case.


ENTERED this 16th day of August, 2005.

Vincent J. Poppiti (DSBA No. 100614)
Special Master