IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| LG PHILIPS LCD CO., LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 04-343-JJF |
| v. | : | |
| | : | |
| TATUNG CO., TATUNG COMPANY | : | |
| OF AMERICA, INC., and VIEWSONIC | : | |
| CORPORATION, | : | |
| | : | |
| Defendants | : | |
| | : | |

## INTERIM OBJECTIONS BY TATUNG COMPANY AND TATUNG COMPANY OF AMERICA TO REPORT AND RECOMMENDATIONS OF SPECIAL MASTER

Jeffrey S. Goddess (Del. Bar. No. 630)
Rosenthal, Monhait, Gross & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel: 302-656-4433
Fax: 302-658-7567
jgoddess@rmgglaw.com

OF COUNSEL:
Julian M. Baum
Robert C. Weems
BAUM & WEEMS
58 Katrina Lane
San Anselmo, CA 94960
Tel: 415-460-1791
Fax: 415-457-9157


Dated: September 6, 2005

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

1.  Initial Proceeding Before The Court.................................................................... 1

2.  The Court Permits Jurisdictional Discovery ....................................................... 1

3.  The Dispute Between TUS and LPL Concerning Depositions............................ 2

4.  The Court's January 24 Hearing and January 25, 2005 Order ............................ 3

5.  Discovery and Discovery Disputes Arising After the January 24 Hearing ......... 3

THE REPORT AND RECOMMEDNATIONS ............................................................. 4

1.  The Report and Recommendation Places Impermissibly Interprets This Court's
    November 18, 2004 Order ..................................................................................... 5

2.  The Report and Recommendation Assertion TUS or TROC Acted Improperly In
    Seeking An Appropriate Protective Order Is Contrary To This Court's January 25,
    2005 Order, This Court's Subsequent Scheduling Order and The History of This
    District's Decisions .............................................................................................. 6

3.  The Report' Findings of Fact Concerning LPL's Conduct, The Relief Sought By
    The Parties From This Court and This Court's Findings Are Erroneous ................. 8

4.  The Report Assessment Surrounding The Depositions of TUS Is Legally And
    Factually Flawed................................................................................................. 11

5.  The TROC Depositions........................................................................................ 17

6.  TROC and TUS's Objections To Interrogatories Were Substantially Justified,
    Even IF Overruled By The Special Master, And Both Provided Complete Responses
    to Those Interrogatories Not Subject To Objection............................................ 18

i

7.   TUS and TROC's Objections to the Documents Request Were Appropriate ... 21

RESERVATION OF ISSUES ..................................................................................... 23

CONCLUSION ............................................................................................................. 24

Attachments:

Banks v. Office of the Senate Sergeant-At-Arms,
    D.D.C. C.A. No. 1:03CV00056 (HHK/JMF);
    Defendant's Motion For A Protective Order
    From Supernumerary Interrogatories                        A

American Chiropractic Association, et al. v.
    Trigon Healthcare, Inc., et al.,
    2002 U.S. Dist. LEXIS 6199 (WD Va. 2002)                  B

Boland Marine & Mfg. Co. v. M/V Bright Field,
    1999 U.S. Dist. LEXIS 6964 (E.D. La. 1999)                C

Commissariat A L'Energie Atomique v. Dell Computer Corp.,
    2004 U.S. Dist. LEXIS 12782 (D. Del. 2004)                D

## TABLE OF AUTHORITIES

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    2002 U.S. Dist. LEXIS 6199 (WD Va. 2002) ..................................................................19

*Banks v. Office of the Senate Sergeant-At-Arms & Doorkeeper*,
    222 F.R.D. 7, 8 (DDC 2004).....................................................................................18, 19

*Boland Marine & Mfg. Co. v. M/V Bright Field*,
    1999 U.S. Dist. LEXIS 6964  (E.D. La. 1999) ..............................................................13

*Coleman v. Dydula,*
    175 F.R.D. 177 (WD NY 1997).......................................................................................21

*Commissariat A L'Energie Atomique v. Dell Computer Corp.*,
    2004 U.S. Dist. LEXIS 12782 (D. Del. 2004) ..................................................................7

*Edberg v. Neogen Corp.*,
    17 F. Supp. 2d 104 (D. Conn 1998)................................................................................16

*Intel Corp. v. Silicon Storage Techn,*
    20 F. Supp. 2d 690 (D. Del. 1998)..................................................................................16

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
    104 F. Supp. 2d 390 (D. Del. 2000)(Sleet, J.)..................................................................1

*Kendall v. GES Exposition Services, Inc., et al.*,
    174 F.R.D. 684 (D.Nev. 1997) ..................................................................................18, 19

*People v. Machado,*
    63 P. 66 (Cal. 1900) .......................................................................................................15

*Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*,
    42 F. Supp. 2d 423 (D. Del. 1990)..................................................................................16

*Richardson Greenshileds Securities, Inc. v. Mui-Hin Lau*,
    825 F.2d 647, 652-653 (2d Cir. 1987) ............................................................................11

*Schoenberg v. Shapolsky Publishers, Inc.*,
    971 F.2d 926 (2d Cir. 1992) ......................................................................................5, 11

*U.S. v. Saunders*, 166 F.3d. 907 (7th Cir. 1999) ...................................................................15

OTHER AUTHORITIES:

*Moore's Federal Practice*, 37.23[2]……………………………………………………….21

Tatung Company ("TROC") and Tatung Company of America ("TUS") request
that the Special Master's Report and Recommendations On Motion of L.G.Philips LCD
Co., Ltd. for Discovery Sanctions Against the Tatung Defendants (D.I. 197) (the
"Report"), not be adopted by this Court.

TROC and TUS respectfully suggest that the Report contains erroneous findings
of fact and applies this Court's prior orders in a manner contrary to precedent and local
rule in the course of reasoning to an overly harsh result. This Court reviews factual
finding for clear error. It reviews findings of law *de novo*. *Joint Stock Soc'y v. UDV N.
Am., Inc.*, 104 F. Supp. 2d 390, 394 (D. Del. 2000) (Sleet, J.)

## NATURE AND STAGE OF PROCEEDINGS

### *1.    Initial Proceeding Before The Court*

This patent infringement action was filed May 27, 2004, by L.G.Philips LCD Co.,
Ltd. ("LPL") against ViewSonic Corporation, TROC and TUS. (D.I. 1). On June 16,
2004, TROC and TUS moved to dismiss for lack of personal jurisdiction and deficiencies
in service. (D.I. 16). TROC and TUS extended LPL's time to answer and discussed
voluntary discovery. (See, D.I. 25, Weems Decl. at Ex. 1 (collected correspondence)).
On July 28, 2004, LPL filed a partial answering brief and an opening brief for
jurisdictional discovery. (D.I. 34 – 40).

### *2.    The Court Permits Jurisdictional Discovery*

Following completion of that briefing, on November 17, 2004, the Court granted
LPL's motion to conduct jurisdictional discovery and set the date for completion of that
discovery as February 15, 2005. (D.I. 88). That day, the Court also set the time for LPL
to file its answering brief to TROC's and TUS's motion to dismiss as March 7, 2005.
(D.I. 90).

1

In what proved to be of particular importance here, on November 18, 2004, the

Court also ordered:

> No further motions may be filed in this case until the Court resolves The Motion
> To Dismiss For Lack Of Personal Jurisdiction, Insufficient Process, And
> Insufficient Service Of Process And, In The Alternative, To Quash Service (D.I.
> 16) filed by Defendants Tatung Co. and Tatung Company of America, Inc.

(D.I. 93).

On November 29, 2004, LPL served interrogatories and document requests on

TROC and TUS. (D.I. 98). On November 30, 2004, prior to any deposition notices

issuing, counsel for TROC and TUS requested a brief extension to accommodate

vacation plans and on December 1, informed LPL's counsel that he was leaving with his

family December 23, 2004 returning January 2, 2005. (Weems Decl. Ex. 1). LPL agreed

to extend the time to respond to written discovery to January 5 (with an equal extension

of the discovery deadline).

### 3.     *The Dispute Between TUS and LPL Concerning Depositions*

On December 2, 2004, plaintiff LPL served a notice for a Rule 30(b)(6)

deposition of TUS on 20 separate topics, setting it for December 22, 2004 -- a date 2

weeks before any interrogatory responses or documents were due and the day before

TUS's counsel was scheduled to leave for vacation. (See, D.I. 99). On receipt of the

Notice, counsel informed LPL of problems with its scope and the parties subsequently

exchanged correspondence on this issue and the need for a protective order. (Weems

Decl. Ex. 1). Because these issues were unable to be resolved, TUS sought a protective

order from the Court on December 20, 2005. (D.I. 105; see also, D.I. 107-108). On

December 29, LPL re-noticed TUS for deposition for January 20, 2005. (D.I. 109). Upon

2

returning from vacation, TUS's counsel promptly took up continued efforts to resolve the issue without success. (Weems Decl. Ex. 1).

### 4.    *The Court's January 24 Hearing and January 25, 2005 Order*

Subsequently, on January 18, 2005, LPL e-mailed the Court requesting a teleconference to resolve the issues surrounding the TUS depositions. (Weems Decl. Ex. 1). LPL e-mailed again on Friday, January 21, 2005, (Weems Decl., Ex. 1) and the Court issued an Order converting LPL's request for a teleconference into a Rule 37 motion concerning the 30(b)(6) deposition of TUS and setting response and hearing date of Monday morning, January 24, 2005. (D.I. 126). Following hearing (reported at D.I. 132), the Court entered an Order that adopted the Protective Order requested by TUS and directed that depositions should proceed. (D.I. 133).

### 5.    *Discovery and Discovery Disputes Arising After the January 24 Hearing*

Following the January 24 Hearing, LPL re-noticed the depositions of TUS's employees and 30(b)(6) deponent for February 7,8 and 9 (D.I. 134-136). Each of these depositions proceeded, as did a plethora of additional third party depositions. (See, e.g., D.I. 117-120, 138-142, 148-153, 159-162). As represented by counsel for TUS at the January 24, 2005 Hearing, (see D.I. 132 at 50:13-19) on January 31, 2005, LPL was provided with the documents that TUS's declarants had referred to in connection with their declarations. (Weems Declaration Ex. 1).

On February 7 LPL filed a request to file a motion to compel production of documents against TUS and TROC which was served on local counsel after hours. (D.I. 154 and D.I. 163). Lead counsel for TUS and TROC received a fax copy of the motion without exhibits late in the day on February 8 due to travel for the depositions being

3

conducted by LPL and a complete version of the filing on February 9, during the deposition of TUS's 30(b)(6) Deponent, its President. (Weems Decl. para. 3). Despite LPL having at least 9 attorneys admitted for this case, prior to that time the only communication from LPL on the substance of the document responses was one letter on January 10, 2005. (Weems Decl., Ex. 1). In response, TUS and TROC sought appointment of the Special Master and due to the inability of the parties to resolve the issues again sought a protective order from the Court to avoid the unreasonable burden and expense of all counsel traveling to Taiwan before the issues presented by LPL could be resolved. (D.I. 168).

On February 4, 2005, the Court appointed a Special Master to resolve the parties' discovery disputes. (D.I. 174). Proceedings were held before the Special Master, by teleconference and live, in March and April, 2005, at which point further action on jurisdictional discovery was rendered moot by virtue of TUS and TROC stipulating to jurisdiction in this case.

The Special Master went on to issue a Report August 16, 2005, recommending sanctions against TUS and TROC. Although it is not the Special Master's final word on the subject, with the amounts imposed still to be determined, the Report was so sharply critical and, defendants TUS and TROC believe, was based on demonstrable and easily corrected misimpressions and erroneous conclusions, that the filing of these interim objections were warranted now, also consonant with Fed.R.Civ.P. 53(g)(2).

## **THE REPORT AND RECOMMEDNATIONS**

The Report emphasize this Court's November 18, 2004 Order barring the parties from filing motions (D.I. 93), and on the transcript of Hearing held January 24, 2005 (D.I. 132). TUS and TROC respectfully suggest that the Special Master has misconstrued

4

each. TUS and TROC further suggest that the Special Master makes numerous erroneous findings of fact due to misleading statements by LPL in connection with the proceedings before the Special Master.

### 1. *The Report and Recommendation Places Impermissibly Interprets This Court's November 18, 2004 Order*

The holding in the Special Master's Report that this Court prohibited the parties

from being able to petition the Court for a protective order or to rely upon local rules

(Report and Recommendation at p. 11), cannot be reconciled with the due process rights

of TUS and TROC. As noted by the *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d

926 (2d Cir. 1992):

> Furthermore, we are deeply troubled by the district court's requirement that defendants comply with plaintiff's discovery request before being permitted to submit their motion to dismiss the complaint for lack of subject matter jurisdiction. As we explained in *Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 652 (2d Cir. 1987),* "absent extraordinary circumstances . . . a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure."

*Schoenberg*, 971 F.2d at 935-936.

Because the Report and Recommendation places just such an interpretation on

this Court's November 18, 2004 Order, the Report and Recommendation is

fundamentally flawed. Further, and as the preceding recitation sets out, both parties

turned to the Court – and were able to turn to the Court – when they felt that the other

side's approach to jurisdictional discovery was unfair and oppressive.

5

**2.    *The Report's Assertion TUS or TROC Acted Improperly In Seeking An Appropriate Protective Order Is Contrary To This Court's January 25, 2005 Order, This Court's Subsequent Scheduling Order and The History of This District's Decisions***

The Report and Recommendation draws improper and prejudicial conclusions

from TUS's (and TROC's) legitimate need for a protective order sufficient to guard

against the risk of inadvertent use of their respective confidential information from patent

counsel for LPL and other competitors. (Report and Recommendation at 3-4). As such, it

is contrary to both established precedent and the law of this case.

Even with only truncated briefing, this Court recognized such protections as

proper and has kept the protective order in place as part of its Rule 16 Scheduling Order.

(D.I. 198). TUS and TROC's concerns were and are quite real. Moreover, because the

Report's conclusions on this issue exceed the scope of hearings before the Special

Master, TUS and TROC feel compelled to remind the Court that despite LPL's

representation to this Court (D.I. 107), Mr. Jung (LPL's patent attorney, including the

corresponding attorney on the patents-in-suit and their related continuation applications)

has appeared in this case although not admitted *pro hac vice*. (See, D.I. 108). [1]

As Judge Jordan noted in connection with some of the very same attorneys

involved here:

> I think it is appropriate to deny CEA's patent prosecution attorneys access to the
> Defendants' highly confidential information or, if they are permitted to have
> access to such information, to prevent them from prosecuting patents in the field
> of LCD technology for one year after the conclusion of this litigation, including
> appeals. Central to my determination is . . . that CEA's patent prosecution
> attorneys - and Mr. Jung, in particular - prosecute patents in the field of LCD

---

[1] TUS and TROC note that Mr. Jung's involvement came to their attention due to the fact
that Viewsonic included portions of the deposition of LPL's expert (who was defended
by Mr. Jung despite not being admitted in this case) at which neither TUS nor TROC
could appear and preserve their respective jurisdictional challenges.

technology for LG.Philips, one of the Defendants' major competitors. (D.I. 198 at
3; D.I. 199 at 4.) I disagree with CEA's assertion that those attorneys' activities do
not rise to the level of "competitive decision making" that is necessary to restrict
their access to highly confidential information. (D.I. 173 at 2 (citing *U.S. Steel*,
730 F.2d at 1468).) Prosecuting patent applications "involves decisions of scope
and emphasis" that implicate competitive decision making, as claims may be
drafted to "read on new products and new directions where [a party] project[s]
sales to be most critical." *Motorola*, 1994 U.S. Dist. LEXIS 20714 at *11. In this
case, as in *Motorola*, "there can be no question" that CEA attorneys who receive
highly confidential information and then later prosecute patents in the field of
LCD technology "will have to distill and compartmentalize the confidential
knowledge they have gained." 1994 U.S. Dist. LEXIS 20714 at *12. This creates
a high risk of inadvertent disclosure of the Defendants' highly confidential
information. See *Motorola*, 1994 U.S. Dist. LEXIS 20714 at *13.

*Commissariat A L'Energie Atomique v. Dell Computer Corp.*, 2004 U.S. Dist. LEXIS

12782 at *7-8 (D. Del. 2004)(emphasis added).

The depositions of TUS employees included two high level sales personnel

knowledgeable about the profitability, technology and R&D direction of products sold by

and service delivery methods of TUS. Similarly, the 30(b)(6) topics included all

products—including test and R&D products-- received from TROC by TUS (TUS Depo

Notice 16) and all contracts—including product design and development-- related to

visual display products (TUS Depo Notice 14) and complete market information on all

domestic sales, including profit and loss margins. (TUS Depo Notice 8). Such

information is and must be protected because

"Prosecuting patent applications 'involves decisions of scope and emphasis' that
implicate competitive decision making, as claims may be drafted to 'read on new
products and new directions where [a party] project[s] sales to be most critical.'

*Id.* at • 9.

Worse yet, due to continuation practice (including continuation practice on the

very applications giving rise to the patents-in-suit) there is the added risk that in making

7

amendments LPL's prosecuting attorneys might amend claims, albeit inadvertently, to read upon additional or more profitable product lines.[2]

### 3. *The Report' Findings of Fact Concerning LPL's Conduct, The Relief Sought By The Parties From This Court and This Court's Findings Are Erroneous*

TUS and TROC believe that underlying the Report's conclusions concerning the parties' conduct is a fundamental error concerning the Order issued by this Court after the January 24, 2005 Hearing (D.I. 133). The Report broadly asserts, "the Court determined that the categories of discovery identified by LPL in its 30(b)(6) deposition notices to the Tatung Defendants were within the permissible scope of jurisdictional discovery."

(Report, at p. 8-9).

Although TUS and TROC agree that not all rulings made by the Court were included in the Order after the Hearing, the Report fails to give due consideration to the Court's explicit reservation of the issues concerning the scope of jurisdictional inquiry in

---

[2] TUS (and TROC) believe the problem of inadvertent use by patent prosecuting attorneys is sufficient to answer the Report's assertion that TUS was involved in some form of improper delaying tactic. Nonetheless, because the Report fail to recognize LPL's part in creating the various discovery delays, there would have been no delay in the TUS 30(b)(6) deposition if LPL had agreed with TUS (and, incidentally, with the other defendant, ViewSonic, to whom LPL had failed to respond on the issue for two months) to the protective order for the duration of jurisdictional discovery, as it admitted it could over a month later before the Court. (See, Weems Decl. Ex. 1, D.I. 132 at 15:8-15, 18:6-19:1). In fact, counsel began meeting with and preparing TUS for the deposition on December 10 and the schedule of TUS 's President was cleared so that he would be available to testify on December 22 and was kept open even following TUS's filing with the Court. Weems Declaration at para. 3). Notably (particularly given LPL's later assertions that its 30(b)(6) deposition was frustrated by lack of documents), LPL's plan was to take the 30(b)(6) deposition of TUS before the time for responding to document requests, due January 5, 2005.

8

its January 26, 2005 Order (D.I. 133).[3] That Order clarified that the Court was reserving

judgment on whether LPL's actual lines of inquiry were within the scope of jurisdiction,

while permitting that the 20 topics (restricted to those 20 topics) were "specific enough

that it should be readily apparent what or the type of person that has to come as a

designee" (D.I. 42:2-5). Specifically, the Order provided:

> Depositions related to jurisdictional discovery shall proceed. If Defendants
> believe Plaintiff's examination exceeds the issues of jurisdiction, Plaintiff may
> object and instruct the witness not to answer. Plaintiff may then file a motion to
> compel on the objected-to question.

(D.I. 133)

Compounding the Report' lack of appreciation for the balance being struck by the

Court through its comments at the Hearing and subsequent Order, are a number of factual

errors which permeate the conclusions reached. Most of these will be discussed in

connection with the topics addressed by the Report and Recommendation, but the errors

are not so limited. Even in the Report discussion of the record before this Court there are

serious errors that color subsequent discussion. For example, the Report and

Recommendation (p. 5) asserts:

---

[3] For example, the January 26, 2005 Order (D.I. 133) does not discuss the Court's
sustaining of TUS's objection that the Notice itself was not limited to the 20 delineated
topics (See, Tatung Company of America's Brief In Response to L.G.Philips LCD Co.,
Ltd.'s E-Mails to Court Requesting Teleconference at p. 3 (D.I. 128), Transcript at p.
64:1-2 (D.I. 132). Likewise, it does not include reference to the deadline TUS complied
with to produce to LPL the documents relied upon by its declarants. (See, Trans. at
56:16-21 (D.I. 132). TUS also notes that although the Court also makes reference to
"answers to interrogatories that are incomplete," there were no such interrogatories at
issue. TUS (and TROC) each had provided complete responses to those interrogatories
that had not been objected to based on supernumerousity and other grounds. (See, Weems
Decl. at Ex. 2). Not insignificantly, LPL's meet and confer efforts on all written
discovery prior to hearing consisted of a single letter on January 10, and LPL made no
effort to resolve the objections to interrogatories following the January 24, 2005 Hearing
until after this Court had granted TUS and TROC's request for appointment of a special
master.

9

> Within a few weeks, LPL found it necessary to again burden the Court when Tatung Taiwan also refused to appear for noticed depositions. LPL moved for leave to file an expedited motion to compel jurisdictional discovery from the Tatung Defendants and for a third extension of the jurisdictional discovery period. D.I. 154. This prompted another round of letters and emails to the Court, D.I. 163-64, 166-67. The Tatung Defendants then filed a request for the appointment of a special master, together with a motion for a protective order. D.I. 168.

LPL's motion (D.I. 154) filed February 7, 2005 (served after hours) sought to compel production of documents that already were subject to objection by TROC and TUS. LPL did not move to compel depositions. Other than a single letter on January 10, 2005, merely asserting its disagreement with the objections made, LPL had never sought to meet and confer with TROC or TUS to resolve these objections before filing its motion. (See, Weems Declaration Ex. 1; D.I. 211). Only after filing its motion did LPL begin to meet and confer following the deposition of TUS's President and 30(b)(6) designee[4]. Only after the parties were unable to resolve the issues over document production did counsel for TROC move for a protective order on February 11, 2005, in part to avoid the undue harassment and expense that would result from proceeding halfway around the world without the document issues being resolved. (D.I. 168). Although the Court might consider this point to be minor, TUS and TROC respectfully suggest that the combined effect of such errors resulted in the Report and Recommendation going significantly astray in its tone and conclusions.

---

[4] For the Court's reference, TUS and TROC note that February 9, 2005 was the Chinese New Year (the holiday running from February 7 to 13), a fact that was pointed out to LPL counsel and which further complicated efforts to resolve any issues concerning producing documents in Taipei in advance of depositions should the parties not agree to defer those depositions.

10

### 4.    *The Report Assessment Surrounding The Depositions of TUS Is Legally And Factually Flawed*

As previously discussed, the Report's conclusion that this Court's November 18, 2005 Order precluded TUS from moving (albeit by letter) for a protective order concerning the December 22, 2004 30(b)(6) deposition and from relying on Local Rule 30.2 in connection with that deposition (and those re-noticed while the motion was pending), cannot be squared with the fundamental right of the parties to bring motions authorized by the Federal Rules of Civil Procedure. See, *Schoenberg, supra*, 971 F.2d at 935-936, *Richardson Greenshileds Securities, Inc. v. Mui-Hin Lau*, 825 F.2d 647, 652-653 (2d Cir. 1987) (discussing obligation of Court to permit litigants timely access to the Court). Indeed, TUS (and TROC) believe that Local Rule 30.2 was adopted to preserve that fundamental right in light of the docket demands of the Judges in this District, which would otherwise be burdened by *ex parte* and other emergency applications for relief in its absence. Accordingly, the conclusion that Local Rule 30.2 did not apply constitutes an error of law that should be set aside, as should the factual determinations made in reliance on that improper legal conclusion.

Moreover, the Report and Recommendation compounds that legal error by confusing the issues presented to the Court at the January 24, 2005 Hearing and ignoring the exigencies under which TUS was required to answer LPL's allegations. As an initial matter, the Hearing concerned TUS (not TROC, except in that the protective order requested by TUS would apply to all discovery) and the relief was being requested by TUS. (D.I. 128). TUS sought three items of relief: (1) The protective order sought, granted by the Court and subsequently reaffirmed by the Court's scheduling order

11

concerned the treatment of confidential information; (2) the quashing of deposition

notices and subpoenas, which was denied; and (3) modification of the 30(b)(6) notice,

which was denied in part and granted in part.[5]

Contrary to the discussion (and suggestions) in the Report, at pp. 11-12, neither

TUS nor TROC moved for a protective order concerning the depositions of "apex"

personnel. Rather, it sought to quash all notices and subpoenas then outstanding. Indeed,

TUS pointed to deposition of Ms. Wen-Yen K. Lin, an executive of TROC (not TUS)[6]

along with others such as Dr. Sun, TUS's Chairman's ex-husband, principally to point

out what it considered to be improper and harassing tactics by LPL. In short, neither

TUS nor TROC undertook at the January 24 Hearing to show good cause for a protective

order against the deposition of TROC's senior executives (nor for that matter its own

senior personnel) and the Report' colloquy (and characterizations) to the contrary is

clearly erroneous. (See, Report at pp. 11-12).[7]

_____

[5] In its Conclusion, TUS requested that the 30(b)(6) notice be limited to a single topic of contacts with the State of Delaware, which was denied. In the body of its brief, TUS objected to topics for testimony "include (but are not limited to) the subjects listed" which was sustained.

[6] Among the factual errors in the Report, it is asserted that Ms Wen-Yen K. Lin is President of TROC and an executive of TUS (Report at p. 18). She is neither. The President of TROC is Mr. Wei Shan Lin. Ms. Wen-Yen K Lin is an Executive Vice President of TROC. Neither Mr. Wei Shan Lin nor Ms. Wen-Yen Lin are officers of TUS. See, Confidential Declaration of Robert C. Weems, Exhibit 1 (Sun (30(b)(6) Deposition, pp. 180-183 identifying all officers of TUS and reporting responsibilities). Because such an erroneous finding of fact has potential implications beyond the Recommendation and Report, TUS and TROC request it be specifically rejected by this Court.

[7] The first filing by TROC that might be considered a motion for a protective order concerning its executives was made February 11, 2005, seeking a 14-day stay and appointment of a special master. (D.I. 167, 168.)

The Report further errs in its characterization of TUS's effort to put forward a

deponent on the 20 topics in LPL's 30(b)(6) Notice. First, TUS put forward its President

as its 30(b)(6) deponent and prepared him to address the Topics identified.[8] Second,

> an inability to answer completely every one of movants' questions is not
> tantamount to a complete failure to appear and does not demonstrate any
> willfulness or bad faith on defendants' part. *United States v. Massachusetts Indus.*
> *Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995); *Zappia Middle E. Constr. Co.*
> *v. Emirate of Abu Dhabi*, 1995 U.S. Dist. LEXIS 17187, No. 94 CIV1942, 1995
> WL 686715, at *5, *8 (S.D.N.Y. Nov. 17, 1995). In order for the court to impose
> sanctions, the inadequacies in a deponent's testimony must be egregious and not
> merely lacking in desired specificity in discrete areas." *Id. at *8* (citing *RTC*, 985
> F.2d at 197; *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 78 (S.D.N.Y.
> 1991); *Thomas v. Hoffman-Laroche, Inc.,* 126 F.R.D. 522, 524 (N.D. Miss.
> 1989)).

*Boland Marine & Mfg. Co. v. M/V Bright Field*, 1999 U.S. Dist. LEXIS 6964, *8-9 (E.D.

La. 1999).

Third, there is a substantial question whether the areas as to which Mr. Sun was

not able to recall information fell within the scope of the deposition topics. An example

put forward in the Report concerned TUS's Compton facility. The testimony preceding

the portion quoted in the Report and Recommendation is telling. It established that while

a very few of the products distributed from Compton may have been made by TROC

(e.g., computers), it did not establish (because it was not asked) that any of the visual

display products distributed were made by or for TROC or TUS. Accordingly, it cannot

be said that the information Mr. Sun was asked to provide was called for under Topic 15

(distribution and sale of visual display products made for TUS or TROC). Indeed, LPL's

counsel abandoned reliance on that Topic as justification for his questions. Similarly, the

line of questions—concerning where third party products are shipped--does not fit well

---

[8] Although within its right to do so, LPL did not seek any testimony from President Sun
concerning the efforts that went into his preparation.

into Topic 2 concerning the relationship between TUS and other entities (which LPL next

contended supported the questioning). Specifically, Topic 2 provided:

> Since January 1, 2000, the relationship between or among Tatung America,
> Tatung and all entities that distribute, market, import, purchase and/or sell visual
> display products manufactured, distributed or sold by or for Tatung or Tatung
> America.

That topic is a far cry from fair notice that TUS's deponent would be called upon

to identify where TUS redistributes outside of Delaware ("Delaware" is called for by

Topic 10) third party visual display products (included within other systems) that are not

made by or for or sold by TUS or TROC (Topic 9). For the convenience of the Court, the

relevant portions of the transcript are attached as Exhibit 1 to the Confidential

Declaration of Robert Weems filed herewith. In short, it cannot be said that TUS failed

to appear for its 30(b)(6) deposition such that sanctions are warranted.

The assertion in the Report that "Tatung's counsel disrupted the flow of

depositions with frequent requests for recess (some within minutes of the start of

depositions) [which is characterized by the Report as "tactical"] and by inserting frequent

and improper objections" is unwarranted. (Report at p. 14). First, analysis of the

transcript shows that there were six recesses, taken on average 155 questions apart.[9]

Further, the objections asserted by counsel were proper, and TUS will briefly address

here the basis for each objection which the Report cited as improper.[10]   In the first cited

---

[9] Analysis of the deposition was performed electronically. Recesses were recorded after
a response was given at question 184, 334, 435, 635 (so that President Sun could address
a business matter that had arisen), 749 and 932. The first recess occurred 50 minutes into
questioning. Counsel did not take recesses when questions were pending nor otherwise
engage in improper disruptive conduct.

[10] Counsel asserting objections at the deposition are prepared to submit the entire
transcript for rulings on each of their objections should the Court request.

example (Sun 17:5-11 [actually 19:6-10])[11] the objection to the question as vague was

proper due to the conjunctive "or" making it uncertain what was being asked. See,

*People v. Machado*, 63 P. 66 (Cal. 1900). In the second cited example (Sun 18:10-17

[actually 20:11-14]), the objection that the question called for speculation was proper

pursuant to Fed.R.Evid. 602 due to a lack of showing that TUS had knowledge of

manufacturing by TROC. In the third cited example (Sun 37:10-17 [actually 41:21-23),

the objection was proper as the question had been asked and answered (a majority is "a

number greater than half of a total," Webster's Third New International Dictionary). See,

*U.S. v. Saunders*, 166 F.3d. 907. In the fourth example cited (Sun 38:5-13 [actually

42:17-20]), the question was argumentative. The immediately preceding exchange was as

follows:

> Q: Did Tatung America distribute those products to retail distribution
> centers?
> A: Well, maybe to be more specific, we prepared those products for
> distribution. And the, you know, a transportation company then takes them and
> actually distributes them.
> Q: Mr. Sun, do you agree that the distribution center in Arlington
> distributes products?
> A: It prepares products for distribution.

(Sun Depo. 42:8-15). In the fifth cited example (Sun 89:23-25to 90:1 [Sun 100:20-22]),

again the objection was proper pursuant to Fed.R.Evid. 602 due to LPL's counsel's

failure to establish knowledge.

In the sixth cited example (Sun 108:25-109:1-11 [122:11-16]), the objection was

proper under the Court's January 26 Order. The objection reflected TROC and TUS's

position that sales following the time the complaint were filed are not relevant to the

---

[11] TUS and TROC note that the Page References provided in the Report and
Recommendation do not correspond to the pages of the certified transcript.

jurisdictional inquiry and that contacts 3 years before the issuance of the patents-in-suit also are not relevant to the jurisdictional inquiry. See, e.g., *Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1990*); Intel Corp. v. Silicon Storage Techn.,* 20 F. Supp. 2d 690, 697 (D. Del. 1998), *Edberg v. Neogen Corp.*, 17 F. Supp. 2d 104 (D. Conn 1998). Pursuant to the Court's Order, counsel properly could have instructed not to answer.

The Report's reference to a "tag-team" approach is also unfounded.[12] The first cited example (Sun 94:24-25 and 95:1-24) does not exist; it is not merely improperly paginated. The passage referred to corresponds to Sun 105:21-107:8, and all of the objections and requests were interposed by Mr. Weems. (Confidential Weems Decl., Ex. 1, pp. 105-107). The last cited example of what is termed improper tag-teaming (Sun 134:18-25 and 135:1-14 [actually, Sun 149:23-150:21]) does not bear scrutiny, either. Durring the period Febraury 7-9, LPL conducted 4 separate depositions, all of which were attended by Mr. Baum. It was appropraite that Mr. Weems bring to his attention events that had transpired without his knowlegdge during that time frame.

Likewise, the accusation of improper coaching do not hold up. In the first cited example (Sun 40:21-25 to 41:1-7 [actually 46:06-17]) is not coaching but rather reflects the preceeding pages of testimony. See, Confidential Weems Decl., Ex. 1 at 45-46). Nor are the admotions cited in the Report given to other deponents coaching—the deponents

---

[12] TUS and TROC note that Court's are split over whether an examination of a party can be conducted by more than one attorney. Counsel is aware of no authority that prohibits each defendant in an action from being separately represented at a deposition (even if both parties are represented by a single law firm). Nonetheless, counsel concedes that under most circumstances as a matter of courtesy (which was largely observed during President Sun's deposition) only one attorney from its firm would have conducted the defense. The facts on the ground, however, were unusual as counsel was simultaneous getting its first look at the complete Motion to Compel filed by LPL.

had given non responsive answers. No legitimate purpose of discovery would have been served by counsel moving to strike the answer (as would be strictly called for) and requiring opposing counsel to then ask the question that had been answered.

As a final matter, and as has been previosuly discussed, the Report erroneously concludes its discussion of the TUS deposition by again wrongfully accusing TUS and TROC of failing to comply with the directive of this Court. TUS produced all documents that it represented would be produced. Moreover, in light of this Court's January 24 guidance concerning limitations on the degree of specificity appropriate in a jurisdictional dispute, there were numerous issues needing to resolved in connection with the objections interposed by both TUS and TROC concerning LPL's document requests. However, other than demands during the course of depositions, none of these issues was raised with TUS or TROC's counsel by any of the attorneys representing LPL until after LPL brought its motion to compel.

### 5. *The TROC Depositions*

TROC's position concerning the Taiwan depositions are stated in its motion to this Court for a protective order on February 11, 2005. (D.I. 168). As reflected in that filing, TROC moved for a protective order because, as a result of LPL's last minute motion to compel documents, it was clear that those depositions could not proceed in an orderly fashion and that the parties would incur unnecessary, burdensome and duplicative expenses unless a full resolution of all of the freshly framed issues were brought to a close. As such , TROC was justified (particularly in light of LPL's refusal to work these matters out in advance rather than on the fly) in moving for a protective order.

17

### 6. *TROC and TUS's Objections To Interrogatories Were Substantially Justified, Even IF Overruled By The Special Master, And Both Provided Complete Responses to Those Interrogatories Not Subject To Objection.*

Although this Court has expressed displeasure with the matter of counting

interrogatories, TUS and TROC respectfully submit that it would be an abuse of

discretion to impose a harsh sanction following a close and, defendants still believe, an

erroneous application of the relevant legal standards.

The test, generally accepted and purported to be applied here, concerning whether

or not an interrogatory contains discrete subparts is set forth in *Kendall v. GES*

*Exposition Services, Inc., et al.*, 174 F.R.D. 684 (D.Nev. 1997). Reduced to its essence,

the inquiry is "whether one question is subsumed and related to another or whether each

question can stand alone and be answered irrespective of the answer to the others." *Banks*

*v. Office of the Senate Sergeant-At-Arms & Doorkeeper*, 222 F.R.D. 7, 8 (DDC 2004).

As *Kendell*, itself reflects, the question is not whether the propounding party could have

asked the interrogatory differently, such that it would constitute a single interrogatory,

but the interrogatory actually asked:

> Interrogatory No. 19 should be counted as two interrogatories.
> (Interrogatory No. 19 could have been drafted as one legitimate interrogatory but
> it was not.)

*Kendall v. GES Exposition Services, Inc., et al.*, 174 F.R.D. at 687.

Even if where there is a common theme can be identified, if the areas of inquiry

are discrete, the interrogatory must be counted as containing multiple subparts.

> I agree that interrogatory six counts as seven interrogatories. Although all of the
> requests for admission are related to the statement of Trigon's representative, each
> request involves a discrete subject. For example, request numbered one requests
> an admission that Ms. Taylor's statement is true. On the other hand, request three
> asks Trigon to "admit that defendants recognize that certain types of healthcare
> treatments can be provided by either medical doctors or doctors of chiropractic."

> Even under the Kendall standard these requests involve discrete questions. Request numbered one may be answered without reference to request numbered three, or in other words, request three is not "logically or factually subsumed" within request one. See *Kendall*, 174 F.R.D. at 686.

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 2002 U.S. Dist. LEXIS 619 (WD Va. 2002); see also, *Banks v. Office of the Senate Sergeant-At-Arms & Doorkeeper*, 222 F.R.D. 7, 8 (DDC 2004).[13]

TROC and TUS include herewith the actual responses provided for consideration by the Court. (Weems Decl., Ex. 2). However, some illustration seems warranted and is provided below.

The Report interpreted Interrogatory 1[14] as being "one seeking the identity of those individuals who assisted with the Tatung defendants' discovery response." The ruling is directly contrary to *Kendall*, and reflects (as does much of the counting recommended an improper rewriting of the interrogatory, rather than consideration of the actual interrogatory posed). Although LPL could have asked the interrogatory posed by the Special Master, it did not. It asked two separate, distinct questions one concerning interrogatory responses and the other requests for production. The interrogatory was properly counted as two by TROC and TUS.[15]

---

[13] Although the interrogatories at issue in many reported decisions are not readily available and often are not restated in the text of decisions, the interrogatories at issue in *Banks* are available through PACER and have been included as an attachment hereto.

[14] "Identify each person who prepared or otherwise assisted in the preparation of your responses to these interrogatories and/or your responses to Plaintiff's first set of requests for production of documents."

[15] TROC and TUS do not dispute that the Special Master may have had authority to give LPL leave to ask more than 25 interrogatories, but that is not the issue presented. The

19

Likewise, the Report interpreted Interrogatory $2^{16}$ as:

one interrogatory requesting information on products manufactured, imported, into purchased, offered for sale and/or sold by and/or sold by Tatung in Delaware or[,] as to the Tatung company[,] in the Untied States.

The problem with calling this one interrogatory is apparent, even in the recitation. For example, asking about products manufactured in Delaware is distinct from and can be answered without reference to what products are imported into Delaware. Even broadly defined one asks about products indigenous to Delaware, the other about what was sent here. So also, what is purchased requires no reference to any of the other topics and is distinct from what is sold and so forth. Hence, the Report and Recommendation on counting was close at best, if not erroneous. Accordingly, its recommendation that sanctions be awarded is neither legally nor factually supported.

Even if this Court were to adopt the counting approach of the Report, the imposition of sanctions would be improper. As the Report recognizes (based on the submissions by TROC and TUS), authority supported the approach followed of refusing to answer interrogatories in excess of the numerical limit and answering the interrogatories in the order presented (rather than selectively). (Report at 22, n. 9). This Court did not, implicitly or otherwise, reject that approach by calling for incomplete responses to be supplemented. (See, Report at 22). Neither TUS nor TROC provided

---

Report does not reach that issue. Rather, the Report harshly criticizes TROC and TUS for proper conduct and would sanction TROC and TUS for legitimate and warranted positions.

[16] For each month or quarter since January 1, 2000, identify all products (including how many of each product) that your directly or indirectly: make (or have made) in Delaware; import (or have imported) to Delaware; cause (or have caused) to be imported to Delaware; purchase (or purchased) in Delaware; offered (or have offered) for sale in Delaware; and sell (or have sold) in Delaware.

20

incomplete responses. Their responses consisted on complete answers to those interrogatories that were proper and objections to those that were improper.[17]

The positions taken by TUS and TROC on the interrogatories were substantially justified by existing law. *Coleman v. Dydula,* 175 F.R.D. 177, 180 (WD NY 1997) ("substantially justified" satisfied where there is a genuine dispute over a legal issue (dealing with interrogatories); *Moore's Federal Practice* § 37.23[2] ("the substantial justification standard is met when a party demonstrates that the dispute was about the matter was "genuine," meaning that reasonable lawyers could disagree about the appropriateness of the disputed position.").

### 7. *TUS and TROC's Objections to the Documents Request Were Appropriate*

In connection with its discussion of the dispute between the parties concerning LPL's requests for production of documents, the Report again misconstrues the subjects covered at the January 21 hearing. As previously noted, TUS fully and completely complied with its undertakings. Moreover, the Report's suggestion that TUS (or TROC) was obligated to produce documents to which valid and appropriate objection had been made, without any effort by LPL to meet and confer to resolve those objections, it is again contrary to law. The issue between the parties was not whether documents existed (or could be created) but rather the scope of documents properly called for where, as here, the only issue was personal jurisdiction. Indeed, the Court recognized the legitimacy of this very concern during the January 21 hearing, and indeed provided some

---

[17]TROC notes that the Report is factually erroneous in its statement that TROC did not answer any interrogatories. (Report p. 21). As renumbered to reflect the supernumerousity, TROC answered interrogatories [14], [27], [31]. [35] and [39]. Weems Decl., Ex. 2.

21

guidance to the parties to help them resolve this issue, albeit in the context of the 30(b)(6) discussion:

7       THE COURT: I get the idea. I see

8   lawyers do it all the time.

9       I'm a purist. I always think

10   everybody just comes and talks.

11       But, no. So I think that that's the

12   framework of the solution here.

13       They're right about you shouldn't be

14   asking about sales volume, and marketing

15   techniques, and product information in a specific

16   way like how many 1937 BADs are you selling

17   through your New York distribution into Delaware

18   Best Buys.

19       It should be: Are you selling

20   product through your New York distribution into

21   Delaware? And, yeah, there can be some general

22   identification, but you don't need to know that

23   they're doing 2,000 a day.

* * *

14       THE COURT: Well, I think the way

15   I've seen it done is they start from Delaware

16   back. And that's what controls the concern you

22

17    have.

18           I haven't seen them start with the

19    boat and then tell us where it all goes in the

20    United States much. I mean, when we've had these

21    motions to dismiss on jurisdiction, it's -- the

22    standard requires you to show the stream of

23    commerce and the ultimate destination in

24    Delaware.

(D.I. 132 at 39 and 44)

The objections raised by TUS and TROC to the document requests concerned just this issue of the proper limits due to the nature of the inquiry, not whether responsive documents existed. LPL's refusal to begin this discussion until after filing its motion to compel does not support the Report's recommendation for sanctions. Accordingly, the Report's recommendations should not be adopted by the Court.

## RESERVATION OF ISSUES

The Report issued by the Special Master does not conclude with a figure, or series of figures, for sanctions and thus, by its terms, is not literally a final report. Accordingly, TROC and TUS cannot fully address the subject of sanctions until that further point in time. They anticipate the need for further and fuller briefing of the issues once a further, final recommendation is filed.

23

## CONCLUSION

TUS and TROC respectfully request that the Report not be adopted by this Court.

Jeffrey S. Goddess (Del. Bar. No. 630)
Rosenthal, Monhait, Gross & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel: 302-656-4433
jgoddess@rmgglaw.com


OF COUNSEL:
Julian M. Baum
Robert C. Weems
BAUM & WEEMS
58 Katrina Lane
San Anselmo, CA 94960
Tel: 415-460-1791
Fax: 415-457-9157



Dated:  September 6, 2005

24