IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

Plaintiff,

v.

TATUNG CO.; TATUNG COMPANY OF
AMERICA, INC.; AND VIEWSONIC
CORPORATION

Defendants.

C. A. NO. 04-343-JJF

## DEFENDANTS TATUNG COMPANY'S AND TATUNG COMPANY OF AMERICA, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

Of Counsel:
Christopher Darrow
Mark H. Krietzman
Frank E. Merideth, Jr.
Alan R. Maler
Valerie W. Ho
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Telephone: 310-586-7700

Kathryn L. Clune
Greenberg Traurig LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006

Eric S. Tautfest
Greenberg Traurig, P.A.
2200 Ross Avenue, Suite 4700E
Dallas, Texas 75201

Dated: December 22, 2006

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
Attorneys for Defendants Tatung Co. and
Tatung Company of America, Inc.

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTS ................................................................... 3
      A.    The Patents-In-Suit ................................................................... 3
      B.    The Problem Posed By The Patents-In-Suit .............................. 4
      C.    The Objects Of The Invention ................................................... 6
      D.    The Prosecution History ............................................................ 7
            1.    LPL Amended The Claims To Include The Term "Rear-
                  Mountable" In Order To Overcome The Cited Prior Art. ..... 7
            2.    LPL Provided A Specific Definition For "Housing" In
                  Order To Overcome A Section 112 Rejection ................... 10

III.  ARGUMENT .................................................................................... 11
      A.    The Law of Claim Construction ................................................ 11
      B.    The Tatung Defendants' Proposed Constructions ...................... 14
            1.    The Court Should Adopt The Tatung Defendants' Proposed
                  Construction For "Rear Mountable" And "Rear Mounted." ...... 14
            2.    The Court Should Adopt The Tatung Defendants' Proposed
                  Constructions For "Liquid Crystal Display Device" And
                  "Flat Panel Display Device." ........................................... 19
            3.    The Court Should Adopt The Tatung Defendants' Proposed
                  Construction For Backlight Unit ......................................... 22
            4.    The Court Should Adopt The Tatung Defendants' Proposed
                  Construction Of "First Frame" And "Second Frame." ....... 24
            5.    The Court Should Adopt The Tatung Defendants' Proposed
                  Construction for "Housing" And "Display Case/Case." ......... 29
                  a.    "Housing" ................................................................ 29
                  b.    Display Case/Case .................................................. 31
            6.    The Court Should Adopt The Tatung Defendants' Proposed
                  Construction For "Data Processing Device." ................... 34
            7.    The Court Should Adopt The Tatung Defendants' Proposed
                  Constructions For "Fastening Part" And "Fastening
                  Element." ....................................................................... 36
            8.    Terms That Do Not Require Construction ......................... 37
                  a.    "First Frame Having A Fastening Part" And "First
                        Frame Having A Fastening Element" ........................ 37
                  b.    "Capable of Being Mounted" And "Capable of
                        Being Fixed" ........................................................... 38
                  c.    "Peg," "Protruding Portion" And "Stepped Hole" ...... 38

IV.   CONCLUSION ................................................................................ 39

i

TABLE OF AUTHORITIES

## Federal Cases

*Aquatex Indus., Inc. v. Techniche Solutions,*
  419 F.3d 1374 (Fed. Cir. 2005) ........................................................................ 12
*Bell Atlantic Services Inc. v. Covad Communications Group Inc.,*
  262 F.3d 1258 (Fed. Cir. 2001) .................................................................. 12, 34
*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
  344 F.3d 1359 (Fed. Cir. 2003) ........................................................................ 13
*Kraft Foods, Inc. v. International Trading Co.,*
  203 F.3d 1362 (Fed. Cir. 2000) ........................................................................ 12
*Kumar v. Ovonic Battery Co.,*
  351 F.3d 1364 (Fed. Cir. 2003) ........................................................................ 13
*Markman,* 52 F.3d at 986 ....................................................................................... 21
*Microsoft Corp. v. Multi-Tech Sys.,*
  357 F.3d 1340, 69 U.S.P.Q.2d (BA) 1815 (Fed. Cir. 2004) ............................ 12
*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) .............................................................. 11, 13, 14
*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
  422 F. Supp. 2d 446, 2006 U.S. Dist. LEXIS 14291 (D. Del. 2006) .............. 16
*Resqnet.com, Inc. v. Lansa, Inc.,*
  346 F.3d 1374 (Fed. Cir. 2003) ........................................................................ 13
*Union Oil Co. of California v. Atlantic Richfield Co.,*
  208 F.3d 989 (Fed. Cir. 2000) .......................................................................... 12
*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 11

## Federal Statutes

35 United States Code Section 112 ........................................................................ 30

RLF1-3097798-1

## I.    INTRODUCTION

The Patents-in-Suit are simple patents directed to the mounting of an LCD device or module in a portable computer. In particular, the patents are concerned with fitting a larger display into a display case that has a fixed size. By way of analogy, the concern was how to build a larger home on a fixed size lot. In the real estate example, a solution would be to reduce the set back (shown in green) around the house (shown in yellow). Lot 2 has a larger home than Lot 1 by virtue of reducing the setbacks. That is what the patents purport to teach.

 

In the patents, the setback is called the "non-display" area. The non-display area comprise of parts of the frames of the module that hold together the layers of an LCD device. These portions of the frames also provide the mountings (for example, holes) to attach the LCD device to a case. The patents explain that the prior art methods of mounting an LCD device had certain disadvantages because those mounting features increased the size of the non-display area, thereby reducing the size of the viewing area

1

of the device.



The patents identify the prior art "front mounting" features as the cause of the oversized setbacks (FIG. A). The patents pose a solution which is to eliminate the setbacks by removing mounting features of the prior art (FIG. B), thereby allowing for an expanded display (FIG. C). Accordingly, the patents teach relocating all of the mounting features to the back of the LCD device (FIG. D). That is the invention. The Tatung Defendants respectfully submit that the claim terms at issue must be understood and construed in the context of the purported invention.

2

## II.    STATEMENT OF FACTS

### A.    The Patents-In-Suit.

The Patents-in-Suit are U.S. Patent No. 6,501,641 (the "'641 Patent") and U.S. Patent No. 6,498,718 (the "'718 Patent"), which is a continuation of the '641 Patent. The '641 Patent is entitled, "Portable Computer Having a Flat Panel Display Device." The "718 Patent is entitled, "Portable Computer and Method for Mounting a Flat Panel Display Device Thereon."[1]

Both patents claim priority from two Korean patent applications:    No. 98-44475 (the "'475 Application"), filed on October 23, 1998;  and No. 98-44973 (the "'973 Application"), filed on October 27, 1998 (collectively, the "Korean Parent Applications").  Both the '641 Patent and the '718 Patent incorporate by reference the Korean Patent Applications.  ('641 Patent, 1:4-7, at Exh. A and '718 Patent, 1:7-10, at Exh. B.)[2]  The '641 and '718 Patents share the same specification.  The '641 Patent contains apparatus claims while the '718 Patent contains method claims.

LPL contends that the Tatung Defendants infringe claims 35, 36 and 55 of the '641 Patent and claims 33, 34, 35, and 40 of the '718 Patent.

---

[1] The application that resulted in the '641 Patent was filed on April 2, 1998 (Application No. 09/285,338).  The application that resulted in the '718 Patent was filed on November 22, 1999 (Application No. 09/444,376).

[2] Unless otherwise noted, all exhibits are attached to the Joint Appendix of Exhibits Identified In The Joint Submission, by counsel for ViewSonic or are attached hereto and referenced herein as Tatung Exh. _____.

3

**B.    The Problem Posed By The Patents-In-Suit.**

The patents describe the structure and method of what they refer to as the

"conventional" prior art method of front mounting a display device and the purported

disadvantages associated with that method. In discussing Prior Art Figure 2, the patentee

states:

> Referring to FIG. 2, which shows conventional assembly structure of the
> LCD device applied to a conventional portable computer...., [t]he LCD
> device 130 has an LCD panel 132, a backlight device 134 fixed to the
> back of the LCD panel 132, and a supporting frame 136 for assembling
> the LCD panel 132 and the backlight device 134 along the edge.



(PRIOR ART)
FIG. 2
'641 Patent

> At the corners of the supporting frame 136, corresponding to the positions of the ribs 123a of the rear case 123, a plurality of protrusions 136a having holes are formed.
>
> For mounting the LCD device 130 to the display case 122, the LCD device 130 is placed on the rear case 123 and the holes of the supporting frame 136 and the ribs 123a are fastened together preferably by screws 138. The front case 121 is coupled to the rear case 123.
>
> Hereinafter, the way in which the LCD device is mounted to the case from the front toward the rear direction is defined as the front mounting method, and the assembled structure of the LCD device and the case formed through the front mounting method is defined as the front mounting structure.
>
> **In the front mounting structure of the LCD device, since the protrusions 136a require additional space corresponding to the protruded width d, the display area of the LCD device is reduced in**

4

comparison to the fixed size of the display case 122.

('641 Patent, 1:35-64, at Exh. A, (emphasis added).)

In discussing Prior Art Figure 3B (an annotated version is shown below), the

patentee states:

In the mounting structure shown in FIG. 3B, the supporting frame 114
requires side spaces for the flanges 114a and 114b. Therefore, the side
space D (d1+d2) [shown in blue] results in a reduction of the display area
[shown in black] of the LCD panel 112 relative to the display case 122.
Moreover, as the display size increases, the display case becomes
undesirably large, especially for a portable computer such as a laptop
computer.

('641 Patent, 2:30-36, at Exh. A)



Thus, according to the patents, the prior art method of front mounting had certain

disadvantages because the "protrusions," "protruded width," and "side space" associated

with front mounting take up space that otherwise could be used for the display area. The

patents further state that "[t]o solve the above problem and to provide a large display area

5

with minimal display case size, a new mounting structure is needed for the LCD device."

('641 Patent, 2:37-39 at Exh. A.)

## C.    The Objects Of The Invention.

The Patents-in-Suit state that the objects of the invention are:  1) "to minimize the non-

display area of the LCD device;" and 2) "to provide a computer having a flat panel

display device with a maximum display area and a minimal display case size." ('641

Patent, 2:47-51 at Exh. A.)  The solution proposed by the patents was to eliminate the

side space taken up by flanges 114a and 114b and mounting holes therein (shown in

green) used for what the patents refer to as "front mounting" (*see* '641 Patent & '718

Patent, FIG. 3A, reproduced below) and to relocate the fastening elements to the back of

the LCD device (*see* '641 Patent & '718 Patent, FIG. 8, reproduced below).



6

To accomplish the objects of the invention, all of the fastening elements are relocated from the front of the LCD device to the back of the device, as depicted in Figures 8 and 5 below.



The purported invention was to eliminate the prior art mounting features and thereby eliminate the space "D" (shown above in Prior Art Figure 3B.)

At the end of the specification, the patents state:

> As explained above, the mounting method according to the present invention **does not require unnecessary side space** for mounting the LCD device on the computer. Thus, the ratio of the display area of the LCD device to the display case can be improved and maximized."

('641 Patent, 7:31-35 at Exh. A, (emphasis added).)

## D.    The Prosecution History

### 1.    LPL Amended The Claims To Include The Term "Rear-Mountable" In Order To Overcome The Cited Prior Art.

During prosecution of the Patents-in-Suit, the Patent Examiner rejected a number of claims on the grounds that they were anticipated or made obvious by U.S. Patent No. 5,835,139, issued to Yun, *et al.* (the "Yun Reference"). (*See* '641 File History, VS5005460-61 at Exh. H; '718 File History, VS014905-06 at Exh. I.) The Yun Reference was assigned to LPL's parent company LG Electronics, Inc. and was

7

subsequently assigned to LPL. The Yun Reference was not cited by LPL in its

Information Disclosure Statement, but instead was found by the Patent Examiner during

the examination of the Patents-in-Suit. (*See* '641 File History, VS5005562 at Exh. H;

'718 File History, VS014909 at Exh. I.) The Patent Examiner found the claimed

invention unpatentable over cited references including the Yun Reference. For example,

the Examiner stated:

> Yun teaches a flat panel display device (fig. 6) comprising: a
> backlight unit including a first frame having fastening parts at four
> corners, a reflector unit, a light source unit, a light guide unit, a diffuser
> unit, and a prism unit; a flat display panel between the first frame and a
> second frame; and screws for fastening purposes.
> Yun discloses the claimed invention except for the fastening part
> being on a rear surface of the first frame. It would have been obvious to
> one having ordinary skill in the art at the time the invention was made to
> rearrange the fastening parts being on the rear surface of the first frame,
> since it has been held that rearranging parts of an invention involves only
> routine skill in the art. *In re Japikse*, 86 USPQ 70 (CCPA 1950).

(*See* '641 File History, VS5005460-61 & VS5005556 at Exh. H.)

The Yun Reference teaches removing the space needed for front mounting in

order "to increase the ratio of the viewing area to the whole area of a computer display."

(*See id.* at VS5005585-86 & VS5005589.) As an alternative to front mounting, Yun

teaches mounting an LCD device (or module) in a portable computer using fasteners

(e.g., screws) that protrude beyond the side edges of the LCD device. In order to

overcome the Patent Examiner's objections, LPL agreed that the claims would be

amended with the limitation that they apply to "back mounted display or the equivalent . .

. ." LPL subsequently amended all of the independent claims to include the term "rear

8

mountable" display device. (*See* '641 File History, VS5005609 & VS5005632 at Exh. H; '718 File History, VS014994 & VS015017-22 at Exh. I.)

The purported invention of the Patents-in-Suit is not directed to the internal structure of an LCD device as that was well-known in the art. For example, the structure of the LCD device disclosed in Figure 4C of the Patents-in-Suit (consisting of a first frame, a reflector on the frame, a light guide film, a diffuser, a first prism sheet, a second prism sheet, another diffuser or protecting film and an LCD panel) is almost identical to the structure of the LCD device disclosed in Figure 6 of the '139 Patent, as depicted below. (*See* '641 Patent, 4:11-25 at Exh. A; '641 File History, VS5005589 (1:16-31) at Exh. H.)



In the '139 Patent, the purported invention, shown in Figure 6 above, was relocating the mounting holes (element 410b) (circled in red) and mounting screws (element 430) to the side edges of the first frame (element 190) and second frame (element 400). In the Patents-in-Suit, as shown in Figure 4C above, the mounting holes (element 15) are moved to the back of the first frame (element 14g).

9

The purported invention of the Patents-in-Suit must be more than what was already taught by the '139 Patent, *i.e.*, the removal of space needed for front mounting and the relocation of fastening elements to the sides of the LCD device. The point of novelty of the Patents-in-Suit, therefore, can only be the removal of space/fasteners needed for front or side mounting **and** the relocation of the fastening elements to the back of the LCD device. In fact, in each of the "embodiments" disclosed by the Patents-in-Suit (*e.g.*, Fig. 4A-14), all of the fasteners on the LCD device (the only flat panel display device described in any detail) are behind the LCD device. None of the fasteners on the LCD device protrude or extend beyond the back of the LCD device. In addition, where hinge supports (element 24) are part of some embodiments disclosed by the Patents-in-Suit, they also are always indicated to have holes for fastening the LCD device located behind the footprint of the LCD device. Further, those hinge supports are indicated to be a support for the LCD device - not a part of the LCD device. Finally, the use of hinge supports or arms to provide additional support when mounting an LCD was commonly known at the time the patents were filed. (*See* '641 Patent, Figs 1, 2, 3A & 3B at Exh. A; '641 File History, VS5005672-80 at Exh. H.) In short, it is the relocation of all fastening parts to the back of the LCD device that is the purported invention of the Patents-in-Suit.

## 2.    LPL Provided A Specific Definition For "Housing" In Order To Overcome A Section 112 Rejection.

During the prosecution of the '641 Patent, the Patent Examiner objected to the specification on the grounds that the term "housing" lacked antecedent basis. (*See* '641 File History, VS5005534 at Exh. H.) In order to overcome this rejection, LPL amended

10

the specification of the patent to include a definition of "housing" as the case and body of a portable computer. (*See* '641 File History, VS5005544 & VS5005547 at Exh. H.)

## III.    ARGUMENT

### A.    The Law of Claim Construction

In construing claims, "the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). In *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), the Court provides an extensive discussion of the intrinsic and extrinsic evidence that should be considered for claim construction. While noting that "'the claims of a patent define the invention to which the patentee is entitled the right to exclude,'" the Court also emphasizes that "[t]he claims, of course, do not stand alone." *Id.* at 1312-15. "[The claims] are part of 'a fully integrated written instrument,' [citation omitted] consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.' [Citation omitted]. . . . [T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315. The Court further elaborates:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. [Citation omitted].
> Consistent with that general principle, our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such

11

> cases, the inventor's lexicography governs. [Citation omitted]. In other
> cases, the specification may reveal an intentional disclaimer, or disavowal,
> of claim scope by the inventor. In that instance as well, the inventor has
> dictated the correct claim scope, and the inventor's intention, as express in
> the specification, is regarded as dispositive. [Citation omitted]. *Id.* at
> 1316.

Although limitations from the patent specification are not to be read into the

claims, claims cannot be read more broadly than the patent's description of what the

inventor regards as his invention. *Microsoft Corp.*, 357 F.3d at 1349 ("We cannot

construe the claims to cover subject matter broader than that which the patentee itself

regarded as comprising its inventions.") *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d

1340, 69 U.S.P.Q.2d (BA) 1815 (Fed. Cir. 2004); *see also Aquatex Indus., Inc. v.*

*Techniche Solutions*, 419 F.3d 1374, 1380-82 (Fed. Cir. 2005) (a patentee's description in

a specification may dictate a narrow claim construction where the specification contains

no support for a broader one); *Bell Atlantic Services Inc. v. Covad Communications*

*Group Inc.,* 262 F.3d 1258, 1273 (Fed. Cir. 2001) ("when a patentee uses a claim term

throughout the entire patent specification, in a manner consistent with only a single

meaning, he has defined that term 'by implication'"); *Kraft Foods, Inc. v. International*

*Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000) (the court construed the claim term

"protecting back panel" as one that must be relatively stiff because "every disclosed

embodiment that employs a back panel employs one that is relatively stiff").

Courts may also construe the claims, in part, by referring to the problems that the

invention allegedly overcomes. *See Union Oil Co. of California v. Atlantic Richfield Co.,*

208 F.3d 989, 995-96 (Fed. Cir. 2000); *see also Resqnet.com, Inc. v. Lansa, Inc.,* 346

12

F.3d 1374, 1380 (Fed. Cir. 2003) (construing claims to solve the problems identified in the specification "confirms the meaning of the claim language").

In addition, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

To determine whether claim amendment gives rise to prosecution history estoppel, the court must first determine whether the claim amendment narrowed the literal scope of the claim. *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("*Festo IX*") (on remand from the Supreme Court). If a narrowing claim amendment is found to have been made for purposes of patentability, courts will presume that the applicant surrendered the equivalent in question. *Festo VIII*, 535 U.S. at 739-40. This "*Festo* presumption" may only be overcome if "the equivalent was unforeseeable at the time of the application; the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; or there was some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo VIII*, 535 U.S. at 740-41. To rebut this presumption, the patentee must show that "at the same time of the amendment, one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the equivalent." *Id.* at 741.

13

Finally, courts also may rely on extrinsic evidence, "which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317.

**B.    The Tatung Defendants' Proposed Constructions**

**1.    The Court Should Adopt The Tatung Defendants' Proposed Construction For "Rear Mountable" And "Rear Mounted."**

| TERM | LPL | TATUNG |
|------|-----|--------|
| Rear Mountable (flat panel display device) | A flat panel display device that is capable of being mounted to the rear housing via fastening part(s) located on the rear surface of the first frame and positioned on or inside the border of the flat display panel. | A flat panel display device, with no fastening element for front or side mounting, having fastening elements only at the rear of its first frame. |
| Rear Mounted (flat panel display device) | | A flat panel display device, with no fastening element for front or side mounting, mounted to a display case by fastening elements at the rear of its first frame. |

The Tatung Defendants' proposed constructions for "rear mountable" and "rear mounted" are supported by the intrinsic evidence. The term "rear mountable" was added to every claim by amendment after several rounds of rejections of all claims by the Patent Office.[3] (*See* '641 File History, VS5005632-40 at Exh. H.) After an interview between the patentee and the Examiner, the Examiner stated in his interview summary that the independent claims were to be "amended with limitation 'back mounted display' or the

---

[3] The term "rear mounted" appears in claim 56 of the '641 Patent.

14

equivalent." (*See* '641 File History, VS5005609 at Exh. H; '718 File History, VS014994

at Exh. I.)  Following that interview, LPL amended the preamble of all of the

independent claims to include the limitation "rear mountable."[4]

The term "rear mountable" necessarily implicates the location of fastening

elements used to attach the flat panel display device to a housing.  For example, claim 56

of the '641 Patent provides:

> A *rear mountable* flat panel display device comprising:
> - a first frame having a fastening part at a rear surface of the first
>   frame;
> - a second frame; and
> - a flat display panel between the first and second frames;
>   wherein *the first frame is capable of being fixed to a housing of a
>   data processing device through the fastening part at the rear
>   surface of the first frame and the flat display panel is rear
>   mounted.*

Because the purported invention includes the removal of side space taken up by flanges

used for front mounting (*see, e.g.*, '641 Patent, Fig. 3A at Exh. A.), the "rear mountable"

flat panel display device claimed by the Patents-in-Suit necessarily does not have

fastening elements for front mounting (*see, e.g.*, '641 Patent, Fig. 8 at Exh. A.)  Indeed,

the patents make clear that "[t]he mounting method according to the present invention

---

[4] For example, claim 35 of the '641 Patent recites:
> A rear mountable flat panel display device capable of being mounted to a data
> processing device, the flat panel display device comprising:
> - a backlight unit including a first frame having a fastening part at a rear surface
> of the first frame, a flat display panel adjacent to the backlight unit; and
> - a second frame;
>   wherein the flat display panel is between the first frame and the second frame,
>   the first frame of the backlight unit capable of being fixed to a housing of the
>   data processing device through the fastening part at the rear surface of the
>   frame.

15

does not require unnecessary side space for mounting the LCD device on the computer.
Thus, the ratio of the display of the LCD device to the display case can be improved and
maximized." ('641 Patent, 7:31-35, at Exh. A.)

During prosecution of the Patents-in-Suit, the patentee distinguished the purported
invention from the cited prior art, including the Yun Reference, by arguing that Yun
disclosed a flat panel display device using side-mounting whereas the claimed invention
used rear mounting. (*See* '641 File History, VS5005630 at Exh. H.) As explained above,
the Yun Reference taught side-mounting of an LCD device using fastening elements that
extend through and protrude past the side edges of the device. The protrusions inherent
in side-mounting take up space around the perimeter of the LCD device that otherwise
could be used for the viewing area. The existence of side-mounting fastening elements,
therefore, would contradict the stated object of the invention. *See Power Integrations,
Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 2006 U.S. Dist. LEXIS
14291 (D. Del. 2006).

In fact, in each of the embodiments disclosed in the Patents-in-Suit, (*see, e.g.*,
'641 Patent, Fig. 4A-14 at Exh. A.), all of the fasteners for mounting the LCD device to a
housing are located exclusively behind the first frame of the LCD device.

LPL's proposed construction, if accepted, would turn an explicit limitation into a
non-limitation. Specifically, LPL's proposed construction, ignores the context of the
"invention" and would extend the patent scope to read on the very subject matter (*e.g.*,
the side-mounting structure taught in Yun) that necessitated the amendment regarding the
"rear mountable" limitation. There is no requirement in LPL's proposed construction
that **all** the fastening parts on the flat panel display device be located behind the device.

16

Rather, the proposed construction only requires that a single fastening part be located at the rear surface of the device. This proposed construction opens the door for a scope that would extend to an unlimited number of prior art fastening elements, structures and parts, including those used for front and side mounting.

LPL's proposed construction would erase the limitation that "rear mountable" (back mounted display) added to the claimed invention. The application of LPL's proposed construction is illustrated in hypothetical figure "H1" (based on FIG. 3B in the '641 Patent). The display area is shown in yellow. The frames are shown in green. Space "D" is taken up by the front mounting structures (white screws on extended portions of frames). ('641 Patent, 2:29-35, 47-51 and Figs. 2 & 3B at Exh. A.) LPL seeks a construction for "rear mountable" flat panel display device that would read on a prior art device that merely has a fastener on the rear surface of the device. However, in rejecting the patentee's initial claims prior to LPL's amendment to add the "rear mountable" limitation, the Patent Examiner made clear that "Yun discloses the claimed invention



17

except for the fastening part being on a rear surface of the first frame. It would have been obvious to one having ordinary skill in the art at the time the invention was made to rearrange the fastening parts being on the rear surface of the first frame, since it has been held that rearranging parts of an invention involves only routine skill in the art." (*See* '641 File History, VS5005556 at Exh. H.) Adding a fastening hole to the back of the LCD device taught by Yun would have been obvious and would not have been patentable.

Throughout the intrinsic record, the "invention" is laid out as having two parts:

1.    Eliminate the prior art front mounting and side-mounting fasteners and the portion of the non-display area in which those fasteners are located.

2.    Relocate all of the fastening parts (such as holes or pegs) to the back of the flat panel display device.

There is a total absence of any disclosure which suggests the inventors believed their "invention" was merely adding a fastening element to the back of the prior art LCD device without minimizing the non-display area at all.

Accordingly, unlike LPL's proposed constructions, the Tatung Defendants' proposed constructions for "rear mountable" and "rear mounted" are the most consistent with the specification and prosecution history of the Patents-in-Suit.

18

2.    **The Court Should Adopt The Tatung Defendants' Proposed Constructions For "Liquid Crystal Display Device" And "Flat Panel Display Device."**

| TERM | LPL | TATUNG |
|------|-----|--------|
| liquid crystal display (LCD) device | An apparatus having at least a liquid crystal display panel and supporting frame(s) | A stack or sandwich of layers, including a LCD panel, fixed together by at least a first frame to assemble a module |
| flat panel display device (FPDD) | An apparatus having at least a flat display panel and supporting frame(s) | A stack or sandwich of layers, including a flat display panel, fixed together by at least a first frame to assemble a module. |

The Patents-in-Suit describe a liquid crystal display device ("LCD device"), known commonly in the industry as an "LCD module,"[5] as a type of "flat panel display device" ("FPDD"). [6]/[7] The patents do not include any discussion or disclosure concerning the structure of any FPDD other than the LCD device. (*See, e.g.*, '641 Patent, 1:16-24 & 7:36-42 at Exh. A.) Therefore, to the extent that the patents can be said to cover other types of FPDD technology, these other types of displays must conform to the structure disclosed for the LCD device.

The patents describe the LCD device as an ordered stack of components or layers assembled by at least one frame. For example, the patents state "[t]he LCD device 130

---

[5] One need only google the words "LCD module" to see that it is a common term in the industry.

[6] The other types of FPDDs are identified as Field Emission Displays ("FED") and Plasma Display Panels ("PDP").

[7] Accordingly, the two terms are being briefed together and the parties have agreed that the constructions for the two terms should be consistent.

19

has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132,

and a supporting frame 136 for assembling the LCD panel 132 and the backlight device

134 along the edge." ('641 Patent, 1:42-45 at Exh. A.)  The patents further explain that

"the LCD device 10 has a first frame 14g, preferably made of plastic, a reflector 14f on

the frame 14g, a light guide film 14e, a diffuser or protecting film 14d, a first prism sheet

14c, a second prism sheet 14b, another diffuser or protecting film 14a, and the LCD panel

12." ('641 Patent, 4:17-21 at Exh. A.)  The layers must be assembled together in that

sequence in order for the LCD device to function.  The LCD device, as disclosed in the

patents, is a discreet component (or module) which is intended to mount to a housing

(*see, e.g.*, '641 Patent, Figs. 2 & 8 at Exh. A.)

  The structure and function of the constituent layers of the LCD device are not the

invention.  The patentee makes clear that the "present invention relates . . . to a flat panel

display device *mounting structure* and a *method of mounting* the flat panel display device

to a computer." ('641 Patent, 1:12-15 at Exh. A, (emphasis added).)  Indeed, the layers

that form an LCD device were well-known in the art.  As depicted below, the Yun

Reference teaches the same sandwich of layers in the same sequential order.

20



| Element | '139 Patent (Yun Reference) | '641 Patent |
|---|---|---|
| First [support] Frame | 190 | 14g |
| reflector | 140 | 14f |
| light guide [film] | 130 | 14e |
| protection sheet | 150 | 14d |
| first prism sheet | 160 | 14c |
| second prism sheet | 170 | 14b |
| diffuser | 180 | 14a |
| LCD panel | 300 | 12 |
| second [supporting] frame | 400 | 16 |

Based on the Yun Reference, it is clear that at the time the applications resulting in the Patents-in-Suit were filed, one of ordinary skill in the art understood that an LCD device consisted of an ordered stack of layers, including the liquid crystal panel, held together by at least a frame. *See Markman*, 52 F.3d at 986 (stating that a claim term should be construed to mean "what one of ordinary skill in the art at the time of the invention would have understood the term to mean.").

Accordingly, the Tatung Defendants' proposed constructions for FPDD and LCD device are in accordance with the specifications of the patents and the cited prior art.

21

3.    **The Court Should Adopt The Tatung Defendants' Proposed**

**Construction For Backlight Unit.**

| TERM | LPL | TATUNG |
|------|-----|--------|
| Backlight unit | An assembly that includes at least a backlight. | Layers of an LCD module from the first (rear) frame to the back of the LCD panel |

The Tatung Defendants' proposed construction for "backlight unit" is supported

by the claims. For instance, claim 35 requires "a backlight unit including a first frame

having a fastening part at a rear surface of the first frame, a flat display panel adjacent to

the backlight unit." Claim 47 further provides that the backlight unit comprises "a first

frame having a fastening part at a rear surface of the first frame; a reflector unit adjacent

the first frame; and a light guide unit adjacent the light source unit; a flat panel display

adjacent to the backlight unit . . . ." In other words, the layers of the backlight unit are

between the first frame and the liquid crystal panel. The backlight unit operates from

behind the LCD device.

22

The specifications of the Patents-in-Suit further support the Tatung Defendants' proposed construction. The specifications indicate that the stack of layers (14a-14g) shown next to the bracketed region in Figure 4C form the layered element "14" which is called out as a "backlight unit." The specification also provides: " The LCD device 130 has an LCD panel 132, a backlight device 134 is fixed to the back of the LCD panel 132, and a supporting



FIG. 4C
'641 Patent

frame 136 for assembling the LCD panel 132 and the backlight unit device 134 along the edge." ('641 Patent 1:42-45 at Exh. A.)

The Korean Patent Applications also support the Tatung Defendants' proposed construction. For example, the Korean '973 Application explains that "[t]he backlight device 14 comprises a diffusing or a protecting sheet 14a diffusing to the display area of the liquid crystal panel 12, first and second prism sheets 14b, 14c condensing rays for some angle, a diffusing or a protecting sheet 14d, a light guide 14e and a reflector 14f …and a fixing frame 14g, **which are mounted sequentially behind the liquid crystal panel 12.**" ('973 Application, VS024435 at Tatung Exh. 1, (emphasis added).)

23

Accordingly, the Tatung Defendants' proposed construction for "backlight unit" is fully supported by the intrinsic record.

4.    **The Court Should Adopt The Tatung Defendants' Proposed Construction Of "First Frame" And "Second Frame."**

| TERM | LPL | TATUNG |
|---|---|---|
| First frame | A structure enclosed by the housing for firmly supporting the flat display panel. | The rear (back) structure of a flat panel display device that, alone or in combination with the second frame, sandwiches and assembles the layers to form the device |
| Second frame | A structure disposed in relation to the first frame such that the flat display panel is between the first frame and the structure. | The front (top) structure of a flat display device that, together with the first frame, sandwiches and assembles the layers to form the device. |

Both LPL's and Tatung's proposed constructions for "first frame" contain a functional aspect. LPL clearly recognizes that based on the intrinsic record, the claimed "first frame" has a function. LPL and Tatung simply differ as to what that functionality is.

Tatung's proposed construction recognizes that the only structure of the "first frame" disclosed in the patents is the structure at the back (bottom) of the ordered stack of layers. The first frame, which is a part of the LCD device, sandwiches and assembles the layers to form the LCD device. The patent specification expressly discloses that the first frame and the second frame are the structures at the rear and front, respectively, of the stack of layers within the flat panel display device. The patent specification and the

24

intrinsic record fully support the construction proposed by Tatung. The patents explain

that the conventional LCD device "includes an LCD panel 112, and a backlight device

... for the LCD panel 112, and [a]

display case 122 supporting the

LCD device 111. The LCD panel

112 and the backlight device are

assembled by a supporting frame

114 along the edges." ('641 Patent,

2:1-6 at Exh. A.) It is repeated that

the LCD device is a structure of

layers, in sequence, assembled and

held together by frames.



FIG. 4C
'641 Patent

The first frame and second

frame (when identified as being

present) are described and shown in

every embodiment of the Patents-

in-Suit as well as the cited prior art (*see e.g.*, '139 Patent at Exh. D.) as being integral to

the LCD device.

The LCD device is a sandwich of thin layers that work together to provide an

image (*see* '139 Patent, Figure 4C at Exh. D.) The layers consist of 14a (diffuser or

protecting film), 14b (second prism sheet), 14c (first prism sheet), 14d (diffuser or

protecting film), and 14f (reflector). Several layers are called out as a film or sheet which

are well known in the art as flimsy and are required to be assembled together by frames

25

along with the edges of the LCD panel. The patents are explicit about the function of the frames as coupling the backlight to the LCD panel.

The Korean '493 Application discloses Figure 3a, which is identical to Figure 4C in the Patents-In-Suit, provides an even more robust disclosure on the structure of the LCD device:

> A support frame 16 is formed along the edges of the liquid crystal panel 12 and back light device 14, and supports **and couples** the liquid crystal panel with the back light device.
>
> The back light device 14 comprises a diffusing or a protecting sheet 14a diffusing to display area of the liquid crystal panel 12, first and second prism sheets 14b, 14c …a protecting sheet 14d, a light guide 14e and a reflector 14f … and a fixing frame 14g, which are **mounted** sequentially behind the liquid crystal panel 12.

('493 Application, VS024435 at Tatung Exh. 1, (emphasis added).)

The above disclosure (incorporated by reference into the Patents-in-Suit) is consistent with the Tatung Defendants' proposed construction. The support frame is an integral part of the LCD device, "formed along the edges of the liquid crystal panel." Moreover, the layers behind the LCD panel are identified as being mounted sequentially behind the LCD panel, *i.e.*, each layer is assembled and held in a particular place via the frames. Clearly the first frame does much more than just support. One might say a plate supports a sandwich, but the plate does not fix together or assemble together. A plate is not integral to the sandwich. Here, the first frame is like the bread on the bottom of a sandwich that holds the sandwich together.

/

26

Figure 5 of the '641 Patent illustrates the assembly of the LCD device 10 to the case 21. The specification states: "To mount the LCD device 10 to the case 21," "screws 18" are "inserted into holes 21a and 15." Hole 21a is the through hole at the rear of the case and hole 15 is the mounting hole in the first frame detailed in Figures 4A-4C. The patents do not say mount the first frame to the case "21" with screw 18 going through holes 15 at the back of the first frame "14g." Rather, the



FIG. 5
'641 patent

patents state "**mount the LCD device 10 to the case 21**" ('641 Patent, 4:56-64 & Fig. 5. at Exh. A.) The patents do not suggest that after one "mounts" the first frame "14g," there is some other unknown technology or unknown method to fix, mount, couple, assemble or otherwise hold together the inner layers of the sandwich which fix the LCD device to the first frame. Rather, the patents disclose the assembly function of the first frame and consistently treat the first frame as integral to the LCD device.

The patents repeatedly indicate the assembly function of the first frame. For example, with reference to Figures 2 and 3A below:

> The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 **for**

27

> **assembling the LCD panel 132 and the backlight device 134 along the edge.**"

['641, Col. 1:42-45, (emphasis added)]

> Referring to FIGS. 3A and 3B, a conventional LCD device assembly 110 includes an LCD panel 112 and a backlight device (not shown) for the LCD panel 112, and display case 122 supporting the LCD device 111. The LCD panel 112 and the backlight device are assembled by a supporting frame 114 along the edges.

('641 Patent, 2:1-6 at Exh. A.)



In both prior art devices, the supporting frame (in green) is clearly identified as assembling the LCD device. Tatung's proposed construction recognizes this explicit disclosure and is consistent with the specification. However, because LPL's proposed construction ignores the "assembling" function of the first frame, the hinge arms "126" (shown in red above) are morphed into something other than hinge arms. Under

28

Tatung's proposed construction, a hinge arm remains a hinge arm. Under the LPL's

construction, the hinge arms are transformed into part of the LCD device. Moreover,

under LPL's proposed construction for "first frame," the hinge arms are transformed into

the "first frame." This type of reshuffling of parts can only take place if one fails to read

the claim terms in light of the context of the specification. LPL's proposed construction

is not consistent with the specification. Moreover, if the specification merely shows the

first frame as being "a structure enclosed by a housing," then the specification completely

failed to provide a "full" or "exact" description of the invention.

5.    **The Court Should Adopt The Tatung Defendants' Proposed
Construction for "Housing" And "Display Case/Case."**

| TERM | LPL | TATUNG |
|------|-----|--------|
| housing | An outer casing or enclosure. | The display case/case and body of a portable computer. |
| display case/case | A rear housing. | The portions of the housing that enclose the display device. |

a.    **"Housing"**

"Housing" is the most unlikely of claim terms to be disputed. Tatung's definition

is no more and no less than the definition which LPL provided to the Patent Office when

it was given the *carté blanche* opportunity to define the term. The definition was

provided as follows:

"The computer includes a body 20 <u>or first section</u> having information
input device <u>and a second section including the case 21</u>. The case 21 may
cover the body 20 and is coupled to the body through a hinge mechanism.
<u>Together, the case 21 and the body 20 may be referred to as a housing, or
a similar conveniently descriptive term.</u>

29

(*See* '641 File History, VS5005547 at Exh. H, (emphasis in original).) LPL was required to provide support for the term "housing" in the specification because the Patent Examiner rejected the claim term "housing" and others as lacking an "antecedent basis in the specification." (*See* '641 File History, VS5005532-537 and VS5005544 at Exh. H.) . The lack of an antecedent basis often results in rejection under 35 U.S.C. 112. In relevant part, 35 U.S.C. § 112 requires that:

> [T]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . .

A rejection under Section 112 may be overcome if the applicant is able to identify where, in the specification, there is support for the claim term. If such support is absent from the specification, the applicant may, in instances where there is some inherent disclosure of the support, amend the specification to establish the antecedent basis. (Manual of Patent Examining Procedure (MPEP), §2173.05(e), Eighth Edition Rev. 5, August 2006 at Tatung Exhibit 2.) It was through such an amendment that LPL told the Patent Examiner (and the public) that together, the case 21 and the body 20 may be referred to as a housing. ('641 Patent, 4:44-50 at Exh. A. & '641 File History, VS5005547 at Exh. H.) "To mount the LCD device 10, the body 20 (first portion) and the display case 30 (second portion) (collectively referred to as a "housing") are connected by the pin portion 24a on the hinge mount 22." ('641 Patent, 6:6-9 at Exh. A. & '641 File History, VS5005549 at Exh. H.)

LPL did not tell the Examiner that "housing" had an ordinary meaning, nor did LPL advise the Patent Examiner or the public that "housing" was understood to be "an

30

outer casing or enclosure," the construction which LPL now puts forth. Rather, LPL amended the specification to provide that a "housing" is the body and case of a portable computer.

The purported invention at issue involved mounting a FPDD (*e.g.*, a LCD device) into a housing (or a part of that housing (*e.g.*, display case)). By specifically defining the "housing" as the body 20 (first portion) and the display case 30 (second portion) which are the portions that are disclosed to be a portable computer, LPL limited the Patent Examiner's inquiry into the field of art. The Patent Examiner clearly relied on the strategic choice made by LPL when it expressly amended the patent application to define "housing" as a structure for a portable computer. In his Reasons of Allowance, the Examiner indicated:

> The best prior art of record . . .taken alone or in combination fails to teach or suggest **portable computer** comprising a rear mountable display device . . . as claimed in Claims 1, 30, 35, 47, 55 and 56.

('641 File History, VS5005645 at Exh. 4, (emphasis added).)

With the entire universe of possibilities (and potential prior art) before it, LPL chose to define "housing" as the case and body of a portable computer. The Tatung Defendants' proposed construction for "housing" is simply based on LPL's pre-litigation definition – the same definition relied on by the Patent Examiner.

### b.    Display Case/Case

As noted above, the only display case and case identified in the Patents-in-Suit are the top and bottom portions of a portable computer. It is not the importation of a limitation to review the patents, the claims and the specification which all confirm that the very nature of the purported invention was to improve a portable computer. There are

31

explicit references to a portable computer throughout the specification. The references

begin at the abstract and consistently appear until the end of the specification. For

example:

> In the Abstract:
>
> A **portable computer** including a housing having first and second
> sections, the first section having an information input device and the
> second section having a case having a first fastening element; a display
> panel including a second fastening element at a rear surface of the panel,
> the case and the display panel being attached through the first and second
> fastening elements; a hinge coupling the first and the second sections to
> each other; and a display panel support member having a third fastening
> element, the display panel support member being attached to the display
> panel through the third fastening element.

('641 Patent, Abstract at Exh. A, (emphasis added).)

> In the Field of the Invention:
>
> The present invention relates generally to a flat panel display device, and
> more specifically, to a flat panel display device mounting structure and a
> method of mounting the flat panel display device **to a computer.**

('641 Patent, 1:10-14 at Exh. A, (emphasis added).)

> In the Description of the Related Art:
>
> Moreover, as the display size increases, the display case becomes
> undesirably large, especially **for a portable computer** such as a laptop
> computer. To solve the above problem and to provide a large display area
> with minimal display case size, a new mounting structure is needed for
> the LCD device.

('641 Patent, 2:33-39 at Exh. A, (emphasis added).)

> In the Summary of the Invention:
>
> Accordingly, **the present invention is directed to a portable computer**
> and method for mounting a flat panel display device thereon that

32

substantially obviates one or more of the problems due to limitations and
disadvantages of the related art.

. . . .

Another object of the present invention is to provide a computer having a
flat panel display device with a maximum display area and a minimal
display case size.

. . .

To achieve these and other advantages and in accordance with the
purpose of the present invention, as embodied and broadly described, **a
portable computer includes a body having an information input
device; a case coupled to the body and having inner and outer
surfaces**; and a flat panel display device having a display surface and a
rear surface, the rear surface being fixed to the inner surface of the case.

According to another aspect of the present invention, **a portable
computer includes a body having an information input device**; a flat
panel display case coupled to the body; a flat panel display device having
a display surface and a rear surface; and a hinge mechanism having a
hinge mount and a hinge arm fixed to the rear surface of the display
device.

('641 Patent, 2:41–3:4 at Exh. A, (emphasis added).)

In the Detailed Description:

Reference will now be made in detail to the preferred embodiments of
the present invention, an example of which is illustrated in the
accompanying drawings.

**The present invention provides a back mounting method and a back
mounting structure for a panel display device in a portable
computer.**  Moreover, the rear surface of the display panel device may
be coupled to a hinge arm for further support of the display panel device.

('641 Patent, 4:3-11 at Exh. A, (emphasis added).)

It will be apparent to those skilled in the art that various modifications
and variation can be made **in the portable computer** and method for
mounting a flat panel display device thereon of the present invention
without departing from the spirit or scope of the invention. Thus, it is
intended that the present invention cover the modifications and
variations of this invention provided they come within the scope of the
appended claims and their equivalents.

33

('641 Patent, 7:46-54 at Exh. A, (emphasis added).)

Thus, the case and display case are those of a portable computer. This meaning is consistent with the Court's opinion in *Bell Atlantic Services Inc. v. Covad Communications Group Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001), which provided that "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"

6.    **The Court Should Adopt The Tatung Defendants' Proposed Construction For "Data Processing Device."**

| TERM | LPL | TATUNG |
|------|-----|--------|
| data processing device | An apparatus that performs an operation or combination of operations on any type of data. | The central processing unit of a computer |

In all of the claims of the '641 Patent, whenever the term "data processing device" appears, it is always preceded by the term "housing of the." The claim element "data processing device" is only disclosed as being a part of a computer or portable computer.[8]   (*See* '641 Patent, 9:62-12:18 at Exh. A).

The specifications of the Patents-in-Suit provide no guidance on the meaning of a "data processing device." Accordingly, "data processing device" should be given its ordinary meaning. At the time the patents were filed, one of ordinary skill in the field of

---

[8] Rather than repeat the lengthy briefing on why the term "housing" as claimed in the patents is properly construed as the case and body of a portable computer and therefore the "data processing device" must be "of a computer," Tatung respectfully refers the Court to the section of the brief that discusses "housing."

34

visual display products would understand a "data processing device" to be a central

processing unit (CPU) of a computer.

There is also dictionary support  for Tatung's proposed construction, "CPU" and

"data processing" are defined below:

> CPU: [T]he hardware component of a computer system that performs the basic
> operations of the system including processing of data, exchange of data with
> memory or peripherals, and management of the system's other components --
> called also *processor.*
>
> (*See Webster's Third New International Dictionary, Unabridged,* 2002, Online
> Dictionary Definition of "CPU," http://unabridged.merriam-webster.com (22 Dec.
> 2006) at Tatung Exh. 3.)
>
> Data processing:[T]he conversion of raw data to machine-readable form and its
> subsequent processing (as storing, updating, combining, rearranging, or printing
> out) by a computer - data processor noun.
>
> (*See Webster's Third New International Dictionary, Unabridged,* 2002, Online
> Dictionary Definition of "data processing," http://unabridged.merriam-
> webster.com (22 Dec. 2006) at Tatung Exh. 3.)

The Korean Patent Applications, which are incorporated by reference into the

'641 and '781 Patents, further support the Tatung Defendants' proposed construction.

For example, when describing the "present invention," Korean Patent Application No.

1998-44973 ('973 Application) states:

> "That is to say, the present invention provides a portable computer
> comprising, a body including an input device and an information
> processing unit; a body case protecting and receiving the body; a flat
> panel display device including a display portion displaying results of the
> information processing unit ...

('973 File History, VS024434 at Tatung Exh. 1)  The "TECHNICAL FIELD FOR THE

INVENTION AND CONVENTIONAL ART OF THE FIELD" section of the '475 Application

states:

35

"The present invention relates to an image display device for use in a computer, a computer having the image display device and a method of mounting the image display device to the computer."

"The computer can be classified into many types such as a laptop computer, a portable computer and the like, and basically has an input device, a memory unit, an arithmetic unit and an image display device displaying arithmetic results by the arithmetic unit."

('475 Application, VS024359, Tatung Exh 4.)

The specifications of the Korean Patent Applications explicitly call the "data processing unit" as a discrete element. The Korean Patent Applications also suggest the operations of what is and was commonly known as a CPU. Accordingly, Tatung's proposed construction is appropriate.

> 7.    **The Court Should Adopt The Tatung Defendants' Proposed Constructions For "Fastening Part" And "Fastening Element."**

| TERM | LPL | TATUNG |
|------|-----|--------|
| fastening part/fastening element | A part(s) that provides the capability for mounting one component to another component(s) | Fastening holes together with the material defining the hole pegs, screws, hooks, bolts, ribs, nails, adhesive tape or other similar fasteners including a fastener with a compressible head |

The terms "fastening part" and "fastening element" are used interchangeably throughout the patents' written description to refer to the same thing.[9] Accordingly, Tatung proposes a single construction for both terms. Tatung's and ViewSonic's proposed constructions differ by one item - Tatung has included "adhesive tape" as

---

[9] The '641 Patent uses "fastening part" and the '718 Patent uses "fastening element."

36

structure that is within the proper definition of fastening part/element. It is undeniable that bolts, fasteners, fastener with a compressible head hooks, nails, pegs, ribs, screws, screw holes and fastening holes (including the material defining the holes) are explicitly disclosed in the specification.[10] Adhesive tape is not explicitly set forth in the specification. However, in the Yun Reference, "adhesive tape" is explicitly disclosed as an alternative to screw holes and screws for mounting the support frame of the LCD module:

> In another embodiment, in order to join the second support frame 400 and the rear case 500, an adhesive device such as double-sided adhesive tape can be used instead of the second and the third screw holes 410b and 410c. This example has an added advantage in that no screws are needed which makes the manufacturing method easy.
>
> In a further embodiment, the rear case 500 and the second support frame 400 are joined to each other using hooks and/or other suitable fastening devices including adhesives formed at inner sides of the rear case 500. This embodiment also does not need fastening devices such as screws 430.

('139 Patent, 4:46-5:9 at Exh. D.)

Thus, it was well-known in the art that adhesive tape could be used, instead of holes and screws, to mount an LCD module or device and it is appropriately included in the definition of fastening part/element.

### 8.    Terms That Do Not Require Construction

#### a.    "First Frame Having A Fastening Part" And "First Frame Having A Fastening Element"

The parties already proposed constructions for "first frame" and "fastening part/element." LPL's insistence on construing the phrase "first frame having a fastening part" and "first frame having a fastening element" unnecessarily requires the Court to

---

[10] '641 Patent, 4:29-32, 4:32-33, 4:58-59, 5:10-13, 5:21, 5:59-61, 6:14-15 at Exh. A.

37

construe the connecting words "having a." The Tatung Defendants believe there is no
need to construe "having a," particularly in the context of the claims in these patents.
The words have an ordinary, well-understood meaning. Should the Court determine that
the terms require construction, Tatung agrees that ViewSonic's proposed construction
(*e.g.*, "fastening element/part integral to the first frame") is the correct construction.

### b.     "Capable of Being Mounted" And "Capable of Being Fixed"

The parties have stipulated to constructions for "mounted" and "fixed." The
agreed upon construction is: "Attached firmly or fixed securely so as to be supported."

Nonetheless, LPL has insisted that "capable of being mounted" and "capable of
being fixed" require construction. Tatung submits that "capable of" has a plain and
ordinary meaning.

In the event that the Court determines these phrases require construction, the
Tatung Defendants believe these phrases should be construed as "capable of being
attached firmly or fixed securely so as to be supported."

### c.     "Peg," "Protruding Portion" And "Stepped Hole"

The Tatung Defendants do not believe these terms require construction. These
terms should be accorded their plain and customary meaning.

38

IV.    CONCLUSION

For the reasons stated above, the Tatung Defendants respectfully request that the

Court adopt their proposed claim constructions.


_Anne Shea Gaza_

Frederick L. Cottrell, III (#2555)

Of Counsel:                                    Anne Shea Gaza (#4093)
Christopher Darrow                             Richards, Layton & Finger, P.A.
Mark H. Krietzman                              One Rodney Square
Frank E. Merideth, Jr.                         P.O. Box 551
Alan R. Maler                                  Wilmington, Delaware 19899
Valerie W. Ho                                  (302) 651-7700
Greenberg Traurig LLP                          cottrell@rlf.com
2450 Colorado Avenue, Suite 400E               gaza@rlf.com
Santa Monica, CA 90404                         Attorneys for Defendants Tatung Co. and
Telephone: 310-586-7700                        Tatung Company of America, Inc.

Kathryn L. Clune
Greenberg Traurig LLP
800 Connecticut Avenue, N.W., Suite
500
Washington, DC   20006

Eric S. Tautfest
Greenberg Traurig, P.A.
2200 Ross Avenue, Suite 4700E
Dallas, Texas 75201

Dated:  December 22, 2006

39

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2006 I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue #900
Wilmington, DE 19899

Jeffrey B. Bove, Esquire
Jaclyn M. Mason, Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

I hereby certify that on December 22, 2006 I caused to be sent by Federal Express the foregoing document to the following non-registered participants:

Daniel G. Jarcho, Esquire
Cass W. Christenson, Esquire
Lora A. Brzezynski, Esquire
Matthew T. Bailey, Esquire
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington D.C. 20006

Tracy R. Roman, Esquire
Bingham McCutchen
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

Scott R. Miller, Esquire
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

_Anne Shea Gaza_
Anne Shea Gaza(#4093)
Gaza@rlf.com