IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

          Plaintiff,

     v.

TATUNG CO.;
TATUNG COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION

          Defendants.

CIVIL ACTION NO. 04-343-JJF

## **DEFENDANT VIEWSONIC CORPORATION'S**
## **OPENING CLAIM CONSTRUCTION BRIEF**

TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1
II.   SUMMARY OF THE ARGUMENT ............................................................................... 1
III.  STATEMENT OF THE FACTS ..................................................................................... 2
IV.   LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ..................................................... 5
V.    CONSTRUCTION OF DISPUTED CLAIM TERMS AND PHRASES ............................... 7
    A.   Construction of *"Rear Mountable"* .............................................................. 8
    B.   Construction of *"Housing,"* *"Case/Display Case"* and *"Data Processing Device"* ......... 15
    C.   Constructions of *"First Frame"* and *"Second Frame"* ...................................... 21
    D.   Construction of *"Backlight Unit"* ................................................................. 24
    E.   Construction of *"Flat Panel Display Device"* and *"LCD Device"* ..................... 26
    F.   Construction of *"Fastening Part"* and *"Fastening Element"* ........................... 28
    G.   Construction of *"Fastening Hole"* ................................................................ 30
VI.   Terms That Should Not Be Construed ................................................................. 32
    A.   Construction of *"First Frame Having A Fastening Part"* and *"First Frame Having A Fastening Element"* .................................................................................... 33
    B.   Construction of *"Capable of Being Mounted"* and *"Capable of Being Fixed"* ............... 35
    C.   Construction of *"Peg"* and *"Protruding Portion"* ........................................... 35
    D.   Construction of *"Stepped Hole"* .................................................................... 37
VII.  CONCLUSION ........................................................................................................ 38

TABLE OF AUTHORITIES

## Cases

*Advanced Medical Optics, Inc. v. Alcon, Inc.*, 361 F. Supp. 2d 370 (D. Del. 2005) ..................... 7

*Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277 (D. Del. 2006)........................................ 5

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003)............................................ 11

*Asymetrix, Inc. v. Illumina, Inc.*, 446 F.Supp.2d 277 (D. DE, 2006)......................................... 15

*Bell Comms. Research, Inc. v. Vitalink Comms. Corp.*, 55 F.3d 615 (Fed. Cir. 1995) ................ 21

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341 (Fed. Cir. 2001) ..................................................................................................................................... 32

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004)....................... 6, 19, 33, 35

*CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997) ........................................ 12

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299 (Fed. Cir. 1997) .................................................... 7

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.* 93 F.3d 766 (Fed. Cir. 1996) ........................... 10, 21

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951 (Fed. Cir. 2000) ................ 7

*Honeywell v. ITT*, 452 F.3d 1312 (Fed. Cir. 2006)............................................................... 17, 18

*In Re Hyatt*, 708 F.2d 712 (Fed. Cir. 1983) ............................................................................... 20

*Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006) ............. 23, 26

*LG.Philips LCD Co. Ltd, v. Tatung Co.*, 434 F. Supp. 2d 292 (D. Del. 2006)...................... 30, 31

*Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649 (D.Del. 2005) ..................... 7

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) .................................... 5, 6

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004)........................... passim

*MicroStrategy Inc. v. Business Objects Americas*, 410 F. Supp. 2d 348 (D. Del. 2006) ............... 6

*Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309 (Fed. Cir. 2006)................ 11

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................................ 5, 6, 7, 15

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446 (D.Del. 2006) ............................................................................................................................................ 6

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ........................ 7

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001)... 6, 11, 22, 24

*SeaChange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) ............... 7, 12, 23, 24

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995)............................... 7, 9

*Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)................................... 9, 32

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*, 299 F.3d 1313 (Fed. Cir. 2002)...................................... 16

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167 (Fed. Cir. 2002) ............................................................................................................................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ................................... 6, 15

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999)............................... 32

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Defendant ViewSonic Corporation ("ViewSonic") hereby submits its Opening Claim Construction Brief, setting forth its proposed construction of the terms identified by the parties pursuant to the Court's Amended Scheduling Order dated September 18, 2006 ("Scheduling Order"). The Court has presently scheduled the claim construction hearing on disputed terms for March 7, 2007.

## II.    SUMMARY OF THE ARGUMENT

The parties have stipulated to the construction of "flat display panel" and to a single identical construction for the terms "attaching," "fastening," "fixed," "fixing," and "mounted." For the Court's convenience, attached hereto as Exhibit 3 is a list of the stipulated constructions.

The terms "rear mountable," "flat panel display device," "housing," "case/display case," "data processing device," "backlight unit," "first frame," "second frame," "fastening element/fastening part" and "fastening hole" appear in one or more asserted claims in both of the Asserted Patents. As the '718 patent is a continuation of the '641 patent, it is clear that the terms should be construed the same for both patents. The term "LCD device," which all the parties agree can be briefed with the related term "flat panel display device" appears only in claim 40 of the '718 patent. Each of these terms should be construed in the manner compelled by their use in the claim terms, the specification and the prosecution history.

LPL has proposed eight additional terms for construction which ViewSonic contends should not be construed by the Court. Four of those terms ("peg," "protruding portion," "stepped hole" and "rear mounted") should not be construed because they only appear in unasserted claims, and their construction will not aid in the construction of the other terms at issue. The remaining four terms are phrases whose key terms are already being construed by the Court. Thus, the phrases "first frame having a fastening part," "first frame having a fastening element," "capable of being fixed" and "capable of being mounted" do not need to be construed by the Court. Should the Court choose to provide a construction, that construction is dictated by the ordinary meaning of the terms.

## III.    STATEMENT OF THE FACTS

Plaintiff LG.Philips LCD Co., Ltd. ("LPL") alleges that various ViewSonic computer monitors and televisions infringe Claims 35, 36, and 55 of U.S. Patent No. 6,501,641 (the "'641 Patent") and Claims 33, 34, 35, and 40 of U.S. Patent No. 6,498,718 (the "'718 Patent") (collectively referred to as the "Asserted Patents"). The '641 Patent is entitled "Portable Computer Having A Flat Panel Display Device." The '718 Patent is a continuation of the '641 Patent, entitled "Portable Computer And Method For Mounting A Flat Panel Display Device Thereon." The written descriptions of both patents are identical except for a few apparent typographical errors.[1] The application that resulted in the '641 Patent was filed on April 2, 1999; the filing date of the '718 Patent is November 22, 1999. Both claim priority from two Korean patent applications filed October 23, 1998 (KR 98-44475) and October 27, 1998 (KR 98-44973).

To construe the claim terms, it is important to differentiate what the supposed invention is and what it is not. The patents do not disclose or claim a new flat panel display technology; rather they purport to modify the prior art structure and method by which flat panel displays were mounted into a portable computer. To understand the invention, the specification first details the conventional prior art mounting structure and method, which the patent identifies as "front mounting" (*see* VS Ex. 2):

> Referring to FIG. 2 which shows conventional assembly structure of the LCD device applied to a conventional portable computer, the display case 122 has a rear case 123 and a front case or frame 121 for mounting the LCD device 130. The rear case or frame 123 has an outer surface and an inner surface and connecting ribs 123a are formed at the corners.

> The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.

> At the corners of the supporting frame 136, corresponding to the positions of the ribs 123a of the rear case 123, a plurality of protrusions 136a having holes are formed.

---

[1] Because the specifications of the Asserted Patents are nearly identical, citations will be made only to the '641 Patent, unless otherwise specifically noted.

> For mounting the LCD device 130 to the display case 122, the LCD device 130 is placed on the rear case 123 and the holes of the supporting frame 136 and the ribs 123a are fastened together preferably by screws 138. The front case 121 is coupled to the rear case 123.
>
> Hereinafter, the way in which the LCD device is mounted to the case from the front toward the rear direction is defined as *the front mounting method*, and the assembled structure of the LCD device and the case formed through the front mounting method is defined as *the front mounting structure*.[2]

As it relates to the subject matter here, the most notable features of front mounting are the mounting flanges or protrusions (*e.g.*, 136a) extending beyond the edges of the LCD display device.

In a portable computer, the size of the case in which a display is mounted is fixed by the overall size of the housing.[3] Using side flanges or protrusions to mount the LCD device to the case consumes space that could otherwise be used to display an image. (*See* VS Ex. 2.) The Asserted Patents call this "side space." The specification explains this problem, as follows:

> In the front mounting structure of the LCD device, since the protrusions 136a require additional space corresponding to the protruded width d, the display area of the LCD device is reduced in comparison to the fixed size of the display case 122.[4]
>
> * * *
>
> In the mounting structure shown in FIG. 3B, the supporting frame 114 requires side spaces for the flanges 114a and 114b. Therefore, the side space D (d1+d2) results in a reduction of the display area of the LCD panel 112 relative to the display case 122.[5]

Thus, the inventors sought to eliminate the use of side space when mounting an LCD device in a portable computer in order to maximize the size of the display viewing area. For example, in theory, a portable computer that has an 11.5 inch viewing area when using the front mounting

---

[2]  For the Court's convenience, the parties have filed a Joint Appendix of Exhibits from the Joint Submission of Intrinsic Evidence ("JA") that includes the applicable intrinsic evidence cited in the parties' November 16, 2006 Joint Submission. *See* JA at Ex. A, '641 Pat., Col. 1:35-58 (emphasis added).

[3]  The patentee confirms that there is a maximum acceptable size for a display to which the invention may be applicable. "Moreover, as the display size increases, the display case becomes undesirably large, especially for a portable computer such as a laptop computer." JA at Ex. A, '641 Pat., Col. 2:34-36.

[4]  JA at Ex. A, '641 Pat., Col. 1:59-63.

[5]  JA at Ex. A, '641 Pat., Col. 2:29-34; *see also*, Figs. 2, 3A and 3B.

method could instead have a 12.1 inch viewing area, without changing the size of the display case, merely by eliminating the front mounting flanges.

The inventors were not the first to address this limitation of front mounting. During prosecution, the Examiner cited two prior art references that addressed the same concern, namely, U.S. Pat. No. 5,835,139 to Yun, *et al.* ("Yun") and U.S. Pat. No. 5,946,061 to Kurihara, *et al.* ("Kurihara"). Kurihara explains:

> Generally, in the case where a liquid crystal panel is fixed to the main cover of a PC with screws, they are fixed together by employing screws at the four corners of the liquid crystal panel in the direction perpendicular to the display screen. FIG. 1 is a top view showing a conventional liquid crystal panel fixed by screws. Since the liquid crystal panel is fixed by inserting screws into the upper surface thereof (i.e., in a direction perpendicular to a paper surface), *spaces must be ensured for flanges* into which screws are inserted and for screw heads. In the case *where flanges for screws protrude* from a liquid crystal panel, there is the fear that the four corner spaces for *the flanges will be dead spaces.*[6]

Yun echoes this observation.[7] Yun's solution for saving side space is to use fasteners inserted from the exterior side edge of the rear case of the portable computer and through the side edges of the two frames (called "first frame" and "second frame") that assemble the components of the LCD display device.[8] Not surprisingly, this method of mounting is referred to as "side mounting." During the prosecution of the Asserted Patents, the inventors expressly distinguished these side mounting structures from the invention sought to be claimed.[9]

As the prior art Kurihara patent observed, side mounting also uses side space, although less than is used by front mounting.[10] To improve upon Yun, the Kurihara solution, best shown in its Fig. 2 (*see* VS Ex. 2), uses a "support body 13" having a rear surface 13a and a side surface 13b. The support body is mounted to the rear case behind the display and attached to tabs on the

---

[6]  JA at Ex. E, Kurihara, Col. 1:13-37, Col. 1:47-51.
[7]  JA at Ex. D, Yun, Col. 1:65-2:3, Col. 2:39-44; and Col. 2:57-63; *see also* Abstract, Col. 3:6-17, Col. 3:35-50; Col. 4:31-33; Col. 4:39-5:28.
[8]  *See, e.g.*, JA at Ex. D, Yun, Figs. 6, 7 and 9.
[9]  JA at Ex. G, '641 File History, at VS5005460, VS 5005512-VS5005513, VS5005556, VS5005605, VS5005614.
[10]  JA at Ex. E, Kurihara, Col. 1:26-37, Col. 3:45-51.

sides of the LCD display.[11]  Kurihara discusses the superiority of its structure to both front and side mounting stating, "it becomes possible to reduce dead space compared with the aforementioned conventional methods."[12]

Each of these prior art mounting references illuminates the stage on which the disputed claims must be construed.  To overcome the side space problem and "to provide a large display area with minimal display case size," the Asserted Patents disclose "a *back mounting* method and a *back mounting* structure for a panel display device in a portable computer."[13]  The key distinction between back mounting and the prior art mounting structures is that the fastening elements are all located on the back of, and within the side edges of, the LCD device rather than at or through a side edge, or protruding from the side edge, of the LCD device.  The Asserted Patents repeatedly confirm this, including when the specification states that compared to the prior art methods of side and front mounting: "the mounting method according to the present invention does not require unnecessary side space for mounting the LCD device on the computer.  Thus, the ratio of the display area of the LCD device to the display case can be improved and maximized."[14]  This is the invention the inventors actually invented, and the context in which the analysis of the claims must take place.

## IV.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a question of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995).  Claim terms "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  More specifically, the "ordinary meaning" is the meaning the term would have to a person of ordinary skill in the art "at the time of the invention."  *Id.* at 1313; *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277, 281 (D. Del. 2006).

---

[11]  JA at Ex. E, Kurihara, Col. 2:53-3:21, Figs. 2, 3, 3a and 4.
[12]  JA at Ex. E, Kurihara, Col. 3:45-58.
[13]  JA at Ex. A, '641 Pat., Col. 2:41-43; Col. 4:7-9 (emphasis added).
[14]  JA at Ex. A., '641 Pat., Col. 7:31-35.

A claim term can be given its correct construction only within the context of "what the inventors actually invented and intended to envelop within the claim." *Phillips*, 415 F.3d at 1316. To determine the correct construction, a court should first look to the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the language of the claims, the remaining specification, and the prosecution history. *Markman*, 52 F.3d at 979. While the context of both the asserted claims and the unasserted claims is instructive as to the meaning of a claim term, the significance of the specification cannot be understated. *Phillips*, 415 F.3d at 1314.

Claims "'must be read in view of the specification, of which they are a part.'" *MicroStrategy Inc. v. Business Objects Americas*, 410 F. Supp. 2d 348, 353 (D. Del. 2006) (quoting *Markman*, 52 F.3d at 979.) The specification is the patentee's description of his invention and sets the scope and outer boundary of the claims. *Phillips*, 415 F.3d at 1313-14. Indeed, the specification is usually "'dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In fact, if the specification "'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, *read without reference to the specification*, might be considered broad enough to encompass the feature in question.'" *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

Sometimes the specification reveals that the inventor gave a claim term a special definition that differs from the meaning it would otherwise have. *Phillips*, 415 F.3d at 1316. In that event, "the inventor's lexicography governs." *Id.*; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 449 (D. Del. 2006). Other times, the specification reveals that the inventor intentionally disclaimed or disavowed a claim scope. That, too, is considered dispositive. *Phillips*, 415 F.3d at 1316 (citing *SciMed Life Sys.*, 242 F.3d

at 1343-44). Thus, "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The last item of intrinsic evidence, the prosecution history, is likewise important as it evidences how the inventor, and the Patent Office, understood the patent. *Phillips*, 415 F.3d at 1317. "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *SeaChange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)). A proper examination looks at the entire prosecution history, including claim amendments and all arguments the inventor made to overcome and distinguish prior art references. *SeaChange*, 413 F.3d at 1372. Like the specification, the prosecution history may reveal that the patentee narrowed the scope of claim terms by disclaiming or disavowing subject matter to overcome prior art. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

By contrast, extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319; if extrinsic evidence is consulted, it cannot be used to contradict the import of the intrinsic record. *See Advanced Medical Optics, Inc. v. Alcon, Inc.*, 361 F. Supp. 2d 370, 376 (D. Del. 2005); *Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649, 653 (D. Del. 2005).

**V.    CONSTRUCTION OF DISPUTED CLAIM TERMS AND PHRASES**
**Terms or Phrases That Should Be Construed.**

Most of the disputed claim terms are found in asserted independent claim 35 of the '641 Patent, as shown by the highlighted language:

> 35. A *rear mountable flat panel display device capable of being mounted* to a *data processing device*, the flat panel display device comprising:

a *backlight unit* including a *first frame having a fastening part* at a rear surface of the *first frame*, a *flat display panel* adjacent to the backlight unit; and

a *second frame*;

wherein the flat display panel is between the first frame and the second frame, the first frame of the backlight unit *capable of being fixed* to a *housing* of the *data processing device* through the *fastening part* at the rear surface of the first frame.[15]

## A.    Construction of *"Rear Mountable"*[16]

ViewSonic proposes two alternative embodiments of its construction of a *"rear mountable"* flat panel display device, namely:

- o  "A flat panel display device that is mountable to a case solely from the back of the first frame and that has no front or side mounting fastening elements"; or,

- o  "A flat panel display device that is mountable to a case with fastening elements located only on the back of the device and which has no fastening element that extends through, from or protrudes beyond any of the four side edges of the device."

The limitation "rear mountable" was inserted by amendment into each of the claims of the '641 and '718 patents.[17] This amendment came at the conclusion of the prosecution and after an interview between the inventors and the Examiner in order to patentably distinguish the claims from the cited prior art cited, including Yun and Abell.

Before that amendment, the inventors argued that the feature differentiating the claims over the prior art was that the fastening element used to mount the flat panel display device was on the *rear surface* of the first frame.[18] The Examiner repeatedly rejected this argument as either anticipated by or merely obvious from the teachings of the prior art.[19] Indeed, the crucial importance of the term "rear mountable" to the perceived patentability of the invention was recently reiterated in a pair of applications which are children of the Asserted Patents,

---

[15] JA at Ex. A, '641 Pat., Claim 35.
[16] Rear mountable appears in Claims 35 and 55 of the '641 Patent and Claims 33 and 40 of the '718 Patent.
[17] JA at Ex. G., '641 Pat. file history, VS005609, VS005632-VS005640; JA at Ex. H, '718 Pat. file history, VS015017-VS015022.
[18] JA at Ex. G, '641 Pat. file history, VS005510-VS005515.
[19] JA at Ex. G, '641 Pat. file history, VS005555-VS005559; *id.* VS005613-VS005616.

Application Serial Nos. 10/294,548 and 10/294,753. In these applications, LPL submitted claims that, as applicable here, tracked the language of Claim 1 of both the `641 and `718 patents except without the "rear mountable limitation.[20] The Examiner of those applications, who was the *same Examiner* on the Asserted Patents, rejected those claims under § 102(a) over the AAPA (Applicant Admitted Prior Art). Specifically, the Examiner cited to element 136(a) in Fig. 2 of the Asserted Patents (VS Ex. 2) – which depicts the prior art "front mounting" – as disclosing a fastening element at a rear surface of the first frame.[21] *Inpro*, 450 F.3d at 1354-57 (arguments in related applications are relevant when applicant consistently describes technologic basis of applications). Thus, it is clear that the "rear mountable" limitation is a substantive limitation added to overcome a rejection on a substantive issue affecting the patentability of the claims of the Asserted Patents. *Southwall*, 54 F.3d at 1576 (holding that statement in prosecution history will limit claim terms to exclude interpretations disclaimed during prosecution); *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998).

Despite the importance of this limitation, the term "rear-mountable" fails to appear anywhere in the specification of the patents-in-suit. Instead, the term finds its genesis in the specification's recitation of "back mounting" the flat panel display device.[22] The specification also explains that the invention sought to be protected involves fastening or mounting "from the back of the case."[23] According to the file history, incorporating the "back mounting" limitation into the claims was the subject of two interviews with the Examiner. The first interview occurred on January 9, 2001. At the conclusion of this interview, the patent examiner directed LPL to argue the structure recited in the claims, and the Examiner indicated that he would search for back mounted/mountable art.[24] For nearly two years the Examiner continued to reject LPL's

---

[20]  JA at Ex. J, U.S. Pat. Appl. No. 10/294,548 ("`548 Pat. Appl.") file history, VS5000005, VS5000022; JA at Ex. L, U.S. Pat. Appl. No. 10/294,753 ("`753 Pat. Appl.") file history, VS5000150, VS5000166.
[21]  JA at Ex. J, `548 Pat. Appl. file history, VS5000118; JA at Ex. L, `753 Pat. Appl. file history, VS5000260.
[22]  JA at Ex. A, `641 Pat., Col. 3:50-53; Col. 3:54-56; Col. 3:62-64; Col. 4:7-11; Col. 5:4-8.
[23]  JA at Ex. A, `641 Pat., Col. 4:27-37; Col. 4:56-64; Col. 6:43-51; Col. 7:16-19; Col. 7:21-27.
[24]  JA at Ex. H, `718 file history, VS014927.

arguments that the recited structure (*without* the rear mountable limitation) was patentable over the prior art. Then a second personal interview transpired. Afterwards, the Examiner wrote a statement indicating the claims may be allowed *if the claims were amended to include the limitation "back mounted display or the equivalent."*[25] At that point, LPL inserted the "rear mountable" limitation into each and every claim, and a notice of allowance promptly followed.[26] Thus, the meaning of the term "rear mountable," if one can be ascertained from the patent, must come from the disclosure of "back mounting." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005).

    When viewed in the context of the patents, the ordinary meaning of the term "back mounting" as it applies to attaching a display device to another component, is mounting a product from the back. It certainly is not consistent with the idea of simultaneously mounting the product from the back and the front, or from the back and its sides. Thus, the ordinary meaning of the term "rear mountable" must be mountable solely from the back or rear of the device. The language of the claims likewise compels this conclusion. Claim 35 provides that the flat panel display device is capable of being fixed "through the fastening part at a rear surface of the first frame." If the term "rear mountable" allows the device to be attached at both the side and the back, then the language "through the fastening part" would be superfluous. *See Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996).

    A proper construction of rear mountable also requires that the fasteners be within and not pass through the side edges of the device. As depicted in the figures (VS Ex. 2), the hallmark of front mounting is the use of mounting fasteners that extend beyond the perimeter or side edge of the flat panel display device that consume side space. Side mounting relies on fastening elements that pass through or extend past a side edge of the device, and also makes use of side space. According to Yun, side-mounting is the use of fastening elements which protrude beyond and extend through the side edges of the frames that assemble the components of the flat panel

---

[25] JA at Ex. G, '641 Pat. file history, VS5005609.
[26] JA at Ex. G, '641 Pat. file history, VS5005632-VS5005640; *id.* VS5005645.

display device.  These side mounting fastening elements extend beyond the lateral side edges of the frames that assemble the flat panel display device.  As confirmed by Kurihara, they occupy space around the perimeter of the flat panel display device which could otherwise be used for viewable screen area and are thus contrary to the teachings of the Patents-in-Suit and the advantages of the supposed inventions disclosed therein.

Yet, a proper construction of rear mountable must be consistent with the invention -- which is a structure and method to minimize the use of space beyond the perimeter of the frames that assemble the components of the flat panel display device so as to maximize the size of the display area of the flat panel display device within the fixed area of the housing.[27]  *See, e.g., Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316-18 (Fed. Cir. 2006) (noting importance of stated objects of the invention to construing claim terms); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).  The inventors said it clearly and unequivocally:

> the mounting method according to the present invention does not require unnecessary side space for mounting the LCD device on the computer.  Thus, the ratio of the display of the LCD device to the display case can be improved and maximized.[28]

If the term "rear mountable" allowed one connection at the back and the remainder of the connections to be front or side mountings, the object and very purpose of the invention sought to be protected would be lost.  No side space would be saved over the prior art methods of mounting a flat panel display device.  Certainly, there is nary a word of explanation in the specification about how the objects of the supposed invention could be realized or achieved by mixing uses of mounting structures.  *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369-70 (Fed. Cir. 2003) (construing claim to include limitation because "very character of the invention" required that the limitation be part of every embodiment).

---

[27]  JA at Ex. A, '641 Pat., Col. 2:1-36, Col. 2:59-65.
[28]  JA at Ex. A, '641 Pat., Col. 7:31-35.

A proper construction of rear mountable also draws from the specification, the prosecution history and the need for the claims to be construed in a manner to make them valid. *SeaChange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005). Thus, the figures (VS Ex. 2) support a construction that the fastening elements can be anywhere behind the device as a whole (*e.g.*, just inside the outermost perimeter of the second frame (elements 15 and 15a in figures 4B, 4C, 8 and 9), or further inward (*i.e.* towards the center of) the flat panel display device from the outer edge).[29] *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997) (noting relevance of drawings to claim interpretation). There is no disclosure applicable to the invention sought to be claimed of a fastening element that extends beyond or through a side edge. During prosecution, the patentee expressly and repeatedly disclaimed and differentiated the invention claimed from the prior art front and side mounting structures and methods. Indeed, when it presented the "rear mountable" amendment, LPL asserted that the cited prior art "discloses a front mounted LCD display while the instant invention utilizes a rear-mountable display."[30] Finally, and perhaps most importantly, the Kurihara prior art reference already disclosed a combination of back and side mounting which would be on all fours with the Asserted Patents had "rear mountable" not been limited to mounting *exclusively* with rear fastening parts. Thus, LPL's construction which would permit "rear mountable" to encompass mounting from the back and the side, is overbroad.

As mentioned above, ViewSonic has submitted two embodiments of its construction of the term "rear mountable." The first embodiment is:

> A flat panel display device that is mountable to a case solely from the back of the first frame and that has no front or side mounting fastening elements.

This articulation follows the patentees express differentiation of the side mounting and front mounting as part of the definition of rear mountable. ViewSonic's second embodiment of its construction of "rear mountable" is:

---

[29] JA at Ex. A, '641 Pat., Figs. 12-14.
[30] JA at Ex. G, '641 Pat. file history, VS5005629.

> A flat panel display device that is mountable to a case with fastening elements located only on the back of the device and which has no fastening element that extends through, from or protrudes beyond any of the four side edges of the device. [31]

ViewSonic refers to this as a "second embodiment" because it captures the same idea as the first embodiment except that it does not use the terms "front mounting" or "side mounting," instead laying out in more detail what those terms communicate. Both of these proposed constructions are fully supported by the claims and the intrinsic evidence.

LPL also seeks to have the term "rear mountable" interpreted to mean that the fastening elements are behind the flat display panel rather than merely behind the display device. This limitation is not supported by either the specification or the file history, and is contrary to the disclosures in the specification and the requirements of the claims.

As discussed above, the specification shows the fastening elements on the back of the device; nowhere is it limited to being behind the flat display panel. While figures such as Fig. 14 show a fastening element (extending between the support member and the rear case) as being behind the flat display panel, the fastening elements shown in Figs. 4B and 4C (which actually connect the housing to the first frame, and not to a support member) do not disclose their placement *behind the panel* 12, rather they are simply behind the device 10.

Indeed, Fig. 4B (VS Ex. 2) shows the fastening elements at the furthest reaches of the corners of the display device, without regard for the location of the corners of the flat display panel. This is consistent with the express disclosure in the specification – to wit: "At each corner of the first frame 14g a screw hole 15 is preferably formed."[32] Since the display panel 12 is a sub-component of the display device 10, physics dictates that it must be smaller in size than the frames 16, 14g. Just like a box must be larger than the item stored therein, the device 10 must be larger in size than the panel 12 it contains. While the patent specification is silent about

---

[31] An alternative articulation of the first embodiment of the construction advanced by ViewSonic is "A flat panel display device that is mountable to a case solely from the back of the flat panel display device within the perimeter/border of the first frame and that has no front or side mounting fastening elements."
[32] JA at Ex. A, '641 Pat., Col. 4:22-24.

the requirement that the mounting structures be behind the smaller panel, LPL seeks to have such a limitation inserted in the claims.

The language of the claims similarly does not support LPL's narrow construction. By way of example, if the Court accepts LPL's construction, Claims 22-26 and 37-38 would be nonsensical. Claims 22-24 claim a portable computer with the fastening elements at *corners of the case*. Likewise, Claims 25-26 call for the fastening elements to be *at the corners of the device*. Finally, Claims 37-38 claim fastening elements in *the corners of the first frame*. In none of these claims are the fastening elements in the corners of the smaller flat display panel.

Similarly, Claim 47 of the '641 and Claim 39 of the '718 patent could not be met if the fastening element were behind the glass sheets of the flat display panel. Both require the first frame be secured to the second frame through the same fastening part LPL contends must be behind the flat display panel. But as the flat display panel is made of glass, neither a screw nor any other fastening part can pass through its surface without destroying its utility or shorting out the circuits of the device. The only way these claims can be met is for a screw or fastening element to be able to pass through whatever gap or space exists between the flat display panel and the edge of the adjacent frame of the device.

In the April 5, 2002 Notice of Allowability, the Examiner's statement of reasons for allowance stated, in relevant part:

> The best prior art of record . . . taken alone or in combination fails
> to teach or suggest a portable computer comprising a rear-
> mountable display device having a fastening element at a rear-
> surface of the rear-mountable *display device* attached to a case
> through the fastening element as claimed in the claims . . . 35 . . .
> 55.[33]

Thus, the Examiner did not understand that the fastening element called out as being "at a rear surface of the first frame of a rear mountable *display device*" was actually located only behind the smaller flat display panel. Certainly, the inventors *never once* mentioned or argued that the

---

[33] JA at Ex. G, '641 Pat. file history, VS5005645.

fastening part was actually behind the flat display panel rather than merely behind the entire display device.

Accordingly, both the prior art of record during the prosecution and the statements made by LPL during the prosecution of the Asserted Patents indicate that a flat panel display device which is rear mountable can only be mounted by fasteners which originate from behind the perimeter of the frames that assemble the flat panel display device and where no side-mounting or front-mounting components are provided. ViewSonic submits that its proposed constructions properly incorporate the teachings of the Asserted Patents, the prior art and the arguments made by LPL during the prosecution of the claims issued by the Examiner.

**B.     Construction of "*Housing*," "*Case/Display Case*" and "*Data Processing Device*"[34]**

- The Court should adopt the express definition of "*housing*" provided in the patents, namely, "*the case and body of a portable computer.*"

Taken together, the intrinsic evidence compels "housing" to be defined as "the case and body of a portable computer." The ordinary meaning of "housing" does not apply here because the inventors acted as their own lexicographers, expressly defining "housing" as something other than its dictionary meaning.[35] "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). When the patentee expressly defines a claim term, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316; *see also Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1177-78 (Fed. Cir. 2002).

---

[34] Housing appears in claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent; "case" or "display case" appears in Claim 40 of the '718 Patent and "data processing device" appears in Claims 35 and 55 of the '641 Patent.

[35] ViewSonic is aware that this Court recently defined housing in the context of a different invention using its ordinary dictionary meaning. *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277 (D. Del. 2006) (defining "housing" as "a structure that covers, protects and supports" that which is enclosed). That definition is not proper here given the specification and prosecution history.

During the first examination of the application leading to the Asserted Patents, the Examiner rejected various claims as lacking in an antecedent basis for certain terms in the specification. He required the inventors to amend the specification to include a definition of these deficient terms. One of those terms was "housing."[36] Rather than taking this opportunity to clearly inform the public that "housing" is "an outer casing or enclosure" (as LPL now contends), the inventors amended the specification in two places to expressly recite that "housing" is the case and body of a portable computer.

> The computer includes a body 20 or first section having an information input device and a second section including the case 21. The case 21 may cover the body 20 and is coupled to the body through a hinge mechanism. *Together, the case 21 and the body 20 may be referred to as a housing,* or a similar conveniently descriptive term.[37]

> To mount the LCD device 10, the body 20 (first portion) and the display case 30 (second portion) (*collectively referred to as a housing*) are connected by the pin portion 24a on the hinge mount 22.[38]

Significantly, these amendments are the *only two places* where the specification articulates the meaning of "housing." And the amendments worked. The Examiner thereafter allowed the claims containing housing. Obviously the Examiner believed the inventors described housing with "reasonable clarity, deliberateness, and precision." *Teleflex, Inc. v. Ficosa N. Am. Corp.,*, 299 F.3d 1313, 1325-26 (Fed. Cir. 2002). The Examiner was certainly not left with any confusion about the invention to be protected here – stating in his statement of record for reasons of allowance:

> The best prior art of record . . .taken alone or in combination fails to teach or suggest *a portable computer comprising* a rear mountable display device . . . as claimed in Claims 1, 30, 35, 47, 55 and 56.[39]

---

[36] JA at Ex. G, '641 Pat. file history, at VS5005534.
[37] JA at Ex. A, '641 Pat., Col. 4:44-50.
[38] JA at Ex. A, '641 Pat., Col. 6:6-9; JA at Ex. G, '641 Pat. file history, at VS5005544, VS5005547).
[39] JA at Ex. G, '641 Pat. file history, VS5005645; *see also*, JA at Ex. H, '718 Pat. file history, VS015043.

By these amendments, the inventors expressly redefined the meaning of "housing." This express definition of "housing" in the specification merely confirms the scope of the invention as disclosed throughout the specification.

As the Court well knows, the claims of a patent are limited to the actual invention as is described in the patent specification. *Honeywell v. ITT,* 452 F.3d 1312 (Fed. Cir. 2006). In *Honeywell,* the face of the patent claims sought to claim a component for a fuel injection system. But the District Court limited the claims to just a fuel filter. *Id.* at 1315-16. The District Court reached this construction despite recognizing that the ordinary meaning of the term "fuel injection system component" is "any constituent part of the fuel injection system of a motor vehicle including, for example, fuel filters, fuel lines, and connectors." *Id.* In fact, the Court limited the claim to a fuel filter even though statements the inventors made during the prosecution could have been interpreted to reflect their view that the "fuel injection system component" was broader than just fuel filters. *Id.* at 1316. The District Court relied instead on the specification which only described the elements and operation of a fuel filter. No other fuel injection system parts or components were described. As such, the inventors had not characterized a fuel filter as merely a preferred version of all possible embodiments, but as *the only* embodiment of the invention.

Affirming the decision, the Federal Circuit held:

> Here the written description uses language that leads us to the conclusion that a fuel filter is the only single "fuel injection system component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment.

*Id.* at 1318. Of particular importance to the Federal Circuit was the written description's reference to a fuel filter as "this invention" or "the present invention" on four separate occasions. The Court noted, "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id.* Further supporting this construction, the patent focused solely on issues involving fuel filters when discussing the limitations of the prior art. *Id.*

To invoke Yogi Berra, the Asserted Patents are more like the patent in *Honeywell* than the patent in *Honeywell*. First, the Asserted Patents repeatedly describe the "invention" as either applicable to, a component of, or directed to a "portable computer." Here, as in *Honeywell*, the patentee failed to describe a housing and/or data processing device in any manner other than as a portable computer. Indeed, it is striking that the patentee expressly noted that LCD devices are used in portable computers *and monitors*,[40] but chose to exclusively and repeatedly describe the invention sought to be protected by these patents solely in connection with a portable computer.

Exhibit 1 hereto sets forth a detailed recitation of more than a dozen instances where the Asserted Patents describe or depict the invention as a portable computer. Highlights from that exhibit include the titles of the patents,[41] the Abstract ("a portable computer including a housing having first and second sections . . ."), the Summary of the Invention ("[a]ccordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon . . ."), and various places throughout the body ("[t]he present invention provides a back mounting method and a back mounting structure for a panel display device in a portable computer"). Indeed, at the conclusion of the specification when seeking to ensure that one of ordinary skill in the art would appreciate the full scope of what was disclosed, the inventors once again confirmed that the present invention is directed to a portable computer, to wit:

> It will be apparent to those skilled in the art that various modifications and variations can be made *to the portable computer and method for mounting a flat panel display device thereon of the present invention* without departing from the spirit or scope of the invention.[42]

Applying the words of the Federal Circuit, "if the written specification could talk, it would say" a "housing" is the case and body of a portable computer. *Honeywell*, 452 F.3d at 1320. Certainly, this is what the inventors said in the specification as it was originally filed and

---

[40]  JA at Ex. A, '641 Pat., Col. 1:32-34.
[41]  JA at Ex. A, '641 Pat., VS015074 ("Computer Having a Flat Panel Display Device"); *id.*, at Ex. B, '718 Pat., VS014789 ("Portable Computer and Method for Mounting a Flat Panel Display Device Thereon").
[42]  JA at Ex. A, '641 Pat., Col. 7:46-50 (emphasis added).

as amended.

The claims and drawings also provide substantial support for ViewSonic's construction. All nine embodiments and related descriptions depict the housing exclusively as the case and body of a portable computer. *See C.R. Bard*, 388 F.3d at 865-69; *Microsoft*, 357 F.3d at 1348. Independent claims 35 and 55 of the `641 Patent each require the rear mountable flat panel display device be mounted to the housing of a data processing device. As discussed below, a "data processing device" is a CPU of a portable computer, or even the computer itself. Likewise, Claims 1-34 claim a "housing" that has both a first section and a second section, which the specification identifies as the body and case of a portable computer.[43]

The entire intrinsic record compels a construction of "housing" as the case and body of a portable computer. Certainly, the public – like the Examiner – is entitled to rely on what the inventors said when they spoke on this matter, over and over again.

- The term *"Case or Display Case"* is likewise properly construed as *"the portions of the housing that enclose the flat panel display device."*

As with housing, the term "case" or "display case" has an express meaning. The specification tells us it as a component of the housing.[44] The specification further describes the display case as the structure that encloses the flat panel display device.[45] The use of the term in the claims is in accord. For example, "display case" appears in asserted Claim 40 of the '718 Patent. The elements of Claim 40 are: "arranging the LCD device on a inner surface of a display case, wherein the display case has an inner surface and back; attaching the LCD device to the display case from the back of the display case."[46] This only make sense where the case encloses the LCD device.

LPL's construction of this term is contrary to the express teachings and definitions of the specification and pulls the claim term out of context. The specification says the case is

---

[43]  JA at Ex. A, '641 Pat., Claims 1-34, Col. 4:48-49; *id*. Col. 6:6-8.
[44]  JA at Ex. A, '641 Pat., Col. 4:44-50; Col. 6:6-9.
[45]  JA at Ex. A, '641 Pat., Fig. 2; Col. 1:35-41; Col. 1:49-54; Col. 5:1-3.
[46]  JA at Ex. B, '718 Pat., Claim 40.

comprised of a front case 121 and rear case 123.[47]  Referencing Fig. 5, the specification expressly states that the front portion is preferably assembled to the "portable computer of the first embodiment of the invention."  This is exactly the same as the prior art configuration shown in Fig. 2.[48]  Nothing in the specification discloses or claims a new portable computer where the case only has a rear portion and no front portion that covers the front of the flat panel display device.  Thus, limiting the terms "case" and "display case" to what the specification teaches is actually only the rear portion of the case is not proper.  Instead, the proper construction of "case" and "display case" is the portions of the housing that enclose the flat panel display device.

- The term "*Data Processing Device*" is "*the central processing unit of a portable computer.*"

Just as the intrinsic evidence compels the conclusion that the housing is a component of a portable computer, so too does the evidence compel the conclusion that the element "Data Processing Device" is a portable computer or the central processing unit ("CPU") thereof.  No matter how hard one listens, the specification simply does not say anything else.

The express language of the claims makes clear that the data processing device is separate and distinct from the flat panel display device.[49]  For example, Claim 35 opens:  "A rear mountable flat panel display device capable of being mounted to a data processing device" and further claims that the first frame of the flat panel display device is "capable of being fixed to a housing of the data processing device."  It is simply not physically possible to mount a flat panel display device to a component that is contained within the flat panel display device.  Moreover, these claims would be nonsensical if the data processing device were a 1-inch microprocessor chip secured inside a flat panel display device, as LPL's construction would allow.  *See In Re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("[a] claim must be read in accordance with the precepts of English grammar").  The housing of a data processing device would in reality be the

---

[47]  JA at Ex. A, '641 Pat., Col. 1-37-39.
[48]  JA at Ex. A, '641 Pat., Col. 4:1-3.
[49]  JA at Ex. A, '641 Pat., Claim 35; *see also* Claim 55 ("capable of being fixed to a housing of a data processing device").

housing of the flat panel display device. This construction would thus entirely read out the "data processing device" limitation from these claims, a highly improper result. *See Gen. Am.,* 93 F.3d at 770.

Technically speaking, one of skill in the art would understand that the component of a portable computer that acts as a data processing device is the CPU. Thus, the proper construction is a CPU of a portable computer. Given the inventors' intention to limit the invention to a portable computer, however, ViewSonic submits that it would be equally proper for the Court to adapt the broader construction of "data processing device" as being a "portable computer."

### C.    Constructions of *"First Frame"* and *"Second Frame"*[50]

- First Frame: *"the structure at the back of a flat panel display device that, together with the second frame structure, sandwiches and assembles the components along the edges to form the device"* and

- Second Frame: *"the structure at the front of a flat panel display device that, together with or as part of the first frame, sandwiches and assembles the components along the edges to form the device".*

Read out of context, it is easy to suggest that "first frame" and "second frame" relate to a generic structure where the labels "first" and "second" are terms of serendipity, having no significance. Claim terms must be construed in context, however. *See Bell Comms. Research, Inc. v. Vitalink Comms. Corp.,* 55 F.3d 615, 621 (Fed. Cir. 1995). Read in context, one of ordinary skill in the art could only understand these terms to refer to specific structural components of a flat panel display device.

The specification shows that the first frame and the second frame are the structures at the rear and front, respectively, of the stack of constituent elements contained in a flat panel display device. As illustrated in figures 4A-C (*see* VS Ex. 2), the first frame and the structure that is called the "second frame" 16 (also called "support frame 16") is like an open bottom box – it has

---

[50] These claim terms appear in Claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent.

an opening for the display area and has sides that surround components of the flat panel display device 10.[51]

The first frame 14g is the structure at the bottom of the stack of constituent elements (as illustrated in figure 4C) and forms the back of the flat panel display device. It engages with the structure that is the second frame components to form the flat panel display device 10. The first frame 14g is connected to the second frame 16 in order to assemble the components as a flat panel display device 10.[52] The specification further discloses that the first frame 14g can be integrated with the structure that is the second frame 16.[53] This presumably refers to the unitary support frame structure the patents describe in conjunction with the prior art front mounted frame, illustrated as element 114 in Fig. 3A.[54]

Likewise, the Asserted Patents specifically differentiate the "first frame" and the "second frame" from the display device support member 24 (as illustrated in figure 14, and elsewhere) which the patent also identifies as the hinge arm.[55] Indeed, the patent expressly teaches away from the idea that any component within the housing can be the first frame. For example, the patents teach the use of an intermediate "support member" 24 between the rear case and the flat panel display device. Throughout the specification and the claims, the inventors specifically differentiate that support member (24) from the first frame (14g) and second frame (16). They never suggest that the support member can replace either the first or second frame. That is because the support member *does not assemble* the components of the flat panel display device along the edges.[56] Thus, the terms "first frame" and "second frame" are not just any structure but are particular structures of a flat panel display device. *See Inpro II Licensing S.A.R.L. v. T-*

---

[51] *See* ViewSonic Ex. 2 attached hereto.
[52] JA at Ex. A, '641 Pat., Col. 4:20-21.
[53] JA at Ex. A, '641 Pat., Col. 4:21-26.
[54] JA at Ex. A, '641 Pat., Col. 2:4-6.
[55] *See* JA at Ex. A, '641 Pat. at Abstract, 6:6-13, 5:40-7:16; claims 1-21, 28, 30.
[56] *Accord, SciMed,* 242 F.3d at 1341 ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claim, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

*Mobile USA, Inc.*, 450 F.3d 1350, 1354-57 (Fed. Cir. 2006) (Court limited claim meaning because specification, embodiments, and prosecution history consistently described claim element as having one structure, and specification emphasized the importance of that structure in solving the problems of the prior art structure).

The claims also confirm ViewSonic's proposed construction. In each claim where a first frame is present, a second frame is also present. The flat display panel is always between these two frames. That is not surprising given that the specification explains that the structures of the first frame and the second frame interact to assemble and form a flat panel display device.

Further, Claims 35 and 47 of the '641 patent, and 33 of the '718 patent, each require that the "first frame" be a part of the backlight unit. As the backlight unit is located behind the flat display panel in a flat panel display device, the language of the claims requires that the first frame be the back of the device. The only structure which consistently forms the back of the flat panel display device is the first frame, and specifically the structure shown as 14g in Fig. 4C.[57] *Microsoft*, 357 F.3d at 1350.

Claim 47 of the '641 patent requires that the first and second frames be connected together. There, a screw attaches the first frame of the backlight unit to the second frame as well as the housing through a single fastening part at the rear surface of the first frame. This example highlights how the inventors defined these terms to not be just any "frames," but to be specific and particular structures that served specific and particular functions in the operation of the invention sought to be protected. Their construction must conform to those same structures. *Nystrom*, 424 F.3d at 1145; *SeaChange*, 413 F.3d at 1369-72.

ViewSonic's construction of these terms is also confirmed by the description of a prior art flat panel display device found in the prosecution history. The Patent Examiner cited Yun as the primary reference upon which he repeatedly rejected the claims during prosecution –until the inventors added the limitation "rear mountable." Not surprisingly, Yun uses "first frame" and

---

[57] JA at Ex. A., '641 Pat., Col. 4:15-25.

"second frame" to describe the same frames as shown in the Asserted Patents.[58]  Unquestionably, one of ordinary skill in the art at the time of the invention, was well aware of the structure of a flat panel display device, including that it has a "first frame" and "second frame" that assemble the stacked components form the device.

Moreover, when the Examiner cited these frames from the prior art as anticipating the frames in the Asserted Patents, the inventors specifically responded by identifying item 14g in figure 4C (VS Ex. 2) as the structure intended to be covered by the term "first frame" in the claims.   The exclusive focus of the ensuing prosecution was about the location of the fastening elements, structure, not the location or function of these prior art frames.[59]

ViewSonic is not seeking to improperly import limitations of the preferred embodiments into these claim terms.   Rather, the whole of the intrinsic evidence unequivocally dictates that the "first frame" and the "second frame" are the structures which assemble components of the flat panel display device and form the side edges of the flat panel display device.  *SeaChange*, 413 F.3d at 1372-74; *SciMed*, 242 F.3d at 1341.  Thus, ViewSonic's construction is proper in light of the claims, the specification, and the prosecution history.

### D.    Construction of *"Backlight Unit"*[60]

- The proper construction of this term is "*a lighting structure that includes at least a reflector, a light guide film, a diffuser or protecting film, a prism sheet, and the first frame.*"

The term "backlight unit" has an express meaning provided in the specification.  The specification first identifies the backlight unit as part of the conventional prior art LCD device shown in figure 2 (ViewSonic Ex. 2):

> The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.[61]

---

[58]  JA at Ex. D, Yun, Col. 2:13-18; Fig. 6.
[59]  JA at Ex. G, '641 Pat. file history, VS5005512-VS5005514.
[60]  This claim term appears in Claim 35 of the '641 Patent and Claim 33 of the '718 Patent.
[61]  JA at Ex. A, '641 Pat., Col. 1:42-45.

Notably, this description identifies the backlight device and supporting frame, but does not detail

the other layers of the backlight unit. The description of the backlight device in figures 3A and

3B is the same. The only reasonable conclusion that can be drawn from this lack of detail is that

the backlight unit is a structure that is well known to one of ordinary skill in the art. In fact, the

prior art cited in the prosecution history confirms the features of a backlight unit that were

known at the time.

> Referring to [prior art] FIG. 1, the LCD device includes a liquid
> crystal panel 20, a *back light unit*, and a driving circuit board 23.
> The *back light unit* is comprised of a luminescent *lamp* 11, a *lamp
> housing* 12 having a U-shape and surrounding the lamp 11, a *light
> guide* 13, a *reflector* 14 reflecting the incident light from the
> horizontal direction to the vertical direction, a protection sheet 15
> contacting the light guide, a *first prism sheet* 16 and a *second
> prism sheet* 17 set on the protecting sheet (diffuser) 15 and
> condensing the incident light from the light guide 13 to some
> direction, a *diffuser* 18 diffusing the light from the first and second
> prisms 16 and 17 to a viewing area 21 of the liquid crystal panel 20
> with a certain viewing angle, and a *first supporting frame* 19
> supporting these elements.[62]

Yun similarly described the components of a backlight unit according to its own

invention as a first support frame, a reflector, a light guide, a protection sheet (diffuser), a first

prism sheet, a second prism sheet, and another diffuser.[63] To form the LCD device, those layers

are stacked sequentially with the liquid crystal panel on top.[64]

Consistent with this known art, the first embodiment of the present invention as shown in

figure 4 (VS Ex. 2) details the backlight unit components as a first frame, a reflector, a light

guide film, a diffuser or protecting film, a first prism sheet, a second prism sheet, and another

diffuser or protecting film.[65] Although figure 4 is described as an "embodiment" of the

invention, it adds nothing new to the well known parts of a conventional backlight unit. Indeed,

the only significant distinction between figure 4 of the present invention, and figure 6 in the prior

---

[62] JA at Ex. D, Yun, FIG. 1 and Col. 1:16-32 (emphasis added); *see also* Col. 2:4-7 ("According to the structure described above, the LCD device operates as follows. The light from the luminescent lamp is incident on the rear surface of the liquid crystal panel through the *back light unit*.") (emphasis added).
[63] JA at Ex. D, Yun, FIG. 6 and Col. 4:38-41.
[64] JA at Ex. D, Yun, FIG. 6 and Col. 4:35-42.
[65] JA at Ex. A, '641 Pat., Col. 4:12-21.

art Yun, or even the prior art figure 1 of Yun, is the location of the mounting holes on the first frame.[66]  (See VS Ex. 2.)  Thus, what makes figure 4 an "embodiment" is simply that the mounting holes are located on the back corners of the first frame, which is purportedly different from the prior art.

The claims also identify the backlight unit components.  Backlight unit first appears in Claim 35 where the first frame of the backlight unit is expressly identified.  In Claim 40, which depends from Claim 35, the reflector, light guide unit, and light source unit are identified.  Claim 41, which depends from Claim 40, further indicates the backlight unit has a diffuser unit and prism unit.  Claims 47 and 48, respectively, provide the same components for the backlight unit as Claims 35, 40 and 41.

Rather than importing any limitations from the specification or the prior art, however, Viewsonic's construction requires no more components for the backlight than is called for by the claims.  *See Inpro*, 450 F.3d at 1354-57.  Specifically, while the prior art and preferred embodiment call for two diffusers or protection sheets and two prism sheets, ViewSonic's construction provides for *at least* one, consistent with the plain language of the claims. ViewSonic's construction is firmly supported by the claims, as well as the specification and the prosecution history.

E. **Construction of *"Flat Panel Display Device"* and *"LCD Device"*[67]**

- The proper construction of these related terms is *"a stack of components, including a flat display panel, assembled as a device along the edges by the first and second frames"* and *"a stack of components, including a liquid crystal flat display panel, assembled as a device along the edges by the first and second frames,"* respectively.

By way of background, these terms are being briefed together because the Asserted Patents describe the flat panel display device in the context of a liquid crystal display device, or "LCD device."  The specification indicates that plasma display panels (PDP) and field emission

---

[66] Figure 4 in the patents-in-suit also does not expressly identify the lamp or lamp housing.  Accordingly, ViewSonic did not include that feature in its construction, despite its obvious presence in the prior art.

[67] Flat panel display device appears in Claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent.  LCD device appears in Claim 40 of the '718 Patent.

displays (FEDs) are types of flat panel display devices that "have been studied and may be applied to computers in the future."[68] But it is devoid of any discussion of how the claimed invention would be applied to these alternative display technologies, or any discussion of the structure of any display device using these alternative technologies. Moreover, the patent repeatedly refers to the invention as being applied to an LCD device.[69]

Once again it is important to stay focused on what the inventors invented. The claimed invention is not a new flat panel display device. Rather it is simply – and exclusively –a structure and method for mounting a flat panel display device in a portable computer. This distinction is evidenced throughout the Asserted Patents including, for example:

### SUMMARY OF THE INVENTION

> Accordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon that substantially obviates one or more of the problems due to limitations and disadvantages of the related art.
>
> An object of the present invention is to minimize the non-display area of the LCD device.
>
> Another object of the present invention is to provide a computer having a flat panel display device with a maximum display area and a minimal display case size.[70]

The Asserted Patents universally depict and identify the "flat panel display device" as a series of components stacked one against another containing at least a flat display panel, where the elements are assembled along the edges into a device by the back (first) and front (second) frames. Given what the patents sought to protect, it is not surprising that this structure is consistent between the preferred embodiments and the prior art mounting techniques, to wit:

> The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.

---

[68]  JA at Ex. A, '641 Pat., Col. 1:20-24.

[69]  JA at Ex. A, '641 Pat., Col. 1:17-24; Col. 2:31-34; *id.* Col. 2:37-39; *id.* Col. 2:47-48; *id.* Col. 3:14-20; *id.* Col. 3:41-42; *id.* Col. 3:50-55; *id.* Col. 3:63-65; *id.* Col. 4:12-26; *id.* Col. 4:42-44; *id.* Col. 5:4-8; *id.* Col. 5:35-37; *id.* Col. 6:16-20; *id.* Col. 6:44-49; *id.* Col. 6:56-60; *id.* Col. 7:31-33.

[70]  JA at Ex. A, '641 Pat., Col. 2:40-51.

\* \* \*

> Referring to Figs. 3A and 3B, a conventional LCD device
> assembly 110 includes an LCD panel 112 and a backlight device
> (not shown) for the LCD panel 112, and display case 122
> supporting the LCD device 111. The LCD panel 112 and the
> backlight device are assembled by a supporting frame 114 along
> the edges.[71]

Yun similarly explains that a flat panel display device has various backlight layers and a liquid

crystal panel that "are stacked sequentially"[72] and are assembled into a device by first and second

frames.[73]

The Asserted Patents contain no disclosure or hint whatsoever that the flat panel display

device is any structure other than stacked components assembled along the edges into a flat panel

display device by the first and/or second frames. Every embodiment in every figure shows these

frames assembling the constituent elements of the flat panel display device to mount the

device.[74] This supports ViewSonic's construction. *See, e.g., Microsoft*, 357 F.3d at 1349

(limiting scope of claims because specification "repeatedly and consistently describes" claimed

invention as limited).

In light of the claims, specification, and file history, the term a "flat panel display device"

is properly construed as the "stack of components, including at least a flat display panel,

assembled as a device along the edges by the first and second frames."

F.    Construction of *"Fastening Part"* and *"Fastening Element"*[75]

- The proper construction of these related terms is *"fastening holes together
  with the material defining the hole, pegs, screws, hooks, bolts, ribs, nails,
  or other similar fasteners including a fastener with a compressible head."*

The '641 Patent claims use the term "fastening part" while the '718 Patent claims use the

term "fastening element." The terms are used interchangeably throughout the patents' written

---

[71] JA at Ex. A, '641 Pat., Col. 1:42-45; Col. 2:1-6.
[72] JA at Ex. D, Yun, Col. 4:38-43, describing Figure 6.
[73] JA at Ex. D, Yun, Col. 3:6-17, and Abstract.
[74] JA at Ex. A, '641 Pat., Figs. 4-16.
[75] Fastening part appears in Claims 35, 36, and 55 of the '641 Patent. Fastening element appears in
Claims 33, 34, and 35 of the '718 Patent.

description to refer to the same thing. ViewSonic therefore proposes that both claim terms have the same meaning. "Fastening part" and "fastening element" should be construed to mean:

> Fastening holes together with the material defining the hole, pegs, screws, hooks, bolts, ribs, nails, or other similar fasteners including a fastener with a compressible head.

The patents define fastening part and fastening element by referencing various types of fasteners. Examples of each from the specification follows:

> the screw hole 15 (which may be referred to as *a fastening hole* or a similar conveniently descriptive term, *and which together with the material defining the hole* may be referred to as a fastening element or fastening part)[76]

> *pegs* 15a *together with the mounting holes formed therein* may be referred to as a fastening element or fastening part[77]

> *screws* 18 (fastening elements or fastening parts)[78]

> *fasteners* 17 (fastening elements or fastening parts) *such as hooks* made of plastic are formed, and the case 21 has corresponding *ribs* 23 (also fastening elements or fastening parts).[79]

> *bolts* 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term)[80]

> *nails* or other similar known fastening elements or fastening parts[81]

> The *fastener* 17 has a *compressible head*[82]

Reading these examples from the specification, one of ordinary skill in the art would understand fastening part and fastening element to be interchangeable, and to mean any of the above types of fasteners. *Nystrom*, 424 F.3d at 1145.

The claims provide further understanding that the fastening part is used to mount one component to another component.[83] Because that feature is already expressed in the claims,

---

[76] JA at Ex. A, '641 Pat., Col. 4:32-36.
[77] JA at Ex. A, '641 Pat., Col. 5:60-62.
[78] JA at Ex. A, '641 Pat., Col. 4:59-60.
[79] JA at Ex. A, '641 Pat., Col. 5:10-13.
[80] JA at Ex. A, '641 Pat., Col. 4:29-32.
[81] JA at Ex. A, '641 Pat., Col. 6:14-15.
[82] JA at Ex. A, '641 Pat., Col. 5:21.
[83] *See, e.g.*, JA at Ex. A, '641 Pat., Claims 35, 55, and 56.

however, there is no need to include it within the construction as LPL proposes. *See LG.Philips LCD Co. Ltd, v. Tatung Co.*, 434 F. Supp. 2d 292, 299 (D. Del. 2006) ("If a feature is specifically claimed, then the Court will not include it in the definition because it is 'both unnecessary' and 'redundant.'").

G.     **Construction of "*Fastening Hole*"**

- The proper construction of this term is "*any hole, including screw holes, through holes, mounting holes and stepped holes.*"

The patent uses the term "fastening hole" to refer to the various types of holes the patent identifies for mounting. Specifically, after identifying a type of hole, such as a screw hole, the specification says, "which may be *referred to as fastening holes* or a similar conveniently descriptive term." This use of "fastening hole" is consistent throughout the specification.[84]

Thus, "fastening hole" is defined in the patent to be:

> Any hole, including screw holes, through holes, mounting holes and stepped holes.

Examples of each reference from the specification follows:

> the *holes* 21a and 15 (which may be referred to as *fastening holes* or a similar conveniently descriptive term . . .)[85]

> the *screw hole* 15 (which may be referred to as a *fastening hole* or a similar conveniently descriptive term . . .)[86]

> a *through-hole* 21a (which may be referred to as a *fastening hole* or a similar conveniently descriptive term . . .)[87]

> *stepped hole* 30b (which may be referred to as a *fastening hole* or a similar conveniently descriptive term . . .)[88]

As these examples show, one of ordinary skill in the art would understand fastening hole to mean any of the above types of holes. *Nystrom*, 424 F.3d at 1145.

---

[84]  Indeed, "fastening hole" is used as part of this phrase in all but one instance in the specification. That one instance appears only after the patent has defined the various holes as fastening holes, and merely provides "The fastening holes may be formed at various positions on the hinge arm. . . ." JA at Ex. A, '641 Pat., Col. 6:41-43. Thus, it does not alter the construction.

[85]  JA at Ex. A, '641 Pat., Col. 4:60-62 (emphasis added).

[86]  JA at Ex. A, '641 Pat., Col. 4:32-33 (emphasis added).

[87]  JA at Ex. A, '641 Pat., Col. 4:51-52 (emphasis added).

[88]  JA at Ex. A, '641 Pat., Col. 7:3-5 (emphasis added).

ViewSonic's construction is fully supported by the language of the claims. For example, asserted Claim 36 provides that the fastening part of Claim 35 includes a "fastening hole." One of ordinary skill in the art, after reading the entire patent, would understand this could be any hole, including a screw hole, through-hole, mounting hole, or stepped hole. The construction is equally proper when applied to the unasserted claims. For example, unasserted Claim 10 reads "the rear mountable display device being attached to the arm through the fastening hole of the arm." One could replace fastening hole with "stepped hole" without changing the meaning of the claim. Thus, the claims and specification both support ViewSonic's construction.

LPL contends that the construction of this term is "provides one component with the capability of being mounted to another component." But the function of the fastening hole is already set forth as an element of the claims. For example, asserted Claim 36 provides that the fastening part in asserted Claim 35 includes a "fastening hole." Claim 35, in turn, provides that the "first frame of the backlight unit [is] capable of being fixed to a housing of the data processing device through the *fastening part. . . .*" Accordingly, there is no need to define "fastening hole" as having that function, contrary to LPL's suggestion. *See LG.Philips*, 434 F. Supp. 2d at 299 ("If a feature is specifically claimed, then the Court will not include it in the definition because it is 'both unnecessary' and 'redundant.'").

Furthermore, the fastening hole by itself is not a fastening element or part. The patent clearly and repeatedly states that a fastening hole can only be referred to as a fastening element or part when the fastening hole is taken "together with the material defining the hole."[89] By definition, then, the fastening hole does not include the material defining the hole. LPL's proposed construction, however, incorrectly requires inclusion of the material defining the hole. This contradicts the stated meaning of the terms. It also ignores the prosecution history. On February 9, 2001, the Examiner objected that the claim term "fastening hole" could not, in and of

---

[89] JA at Ex. A, '641 Pat., Col. 4:32-36 ("which may be referred to as a *fastening hole* or a similar conveniently descriptive term, *and which together with the material defining the hole* may be referred to as a fastening element or fastening part)" (emphasis added); Col. 4:51-54 (same); Col.4:60-64 (same); Col. 5:53-56 (same); Col. 5:65-6:1 (same); Col. 6:65-7:2 (same); and Col. 7:3-7 (same).

itself, be a fastening part or fastening element because a hole by definition was empty space.[90]
To overcome this objection, the inventors amended the specification to include the language
"and which together with the material defining the hole may be referred to as a fastening element
or fastening part." Thus, that language is simply not part of the definition of a fastening hole.
*Spectrum*, 164 F.3d at 1378. LPL's construction should be rejected not only as redundant, but
because it also contradicts the specification and the prosecution history.

## VI.    TERMS THAT SHOULD NOT BE CONSTRUED.

At the insistence of LPL, eight additional terms are discussed below. ViewSonic
contends that none of these terms need to be construed. Four of these terms – peg, protruding
portion, stepped hole and rear mounted[91] – appear only in unasserted claims, and their
construction will not aid in construing other terms.[92] Thus, the Court should decline to construe
these terms. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999);
*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349
(Fed. Cir. 2001) (terms in unasserted claims do not require construction). Construction of these
terms does not assist in the construction of other terms at issue, and thus should not be construed
by the Court at this time. ViewSonic nevertheless addresses them here for completeness.
ViewSonic additionally addresses the four phrases which it believes do not require construction
once the above terms have been construed.

---

[90] JA at Ex. G, '641 Pat. file history, VS5005535.

[91] If the Court chooses to construe rear mounted, it should simply be construed as the past verb tense of "rear mountable."

[92] Under the Amended Scheduling Order, the parties made a final exchange of claim terms on October 2, 2006. At that time, LPL proposed several terms that were not in any claims that had as of then been asserted. ViewSonic immediately objected to the construction of claim terms contained solely in unasserted claims as a waste of judicial resources and the parties' time. Weeks later, on November 8, LPL first informed ViewSonic that it intended to assert 12 new claims as part of its infringement argument. Having propounded discovery requesting a list of the claims LPL intended to assert, ViewSonic objected that the untimely addition of new claims violated LPL's discovery obligations, and would interfere with claim construction. ViewSonic has filed a motion seeking to exclude these new claims. The motion is scheduled to be heard by Special Master Poppiti on December 28, 2006. During the meet and confer process leading up to this filing, ViewSonic again proposed that these unasserted claim terms not be construed. LPL insisted the terms be construed, and therefore, ViewSonic has briefed them here, subject to its objections.

A.    Construction of *"First Frame Having A Fastening Part"* and *"First Frame Having A Fastening Element"*[93]

- The proper construction of these related terms is *"fastening element/part integral to the first frame."*

ViewSonic contends these two phrases need not be construed. The parties have already proposed constructions for "first frame" and for "fastening part/element." Thus, the only thing left in these phrases are the words "having a." These words have ordinary, understood meanings. Thus, any construction would merely be substituting synonyms for "having," which the Federal Circuit counsels against. *C.R. Bard*, 388 F.3d at 863.

LPL, on the other hand, insists these phrases must be construed. Their proposed construction explains their insistence but ignores the plain language of these phrases. LPL proposes that these phrases be construed as a "first frame having a fastening part(s) positioned on or within the border of the flat display panel." LPL's construction repeats the very phrase it proposes to construe, namely, "first frame having a fastening part." In short, LPL is not actually construing these phrases. Instead, it is using this phrase to improperly add a physical location limitation that does not appear anywhere in these phrases and is contrary to the claim language, which already recites the position of the fastening part as being "at a rear surface of the first frame." Thus, the claim language negates LPL's construction.

If the Court agrees that "first frame having a fastening part" does not simply mean what it says, *e.g.*, that the first frame has a fastening part, then ViewSonic proposes the phrase be construed to mean "a fastening part integral to the first frame."[94] The plain language of the phrase indicates that the fastening part or element is actually part of the first frame. The word "having" signifies possession or inclusion, that one thing is integral to another. Here, it is the first frame that possesses or includes a fastening part. Indeed, the similar claim element appears in unasserted Claim 1, but substitutes the word "including" for "having": "a rear mountable

---

[93] These phrases appear in Claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent.

[94] The proposed constructions for "first frame" and "fastening part" or "fastening element" are discussed above. Those terms maintain their same meaning when used in this phrase.

display device *including* a fastening element at a rear surface of the rear mountable display device."

Not only is ViewSonic's construction consistent with, and supported by, the use of these phrases in each of the claims, but it also fits other uses of the word "having" in unasserted claims. For example, dependent Claim 52 says the protruding portion of a fastening part includes a "peg *having* a fastening hole." The fastening hole is formed at one end of the peg.[95] Thus, the fastening hole is integral to the peg. Likewise, Claim 1 says "a housing including first and second sections, the first section *having* an information input device and the second section *having* a case *having* a first fastening element." The patent specification makes clear that these features are part of, or integral to, the housing.[96]

The specification provides further support for ViewSonic's construction. Each time the fastening part of the first frame is described, it is said to be "formed." It is described this way in the first embodiment in figure 4C, "At each corner of the first frame 14*g* a screw hole is preferably *formed*,"[97] as well as the last embodiment in figure 16, "At the rear surface of the LCD device 10 at least one fastener (fastening element or part) such as a hook . . . is *formed*."[98] In order to be "formed," the fastening element must be integral to, or part of, the first frame.

Thus, ViewSonic's construction is consistent with the plain language of the phrase, the plain meaning of the claims, and the specification.

---

[95] JA at Ex. A, '641 Pat., Col. 5:57-59 ("At the back surface of the LCD device 10, pegs 15*a* having mounting holes formed therein").
[96] JA at Ex. A, *see, e.g.*, '641 Pat., Col. 4:44-55 ("The computer includes a body 20 or first section having an information input device and a second section including the case 21. . . . Together, the case 21 and the body 20 may be referred to as a housing, or a similar conveniently descriptive term. Preferably at each corner of the case 21 a through-hole 21*a* . . . which may be referred to as a fastening element . . . is formed.")
[97] JA at Ex. A, '641 Pat., Col. 4:22-24 (emphasis added).
[98] JA at Ex. A, '641 Pat., Col. 6:57-60.

**B.**    **Construction of *"Capable of Being Mounted"* and *"Capable of Being Fixed"*[99]**

- The proper construction of these related terms is *"capable of being fixed/mounted."*

The parties have stipulated to the construction of the terms "fixed" and "mounted" as both meaning "attached firmly or fixed securely so as to be supported." ViewSonic thus contends that these two phrases need not be construed as the only words left undefined – "capable of being" – have ordinary, understood meanings. Thus, any construction would merely be substituting synonyms for "having," which the Federal Circuit counsels against. *C.R. Bard*, 388 F.3d at 863.

Not surprisingly, substituting synonyms is precisely what LPL proposes the Court do. LPL asks the Court to construe the words "capable of being" to mean "having the ability to be." Not only does this construction unnecessarily lengthen the claim term, but it provides no greater insight to its meaning than the term itself, and may make the term even less certain. "Having the ability to be" invites a hypothetical interpretation untethered to reality, that is avoided by the common everyday words "capable of being."

If the Court determines these phrases require construction, ViewSonic submits that the proper construction simply needs to replace "fixed" or "mounted" with the parties' stipulated construction. Thus the phrases will read: "capable of being attached firmly or fixed securely so as to be supported."

**C.**    **Construction of *"Peg"* and *"Protruding Portion"***

- The proper constructions of these terms are *"a boss"* and *"the portion of a fastening element that extends out from the surrounding surface,"* respectively.

These are terms from unasserted claims. A "peg" is one type of fastening part.[100] ViewSonic contends that it requires no construction because the patent defines it as a fastening

---

[99]  These phrases appear in Claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent.
[100]  JA at Ex. A, '641 Pat., Col. 5:60-63 ("The pegs 15a together with the mounting holes formed therein may be referred to as a fastening element or fastening part and as shown in FIG. 8 protrude away from the LCD device 10.")

part, and it has a plain, ordinary meaning that is understood by one of ordinary skill in the art. Likewise, "protruding portion" has a plain, ordinary meaning that is consistent with the context of the claims. LPL disagrees.

One of ordinary skill in the art would understand a peg to be the same thing as a boss, or any type of small cylindrical fastener. Indeed, anyone who has ever assembled furniture from IKEA has seen at least one type of peg. A "protruding portion" is the part of something that protrudes, or extends out from the surrounding surface. For example, a screw has a head and a tail. The tail is the protruding portion of the screw because it extends out from the flat surrounding surface of the head. Nothing in the claims, specification, or prosecution history change the ordinary meaning of peg or protruding portion.

Peg and protruding portion appear in the same manner in several unasserted dependent claims. Taking Claims 44 and 45, for example:

> 44. The rear mountable flat panel display device according to claim 35, wherein the fastening part includes a protruding portion protruding away from the flat display panel.
>
> 45. The rear mountable flat panel display device according to claim 44, wherein the protruding portion includes a peg having a fastening hole.[101]

In other words, in Claim 44 the fastening part has a protruding portion, which simply narrows the type of fastening part that can be used to, for example, a peg. Claim 45 further narrows Claim 44 by limiting the peg to one that has a fastening hole, thereby excluding solid pegs. Protruding portion also appears in unasserted Claim 46 which provides that the protruding portion of Claim 44 includes a first part and a second part, the first part being larger than the second part.[102] Again, this simply narrows the type of fastening part that can be used to, for example, a fastener with a compressible head.

In short, these terms do not require construction. But if the Court is inclined to construe them, they should be given their ordinary meanings as supported by the plain language and

---

[101] *See also* JA at Ex. A, '641 Pat., Claims 33/34 and Claims 51/52.
[102] *See also* JA at Ex. A, '641 Pat., Claim 53 (same).

context of the claims. Specifically, peg should be defined as "a boss," and protruding portion should be defined as "the portion of a fastening element that extends out from the surrounding surface."

**D.    Construction of "*Stepped Hole*"**

- The proper construction of this term is "*a hole where the fastening surface is on a different plane than the component being secured, e.g., a countersunk hole.*"

Hereto, the term is only in unasserted claims. Although "stepped hole" appears in the specifications, it does not appear in any claim in the '641 Patent. It only appears in one unasserted dependent claim in the '718 patent, Claim 36:

> 36. The method of claim 33, wherein the fastening element comprises a stepped hole.

As shown by this claim, a "stepped hole" is defined by the patent as one type of fastening hole.[103] ViewSonic contends, therefore, that it requires no construction. Moreover, it has a plain, ordinary meaning that is understood by one of ordinary skill in the art and is consistent with the context of the claims. LPL disagrees.

One of ordinary skill in the art would understand a stepped hole to be a hole that changes size, either from wide to narrow or narrow to wide. A stepped hole enables the fastener to sink below the surface it does not protrude from, or break the surface. In describing figure 5, for example, the specification explains that the "through-hole 21a is preferably a stepped hole so that the head of the screw 18 will not protrude from the outer surface of the case 21." In that circumstance, the stepped hole changes from wide to narrow. Figure 6 also has a stepped hole that is identified as part of rib 23. There, the stepped hole changes from narrow to wide as it is meant to receive a fastener with a compressible head, such as the one designated 17 in figure 6. The shape of the stepped hole will vary depending on the type of fastener to be inserted into it.

---

[103] JA at A, '641 Pat., Col. 7:3-5 ("stepped hole 30b (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .)")

In short, this term does not require construction.  But if the Court is inclined to construe it, it should be given its ordinary meanings as supported by the plain language and context of the claims.  Specifically, a stepped hole is "a hole where the fastening surface is on a different plane than the component being secured, *e.g.*, a countersunk hole."

**VII.    CONCLUSION**

For the foregoing reasons, ViewSonic respectfully requests that the Court adopt its proposed constructions for these claim terms.

CONNOLLY BOVE LODGE & HUTZ LLP

Dated:  December 22, 2006

By:  */s/   Jeffrey B. Bove*
Jeffrey B. Bove, Esq. (#998)
Jaclyn M. Mason, Esq. (#4737)
The Nemours Building, 8th Floor
1007 North Orange Street
Wilmington, DE  19801
Telephone:  (302) 658-9141
Facsimile:   (302) 658-5614

Scott R. Miller, Esq.
355 South Grand Avenue, Suite 3150
Los Angeles, CA  90071
Telephone:  (213) 787-2500
Facsimile:  (213) 687-0498

*Attorneys for ViewSonic Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December, 2006, a true copy of the foregoing

**ViewSonic Corporation's Opening Brief in Support of Claim Construction** was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following and the document is

available for viewing and downloading from CM/ECF:

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE  19801

Anne Shea Gaza
Frederick L. Cottrell III
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19801


I hereby certify that on the 22nd day of December, 2006, I have sent by email and U.S.

Mail the foregoing document to the following non-registered participants:

Cass W. Christenson
Lora A. Brzezynski
Rel S. Ambrozy
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC  20006

Mark H. Krietzman
Valerie W. Ho
Frank E. Merideth, Jr.
Steve P. Hassid
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA  90404


Tracy R. Roman
Raskin Peter Rubin & Simon
1801 Century Park East 23rd Floor
Los Angeles, CA  90067

Jong P. Hong
Greenberg Traurig, LLP
1900 University Avenue, 5th Floor
East Palo Alto, CA  94303

By:  */s/  Jeffrey B. Bove*
    Jeffrey B. Bove (#998)
    jbove@cblh.com