# CASE 1

Westlaw.

435 F.3d 1356                                                              Page 1
435 F.3d 1356, 77 U.S.P.Q.2d 1666
**(Cite as: 435 F.3d 1356)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Federal Circuit.
APPLIED MEDICAL RESOURCES
CORPORATION, Plaintiff-Appellee,
v.
UNITED STATES SURGICAL CORPORATION,
Defendant-Appellant.
**No. 05-1149.**

Jan. 24, 2006.

**Background:** Owner of patent for "trocar" surgical
device sued competitor for infringement. The United
States District Court for the Central District of
California, Cormac J. Carney, J., 352 F.Supp.2d
1119, held for owner, and competitor appealed.

**Holdings:** The Court of Appeals, Lourie, Circuit
Judge, held that:
(1) owner, having previously prevailed on
infringement claim against competitor, was not
collaterally estopped from asserting different
hypothetical royalty rate, and
(2) evidence supported finding that infringement
was willful.
Affirmed.

West Headnotes

**[1] Courts** 📧➔96(7)
106k96(7) Most Cited Cases
Application of collateral estoppel in patent case is
governed by law of regional circuit.

**[2] Patents** 📧➔327(13)
291k327(13) Most Cited Cases
Patent infringement plaintiff, having previously
prevailed on infringement claim based on prior
version of accused device and received reasonable
royalty damages, was not collaterally estopped from
asserting different hypothetical royalty rate for
current infringement; infringements were different,
and market conditions under which hypothetical
negotiations would have taken place at start of each
infringement were different. 35 U.S.C.A. § 284.

**[3] Patents** 📧➔319(1)
291k319(1) Most Cited Cases
"Reasonable royalty," as measure of damages for
patent infringement, is amount that person, desiring
to manufacture, use, or sell patented article, as
business proposition, would be willing to pay as
royalty and yet be able to make, use, or sell patented
article, in market, at reasonable profit. 35 U.S.C.A. §
284.

**[4] Patents** 📧➔319(1)
291k319(1) Most Cited Cases
When established royalty does not exist, court
calculating patent infringement damages may
determine reasonable royalty based on hypothetical
negotiations between willing licensor and willing
licensee. 35 U.S.C.A. § 284.

**[5] Patents** 📧➔319(1)
291k319(1) Most Cited Cases
Reasonable royalty determination, for purposes of
calculating patent infringement damages, must relate
to time infringement occurred. 35 U.S.C.A. § 284.

**[6] Patents** 📧➔319(1)
291k319(1) Most Cited Cases
Fact that same company sold two different products
which infringed patent does not prevent patentee
from litigating and collecting separate damages for
each infringement.

**[7] Patents** 📧➔327(13)
291k327(13) Most Cited Cases
Patent infringement defendant, having lost on claim
that patent was invalid when previously sued for
infringement based on prior version of accused
device, was collaterally estopped from asserting from
asserting same invalidity argument in current
litigation.

**[8] Patents** 📧➔319(1)
291k319(1) Most Cited Cases
Hypothetical license negotiation, for purpose of
calculating reasonable royalty damages for patent
infringement, occurs on date of first infringement. 35
U.S.C.A. § 284.

**[9] Patents** 📧➔312(8)
291k312(8) Most Cited Cases
Finding that surgical device manufacturer's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

435 F.3d 1356
435 F.3d 1356, 77 U.S.P.Q.2d 1666
**(Cite as: 435 F.3d 1356)**

Page 2

infringement of trocar patent was willful was supported by evidence that manufacturer desperately needed accused device to remain competitive, that its management placed intense time pressure on its engineers, who were attempting to design around patent, and that it did not rely on opinions of counsel in good faith.

**[10] Patents** ☞**312(2)**
291k312(2) Most Cited Cases
Admission of evidence in patent infringement case, that plaintiff had previously prevailed on infringement claim against defendant, was not abuse of discretion; evidence was relevant both to issue of willfulness and as factor affecting reasonable royalty calculation.

**Patents** ☞**328(2)**
291k328(2) Most Cited Cases
5,385,553. Infringed.
*1357 Joseph R. Re, Knobbe, Martens, Olson & Bear, LLP, of Irvine, California, argued for plaintiff-appellee. With him on the brief were Karen Vogel Weil, Joseph F. Jennings, Joseph S. Cianfrani, and Christy Green Lea. Of counsel was Brian C. Horne, of Los Angeles, California.

Glen E. Summers, Bartlit Beck Herman Palenchar & Scott LLP, of Denver, Colorado, argued for defendant-appellant. Of counsel on the brief were Donald L. Morrow, Paul Hastings Janofsky & Walker LLP, of Costa Mesa, California. Of counsel was Fred H. Bartlit, Jr., Bartlit Beck Herman Palenchar & Scott LLP, of Denver, Colorado.

Before LOURIE, RADER, and LINN, Circuit Judges.

LOURIE, Circuit Judge.

United States Surgical Corporation ("U.S.Surgical") appeals from the decision of the United States District Court for the Central District of California granting *1358 judgment of willful infringement of U.S. Patent 5,385,553 in favor of Applied Medical Resources Corporation ("Applied"), and awarding damages, enhanced damages, attorney fees, and prejudgment interest totaling $64.5 million. *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* Civ. No. 99-CV-625 (C.D.Cal. Jan. 27, 2005). Because the district court did not err in not applying collateral estoppel to the reasonable royalty rate, substantial evidence supports the jury's verdict of willful infringement, and the court did not abuse its

discretion in admitting evidence regarding a prior litigation, we affirm.

BACKGROUND
The '553 patent is entitled "Trocar With Floating Septum Seal" and was issued to Applied as assignee. The invention relates to surgical devices called trocars, which are used as access ports into the abdomen during laparoscopic surgery. Laparoscopic surgery is performed by inflating the abdomen and inserting instruments through trocars. It is important for the trocar to maintain a seal with the instrument; otherwise, the insufflation gas used to inflate the abdomen would leak and potentially cause serious complications.

Early trocars did not accommodate instruments of different diameters. For example, inserting a relatively small instrument through a large seal would produce a gap between the instrument and the seal, allowing the insufflation gas to leak out from the abdomen. As a result, surgeons were required to either use multiple trocars with differently sized seals or "flip top" adapters to accommodate differently sized instruments. The invention of the '553 patent eliminates the need for adapters, describing a trocar which maintains a seal around instruments of various sizes, using a "floating seal." Specifically, claim 3 recites a trocar whose seal includes excess material at its outer portions, which permits the seal orifice to move without allowing gas to leak. '553 patent, col. 11, ll. 57-62. Claim 4, which depends from claim 3, further requires that the excess material be configured in a bellows shape. *Id.,* col. 11, ll. 63-64.

The parties to this appeal are no strangers to each other and to this court. Applied first sued U.S. Surgical in the United States District Court for the Eastern District of Virginia in 1996 ("*Applied I* "), alleging that U.S. Surgical's sale of its Versaport trocars ("Versaport I") infringed the '553 patent, as well as two other Applied patents. In 1997, a jury found that U.S. Surgical willfully infringed claims 4 and 18 of the '553 patent as well as two other Applied patents, and awarded damages in the form of a 7% reasonable royalty. The court granted judgment for $20.5 million and entered a permanent injunction enjoining further infringing sales effective May 20, 1997. *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 967 F.Supp. 861 (E.D.Va.1997). We affirmed that judgment on June 30, 1998. *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 147 F.3d 1374 (Fed.Cir.1998).

During the *Applied I* litigation, U.S. Surgical began

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

435 F.3d 1356
435 F.3d 1356, 77 U.S.P.Q.2d 1666
(Cite as: 435 F.3d 1356)

Page 3

redesigning its Versaport trocar. U.S. Surgical completed its redesign shortly after the *Applied I* verdict and began selling the redesigned Versaport ("Versaport II") by June 2, 1997. [FN1] On *1359 April 16, 1999, Applied filed a second complaint against U.S. Surgical in the United States District Court for the Central District of California, alleging that Versaport II infringed the '553 patent ("*Applied II* "). The parties filed competing motions for summary judgment: Applied, for infringement of claim 3 of the '553 patent, and U.S. Surgical, for noninfringement and invalidity of claim 3. On February 28, 2002, the district court granted Applied's motion for summary judgment of infringement of claim 3, and entered a permanent injunction effective November 1, 2002. U.S. Surgical appealed to this court, and we affirmed the court's judgment and injunction on September 11, 2003. *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 75 Fed.Appx. 765 (Fed.Cir.2003).

> FN1. The redesigned Versaport continued to be sold under the same name and the same model number as the original Versaport. To avoid confusion, however, we will refer to the original trocar as Versaport I and the redesigned trocar as Versaport II.

Having resolved liability and validity issues, the district court then held a trial to determine the damages owed to Applied for U.S. Surgical's infringing sales of Versaport II, and to determine whether U.S. Surgical's infringement was willful. Before trial, U.S. Surgical moved to establish as a matter of law that the reasonable royalty for infringing sales of Versaport II was 7%, arguing that the reasonable royalty established in *Applied I* for infringing sales of Versaport I was binding under principles of collateral estoppel. U.S. Surgical also sought to preclude introduction of evidence related to the jury's finding of willful infringement in *Applied I*. The court denied both motions. The court first held that the jury would have "its own '*independent* ' determination of the reasonable royalty rate in 1997" and was thus not bound by the royalty rate in *Applied I*. (emphasis in original). The court also concluded that evidence regarding *Applied I* was relevant to willful infringement and damages because the "fact that U.S. Surgical had infringed the '553 patent once before in its actions in response thereto is probative of its intent to infringe the '553 patent a second time."

The trial commenced on July 14, 2004. At the close of Applied's case-in-chief, U.S. Surgical again moved for judgment as a matter of law that the 7%

reasonable royalty from *Applied I* for infringing sales of Versaport I estopped Applied from asserting that a different damages determination should apply in *Applied II*. The court denied the motion, stating that it had "already ruled on that." U.S. Surgical also moved for judgment as a matter of law of no willful infringement. The court deferred that ruling under Federal Rule of Civil Procedure 50(b) until after the jury rendered its verdict.

On July 27, 2004, the jury found that U.S. Surgical's infringement was willful and awarded Applied damages of $43,575,907. U.S. Surgical renewed its motions for judgment as a matter of law on the grounds of collateral estoppel and lack of willful infringement. At the same time, Applied filed a motion for enhanced damages. The court denied both of U.S. Surgical's motions for judgment as a matter of law on October 4, 2004. On the same day, the court granted Applied's post-trial motion and enhanced compensatory damages by 25%. Applied then moved for attorney fees, prejudgment interest, and post-judgment interest. The court granted that motion on January 12, 2005.

On January 27, 2005, the court entered final judgment in favor of Applied in the amount of $64.5 million. U.S. Surgical timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION
I. *Collateral Estoppel*

[1] We review a trial court's application of collateral estoppel by applying the *1360 law of the regional circuit. *See Bayer AG. v. Biovail Corp.,* 279 F.3d 1340, 1345 (Fed.Cir.2002) ("Because the application of collateral estoppel is not a matter within the exclusive jurisdiction of this court, this court applies the law of the circuit in which the district court sits."). The Ninth Circuit has reviewed the application and non-application of collateral estoppel by trial courts under varying standards, either without deference or for abuse of discretion. *Compare McQuillion v. Schwarzenegger,* 369 F.3d 1091, 1096 (9th Cir.2004) ("We review de novo the application of collateral estoppel."); *United States v. Real Prop. Located at 22 Santa Barbara Drive,* 264 F.3d 860, 868 (9th Cir.2001) ("Application of collateral estoppel is reviewed *de novo*."), with *Bates v. Union Oil Co. of Cal.,* 944 F.2d 647, 651 (9th Cir.1991) ("We review a district court's decision to apply collateral estoppel for abuse of discretion."); *Garrett v. City & County of San Francisco,* 818 F.2d 1515, 1520 (9th Cir.1987) ("The *availability* of collateral

435 F.3d 1356
435 F.3d 1356, 77 U.S.P.Q.2d 1666
**(Cite as: 435 F.3d 1356)**

Page 4

estoppel is subject to *de novo* review, but *application* of the doctrine, if available, is reviewed for abuse of discretion."). We need not resolve which standard should apply to the collateral estoppel analysis because even under a more exacting plenary review, the result in this case would be the same.

On appeal, U.S. Surgical argues that the district court erred in refusing to give collateral estoppel effect to the 7% reasonable royalty rate found by the jury in *Applied I*. U.S. Surgical contends that all of the requirements for application of collateral estoppel are satisfied because the reasonable royalty rate was actually litigated in *Applied I*, it was decided by a jury, and the jury's determination was essential to the district court's final judgment in *Applied II*. U.S. Surgical maintains that the issue that the *Applied I* jury decided is the same issue presented in *Applied II*, and points out that both cases involved the same parties, the same patent, and the same type of product. In addition, according to U.S. Surgical, the infringement in *Applied II* is an uninterrupted continuation of the infringement in *Applied I*, and therefore the correct date of a hypothetical negotiation in *Applied II* is the 1994 time period used in *Applied I*, rather than 1997.

Applied responds that the court properly denied collateral estoppel effect to the 7% reasonable royalty rate found by the jury in *Applied I* because that determination was for infringing sales of Versaport I, and should not limit U.S. Surgical's liability for later infringing sales of Versaport II. Applied contends that because the parties independently litigated infringement, willfulness, and damages for Versaport I and Versaport II, the products constitute separate infringements and require separate hypothetical negotiations to determine damages. According to Applied, the hypothetical negotiation relating to Versaport II involved market conditions that did not exist at the time of the 1994 hypothetical negotiation in *Applied I*, viz., increased demand for the patented product and decreased supply resulting from U.S. Surgical's enjoinment from making Versaport I.

[2] We agree with Applied that the district court properly denied collateral estoppel effect to the 7% reasonable royalty rate found by the jury in *Applied I*. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *1361Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing *Montana v. United States,* 440 U.S. 147, 153, 99

S.Ct. 970, 59 L.Ed.2d 210 (1979)); *see also San Remo Hotel, L.P. v. City and County of San Francisco, Cal.,* 545 U.S. 323, ---- - ----, 125 S.Ct. 2491, 2500-01, 162 L.Ed.2d 315 (2005). As we explained in *Arkla, Inc. v. United States,* 37 F.3d 621 (Fed.Cir.1994):

Collateral estoppel is appropriate only if: (1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action.

*Id.* at 624 (citation omitted). Here, collateral estoppel is not appropriate because the necessary reasonable royalty determination in *Applied II* is not identical to that decided in *Applied I*.

[3] As an initial matter, the juries in both *Applied I* and *Applied II* employed a reasonable royalty calculation because actual damages could not be adequately proved. *Wang Labs., Inc. v. Toshiba Corp.,* 993 F.2d 858, 870 (Fed.Cir.1993) (citing *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574 (Fed.Cir.1988)). "A reasonable royalty is the amount that 'a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make [, use, or] sell the patented article, in the market, at a reasonable profit.' " *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1568 (Fed.Cir.1984) (citations omitted). "The objective of [a] reasonable royalty calculation is to determine the amount necessary to adequately compensate for an infringement." *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1109 (Fed.Cir.1996).

[4][5] When an established royalty does not exist, a court may determine a reasonable royalty based on "hypothetical negotiations between willing licensor and willing licensee." *Fromson,* 853 F.2d at 1574. We have held that a reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred. *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1079 (Fed.Cir.1983) ("The key element in setting a reasonable royalty ... is the necessity for return to the date when the infringement began.") (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158 (6th Cir.1978)); *see also Fromson,* 853 F.2d at 1575 (holding that hypothetical royalty negotiations methodology "speaks of negotiations as of the time infringement began").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

435 F.3d 1356                                                                                    Page 5
435 F.3d 1356, 77 U.S.P.Q.2d 1666
(Cite as: 435 F.3d 1356)

Consistent with our precedent, reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed. *Id.* We are required to identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation at the time that infringement began, not an earlier one. *Id.* Here, the issue of reasonable royalty damages in *Applied II* is not identical to the issue of reasonable royalty damages in *Applied I* because the infringements requiring compensation began at separate and distinct times. The infringement in *Applied II* was caused by sales of Versaport II, which began in 1997, whereas the infringement in *Applied I* was caused by sales of Versaport I, which began in 1994. Because Versaport I and Versaport II caused two separate infringements, and each infringement commenced on a different date, it follows that the *1362 reasonable royalties may well be different from each other. Reasonable royalty damages for the infringement caused by Versaport II are tied to sales of Versaport II beginning in 1997. We cannot relate reasonable royalty damages for Versaport II sales back to a separate and past infringement caused by Versaport I sales beginning in 1994. Indeed, the issue of reasonable royalty damages for Versaport II sales could not have been and was not considered, much less decided, in *Applied I* because that product had not yet been determined to infringe. We conclude that the damages issues in *Applied I* and *Applied II* are not identical, and therefore the jury's award of reasonable royalty damages for infringing sales of Versaport I in *Applied I* does not preclude another jury's evaluation of reasonable royalty damages for infringing sales of Versaport II at a different time in *Applied II.*

Further, there is no legal or factual basis for viewing the separate infringements caused by sales of Versaport I and Versaport II as the same infringement. U.S. Surgical has asserted that Versaport II is a different product from the Versaport I trocar: the "product that was at issue in *Applied I* is *vastly different* than the new [Versaport II] at issue in this case." (emphasis added). U.S. Surgical has also agreed that Versaport II involved different infringement issues than Versaport I because the seals were different: "[f]rom this thorough and careful re-design process emerged an *entirely different,* non-infringing trocar, with a *completely new* and improved seal system." (emphases added). Having conceded that Versaport I and Versaport II were different infringements, U.S. Surgical's attempt to conflate the two products for purposes of damages fails. Because the determination of reasonable royalty damages is tied to the infringement being redressed, a separate infringement beginning at a different time requires a separate evaluation of reasonable royalty damages. To argue otherwise, U.S. Surgical would have to concede that it has willfully violated the permanent injunction in *Applied I.*

[6][7] U.S. Surgical argues that its infringement of the '553 patent has been continuous and uninterrupted since 1995, and therefore that the damages issue in *Applied II* was decided in *Applied I.* U.S. Surgical also contends that there can be no genuine dispute that the issues in *Applied I* and *Applied II* were the same because the final judgment in *Applied I* had stated that "Applied is entitled to a seven percent royalty on the sales of each Surgical product which infringed ... the '553 patent." We disagree. That the infringement activity caused by Versaport I and Versaport II may appear to be continuous in time does not mean that it is a continuous infringement in law. The sales of Versaport II constituted a separate and distinct infringement from sales of Versaport I, and Applied is entitled to prosecute and recover damages for each infringement under the statute. 28 U.S.C. § 271 (2000). Indeed, simply because the *same* company sold two *different* products which infringed a patent does not prevent the patentee from litigating and collecting *separate* damages for *each* infringement. Further, we reject U.S. Surgical's contention that the district court's denial of collateral estoppel for purposes of damages is inconsistent with its grant of collateral estoppel for purposes of validity. A conclusion in *Applied I* that the patent is not invalid properly estops U.S. Surgical from making the same arguments in *Applied II.* The issue is the same. That the validity of the '553 patent was adjudicated in *Applied I* does *1363 not mean, however, that the reasonable royalty rate for infringing sales of Versaport II was also decided in *Applied I.* The damages issues are not the same.

U.S. Surgical asserts that even if there were a lack of "total identity" of issues between *Applied I* and *Applied II,* the issues must be deemed identical for collateral estoppel purposes because, in both litigations, there was substantial overlap in the evidence, application of the same rule of law, similar matters embraced in pre-trial preparation, and closely related claims involving the same patent, the same parties, and the same type of product. That argument misses the point. We recognize that there may be instances, which we do not address here, in which two products, even if not identical, may present the same damages analysis. That is not the case here.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

435 F.3d 1356
435 F.3d 1356, 77 U.S.P.Q.2d 1666
**(Cite as: 435 F.3d 1356)**

Page 6

The two infringements caused by Versaport I and Versaport II sales began at *different* times, and require two different hypothetical negotiation dates. Indeed, the evidence supporting damages in *Applied II* was entirely different from the evidence offered in *Applied I.* For example, the *Applied II* jury heard evidence regarding the market conditions in 1997 for Versaport II, the license agreements entered into by Applied in 1998 and 1999, and the ability of Versaport II to compete with Applied's products in 1997, none of which was available to the *Applied I* jury. Because the determination of reasonable royalty damages is tied to the infringement being compensated for, reasonable royalties for a different infringement beginning at a different time may well be different from each other.

U.S. Surgical also argues that the district court confused the start of the infringement with the start of the damages period, relying on *Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 860 (Fed.Cir.2003), *vacated and remanded,* 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005) and *Wang Labs., Inc. v. Toshiba Corp.,* 993 F.2d 858 (Fed.Cir.1993). These cases do not provide the necessary support for its argument. Both cases involved one initial infringement, not two separate infringements. In *Wang,* the parties agreed that the single infringement at issue began in 1987. 993 F.2d at 869. However, the district court in *Wang* chose January 1990, the date the patentee gave notice of the infringement, rather than April 1987 as the date of hypothetical negotiation. *Id.* We reversed, holding that the hypothetical negotiation occurred "when the infringement began" in April 1987. *Id.* at 870. We observed that that was the case even though the damages period did not begin until six years prior to the filing of the infringement action under 35 U.S.C. § 286.

Similarly, the alleged infringement in *Integra* was a single infringement consisting of a series of experiments that took place between 1994 and 1998. 331 F.3d at 870. The district court held that some of the 1994 experiments were not infringing acts due to experimental use, but the record showed that at least one of the 1994 experiments was not considered exempted from infringement. *Id.* We remanded for the district court to determine whether the 1994 experiments were infringing acts, and to clarify whether the hypothetical negotiation would have occurred in 1994 or 1995. *Id.* We explained, "If indeed the record shows that the first infringement occurred in 1994, then the hypothetical negotiation should be regarded as having occurred at least before

that earlier date. On remand, the trial court will have the opportunity to clarify the proper timing of the reasonable royalty calculus." *Id.*

[8] Our holdings in *Wang* and *Integra* reiterate the rule that the hypothetical negotiation *1364 relates to the date of first infringement. There is nothing to suggest that we should tie a hypothetical negotiation to a prior infringement no longer at issue. Here, the hypothetical negotiation date for infringing sales of Versaport II relates to the infringement caused by Versaport II sales beginning in 1997, not the past infringement caused by Versaport I sales beginning in 1994. Moreover, while a hypothetical negotiation may occur on a different date than the beginning of the damages period in certain circumstances, as in *Wang,* that outcome results from the statute limiting the damages period. 35 U.S.C. § 286 (2000). No such limitation operates here. In this case, the complaint was filed less than six years after the infringement began, and therefore damages first began to accrue at the same time that the infringement began. Accordingly, the proper hypothetical negotiation date for calculation of reasonable royalty damages in *Applied II* is 1997.

## II. *Denial of Judgment as a Matter of Law*

[9] The denial of a motion for judgment as a matter of law "is a procedural issue not unique to patent law, which we review under the law of the regional circuit where the appeal from the district court normally would lie." *Riverwood Int'l Corp. v. R.A. Jones & Co.,* 324 F.3d 1346, 1352 (Fed.Cir.2003). In the Ninth Circuit, the denial of a motion for judgment as a matter of law is reviewed *de novo. Lytle v. Carl,* 382 F.3d 978, 982 (9th Cir.2004). Judgment as a matter of law requires that "we view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of that party." *Id.* (citation omitted). The Ninth Circuit upholds any jury verdict supported by substantial evidence. *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.,* 411 F.3d 1030, 1040 (9th Cir.2005) (citation omitted). The Ninth Circuit has explained that when reviewing the record as a whole, we must keep in mind that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 1040-41.

U.S. Surgical argues that the court erred in not granting its motion for judgment as a matter of law of

no willful infringement because the evidence established at every stage of the development process for Versaport II, U.S. Surgical acted with due care and a good faith belief of noninfringement. U.S. Surgical points out that the district court found no evidence that U.S. Surgical deliberately copied Applied's patent, and that the court concluded that U.S. Surgical engaged in an intense and deliberate program to design around the '553 patent. U.S. Surgical also asserts that uncontroverted evidence established that U.S. Surgical regularly consulted with its in-house patent counsel during the redesign process, requested the advice of outside law firms, and did not make a single sale until after U.S. Surgical received a written second opinion from a patent attorney at another law firm. According to U.S. Surgical, Applied did not introduce "clear and convincing" evidence that U.S. Surgical lacked a good faith belief that its Versaport II trocar did not infringe.

Applied responds that U.S. Surgical does not rebut the evidence cited by the court as supporting the jury's verdict of willful infringement, which showed that *1365 U.S. Surgical (1) desperately needed a trocar with a floating seal to satisfy its customer demands, (2) began its redesign efforts only in response to the threat of an injunction in Applied I, (3) did not give its engineers sufficient time to avoid an infringing design, (4) did not rely upon any opinions of counsel in good faith, and (5) continued selling its infringing trocars for eight months after the ruling of infringement.

We agree with Applied that substantial evidence supports the jury's verdict of willful infringement. As the district court correctly noted, Applied presented evidence from which a jury could reasonably infer that U.S. Surgical desperately needed a universal seal trocar to remain competitive in the surgical business, that U.S. Surgical's management did not properly oversee or adequately participate in the development of Versaport II, and that U.S. Surgical's management placed intense time pressure on their engineers to create a new product.

At trial, U.S. Surgical produced three written opinions from outside counsel dated May 29, 1997, May 30, 1997, and June 30, 1997, in an attempt to show that it relied on legal advice to make and sell the infringing trocars. However, the first letter was simply "ship[ped] off in the mail," the second letter did not address infringement of the claims of the '553 patent and was limited to the issue of contempt, and the third letter arrived after U.S. Surgical began

selling Versaport II. Based on this evidence, a jury could have reasonably concluded that U.S. Surgical paid little if any attention to the opinion letters. Other evidence also undermines U.S. Surgical's alleged good faith reliance on the legal opinions. Thomas Bremer, U.S. Surgical's former Senior Vice President and General Counsel, testified that U.S. Surgical wanted "no gap" in the supply of Versaport trocars once the Applied I injunction took effect on May 20, 1997. A reasonable jury could have believed that U.S. Surgical was not concerned about infringement and would have proceeded to manufacture Versaport II despite receiving outside legal opinions. Mr. Bremer also offered additional testimony from which a jury could have inferred that he did not rely on the legal opinions as legitimate advice as to whether Versaport II infringed, but rather sought legal opinions for their potential evidentiary value on the issue of willful infringement in future litigation. This could have suggested to the jury that U.S. Surgical did not rely on any opinions of counsel in good faith.

We conclude that the jury's finding of willfulness was supported by substantial evidence, and therefore that the district court did not err in denying U.S. Surgical's motion for judgment as a matter of law of no willful infringement.

III. Evidentiary Rulings

We review evidentiary rulings of the district court applying the law of the regional circuit. Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed.Cir.2004). The Ninth Circuit reviews evidentiary rulings for abuse of discretion; to reverse, we must conclude both that the district court abused its discretion and that the error was prejudicial so that it more probably than not tainted the verdict. McEuin v. Crown Equip. Corp., 328 F.3d 1028, 1032 (9th Cir.2003).

[10] U.S. Surgical challenges the district court's evidentiary ruling allowing Applied to introduce evidence regarding the Applied I litigation, including the *1366 jury's finding that U.S. Surgical's infringement was willful. Applied responds that the Applied I litigation was highly relevant to the 1997 hypothetical negotiation, and was probative of U.S. Surgical's state of mind when it decided to make the infringing Versaport II products. Applied also maintains that U.S. Surgical failed to allege, much less show, that the admission of evidence regarding Applied I would potentially lead to unfair prejudice, substantially outweighing its probative value.

We agree with Applied that the *Applied I* litigation was relevant to the reasonable royalty analysis because the hypothetical negotiation in 1997 took place on the heels of the *Applied I* jury verdict. We also agree that *Applied I* was relevant to the jury's willfulness determination. Basam Nabulsi, an in-house patent lawyer at U.S. Surgical, testified at trial that U.S. Surgical initiated the design of Versaport II in December 1996 because Applied had commenced the *Applied I* litigation by filing suit in the Eastern District of Virginia. U.S. Surgical also admitted that the *Applied I* verdict caused U.S. Surgical to redouble its efforts to avoid willful infringement. Thus, *Applied I* was clearly relevant to U.S. Surgical's state of mind, and U.S. Surgical has not shown that its probative value was outweighed by the danger of unfair prejudice. We therefore conclude that the court acted within its discretion.

CONCLUSION

We conclude that the district court did not err in not applying collateral estoppel to the reasonable royalty rate, did not err in denying U.S. Surgical's motion for judgment as a matter of law of no willfulness, and did not abuse its discretion in admitting evidence regarding *Applied I.* The decision of the court granting judgment of willful infringement of the '553 patent in favor of Applied, and awarding damages, enhanced damages, attorney fees, and prejudgment interest totaling $64.5 million, is

*AFFIRMED.*

435 F.3d 1356, 77 U.S.P.Q.2d 1666

**Briefs and Other Related Documents (Back to top)**

• 2005 WL 2156880 (Appellate Brief) Reply Brief of Defendant-Appellant United States Surgical Corporation (Aug. 1, 2005)

• 2005 WL 1923481 (Appellate Brief) Brief of Plaintiff-Appellee Applied Medical Resources Corporation (Jul. 13, 2005)Original Image of this Document (PDF)

• 2005 WL 1178162 (Appellate Brief) Brief of Defendant-Appellant United States Surgical Corporation (Apr. 29, 2005)

• 05-1149 (Docket) (Dec. 22, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# CASE 2

Westlaw.

318 F.Supp. 1116                                                                 Page 1
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

▷
United States District Court, S.D. New York.
GEORGIA-PACIFIC CORPORATION, Plaintiff,
v.
UNITED STATES PLYWOOD CORPORATION,
Defendant. [FN*]

FN* State Report Title: Georgia-Pacific
Corp. v. U.S. Plywood-Champion Papers
Inc.

Civ. A. No. 99-195.

May 28, 1970.

Proceeding to determine amount of reasonable
royalty to be paid by infringer to patent holder. The
District Court, Tenney, J., held that evidence
established that $50 per thousand square feet of
patented striated fir plywood made and sold by
infringer represented fair and reasonable royalty that
should be paid by infringer to patent holder.

Judgment accordingly.

West Headnotes

**[1] Patents** ☞312(2)
291k312(2) Most Cited Cases
Some of factors relevant in infringement case to
determination of amount of a reasonable royalty for
patent license stated. 35 U.S.C.A. § 284.

**[2] Patents** ☞319(1)
291k319(1) Most Cited Cases
That patent had only four years to run at time
infringement began did not require that reasonable
royalty be minimal for purposes of determining
infringement damages, where the patented product
was a great commercial success, infringer did not
assume any fixed financial obligation, opportunity to
engage in sale of product before patent's expiration
constituted definite advantage to infringer who
intended to market product after expiration, and
infringer could get into profitable production of
product with only modest investment.

**[3] Patents** ☞319(1)
291k319(1) Most Cited Cases
For very reason that patent holder was unable to
prove quantum of its damage from lost profits

resulting from infringer's production of patented
product, reasonable royalty that infringer would have
been required to pay was proper measure of damages.
35 U.S.C.A. § 284.

**[4] Patents** ☞319(1)
291k319(1) Most Cited Cases
Statute requiring award adequate to compensate for
infringement of patent and no less than reasonable
royalty for use made of invention by infringer was
intended to afford fair compensation in cases where
victimized patentee is unable to prove that he lost a
measurable amount of profits as result of the
infringement and the statute provides alternative way
of recovering general compensatory damages. 35
U.S.C.A. § 284.

**[5] Patents** ☞319(1)
291k319(1) Most Cited Cases
In determining amount of reasonable royalty that
infringer would have had to pay patent holder, fact
that, at time of hypothetical royalty negotiations,
infringer would reasonably have expected to derive
substantial additional profits from collateral sales of
other products sold along with the patented product
was significant, in that it had logical tendency to
increase amount of reasonable royalty. 35 U.S.C.A.
§ 284.

**[6] Patents** ☞319(1)
291k319(1) Most Cited Cases
Principle of apportionment was not applicable in
determining amount of reasonable royalty that
infringer would have had to pay to patent holder,
where the patent was not for an improvement, the
infringement of patented feature was not sold
together with unpatented parts and the patent covered
a marketable article as an entirety. 35 U.S.C.A. §
284.

**[7] Patents** ☞319(1)
291k319(1) Most Cited Cases
Decorative effect of striated fir plywood was not per
se a patented element of invention relating to
production of such plywood, but where the
decorative effect was an inherent, indivisible and
inextricable characteristic of the deep and random
striations provided for by patent and contributed
toward commercial success it must be given weight
in determining reasonable royalty that would have
been paid by infringer of the patent. 35 U.S.C.A. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)

Page 2

284.

**[8] Patents ☜319(1)**
291k319(1) Most Cited Cases
In assessing probative value of royalty rate offered by infringer to prove rate lower than that claimed by patentee, court may not uncritically accept that numerical evidence but must consider economic ambiance of that statistic, since special circumstances may explain why that particular rate was depressed or lower than others. 35 U.S.C.A. § 284.

**[9] Patents ☜319(1)**
291k319(1) Most Cited Cases
District judge in determining true measure of reasonable royalty in patent infringement case should not consider a diminished royalty rate which represents an amount that patentee may have been compelled to accept in individual cases by disrepute of his patent and open defiance of his rights. 35 U.S.C.A. § 284.

**[10] Patents ☜312(10)**
291k312(10) Most Cited Cases
    (Formerly 291k312(3))
Evidence established that $50 per thousand square feet of patented striated fir plywood made and sold by infringer represented fair and reasonable royalty that should be paid by infringer to patent holder. 35 U.S.C.A. § 284.

**[11] Patents ☜319(4)**
291k319(4) Most Cited Cases
Patent infringer was required to pay interest computed from date of last infringement to date of payment of award at rate of 6% per annum.

**Patents ☜328(2)**
291k328(2) Most Cited Cases
2,286,068. Cited.
 *1117 John Vaughan Groner, New York City, for plaintiff; Ronald F. Ball, New York City, of counsel.

 James M. Heilman, Raymond T. Heilpern, New York City, for defendant; Raymond T. Heilpern, Sydney Krause, James M. Heilman, Stephen R. Barnett, Marvin H. Ginsky, New York City, of counsel.

 OPINION

 TENNEY, District Judge.

 By opinion dated October 26, 1956, entered in an

action by Georgia-Pacific Corporation (hereinafter referred to as 'GP') for a declaratory judgment of invalidity and non-infringement of three patents held by United States Plywood Corporation (hereinafter referred to as 'USP') and upon a counterclaim by USP for patent infringement and unfair competition, my late brother Judge Herlands found USP's three patents (one Deskey and two Bailey patents) invalid for lack of invention, not infringed by GP's product and further, that there was no proof that GP engaged in acts of unfair competition. 148 F.Supp. 846 (S.D.N.Y.1956). The Court of Appeals reversed and remanded in 1958, holding that Claim 1 of USP's Deskey Patent No. 2,286,068 covering 'Weldtex' striated fir plywood valid and infringed by GP. 258 F.2d 124 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

 Following the decision of the Court of Appeals, the case was referred to a special master to determine the amount of damages to be awarded to USP under 35 U.S.C. § 284 (1952), [FN1] which provides for 'damages adequate to compensate for the infringement.' The master, computing damages upon the basis of GP's profits derived from the sale of the infringing article, [FN2] awarded $685, *1118 837.00 to USP. Judge Herlands, on exception to the Master's Report, concluded that under the instant circumstances and controlling statute GP's profits did not constitute the proper measure of recovery, and that the award to USP should have been computed on the basis of a reasonable royalty. 243 F.Supp. 500 (S.D.N.Y.1965).

      FN1. The statute provides:
      '§ 284. Damages
      Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
      When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
      The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.'

      FN2. In the proceedings before the special master, USP sought recovery on three alternative theories:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) 'Lost profits' of $1,101,520, representing the net profits on Weldtex that were diverted from USP by GP's infringement (on the assumption that USP would have sold 80% Of the striated plywood footage sold by GP), supplemented by an additional lost profit of $431,410, on 'convoyed sales' of other USP products that would have been generated by and sold along with the projected sales of Weldtex;

(2) 'Infringer's profits' of $1,004,735, representing the net profits derived by GP from the infringing sales, and supplemented by an additional infringer's profit of $431,000 on convoyed sales of other GP products generated by and sold along with the GP striated; and

(3) As an alternative method of computation, USP sought damages of $974,953 on the 'standard of comparison' theory, this sum representing the difference between GP's profits on the infringing sales of GP striated and the profits GP would have earned by selling an equal quantity of unpatented 1/4' AD panels.

In ruling on USP's claims, the master rejected the 'lost profits' submission. Although finding that USP had proved, among other things, the fact of damage,-- i.e., that loss of sales of Weldtex occurred by reason of GP's infringement-- the master found that USP had failed to establish that a measurable quantity of such sales had been lost or that such loss of sales resulted in the loss of a measurable sum in profits.

The master upheld, however, the claim for 'infringer's profits,' and computed these in the amount of $685,837-- as against USP's claim that they were $1,004,735 and GP's claim that they were only $145,090.73.

In recommending that the entire $685,837 be awarded to USP, the master rejected GP's contention that the value of the infringing article had to be apportioned between the Deskey patent and the article's other, non-infringing elements. The master found that the entire market value of the infringing article is attributable to the Deskey patent.

On objections to the master's report, this Court sustained the finding that USP had proved the fact of harm in the form of lost sales due to the infringement, and sustained also the master's rejection of the lost-profits claim. 243 F.Supp. at 512-513. The master's conclusion that USP should be

awarded the infringer's profits was rejected, however, on the ground that such an award falls outside the statute's provision for recovery of damages. 243 F.Supp. at 514-546.

Having rejected USP's claims for lost profits or infringer's profits, the Court decided that 'the award to USP should have been and will be computed on the basis of a reasonable royalty.' 243 F.Supp. at 505, 512, 514, 546.

Evidence relating to the issue of the amount of reasonable royalty to be paid by GP to USP was presented to Judge Herlands on June 8 and October 2, 3 and 4, 1967, November 12 and 20, 1968, April 30, May 19-22, and June 23-24, 1969. During the course of these hearings, GP's Exhs. 1-38 and USP's Exhs. 1-47, 50, 53-56, 59-68 were received in evidence. Briefs were filed by both parties herein on September 22 and 23, 1966, November 28, 1966, January 22, 1968, and July 22, 1969 (proposed findings of fact and conclusions of law having been submitted with the briefs of November 28, 1966 and July 22, 1969).

After having viewed the demeanor of witnesses and examined the transcript, briefs, Master's Report (hereinafter referred to as 'MR'), and applicable authority with a degree of care characterized by his judicial career, Judge Herlands died on August 28, 1969 without having filed a formal opinion on this issue. However, at the time of his death Judge Herlands had substantially completed a draft of his opinion.

Thereafter, on October 9, 1969, Chief Judge Sugarman referred this action to me for all purposes. On the basis of a conference held on December 16, 1969, the parties have stipulated that this cause be submitted for the purpose of determining the amount of the reasonable royalty upon the proceedings and briefs previously referred to herein, 'it being specifically understood and agreed between the parties hereto that (the Court) shall have the full and unlimited right to use or not to use all or any part of said draft of opinion, notes and memoranda, with or without acknowledgment *1119 of its source, as though the same were a part of the record made herein.' [FN3]

FN3. STIPULATION
WHEREAS, the following facts appear herein:
1. On June 15, 1965, this Court, by The Honorable William B. Herlands, Judge, sustaining exceptions to the report of the

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)                                    Page 4

Special Master herein, held and ordered that the proper measure of recovery by the defendant, United States Plywood Corporation, because of the infringement by plaintiff, Georgia-Pacific Corporation, of claim 1 of United States patent to Deskey, No. 2,286,068, should have been, and would be computed on the basis of a reasonable royalty, and that further hearings should be had to determine the amount of said royalty (243 F.Supp. 500, 546-547).

2. Pursuant to this order, a first hearing was duly held for the purpose of determining said reasonable royalty on June 29, 1965 (Tr. p. 1)*. The last of said

*The hearings commencing with that of June 29, 1965 are reported and are consecutively numbered from page 1 through page 1428A, and are here designated as 'Tr. p. .'

hearings occurred on June 24, 1969 (Tr. p. 1272), at the conclusion of which it was ordered that briefs be submitted on July 22, 1969 at 5:00 P.M. (Tr. pp. 1427-1428A).

3. During the course of said hearings, Georgia-Pacific Corporation Exhibits Nos. 1 through 38, and United States Plywood Corporation Exhibits Nos. 1-47, 50, 53-56, 59-68 (including all subletterings or numbers) were received in evidence, together with two letters dated June 27, 1969 and June 30, 1969, respectively, from Raymond T. Heilpern to Judge Herlands, together with an enclosure, and from John Vaughan Groner to Judge Herlands.

4. Following the submission of this cause to Judge Herlands as set forth above, Judge Herlands on August 28, 1969 died without having made such determination, it being understood, however, that at time time of his death, Judge Herlands had prepared a draft of his opinion herein together with notes or other memoranda relating thereto.

5. Thereafter, on or about October 9, 1969, the Honorable Sidney Sugarman, Chief Judge of this Court, referred this action to the Honorable Charles H. Tenney, United States District Judge, for all purposes.

Now, therefore, it is stipulated by and between the parties hereto, by their counsel, that this cause be submitted for the purpose of determining the amount of said reasonable royalty upon the proceedings referred to herein, and upon the briefs filed by both parties herein on September 22, and September 23, 1966, November 28, 1966, January 22, 1968, and July 22, 1969 (proposed findings of fact and conclusions of law having been submitted with the briefs of November 28, 1966 and July 22, 1969), together with oral argument if desired or ordered by Judge Tenney; it being specifically understood and agreed between the parties hereto that Judge Tenney shall have the full and unlimited right to use or not to use all or any part of said draft of opinion, notes and memoranda, with or without acknowledgment of its source, as though the same were a part of the record made herein.

Georgia-Pacific Corporation
By--------------------
Its Attorney
Dated: December 17, 1969
United States Plywood Corporation
By--------------------
Its Attorney
Dated: December 17, 1969

Based upon this stipulation, and after a careful review of the entire record, the Court has accepted and adopted, with minor amendment, the reasoned opinion of Judge Herlands, which follows. [FN4]

> FN4. Both GP and USP have declined the opportunity for further oral argument before this Court.

While the parties agree upon the doctrinal criteria of a reasonable royalty, they differ sharply in their application of those principles to the hard specifics of the evidence. The extreme divergence of the parties is reflected in the difference between GP's submission that the reasonable royalty herein should be fixed at a figure somewhere between a dollar and one-half to three dollars per thousand square feet and USP's claim that the minimum reasonable royalty should be the rate of fifty dollars per thousand square feet.

*1120 [1] A comprehensive list of evidentiary facts relevant, in general, to the determination of the amount of a reasonable royalty for a patent license may be drawn from a conspectus of the leading cases. The following are some of the factors mutatis mutandis seemingly more pertinent to the issue herein:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Page 5

prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process,

business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention-- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

The drawing of proper conclusions from conflicting evidence concerning the amount of a reasonable royalty has been said to call 'for the exercise of judicial discretion by the District Court.' General Motors Corp. v. Dailey, 93 F.2d 938, 942 (6th Cir. 1937). Both sides agree that this Court has a broad range of judgment in evaluating the relevant factors.

In the present case there is a multiplicity of inter-penetrating factors bearing upon the amount of a reasonable royalty. But there is no formula by which these factors can be rated precisely in the order of their relative importance or by **\*1121** which their economic significance can be automatically transduced into their pecuniary equivalent. In discharging its responsibility as fact finder, the Court has attempted to exercise a discriminating judgment reflecting its ultimate appraisal of all pertinent factors in the context of the credible evidence.

The parties agree that there was no 'established' royalty for USP's Weldtex or GP striated. Consequently, it is necessary to resort to a broad spectrum of other evidentiary facts probative of a 'reasonable' royalty.

Two of the earlier and typical cases relied upon by both parties are Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915) and United States Frumentum Co. v. Lauhoff, 216 F. 610 (6th Cir. 1914). In Dowagiac Mfg. Co., supra, 235 U.S. at 648, 35 S.Ct. at 224, the Supreme Court said that, where a patentee could not prove lost profits, infringer's profits or an established royalty, the patentee could 'show the value by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

advantages, and the extent of the use involved.' In United States Frumentum Co., supra, 216 F. at 617, the Court referred to the following elements as relevant to the determination of a reasonable royalty: the nature of plaintiff's patent property; the extent to which defendant took it; and its utility and commercial value as evidenced by its advantages over other devices, by the extent of its use, and by the profits and savings that could be made upon its sale or adoption.

The parties rely upon the traditional array of facts probative of a reasonable royalty. But, in addition, USP places heavy reliance upon a later formulation called 'the willing buyer and willing seller' rule.

The rule is pronounced in Horvath v. McCord Radiator & Mfg. Co., 100 F.2d 326, 335 (6th Cir. 1938), cert. denied, Carrier Engineering Corporation v. Horvath, 308 U.S. 581, 60 S.Ct. 101, 84 L.Ed. 486, rehearing denied, 308 U.S. 636, 60 S.Ct. 171, 84 L.Ed. 529 (1939), in these terms:

'In fixing damages on a royalty basis against an infringer, the sum allowed should be reasonable and that which would be accepted by a prudent licensee who wished to obtain a license but was not so compelled and a prudent patentee, who wished to grant a license but was not so compelled.'

A variant phrasing set forth in Faulkner v. Gibbs, 199 F.2d 635, 639 (9th Cir. 1952) reads:

'The primary inquiry, often complicated by secondary ones, is what the parties would have agreed upon, if both were reasonably trying to reach an agreement.'

The rule is more a statement of approach than a tool of analysis. It requires consideration not only of the amount that a willing licensee would have paid for the patent license but also of the amount that a willing licensor would have accepted. What a willing licensor and a willing licensee would have agreed upon in a suppositious negotiation for a reasonable royalty would entail consideration of the specific factors previously mentioned, to the extent of their relevance. Where a willing licensor and a willing licensee are negotiating for a royalty, the hypothetical negotiations would not occur in a vacuum of pure logic. They would involve a market place confrontation of the parties, the outcome of which would depend upon such factors as their relative bargaining strength; the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent as compared to the anticipated royalty income; the anticipated amount of net profits that the prospective licensee reasonably thinks he will make; the commercial past performance of the invention in terms of public acceptance and profits; the market to be tapped; and any other economic factor that normally prudent businessmen would, under similar circumstances, take into consideration in negotiating the hypothetical license.

*1122 As pointed out in an earlier decision herein by this Court (243 F.Supp. at 539), the very definition of a reasonable royalty assumes that, after payment, 'the infringer will be left with a profit.' It is necessary to consider, as an element in determining the amount of the reasonable royalty, the fact that GP would be willing hypothetically to pay a royalty which would produce 'a reasonable profit' for GP. See Faulkner v. Gibbs, 199 F.2d 635, 639 (9th Cir. 1952).

It is evidence, therefore, that the formulation called the willing seller and willing buyer rule represents an attempt to colligate diverse evidentiary facts of potential relevance. In applying the formulation, the Court must take into account the realities of the bargaining table and subject the proofs to a dissective scrutiny.

In order to establish what USP 'would have' demanded and what GP 'would have' agreed to pay at the time of the suppositious negotiations, USP has hypothesized certain economic facts having experiential validity 'as of' the time of the assumed negotiations.

USP's reconstruction is attacked by GP as a distorted fictional playback that trims the facts to fit USP's theory. For example, GP describes the trial testimony of USP's witnesses, Antoville and Heilpern, as:

'insulated from reality by assuming to recapture the mood of 1954 without any such modification as is required by subsequently developed facts. This is the direct result of a basic misconception by plaintiff of the 'willing seller' rule. The entire thrust of the Heilpern-Antoville testimony was to give expression to an opinion of what USP would have asked had there been a 1955 negotiation with GP for a Deskey license.

Testimony of this nature is irrelevant and, if regarded at all, misleading.

The 'willing seller' rule does not contemplate a confrontation between adverse negotiators and the use of their campaign slogans as evidence.

It does contemplate a marshaling of all of the pertinent facts which, like cards dealt face up, are for all to see. And it then contemplates the supposititious meaning of buyer and seller, who are able, on the basis of the over-all round-up of information, to become 'willing' buyers and sellers, at a royalty which will enable the buyer to make and sell at a reasonable profit.'

Referring to the decisions expounding the willing seller rule, GP argues that 'none of these cases has allowed the supposititious deal between buyer and seller to be infected by a guesswork opinion, unembarrassed by a single fact. And the realism of these cases is in stark contrast with the fictional character of the USP approach.'

The Court, having considered GP's critique, finds that USP's presentation is, in decisive respects, rooted in reality. The total record has been sifted to separate the probative evidence from surmise, speculation, 'guesswork opinion', and 'campaign slogans'. For the most part, where facts have been hypothesized by USP, they are premised on record evidence, direct and circumstantial. This is particularly true with respect to such elements as reasonably anticipated rates of profit, probable volume of sales, normal economic motivations, and the prevailing business outlook, all as of the time of the supposititious negotiations.

Moreover, the Court as taken into account the modifying effect of the facts developed subsequent to 1955 and has assessed them together with all other probative evidence so far as they bear upon the reasonablness of the assumptions and expectations of the parties in their hypothetical negotiations in 1955.

There is some confusion in GP's analysis arising out of the circumstance that USP was unable to prove before the master the amount of its lost profits as damages. GP argues that the same deficiencies of proof which resulted in the master's finding-- that USP proved the *1123 fact of damage but not the quantum of such damage-- similarly vitiate USP's present effort to use, as one of the primary factors for evaluating a reasonable royalty, the profits that it would have reasonably anticipated it would make at the time when a royalty would have been negotiated hypothetically with G.P. Similarly, GP is in error when it argues that, because this Court rejected the

master's use of GP's infringing profits as the legal measure of damages, evidence of GP's reasonably anticipated profits as of 1955 is irrelevant to the present inquiry.

Certain basic statistics are not in dispute. GP's sales of the infringing striated plywood totalled 15,899,000 square feet and amounted to sales proceeds to GP of $2,547,393. The period of the infringement was March 1955 through September 1958.

The manufacturing part of the infringement began in February 1955. As pointed out by the Court of Appeals (258 F.2d at 127):

'The plaintiff, Georgia-Pacific Corporation, first manufactured its accused panels in February 1955 and in March delivered a sample to defendant's manager in Newark.'

The hypothetical negotiations are, therefore, time-placed in February 1955 and the relevant factors are viewed in that frame of time-reference.

I

USP'S POLICY TO MAINTAIN AND ITS ACTUAL MAINTENANCE OF A VALUABLE MONOPOLY ON SALES OF STRIATED FIR PLYWOOD IN THE ABSENCE OF GP'S INFRINGEMENT.

USP's undeviating policy was to maintain its patent monopoly on sales of striated fir plywood in the United States. Its exploitation of the Deskey patent through the sale of Weldtex was extremely successful and profitable. The Court of Appeals characterized the commercial success of Weldtex as a factor of 'very great significance'. 258 F.2d at 133.

USP manufactured and sold Weldtex in substantial quantities since 1946. From April 30, 1951 to January 31, 1955, the annual average sales of Weldtex was approximately $6,000,000. During the last six quarter-annual periods before the infringement, extending up to January 31, 1955, sales of Weldtex totalled $9,325,022, the quarterly average being $1,554,170, compared with quarterly average sales of $1,456,605 during the period from April 30, 1951 to January 31, 1955. During the quarter ending April 30, 1955, the Weldtex sales amounted to $1,601,814.

The February 1955, USP had no reason to anticipate that there would be a significant decline in the

demand for Weldtex in the foreseeable future. In fact, no such decline took place for two years subsequent to February 1955.

The commodity most relevant to the subject of USP's monopoly was striated fir plywood. GP argues that the relevant commodity is 'decorative plywood' as a class, of which striated fir plywood (exemplified by USP's Weldtex) was only one of many; that USP's monopoly was diluted by the competition of other decorative plywoods with Weldtex; and that this competition in February 1955 was a factor that significantly tended to reduce the royalty for Weldtex that would have been negotiated hypothetically at that time. In fact, GP contends that the competition that Weldtex faced was so keen that only a minimal royalty can be justified.

Noteworthy is the fact that, despite the allegedly fierce competition between Weldtex and other decorative plywoods, GP deliberately decided to duplicate Weldtex notwithstanding the caveat of GP's own counsel that an expensive infringement suit was inevitable. GP's calculated infringement of Weldtex is an admission by conduct that it regarded Weldtex as occupying a uniquely favorable position in the market.

In this connection, it is also important to consider that, without a license from USP, GP could not legitimately manufacture striated fir plywood and, on the **1124** other hand, the granting of a license by USP to GP would place GP in direct and active competition with USP in the United States with respect to striated fir plywood. Obviously, only an adequate royalty would make this proposition palatable to USP.

The separate question-- whether there were other competing decorative plywood panels-- poses an inquiry into the extent of that competition and its ultimate bearing upon the determination of the amount of a reasonable royalty.

During the period February 1955 to 1958, Weldtex was not confronted with significant competition except that created by GP's infringing striated. Judge Herlands sharply discounts the testimony before the special master (transcript of the proceedings before the special master herein referred to as 'SM') of GP's witnesses Beggs, L. G. Buckley and Elmendorf, in determining the popularity, life cycle and competitive situation with respect to USP's striated fir plywood. Aside from their lesser credibility than USP's witnesses on the point, the questions put to Beggs,

Buckley and Elmendorf were not directed to the relevant period 1955 to 1958 or to February-March, 1955, when the infringement commenced and hence the time when the reasonable royalty would have been negotiated. Beggs was questioned about the period '1955 to 1958' (GP Exh. 18, SM 3360-61). L. G. Buckley was asked a question in the then present tense (1960) with respect to 'other wall covering products which are competitive with Weldtex' (GP Exh. 21, SM 3314). The same use of the then present tense was used with respect to Elmendorf, when he was asked about other products competing with Weldtex (GP Exh. 22, SM 3300, 3301). A similar irrelevant time period is reflected in the testimony of Monroe Pollack, then an officer and sales director of USP, when he described the competition 'in 1957 or thereabouts' (GP Exh. 25, SM 389, 415) or 'in about late 1958 or early 1959' (GP Exh. 25, SM 388).

The evidence that, in February 1955, Weldtex was without keen competition is corroborated by admissions from GP's own files relating to times both before and after the hypothetical negotiations. For example, GP's attorney, in a letter dated July 23, 1953, said that Weldtex 'has been without any substantial competition' (USP Exh. 14a, at 1887a). Five years later, on May 13, 1958, a ranking representative of GP (Leonardson) wrote that Weldtex 'is certainly one product on which they (USP) have very little competition' (USP Exh. 6).

While in a generalized sense Weldtex was only one of a number of decorative wall panels that were competitive (e.g., brushed fir plywood, Philippine mahogany plywood and embossed plywood) the Court accepts Mr. Heilpern's testimony that, to determine whether and to what extent various plywood and similar products were competitive with each other, it is necessary to know their respective price ranges and the respective markets that had been developed for them (Tr. 222-40). The Court is convinced that, in February 1955, the commercial value of Weldtex was not undermined by competition (Tr. 223-30, 234-35, 238, 330-31).

Particularly convincing on the point of the absence of substantial competition is the testimony of Monroe Pollack, USP's vice president in charge of sales from 1950 to 1957 (GP Exh. 25, SM 369, 383-388) which is corroborated by the Antoville testimony (Tr. 349-357) and the striated fir plywood statistics (USP Exh. 1). Pollack testified that Weldtex represented a unique decorative panel 'which, to a large degree, were (was) non-competitive' and that there was no competition in this particular field until late 1958 or

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

early 1959.

The master found and this Court approved the finding, that Weldtex and GP's infringing striated plywood were competitive with each other to a greater degree than with other decorative panels. 243 F.Supp. at 510, 511; MR 105. Competition in the form of imported products was not significant in February *1125 1955. Such competition assumed substantial proportions only in 1957 or thereabouts. Mr. Heilpern's testimony proves that, while there were a number of other competitive decorative wall panels on the market during the period of infringement, they were not substantially significant as competitive items with Weldtex. This is corroborated by the fact that USP was able to maintain the volume of its sales at original prices. Mr. Antoville's credible testimony proves that, in 1955, the other decorative plywoods did not constitute a substantial competitive factor.

The Court reiterates its prior finding that, at the time of GP's infringement, Weldtex was relatively insulated from competition. See 243 F.Supp. at 510, 511.

It follows that, in February 1955, the time of the hypothetical negotiations, the determination of a reasonable royalty would have been strongly influenced by the then dominant market position of Weldtex. While this element cannot be converted into commensurable arithmetical terms, it is a highly significant fact in the mix of factors.

The evidence referred to must be considered in conjunction with USP's policy not to license anyone to sell Weldtex in the United States or in any other area where USP was capable of making its own sales. In the licenses that USP did grant for the manufacture of Weldtex in the United States, USP stipulated that the licensee could sell only to USP or USP's designee.

The master found that USP had the financial and physical capacity to market an additional amount of striated fir plywood equaling 80% Of the amount infringingly sold by GP. While the master and the Court found that USP had possessed that capacity, the master found, and the Court approved the finding, that the proof was insufficient to establish that USP would have in fact manufactured and sold any measurable quantity of Weldtex between February 1955 and September 1958, in addition to the quantities of Weldtex which they did actually manufacture and sell during that period.

What is pertinent for present purposes is that, at the time of the hypothetical negotiations, USP did have the physical and financial capacity to market an additional 12,784,000 square feet of Weldtex between March 1955 and September 1958 and that, when it would have entered into the hypothetical licensing agreement with GP, it was not doing so because it could not have produced additional Weldtex itself.

Next to be considered is the matter of the market demand for Weldtex in or about February 1955 and the then reasonable anticipation as to the continuance of that customer popularity. GP argues that Weldtex had passed its apogee just before GP began its infringing sales of striated plywood. Citing sales statistics, GP claims that Weldtex lost standing in each succeeding year since early 1955.

The more persuasive fact is that, in February 1955, there was no reason to anticipate any significant decline in the foreseeable future in the demand for the striated fir plywood on which USP had a legal monopoly. USP executives in fact anticipated no such decline. Sales of striated fir plywood were still rising in February 1955, and did not fall off significantly until about two years later. During six of the eight quarterly periods following the start of the infringement-- up to April 30, 1957-- the total combined sales of striated fir plywood by USP and GP exceeded USP's quarterly average over the period April 30, 1951, up to the beginning of the infringement. For the eighth quarter following the commencement of the infringement the combined sales by USP and GP were 88.2% Of USP's pre-infringement average. For the entire four year period following the infringement up to January 31, 1959, the total striated fir plywood sales was more than 80% Of the sales during the four years prior to the infringement.

USP recognizes the abstract proposition that specialty plywood products tend *1126 to go through cycles of popularity. But the record shows that in February, 1955 the popularity of striated fir plywood had not yet begun to decline; that (as the credible testimony of Heilpern and Antoville indicated) no one familiar with it thought it had; and that no one, least of all GP, considered that its commercial value and future prospects were anything but attractive. The very circumstance that GP decided to manufacture and sell infringing striated fir plywood reflects its sanguine view that this was a profitable item despite the almost certain litigation that would

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Page 10

ensue.

The contemporaneous documentation indicates that GP's entrance into the striated fir plywood field met with enthusiastic sales inception; that shortages soon arose; that re-orders for the product were obtained; and that even in 1958 GP's pricing of striated fir plywood was holding up.

The evidence on which GP relies to show that Weldtex had lost its popularity was not focused on or near February 1955 (the time of the hypothetical negotiations) nor on the year 1955. For example, GP's witness Beggs, in testifying as to the decline of the market for striated plywood, was answering a question that was pegged to the time period of '1955 to 1958' (GP Exh. 18, SM 3363-64). The same period was used in the framing of a question to GP's witness L. G. Buckley about the 'status of the life cycle' of Weldtex's popularity (GP Exh. 21, SM 3317); and, interestingly enough, Buckley answered that the peak of striated fir plywood had not yet been reached by 1955 (GP Exh. 21, SM 3317-18).

Similarly, the testimony of the retail lumber dealer Levine, concerning a 'change of style' away from striated fir, was given in answer to questions concerning the level of Weldtex sales in 1961, as compared with the level in 'past years' (GP Exh. 24, SM 3673-74).

The Court, therefore, finds that, in or about February 1955 and for approximately two years thereafter, the popularity of striated fir plywood was still a choice commodity; that it was viewed by USP and GP as one that would bring in substantial profits; that it was desirable in the eyes of GP; and that because GP coveted it, it deliberately proceeded to manufacture its own striated fir plywood imitation of Weldtex. Consequently, in considering the ultimate question of reasonable royalty, striated fir plywood must be evaluated in the foregoing context.

The entire and actual sales picture of striated plywood during the period from February 1955 through September 19, 1958 has been considered as a circumstance together with all of the other evidence in the case. Taking all of the historical facts into consideration the Court finds that, for purposes of determining a reasonable royalty, striated fir plywood was considered by the parties as a readily salable and highly profitable commodity; and that striated fir plywood had not lost its commercial value as a popular product at the time of the hypothetical negotiations.

[2] The circumstance that the Deskey patent (which had issued on June 9, 1942) had only a little over four years to run from February 1955 until it expired on June 9, 1959 (GP Exh. 15) and the argument of GP that the reasonable royalty should therefore be minimal (as testified to by GP's witness L. G. Buckley, SM 3322 (GP Exh. 21)), are neutralized by certain practical business considerations: (1) because striated fir plywood was a product of demonstrated great commercial success, GP did not assume any risk in this respect; (2) a royalty calculated as a percentage of footage actually sold or volume of actual sales, as distinguished from a license fee expressed in advance as a flat amount of dollars, would mean that GP did not assume any fixed financial obligation (Tr. 373-74 (Antoville); Tr. 295-96, 309, 313 (Heilpern)); (3) the opportunity to engage in the sale of a patented product even several years before the patent's expiration would constitute a definite advantage to GP who intended *1127 to market the product after the expiration of the patent (Tr. 386-87 (Antoville)); and (4) GP could get into the profitable production of striated fir plywood with only the modest investment required for a striating machine, amounting to approximately $12,000 to $15,000 (Tr. 148-49, 288-89, 323, 344-45).

II

THE FACTOR OF THE PROFITABILITY OF WELDTEX.

The amount of profits that USP was making and could (in February 1955) reasonably expect to continue to make on its sales of Weldtex by licensing no one to sell Weldtex in the United States is of major relevance to the determination of the amount of royalty that USP would accept from GP and that GP would offer. USP was enjoying the profits of a readily salable product. USP was in a position to retain the entire market on striated fir plywood for itself. The result of GP's infringement was to interfere with that monopoly and, as planned, to put GP in direct competition with USP's Weldtex throughout the period of infringement. The hypothetical license would have been one whereby GP would have been permitted to market striated fir plywood throughout the United States (as GP infringingly did).

GP admits that 'one of the most pertinent factors in ascertaining the value of a patent for royalty purposes is the ability or inability of the invention of the patent to make money.' GP does not claim that USP's

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Page 11

profits on its Weldtex sales are not a proper factor for consideration in determining the amount of a reasonable royalty.

In the hypothetical negotiations, USP would have been reasonable in taking the position that it would not accept a royalty significantly less than the profit it was making by its policy of licensing no one to sell striated fir plywood in the United States.

In searching for and considering the available evidence of Weldtex's profitability-- evidence claimed by USP to exist but whose existence in the record is denied by GP-- it is necessary to distinguish sharply that inquiry from the entirely separate issue of the amount of USP's damages in the form of lost profits attributable to GP's infringing sales. That latter issue of lost profits as the measure of damages had been litigated before the special master who found (and this Court affirmed that finding, 243 F.Supp. at 510) that USP had failed to prove that it had sustained a measurable amount of lost profits caused by GP's infringing sales after February 1955 although USP had proved the fact of such damages as distinguished from its quantum. 243 F.Supp. at 512-513.

[3][4] What must be considered now is the fixation of a reasonable royalty--a determination prescribed by the statute and made necessary for the very reason that USP was unable to prove the quantum of its damages in the form of lost profits. What must be considered now as one of the elements, inter alia, relevant to the determination of the amount of a reasonable royalty, it the rate of profits that USP was making on Weldtex at the time GP began its infringement, and not the amount of profits that USP lost as the result of GP's infringing sales-- profits that USP made and was making on and before February 1955 and that it reasonably anticipated it would continue to make, not the profits that it actually lost after February 1955. The statute created the recovery of a reasonable royalty for the very purpose of affording fair compensation in cases such as this, where the victimized patentee is unable to prove that he lost a measurable amount of profits as the result of the infringement.

It is clear, then, that under the statute a reasonable royalty is an alternative way of recovering general compensatory damages and that it is not equitable or commensurable with actual damages computed in terms of demonstrably proved lost profits. This distinction must be emphasized because GP has *1128 obfuscated the issue by coalescing the two

different concepts.

Still another preliminary clarification of the issue is needed.

GP makes the dual argument that 'the proofs of 'profitability' of Weldtex are so unsubstantial, or are so unrelated to Deskey value that the backlash is proof that there is no Deskey value'. The foregoing statement, phrased as it is in the disjunctive, embraces two independent points; (1) that USP has failed to prove the profitability of Weldtex and (2) that USP's evidence of Weldtex's profitability is 'unrelated to Deskey value'-- the latter contention being one that poses the issue of apportionment and that will be discussed separately herein in terms of the value of the Deskey invention.

In this juncture, we are considering the issue of the profitability of Weldtex and the record evidence bearing upon that issue.

According to GP, Mr. Heilpern based his figures of value on USP Exh. 58 (Tr. pp. 141-45); Mr. Antoville 'simply generalized about 'its great profitability'' (Tr. p. 339), and 'the high profitability'' (Tr. pp. 353-55); 'this record provides no clue as to what 'great profitability' or 'high profitability' means'; and 'USP has failed utterly to give any semblance of meaning to the word 'profitability' using 'a false yardstick'.

Mr. Heilpern testified that the profit on Weldtex sales was 'extremely generous' (Tr. 132), 'very substantial' (Tr. 138), and 'extremely profitable' (Tr. 139).

That Weldtex commanded a high selling price in relation to its low manufacturing cost is evidenced by the statement of USP's former president and chairman of its board, as quoted by Mr. Heilpern: 'We made a silk purse out of a sow's ear' (Tr. 132-33 243, 247-51).

A considerable amount of the Heilpern testimony was devoted to explaining the computations contained in USP's Exh. 5B (the same as USP's Exh. 38A in the proceeding before the special master). The data in this exhibit includes, inter alia, the prices and costs involved in USP's actual production and sale of Weldtex and, hence provide some basis for computing the amount or rate of USP's profit on that production and sale.

Mr. Antoville testified that Weldtex had 'great profitability' (Tr. 339); that it was 'a highly profitable

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

item' because it sold for a considerable premium over the price of one quarter AD panel and yet 'cost practically no more to make' (Tr. 339-41) and that Weldtex possessed 'high profitability' (Tr. 353).

During the years 1952 to 1958, Weldtex was manufactured to two sources: the contract mills where approximately 80 per cent of USP's total Weldtex was produced and sold to USP by said mills; and USP's own Seattle plant where approximately 20 per cent of the Weldtex was produced (GP Exh. 8). On an incremental or differential cost accounting basis (as distinguished from an absorption-cost accounting basis), USP made an average profit of $54.25 per thousand square feet with respect to the Weldtex produced by USP from the contract mills; and USP made an average profit of $86.16 per thousand square feet with respect to the Weldtex produced at USP's Seattle plant. When these two profit figures are weighed on the basis of the 80 per cent to 20 per cent production ratio, the ultimate result is $60.63 as the average rate of profit per thousand square feet earned by USP on all its Weldtex sales at the time of the infringement, computed on an incremental cost accounting basis.

Incremental cost accounting, however, is not considered by the Court as appropriate in determining the actual profitability of Weldtex during the years prior to and up to February 1955. Arguably, that method of cost accounting might be appropriate in evaluating the factor of suppositions profit on additional hypothetical sales that USP would anticipate and preserve for itself by not licensing GP. But the absorption cost-basis is more reliable and pertinent to a determination of the historical profitability *1129 of Weldtex during the years prior to and up to February 1955.

Computed by the absorption method, USP's average rate of profit on its Weldtex sales was $48.64 per thousand square feet at the time of the infringement.

USP argues that, independently of USP Exhibit 5B, the Antoville and Heilpern testimony establishes that $60.63 is the rate of profit per thousand square feet of Weldtex sold, and that that figure is 'conservative'. The Court has considered the Antoville testimony (e.g., Tr. 340-41, 343-44)-- which is the predicate for USP's contention that the overall profit on Weldtex was approximately $68.00 per thousand square feet-- and the Heilpern testimony (e.g., Tr. 135)-- which is the predicate for USP's contention that the overall profit on Weldtex renaged from $52.00 to $60.00 per thousand square feet. That testimony does not

impress the Court as sufficiently persuasive to warrant a finding other than that USP's average actual profit on Weldtex sales was approximately $48.00 per thousand square feet; and the Court so finds.

III

THE ASSERTED FACTOR OF INCREASED POTENTIAL PROFITABILITY VIA OPERATIONS OF USP'S PLANT AT EUGENE, OREGON.

Another factor-- in addition to the actual profitability rate of Weldtex-- urged upon the Court by USP as relevant to the determination of a reasonable royalty is 'the higher potential profits' that USP anticipated it could and would make by producing Weldtex at its plant at Eugene, Oregon, which it acquired in February 1955. (Tr. 137). Mr. Heilpern testified that these estimated higher profits were among the factors that 'would have been taken into consideration in negotiating a royalty agreement or a license agreement with Georgia-Pacific in 1955' (Tr. 137, 145).

However, it must be noted that the idea of producing Weldtex at Eugene was specifically considered by USP only in mid-1955, according to USP's president, Mr. Brewer. Both the special master and this Court have found that USP failed to prove that it would have manufactured Weldtex at Eugene in the absence of GP's infringement. 243 F.Supp. at 510-511.

Considering all the relevant evidence, the Court's opinion is that the proofs about USP's earning higher potential profits through the prospective operations of the recently-acquired plant at Eugene are not sufficiently reliable and persuasive to warrant a finding that that particular factor would have played a significant part in the formulation of a reasonable royalty at the hypothetical negotiations in February 1955.

IV

THE FACTOR OF USP'S PROFITS VIA COLLATERAL OR CONVOYED SALES.

Another element emphasized by USP as one that it would have taken into account in the hypothetical negotiations to fix a reasonable royalty was the profits it was making on collateral or convoyed sales of other USP products that were generated by Weldtex sales.

318 F.Supp. 1116                                                                              Page 13
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Both the special master and the Court have found that USP had failed to prove that it would have earned a measurable or specific amount of additional profits on collateral sales in the absence of GP's infringement; and thus USP had failed to sustain a recovery of damages in any assessable amount under the heading of such lost profits. 243 F.Supp. at 512.

There is logic to USP's present argument distinguishing between the profits derivable from collateral or convoyed sales as one of the elements relevant to the fixation of a reasonable royalty (the current issue) and, on the other hand, the loss of profits from such sales as part of actually sustained damages (the issue previously litigated before the master).    The fact of the existence and the substantiality of such profits and the fact of the loss of some of those profits in *1130 the event that GP were licensed to sell striated fir plywood were established by USP.    And such facts have some bearing upon the determination of a reasonable royalty.

It would have been reasonable on USP's part in February 1955 to have expected to make future profits through collateral or convoyed sales, which USP would have anticipated losing at least in part by licensing GP to make striated fir plywood.    Hence, 'this expectant loss is an element to be considered in retroactively determining a reasonable royalty.' Egry Register Co. v. Standard Register Co., 23 F.2d 438, 443 (6th Cir. 1928); Union Carbide Corp. v. Graver Tank & Mfg. Co., 282 F.2d 653, 671-672 (7th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961).

The testimony of Mr. Heilpern (Tr. 138-39, 323) and Mr. Antoville (Tr. 347-48, 353-55, 370) supports the finding that that element would have influenced them importantly in negotiating the hypothetical royalty with GP; and the Court so finds.    The import of their testimony is corroborated by a similar statement emanating from GP's vice president in charge of sales, J. L. Buckley (USP Exh. 8).

The profitability of the collateral or convoyed sales was significant not only from the viewpoint of USP's bargaining position but also in terms of GP's own expectations of an economic advantage, obvious both the USP and GP.    GP's reasonable expectation of collateral profits from convoyed sales of products sold along with its striated fir plywood is a factor in the hypothetical negotiations. Union Carbide Corp. v. Graver Tank & Mfg. Co., supra.    In point of fact, GP sales of striated fir plywood did generate

collateral sales (USP Exhs. 8; 14c; 18, par. 12.B; James L. Buckley's testimony before the special master, SM 2590).

The record therefore leads to the finding that consideration of the collateral sales factor by both parties would have tended to increase significantly the amount of the reasonable royalty hypothetically negotiated between them; and the Court so finds.    The record, however, does not enable the Court to quantify the monetary amount of that economic significance in terms of a dollar and cents figure although the factor of profits on collateral sales did possess the economic significance already pointed out.

V

THE FACTOR OF THE SUBSTANTIAL PROFITS GP WOULD REASONABLY HAVE EXPECTED TO EARN ON ITS PRODUCTION AND SALE OF STRIATED FIR PLYWOOD.

GP was most eager to manufacture and sell striated fir plywood because, in the words of its attorney, it had been 'extremely successful * * * without any substantial competition' (USP Exh. 14a).

GP would not have been at a significant competitive disadvantage in marketing striated fir plywood because (1) GP's striated plywood was exactly the same product as Weldtex for which USP had developed the market; (2) GP had contacts with all of USP's customers; and (3) GP's striated plywood would have been welcomed by the trade as an additional source of supply that would make the market competitive (Tr. 371-72; USP Exh. 9).

This Court found that, if a one-quarter inch AD blank is 'upgraded' by being converted into a 'specialty', 'the possibility of a substantial profit is presented', 243 F.Supp. at 507; and that 'GP's purpose in producing GP striated' was to make a product that would yield 'a substantial profit', supra.

The Court of Appeals not only noted the 'profitable market' that USP had developed for Weldtex but also quoted testimony that GP had begun to manufacture striated fir plywood because it was 'extremely advantageous from a profit standpoint'. 258 F.2d at 133-134.

*1131 The special master found 'that the production of GP striated was planned as a high profit item'. (MR 80.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)

GP was willing to assume substantial risks and costs in order to make and sell striated fir plywood without authority from USP. The Court finds that GP would have been willing to pay a substantial royalty to USP in order to obtain reasonably anticipated large profits without the risk of infringement liability.

The Court has considered the evidence in order to quantify the amount of profits that GP would reasonably have expected, at the time of the hypothetical negotiations, to earn on its production and sale of striated fir plywood. This is a different question from the amount of infringing profits that GP actually did make-- $685,837, according to the special master.

GP took, as its own guide for the purpose of profit expectations, the profit that USP was then making on its Weldtex sales. The evidence supports the inference that GP was able to estimate, fairly accurately, the amount of USP's costs on Weldtex; and that GP knew that its own costs would not be significantly higher.

It is undisputed that GP was also well aware of both the warehouse and the direct mill prices of Weldtex (Tr. 136). GP would have expected to sell its own striated fir plywood at the same prices (as, in fact, it did).

Note has already been made of the fact that, in 1955, a striating machine fact that, in 1955, a striating machine

GP had a good idea of what USP's profits on Weldtex were, and could reasonably have expected that it would make at least comparable profits on its own striated plywood.

In fact, there is some basis for the view that GP would reasonably have expected to enjoy a higher average profit margin than USP's because GP's production was predominately at GP's own mills (where average striated fir costs were lower than at contract mills), whereas about 80 per cent of Weldtex in the years 1952 to 1955 came from contract mills.

In any event, since the Court has found that USP's average rate of profit on its Weldtex sales was $48.64 per thousand square feet at the time of the infringement, the Court also finds that GP would reasonably have expected to earn on its manufacture and sale of striated fir plywood profits at least approximately the same rate.

Moreover, this figure of $48.64 per thousand square feet must be amplified by virtue of the collateral sales factor insofar as that factor would have reasonably entered into GP's thinking at the time of the hypothetical royalty negotiations.

VI

THE FACTOR OF THE PROFITS THAT GP WOULD REASONABLY HAVE EXPECTED TO EARN ON COLLATERAL OR CONVOYED SALES.

[5] The Court finds that, at the time of the hypothetical negotiations, GP would reasonably have expected to derive substantial additional profits from collateral sales of other profits (particularly non-specialty items) sold along with its striated fir plywood, a specialty item. (USP Exh. 8, report of GP's vice president, James Buckley, dated June 29, 1956; USP Exh. 14c, letter of GP's attorney, dated February 8, 1954; USP Exh. 18, par. 12.B; testimony of James Buckley, SM 2590; testimony of Heilpern, Tr. 138-39, 223; Testimony of Antoville, Tr. 353-55.) This is a significant factor to be considered by the Court in determining the reasonable royalty because it has the logical tendency, as a matter of simple economics, to increase the amount of the reasonable royalty.

This factor is relevant to the question now under consideration notwithstanding the fact that USP's proof was found insufficient to show either a measurable amount of collateral profits diverted *1132 from it to GP (and, hence, recoverable as lost profits) or any specific amount of collateral profits earned by GP as the result of the sale of other products generated by the sale of GP striated.

Both the hypothetical licensor's expectant loss of collateral sales (Egry Register Co. v. Standard Register Co., supra) and the hypothetical licensee's expectation of profits on its collateral sales (Union Carbide Corp v. Graver Tank & Mfg. Co., supra) are relevant elements to be considered in determining a reasonable royalty.

If GP had been negotiating with USP for a license, GP would have taken into consideration all advantages which might accrue to it in determining a royalty which it would be willing to pay. A license to sell the patented striated fir plywood would have enabled GP to expend its business, increase its sales of non-infringing materials and thereby increase its

profits. Absent a license, GP accomplished the same result by the sale of its infringing GP striated.

In view of the foregoing, the figure of $48.64 per thousand square feet of striated fir plywood sold, representing GP's probable expectation of profit on that item alone, would not reflect the factor of GP's expectation of profits on collateral sales generated by the sale of striated plywood.

The evidence does not permit an inference as to the quantum, even approximately, of the profits derivable from collateral sales by GP. To assess this factor separately and monetarily by assigning a dollar and cents valuation to it would involve impermissible conjecture and speculation. In the circumstances, therefore, the indisputable fact that such profits would be generated in a significant amount by the sale of striated fir plywood is treated by the Court as a factor strengthening USP's bargaining position and supporting the reasonableness of the figure of the profit rate on the sale of striated fir plywood.

VII

THE AMOUNT OF THE REASONABLE ROYALTY.

a) GP's argument that the value of striated fir plywood was substantially attributable to elements other than the Deskey patent.

[6] This case does not permit application of the principle of apportionment inasmuch as the Deskey patent was not one for an improvement on an article nor was GP's infringement of a patented feature sold together with unpatented parts. Decisions illustrating the rule applicable to patented improvements or to patented parts of articles also embodying unpatented parts are not apposite for the reason that the Deskey patent covered and Weldtex represented a marketable article-- a panel of striated fir plywood-- as an entirety.

The Deskey patent, though using the prior art to a degree, gives substantially the entire value to the structure represented by the infringing article. The present case well illustrates Judge Learned Hand's observation that 'patent infringement often involves nice and casuistical questions * * *.' Cincinnati Car Co. v. New York Rapid Transit Corp., 66 F.2d 592, 593 (2d Cir. 1933).

In terms of a structural test, for example, the contribution of the Deskey invention cannot be

isolated as a separate physical part. The invention permeated the plywood panel to such a degree that it should be considered as covering the article as a whole. In this situation, the invention was not only for an improvement.

There is a basic distinction between a patent which is only a part of a machine or structure and which creates only a part of the profits and, on the other hand, a patented article or a patent which gives the entire value to the combination or an article patented as an entirety. Consequently, it is necessary to determine where the invention extends to and affects the whole article, giving it its essential marketability, or *1133 whether it is only for an improvement. This distinction and the related problem of apportionment are expounded in such cases as Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222 (1912); Cincinnati Car Co. v. New York Rapid Transit Corp., supra; Rockwood v. General Fire Extinguisher Co., 37 F.2d 62 (2 Cir. 1930); and Egry Register Co. v. Standard Register Co., supra.

Inspired by the distinctions discussed in the above-cited cases, GP attempts to attenuate the significance and value of the Deskey patent by arguing that approximately 50 per cent of the value of striated fir plywood (GP's proposed finding of fact #6) was not essentially attributable to the Deskey patent, but rather was allocable to the method employed on the three-ply panel to 'balance' the striation of the face ply and to its decorative effect.

USP's method of 'balancing' was covered by the Bailey patents (involving the use of an initially heavier ply for the exposed face) whereas GP's method was covered by the Leonardson patent (involving the cutting of wide channels at regular intervals in the reverse ply to remove enough wood to balance the striation of the face). 258 F.2d at 127, 129. Without some such balance, the fir plywood panel (being made of soft wood like Douglas fir) would have warped and been unsalable. (See e.g., G.P Exh. 19, SM 3664-65 (Brewer)).

Since USP and GP were the only manufacturers of striated fir plywood, the methods of avoiding warping that were used were, understandably, limited to the two methods taught by Bailey and Leonardson. Other methods, however, were commonly known and readily and economically available to solve this easy mechanical problem. SM 3597-98 (Brewer). They simply were not used by either USP or GP.

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)

Page 16

Many different and long-standing methods had been devised to solve the warping problem. But the solution of that problem did not evolve or create any commercially successful article like 'Weldtex'. The birth of 'Weldtex' had to await the solution of the other problems of checking and edge separation. This was Deskey's achievement.

The Court of Appeals was fully aware of the warping problem and how it had been solved prior to Deskey. That Court pointed out that 'warping and curling' had been attacked in the prior art by the Hansen patent (by incising the face of the veneer panel with short slits); by three Maurer patents (by incising the face of the panel); and by two Elmendorf patents (by rupturing the veneer and then mounting it on an elastic plastic substance or on a flexible backing); and that those skilled in the art 'were familiar with * * * incising and rupturing as a means of controlling warping' (258 F.2d at 129). The Court of Appeals observed that striation 'does not purport to have a significant effect on warp control' (258 F.2d at 129) and that, in fact, 'striation increases the tendency of the entire panel to warp or curl.' (258 F.2d at 129). The Court then declared that the 'contribution of the Deskey patent' lies 'beyond the area' of the problems of warping or curling caused by striation. (258 F.2d at 129.)

Balancing the panel to prevent warping was no significant problem to anyone possessed of the normal plywood industry skills. It is noteworthy, moreover, that the Deskey patent itself expressly suggested a solution to that recognized problem when it pointed out that the back ply as well as the face ply of the panel could be grooved. See patent, in USP Exh. 31 at 1, col. 2 (describing Fig. 2), at 2, col. 1 at 2, col. 2; Tr. 276-78, 305 (Heilpern) SM 3590-91, 3630-33 (Brewer) (USP Exh. 31).

GP has offered no proof, either before the special master or this Court, to establish that the Leonardson patent contributed any value to the infringing article. On the other hand, USP's president, Mr. Brewer, testified (SM 3581- 3667; USP Exhs. 28, 31) persuasively that Leonardson contributed very little value to GP striated; that *1134 Leonardson merely taught another way to solve an easy problem; that the Leonardson nonwarping feature would have to be valued on the basis of the economy that it effected over the cost of controlling warpage by one of several other unpatented methods such as sanding or incising (SM 3597-99, 3608-15, 3617); and that the cost of using these other methods would very from approximately $1.00 to $2.00 per thousand square

feet, and the cost of the necessary incising machine would be about $6,000. SM 3617- 19. Mr. Brewer was corroborated by the trial testimony of Mr. Antoville. Tr. 361-65.

The special master found (MR 89-91), and this Court reaffirms and adopts the findings, that any economy effected by the Leonardson patent (and any consequent value ascribable to the balancing function of that patent) was minimal; that GP has offered no proof of value attributable either to the prior art or the Leonardson patent; that GP has not offered any further evidence on that subject before this Court; that the matter of achieving balance through any of the readily available and commonly known methods was unimportant because the fir plywood panel has no commercial value at all unless the other side were striated; that whichever means was used to achieve the balancing of the panel the sales price of the striated fir plywood panel would not have varied; that it is the value of the striated face that created the value of the striated fir plywood panel; that the entire market value of Weldtex and GP striated was attributable to the Deskey patent; and that if any value was attributable to the contribution made by the Bailey patents, in the one case, and by the Leonardson patent, in the other, it would be of minimal character, having little or no influence upon the amount of a reasonable royalty in this case.

There is no basis for GP's argument that the value of striated fir plywood is significantly attributable to elements other than the Deskey patent. Such a proposition is as illogical as a claim that, because an automobile needs wheels to run, an automobile motorized by a patented electronic device owes its substantial value to the wheels.

The Court reaffirms and adopts the special master's findings that Weldtex was an entity in itself, not a combination of things or elements separable in value or profit-producing potentialities; the commercial success of Weldtex was the result of the deep striation of the face, Deskey's invention, which created a new kind of plywood panel, a novel and useful work of craft and art; that no thing or structure or entity, part of Weldtex or of GP's striated, is separable in the manner suggested by subparagraph 'c' of Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co., supra, 225 U.S. at 614-615, 32 S.Ct. 691, 56 L.Ed. 1222; that the nonwarping or balancing feature of the Leonardson patent or the Bailey patents represents no separable 'thing' within the meaning of said subparagraph 'c' of Westinghouse because it made no substantial or significant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 F.Supp. 1116                                                                                         Page 17
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)

contribution of value to the creation of the profits from the sale of the striated fir plywood; that substantially the entire market value of Weldtex and the infringing GP striated is attributable to the Deskey patent; and that, if any value were allocable to either the Bailey or the Leonardson patents, it would be minimal.

b) The significance of the decorative apprearance of Weldtex and GP striated in relation to the question of the amount of a reasonable royalty.

Of course, Weldtex had a pleasing appearance and decorative effect. The Court of Appeals, in alluding to 'the decorative appearance of Weldtex' as having 'contributed toward this (Weldtex's) commercial success' (258 F.2d at 131), observed that 'this commercial success may in considerable measure be due to the decorative appeal of Weldtex and the effectiveness of the striation in masking joints and checks.' (258 F.2d at 133.) It is necessary to determine the **1135** relationship of these facts to the issue of reasonable royalty.

[7] The decorative appearance or 'decorative effect' of Weldtex was not per se a patented element of the Deskey invention. Upon that circumstance as a foundation fact, GP erects the argument that whatever value of Weldtex may be attributable to its decorative appearance must be disregarded in determining the amount of a reasonable royalty for the use of the Deskey patent because 'decorative appearance' is a feature beyond the scope of that patent.

The face of GP's infringing striated fir plywood was, from the viewpoint of deep striations and appearance, structurally and esthetically a replica of USP's Weldtex. This was the inevitable result of the infringement because the decorative effect or appearance of Weldtex and GP striated is an inherent, indivisible, and inextricable characteristic of Deskey's deep and random striations.

The originality or uniqueness of Deskey's striation from the viewpoint of inventive novelty was the deep and random grooving in relation to Douglas fir and other soft woods that solved the problems of checking and edge separation (the tendency of abutting panels to draw away from each other). 258 F.2d at 126-127. The heart of Deskey's invention was its effective solution of the old and very real problems of checking and edge effects by deep striation (258 F.2d at 130, 134); and 'deep grooving is an inventive concept' in relation to soft woods like

Douglas fir. 258 F.2d at 135. Because USP was able 'to warrant Weldtex against checking', it 'has used this feature as an essential element of its commercial production'. 258 F.2d at 131. 'Indeed, * * * it was a demonstration of the effectiveness of the Deskey patent in meeting these two problems which caused the Patent Office to issue the patent.' 258 F.2d at 129.

But the Court of Appeals went further and addressed itself to the subject of decorative appearance. Declaring that the patent covers more than a decorative panel (258 F.2d at 130), the Court of Appeals pointed out that prior to the Deskey patent, striation and grooving of wood products, including plywood, had been used 'for decorative effect' and were 'well known'. 258 F.2d at 128, 129.

The Court of Appeals pointed out, however, that Deskey's concept of striation turned a 'decorative effect * * * to a utilitarian advantage by cutting deeper into the surface of the plies'. 258 F.2d at 131. This was something not taught by the prior art; Deskey solved problems (i.e., checking and edge separation) 'without loss of other features'. 258 F.2d at 132. The Court explicitly recognized that 'Basic to the Deskey patent is the fact that plywood panels covered by the claims are to be used where an esthetically pleasing appearance is essential. Thi on appearance raises several problems'. 258 F.2d at 129.

In discussing Weldtex's commercial success, the Court of Appeals stated that, over a sixteen-year period (1940-1956), Weldtex 'has enjoyed an amazing success, with total sales in the United States exceeding $56,000,000'; that 'neither checking nor edge separation has been a source of complaints from users of Weldtex'; and that 'the advantages stressed in the Deskey patent have played a significant role in the widespread and continued public acceptance of the product.' (258 F.2d at 131.)

On the same subject, the Court of Appeals also expressed the following opinion:

'* * * this commercial success may in considerable measure be due to the decorative appeal of Weldtex and the effectiveness of the striation in masking joints and checks. It seems obvious, however, that effective relief of stresses substantially contributed to that success because striation was recognized as a novel and inventive solution to old problems, meeting a long **1136** standing need.' (258 F.2d at 133.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The fact that Weldtex's decorative appearance, a non-patented feature, 'contributed toward' its commercial success and that 'the decorative appeal of Weldtex and the effectiveness of the striation in masking joints and checks' may account 'in considerable measure' for its commercial success-- as pointed out by the Court of Appeals, 258 F.2d at 131, 133-- has been given due and appropriate consideration and weight by this Court in evaluating all of the evidence bearing upon the question of the amount of a reasonable royalty, especially in light of the explicit references by the Court of Appeals to the subject of the decorative appeal of Weldtex.

Though it be reiteration, we draw attention to the view expressed by the Court of Appeals (quoted above) tAt 'an esthetically pleasing appearance is essential' for plywood panels and that this 'emphasis on appearance' is 'basic to the Deskey patent'. 258 F.2d at 129. The quoted language must, of course, be read and construed in factual and literary context with the other sections of the Court of Appeals' opinion, especially its sharply made point that Deskey turned a decorative effect to a utilitarian advantage thereby successfully elevating the prior well-known art of striation only for decorative effect to the height of invention.

In attempting to allocate to Weldtex's decorative appearance its proper economic significance in relation to the fixation of a reasonable royalty, the Court is mindful of the salient fact that the decorative appearance of striated fir plywood made under Deskey's patent was not created by an additive, that is, by some auxiliary substance or process accessory to the striations. The decorative effect represented the automatic and spontaneous appearance of the striations themselves. The deep striations, their decorative effect and their innovative utilitarian results were coupled in an indivisible union of form and function. That union cannot be split by the fission of formal logic to yield separate components of precisely measurable economic significance.

The Court has considered the evidence stressed by GP, that many purchasers of striated fir plywood were motivated to buy it only by its decorative appearance. This evidence does not tend to diminish or deflate the amount of a reasonable royalty in any significant fashion. Without the Deskey patent, GP could not lawfully have sold one square inch striated fir plywood. The Deskey patent created a new article, something that GP had never been able to sell before. GP was seeking the substantial profits it could obtain from the sale of striated fir plywood and of

collateral products. To obtain any of those profits legitimately, GP would have had to have a license under the Deskey patent. The fact-- as we now know it in retrospect, according to the evidence of the motives of the purchasers of striated fir plywood-- that the buyers of that product were attracted to it by its decorative appearance is irrelevant to the hypothetical negotiations of a reasonable royalty where GP's expectations of profits could be lawfully fulfilled only by a license of the Deskey patent and where the rate of profit could be estimated by both USP and GP on the basis of a long and recognized record of past performance. In this setting of the relative bargaining positions of the parties and the economic realities of this particular situation, the Court rejects GP's argument based on the decorative appearance of striated fir plywood.

It cannot be said that the fact that the purchasers' motivation in buying Weldtex was activated by its decorative appeal is irrelevant as a matter of logic or immaterial as a matter of law. That evidence, however, is only one of many other tiles in the mosaic of proof. Since GP could not have created that particular decorative appeal for striated fir plywood without USP's Deskey patent, the bargaining motivations of USP and GP as aggressive competitors vis-a-vis each other overshadowed the economic significance of the consumers' motivations. If *1137 the Deskey patent had untested commercial appeal, that is, if Weldtex had just been making its debut in the marketplace, motivational research and evidence as to the nature of the consumers' reactions would undoubtedly constitute a cogent consideration. Here, however, Weldtex was a well-established, highly successful product, with a consistent profit record of many years. In this particular factual context, psychological analysis of the consumers is largely academic.

c) Absence of a prevailing royalty or royalties in generally comparable circumstances.

GP claims that the amount of a reasonable royalty is strongly evidenced by the proofs concerning (1) the financial arrangements between USP and Deskey; (2) the royalties payable under the five licenses granted by USP to its contract or 'captive' mills; (3) the royalties payable under the three licenses granted by USP outside the United States; (4) eight or more miscellaneous other licenses cited by GP; and (5) the opinion testimony of GP's experts.

Accepting GP's proofs as possessing sufficient probative value to render them admissible, the Court

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
(Cite as: 318 F.Supp. 1116)

Page 19

finds that that evidence does not significantly tend to indicate the amount of a reasonable royalty in the present situation. In each instance, the royalty or other payment cited by GP was made under circumstances that are sharply and fundamentally different from the congeries of controlling facts presently before the Court. Each of the alleged analogies will now be considered seriatim.

(1) The financial arrangements between USP and Deskey.

USP's original agreement with Deskey was made in 1940. Tr. 116, 150 (Heilpern); see GP Exh. 1. The royalty originally provided for was 5 per cent of the mill price. Tr. 150, 213-14. At that time no patent had been issued. As assignee of the patent application, USP prosecuted the application, paying all the expenses involved, and actually obtaining the patent. Tr. 115, 151, 213 (Heilpern); Tr. 345-46 (Antoville). At the time the agreement was made with Deskey 'it was a gamble'; no one knew whether striated fir plywood 'would sell or not sell' or whether the patent would be obtained. Tr. 115-16, 151-52 (Heilpern).

Contrary to GP's reference to this agreement as 'a license from Deskey to make grooved plywood under the patent in suit', the agreement was an assignment by Deskey to USP of his unpatented invention. USP Exh. 31 (Deskey patent); Tr. 149, 151 (Heilpern); Tr. 345-46 (Antoville); see 258 F.2d at 126; 243 F.Supp. at 502.

Significant production of striated fir plywood by USP did not begin until 1945 or 1946. Tr. 117-118. In 1946, the USP-Deskey agreement was revised to give Deskey a royalty of $2.00 per thousand square feet on the first 12 million square feet each year, and $1.00 per thousand square feet on the excess. Tr. 116, 188, 192 (Heilpern); GP Exh. 9; see GP Exha. 1 and 1A, and Tr. 194-95 When, in 1946, USP gave Deskey an advance of $48,000 on royalties, USP regarded it as 'a real gamble because we (USP) did not know how much of the Weldtex we (USP) would sell at all' and 'we (USP) had no means of knowing whether we (USP) would ever earn that royalty at that time.' Tr. 116, 151-52 (Heilpern). USP agreed to pay the royalty to Deskey because it 'hoped to make a good profit'. Tr. 152 (Heilpern).

The circumstances and arrangements between Deskey, the inventor, and USP, the promoter, were basically different from those that would be applicable to the negotiation of a reasonable royalty

between two keen competitors like USP and GP in February 1955, when striated fir plywood was already a firmly-established and widely-recognized success.

In February 1955, Weldtex was at the height of its 'amazing success'. 258 F.2d at 131. Its sales since 1951 totaled more than $23 million and averaged almost $6 million per year. USP Exh. 1. *1138 USP 'paid out to Deskey in the period 1940-1956 over $533,000 in royalties'. 258 F.2d at 134. 'The large profits to be made as a result of the strong commercial appeal of a product like Weldtex were well recognized.' 258 F.2d at 134. Cornelius Reckers, GP's laboratory chief, testified that GP began the manufacture of striated plywood because it was "extremely advantageous from a profit standpoint". 258 F.2d at 134. GP's attorney described Weldtex as 'extremely successful'. USP Exh. 14a.

The preponderant weight of the credible evidence (see also Tr. 153 (Heilpern); Tr. 373 (Antoville)) demonstrates convincingly that the commercial circumstances and economic relationships prevailing between Deskey and USP in 1939 or 1940 and in 1946 have no significant probative bearing upon the issue of a reasonable royalty as between USP and GP.

(2) The royalties payable under the five licenses granted by USP to its contract or 'captive' mills.

In the years 1946 and 1950, USP granted licenses--providing for the payment of a royalty to it of $2.00 per thousand square feet-- to five 'captive' mills as follows: Peninsula Plywood Corporation license on October 1, 1946 (GP Exh. 2; USP Exh. 19; Tr. 160-65); Cascades Plywood Corporation license on January 21, 1946 (GP Exh. 3; USP Exh. 20); Mutual Plywood Corporation license on October 26, 1950 (GP Exh. 4; USP Exh. 21); Davidson Plywood & Lumber Co. license re Weldtex on March 31, 1950 (GP Exh. 5; USP Exh. 22); Davidson Plywood & Lumber Co. license on August 1, 1950 re Sketchwood (GP Exh. 6; USP Exhs. 23, 27 (sample of Sketchwood); Tr. 165-69, 242).

With the exception of the Davidson 'Sketchwood' license (which will be discussed separately), these licenses were limited to the right of the 'captive' mills to manufacture Weldtex for sale only to USP, in effect, to manufacture for USP's account. (Tr. 146.) It was USP that made the substantial profits (of about $54.25 per thousand square feet) by selling the

318 F.Supp. 1116                                                                         Page 20
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Weldtex that the 'captive' mills produced for it. There is, therefore, a world of difference between a restricted license to a non-competitive 'captive' mill to manufacture (and only to manufacture) exclusively for USP and, on the other hand, an unrestricted license that would have enabled GP to manufacture and sell for its own account in competition with USP in the very same markets.

The economic value of the 'captive' mills to USP consisted primarily of the assurance of its major supply of fir plywood and only incidentally of a royalty of $2.00 per thousand square feet, most of which USP, in effect, passed on to Deskey. Tr. 146-47 (Heilpern).

Manifestly, the royalty prescribed by USP for its captive mills has hardly any relevance to the issue of the amount of a reasonable royalty to be negotiated by USP and GP nor does it afford any indication of what the Deskey patent was worth to USP.

The 'Sketchwood' non-exclusive license to Davidson Plywood & Lumber Company, providing for a royalty of $2.00 per one thousand square feet and terminable on 30 days' notice, does not materially aid GP. Tr. 169-70 (Heilpern). The credible evidence is that 'Sketchwood', a speciality product of Davidson, did not involve striation, although the licensee was authorized to use the Deskey patent. Tr. 166 (Heilpern). 'Sketchwood' was a completely different product from both Weldtex and GP striated. USP Exh. 27; Tr. 170 (Heilpern). Davidson's business was local. 'Sketchwood' was never made or sold by USP. It had no impact on the market for Weldtex or GP striated. The 'Sketchwood' license, therefore, does not have a bearing on the issue before the Court. The circumstances affecting the isolated and somewhat anomalous 'Sketchwood' license were not comparable to those affecting the nationwide infringement by GP or the hypothetical license between USP and GP.

**\*1139** (3) The royalties payable under the three licenses granted by USP outside the United States.

The three foreign licenses were: a license on November 26, 1946 by USP to Canadian Forest Products, Ltd. and providing for a royalty of $3.00 per one thousand square feet of Weldtex (GP Exh. 23; SM 3284-88; Tr. 170-74); a license on December 23, 1947 by USP to Proofwood, Ltd., in Australia, and providing for a royalty of $3.00 per one thousand square feet of Weldtex (GP Exh. 23; SM 3281-84, 3290; Tr. 170-74); and a license on August 22, 1947 by USP to Fletcher Holdings, Ltd., in New Zealand,

and providing for a royalty of $3.00 per one thousand square feet of Weldtex (GP Exh. 23; SM 3289-90; Tr. 170-74).

The significance of these royalties is largely neutralized by the credible evidence that these licenses were granted by USP outside the United States, in areas where USP itself had no established sales facilities. As to the Australian and New Zealand licenses, USP had no idea what kind of a market could be established there for Weldtex, which was a new product in those remote countries; and, therefore, USP fixed a minimum royalty. USP's purpose in granting the licenses was not so much to obtain royalty income as to establish relationships with the licensees. Tr. 173 (Heilpern).

As to the Canadian license, USP reserved the exclusive right to sell Weldtex in Ontario for its distributing subsidiary in that province, and obtained the licensee's agreement (which was USP's reason for granting the license) to provide that subsidiary with an assured supply of Weldtex and conventional fir plywood. USP had opened distribution in theProvince of Ontario but did not have a supply of fir, while the Canadian duty on imported Weldtex was prohibitive. In order to obtain a source of fir and Weldtex, USP gave Canadian Forest Products, Ltd. a license. Tr. 172-73 (Heilpern); GP Exh. 23, including SM 3281-90 (Heilpern).

Because there is no sound basis for a meaningful comparison, the amounts of the royalties payable under the foreign licenses do not carry any significant weight with respect to the issue of a reasonable royalty between USP and GP.

The foreign licenses, like the licenses with the domestic captive mills, were consistent with, and an important part of, USP's policy of reserving for itself the exclusive right to sell Weldtex wherever it had facilities with which to do so, and refusing to license anyone else to sell Weldtex wherever USP itself was able to do so. The rights granted by USP to the foreign licensees were completely different from the rights appropriated by GP, which sold its infringing product in competition with USP throughout the United States.

(4) Eight or more miscellaneous other licenses cited by GP.

As part of GP's thesis that there is a 'pattern of royalties' in the 'plywood and panel industry' 'in generally comparable circumstances', GP relies upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 F.Supp. 1116                                                                                          Page 21
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

the evidence of royalties payable by USP under three licenses to it; royalties payable by GP under four licenses to it; and several other license royalties.

The three licenses to USP were: a license covering 'Novaply', a three-ply particle board, originally at the rate of 5 per cent of the sales price, which rate was later substantially reduced (Tr. 174-78 (Heilpern)); a license covering 'Planktex', a decorative plywood panel, at the rate of $3.00 per thousand square feet (Tr. 179-80 (Heilpern)); and a license covering 'Techwood', made of a core of wood, a thin veneer of wood and paper on each side of it, at the rate of 50 cents per thousand square feet (Tr. 180-83 (Heilpern)).

The four licenses to GP were: a non-exclusive license for a plastic overlaid plywood, at the rate of 80 cents per thousand square feet (GP Exh. 20; SM 2622- 24 (J. L. Buckley)); an **\*1140** exclusive license for a laminated oak flooring at the rate of 1 1/2 to 3 1/2 per cent (GP Exh. 20; SM 2625-26 (J. L. Buckley)); an exclusive license for 'Fiberply', an overlaid plywood, made from green rather than dry veneer, at the rate of 1 1/2 per cent. (GP Exh. 20; SM 2627 (J. L. Buckley)); and an exclusive license for hot pressed plywood having no overlay, at the rate of one-half of one per cent. (GP Exh. 20; SM 2627-28 (J. L. Buckley)).

The other license royalties cited by GP were a license granted by L. G. Buckley, providing for an overall royalty of $8.00 per one thousand square feet (GP Exh. 21; SM 3326-28 (L. G. Buckley)); and two or more unspecified licenses to Armin Elmendorf, providing for various royalty rates ranging up to $3.00 per thousand square feet. (GP Exh. 22; SM 3304 (Elmendorf)).

Much, though not all, of the probative force of the foregoing evidence is dissipated by the radically different features and controlling circumstances pertaining to the compared but widely diverse products and the various respective licensors and licenses. While there appear to be some surface similarities to the situation at bar involving striated fir plywood, the dissimilarities as to the products and the parties' relationships preponderate; the relevance of the cited instances to the issue before the Court is superficial, inconclusive and not persuasive.

[8][9] In assessing the probative value of a royalty rate offered by the infringer to prove a rate lower than that claimed by the patentee, the Court may not uncritically accept that numerical evidence. The

Court must consider the economic ambiance of that statistic; special circumstances may explain why that particular rate was depressed or lower than others. See General Motors Corp. v. Dailey, 93 F.2d 938, 941-942 (6 Cir. 1937). The district judge, in determining the true measure of reasonable royalty, should not consider a 'diminished royalty rate' which represented an amount that the patentee may have been compelled to accept in individual cases 'by the disrepute of his patent and the open defiance of his rights.' General Motors Corp. v. Dailey, supra.

This rudimentary principle of analysis has been largely disregarded by GP's simplistic discussion of the figures of royalty rates. There is an absence of meaningful evidence about such obviously pertinent factors as the relative economic positions of the licensor and licensee at the time the particular royalty was negotiated, in terms of their respective bargaining strength and their competitive status inter se; the economics of the market for the particular product before and at the time the particular royalty was negotiated; the character of the particular product itself, as either new or commercially accepted, at the time the particular royalty was negotiated; the past performance of the licensed product in terms of profit-bearing and the degree of its commercial success; and many other similar features that would enable the Court to make a sound businesslike evaluation. Without such evidence, bare data as to a royalty rate and cursory information as to the nature of a particular license transaction are gravely deficient in probative value. They lack the dimension of reality. The Court finds that the preponderant weight of the credible evidence does not establish a meaningful pattern of royalties relevant to the issue now before the Court.

5) The opinion testimony of GP's experts.

GP also relies upon the opinion testimony of four experts as to the amount of royalty which they thought 'would be fair to both of the parties'. None of these witnesses appeared before the Court. Their testimony was put into the record by introducing the transcripts of their prior testimony given before the special master, as follows: Armin Elmendorf (GP Exh. 22; SM 3290-3306); L. G. Buckley (GP Exh. 21; SM 3307-36); Robert Beggs (GP Exh. 18; SM 3338-64); and James L. Buckley (GP Exh. 20; SM 2535, 2612-30).

**\*1141** Elmendorf, a wood technologist, is a research engineer in forest products, including plywood. He invented 'Flexwood', which was licensed to USP (Tr.

255 (Heilpern)). Since 1933, he has had his own research and development company, primarily devoted to developing new wood products. He has taken out over 90 patents and has granted approximately 15 licenses, 'almost all of (which) * * * licenses were made very soon after the development of the invention.' He was asked what royalty would represent a fair value for a product like Weldtex under a non-exclusive license granted about four years before the expiration of the patent. In his opinion, his 'own experience' would indicate that 'a fair royalty would be less than 3 per cent.'

L. G. Buckley is in the business of developing and licensing wall panels of various sorts. He also was asked what royalty would represent a fair value for a product like Weldtex under a non-exclusive license granted about four years before the expiration of the patent. His opinion was that 'The figure would be in the range of $3 per thousand square feet'; that he 'would have a great deal of difficulty in negotiating a contract of any kind with less than six or eight years left on the patent'; and that the two most important factors to be considered in negotiating a license are 'probably, the nature of the product' and how competitive the market was for that product.

Beggs was associated from 1936 to 1959 with Roddis Plywood Corporation, a very substantial enterprise; and from 1945 until 1959 he was first vice president of that company. In response to the same question that had been put to Elmendorf and L. G. Buckley, he expressed the opinion that 'the value of any license that would be granted under' a patent that had three or four years to run and the amount of a 'royalty payment (under such license) would be de minimis'; and that a royalty for Weldtex would amount to 'maybe one or two per cent at the outside'.

James L. Buckley, GP's vice president in charge of sales, has been connected with GP since 1942 and has been GP's chief license negotiator. After enumerating the considerations that influenced him in making or not making a license, he testified that he would have been willing to pay as a royalty for a Deskey license 'not over 2 1/2 per cent' and then 'only if our (GP's) net profit were 5 per cent or more.'

Judge Herlands does not find the testimony of Elmendorf, L. G. Buckley and Beggs persuasive on any of the material points now in issue. They were questioned about 'licenses' in abstract terms; they did not know anything about a licensing situation realistically comparable to that presented by the present case; they were not conversant with the

business considerations in the marketing of striated fir plywood; and L. G. Buckley and Elmendorf did not know of any instance where a company successfully marketing a patented product had licensed the patent to a major competitor. Beggs' qualifications were described by the special master as 'thin but not so thin as to dissolve into a nullity.' (GP Exh. 18, at SM 3355). The Elmendorf, Buckley, and Beggs testimony, designed to completely deflate the value of the Deskey patent and to support only a nominal royalty, is at odds with the preponderant weight of the credible evidence.

The testimony of James L. Buckley furnishes some indication, though slight, that GP would have been willing to pay a royalty equal to one-half of the net profit that GP could expect to make on its striated fir plywood sales (GP Exh. 20; SM 2620-21). For the sake of argument premised on the foregoing Buckley position, GP would have been willing to pay a royalty of about $25.00 per thousand square feet, inasmuch as GP's reasonably expected rate of profit on the sale of striated fir plywood would have been $50.00 per thousand square feet. It would then be reasonable to assume further that the negotiations would have led to a compromise at about the midpoint *1142 between approximately $25.00 (that GP would have been willing to pay according to the foregoing assumption) and approximately $50.00 (that USP would have found acceptable). The result would be a royalty of about $37.50 per thousand square feet.

Both Raymond T. Heilpern and Sol W. Antoville testified in person before Judge Herlands in behalf of USP. The Court exercised the opportunity thus presented of questioning them. Their extensive appearance on the stand also afforded the Court ample opportunity to observe their demeanor and manner of testifying. Their professional and technical qualifications and their testimonial credibility and reliability appear to have impressed Judge Herlands, and their testimony is equally impressive to me.

Mr. Heilpern had served USP since 1937. In 1955, he was USP's general counsel. He was not only attorney to the company but also business counselor. He attended all the USP board meetings and virtually all management meetings when he was in town and participated in business negotiations and decisions. He had participated in the decision to take an assignment of the Deskey invention in 1940 and in subsequent negotiations with Deskey in 1945 or 1946 concerning modification of the agreement. He had handled the agreements between USP and the

318 F.Supp. 1116
318 F.Supp. 1116, 166 U.S.P.Q. 235
**(Cite as: 318 F.Supp. 1116)**

Page 23

contract or 'captive' mills.

Moreover, not only did Mr. Heilpern participate in more than a dozen license or royalty agreements in the course of his services for USP, but he actively practiced law, in connection with which he represented other clients in matters involving the formulation of license agreements providing for royalties for the use of various products.

In addition to his general familiarity with the various factors entering into the determination of a royalty to be paid under a license agreement to manufacture a given product, he was intimately familiar with the business and legal factors involved in USP's marketing of Weldtex under the Deskey patent. He would have been personally and significantly involved in the decisions and negotiations concerning the hypothetical licensing of the Deskey patent to GP in February 1955. He was preeminently qualified, on the basis of his first-hand knowledge as well as his expertise, to state the factors that would have been taken into account by USP and the ensuing conclusions by USP in determining the amount of the royalty to be required from GP in February 1955 for a license under the Deskey patent.

Mr. Antoville, now retired, had been vice president in charge of sales of USP from 1944 to 1953, and was the company's president and chief executive officer in early 1955, at the time of the hypothetical negotiations. He thus would have made the final decision concerning the hypothetical royalty to be negotiated with GP.

The Heilpern and Antoville testimony was factually supported, authoritative, forthright, realistic, reasoned and specifically and concretely directed to the subject of striated fir plywood.

Mr. Heilpern testified that the range of royalties that USP would have considered accepting in negotiating the hypothetical royalty was between $50.00 and $54.00 per thousand square feet of striated fir plywood manufactured and sold by GP, with $50.00 representing 'the cheapest rate we (USP) would have consented to' (Tr. 132, 324) and that, in his judgment, GP would have been willing to pay at least that minimum rate (Tr. 132-41, 316).

Mr. Antoville's testimony is that USP 'would have asked for $55.00 to $65.00 per thousand.' (Tr. 357-58.)

In their opinion, they regarded those figures as

representing a reasonable royalty that should be awarded by this Court for GP's infringement. It is USP's submission 'that the minimum amount of the reasonable royalty to be awarded by the Court should be $50 per thousand square feet of the infringing product made and sold by GP.'

**\*1143** The Court accepts the substance of the Heilpern-Antoville testimony (and finds as facts) that a royalty of $50.00 per thousand square feet payable by GP to USP would have enabled GP to realize a reasonable profit; that GP's average realization on all its striated fir plywood sales throughout the infringement period was $159.41 per one thousand square feet (USP Exh. 15, col. 3); that, after paying $50.00 per one thousand square feet to USP, the remainder of about $109.41 would enable GP to make a substantial profit; and that, in addition, GP would have the benefit of profits on collateral sales, though that amount cannot be quantified.

CONCLUSION

The amount of the reasonable royalty fixed by the Court has been derived from a close factual analysis of the total record. The reasonable-royalty case law analysis, based on all the reasonable-royalty decisions in this circuit and the most pertinent decisions elsewhere, has furnished general guidelines in the form of the applicable criteria of legal principles and operative facts. To the extent that there is precedential guidance, that factor has been subjected to the qualifications and modifications required by a realistic comparison of the particular facts and individual circumstances in the prior decisions and those in the case at bar.

[10][11] The Court finds and concludes that $50.00 per thousand square feet of the patented product, striated fir plywood, made and sold by GP, represents a fair reasonable royalty that should be paid by GP. This amounts to $800,000, which is hereby awarded to USP, together with interest on the said award computed from the date of the last infringement, September 1, 1958, to the date of payment of the award, at the rate of 6 per cent per annum. [FN5] Cincinnati Car Co. v. New York Rapid Transit Corp., supra at 595; Rockwood v. General Fire Extinguisher Co., supra 37 F.2d at 66; Egry Register Co. v. Standard Register Co., supra, 23 F.2d at 442.

FN5. The Supreme Court in Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 505-506, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964), referred to the

legislative history:

"The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, together with interest from the time infringement occurred, rather than profits and damages.' H.R.Rep. No. 1587, 79th Cong., 2d Sess. (1946), to accompany H.R. 5311, at 1-2; S.Rep. No. 1503, 79th Cong., 2d Sess. (1946), to accompany H.R. 5311, at 2, U.S.Code Cong.Service 1946, p. 1387.'

This opinion contains the findings and conclusions required by Fed.R.Civ.P. 52(a).

Within then days from the date of the filing of this opinion and decision, proposed additional or supplemental findings and conclusions may be exchanged and submitted.

Within twenty days from the date of the filing of this opinion and decision, a judgment shall be settled.

318 F.Supp. 1116, 166 U.S.P.Q. 235

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.