IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

                Plaintiff,

        v.

TATUNG CO.; TATUNG COMPANY OF
AMERICA, INC.; AND VIEWSONIC
CORPORATION

                Defendants.

C. A. NO. 04-343-JJF

**COMPENDIUM OF CASES CITED IN
DEFENDANTS TATUNG COMPANY'S AND TATUNG COMPANY OF
AMERICA, INC.'S ADVICE OF COUNSEL BRIEF**

Of Counsel:
Mark H. Krietzman
Frank E. Merideth, Jr.
Alan R. Maler
Valerie W. Ho
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Telephone: 310-586-7700

Kathryn L. Clune
Greenberg Traurig LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
Attorneys for Defendants Tatung Co. and
Tatung Company of America, Inc.

Dated: February 15, 2006

# TABLE OF CONTENTS

*A.L. Hansen Manufacturing v. Bauer Products, Inc.*,
2004 WL 1125911 (N. D. Ill. 2004) ...................................................................... 1

*Baker v. City of Detroit*,
483 F.Supp. 919 (E.D. Mich. 1979) ...................................................................... 2

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
897 F.2d 508 (Fed. Cir. 1990) ............................................................................... 3

*Kennan v. Dow Chemical Co.*,
717 F.Supp. 799 (M.D. Fla. 1989) ........................................................................ 4

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp.*,
383 F.3d 1337 (Fed. Cir. 2004) ............................................................................. 5

*Menchaca v. American Med. Response of Ill.*,
6 F.Supp.2d 971 (N.D. Ill. 1998) .......................................................................... 6

*nCube Corp. v. Seachange Intern., Inc.*,
436 F.3d 1317 (Fed. Cir. 2006) ............................................................................. 7

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ............................................................................... 8

*Reis Robotics USA, Inc. v. Concept Industries, Inc.*,
2006 WL 3198934 (N.D. Ill. 2006) ....................................................................... 9

*Rolls-Royce Ltd. v. GTE Valeron Corp.*,
800 F.2d 1101 (Fed. Cir. 1986) ........................................................................... 10

*Saks v. Franklin Covey Co.*,
316 F.3d 337 (2d Cir. 2003) ................................................................................ 11

*Sanden v. Mayo Clinic*,
495 F.2d 221 (8th Cir. 1974) ............................................................................... 12

*Smith v. Sushka*,
117 F.3d 965 (6th Cir. 1997) ............................................................................... 13

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
411 F.3d 1369 (Fed. Cir. 2005) ........................................................................... 14

*Wilson Group, Inc. v. Quorum Health Resources, Inc.*,
880 F.Supp. 416 (D.S.C. 1995) ........................................................................... 15

# EXHIBIT 1

Westlaw.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
(Cite as: Not Reported in F.Supp.2d)

Page 1

C
Briefs and Other Related Documents
A L   Hansen   Mfg   Co   v   Bauer   Products,
Inc N D Ill ,2004 Only the Westlaw citation is cur-
rently available

United States District Court,N D Illinois, Eastern Di-
vision
A L  HANSEN MANUFACTURING CO , Plaintiff,
v
BAUER PRODUCTS, INC , Defendant
No. 03 C 3642.

May 18, 2004

Allan J. Sternstein, Jeffry M. Nichols, Brinks, Hofer,
Gilson & Lione, Chicago, IL, for Plaintiff
Paul G. Juettner, Thomas R. Fitzsimons, Greer,
Burns & Crain, Ltd , Chicago, IL , for Defendant
Steven L. Under-
wood, Price, Heneveld, Cooper, DeWitt & Litton,
Grand Rapids, MI, for Defendant

*MEMORANDUM OPINION AND ORDER*
ASHMAN, Magistrate J
**\*1** Plaintiff, A L  Hansen Manufacturing Co
("Hansen"), filed suit against Defendant, Bauer
Products, Inc  ("Bauer"), alleging infringement of
two patents held by Hansen  Hansen alleges infringe-
ment either literally or through the doctrine of equi-
valents and seeks increased damages due to Bauer's
alleged willful infringement  Pursuant to Federal
Rule of Civil Procedure 42(b), Bauer seeks to bifurc-
ate the action into two phases: first, a liability phase,
and second, a damages phase that will also address
the issue of willfulness [FN1] Bauer also asks the
Court to stay discovery on the issue of willfulness

> FN1. Bauer's motions and memoranda are
> inconsistent with regard to bifurcation
> Bauer alternates between bifurcation into an
> initial liability and damages phase followed
> by a willfulness phase, and bifurcation into
> an initial liability phase followed by pro-
> ceedings on both damages and willfulness
> However, Bauer's original motion of Janu-
> ary 6, 2004 proposes the latter bifurcation: a
> separate liability phase followed by damages

and willfulness  Bauer suggested the same
arrangement at oral argument  Therefore the
Court will treat this bifurcation proposal as
the substance of Bauer's motion

**\*1** This matter has been referred to this Court pursu-
ant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 72 1
For the reasons set forth below, Bauer's motion to bi-
furcate is granted in part and denied in part: the issue
of damages is bifurcated from liability, however, the
issues of liability and willfulness shall be tried to-
gether  The Court grants a stay of discovery on
Bauer's opinion of counsel

*1 Background and Procedural History*

**\*1** Hansen is an Illinois corporation which manufac-
tures the "Support Arm" at issue in this case  On
March 28, 2000, the United States Patent and Trade-
mark Office ("PTO") issued U.S. Patent No.
6,041,548 ("the '548 patent") to Hansen as assignee
The PTO issued a second patent to Hansen as assign-
ee on April 10, 2001: U.S. Patent No. 6,212,827 ("the
'827 patent") Both patents claim the support arm, an
invention comprised of interlocking arms and pivots
designed to support the hinged lid for a pickup truck
bed with the assistance of a biasing element such as a
gas strut

**\*1** Bauer, a Michigan Corporation, began selling sup-
port arms in late October 2002  On September 26,
2002, before selling its support arms, Bauer obtained
an opinion of counsel to determine whether the sup-
port arms infringed on any existing patents, including
Hansen's '548 and '827 patents  According to Bauer's
memoranda, only Bruce Bacon, Bauer's Vice-
President of Engineering, relied on the analysis con-
tained in this opinion of counsel  Bauer has submitted
this opinion of counsel to the Court for *in camera* in-
spection

**\*1** Hansen requested that Bauer cease and desist mar-
keting the support arms in January 2003  Bauer did
not comply with this request and Hansen filed the in-
stant suit on May 28, 2003  Bauer then filed its mo-
tion to bifurcate the proceedings and stay discovery

Not Reported in F Supp 2d                                                      Page 2
Not Reported in F Supp 2d, 2004 WL 1125911 (N.D Ill )
**(Cite as: Not Reported in F.Supp.2d)**

on the issue of willfulness on January 6, 2004 Specifically, Bauer asks the Court to stay discovery on all matters involving the opinion of counsel unless and until Hansen can establish Bauer's liability for infringement Pending the Court's resolution of this motion, Bauer has objected to all of Hansen's discovery requests that involve the opinion of counsel

## II. Discussion

**\*1** Federal Rule of Civil Procedure 42(b) authorizes bifurcation of trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy " The Seventh Circuit has explained that Rule 42(b) allows separate trials only when three conditions are met *Houseman v. United States Aviation Underwriters, 171 F.3d 1117, 1121 (7th Cir.1999)* First, the trial court must determine whether bifurcation would either promote judicial economy or avoid prejudice to the parties *Id* Next, if one or both of these interests are implicated, the trial court must balance these interests against any countervailing prejudice to the non-moving party *Id* Third, when the trial court is satisfied that this balance favors bifurcation, the court may order separate proceedings, but only if doing so would not violate the Seventh Amendment *Id*

**\*2** Thus the decision to bifurcate centers on a balance of equities *Id* However, this balance is weighted against bifurcation *William Reber, LLC v. Samsung Elecs. Am., Inc., No. 03 C 4174, 2004 WL 541851, at \*4 (N.D.Ill. March 12, 2004)* Rule 42 is read in light of the overarching policy principle behind the Federal Rules, which seeks the just, speedy, and inexpensive resolution of every trial *Id* at \*2 Accordingly, because bifurcation risks additional delay, it has remained the exception and not the rule *Id* (citing *Pfizer, Inc. v. Novopharm, Ltd., 57 U.S.P.Q.2d 1442, 1443 (N.D.Ill.2000)*) Ultimately, however, the decision to bifurcate is made on a case by case basis and rests with the sole discretion of the trial court *Houseman, 171 F.3d at 1121*

**\*2** The burden is on the moving party to show that bifurcation is proper *Real v. Bunn-O-Matic Corp., 195 F.R.D. 618, 620 (N.D.Ill.2000)* Here, the parties agree that bifurcating damages and liability is proper,

but Hansen objects to bifurcating willfulness and liability (Def 's Mem Opp'n at 15 n 6 )

### A Bifurcation of Liability and Willfulness is Inappropriate

**\*2** Bauer argues that bifurcation of liability and willfulness meets the first prong of the *Houseman* test both by serving the interests of judicial economy and by avoiding the prejudicial effects of the so-called "*Quantum* dilemma " See *Quantum Corp. v. Tandon Corp., 940 F.2d 642, 643-44 (Fed.Cir.1991)* Under the second prong of *Houseman,* Bauer argues that Hansen will not suffer prejudice if the Court bifurcates willfulness and liability because the same jury will hear both issues and bifurcation will not cause undue delay

#### 1. Judicial Economy

**\*2** In every case, there is a speculative possibility that judicial economy will be served if the accused infringer prevails on the liability issue, thus eliminating the need to consider other issues See *Pfizer, 57 U.S.P.Q.2d at 1444.* This Court has looked to two factors which demonstrate that this potential benefit tips the balance in favor of bifurcation *Clintec Nutrition Co. v. Abbott Labs., No. 94 C 3152, 1995 WL 228988, at \*5 (N.D. Ill. April 14, 1995)* First, the likelihood that a finding of no liability will actually occur: where the movant can make a *prima facie* showing of success, this Court is more likely to grant bifurcation in the interests of judicial economy *Id* Second, where substantial time and effort will be saved by a finding of no liability, the Court is more likely to grant bifurcation *Id* In other words, if the movant can show that the additional issues avoided by a finding of no liability are complex and time consuming, the Court is more likely to bifurcate *Id*[FN2]

> [FN2]. In *Clintec,* which was decided before *Houseman,* this Court also noted that any increased efficiency must not be outweighed by potential prejudice to the non-moving party *Id* This observation is analytically the same as the second prong of *Houseman*

**\*2** At this stage of the proceedings, Bauer cannot demonstrate any likelihood that it will prevail on li-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
(Cite as: Not Reported in F.Supp.2d)

ability, thus the first factor is inapplicable *See Aptar-group, Inc. v. Owens-Illinois, Inc., No. 02 C 5058, 2003 WL 21557632, at \*1 (N.D.Ill. July 3, 2003)* (granting bifurcation in part because the plaintiff's liability case took "a real hit" from the court's claim construction)

**\*3** Nor does the second factor carry much weight because the willfulness issue is not especially complex in this case The presence of willful infringement is a factual question for the jury and must be determined from the totality of the circumstances *See, e g, WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1354 (Fed.Cir.1999)* (quoting *Amsted Indus., Inc. v. Buckeye Steel Casing Co., 24 F.3d 178, 181 (Fed.Cir.1994)*) While that test implies that the willfulness determination requires the evaluation of much evidence, it also implies that willfulness and liability substantially overlap Accordingly, much of the evidence establishing the totality of the circumstances will have already been presented in the initial liability phase [FN3] The relevant question, therefore, is whether the willfulness issue would require presentation of large amounts of additional evidence that a finding of no liability would circumvent *See, e g. Caterpillar, Inc. v. Deere & Co., No. 96 C 5355, 1997 WL 17798, at \*1 (N.D.Ill, Jan. 14, 1997)* (citing *Remcor Prods. Co. v. Servend Int'l, No. 93 C 1823, 1994 WL 594723, at \*1 (N.D.Ill. Oct. 28, 1994)*) (holding that bifurcating willfulness would not eliminate the need to present additional evidence, but would in fact require duplication of evidence) This additional evidence may include opinions of counsel, minutes from meetings, and other evidence that suggests subjective intent In this case, the parties have not shown that the additional evidence will be extensive. Thus a finding of no liability would not save the court much time because additional proceedings on willfulness will be relatively short

> FN3. An obvious example is the strength of the infringer's validity and non-infringement defenses Where an infringer has presented a good-faith and vigorous defense, that by itself militates for a finding of no willfulness *See* 7-20 Donald S Chisum, *Chisum on Patents* § 23 03(4)(b)(v)(E) (1978) Thus the evidence given on patent validity, such as

obviousness, and infringement, such as the similarity between the products under the doctrine of equivalents, may be highly relevant to willfulness but always is presented during the liability phase Bifurcation could never eliminate the need to present this evidence and other evidence that fleshs out the full totality of the circumstances

**\*3** Accordingly, the Court sees no reason to depart from the general presumption that a single trial will best serve judicial economy. However, Bauer can still prevail on the first prong of the *Houseman* test if it can demonstrate that bifurcation would avoid prejudice

### 2 *Avoiding Prejudice to Bauer -the* Quantum *Dilemma*

**\*3** Bauer argues that the Court should bifurcate willfulness from liability because of the potential prejudice arising from its *Quantum* dilemma In *Quantum,* the Federal Circuit explained that an accusation of willfulness forces the accused infringer to choose between waiving attorney-client privilege or forfeiting the use of its opinions of counsel as a defense to the allegation of willfulness *940 F.2d at 643-44* The former choice prejudices the accused infringer by giving the adversary a glimpse at its attorney's work product, the latter choice prejudices the accused infringer by drastically undercutting its defense *Id*

**\*3** Although willfulness is ultimately determined from the totality of the circumstances, the issue often turns on the defendant's opinion of counsel letters, because these letters indicate whether the accused infringer was aware that its activities were illegal or whether it had a good faith belief that it was not violating any patents *Comark Communs., Inc. v. Harris Corp., 156 F.3d 1182, 1191 (Fed.Cir.1998)*. These opinion letters are, of course, protected by attorney-client privilege and the accused infringer need not produce them *See Electro Med. Sys., S.A. v. Cooper Life Scis., Inc., 34 F.3d 1048, 1056 (Fed.Cir.1994)* However, the Federal Circuit has held that, where the accused infringer does not produce an opinion of counsel, the finder of fact may legitimately infer that the accused infringer either failed to obtain an opin-

© 2007 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
(Cite as: Not Reported in F.Supp.2d)

ion of counsel, or, worse yet, obtained an opinion that warned the infringer not to proceed *Id* [FN4]

> FN4. The *en banc* Federal Circuit is currently reevaluating this inference *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 344 F.3d 1336 (Fed.Cir.2003) Of course, if the Federal Circuit were to eliminate the propriety of these negative inferences, the force of the *Quantum* dilemma would be greatly reduced

**\*4** Therefore, because that inference strongly suggests willfulness, considerable pressure exists for the accused infringer to rely on exculpatory opinions of counsel and thus forfeit the attorney-client privilege, or else forego an effective defense against willfulness *Quantum,* 940 F.2d at 644

**\*4** Bifurcation can mitigate the *Quantum* dilemma by delaying this choice *Id* By splitting the proceedings and staying discovery on opinions of counsel, the trial court allows the accused infringer to maintain attorney-client privilege throughout the liability phase The court may then reopen discovery on opinions of counsel if and when the jury finds infringement, thus allowing the defendant to present a more effective defense against the allegation of willful infringement

**\*4** Thus the Federal Circuit suggested in *Quantum* that the trial court receive opinions of counsel *in camera* to determine whether the accused infringer is presented with such a dilemma and, if so, to give "careful consideration" to bifurcation *Id* Here, Bauer has submitted its opinions for inspection The Court concludes that Bauer indeed faces a *Quantum* dilemma: its opinions include detailed analysis of the '548 and '827 patents including patent prosecution history and claims, claims construction, defenses, and mental impression work product Therefore, Bauer has satisfied prong one of the *Houseman* test by showing that bifurcation of liability from willfulness would avoid prejudice

### 3 Avoiding Prejudice to Bauer-Jury Confusion

**\*4** Bauer also argues that bifurcation of willfulness and liability would avoid prejudice caused by jury

confusion Specifically, Bauer, relying on *Pfizer,* 57 U.S.P.Q.2d at 1444, argues that the evidence of subjective intent relevant to willfulness is not relevant to the objective question of infringement and that the jury would thus confuse the two issues Moreover, Bauer submits that evidence of its subjective intent might bias the jury against it on the question of infringement Nevertheless, the issues of willfulness and infringement are not readily separable To the contrary, as we have noted, the Federal Circuit has repeatedly held that willfulness must be determined from the totality of the circumstances *See. e g . WMS Gaming,* 184 F.3d at 1354 Therefore, because the issues of willfulness and infringement substantially overlap, bifurcation of the two may be inappropriate *Real,* 195 F.R.D. at 626; *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* No. IP-96-1718-C-II/G, 2001 WL 699856, at \*3 (S.D.Ind. May 31, 2001) Instead, courts have allowed the jury to hear all the evidence in one contiguous proceeding so that the jury may better grasp the totality of the circumstances, while alleviating prejudice with jury instructions *See Dentsply Int'l Inc. v. Kaydex,* No. 93 C, 1994 WL 376276, at \*2 (N.D.Ill, July 11, 1994) (observing that even though trying these issues together inevitably creates the risk of jury prejudice, that routine risk does not justify bifurcation) Thus, in weighing the interests that favor bifurcation, the Court does not give much credit to the interest in avoiding this jury prejudice

### 4 Countervailing Prejudice against Hansen under the Second Prong of Houseman

**\*5** In summary, the Court holds that Bauer has met the first prong of the *Houseman* test for its proposed bifurcation of willfulness and liability because bifurcation would avoid *Quantum* dilemma prejudice Under the second prong of *Houseman.* we must now decide whether bifurcation would create undue prejudice to Hansen

**\*5** Bifurcation causes additional delay between trial phases *Real,* 195 F.R.D. at 621 The court gives great weight to this problem, again cutting the balance against bifurcation, where this delay has the potential to create prejudice against the non-moving party *Id*

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
(Cite as: Not Reported in F.Supp.2d)

**\*5** The added delay between a liability and willfulness phase would prejudice Hansen Bauer argues that its proposed bifurcation will create only a short delay, perhaps only a single day Bauer argues that Hansen will only need to depose a few witnesses, and probably only one: Bruce Bacon, Vice-President of Engineering, who relied on the opinion Hansen suggests that it will need more extensive discovery, that it will depose additional third parties who may have relied on the opinion and seek expert testimony In response, Bauer argues that such discovery would be unnecessary Thus Bauer implicitly asks this Court to accept its proposed scope of future discovery proceedings, in effect asking the Court to limit Hansen's discovery in advance Bauer also asks the Court to limit Hansen's trial preparation for the willfulness phase to a single day The Court refuses to do either Hansen has the right to seek broad discovery Fed.R.Civ.P. 26(b)(1) We will not suggest in advance that Hansen's future discovery requests be narrowed and thus we accept Hansen's quite reasonable contention that its discovery will take more than a mere day or two

**\*5** On the other hand, Bauer is correct insofar as discovery on opinions of counsel would not take an exorbitant amount of time because there is only one relatively short opinion Yet, as Hansen points out, the more time taken between trial phases, the greater the risk of losing jurors or having their memory fade before evaluating the totality of the circumstances Here, one week is a reasonable, but still optimistic, estimate of the additional time needed, yet even that short delay risks undue prejudice And, as any practitioner knows, further delays in discovery arising from disputes or other reasons are not rare Such delays would push back the resumption of the trial even further.

**\*5** The prejudice arising from undue delay can only be avoided by denying bifurcation entirely By the same token, the interest in judicial economy is best served by conducting a single phase on liability and willfulness For these reasons, the Court finds that Bauer's motion to bifurcate liability from willfulness should be denied

B Bifurcation of Liability and Damages is Appropri-

ate

**\*5** The parties submit that a liability phase followed by a damages phase, if necessary, is appropriate in this case We agree In particular, bifurcation of damages serves the interests of judicial economy because, unlike willfulness, the damages issue in patent cases often requires significant amounts of complex additional evidence The parties have not indicated the amount of evidence they expect to present and the amount of trial time they will likely use on the damages issue Yet, in every patent case, courts award those damages that will put the patentee in the same position it would have been in absent infringement: either lost profits or a reasonable royalty Either calculation usually demands considerable proofs to accomplish the formidable task of recreating a past marketplace that never actually existed The evidence may include sales records, market pricing and demand fluctuations, proof of the patentee's ability to meet increased demand, and extensive expert testimony to interpret all this hard data Thus patent cases are particularly well-suited to bifurcation of liability and damages in service of efficiency *See* 8 James Wm Moore et al , *Moore's Federal Practice* § 42 24 (3d ed 1997) (citing *Novopharm Ltd. v. Torpharm, Inc.,* 181 F.R.D. 308, 310 (E.D.N.C.1998))

**\*6** Bifurcation of damages and liability will not cause prejudicial delay to Hansen Bauer proposes that the Court bifurcate damages from liability without staying discovery Thus Hansen will have adequate time to discovery evidence and prepare for trial on the damages issue Moreover, the delay between phases will not prejudice Hansen because the issues of liability and damages are more separable than liability and willfulness Thus Hansen need not worry about fading memories of the jurors because most of the evidence relevant to infringement will not be relevant to the computation of damages

**\*6** Finally, bifurcation of damages and liability would not violate the Seventh Amendment, which prohibits splitting the proceedings such that a second jury weighs the same factual issues as the first jury *See Houseman, 171 F.3d at 1126* (quoting *In Re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir.1995)) Here Bauer has proposed that the same

© 2007 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                Page 6
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
**(Cite as: Not Reported in F.Supp.2d)**

jury try both liability and damages, thus avoiding any
Seventh Amendment pitfalls.

### C Staying Discovery is Appropriate

**\*6** Although the Court denies Bauer's motion to bi-
furcate, it will stay certain discovery to minimize the
prejudicial effects of the *Quantum* dilemma  *See Wil-
liam Reber, 2004 WL 541851, at \*10* (denying bi-
furcation but staying discovery on opinions of coun-
sel)  This approach would best protect Bauer from the
prejudice resulting from early disclosure of its attor-
neys' thought processes while preserving an efficient
trial  *See id* at *9

**\*6** Therefore, the Court will stay discovery of Bauer's
opinion of counsel through the discovery phase  The
Court will set a date for the filing of dispositive mo-
tions by later order, and no dispositive motions shall
be filed until such date  At that time, Bauer must
make the *Quantum* choice: if Bauer intends to present
its opinion of counsel at trial, the parties shall con-
duct expedited discovery on the opinion  Naturally
the Court will preclude Bauer from presenting the
opinion at trial if Bauer elects not to waive the priv-
ilege at that time

**\*6** In the meantime, the Court will allow discovery
on all other matters, including liability, damages, and
willfulness  Hansen may conduct discovery on all
matters not privileged, including its interrogatories
asking who obtained, provided, and relied on the
opinions  Hansen may also conduct depositions of
such persons if it wishes, but Bauer may object to and
refuse to answer any questions that disclose the priv-
ileged material contained within the opinion

**\*6** In this way, Bauer can at least maintain attorney-cli-
ent privilege throughout the pre-trial phase, including
the *Markman* hearing and until the filing of summary
judgment motions  However, expedited discovery on
Bauer's opinion of counsel will begin immediately if
Bauer relies on its opinion of counsel earlier for any
reason

### III *Conclusion*

**\*6** Bauer's motion is granted in part and denied in
part  Bifurcation of damages from liability is appro-

priate in this case and is granted  However, Bauer has
failed to meet its burden of showing that bifurcation
of willfulness from liability is preferable  Considera-
tions of judicial economy weigh against bifurcation
And although the *Quantum* dilemma raises potential
prejudice against Bauer, bifurcation would create po-
tential prejudice against Hansen  This part of Bauer's
motion to bifurcate is therefore denied  However, to
minimize *Quantum* prejudice, the Court grants
Bauer's motion to stay discovery on its opinion of
counsel through the discovery phase and until a date
which will be set by a future order of the Court  If
Bauer chooses to rely on its opinion when discovery
is completed or earlier, the parties shall conduct ex-
pedited discovery on the opinion of counsel  Neither
party shall file dispositive motions until the date set
by the Court

N D Ill ,2004
A L  Hansen Mfg  Co  v  Bauer Products, Inc
Not  Reported  in  F Supp 2d, 2004  WL  1125911
(N D Ill )

Briefs and Other Related Documents (Back to top)

• 2004 WL 2175451 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Reply to Defendant's Coun-
terclaims (Jun  23, 2004) Original Image of this Doc-
ument (PDF)
• 2004 WL 2175446 (Trial Pleading) Answer to First
Amended  Complaint,  Affirmative  Defenses  and
Counterclaims (Jun  1, 2004) Original Image of this
Document (PDF)
• 2004 WL 2175442 (Trial Pleading) First Amended
Complaint for Patent Infringement (May 25, 2004)
Original Image of this Document with Appendix
(PDF)
• 2004 WL 2175438 (Trial Motion, Memorandum
and Affidavit) Hansen's Motion to Compel Respons-
ive Answers to Its Interrogatory Nos  1-4 (May 20,
2004) Original Image of this Document with Ap-
pendix (PDF)
• 2004 WL 2175432 (Trial Motion, Memorandum
and Affidavit) Defendant's Reply to Plaintiff's Op-
position to Defendant's Motion to Bifurcate (Feb  10,
2004) Original Image of this Document with Ap-
pendix (PDF)
• 2004 WL 2175430 (Trial Motion, Memorandum

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2004 WL 1125911 (N D Ill )
**(Cite as: Not Reported in F.Supp.2d)**

and Affidavit) Bauer's Motion to Bifurcate (Jan 6, 2004) Original Image of this Document (PDF)

• 2003 WL 23801003 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply to Defendant's Counterclaims (Aug 4, 2003) Original Image of this Document (PDF)

• 2003 WL 23800997 (Trial Pleading) Answer to Complaint, Affirmative Defenses and Counterclaims (Jul 11, 2003) Original Image of this Document (PDF)

• 2003 WL 23800990 (Trial Pleading) Complaint for Patent Infringement (May 28, 2003) Original Image of this Document with Appendix (PDF)

• 1:03CV03642 (Docket) (May 28, 2003)

END OF DOCUMENT

# EXHIBIT 2

Westlaw.

483 F Supp 919                                                            Page 1
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
**(Cite as: 483 F.Supp. 919)**

▷

Baker v City of DetroitD C Mich , 1979
 United States District Court, E D Michigan, South-
                     ern Division
  Kenneth BAKER, Arthur Bartniczak, Hanson Brat-
ton, Patrick Jordan, Frank Krzesowik, Elbert McVay
  and Robert Scally, Plaintiffs in Civ No 5-71937,
     andHanson Bratton, Gale Bogenn, William Shell,
  Patrick Jordan, Charles Mahoney, Individually and
 on behalf of all others similarly situated and the De-
 troit Police Lieutenants & Sergeants Association,
            Plaintiffs in Civ No 5-72264,
                         v
   CITY OF DETROIT, a Municipal Corporation,
Philip G Tannian, Chief of Police, Detroit Police De-
 partment; Coleman A Young, Mayor, City of De-
troit; and the Board of Police Commissioners, City of
                 Detroit, Defendants,
   andGuardians of Michigan, David L Simmons,
  Arnold D Payne, James E Crawford, Clinton Don-
aldson, Willie Johnson, Kenneth M Johnson and Al-
         fred Brooks, Intervening Defendants
           **Civ. Nos. 5-71937, 5-72264.**

                    Sept 25, 1979

Action was brought alleging that white police officers
were illegally discriminated against when the city of
Detroit adopted affirmative action program whereby
equal numbers of white and black police sergeants
were promoted to rank of lieutenant. The District
Court, 458 F.Supp. 379, denied plaintiffs' demand for
jury trial On defendants' motion for partial summary
judgment dismissing claims as to monetary damages
other than back pay, the District Court, Keith, Circuit
Judge, sitting by designation, held that: (1) in light of
unsettled nature of legal issues, public hearings held
by city board of police commissioners, beneficial ef-
fects of board's actions on blacks, and prominence of
board's membership, officers had to make some kind
of showing to demonstrate even remote possibility of
malice required to overcome city officials' good-faith
qualified immunity, and (2) in light of all the circum-
stances and specific affidavits denying any malicious
intent, officers' allegations fell short of indicating any
malice

Motion granted

See also D.C., 483 F.Supp. 930
West Headnotes
**[1] Federal Civil Procedure 170A €══656**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak656 k Liberal or Strict Construc-
tion Most Cited Cases
Liberal pleading rules are equally applicable to plead-
ing of affirmative defenses and, more importantly,
what matters is not whether magic words "affirmative
defense" appear in pleadings but whether court and
parties were aware of issues involved

**[2] Federal Civil Procedure 170A €══2557**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2557 k Partial Summary Judg-
ment Most Cited Cases
Where defendant city officials' good faith was inher-
ent in their affirmative defenses that police promo-
tions were made in compliance with United States
Constitution, Civil Rights Act, and city charter in or-
der to counteract past hiring promotional system that
had discriminated against blacks, good-faith im-
munity of officials being sued was at all times prop-
erly before the district court, and thus city officials
had not waived defense on theory that they had never
asserted it but, rather, such defense was properly sub-
ject of motion for partial summary judgment in action
alleging that white police officers were illegally dis-
criminated against when city adopted affirmative ac-
tion program Civil Rights Act of 1964, §§ 601 et
seq , 701 et seq , 42 U.S.C.A. §§ 2000d et seq , 2000e
et seq

**[3] Civil Rights 78 €══1562**

78 Civil Rights
   78IV Remedies Under Federal Employment Dis-

483 F Supp 919                                                                Page 2
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

crimination Statutes
    78k1559 Relief
        78k1562 k  Affirmative Action; Recruit-
ment and Hiring  Most Cited Cases
    (Formerly 78k393, 78k46(4), 78k46)
Given unsettled nature of law in area, it would be un-
just and contrary to policy of giving public officials
broad leeway in decision making, even if in retro-
spect decision turned out to be wrong, to inflict mon-
etary damages on defendant city officials who pro-
mulgated affirmative action program for police de-
partment where it was not clear now, nor was it clear
when city board of police commissioners first acted,
that a voluntary affirmative action program relating
to promotions of public employees is illegal  Civil
Rights Act of 1964, §§ 601 et seq , 701 et seq , 42
U.S.C.A. §§ 2000d et seq , 2000e et seq ;
U.S.C.A.Const. Amend. 14

[4] Civil Rights 78 ☞1483

78 Civil Rights
    78III Federal Remedies in General
        78k1477 Attorney Fees
            78k1483 k  Good or Bad Faith; Misconduct
Most Cited Cases
    (Formerly 78k297, 78k13 17(14), 78k13 17)
To be subject to monetary damages under
"malicious" prong of good-faith immunity test, pub-
lic official in question must specifically and mali-
ciously have intended to harm plaintiff

[5] Civil Rights 78 ☞1529

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1529 k  Defenses in General  Most Cited
Cases
    (Formerly 78k372, 78k39)
In light of unsettled nature of legal issues, public
hearings held by city board of police commissioners,
beneficial effect of board's actions on blacks, and
prominence of membership of board, which instituted
voluntary race-conscious promotion program after
carefully examining past practices, current needs and
legal justification for program, and considering ab-
sence of any allegations by police officers demon-

strating malice on part of city officials, no basis exis-
ted in action alleging that white police officers were
illegally discriminated against when city adopted af-
firmative action program for assertions that city offi-
cials acted maliciously and were therefore not en-
titled to good-faith qualified immunity

[6] Civil Rights 78 ☞1529

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1529 k  Defenses in General  Most Cited
Cases
    (Formerly 78k372, 78k39)
Good-faith immunity defense was allowable in action
alleging that white police officers were illegally dis-
criminated against when city adopted affirmative ac-
tion program, whereby equal numbers of white and
black police sergeants were promoted to rank of lieu-
tenant, where affirmative action program was adop-
ted to aid minority group that had been found to have
been victim of past discrimination  Civil Rights Act
of 1964, §§ 601 et seq , 701 et seq , 42 U.S.C.A. §§
2000d et seq , 2000e et seq

[7] Civil Rights 78 ☞1238

78 Civil Rights
    78II Employment Practices
        78k1236 Affirmative Action; Remedial Meas-
ures
        78k1238 k  Race, Color, Ethnicity, or Na-
tional Origin  Most Cited Cases
    (Formerly 78k154, 78k9 10)
For purposes of determining proper labor market to
be used, there was nothing inherently wrong with po-
lice chiefs' presentations to city board of police com-
missioners, in which they relied on general comparis-
ons between minority population of city and minority
population of police department, and following which
affirmative action program was adopted whereby
equal number of white and black police sergeants
were promoted to rank of lieutenant

[8] Federal Civil Procedure 170A ☞2497.1

170A Federal Civil Procedure
    170AXVII Judgment

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

483 F Supp 919                                                                    Page 3
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
**(Cite as: 483 F.Supp. 919)**

170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
      170Ak2497 Employees and Employment
Discrimination, Actions Involving
         170Ak2497.1 k In General Most
Cited Cases
  (Formerly 170Ak2497)
Although some courts have stated that question of
good-faith immunity is ordinarily question for jury,
grant of summary judgment was appropriate where
constitutional right allegedly infringed by city offi-
cials in adopting affirmative action program for po-
lice department promotion could not be said to have
been clearly established, and where white police of-
ficers' claims, at most, showed negligence and not
malice

**\*920** James P Hoffa, Murray J Chodak, Hoffa,
Chodak & Robiner, Detroit, Mich , for plaintiffs in
No 5-71937.
K Preston Oade, Jr , Bernard A Friedman, Robert S
Harrison, Marc G Whitefield, Lippit, Harrison, Per-
love, Friedman & Zack, Southfield, Mich , for
plaintiffs in No 5-72264
Beth J Lief, Jack Greenberg, James M Nabrit, III, O
Peter Sherwood, Napoleon B Williams, Lowell
Johnston, New York City, Barry L Goldstein, Wash-
ington, D C , James R Andary, Sp Asst Corp
Counsel for the City of Detroit, George Matish, **\*921**
Anna Diggs-Taylor, Nancy McCaughan, James Ze-
man, Denise Page Hood, Law Dept , City of Detroit,
Detroit, Mich , for defendants
Warren J Bennia, New York City, for intervening
defendants

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KEITH, Circuit Judge, Sitting by Designation
A class of white police officers and the Detroit Police
Lieutenants & Sergeants Association have brought
this action, alleging that they were illegally discrim-
inated against when the City of Detroit adopted an af-
firmative action program whereby equal numbers of
white and black police sergeants were promoted to
the rank of lieutenant In an order and opinion dated
July 31, 1978, this Court denied plaintiffs' demand
for a jury trial, and requested that the parties brief the

issue of whether plaintiffs' claims for actual and pun-
itive damages could withstand a motion for partial
summary judgment in light of a record indicating
good faith conduct by the city officials who promul-
gated the affirmative action program in question

In response to this Court's invitation, on August 19,
1978, defendants moved for partial summary judg-
ment dismissing plaintiffs' claims as to monetary
damages other than back pay Defendants' motion
was argued before the Court on September 5, 1978

I

Before reaching the merits of the summary judgment
motion, the Court must discuss a threshold procedur-
al objection raised by the plaintiffs Plaintiffs contend
that good faith qualified immunity is an affirmative
defense which must be properly pleaded or it is
waived They further claim that a review of the
pleadings establishes that defendants never asserted
the affirmative defense of qualified immunity They
therefore conclude that defendants must be deemed to
have waived the defense Alternatively, plaintiffs
claim that they have been prejudiced because this is-
sue has not been raised previously and assert a need
to develop additional discovery

This Court will assume, without deciding, that good
faith immunity is an affirmative defense which must
be pleaded and proved by the defendant Compare
Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855,
55 L.Ed.2d 24 (1978) (district court's grant of a
threshold summary judgment motion on good faith
immunity grounds upheld) with Skehan v. Board of
Trustees of Bloomsburg State College, 538 F.2d 53,
61-62 (3rd Cir , cert denied 429 U.S. 979, 97 S.Ct.
490, 50 L.Ed.2d 588 (1976)) ("(S)ince good faith
was a matter of defense it could not be determined on
Rule 12(b)(6) motion ")

[1] The requirement that affirmative defenses be spe-
cifically pleaded is based on notions of fair play A
party should not have to deal with an extraneous is-
sue in a lawsuit unless it is specifically brought to his
attention At the same time, hypertechnicality in
pleading requirements should be avoided Thus, lib-
eral pleading rules are equally applicable to the

© 2007 Thomson/West No Claim to Orig U S Govt Works

483 F Supp 919                                                                    Page 4
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

pleading of affirmative defenses. See 2A Moore's Federal Practice Par 8 27(3) More important, what matters is not whether the magic words "affirmative defense" appears in pleadings, but whether the Court and the parties were aware of the issues involved See Backar v. Western States Producing Company, 547 F.2d 876, 881 (5th Cir. 1977)

[2] It is clear to this Court that the issue of the good faith immunity of the officials being sued in this case has been at all times properly before the Court Initially, it is clear that the defendants' good faith is inherent to their affirmative defenses that the promotions in question were made in compliance with the United States Constitution, Civil Rights Acts, and the Charter of the City of Detroit in order to counteract a hiring and promotional system which in the past had discriminated against blacks These defenses clearly set forth legal *922 grounds for a claim of governmental immunity That is, that the actions taken by the defendants were consistent with the law and indeed were meant to comply with the law and were in no way malicious or based on bad faith

If there were any doubt as to this, plaintiffs themselves have removed it In February of 1977, the Bratton plaintiffs amended their complaint and added specific allegations of willful, knowing, and intentional discrimination It was via this amended complaint that the Bratton plaintiffs for the first time, raised the issue of actual and punitive damages Indeed, the basis raised for punitive damages was that defendant had initiated the affirmative action program with full knowledge that it was illegal See Bratton complaint, paragraph 5 In response, defendants specifically denied each and every allegation made In light of the above, the Court has no trouble concluding that the instant motion for summary judgment is properly before it

II

[3] The good faith immunity test which is applicable here was recently restated by the Supreme Court in Procunier v. Navarette, 434 U.S. 555, 562, 566, 98 S.Ct. 855, 860, 862, 55 L.Ed.2d 24 (1978):
"If the constitutional right allegedly infringed by them was clearly established at the time of their chal-

lenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm"; or "where the official has acted with 'malicious intention' to deprive the plaintiff of a constitutional right or to cause him 'other injury ' ' "

There is no doubt that defendants are entitled to immunity under the first prong of the test articulated above This case concerns a voluntary race-conscious promotion program instituted by the Detroit Board of Police Commissioners Contrary to plaintiffs' continued assertions, it is not clear now nor was it clear in 1974 and 1975 when the Board first acted, that a voluntary affirmative action program relating to promotions of public employees is illegal

Numerous cases have repeatedly held that numerical race-conscious remedies may be imposed to eradicate the effects of past discriminatory employment practices See Davis v. County of Los Angeles, 566 F.2d 1334, 1342-43 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) and cases cited Plaintiffs cannot deny that they would have no cause to complain if this affirmative action program had been imposed by a court pursuant to a lawsuit brought by the EEOC or by black policemen It is the voluntary, extra-judicial nature of this program which subjects it to question in this forum Voluntary affirmative action was struck down in Weber v. Kaiser Aluminum Company, 563 F.2d 216 (5th Cir. 1977), Reeves v. Eaves, 411 F.Supp. 531 (M.D.Ga.1976) and Chmill v. City of Pittsburgh, 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977) However, it was upheld in Germann v. Kipp, 429 F.Supp. 1323 (W.D.Mo.1976), vacated as moot, 572 F.2d 1258 (8th Cir. 1978); Lindsay v. City of Seattle, 86 Wash.2d 698, 548 P.2d 320 (1976), cert denied 429 U.S. 886, 97 S.Ct. 237, 50 L.Ed.2d 167 (1976); Hutchinson Commission v. Midland Credit Management, Inc., 213 Kan. 399, 517 P.2d 158 (1973) The Supreme Court's recent decision in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), five years after the City first promulgated the affirmative action program under attack here, makes it clear that under some circumstances, voluntary race-conscious affirmative action programs are allowable Even if the city's program under attack in

483 F Supp 919                                                                    Page 5
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

this litigation is determined to be unreasonable, it cannot be said that the City defendants ever acted contrary to known law

Weber dealt with a private employer's affirmative action program and found that Title VII's prohibition of racial preference did not always bar a voluntary preference in favor of blacks A Title VII claim is present in this case as well, but additional statutory and constitutional issues are present because the City is a public entity subject to the command of Title VI of the *923 Civil Rights Act and the Fourteenth Amendment to the Constitution The limitations on voluntary race-conscious promotional efforts under Title VI and the Fourteenth Amendment are unsettled One need look no further than the close division of the Justices in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) to see that this is true.

This Court is aware that another district judge of this bench has recently ruled that the city's voluntary affirmative action program was per se illegal as a matter of constitutional and statutory law Detroit Police Officers Association v. Young, 446 F.Supp. 979 (E.D.Mich.1978) This Court notes, however, that a preliminary injunction entered by that court prior to making its final determination was dissolved by the Sixth Circuit Id. at 986 Further, in Detroit Fire Fighters Association, Local No. 344 v. Dixon, 572 F.2d 557, 559 (6th Cir. 1978), the Court of Appeals for the Sixth Circuit declined to rule upon a voluntary affirmative action program instituted by the City of Detroit regarding its fire fighting personnel because the controversy was moot Significantly, even though the Sixth Circuit did not reach the merits of the issue presented, it did state that the constitutional issues were "difficult"

The purpose of the good faith immunity defense is to give public officials broad leeway in decision-making, even if in retrospect the decision turns out to be wrong As the Supreme Court pointed out when discussing the good faith defense of school board members:

" '(I)f the work of the schools is to go forward; 'there must be a degree of immunity so that 'public school officials understand that action taken in the good-

faith fulfillment of their responsibilities and within the bounds of reason under all circumstances will not be punished and that they need not exercise their discretion with undue timidity "

Procunier v. Navarette, supra, 434 U.S. at 562, 98 S.Ct. at 860, quoting Wood v. Strickland, 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)

Given the unsettled nature of the law in this area, it would be unjust and contrary to the above-stated policy to inflict monetary damages on the defendant Detroit officials who promulgated the affirmative action program in question

III

The only basis on which plaintiffs can avoid summary judgment on the good faith issue is under the second prong of the good faith immunity test That is, whether the Detroit public official defendants acted with "malicious intention" to deprive plaintiffs of their constitutional rights or to cause them "other injury "

[4] The meaning of this prong of the good faith immunity test is not clear The court in Procunier v. Navarette, supra, 434 U.S. at 566, 98 S.Ct. at 862 indicated that "This part of the (good faith) rule speaks of 'intentional injury,' contemplating that the actor intends the consequences of his conduct See Restatement 2d of Torts, Section 8A (1965) " Mr Justice Stevens, in dissent, explained that this section meant that "an official steps outside his proper role when he uses his powers to inflict constitutional or other harm on an individual for reasons unrelated to the performance of his duty " Procunier v. Navarette, supra, at 571, 98 S.Ct. at 864-65 (Stevens, J , dissenting) To be subject to monetary damages under this prong, the public official in question must specifically and maliciously intend to harm the plaintiff See Bogard v. Cook, 586 F.2d 399, 420 (5th Cir. 1978)

[5] An examination of the undisputed facts of this case reveals no basis for plaintiffs' assertions that the defendants acted maliciously This affirmative action program was not imposed overnight by a reckless official An examination of the decision-making process which culminated in the adoption of the affirm-

483 F Supp 919                                                                   Page 6
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

ative action program reveals that there is no genuine issue of material fact about the defendants' good faith

**\*924** A review of the complaints, depositions, exhibits and affidavits reveals that there is no dispute as to the following:

1 On July 11, 1974, a new City Charter for the City of Detroit became effective which required the Mayor to appoint a five-member Board of Commissioners

2 The functions of the Board of Police Commissioners include, inter alia, the approval of all promotions within the Detroit Police Department [FN1]

> FN1. Charter of the City of Detroit, Chapter II, Section 7-1114

3 The first meeting of the Board of Police Commissioners was held on July 22, 1974 [FN2]

> FN2. Minutes of the Board of Police Commissioners (hereinafter "Minutes"), July 22, 1974

4 At the July 22, 1974 meeting, then Chief of Police Tannian made a presentation to the Board He claimed that there was a need for an affirmative action promotional plan because of the Department's prior history of discrimination and the Department's operational need for more black lieutenants [FN3] The stated purposes of the proposed affirmative action program were to remedy prior discriminatory employment practices; to overcome the present barriers to the promotion of blacks in the promotional model then in operation; and to satisfy the operational needs of the Police Department for greater numbers of black lieutenants [FN4]

> FN3. Id at pp 11-13, 20

> FN4. Affidavit of Edward J Littlejohn, P 6

5 Legal Counsel for the City of Detroit informed the Board that he had concluded there was an overwhelming case of de facto discrimination that compelled the City, pursuant to the Civil Rights Act, the United States and Michigan Constitutions and the Charter of the City of Detroit to take corrective affirmative action [FN5] The Board relied upon the advice of counsel that the proposed affirmative action plan was legal [FN6]

> FN5. Minutes, July 22, 1974, pp 22-25

> FN6. Minutes, July 22, 1974, pp 22-23

6 The Board tabled the proposal for the affirmative action program on July 22, 1974 At the next meeting of the Board on July 26, 1974, several speakers offered their personal and organizational views of the affirmative action program to the Board, including Robert Peterson, President of the Sergeants and Lieutenants Association The Board decided to reconvene on July 31, 1974, to determine whether or not to adopt the affirmative action program [FN7]

> FN7. Minutes, July 26, 1974, p 2

7 At the July 31, 1974, meeting, the Board was specifically asked if the reason for the affirmative action plan was based only on the past hiring practices as regards black officers The Chairman of the Board answered that it was not and that the Board believed that there was definitely evidence of discrimination within the Detroit Police Department promotional process [FN8] The Board studied the promotional model for promotion to the rank of lieutenant and concluded that the model had an adverse impact on minorities [FN9]

> FN8. Minutes, July 31, 1974, p 4

> FN9. Deposition of Edward J Littlejohn, p 31

8 After hearing the views of several speakers, the Board of Police Commissioners on July 31, 1974, unanimously adopted the affirmative action program by resolution which provided:
"It has been determined that the Detroit Police Department has submitted that de facto discrimination exists in the hiring of Blacks and other minority groups as police officers contrary to the U S and Michigan Constitutions, the Charter of the City of Detroit, and the Civil Rights Acts
It has also determined from those facts that de facto

483 F Supp 919
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
**(Cite as: 483 F.Supp. 919)**

discrimination exists in the promotion of Blacks and other minority groups to supervisory positions in the Detroit Police Department contrary to U S and Michigan Constitutions, the charter of the City of Detroit, and the Civil Rights Acts

**\*925** It is necessary because of past and present discrimination in the hiring and promotional policies of the Detroit Police Department that this Board establish an Affirmative Action policy that will guarantee to every individual who is now a police officer or who intends to pursue a career as a police officer, a policy of equality in hiring and in promotion and most importantly, an Affirmative Action Program of enforcement to support that policy

The U S Constitution, the Michigan Constitution, the Charter of the City of Detroit, the Civil Rights Acts, and the overwhelming moral principle of equality compels this Board to take Affirmative Action to guarantee to all persons equality in their promotional and hiring rights

THEREFORE, BE IT RESOLVED, that the Chief of Police is instructed to take immediate Affirmative Action to eliminate any discriminatory hiring practices that systematically exclude minority groups from being appointed as Detroit Police Officers, and

BE IT FURTHER RESOLVED, that the Chief of Police take Affirmative Action to promote minorities from the existing promotional lists, and

BE IT FURTHER RESOLVED, that the Chief of Police establish criteria, with weighted component parts, used to establish promotional lists that are nondiscriminatory with respect to minority groups and

BE IT FURTHER RESOLVED, that the Chief of Police shall regularly report to the Board of this Affirmative Action policy in order that this Board may reevaluate and, if necessary, order additional action that may have to be taken "

9  On November 4, 1975, the Board adopted the following resolution on the Continued Implementation of Affirmative Action Policy:

### WHEREAS:

1  This Board did adopt on July 31, 1974, an Affirmative Action Resolution

2  The Chief of Police has filed this date with this

Board certification that in order to achieve the objectives established by the July 31, 1974, Affirmative Action Resolution, it is necessary to continue this policy to promote members of the protected class to the rank of lieutenant; and the Chief of Police has also filed statistical data to support that certification

3  This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit

4  This Board recognizes that in the acceptance of Federal Funds from the Law Enforcement Assistance Administration, the Department is required to comply with guidelines established by that organization in regard to proportionate representation of members of the protected class

5  This Board remains committed to its policy of equality to all persons in its promotional and hiring practices; additionally, this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department

### THEREFORE, BE IT RESOLVED BY THE BOARD OF POLICE COMMISSIONERS THAT:

1  The Chief of Police is authorized and instructed to establish a promotion list for the rank of lieutenant as furnished to this Board on this date by the Chief of Police

2  The Chief of Police is authorized and instructed to take Affirmative Action to promote members of the protected class from the list established pursuant to Paragraph 1 of this Resolution and Section 7-1114 of the Charter of the City of Detroit which permits the Chief of Police to pass over members on the eligibility **\*926** register after the Chief of Police files with this Board written reasons acceptable to this Board; to which the Chief of Police has complied "

10  On December 14, 1975, Chief of Police Tannian made an extensive presentation to the Board on the need for continuing the affirmative action program,

483 F Supp 919                                                    Page 8
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

including a presentation of documentary evidence and legal mandates for affirmative action [FN10]

> FN10. Minutes, December 14, 1975, and attachments thereto

11. On December 28, 1975, the Board adopted the following resolution:

"WHEREAS:

1 This Board did adopt on July 31, 1974, an Affirmative Action Resolution; and did reaffirm that action on November 4, 1975

2. The Chief of Police has filed this date with this Board certification that in order to achieve the objectives established by the July 31, 1974, Affirmative Action Resolution, it is necessary to promote members of the protected class to the rank of lieutenant; and the Chief of Police has also filed statistical data to support that certification

3. This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit

4 This Board recognizes that in the acceptance of Federal Funds from the Law Enforcement Assistance Administration, the Department is required to comply with guidelines established by that organization in regard to proportionate representation of members of the protected class

5 This Board remains committed to its policy of equality to all persons in its promotional and hiring practices; additionally, this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department

THEREFORE, BE IT RESOLVED BY THE
BOARD OF POLICE COMMISSIONERS THAT:

1 The Chief of Police is authorized and instructed to establish a promotion list for the rank of lieutenant as furnished to this Board on this date by the Chief of

Police

2 The Chief of Police is authorized and instructed to take Affirmative Action to promote members of the protected class from the list established pursuant to Paragraph 1 of this Resolution and Section 7-1114 of the Charter of the City of Detroit which permits the Chief of Police to pass over members on the eligibility register after the Chief of Police files with this Board written reasons acceptable to this Board; to which the Chief of Police has complied "

12 On April 27, 1977, the Board again reviewed the hiring and promotional patterns of the Police Department as well as the federal guidelines of the Law Enforcement Assistance Administration, Federal Revenue Sharing, the United States Equal Employment Opportunity Commission, and the Michigan Civil Rights Commission Members of the Board reiterated that the Affirmative Action Program was and will be reviewed to determine whether the present effects of past discrimination have been as completely eradicated as possible [FN11]

> FN11. Minutes, April 27, 1977

13 On April 28, 1977, the Board adopted a Resolution for Continued Implementation of Affirmative Action Policy which states, inter alia :

WHEREAS:

1 This Board did adopt on July 31, 1974, an Affirmative Action Resolution; and did reaffirm that action on November 4, 1975, and December 28, 1975

*927 2 This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit

3 This Board recognizes that in the acceptance of Federal Funds, from the Law Enforcement Assistance Administration, the Department is required to comply with the guidelines established by that organization in regard to proportionate representation of members of the protected class

© 2007 Thomson/West No Claim to Orig U S Govt Works

483 F Supp 919                                                                    Page 9
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
(Cite as: 483 F.Supp. 919)

4 This Board remains committed to its policy of equality to all persons in its promotional and hiring practices, additionally this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department

The above undisputed facts paint a picture of careful, reasoned decision-making It is clear to the Court that the Board of Police Commissioners did not lightly adopt any of the resolutions concerning the Police Department's affirmative action program, but carefully examined past practices, current needs, and the legal justification for the program

The Court emphasizes two significant considerations First, that whatever the adverse impact of affirmative action on whites, there is no question that the program greatly helped black officers Thus, this is unlike a case where public officials act solely to deprive someone of a right Here, public officials chose to help members of one of two competing classes There is a palpable basis for the Board's statements that it was not acting to hurt anyone, but to help members of a disadvantaged class The Board may have been right or wrong in this decision, but this Court sees no evidence of malice on a record which shows that public hearings were held, all parties were heard and that the Board then chose to favor blacks upon finding that blacks had been subject to past discrimination This Court cannot find malice in a decision which helped a black minority upon a finding that it had been discriminated against in the past, simply because that would inevitably hurt the white majority The good faith immunity defense is meant to protect public officials who make difficult choices such as those presented here

All affirmative action programs have some adverse effect on whites who must step aside so that blacks may be hired or promoted The Board of Police Commissioners was well aware of this, but made the reasoned decision that promoting blacks was not unjust in the light of past discrimination since no one had a right to be promoted and since it considered the black and the white candidates to be equally qualified The Board concluded that the larger need of the City for Black Officers and the need to offset the ef-

fects of past discrimination mandated the affirmative action promotional model The Board may have been right or wrong in its conclusions, (that is the principal question before this court), but it is clear that it acted in good faith

Secondly, the Court notes the prominence of the Board's membership For example, two of the members in 1975 were Edward Littlejohn and Avern Cohen Mr Littlejohn is a Professor of Law at Wayne State University Mr Cohen is a prominent attorney in Detroit, who has recently been nominated as a Federal District Judge For plaintiffs to say that these persons acted out of deliberate malice against white police officers defies belief

In sum, in light of the unsettled nature of the legal issues, the public hearings held by the Board, the beneficial effects of the Board's actions on blacks, and the prominence of the Board's membership, plaintiffs must make some kind of showing to demonstrate even the remote possibility of malice Compare the factors which need be considered to show discriminatory intent by a public body under the 14th Amendment. *928 Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)

[6] Plaintiffs seek to make this showing in various ways First, plaintiffs argue that no good faith immunity defense should be allowed in a case involving racial discrimination, relying upon Curry v. Gillette, 461 F.2d 1003, 1005 (6th Cir.), cert denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972)

This argument ignores that fact that the affirmative action program here was adopted to aid a minority group which the Board found to have been the victim of past discrimination The cases relied upon by plaintiffs Bakke, supra and McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) to the effect that discrimination against whites is the equivalent of discrimination against blacks, did not discuss the issue of affirmative action, where a finding of past discrimination was made Indeed, Mr Justice Powell carefully noted in the Bakke case that, there had been "no determination by the legislature or a responsible ad-

483 F Supp 919
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
**(Cite as: 483 F.Supp. 919)**

Page 10

ministrative agency that the University engaged in a discriminatory practice requiring remedial efforts " Bakke, supra, 98 S.Ct. at 2756 (Opinion of Powell, J ) (emphasis added) See also, Weber, supra; Mc-Donald, supra, 427 U.S. at 281 n. 8, 96 S.Ct. at 2579 n. 8 (" we emphasize that we do not consider here the permissibility of (an affirmative action) program, whether judicially required or otherwise prompted")

Plaintiffs next proceed to attack the quality of the Board's data and factfinding, alleging that Police Chief Tannian's presentation to the Board was deficient and contradictory to assertions which the department made to the Law Enforcement Assistance Administration This position is supported by the findings of another District Judge in this District who concluded that:

"Tannian neglected to paint the full picture in his presentations to the board regarding these factors and that the BPC failed to fulfill their duty to investigate the factual matters as presented by Tannian "

Detroit Police Officer's Ass'n v. Young, 446 F.Supp. 979, 997 (E.D.Mich.1978) The above finding however, clearly speaks of negligence and failure to perform one's duty At best, plaintiff's allegations establish negligence, not malice And, as Procunier v. Navarette, supra, 434 U.S. at 566, 98 S.Ct. 855, makes clear, negligence is insufficient to establish bad faith under the second prong of the good-faith immunity test

Plaintiffs' other allegations are similarly insufficient Plaintiffs argue that the Board's legal advice was deficient and that the Board's actions were procedurally deficient in that none of the testimony before the Board was under oath and the Board conducted no independent investigation This ignores the fact that public hearings were held at which plaintiffs, among others, were allowed to present their case More importantly, plaintiffs' point to no requirement that testimony be under oath or that an independent investigation be taken Procedural informality is the hallmark of administrative proceedings as opposed to judicial proceedings Again, even assuming that everything plaintiffs say is true and making all inferences in their favor, there is no indication of malice, only of negligence

Plaintiffs further argue that Commissioner Cohen was unfamiliar with the case law in this area and that Defendant Tannian used incorrect labor market statistics when he compared the racial composition of the City of Detroit with the racial composition of the police department. Plaintiffs additionally maintain that there was no evidence before the Board of past discrimination in promotions and that Detroit Mayor Coleman Young made a statement showing malice when he allegedly stated: "I say that's the way to handle discrimination reverse it!"

These allegations fall far short of indicating any malice Although one may second guess legal opinion and the quality of legal research, it is undisputed that the Board received legal advice from counsel for the city approving its actions and that the Board, including attorney members Cohen and Littlejohn, examined the affirmative *929 action program carefully before approving it. In response to plaintiffs' charge that a finding of past discrimination in promotions must be made, the Court notes that the Seventh Circuit has approved race-conscious affirmative action promotions of Hispanics even in the absence of a finding of past discriminatory promotions as to Hispanics See United States v. City of Chicago, 549 F.2d 415, 437 n. 30 (7th Cir.) cert denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)

[7] Regarding the proper labor market to be used, the Court notes that there is no ready test to apply; careful factfinding must be made See Hazelwood School District v. United States, 433 U.S. 229, 310-313, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) There is nothing inherently wrong with Chiefs Tannian's and Hart's presentations to the Board of Police Commissioners because they relied on general comparisons between the minority population of the City of Detroit and the minority population of the Detroit Police Department The Supreme Court has specifically approved comparisons between an employer's workforce and the general population, stating that such comparisons can provide "significant" proof of intentional discrimination Internat'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 337 n. 17 and 339-40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) As the Supreme Court noted in Hazelwood, supra, 433 U.S. at 308 n. 13, 97 S.Ct. 2736, general population figures are ap-

propriate for positions which do not require special qualifications. In such cases, it is reasonable to infer that qualified minorities should roughly mirror the minority population in the surrounding community

Courts have looked to comparisons of the percentage of minority residents in the service area (here the City of Detroit) and the percentage of minorities employed when considering discrimination claims involving municipal police and fire departments See Afro-America Patrolman's League v Duck, 503 F 2d 284, 299 (6th Cir 1974); United States v. City of Buffalo, 457 F.Supp. 612, 621 (W.D.N.Y.1978); League of United Latin American Citizens v. City of Santa Ana, 410 F.Supp. 873, 896-8 (C.D.Cal.1976) Similarly, courts which have ordered affirmative-action relief have also looked to the minority population in the service area A leading case taking this approach is NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974) There, the Fifth Circuit approved an order entered by then District Judge Frank Johnson requiring that the Alabama Department of Public Safety hire state troopers on a 50/50 black-white basis until 25% of state troopers were black The Court specifically noted that the population of Alabama was 26 2% black Id. at 617 n. 3 Compare this court's finding in Stamps v. Detroit Edison Co., 365 F.Supp. 87, 122 n. 4 (E.D.Mich.1973) that a reasonable affirmative action goal for an employer in the Detroit Metropolitan area was a 30% black workforce See also, the Law Enforcement Assistance Administration's Equal Employment Opportunity Development Manual 13 (1974), citing 28 C.F.R. s 42.306, which states: "A significant disparity between minority representation in the service population and the minority representation in the agency workforce may be deemed to exist if the percentage of a minority group in the employment of the agency is not at least seventy (70) percent of the percentage of that minority in the service population " This provision was specifically cited to the Board of Police Commissioners

Finally, the Court can see no malice in the alleged statement by Mayor Young, nor are any allegations made concerning the effect of this statement on the Board of Police Commissioners

In light of all of the circumstances and the specific affidavits denying any malicious intent, plaintiffs cannot rest on their pleadings, but must advance some basis to show material facts in dispute See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289-290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) This they have failed to do

IV

[8] It is true that some courts have stated that the question of good faith immunity *930 is "ordinarily a question for the jury " Landrum v. Moats, 576 F.2d 1320 (8th Cir. 1978) See also Duchesne v. Sugarman, 566 F.2d 817, 883 (2d Cir. 1977) However, the Supreme Court approved a grant of summary judgment on the basis of good-faith immunity in Procunier v Navarette, supra, under circumstances similar to those here; that is, where the constitutional right allegedly infringed could not be said to have been "clearly established," and where plaintiff's claims, at most, showed negligence and not malice Also, in Butz v. Economou, 98 S.Ct. 2894, 2911 (1978), the Supreme Court spoke in strong language of the usefulness of summary judgment when public officials are sued for money damages See also Hanna v. Drobnick, 514 F.2d 393 (6th Cir. 1975) (Affirming grant of summary judgment based on good faith immunity)

This case is similar to Kreft v. Pataky, 595 F.2d 1224 (6th Cir. 1979) where the court found that an affidavit outlining the objective reasonableness of a public official's conduct constituted evidence from which the official's subjective good faith could be inferred Absent specific countervailing facts showing malice, the Court did not let plaintiff rest on his pleadings, but affirmed the entry of summary judgment against him

Affirmative action may or may not be proper in various factual contexts, but this record reveals no genuine issue of material fact as to the good faith of the officials who brought it about in this case If it is ultimately determined that plaintiffs' rights were violated, they will be entitled to reinstatement and/or back pay Given the unsettled nature of the law in this area and the clearly non-malicious conduct of the city officials, plaintiffs should not also be entitled to re-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

483 F Supp 919
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979
**(Cite as: 483 F.Supp. 919)**

cover actual or punitive damages

Procedurally, this motion for summary judgment has not been ruled upon until after trial on the issue of liability [FN12] This is because of the Court's crush of work on the Court of Appeals as well as the time required by the trial itself The Court has been careful to consider only pre-trial materials in making its ruling Nonetheless, the Court parenthetically notes that nothing developed at trial does anything but support this ruling This is a paradigm case of the usefulness of summary judgment to protect good faith actions by public officials

> FN12. By stipulation, trial on the issue of liability was severed from trial on the issue of damages

Defendants motion for partial summary judgment is GRANTED It is so ORDERED

D C Mich , 1979
Baker v City of Detroit
483 F Supp 919, 24 Fair Empl Prac Cas (BNA) 1572, 23 Empl Prac Dec P 30,979

END OF DOCUMENT

# EXHIBIT 3

Westlaw.

897 F 2d 508                                                                    Page 1
897 F 2d 508, 58 USLW 2523, 13 U S P Q 2d 1972
**(Cite as: 897 F.2d 508)**

▷
<u>Briefs and Other Related Documents</u>
Gustafson, Inc v Intersystems Indus Products,
Inc C A Fed (Tex ),1990
   United States Court of Appeals,Federal Circuit
      GUSTAFSON, INC , Plaintiff-Appellant,
                         v
   INTERSYSTEMS INDUSTRIAL PRODUCTS,
   INC and Hugo Wenshau, Defendants/
               Cross-Appellants
            Nos. 89-1383, 89-1410.

                  Feb 22, 1990

Patent infringement action was brought The United
States District Court for the Northern District of
Texas, <u>Robert B. Maloney</u>, J , determined that patents
for devices that removed samples from pressurized
pipes were not invalid and were willfully infringed
Defendant appealed The Court of Appeals, <u>Markey</u>,
Chief Judge, held that patent infringement was not
willful

Affirmed in part and reversed in part
West Headnotes
**[1] Patents 291** ☞**324.55(5)**

<u>291</u> Patents
   291XII Infringement
      <u>291XII(C)</u> Suits in Equity
         <u>291k324</u> Appeal
            <u>291k324.55</u> Questions of Fact, Verdicts,
and Findings
               <u>291k324.55(5)</u> k Issues of Infringe-
ment <u>Most Cited Cases</u>
   (Formerly 291k324 55)
Whether patent infringement is willful, authorizing
award of attorney fees, is a question of fact, findings
on which are reviewable under clearly erroneous
standard of review <u>Fed.Rules Civ.Proc.Rule 52(a),
28 U.S.C.A</u>

**[2] Patents 291** ☞**325.11(5)**

<u>291</u> Patents
   291XII Infringement
      <u>291XII(C)</u> Suits in Equity

         <u>291k325</u> Costs
            <u>291k325.11</u> Disbursements in General
               <u>291k325.11(2)</u> Attorney Fees
                  <u>291k325.11(5)</u> k Proceedings for
Allowance; Evidence <u>Most Cited Cases</u>
Willfulness of patent infringement is determined
from totality of circumstances that must be proven by
clear and convincing evidence

**[3] Patents 291** ☞**325.11(5)**

<u>291</u> Patents
   291XII Infringement
      <u>291XII(C)</u> Suits in Equity
         <u>291k325</u> Costs
            <u>291k325.11</u> Disbursements in General
               <u>291k325.11(2)</u> Attorney Fees
                  <u>291k325.11(5)</u> k Proceedings for
Allowance; Evidence <u>Most Cited Cases</u>
The absence of a finding that defenses asserted by al-
leged infringer of patents for devices to remove
samples from pressurized pipes were fruitless,
coupled with alleged infringer's simultaneous receipt
of knowledge of patent and court summons for patent
infringement action, precluded a finding of willful-
ness

**[4] Patents 291** ☞**325.11(2.1)**

<u>291</u> Patents
   291XII Infringement
      <u>291XII(C)</u> Suits in Equity
         <u>291k325</u> Costs
            <u>291k325.11</u> Disbursements in General
               <u>291k325.11(2)</u> Attorney Fees
                  <u>291k325.11(2.1)</u> k In General
<u>Most Cited Cases</u>
   (Formerly 291k325 11(2))
Whether patent infringement is "willful" is by defini-
tion a question of actor's intent, the answer to which
must be inferred from all circumstances; hence, a
party cannot be found to have "willfully" infringed a
patent of which party had no knowledge

**[5] Patents 291** ☞**325.11(2.1)**

<u>291</u> Patents

897 F 2d 508                                                                                    Page 2
897 F 2d 508, 58 USLW 2523, 13 U S P Q 2d 1972
(Cite as: 897 F.2d 508)

291XII Infringement
   291XII(C) Suits in Equity
      291k325 Costs
         291k325.11 Disbursements in General
            291k325.11(2) Attorney Fees
               291k325.11(2.1) k  In General

Most Cited Cases
  (Formerly 291k325 11(2))

Exercising due care, a party may continue to manu-
facture and may present what in good faith it believes
to be a legitimate defense to patent infringement
claim without risk of being found on that basis alone
a willful infringer; that such a defense is not success-
ful does not establish that infringement was willful

[6] Patents 291 ⟨⟩325.11(2.1)

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k325 Costs
            291k325.11 Disbursements in General
               291k325.11(2) Attorney Fees
                  291k325.11(2.1) k  In General

Most Cited Cases
  (Formerly 291k325 11(2))

District court abused its discretion in awarding attor-
ney fees in patent infringement action in the absence
of a showing that infringement was willful  35
U.S.C.A. § 285

*508 Gordon T. Arnold, of Richards, Harris, Med-
lock & Andrews, Dallas, Tex , argued for plaintiff-
appellant  With him on the brief was V. Bryan Med-
lock, Jr.
Jerry R. Selinger, of Baker, Mills & Glast, Dallas,
Tex , argued for defendants/cross-appellants   Of
counsel were Martha E  Waters and Tori L  Smith, of
Baker, Mills & Glast, and Bernard Malina, of Malina
& Wolson, New York City

Before MARKEY, Chief Judge, and BISSELL  FN*
and ARCHER, Circuit Judges

      FN* The Honorable Jean Galloway Bissell,
      who died on February 4, 1990, did not parti-
      cipate in the decision

MARKEY, Chief Judge

Appeal from a judgment of the United States District
Court for the Northern District of Texas, No  CA
3-83-1330-T  The district court determined that Gust-
afson, Inc 's (Gustafson's) United States Patent Nos.
3,383,924 ('924) and 4,443,587 ('587) were not inval-
id and were willfully infringed by Intersystems In-
dustrial Products, *509 Inc  (Intersystems)  The court
awarded no damages to Gustafson, permanently en-
joined Intersystems from "designing, manufacturing,
or selling either its Model PTI sampler or Model PDP
sampler," and awarded Gustafson attorney fees of
$113,220 38  Gustafson appeals from the denial of
damages  Intersystems cross-appeals from the injunc-
tion and the award of attorney fees  We reverse the
award of attorney fees and affirm in all other re-
spects

BACKGROUND

The '924 and '587 patents relate to devices that re-
move samples from pressurized pipes  On August 4,
1983 Gustafson sued Intersystems, alleging the lat-
ter's model PS sampler infringed claims 1-11 of the
'924 patent  FN1  On February 28, 1984, Gustafson's
'587 patent issued and on June 7, 1984 Gustafson
amended its complaint to assert that Intersystems's
models PTI and PDP samplers infringed claims 1, 7,
15 and 16 of that patent

      FN1. Gustafson also asserted infringement
      of its United States Patent No. 4,389,906
      The district court held that patent invalid in
      a November 12, 1986 partial summary judg-
      ment not challenged by Gustafson in con-
      nection with this appeal

The district court made these findings and conclu-
sions: (1) Intersystems's model PS sampler infringed
the '924 patent;  FN2  (2) Intersystems's models PDP
and PTI samplers infringed the '587 patent under the
doctrine of equivalents; (3) The inventions defined in
the asserted claims of the '924 and '587 patents would
not have been obvious, 35 U.S.C  § 103 (1982), and
were not anticipated, 35 U.S.C. § 102 (1982); (4) If
Gustafson's evidence were admissible, its lost profits
would be $163,597; and (5) Gustafson "cannot recov-
er damages because the Court cannot consider
[Gustafson's] evidence of lost profits "

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

897 F 2d 508
897 F 2d 508, 58 USL W 2523, 13 U S P Q 2d 1972
**(Cite as: 897 F.2d 508)**

Page 3

FN2. The '924 patent expired on May 21, 1985. Hence Intersystems's challenge to the injunction relates only to the '587 patent

The district court having found that Intersystems had willfully infringed and that this is an exceptional case, awarded Gustafson attorney fees. The relative findings read in their entirety:

14 Defendant Intersystems was aware of the existence of Plaintiff's '924 patent as of the date Plaintiff's Original Complaint was filed

15 Defendant Intersystems was aware of the existence of Plaintiff's '587 patent as of the date Plaintiff's First Supplemental Complaint was Filed

16 Defendant Intersystems took no action to ascertain whether the samplers it was producing would infringe on Plaintiff's samplers patents

17 Defendant designed, engineered and manufactured its Model PS sampler to compete with the Model R Gustafson sampler

18 This is an exceptional case pursuant to 35 U.S.C. § 285

ISSUE

Whether the district court clearly erred in finding Intersystems's infringement willful

OPINION

*Introduction*

The parties attempt to retry their cases on appeal Except for the arguments on willfulness, none even remotely approaches a showing of reversible error Hence a detailed discussion of those arguments would serve no useful purpose and would unduly lengthen this opinion

It is sufficient to state that we find no reversible error in the district court's: (1) finding that Intersystems's model PTI and model PDP samplers infringed claims 1, 7, 15, and 16 of the '587 patent under the doctrine of equivalents; (2) holding that those claims had not been shown to be invalid; (3) excluding plaintiff's exhibit 29 as inadmissible hearsay, *Florida Canal Indus., Inc. v. Rambo,* 537 F.2d 200, 202 (5th Cir.1976) (report of third-party statement inadmissible); (4)

awarding no damages to Gustafson because none were proven, *see* **\*510**_Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,_ 895 F.2d 1403, 1407 (Fed.Cir.1990); and (5) crafting the injunction Accordingly, the judgment is affirmed in all respects save that part based on willful infringement

*Willful Infringement*

[1][2] Whether infringement is willful is a question of fact, findings on which are reviewable under the clearly erroneous standard of Rule 52(a), Fed.R.Civ.P *CPG Prods. Corp. v. Pegasus Luggage, Inc.,* 776 F.2d 1007, 1015, 227 USPQ 497, 502 (Fed.Cir.1985) Willfulness is determined from the totality of the circumstances, *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 867, 226 USPQ 402, 412 (Fed.Cir.1985), and must be proven by clear and convincing evidence, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1440, 7 USPQ2d 1129, 1137 (Fed.Cir.), *cert. denied.* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988)

[3] The district court found that Intersystems "took no action to ascertain whether the samplers it was producing would infringe " However, the district court also found that Intersystems was aware of each of the patents only "as of" the date on which suit was filed on each. Gustafson does not challenge that finding, but argues, from its version of bits and pieces of the record, that the court *might* have found earlier awareness of the patents Gustafson forgets that we do not sit to find facts or to decide hypotheticals

In a sequence of cases involving claims of willful infringement, this court has evolved a jurisprudence applicable to situations in which a product found an infringement at trial had been manufactured before the patent issued In *State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 1236, 224 USPQ 418, 425 (Fed.Cir.1985), State sued Smith twenty-two days after its patent issued and without notifying the defendant of the alleged infringement Under the circumstances of that case, we overturned a finding of willfulness stating: "[t]o willfully infringe a *patent,* the patent must exist and one must have knowledge of it " *Id.,* 751 F.2d at 1236, 224 USPQ at 425 (emphasis in original) Under the same circum-

© 2007 Thomson/West No Claim to Orig U S Govt Works

897 F 2d 508
897 F 2d 508, 58 USLW 2523, 13 U S P Q 2d 1972
(Cite as: 897 F.2d 508)

Page 4

stances, we sustained a finding of nonwillfulness in _American Original Corp. v. Jenkins Food Corp._, 774 F.2d 459, 465, 227 USPQ 299, 302-03 (Fed.Cir.1985) In _Power Lift, Inc. v. Lang Tools, Inc._, 774 F.2d 478, 482, 227 USPQ 435, 438 (Fed.Cir.1985), we sustained a jury finding of willful infringement, distinguishing _State Industries_ because Lang had been earlier warned about the patent the day it issued In _Shiley, Inc. v. Bentley Laboratories, Inc._, 794 F.2d 1561, 1568, 230 USPQ 112, 115 (Fed.Cir.1986), _cert denied_, 479 U.S. 1087, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987), we sustained a jury finding of willfulness, explaining that _State Industries_ did not lay down a _per se_ rule that willful infringement could never be found when manufacture began before issuance of a patent, and applied the "totality of the circumstances" guideline applicable to willful infringement generally, as in _Central Soya Co. v. George A. Hormel & Co._, 723 F.2d 1573, 1577, 220 USPQ 490, 492 (Fed.Cir.1983), _King Instrument, 767 F.2d at 867, 226 USPQ at 412_, and _Machinery Corp. v. Gullfiber AB_, 774 F.2d 467, 473, 227 USPQ 368, 372 (Fed.Cir.1985) In _Pacific Furniture Mfg. Co. v. Preview Furniture Corp._, 800 F.2d 1111, 1114-15 n. 9, 231 USPQ 67, 69 n. 9 (Fed.Cir.1986), wherein defendant started manufacture before issuance of the patent of which it had warning, we sustained a finding of willful infringement in light of all of the circumstances. We did the same in _Kaufman Co. v. Lantech, Inc._, 807 F.2d 970, 979, 1 USPQ2d 1202, 1208-09 (Fed.Cir.1986) In _Rolls-Royce Ltd. v. GTE Valeron Corp._, 800 F.2d 1101, 1110, 231 USPQ 185, 191 (Fed.Cir.1986), we sustained a finding of nonwillfulness saying "in respect of willfulness, there cannot be hard and fast _per se_ rules "

[4][5] It is obvious that a party cannot be held liable for "infringement", and thus not for "willful" infringement, of a _nonexistent_ patent, i e , no damages are payable on products manufactured and sold before the patent issued Whether an act is "willful" is by definition a question of the actor's _intent_. the answer to which *511 must be inferred from all the circumstances Hence a party cannot be found to have "willfully" infringed a patent of which the party had no knowledge Nor is there a universal rule that to avoid willfulness one must cease manufacture of a

product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit Exercising due care, _Underwater Devices Inc. v. Morrison-Knudsen Co._, 717 F.2d 1380, 1389, 219 USPQ 569, 576 (Fed.Cir.1983), a party may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis alone a willful infringer That such a defense proves unsuccessful does not establish that infringement was willful. Presentation in bad faith of a totally unsupportable, frivolous defense may in itself provide a basis for attorney fees under section 285 and may, in light of all the circumstances, also constitute some evidence that continued infringement was willful _See Kaufman, 807 F.2d at 979, 1 USPQ2d at 1209_ There is no finding here that Intersystems's defenses were frivolous That fact, coupled with Intersystems's simultaneous receipt of knowledge of the patent and a court summons, precludes a finding of willfulness

In our patent system, patent applications are secret, and patentees are authorized to sue "innocent" manufacturers immediately after their patents issue and without warning To hold such patentees entitled to increased damages or attorney fees on the ground of willful infringement, however, would be to reward use of the patent system as a form of ambush

Because nothing of record indicates that Intersystems knowingly acted in disregard of Gustafson's patent rights, the finding of willful infringement cannot stand

### _Attorney Fees_

[6] At oral argument, Gustafson admitted that the award of attorney fees was based solely on the finding of Intersystems's willful infringement Because that finding is clearly erroneous, no basis exists for designating this an "exceptional" case or for granting attorney fees _See State Indus., 751 F.2d at 1238, 224 USPQ at 426_ An award of attorney fees without basis in the record is an abuse of discretion _See Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 629, 225 USPQ 634, 644 (Fed.Cir.1985)_ Hence we reverse that part of the judgment awarding attorney fees to Gustafson.

© 2007 Thomson/West No Claim to Orig U S Govt Works

897 F 2d 508
897 F 2d 508, 58 USLW 2523, 13 U S P Q 2d 1972
**(Cite as: 897 F 2d 508)**

AFFIRMED IN PART AND REVERSED IN PART

C A Fed (Tex ),1990
Gustafson, Inc v Intersystems Indus Products, Inc
897 F 2d 508, 58 USLW 2523, 13 U S P Q 2d 1972

Briefs and Other Related Documents (Back to top)

• 1989 WL 1129274 (Appellate Brief) Reply Brief
for Defendant/Cross-Appellant Intersystems Industri-
al Products, Inc (Sep 22, 1989)
• 1989 WL 1129273 (Appellate Brief) Corrected
Reply Brief for Appellant Gustafson, Inc (Aug 29,
1989)
• 1989 WL 1129272 (Appellate Brief) Brief for De-
fendants/Cross-Appellant Intersystems Industrial
Products, Inc and Hugo Wenshau (Jul 19, 1989)
• 1989 WL 1129271 (Appellate Brief) Brief for Ap-
pellant Gustafson Inc (Jun 12, 1989)

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

# EXHIBIT 4

Westlaw.

▷

Kennan v Dow Chemical Co M D Fla ,1989
United States District Court,M D Florida,
Jacksonville Division
Edith KENNAN, as personal representative of
George Kennan, Deceased, Plaintiff,
v.
DOW CHEMICAL COMPANY, et al , Defendants
No. 86-69-Civ-J-14.

July 20, 1989

Widow brought suit in state court against chemical manufacturers, alleging that her husband was exposed to PCP contained in their pesticide products, and that he contracted a fatal blood disease as a result On defendants' motion for summary judgment, the District Court, Susan H Black, J , held that: (1) affirmative defense of preemption was not waived by failure of defendants to plead such defense in their answers, and (2) negligence and products liability claims were preempted by the Federal Insecticide, Fungicide, Rodenticide Act, insofar as they were based on failure to warn

Motion granted in part and denied in part

West Headnotes

**[1] States 360 ☜18.3**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.3 k Preemption in General  Most Cited Cases
Preemption is deemed mandatory when Congress expresses a clear intent to preempt state law, where there is a conflict between state and federal law, where compliance with both state and federal law is impossible, where federal law implicitly bars state regulation, where Congress has legislated comprehensively, or where state law serves as an obstacle to federal objectives

**[2] Products Liability 313A ☜43.5**

313A Products Liability
  313AI Scope in General

    313AI(B) Particular Products, Application to
      313Ak43.5 k  Pesticides, Herbicides, Insecticides, Fungicides and Rodenticides  Most Cited Cases
      (Formerly 23k9 13)

**States 360 ☜18.65**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.65 k  Product Safety; Food and Drug Laws  Most Cited Cases
State law negligence claim that pesticide manufacturers failed to warn decedent of dangers associated with products containing PCP and highly toxic contaminants including dioxin was preempted by the Federal Insecticide, Fungicide and Rodenticide Act, inasmuch as state court jury verdict would have the effect of "regulating" the content of a warning label Federal Insecticide, Fungicide and Rodenticide Act, § 2 et seq , as amended, 7 U.S.C.A. § 136 et seq

**[3] Federal Courts 170B ☜373**

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(A) In General
      170Bk373 k  Substance or Procedure; Determinativeness  Most Cited Cases
In a diversity case, a state's substantive law will determine whether a defense not enumerated in civil procedure rule will constitute an affirmative defense Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**[4] Federal Civil Procedure 170A ☜751**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(C) Answer
      170AVII(C)2 Affirmative Defense or Avoidance
        170Ak751 k  In General  Most Cited Cases
Where a defense does not tend to controvert an element of plaintiff's prima facie case, where the defense tends to annul the cause of action and not merely

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

717 F Supp 799                                                      Page 2
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
(Cite as: 717 F.Supp. 799)

provide a different legal standard, and where failure to plead the defense would tend to surprise a plaintiff, the defense must be considered an "affirmative defense." Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**[5] Products Liability 313A ⬡➞43.5**

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak43.5 k Pesticides, Herbicides, Insecticides, Fungicides and Rodenticides Most Cited Cases
   (Formerly 23k9 13)

**States 360 ⬡➞18.65**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.65 k Product Safety; Food and Drug Laws Most Cited Cases
Preemption by the Federal Insecticide, Fungicide, and Rodenticide Act constituted an affirmative defense in negligence and products liability suit arising from exposure to pesticide products containing PCP Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**[6] Federal Civil Procedure 170A ⬡➞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or Avoidance
            170Ak751 k In General Most Cited Cases

**Federal Civil Procedure 170A ⬡➞846**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak844 Answer
            170Ak846 k New Defense Most Cited Cases
Generally, if a party fails to raise an affirmative defense in its pleadings, that party waives its right to raise the defense at trial; however, if party can show

that its opponent would not be prejudiced by court's hearing evidence on the issue at trial, court should permit party to amend its pleadings Fed.Rules Civ.Proc.Rules 8(c), 15(b), 28 U.S.C.A

**[7] Federal Civil Procedure 170A ⬡➞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or Avoidance
            170Ak751 k In General Most Cited Cases
Party may not raise an affirmative defense by reference thereto in a memorandum offered in support of a motion for summary judgment Fed.Rules Civ.Proc.Rules 8(c), 56, 28 U.S.C.A

**[8] Federal Civil Procedure 170A ⬡➞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or Avoidance
            170Ak751 k In General Most Cited Cases
Defendants did not waive affirmative defense of preemption in negligence and products liability suit arising from exposure to pesticide products containing PCP by their failure to plead the defense in their answers, and could assert the defense in motion for summary judgment, in absence of prejudice to plaintiff Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**[9] Products Liability 313A ⬡➞43.5**

313A Products Liability
   313AI Scope in General
      313AI(B) Particular Products, Application to
         313Ak43.5 k Pesticides, Herbicides, Insecticides, Fungicides and Rodenticides Most Cited Cases
   (Formerly 23k9 13)

**States 360 ⬡➞18.65**

360 States

717 F Supp 799                                                        Page 3
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

3601 Political Status and Relations
    360I(B) Federal Supremacy; Preemption
        360k18.65 k Product Safety; Food and
Drug Laws Most Cited Cases
Preemption defense was not unavailable to defend-
ants in negligence and products liability suit arising
from exposure to pesticides, on ground that decedent
was exposed to the pesticides prior to the enactment
of the Federal Insecticide, Fungicide, and Rodenti-
cide Act Federal Insecticide, Fungicide and Rodenti-
cide Act, § 2 et seq , as amended, 7 U.S.C.A. § 136 et
seq

**[10] Products Liability 313A ⇐⇒43.5**

313A Products Liability
    313AI Scope in General
        313AI(B) Particular Products, Application to
        313Ak43.5 k Pesticides, Herbicides, Insect-
icides, Fungicides and Rodenticides Most Cited
Cases
    (Formerly 23k9 13)

**States 360 ⇐⇒18.65**

360 States
    3601 Political Status and Relations
        360I(B) Federal Supremacy; Preemption
        360k18.65 k Product Safety; Food and
Drug Laws Most Cited Cases
To extent that products liability claims were based on
the defective and unreasonably dangerous condition
of pesticides due to the failure to warn, claims were
preempted by the Federal Insecticide, Fungicide, and
Rodenticide Act Federal Insecticide, Fungicide and
Rodenticide Act, § 2 et seq , as amended, 7 U.S.C.A.
§ 136 et seq

***800** Wayne Hogan, Jacksonville, Fla , for plaintiff
Charles C Howell, III, William R Swain, Jeffrey D
Dunn, Don H Lester, Frank Hession, Victor M Hal-
back, Jr , Jacksonville, Fla , Joseph J Ortego, Uni-
ondale, N Y , and Peter D Braun, Buffalo, N Y , for
defendants

AMENDED OPINION AND ORDER [FN1]

    FN1. This Court conducted a charge confer-
    ence on June 27, 1989, in order to obtain a

final jury charge in this case In the course
of that hearing the Court became aware of
various questions as to the interpretation of
certain parts of this Court's original Opinion
And Order, filed January 25, 1989 The
Court shall, therefore, file this Amended
Opinion And Order to clarify those is-
sues SUSAN H BLACK, District Judge

This case came on to be heard on Reichold Chemic-
als, Inc 's Motion For Summary Judgment, filed on
October 21, 1988 The remaining defendants adopted
Reichold's motion Plaintiff filed a response in oppos-
ition to the motion on November 14, 1988 The Court
heard oral argument on December 2, 1988 At the
hearing, the Court ordered the parties to file various
supplemental memoranda Reichold filed a supple-
mental memorandum on December 16, 1988
Plaintiff filed a response to the supplemental memor-
andum on January 6, 1989 Reichold filed a reply to
plaintiff's supplemental memorandum on January 18,
1989

***801** I Procedural History*

Plaintiff filed the original Complaint in this case on
December 18, 1985, in the Circuit Court for Duval
County, Florida The original Complaint named Dow
Chemical Company, Monsanto Chemical Company,
Reichold Chemicals, Inc , and Vulcan Materials
Company The defendants jointly removed the case
to this Court on January 30, 1986, pursuant to the
Court's diversity jurisdiction Subsequently, the vari-
ous defendants filed answers to the Complaint

On November 25, 1986, this Court entered an Order
For Limiting Time For Completion Of Discovery
And Setting Pretrial Conference That order cut off
discovery on March 31, 1987, set a deadline for filing
motions to add parties and for summary judgment on
April 5, 1987, and set a pretrial conference for May
5, 1987

On April 3, 1987, plaintiff filed a motion to add Ida-
con and Forshaw Industries as defendants On April
6, 1987, defendant Vulcan Materials filed a motion
requesting additional time in which to file a motion
for summary judgment On April 9, 1987, this Court
filed an Amended Order For Pretrial Conference and

© 2007 Thomson/West No Claim to Orig U S Govt Works

717 F Supp 799
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
(Cite as: 717 F.Supp. 799)

Limiting Time For Completion Of Discovery The
Court extended the discovery deadline to May 30,
1987, set a deadline on which motions were to be
filed for June 22, 1987, and set the pretrial confer-
ence for July 22, 1987

On May 5, 1987, the Magistrate granted plaintiff's
motion to add parties Pursuant to that order, plaintiff
on June 17, 1987, filed the Amended Complaint at
bar The defendants subsequently filed answers to the
Amended Complaint On June 18 and 19, 1987, re-
spectively, Defendants Dow Chemical and Monsanto
moved to continue the pretrial conference The Court
granted the motion on June 23, 1987 The Court ex-
tended discovery through September 30, 1987, re-
quired that motions for summary judgment be filed
no later than October 12, 1987, and that the parties
attend a pretrial conference on November 12, 1987
On September 10, 1987, the Court set the case for tri-
al during the trial term commencing on December 28,
1987

Defendants Idacon, Forshaw, Dow Chemical Co,
and Monsanto filed motions for continuance of trial
Defendants Idacon and Forshaw argued that because
they were joined late in the litigation that they did not
have adequate time to conduct discovery Defendants
Dow and Monsanto argued that they needed more
time to conduct discovery so that they could properly
prepare a motion for summary judgment The Court
denied the motions for continuance on November 2,
1987, with leave for the defendants to renew their
motions and present oral argument in support of their
motions at the pretrial conference

At the pretrial conference on November 12, 1987, it
appeared that plaintiff had failed to provide the de-
fendants with certain evidence that plaintiff intended
to introduce at trial. In addition, plaintiff failed to list
the evidence in the pretrial stipulation filed by the
parties on November 6, 1987 The Court ordered
plaintiff to provide the evidence to the defendants
and for the defendants to then file motions with spe-
cific objections to the evidence The plaintiff
provided the defendants with the evidence, and the
defendants subsequently filed motions to strike the
evidence arguing that they were prejudiced by
plaintiff's late disclosure and their inability to conduct

discovery

On December 18, 1987, the Court granted defendants'
motions to exclude any evidence not specifically lis-
ted by plaintiff on the pretrial stipulation filed on
November 6, 1987 The Court gave plaintiff leave to
file a motion for continuance of trial with the under-
standing that such a motion would be automatically
granted and that discovery would be reopened con-
cerning the aforementioned evidence Plaintiff filed a
motion for continuance on December 21, 1987 The
Court granted plaintiff's motion for continuance on
December 23, 1987, and removed the case from the
trial calendar The Court also extended discovery
through February 1, 1988

The defendants each filed motions for summary judg-
ment on the issue of causation in May and June,
1988 Plaintiff filed a response on June 16, 1988 On
September *802 29, 1988, the Court filed an opinion
and order denying the motions for summary judg-
ment

On September 19, 1988, the Court once again set the
case for trial during the trial term commencing on
February 27, 1989 Thereafter, defendant Reichold
filed the instant motion for summary judgment on
October 21, 1988 The other defendants adopted the
motion, the plaintiff responded, the Court heard oral
argument, and the parties filed supplemental memor-
anda [FN2]

> [FN2]. The Court notes that each of these mo-
> tions for summary judgment were filed well
> past the October 12, 1987, deadline estab-
> lished by the Court in its order of June 23,
> 1987 The parties were never given leave by
> the Court to amend that order or otherwise
> file their motions The Court did not raise
> this issue with respect to the first motion for
> summary judgment The Court will waive
> application of paragraph 2(b) and 9 of that
> order for purposes of the instant motion

II *Summary Of The Amended Complaint*

The Amended Complaint filed on June 17, 1987, al-
leges that George Kennan [hereinafter "decedent"]
was exposed to pentachlorophenol [hereinafter

© 2007 Thomson/West No Claim to Orig U S Govt Works

717 F Supp  799
717 F Supp  799, Prod Liab Rep  (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

"PCP"], a chemical contained in products manufac-
tured by the defendants, while working for Koppers
Company in Alachua County, Florida, beginning in
1961 and continuing through the 1970's and 1980's
Plaintiff alleges that due to the decedent's exposure to
PCP, the decedent contracted a blood disease,
suffered severe complications, and died

Count I of the Amended Complaint alleges a claim
for negligence in that the defendants: 1) failed to
warn the decedent of the dangers associated with
products containing PCP and highly toxic contamin-
ants including dioxin, Amended Complaint ¶¶ 8(c) &
8(d); 2) continued to design, manufacture, and market
products containing PCP after it became reasonably
feasible to design comparable products not contain-
ing the chemical, Amended Complaint ¶ 8(b); and 3)
failed to take reasonable steps to remove highly toxic
contaminants from products containing PCP
Amended Complaint ¶ 8(c)

Count II of the Amended Complaint alleges a claim
for strict products liability in that the products pro-
duced by the defendants: 1) did not have a reasonably
adequate warning of the potential harm that might
result from exposure to the products containing PCP,
an adequate warning of the presence of highly toxic
contaminants, including dioxins, or instructions for
working in the vicinity of PCP, Amended Complaint
¶¶ 14(a) & 14(d); 2) contained PCP after it became
reasonably feasible to design, manufacture and mar-
ket reasonably comparable products not containing
PCP; and 3) carried with them highly toxic contamin-
ants including dioxins

### III  Defendants' Motion For Summary Judgment

Defendants argue that neither count of the Amended
Complaint states a cause of action because of federal
preemption of state tort law  In particular, the defend-
ants argue that a damage award under either count
would have the effect of regulating insecticide labels
contrary to regulations promulgated by the Environ-
mental Protection Agency [hereinafter "EPA"] pursu-
ant to the Federal Insecticide. Fungicide, and Ro-
denticide Act, [hereinafter "FIFRA"], 7 U.S.C. § 136,
et seq  Defendants argue that plaintiff's negligence
count is wholly based on a theory that an inadequate

label constituted negligent failure to warn, and that
damage award based on state negligence law would
cause the defendants to change their labels in contra-
vention of FIFRA  Similarly, the defendants argue
that the strict liability count is based on a theory that
an inadequate label rendered the defendants' products
that contained PCP defective and unreasonably dan-
gerous  A damage award based on strict liability, de-
fendants argue, would also contravene FIFRA

Plaintiff responds that preemption is an affirmative
defense, and that the defendants' failure to plead pree-
mption in their answers to the Amended Complaint
constitutes waiver of the defense [FN3]  Plaintiff also
*803 argues that defendants' assertion of the defense
at this late date will cause her prejudice  Plaintiff fur-
ther responds that because the decedent's exposure to
PCP occurred prior to the promulgation of FIFRA's
labeling provisions, the cause of action could not be
preempted  Finally, plaintiff states that there is no
preemption because state law is not in conflict with
federal law

> FN3. Plaintiff took this position for the first
> time in her supplemental memorandum of
> law  At oral argument on Reichold's motion
> for summary judgment, plaintiff stated that
> she would not object to defendants' amend-
> ing their pleadings to add the affirmative de-
> fense of preemption

### A  Standard On Summary Judgment

A district court's review of a case on a motion for
summary judgment is governed by Fed.R.Civ.P. 56
A moving party discharges its burden on a motion for
summary judgment by "showing" or "pointing out"
to the district court that there is an absence of evid-
ence to support the nonmoving party's case  See
Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106
S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)
Fed.R.Civ.P. 56 permits the moving party to dis-
charge its burden with or without supporting affi-
davits and to move for summary judgment on the
case as a whole or on any claim 477 U.S. at 325, 106
S.Ct. at 2553. When a moving party has so dis-
charged its burden, the nonmoving party must then
"go beyond the pleadings and by her own affidavits,

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial ' " 477 U.S. at 324, 106 S.Ct. at 2553.

The district court must enter summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial " 477 U.S. at 322, 106 S.Ct. at 2552; Fed.R.Civ.P. 56(c)  See also _Reflectone, Inc. v. Farrand Optical Co., Inc.,_ 862 F.2d 841, 843-44 (11th Cir.1989)  Whether or not the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law, requires the court to draw inferences from the evidence as viewed in the light most favorable to the nonmoving party, and to resolve all reasonable doubts in that party's favor

The Eleventh Circuit Court of Appeals explained the reasonableness standard in _WSB-TV v. Lee,_ 842 F.2d 1266, 1270 (11th Cir.1988):
In deciding whether an inference is reasonable, the court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness "    The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts    When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one

842 F.2d at 1270 (citations omitted)

Fed.R.Civ.P. 56(c) requires the district court to deny a motion for summary judgment if the court finds that there exists a genuine issue for trial  What constitutes a "genuine issue for trial" was addressed by the Supreme Court in _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)  In _Anderson,_ the Court stated that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party " 477 U.S. at 248, 106 S.Ct. at 2510. The Court

further stated that the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law " 477 U.S. at 251-52, 106 S.Ct. at 2511-2512.

The Court finds that the parties have had adequate time to conduct discovery in this case  The Court will, therefore, address the motion for summary judgment

### B  _Preemption Of State Tort Law By FIFRA_

#### 1  _The Concept of Federal Preemption_

[1] The doctrine of preemption is based on Article VI. Clause 2 of the United States Constitution which provides:
***804** The Constitution and the Laws of the United States which shall be made in Pursuance thererof  shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding

Preemption is deemed mandatory when Congress expresses a clear intent to preempt state law, where there is a conflict between state and federal law, where compliance with both state and federal law is impossible, where federal law implicitly bars state regulation, where Congress has legislated comprehensively, or where state law serves as an obstacle to federal objectives  _Public Service Commission v. Federal Communications Commission,_ 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898-1899, 90 L.Ed.2d 369 (1986); _Silkwood v. Kerr-McGee Corp.,_ 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)  This Court has recognized that, in deciding whether a federal statute preempts state law, "the Court must ascertain Congressional intent in enacting the federal statute at issue " _Blue Cross and Blue Shield of Florida, Inc. v. Department of Banking and Finance,_ 613 F.Supp. 188, 191 (M.D.Fla.1985), _aff'd_ 791 F.2d 1501 (11th Cir.1986)  An analysis of the legislative history and the specific provisions of FIFRA reveals that in enacting FIFRA Congress expressly intended to preempt state labeling requirements

#### 2  _Legislative History of FIFRA_

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

717 F Supp  799
717 F Supp  799, Prod Liab Rep  (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

FIFRA represents the federal government's detailed comprehensive system for the strict regulation of pesticides  FIFRA was enacted in June, 1947, to replace and expand the protection afforded by the Insecticide Act of 1910, the first federal act regulating the pesticide industry  H.R Rep  No  313, 80th Cong , 1st Sess , *reprinted in* 1947  U S Code Cong  & Ad News 1200, 1201  The 1947 Act gave the United States Department of Agriculture authority over the regulation, registration and labeling of "economic poisons and devices "

In 1972, FIFRA was completely revised  Responsibility for enforcement of FIFRA was transferred from the Department of Agriculture to the newly created EPA  The two major goals of the 1972 revisions were to "regulate the use of pesticides to protect man and his environment" and to "extend Federal pesticide regulations to actions *entirely within a single State* "  S.Rep. No. 92-838, 92d Cong 2d Sess , *reprinted in* 1972 U S Code Cong  & Ad News 3993 (emphasis added)  The intent to create a comprehensive regulatory statute is demonstrated by the President's environmental message included in the Senate Report on the proposed 1972 Act  It notes, in pertinent part, that:

Currently, Federal controls over pesticides consist of the regulation of the registration and labeling requirements of the Federal Insecticide, Fungicide and Rodenticide Act  The administrative processes contained in the law are inordinately cumbersome and time consuming, and there is no authority to deal with the actual use of pesticides  The labels approved under the Act specify uses to which pesticide may be put, but there is no way to insure that the label will be read or obeyed  The comprehensive strengthening of our pesticide control laws is needed

S.Rep. No. 92-970, 92d Cong , 2d Sess , *reprinted in* 1972 U S Code Cong  & Ad News 4092, 4093-94

Both the House and Senate bills explicitly detail the desire for federal preemption concerning labeling  The House bill provides:
Section 23  AUTHORITY OF STATES
Subsection (b) *preempts any State labeling or packaging requirements* differing from such requirements under the Act

H R  10729, 92d Cong , 2d Sess , *reprinted in* 1972 U S Code Cong  & Ad News 4010, 4021 (emphasis added)  Similarly, the Senate bill provides:Section 24  AUTHORITY OF STATES
Subsection (b) *preempts any State or local government labeling or packaging requirements* differing from such requirements under the Act

*805 S.Rep. No. 92-970, 92d Cong , 2d Sess , *reprinted in* 1972 U S Code Cong  & Ad News 4092, 4128 (emphasis added)  Therefore, it is clear that the express intent of Congress in enacting the 1972 revisions to FIFRA was to preempt state regulation of labeling requirements  The authority to promulgate such regulations was reserved exclusively for the EPA

### 3  *Construction of FIFRA and its Regulations*

Pursuant to 7 U.S.C. § 136a(c)(5)(C), the administrator of the EPA shall register a pesticide if he determines, *inter alia*, that it will perform its intended function without "unreasonably adverse effects" on man or the environment  A pesticide that is duly registered with the EPA must bear a label which contains EPA-approved warnings that the product is adequate to protect health and the environment  7 U.S.C. § 136(q)(1)(G)  Moreover, a label cannot contain language that is not approved by the EPA  40 C F R § 162 10(a)  Pursuant to the regulations promulgated under FIFRA, the EPA not only specifies the particular warning language required, *see* 40 C F R § 162 10(a)(1), but also the type size, *see* 40 C F R § 162 10(a)(2)(ii)(A), color, *see* 40 C F R § 162 10(a)(2)(ii)(B), and placement, *see* 40 C F R § 162 10(a)(4), of the warning and all other specifications concerning labeling

FIFRA is explicit as to the preemption of state authority to regulate pesticide labeling  It specifically provides that:
Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter

7 U.S.C. § 136v(b)

Thus, the statutory construction of FIFRA and its le-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

gislative history demonstrate a definitive congressional mandate that the regulation of pesticide labeling be controlled solely by the EPA It is clear that Congress has legislated comprehensively, barring the states from interfering with the regulation of pesticide labels

### 4 *Judicial Precedent in Support of FIFRA's Preemptive Status*

FIFRA's preemption of state law claims based on theories of negligent labeling and failure to warn was recognized in *Fitzgerald v. Mallinckrodt, 681 F.Supp. 404 (E.D.Mich.1987)* In *Fitzgerald,* plaintiff alleged personal injuries resulting from his exposure to defendant's chemical product, Calo-Clor, during the course of his employment Calo-Clor is an inorganic mercury-based fungicide which was registered with the EPA pursuant to FIFRA

In granting summary judgment to the defendant on the basis of preemption, the Court recognized that in enacting FIFRA "Congress had *enacted a comprehensive system* for the registration and labeling of pesticides " 681 F.Supp. at 406 (emphasis added) The Court determined that "any state law tort recovery based on failure to warn theory, would abrogate the Congress' intent to provide uniform regulations governing the labeling of pesticides " *Id. at 407.*

In reaching its conclusion that state tort claims were preempted by FIFRA, the Court in *Fitzgerald* considered and rejected an earlier contrary holding in *Ferebee v. Chevron Chemical Company, 736 F.2d 1529 (D.C.Cir.), cert denied. 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)* Instead, the court relied on the recent holding in *Palmer v. Liggett Group, Inc., 825 F.2d 620 (1st Cir.1987), cert denied. 488 U.S. 1030. 109 S.Ct. 838, 102 L.Ed.2d 970 (1989),* where the First Circuit reasoned that a finding that a label is inadequate under a state tort theory,
effectively compels the manufacturer to alter its warning to conform to different state law requirements as "promulgated" by a jury's findings . This challenge to the federal warning label's sufficiency-surely contravenes the Act's policy of uniform labeling    Indeed, it arrogates to a single jury the regu-

latory power explicitly denied to all fifty states' legislative bodies

*Fitzgerald, 681 F.Supp. at 407, (quoting Palmer v. Liggett Group, Inc., 825 F.2d at 627-28).* **\*806** *See also Cipollone v. Liggett Group, Inc., 789 F.2d 181 (3rd Cir.1986)* (finding the Federal Cigarette Labeling and Advertising Act preempts state tort claims based on alleged inadequacy of warnings)

The reasoning of *Fitzgerald* applies in this action To permit additional labeling requirements to be imposed under state common law "would effectively authorize the state to do through the back door" that which was expressly preempted through the front *Fitzgerald, 681 F.Supp. at 407.*

Plaintiff's argument against preemption is primarily based upon *Ferebee v. Chevron Chemical Co., 736 F.2d 1529 (D.C.Cir.1984),* which held that FIFRA does not preempt state tort actions based on the inadequacy of an EPA-approved label Plaintiff's Brief, pp 4-6 Central to the decision in *Ferebee* was the determination that a state court jury verdict does not automatically "require" a manufacturer to change its labels, but rather, leaves to the manufacturer the "choice of how to react" to such jury verdict *Id. at 1542.* ("Chevron can continue to use the EPA-approved label and can at the same time pay damages to successful tort plaintiffs such as Mr Ferebee; alternatively, Chevron can petition the EPA to allow the label to be made more comprehensive ")

This Court must reject any argument holding that a state court jury verdict would merely leave to the manufacturer the "choice of how to react" to such jury verdict and would not automatically "require" a manufacturer to change its labels As the First Circuit noted in *Palmer,*
This *'choice of reaction" seems akin to the free choice of coming up for air after being underwater* Once a jury has found a label inadequate under state law, and the manufacturer liable for damages for negligently employing it, it is unthinkable that any manufacturer would not immediately take steps to minimize its exposure to continued liability *The most obvious change it can take, of course, is to change its label*

717 F Supp 799
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

*Palmer v. Liggett Group,* 825 F.2d at 627-28 (emphasis added)

This "choice of reaction" analysis was expressly considered and rejected in *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp. 404 (E.D.Mich.1987), in which it was held that FIFRA preempts state tort actions based on the inadequacy of an EPA-approved label Most recently, the "choice of reaction" analysis has been rejected by the United States Supreme Court in *International Paper Company v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)

*Ouellette* involved an action against a paper mill located in New York State that discharged effluents into Lake Champlain pursuant to a discharge permit issued under the Clean Water Act, 33 U.S.C. § 1251, *et seq* Plaintiffs, residents of Vermont, filed suit against the paper mill alleging that the discharge constituted a common-law nuisance under Vermont law A preemption argument was raised based upon the Clean Water Act's prohibition of state regulation of an out-of-state "source" of discharged effluents The Supreme Court held that the Clean Water Act preempted the common-law nuisance action In doing so, the Court noted:

The affected state's nuisance laws would subject [International Paper] to the threat of legal and equitable penalties   Such *penalties would compel the source* to adopt different control standards and a different compliance schedule from those approved by the EPA

*Ouellette,* 479 U.S. at 495, 107 S.Ct. at 813 (emphasis added) Additionally, the Court held that:If the Vermont court ruled that respondents were entitled to the full amount of damages and injunctive relief sought in the complaint, *at a minimum* [International Paper] *would have to change* its methods of doing business and controlling pollution to avoid the threat of ongoing liability   The inevitable result of such suits would be that Vermont and other states could do indirectly what they could not do directly-regulate the conduct of out-of-state sources

*Id.* (emphasis added)

[2] The Court finds, therefore, that a state court jury

verdict would have the **\*807** effect of "regulating" the content of a warning label  Since FIFRA expressly preempts state law regulation of pesticide labeling, plaintiff's state law claims fail to the extent that they are based on defendants' failure to warn

### C *Fed.R.Civ.P. 8(c)*

Plaintiff argues that preemption is an affirmative defense and that defendants' failure to plead the defense in their answers constitutes waiver of the defense The Court will first determine whether or not the defense of preemption constitutes an "affirmative defense" under Fed.R.Civ.P. 8(c) and then analyze whether or not the defense has been waived Fed.R.Civ.P. 8(c) provides in pertinent part as follows:

**(c) Affirmative Defenses.** In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense

Fed.R.Civ.P. 8(c) Defenses that are not specifically included in Fed.R.Civ.P. 8(c) may be considered affirmative defenses under the clause, "any other matter constituting an avoidance or affirmative defense " *Id.*

[3] A panel of the Eleventh Circuit Court of Appeals recently stated the test for determining whether or not a defense is an "affirmative defense:"

An affirmative defense has been described as "[a]ny matter that does not tend to controvert the opposing party's prima facie case as determined by the application of substantive law " 2A J  Moore, Moore's Federal Practice ¶ 8 27 [3] (2d ed  1985) In determining whether a particular argument is an affirmative defense, courts consider "the logical relationship between the defense and the cause of action," and the likelihood that the plaintiff will be unfairly surprised if the defense does not appear in the pleadings *Ingraham v. United States,* 808 F.2d 1075, 1079 (5th

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

Cir.1987)

*Hassan v. U.S. Postal Service,* 842 F.2d 260, 263 (11th Cir.1988) *See also In Re Rawson Food Service, Inc.,* 846 F.2d 1343, 1349 (11th Cir.1988) In a diversity case, a state's substantive law will, therefore, determine whether or not a defense not enumerated in Fed.R.Civ.P. 8(c) will constitute an affirmative defense *Troxler v. Owens-Illinois, Inc.,* 717 F.2d 530, 532 (11th Cir.1983); *Freeman v. Chevron Oil Company,* 517 F.2d 201, 204 (5th Cir.1975) The Court will first determine whether or not preemption is part of plaintiff's *prima facie* case under Florida law Second, the Court will determine the logical relationship between the defense of preemption and plaintiff's causes of action Finally, the Court will make a determination whether or not the absence of the defense of preemption in a case of negligence or strict liability would unfairly surprise plaintiff

### 1 *Prima Facie Case*

To establish a *prima facie* case for negligence in a products liability case, plaintiff must show 1) the existence of a duty on the part of the defendant to protect the plaintiff from injury or damage of which plaintiff complains, 2) the failure of the defendant to perform that duty, and 3) injury or damage to plaintiff proximately caused by such failure *Blackton Building Supply Co. v. Garesche,* 383 So.2d 250, 251 (Fla. 5th DCA 1980) To establish a *prima facie* case of strict liability in tort, plaintiff must show 1) the manufacturer's relationship to the product in question, 2) the defect and unreasonably dangerous condition of the product, and 3) the existence of the proximate causal connection between such condition and the user's injuries or damages *West v. Caterpillar Tractor Company, Inc.,* 336 So.2d 80, 87 (Fla.1976)

The Court finds that under Florida law, plaintiff need not establish the absence of preemption of state law by federal law as an element of her *prima facie* cases of either negligence or strict liability in tort A showing of preemption does not tend to *808 controvert any element of plaintiff's *prima facie* case

### 2 *Logical Relationship*

Defendants argue that preemption is merely a choice

of law principle Defendants cite cases in which actions requiring the construction of collective bargaining agreements are analyzed under federal labor law rather than state contract law *See Billy Jack, Etc. v. New York Coat, Suit, Etc.,* 511 F.Supp. 1180 (S.D.N.Y.1981) Plaintiffs agree that preemption is a choice of law principle, but that such a characterization still renders preemption an affirmative defense

The Court finds that in this case, preemption is not merely a choice of law principle Unlike the case of collective bargaining agreements, a finding of preemption in this case would annul all or part of the state-created cause of action *ab initio* and would not replace it with a parallel federal cause of action [FN4] Although this Court agrees that in the labor law context the preemption defense acts as a choice of law principle, the same cannot be said in this case

> [FN4] The Court notes that federal courts including courts in the jurisdiction in which *Billy Jack* was decided are divided on the question of whether or not preemption is merely a choice of law principle, *see Sarnelli v. Tickle,* 556 F.Supp. 557, 561-62 (E.D.N.Y.1983), or what consequences derive from such a characterization of the preemption defense

### 3 *Surprise*

Although plaintiff should have been on notice of the existence of federal statutes preempting state regulation of insecticide warning labels, such notice would not necessarily preclude a finding of unfair surprise In this case, even if plaintiff were on notice of federal statutes preempting state regulation of warning labels, plaintiff could have relied on *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.), *cert denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), which held that FIFRA did not preempt state common law tort remedies Defendants' decision to challenge *Ferebee* was based on *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp. 404 (E.D.Mich.1987), a case decided during the pendency of this litigation and subsequent to this case first having been set for trial Given plaintiff's reasonable understanding that federal law did not preempt state tort

717 F Supp 799
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

law prior to the decision of _Fitzgerald,_ the Court finds that defendant's decision to assert the preemption defense would tend to surprise plaintiff

### 4  _Preemption Is An Affirmative Defense In This Case_

[4][5] Where a defense does not tend to controvert an element of plaintiff's _prima facie_ case, where the defense tends to annul the cause of action and not merely provide a different legal standard, and where failure to plead the defense would tend to surprise a plaintiff, the defense must be considered an affirmative defense  Based on the foregoing factors, the Court finds that in this case, preemption constitutes an affirmative defense [FN5]

> FN5.  The Court notes that this finding is in agreement with the characterization of the preemption defense in Florida state courts  See _Wolmer v. Chrysler Corp., 474 So.2d 834, 839 (Fla. 4th DCA 1985),_ quashed on other grounds 499 So.2d 823 (Fla.1986) (in a negligence and strict liability case, it was defendant's burden to prove federal preemption)

### D  _Waiver Of The Defense Of Preemption_

[6]  As a general rule, if a party fails to raise an affirmative defense in its pleadings, that party waives its right to raise the defense at trial _Hassan, 842 F.2d at 260._ If, however, a party can show that its opponent would not be prejudiced by the Court's hearing evidence on the issue at trial, the Court should permit the party to amend its pleadings  _Id_  Such an exception to the general rule is supported by the liberal federal pleading rules  See _Fed.R.Civ.P. 15(b)_

[7]  A party may not, however, raise an affirmative defense by reference thereto in a memorandum offered in support of a motion for summary judgment  _Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 96 (5th Cir.1976)  See also United States v. Burzynski Cancer Research Institute, 819 F.2d 1301, 1307 (5th Cir.1987),_ cert denied.  *809 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988)  The district court's inclusion of the affirmative defense in the pretrial order could, however, cure defendant's failure to include the defense in its answer  _Jackson v._

_Seaboard Coast Line Railroad Co., 678 F.2d 992, 1012 (11th Cir.1982)_

Defendants have neither moved to amend their answers or sought to have the affirmative defense included in the pretrial order by so indicating in the pretrial stipulation filed on November 6, 1987  The defendants have, however, stated in a footnote to their memorandum in support of their motion for summary judgment that in the event the Court found preemption to be an affirmative defense under _Fed.R.Civ.P. 8(c),_ they requested leave to amend their answer or amend the pretrial stipulation  The Court does not construe this conditional statement in defendant's memorandum as a motion  The memorandum in which the statement appears is not captioned to indicate that it is a motion to amend pursuant to _Fed.R.Civ.P. 10(a), Fed.R.Civ.P. 7(b)(2),_ or Rule 1 05(b), Local Rules Of The United States District Court For The Middle District Of Florida  Nor have the defendants filed a memorandum of law in support of the motion to amend as required by Rule 3 01(b), Local Rules Of The United States District Court For The Middle District Of Florida

Despite the awkward manner in which the defendants manifested their desire to amend their answers or the pretrial stipulation, the Court will analyze whether or not plaintiff would be prejudiced by the Court's permitting defendants to raise the preemption defense at the present time  The Court notes that defendants' desire to amend their answers or the pretrial stipulation was fully discussed at the hearing on this motion for summary judgment  The issue was also fully briefed by the parties subsequent to the hearing [FN6]

> FN6.  The awkward manner in which the defendants raised the question of amendments of the pleadings and the pretrial stipulation explains plaintiff's counsel's initial failure to oppose defendants' conditional motion to amend at oral argument  The Court assumes that plaintiff's counsel was unprepared to address the issue at that time  In his supplemental memorandum, after more careful examination of the law, plaintiff's counsel voiced strenuous opposition to amendment of the pleadings

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

717 F Supp 799
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

Plaintiff asserts that she will suffer prejudice from the defendants' asserting the affirmative defense of preemption at this time Plaintiff argues that the affirmative defense raises factual issues on which plaintiff has not had an opportunity to conduct discovery In particular, plaintiff argues that there is a material factual issue whether or not the EPA approved the defendants' labels Plaintiff also argues that there is a material issue of fact whether or not the defendants gave the EPA all the information necessary for the EPA to properly warn consumers against the dangers of defendants' products Finally, plaintiff argues that there is an issue of fact whether or not a damage award would cause the defendants to change their labels such that the damage award would constitute regulation The Court will address each of these issues in turn

### 1 *Approval Of Defendants' Labels By The EPA*

Plaintiff argues that the defendants have not established that the EPA approved their labels. Apparently it is plaintiff's position that absent such approval, the preemption defense is not available to the defendants Plaintiff specifically objects to the defendants' introduction of the affidavits of individuals who do not have personal knowledge of whether or not the EPA approved of defendants' labels

The Court disagrees with plaintiff's implicit assumption that the preemption defense requires a showing that the EPA actually approved of defendants' labels At most, such a showing would establish that the defendants violated federal regulations concerning labeling Such a showing would not negate the fact that Congress has expressly preempted state regulation of labeling through a specific expression to that effect by statute The Court finds that various affidavits submitted by the defendants to show that the EPA approved their labels are irrelevant to this proceeding *810 and have no bearing on this Court's finding of preemption

### 2 *Necessary And Available Information*

The Court disagrees with plaintiff's argument that preemption requires defendants to show that they have provided to the regulatory agency all the necessary and available information on which to base a warning A showing that the EPA approved defendants' labels based on inadequate information would not negate a finding that under the law of preemption, the EPA has the exclusive right to regulate those labels A showing that the EPA based its decision on inadequate information would be appropriate if, for example, the agency approval of defendants' labels were offered for its collateral estoppel effect This Court's finding of preemption is not based on collateral estoppel or on the agency's approval of the defendants' labels

The Court's finding of preemption in this case is based on the fact that Congress expressly preempted state law If Congress has taken away the ability of the states to regulate labels and assigned the regulation of labels to a federal agency, Congress has determined that such an assignment promotes the general welfare Whether that federal regulatory agency carries out its function based on all available and necessary information is, therefore, irrelevant to a preemption inquiry This Court cannot second guess the wisdom of that decision A cause of action based on insufficient labeling would subvert the regulatory scheme for pesticide labeling Such a cause of action would permit states to regulate labels in the guise of an action for damages and violate Congress's expressed mandate that state's should not regulate labels

### 3 *Whether A Damage Award Constitutes Regulation*

Plaintiff argues that even if federal law has preempted state damage actions where a manufacturer would be caused to change its label, a damage award in this case would not cause the defendants to change their labeling Plaintiff argues that the labels on defendants' pesticides have already been changed since the time of decedent's exposure and would not be changed further In addition, plaintiff argues that at least one of the defendants no longer manufacturers the product at issue in this case

This Court once again disagrees with plaintiff's understanding of the preemption defense The statutory language and legislative history shows Congress's clear intention to preempt state law Congress did not

© 2007 Thomson/West No Claim to Orig U S Govt Works

intend preemption to be decided on a case by case basis as plaintiff's argument would suggest  The Court found preemption based in part on a finding that a reasonable manufacturer of pesticides would tend to change its label subsequent to a damage awarded against it by a jury  Once the Court determines that damage awards tend to cause reasonable manufacturers to change their labels, it is irrelevant whether or not the defendants in this case are reasonable or indeed whether or not they continue to manufacture the product at all

### 4  *Defendants Have Not Waived the Preemption Defense*

[8] Based on the foregoing analysis, the Court finds that plaintiff would not be prejudiced by defendants' assertion of the preemption defense  The Court finds that the availability of the preemption defense in this case is a question of law, and that there are no factual issues on which plaintiff could conduct discovery that would alter the Court's finding of preemption  Plaintiff has had adequate opportunity to conduct legal research, file legal memoranda, and present the Court with oral argument on the issue  The Court finds, therefore, that the defendants have not waived the preemption defense and have properly asserted the defense on this motion  The Court will, therefore, on this date file a pretrial order recognizing the defendants' right to assert the preemption defense  It is, therefore, unnecessary for the defendants to file amended answers

### E  *Exposure To Pesticides Prior To Enactment Of FIFRA*

[9] Plaintiff also argues that the preemption defense should be unavailable to *811 the defendants in this case because it has alleged that the decedent was exposed to defendants' pesticides prior to the enactment of FIFRA in 1972  It is well settled that a court must apply the law in effect at the time it renders its decision, unless the award would cause a manifest injustice  *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)  There is no indication that Congress intended 7 U S C  § 137(b) to apply only to cases arising after the enactment of the statute  The Court recognizes

that this holding is a harsh result, however, the Court is bound by clear Congressional intent  Furthermore, whether or not the decedent was exposed prior to 1972 does not negate the fact that a jury award today would constitute regulation by causing manufacturers to change their labels  As stated above, Congress has expressly preempted such regulation by the states

### F  *Defectiveness And Unreasonable Dangerousness Under Non-Warning Theories*

In Florida the elements of a cause of action for strict liability in tort are 1) the manufacturer's relationship to the product in question, 2) the defective and unreasonably dangerous condition of the product, and 3) the existence of the proximate causal connection between such condition and the user's injuries or damages  *West v. Caterpillar Tractor Company, Inc.,* 336 So.2d 80, 87 (Fla.1976)  The elements of a cause of action in a negligence products liability case are 1) the existence of a duty on the part of the defendant to protect the plaintiff from injury or damage of which plaintiff complains, 2) the failure of the defendant to perform that duty, and 3) injury or damage to plaintiff proximately caused by such failure  *Blackton Building Supply Co. v. Garesche,* 383 So.2d 250, 251 (Fla. 5th DCA 1980)  In practice, the causes of action for strict liability in tort and negligence are similar, and both require proof that the defendant's product was defective and unreasonably dangerous  *See Witt v. Norfe, Inc.,* 725 F.2d 1277-79 (11th Cir.1984)

Florida law recognizes that the defective and unreasonably dangerous condition of a product can be established by showing that a product contained a manufacturing flaw, *see Matter of Standard Jury Instr. (Civil Cases),* 435 So.2d 782, 782-83 n. * (*citing Restatement (Second) of Torts, § 402A,* comment k, (1965)), or by showing that a product contained a design defect  Id  It appears that Florida courts have not spoken definitively as to whether or not a manufacturer's failure to warn can constitute a ground for finding a product defective and unreasonably dangerous  *See id.,* 435 So.2d at 783 n. *.

This Court assumes without deciding that Florida law would recognize that a manufacturer's failure to warn could at least under certain conditions render a

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

717 F Supp 799
717 F Supp 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

product defective and unreasonably dangerous Although this Court is aware that other jurisdictions have found that a manufacturer's failure to warn can constitute an independent ground for finding a product to be defective and unreasonably dangerous, *see* 2 *American Law of Products Liability 3d.* Part 5, Chapter 17, § 17:3, n 9 (T E Travers ed 1987), this Court's ruling should not be interpreted as any extension of Florida law on this issue In light of the Court's conclusion that any cause of action based on the defendants' failure to warn is preempted, the existence of the cause of action in the first instance is immaterial to the Court's decision

The defendants argue that plaintiff's theory for finding the products defective and unreasonably dangerous is based entirely on defendants' failure to warn and not on defective design or manufacturing flaw Plaintiff argues that even if the Court finds that defendants' PCP containing products cannot be found to be defective and unreasonably dangerous based on defendants' failure to warn, the products can be found defective and unreasonably dangerous on a theory that the products contained a design defect or a manufacturing flaw

[10] The Court finds that plaintiff's theory for finding the products defective and unreasonably dangerous is not based exclusively *812 on defendants' failure to warn, but on a theory that products containing PCP have design defects and/or manufacturing flaws *See* Amended Complaint ¶¶ 8(b), 8(c), 12(b), and 12(c) The Court will, therefore, grant defendant's motion for summary judgment only in part To the extent that plaintiff's claims are based on the defective and unreasonably dangerous condition of defendants' products due to defendant's failure to warn, plaintiff's claims are preempted as a matter of law To the extent that plaintiff's claims are otherwise based on the defectiveness or unreasonable dangerousness of defendants' product on theories of defective design or manufacturing flaw, the motion for summary judgment is denied

The defendants also argue that even if their products are found to be defective and unreasonably dangerous, that they cannot be found liable under *Werner v. Upjohn Co., 628 F.2d 848 (4th Cir.1980), cert*

*denied.* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981) The Court finds *Werner v. Upjohn Co., 628 F.2d 848 (4th Cir.1980), cert denied.* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981) distinguishable from this case *Werner* found pursuant to Restatement (Second) of Torts § 402A, comment k, (1965), that a drug manufacturer is not to be held strictly liable for injuries caused by an unavoidably dangerous new drug if the warning is adequate The Court finds that comment k deals expressly with new drugs whose production is justified for their life saving characteristics The defendants have not demonstrated that their products, like life-saving drugs, are "unavoidably" dangerous Furthermore, even if the defendants' products were found to be unavoidably dangerous, the defendants have not demonstrated that the defense of unavoidable dangerousness under comment k has not been preempted by FIFRA Because the defense of unavoidable dangerousness under comment k requires that the defendants demonstrate that their warnings were adequate, such a defense could be found to constitute regulation of warning labels by state law, and would, therefore, be preempted by FIFRA This Court states no view at this time as to whether or not the defense of unavoidable dangerousness has been preempted

This Court stresses that this opinion does not address any issue not raised and briefed by the parties In particular, the parties have not addressed the question whether or not the defendants can assert their warnings as a defense to plaintiff's remaining claims, or whether or not the assertion of a defense of warning is preempted by FIFRA

Accordingly, it is

ORDERED:

1 That Reichold Chemicals, Inc 's Motion For Summary Judgment, filed on October 21, 1988, and subsequently adopted by the other defendants, is granted in part and denied in part

2 That to the extent that plaintiff's claims are based on the defective and unreasonably dangerous condition of defendants' products due to defendant's failure to warn, plaintiff's claims are preempted as a matter

© 2007 Thomson/West No Claim to Orig U S Govt Works

717 F Supp 799
717 F Supp. 799, Prod Liab Rep (CCH) P 12,371
**(Cite as: 717 F.Supp. 799)**

of law

3 That to the extent that plaintiff's claims are otherwise based on the defectiveness or unreasonable dangerousness of defendants' product on theories of defective design or manufacturing flaw, the motion for summary judgment is denied

4 That the Court's Opinion and Order, filed January 25, 1989, is hereby vacated

DONE AND ORDERED

M D Fla ,1989
Kennan v Dow Chemical Co
717 F Supp 799, Prod Liab Rep (CCH) P 12,371

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

# EXHIBIT 5

Westlaw.

383 F 3d 1337                                                                                                    Page 1
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
(Cite as: 383 F.3d 1337)

▷
Briefs and Other Related Documents
Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH
v Dana Corp C A Fed (Va ),2004
    United States Court of Appeals,Federal Circuit
        KNORR-BREMSE SYSTEME FUER
    NUTZFAHRZEUGE GMBH, Plaintiff-Cross Appel-
                        lant,
                          v
    DANA CORPORATION, Defendant-Appellant,
    andHaldex Brake Products Corporation, and Haldex
      Brake Products AB, Defendants-Appellants
        Nos. 01-1357, 01-1376, 02-1221, 02-1256.

                    Sept 13, 2004

**Background:** Owner of patent for air disk brake sued
competitors for infringement The United States Dis-
trict Court for the Eastern District of Virginia, T. S.
Ellis, III, J , 133 F.Supp.2d 843, found willful in-
fringement, but declined to order destruction of data
related to infringing brake  Cross-appeals were taken

**Holdings:** The Court of Appeals, Newman, Circuit
Judge, held that:

(1) adverse inference that legal opinion was or would
have been unfavorable should not be drawn from pat-
ent infringement defendant's invocation of attorney-cli-
ent and/or work product privileges or from such de-
fendant's failure to consult with counsel, overruling
Kloster Speedsteel AB v. Crucible Inc., 793 F.2d
1565, and Fromson v. Western Litho Plate & Supply
Co., 853 F.2d 1568, and

(2) refusal to order destruction of data was reason-
able

Vacated and remanded

Dyk, Circuit Judge, concurred in part, dissented in
part, and filed opinion
West Headnotes
[1] Patents 291 ⊗══319(3)

291 Patents

    291XII Infringement
        291XII(C) Suits in Equity
            291k319 Damages
                291k319(3) k  Right to Increase Dam-
ages Awarded  Most Cited Cases

**Patents 291 ⊗══325.11(3)**

    291 Patents
        291XII Infringement
            291XII(C) Suits in Equity
                291k325 Costs
                    291k325.11 Disbursements in General
                        291k325.11(2) Attorney Fees
                            291k325.11(3) k  Award to
Plaintiff  Most Cited Cases
Determination of whether patent infringement was
"willful," for purpose of enhancing damages or
awarding attorney fees, is made on consideration of
totality of circumstances  35 U.S.C.A. §§ 284, 285

[2] Patents 291 ⊗══227

    291 Patents
        291XII Infringement
            291XII(A) What Constitutes Infringement
                291k227 k  Intent or Purpose, and Know-
ledge  Most Cited Cases
Adverse inference that legal opinion was or would
have been unfavorable should not be drawn from pat-
ent infringement defendant's invocation of attorney-cli-
ent or work product privileges, or from such defend-
ant's failure to consult with counsel, for purpose of
determining whether infringement was "willful "  35
U.S.C.A. §§ 284, 285

[3] Patents 291 ⊗══325.11(2.1)

    291 Patents
        291XII Infringement
            291XII(C) Suits in Equity
                291k325 Costs
                    291k325.11 Disbursements in General
                        291k325.11(2) Attorney Fees
                            291k325.11(2.1) k  In General
Most Cited Cases
Award of attorney fees in exceptional patent case is

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

383 F 3d 1337                                                                                          Page 2
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed  R  Evid  Serv  365
**(Cite as: 383 F.3d 1337)**

not improperly punitive, even if no actual damages are awarded  35 U.S.C.A. § 285.

**[4] Patents 291 ⊙⊃227**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k227 k  Intent or Purpose, and Knowledge  Most Cited Cases
Existence of substantial defense to patent infringement is not per se sufficient to defeat liability for willful infringement  35 U.S.C.A. §§ 284, 285.

**[5] Patents 291 ⊙⊃324.56**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k324 Appeal
                291k324.56 k  Harmless Error  Most Cited Cases
District court's refusal to require destruction of technical data that were obtained by patent infringement defendants for infringing device was not reversible error; parts of data were obtained before issuance of patent, and some data related to non-infringing aspects including design-around efforts and safety studies

**Patents 291 ⊙⊃328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k  Original Utility  Most Cited Cases
5,927,445 Cited

**\*1338** Jeffrey D. Sanok, Crowell & Moring  L L P , of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Michael I. Coe, Herbert I. Cantor and Karen Canaan  Of counsel were John C. Lenahan, Edward R. Murray and Clifton Elgarten

Ellen A. Efros, Rader, Fishman & Grauer, PLLC, of Washington, DC, for defendant-appellant Dana Corporation, joined in the brief of Haldex Brake Products

AB, et al

Stanley H. Lieberstein, St  Onge Steward Johnston & Reens, LLC, of Stamford, CT, argued for defendants-appellants Haldex Brake Products AB and Haldex Brake Products Corporation; and defendant-appellant Dana Corporation  With him on the brief for Haldex were Wesley W  Whitmyer, Jr  and Richard J  Basile  Of counsel were James P. Jeffry, Michael G. Gabriel, and David W. Aldrich

**\*1339** Ralph P. Albrecht, Venable LLP, of Washington, DC, for amicus curiae Bar Association of the District of Columbia-Patent, Trademark & Copyright Section  With him on the brief was Lynn E. Eccleston, The Eccleston Law Firm, of Washington, DC

Norman L. Balmer, Washington & Lee University School of Law, of Lexington, VA, for amicus curiae Lexington Patent Policy Group

Nicholas M. Cannella, Fitzpatrick, Cella, Harper & Scinto, of New York, NY, for amicus curiae New York Intellectual Property Law Association  With him on the brief was F. Christopher Mizzo  Of counsel on the brief  was Melvin C. Garner, Darby & Darby P C , of New York, NY

Donald S. Chisum, Morrison & Foerster LLP, of Palo Alto, California, for amici curiae BEA Systems, Inc  and Novell, Inc  With him on the brief was Emily A. Evans  Of counsel were Michael A. Jacobs and Alison M. Tucker, of San Francisco, CA

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L L P , of Washington, DC, for amicus curiae American Intellectual Property Law Association  With him on the brief was Jeffrey I.D. Lewis, Patterson, Belknap, Webb & Tyler, LLP, of New York, NY  Also on the brief was David G. Conlin, Edwards & Angell, LLP, of Boston, MA

George E. Hutchinson, Executive Director, Federal Circuit Bar Association, of Washington, DC, for amicus curiae Federal Circuit Bar Association  With him on the brief was Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, of New York, NY

Jerold A. Jacover, Brinks Hofer Gilson & Lione, of Chicago, IL, for amicus curiae The City of Chicago  With him on the brief were Roy E. Hofer, Thomas J. Filarski, Meredith Martin Addy and Janet A. Pioli

Kelly L. Morron, Chadbourne & Parke LLP, of New

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

383 F 3d 1337                                                    Page 3
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
**(Cite as: 383 F.3d 1337)**

York, NY, for amicus curiae The Association of the Bar of the City of New York With him on the brief was Peter A. Sullivan, Hughes Hubbard & Reed L L P, of New York, NY

Steven L. Friedman, Dilworth Paxson L L P, of Philadelphia, PA, for amicus curiae Securities Industry Association

Ronald E. Myrick, Chair, Amicus Brief Committee, Intellectual Property Owners Association, of Washington, DC, for amicus curiae Intellectual Property Owners Association With him on the brief were Paul H. Berghoff and Joshua R. Rich, McDonnell Boehnen Hulbert & Berghoff, of Chicago, IL Of counsel was Herbert C. Wamsley, Intellectual Property Owners Association, of Washington, DC

Frank E. Scherkenbach, Fish & Richardson P C, of Boston, MA, for amicus curiae Microsoft Corporation With him on the brief were John A. Dragseth, of Minneapolis, MN; and Jennifer K. Bush, of San Diego, CA

Steven C. Sereboff, SoCal IP Law Group, of Westlake Village, CA, for amicus curiae Conejo Valley Bar Association With him on the brief was Karol M. Pessin

Edward R. Reines, Weil, Gotshal & Manges L L P, of Redwood Shores, CA, for amici curiae United States Council for International Business, et al With him on the brief were Matthew D. Powers and Steven C. Carlson

Elizabeth H. Rader, Center for Internet & Society, Stanford Law School, of Stanford, CA, for amicus curiae Public Patent Foundation With her on the brief was Daniel B. Ravicher, Executive Director, Public Patent Foundation, of New York, NY

*1340 Philip T. Petti, Fitch, Even, Tabin & Flannery, of Chicago, IL, for amicus curiae The Association of Patent Law Firms With him on the brief was G. Paul Edgell

Mitchell G. Stockwell, Kilpatrick Stockton L L P, of Atlanta, GA, for amicus curiae Association of Corporate Counsel With him on the brief was Cynthia B Rothschild, of Winston-Salem, NC

Joshua D. Sarnoff, Glushko-Samuelson Intellectual Property Law Clinic, Washington College of Law, American University, of Washington, DC, for amicus curiae Public Knowledge

Brian P. Barrett, Eli Lilly and Company, of Indiana-

polis, IN, for amicus curiae Biotechnology Industry Organization With him on the brief was Thomas S. Borecki, Baxter Healthcare Corporation, of Deerfield, IL

Joel W. Nomkin, Brown & Bain, P A, of Phoenix, AZ, for amicus curiae Semiconductor Industry Association

William A. Rakoczy, Lord, Bissell & Brook L L P, of Chicago, IL, for amicus curiae Generic Pharmaceutical Association With him on the brief was Hugh S. Balsam

L.J. Chris Martiniak, Heller Ehrman White & McAuliffe LLP, of San Francisco, CA, for amici curiae Computer Associates International, Inc, et al

Dennis W. Archer, President, American Bar Association, of Chicago, IL, for amicus curiae American Bar Association With him on the brief were Richard P. Beem and Joseph N Welch II

L. Gene Spears, Baker Botts, L L P, of Houston, TX, for amicus curiae Houston Intellectual Property Law Association

John E. Peterson, Paul, Hastings, Janofsky & Walker, L L P, of San Diego, CA, for amicus curiae San Diego Intellectual Property Law Association With him on the brief were Douglas E. Olson and Howard N. Wisnia

Before MAYER, Chief Judge, NEWMAN, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, and PROST, Circuit Judges FN*

> FN* MICHEL, *Circuit Judge,* took no part in the consideration or decision of this case

NEWMAN, Circuit Judge

Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH is the owner of United States Patent No. 5,927,445 (the 445 patent) entitled "Disk Brake For Vehicles Having Insertable Actuator," is sued on July 27, 1999 At trial to the United States District Court for the Eastern District of Virginia, the appellants Dana Corporation, Haldex Brake Products Corporation, and Haldex Brake Products AB were found liable for infringement and willful infringement FN1 No damages were awarded, for there were no sales of the infringing brakes Based on the finding of willful infringement the court awarded partial attorney fees under 35

© 2007 Thomson/West No Claim to Orig U S Govt Works

383 F 3d 1337                                 Page 4
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
**(Cite as: 383 F.3d 1337)**

U.S.C. § 285

> FN1. _Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 133 F.Supp.2d 833 (E.D.Va.2001)_ (partial summary judgment) ("_Knorr-Bremse I_"); _133 F.Supp.2d 843 (E.D.Va.2001)_ (findings of fact and conclusions of law) ("_Knorr-Bremse II_"); Civ A No 00-803-A (E D Va Mar 7, 2001) (final judgment); No 00-803-A (E D Va Apr 9, 2001) (amended final judgment) ("_Knorr-Bremse III_")

The appellants seek reversal of the finding of willful infringement, arguing that an adverse inference should not have been drawn from the withholding by Haldex of an opinion of counsel concerning the patent issues, and from the failure of Dana to obtain its own opinion of counsel Applying*1341 our precedent, the district court inferred that the opinion of counsel withheld by Haldex was unfavorable to the defendants After argument of the appeal we took this case en banc in order to reconsider our precedent with respect to these aspects The parties were asked to submit additional briefing on four questions, and amicus curiae briefs were invited FN2 _Knorr-Bremse, 344 F.3d 1336 (Fed.Cir.2003)_ (En banc Order)

> FN2. Amicus curiae briefs were filed by the American Bar Association; American Intellectual Property Law Association; Association of the Bar of the City of New York; Association of Corporate Counsel; Association of Patent Law Firms; Bar Association of the District of Columbia; BEA Systems, Inc and Novell, Inc ; Biotechnology Industry Organization; The City of Chicago; Computer Associates International, Inc et al ; Conejo Valley Bar Association; Federal Circuit Bar Association; Generic Pharmaceutical Association; Houston Intellectual Property Law Association; Intellectual Property Owners Association; Lexington Patent Policy Group; Microsoft Corporation; New York Intellectual Property Law Association; Public Knowledge; Public Patent Foundation; San Diego Intellectual Property Law

Association; Securities Industry Association; Semiconductor Industry Association; and the United States Council for International Business, Center for Advanced Study & Research on Intellectual Property et al

We now hold that no adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel Precedent to the contrary is overruled We therefore vacate the judgment of willful infringement and remand for redetermination, on consideration of the totality of the circumstances but without the evidentiary contribution or presumptive weight of an adverse inference that any opinion of counsel was or would have been unfavorable

## BACKGROUND

Knorr-Bremse, a German corporation, manufactures air disk brakes for use in heavy commercial vehicles, primarily Class 6-8 trucks known as eighteen wheelers, semis, or tractor-trailers Knorr-Bremse states that air disk brake technology is superior to the previously dominant technology of hydraulically or pneumatically actuated drum brakes, and that air disk brakes have widely supplanted drum brakes for trucks in the European market

Dana, an American corporation, and the Swedish company Haldex Brake Products AB and its United States affiliate, agreed to collaborate to sell in the United States an air disk brake manufactured by Haldex in Sweden The appellants imported into the United States about 100 units of a Haldex brake designated the Mark II model Between 1997 and 1999 the Mark II brake was installed in approximately eighteen trucks of Dana and various potential customers The trucks were used in transport, and brake performance records were required to be kept and provided to Dana Dana and Haldex advertised these brakes at trade shows and in industry media in the United States

Knorr-Bremse in December 1998 orally notified Dana of patent disputes with Haldex in Europe involving the Mark II brake, and told the appellants

© 2007 Thomson/West No Claim to Orig U S Govt Works

that patent applications were pending in the United States On August 31, 1999 Knorr-Bremse notified Dana in writing of infringement litigation against Haldex in Europe, and that Knorr-Bremse's United States 445 patent had issued on July 27, 1999 Knorr-Bremse filed this infringement suit on May 15, 2000 In September 2000 Haldex presented to the district court a modified brake design designated the Mark III, and moved for a summary declaration of non-infringement by the Mark *1342 III brake Knorr-Bremse in turn moved for summary judgment of literal infringement by the Mark II brake, and infringement by the Mark III either literally or under the doctrine of equivalents After a hearing in November 2000 the district court granted Knorr-Bremse's motion for summary judgment of literal infringement by the Mark II brake, and set for trial the issues with respect to the Mark III Before and after the judgment of infringement by the Mark II, Dana and others continued to operate trucks in the United States containing the Mark II brake Following a bench trial in January 2001, the district court found literal infringement by the Mark III brake

On the issue of willful infringement, Haldex told the court that it had consulted European and United States counsel concerning Knorr-Bremse's patents, but declined to produce any legal opinion or to disclose the advice received, asserting the attorney-client privilege Dana stated that it did not itself consult counsel, but relied on Haldex Applying Federal Circuit precedent, the district court found: "It is reasonable to conclude that such opinions were unfavorable " The court discussed the evidence for and against willful infringement and concluded that "the totality of the circumstances compels the conclusion that defendants' use of the Mark II air disk brake, and indeed Dana's continued use of the Mark II air disk brake on various of its vehicles [after the judgment of infringement] amounts to willful infringement of the 445 patent " Knorr-Bremse II, 133 F.Supp.2d at 863 Based on the finding of willful infringement the court found that the case was "exceptional" under 35 U.S.C. § 285, and awarded Knorr-Bremse its attorney fees for the portion of the litigation that related to the Mark II brake, but not the Mark III

The appellants appeal only the issue of willfulness of

the infringement and the ensuing award of attorney fees Knorr-Bremse cross-appeals, seeking to enjoin the appellants from retaining and using the brake performance records and test data obtained through use of the Mark II brake

I

WILLFUL INFRINGEMENT

In discussing "willful" behavior and its consequences, the Supreme Court has observed that "[t]he word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent," McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the Court citing conventional definitions such as "voluntary," "deliberate," and "intentional " Id The concept of "willful infringement" is not simply a conduit for enhancement of damages; it is a statement that patent infringement, like other civil wrongs, is disfavored, and intentional disregard of legal rights warrants deterrence Remedy for willful infringement is founded on 35 U.S.C. § 284 ("the court may increase the damages up to three times the amount found or assessed") and 35 U.S.C. § 285 ("the court in exceptional cases may award reasonable attorney fees to the prevailing party") See generally Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 508, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (the patentee "could in a case of willful or bad-faith infringement recover punitive or 'increased' damages under the statute's trebling provision")

[1] Determination of willfulness is made on consideration of the totality of the circumstances, see *1343Gustafson, Inc. v. Intersystems Indus. Prods., Inc., 897 F.2d 508, 510 (Fed.Cir.1990), and may include contributions of several factors, as compiled, e g . in Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1110 (Fed.Cir.1986) and Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed.Cir.1992) These contributions are evaluated and weighed by the trier of fact, for, as this court remarked in Rite-Hite Corp. v. Kelley Co., 819 F.2d 1120, 1125-26 (Fed.Cir.1987), " '[w]illfulness' in infringement, as in

383 F 3d 1337                                                                Page 6
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
**(Cite as: 383 F.3d 1337)**

life, is not an all-or-nothing trait, but one of degree It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of a patentee's legal rights "

Fundamental to determination of willful infringement is the duty to act in accordance with law Reinforcement of this duty was a foundation of the formation of the Federal Circuit court, at a time when widespread disregard of patent rights was undermining the national innovation incentive *See Advisory Committee On Industrial Innovation Final Report,* Dep't of Commerce (Sep 1979) Thus in *Underwater Devices, Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380 (Fed.Cir.1983) the court stressed the legal obligation to respect valid patent rights The court's opinion quoted the infringer's attorney who, without obtaining review by patent counsel of the patents at issue, advised the client to "continue to refuse to even discuss the payment of a royalty " *Id.* at 1385. The attorney advised that "[c]ourts, in recent years, have-in patent infringement cases-found the patents claimed to be infringed upon invalid in approximately 80% of the cases," and that for this reason the patentee would probably not risk filing suit *Id* On this record of flagrant disregard of presumptively valid patents without analysis, the Federal Circuit ruled that "where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing," including "the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity " *Id* at 1389-90.

*Underwater Devices* did not raise any issue of attorney-client privilege, while applying precedent that a finding of willfulness requires the factfinder to find by clear and convincing evidence "that the infringer acted in disregard of the patent," citing *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1565 (Fed.Cir.1983) The aspect of privilege arose in *Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565 (Fed.Cir.1986), where the Federal Circuit observed that the infringer "has not even asserted that it sought advice of counsel when notified of the allowed claims and [the patentee's] warning, or at any time before it began this litigation," and held that the infringer's "silence on

the subject, in alleged reliance on the attorney-client privilege, would warrant the conclusion that it either obtained no advice of counsel or did so and was advised that its importation and sale of the accused products would be an infringement of valid U S patents " *Id.* at 1580. Thus arose the adverse inference, reinforced in *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568 (Fed.Cir.1988), and establishing the general rule that "a court must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention " *Id.* at 1572-73. Throughout this evolution the focus was not on attorney-client relationships, but on disrespect for law However, implementation of this precedent has resulted in inappropriate burdens on the attorney-client relationship

We took this case en banc to review this precedent. While judicial departure from *1344 stare decisis always requires "special justification," *Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the "conceptual underpinnings" of this precedent, *see id.* have significantly diminished in force The adverse inference that an opinion was or would have been unfavorable, flowing from the infringer's failure to obtain or produce an exculpatory opinion of counsel, is no longer warranted Precedent authorizing such inference is overruled

We answer the four questions presented for en banc review, as follows:

### QUESTION 1

When the attorney-client privilege and/or work-product privilege is invoked by a defendant in an infringement suit, is it appropriate for the trier of fact to draw an adverse inference with respect to willful infringement?

[2] The answer is "no " Although the duty to respect the law is undiminished, no adverse inference shall arise from invocation of the attorney-client and/or work product privilege

The Supreme Court describes the attorney-client privilege as "the oldest of the privileges for confidential communications known to common law," and has

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

383 F 3d 1337                                                                            Page 7
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
**(Cite as: 383 F.3d 1337)**

stressed the public purpose
to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client

*Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) Professor Wigmore has elaborated:The lawyer must have the whole of his client's case, or he cannot pretend to give any useful advice . That the whole will not be told to counsel unless the privilege is confidential, is perfectly clear A man who seeks advice, seeks it because he believes that he may do so safely; he will rarely make disclosure which may be used against him; rather than create an adverse witness in his lawyer, he will refuse all private arbitration, and take the chance of a trial

8 J Wigmore, *Evidence in Trials at Common Law* § 2291 at 548 (McNaughton rev 1961) *See Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) (the attorney-client privilege is designed to encourage candid exchange of information)

Although this court has never suggested that opinions of counsel concerning patents are not privileged, the inference that withheld opinions are adverse to the client's actions can distort the attorney-client relationship, in derogation of the foundations of that relationship We conclude that a special rule affecting attorney-client relationships in patent cases is not warranted *See Swidler & Berlin v. United States,* 524 U.S. 399, 410, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (ad hoc exceptions to privilege may cause "general erosion") There should be no risk of liability in disclosures to and from counsel in patent matters; such risk can intrude upon full communication and ultimately the public interest in encouraging open and confident relationships between client and attorney As Professor McCormick has explained, the attorney-client privilege protects "interests and relationships which are regarded as of sufficient social importance to justify some sacrifice of availability of evidence relevant to the administration of justice " 1 *Mc-*

*Cormick on Evidence* § 72, 299 (5th ed.1999)

**\*1345** There is precedent for the drawing of adverse inferences in circumstances other than those involving attorney-client relationships; for example when a party's refusal to testify or produce evidence in civil suits creates a presumption of an intent to withhold damaging information that is material to the litigation [FN3] However, the courts have declined to impose adverse inferences on invocation of the attorney-client privilege *See. e g . Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 225-26 (2nd Cir.1999) (no adverse inference from the defendant's refusal to produce an opinion letter of counsel in a trademark dilution case), *overruled on other grounds sub nom Moseley v. Secret Catalogue,* 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003); *Parker v. Prudential Insurance Co.,* 900 F.2d 772, 775 (4th Cir.1990) (no negative inference from assertion of attorney-client privilege) We now hold that this rule applies to the same extent in patent cases as in other areas of law A defendant may of course choose to waive the privilege and produce the advice of counsel However, the assertion of attorney-client and/or work-product privilege and the withholding of the advice of counsel shall no longer entail an adverse inference as to the nature of the advice

FN3. For example, in *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) the Court confirmed that in civil proceedings fact finders may draw adverse inferences against a party who refuses to testify *See also, e g , International Chemical Workers Union v. Columbian Chemicals Co.,* 331 F.3d 491, 497 (5th Cir.2003) ("when a subpoena is ignored, a party can draw an adverse inference"); *Penalty Kick Management, Ltd. v. Coca Cola Co.,* 318 F.3d 1284, 1294 (11th Cir.2003) (adverse inference drawn from a party's failure to preserve evidence when predicated on bad faith); *MacNaughton v. United States,* 888 F.2d 418, 423 (6th Cir.1989) (permitting adverse inference from failure to call witnesses peculiarly within the party's power to produce)

© 2007 Thomson/West No Claim to Orig U S Govt Works

383 F 3d 1337                                                                    Page 8
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
(Cite as: 383 F.3d 1337)

### QUESTION 2

When the defendant had not obtained legal advice, is it appropriate to draw an adverse inference with respect to willful infringement?

The answer, again, is "no " The issue here is not of privilege, but whether there is a legal duty upon a potential infringer to consult with counsel, such that failure to do so will provide an inference or evidentiary presumption that such opinion would have been negative

Dana Corporation did not seek independent legal advice, upon notice by Knorr-Bremse of the pendency of the 445 application in the United States and of the issuance of the 445 patent, followed by the charge of infringement In tandem with our holding that it is inappropriate to draw an adverse inference that undisclosed legal advice for which attorney-client privilege is claimed was unfavorable, we also hold that it is inappropriate to draw a similar adverse inference from failure to consult counsel The amici curiae describe the burdens and costs of the requirement, as pressed in litigation, for early and full study by counsel of every potentially adverse patent of which the defendant had knowledge, citing cases such as _Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1364 (Fed.Cir.1998)_, wherein the court held that to avoid liability for willful infringement in that case, an exculpatory opinion of counsel must fully address all potential infringement and validity issues Although other cases have imposed less rigorous criteria, the issue has occasioned extensive satellite litigation, distorting the "conceptual underpinnings" of _Underwater Devices_ and _Kloster Speedsteel_ Although there continues to be "an affirmative duty of due care to avoid infringement of the known patent rights of others," *1346_L.A. Gear Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1127 (Fed.Cir.1993)_, the failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or evidentiary presumption that such an opinion would have been unfavorable

### QUESTION 3

If the court concludes that the law should be changed, and the adverse inference withdrawn as applied to this case, what are the consequences for this case?

#### A

The district court based its willfulness determination on several factors in addition to the adverse inference arising from the assertion of attorney-client privilege by Haldex and the failure of Dana to obtain legal advice This court has explained that "there are no hard and fast per se rules" with respect to willfulness of infringement _Rolls-Royce, 800 F.2d at 1110_ Precedent illustrates various factors, some weighing on the side of culpability and some that are mitigating or ameliorating See _Read v Portec. supra_

The district court found, on the evidence presented, that literal infringement by the Mark II brake was reasonably clear and did not present close legal or factual questions As for the validity of the 445 patent, the court found that "given the quantity and quality of the evidence presented by defendants at trial on the issues of obviousness and indefiniteness, it cannot fairly be said that defendants, throughout the litigation, had a good faith belief that the 445 patent would ultimately be found invalid on these grounds " _Knorr-Bremse II, 133 F.Supp.2d at 863._ The court also found that the appellants failed to take prompt remedial action to terminate infringement after the judgment of literal infringement by the Mark II, stating that "Dana deliberately yielded to market pressures in deciding to continue using the infringing Mark II air disk brakes on test vehicles pending future receipt of replacement Mark III air disk brakes " _Id_ The court also found that "although Haldex indeed developed the Mark III air disk brake in a good faith effort to design around the 445 patent, Haldex nonetheless continued to use the Mark II air disk brake throughout the redesign effort, including displaying Mark II air disk brakes at various automotive conferences in the United States and distributing Mark II promotional literature to potential customers at these conferences," _id.;_ the court also noted that infringement was not then enjoined _Knorr-Bremse III._ at 2

The district court also considered Haldex's invocation of the attorney-client privilege in order to withhold

383 F 3d 1337                                                                           Page 9
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365
(Cite as: 383 F.3d 1337)

its opinions of counsel, and Dana's failure to obtain an independent legal opinion despite the warning and notice of infringement The appellants argue that but for the adverse inference of unfavorable opinions drawn from these actions, the finding of willfulness of infringement is not supported Knorr-Bremse responds that willful infringement is well supported by the remaining findings. Because elimination of the adverse inference as drawn by the district court is a material change in the totality of the circumstances, a fresh weighing of the evidence is required to determine whether the defendants committed willful infringement This determination is the primary responsibility and authority of the district court We therefore vacate the finding of willful infringement and remand for redetermination of the issue

Several amici curiae raised the question of whether the trier of fact, particularly a jury, can or should be told whether or not counsel was consulted (albeit without any *1347 inference as to the nature of the advice received) as part of the totality of the circumstances relevant to the question of willful infringement The amici pointed to various hypothetical circumstances in which such information could be relevant, even when there was no issue of attorney-client privilege That aspect is not raised by this case, was not before the district court, and has not been briefed on this appeal Today we resolve only the question of whether adverse inferences of unfavorable opinions can be drawn, and hold that they can not

### B

[3] The appellants also argue that the award of attorney fees is a matter of punitive damages, and is therefore improper Precedent and statute do not support this position 35 U.S.C. § 285 provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party"; and the court has confirmed that a finding of willful infringement may qualify a case as exceptional under § 285 See. e g . _Modine Mfg. Co. v. The Allen Group, Inc., 917 F.2d 538, 543 (Fed.Cir.1990)_ That there were not actual damages does not render the award of attorney fees punitive. Attorney fees are compensatory, and may provide a fair remedy in appropriate cases Upon a

finding of willful infringement, the award of attorney fees is within the district court's sound discretion

In view of our vacatur of the finding of willful infringement, the award of attorney fees is also vacated On remand the award may be reconsidered, should the judgment of willful infringement be restored

### QUESTION 4

Should the existence of a substantial defense to infringement be sufficient to defeat liability for willful infringement even if no legal advice has been secured?

[4] The answer is "no " Precedent includes this factor with others to be considered among the totality of circumstances, stressing the "theme of whether a prudent person would have sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated," _SRI Int'l, Inc. v. Advanced Tech. Labs. Inc., 127 F.3d 1462, 1465 (Fed.Cir.1997)_ However, precedent also authorizes the trier of fact to accord each factor the weight warranted by its strength in the particular case We deem this approach preferable to abstracting any factor for per se treatment, for this greater flexibility enables the trier of fact to fit the decision to all of the circumstances We thus decline to adopt a per se rule

### II

### THE CROSS APPEAL

[5] The district court rejected Knorr-Bremse's request for destruction of the technical data that were obtained by the appellants for the Haldex air disk brakes The court found that much of the data were obtained before issuance of the patent, and that some of the data relate to non-infringing aspects including design-around efforts and safety studies _Knorr-Bremse III._ at 2 We do not discern reversible error in the court's decision of this issue That decision is affirmed

### SUMMARY

© 2007 Thomson/West No Claim to Orig U S Govt Works

An adverse inference that a legal opinion was or would have been unfavorable shall not be drawn from invocation of the attorney-client and/or work product privileges or from failure to consult with counsel Contrary holdings and suggestions of precedent are overruled

**\*1348** This case is remanded for redetermination of the issue of willful infringement and any remedy therefor

*Costs*

Each party shall bear its costs

*VACATED AND REMANDED. CROSS-APPEAL AFFIRMED*

DYK, Circuit Judge, concurring-in-part and dissenting-in-part.

I join the majority opinion insofar as it eliminates an adverse inference (that an opinion of counsel would be unfavorable) from the infringer's failure to disclose or obtain an opinion of counsel I do not join the majority opinion to the extent that it may be read as reaffirming that "where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing " Maj Op, *ante.* at 1343 (quoting *Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1389 (Fed.Cir.1983)*)

There is a substantial question as to whether the due care requirement is consistent with the Supreme Court cases holding that punitive damages can only be awarded in situations where the conduct is reprehensible *See. e g . State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)* ("*Gore* ") While the majority properly refrains from addressing this constitutional issue, as it has not been briefed or argued by the parties or *amici* in this case, I write separately to note my view that enhancing damages for failure to comply with the due care requirement cannot be squared with those recent Supreme Court cases

I

We have often recognized that enhanced damages awarded pursuant to *35 U.S.C. § 284* are a form of punitive damages *See. e g , Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed.Cir.1996)* ("[E]nhanced damages are punitive, not compensatory ") [FN4] Punitive damages are awarded to punish reprehensible behavior, referred to in this context as willful infringement "Enhancement    depends on a showing of willful infringement or other indicium of bad faith warranting punitive damages." *Id . see also Nat'l Presto Indus., Inc. v. West Bend Co., 76 F.3d 1185, 1192 (Fed.Cir.1996)* ("Liability for willfulness of infringement turns on considerations of intent, state of mind, and culpability "); *Beatrice Foods Co. v. New Eng. Printing & Lithographing Co., 923 F.2d 1576, 1579 (Fed.Cir.1991)* ("Under our cases, enhanced damages may be awarded only as a penalty for an infringer's increased culpability, namely willful infringement or bad faith ")

> FN4. This case, of course, does not involve an award of enhanced damages, but rather an award of attorney fees based on a willfulness finding The majority correctly rejects the contention that an award of attorney fees pursuant to *35 U.S.C. § 285* is a form of punitive damages *See* Maj Op, *ante.* at 1346 - 47 While attorney fees are not punitive damages, our case law makes clear that, where attorney fees are awarded based on a willfulness finding, the same standard for willfulness applies to both enhancement and attorney fees *See . Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1340 (Fed.Cir.2004)* Thus, while it might not be unconstitutional to award attorney fees on a due care theory, if we were to restrict the award of enhanced damages, an award of attorney fees on a willfulness theory would also be restricted because the same standard applies to both

There are many circumstances that may create an appropriate predicate for a finding of willful infringement, and hence punitive damages, including deliberate**\*1349** copying, concealing infringing activity, infringement where the infringer knows that it is infringing or where it knows it has only frivolous de-

383 F.3d 1337                                                      Page 11
383 F.3d 1337, 72 U.S.P.Q.2d 1560, 65 Fed. R. Evid. Serv. 365
(Cite as: 383 F.3d 1337)

fenses, infringement designed to injure a competitor, etc. We have appropriately held that such activity is reprehensible and that enhanced damages may be awarded in such circumstances. *See, e.g., Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1583 (Fed.Cir.1996) ("Willful infringement is . . . a measure of reasonable commercial behavior in the context of the tort of patent infringement. The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement and the enhancement of damages."); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1127 (Fed.Cir.1993) (reversing the district court's ruling that infringement was not willful because the infringer's "deliberate copying was strong evidence of willful infringement, without any exculpatory evidence to balance the weight"); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed.Cir.1992) (including "[w]hether defendant attempted to conceal its misconduct" as a factor to be considered in enhancing damages); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-79 (Fed.Cir.1986) (affirming the district court's finding of willfulness based on the district court's findings that the infringer "faithfully copied the claimed invention, took an untenable position regarding validity of the patent, and *presented a frivolous defense of noninfringement*" (emphasis added))

But a potential infringer's mere failure to engage in due care is not itself reprehensible conduct. To hold that it is effectively shifts the burden of proof on the issue of willfulness from the patentee to the infringer, which must show that its infringement is not willful by showing that it exercised due care. While the duty of care is only one factor in the determination of enhanced damages, no one can seriously doubt that, both in the minds of the jurors (in determining willfulness) and in the decision of the district court (concerning enhancement), the duty of care is by far the preeminent factor in the vast majority of cases.

II

The duty of care requirement finds no support in the patent damages statute, the legislative history, or Su-

preme Court opinions. The enhancement statute merely provides that "the court may increase the damages up to three times the amount found [by the jury] or assessed [by the court]." 35 U.S.C. § 284 (2000). No other mention is made of enhancement, willful infringement, or a duty of care. The present statute, which was enacted in 1952, simply "consolidates the provisions relating to damages" from the previous version of the patent law. S.Rep. No. 82-1979, at 29 (1952); H.R. Rep. No. 82-1923, at 29 (1952). The previous version of the statute-in effect since 1836-provided that courts can enhance damages "according to the circumstances of the case."[FN5] Our attention **1350** has been directed to no meaningful legislative history for the current statute or the earlier statutes.

> FN5. The Patent Act of 1870 provided:
> [W]henever in any [patent infringement] action a verdict shall be rendered for the plaintiff, the court may enter judgment thereon for any sum above the amount found by the verdict as the actual damages sustained, according to the circumstances of the case, not exceeding three times the amount of such verdict, together with the costs.
> Ch. 230, § 59, 16 Stat. 198, 207 (1870). The Patent Act of 1836 likewise provided:
> [I]t shall be in the power of the court to render judgment for any sum above the amount found by such verdict as the actual damages sustained by the plaintiff, not exceeding three times the amount thereof, according to the circumstances of the case, with costs.
> Ch. 357, § 14, 5 Stat. 117, 123 (1836).

Nor does any of the few Supreme Court cases interpreting section 284 provide any basis for a duty of care. Indeed, they appear to limit enhanced damages to cases of "willful or bad-faith infringement," *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 508, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (stating that the patentee "could in a case of willful or bad-faith infringement recover punitive or 'increased' damages under the statute's trebling provision"), or "wanton or malicious" injury, *Seymour v. McCormick*, 57 U.S. 480, 489, 16 How. 480, 14 L.Ed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1024 (1853) ("It is true, where the injury is wanton or malicious, a jury may inflict vindictive or exemplary damages, not to recompense the plaintiff, but to punish the defendant ") Furthermore, the entire provenance of the due care requirement is dictum in earlier regional circuit cases. See *Milgo Elec. Corp. v. United Bus. Communications, Inc.*, 623 F.2d 645, 666 (10th Cir.), *cert denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Coleman Co. v. Holly Mfg. Co.*, 269 F.2d 660, 666 (9th Cir.1959)

### III

Whatever justification there may have been for the due care approach in the past, that doctrine has been undermined by the decisions of the Supreme Court beginning in 1996, which have limited the award of punitive damages on due process grounds. See. e g. *State Farm*, 538 U.S. at 416-18, 123 S.Ct. 1513; *Gore*, 517 U.S. at 568, 116 S.Ct. 1589 The Supreme Court first held in *Gore* that an award of punitive damages can violate the Due Process Clause,[FN6] stating that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct " 517 U.S. at 575, 116 S.Ct. 1589 The Court stated:

> FN6. The Court had previously held in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), that punitive damage awards can violate the Due Process Clause, but the particular damage award in *Haslip* did not violate that clause. *Id.* at 18-19, 111 S.Ct. 1032

There is no evidence that BMW acted in bad faith when it sought to establish the appropriate line between presumptively minor damage and damage requiring disclosure to purchasers. In this regard, it is also significant that there is no evidence that BMW persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions
Finally, the record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive

*Id* at 579, 116 S.Ct. 1589 The Court further explained the importance of reprehensibility to an award of punitive damages in *State Farm*. making clear that reprehensibility is indispensable to a punitive damages award:[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence

*Id.* at 419, 123 S.Ct. 1513. Thus, even where the damages multiple is within accepted***1351** bounds, the Court has required a finding of reprehensibility as a predicate to an award of punitive damages Patent law is not an island separated from the main body of American jurisprudence. The same requirement of reprehensibility restricts an award of enhanced damages in patent cases as in other cases. When an infringer merely fails to exercise his supposed duty of care, there are "none of the circumstances ordinarily associated with egregiously improper conduct" that could be sufficiently reprehensible to warrant imposition of punitive damages, as in *Gore*, 517 U.S. at 580, 116 S.Ct. 1589[FN7]

> FN7. The imposition of treble damages by a court based on a lack of due care by an infringer is unlike such an imposition for violations of the Sherman Act or for intentional use of a counterfeit mark in violation of the Lanham Act, where damages are automatically trebled pursuant to statute, based on a congressional judgment that the conduct is *per se* reprehensible See 15 U.S.C. § 15(a) (2000); 15 U.S.C. § 1117(b) (2000) Here, significantly and unlike in those situations, there is no judgment by Congress that infringement is *per se* reprehensible conduct requiring automatic trebling

### V

Finally, in my view, the imposition of the due care requirement has produced nothing of benefit to the patent system In cases where the potential infringer has been guilty of deliberate copying, concealment of infringement, or other reprehensible conduct, enhanced damages serve a useful purpose But where

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

such reprehensible conduct is absent, it is unnecessary to stretch the law of punitive damages to protect the patentee because the patentee can secure a preliminary injunction once he has learned of infringement If the patentee is unable to secure a preliminary injunction because he cannot make a clear showing of likelihood of success on the merits (the accused infringer having a substantial defense, *see. e g . Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed.Cir.2004); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed.Cir.2001)), there is no reason the patentee should be able to secure punitive damages based merely on a showing of lack of "due care" by the accused infringer during the pendency of the litigation

Second, the due care requirement exists in the context of patent law that is complex, where ultimate outcomes are difficult to predict, and, as the majority holds, the existence of a substantial defense on the merits will not bar a finding of willfulness *See* Maj Op , *ante, at 1357.* As the *amici* point out, the due care requirement has fostered a reluctance to review patents for fear that the mere knowledge of a patent will lead to a finding of lack of due care, *see. e g . Amici Curiae* Br of U S Council for Int'l Bus *et al* at 9 n 4; a cottage industry of window-dressing legal opinions by third party counsel designed to protect the real decision-making process between litigating counsel and the company's executives, *see . id* at 9; the imposition of substantial legal costs on companies seeking to introduce innovative products, *see, e g , Amicus Curiae* Br of Sec Indus Ass'n at 9-11; and an enhanced ability of holders of dubious patents to force competitors' products off of the market through the threat of enhanced damages, *see. e g , id* at 5-6 These concerns have led *amici*,[FN8] the Federal Trade Commission working group,[FN9] and a committee of the *1352 National Academies,[FN10] to urge us to reconsider our willfulness jurisprudence

> FN8. *See. e g .* Br for *Amicus Curiae* Am Intellectual Prop Law Ass'n at 6-8; Br for *Amicus Curiae* N Y Intellectual Prop Law Ass'n at 9-11

> FN9. *See. e g .* Federal Trade Comm'n, *To Promote Innovation  The Proper Balance of*

*Competition and Patent Law and Policy.* ch 5, at 31 (2003), *available at* http://www ftc gov/os/2003/10/innovationrpt p df ("The Commission recommends that legislation be enacted requiring either actual, written notice of infringement from the patentee or deliberate copying of the patentee's invention, knowing it to be patented, as a predicate for willful infringement ") *See generally id* at 28-31

> FN10. *See. e g .* Comm on Intellectual Prop Rights in the Knowledge-Based Economy, The National Academies, *A Patent System for the 21st Century* 119 (Stephen A Merrill et al eds , 2004), *available at* http://www nap edu/html/patentsystem/ 0309089107 pdf ("Lacking evidence of its beneficial deterrent effect but with evidence of its perverse anti-disclosure consequences, the committee recommends elimination of the provision for enhanced damages based on a subjective finding of willful infringement ") *See generally id* at 118-20

The majority opinion here ameliorates these concerns to some very limited extent by eliminating the inference that an undisclosed or unobtained opinion of counsel was or would have been adverse But the majority opinion does not address whether a potential infringer can satisfy the requirement of due care without securing and disclosing an opinion of counsel, or, if such an opinion is not absolutely required, whether an adverse inference can be drawn from the accused infringer's failure to obtain and disclose such an opinion More fundamentally, the opinion does not address whether the due care requirement, whatever its parameters, is consistent with the Supreme Court's punitive damages jurisprudence

I would recognize that the due care requirement is a relic of the past and eliminate it as a factor in the willfulness and enhancement analysis

C A Fed (Va ),2004
Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v Dana Corp
383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid

383 F 3d 1337

383 F 3d 1337, 72 U S P Q 2d 1560, 65 Fed R Evid Serv 365

**(Cite as: 383 F.3d 1337)**

Page 14

Serv 365

Briefs and Other Related Documents (Back to top)

• 2004 WL 188813 (Appellate Brief) Corrected Brief for Amicus Curiae Microsoft Corporation in Support of Defendants-Appellants (No View Expressed on Affirmance or Reversal) (Nov 04, 2004)
• 2003 WL 23200567 (Appellate Brief) Corrected Brief of the American Bar Association as Amicus Curiae Supporting Neither Party (Dec 15, 2003) Original Image of this Document (PDF)
• 2003 WL 24305252 (Appellate Brief) Corrected Brief of the American Bar Association as Amicus Curiae Supporting Neither Party (Dec 10, 2003) Original Image of this Document (PDF)
• 2003 WL 23200560 (Appellate Brief) Brief for the Association of Patent Law Firms as Amicus Curiae (Nov 25, 2003) Original Image of this Document (PDF)
• 2003 WL 24305260 (Appellate Brief) Brief for the Association of Patent Law Firms as Amicus Curiae (Nov 20, 2003) Original Image of this Document (PDF)
• 2003 WL 24305273 (Appellate Brief) Brief for Amicus Curiae New York Intellectual Property Law Association in Support of Eliminating the Adverse Inference Arising from the Assertion of Attorney-Client Privilege in Defense of Willful Infringement (Nov 16, 2003) Original Image of this Document (PDF)
• 2003 WL 23200554 (Appellate Brief) Brief for Amicus Curiae New York Intellectual Property Law Association in Support of Eliminating the Adverse Inference Arising from the Assertion of Attorney-Client Privilege in Defense of Willful Infringement (Nov 14, 2003) Original Image of this Document (PDF)
• 2003 WL 23200559 (Appellate Brief) Brief for Amicus Curiae San Diego Intellectual Property Law Association (Nov 14, 2003) Original Image of this Document (PDF)
• 2003 WL 23204254 (Appellate Brief) Brief of Amicus Curiae, the Federal Circuit Bar Association, in Response to the Court's Order Inviting Briefs (Nov 14, 2003) Original Image of this Document (PDF)
• 2003 WL 24305250 (Appellate Brief) Brief for

Amicus Curiae San Diego Intellectual Property Law Association (Nov 14, 2003) Original Image of this Document (PDF)
• 2003 WL 24305264 (Appellate Brief) Brief of Amicus Curiae, the Federal Circuit Bar Association, in Response to the Court's Order Inviting Briefs (Nov 14, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23200570 (Appellate Brief) Brief of Amici Curiae Bea Systems, Inc and Novell, Inc in Support of Neither Party (Nov 06, 2003) Original Image of this Document (PDF)
• 2003 WL 23200568 (Appellate Brief) Motion for Leave to File Brice, and Brief of Amicus Curiae Conejo Valley Bar Association (Nov 05, 2003) Original Image of this Document (PDF)
• 2003 WL 23200569 (Appellate Brief) Brief of Amicus Curiae Public Patent Foundation (Nov 05, 2003) Original Image of this Document (PDF)
• 2003 WL 23208764 (Appellate Brief) Brief of Amicus Curiae in Support of Defendant-Appellants (Nov 05, 2003) Original Image of this Document (PDF)
• 2003 WL 24305251 (Appellate Brief) Brief for Amicus Curiae, Houston Intellectual Property Law Association, in Support of Defendant-Appellants (Nov 5, 2003) Original Image of this Document (PDF)
• 2003 WL 24305253 (Appellate Brief) Brief of Amicus Curiae in Support of Defendant-Appellants (Nov 5, 2003) Original Image of this Document (PDF)
• 2003 WL 24305270 (Appellate Brief) Motion for Leave to File Brief, and Brief of Amicus Curiae Conejo Valley Bar Association (Nov 5, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23200571 (Appellate Brief) Brief for Amicus Curiae, Houston Intellectual Property Law Association, in Support of Defendant-Appeallants (Nov 04, 2003) Original Image of this Document (PDF)
• 2003 WL 23208762 (Appellate Brief) Brief of Lexington Patent Policy Group as Amicus Curiae in Support of Reversal and Remand (Nov 04, 2003) Original Image of this Document (PDF)
• 2003 WL 24305262 (Appellate Brief) Brief of Amici Curiae Bea Systems, Inc and Novell, Inc in

Support of Neither Party (Nov 4, 2003) Original Image of this Document with Appendix (PDF)

• 2003 WL 24305269 (Appellate Brief) Corrected Brief for Amicus Curiae Microsoft Corporation In Support of Defendants-Appellants (No View Expressed on Affirmance or Reversal) (Nov 4, 2003) Original Image of this Document (PDF)

• 2003 WL 24305272 (Appellate Brief) Brief of Lexington Patent Policy Group as Amicus Curiae in Support of Reversal and Remand (Nov 4, 2003) Original Image of this Document (PDF)

• 2003 WL 23200556 (Appellate Brief) Brief for Amicus Curiae American Intellectual Property Law Association (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23200558 (Appellate Brief) Brief for Amicus Curiae the Association of the Bar of the City of New York in Support of Neither Party (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23200562 (Appellate Brief) Amicus Curiae Brief of Securities Industry Association in Support of Defendants-Appellants (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23200563 (Appellate Brief) Amici Curiae Brief of United States Council for International Business, Center for Advanced Study & Research on Intellectual Property, Federation Internationale des Conseils En Propriete Industrielle, Applera Corporation, Applied Materials, Inc , Cis co Systems, Inc and Cisco Technologies, Inc ; Oracle Corporation; Sony Computer Entertainment America Inc , in Support of Defendants-Appellants (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23200564 (Appellate Brief) Brief of Amicus Curiae Generic Pharmaceutical Association in Support of Defendants-Appellants (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23208464 (Appellate Brief) Brief of Amicus Curiae Public Knowledge in Support of Defendant-Appellants (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 23208763 (Appellate Brief) Brief of Amicus Curiae Intellectual Property Owners Association (Nov 03, 2003) Original Image of this Document with Appendix (PDF)

• 2003 WL 23208765 (Appellate Brief) Brief for Amicus Curiae Association of Corporate Counsel

against Finding an Adverse Inference upon Assertion of Attorney-Client Privilege (Nov 03, 2003) Original Image of this Document (PDF)

• 2003 WL 24305254 (Appellate Brief) Brief of Amicus Curiae Generic Pharmaceutical Association in Support of Defendants-Appellants (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305255 (Appellate Brief) Brief for Amicus Curiae Association of Corporate Counsel Against Finding an Adverse Inference Upon Assertion of Attorney-Client Privilege (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305256 (Appellate Brief) Brief of Amicus Curiae Public Knowledge In Support of Defendant-Appellants (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305258 (Appellate Brief) Amici Curiae Brief of United States Council for International Business, Center for Advanced Study & Research On Intellectual Property, F%21ed%21eration Internationale Des Conseils En Propri%21ct%21e Industrielle, Applera Corporation, Applied Material s, Inc , Cisco Systems, Inc and Cisco Technologies, Inc ; Oracle Corporation; Sony Computer Entertainment America Inc , In Support of Defendants-Appellants (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305259 (Appellate Brief) Brief of Amicus Curiae Public Patent Foundation (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305263 (Appellate Brief) Brief for Amicus Curiae American Intellectual Property Law Association (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305266 (Appellate Brief) Brief for Amicus Curiae the Association of the Bar of the City of New York In Support of Neither Party (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305267 (Appellate Brief) Amicus Curiae Brief of Securities Industry Association In Support of Defendants-Appellants (Nov 3, 2003) Original Image of this Document (PDF)

• 2003 WL 24305268 (Appellate Brief) Brief of Amicus Curiae Intellectual Property Owners Association (Nov 3, 2003) Original Image of this Document with Appendix (PDF)

• 2003 WL 23200565 (Appellate Brief) Brief of the

© 2007 Thomson/West No Claim to Orig U S Govt Works

Semiconductor Industry Associations as Amicus Curiae in Support of Defendants-Appellants, and for Reversal on Willfulness (Nov 01, 2003) Original Image of this Document (PDF)
• 2003 WL 24305261 (Appellate Brief) Brief of the Semiconductor Industry Association as Amicus curiae in Support of Defendants-Appellants, and for Reversal on Willfulness (Nov 1, 2003) Original Image of this Document (PDF)
• 2003 WL 23200555 (Appellate Brief) Brief of Amicus Curiae Biotechnology Industry Organization in Support of Neither Party (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 23200557 (Appellate Brief) Brief Amicus Curiae of the City of Chicago (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 23200561 (Appellate Brief) Brief of Amicus Curiae Bar Association of the District of Columbia - Patent, Trademark & Copyright Section (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24305257 (Appellate Brief) Brief of Amicus Curiae Biotechnology Industry Organization In Support of Neither Party (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24305265 (Appellate Brief) Brief Amicus Curiae of the City of Chicago (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24305271 (Appellate Brief) Brief of Amicus Curiae Bar Association of the District of Columbia - Patent, Trademark & Copyright Section (Oct 31, 2003) Original Image of this Document (PDF)
• 2003 WL 23200566 (Appellate Brief) Brief of Defendants-Appellants (Oct 27, 2003) Original Image of this Document (PDF)
• 2001 WL 34378624 (Appellate Brief) Reply Brief for Plaintiff-Cross Appellant Knorr-Bremse Systeme Fuer Nutzfagrzeuge Gmbh (Oct 26, 2001) Original Image of this Document (PDF)
• 2001 WL 34901641 (Appellate Brief) Reply Brief for Plaintiff-Cross Appellant Knorr-Bremse Systeme Fuer Nutzfahrzeuge Gmbh (Oct 26, 2001) Original Image of this Document (PDF)
• 2001 WL 34378623 (Appellate Brief) Reply Brief or Defendants-Appellants & Brief for Defendants-Cross Appellants (Oct 09, 2001) Original Image of

this Document (PDF)
• 2001 WL 34901642 (Appellate Brief) Reply Brief of Defendants-Appellants & Brief for Defendants-Cross Appellants (Oct 9, 2001) Original Image of this Document (PDF)
• 2001 WL 34378622 (Appellate Brief) Brief for Plaintiff-Cross Appellant Knorr-Bremse System Fuer Nutzfahrzeuge Gmbh (Aug 27, 2001) Original Image of this Document (PDF)
• 2001 WL 34901640 (Appellate Brief) Brief for Plaintiff-Cross Appellant Knorr-Bremse Systeme Fuer Nutzfahrzeuge Gmbh (Aug 27, 2001) Original Image of this Document (PDF)
• 2001 WL 34901621 (Appellate Brief) Opening Brief of Defendants-Appellants (Jul 16, 2001) Original Image of this Document (PDF)
• 2001 WL 34901639 (Appellate Brief) Opening Brief of Defendants-Appellants (Jul 16, 2001) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

# EXHIBIT 6

Westlaw.

6 F Supp 2d 971                                                            Page 1
6 F Supp 2d 971
**(Cite as: 6 F.Supp.2d 971)**

◄

Menchaca v American Medical Response of Illinois,
Inc N D Ill ,1998
United States District Court, N D Illinois, Eastern
Division
Anna MENCHACA, Plaintiff,
v.
AMERICAN MEDICAL RESPONSE OF
ILLINOIS, INC , Defendant.
No. 98 C 547.

June 3, 1998

In an employment discrimination suit, the District
Court, Shadur, Senior District Judge, held that: (1)
Equal Employment Opportunity Commission
(EEOC) complied with a regulation permitting an ag-
grieved person to trigger the issuance of a right-
to-sue letter before expiration of the 180-day time
period, and (2) employer's pleading, asserting that it
"terminated [employee]'s employment for legitimate
business reasons following a merger of competitive
companies and change in company management," did
not fit the concept of an affirmative defense

Ordered accordingly
West Headnotes
**[1] Civil Rights 78 ☰1523**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1521 Persons Protected and Entitled to Sue
            78k1523 k Right to Sue Letter or Notice;
Official Inaction Most Cited Cases
    (Formerly 78k367)

**Civil Rights 78 ☰1530**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1530 k Time for Proceedings; Limitations
Most Cited Cases
    (Formerly 78k373)
Equal Employment Opportunity Commission's
(EEOC) determinations that it would "be unable to

complete its process within 180 days from the filing
of the charge" and that it was "terminating its process
with respect to this charge," complied directly with
the regulation permitting an aggrieved person to trig-
ger the issuance of a right-to-sue letter before expira-
tion of the 180-day time period, and hence, author-
ized a former employee's bringing of her employment
discrimination action within 90 days after issuance of
the right-to-sue letter Civil Rights Act of 1964, §
706(e), as amended, 42 U.S.C.A. § 2000e-5(f)(1); 29
C.F.R. § 1601.28(a)(2)

**[2] Civil Rights 78 ☰1532**

78 Civil Rights
    78IV Remedies Under Federal Employment Dis-
crimination Statutes
        78k1532 k Pleading Most Cited Cases
    (Formerly 78k375)
Where former employee had plainly alleged imper-
missible discriminatory and retaliatory reasons for
her firing, and former employer had already put those
matters in issue by denials of those allegations, em-
ployer could not put those matters in issue again via
an affirmative defense asserting that it "terminated
[former employee]'s employment for legitimate busi-
ness reasons following a merger of competitive com-
panies and change in company management"
Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**\*971** David A. Cerda, Cerda & Associates, Chicago,
IL, for Plaintiff
**\*972** Thomas F. Ging, Robert H. Smeltzer, Hinshaw
& Culbertson, Chicago, IL, for Defendant

*MEMORANDUM OPINION AND ORDER*
SHADUR, Senior District Judge
American Medical Response of Illinois, Inc
("American Medical") has filed its Amended Answer
and Affirmative Defenses ("ADs") to the Complaint
brought against it by its ex-employee Anna Men-
chaca ("Menchaca") That pleading was intended to
be responsive to this Court's May 6, 1998 memor-
andum opinion and order that had identified, and had
directed American Medical to correct, several prob-
lematic aspects of the original Answer and ADs But

© 2007 Thomson/West No Claim to Orig U S Govt Works

because that effort has not been fully successful, this follow-up opinion is issued sua sponte to strike two obviously defective aspects of the new pleading

[1] First, AD 1 asserts that because Menchaca filed her Charge of Discrimination (part of Complaint Ex A) on October 14, 1997 and EEOC then issued its right-to-sue letter (also part of Ex A) at the end of the same month (October 30, 1997), Menchaca's action in depriving EEOC of a 180-day time frame to process Menchaca's charge constituted a failure on her part to exhaust the required administrative remedies But that contention is at odds with both the statute and with EEOC's implementing regulation Here in relevant part is 42 U.S.C. § 2000e-5(f)(1):

If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission    the Commission    shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge    by the person claiming to be aggrieved.

And here is the equally relevant part of EEOC's implementing regulation (29 C.F.R. § 1601.28(a)(2)) that permits an aggrieved person to trigger the issuance of a right-to-sue letter *before* expiration of the 180-day time period that is sought to be relied on by American Medical:When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued,    the Commission may issue such notice    at any time prior to the expiration of 180 days from the date of filing the charge with the Commission; provided, that [a designated official] has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.

Both that regulation and right-to-sue letters issued in reliance upon it have been upheld in such cases as *Sims v. Trus Joist MacMillan,* 22 F.3d 1059 (11th Cir.1994), which in material part relied upon and quoted the opinion issued by this Court's colleague Honorable James Moran in *Rolark v. University of Chicago Hosps.,* 688 F.Supp. 401 (N.D.Ill.1988) And Complaint Ex A expressly includes EEOC's de-

terminations that it "will be unable to complete its process within 180 days from the filing of the charge" and that it "is terminating its process with respect to this charge." Those determinations comply directly with the regulation and hence authorize Menchaca's bringing of this action within 90 days after issuance of the right-to-sue letter AD 2 is therefore stricken

[2] Second, AD 3 says this:
AMR terminated Plaintiff's employment for legitimate business reasons following a merger of competitive companies and change in company management

That however does not fit the concept of an AD under Fed.R.Civ.P. 8(c), which requires a responding party to *admit* a complaint's allegations but then permits the responding party to assert that for some legal reason it is nonetheless excused from liability (or perhaps from full liability)-see, e g , *Bobbin v. Victorian House, Inc.,* 532 F.Supp. 734, 736-37 (N.D.Ill.1982), a decision approved in *Heller Financial, Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir.1989) Here Menchaca has plainly alleged impermissible discriminatory and retaliatory reasons for her firing (Complaint ¶¶ 23 and 26), and **\*973** American Medical-having already put those matters in issue by denials of those allegations-not only cannot but need not again do so via an AD Accordingly AD 3 is also stricken

N D Ill ,1998
Menchaca v American Medical Response of Illinois, Inc
6 F Supp 2d 971

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

# EXHIBIT 7

# Westlaw.

436 F.3d 1317
436 F.3d 1317, 77 U.S.P.Q 2d 1481
**(Cite as: 436 F.3d 1317)**

## H

Briefs and Other Related Documents
nCube Corp. v. Seachange Intern., Inc. C.A. Fed. (Del ),2006

United States Court of Appeals,Federal Circuit.
NCUBE CORPORATION (now C-COR Inc.),
Plaintiff-Cross Appellant,

v.

SEACHANGE INTERNATIONAL, INC., Defendant-Appellant.
**No. 03-1341, 03-1366.**

Jan. 9, 2006.
Rehearing and Rehearing En Banc Denied March 1, 2006.

**Background:** Owner of patent for method of providing multimedia data in networked system sued competitor for infringement. The United States District Court for the District of Delaware, Joseph J. Farnan, Jr., J., 313 F.Supp.2d 361, generally upheld jury's finding of infringement and awarded damages and

291XII(C) Suits in Equity
291k319 Damages
291k319(3) k. Right to Increase Damages Awarded Most Cited Cases

**Patents 291 ☞325.11(3)**

291 Patents
291XII Infringement
291XII(C) Suits in Equity
291k325 Costs
291k325.11 Disbursements in General
291k325.11(2) Attorney Fees
291k325.11(3) k. Award to

Plaintiff. Most Cited Cases
Finding that patent infringement was "willful," for purpose of awarding enhanced damages or attorney fees, requires clear and convincing evidence, in view of totality of circumstances, that defendant acted in disregard of patent and lacked reasonable basis for believing it had right to do what it did. 35 U.S.C.A. §§ 284, 285.

436 F 3d 1317                                                    Page 2
436 F 3d 1317, 77 U S P Q 2d 1481
**(Cite as: 436 F.3d 1317)**

ent case is reviewed for abuse of discretion. 35
U.S.C.A. §§ 284, 285.

**[4] Courts 106 ☞96(7)**

106 Courts
   106II Establishment, Organization, and Procedure
      106II(G) Rules of Decision
         106k88 Previous Decisions as Controlling
or as Precedents
           106k96 Decisions of United States
Courts as Authority in Other United States Courts
             106k96(7) k Particular Questions or
Subject Matter  Most Cited Cases
Motion for new trial in patent case is procedural issue
governed by regional circuit law.

**[5] Patents 291 ☞101(2)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k Construction in General
Most Cited Cases

**[7] Patents 291 ☞312(5)**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity
         291k312 Evidence
           291k312(3) Weight and Sufficiency
             291k312(5) k Particular Patents
Most Cited Cases
Finding that infringement of patent for method of
providing multimedia data in networked system was
willful was supported by evidence that defendant in-
tentionally failed to supply important technical docu-
ment to its opinion counsel

**[8] Patents 291 ☞227**

291 Patents
   291XII Infringement
      291XII(A) What Constitutes Infringement
         291k227 k Intent or Purpose, and Know-
ledge Most Cited Cases
Actual notice of another's patent rights triggers af-
firmative duty of due care to avoid infringement

Page 3

436 F 3d 1317
436 F 3d 1317, 77 U S P.Q 2d 1481
(Cite as: 436 F.3d 1317)

through circumstantial evidence. 35 U.S.C.A. § 271(b)

**[11] Patents 291 ☞312(8)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k312 Evidence
        291k312(3) Weight and Sufficiency
          291k312(8) k Participation, Intent, and Contributory Infringement. Most Cited Cases
Finding that defendant induced infringement of patent for method of providing multimedia data in networked system was supported by evidence that it sold systems without relevant component to customers whose networks already contained their own version of relevant component 35 U.S.C.A. § 271(b)

**[12] Patents 291 ☞325.11(2.1)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity

**[14] Patents 291 ☞237**

291 Patents
  291XII Infringement
    291XII(A) What Constitutes Infringement
      291k233 Patents for Machines or Manufactures
        291k237 k Substitution of Equivalents Most Cited Cases
Plaintiff asserting patent infringement under doctrine of equivalents must present evidence and argument concerning doctrine and each of its elements; evidence and argument on doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement

**Patents 291 ☞328(2)**

291 Patents
  291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
    291k328 Patents Enumerated
      291k328(2) k. Original Utility. Most Cited Cases

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

Circuit Judge, and <u>DYK</u>, Circuit Judge
Opinion for the court filed by Circuit Judge <u>RADER</u>
Dissenting opinion filed by Circuit Judge <u>DYK</u>

#### *1319 Background

<u>RADER</u>, Circuit Judge
After the U S District Court for the District of
Delaware construed the relevant claims, a jury found
SeaChange International, Inc (SeaChange) to have
willfully infringed, literally and under the doctrine of
equivalents, claims 1-4, 6-10, 12, and 14 of nCube
Corporation's (nCube's) <u>U.S. Patent No. 5,805,804</u>
<u>(Sept. 8, 1998) (the '804 patent)</u> The trial judge
denied SeaChange's motions for Judgment as a Mat-
ter of Law (JMOL) on literal infringement, willful-
ness, and indirect infringement for incomplete sys-
tems sold to Scientific-Atlanta Corp , but vacated the
jury's verdict of infringement under the doctrine of
equivalents The judge also denied SeaChange's mo-
tion requesting a new trial, and awarded nCube
double its actual damages and two-thirds of its attor-
ney fees Because the court properly decided the
JMOL motions, this court affirms Because the trial
court did not abuse its discretion in making its dam-

[find willful infringement] under the clear and con-
vincing evidence standard " <u>Braun, Inc. v. Dynamics</u>
<u>Corp. of Am., 975 F.2d 815, 822-23 (Fed.Cir.1992)</u>

[2][3] This court reviews a district court's exceptional
case finding for clear error <u>Pharmacia & Upjohn Co.</u>
<u>v. Mylan Pharms., Inc., 182 F.3d 1356, 1359</u>
<u>(Fed.Cir.1999)</u> Criteria for declaring a case excep-
tional include willful infringement, bad faith, litiga-
tion misconduct, and unprofessional behavior See
<u>Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566,</u>
<u>1574 (Fed.Cir.1996)</u> This court reviews increased
damages awards or attorney fees for abuse of discre-
tion <u>Electro Scientific Indus., Inc. v. Gen. Scanning</u>
<u>Inc., 247 F.3d 1341, 1349 (Fed.Cir.2001)</u>

[4] The denial of a motion for a new trial is a proced-
ural issue not unique to patent law which this court
reviews under the law of the appropriate regional cir-
cuit-in this case, the United States Court of Appeals
for the Third Circuit <u>Union Carbide Chems. &</u>
<u>Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167,</u>
<u>1182 (Fed.Cir.2002)</u> The Third Circuit reviews a dis-
trict court's decision whether to grant a new trial on

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
**(Cite as: 436 F.3d 1317)**

a downstream manager sending a stream of said mul-
timedia data from said appropriate service on said
server to said client, said downstream manager being
coupled to a second network; and

a connection service for maintaining information to
connect said client, said upstream manager, said
downstream manager, and said appropriate service on
said server

In the invention, as shown in Fig 6 from the '804 pat-
ent below, the client communicates his desires to the
system using a client device 110 The upstream man-
ager 220 accepts a message, e g , a request for a par-
ticular service, from the client device and routes them
to the media server service 322, which will supply
that service

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)



436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
**(Cite as: 436 F.3d 1317)**

The client may request such services as interactive shopping, news, games, education, movies, etc The downstream manager 210 sends the data, i e , the requested service, to the client device 110 (Col 16, ll 11-18) The additional elements in the figure deal with managing the requested service data flows to the requesting client, including obtaining and associating the addresses of the client and the appropriate media server

**\*1321** This court must interpret the terms governing operation of an "upstream manager" and use of addresses in the invention As mentioned, the invention of the '804 patent allows the client to receive requested material from different types of networks This function, in turn, requires the invention to accommodate the addressing schemes of each separate network, which may differ from one another In order to accommodate the different types of addresses for each data link, the network protocol of the invention superimposes its own independent addresses on top

(d) receive and route *all* messages from clients that are "bound for" services, and (e) must do so using only logical, not physical, addresses, of both sender and receiver of a message SeaChange also reserves an argument of noninfringement even under the court's claim construction

The district court's claim construction correctly does not require the upstream manager to receive and route *all* messages from a client bound for a server The patent claims require that the upstream manager receive messages from the client and the downstream manager send data to the client, but do not make these the exclusive functions of the units Figures 1, 2, and 6 of the specification show that the paths from the client to the upstream manager are unidirectionally upward, and from the downstream manager to the client unidirectionally downward, and the text of the specification reflects this asymmetry (Col 3, ll 21-22 ) However, the specification describes only one embodiment of the invention, and encompasses divergence from that embodiment: "[i]t may be the

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
**(Cite as: 436 F.3d 1317)**

Page 8

sage includes the client's downstream logical address and a service destination logical address, is specifically described in unasserted claims 5 and 11 Claim 1 does not describe an upstream manager that *1322 requires routing only with logical addresses To read a requirement for use of logical addresses into claim 1 would impermissibly read the "virtual connection" limitation of claim 2 into claim 1, making these claims redundant *See, e g , LizardTech, Inc. v. Earth Res. Mapping, Inc.,* 424 F.3d 1336, 1344 (Fed.Cir.2005) In this case, the claim term "upstream manager" is not "so amorphous that one of skill in the art can only reconcile the claim language with the inventor's disclosure by recourse to the specification " *Comark Comme'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed.Cir.1998) It is clear that the upstream manager of claim 1 routes messages This court need not interpret what the patentee meant by "upstream manager" in this claim by importing the limitation of claim 2 into this term See *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.1988) (holding that it is improper to read a limitation "into a claim from the spe-

436 F 3d 1317
436 F .3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)



436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

#### *1323 B *Infringement*

[6] SeaChange's systems, used by cable TV networks, are illustrated below

In these systems, the hardware is part of a uniform network although the physical connections within the network may be of various physical types, such as coaxial cable or optical fiber Addressing protocols are uniform throughout these systems To receive a particular program, a client requests the program from the CM block through the block labeled DNCS The CM then finds a free transmission channel, assigns the desired program to the free channel, and instructs the client to "tune" to that channel In SeaChange's Cable TV systems, the only message received (and "routed") from the client is the request for service, which the DNCS routes to the CM The client may interact with the service, to start, stop, rewind, etc , but that interaction is directly with the service provider

the DNCS is an upstream manager The jury was also presented with evidence from SeaChange's technical documents which, it could have concluded, confirmed Dr Schonfeld's opinion that SeaChange's DNCS receives messages and performs routing SeaChange does not cite any expert or other testimony presented to the jury that contradicts Dr Schonfeld's opinion

SeaChange argues to this court that this expert opinion is contradicted by the factual record and thus cannot support the jury's verdict *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)* ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict ") However, Dr Schonfeld supported his opinion by relying on SeaChange's own technical documents Although the jury was not required to accept that opinion, even if it was not con-

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

See *Rolls-Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1109 (Fed.Cir.1986). Willful infringement in this case hinges on when the defendants had actual knowledge of plaintiff's patent rights, and their actions after that time. nCube does not argue that SeaChange knew of the '804 patent before it filed suit, but rather attacks Seacube's reliance on the opinion letter it obtained after suit was filed nCube asserts that the opinion letter, which counsel shared with SeaChange management, was flawed because SeaChange manipulated the information given to counsel to ensure an opinion of non-infringement nCube also casts doubt on the trustworthiness of the letter because SeaChange produced early drafts of the letter only after trial

The record shows that at least one important technical document was not supplied to SeaChange's opinion counsel Thus, "the best information [was] intentionally not made available to counsel during the preparation of the opinion, [so that] the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement " *Comark,* 156 F.3d at 1191. Therefore the record contains substantial evid-

overall verdict of infringement

On appeal, SeaChange argues that sales of its systems to customers using Scientific-Atlanta network equipment could not constitute indirect infringement SeaChange asserts that there is no evidence that it knew that these sales would result in actual infringement of the patent, so that SeaChange could not have intended to induce infringement

[9] To show intent for indirect infringement, "a patentee must be able to demonstrate at least that the alleged inducer had knowledge of the infringing acts " *MercExchange, LLC v. eBay, Inc.,* 401 F.3d 1323, 1332 (Fed.Cir.2005) SeaChange argues that it did not have such knowledge because it did not know of nCube's infringement allegations until this lawsuit was filed, and at that time it consulted counsel, who advised that the design of its system did not infringe the '804 patent In its finding of willfulness, however, the jury found otherwise

[10][11] A patentee may prove intent to induce infringement through circumstantial evidence *Meta-*

436 F.3d 1317
436 F.3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

[13] The trial court awarded enhanced damages on the basis of the jury's willfulness finding and the *Read* factors for enhancing damages *See Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed.Cir.1992)* Most importantly, the court found that the case for literal infringement was not close. Moreover, SeaChange deliberately copied the invention in its products without investigating the scope of the patent Thus, SeaChange had not formed a good faith belief excusing its conduct Accordingly, the trial court declared this an exceptional case under 35 U.S.C. § 285 and awarded attorney fees This court detects no clear error in any of the court's subsidiary factual findings leading to its conclusion that this was an exceptional case Further, this court perceives no abuse of discretion in the trial court's award of attorney fees

### E *Denial of Motion for New Trial*

As discussed above, the weight of the evidence was sufficient for the jury's verdicts on literal infringement, willfulness, and indirect infringement Therefore, this court sustains the district court's denial of a new trial

valents cannot merely be subsumed in plaintiff's case of literal infringement " *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc., 873 F.2d 1422, 1425 (Fed.Cir.1989)* (Internal citations omitted) (Emphasis in original) Not having satisfied this evidentiary burden, nCube's arguments do not persuade this court

### *1326 Conclusion

For the reasons stated above, this court affirms the trial court's denials of JMOL on literal infringement and willfulness for all of the systems it sold, its award of enhanced damages and attorney fees, its grant of JMOL on the jury verdict of infringement under the doctrine of equivalents, and its denial of defendant's motion for a new trial

### COSTS

Each party shall bear its own costs

### *AFFIRMED*

DYK, Circuit Judge, dissenting
While I agree with much of the majority opinion, I

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

Page 13

in a networked system, said server comprising:

an *upstream manager* receiving messages from said client and routing said messages to an appropriate service on said server, said *upstream manager* being coupled to a first network;

a downstream manager sending a stream of said multimedia data from said appropriate service on said server to said client, said downstream manager being coupled to a second network; and

a connection service for maintaining information to connect said client, said *upstream manager,* said downstream manager, and said appropriate service on said server

Col 25 ll 1-16 (emphases added) The server stores and manages various types of data, including audio and video, and sends that data to client devices upon request Col 2 ll 31-38 The component of the server that sends the data to the clients is called a "service "

The client and server communicate via components called the "upstream manager" and "downstream manager " "The upstream manager 220(USM) accepts messages from [client devices] and routes them

vention resolves this problem by "defin[ing] its own independent address space," called a "logical" address space *Id.; see generally* Col 12 l 31-Col 15 l 56 A logical address "reflect[s] the administrative or functional relationships [among the addressed entities] " *Oxford, supra* at 9.<sup>FN1</sup> Data packets that are sent between the server and client are routed using this logical addressing scheme. The specification states that "*[i]t is important to note that all routing is accomplished based on logical addresses. not physical addresses* " Col 23 ll 1-2 (emphasis added)

> FN1. A telephone number is an example of a logical address, while the port to which the telephone is connected is a physical address *Newton's Telecom Dictionary* 645 (21st ed 2005) "A logical address    may have no fixed physical address " *Id.* That is, a person might move from one home to another, keeping the same telephone number

The "upstream manager" is a key component in this system, and is required by every claim in the '804 patent The district court construed the term

436 F.3d 1317
436 F.3d 1317, 77 U.S.P.Q.2d 1481
**(Cite as: 436 F.3d 1317)**

have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed.Cir.2005) (en banc) (internal citations omitted). The specification plays a key role in determining this meaning: "the specification is 'always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)) Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316; *see also E-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed.Cir.2005) (restricting the meaning of the claim term "releasably attaching" to require that the attached components be easily removed and replaced) Here, the construction of "upstream manager" that most naturally aligns with **\*1328** the '804 patent's description of the invention requires the use of logical addressing

11-15 The specification reveals that the upstream manager accomplishes this routing using logical addressing The patent describes the upstream manager and downstream manager as a "gateways that bridge ... different types of networks." The upstream manager bridges these different types of networks by routing messages (which contain only logical addresses) from clients to their server destinations. Col 16 ll 24-25. The downstream manager completes the bridge by directing the downstream data stream to its ultimate destination. As noted above, the use of the independent, logical addressing scheme "hides the many different types of [physical] addresses in use" in the underlying networks Col 13 ll 14-15. Because these physical addresses are hidden, the client device is relieved of the burden of identifying the upstream physical destinations of the messages it sends; it relies on the upstream manager to perform this routing function

Nowhere does the '804 patent disclose or suggest that the upstream manager routes messages from a client using physical, as opposed to logical addresses. Indeed, if the upstream manager could not route mes-

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
(Cite as: 436 F.3d 1317)

be construed as limited to that embodiment *See. e g . Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.Cir.2004).* However, the claims will be read restrictively if the patentee has demonstrated a clear intention to limit the claim scope *Id.; see also *1329 Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed.Cir.2002)* Moreover, "the characterization of [a limitation] as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure " *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed.Cir.2001); see also Wang Labs., Inc. v. America Online, Inc., 197 F.3d 1377, 1383 (Fed.Cir.1999); Modine Mfg. Co. v. U.S. Int'l Trade Comm'n, 75 F.3d 1545, 1551 (Fed.Cir.1996)*

Here, the patentee clearly demonstrated that the upstream manager accomplishes routing by logical addressing The specification characterizes the "present invention" as including the logical addressing limitation:

"[b]ecause a packet may travel through several different types of underlying networks, each with their own [physical] addressing schemes, the network protocol

reading claim 1 to include logical addressing does not make the two claims redundant, because claim 1 does not contain a requirement that the *connection service* create a virtual connection Claim 2 adds simply that requirement There is thus no inconsistency in reading "upstream manager" in claim 1 to require logical addressing

Third, the majority points out that unasserted claims 5 and 11 specifically refer to logical addresses Maj Op at 1321 - 1322 In contrast, the asserted claims do not The majority suggests that the presence of the references to logical addresses in the unasserted claims indicates that the omission of logical addresses from the asserted claims was intentional; hence, the asserted claims do not require logical addressing *Id*

In my view the majority misreads claims 5 and 11 to add the requirement that routing be accomplished by logical addressing *Id* Rather, these claims simply recite a specific means of using logical addresses that are already required by the upstream manager Claim 5 recites:

436 F 3d 1317
436 F 3d 1317, 77 U S P Q 2d 1481
**(Cite as: 436 F.3d 1317)**

Therefore the omission of the term "logical address" from the asserted claims does not reflect the claimant's intent that logical addressing not be part of those claims  The same analysis applies to Claim 11, which rewrites Claim 4 in means-plus-function form FN2

> FN2. Claim 11 recites:
>
> 11  The server as claimed in claim 10 further including:
>
> means for receiving a service request message from said client via said upstream manager, said service request corresponding to said service on said server, said service request message including said client downstream logical address and a service destination logical address;
>
> means for generating a response message to said client, said response message including said client downstream logical address; and
>
> means for sending said response message to said client via said downstream manager
>
> Col  26, ll  32-46  Claim 11 describes a server which includes several means directed to

for Defendant-Appellant (Feb  10, 2005)

• 2005 WL 1178109 (Appellate Brief) Cross-Appellant Brief for Plaintiff-NCube Corporation (Jan 03, 2005)

• 2004 WL 3335255 (Appellate Brief) Brief for Defendant-Appellant (Nov  22, 2004)

• 03-1366 (Docket) (May  02, 2003)

• 03-1341 (Docket) (Apr  21, 2003)

END OF DOCUMENT

EXHIBIT 8

Westlaw.

970 F.2d 816
970 F.2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

Page 1

▷

Briefs and Other Related Documents

Read Corp. v. Portec, Inc. C A Fed. (Del ),1992
United States Court of Appeals,Federal Circuit
The READ CORPORATION and F.T. Read & Sons,
Inc., Plaintiffs-Appellees,

v

PORTEC, INC., d/b/a Portec/Kolberg Division, De-
fendant-Appellant
No. 91-1069.

July 10, 1992
Rehearing Denied and Suggestion for Rehearing In
Banc Declined Sept. 23, 1992.

In action for infringement of patents for portable
loam screening apparatus, the United States District
Court for the District of Delaware, Jane R. Roth, J,
748 F.Supp. 1078, denied defendant's motion for
JNOV and held defendant liable for infringement and
awarded treble damages and attorney fees. Defendant
appealed. The Court of Appeals, Nies, Chief Judge,

and Findings

    170Bk846 k. Substantial Evidence  Most
Cited Cases

Party seeking to overturn jury verdict must establish
that jury's findings of disputed material factual issues,
presumed or expressed, are not supported by substan-
tial evidence, or, if they were, that legal conclusions
implied from jury's verdict cannot in law be suppor-
ted by those findings

[2] Patents 291 ⬥226.6

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject
Matter
            291k226.6 k  Comparison with Claims of
Patent  Most Cited Cases

In determining whether patent is infringed, language
of claim must first be interpreted, and then accused
device must be compared to claim language as inter-

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

Page 2

equivalents.

**[4] Patents 291 🗝237**

291 Patents
   291XII Infringement
     291XII(A) What Constitutes Infringement
       291k233 Patents for Machines or Manufactures

        291k237 k. Substitution of Equivalents.
Most Cited Cases
Under "doctrine of equivalents," patentee must show that accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result; the "substantially the same way" prong of the test may be met if equivalent of recited limitation has been substituted in accused device

**[5] Patents 291 🗝314(5)**

291 Patents
   291XII Infringement
     291XII(C) Suits in Equity

       291k168(1) k. In General  Most Cited
Cases
One must look to language of patent claim and patent's specification and prosecution history to properly interpret scope of claim.

**[7] Patents 291 🗝235(2)**

291 Patents
   291XII Infringement
     291XII(A) What Constitutes Infringement
       291k233 Patents for Machines or Manufactures

        291k235 Identity of Principle or Mode of
Operation

        291k235(2) k. Particular Patents or
Devices. Most Cited Cases
Patent for portable loam screening apparatus was infringed by defendant's device; claim limitation requiring short end to be close to the ground did not require short end to actually touch the ground and accused device met this claim language literally, and accused device's substituted structure of one or two retractable footpads was equivalent to retractable

970 F 2d 816

970 F 2d 816, 23 U S P Q 2d 1426

**(Cite as: 970 F.2d 816)**

291III(A) Invention; Obviousness

291k28 k  Designs  Most Cited Cases

Nonornamentality or functionality of parts of device does not necessarily preclude patentability of overall design  35 U.S.C.A. § 171

**[10] Patents 291 ⬠252**

291 Patents

291XII Infringement

291XII(A) What Constitutes Infringement

291k252 k  Patents for Designs  Most Cited

Cases

Where design is composed of functional as well as ornamental features, to prove infringement, patent owner must establish that ordinary person would be deceived by reason of common features in claimed and accused designs which are ornamental

**[11] Patents 291 ⬠252**

291 Patents

291XII Infringement

291XII(A) What Constitutes Infringement

291XII(C) Suits in Equity

291k319 Damages

291k319(3) k  Right to Increase Damages Awarded  Most Cited Cases

Paramount determination in deciding to award enhancement damages for patent infringement, and amount thereof, is egregiousness of defendant's conduct based on all facts and circumstances; court must consider factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating  35 U.S.C.A. § 284

**[14] Patents 291 ⬠323.1**

291 Patents

291XII Infringement

291XII(C) Suits in Equity

291k323 Final Judgment or Decree

291k323.1 k  In General  Most Cited

Cases

To enable appellate review, district court is obligated to explain basis for award of enhanced damages for patent infringement, particularly where maximum amount is imposed; for the latter, court's assessment

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

patented device, defendant made specific changes deemed adequate by counsel to avoid infringement 35 U.S.C.A. § 285

**[16] Patents 291 ☜227**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k227 k Intent or Purpose, and Knowledge Most Cited Cases

One who has actual notice of another's patent rights has affirmative duty to respect those rights; that affirmative duty normally entails obtaining advice of legal counsel, although absence of such advice does not mandate finding of willful infringement

**[17] Patents 291 ☜283(1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k283 Defenses
                291k283(1) k In General Most Cited

291XII Infringement
    291XII(C) Suits in Equity
        291k325 Costs
            291k325.11 Disbursements in General
                291k325.11(2) Attorney Fees
                    291k325.11(3) k Award to
Plaintiff. Most Cited Cases

Before finding misconduct and awarding attorney fees based on absence of hitch from photograph of device introduced in attempt to show that patent claims were invalid, court had to consider defendant's surrebuttal evidence explaining absence of hitch 35 U.S.C.A. § 285

**[20] Patents 291 ☜325.11(2.1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k325 Costs
                291k325.11 Disbursements in General
                    291k325.11(2) Attorney Fees
                        291k325.11(2.1) k In General.
Most Cited Cases

970 F.2d 816

970 F.2d 816, 23 U.S.P.Q.2d 1426

**(Cite as: 970 F.2d 816)**

Patents 291 🖘328(2)

291 Patents

   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents

      291k328 Patents Enumerated

         291k328(2) k. Original Utility. Most Cited Cases

4,197,194 Infringed

**\*817** Jack R. Pirozzolo,Willcox, Pirozzolo & Mc-Carthy, Boston, Mass., argued for plaintiffs-appellees.**\*818** With him on the brief was Richard L. Binder Also on the brief was Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, of Wilmington, Delaware

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D C, argued for defendant-appellant. With him on the brief was Barry W. Graham.

Before NIES, Chief Judge, ARCHER, and MICHEL, Circuit Judges.

NIES, Chief Judge.

James L. Read is the president of Read and the named inventor in both the '194 and '836 patents. The '194 patent is directed to a portable loam screening apparatus for separating fine earth material from coarser materials The '836 patent is directed to an ornamental design of such a screening apparatus. Below are figures from each of the patents:

970 F.2d 816
970 F.2d 816, 23 U.S.P.Q.2d 1426
**(Cite as: 970 F.2d 816)**



Fig. 1 of '194 patent    Fig. 6 of '836 patent

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

-----

As seen above, the apparatus has a generally rectangular frame 12, made up of "tall end" 14 and "short end" 16 which are joined together by sides Hitch 34 is attached to side 18 and wheels 36 are attached to the fourth side 20 The wheels are movable relative to the frame between an extended position where the weight of the apparatus is on the wheels, so that the apparatus can be transported, and a retracted position, as shown in Figure 1, so that the weight is transferred to the frame during operation

In operation, a load of loam and coarse materials is dumped from a payloader over the tall end on to the vibrating screens 30 and 32 The screens are sloped so that, **\*819** when material is deposited on them, the finer material passes through the screens while the coarser material rolls off the screens and falls outside the frame next to short end 16 The tall end 14 of the apparatus is completely open (visible in Fig 6) so that the payloader can drive within the frame to scoop

wardly from near the upper edge of said tall end to near the upper edge of said short end;
*a set of wheels mounted to one of said sides and movable relative to said frame from an operative position for transporting said apparatus to an inoperative position for resting said frame flush on the ground,* and a trailer hitch mounted to the other of said sides.

(Emphasis added )

As will become evident *infra,* critical to this case are the claim limitations requiring the short end to be closed "to the ground" and a set of wheels which are "movable relative to said frame" from "an operative position" to "an inoperative position for resting said frame flush on the ground."

U S Patent Application Serial No 947,380, from which the '194 patent issued, was filed October 2, 1978, with 11 claims. Claim 2 as originally filed did not contain any wheels limitation, and required only that the short end be "closed." The examiner rejected

970 F.2d 816                                                                                               Page 8
970 F.2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

tion of the frame to a payloader and the relation of where the short end's "closed" characteristics begin and end

Claim 2 and the other independent claims were thereafter amended, by examiner's amendment, to include, among other things, the requirement that the short end be closed "to the ground " The claims were subsequently allowed.

Read has been making screening devices in accordance with its invention since the late 1970's under the name "Read Screen-All " In December of 1984, officials from Portec met with James Read to discuss a possible acquisition of Read by Portec Those discussions proved fruitless, and *820 Portec began to consider whether it could produce a device to compete with the Read Screen-All

In doing so, Portec obtained a written opinion by patent attorney Emory Groff, Jr, concerning the '194 and '836 patents in January of 1985 This opinion is very general, as it was prepared before Portec had done any significant development work With respect

linger and Valiquet discussed several possibilities for designing around the claims of the '194 patent, including "wheels which are not movable relative to the frame and not moving the frame onto the ground," and a "completely open short end "

Over the next several months, Portec developed design drawings for its proposed portable screening device This screening device had two features designed to avoid infringement of the '194 patent: (1) the bottom of the short end ended about six inches from the ground; and (2) fixed wheels and a "footpad" attached to each side of the frame replaced the retractable wheels The footpads were long metal bars which extended the entire length of the sides and which were movable relative to the frame by hydraulic cylinders The footpads could be extended so as to lift the wheels off the ground, placing the weight of the device on the footpads.

Drawings of this design were given to Valiquet for an analysis of infringement of both the '194 and '836 patents Valiquet concluded, in a written opinion dated September 25, 1987, that Portec's proposed

device, Portec sent these drawings to Valiquet, who, in a letter dated November 25, 1987, again confirmed his opinion of noninfringement Portec began making its portable screening device shortly thereafter

Read brought the present suit in January of 1988, charging Portec with infringement of the '836 patent and claims 2 and 7 of the '194 patent. Portec denied infringement*821 and also asserted that the two patents were invalid on various grounds.

During pendency of the suit, Portec made several changes to its device in order to further distinguish it from that of the '194 and '836 patents One of these changes arose from the discovery by Portec's customers that its device worked satisfactorily with only the front footpad (the one adjacent the hitch) lowered, so that at least part of the weight of the device remained on the wheels. Thus, Portec began making a new device which had only a single footpad located on the side adjacent to the hitch The other changes were ornamental, designed to further make Portec's device, particularly the fender portion, look different from that of the '836 patent (See appendix.)

substantial evidence or,

[2] if they were, that the legal conclusion(s) implied from the jury's verdict cannot in law be supported by those findings [Citations omitted ]

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), *cert denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984) The "substantial evidence" standard for reviewing a finding of fact raises the question whether the jury's resolution of a factual dispute was *reasonable* See *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 417, 8 USPQ2d 1692, 1694 (Fed.Cir.1988), *cert denied.* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). A finding of fact must stand unless appellant shows that on the entirety of the evidence of record, including that which detracts from the weight of the favorable evidence, and taking into account the required quantum of proof, no reasonable juror could have made the finding *See Perkin-Elmer,* 732 F.2d at 893, 221 USPQ at 673; *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1512-13, 220 USPQ 929, 936 (Fed.Cir.), *cert denied.* 469 U.S. 871, 105 S Ct 220, 83 L.Ed.2d 150 (1984) The

970 F.2d 816
970 F.2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

Page 10

fied, infringement may be found in appropriate cir-
cumstances **\*822** under the doctrine of equivalents
_Pennwalt Corp. v. Durand-Wayland, Inc._, 833 F.2d
931, 935-36, 4 USPQ2d 1737, 1738-40
(Fed.Cir.1987) (in banc), _cert denied._ 485 U.S. 961,
1009, 108 S.Ct. 1226, 1474, 99 L.Ed.2d 426, 703
(1988)

[4] Under the doctrine of equivalents, a patentee must
show that the accused device performs substantially
the same function, in substantially the same way, to
achieve substantially the same result _Graver Tank &
Mfg. Co. v. Linde Air Prods. Co._, 339 U.S. 605, 607,
70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950) "The
'substantially the same way' prong of the test may be
met if an equivalent of a recited limitation has been
substituted in the accused device " _Malta v.
Schulmerich Carillons, Inc._, 952 F.2d 1320, 1325-26,
21 USPQ2d 1161, 1164-65 (Fed.Cir.1991), _cert
denied._ 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d
566 (1992) Thus, infringement requires that each
limitation of a claim be met exactly or by a substan-
tial equivalent [FN2]

doctrine of equivalents cover a pencil and
_vice versa_

In the present case, Portec argues that no reasonable
jury could have found claims 2 and 7 of the '194 pat-
ent, properly construed, to be infringed, either liter-
ally or under the doctrine of equivalents While ac-
knowledging that all other limitations are met, Portec
maintains (1) the "short end closed to the ground"
limitation must be interpreted as meaning _completely_
closed, _i e_. actually touching the ground, and (2) the
claim language describing the structure for convert-
ing the device from a portable to a rest position cov-
ers only retractable wheels Because its device does
not satisfy this claim language, Portec contends there
is no literal infringement Furthermore, Portec argues
that the prosecution history of the '194 patent pre-
vents a finding that Portec's substitution of a short
end terminating six inches above the ground and its
substitution of one or two retractable footpads for re-
tractable wheels are equivalents to the claimed struc-
ture and thus there can be no infringement of claims
2 and 7 under the doctrine of equivalents

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

law in ruling on the JNOV motion *See Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1550, 220 US-PQ 193, 200 (Fed.Cir.1983)* (while not *reversible* error to submit legal issue to jury, "question of law [is] decidable by the court in response to a motion for JNOV"). The district court here, in ruling on the JNOV, held that the word "to" in context meant the short end may be either on or near the ground

> FN3. *See Jamesbury Corp. v. Litton Indus. Prods., Inc., 756 F.2d 1556, 1564-65, 225 USPQ 253, 259-60 (Fed.Cir.1985)* ("[district] court should instruct the jury on what the claim means"); *Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 721, 223 USPQ 1264, 1275 (Fed.Cir.1984)* ("claim interpretation [is] matter for the court to decide and to make known to the jury by its instructions"). *But see Tol-O-Matic, Inc. v. Proma Produkt-Und Marketing Gesellschaft M.b.II., 945 F.2d 1546, 20 USPQ2d 1332 (Fed.Cir.1991)* We endorse the earlier precedent

accused device are identical with respect to the *frame* in both devices being closed to the ground We conclude, therefore, as a matter of law, that the district court was correct in its interpretation of this language Further, viewing the evidence presented at trial in a light most favorable to Read, we conclude that the jury could reasonably find therefrom that the short end of the Portec device met this claim language literally

The second limitation in dispute requires that the wheels be "movable relative to said frame" from an operative to "an inoperative position for resting said frame flush on the ground " The specification and drawings of the '194 patent show only wheels that lift up Read argues nonetheless that this limitation is met literally by Portec's fixed wheels and extendable footpad structure Although in Portec's device the frame (*i e ,* footpad(s)) moves, rather than the wheels, this limitation per Read is literally met because the "movability" of the wheels is in terms of "movable" *relative* to the frame We disagree with this characterization and conclude that substantial evidence does not support a finding that the claim language "wheels

970 F.2d 816
970 F.2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

the one or two footpad arrangement of Portec's device, albeit less effectively by the *824 one footpad arrangement. When extended, the footpad becomes an extension of the frame "flush on the ground" which removes weight from the wheels. While Read stated during prosecution that failure would be likely where *all* of the weight is distributed to the wheels, except at a very high cost of construction, this statement does not translate, as argued by Portec, into a requirement that to find equivalency none of the weight can be distributed to the wheels during the device's operation. The claim does not exclude some weight remaining on the wheels. In sum, a finding of equivalency to the required limitation is supported by substantial evidence.

[8] With respect to prosecution history estoppel, Portec argues that Read added the movable wheels limitation in response to the Examiner's rejection of several of Read's original claims which did not specify any wheels. However, in the same rejection, the Examiner refused to allow claims which *had* the movable wheels limitation, based upon the very same prior art which was cited against the claims which

970 F.2d 816
970 F.2d 816, 23 U.S.P.Q.2d 1426
**(Cite as: 970 F.2d 816)**



970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

-----

Read pointed out differences not only respecting the wheels, including that they were not collapsible and were in a different location (on the side, not the end) but also marked differences in *other* parts of the structure Thus, any estoppel created by Portec's argument encompasses *all* of these *combined* distinctions of Deister and not an estoppel respecting *each* of the *individual* differences, e g , that any device with non-movable wheels cannot infringe [FN4] That feature in itself was never asserted to be the basis for patentability over Deister Thus, there is no basis for an assertion that **\*825** Read is seeking to recapture anything which was surrendered to obtain the patent, the essence of the prosecution history estoppel *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 882, 20 USPQ2d 1045, 1054 (Fed.Cir.1991)*

> FN4. Acceptance of Portec's argument respecting estoppel for each item in a pat-

## C *The '836 Patent*

Portec asserts that the district court erred in denying JNOV on the issues of validity and infringement of the '836 patent Having reviewed the evidence of record, we agree with Portec that substantial evidence does not support the jury's verdict of infringement under the correct legal standard for infringement of a design patent

[9] The patent statute in 35 U.S.C. § 171 provides for patentability of "new, original and ornamental designs " The nonornamentality or functionality of the parts of a device does not necessarily preclude patentability of the overall design *Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1563, 7 USPQ2d 1548, 1553 (Fed.Cir.1988)* Nevertheless, in that case, "it is the non-functional, design aspects that are pertinent to determinations of infringement " *Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1188, 5 USPQ2d 1625, 1627 (Fed.Cir.1988)* (footnote omitted)

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase on supposing it to be the other, the first one patented is infringed by the other

[10] Read misperceives the holding of *Gorham* *Gorham* sets forth the standard of infringement of an ornamental design In *Gorham,* however, there was no preliminary issue respecting what the ornamental features of the design in issue were The *Gorham* design patent claimed only the scroll work on the handle portion of table flatware The tines or the bowl of the utensils did not appear in the patent Thus, all elements forming the claimed design were ornamental Where this is not the case, that is, a design is composed of functional as well as ornamental features, to prove infringement a patent owner must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental. *Lee,* 838 F.2d at 1188, 5 USPQ2d at 1627.

damages was attributed to infringement of the '194 patent; nothing was awarded for infringement of the '836 patent Inasmuch as the quantum of damages prior to enhancement is not at issue, we need not remand for redetermination of damages However, the injunction must be modified on remand

## D  *Enhanced Damages*

[12] Under section 284 of Title 35, damages may be enhanced *up to* three times the compensatory award An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court While no statutory standard dictates the circumstances under which the district court may exercise its discretion, this court has approved such awards where the infringer acted in wanton disregard of the patentee's patent rights, that is, where the infringement is willful *Great Northern Corp. v. Davis Core & Pad Co.,* 782 F.2d 159, 166, 228 USPQ 356, 360 (Fed.Cir.1986) *See also Mathis v. Spears,* 857 F.2d 749, 754, 8 USPQ2d 1029, 1033 (Fed.Cir.1988) ("Provisions for increased damages  are available as deterrents to blatant,

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

1071, 1074, 1990 WL 10345 (D.N.J.1990) ("A fifty-percent enhancement of damages is appropriate here Although SMEC's infringement was willful, it was not blatant."); *and Chisum v. Brewco Sales & Mfg.,* 726 F.Supp. 1499, 13 USPQ2d 1657, 1668 (W.D.Ky.1989) ("The lost profits will however be doubled rather than tripled, since we find that Brewer's actions were willful, but not so egregious as to warrant trebling of the damages ") In *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed.Cir.1986), three factors were identified for consideration in determining when an infringer "acted in [such] bad faith as to merit an increase in damages awarded against him":

*827 (1) whether the infringer deliberately copied the ideas or design of another; FN7

> FN7. "Ideas" and "design" would encompass, for example, copying the commercial embodiment, not merely the elements of a patent claim

(2) whether the infringer, when he knew of the other's

USPQ 1302, 1312 (E.D.La.1982) (Exemplary damages "should not unduly prejudice the defendants' non-infringing business "), *aff'd,* 761 F.2d 649, 225 USPQ 985 (Fed.Cir.), *cert denied.* 474 U.S. 902 [106 S.Ct. 230, 88 L.Ed.2d 229] (1985)

(5) Closeness of the case *Modine Mfg. Co. v. The Allen Group,* 917 F.2d at 543, 16 USPQ2d at 1626 (No abuse of discretion to award no enhanced damages on the ground that willfulness was "sufficiently close on the evidence."); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB,* 701 F.Supp. 1157, 1164, 10 USPQ2d 1190, 1196 (W.D.Pa.1988) ("[B]ecause the court still considers the [willfulness] question to be a close one  double, and not treble damages are appropriate ")

(6) Duration of defendant's misconduct *Bott v. Four Star Corp.,* 229 USPQ 241, 255 (E.D.Mich.1985) (For sales prior to the appellate court's affirmance of the liability judgment, damages increased by 20%; for sales after the affirmance, damages doubled ), *vacated and remanded for clarification of damage amount.* 807 F.2d 1567, 1 USPQ2d 1210 (Fed.Cir.1986)

(7) Remedial action by the defendant *Intra Corp. v. Hamar Laser Instruments, Inc,* 662 F Supp 1420

Use of these factors in patent cases is in line with punitive damage considerations in **\*828** other tort contexts <u>FN8</u>

> <u>FN8.</u> *See, e g ,* the recent case of *Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900-01 (Tenn.1992)*, where the court stated that, in determining the amount of a punitive damage award, the factfinder should consider, among other factors: defendant's size and financial condition; the reprehensibility of defendant's conduct; the duration of defendant's misconduct; whether defendant attempted to conceal his misconduct; whether defendant had been punitively sanctioned previously for the same acts; and defendant's motivation for harm

[14] Inasmuch as a finding of willful infringement does not mandate enhancement of damages, the above factors taken together assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages and how much the dam-

Portec's efforts was to make a device which would compete with the Read Screen-All However, the undisputed evidence of record shows that Portec made specific changes deemed adequate by counsel to avoid infringement of both of Read's patents We have often noted that one of the benefits of the patent system is the incentive it provides for "designing around" patented inventions, thus creating new innovations *See Slimfold Mfg. Co. v. Kinkead Indus., Inc., 932 F.2d 1453, 1457, 18 USPQ2d 1842, 1845-46 (Fed.Cir.1991); State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1235-36, 224 USPQ 418, 424 (Fed.Cir.1985)*

Of course, determining when a patented device has been "designed around" enough to avoid infringement is a difficult determination to make One cannot know for certain that changes are sufficient to avoid infringement until a judge or a jury has made that determination In the present case, the jury found that the changes made by Portec were not sufficient to avoid infringement of either patent, and we have herein reversed the judgment respecting infringement of the '836 patent and affirmed the judgment respect-

counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent See *Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 828-29, 11 USPQ2d 1321, 1326-27 (Fed.Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 656-57, 225 USPQ 985, 989 (Fed.Cir.), *cert denied.* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985) This precedent does not mean a client must itself be able to evaluate the legal competence of its attorney's advice to avoid a finding of willfulness The client would not need the attorney's advice at all in that event That an opinion is "incompetent" must be shown by objective evidence For example, an attorney may not have looked into the necessary facts, and, thus, there would be no foundation for his opinion *Datascope,* 879 F.2d at 828-29, 11 USPQ2d at 1326-27 A written opinion may be incompetent on its face by reason of its containing merely conclusory statements without discussion of facts or obviously presenting only a superficial or off-the-cuff analysis *Underwater Devices, Inc. v. Morrison-Knudsen Co.,*

not unequivocally state that the client will not be held liable for infringement An honest opinion is more likely to speak of probabilities than certainties A good test that the advice given is genuine and not merely self-serving is whether the asserted defenses are backed up with viable proof during trial which raises substantial questions, as here

The district court indicated that Portec failed to heed the advice of its counsel. In support of this contention, the district court cites the January 1985 opinion of Groff as advising Portec that he "doubted" whether a device sufficiently modified to avoid infringement would be "as efficient and commercially appealing " This appears to be a misunderstanding of Groff's opinion Groff stated unequivocally the patents "could be circumvented," but said it was *questionable* whether a device modified to avoid infringement would be as *efficient* or *commercially appealing* However, the fact is that at the time Groff rendered his opinion, Portec had not yet begun design of any device, and thus Groff had no idea whether Portec could design a commercially acceptable

970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
(Cite as: 970 F.2d 816)

Read was required by the patent office to add the limitation to his claims that the short end extends to the ground Also, Read voluntarily added to his patent claims the concept of moving the frame so that is could be flush on the ground through use of movable wheels *Since these distinctions were added in view of prior art cited by the Examiner, Read cannot argue that Portec has any type of equivalent structure* [Emphasis added ]

The district court maintained that this portion of Valiquet's opinion was directed solely to the question of literal infringement We disagree The substance of this analysis with its reference to "prior art" and "equivalent structure" can only relate to infringement under the doctrine of equivalents

Further, the failure to give the first lawyer's opinion to Valiquet is a plus, not a minus Valiquet was not influenced thereby and was able to make his own *independent* evaluation

The most important consideration, however, is that nothing in Valiquet's letter would alert a client to re-

In February of 1987, Portec had developed no specific designs for a device Whatever discussions Valiquet had with Dahlinger in February of 1987 can hardly be characterized as an "opinion" on the structure in issue; hand-written notes made during the discussions merely describe general avenues by which the '194 patent could be avoided In fact, those notes describe other possibilities for avoiding infringement of the '194 patent, such as the use of a horizontal shaker screen The fact that Portec later designed a device which incorporated some, but not all, of the design modifications first discussed by Valiquet and Dahlinger, and that Valiquet concluded that the resulting device was not an infringement, does not render his final opinion inconsistent

In sum, upon review of the record before us, we hold that there is insufficient evidence from which a *reasonable* jury could find that Portec's infringement was willful Inasmuch as there is no infringement of the '836 patent, a finding of willful infringement with respect to that patent necessarily drops out of the case That counsel's opinion turned out to be contrary to our judgment with respect to the '194 patent does not

FN10. *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 948 F.2d 1573, 1577, 20 USPQ2d 1738, 1741 (Fed.Cir.1991); *Beatrice Foods Co. v. New England Printing and Lithographing Co.,* 923 F.2d 1576, 1578-79, 17 USPQ2d 1553, 1555-56 (Fed.Cir.1991) We note, in this connection, that other sanctions are generally available for litigation misconduct *See. e g , Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1553-54, 13 USPQ2d 1301, 1306-07 (Fed.Cir.1989); 28 U.S.C. 1927.

E *Attorney Fees*

[18] With respect to making its award of attorney fees under 35 U.S.C. § 285, the district court again relied on the willfulness of Portec's infringement to find the case was exceptional Thus, this award cannot stand. However, litigation misconduct may in itself make a case "exceptional" *Kloster Speedsteel,* 793 F.2d at 1580-81, 230 USPQ at 91; *Rohm & Haas Co. v. Crystal Chem. Co.,* 736 F.2d 688, 691-92, 222 USPQ 97, 99 (Fed.Cir.1984). The district court found testimony which had already been presented by Portec concerning the chronology of the development of the Hoehn device. Portec asked the district court to allow it to present surrebuttal evidence to explain the absence of the hitch, but the district court denied its request, explaining that Portec should have presented this evidence in its case in chief.

[20] We cannot say that the district court abused its discretion in not allowing Portec to present additional evidence to explain away the missing hitch on the Hoehn exhibit in connection with the issue of validity On the other hand, where the question is improper conduct to support an award of attorney fees, we conclude that the evidence must be considered by the court before finding misconduct and that the finding that this incident constituted improper litigation strategy cannot stand Accordingly, we remand for a re-determination by the district court whether Portec did engage in litigation misconduct and, if so, whether it was sufficiently culpable as to make the case exceptional We point out that, when attorney fees under 35 U.S.C. § 285 are awarded solely on the basis of litigation misconduct, the amount of the award

970 F 2d 816                                                                                      Page 21
970 F 2d 816, 23 U.S P Q 2d 1426
(Cite as: 970 F.2d 816)



970 F 2d 816                                                              Page 22
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

Portec's original device

970 F.2d 816                                  Page 23
970 F.2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**



970 F 2d 816
970 F 2d 816, 23 U S P Q 2d 1426
**(Cite as: 970 F.2d 816)**

Page 24

Portec's modified device

C.A.Fed. (Del.),1992
Read Corp. v. Portec, Inc
970 F 2d 816, 23 U S P Q 2d 1426

Briefs and Other Related Documents (Back to top)

• 1991 WL 11010833 (Appellate Brief) Reply Brief
for Appellant, Portec, Inc (Mar 29, 1991) Original
Image of this Document (PDF)
• 1991 WL 11010832 (Appellate Brief) Appellee's
Brief (Mar 12, 1991) Original Image of this Docu-
ment with Appendix (PDF)
• 1991 WL 11010831 (Appellate Brief) Corrected
Brief Brief for Appellant, Portec, Inc (Jan 22, 1991)
Original Image of this Document with Appendix
(PDF)

END OF DOCUMENT