# EXHIBIT 12

Westlaw.

495 F 2d 221                                                    Page 1
495 F 2d 221, 18 Fed R Serv 2d 1439
**(Cite as: 495 F.2d 221)**

**C**

Sanden v Mayo Clinic,C A Minn 1974
United States Court of Appeals, Eighth Circuit
Lorraine SANDEN, Appellant,

v

MAYO CLINIC et al , Appellees
No. 73-1575.

Submitted Feb 14, 1974
Decided April 17, 1974, Rehearing Denied May 24,
1974

Action by patient against clinic, foundation and sur-
geons on clinic's staff for malpractice  The United
States District Court for the District of Minnesota,
Edward J Devitt, Chief Judge, entered judgment ad-
verse to plaintiff who appealed  The Court of Ap-
peals, Webster, Circuit Judge, held that defendants
were entitled to show that injuries were feigned
without specific allegations of fraud as an affirmative
defense, that trial judge did not abuse his discretion
in refusing to permit plaintiff's physician to attend
court-ordered medical examination by defendant's ex-
pert and there was no error in denying motion to ex-
tend completion date for taking depositions

Affirmed
West Headnotes
**[1] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(C) Answer
            170AVII(C)2 Affirmative Defense or
Avoidance
                170Ak751 k  In General  Most Cited
Cases
Although rule requires fraud and other matters in
avoidance of plaintiff's case to be specifically pleaded
in answer when invoked as an affirmative defense,
defense which merely negates some element of
plaintiff's prima facie case is not a true affirmative
defense and need not be pleaded  Fed.Rules Civ.Proc.
rule 8(c), 28 U.S.C.A

**[2] Health 198H ☞814**

**[198H Health**
    198HIV Malpractice, Negligence, or Breach of
Duty
        198HIV(G) Actions and Proceedings
            198Hk814 k  Issues, Proof, and Variance
Most Cited Cases
    (Formerly 299k18 50 Physicians and Surgeons)
Defendants by contending that plaintiff's injuries
were feigned and the malpractice action was no more
than a scheme for financial gain in no way conceded
any color to plaintiff's case and it was not error to
permit them to introduce evidence on such matters
despite fact that they had not specifically alleged
fraud in answer to complaint  Fed.Rules Civ.Proc.
rule 8(c), 28 U.S.C.A

**[3] Federal Civil Procedure 170A ☞1651**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(F) Physical or Mental Examination of
Person
            170Ak1651 k  In General  Most Cited Cases
Manner and conditions of court-ordered medical ex-
amination as well as designation of person or persons
to conduct such an examination are matters vested in
sound discretion of trial court  Fed.Rules Civ.Proc.
rule 35(a), 28 U.S.C.A

**[4] Federal Civil Procedure 170A ☞1651**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(F) Physical or Mental Examination of
Person
            170Ak1651 k  In General  Most Cited Cases

**Federal Courts 170B ☞895**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk895 k  Pretrial Proceedings; Dis-
covery and Depositions  Most Cited Cases
    (Formerly 106k406 6(12))
Refusal of trial judge to allow plaintiff in malpractice

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

495 F 2d 221
495 F 2d 221, 18 Fed R Serv 2d 1439
(Cite as: 495 F.2d 221)

Page 2

action to have a physician of her own choosing in attendance at court-ordered medical examination was not an abuse of discretion or prejudicial to plaintiff whose own physician examined her a few hours after the adverse examination and who also placed before jury extensive medical testimony from variety of doctors  Fed.Rules Civ.Proc. rule 35(a), 28 U.S.C.A

**[5] Federal Civil Procedure 170A ⊜⇒2313**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(A) In General
      170Ak2313 k  Discretion of Court  Most Cited Cases

**Federal Courts 170B ⊜⇒825.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk825 New Trial or Rehearing
          170Bk825.1 k  In General  Most Cited Cases
  (Formerly 170Bk825, 106k406 5(21))
Motion for new trial is addressed to sound discretion of trial court whose action should not be upset absent strong showing of an abuse thereof

**[6] Federal Civil Procedure 170A ⊜⇒2331**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2331 k  In General  Most Cited Cases
It was well within discretion of trial judge, in malpractice action involving claim of damage to the nerves and muscles of the anal sphincter and allegedly shown by a tape of an electromyograph study of plaintiff which was allegedly furnished to defense counsel but which had disappeared, to deny posttrial motions of plaintiff for an independent court-ordered medical examination and for FBI investigation of alleged disappearance of tape

**[7] Federal Civil Procedure 170A ⊜⇒2334**

170A Federal Civil Procedure

170AXVI New Trial
  170AXVI(B) Grounds
    170Ak2333 Trial Errors
      170Ak2334 k  Evidence  Most Cited Cases
Where defendants' expert witness in malpractice action did not testify falsely but merely stated that a demonstration tape without plaintiff's tape from an electromyographic study had been submitted to him and that he was of the opinion that one of the photographs introduced in evidence had been made from the demonstration tape, there was no abuse of discretion in refusing to grant plaintiff's motion for new trial on ground of introduction of false evidence  Fed.Rules Civ.Proc. rule 59, 28 U.S.C.A

**[8] Federal Courts 170B ⊜⇒640**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
      170BVIII(D)2 Objections and Exceptions
        170Bk639 Motions Presenting Objections
          170Bk640 k  In General; Necessity  Most Cited Cases
  (Formerly 30k301, 30k237(1))
In view of lack of a motion for mistrial at time of bench colloquy in malpractice action during which defense counsel allegedly spoke so loudly that jury could hear contrary to ruling of trial court and a failure to specifically mention the matter in motion for new trial after verdict, issue was not properly preserved for review

**[9] Federal Courts 170B ⊜⇒903**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
        170Bk903 k  Examination and Impeachment of Witnesses  Most Cited Cases
  (Formerly 106k406 6(7))
Questioning of plaintiff in malpractice action designed to show that her case was fraudulent did not constitute any error requiring new trial where ques-

495 F 2d 221
495 F 2d 221, 18 Fed R Serv 2d 1439
**(Cite as: 495 F.2d 221)**

tions propounded were properly raised and not argumentative

**[10] Federal Civil Procedure 170A ⟨⟩1973**

170A Federal Civil Procedure
 170AXV Trial
  170AXV(A) In General
   170Ak1970 Counsel's Conduct and Arguments
    170Ak1973 k Statements as to Facts, Comments and Arguments  Most Cited Cases
Normally, it is improper for an attorney to argue before jury that the case of his opponent is false or fraudulent

**[11] Federal Courts 170B ⟨⟩626**

170B Federal Courts
 170BVIII Courts of Appeals
  170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
   170BVIII(D)2 Objections and Exceptions
    170Bk626 k Conduct of Trial in General. Most Cited Cases
 (Formerly 30k207)
Where supporting facts were developed at trial and the conclusion that plaintiff's malpractice action, if evidence was to be believed, was fraudulent was at least a permissible one and no objection was made during or immediately after either the opening or closing argument, there was no plain error with respect to defense counsel's statements describing case as false and fraudulent

**[12] Federal Civil Procedure 170A ⟨⟩1855.1**

170A Federal Civil Procedure
 170AXII Continuance
  170Ak1855 Grounds
   170Ak1855.1 k In General  Most Cited Cases
 (Formerly 170Ak1855)
Where judge granted one continuance and rescheduled malpractice trial for precisely the date requested by plaintiff's second local counsel, there was no abuse of discretion in refusing to allow a continuance requested by plaintiff when her original local counsel withdrew from case and was replaced by another

**[13] Federal Civil Procedure 170A ⟨⟩1969**

170A Federal Civil Procedure
 170AXV Trial
  170AXV(A) In General
   170Ak1969 k Judge's Remarks and Conduct  Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩2333.1**

170A Federal Civil Procedure
 170AXVI New Trial
  170AXVI(B) Grounds
   170Ak2333 Trial Errors
    170Ak2333.1 k In General  Most Cited Cases
 (Formerly 170Ak2333)
Comment of trial judge during pretrial proceeding to the effect that he didn't think there was any merit in case because that is what plaintiff's attorney had told judge did not constitute a prejudgment of case on the merits and did not entitle plaintiff to a new trial after adverse jury verdict

**[14] Federal Civil Procedure 170A ⟨⟩1383**

170A Federal Civil Procedure
 170AX Depositions and Discovery
  170AX(C) Depositions of Parties and Others Pending Action
   170AX(C)3 Examination in General
    170Ak1383 k Time and Place of Examination  Most Cited Cases
There was no error in trial judge's refusal to modify further the original date for completion of discovery in malpractice action after partial modification thereof to enable plaintiff to take deposition of principal doctor-defendant as well as the deposition of certain witnesses in other states

**[15] Federal Civil Procedure 170A ⟨⟩1383**

170A Federal Civil Procedure
 170AX Depositions and Discovery
  170AX(C) Depositions of Parties and Others Pending Action
   170AX(C)3 Examination in General
    170Ak1383 k Time and Place of Examination  Most Cited Cases

© 2007 Thomson/West No Claim to Orig U S Govt Works

495 F 2d 221                                                                              Page 4
495 F 2d 221, 18 Fed R Serv 2d 1439
**(Cite as: 495 F.2d 221)**

There is no abuse of trial court's discretion in scheduling deposition of principal doctor-defendant in malpractice action two days before commencement of trial Fed.Rules Civ.Proc. rule 26(c), 28 U.S.C.A

**\*223** Paul D Tierney, Minneapolis, Minn , and John J Doyle, San Francisco, Cal , for appellant

James H O'Hagan, Minneapolis, Minn , for appellees

Before GIBSON, STEPHENSON and WEBSTER, Circuit Judges

WEBSTER, Circuit Judge

Lorraine Sanden, a registered nurse residing in San Francisco, California, brought an action against the Mayo Clinic, the Mayo Foundation and two surgeons on the Clinic's staff In her complaint she alleged that defendants had subjected her to extensive anal surgery, which she had not authorized, including a negligently performed radical hemorrhoidectomy, as a result of which her anal sphincter was irreparably injured, causing her permanent incontinence of the feces, as well as other disabilities Federal jurisdiction was premised on diversity of citizenship and an amount in controversy exceeding $10,000, 28 U.S.C. § 1332

Following a seven-day trial, the jury returned a verdict in favor of defendants on May 30, 1973 Ms Sanden appeals from the order of the District Court denying her timely filed motion for new trial In this appeal, she asserts as prejudicial error a number of trial rulings by the District Judge, all of which are discussed infra

## I DEFENDANTS' FAILURE TO PLEAD FRAUD AS A SPECIFIC DEFENSE

[1] Ms Sanden's first assignment of error challenges the defendants' introduction of evidence of fraud at the trial It was the defendants' position that Ms Sanden, together with her San Francisco attorney,FN1 had planned to bring this lawsuit even before she had submitted to surgery at the Mayo Clinic; that she had faked the disabilities purportedly resulting from that surgery; and that she had attempted to introduce at trial **\*224** fraudulent evidence to

substantiate those disabilities Ms Sanden argues that since the defendants did not specifically allege fraud in their answer to her complaint, it was error to permit the introduction of such evidence at trial under Fed.R.Civ.P. 8(c)FN2 We disagree Rule 8(c) requires that fraud and other matters in avoidance of the plaintiff's case be specifically pleaded in the defendants' answer when invoked as affirmative defenses. However, 'if the defense involved is one that merely negates an element of the plaintiff's prima facie case * * * it is not truly an affirmative defense and need not be pleaded despite rule 8(c) ' 2A J Moore, Moore's Federal Practice P8 27(2), at 1843 (2d ed 1974) See Lomartira v. American Automobile Insurance Co., 245 F.Supp. 124 (D.Conn.1965), aff'd, 371 F.2d 550 (2d Cir. 1967) Cf Goodwin v. Townsend, 197 F.2d 970, 971 (3d Cir. 1952); Feller v. McGrath, 106 F.Supp. 147, 149 (W.D.Pa.1952), aff'd mem sub nom , Feller v. Brownell, 201 F.2d 670 (3d Cir.), cert denied, 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355 (1953)

> FN1. Several attorneys have represented Ms Sanden since the inception of this action The complaint was initially filed by Thomas F Burns and Associates, a Minneapolis law-firm, and John J Doyle, a San Francisco attorney Subsequently, Paul D Tierney of the Minneapolis law-firm of LeVander, Zimpfer & Tierney, Ltd replaced Thomas F Burns and Associates as Ms Sanden's local counsel; Mr Doyle continued to serve as co-counsel

> FN2. Rule 8(c) provides in part:
> Affirmative Defenses In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata. statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense * * *

In contending that Ms Sanden's injuries were feigned and that the lawsuit was no more than a scheme for

© 2007 Thomson/West No Claim to Orig U S Govt Works

financial gain, the defendants in no way conceded any color to plaintiff's claim, but were simply attempting to persuade the jury to reject her entire case as untrue.[FN3] This assignment of error is frivolous

> FN3. 'At common law an affirmative defense should give color to the opposing party's claim, i e , admit an apparent right in the opposite party and rely on some new matter by which that right is defeated ' 2A J Moore, Moore's Federal Practice P8 27(3), at 1856 (2d ed 1974)

II REFUSAL OF THE DISTRICT JUDGE TO PERMIT THE PLAINTIFF'S PHYSICIAN TO ATTEND HER MEDICAL EXAMINATION BY DEFENDANTS' EXPERT

On the third day of trial, the District Court ordered Ms Sanden to submit to an examination by defendants' medical expert The examination was to include an electromyographic study of the plaintiff's anal sphincter; such a study distinguishes healthy and intact nerves from damaged nerves through the placement of electrodes in one's muscles and through analysis of the reaction of those muscles to electrochemical impulses

Plaintiff requested that a physician of her choice attend this examination as an observer The defense counsel objected, and Judge Devitt sustained that objection The examination was performed on behalf of the defendants by William R Kennedy, M D , Professor of Neurology, Director of the Neuromuscular Laboratory in the Department of Neurology, University of Minnesota, in Minneapolis At trial Dr Kennedy testified that the electromyograph indicated that the muscles and nerves in question were normal and that any abnormal reactions displayed by Ms Sanden were the result of her purposeful efforts to determine the outcome of the test[FN4] The conclusions so drawn by Dr Kennedy stand in direct contradiction to the findings of three *225 other physicians who examined Ms Sanden and testified on her behalf[FN5]

> FN4. On direct examination by the defense, Dr Kennedy testified in part as follows:

Q Now, do you have an opinion as to whether the patient was trying to contract when you asked her to?
A Well, yes I concluded that she was not trying, because I had taken a neurological history and performed a neurological examination and looked for any diseases, neurological diseases, as we always do, and I found nothing to indicate that there were other reasons that she couldn't contract when I asked her, that is, no brain damage or spinal cord lesions, et cetera
Q So you concluded, when you asked her to contract, the contraction didn't come because she wasn't trying; is that correct? A Yes.

> FN5. Dr Willibald Nagler, head of the Department of Physical Medicine and Rehabilitation, New York Hospital and Cornell University, testified that he found the nerves which supply the anal sphincter muscles to be damaged Dr Essam Awad, a professor at the University of Minnesota Medical School, specializing in neuromuscular diseases, testified that he had discovered 'definite evidence of denervation in the inner sphincter ' Dr Joseph Engel, a physician in private practice in Minneapolis, answered in the affirmative when asked whether there was denervation of Ms Sanden's anal sphincter.

In this appeal, Ms Sanden urges that Judge Devitt's refusal to allow one of plaintiff's physicians to attend the adverse medical examination performed by Dr Kennedy constitutes prejudicial error She contends that this is so particularly because of the importance of the electromyographic study in resolving the disputed questions of fact and because of the conflicting testimony elicited on the test results We uphold the District Court

[2][3] The manner and conditions of a court-ordered medical examination, as well as the designation of the person or persons to conduct such an examination, are vested in the sound discretion of the trial court Fed.R.Civ.P. 35(a)[FN6] Although the examined party will usually be permitted to have his or her own physician present, see 4A J Moore, Moore's Federal Practice P35 04, at 35-24, 35-25 n 11 (2d ed

495 F 2d 221                                                                          Page 6
495 F 2d 221, 18 Fed R Serv 2d 1439
**(Cite as: 495 F.2d 221)**

1974); 64 A.L.R.2d 498-500 (1959), we find that under the circumstances of this case Judge Devitt did not abuse his discretion [FN7] No argument was advanced that a physician of her own choosing was needed to protect the privacy of Ms Sanden, or to shield her from embarrassment Cf 64 A.L.R.2d 499-501 (1959) And properly so She was a trained, registered nurse We note that not only did plaintiff's own physician examine her a few hours after the adverse examination but also, in addition to Dr Kennedy's testimony, the jury had before it extensive medical evidence from a variety of doctors from which to draw its findings of fact [FN8] In this context, we perceive no prejudice resulting from Judge Devitt's refusal to permit Ms Sanden's own physician to attend the adverse examination

FN6. Rule 35(a):

(a) Order for examination When the mental or physical condition * * * of a party * * * is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician * * * The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made

FN7. In so finding, we express no disapproval of those cases in which the examined party has been allowed to have his or her own physician present

FN8. A total of eighteen medical doctors testified by appearance or by deposition at the trial

III  SUBMISSION OF 'FALSE EVIDENCE' TO THE JURY

Plaintiff contends that during the course of the trial her attorney submitted to the defense counsel a tape of an electromyographic study performed on Ms Sanden by Dr Willibald Nagler The tape, as allegedly submitted to the defense counsel, was attached to a demonstration tape showing damaged nerves and muscles of the anal sphincter [FN9] The de-

fendants' medical expert, Dr Edward Lambert, testified that he was given only the demonstration tape, without Ms Sanden's tape attached; he further claimed that of a series of photographic projections purportedly made from Dr Nagler's electromyographic study of Ms Sanden and later introduced as evidence, *226 he had determined that at least one had been prepared from the demonstration tape

FN9. The 'demonstration tape' was a tape provided by a Dr Rogoff of New York who makes such tapes to teach the proper methods of interpreting electromyographic studies During oral argument before this court, counsel for Ms Sanden explained that 15 to 20 feet of Ms Sanden's tape had been attached to a much longer demonstration tape

Plaintiff would have us remand for a new trial on the ground that 'false evidence' was submitted to the jury [FN10] She argues that the defense counsel lost or destroyed Ms Sanden's tape and that, in any event, the disclosure of the discrepancy should not have been made before the jury without first apprising the plaintiff's attorney of the problem

FN10. See Fed.R.Civ.P. 59; Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350 (4th Cir. 1941).

[4][5] A motion for a new trial is addressed to the sound discretion of the trial court and the action of the trial court should not be upset absent a strong showing of an abuse thereof Farmers' Co-operative Elevator Association Non-Stock of Big Springs, Nebraska v. Strand, 382 F.2d 224, 230-231 (8th Cir.), cert denied, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967); Bankers Life & Casualty Co. v. Kirtley, 307 F.2d 418, 423 (8th Cir. 1962) We discern no abuse of that discretion The defendants' expert witness did not testify falsely; he merely testified that a demonstration tape, without Ms Sanden's tape attached, had been submitted to him [FN11] and opined that at least one of the photographs introduced as evidence had been made from that demonstration tape In addition, while counsel for the plaintiff interposed one objection at the outset of Dr Lambert's

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

495 F 2d 221                                                          Page 7
495 F 2d 221, 18 Fed R Serv 2d 1439
(Cite as: 495 F.2d 221)

testimony- on grounds of irrelevancy and immateriality- , he made no further objection as this line of evidence was developed; in fact, plaintiff's attorney explicitly answered in the negative when asked by the court whether such evidence would be harmful The court thereupon permitted the defense to continue its questioning of Dr Lambert

> FN11. The tape was then played before the jury so that they might decide whether the voice thereon was that of Dr Nagler or that of the demonstration instructor, Dr Rogoff

[6] After the entry of the verdict and the judgment thereon, Ms Sanden submitted to Judge Devitt, together with her motion for a new trial, motions for an independent court-ordered medical examination and for an F B I investigation of the disappearance of the plaintiff's electromyographic tape Judge Devitt denied each of these post-trial motions It is not clear whether appellant attempted to preserve these points on appeal; in any event, we decline to disturb Judge Devitt's orders, for we find them well within his discretion.[FN12]

> FN12. Following oral argument before this court, Ms Sanden asked us to order an independent court-appointed electromyographic study of her anal sphincter to resolve the evidentiary discrepancies adduced at trial An order denying that request was entered March 5, 1974

IV THE MISCONDUCT OF THE DEFENSE COUNSEL AND THE TRIAL COURT'S FAILURE TO REPRIMAND HIM

Appellant assigns as prejudicial error the trial court's failure to disallow certain questions propounded by the defense in open court The questions included, inter alia, suggestions that Ms Sanden had administered to herself a pudendal nerve block in an effort to control the results of the adverse electromyograph; that she was romantically involved with her San Francisco attorney; that one of her medical witnesses regularly testified for a New York law firm; and that her entire case was fraudulent Appellant further contends that on certain occasions when the attorneys

had approached the bench, counsel for the defense repeatedly spoke loudly, within the hearing of the jury, in disregard of rulings from the bench not to do so.

[7] We have studied the transcript and find no error requiring a new trial The questions propounded by the defense counsel were properly phrased and were not argumentative Some of the questioning challenged herein occurred during cross-examination by the defense *227 of a character witness called on behalf of the plaintiff

[8] We also note that when the colloquy at the bench became too loud, the court admonished the defense to speak more softly; moreover, the trial court was in a better position than are we to determine the effect, if any, of these remarks on the jury. There was no motion for a mistrial at the time of the bench colloquy nor was this matter specifically mentioned when plaintiff moved for a new trial after the verdict had been rendered As a result, this issue was not properly preserved for our review Skogen v. Dow Chemical Co.,375 F.2d 692 (8th Cir. 1967)

[9][10][11] Finally, appellant contends that her case was prejudicially described as false and fraudulent during opening statement and closing argument Normally, it is improper for an attorney to argue before the jury that the case of his opponent is false or fraudulent See F. W. Woolworth Co. v. Wilson, 74 F.2d 439 (5th Cir. 1934); State v. Williams, 210 N.W.2d 21 (Minn.1973) Yet here the supporting facts were developed at trial and the conclusion, if such evidence was believed, was at least a permissible one Further, there were no objections made during or immediately after either the opening or the closing argument See St. Louis Southwestern Railway Co. v. Ferguson, 182 F.2d 949, 954 (8th Cir. 1950); Thomson v. Boles, 123 F.2d 487, 495-496 (8th Cir. 1941), cert denied, 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1204 (1942); London Guarantee & Accident Co. v. Woelfle, 83 F.2d 325, 344 (8th Cir. 1936); Brinegar v. San Ore Construction Co., 302 F.Supp. 630, 641 (E.D.Ark.1969) We have reviewed the statements complained of and find no plain error

V PREJUDGMENT OF THE CASE ON THE MERITS

495 F 2d 221                                                          Page 8
495 F 2d 221, 18 Fed R Serv 2d 1439
(Cite as: 495 F.2d 221)

[12] Appellant contends that the trial court prejudged the case in favor of defendants-appellees as demonstrated by several prejudicially erroneous rulings These include: refusal to allow a continuance, which Ms Sanden requested when her original Minneapolis attorney withdrew from the case and was replaced by another; pre-trial comments to the effect that plaintiff had 'no case'; and refusal to grant a new trial

Motions for continuance lie within the broad discretion of the trial judge  Anzaldo v. Croes, 478 F.2d 446 (8th Cir. 1973)  The record discloses no abuse of discretion  Judge Devitt granted one continuance and rescheduled the trial for precisely the date requested by the plaintiff's second Minneapolis counsel, Paul D Tierney

[13] During a pre-trial proceeding on May 7, 1973, Judge Devitt remarked:

I didn't think there was any merit in the case because that's what plaintiff's attorney told me * * *

This was in response to a statement of defense counsel and indicated a prior view of the case  Judge Devitt further explained that although the Minneapolis attorney who had withdrawn from the case favored dismissal of the case, he would grant no dismissal without the approval of Ms  Sanden and her San Francisco attorney  In fact, the record shows that although the defense twice moved that the complaint to be dismissed, Judge Devitt did not dismiss the case but instead afforded Ms  Sanden a full and fair trial  Appellant's charges of prejudgment are without merit FN13

> FN13. It is apparent from a reading of the record that the District Judge was confronted with numerous problems in the management of this case which must have taxed his patience, not to mention his credulity  Despite an atmosphere permeated by charges and counter-charges of professional misconduct, Chief Judge Devitt conducted the trial with fairness and with full consideration of the rights and needs of the parties

**\*228** VI  THE TRIAL COURT'S QUASHING OF DEPOSITIONS AND ITS SCHEDULING OF THE

DEPOSITION OF THE PRINCIPAL DOCTOR-DEFENDANT CLOSE TO THE TIME OF TRIAL

[14] Appellant claims as her final assignment of prejudicial error the quashing of notices to take two depositions and the scheduling of another in close proximity to trial  The record reveals that by an order dated May 8, 1973, following a hearing, Judge Devitt partially modified his original order terminating discovery, thereby enabling the plaintiff to take the deposition of Dr Hill, the principal doctor-defendant as well as the depositions of certain witnesses in California and Florida  We find no error in Judge Devitt's refusal to modify further the original date for completion of discovery, which resulted in the quashing of the deposition of Dr  Quan, one of plaintiff's experts who was unable to appear as a witness at trial, and the effective quashing of the deposition of Dr Manson, one of the doctor-defendants, who did testify at trial FN14

> FN14. At the hearing, defendants had objected to taking the depositions and had sought protection by means of a motion to quash, which the court apparently treated as a Rule 26(c) motion for protective order  We need not consider the procedural requirements of Fed.R.Civ.P. 26(c), since the challenge was only to the prejudicial effect of the order

[15] Nor do we find any abuse of the trial court's discretion FN15 in the scheduling of the deposition of Dr Hill, the principal doctor-defendant, two days before the commencement of the trial  Rule 26(c) expressly permits the trial judge to protect a party from any undue burdens of discovery by, inter alia, ordering that 'the discovery may be had only on specified terms and conditions, including a designation of time or place * * *' (emphasis added)  Moreover, the record indicates that during the pre-trial hearing before Judge Devitt on May 7, 1973. Mr  Tierney, counsel for the plaintiff, described as 'satisfactory' an arrangement to depose the defendant on 'the day before trial'

> FN15. See General Dynamics Corp. v. Selb Manufacturing Co., 481 F.2d 1204, 1212 (8th Cir. 1973), cert denied, 414 U.S. 1162,

495 F 2d 221
495 F.2d 221, 18 Fed R Serv 2d 1439
**(Cite as: 495 F.2d 221)**

94 S.Ct. 926, 39 L.Ed.2d 116 (1974):

Since the granting or denial of a protective order is
within the discretion of the trial court, 4 Moore's Fed-
eral Practice P29 68 at 26-491, only an abuse of that
discretion would be cause for reversal

Affirmed

C A Minn  1974
Sanden v  Mayo Clinic
495 F 2d 221, 18 Fed R Serv 2d 1439

END OF DOCUMENT

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

# EXHIBIT 13



ALLSTATE LEGAL · 800.222.0510 · EDH · RECYCLED

Westlaw.

117 F 3d 965                                                    Page 1
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
**(Cite as: 117 F.3d 965)**

▷

Smith v. Sushka C A 6 (Ohio),1997 1997 Fed App
0197P
United States Court of Appeals,Sixth Circuit
Sandra S SMITH, Plaintiff-Appellant,
v
Ted W SUSHKA, Defendant-Appellee
No. 95-4261.

Argued Oct 8, 1996
Decided July 2, 1997

Administrative assistant sued county engineer, claim-
ing that her termination was improperly politically
motivated The United States District Court for the
Southern District of Ohio at Columbus, Mark R.
Abel, United States Magistrate Judge, granted sum-
mary judgment for engineer Assistant appealed The
Court of Appeals, Boggs, Circuit Judge, held that
state court's earlier decision that assistant held unclas-
sified position, and factual findings on which de-
cision was based, collaterally estopped assistant from
bringing federal claim

Affirmed

Lively, Circuit Judge, filed dissenting opinion
West Headnotes
**[1] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(C) Answer
170AVII(C)2 Affirmative Defense or
Avoidance
170Ak751 k In General Most Cited
Cases
Failure to raise affirmative defense by responsive
pleading does not always result in waiver Fed.Rules
Civ.Proc.Rule 8(c), 28 U.S.C.A

**[2] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(C) Answer
170AVII(C)2 Affirmative Defense or

Avoidance
170Ak751 k In General Most Cited
Cases
Purpose of requiring that affirmative defense be set
forth in pleadings is to give opposing party notice of
affirmative defense and chance to respond Fed.Rules
Civ.Proc.Rule 8(c), 28 U.S.C.A

**[3] Federal Civil Procedure 170A ☞758**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(C) Answer
170AVII(C)2 Affirmative Defense or
Avoidance
170Ak758 k Res Judicata and Pendency
of Another Action Most Cited Cases
County engineer did not waive affirmative defenses
by failing to raise them before second motion for
summary judgment on administrative assistant's
claim that her termination was politically motivated;
district court extended trial date to give assistant op-
portunity to fully respond to and brief engineer's as-
sertions that State Personnel Board of Review's de-
cision collaterally estopped assistant from relitigating
factual issue of duties she performed for engineer and
that political affiliation was appropriate job require-
ment, and both parties understood that Board's de-
cision could determine some issues in case
Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A

**[4] Judgment 228 ☞724**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k723 Essentials of Adjudication
228k724 k In General Most Cited Cases
Collateral estoppel, also called claim preclusion, pre-
vents party from relitigating issues of fact or law
which were necessarily decided by previous final
judgment

**[5] Federal Courts 170B ☞420**

170B Federal Courts
170BVI State Laws as Rules of Decision

© 2007 Thomson/West No Claim to Orig U S Govt Works

117 F 3d 965                                                                    Page 2
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

170BVI(C) Application to Particular Matters
    170Bk420 k Judgments Most Cited Cases

Court of appeals is required to apply doctrine of collateral estoppel in same manner as state courts in state in which earlier judgment was rendered

[6] Judgment 228 &#128;713(1)

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(1) k In General Most Cited Cases

Under Ohio law, collateral estoppel bars relitigation of those claims on which final judgment on the merits has been entered, so long as there has been fair opportunity to fully litigate claim

[7] Judgment 228 &#128;720

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k Matters Actually Litigated and Determined Most Cited Cases

Judgment 228 &#128;724

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k723 Essentials of Adjudication
                228k724 k In General Most Cited Cases

Under Ohio law, party asserting collateral estoppel must prove that identical issue was actually litigated, directly determined, and essential to judgment of prior action

[8] Judgment 228 &#128;720

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k Matters Actually Litigated and Determined Most Cited Cases

Under Ohio law, collateral estoppel bars relitigation only when identical issue was actually decided in prior case; however, prior court need not have framed conclusion in exact same manner

[9] Judgment 228 &#128;585(2)

228 Judgment
    228XIII Merger and Bar of Causes of Action and Defenses
        228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
            228k585 Identity of Cause of Action in General
                228k585(2) k What Constitutes Identical Causes Most Cited Cases

Under Ohio law, if same facts or evidence would sustain issues in two actions, actions are considered the same and judgment in former bars latter, under doctrine of collateral estoppel, but if actions rest upon different states of facts, or if different proofs would be required to sustain two actions, judgment in former is no bar to maintenance of latter

[10] Judgment 228 &#128;828.15(1)

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
        228k828.15 Identity of Cause of Action or Relief Sought
            228k828.15(1) k In General Most Cited Cases

Under Ohio law, state court's decision that administrative assistant to county engineer held unclassified position, and factual findings on which decision was based, were identical to issue of whether party affiliation was appropriate requirement for assistant's job, and thus state decision collaterally estopped assistant from bringing later federal claim that termination was improper political firing 42 U.S.C.A. §§ 1983, 1985; Ohio R.C. § 124.03

[11] Constitutional Law 92 &#128;91

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k91 k Right of Assembly and Petition Most

117 F 3d 965                                                                                              Page 3
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
**(Cite as: 117 F.3d 965)**

Cited Cases
Whether political affiliation is appropriate basis for
personnel decision depends upon inherent duties of
that position and duties that new holder of that posi-
tion performs

**\*966** Mark S. Coco, argued and briefed, Harris, Mc-
Clellan, Binau & Cox, Columbus, OH, for Plaintiff-
Appellant.
**\*2** Randall Lee Lambert, argued and briefed, Ironton,
OH, for Defendant-Appellee.

Before: LIVELY, BOGGS, and NORRIS, Circuit
Judges
BOGGS, J, delivered the opinion of the court, in
which NORRIS, J, joined LIVELY, J (pp
971-974), delivered a separate dissenting opinion

**OPINION**
BOGGS, Circuit Judge
Plaintiff Sandra S Smith appeals from a magistrate
judge's [FN1] grant of summary judgment to defendant
Ted W Sushka in this dispute over an allegedly polit-
ical firing Smith filed suit under 42 U.S.C. §§ 1983
and 1985, alleging that she had been terminated as
administrative assistant to the Washington County,
Ohio engineer, in violation of her First and Four-
teenth Amendment rights The magistrate judge, in
reaching his decision in favor of Sushka, held that
Smith was collaterally estopped from relitigating the
issue of her job duties as administrative assistant and
that, based on the facts found by the Ohio State Per-
sonnel Board of Review ("SPBR"), her position "was
one for which party affiliation is an appropriate re-
quirement for the effective performance of the of-
fice " We affirm

> FN1. The parties agreed to plenary magis-
> trate judge jurisdiction, pursuant to 28
> U.S.C. § 636(c)

**I**

In November 1981, Smith began working as an ad-
ministrative assistant to the Washington County en-
gineer, who at that time was Paul Junk Sushka,
however, defeated Junk in the 1992 Democratic
primary and ultimately prevailed in the general elec-
tion In March 1993, after two months in office,

Sushka fired Smith On May 28, 1993, Smith filed a
two-count complaint in federal court, alleging termin-
ation without due process of law and **\*3** on the basis
of her political affiliation In this suit, Smith sought
reinstatement, a permanent injunction, compensatory
and punitive damages, and attorney's fees

While the suit was pending, Smith brought an action
before the SPBR, contesting her dismissal The
parties agreed to stay discovery in the federal suit
pending a decision by the SPBR concerning the
status of Smith's **\*967** former job The SPBR ruled
that Smith was an unclassified employee, as defined
by Ohio Rev.Code § 124.11(A)(9),[FN2] and dis-
missed her action for lack of jurisdiction [FN3] The
Administrative Law Judge issued a 28-page opinion,
finding the following facts:

> FN2. That provision states in pertinent part:
> (A) The unclassified service shall comprise
> the following positions, which shall not be
> included in the classified service, and which
> shall be exempt from all examinations re-
> quired by this chapter:
>
> (9) The deputies and assistants of elective or
> principal executive officers authorized to act
> for and in the place of their principals, or
> holding a fiduciary relations to such prin-
> cipals and those persons employed by and
> directly responsible to elected county offi-
> cials and holding a fiduciary or administrat-
> ive relationship to such elected county offi-
> cials, and the employees of such county offi-
> cials whose fitness would be impracticable
> to determine by competitive examination
> Ohio    Rev.Code    §    124.11(A)(9)
> (Banks-Baldwin 1994)

> FN3. Since the Board lacks jurisdiction over
> an appeal by an employee in an unclassified
> position, the determination of whether Smith
> was a classified employee was logically pri-
> or to any consideration of the merits of her
> claim See Ohio Rev.Code § 124.03

I find that, during the pertinent approximate one year
period prior to her removal, Appellant served as the

© 2007 Thomson/West No Claim to Orig U S Govt Works

117 F 3d 965                                                                    Page 4
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

Administrative Assistant to the Washington County *4 Engineer I further find that, during that period, a large portion of Appellant's work was divided into two general areas, fiscal and administrative

In regard to the fiscal area, appellant kept the accounts for the WCE, was privy to all information concerning the fiscal aspects of the WCE and was more knowledgeable concerning those accounts than any other Washington County employee I also find that on a continuing basis, Appellant advised WCE Junk concerning the availability of funds, transfers, budget allocations and projections, et cetera Among her other duties were to provide explanations or embellishments along a spreadsheet column providing the WCE with vital information concerning his decision making regarding budgetary allocations for the entire Office of the Engineer

Further Appellant was authorized to and on occasion did certify the entire payroll and each separate line item therein as accurate using her signature Further, there were a number of times when that payroll, which was initially prepared by Appellant, or by the Account Clerk under [her] supervision would not again cross Mr Junk's desk once it had been approved As well, Appellant had the authority to open accounts on behalf of the WCE

I find that, while carrying out these responsibilities and other fiscal and administrative responsibilities, Appellant had significant interaction with the Washington County Commissioners, themselves, with the Washington County Commissioners' Prevailing Wage Coordinator, and with the Washington County Auditor or the Auditor's Bookkeeper Appellant accompanied the Engineer to meetings with the Washington County Commissioners and provided him with data and provided responses to questions concerning the WCE's budget Further, there would have been times when the Commissioners would *5 have gone directly to Appellant with questions concerning the budget

Additionally, Appellant interacted with both township trustees and with the township Board's clerks during this period That interaction included answering telephone inquiries or face-to-face inquiries from trustees or their respective clerks regarding various activities of the WCE's office and assisting the trustees to process funds or order various items including

piping and road signs I also find that Appellant set up the procedure to and assisted in collecting payments for Frost Law exemptions, which funds were later distributed to the township trustees

Further, during this period, Appellant had the authority to and did approve various requests for leave for various employees within the office and had the authority to deny that leave Additionally, Appellant had the authority to and did approve expenditure requests and purchases of under one hundred fifty dollars*968 for various employees of the WCE Also, under extraordinary circumstances, Appellant had the authority to approve purchase of greater than one hundred fifty dollars Additionally,

in late December, 1992, Mr Junk designated Appellant as the employee in charge of the WCE's office staff

[I]n late December. 1988, Appellant, had an oath of office administered to her by the Honorable Robert Rawson [The oath] was administered [because] Mr Junk wished to publically recognize her

[A]s well as performing functional supervision over the administrative office staff, Appellant performed direct supervision over Raelene Malster, the Account Clerk

Appellant's administrative functions included interacting with workers' compensation and *6 unemployment compensation processors and in assisting WCE employees in their relationships with those processors

I also find that Appellant performed various other miscellaneous functions Appellant also performed duties including answering general telephone calls or inquiries and dealing with the public either over the telephone or in person I further find that Appellant prepared various contracts for the WCE, usually by amending previous contracts submitted to vendors

Finally, Appellant answered directly to Mr Junk during his tenure and later to Mr Sushka during the remainder of Appellant's tenure with the WCE

Report and Recommendation of the SPBR at 22-24, No 93-REM-03-0182 (Feb 7, 1994) Smith appealed the decision, and the parties agreed that, except for a ruling on Sushka's motion for summary judgment on the political affiliation claim, the federal court case

117 F 3d 965                                                                 Page 5
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

would be held in abeyance pending the SPBR's de-
cision on appeal The SPBR's decision was affirmed
by the Washington County Court of Common Pleas
and the Ohio Court of Appeals As a result, Smith
voluntarily dismissed her due process claim against
Sushka in federal court [FN4] This left only the politic-
al affiliation claim remaining

> FN4. Smith dropped this claim because,
> after the court of appeal's decision, it be-
> came apparent that her due process claim
> was untenable because unclassified state
> employees serve at the discretion of the ap-
> pointing authority and may be removed at
> his pleasure Ohio Admin. Code 124-1-01

After the court of appeals upheld the SPBR's decision
and three days before the political affiliation claim
was to go to trial in federal court, Sushka filed a
second motion for summary judgment, raising collat-
eral estoppel for the *7 first time [FN5] In this motion,
he admitted firing Smith for political reasons but ar-
gued that political affiliation was an appropriate re-
quirement for the effective performance of Smith's
position Relying on the SPBR's decision, he argued
that Smith was collaterally estopped from litigating
the factual issue of her duties as administrative assist-
ant under Junk and that these factual findings showed
that political affiliation was an appropriate require-
ment for that position The magistrate judge delayed
the trial to give Smith time to respond to the motion
After briefing and argument, the magistrate judge
granted Sushka's motion and dismissed the action

> FN5. Sushka had previously filed a motion
> for summary judgment on the political asso-
> ciation claim, arguing that Smith had failed
> to meet her burden of showing that political
> association was a substantial or motivating
> factor in her termination The district court
> denied this motion, finding that the evidence
> was sufficient to raise a genuine issue of ma-
> terial fact as to whether Smith's political af-
> filiation with Junk was a factor in her ter-
> mination

In his opinion, the magistrate judge held that Smith
was collaterally estopped from relitigating the factual

issue of what duties she had performed as adminis-
trative assistant under Junk He found that Smith had
had a fair opportunity to litigate this issue, and in
fact, had litigated the issue fully before the SPBR and
the Ohio courts Based on the facts as found by the
SPBR, the magistrate judge concluded that
"plaintiff's position was one for which party affili-
ation is an appropriate requirement for the effective
performance of the office " Smith timely appealed
this decision

*969 On appeal, Smith makes two arguments First,
she argues that the issues of collateral estoppel and
political affiliation as an appropriate job requirement
were waived by Sushka because he never pled or
properly relied on them prior to his second motion for
summary judgment Second, she argues that the dis-
trict court improperly applied collateral estoppel to
her case

## *8 II

[1][2][3] Plaintiff begins her attack on the judgment
by raising a technical point of pleading, arguing that
Sushka has waived his right to raise either the affirm-
ative defense of collateral estoppel or political affili-
ation as an appropriate job requirement Although
Sushka did not raise either defense before the second
motion for summary judgment, we do not believe this
is fatal Failure to raise an affirmative defense by re-
sponsive pleading does not always result in waiver
See Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d
1439, 1445 (6th Cir.1993) The purpose of Rule 8(c)
of the Federal Rules of Civil Procedure is to give the
opposing party notice of the affirmative defense and
a chance to respond Ibid While we agree that
Sushka should have been more diligent in raising
these defenses, we do not believe that the district
court abused its discretion by permitting them to be
raised in the second motion for summary judgment
Sushka's failure to raise either affirmative defense did
not result in surprise or unfair prejudice to Smith, es-
pecially since the district court extended the trial date
in order to give Smith the opportunity to fully re-
spond to and brief the issues Additionally, both
parties understood that the decision by the SPBR
could determine some of the issues in this case In
fact, the SPBR decision led Smith to drop her due

© 2007 Thomson/West No Claim to Orig U S Govt Works

117 F 3d 965                                                                 Page 6
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

process claim altogether Moreover, by admitting that he discharged Smith for political reasons, Sushka narrowed the remaining issues in the case Thus, Smith needed only prove that her job was protected by the First Amendment, lessening her burden

### III

The next assignment of error is more difficult to answer Nevertheless, we believe that the doctrine of collateral estoppel as it applies in Ohio bars Smith from litigating her job duties in federal court and that these job duties, as found by the SPBR, show that political affiliation is an appropriate requirement for the position of administrative assistant to the Washington County engineer

[4][5] *9 Collateral estoppel, also called claim preclusion, prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment As a federal court, we are required to apply the doctrine of collateral estoppel in the same manner as the state courts in the state in which the earlier judgment was rendered See *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984)

[6][7][8][9] In Ohio, collateral estoppel bars relitigation of those claims on which a final judgment on the merits has been entered, so long as there has been a "fair opportunity to fully litigate" the claim. *Goodson v. McDonough Power Equip., Inc.,* 2 Ohio St.3d 193, 443 N.E.2d 978, 985 (1983) "[T]he party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment of the prior action " *Ibid* (citations omitted) Thus, collateral estoppel bars relitigation only when the identical issue was actually decided in the prior case *Id.* 443 N.E.2d at 987 This requirement, however, is not so narrow as to require the courts to have framed their conclusion in the exact same manner [Rather,] the Ohio Supreme Court [has] stated that the test to be used in determining the identity of issues involves a consideration of the evidence presented in support of each: If the same facts or evidence would sustain both, the two actions are considered the same within the rule that the judgment in the

former is a bar to the subsequent action If, however, the two actions rest upon different states of facts, or if different proofs would be required to sustain the two actions, a judgment in one is no bar to the maintenance of the other

*970 *Monahan v. Eagle Picher Indus.,* 21 Ohio App.3d 179, 486 N.E.2d 1165, 1168 (1984) (quoting *Norwood v. McDonald,* 142 Ohio St. 299, 52 N.E.2d 67 (1943) (internal quotations omitted)) "It is [thus] the differences in the focus of evidence and proof that determine the dissimilarity of issues and requires that *10 a judgment in one action not be a bar to the maintenance of the other " *Id.* 486 N.E.2d at 1169

[10] Necessary to the state court decision in this case was the determination of whether Smith had, in the language of the Ohio statute, a "fiduciary or administrative relationship" to the Washington County engineer We hold, upon de novo review, that this issue is identical, for purposes of collateral estoppel, to the issue of whether political affiliation is an appropriate consideration in staffing Smith's position While the ultimate conclusions are framed differently, the "same facts or evidence  sustain both " *Id.* at 1168.

The Supreme Court trilogy of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Rutan v. Republican Party,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), establishes the boundaries for determining when political affiliation is an appropriate consideration for staffing a position In *Branti,* a majority of the Court reaffirmed the holdings of the *Elrod* plurality that patronage dismissal violates the First Amendment and that permitting politically motivated dismissals of persons in certain politically sensitive positions is necessary to uphold vital governmental interests 445 U.S. at 513-16, 100 S.Ct. at 1292-94 [FN6] The Court in *Branti,* however, reformulated the scope of permissible patronage, holding that "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate *11 requirement for the effective performance of the public office involved " *Id.* at 518, 100 S.Ct. at 1295 [FN7]

FN6. Although *Branti* concerned member-

117 F 3d 965                                                                    Page 7
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

ship in different political parties, the under-
lying rationale has been understood by this
circuit to apply to any political difference;
thus, political affiliation is not limited to
membership in a political party and includes
commonality of political purpose and sup-
port of political candidacy *McCloud v.
Testa*, 97 F.3d 1536, 1548 (6th Cir.1996)
("dicta and holdings in our own circuit
strongly and nearly without exception sup-
port the concept of applying the ban on pat-
ronage employment practices to non-
ideological factions within the same party")
Thus the fact that both the previous county
engineer, Junk, and Sushka are Democrats
does not make the decision to terminate
Smith any less political

FN7. Prior to this, the inquiry had been
whether the position was one of
"policymaker" or was "confidential" *Branti,*
445 U.S. at 518, 100 S.Ct. at 1295

[11] Determining whether political affiliation is an
appropriate basis for a personnel decision depends
upon "the inherent duties of that position *and* the du-
ties that the new holder of that position will perform.
A plaintiff's failure to meet either part of this test
would cause the claim to be dismissed " *Faughender
v. City of North Olmsted, Ohio,* 927 F.2d 909, 913
(6th Cir.1991) (emphasis in original) The two tests
outlined in *Faughender,* "the job as actually per-
formed" and "the job as envisioned," are not com-
pletely separate and independent Rather, if one or
the other test is clearly and directly applicable, the
other is not independently necessary, although it may
be somewhat informative See *McCloud v. Testa,* 97
F.3d 1536, 1561 (6th Cir.1996)

And while *Faughender* states that a court must exam-
ine the position itself, not just the position as per-
formed, an employer's prior duties can be used "as a
way to gather evidence that the person's position was
one affecting policy " *Faughender,* 927 F.2d at 915
We believe that the SPBR's findings of "the job as
actually performed" by Smith shows the "inherent
duties" of her position are political in nature There-
fore, we do not believe that this case needs to be re-

manded for a determination of the duties of the posi-
tion as envisioned by the new county engineer, espe-
cially since the record does not indicate that Sushka
intended to make the duties of the administrative as-
sistant any different [FN8]

FN8. Although Smith performed mainly
clerical duties after Sushka took office, this
appears to have been due to her political af-
filiation with Junk and not to Sushka's desire
to change the duties of her position

*971 *12 The evidence of Smith's job duties as per-
formed clearly shows that her position was political,
as it falls squarely within the "Category Three" posi-
tions discussed in *McCloud* [FN9] As administrative
assistant to the Washington County engineer, Smith
was a "confidential employee[ ] who control[led] the
lines of communications to [a] category one position
[ ] " [FN10] *McCloud,* 97 F.3d at 1557 And there is
nothing in the inherent nature of the position of ad-
ministrative assistant to contradict her previous du-
ties

FN9. This court in *McCloud* categorized
certain positions as falling into the *Branti*
exception One of those categories,
"Category Three," includes:
confidential advisors who spend a signific-
ant portion of their time on the job advising
category one or category two position-hold-
ers on how to exercise their statutory or del-
egated policymaking authority, or other con-
fidential employees who control the lines of
communications to category one positions,
category two positions or confidential ad-
visors
97 F.3d at 1557

FN10. A "Category One" position includes
"positions specifically named in relevant
federal, state, county, or municipal law to
which discretionary authority with respect
tot he enforcement of that law or the carry-
ing out of some other policy of political con-
cern is granted " *McCloud,* 97 F.3d at 1557

The state court's determination that Smith held an un-

classified position because of the fiduciary nature of her position further supports a finding that the inherent nature of her position is such that political affiliation is appropriate  As noted in *McCloud*  while the *Elrod* test in *Branti* was modified from an inquiry into whether the position is "confidential" or "policymaking" in nature to an inquiry of whether political affiliation is an appropriate requirement, "for the most part" the old labels "remove First Amendment protection from the same class of jobs " *McCloud,* 97 F.3d at 1553-54  Thus, in a case where the actual duties previously assigned were political, as here, *13 and nothing in the inherent nature of the position suggests otherwise, summary judgment is appropriate, especially where, as here, a determination that the position was one of fiduciary responsibility has already been made  Therefore, we hold that the legal issue determined by the SPBR, though framed differently, and the factual findings on which its decision was based, are identical to the issue of whether Smith's position is one "where party affiliation is an appropriate requirement for the effective performance of the public office involved " *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295

### IV

For the foregoing reasons, the district court's order granting Sushka's motion for summary judgment is **AFFIRMED**

### *14 DISSENT

LIVELY, Circuit Judge, dissenting
In my opinion this court has not been consistent in its treatment of cases involving political firings  In fact, it seems to me that the court often goes out of its way to deny to fired public employees the benefit of the holdings by the Supreme Court in the *Elrod-Branti-Rutan* trilogy  The present case is, I believe, an example of the court's tendency to eviscerate the protection afforded public employees in these decisions by finding that "party affiliation is an appropriate requirement for the effective performance," *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980), of every public job except those at the very lowest level

### I.

The *Elrod-Branti-Rutan* trilogy establishes that public employees continue to enjoy First Amendment freedoms of political belief and associational activity save in the narrow exception where "party affiliation is an appropriate requirement for the effective performance of the public office involved " *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295  The majority opinion in the present case is this court's most recent effort to allow this narrow exception to swallow the broad general rule that dismissal of government employees on the basis of political affiliation runs afoul of the First Amendment by restraining freedom of political belief and infringing upon the right to associate with others to advance those beliefs  *972Elrod v. Burns,* 427 U.S. 347, 355-60, 96 S.Ct. 2673, 2680-83, 49 L.Ed.2d 547 (1976)

In *Williams v. City of River Rouge,* 909 F.2d 151 (6th Cir.1990), this court stated: "When examining a public office for first amendment protection against politically-motivated dismissal, the relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office " *Id.* at 154. (citation omitted)  The *Williams* court reasoned that consideration *15 of the position itself "rather than the position as performed by appellant" was important because "[a]ny other approach would tend to bind a later [employer] to employ the [appellant] in the way that the official had been employed in the past " *Id* at 155  After *Williams,* this court broadened the narrow exception, indicating that the determination of whether political affiliation is an appropriate basis for personnel decisions is dependent upon "the inherent duties of that position *and* the duties that the new holder of that position will perform " *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909, 913 (6th Cir.1991) (emphasis in original)

The *Faughender* court indicated that this two-pronged test was derived from *Elrod* and *Branti.* reasoning that "a position that controls the lines of communication of a political actor must be inherently political" because political action cannot occur without communication, *id.* at 914, and that "[p]ermitting elected officials entrusted with adminis-

117 F 3d 965                                                                 Page 9
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

trative duties to reorganize their staffs according to their wishes is also derived from *Elrod* and *Branti* " *Id.* at 915. The court later relied on *Faughender* to uphold the finding that an administrative assistant position at the Ohio Department of Transportation sought by the plaintiff was one that could be filled on a political patronage basis without violating the constitutional rights of unsuccessful candidates *Rice v. Ohio Dep't of Transportation,* 14 F.3d 1133 (6th Cir.1994)

In the present case, the majority finds the issue of whether Ms Smith had a "fiduciary or administrative relationship" to the Washington County Engineer for purposes of Ohio law identical to the issue of whether political affiliation is an appropriate consideration in staffing Ms Smith's position I disagree The majority's determination is based, in part, on its erroneous recitation of the two prongs of *Faughender* as: "the job as actually performed" and "the job as envisioned " Under the *Faughender* standard, and the express language of *Williams,* the appropriateness of basing a personnel decision on political considerations is not tested by the *16 actual work performed by the plaintiff While *Faughender* teaches that the facts relating to the position as performed may be useful in determining whether the position is one for which political affiliation is an appropriate consideration, consideration of the "job as actually performed" is different from consideration of the inherent duties, although the two may certainly overlap

To reach its result in the present case, the majority relies heavily on *McCloud v. Testa,* 97 F.3d 1536 (6th Cir.1996), where the court stated: "There can be no doubt about the essence of the rough distinction that the Supreme Court was trying to create in the *Elrod-Branti-Rutan* trilogy of cases: "grunt" or "line" workers are entitled to First Amendment protection, but workers analogous to a cabinet secretary to a chief executive, along with the confidential advisors and administrative assistants of such executives and cabinet secretaries, are not entitled to First Amendment protection " *Id.* at 1556. (footnote and citation omitted) The *McCloud* opinion discovered four categories of employees to whom no First Amendment protection from patronage dismissal is owed [FN1] *973 Resort to *17 category three, as the majority does in

the present case, deprives public employees of First Amendment protection merely on the basis of their relationship as advisors or controllers of communications to supervisors and superiors in their chain of command The present case illustrates the fallacy of such a categorical approach

> [FN1] **Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
> **Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies
> *McCloud,* 97 F.3d at 1557 (emphasis in original; footnotes omitted)

Reliance solely on the job as actually performed is improper in this case because it is clear from the record that Ms Smith had a very close relationship with the former county engineer, Paul Junk, and his assistant, Dale Cottrill It is quite possible that these two men, because of the personal confidence they had in her based on this relationship, may have given Ms Smith assignments and responsibilities not inherent in the position of an administrative assistant The

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

decision of the Ohio State Personnel Board of Review (SPBR) contains voluminous factual findings concerning the actual duties performed by Ms. Smith in the one-year period immediately prior to her termination, but it contains no findings respecting the inherent nature of the position apart from the actual work performed by the plaintiff, and the SPBR did not consider the impact of Ms Smith's personal relationship with Junk and Cottrill

## II.

I find it particularly disturbing that the majority bases its affirmance on the conclusion that Ms Smith was collaterally estopped from asserting her claim in district court by reason of the administrative decision of the SPBR Collateral estoppel prevents a party from relitigating issues of fact or law which were *necessarily* decided by a previous final judgment Federal courts are required to apply the doctrine of collateral estoppel in the same way as the state courts apply it in the state in which the earlier *18 judgment was rendered See *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984)

Under Ohio law, the doctrine of collateral estoppel bars relitigation of those claims on which a final judgment on the merits has been entered, so long as there has been a "fair opportunity to fully litigate" the claim *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978 (1983) "[A]n absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action " *Id. at 201, 443 N.E.2d 978* (citing *Norwood v. McDonald*, 142 Ohio St. 299, 52 N.E.2d 67 (1943); *First Nat'l Bank v. Berkshire Life Ins. Co.*, 176 Ohio St. 395, 199 N.E.2d 863 (1964); *Ohio Finance Co. v. McReynolds*, 27 Ohio App. 42, 160 N.E. 727 (1927)) Collateral estoppel bars relitigation only when the identical issue was actually decided in the prior case *Id* at 203, 443 N.E.2d 978 Determination of whether a subsequent suit is based upon the same cause of action as a prior suit requires a court to consider the facts necessary to sustain each of the claims *Duncan v. Peck*, 752 F.2d 1135, 1139 (6th Cir.1985) (applying Ohio law)

The district court granted summary judgment on the basis of the SPBR's findings concerning the work actually performed by Ms Smith during the year immediately prior to the time the new county engineer took office Based on the administrative record of the SPBR proceedings alone, the magistrate judge had no basis for determining that the position of administrative assistant to the county engineer is inherently political under either prong of the *Faughender* test This would have required an inquiry beyond the factual findings of the SPBR because that body never considered the inherent nature of the position Its only purpose was to determine whether the job, as performed by Ms Smith, should be denominated classified or unclassified Thus, neither the legal issue determined by the SPBR nor the factual *974 findings on which its decision was based is relevant to Ms Smith's claim that the position from which she was fired was protected by the First *19 Amendment from a politically motivated discharge For this reason, collateral estoppel should not bar Ms Smith's pursuit of her claim in this action

The record before the SPBR does not answer the "inherent duties" prong, as discussed above, and it is totally silent with respect to the other prong of the *Faughender* test-the duties of the position as envisioned by the new county engineer, Mr Sushka In a letter to Ms Smith advising her that she was being terminated, Mr Sushka stated that the position of administrative assistant was being abolished in a reorganization of the county engineer department In a discovery deposition before conclusion of the SPBR proceedings, the defendant testified that while an office as small as the county engineer's did not need an administrative assistant, he contemplated hiring a "confidential secretary " The position of confidential secretary would "most definitely" be different from the plaintiff's position, according to the defendant He gave no description, however, of what the duties of the new position would be, and *Branti* teaches that the label "confidential" does not resolve the question of whether party affiliation is an appropriate requirement for the effective performance of a public office 445 U.S. at 518, 100 S.Ct. at 1294-95

© 2007 Thomson/West No Claim to Orig U S Govt Works

117 F 3d 965
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P
(Cite as: 117 F.3d 965)

Neither of the two essential issues of fact required to be resolved in determining whether the holder of a public job is protected from dismissal---whether the duties of the position held by the plaintiff are inherently political and whether the duties envisioned for the new holder of that position are inherently political, *Faughender*. 927 F 2d at 913---was addressed by the SPBR Furthermore, Mr Sushka never described to the district court the duties that he envisioned for the new holder of the substituted position Relying as it did solely on the SPBR's findings concerning the duties performed by Ms Smith while working under the previous county engineer, the district court made no determination of whether the position of administrative assistant was inherently political. The record contains no written job description for the position, and it is not clear from the record whether Ms Smith's *20 other activities in support of the county engineer and in communication with persons outside the office were required by the job or merely entrusted to her because of her close relationship with the two top officials in the department

### CONCLUSION

I believe Ms Smith was short-changed She was entitled to an opportunity to show, either in response to a motion for summary judgment or at trial, that she was entitled to First Amendment protection from a political firing But she should not have been foreclosed by improper application of collateral estoppel It was unfair and impermissible to shut her off on the basis of an administrative determination based on a totally different inquiry This is just the latest example of this court's increasingly hostile attitude toward the First Amendment claims of public employees who suffer political firings

I respectfully dissent

C A 6 (Ohio),1997
Smith v Sushka
117 F 3d 965, 38 Fed R Serv 3d 435, 1997 Fed App 0197P

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

EXHIBIT 14

Westlaw.

411 F.3d 1369                                                          Page 1
411 F.3d 1369, 75 U.S.P.Q.2d 1065
(Cite as: 411 F.3d 1369)

C

Briefs and Other Related Documents
Ultra-Precision Mfg., Ltd. v. Ford Motor
Co C.A.Fed. (Mich.),2005.
    United States Court of Appeals,Federal Circuit
ULTRA-PRECISION MANUFACTURING, LTD.,
            Plaintiff-Appellant,
                    v.
FORD MOTOR COMPANY, Defendant-Appellee
                No. 04-1329.

                June 15, 2005

**Background:** Consultant sued owner of patent for
automobile air conditioner compressor, claiming joint
inventorship and unjust enrichment. The United
States District Court for the Eastern District of
Michigan, Victoria A. Roberts, J., granted summary
judgment for owner, and consultant appealed.

**Holdings:** The Court of Appeals, Linn, Circuit
Judge, held that:

(1) unjust enrichment claim was preempted by feder-
al patent law, and

(2) finding that consultant's employees did not quali-
fy as joint inventors was not clearly erroneous.


Affirmed.

See also 338 F.3d 1353.
West Headnotes
[1] Courts 106 ☞96(7)

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling
or as Precedents
                106k96 Decisions of United States
Courts as Authority in Other United States Courts
                    106k96(7) k. Particular Questions or
Subject Matter. Most Cited Cases
Regional circuit law governs question of waiver of
defense in patent case.

[2] Patents 291 ☞324.54

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k324 Appeal
                291k324.54 k. Presumptions and Discre-
tion of Lower Court. Most Cited Cases
Finding that party in patent suit did not waive affirm-
ative defense is reviewed for abuse of discretion.

[3] Courts 106 ☞96(7)

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling
or as Precedents
                106k96 Decisions of United States
Courts as Authority in Other United States Courts
                    106k96(7) k. Particular Questions or
Subject Matter. Most Cited Cases
Federal Circuit law governs whether federal patent
law preempts state law claim.

[4] Patents 291 ☞324.5

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k324 Appeal
                291k324.5 k. Scope and Extent of Re-
view in General. Most Cited Cases
Whether federal patent law preempts state law claim
is question of law reviewed de novo.

[5] Federal Civil Procedure 170A ☞751

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(C) Answer
            170AVII(C)2 Affirmative Defense or
Avoidance
                170Ak751 k. In General. Most Cited
Cases
Failure to raise affirmative defense by responsive
pleading does not always result in waiver. Fed.Rules

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

411 F 3d 1369                                                                 Page 2
411 F 3d 1369, 75 U S P Q 2d 1065
**(Cite as: 411 F.3d 1369)**

Civ.Proc.Rule 8(c), 28 U.S.C.A

**[6] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or
Avoidance
          170Ak751 k In General Most Cited
Cases
Purpose of rule requiring that affirmative defense be
set forth in pleadings is to give opposing party notice
of affirmative defense and chance to respond
Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or
Avoidance
          170Ak751 k In General Most Cited
Cases
Finding that unjust enrichment defendant had not
waived patent preemption defense by failing to raise
it until post-answer motion in limine was not abuse of
discretion; defense was raised prior to entry of pretri-
al order, and opponent was afforded opportunity to
respond through both briefing and oral argument
Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A.

**[8] States 360 ☞18.5**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.5 k Conflicting or Conforming
Laws or Regulations Most Cited Cases
"Conflict preemption" occurs when state law stands
as obstacle to accomplishment and execution of full
purposes and objectives of Congress

**[9] Patents 291 ☞280**

291 Patents
   291XII Infringement
      291XII(C) Suits in Equity

291k280 k Nature of Remedy Most Cited
Cases

**States 360 ☞18.87**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.83 Trade Regulation; Monopolies
           360k18.87 k Copyrights and Patents
Most Cited Cases
Federal law preempts state law that offers patent-like
protection to discoveries unprotected under federal
patent law

**[10] Implied and Constructive Contracts 205H ☞3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
          205Hk3 k Unjust Enrichment Most
Cited Cases
Elements of unjust enrichment claim under Michigan
law are (1) receipt of benefit by defendant from
plaintiff, and (2) inequitableness of defendant's reten-
tion of that benefit.

**[11] Implied and Constructive Contracts 205H ☞3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
          205Hk3 k Unjust Enrichment Most
Cited Cases
Michigan law is broad enough to permit unjust en-
richment plaintiff to recover unjust benefit received
by defendant, even if that benefit was related to and
calculated on basis of use of information available to
public

**[12] Implied and Constructive Contracts 205H ☞3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation

411 F 3d 1369                                                                    Page 3
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

205HI(A) In General
205HIk2 Constructive or Quasi Contracts
205HIk3 k Unjust Enrichment  Most Cited Cases

States 360 ☞18.15

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.15 k  Particular Cases, Preemption or Supersession  Most Cited Cases

Unjust enrichment claim, asserted by designers of automobile air conditioning compressor against manufacturer who allegedly benefited from technical information publicly disclosed in designers' patents, was preempted by federal patent law; designers provided no incremental benefit to manufacturer over and above benefit general public received when they published information in issued patents.

[13] Patents 291 ☞92

291 Patents
291III Persons Entitled to Patents
291k92 k  Joint Inventors  Most Cited Cases

Finding that consultants had not conceived of arcuately extending discharge transfer cavity or recognized cylinder offset problem, and thus that they did not qualify as joint inventors of manufacturer's automobile air conditioner compressor design, was not clearly erroneous

Patents 291 ☞328(2)

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k  Original Utility  Most Cited Cases

4,929,157, 4,934,482, 5,133,647, 5,236,312  Cited

*1371 Andrew Kochanowski, Sommers, Schwartz, Silver & Schwartz, P C , of Southfield, Michigan, argued for plaintiff-appellant  With him on the brief was James J. Vlasic  Of counsel on the brief was Michael H. Baniak, Baniak Pine & Gannon, of Chicago, Illinois

Ernie L. Brooks, Brooks Kushman P C , of Southfield, Michigan, argued for defendant-appellee  With him on the brief were Frank A. Angileri and Marc Lorelli

Before MAYER,[FN*] CLEVENGER, and LINN, Circuit Judges

FN* Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004

LINN, Circuit Judge

Ultra-Precision    Manufacturing,    Ltd , ("Ultra-Precision") appeals from a judgment of the United States District Court for the Eastern District of Michigan ("district court") denying Ultra-Precision's claim that Ross Herron ("Herron") and Gary Beard ("Beard") were joint inventors of U.S. Patent No. 5,236,312 ( the '312 patent") Ultra-Precision Mfg . Ltd v Ford Motor Co . No 01-70302 (E D Mich March 30, 2004) ("Inventorship Opinion"); Ultra-Precision Mfg . Ltd v Ford Motor Co , No 01-70302 (E D Mich March 30, 2004) ("Final Judgment Order") Ultra-Precision also appeals from the district court's grant of summary judgment to Ford on Ultra-Precision's unjust enrichment claim, which the district court held preempted, as pled, by federal patent law  Ultra-Precision Mfg . Ltd v Ford Motor Co . No 01-70302 (E D Mich Sept 23, 2003) ("Nunc Pro Tunc Order"); Ultra-Precision Mfg . Ltd v Ford Motor Co . No 01-70302 (E D Mich Sept 23, 2003) ("Summary Judgment Order II") Because the district court did not abuse its discretion in permitting Ford to raise the preemption defense during pre-trial motions, because the district court did not err in holding that Ultra-Precision's unjust enrichment claim was preempted as pled, because the district court's findings of fact with respect to inventorship were not clearly erroneous, and because its conclusion of law with respect to inventorship was correct, we affirm

I BACKGROUND

In the mid-1980's, Ford engaged in an effort to reduce excessive noise, vibration, and harshness ("NVH") in an air conditioner compressor it referred to as "the FX-15 " Ford assigned several engineers

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

411 F 3d 1369                                                                                                    Page 4
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F 3d 1369)

including Eugene Warman ("Warman") to work on the project By 1987, Ford had found at least a partial solution, which became the subject of a patent application that matured into U.S. Patent No. 4,929,157 ('the '157 patent') Ford's solution described in the '157 patent added a pulse damper ("PD") tube at the outlet port of the compressor to reduce peak-to-peak *1372 pressure pulsations thought to be a cause of NVH Although Ford's PD tube achieved a pressure pulse reduction meeting its objective, Ford did not commercialize its PD tube because of concerns about possible damage from the accumulation of liquid refrigerant in compressors incorporating this design

In 1988, Frank Sullivan, an employee in Ford's Climate Control Division, reached out to Herron and Beard at Ultra-Precision for help in solving the NVH problem Herron, an industrial engineer, had worked for Ford until 1957 Beard had worked as a product design engineer at Ford until he retired in 1988 After Beard's retirement, Herron and Beard formed Ultra-Precision, which was engaged in the business of designing, engineering, and manufacturing prototype equipment for the automotive industry Responding to Sullivan's request, Herron and Beard eventually met with Warman, who explained Ford's interest in solving the NVH problem by finding a way to lower the peak-to-peak pressure pulse level below 6 25 PSI while eliminating the need for an in-line muffler. When Herron and Beard met with Warman, Ultra-Precision believed that the in-line muffler added approximately five dollars to the cost of each unit and that it could solve the NVH problem and eliminate the in-line muffler for a fraction of the muffler's cost on a per unit basis There is nothing in the record to indicate that Ultra-Precision and Ford ever entered into a written agreement Notwithstanding the absence of any written agreement or confidentiality undertaking, Herron and Beard set out to work on the project They disassembled an FX-15 compressor to determine how it functioned, studied its construction and operation, and, on January 18, 1989, conceptualized a solution

They theorized that pulses of pressurized refrigerant from each side of the five reciprocating, cylindrically arranged cylinders within the compressor were superimposing into five large pressure pulses before the

pulses left the discharge side of the compressor, thereby causing NVH Their solution was to change or manipulate the paths of the pulses to make gas flow roughly equidistant and thereby maintain pulse separation To accomplish that, they used a PD tube to redirect gas much like Ford's earlier PD tube However, Ultra-Precision's tube had a tighter fit in the outlet port and employed grooves to better reroute and directionalize fluid flow Herron and Beard delivered prototypes of their PD tube to Ford for testing Ford conducted tests and Warman informed Herron and Beard that the peak-to-peak discharge level of their PD tube was 4 7 PSI, well within Ford's 6 25 PSI upper limit target Herron and Beard told Warman that a compressor housing could be integrally cast to incorporate their new design In May 1989, Herron and Beard understood that their PD tube design was approved for production by Ford They subsequently presented Ford with a cost of $0 31 per unit

On July 7, 1989, Herron and Beard filed a patent application on their PD tube invention The application matured into U.S. Patent No. 4,934,482 ("the '482 patent") On June 15, 1990, Herron and Beard filed a continuation-in-part application, which matured into U.S. Patent No. 5,133,647 ("the '647 patent") Herron and Beard assigned both patents to Ultra-Precision To obtain the '482 patent, Herron and Beard had to distinguish their invention over Ford's earlier '157 patent The '482 patent thus called for the use of "grooves" on the PD tube's outer surface, which would direct the pulses through the valve plate in a controlled manner See e g '482 patent, col 5, ll 32-47 The '647 patent mentioned that the pulse damper *1373 could be integrally cast into the compressor housing '647 patent, col 5, ll 61-63

In July 1990, Herron and Beard met with Jim Graham, an employee in Ford's vehicle office, to discuss installation of compressors with Ultra-Precision's PD tube into concept cars In October 1990, Herron delivered compressors to Graham with Ultra-Precision PD tubes installed for testing But shortly thereafter, Herron and Beard received a letter dated October 18, 1990, from Thomas E Finn ("Finn"), a Ford engineer who had replaced Warman, complaining about Herron and Beard's "actively trying to sell the merits of

the P D Tube to various vehicle offices" within Ford rather than Ford's Climate Control Division and the inefficiencies attendant thereto In the letter, Finn stated that he was "well aware of the merits of the P D Tube" and that he was "investigating its performance with other design changes " He also remarked that the PD tube "does not work well alone in our system," and "[i]f it had, [Ford] would have implemented the change " Finn advised Herron and Beard to direct their future contacts to the Climate Control Division After concluding that Ford was not interested, Ultra-Precision decided simply to move on to other projects, leaving Finn's letter as the last communication between Ultra-Precision and Ford

Finn and his team continued to work on solving the FX-15's NVH problem, and sometime after December 7, 1990, studied a compressor made by Nippondenso ("Denso") The Denso compressor had an internal cast-in muffler cavity The gases of the Denso device exited from the center and did not have the axial offset of the FX-15, i e , the additional distance the gas from the front had to travel to reach the rear discharge cavity To correct for axial offset in the FX-15, Finn modified the rear cylinder head to include an internally cast "arcuate transfer cavity," as shown below



By design, the travel length of the rear gases through the arcuate cavity was made approximately equal to the travel length of the front gases through the axial discharge cavity In this way, Ford corrected for NVH caused by "axial offset "

Finn also theorized that because each compressor employed five double-ended pistons in a cylindrical array, the travel distances between the respective discharge ports of the cylinders and the compressor output differed circumferentially and introduced*1374 what he called "cylinder offset " He corrected for "cylinder offset" by moving the rear discharge port circumferentially by 144 to a position between cylinders (2) and (4), thereby equalizing the lengths from opposing cylinders to the discharge port of the compressor On December 23, 1991, Finn's team filed a patent application, which matured into the '312 patent

In 1993, Ford began to incorporate Finn's redesigned compressor, designated "the FS-10," into its vehicles In 2000, Herron and Beard noticed a Ford vehicle with an air conditioner compressor that did not have an in-line muffler, conducted an investigation, and discovered what they believed to be their solution embodied in the FS-10

## II PROCEDURAL HISTORY

On January 22, 2001, Ultra-Precision filed suit against Ford on four counts: (1) unjust enrichment; (2) correction of inventorship; (3) commercial misappropriation; and (4) breach of contract (Compl at 6-8 ) Ultra-Precision did not claim infringement of its '482 or '647 patents, misappropriation of a trade secret, or breach of a confidentiality agreement Indeed, Ultra-Precision's complaint did not allege that its solution was at any time disclosed to Ford in confidence or kept as a trade secret Ultra-Precision claimed it was aware of a Ford policy intended to provide an incentive to Ford's existing suppliers by sharing with a supplier one-half of any cost savings achieved by that supplier's innovation Ultra-Precision also alleged that its motivation to help Ford was to take advantage of this policy Because Ultra-Precision dropped the contract claim early in the litigation, the district court made no fact findings as to Ford's supplier cost-saving policy or why Ultra-Precision believed that it qualified or otherwise might have been entitled to benefit from that policy The commercial misappropriation count also was resolved early in the litigation by the district court's grant of a motion filed by Ford for summary judgment, a de-

© 2007 Thomson/West No Claim to Orig U S Govt Works

411 F 3d 1369
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

termination Ultra-Precision does not appeal

This left only the inventorship and unjust enrichment counts at issue On the first of these counts, Ultra-Precision initially contended that Herron and Beard were the only inventors of the '312 patent On the second count, Ultra-Precision alleged that it solved a problem that Ford could not solve and that Ultra-Precision's financial incentive in solving the problem was the benefit it anticipated under Ford's cost savings program (Compl at 2-4 ) More specifically, the unjust enrichment count of the complaint averred:
23 Plaintiff has conferred a measurable benefit upon Defendant by designing, engineering and inventing the solution to the FX-15 compressor's NVH problem which FMC was unable to do by itself
24 Defendant has been, continues to be, and will in the future be unjustly enriched by (a) using, manufacturing, and selling vehicles equipped with Plaintiff's technology without compensating Plaintiff, and (b) patenting Plaintiff's invention, and maintaining, and exercising exclusive rights thereto to the exclusion of Plaintiff until the year 2010 or later

(Compl at 6 ) Ultra-Precision alleged that Ford had benefited by:d Defendant's cost savings of developing a successful NVH-suppression technology for the FX-15 compressor;
e Defendant's past cost savings for not paying Plaintiff under the 1989 cost savings program for the life of the FX-15 part; [and]
f Defendant's future cost savings for not paying Plaintiff under the 1989 *1375 cost saving program for the life of the FX-15 part[ ]

(Compl at 9 ) In contesting the unjust enrichment count, Ford first filed a motion for summary judgment, which the district court denied *Ultra-Precision Mfg , Ltd v Ford Motor Co* . No 01-70302 (E D Mich May 31, 2002) ("*Summary Judgment Order I*") The district court held that Ultra-Precision had stated a claim for unjust enrichment under Michigan law The district court reasoned that Ultra-Precision's unjust enrichment claim was similar to the claim at issue in *B & M Die Co, v Ford Motor Co.,* 167 Mich.App. 176, 421 N.W.2d 620, 622 (1988), and that "[t]he form of plaintiff's ownership of the idea at issue [in *B & M Die*] was not material to the

[Michigan] court's decision that the jury could consider the extent to which defendant benefited from plaintiff's [technical] information " *Summary Judgment Order I* at 18 The district court, *sua sponte,* raised the question of preemption but held that federal patent law did not preempt the unjust enrichment claim, citing *University of Colorado Foundation v. American Cyanamid.* 196 F.3d 1366, 1371 (Fed.Cir.1999) *Summary Judgment Order I* at 13

During the course of the summary judgment proceedings, Ultra-Precision modified its position on the inventorship count to drop the allegation that Herron and Beard were the only inventors of the '312 patent and instead asserted that they were joint inventors, along with the Ford inventors already named Thereafter, in two June 24, 2002, motions in limine, Ford, for the first time on its own accord, raised the defense that federal patent law preempted Ultra-Precision's unjust enrichment claim Ford argued to exclude evidence of damages based on Ford's alleged savings resulting from: (a) use of the invention of the '312 patent, and (b) use of ideas disclosed in Ultra-Precision's patents but not claimed On July 10, 2002, Ultra-Precision filed a brief in response arguing that Ford waived the preemption defense by not presenting it in its answer and, regardless, that the unjust enrichment claim is not preempted

On August 16, 2002, the district court held a hearing on Ford's motions and then ruled from the bench that Ford did not waive the preemption defense because Ford raised the issue before the pretrial order, in accord with *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp. 404, 405 (E.D.Mich.1987) The district court also commented that Ultra-Precision originally pled that Herron and Beard were the only inventors, suggesting that the new defense was not available until Ultra-Precision changed its position to assert joint inventorship with the Ford inventors The district court then took Ford's motions in limine under advisement, and in an August 21, 2002 order, ruled in Ford's favor Following its ruling, the district court invited Ultra-Precision to amend its complaint and either allege an unjust benefit other than cost-savings from the use of Ultra-Precision's idea after issuance of Ultra-Precision's patents, or state a claim for unjust enrichment on grounds other than Herron and Beard's al-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

411 F.3d 1369                                                      Page 7
411 F.3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

leged status as co-inventors Ultra-Precision declined On September 5, 2002, the district court entered a Rule 54(b) certification of the August 21, 2002 order on the motions in limine Ultra-Precision appealed On July 23, 2003, we held that the evidentiary order was not a final disposition of the unjust enrichment claim that could be certified for appeal and remanded the case to the district court *Ultra-Precision Mfg. Ltd. v. Ford Motor Co., 338 F.3d 1353, 1360 (Fed.Cir.2003)*

Following this court's remand, on September 23, 2003, the district court entered a *nunc pro tunc* order clarifying the disposition of the unjust enrichment claim The **\*1376** district court explained that Ultra-Precision's claim "based upon [Ford's] unauthorized use of a concept that Plaintiff admits was not patented and that was publicly disclosed in Plaintiff's '482 and '647 patents" was preempted under *Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) Nunc Pro Tunc Order* at 3 The district court also reasoned that 35 U.S.C. § 262 precluded Ultra-Precision from obtaining an "accounting" from joint inventors *Id* The district court thus granted summary judgment on the unjust enrichment count to Ford *Summary Judgment Order II* at 1. A non-jury trial was then held on the remaining inventorship count, and on March 30, 2004, the district court made findings of fact and concluded as a matter of law that Herron and Beard were not joint inventors *Inventorship Opinion* The district court then entered a final judgment from which Ultra-Precision appeals, challenging the district court's rulings on waiver, preemption, and joint inventorship We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1)

### III ANALYSIS

#### A Standard of Review

[1][2][3][4] Regional circuit law governs the question of waiver of a defense *Riverwood Int'l Corp. v. R.A. Jones & Co., 324 F.3d 1346, 1352 (Fed.Cir.2003)* The Sixth Circuit reviews a finding that a party did not waive an affirmative defense for abuse of discretion *Smith v. Sushka, 117 F.3d 965, 969 (6th Cir.1997)* Federal Circuit law governs whether fed-

eral patent law preempts a state law claim *Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1361 (Fed.Cir.1999)* Preemption is a question of law reviewed *de novo See Dow Chem. Co. v. Exxon Corp., 139 F.3d 1470, 1473-79 (Fed.Cir.1998)* In analyzing inventorship, a district court makes underlying findings of fact and then decides inventorship as a matter of law *Trovan, Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1301 (Fed.Cir.2002)* We review those findings of fact for clear error and conclusions of law *de novo Id.*

#### B Waiver

[5][6] Ultra-Precision argues that the district court abused its discretion in allowing Ford to raise preemption because Ford did not plead preemption or raise the defense earlier than the time of the pre-trial motions "Failure to raise an affirmative defense by responsive pleading does not always result in waiver The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond" *Sushka, 117 F.3d at 969* (citing *Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1445 (6th Cir.1993)*) In *Sushka,* the court found no abuse of discretion in the district court's permitting defendant to raise two affirmative defenses in a second motion for summary judgment because there was no unfair prejudice given that the district court allowed plaintiff the opportunity to fully respond to and brief the issues. *117 F.3d at 969*

[7] Here, preemption first entered the case when the district court addressed the issue, *sua sponte.* in denying Ford's initial motion for summary judgment on unjust enrichment Although Ford did not raise preemption on its own accord until its motions in limine, the district court afforded Ultra-Precision the opportunity to respond to Ford's preemption argument through both briefing and oral argument Thus, the district court's ruling is consistent with the Sixth Circuit's decision in *Sushka* and the district court's earlier ruling in *Fitzgerald, 681 F.Supp. at 405,* in which it held that a preemption defense was not waived if raised anytime before the pretrial order, even if not pled as an **\*1377** affirmative defense We find no basis to conclude that the district court abused its dis-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

411 F 3d 1369                                                              Page 8
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

cretion in finding no waiver  The cases to which Ul-tra-Precision cites are not germane.

### C Preemption

#### 1 The Parties' Arguments

Ultra-Precision argues that Michigan unjust enrich-ment law permits a plaintiff to present evidence to a jury of a defendant's unjust benefit from the use of technical information given to defendant by plaintiff, regardless of plaintiff's property interest, *vel non.* in the technical information  Ultra-Precision asserts that given Ford's supplier cost-savings policy, the money Ford saved by not paying Ultra-Precision under that policy is the fairest measure of Ford's unjust benefit  Ultra-Precision argues that this court's decisions in the *American Cyanamid* cases recognize the distinc-tion, for preemption purposes, between an unjust en-richment claim, which is a claim in quasi-contract, and a claim for infringement of a property right  Ul-tra-Precision argues that just as federal patent law does not preempt a damage recovery based on use of an idea in the public domain on an express contract theory, *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 266, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), fed-eral patent law should not preempt a damage recov-ery based on use of an idea in the public domain on a quasi-contract claim  Ultra-Precision asks that we permit its unjust enrichment claim to proceed because we allow claims to proceed based upon misappropri-ation of a trade secret, *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 493, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), or use of non-functional trade dress, *Mid-west Indus.,* 175 F.3d at 1364-65

Ford argues that Ultra-Precision is seeking an award of damages for the making, using, and selling of in-formation and ideas not protected under federal pat-ent law and that federal patent law preempts such a claim, relying on *Bonito Boats.* Ford asserts that *Aronson* is inapposite because it dealt with an express contract and here Ultra-Precision pled and dropped its contract claim  Ford also argues that *American Cy-anamid* is distinguishable because Ultra-Precision does not claim an incremental benefit based on incor-rect inventorship  Finally, Ford argues that *Water v. Ford Motor Co.,* 331 F.3d 851 (Fed.Cir.2003), was

decided on similar facts and supports its preemption defense

#### 2 Discussion

[8] Under the Supremacy Clause, state law that con-flicts with federal law is without effect  U S  Const. art VI, cl 2; *Bonito Boats,* 489 U.S. at 168, 109 S.Ct. 971; *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1331 (Fed.Cir.1998), *overruled in part on other grounds by. Midwest Indus.,* 175 F.3d at 1361. Preemption can be any of three types: expli-cit, field, or conflict preemption  *Hunter Douglas.* 153 F.3d at 1332. Because federal patent law does not provide explicit preemption, 35 U.S.C. §§ 1-376 (2000); *Hunter Douglas,* 153 F.3d at 1332, and be-cause Congress does not intend to occupy exclusively the field of unjust enrichment law, *American Cyan-amid,* 196 F.3d at 1371, we are concerned in this case with only conflict preemption  Conflict preemption occurs when state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ' " *Aronson,* 440 U.S. at 262, 99 S.Ct. 1096 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941))

[9] Federal law preempts state law that offers "patent-like protection" to discoveries unprotected under federal patent *1378 law  *Bonito Boats,* 489 U.S. at 156, 109 S.Ct. 971. Federal patent law reflects the objectives of Congress, which include "seek[ing] to foster and reward invention," "promot [ing] dis-closure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires," promoting "the stringent re-quirements for patent protection  to assure that ideas in the public domain remain there for the free use of the public," *Aronson,* 440 U.S. at 156-57, 99 S.Ct. 1096 (citing *Kewanee Oil,* 416 U.S. at 480-81, 94 S.Ct. 1879), providing a "clear federal demarca-tion between public and private property," and promoting "nationwide uniformity in patent law," *Bonito Boats,* 489 U.S. at 162-63, 109 S.Ct. 971. A state cause of action that frustrates these objectives is preempted  *Id.* at 156-57, 161, 109 S.Ct. 971; *Aronson,* 440 U.S. at 262, 99 S.Ct. 1096

[10][11] Under Michigan law, "a person who has

411 F 3d 1369                                                                                            Page 9
411 F.3d 1369, 75 U S P Q 2d 1065
**(Cite as: 411 F.3d 1369)**

been unjustly enriched at the expense of another is re-
quired to make restitution to the other " *Kammer As-*
*phalt Paving Co. v. E. China Township Schs.*, 443
Mich. 176, 504 N.W.2d 635, 640 (1993) (quoting Re-
statement of Restitution § 1 (1937)) "The essential
elements of such a claim are (1) receipt of a benefit
by the defendant from the plaintiff, and (2) which be-
nefit it is inequitable that the defendant retain " *B &*
*M Die,* 421 N.W.2d at 622. The district court held
that Ultra-Precision stated a cognizable unjust enrich-
ment claim  Neither party, on appeal, challenges the
conclusion that Michigan law is broad enough to per-
mit an unjust enrichment plaintiff to recover an un-
just benefit received, even if that benefit was related
to and calculated on the basis of the use of informa-
tion available to the public

Thus, the question presented in this case is whether
permitting a court to entertain the specific unjust en-
richment claim pled by Ultra-Precision-seeking dam-
ages for Ford's making, using, and selling vehicles
equipped with the solution to the FX-15 compressor
NVH problem that Ultra-Precision contends it de-
signed, engineered, and invented, but did not protect
under the federal patent laws-"stands as an obstacle
to the accomplishment and execution of the full pur-
poses and objectives of Congress" and is thus pree-
mpted  *See American Cyanamid,* 196 F.3d at 1371
(evaluating whether an unjust enrichment claim was
preempted as pled)

This court has on three occasions considered whether
federal patent law preempts state law unjust enrich-
ment claims  In *Waner,* a panel majority held that the
district court properly granted summary judgment to
Ford on Waner's unjust enrichment claim seeking
restitution for the use of an idea over a time period
after Waner disclosed the idea to the public, but be-
fore Waner secured a patent  331 F.3d at 856-57. The
majority found that "there [wa]s no genuine issue of
material fact that Waner's fender liner was introduced
to and available to the public " *Id.* at 857. The court
relied on *Bonito Boats.* In that case, the Supreme
Court held that federal patent law preempted a Flor-
ida statute making it unlawful for a person to use a
particular molding process to duplicate boat hulls
489 U.S. at 144-45, 109 S.Ct. 971. The statute
provided for injunctive relief and damages  *Id.* The

Supreme Court remarked that "[a] state law that sub-
stantially interferes with the enjoyment of an unpat-
ented utilitarian or design conception which has been
freely disclosed by its author to the public at large
impermissibly contravenes the ultimate goal of public
disclosure and use which is the centerpiece of federal
patent policy " *Id.* at 156-57, 109 S.Ct. 971; *accord*
*Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S.
234, 237-38, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964);
*1379*Sears, Roebuck & Co. v. Stiffel Co., 376 U.S.
225, 230-33, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964)
Applying *Bonito Boats,* the majority explained that
"[a]bsent secrecy, state law cannot create a collateral
set of rights available as an adjunct or expansion to
patent rights " *Waner,* 331 F.3d at 856; *accord*
*Darling v. Standard Alaska Prod. Co.,* 818 P.2d 677,
682 (Alaska 1991) (holding that federal patent law
preempted a state law unjust enrichment claim seek-
ing restitution based on the use of an idea in the pub-
lic domain)

Apart from the broad statements in *Waner,* the major-
ity noted that "[w]ere Michigan case law the applic-
able law here, [it] could have a bearing on the result "
*Waner,* 331 F.3d at 856 n. 2. The majority applied
South Dakota law, which it interpreted to foreclose
Waner's claim  *Id.* at 857. The dissent focused on *B &*
*M Die* and argued that although Waner's invention
was in the public domain, "it is undisputed that Ford's
knowledge of it was only through Waner and the
sample fender liners he left with them for evalu-
ation " 331 F.3d at 859 (Newman, J , dissenting)  The
dissent asserted that "[u]nder these circumstances, the
plaintiff's right to compensation is based on a con-
tract implied in law, not the infringement of intellec-
tual property rights " *Id.* at 858.

The *American Cyanamid* case was before us twice  In
that case, Cyanamid breached a confidentiality agree-
ment with University of Colorado researchers
("researchers"), copied the researchers' pre-
publication manuscript into a patent application, held
the invention out as its own, and secured a patent
*Univ. of Colo. Found. v. Am. Cyanamid,* 342 F.3d
1298, 1302-03 (Fed.Cir.2003)  The court held that
patent law did not preempt the researchers' unjust en-
richment claim and that the researchers could recover
the incremental profits that Cyanamid gained by use

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

of the improperly procured patent to exclude others *Id.* at 1307. The court reasoned that the researchers' unjust enrichment claim was not patent-like because it provided a remedy for "the breach of a contract implied in law for disclosure of [the researchers'] confidential manuscript in exchange for a promise not to disseminate the idea without the [researchers'] consent " *342 F.3d at 1306.* The court distinguished *Waner,* explaining that

[u]nlike the inventor in *Waner,* the Doctors here did not seek to prevent the *use of information they placed in the public domain.* rather, they seek to prevent Cyanamid from unjustly securing the '634 patent and obtaining the *incremental profits* by copying significant portions of the Doctors' confidential manuscript describing the invention The district court's unjust enrichment remedy was specifically limited to *incremental profits* Cyanamid wrongfully made by obtaining the '634 patent and did not encompass total profits Cyanamid made by selling a product incorporating the Doctors' invention

*Id.* at 1307 (italicized emphases added); *accord Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.,* 399 F.3d 360, 373-75 (1st Cir.2005) (holding that federal patent law did not preempt an unjust enrichment claim to recover an unfair incremental benefit where defendant persuaded plaintiff to combine into one patent application subject matter invented by plaintiff and defendant, the addition of inventors reduced plaintiff's potential profits because defendant would not need to take a license, and defendant assured plaintiff that it would pay plaintiff a royalty)

[12] In this case, Ultra-Precision makes no claim to an incremental benefit over and above the benefit the public received when Ultra-Precision published the technical information it gave to Ford when Ultra-Precision's patents issued To the contrary, even after the district court *1380 ruled that Ultra-Precision's unjust enrichment claim was preempted as pled and gave Ultra-Precision the opportunity to amend its complaint to assert a different measure of unjust benefit than that held preempted under *Bonito Boats,* Ultra-Precision declined to change its pleading Ultra-Precision never alleged that it enjoyed a confidential relationship with Ford or that its technical information enjoyed trade secret protection Nor did it

allege that the information provided to Ford by Herron and Beard conferred a benefit for services rendered or for a head start over competitors Instead, Ultra-Precision has insisted throughout this lawsuit that it is entitled to damages based on cost savings Ford allegedly realized by "using, manufacturing, and selling vehicles equipped with [Ultra-Precision's] technology," (Compl at 6), despite the fact that the technology that Ford used "was not patented and ... was publicly disclosed in Plaintiff's '482 and '647 patents, such that 'one of ordinary skill in the art' could readily glean the concept from Plaintiff's patents " *Nunc Pro Tunc Order* at 3

Patent law specifies that a party infringes a patent when it "makes, uses, offers to sell, or sells any patented invention, within the United States " 35 U.S.C. § 271(a) (2000) The statute goes on to provide that the patentee is entitled to recover "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer" *Id* § 284 Because "concepts within the public grasp ... provide the baseline of free competition upon which the patent system's incentive to creative effort depends," *Bonito Boats,* 489 U.S. at 156, 109 S.Ct. 971, federal patent law generally precludes a plaintiff from recovering a royalty-like award premised on defendant's making, using, offering to sell, or selling an unpatented discovery after plaintiff makes the discovery available to the public, *see* 35 U.S.C. § 271(a); *Bonito Boats,* 489 U.S. at 156-61. 109 S.Ct. 971. Here, Ultra-Precision seeks a royalty-like award, premised on Ford's savings from using Ultra-Precision's technical information after Ultra-Precision made the discovery available to the public

Ultra-Precision argues that based on Ford's supplier cost-savings policy, Ford's use provides a fair measure of Ford's unjust benefit Regardless of whether the royalty Ultra-Precision sought is "fair," the problem Ultra-Precision faces is that it has not pled that it provided any incremental benefit to Ford over and above the benefit the general public received when Ultra-Precision published its information in its issued patents Indeed it eschewed the district court's invitation to amend its complaint to add a claim for such incremental benefit Ultra-Precision's unjust enrich-

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

411 F 3d 1369                                                      Page 11
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

ment claim, as pled, renders the status of design and utilitarian "ideas" in the public domain less certain and "blurs th[e] clear federal demarcation between public and private property " *See Bonito Boats,* 489 U.S. at 162, 109 S.Ct. 971. As the Supreme Court explained,

[g]iven the inherently ephemeral nature of property in ideas, and the great power such property has to cause harm to the competitive policies which underlay the federal patent laws, the demarcation of broad zones of public and private right is "the type of regulation that demands a uniform national rule " Absent such a federal rule, each State could afford patent-like protection to particular [parties]

*Id.* at 163, 109 S.Ct. 971 (quoting *Ray v. Atl. Richfield Co.,* 435 U.S. 151, 179, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978))

Ultra-Precision's unjust enrichment claim. as pled, also frustrates Congress's objective of "creating an incentive to develop inventions that meet the rigorous requirements**1381** of patentability " *Bonito Boats,* 489 U.S. at 160-63, 109 S.Ct. 971. If Ultra-Precision's unjust enrichment claim were available, a would-be inventor need not satisfy any of the rigorous standards of patentability to secure a perpetual patent-like royalty under state law based on the use of an unpatented idea

Ultra-Precision's reliance on *American Cyanamid* is misplaced *American Cyanamid* found no preemption for a claim for the incremental benefit conferred by an unjustly obtained patent In this case, Ultra-Precision claims no incremental benefit Ultra-Precision does not now contend that its inventors should be substituted for the named Ford inventors. It presently seeks only to add Herron and Beard as joint inventors alongside the Ford inventors Under these facts, Ultra-Precision cannot claim that any nonjoinder by Ford gave it the kind of incremental benefit addressed in *American Cyanamid,* because Ford's ability to use the invention claimed in the '312 patent is unencumbered by the existence of any co-inventors 35 U.S.C. § 262 (2000) Nor can Ultra-Precision claim an incremental benefit to Ford based on use of information during the period of time between Herron and Beard's meetings with Ford and

the time Ultra-Precision's patents issued, because Ford did not make, use or sell any modified compressors until well after Ultra-Precision's alleged solution to the NVH problem became publicly known Finally, Ultra-Precision cannot claim an incremental benefit by Ford based on the number of hours that Ultra-Precision worked on Ford's problem, or on the value of any head-start that Ford might have received over competitors, because Ultra-Precision has declined to amend its pleadings to assert such a claim

Ultra-Precision's reliance on *Aronson* is also misplaced In *Aronson,* "the contracting parties agreed expressly as to alternative obligations if no patent should issue " 440 U.S. at 262, 99 S.Ct. 1096. Attempting to avoid payment of a perpetual royalty, Quick Point asserted that federal patent law preempted the contract claim *Id.* The Court found no preemption and explained that

[t]he design for the keyholder was not in the public domain before Quick Point obtained its license to manufacture it In negotiating the agreement, Mrs Aronson disclosed the design in *confidence* Had Quick Point tried to exploit the design in *breach of that confidence.* it would have risked legal liability It is equally clear that the design entered the public domain as a result of the manufacture and sale of the keyholders under the contract

*Enforcement of these contractual obligations. freely undertaken in arm's length negotiations* and with no fixed reliance on a patent or probable patent grant "[does not deprive the public] of the use of valuable, if not quite patentable, invention [sic] "
The device which is the subject of this contract ceased to have any secrecy as soon as it was first marketed, yet when the contract was negotiated the inventiveness and novelty were sufficiently apparent to induce an experienced novelty manufacturer to agree to pay for the opportunity to be first in the market Federal patent law is not a barrier to such a contract

*Id.* at 263-66, 99 S.Ct. 1096 (emphasis added)

Here, Ultra-Precision has not claimed breach of a confidential relationship and has withdrawn its con-

411 F 3d 1369
411 F 3d 1369, 75 U S P Q 2d 1065
(Cite as: 411 F.3d 1369)

tract claim Herron and Beard freely disclosed information to Ford without attempting to negotiate terms for payment of any kind And Ultra-Precision makes no claim that the discussions*1382 it had with Ford gave Ford "the opportunity to be first in the market " *Id. at 266, 99 S.Ct. 1096.* To the contrary, Ultra-Precision seeks a patent-like remedy for Ford's conduct in making, using, and selling products embodying information Ultra-Precision was not successful in protecting under the federal patent laws and which is free for all the world to enjoy In the absence of an incremental benefit conferred, any attempt to obtain a patent-like royalty for the making, using, or selling of a product in the public domain under the rubric of state unjust enrichment law is preempted

Drawing a line between contract claims and unjust enrichment claims, for preemption purposes, is not unprecedented *See Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.,* 264 F.3d 622, 637-38 (6th Cir.2001) (distinguishing between contract claims and unjust enrichment claims under Michigan law and holding that the unjust enrichment claim was preempted by the federal copyright laws); *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 455-59 (6th Cir.2001) (distinguishing between contract claims and unjust enrichment claims under Michigan law and holding that the implied-in-fact contract claim was not preempted by the copyright laws); *cf Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 439, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (noting the "historic kinship between patent law and copyright law") Allowing states to enforce contracts is consistent with allowing states to protect against misappropriation of trade secrets, *Kewanee,* 416 U.S. at 491-92, 94 S.Ct. 1879, and against consumer confusion, *Midwest Indus.,* 175 F.3d at 1364-65. "In both situations, state protection was not aimed exclusively at the promotion of invention itself, and the state restrictions on the use of unpatented ideas were limited to those necessary to promote goals outside the contemplation of the federal patent scheme " *Bonito Boats,* 489 U.S. at 166, 109 S.Ct. 971. However, unjust enrichment has the potential to take aim at the federal scheme Litigants might press courts to "scrutinize the outcomes of otherwise applicable

rules [e g , the patent laws] and reject results that seem harsh or contrary to the perceived objectives of the rules " *See* Emily Sherwin, *Restitution and Equity: An Analysis of the Principle of Unjust Enrichment,* 79 Tex. L. Rev. 2083, 2095-96, 2101-02 (2001) (discussing one way in which a judge might implement a principle of unjust enrichment) Congress struck a balance with the Patent Act, and it is not for states to scrutinize outcomes and upset the balance *Bonito Boats,* 489 U.S. at 164, 109 S.Ct. 971

The district court's holding that federal patent law preempts Ultra-Precision's unjust enrichment claim, as pled, is affirmed

### D Inventorship

[13] The district court made factual findings and concluded as a matter of law that Herron and Beard are not joint inventors on the '312 patent The district court construed claim 1 to include: (1) an arcuately extending discharge transfer cavity in the rear; (2) an approximately equal length for the arcuate transfer cavity and the axial transfer cavity (which corrects for axial offset); and (3) the distance between a cylinder chamber and its associated discharge cavity port associated with the front cylinder block equals the distance between the next cylinder chamber in the activation sequence and its associated discharge cavity port in the rear (which corrects for cylinder offset) *Inventorship Opinion* at 18-19 The district court noted that claim 6 also employs an arcuate discharge cavity and addresses "cylinder offset " *Id.*

The district court determined that Herron and Beard's inventive concept was "recognizing separation of pulses at their *1383 origin and maintaining that separation through the flow paths out the pump discharge port by equalizing the flow paths " *Id.* at 13. The district court found that Herron and Beard never measured the path lengths of gases using their PD tube *Id.* at 10-11. The district court found that Ultra-Precision had neither documents nor other corroborating evidence reflecting a realization of the importance of the length of the PD tube in addressing axial offset *Id.* at 25. The district court concluded that Herron and Beard did not conceive of manipulating

© 2007 Thomson/West No Claim to Orig U S Govt Works

411 F 3d 1369                                                                    Page 13
411 F 3d 1369, 75 U S P Q 2d 1065
**(Cite as: 411 F.3d 1369)**

path length to address axial offset *Id. at 23.* Herron and Beard admitted that they did not conceive of an arcuately extending discharge transfer cavity or conceive of eliminating cylinder offset *Id. at 13, 18-19.* The district court found that there was no evidence of collaboration between Herron and Beard, and the Finn team *Id. at 23-24.*

On appeal, Ultra-Precision does not contest claim construction Ultra-Precision argues that the only novel concept in the '312 patent is the approximate equalization of the path lengths Ultra-Precision asserts that because Herron and Beard conceived of equalizing path lengths, they are entitled to joint inventorship Ultra-Precision argues that one of ordinary skill in the art would know to try an arcuate design once that person knew to focus on equalizing path lengths As to the feature addressing cylinder offset, Ultra-Precision argues that this was no meaningful invention Ultra-Precision argues that the disclosure of the '312 patent is inadequate, and as a result, the '312 patent is invalid. Ford counters that Ultra-Precision does not challenge the district court's core factual findings Ford asserts that Ultra-Precision admitted that Herron and Beard did not conceive of several claim limitations

The district court found that Herron and Beard admitted that that they did not conceive of the arcuately extending discharge transfer cavity or recognize the cylinder offset problem Ultra-Precision's mere assertion that Herron and Beard in fact conceived of solving the axial offset problem by equalizing path lengths is insufficient. The district court reached the opposite conclusion, and Ultra-Precision has not explained why any of the district court's underlying factual findings is clearly erroneous We have considered Ultra-Precision's remaining arguments and find them to be without merit Thus, we affirm the district court's conclusion that Herron and Beard are not joint inventors

### IV CONCLUSION

Because the district court did not abuse its discretion in permitting Ford to raise the preemption defense, because the district court did not err in holding that Ultra-Precision's unjust enrichment claim was pree-

mpted as pled, because the district court's findings of fact with respect to inventorship were not clearly erroneous, and because its conclusion of law with respect to inventorship was correct, we affirm

*AFFIRMED*

C A Fed (Mich ),2005
Ultra-Precision Mfg , Ltd v Ford Motor Co
411 F 3d 1369, 75 U S P Q 2d 1065

Briefs and Other Related Documents (Back to top)

• 2004 WL 4976897 (Appellate Brief) Reply Brief for Plaintiff-Appellant (Sep 10, 2004) Original Image of this Document (PDF)
• 2004 WL 4976896 (Appellate Brief) Brief for Plaintiff-Appellant (Jun 28, 2004) Original Image of this Document with Appendix (PDF)
• 04-1329 (Docket) (Apr 28, 2004)

END OF DOCUMENT

© 2007 Thomson/West No Claim to Orig U S Govt Works

# EXHIBIT 15

Westlaw.

880 F Supp 416                                                                      Page 1
880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

▷
Wilson Group, Inc v Quorum Health Resources, Inc D S C ,1995.

United States District Court,D South Carolina,Florence Division.

The WILSON GROUP, INC , Plaintiff,

v

QUORUM HEALTH RESOURCES, INC , successor to HCA Management Company, Inc , and Hospital Corporation of America, Defendants.

**Civ. A. No. 4:93-2768-22.**

March 21, 1995

Owner brought action in state court against corporation hired to manage owner's hospitals and clinics and guarantor of first of three management agreements for breach of contract, breach of contract accompanied by fraudulent act, and South Carolina Unfair Trade Practices Act (UTPA) violations. Corporation and guarantor removed action and moved for summary judgment Owner moved to amend complaint. The District Court, Currie, J, held that: (1) issues of fact precluded summary judgment as to whether contract claims were barred by statute of limitations; (2) provision of current management agreement released corporation from liability under prior agreement; (3) owner failed to establish impact on public interest and potential for repetition necessary for UTPA claim; and (4) owner would not be allowed to amend complaint to include negligence claim.

Defendants' motions granted in part and denied in part; plaintiff's motion denied

West Headnotes

**[1] Federal Civil Procedure 170A ⟲⟳2554**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C)3 Summary Judgment
        170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
                170Ak2554 k Matters Considered
Most Cited Cases
In deciding summary judgment motion, court must

look beyond pleadings and determine whether there is genuine need for trial Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A

**[2] Federal Civil Procedure 170A ⟲⟳2470.4**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to Judgment
                170Ak2470.4 k Right to Judgment as Matter of Law Most Cited Cases
    (Formerly 170Ak2549)
On motion for summary judgment, court must determine whether evidence presents sufficient disagreement to require submission to jury or whether it is so one-sided that one party must prevail as matter of law Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A

**[3] Federal Civil Procedure 170A ⟲⟳2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
            170Ak2542 Evidence
                170Ak2544 k Burden of Proof Most Cited Cases
If defendants carry their burden of showing on motion for summary judgment that there is absence of evidence to support claim, then plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, or admissions on file that there is genuine issue of material fact for trial Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A

**[4] Federal Civil Procedure 170A ⟲⟳2470.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to Judgment
                170Ak2470.1 k Materiality and

880 F Supp 416
880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

Genuineness of Fact Issue  Most Cited Cases
For purposes of summary judgment motion, issue of
fact is "genuine" if evidence is such that reasonable
jury could return verdict for plaintiff  Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A

**[5] Federal Civil Procedure 170A ☜═►2470.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to
Judgment
                    170Ak2470.1 k  Materiality and
Genuineness of Fact Issue  Most Cited Cases
For purposes of summary judgment motion, issue of
fact concerns "material" fact only if establishment of
fact might affect outcome of lawsuit under governing
substantive law  Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A

**[6] Federal Civil Procedure 170A ☜═►2470.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to
Judgment
                    170Ak2470.1 k  Materiality and
Genuineness of Fact Issue  Most Cited Cases
For purposes of summary judgment motion, complete
failure of proof concerning essential element of cause
of action necessarily renders all other facts immateri-
al  Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A

**[7] Federal Civil Procedure 170A ☜═►2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k  Weight and Suffi-
ciency  Most Cited Cases
Production of mere scintilla of evidence in support of
essential element of cause of action will not forestall
summary judgment  Fed.Rules Civ.Proc.Rule 56, 28

U.S.C.A

**[8] Federal Civil Procedure 170A ☜═►2470**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to
Judgment
                    170Ak2470 k  Absence of Genuine
Issue of Fact in General  Most Cited Cases
Summary judgment should be granted in those cases
in which it is perfectly clear that no genuine issue of
material fact remains unresolved and inquiry into
facts is unnecessary to clarify application of law
Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A

**[9] Federal Civil Procedure 170A ☜═►2543**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2543 k  Presumptions  Most
Cited Cases
In making its determination on defendants' motion for
summary judgment, district court must draw all per-
missible inferences from underlying facts in light
most favorable to plaintiffs  Fed.Rules Civ.Proc.Rule
56, 28 U.S.C.A

**[10] Federal Civil Procedure 170A ☜═►2468**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)1 In General
                170Ak2465 Matters Affecting Right to
Judgment
                    170Ak2468 k  Bar of Statute of Lim-
itations  Most Cited Cases
For defendant to prevail on its statute of limitations
argument at summary judgment stage, it has burden
of proving that claims fall outside applicable limita-
tions period

**[11] Action 13 ☜═►27(1)**

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

880 F Supp 416
880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

13 Action
  13II Nature and Form
    13k26 Contract or Tort
      13k27 Nature of Action
        13k27(1) k In General  Most Cited
Cases

**Limitation of Actions 241 ☜21(1)**

241 Limitation of Actions
  241I Statutes of Limitation
    241I(B) Limitations Applicable to Particular
Actions
      241k21 Contracts in General
        241k21(1) k In General  Most Cited
Cases

**Limitation of Actions 241 ☜37(1)**

241 Limitation of Actions
  241I Statutes of Limitation
    241I(B) Limitations Applicable to Particular
Actions
      241k37 Relief on Ground of Fraud or Mis-
take
        241k37(1) k In General  Most Cited
Cases
Under South Carolina law, although cause of action
for breach of contract accompanied by fraudulent act
has elements of contract and tort, it is considered
contractual in nature and, therefore, cause of action
for breach of contract accompanied by fraudulent act
is governed by limitations period for contract actions
S.C.Code 1976, § 15-3-530

**[12] Limitation of Actions 241 ☜95(1)**

241 Limitation of Actions
  241II Computation of Period of Limitation
    241II(F) Ignorance, Mistake, Trust, Fraud, and
Concealment or Discovery of Cause of Action
      241k95 Ignorance of Cause of Action
        241k95(1) k In General; What Consti-
tutes Discovery  Most Cited Cases
Under South Carolina law, limitations period may be
extended by discovery rule  S.C.Code 1976, §
15-3-530(7)

**[13] Limitation of Actions 241 ☜95(9)**

241 Limitation of Actions
  241II Computation of Period of Limitation
    241II(F) Ignorance, Mistake, Trust, Fraud, and
Concealment or Discovery of Cause of Action
      241k95 Ignorance of Cause of Action
        241k95(9) k Contracts; Warranties
Most Cited Cases
Under South Carolina's discovery rule, causes of ac-
tion for breach of contract do not accrue until
plaintiff knows or reasonably should know breach
has occurred  S.C.Code 1976, § 15-3-530

**[14] Federal Courts 170B ☜427**

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
      170Bk422 Limitation Laws
        170Bk427 k Computation and Tolling
Most Cited Cases
Federal court sitting in diversity must apply state law
to determine when action is commenced for purposes
of state statute of limitations

**[15] Federal Civil Procedure 170A ☜2492**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2492 k Contract Cases in Gener-
al  Most Cited Cases
Issues of fact as to when owner knew or should have
known of alleged breaches of contract by corporation
hired to manage owner's hospitals and clinics pre-
cluded summary judgment as to whether owner's
claims, under South Carolina law, of breach of con-
tract and breach of contract accompanied by fraudu-
lent act were barred by statute of limitations
S.C.Code 1976, § 15-3-530

**[16] Release 331 ☜1**

331 Release
  331I Requisites and Validity
    331k1 k Nature and Requisites in General
Most Cited Cases
Under South Carolina law, "release" is relinquish-
ment of right or claim by person in whom right exists

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

to person against whom it might have been enforced

**[17] Release 331 ☞25**

331 Release
   331II Construction and Operation
      331k25 k. General Rules of Construction. Most
Cited Cases
Under South Carolina law, release is specific type of
contract and is governed by same principles of inter-
pretation as other contracts

**[18] Release 331 ☞58(1)**

331 Release
   331III Proceedings to Establish Release
      331k58 Questions for Jury
         331k58(1) k. In General  Most Cited Cases
Under South Carolina law, construction of release is,
in first instance, question of law for court

**[19] Release 331 ☞25**

331 Release
   331II Construction and Operation
      331k25 k. General Rules of Construction  Most
Cited Cases
Under South Carolina law, in construing release,
court must seek to ascertain and give effect to inten-
tion of parties

**[20] Release 331 ☞25**

331 Release
   331II Construction and Operation
      331k25 k. General Rules of Construction  Most
Cited Cases
Under South Carolina law, in determining nature of
release, court must first look to instrument itself

**[21] Contracts 95 ☞338(1)**

95 Contracts
   95VI Actions for Breach
      95k331 Pleading
         95k338 Plea, Answer, or Affidavit of De-
fense in General
            95k338(1) k. In General  Most Cited
Cases

**Federal Civil Procedure 170A ☞756**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or
Avoidance
            170Ak756 k. Release, Payment and Ac-
cord and Satisfaction  Most Cited Cases
Hospital management corporation adequately pled re-
lease as affirmative defense to action by hospital
owner for breach of contract and breach of contract
accompanied by fraudulent act; corporation's answer
stated that any claims arising from any management
agreement between parties entered into prior to cur-
rent agreement were "barred because of the waiver"
in current agreement  Fed.Rules Civ.Proc.Rule 8(c),
28 U.S.C.A

**[22] Federal Civil Procedure 170A ☞751**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(C) Answer
         170AVII(C)2 Affirmative Defense or
Avoidance
            170Ak751 k. In General  Most Cited
Cases
Purpose of rule governing pleading of affirmative de-
fenses is to ensure that plaintiff has adequate notice
of such defenses  Fed.Rules Civ.Proc.Rule 8(c), 28
U.S.C.A

**[23] Release 331 ☞58(1)**

331 Release
   331III Proceedings to Establish Release
      331k58 Questions for Jury
         331k58(1) k. In General  Most Cited Cases
Under South Carolina law, whether release is unam-
biguous is matter of law for court to decide

**[24] Release 331 ☞25**

331 Release
   331II Construction and Operation
      331k25 k. General Rules of Construction  Most
Cited Cases
Under South Carolina law, release is ambiguous only

when it may fairly and reasonably be understood in more than one way

**[25] Release 331 ☞33**

331 Release
    331II Construction and Operation
        331k33 k Release of Specific Indebtedness or Liability in General  Most Cited Cases
Under South Carolina law, provision of current management agreement between hospital owner and hospital management corporation stating that, upon owner's payment of outstanding expenses, both parties would be "deemed to have performed their obligations under" prior agreement and neither party would have "any further obligation" under prior agreement except as expressly set forth in current agreement was unambiguous release of any claims owner had under prior agreement, even though provision was under headings "Management Fee" and "Outstanding Debt" and provision did not contain words "release" and "discharge"; corporation forgave outstanding fees of $102,000, current agreement stated that headings were for convenience and were not to be used to construe agreement, and no "magic" words were necessary to create valid release

**[26] Release 331 ☞5**

331 Release
    331I Requisites and Validity
        331k5 k Agreements to Release  Most Cited Cases
Under South Carolina law, no "magic" words are necessary to create valid release

**[27] Contracts 95 ☞147(1)**

95 Contracts
    95II Construction and Operation
      95II(A) General Rules of Construction
        95k147 Intention of Parties
          95k147(1) k In General  Most Cited Cases
Under South Carolina law, subjective intention of parties to clear and unambiguous contract does not control its meaning

**[28] Release 331 ☞33**

331 Release
    331II Construction and Operation
        331k33 k Release of Specific Indebtedness or Liability in General  Most Cited Cases
Under South Carolina law, provision of current management agreement between hospital owner and management corporation was valid release of any claims owner had under prior agreement, notwithstanding contention that owner's representative did not intend to execute general release; subjective intentions of parties to clear and unambiguous release did not control its meaning, and both parties were represented by counsel and were presumed to understand legal ramifications of provision

**[29] Contracts 95 ☞155**

95 Contracts
    95II Construction and Operation
      95II(A) General Rules of Construction
        95k151 Language of Instrument
          95k155 k Construction Against Party Using Words  Most Cited Cases
Under South Carolina law, rule of construction that ambiguities are to be construed against drafter of contract is not automatically applied when there is no evidence of adhesion or unequal bargaining power

**[30] Release 331 ☞13(1)**

331 Release
    331I Requisites and Validity
      331k11 Consideration
        331k13 Sufficiency in General
          331k13(1) k In General  Most Cited Cases
Under South Carolina law, provision of current management agreement between hospital owner and management corporation was valid release of any claims owner had under prior agreement, notwithstanding contention that $102,000 debt which corporation forgave was inadequate consideration for release from liability for breach of contract allegedly exceeding $3,000,000

**[31] Release 331 ☞12(3)**

331 Release
    331I Requisites and Validity

880 F Supp 416
880 F Supp 416
(Cite as: 880 F.Supp. 416)

331k11 Consideration
   331k12 Necessity and Nature
      331k12(3) k Adequacy  Most Cited Cases

Under South Carolina law, when consideration agreed upon for release is something of value, courts generally will not avoid release on ground of inadequacy of consideration for release as contracting parties, not court, must determine quid pro quo

**[32] Antitrust and Trade Regulation 29T ☞151**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk151 k Public Impact or Interest; Private or Internal Transactions  Most Cited Cases
      (Formerly 382k864 Trade Regulation)

In order to bring cause of action under South Carolina Unfair Trade Practices Act (UTPA), alleged unfair acts or practices must adversely affect public interest; that public impact must be proven with specific facts that members of public were adversely affected S.C.Code 1976, § 39-5-10 et seq

**[33] Antitrust and Trade Regulation 29T ☞147**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk139 Persons and Transactions Covered Under General Statutes
            29Tk147 k Contractual Relationships and Breach of Contract in General  Most Cited Cases
      (Formerly 382k862 1 Trade Regulation)

Deliberate or intentional breach of contract, without more, does not constitute violation of South Carolina Unfair Trade Practices Act (UTPA) S.C.Code 1976, § 39-5-10 et seq

**[34] Antitrust and Trade Regulation 29T ☞151**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk151 k Public Impact or Interest;

Private or Internal Transactions  Most Cited Cases
      (Formerly 382k862 1 Trade Regulation)

Hospital owner failed to establish impact on public interest necessary for claim against management corporation for violation of South Carolina Unfair Trade Practices Act (UTPA) in connection with corporation's alleged breach of management agreement, notwithstanding contention that corporation misbilled Medicaid and Medicare, injuring taxpayers; owner was reimbursed at higher rate as result of any misbilling, suffering no actual injury, and, thus, was not appropriate party to seek recovery for possible injuries suffered by taxpayers S.C.Code 1976, § 39-5-10 et seq

**[35] Antitrust and Trade Regulation 29T ☞151**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk151 k Public Impact or Interest; Private or Internal Transactions  Most Cited Cases
      (Formerly 382k864 Trade Regulation)

Hospital owner failed to establish impact on public interest necessary for claim against management corporation for violation of South Carolina Unfair Trade Practices Act (UTPA) in connection with corporation's alleged breach of management agreement, notwithstanding contention that corporation's alleged underbilling deprived patients of improved services as owner historically reinvested its earnings in operation and improvement of its facilities; possible impact was too attenuated, and there was no evidence that owner ever provided less than excellent care or that alleged loss of revenues caused stagnation in owner's services S.C.Code 1976, § 39-5-10 et seq

**[36] Antitrust and Trade Regulation 29T ☞151**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk151 k Public Impact or Interest; Private or Internal Transactions  Most Cited Cases
      (Formerly 382k864 Trade Regulation)

Hospital owner failed to establish impact on public

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

interest necessary for claim against management corporation for violation of South Carolina Unfair Trade Practices Act (UTPA) in connection with corporation's alleged breach of management agreement, notwithstanding contention that corporation failed to improve billing practices and properly train staff in billing procedures; there was no evidence that any patient lost confidence in owner's facilities due to corporation's billing practices or that any alleged lost confidence caused owner to lose revenue S.C.Code 1976, § 39-5-10 et seq

**[37] Antitrust and Trade Regulation 29T ☞149**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk149 k Number or Frequency of Transactions or Acts Most Cited Cases
    (Formerly 382k864 Trade Regulation)
Hospital owner failed to establish potential for repetition necessary for claim against management corporation for violation of South Carolina Unfair Trade Practices Act (UTPA) in connection with corporation's alleged breach of management agreement, even though several corporate employees who were involved in alleged unfair acts still worked for corporation and corporation had over 180 contracts to manage hospitals; there was no evidence of other similar acts by corporation S.C.Code 1976, § 39-5-10 et seq

**[38] Federal Civil Procedure 170A ☞851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k Form and Sufficiency of Amendment Most Cited Cases
Leave to amend should be denied on ground of futility only when proposed amendment is clearly insufficient because of substantive or procedural considerations Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A

**[39] Action 13 ☞27(1)**

13 Action
    13II Nature and Form
        13k26 Contract or Tort

            13k27 Nature of Action
                13k27(1) k In General Most Cited Cases
Under South Carolina law, no tort claim will lie when parties' duties are defined by contract

**[40] Federal Civil Procedure 170A ☞851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k Form and Sufficiency of Amendment Most Cited Cases
Hospital owner would not be allowed to amend its complaint against management corporation asserting breach of management agreements to assert negligence claim alleging that corporation breached its duty to use reasonable care in managing owner's facilities and to deal justly and fairly with owner in operation of facilities as amendment would be futile; duties alleged by owner arose from management agreements, and, under South Carolina law, no tort claim will lie when parties' duties are defined by contract Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A

**\*420** Saunders McKenzie Bridges, Lawrence B. Orr, Julie Berly Ervin, Bridges, Orr, Derrick & Ervin, Florence, SC, for plaintiff
Stuart M. Andrews, Jr., Daniel J. Westbrook, Jonathon P Dyer, Nelson Mullins Riley & Scarborough, L L , Columbia, SC, for defendant

**ORDER**
CURRIE, District Judge
This is an action based on three causes of action: (1) breach of contract; (2) breach of contract accompanied by fraudulent act; and (3) Unfair Trade Practices Act ("UTPA") violations, S.C.Code Ann. §§ 39-5-10 et seq The matter is before the court on (1) Defendant Quorum Health Resources, Inc 's (hereinafter "Quorum") Motion for Partial Summary Judgment, (2) Defendant Hospital Corporation of America's (hereinafter "HCA") Motion for Summary Judgment, and (3) Plaintiff The Wilson Group, Inc 's (hereinafter "Wilson Group") Motion to Amend Complaint On July 20, 1994, both Defendants filed motions for summary judgment The court heard oral argument on the motions for summary judgment on

880 F Supp 416                                                                            Page 8
880 F Supp 416
(Cite as: 880 F.Supp. 416)

September 27, 1994, and took the motions under advisement On November 14, 1994, Wilson Group filed a motion to amend the complaint to allege a negligence cause of action against Quorum for matters arising from November 12, 1991 forward For the reasons set forth below, the court: (1) grants in part and denies in part Quorum's Motion for Partial Summary Judgment; (2) grants in part and denies in part HCA's Motion for Summary Judgment; and (3) denies Wilson Group's Motion to Amend Complaint

## I SUMMARY JUDGMENT STANDARD

[1][2][3][4][5][6][7] In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53, 106 S.Ct. 2505, 2511-13, 91 L.Ed.2d 202 (1986) If Defendants carry their burden of showing there is an absence of evidence to support a claim, then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories or admissions on file that there is a genuine issue of material fact for trial *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986) An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for Plaintiff *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law *Id* A complete failure of proof concerning an essential element of a cause of action necessarily renders all other facts immaterial *Celotex*, 477 U.S. at 322-23, 106 S.Ct. at 2552-53 Moreover, production of a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511-12

[8][9] In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unre-

solved and inquiry into the facts is unnecessary to clarify the application of the law *McKinney v. Bd. of Trustees*, 955 F.2d 924, 928 (4th Cir.1992); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) In making its determination under this standard, this court must draw all permissible inferences from the underlying facts in the light most favorable to Plaintiffs *421Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986); *McKinney*, 955 F.2d at 928

## II FACTUAL BACKGROUND

The following factual background is based on the current record before this court for purposes of summary judgment drawing all permissible inferences from the record in the light most favorable to Plaintiff

This action arises out of a twelve-year contractual relationship between Wilson Group and Defendants. Wilson Group is a South Carolina corporation that owns and operates hospitals and clinics in South Carolina Defendant Quorum is a Delaware corporation with its principal place of business in Tennessee and Defendant HCA is a Tennessee corporation with its principal place of business in Tennessee

Wilson Group and Quorum began their contractual relationship on October 1, 1980 when they signed a five-year management agreement in which Quorum undertook to manage Wilson Groups' facilities [FN1] HCA signed the agreement as guarantor [FN2] On October 1, 1985, Wilson Group and Quorum entered into another five-year management agreement in which Quorum again undertook to manage Wilson Group's facilities [FN3] HCA was not a party to this agreement

> FN1. The October 1, 1980 agreement was actually between Wilson Clinic & Hospital, Wilson Outpatient Clinic, P A , Oakhaven, Inc , and Darlington Convalescent Center and HCA Management Company, Inc Wilson Group is the successor to and parent corporation of the first four parties to the agreement Quorum is the successor to HCA Management Company, Inc

To simplify matters, for purposes of this order, whenever possible the court will refer to Plaintiff and its predecessors and subsidiaries as "Wilson Group" and HCA Management Company, Inc and Quorum Health Resources, Inc as "Quorum "

FN2. HCA was the parent corporation of Quorum's predecessor, HCA Management Company, Inc

FN3. The October 1, 1985 agreement was actually between Plaintiff Wilson Group, Inc and HCA Management Company, Inc , Quorum's predecessor The agreement called for HCA Management Company, Inc to manage Wilson Clinic & Hospital, Inc , Oakhaven, Inc , Wilson Realty, Inc (Darlington Convalescent Center), Wilson Medical Supply, Inc , and the Wilson Clinic, P A

In a letter dated June 13, 1986, John L Wilson, Executive Director of Wilson Clinic and Hospital FN4, wrote to Mr Creighton Likes at Quorum:

FN4. He is also the son of Wilson Group's founder, Dr John M Wilson, M D

As we have stated in the past, it is essential that Wilson [Group] and [Quorum] work very closely together to operate [the Wilson facilities] to our best possible advantage The difficulties of an operation this size are great The expertise required to run it obvious This is the reason [Quorum] is here

\* \* \* \* \* \*

[Wilson Group] feel strongly that revenue ... is being lost These have been brought up in the past to the [Quorum] people at our hospital We will discuss specifics at our next Executive Committee on June 24 It is our intention as a small privately owned business to maximize revenue and remain a top-notch ethical operation This is not being done [Quorum] is your company and the focal point of your career Wilson ... is mine Through the management contract, Wilson ... must also be yours During this period of transition with your leaving the Charlotte office, our receiving an excellent controller, and

the other things which are always in a state of change, it is imperative that full support be given to us not only on the big issues, but the details as well .
As you well know, a hospital which is making a profit does not have the complaints which an unprofitable hospital has We are in that area of unprofitability and attribute part of it to forces beyond our control The other part, over which we do have control, is that which we are depending on you and [Quorum] for innovation, management and air tight control
We are planning to use the June Executive Committee meeting to discuss this further We also plan to let this be a starting point of unparalleled efficiency and profit maximization It is important that everyone involve realize this and be prepared to do everything possible to achieve this end There is no other way to approach this

**\*422** At the June 24, 1986 Executive Committee meeting, Mr Likes gave an overview of the financial status of Wilson Clinic and Hospital and reviewed recent activities designed to correct current problems John L Wilson noted the organization's need for continued efficiencies and additional growth He also distributed an article regarding recent recognition that Quorum had received regarding their dynamic growth within the health care industry and noted the need for that same type of dynamic innovation within the Darlington, South Carolina community A short discussion followed concerning billing and suggestions for improvement and increased collection of patient billings

In November 1986, Wilson Group received its consolidated financial statements and schedules and auditors' report for the fiscal year ending September 30, 1986 from its accountant, Peat, Marwick, Mitchell & Co The consolidated balance sheet showed the Wilson facilities' net accounts receivable to be $1,230,558 The accounts receivable for the previous fiscal year had been $1,266,725 The auditors' report did not indicate whether this amount of accounts receivable was unusual

At the November 25, 1986 Executive Committee meeting, James Worrell, Quorum's new financial controller of Wilson Group facilities, presented the Controller's Report Mr Worrell noted "that all facil-

© 2007 Thomson/West No Claim to Orig U S Govt Works

ities were doing well for the first month of the new fiscal year, showing good overall utilization trends and strong financial results " At the following month's Executive meeting, Mr Worrell gave his report, noting that "bad debt appears to be moderating, giving the hospital a positive variance with respect to budgeted net income "

Due to the large accumulation and age of Wilson Group's accounts receivable, Quorum retained Ray Jordan, an external consultant Mr Jordan was to analyze the accounts receivable and determine how to improve collection efforts There is no indication that Wilson Group requested that Mr Jordan be retained Wilson Group, however, had begun an in-house collection service at the Wilson Clinic and Hospital a few months earlier

The next significant series of events between Wilson Group and Quorum began in 1990 At the July 1990 Executive Committee meeting, Mr Worrell gave the Controller's Report noting that "utilization continued to be strong throughout the organization and that the operating results reflected this fact He expressed optimism for the projected 1990 fiscal year end operating results " At the August, 1990 Executive Committee meeting, Mr Worrell again gave the Controller's Report noting that "accounts receivable were being worked aggressively throughout the organization "

In September 1990, Mr Worrell disclosed to John L Wilson that he was having vendors' checks held In December 1990, Mr Worrell informed John L Wilson that he had not paid FICA, FIT, and SIT taxes due from Wilson Group At the April 1991 Executive Committee meeting, Dick Reif, Vice President of Quorum "stated that he was unaware of unpaid payroll taxes until February, 1991 " In March, 1991, Ruth McDaniel was sent by Quorum to replace Jim Zager as Administrator at Wilson

In a letter dated May 8, 1991, John L Wilson wrote to John Shea, Regional Vice President of Quorum, expressing serious concerns about Quorum's performance in managing the Wilson Group facilities Wilson noted that "our organization is suffering because of two primary reasons, one self inflicted, one Quorum management inflicted " Wilson stated that "our or-

ganization has been neglected over the last 18 or more months by your Charlotte office " He further noted: "A less understanding client would have fired Quorum for the reasons we're continuing to discuss An unreasonable client would probably seek a judicial remedy "

In a letter dated September 10, 1991, James G Stokes, Regional Vice President of Quorum, assured Dr John Wilson that he took very seriously Wilson Group's concerns about Quorum's support and management He stated that he was prepared to work hard at overcoming the past concerns of Wilson Group and place the Wilson Group and Quorum relationship on the right track to make Wilson Group successful in the future

**\*423** Quorum brought in consultants to evaluate the problems and recommend improvements in Wilson's operations In October 1991, Quorum sent six different consulting teams to Wilson for thirteen days Wilson Group could have reasonably believed that this activity would improve the alleged problems caused by both Quorum and Wilson Group

On November 12, 1991, Wilson Group and Quorum entered into a three-year management agreement in which Quorum again undertook to manage Wilson Group's facilities [FN5] Both parties were represented by counsel HCA was not a party to this agreement The 1991 management agreement contained the following provision:

> FN5. Between October 1, 1991 and November 12, 1991, Quorum operated Wilson Group's facilities under the 1985 management agreement pursuant to an automatic renewal provision that extended the agreement by one year if neither party notified the other within 90 days of expiration that it did not wish to renew the agreement

5 MANAGEMENT FEE
(d) *Outstanding Debt to Quorum* Wilson acknowledges that it has accrued a debt to Quorum which is comprised of overdue management fees and reimbursable salary and benefit expenses which were due prior to August 31, 1991 under the Management

880 F Supp 416
880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

Agreement between Wilson and HCA Management Company, Inc (Quorum's former name) which was in effect at that time (the Prior Management Agreement) The amount of overdue management fees is $102,244 70, and the amount of overdue reimbursable expenses is $110,148 09 Quorum has agreed to compromise and settle this debt in return for payment in full of the reimbursable expenses

The parties therefore agree that Wilson will use its best efforts to pay the sum of $110,148 09, without interest, no later than January 31, 1992; and the parties further agree that, if such sum is not paid by January 31, 1992, excess cash generated from the operation of the Hospital will be applied to pay off this debt to Quorum as quickly as possible thereafter Upon payment of this compromise figure, Wilson shall have no further obligation to pay management fees and reimbursable expenses under the Prior Management Agreement, Wilson and Quorum will both be deemed to have performed their obligations under the Prior Management Agreement, and neither party shall have any further obligation under the Prior Management Agreement except as expressly set forth therein

At the end of 1991 and the beginning of 1992, Ruth McDaniel, the Quorum Administrator for Wilson Group, revealed that recommendations made by Quorum's consultants had not been implemented and problems were still being uncovered She assured Wilson Group that she would work hard to resolve these problems Wilson Group believed Ms McDaniel was working to resolve these problems

At the end of 1991, Ms McDaniel came to Dr John M Wilson, M D and offered to help Wilson Group sue Quorum Dr Wilson informed Quorum of this development Wilson Group and Quorum agreed that Ms McDaniel must be removed

Quorum continued to manage Wilson Group's facilities through 1992 In a letter dated September 3, 1992, Dr John M Wilson sent Quorum a notice of alleged breach of the 1991 management agreement and gave Quorum 60 days to cure the problem

This action was filed September 16, 1993 in the Court of Common Pleas for Darlington County The

complaint was served on September 20, 1993 Defendants removed the action to this court October 20, 1993

## III SUMMARY JUDGMENT ANALYSIS

### A QUORUM'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Quorum moves for partial summary judgment on the three grounds: (1) the statute of limitations bars Wilson Group from recovering for any alleged breach of contract that occurred before September 20, 1987, and any alleged breach of contract that occurred between April 5, 1988 and September 20, 1990; (2) Wilson Group has released all claims it may have had against Quorum arising out of the October 1, 1985 management agreement; **\*424** and (3) Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against Quorum

#### 1 STATUTE OF LIMITATIONS

Quorum argues that the applicable statute of limitations bars Wilson Group from recovering under its first two causes of action, breach of contract and breach of contract accompanied by fraudulent act, for breaches before September 20, 1987 or between April 5, 1988 and September 20, 1990 This argument is premised on Quorum's contention that Wilson Group, as a matter of law, knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990 This argument fails

[10] For Quorum to prevail on its statute of limitations argument at the summary judgment stage, it has the burden of proving that the claims fall outside the applicable limitations period *Creech v. N.D.I. Industries, Inc.,* 815 F.Supp. 165, 167 (D.S.C.1993)

[11][12][13][14] The statute of limitations for Wilson Group's first two causes of action is six years from the date of filing for breaches that occurred before April 5, 1988, and three years from the date of filing for breaches that occurred on or after April 5, 1988 S.C.Code Ann. § 15-3-530 (Law Co-op 1976 & Supp 1993) Because of the effective date of § 15-3-530, April 5, 1988, contract claims arising be-

880 F Supp 416
880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

fore that date can be brought within six years, but claims arising after that date must be brought within three years [FN6] The limitations period, however, may be extended by the "discovery rule " *Santee Portland Cement Co. v. Daniel Int'l Corp., 299 S.C. 269, 384 S.E.2d 693 (1989);* S.C.Code Ann. § 15-3-530(7) (Law Co-op 1976 & Supp 1993) Under the "discovery rule," causes of action for breach of contract do not accrue until a plaintiff knows or reasonably should know a breach has occurred Therefore, to prevail on its statute of limitations argument Quorum must show, as a matter of law, Wilson Group knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990 [FN7]

> FN6. Although a cause of action for breach of contract accompanied by a fraudulent act has elements of contract and tort, it is considered contractual in nature *Peeples v. Orkin Exterminating Co.,* 244 S.C. 173, 135 S.E.2d 845, 847 (1964) Therefore, Wilson Group's cause of action for breach of contract accompanied by a fraudulent act is governed by the limitations period for contract actions.

> FN7. A federal court sitting in diversity must apply state law to determine when an action is commenced for purposes of a state statute of limitations *Wolfberg v. Greenwood Development Corp.,* 868 F.Supp. 132, 134 (D.S.C.1994) Rule 3, South Carolina Rules of Civil Procedure, requires service of process to commence an action The complaint was served on September 20, 1993

[15] Viewing the facts and all reasonable inferences in the light most favorable to Wilson Group, the court cannot say as a matter of law that Wilson Group knew or reasonably should have known of Quorum's alleged breaches before September 20, 1987, or September 20, 1990 It is true, as described above, that there were many discussions and correspondence between Wilson Group and Quorum regarding Quorum's management of Wilson Group's facilities These discussions and correspondence began by June 1986 On one hand, they could be described as constructive

communication aimed at solving the mutual problems confronting both parties in operating the Wilson Group's facilities Because Wilson Group complained about Quorum's operation of its facilities does not necessarily lead to the conclusion that Wilson Group knew Quorum had allegedly breached its contract On the other hand, the discussions and correspondence might demonstrate that Wilson Group knew or reasonably should have known of the alleged breaches before September 20, 1987, or September 20, 1990 Not until the May 8, 1991 letter is it clear, as a matter of law, that Wilson Group discovered or reasonably should have discovered the alleged breaches This case presents the typical situation where determining whether the discovery rule will relieve a plaintiff from the operation of the statute of limitations is a question for the jury Therefore, Quorum's Motion for Partial Summary *425 Judgment as it relates to the statute of limitations is denied [FN8]

> FN8. Because of the court's ruling, it need not address Wilson Group's argument that Quorum should be estopped from asserting the statute of limitations under *Dillon School Dist. v. Lewis Sheet Metal Works, Inc.,* 286 S.C. 207, 332 S.E.2d 555 (Ct.App.1985)

### 2 RELEASE

Quorum next argues that Wilson Group released all claims it may have had against Quorum arising out of the October 1, 1985 management agreement when it signed the November 12, 1991 management agreement The court agrees

[16][17][18][19][20] A release is the relinquishment of a right or claim by the person in whom the right exists to the person against whom it might have been enforced 18 S.C.Juris. Release § 2 A release is a specific type of contract and governed by the same principles of interpretation as other contracts *Cf Lowery v. Callahan,* 210 S.C. 300, 42 S.E.2d 457, 458 (1947) (noting that same principles of adequacy of consideration govern contracts and releases) "No set form of words is necessary to constitute a release " *Gardner v. City of Columbia Police Dept.,* 216 S.C. 219, 57 S.E.2d 308, 310 (1950) Pursuant to

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

the general rule, particular words and expressions in releases are given their ordinary meanings, unless the context indicates their use in a different sense *Id.* 57 S.E.2d at 309 The construction of a release is, in the first instance, a question of law for the court In construing the release, the court must seek to ascertain and give effect to the intention of the parties In determining the nature of the release, the court must first look to the instrument itself *Campbell v. Bi-Lo, Inc.,* 301 S.C. 448, 392 S.E.2d 477, 479 (Ct.App.1990) (citations omitted)

In this case, the meaning of the release contained in the November 12, 1991 management agreement is clear and unambiguous Wilson Group owed Quorum over $212,000 00 in past fees and expenses By the plain language of Section 5(d), Quorum agreed to forgive over $102,000 00 in overdue fees and interest on more than $110,000 00 in overdue expenses in exchange for release from any liability under the October 1, 1985 management agreement

Wilson Group raises several arguments it contends demonstrate that Section 5(d) does not release all of Wilson Group's claims against Quorum arising out of the October 1, 1985 management agreement These arguments fail

[21][22] First, Wilson Group contends that Quorum failed to plead release as an affirmative defense as required by Fed.R.Civ.P. 8(c) Quorum's Answer, however, states that Wilson Group's claims arising from any agreement between the parties entered into prior to November 12, 1991 "are barred because of the waiver in the [November 12, 1991 management] agreement Quorum's Answer at ¶ 14 The purpose of Rule 8(c) is to ensure that a plaintiff has adequate notice of affirmative defenses *Blonder-Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453-54, 28 L.Ed.2d 788 (1971) Paragraph 14 accomplishes that purposes

Second, Wilson Group contends that the plain and ordinary meaning of Section 5(d) does not establish a release Wilson notes that (1) the release is contained under the headings "Management Fee" and "Outstanding Debt to Quorum"; (2) the terms "release" and "discharge" are not contained in Sec-

tion 5(d); and (3) the release states that "neither party shall have any further obligation under the Prior Management Agreement *except as expressly set forth therein* "

[23][24][25][26][27][28][29] Whether a release is unambiguous is a matter of law for the court to decide *Campbell,* 392 S.E.2d at 479 A release is ambiguous only when it may fairly and reasonably be understood in more than one way See *Far v. Duke Power Co.,* 265 S.C. 356, 218 S.E.2d 431, 433-34 (1975) As to the headings, Section 19(a) of the 1991 management agreement states that "[s]ection headings are for convenience of reference only and shall not be used to construe the meaning of any provision of this Agreement " As to the argument that the terms "release" and "discharge" are not used, South Carolina law is clear that no "magic" words are necessary to create a valid release *426*Gardner, 57 S.E.2d at 310 Because the court finds Section 5(d) to be a clear and unambiguous release, Wilson Group's arguments concerning extrinsic evidence [FN9] and the rule of construction that ambiguities are to be construed against the drafter are inapplicable [FN10]

> FN9. Wilson Group argues its representatives who negotiated the 1991 management agreement did not intend to provide a general release This argument would fail for two reasons First, the subjective intention of parties to a clear and unambiguous contract do not control its meaning Any other principle would allow a party to avoid the legal effect of a release by claiming it did not believe it was releasing its rights Second, both parties were represented by counsel in the negotiation of the release and are presumed to understand its legal ramifications *Somora v. Marriott Corp.,* 812 F.Supp. 917, 922-23 (D.Minn.1993)

> FN10. The court also notes that this rule of construction is not automatically applied when there is no evidence of adhesion or unequal bargaining power *Int'l Wood Processors v. Power Dry, Inc.,* 593 F.Supp. 710, 734 (D.S.C.1984) *aff'd.* 792 F.2d 416 (4th Cir.1986)

© 2007 Thomson/West No Claim to Orig U S Govt Works

[30][31] Finally, Wilson Group contends that the $102,000 00 debt forgiven in exchange for a release from liability that it contends is in excess of $3,000,000 00 is insufficient This argument fails for two reasons First, the amount of damages in this action is hotly contested Second, when the consideration agreed upon for a release is something of value, courts generally will not avoid a release on the ground of inadequacy of consideration for the release because the contracting parties, not the court, must determine the quid pro quo *Lowery,* 42 S.E.2d at 458 This rule has been held to apply even though the settlement is improvident, and even when the releasor was ignorant of his rights *Id* Therefore, the court grants Quorum's Motion for Partial Summary Judgment as to Wilson Group's release of all claims it may have had against Quorum arising out of the October 1, 1985 management agreement

### 3 UTPA

Quorum next argues that Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against Quorum The court agrees

The UTPA provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful " S.C.Code Ann. § 39-5-20(a) The terms "trade" and "commerce" are defined by § 39-5-20(b) to include the sale of services The UTPA creates a private right of action in § 39-5-140(a):
"Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages "

[32][33] In order to bring a cause of action under the UTPA, the alleged unfair acts or practices must adversely affect the public interest *Florence Paper Co. v. Orphan,* 298 S.C. 210, 379 S.E.2d 289, 291 (1989); *LaMotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66, 370 S.E.2d 711, 713 (1988); *Noack Enterprises, Inc. v. Country Corner Interiors of Hilton Head Island, Inc.,* 290 S.C. 475, 351 S.E.2d 347, 349-350 (Ct.App.1986) This public impact must be proven with specific facts that members of the public were adversely affected *Daisy Outdoor Advertising Co. v. Abbott,* 317 S.C. 14, 451 S.E.2d 394, 397 (Ct.App.1994); *Jefferies v. Phillips,* 316 S.C. 523, 451 S.E.2d 21, 23 (Ct.App.1994) "An unfair or deceptive trade practice has an impact upon the public interest if it has the potential for repetition " *Haley Nursery Co. v. Forrest,* 298 S.C. 520, 381 S.E.2d 906, 908 (1989) (citing *Noack Enterprises, Inc* ) A deliberate or intentional breach of contract, without more, does not constitute a violation of the UTPA *Ardis v. Cox,* 314 S.C. 512, 431 S.E.2d 267, 271 (Ct.App.1993)

Quorum contends that Wilson Group's claim in essence is for breach of contract, an alleged private wrong between two private commercial entities that does not impact the public interest. Wilson Group responds that the alleged acts impact the public interest and are capable of repetition. Wilson Group puts forth several novel and creative arguments*427 in an attempt to satisfy the public impact requirement. The court finds none of these persuasive.

[34] Wilson Group first contends that Quorum filed Medicaid and Medicare claims that miscoded procedures and incorrectly used Dr John Wilson's provider number even though the procedures were done by other doctors Because Dr Wilson was more experienced and reimbursed at a higher rate, Wilson Group was allegedly reimbursed at a higher rate than that to which it was entitled Wilson Group also was allegedly reimbursed at a higher rate because of the miscoding Wilson Group contends that these acts caused taxpayers to pay excessive claims The court does not believe that Wilson Group is the appropriate party to seek recovery of possible injuries suffered by the taxpayers "The UTPA limits recovery to persons who have suffered 'actual damages' and does not afford a right of action which is brought 'in a representative capacity ' " *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.,* 974 F.2d 502, 507 (4th Cir.1992) (citing S.C.Code Ann. § 39-5-140(a)) Wilson Group "cannot piggyback on injuries suffered by others " *Id* [FN11]

880 F Supp 416
880 F Supp 416
(Cite as: 880 F.Supp. 416)

FN11. Wilson Group also claims that Dr Wilson is subject to possible "exposure for Quorum's filing of fraudulent claims " This assertion is sheer speculation and unsupported by affidavit

[35] Wilson Group next contends that Quorum deprived Wilson Group of revenues by miscoding and undercharging for medical procedures performed at Wilson Group FN12 Wilson Group asserts that because historically it has reinvested 100% of its net earnings to the operation and improvement of its facilities, Quorum's actions deprived patients of improved services This argument fails for two reasons First, the possible impact on the public is too attenuated Anytime a business allegedly loses revenues the argument can be made that the public is harmed through higher prices, etc These potential public ramifications are too remote to satisfy the public impact requirement *Omni Outdoor Advertising*, 974 F.2d at 507-08 Second, Wilson Group has failed to set forth specific facts to support a finding of impact on the public There is nothing in the record that demonstrates that Wilson Group ever provided less than excellent care Nor is there any evidence of record that the alleged loss of revenues caused a stagnation in Wilson Group's services

FN12. This argument partially undercuts Wilson Group's contention that the public was hurt by Quorum's handling of Wilson Group's billings If Quorum miscoded and undercharged for services, Wilson Group would not have been fully reimbursed by Medicare and Medicaid thereby saving taxpayers money Furthermore, individual patients would have benefitted by being undercharged

[36] Wilson Group's next argument concerning public impact is that Quorum failed to follow its own consultants' recommendations to improve billing practices and failed to properly train staff in billing procedures Wilson Group contends that this caused patients to lose confidence in Wilson and caused Wilson to lose patients' business However, Wilson Group failed to produce evidence that even a single patient lost confidence in Wilson Group due to its

billing practices Wilson Group also failed to produce any evidence that any alleged lost confidence caused Wilson Group to lose revenue FN13 Without proof of specific facts disclosing that any member of the public was adversely affected by Quorum's alleged actions, all that is left is a " 'speculative [claim] of adverse of adverse public impact' and that will not suffice for a recovery under the UTPA " *Daisy Outdoor Advertising Co.,* 451 S.E.2d at 397 (quoting *Omni Outdoor Advertising, Inc.,* 974 F.2d at 507).

FN13. In support of this contention, Wilson Group cites to an article in JOURNAL OF HEALTHCARE MARKETING entitled "Do Patients Perceptions of Quality Relate to Hospital Financial Performance?" This article does not concern Wilson Group's facilities Nor does it provide any evidence that Wilson Group patients knew of Wilson Group's alleged billing problems or that Wilson Group patients lost confidence in Wilson Group

[37] Finally, Wilson Group contends Quorum's alleged acts have the potential for repetition Wilson Group argues that because several Quorum employees that were involved**428** in the alleged acts involving Wilson Group still work for Quorum and because Quorum has over 180 contracts to manage hospitals across the United States, the potential for repetition exists FN14 This argument also fails Faced with nearly the identical argument, the Court of Appeals of South Carolina recently noted: "In the course of human endeavor, every action has some potential for repetition The mere proof that the actor is still alive and engaged in the same business is not sufficient to establish this element " *Jefferies,* 451 S.E.2d at 24 There is no evidence in this case of other similar acts and, therefore, no basis to conclude that Quorum's alleged acts have the potential for repetition FN15

FN14. Wilson Group also claims Quorum sent a letter, news release, and question and answer packet to Dr John Wilson that contained false information Wilson Group failed to produce any evidence that this material was to be sent or ever was sent to any

other Quorum customers

> FN15. In support of its argument regarding the potential for repetition, Wilson Group claims that Ruth McDaniel was transferred from a Quorum-managed Wyoming hospital to the Wilson Group facilities because of an alleged sexual harassment incident The court finds this fact to be immaterial to the potential for repetition argument Even if true, this incident does not relate to the claims that Wilson Group makes in this action

Wilson Group has failed to set forth specific facts to demonstrate that members of the public were adversely affected by Quorum's alleged acts Furthermore, Wilson Group has failed to set forth facts showing a real potential for repetition This action involves an alleged intentional breach of contract within a commercial setting South Carolina courts have held such a breach is not a violation of the UTPA See e g . _Ardis,_ 431 S.E.2d at 271 As the Fourth Circuit has reasoned:

While every private dispute doubtless has remote public ramifications, these cannot be held to satisfy the element of injury to the public interest which is a prerequisite to any recovery under the UTPA Were we to rule otherwise, every ordinary commercial dispute would become a candidate for the extraordinary remedies provided by the Act

_Id_ at 507-08 Therefore, the court grants Quorum's Motion for Partial Summary Judgment as to Wilson Group's cause of action for UTPA violations

## B HCA'S MOTION FOR SUMMARY JUDGMENT

HCA also moves for summary judgment, but only on two grounds: (1) the statute of limitations bars Wilson Group from recovering for any alleged breach of contract by HCA and (2) Wilson Group has failed to allege or set forth facts to support its cause of action for UTPA violations against HCA For the same reasons noted above, the court denies HCA's Motion for Summary Judgment as to the statute of limitations and grants HCA's Motion for Summary Judgment as to Wilson Group's UTPA cause of action [FN16]

> FN16. The court notes that HCA's only connection with this action is that it guaranteed the 1980 management agreement Although Wilson Group alleged that HCA and Quorum are the "alter egos" of one another, it has produced no evidence that would justify piercing the corporate veil _See e g . DeWitt Truck Brokers v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir.1976)_ Therefore, HCA's liability in this action is limited to its liability resulting from its role as guarantor of the 1980 management agreement

## IV MOTION TO AMEND

[38] _Rule 15(a) of the Federal Rules of Civil Procedure_ provides that after a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires " The United States Supreme Court has admonished that "this mandate is to be heeded " _Foman v. Davis,_ 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) In _Foman,_ the Court stated,

If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue *429 prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc -the leave sought should, as the rules require, be "freely given " Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules

Id at 182, 83 S.Ct. at 230 In the present case, Defendants argue that the court should deny the proposed amendment because it is futile Leave to amend should be denied on the ground of futility only when the proposed amendment is clearly insufficient because of substantive or procedural considerations

© 2007 Thomson/West No Claim to Orig U S Govt Works

880 F Supp 416
**(Cite as: 880 F.Supp. 416)**

_Davis v. Piper Aircraft Corp.,_ 615 F.2d 606, 613 (4th Cir.), _cert dismissed,_ 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); _See e g . Watts-Means v. Prince George's Family Crisis Center,_ 7 F.3d 40, 43 (4th Cir.1993) (upholding district court's refusal to allow amendment asserting § 1983 claim because plaintiff could not show defendant acted under color of law); _Frank M. McDermott, Ltd. v. Moretz,_ 898 F.2d 418, 421 (4th Cir.1990) (upholding district court's refusal to allow amendment asserting fraudulent misrepresentation counterclaim because it would have been subject to dismissal under Rule 12(b)(6) ); _DeLoach v. Woodley,_ 405 F.2d 496, 497 (5th Cir.1968). With these standards in mind, the court turns to the motion to amend of Wilson Group

## V MOTION TO AMEND ANALYSIS

Wilson Group seeks to amend the complaint to allege a negligence cause of action against Quorum for matters arising from November 12, 1991 forward In the proposed amended complaint Wilson Group asserts that Quorum owed a duty of care to Wilson Group to use reasonable care in its management of Wilson Group's facilities Wilson Group also asserts that Quorum had a duty to deal fairly and justly with Wilson Group in its operations of the facilities Wilson Group alleges that Quorum breached its duty by failing to: (1) implement recommendations suggested by its consultants; (2) advise Wilson Group of its failure to implement the consultants' recommendations; (3) properly collect monies owed to Wilson Group; (4) maximize Wilson Group's profits; (5) inform Wilson Group that it was charging less than prevailing rates; (6) adequately train Wilson Group employees regarding proper coding of billing entries; (7) apply Medicare and Medicaid regulations to Wilson Group's advantage; (8) inform Wilson Group regarding business developments; and (9) provide appropriate and nondisruptive managers to operate Wilson Group's facilities  The court will not allow the proposed amendment because it would be futile

[39][40] The instant case involves three contracts for hospital management services between the parties The duties alleged in Wilson Group's proposed negligence claim all arise from the management agreements  South Carolina law has long recognized the

principle that no tort claim will lie when the parties' duties are defined by a contract  _See, e g . Meddin v. Southern Ry.-Carolina Div.,_ 218 S.C. 155, 62 S.E.2d 109, 112 (1950) ("[I]f the cause of action is predicated on the alleged breach, or even negligent breach, of a contract between the parties, an action in tort will not lie "); _Foxfire Village, Inc. v. Black & Veatch, Inc.,_ 304 S.C. 366, 404 S.E.2d 912, 917 (Ct.App.1991) (same)  If Wilson Group were allowed to bring its negligence action, the distinction between tort and contract would be totally eviscerated  "The integrity of contract must be maintained, or contract law will 'drown in a sea of tort ' The court must be vigilant in preventing the 'inevitable efforts of lawyers to turn every breach of contract into a tort ' " _Myrtle Beach Pipeline Corp. v. Emerson Electric Co.,_ 843 F.Supp. 1027, 1043 (D.S.C.1993), _aff'd._ 46 F.3d 1125 (4th Cir.1995)  Moreover, permitting Wilson Group to prosecute its negligence claim would undermine the reason and goal of entering into contracts-that the parties receive the benefit of their bargain  Therefore, the court denies Wilson Group's Motion to Amend Complaint because it would be futile

## VI CONCLUSION

For the forgoing reasons the court: (1) denies Quorum's Motion for Partial Summary\*430 Judgment as it relates to the statute of limitations (2) grants Quorum's Motion for Partial Summary Judgment as it relates to Wilson Group's release of all claims it may have had against Quorum arising out of the October 1, 1985 management agreement; (3) grants Quorum's Motion for Partial Summary Judgment as it relates to the UTPA; (4) denies HCA's Motion for Summary Judgment as it relates to the statute of limitations; (5) grants HCA's Motion for Summary Judgment as it relates to the UTPA; and (6) denies Wilson Group's Motion to Amend Complaint

IT IS SO ORDERED

D S C ,1995
Wilson Group, Inc  v  Quorum Health Resources, Inc
880 F Supp  416

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

880 F Supp  416                                                                     Page 18
880 F Supp  416
**(Cite as: 880 F.Supp. 416)**


END OF DOCUMENT

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007 I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue #900
Wilmington, DE 19899

Jeffrey B. Bove, Esquire
Jaclyn M. Mason, Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

I hereby certify that on February 15, 2007 I caused to be sent the foregoing document to the following non-registered participants in the manner indicated below:

**VIA ELECTRONIC MAIL**
Gaspare J. Bono, Esquire
Rel S. Ambrozy, Esquire
Lora A. Brzezynski, Esquire
Cass W. Christenson, Esquire
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington D.C. 20006

**VIA ELECTRONIC MAIL**
Tracy R. Roman, Esquire
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

**VIA ELECTRONIC MAIL**
Scott R. Miller, Esquire
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Anne Shea Gaza (#4093)
Gaza@rlf.com