# THE BAYARD FIRM
A T T O R N E Y S

222 DELAWARE AVENUE, SUITE 900
P.O. BOX 25130
WILMINGTON, DE 19899
ZIP CODE FOR DELIVERIES: 19801

MERITAS LAW FIRMS WORLDWIDE
www.bayardfirm.com
302-655-5000
(FAX) 302-658-6395

WRITER'S DIRECT ACCESS

(302) 429-4208
rkirk@bayardfirm.com

BY HAND AND BY EMAIL

February 23, 2007

The Honorable Vincent J. Poppiti
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE  19801

      Re:    *LG.Philips LCD Co., Ltd. v. ViewSonic,* C.A. No. 04-343 JJF

Dear Special Master Poppiti:

      This is Plaintiff LG.Philips LCD Co., Ltd.'s ("LPL") response to Defendant ViewSonic's ("ViewSonic") February 16, 2007 motion to compel LPL to provide discovery regarding the mounting methods and structures used in LPL's flat panel display products since January 1, 1997 (the "Motion"). The Motion should be denied for several reasons. First, the Motion improperly seeks voluminous discovery that ViewSonic previously agreed LPL does not need to produce. Second, the Motion tries to expand discovery beyond that which is reasonably calculated to lead to the discovery of admissible evidence or that would be relevant to the claims or defenses at issues in this case. Third, ViewSonic's attempts to improperly expand discovery would impose unfair and unnecessary burdens on LPL. It is ViewSonic, not LPL, which has adopted a new and baseless position regarding the scope of the patented invention. Specifically, ViewSonic argues that any flat panel display "module" that is capable of being mounted from the back surface, in and of itself practices the invention. But this new construction would likely mean that *all* of the Defendants' products infringe simply because they contain modules or frames that could possibly be mounted from the back surface.

      During the December 28, 2006 hearing (the "Hearing"), ViewSonic raised disputes concerning numerous of its Document Requests that related to LPL's products. For example, ViewSonic asked Your Honor to compel LPL to produce bills of materials and documents sufficient to identify parts of LCD modules. (*See generally* Hr'g Tr. at 113-41, cited portions of which are attached as Exhibit 1.) LPL objected to the temporal scope of each of the Requests because they sought documents from January 1, 1997 through the present. (*Id.* at 115-17 & 120-21.) Because the only relevant documents covered by ViewSonic's Requests would pertain to products that were developed within the calendar year before LPL first conceived of and reduced the patented inventions to practice, October 1998, LPL stated that its response to ViewSonic's Requests should be limited to only those documents. (*See id.*; Letter from C. Christenson to S. Miller at 2 (Feb. 12, 2007), a copy of which is attached as Exhibit 2.) ViewSonic ultimately

652678-1

THE BAYARD FIRM

The Honorable Vincent J. Poppiti
February 23, 2007
Page 2

agreed that products developed after the October 1998 priority date are irrelevant and the parties agreed to limit the temporal scope of ViewSonic's Requests to 1997-98. (*See* Ex. 1 at 115-17 & 120-21.) Now, despite its prior agreement, ViewSonic seeks discovery concerning LPL modules that were made and sold *after* 1998. (*See, e.g.*, Exs. 11 & 12 to Motion (dated December 2003 and April 2004, respectively).)

ViewSonic now seeks to rescind its agreement by falsely accusing LPL of misconduct. (*See* Motion at 2.) ViewSonic's accusations are contrary to ViewSonic's repeated inquiries during the Hearing concerning how LPL would evaluate the temporal limits. (*See* Ex. 1 at 124-27.) Notably, ViewSonic specifically asked Your Honor and LPL to confirm that the 1997-98 limitation would not be construed in a way that would exclude products that were developed during 1997-98 by an LPL predecessor but then sold later by LPL. (*See id.*) LPL assured ViewSonic that it would produce all responsive documents. (*See id.*) The parties' agreement during the Hearing is significant and shows that ViewSonic agreed that only those products that were ***developed during 1997-98*** would be relevant because only those products could even conceivably qualify as invalidating prior art. (*See id.*)

LPL makes hundreds of different modules. None of the modules that LPL developed after 1998, however, has any bearing on any validity issues because they were all developed after the relevant priority date. Furthermore, LPL has already produced detailed sales and costs summaries for its products that show information for LPL's modules between 2000 and 2006, (*see, e.g.*, LPL 8371-9245 & LPL 11781-860), which is a broader time frame than even the discovery that Defendants have agreed to provide.[1] LPL has also produced its licensing agreements, inventorship documents and patent files. Accordingly, ViewSonic already has all of the discovery it needs to evaluate damages and validity issues.

The Motion also argues generally that LPL misled ViewSonic concerning the types of products that LPL makes and that these purported misrepresentations have prevented ViewSonic from obtaining full discovery on the 27 different Document Requests identified in the Motion. These accusations are unfounded. The '641 Patent requires, in relevant part, a first frame of the backlight unit that is capable of being fixed to a housing of the data processing device. (*See* Claim 35.) The '718 Patent similarly requires a first frame having a fastening element for fastening the first frame to a housing. (*See* Claim 33.) As such, an LCD module that lacks a first frame and that lacks a housing does not practice LPL's inventions. LPL makes and sells only modules. LPL does not make finished products that contain first frames and a housing. Some of LPL's modules have holes at the rear surface, but also have holes in other locations. These holes may or may not be used by a third party to mount that module to a housing. Further, LPL does not have documents from third parties that identify how the third parties assemble or mount LPL's modules within finished LCD products, such that LPL does not know whether these third parties mount the modules in a way that falls within the scope of the inventions claimed by the Patents-in-Suit. Thus, when LPL informed ViewSonic and the other Defendants on numerous

---

[1] For example, Tatung Company has produced virtually no sales summaries and ViewSonic has refused to provide sales summaries for dates prior to December 2002, even though LPL has specifically requested data for all of 2002 through the present day.

652678-1

THE BAYARD FIRM

The Honorable Vincent J. Poppiti
February 23, 2007
Page 3

occasions that LPL does not make products that practice the inventions claimed by the Patents-in-Suit, LPL has been entirely correct at all times.

Recently, and to pursue virtually unlimited discovery from LPL, ViewSonic has started to argue that the Patents-in-Suit claim only a module that is "capable" of being mounted from the rear. Yet, in its Opening Claim Construction Brief, ViewSonic took the *exact opposite* position. In their brief, ViewSonic agreed with LPL that "claims 35 and 55 of the '641 Patent each *require the rear mountable flat panel display device be mounted to the housing of the data processing device*." (D.I. 372 at 19 (emphasis added).) ViewSonic is trying to shoehorn new damages discovery into Requests that relate to validity issues. Any discovery that ViewSonic seeks should be subject to the issues relevant to this case and to its prior agreements as to the scope of that discovery. ViewSonic's Motion assumes an untenable claim construction that is directly contradicted by its own submissions to this Court in its claim construction brief. LPL has never made any misrepresentations about whether it makes products that practice the invention claimed by the Patents-in-Suit and ViewSonic's claims to the contrary are without merit.

Because the LPL products covered by the instant Motion are merely modules that contain rear surface holes, these modules alone do not practice the entire invention taught by either of the Patents-in-Suit. As a result, the Motion and ViewSonic's demand for an ever-expanding range of discovery only on these modules is totally improper. Notably, this issue started with ViewSonic asking for discovery on LPL's modules in response to ViewSonic's Document Requests 71-74 and 118 and, in response, LPL stated that it makes products "that could be used for rearmounting" but confirmed that it does not make products that practice the patented inventions. (*See* Status Report to Special Master at 2 (Jan. 8, 2007).) LPL then produced data pertaining to its bills of materials, as it had promised to do. On February 5, the parties submitted a joint status report, in which ViewSonic argued that LPL's modules practice the patented invention and, therefore, LPL should supplement discovery concerning not only Document Requests 71-74, but also Requests 82, 84, 85 and 102. (*See* Status Report to Special Master at 2 (Feb. 5, 2007); Ex. 2 at 3.) Then, on February 7, ViewSonic demanded supplemental discovery for 29 Document Requests and two Interrogatories. (*See* Ex. 2 at 3.) The next day, ViewSonic demanded supplemental discovery for an additional ten Document Requests, totaling 41 discovery requests. (*See id.*)

The Document Requests addressed in the Motion pertain to products that practice the *patented inventions*, not to every product or module that LPL makes. Taken together, these new discovery demands amount to a massive expansion of discovery, all of which, however, pertains to irrelevant material. As stated above, LPL's modules do not and cannot, by themselves, practice either of the patented inventions. LPL has not withheld any information about any products that practice the patented inventions because LPL does not make any products that practice or embody those inventions. ViewSonic's Motion, therefore, should be denied.

Respectfully submitted,

*/s/ Richard D. Kirk*
Richard D. Kirk (rk0922)

cc: Counsel as shown
    on the attached certificate

652678-1

# EXHIBIT 1

Hearing

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD,       )
                                    )
        Plaintiffs,                 )   C.A. No. 04-343(JJF)
                                    )
v.                                  )
                                    )
TATUNG CO., TATUNG COMPANY OF       )
AMERICA, INC., and VIEWSONIC        )
CORPORATION,                        )
                                    )
        Defendants.                 )

     Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Thursday, December 28, 2006, beginning at approximately 11:30 p.m., there being present:

BEFORE:  VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

       THE BAYARD FIRM
       RICHARD D. KIRK, ESQ.
         222 Delaware Avenue, Suite 900
         Wilmington, Delaware  19899
         for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 110

1  products which are -- which LPL, as Mr. Miller said, does
2  not assemble visual display products that use LPL's
3  products. LPL makes a component, a module, that goes
4  into the --
5       SPECIAL MASTER POPPITI: I understand
6  that. Maybe what I -- I thought I understood Mr. Miller
7  to say that there is -- there will be a lot of discussion
8  about prior art. That's the first thing I understood him
9  to say; correct, Mr. Miller?
10      MR. MILLER: Yes, Your Honor.
11      SPECIAL MASTER POPPITI: And I also
12 understood him to say that they expect that, in prior art
13 that deals with other mounting methodologies, there is
14 language that suggests -- in the nature of warnings;
15 correct, Mr. Miller?
16      MR. MILLER: Yes, Your Honor.
17      SPECIAL MASTER POPPITI: And would you
18 remind me again precisely what you said about those
19 warnings?
20      MR. MILLER: That they restrict the
21 mounting of these products solely to the mounting holes
22 and it's not possible to merely just put a mounting
23 structure anywhere in conjunction with this product that
24 they sell.

Page 111

1       SPECIAL MASTER POPPITI: It seems to
2  me --
3       MR. MILLER: And they take the position
4  that the patents in suit enable a mounting structure
5  anywhere on the back surface, and, yet, there is no
6  discussion about the technical aspects or requirements
7  that that necessitates.
8       One of the issues, as Mr. Christenson's
9  comments illuminate to me, at least, is that it's
10 difficult to reach an agreement in a patent case when
11 your opponent says, I will tell you about the patents but
12 I won't tell you anything we know about the prior art,
13 and that's essentially what he is telling us.
14      SPECIAL MASTER POPPITI: That's not
15 going to happen here. I am going to require, because you
16 can't forge an agreement, that the -- that the request --
17 that there be production with respect to the request, and
18 what I -- understanding that this represents an order as
19 opposed to an agreement which will be ordered. It will
20 be in the nature of a finding and recommendation, which I
21 will have to make at -- in due course, and what I would
22 like from you is a suggestion as to when that production
23 occurs, understanding that it's either going to occur
24 within so many days of your having the right to take

Page 112

1  exception and you don't, or so many days, at least a
2  proposal to Judge Farnan, so many days after he has the
3  opportunity to review whatever I do if asked to.
4       And you all know what that means. That
5  just pushes it out there in terms of -- not in terms of
6  when the Court acts. It just pushes it out there because
7  I have got to do some work on this end. You will have
8  the opportunity to do something with my work at your end.
9  And then Judge Farnan ultimately will have it on his
10 desk, and we all know that that process, I don't believe
11 we shortened the time frame in this case, have we,
12 counsel?
13      MR. MILLER: Not as to these motions, we
14 didn't.
15      SPECIAL MASTER POPPITI: Not as to these
16 motions. So we are out there over a month.
17      MR. MILLER: I would hope that we would
18 do it, given that inherent time frame, that we could do
19 it within a week of either of those events transpiring.
20      SPECIAL MASTER POPPITI: Is that
21 acceptable, one week, five business days?
22      MR. CHRISTENSON: Could we make it two
23 weeks?
24      MR. MILLER: I wouldn't object to two

Page 113

1  weeks if they don't appeal, but one week if they do, I
2  guess.
3       SPECIAL MASTER POPPITI: Is that
4  acceptable? Because you will have the time.
5       MR. CHRISTENSON: Right. I think we
6  probably could live with that.
7       SPECIAL MASTER POPPITI: Okay. Then it
8  will be two weeks if there is no appeal and one week
9  after Judge Farnan rules, and, of course, he maintains
10 the ultimate authority to adjust that one week. But I
11 will indicate that it will be one week by agreement, so
12 it's likely that he would -- I would anticipate he would
13 accept that.
14      MR. MILLER: The next set of requests
15 deal with information relating to flat panel display
16 devices, not directed specifically to mounting structures
17 but to LCD products or plasma products, for example.
18      Again, these -- these patents in suit
19 discuss how you mount a conventional component inside of
20 a housing, and what we have sought are the documents and
21 information relating to separate components of a flat
22 panel display device.
23      The patents describe how certain of the
24 components that are used in the invention, the frames,

Page 114

1  for example, assemble these components, and, so, we are
2  seeking some information about conventional products and
3  what would be known to one of ordinary skill in the art
4  at the time of this invention that relates to these
5  devices that the invention supposedly applies to.
6      The only response we have gotten back
7  from LPL is that they will respond when we agree to
8  narrow them, without any suggestion about why they are
9  overbroad or how they should be narrowed.
10     Again, we believe that this is clearly
11 information that is relevant to a variety of issues in
12 this case and that it should be produced forthwith.
13     SPECIAL MASTER POPPITI: Why don't you
14 articulate for the record the relevance with respect to
15 the variety of issues?
16     MR. MILLER: Well, the variety of issues
17 would be, again, the issue of enablement, whether or not
18 the patents sufficiently disclose how these components go
19 together, or whether what one ordinarily skilled in the
20 art would know, the nature of whether or not the
21 difference between other prior art that we have located
22 and the disclosure and the patents would be obvious to
23 one skilled in the art based on how these components
24 interact and what they do, the, you know, the relative

Page 115

1  value of this invention, potentially, from the standpoint
2  of a reasonable royalty and how easy it is to design
3  around based on one of ordinary skill in the art of
4  knowledge of these components and how they work together
5  for mounting, which was, obviously, done prior to this
6  invention, but how they work together for mounting in
7  these kinds of products.
8      So, those would be the three that I
9  know, with a high degree of certainty, are applicable,
10 and there may be others.
11     SPECIAL MASTER POPPITI: Thank you.
12 Mr. Christenson.
13     MR. CHRISTENSON: Your Honor, the
14 requests that they have propounded would call for LPL to
15 produce all sorts of documents going back to 1997 to the
16 present for every LCD module that LG Phillips has made
17 and all the components that relate to every one of those
18 modules. It's just a remarkably overbroad set of
19 requests and it's not calculated within reason to lead to
20 discovery of admissible evidence, and it's not -- it's
21 just not relevant to the issues in the case, including
22 the issues that Mr. Miller just discussed.
23     SPECIAL MASTER POPPITI: Why isn't it
24 relevant to the issues that he just discussed?

Page 116

1      MR. CHRISTENSON: For example, the issue
2  of enablement is a question that can be resolved by
3  looking at the patent and understanding whether the
4  patent sufficiently discloses aspects of the invention.
5  Whether the written description in the patent is
6  sufficient is not something that's going to be informed
7  by all the documents related to all the manufacturing
8  that LPL has done, since 1997, of modules. And the
9  claims at issue, Your Honor, don't refer to LCD modules.
10 They refer to a certain type of mounting and assembly of
11 a display device to a case, and that's not -- LPL doesn't
12 have those documents because it doesn't do that.
13     So, this is really -- these are kitchen
14 sink requests that aren't going to get anybody anywhere
15 with respect to the claims and defenses in this case.
16     SPECIAL MASTER POPPITI: I understand
17 your position with respect to enablement. Talk about the
18 prior art.
19     MR. CHRISTENSON: Again, Your Honor, the
20 prior art issue is: Was this invention obvious or was it
21 anticipated by -- it had already been invented; was it
22 already out in the public realm? And there is nothing
23 that's going to be learned from LPL's manufacturing
24 yesterday and a year ago and for the past ten years of

Page 117

1  all different sorts of modules that are later assembled
2  by a different company that buys the modules into -- into
3  finished devices.
4      SPECIAL MASTER POPPITI: Who's to say
5  that? How can I be assured that that isn't the case? I
6  mean, it may be, and I will listen to your discussion of
7  overbroad, I haven't seen anything that describes what
8  that means, but how can I be, to the extent that there
9  should be some degree of certainty here, how can I be
10 certain, because that's what you are saying, that no
11 information that is being requested would lead to the
12 discovery of relevant evidence as it relates to prior
13 art/obviousness?
14     MR. CHRISTENSON: Your Honor, I
15 understand your concern, and I -- the only way I can
16 respond to that is to say if you -- what I have done is
17 looked at the -- what documents have been requested, and
18 the documents that they have requested don't -- are not
19 -- are not focused on any of these issues that are being
20 discussed, including the prior art issues, and maybe it
21 would be helpful to look at some of these specific
22 requests, but -- and I am happy to do that if that's --
23     SPECIAL MASTER POPPITI: I think that's
24 going to be important to do that.

Page 118

1   MR. CHRISTENSON: All right.
2   SPECIAL MASTER POPPITI: You know,
3   Mr. Miller is saying --
4   MR. MILLER: Your Honor, I think we
5   start at 82 on these.
6   SPECIAL MASTER POPPITI: Just give me a
7   second.
8   MR. CHRISTENSON: Your Honor, I believe
9   that you could turn to Exhibit 4 to LPL's opposition, and
10  that should set forth the requests and the responses.
11  SPECIAL MASTER POPPITI: It does. And
12  which one? 82?
13  MR. MILLER: 82, that's where we start.
14  SPECIAL MASTER POPPITI: Mr. Miller,
15  it's your request, so have at it.
16  MR. MILLER: And this seeks information
17  that our bills and materials for an LCD module made by
18  LPL from the date prior -- one year prior to the priority
19  date to understand what these components are and how --
20  whether or not they were -- what functions they have.
21  You will see there is bill of materials requests for
22  different components.
23  SPECIAL MASTER POPPITI: I see that.
24  MR. MILLER: So that we can ascertain,

Page 119

1   because the patent merely describes these components as
2   part of a first embodiment of the invention, and what we
3   need to do is to be able to, very clearly, understand and
4   know, to be able to point out to the Court and the jury,
5   what's the difference between the structure described in
6   the first embodiment of the invention and what is truly
7   the prior art? And, so, we felt these bill of materials
8   was the least intrusive kind of thing we could ask for
9   that would relate to these products as opposed to asking
10  for every document that shows every component of the
11  module.
12  SPECIAL MASTER POPPITI: Well, you are
13  certainly not asking for every document that shows every
14  component of the module. You are asking for something
15  more narrow than that. It's -- you made an effort to
16  restrict the request and reduce the universe.
17  Mr. Christenson.
18  MR. MILLER: Then if you go down to,
19  like, No. 84, for example, we ask for documents
20  sufficient to identify --
21  MR. CHRISTENSON: Are we going to go in
22  order, or are some of these now off the table?
23  SPECIAL MASTER POPPITI: No, they are
24  not off the table.

Page 120

1   MR. CHRISTENSON: 82 and 83 are bill of
2   material requests.
3   SPECIAL MASTER POPPITI: Right.
4   MR. CHRISTENSON: May I respond?
5   SPECIAL MASTER POPPITI: Yes.
6   MR. CHRISTENSON: On No. 82, if we are
7   talking prior art, the priority date in this case would
8   be October 1998. So, you go -- that's the conception
9   date. If you go back the year before that, it's October
10  1997. So, they would need to show that something
11  happened to invalidate the patent, they would have to
12  show something related to that time period of before
13  October of 1997, and, yet, the unrestricted time period
14  for the request is January 1, 1997, to the present.
15  SPECIAL MASTER POPPITI: Mr. Miller.
16  MR. MILLER: That's certainly a
17  fundamental issue that we have that relates, I think,
18  generally to these requests.
19  SPECIAL MASTER POPPITI: Well, let's
20  talk about the date, then.
21  MR. MILLER: We picked January 1 because
22  it was a date that was, you know, several months prior to
23  the one year prior to the foreign priority date because
24  we are trying to ascertain what is the knowledge of one

Page 121

1   ordinary skilled in the art. And we are happy to agree
2   to some reasonable cutoff date. If -- if LPL believes
3   that we should have a cutoff date, you know, of the
4   patent issuance date, or we can pick some other date that
5   would make sense, you know, we are happy to do that. But
6   that, of course, has never been proffered.
7   SPECIAL MASTER POPPITI: Because
8   Mr. Christenson wanted to focus on the date, let's do
9   that, and why don't you propose or discuss an appropriate
10  date expecting that I am going to -- I am going to order
11  the production. Or perhaps by virtue of agreeing on the
12  date, you will agree to the production.
13  MR. CHRISTENSON: I think that would be
14  -- we may be able to resolve some of these issues. I
15  don't expect we will resolve all the issues, Your Honor.
16  SPECIAL MASTER POPPITI: I understand
17  that.
18  MR. CHRISTENSON: We can resolve the
19  date issue, but I think that would make substantial
20  progress.
21  SPECIAL MASTER POPPITI: Let's take the
22  time to -- do you want to take the time to do that now
23  because it makes sense? Mr. Miller?
24  MR. MILLER: The patent issuance date

Page 122

1  was December 22, 2002, was it, Cass?
2      MR. CHRISTENSON: Yeah. I think that's
3  -- I don't think that has any bearing on prior art. For
4  art to be prior and to be evidence that would support
5  invalidation, we would have to be talking about something
6  back in the time period of the critical date. So, again,
7  that's going back to October '97.
8      MR. MILLER: Well, there is a question
9  of the filing date in the U.S. was October of '98, so, I
10 mean, I am happy to go to -- I just tried to pick a date
11 that would have some significance in the case.
12     MR. CHRISTENSON: The end of 1998, is
13 that appropriate?
14     SPECIAL MASTER POPPITI: What did you
15 just say, December of 1998?
16     MR. CHRISTENSON: Yes.
17     SPECIAL MASTER POPPITI: Mr. Miller?
18     MR. MILLER: That's fine, Your Honor.
19     SPECIAL MASTER POPPITI: And that would
20 be with respect to request for production No. 82 and 83.
21     MR. CHRISTENSON: I assume that would
22 apply to this set?
23     SPECIAL MASTER POPPITI: The entire set,
24 yes.

Page 123

1      Mr. Miller, is that agreeable?
2      MR. MILLER: Yes.
3      SPECIAL MASTER POPPITI: So, then let me
4  re-ask the question: Your having agreed on the date, may
5  I have your agreement with respect to the production?
6      MR. CHRISTENSON: Your Honor, we will
7  agree to produce, in response to No. 82, subject to that
8  date limitation.
9      SPECIAL MASTER POPPITI: Okay.
10     MR. CHRISTENSON: To the extent there is
11 documents. I have to check on the availability.
12     SPECIAL MASTER POPPITI: Sure. I
13 understand that. And would it make sense to do with, and
14 I realize we are only on 82, but would it make sense to
15 do with LPL what we have done with Viewsonic and focus on
16 a date for that production?
17     MR. CHRISTENSON: I think that's only
18 fair, Your Honor, and I think what we would -- what we
19 should try to do is to try to meet the date that
20 Viewsonic has selected for its production, supplemental
21 productions.
22     SPECIAL MASTER POPPITI: That would be
23 the 19th?
24     MR. CHRISTENSON: Was that the 19th, did

Page 124

1  you say?
2      SPECIAL MASTER POPPITI: Yes. Wasn't
3  it?
4      MR. CHRISTENSON: Right.
5      MR. MILLER: Yes, January 19th.
6      SPECIAL MASTER POPPITI: January 19th is
7  a Friday.
8      MR. CHRISTENSON: We will put that date
9  down and respond by that date, and if there is some
10 extenuating circumstances, of which I am not aware, I am
11 confident we can work that out among counsel. We will
12 expect to investigate and produce the documents by
13 January 19th, Your Honor.
14     MR. MILLER: Cass, let me ask one
15 question, if I might, please.
16     SPECIAL MASTER POPPITI: Please do.
17     MR. MILLER: When was -- LPL is a
18 continuation of the business of LG Electronics when it
19 did a joint venture with Phillips Electronics. Are we at
20 a date and point here where you are going to take the
21 position that LPL doesn't have any documents because it
22 was LG Electronics' documents if we pick a December 1998
23 date?
24     MR. CHRISTENSON: I am not picking any

Page 125

1  date with any intent of avoiding discovery. I don't know
2  what the facts are on that, Scott. I just don't know the
3  answer to that. But, you know, if the company has
4  documents that are responsive, then we have agreed to
5  produce those documents.
6      MR. MILLER: I guess my only point is
7  that if there are documents -- I guess if you don't have
8  any documents that relate to products that were sold
9  during this time period, and I guess I want to be clear
10 that if you took over the business from LG Electronics
11 and continued to sell products but those sales took place
12 outside the scope of this but they are the same products,
13 I would expect those documents, the technical documents
14 to be produced with regard to that even if you didn't
15 sell them during this time period if the products were
16 the same; do you understand that to be -- is that
17 consistent with your understanding, Cass?
18     MR. CHRISTENSON: My understanding is
19 that we are going to respond to your request 82, which is
20 bills and materials for the modules, and if LPL has those
21 documents, then we will produce those documents.
22     MR. MILLER: Your Honor, I guess -- I
23 don't want to backtrack, but I am very concerned about a
24 December 1998 date as opposed to some date when I know

Page 126

1  that LPL was in existence and was actually selling
2  products and would propose, then, a date in 2000, just to
3  be sure that we don't end up getting nothing out of this
4  because of some fine point on the question of whether the
5  products were sold during the time period.
6        If they are substantively the same as
7  the products that were sold by your predecessor and that
8  business was transferred to you, I would expect to get
9  those documents.
10       SPECIAL MASTER POPPITI: I certainly
11 want the production to encompass the concern that you
12 have just raised.
13       MR. CHRISTENSON: Your Honor, we have no
14 -- I can assure -- we don't have any intention of denying
15 the existence of documents under some sort of, you know,
16 technical basis that Mr. Miller is raising.
17       We have identified the date that's much
18 more appropriate than the date that was in the request.
19       SPECIAL MASTER POPPITI: Let's do it
20 this way: I will -- you are an officer of the Court, I
21 will accept you at your word, and if there becomes an
22 issue at a later point in time, I will deal with it
23 rather than directly and forcefully.
24       MR. MILLER: Thank you, Your Honor.

Page 127

1        MR. CHRISTENSON: With that
2  understanding, we can -- that is acceptable.
3        MR. AMBROZY: Your Honor, a point of
4  reference.
5        SPECIAL MASTER POPPITI: Yes, please.
6        MR. AMBROZY: We had raised a similar
7  issue with Viewsonic earlier that Viewsonic has different
8  entities but Mr. Miller continued to restrict all his
9  document production regarding technical documents just to
10 Viewsonic America, and I am just curious how that cuts
11 with his request that LPL would request, of all its other
12 subsidiaries, that those documents be produced?
13       MR. CHRISTENSON: I don't think that's
14 what he was saying.
15       SPECIAL MASTER POPPITI: Is something
16 like that before me at this point?
17       MR. MILLER: No, I don't think so, Your
18 Honor.
19       SPECIAL MASTER POPPITI: Well, then, you
20 may want to discuss that on your -- and I say this,
21 again, respectfully -- on your own meet and confer.
22       MR. AMBROZY: Thank you, Your Honor.
23       MR. CHRISTENSON: My understanding is we
24 are talking about LPL and its predecessors and any

Page 128

1  documents within LPL's custody, possession, and control,
2  and we are going to abide by that.
3        SPECIAL MASTER POPPITI: Yes. Okay.
4  Next, please.
5        MR. MILLER: Next would be No. 83 would
6  be the next request, which is the bill of materials for
7  LCD modules. And, again, we would, with the history of
8  the discussion, we would accept the same date of
9  parameters that we have discussed.
10       SPECIAL MASTER POPPITI:
11 Mr. Christenson.
12       MR. CHRISTENSON: Yes, Your Honor.
13       SPECIAL MASTER POPPITI: I feel like I
14 should be doing "Mutiny on the Bounty" when I refer to
15 you, sir, but that would be, that's a great part, but in
16 any event, is there agreement with respect to 83?
17       MR. CHRISTENSON: With respect to 83,
18 they are now asking for bills and materials, I guess, for
19 modules made by companies other than LPL, and I am not
20 sure I understand what it is they are seeking there.
21       MR. MILLER: I think what I am seeking
22 is if you have possession, custody, or control over bills
23 and materials from your competitor's products or someone
24 else's products for the relevant time period, we want --

Page 129

1  we would like them.
2        SPECIAL MASTER POPPITI: And your
3  definition of "custody and control" may be more narrow
4  than Mr. Christenson's, but we will deal with that at
5  some other point. I expect I understand what you are
6  asking for.
7        Mr. Christenson, do you?
8        MR. CHRISTENSON: I think I do. So I
9  guess we are just going to make this broadly bills and
10 materials for whatever products. So 82 and 83, we will
11 take together.
12       SPECIAL MASTER POPPITI: Okay.
13       MR. MILLER: 84 would be next.
14       SPECIAL MASTER POPPITI: Yes, please.
15       MR. MILLER: And they are documents
16 sufficient to identify the parts of an LCD module and the
17 structure, function, source, and/or assemblage of those
18 parts, again, from January 1, '97, we would again, with
19 date parameters we have discussed, we would be willing to
20 accept that same date parameters.
21       SPECIAL MASTER POPPITI:
22 Mr. Christenson.
23       MR. CHRISTENSON: Your Honor, it seems
24 to me, if we are already dealing with bills of materials,

Page 130

1  I am not sure what documents would be necessary in
2  response to this where they are talking here about parts
3  of a module.
4         SPECIAL MASTER POPPITI: I mean, you may
5  be suggesting duplication. I don't know whether it does
6  duplicate. Is that what you are suggesting?
7         MR. CHRISTENSON: Well, I am suggesting
8  that, among other things. I also don't see what, you
9  know, what -- what documents would be responsive more
10 generally and I don't see why they would need those
11 documents.
12        Viewsonic is well aware of -- of LPL
13 modules and the parts of LPL modules, but once we have
14 produced the bills and materials, I would think this
15 would be redundant.
16        MR. MILLER: Your Honor, it's not
17 redundant because these are documents that relate to the
18 structure, the function, and how those components are
19 assembled. The bill of material, in my experience,
20 merely just identifies the particular components.
21        Obviously, we are not looking for them
22 to reproduce it. This was a request limited by documents
23 sufficient to identify and not all documents, again,
24 relating to these components.

Page 131

1         SPECIAL MASTER POPPITI: I see that.
2  Yeah. I can understand the expected difference between
3  documents requested in 84 and the ones that we have just
4  talked about.
5         MR. CHRISTENSON: The other issue that's
6  raised here is if we are talking about now assembly of
7  the different parts, again, the modules and the claims --
8  the claims in this case do not have to do with modules
9  and they don't have to do with assembly of modules, so we
10 are going to get into a lot of, basically, all of the
11 manufacturing records in the company that have to do --
12 that have nothing to do with the issues in the case
13 because they are going to deal with assembling components
14 and subcomponents used within a module.
15        SPECIAL MASTER POPPITI: Mr. Miller,
16 would you address that, please?
17        MR. MILLER: Sure. I guess the first
18 frame and second frame, which are critical components of
19 the alleged invention of the patents in suit. The
20 patents each are used for assembling the components, and
21 how these components interact and what they do and what
22 was known in the art at the time, again, goes to the
23 issues that we have discussed previously. And, so, I
24 think they are clearly different and they are clearly

Page 132

1  relevant.
2         MR. CHRISTENSON: Your Honor, we
3  disagree. One of the terms for the Court to construe in
4  this case is a flat panel display device and what that
5  means and what it includes. So this goes far, far
6  afield, and just asks us to produce everything --
7  documents related to every part of the module and every
8  aspect of assembly of every part of the module.
9         SPECIAL MASTER POPPITI: Mr. Miller, is
10 there any way to more tightly focus the request?
11        MR. MILLER: Without seeing the bill of
12 materials, it's a little hard to know.
13        SPECIAL MASTER POPPITI: Maybe that's --
14 maybe that's the point.
15        MR. MILLER: That's part of the problem.
16 And, you know, Mr. Christenson, all due respect,
17 Viewsonic is not in the LCD module business and really
18 does not focus its energies on LCD modules, so we are
19 trying to take discovery to be able to defend this case
20 and that's what this is directed towards.
21        SPECIAL MASTER POPPITI: Any other
22 comments with respect to 84?
23        MR. CHRISTENSON: No, Your Honor. My
24 only comment, last comment is that Viewsonic may not make

Page 133

1  the LCD modules, but they buy these modules in vast
2  quantities to be used in their products and they know how
3  the products are assembled. The products are assembled
4  for Viewsonic and that's the type of assembly that the
5  package claims really address. They don't address
6  assembly of the modules or the subcomponents in the
7  modules.
8         SPECIAL MASTER POPPITI: Well, I am -- I
9  am going to grant the production of, by agreement, the
10 date will be adjusted to the date that you have selected,
11 and I will issue appropriate findings and recommendations
12 if you tell me that you are not agreeing.
13        MR. CHRISTENSON: I think that would be
14 helpful, Your Honor, just to get your guidance on what it
15 is you think we should be producing.
16        SPECIAL MASTER POPPITI: Thank you.
17 No. 85, please.
18        MR. MILLER: 85 is the -- those
19 components of an LCD module that are or can be used for
20 mounting the module to the external case of a product.
21        Again, this is -- this is a, I guess, a
22 subset 84, to some extent, but it is more focused on the
23 mounting side of it to make sure that we understand what
24 was known, and, again, we would be amenable to the

Page 134

1  discussed date parameters.
2  SPECIAL MASTER POPPITI:
3  Mr. Christenson, this certainly is more, I will accept
4  Mr. Miller's word, more focused than 84. Any objection
5  to this with the amended date?
6  MR. CHRISTENSON: What I am trying to
7  determine is whether -- is 85 subsumed within 84?
8  SPECIAL MASTER POPPITI: Is 85 subsumed
9  within 84? Well, from my perspective, it looks like it
10 could be, but it's Mr. Miller's request. Mr. Miller.
11 MR. MILLER: Again, I am not sure that
12 it's completely subsumed because I don't know how LPL
13 defines the edges of the module and what is part of the
14 module components and what is a structure that is used
15 for mounting. And, so, you know, my guess would be that
16 it is subsumed, but I don't know that for a fact because
17 I don't know how, as I said, how LPL defines the edge of
18 the module and what is or isn't part of it.
19 SPECIAL MASTER POPPITI: You are not
20 going to know it until you see it.
21 MR. MILLER: That's the problem.
22 SPECIAL MASTER POPPITI: I understand.
23 I will treat it separately in light of counsel's
24 representation.

Page 135

1  And, again, my question is,
2  Mr. Christenson: Do you agree to 85?
3  MR. CHRISTENSON: Well, given Your
4  Honor's ruling on request 84, we will agree to 85 --
5  SPECIAL MASTER POPPITI: Thank you.
6  MR. CHRISTENSON: -- with the date
7  limitation.
8  And, Your Honor, if we are going to be
9  providing a more, you know, a more comprehensive set of
10 documents for which we need to investigate, I would ask
11 that we maybe be given until the other date that
12 Viewsonic had mentioned, I think maybe it was the 29th?
13 SPECIAL MASTER POPPITI: Yeah, it was
14 the 29th.
15 MR. CHRISTENSON: And I don't intend to
16 wait until the last day. I am happy to do this on a
17 rolling basis.
18 SPECIAL MASTER POPPITI: I understand.
19 Mr. Miller, any problem with the 29th,
20 then?
21 MR. MILLER: Only that we are -- that it
22 really pushes us out in terms of our depositions. You
23 know --
24 SPECIAL MASTER POPPITI: It would be the

Page 136

1  same understanding, and I understand that, that, unless
2  you have this information, you are going into -- it makes
3  no sense to go into deposition.
4  MR. MILLER: Right.
5  SPECIAL MASTER POPPITI: So the 29th,
6  then.
7  This is 86.
8  MR. MILLER: Yes.
9  SPECIAL MASTER POPPITI: Mr. Miller.
10 MR. MILLER: I think 86 is probably
11 subsumed within 85 if they are going to produce on 85.
12 SPECIAL MASTER POPPITI: Yeah. I am
13 flipping, paging back and forth and I am having to blink
14 to see the difference.
15 Mr. Christenson.
16 MR. CHRISTENSON: Yeah. The wording is
17 a little bit different.
18 SPECIAL MASTER POPPITI: The wording is
19 a little bit different.
20 MR. CHRISTENSON: I can't articulate the
21 difference offhand. I am happy to focus on 85 and treat
22 86 as moot if that's agreeable.
23 MR. MILLER: That's fine, Your Honor.
24 SPECIAL MASTER POPPITI: That's fine.

Page 137

1  Thank you.
2  MR. MILLER: And now we are back to 87,
3  is a bill of materials for the back light unit, which is
4  a -- a particular component described in the patent of
5  these modules.
6  SPECIAL MASTER POPPITI: And the rest of
7  them deal with the back light unit?
8  MR. MILLER: Yes.
9  SPECIAL MASTER POPPITI:
10 Mr. Christenson.
11 MR. CHRISTENSON: Well, yeah, 87, I
12 believe, and 88 deal with a back light unit. And then I
13 believe, Your Honor, that there is a continuing series of
14 requests that, essentially, scroll through all manner of
15 different subcomponents that are used to assemble LCD
16 products. And, you know, we started off more broadly
17 with what we discussed, I think, so far, and it seems to
18 me that this is just unnecessary for us to go through
19 each sub component like this in all manner of records, so
20 we object to these requests.
21 MR. MILLER: To the extent that these
22 are included in 82 or 83, I mean, obviously, they just
23 need to refer back and they don't have to produce them
24 more than once.

Page 138

1    To the extent they are not, which
2    Mr. Christenson's response leads me to think they may not
3    be, in his mind, then they, independently, should be
4    produced.
5        SPECIAL MASTER POPPITI: For the same
6    reasons that you articulated earlier?
7        MR. MILLER: Absolutely.
8        MR. CHRISTENSON: And, Your Honor, I
9    cannot say how the bills of materials are formatted or
10   what is or is not included in the bill of materials
11   related to a module, for example. That may have a line
12   item for a back light unit. I don't know if there is a
13   separate set of documents and records that would break
14   out additional subcomponents for each component; for
15   example, a back light unit bill of materials that then
16   lists other subcomponents. I just don't know the answer
17   to that.
18       SPECIAL MASTER POPPITI: If it doesn't,
19   you know, you don't have it to give. If it does, you
20   have it.
21       MR. CHRISTENSON: Right. I don't know
22   if it exists and I just dispute the relevance of that
23   discovery, Your Honor.
24       SPECIAL MASTER POPPITI: Do you want to

Page 139

1    make any further record, Mr. Miller, on relevance?
2        MR. MILLER: Excuse me?
3        SPECIAL MASTER POPPITI: Do you want to
4    make any further record on relevance?
5        MR. MILLER: No. The only thing I would
6    say, just to pinpoint it, is that the patents discuss the
7    first frame, which is a critical component, as being a
8    component of the back light unit in certain
9    circumstances, and, therefore, the back light unit also
10   has particular interest in this matter.
11       SPECIAL MASTER POPPITI: Okay. I am
12   satisfied that the record is similar to my ruling on
13   other discussions, and with respect to, then, to 87 and
14   those requests that follow relating to the -- the back
15   light unit and/or its components, unless you tell me that
16   there is agreement, I will issue a finding and
17   recommendation with respect to that.
18       MR. CHRISTENSON: Yes, Your Honor. I
19   think we are in dispute on that, but I understand your
20   ruling, obviously.
21       SPECIAL MASTER POPPITI: Okay. And it
22   will be structured in the fashion that we have talked
23   about earlier in terms of providing it within so many
24   days after either I issue my findings and recommendations

Page 140

1    without exception or after Judge Farnan finally rules.
2        Next, please.
3        MR. CHRISTENSON: Yes, Your Honor. And
4    by the way, some of this may not be -- some of this we
5    may be able to work through depending on the formatting
6    of the documents and depending on what level of detail
7    turns out to be satisfactory.
8        SPECIAL MASTER POPPITI: That's fine. I
9    would hope that, in light of even the findings and
10   recommendations, that you would take the opportunity to
11   see if you can't forge some agreements so that we can,
12   you know, continue on track without having to sidetrack
13   the Court.
14       MR. CHRISTENSON: Yes, Your Honor.
15       SPECIAL MASTER POPPITI: Next, please.
16       MR. MILLER: Your Honor, one, I guess,
17   point of housekeeping, looking at my notes, I see that
18   the only request to which they actually agreed to produce
19   documents were 82, 83, and 85, and I guess, in light of
20   that, I am not sure that, you know, I am -- I guess I'd
21   re-raise the issue of whether the 29th is an improper
22   date or whether they can be -- do it earlier so we can at
23   least get those documents, these materials that are going
24   to be subject to an order that we are not going to get

Page 141

1    until February, probably.
2        I'd at least like to start being able to
3    get some of these materials to move this case forward.
4    Whether we could go back to the 19th on those, to the
5    three they have agreed to --
6        SPECIAL MASTER POPPITI: I understand
7    what you have just said.
8        Mr. Christenson, is there any give on
9    the agreement date?
10       MR. CHRISTENSON: I'd like to be as
11   cooperative as we can, Your Honor. I am just trying to
12   avoid being unrealistic. I think that -- I don't have my
13   calendar right in front of me. Is the 19th a Friday?
14       SPECIAL MASTER POPPITI: The 19th is a
15   Friday.
16       MR. CHRISTENSON: What if we had until
17   that following Monday?
18       SPECIAL MASTER POPPITI: The 23rd?
19       MR. CHRISTENSON: Right.
20       SPECIAL MASTER POPPITI: Mr. Miller. I
21   am sorry, the 22nd.
22       MR. MILLER: That's fine, Your Honor.
23   We can do it then.
24       SPECIAL MASTER POPPITI: Then let's do

# EXHIBIT 2

# McKenna Long
# & Aldridge LLP
Attorneys at Law

Atlanta

Denver

Los Angeles

Philadelphia

1900 K Street, NW • Washington, DC 20006
202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

San Diego

San Francisco

Washington, DC

Brussels

CASS W. CHRISTENSON
(202) 496-7218

EMAIL ADDRESS
cchristenson@mckennalong.com

February 12, 2007

**VIA E-MAIL AND U.S. MAIL**

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz, LLP
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071

Re: LG.Philips LCD Co., Ltd. v. Tatung, et al.; Civil Action No. 04-343 (JJF)

Dear Scott:

I write in response to your letters sent the evenings of February 7 and February 8, 2007. You demand in your letters supplemental discovery due to a purported "extended misrepresentation regarding [LPL's] commercialization of products that practice the supposed invention of the patents in suit." Because your premise for seeking this additional discovery is false, your accusations and requests for additional discovery are moot, and we oppose ViewSonic's attempt to inflict unnecessary burdens on LPL by making unfounded accusations for strategic purposes. Even if LPL practiced the invention, which it does not, the discovery that ViewSonic seeks is burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Your February 7 and 8 letters reflect several misconceptions and incorrect statements. In your February 7 letter, for example, you incorrectly state that since September 2006, LPL "represented that it did not make any products that are rear mountable or capable of being rearmounted, or that otherwise practice the invention disclosed and claimed in the patents in suit." This statement is doubly inaccurate because: (1) it mischaracterizes "any products that are rearmountable or capable of being rearmounted" as practicing the invention claimed in the patents; and (2) since September 2006, we have correctly informed you that LPL does not practice the invention. The specific issue of whether LPL makes products that are "rear mountable or capable of being rearmounted" was raised by you during the December 28, 2006 hearing and was addressed by us promptly and in good faith. Your February 8 letter likewise suggests incorrectly that LPL made a "false assertion that it did not make products that practice any of the supposed inventions of the patents in suit . . . ." LPL does not practice the claimed invention. Rather, as we stated in Mr. Kirk's January 8, 2007 letter to Special Master Poppiti, LPL sells certain modules "that could be used by third party assemblers in a way that practices LPL's rearmounting technology claimed in the Patents-in-Suit, depending on the construction of

Scott R. Miller, Esq.
February 12, 2007
Page 2

the claims and how third parties assemble finished products that incorporate LPL's modules." You thus are wrongly and unfairly accusing LPL of misrepresentations.

  We have correctly and consistently informed you, including at the December 28 hearing, that LPL does not practice the asserted claims. In order for a product to be covered by a given claim, the device in question must contain an element that corresponds to *each and every* limitation recited in that claim, either literally or under the doctrine of equivalents. LPL sells modules. LPL's modules do not contain an element that corresponds to a rear housing, which is a limitation of every asserted claim. Thus, at best the modules that LPL sells contain elements that correspond to *only some* of the limitations of the asserted claims. Indeed, ViewSonic has expressly agreed that the claimed invention requires more than a module. For example, ViewSonic's Opening Claim Construction Brief states on page 19 that "Independent claims 35 and 55 of the '641 Patent each require the rear mountable flat panel display device be mounted to the housing of a data processing device."

  You now attempt to manufacture a misrepresentation by twisting our good faith efforts to address confusion that you created, or at least fostered, by your misleading statements in the December 28 hearing. You sought certain discovery based on whether LPL practices its invention, but you then incorrectly conflated the separate issues of whether LPL practices its Patents-in-Suit and whether LPL's modules are capable of being rearmounted -- two different things. Specifically, you stated in the December 28 hearing that ViewSonic's document requests number 71 through 74 seek "documents that relate to the use of products or practices of any of the inventions in the patents-in-suit." Dec. 28 Tr. at 165. Shortly thereafter, you twice mischaracterized the inventions. First, you misleadingly stated that "the patents talk about, and certain of the claims within it talk about a module that is, quote, capable of being rear mounted." Dec. 28 Tr. at 166. You then characterized "certain of the patent claims" as "speak[ing] of a flat panel display device which is, quote, capable of, closed quote, being mounted, and I would presume that all of their products are capable of being mounted," incorrectly suggesting that discovery on products that practice the various inventions claimed by the Patents-in-Suit applies to all modules that can be mounted. Dec. 28 Tr. at 168. Whether intentionally or not, you have confused the issue of what the claims actually cover.

  Whether LPL sells modules with holes at the rear surface has no bearing on whether Defendants infringe the Patents-in-Suit, whether the claims are valid, or the amount of damages to which LPL is entitled in this case. When Mr. Ambrozy commented during the December 28 hearing that LPL's products do not include fastening parts at the rear surface of a frame or tray, moreover, he stated that he wanted to confirm with LPL and would then promptly report back to the Special Master. After further investigation, it was determined that some of LPL's products contain holes at the rear surface of the module. On January 8, 2007, as agreed, we promptly reported to the Special Master on the existence of LPL modules with rear surface holes. Such products are, however, not covered by the Patents-in-Suit.

  Further, the agreement made during the December 28, 2006 hearing to limit certain discovery from LPL to the time period ending December 1998 had nothing to do with whether

Scott R. Miller, Esq.
February 12, 2007
Page 3

LPL made products that could be rearmounted. Rather, this time period was agreed to based on your contention that the discovery sought was relevant to validity issues. See Dec. 28 Tr. at pp. 120-23. Your attempt to manufacture an argument now that you were misled is undermined by the record. You initially raised the idea of LPL's discovery running to the time that the Patents-in-Suit issued in December 2002, but after some discussion you expressly agreed to limit discovery to the end of 1998. *See* Dec. 28 Tr. at 121-23. Inexplicably, you now seek to disavow your agreement and seek irrelevant discovery, much like you have objected to the Special Master's Report concerning advice of counsel discovery after specifically agreeing during the hearing that ViewSonic needed to seek leave to plead any advice of counsel defense. ViewSonic's motion to compel further confirms that the disputed discovery was not related to damages issues. Your attempt to repackage this technical discovery now as "damages discovery" is improper and harassing.

ViewSonic's intent to use discovery as a tactical weapon is evident from your practice of continuously demanding more and more discovery. On January 8, we reported to the Special Master regarding LPL's products. In response, at the January 19, 2007 hearing, you demanded broader discovery concerning document requests 71-74 and 118, because of what you described as LPL's "behavior in the use of products and the sale of products or offering for sale of products *that utilized the inventions here.*" Jan. 19 Tr. at 40 (emphasis added). On January 24, ViewSonic filed its supplemental brief characterizing Requests 71-74 and 118 as related to "Flat Panel Display Products" that "use any invention disclosed in the patents-in-suit or Foreign counterparts to the patents in suit" and any LPL product "that incorporates any invention disclosed in the patents-in-suit." Jan. 24, 2007 Ltr. To Special Master at 1. On February 5, we submitted a joint status report to the Special Master. In that status report, ViewSonic made a last-minute revision to argue that LPL practices the invention with rearmountable modules, and therefore LPL should supplement discovery concerning document requests 71-74 as previously briefed, and also *four* additional requests (numbers 82, 84, 85, and 102). In response, LPL pointed out that ViewSonic had failed to ever discuss this issue with LPL before adding it to the status report. Then, in your February 7 letter, you demanded supplemental discovery for *twenty-nine (29)* document requests (numbers 63, 64, 65, 66, 77, 78, 79, 80, 81, 82, 83, 84, 85, 87, 88, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 101, 102, 103) and two interrogatories (numbers 9 and 25). You demanded that LPL respond in less than twenty-four (24) hours. The next day, in your February 8 letter, you demanded supplemental discovery for an additional ten (10) document requests (numbers 12, 13, 15, 28, 29, 33, 67, 68, 69, 70), for a total of *thirty-nine (39)* document requests. You further demanded that LPL produce this new discovery "immediately" and by February 12, in two business days. If these impossible demands are not met, you threatened to repudiate the schedule for LPL's depositions that we have worked with you on for two months. ViewSonic clearly is engaged in an improper pattern of harassment. Further, this discovery purportedly arises based on LPL's alleged use of one or more inventions claimed in the Patents-in-Suit, but, as discussed above, LPL does not practice any of the claims asserted in this case.

LPL has diligently provided discovery and responded to ViewSonic's discovery requests throughout this case. With respect to your complaints about Mr. Ambrozy's statements during

Scott R. Miller, Esq.
February 12, 2007
Page 4

the December 28 hearing, those statements were made after we had agreed on the time period for LPL's production concerning various document requests, and, as discussed above, the agreement to limit the time period for certain requests was unrelated to whether LPL's products could be rearmounted. You also mischaracterize my accurate comments at pages 109-110 and 116 of the December 28 transcript. I correctly stated that LPL does not assemble the finished visual display products that use LPL's modules. I did not, as you imply, "perpetuate" a "misrepresentation." Your new arguments appear to attempt to rewrite several of ViewSonic's document requests, which focus on discovery regarding assembled visual display products such as LCD monitors and televisions. ViewSonic cannot now expand the scope of those requests to seek broader discovery than is actually requested in ViewSonic's Document Requests. Further, you also mischaracterize LPL's position concerning ViewSonic's Document Request 101. LPL is not attempting to limit Request 101, but rather is not aware of any responsive documents.

With respect to the reference in your February 8 letter to LPL's deposition dates, as I stated in my February 9 email to you, we will object to any attempt to repudiate the existing schedule for LPL's depositions. As you know, we have reserved deposition dates based on your insistence to take LPL's depositions as soon as possible, and we have worked to overcome numerous scheduling and logistical obstacles to secure the existing deposition dates starting February 26 in Washington, D.C. We assume that you will proceed with these depositions.

ViewSonic, not LPL, has avoided discovery in this case. We produced documents from LPL's patent files and our firm's own prosecution files in April 2006, long before ViewSonic was willing to provide any discovery, except limited information specifically related to the VX900 product. We provided LPL's sales information and license agreements long before we had to move to compel that same discovery from ViewSonic. We agreed to provide bill of sale information during the December 28 hearing and we then provided a 300 page document with complete detail for LPL's products, which exceeded the scope of what we agreed to provide. We produced this document on January 22, and you never complained about it until a few days ago. Last week, we voluntarily produced additional documents from LPL as potentially responsive to ViewSonic's document requests, even though we are forced to resort to the Special Master to obtain technical discovery from Defendants.

Despite this history, we remain willing to discuss with you specific discovery issues, if any, that you would like to discuss. We continue to believe that teleconferences are the most efficient and effective way to communicate. Although you repeatedly have refused to speak with us or to take our telephone calls, we remain willing to speak with you.

Very truly yours,

Cass W. Christenson

CWC:ea

Scott R. Miller, Esq.
February 12, 2007
Page 5

cc: Rel S. Ambrozy, Esq. (via e-mail)
Lora A. Brzezynski, Esq. (via e-mail)
Cormac T. Connor, Esq. (via e-mail)
Richard D. Kirk, Esq. (via e-mail)
Mark Krietzman, Esq. (via e-mail)
Valerie W. Ho, Esq. (via e-mail)
Steve P. Hassid, Esq. (via e-mail)
Anne Shea Gaza, Esq. (via e-mail)
Frederick L. Cottrell, III, Esq. (via e-mail)
Tracy R. Roman, Esq. (via e-mail)
Jeffrey B. Bove, Esq. (via e-mail)
Jaclyn M. Mason, Esq. (via e-mail)
Manuel C. Nelson, Esq. (via e-mail)
James D. Heisman, Esq. (via e-mail)

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on February 23, 2007, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Jeffrey B Bove, Esq.
Jaclyn M. Mason, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207

Frederick L. Cottrell, III, Esq.
Anne Shea Gaza, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

The undersigned counsel further certifies that copies of the foregoing document were sent by email to the above counsel on February 23, 2007, and will be sent by hand on February 23, 2007, and were sent by email on February 23, 2007, and will be sent by first class mail on February 23, 2007, to the following non-registered participants:

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Valerie Ho, Esq.
Mark H. Krietzman, Esq.
Frank C. Merideth, Jr., Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy Roman, Esq.
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

/s/ Richard D. Kirk (rk922)
Richard D. Kirk

571447-1