# CASE 1

Westlaw.

176 F.3d 669                                                                                                    Page 1
176 F.3d 669, 50 U.S.P.Q.2d 1665
(Cite as: 176 F.3d 669)

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
MAX'S SEAFOOD CAFE, by LOU-ANN, INC.,
successor to Max's Seafood Cafe, Inc.
v.
Max QUINTEROS; Jack-Mack, LLC; and all others
in active concert or
participation with Appellants, jointly, severally, and
in the alternative,
Appellants.
No. 98-5287.

Argued Jan. 25, 1999.
Filed May 5, 1999.

Operator of restaurant brought contempt proceeding alleging that individual who operated competing restaurant, and corporation formed by that individual, violated consent order entered by individual and operator's predecessor in trademark infringement action. The United States District Court for the District of New Jersey, Stanley S. Brotman, J., held both individual and corporation in civil contempt for violation of consent order, and they appealed. The Court of Appeals, Sloviter, Circuit Judge, held that: (1) individual could not be held liable for violations of consent order by his business associate; (2) corporation was not liable for violations by associate; and (3) corporation could raise defense based on when it came into existence in motion for reconsideration.

Reversed and remanded.

West Headnotes

[1] Federal Courts ⟨⟩776
170Bk776 Most Cited Cases

[1] Federal Courts ⟨⟩829
170Bk829 Most Cited Cases

[1] Federal Courts ⟨⟩870.1
170Bk870.1 Most Cited Cases
Court of Appeals generally reviews the district court's denial of reconsideration for abuse of discretion, but, to the extent that the denial is predicated on an issue of law, such an issue is reviewed de novo; to the extent that the district court's disposition of the reconsideration motion is based upon a factual finding, it is reviewed for clear error.

[2] Federal Civil Procedure ⟨⟩2397.6
170Ak2397.6 Most Cited Cases
Individual who entered consent decree, in trademark infringement action, prohibiting individual, and those in active concert and participation with him, from using name "Max" in connection with restaurant business and from referring to individual as the original or genuine Max, could not be held liable for conduct of individual's business associate that violated decree, absent evidence that individual instigated, endorsed, or ratified associate's violations.

[3] Federal Civil Procedure ⟨⟩2397.5
170Ak2397.5 Most Cited Cases
Terms of consent judgments are construed strictly.

[4] Federal Civil Procedure ⟨⟩2397.5
170Ak2397.5 Most Cited Cases
Court discerns the scope of a consent judgment by reviewing what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it.

[5] Contempt ⟨⟩29
93k29 Most Cited Cases
One with knowledge of a court order who abets another in violating the order is surely in contempt.

[6] Federal Civil Procedure ⟨⟩2397.6
170Ak2397.6 Most Cited Cases
Corporation formed by individual that had entered consent decree with restaurant operator, which prohibited individual from using name "Max" in connection with restaurant business and from referring to himself as the original or genuine Max, could not be held in contempt based on violations of decree by individual's former business associate, where corporation did not exist as an entity at time of associate's contemptuous statements.

[7] Federal Civil Procedure ⟨⟩2397.6
170Ak2397.6 Most Cited Cases
Corporation formed by individual that had entered consent decree with restaurant operator, which prohibited individual from using name "Max" in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

connection with restaurant business and from referring to himself as the original or genuine Max, was entitled to offer its date of incorporation into evidence on motion for reconsideration, as defense to contempt liability for statements of individual's former business associate that violated decree, to avoid clear error of law and fact, particularly since there was no evidence offered against corporation at contempt hearing.

[8] Federal Civil Procedure ⚷2651.1
170Ak2651.1 Most Cited Cases
A judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.

[9] Corporations ⚷445.1
101k445.1 Most Cited Cases
Successorship liability, where applicable, is imposed only after a full hearing with specific attention given to the details of the arrangements between the parties and full findings of fact that the parties have had an opportunity to address.

*671 Scott R. Knapp (Argued), Steven J. Fram, Archer & Greiner Haddonfield, New Jersey, for Appellants.

Carlo Scaramella (Argued), Scott Freemann, Hunt & Scaramella, Cherry Hill, New Jersey, for Appellee.

Before: SLOVITER, McKEE and RENDELL, Circuit Judges.

### OPINION OF THE COURT

SLOVITER, Circuit Judge.

#### I.
#### INTRODUCTION

Max Quinteros and Jack-Mack Seafood, LLC ("Jack-Mack") appeal from the District Court's order holding them in civil contempt for violations of a consent order to which Quinteros was a party. Quinteros urges that the District Court erred in holding him liable for Frank Miraglia's violations of that consent order. The other appellant, JackMack, complains that because it was not in existence at the time of the contumacious acts in question, the District Court erred in holding it in contempt. We consider their contentions in turn.

#### II.
#### BACKGROUND

Max's Seafood Cafe is a well-known restaurant in Gloucester City, New Jersey, that had been in operation under that name since at least 1940. Max Quinteros, who had purchased the restaurant in 1977, sold it to Lou-Ann, Inc. ("Lou-Ann") in 1983, who in turn sold it to Stephen Renzi. Several years later, in 1990, Renzi sued Quinteros for trademark infringement. The complaint alleged that, in operating a competing restaurant nearby, Quinteros was breaching his agreement to transfer to the purchaser all goodwill associated with Max's Seafood Cafe and all rights in the trade name "Max's." The lawsuit resulted in a consent order entered in June 1990--signed by Quinteros--that enjoins "Max Quinteros, their [sic] employees, agents, servants and all others in active concert or participation with Defendants" from "(1) Using the name 'The Original Max's Seafood,' ... 'Max's Cafe,' 'Max's,' 'Max,' ... or any confusingly similar designation or name or mark ... [t]o market, designate, or identify Defendants' restaurant business or vocation," and "(2) Communicating to any person ... that one or more Defendants are the 'original' or 'authentic' or 'genuine' Max, or any indication of present association with [plaintiff's restaurant]." The consent order further provides that Quinteros can use the name "Max" in advertisements, provided it is followed immediately by "Quinteros." *Max's Seafood Cafe, Inc. v. Jim E. Kay, Inc.*, Civ. Action No. 90-2137(SSB) (D.N.J. June 13, 1990). The court retained jurisdiction over enforcement of the consent decree.

Lou-Ann repurchased Max's Seafood Cafe from Renzi in 1992. Louis and Antoinette Del Brocco are the principal shareholders of Lou-Ann, Inc. In 1995, Quinteros began operating the kitchen of an establishment owned by Frank Miraglia called "Frank's Place;" the restaurant part of the operation was called "Bayshore Seafood Restaurant." The Del Broccos' attorney sent Quinteros a letter on June 29, 1995, complaining that Quinteros was telling people that he was "the original Max" associated with Max's Seafood Cafe and directing him to cease and desist. The Del Broccos did not pursue the matter further until 1997.

Quinteros, who left the Bayshore establishment for one month in a dispute with Miraglia, finally quit in August of 1996 because, according to Quinteros, Miraglia had not followed through on his promise to make Quinteros a full partner. In 1997, however,

Quinteros and his wife returned to the Bayshore, at which point they, *672 through a newly formed corporation, appellant Jack-Mack Seafood, LLC, purchased the business on April 23, 1997. The new entity dropped the name "Frank's Place" and began placing advertisements which stated that the Bayshore Seafood Restaurant and Tavern was under new management and which identified Max Quinteros by name.

The contempt proceeding that is the subject of this appeal was initiated when Lou-Ann, proceeding in the name Max's Seafood Cafe, [FN1] filed an "order to show cause" in the District Court on September 3, 1997, seeking to have Quinteros and Jack-Mack, the new corporation, held in contempt. The District Court held a hearing on October 14, 1997. The gravamen of Lou-Ann's complaint at the hearing was that Quinteros had been violating the consent order since April 1995 by referring to himself as "the original Max," and, after his purchase of the restaurant, by placing advertisements which set the word "Max" in letters larger than the word "Quinteros." Lou-Ann further alleged that Jack-Mack was liable "on an aiding and abetting theory." Lou-Ann did not specify which acts it alleged Jack-Mack aided and abetted. Testimony was taken from several witnesses, including Max Quinteros, Frank Miraglia, and Louis Del Brocco.

> FN1. For convenience, we will refer to the plaintiff-appellee as Lou-Ann throughout.

The District Court issued its decision on December 18, 1997. The court concluded that the print advertisements did not violate the consent order. *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 11 (D.N.J. Dec. 18, 1997). The court found the testimony regarding Quinteros's alleged oral communications to be "unclear and imprecise," "lack[ing in] specificity," and "no better than vague." *Id.* at 7. It noted that none of Lou-Ann's witnesses alleged that any of these oral communications had occurred after August 1996, and it concluded that the contempt allegations relating to Quinteros's alleged statements were barred by the doctrine of laches (a ruling that is not cross-appealed). The court did find, however, that there was clear and convincing evidence "that Frank Miraglia did, on approximately twenty-five (25) occasions, refer to Max Quinteros as the 'original Max' to customers," but that "[I]t has not been clearly established that Max Quinteros ever referred to himself that way." *Id.*

Nonetheless, the District Court found Quinteros liable for Miraglia's statements because Quinteros and Miraglia had split profits from the restaurant. The court stated: "Max Quinteros had influence with Frank Miraglia. He was not a mere 'employee' who simply had no control whatsoever over the actions of Frank Miraglia." *Id.* at 8. The court further found that "Quinteros told Frank Miraglia that he could not introduce Quinteros as the 'original Max,' " but that "[a]fter being advised that he could not introduce Max Quinteros as the 'original Max,' Frank Miraglia nevertheless continued to introduce Max Quinteros as the 'original Max.' Thus, whatever efforts Max Quinteros made to prevent Frank Miraglia from violating the order were ineffective and inadequate. Max Quinteros knew that simply telling Frank Miraglia to stop ... had been ineffective, yet he took no other steps to curb Frank Miraglia's conduct." *Id.* The court ultimately concluded that Max Quinteros was liable in contempt "for his ineffective efforts at ensuring Miraglia's compliance." *Id.* at 18.

Additionally, the court found Jack-Mack in contempt, although there is no discussion in the court's memorandum opinion disclosing the rationale for this decision. As a remedy, the court ordered that advertisements for the Bayshore include the words "not affiliated with Max's Seafood Cafe," fined Quinteros and Jack-Mack each $25 (representing $1 for each of Miraglia's statements), and awarded attorney's fees to Lou-Ann pursuant to the consent order, the amount to be determined after the submission of a fee petition. *673 *Id.* at 24-27. Lou-Ann submitted a fee petition, to which Quinteros and JackMack filed objections. The fee issue is currently pending, and the District Court reserved decision pending this appeal.

Quinteros and Jack-Mack moved for reconsideration. They argued that (1) Quinteros cannot be held liable for Miraglia's violations of the consent decree merely because of the business association between them, (2) Jack Mack cannot be held liable because it was not in existence at the time of the violations, having been incorporated only in June 1997, and (3) the District Court erred in not holding Frank Miraglia in contempt. The District Court denied the motion, concluding that the movants had not satisfied the standard for granting of reconsideration on any of the issues raised. *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), (D.N.J. May 1, 1998). Quinteros and JackMack timely brought this appeal.

### III.
### DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Quinteros and Jack-Mack assign four errors to the District Court: They argue that the court (1) erred as a matter of law in finding Quinteros in contempt on the basis of statements made by Miraglia; (2) erred as a matter of law in finding Jack-Mack in contempt based upon statements made by a third party before the entity was formed; (3) erred in failing to find plaintiff's entire claim barred under the doctrine of laches; and (4) erred in failing to award attorney's fees to Quinteros and Jack-Mack as successful parties with respect to the print advertisements issue.

[1] The first issue, presenting a question of law, is subject to plenary review. See Harris v. City of Philadelphia, 47 F.3d 1333, 1338 (3d Cir.1995). The second issue presents a mixed question of law and fact, but it was raised for the first time in appellants' motion for reconsideration. We generally review the District Court's denial of reconsideration for abuse of discretion. See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1203 (3d Cir.1995). However, to the extent that the denial of reconsideration is predicated on an issue of law, such an issue is reviewed de novo; to the extent that the District Court's disposition of the reconsideration motion is based upon a factual finding, it is reviewed for clear error. Id. The abuse of discretion standard applies to the laches and attorney's fee issues as well. See Bermuda Express, N.V. v. M/V Litsa, 872 F.2d 554, 557 (3d Cir.1989). We address these questions in turn.

A.
*Quinteros*

[2] Quinteros argues that the District Court erred in finding him in contempt, given that the only violations of the consent order that the court found had been committed by Miraglia, not Quinteros. As stated above, the District Court concluded that Quinteros was "in contempt for his ineffective efforts at ensuring Miraglia's compliance." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 18 (D.N.J. Dec. 18, 1997).

[3][4] At the outset, we note that the consent order does not impose upon Quinteros a duty to police Miraglia's, or any other person's, compliance with the injunction. It simply enjoins Quinteros, and anyone legally associated with him, from violating its terms. We construe the terms of consent judgments strictly. See Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3d Cir.1994). We "discern the scope of a consent judgment by review [ing] what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it."

*Id.* (internal quotation marks omitted). Accordingly, because the District Court did not find any acts on the part of Quinteros that violated the terms of the court's order, Quinteros's liability may only be established on an aiding and *674 abetting theory or on some rule of imputation.

The District Court reasoned, and Lou-Ann urges, that a finding of contempt as to Quinteros is appropriate because of his business association with Miraglia. The court found that the fact that Quinteros and Miraglia shared profits supported the imputation of contempt liability. Neither the District Court nor Lou-Ann has offered any authority for the proposition that the business association between two individuals, standing alone, is a sufficient ground for holding one in contempt for acts committed by another. Nor have we found any such authority.

[5] One with knowledge of a court order who abets another in violating the order is surely in contempt. See Roe v. Operation Rescue, 54 F.3d 133, 140 (3d Cir.1995); Quinter v. Volkswagen of Am., 676 F.2d 969, 972 (3d Cir.1982). As we have stated: "The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others." Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir.1990). But the District Court did not find that Quinteros instigated, endorsed, or ratified Miraglia's violations. Nor is there any evidence of record that would permit a reasonable fact-finder to so conclude. Quite the contrary: the District Court found that Quinteros exhorted Miraglia to cease violating the order, and the record plainly supports this finding. We therefore reject the argument that Quinteros's business association with Miraglia alone, in the absence of a finding that Quinteros acted to aid or abet Miraglia's violations, establishes Quinteros's liability for Miraglia's acts.

Lou-Ann emphasizes that the order enjoined not only Quinteros, the only person named in the injunction, but also "all those in active concert and participation" with him. In its opinion, the District Court's also used this rationale, stating, "[t]he Court can think of no better example of 'in active concert and participation' as the profit-sharing business partnership these two men had together." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 16 (D.N.J. Dec. 18, 1997). In deciding the motion for reconsideration shortly thereafter, the District Court expressly disavowed resting its holding on a finding that Quinteros and Miraglia were partners: "while the Court acknowledges Miraglia's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 669
Page 5
176 F.3d 669, 50 U.S.P.Q.2d 1665
(Cite as: 176 F.3d 669)

sole ownership and Quinteros's failed attempt at obtaining partnership recognition, there is no need to delve into the distinctions associated with various business organizations.... The Court does not read the term 'in active concert or participation' to require a finding of the existence of a partnership." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 5 (D.N.J. May 1, 1998).

Whether the business relationship between Quinteros and Miraglia was a partnership or not, the inclusion of the phrase of art "in active concert or participation" in the consent order does not support the District Court's conclusion that Quinteros can be held liable for Miraglia's statements. The term "active concert and participation" merely speaks to the question of the persons who can permissibly be bound by an injunction. This is a limitation built into the Federal Rules of Civil Procedure for reasons of due process. *See* Fed.R.Civ.P. 65(d) ("[O]rder granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them...."); *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832 (2d Cir.1930) ( "[A court] cannot lawfully enjoin the world at large, no matter how broadly it words its decree."). Thus, a finding that Miraglia was in active concert or participation with Quinteros would support a finding that Miraglia, though not a party, *675 could be bound by the injunction. [FN2] "Active concert or participation" does not, however, speak at all to the question of vicarious liability for another's violation of an order.

> FN2. The District Court, though noting that Miraglia was bound by the injunction, expressly declined to adjudicate Miraglia a contemnor out of concern about Miraglia's lack of representation at the contempt hearing and the unfair surprise that might attend a finding of contempt on the part of Lou-Ann's principal witness. No party has appealed this ruling.

Lou-Ann argues that Quinteros's position should be analogized to that of a union, which can be held liable for contumacious strike activity by members in some circumstances. In support of this contention, Lou-Ann cites two cases in which this court held unions liable for failing to take measures to prevent unlawful strikes. *See Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 959-60 (3d Cir.1975), ("[A] union may not disclaim responsibility [for wildcat strikes by its members] unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end."), and *United States Steel Corp. v. UMWA,* 534 F.2d 1063 (3d Cir.1976) (same).

We note at the outset that some of the doctrines that evolved in the federal labor law arena do not necessarily lend themselves to application in other contexts. Questions concerning the appropriateness and reach of the courts' equitable powers in the labor setting involve policy judgments that are particular to that context. Indeed, many of these questions are subject to statute, in particular the Norris-LaGuardia, Taft-Hartley, and Landrum-Griffin Acts. [FN3] Thus, one cannot automatically draw an analogy between a union and its officers and members on the one hand, and an individual who shares profits with another in a business association, on the other hand.

> FN3. *See* 29 U.S.C. § 106 ("No[labor organization] participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."); 29 U.S.C. § 160(*l* )(governing injunctions for secondary activity); 29 U.S.C. § 185(b) (governing responsibility of unions for acts of agents).

An even more telling reason for us to decline Lou-Ann's invitation to extend the holdings of *Eazor* and *United States Steel* is that the Supreme Court disagreed with this court's conclusions in those cases in *Carbon Fuel Co. v. UMWA,* 444 U.S. 212, 215 & n. 4, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). In *Carbon Fuel,* the Court held that courts cannot imply an obligation on a union to use all reasonable means to prevent and end strikes that it did not authorize, participate in, or ratify. Justice Brennan, writing for the Court, pointed out that the LMRA makes "clear that Congress [has] limited the responsibility of unions for strikes in breach of contract to cases when the union may be found responsible according to the common-law rule of agency." *Id.* at 216. Because the principles that Lou-Ann urges us to apply in this setting no longer have application even within the context in which they were developed, they must perforce be rejected as a basis for finding liability here.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 669 Page 6
176 F.3d 669, 50 U.S.P.Q.2d 1665
(Cite as: 176 F.3d 669)

Accordingly, we turn for guidance to cases that concern the question of vicarious liability for contumacious conduct in the business-association setting. There is a body of case law that deals with the subject, although not referred to by either party. In _Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911)_, the Supreme Court affirmed a contempt judgment against a corporation's president for the corporation's failure to comply with a subpoena. "A command to the corporation," the _Wilson_ Court held, "is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power *676 for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." _Id._ at 376.

The Court of Appeals for the Fourth Circuit took guidance from _Wilson_ in _Colonial Williamsburg Foundation v. Kittinger Co., 38 F.3d 133 (4th Cir.1994)_. That case, like the one before us, involved alleged violations of a consent judgment in a trademark infringement suit. The District Court entered a consent judgment permanently enjoining Kittinger, the former licensee of Colonial Williamsburg, from using the names or marks of Colonial Williamsburg furniture and from manufacturing or selling Colonial Williamsburg products. Finding that the injunction had been violated in several respects by functionaries of Kittinger, the District Court found the corporation, its president, Michael Carlow, and its vice-president, Nicholas Defino, in contempt for violating the judgment. On appeal, Carlow argued that he was not properly found in contempt because "the district court made no specific findings of misconduct with regard to him and premised its finding of contempt on the fact that he, as President of Kittinger, had not done enough to guarantee compliance with the consent judgment." _Id. at 136._ Carlow further urged in his defense that he had delegated the day-to-day activity of running the business to Defino. _Id._

The Court of Appeals for the Fourth Circuit rejected Carlow's arguments. After noting that Carlow did not read the judgment even though it was served on him, and subsequently signed a letter that specifically referenced Kittinger's former relationship with Colonial Williamsburg, the court ruled:

As President of Kittinger, Carlow was charged with the responsibility of ensuring that Kittinger complied with the consent judgment, and he did nothing to ensure compliance. While he couches his inaction as a proper delegation of authority to Defino, we are of [the] opinion that his actions evidence a studied disregard of a court order....

_Id._ at 137.

The distinction between the present case and both _Wilson_ and _Colonial Williamsburg_ is plain. In both of those cases, the individuals who were held responsible for their corporations' contumacy were the chief executive officers of those entities. There is no finding in this case suggesting that Quinteros had similar responsibility for Frank's Place. In fact, as noted above, the District Court was chary of characterizing Quinteros as a partner, notwithstanding evidence that Quinteros received a percentage return. We need not consider whether partner status would have altered the analysis because the court made no finding that a partnership had been established.

And, unlike the company president in _Colonial Williamsburg,_ who failed to read the court order and was thus found to have exercised "studied disregard" of the injunction, Quinteros, by contrast, both read the injunction and, as the District Court found, told Miraglia to stop referring to him as "the original Max." There is, in short, nothing in the record suggesting that Quinteros should be liable on the basis of an agency relationship.

Finally, Lou-Ann urges that a finding of contempt on the part of Quinteros is justified because Quinteros failed to meet his "burden of showing that [he has] made 'in good faith all reasonable efforts to comply.'" Appellee's Br. at 20 (quoting _Harris v. City of Philadelphia, 47 F.3d 1311, 1324 (3d Cir.1995))_. The _Harris_ opinion is inapplicable.

_Harris_ was the product of litigation involving the Philadelphia Prison system, which resulted in a number of opinions by this court. In the _Harris_ opinion referred to, we upheld the District Court's finding that the City of Philadelphia was in contempt for its delay in producing documents in accord with deadlines set forth in a consent decree between the City and the *677 plaintiffs. _Id._ at 1324. We acknowledged that "[t]here is general support for the proposition that a defendant may not be held in contempt as long as it took all reasonable steps to comply," _id.,_ but concluded on the record before us that the City had not shown "that it was in fact unable to comply" or that it had "good cause for [its] failure to comply" as required by the consent decree, _id._ at 1325. Accord _Harris v. City of Philadelphia, 47 F.3d 1333, 1340-41 (3d Cir.1995)_ (employing same

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

analysis with respect to violation of consent decree provision relating to occupancy levels in drug treatment facility).

Unlike *Harris,* where the City was attempting to avoid liability for its own violations of the order, here the terms of the consent order did not put Quinteros under an obligation to take steps to prevent Miraglia, or anyone else, from violating the order. Whatever attempts Quinteros made to stop Miraglia from violating the order were not commanded by court order, and he cannot be held in contempt merely because the efforts he did make failed to accomplish the end sought. And, as is evident from the *Harris* opinion, it is not ordinarily the alleged contemnor's burden to show compliance. The *Harris* burden only applies to alleged contemnors who assert, as a defense to contempt liability, that adherence to the order is not possible. That is not the case in the instant matter, and therefore *Harris* is inapposite.

Because all of the possible bases for imputation of liability on Quinteros are inapplicable, we conclude that the District Court erred in finding Quinteros in contempt for Miraglia's violations of the consent order.

### B.
### *Jack-Mack*

[6] Jack-Mack argues that because it did not exist as an entity at the time of Miraglia's contemptuous statements about Quinteros, the District Court erred when it found Jack-Mack was also in contempt for Miraglia's statements. Jack-Mack notes that the District Court found that the contumacious acts occurred before August 1996, whereas its certificate of incorporation demonstrates that it came into existence on February 24, 1997, considerably after the events in question. And it is uncontested that promptly after Quinteros, through Jack-Mack, bought the restaurant from Miraglia on April 23, 1997, Miraglia was, in the District Court's words, "out of the picture." See *Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 5 (D.N.J. Dec. 19, 1997). By then, of course, the contemptuous acts and statements by Miraglia had been discontinued. There is therefore nothing on the record showing any relationship between Jack-Mack and Miraglia to support the imposition of liability on Jack-Mack for Miraglia's contumacious statements.

[7] In an effort to sustain the District Court's decision, LouAnn argues that the District Court was not required to take cognizance of Jack-Mack's date of incorporation because Jack-Mack failed to proffer its certificate of incorporation until it filed its motion for reconsideration. We do not regard Jack-Mack's failure to raise the issue of its subsequent incorporation during the contempt proceedings to be fatal to its defense in this case.

[8] "The purpose of a motion for reconsideration," we have held, "is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. See *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995).

*678 In denying reconsideration to Jack-Mack on this issue, the District Court ruled that there was no intervening change in controlling law or newly discovered evidence; it failed to address the third issue: whether holding JackMack in contempt resulted in a clear error of law or fact or resulted in a manifest injustice. Although we have pointed out that "[c]ourts often take a dim view of issues raised for the first time in post-judgment motions," *Kiewit E. Co., Inc. v. L & R Constr. Co., Inc.,* 44 F.3d 1194, 1204 (3d Cir.1995), in this case the issue that Jack-Mack sought to raise as a defense in its motion for reconsideration was so fundamental, i.e., that Jack-Mack had not come into being until more than six months after the last of Miraglia's contumacious acts, that it was not consistent with the wise exercise of discretion for the District Court to have declined even to consider it. As we have previously emphasized, reconsideration is the appropriate means of bringing to the court's attention manifest errors of fact or law. See *Harsco,* 779 F.2d at 909.

In the circumstances of this case, it is not surprising that Jack-Mack did not produce its certificate of incorporation at the contempt hearing. Although Jack-Mack was named by Lou-Ann in this "order to show cause," and Lou-Ann's counsel stated at the beginning of the hearing that it sought to hold Jack-Mack liable "on an aiding and abetting theory," there was no evidence produced to support liability on this basis. Inasmuch as Lou-Ann bore the burden to prove contempt liability by clear and convincing evidence, Jack-Mack may well have believed that in light of the lack of any evidence against it, there was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 669  
176 F.3d 669, 50 U.S.P.Q.2d 1665  
**(Cite as: 176 F.3d 669)**

Page 8

no need to raise its incorporation date as a defense.

Once the evidence is considered, the force of Jack-Mack's argument that it may not be held for Miraglia's acts and statements is clear. The evidence showed, and the District Court was aware at the time of the contempt hearing, that Jack-Mack did not come on the scene until its purchase of the restaurant in April 1997, at which point Miraglia was no longer associated with the restaurant.

[9] Lou-Ann also urges, for the first time on appeal, that we may affirm the District Court's judgment with respect to Jack-Mack on a theory that was neither raised in nor addressed by the District Court, namely that of "successor liability." However, successorship liability, where applicable, is imposed only after a full hearing with specific attention given to the details of the arrangements between the parties and full findings of fact that the parties have had an opportunity to address. *See, e.g., Stardyne, Inc. v. NLRB,* 41 F.3d 141, 151 (3d Cir.1994); *Systems Management, Inc. v. NLRB,* 901 F.2d 297, 301-05 (3d Cir.1990). This case is devoid of any such record.

Lou-Ann does not suggest that the District Court found Jack-Mack liable as a successor. Instead, it argues disingenuously that there was sufficient evidence to hold Jack-Mack liable for contempt, apparently suggesting that the District Court could have, had it focused on the issue, found Jack-Mack to be a successor. But Lou-Ann's position on the successorship issue is vague, at best. It argues merely that Jack-Mack "was a successor to Quinteros' prior attempts to operate a Bayshore restaurant in Gloucester City," Appellee's Br. at 21, and that "Jack-Mack is the present incarnation of Max Quinteros' effort to own and operate a seafood restaurant in Gloucester City," *id.* at 22. This would be a casual and indefinite basis on which to impose liability, and Lou Ann's one-paragraph discussion of it in its brief demonstrates it does not base much reliance on it.

Nor do the two cases that it cites in that brief discussion mandate a different result. The case before us is not one in which we are dealing with a violation of a continuing nature, as in *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), nor is it one in which the defendant operates as "merely a disguised *679 continuance of the old employer," *see Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (internal quotation marks omitted).

The District Court did not find any ongoing conduct by Jack-Mack that would support contempt liability. Nor would the record have supported such a finding. JackMack is a limited liability company owned by Max Quinteros and his wife. Through this entity, Quinteros bought the restaurant from Miraglia. Until that purchase, as the District Court found, the business was a sole proprietorship owned by Miraglia. *See Max's Seafood Cafe v. Quinteros,* Civ. No. 90-2137(SSB), slip op. at 5 (D.N.J. May 1, 1998) ("[T]he Court acknowledges Miraglia's sole ownership...."). The only actions found to be violative of the order, Miraglia's statements, were of a discrete, rather than ongoing, nature, and ceased nearly one year before Jack-Mack acquired the business. In arguing that the contempt judgment against Jack-Mack be affirmed on the basis of successorship principles, Lou-Ann seeks to hold Jack-Mack responsible for past violations committed by Miraglia, the former owner, not for the kind of continuing violation at issue in *Golden State.*

There are substantial questions about the applicability of those two decisions in cases outside of the labor context, and because this rationale for liability was neither raised nor decided in the District Court, we will not undertake to consider those questions here.

We conclude, therefore, that Jack-Mack has shown that the District Court's order resulted in a clear error of law and fact and that the court's later refusal to reconsider the order was not consistent with the sound exercise of its discretion. Consequently, we conclude that the District Court erred in failing to grant reconsideration upon receiving evidence of Jack-Mack's incorporation date.

### C.
### *Remaining Issues*

In light of our holding, we need not address the laches issue raised by appellants. It follows from our reversal of the decision holding appellants in contempt that the award of attorney's fees to Lou-Ann cannot stand.

Quinteros and Jack-Mack have argued on appeal that because they were successful parties with respect to LouAnn's print advertising claim, the District Court erred in failing to award counsel fees to them. They will undoubtedly extend that claim to the entire contempt order in light of our decision here. The consent order states, "in the event that any party seeks enforcement of this Order, the successful party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

176 F.3d 669
176 F.3d 669, 50 U.S.P.Q.2d 1665
**(Cite as: 176 F.3d 669)**

Page 9

or parties shall be awarded counsel fees." We will remand this issue to the District Court so that it can consider the applicability of that provision and conduct further proceedings pursuant thereto.

### IV.
### *CONCLUSION*

For the foregoing reasons, the judgment of the District Court finding Quinteros and Jack-Mack in contempt will be reversed and the case remanded for proceedings consistent with this opinion.

176 F.3d 669, 50 U.S.P.Q.2d 1665

**Briefs and Other Related Documents (Back to top)**

• 1998 WL 34083707 (Appellate Brief) Reply Brief for Appellants (Dec. 23, 1998)Original Image of this Document (PDF)

• 1998 WL 34083644 (Appellate Brief) Brief and Appendix of Plaintiff-Appellee, Max's Seafood Cafe by Lou-Ann, Inc. (Dec. 11, 1998)Original Image of this Document with Appendix (PDF)

• 1998 WL 34083692 (Appellate Brief) Brief for Appellants (Oct. 27, 1998)Original Image of this Document with Appendix (PDF)

• 98-5287 (Docket) (Jun. 11, 1998)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.