# EXHIBIT 4

RECEIVED

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### (Norfolk Division)

FILED

DEC 2 3 2004

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| SAFER DISPLAY TECHNOLOGY, LTD., ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 2:04cv154 |
| v. ) | Judge Robert G. Doumar |
| ) | |
| TATUNG COMPANY and ) | Pursuant to Local Rule 5 and the Protective |
| TATUNG CO. OF AMERICA, INC. ) | Order Entered on September 28, 2004, the |
| ) | Declaration of Douglas Weinstein and |
| Defendants. ) | Attachments Thereto are Filed Under Seal. |
| ) | |
| ) | |

## PLAINTIFF SAFER'S SUBMISSION REGARDING COURT'S HEARING FOR DECEMBER 29, 2004 ON TATUNG'S MOTION FOR LEAVE TO WITHDRAW ITS JURISDICTIONAL CHALLENGE

**I.    Introduction**

Tatung's litigation tactics have needlessly driven up litigation costs since July.  It should be sanctioned for its tactics and ordered to pay Safer's attorney fees.

In attempting to have this case dismissed for lack of personal jurisdiction, Tatung never denied that its accused computer monitors were sold in Virginia.  Instead, it put Safer to the burden of proving sales of Tatung monitors in Virginia—sales that would be expected from a multibillion-dollar company that annually sells hundreds of millions of dollars of products in the United States.

In refusing to submit to the jurisdiction of this court, Tatung forced Safer to pursue jurisdictional discovery from defendants and from third party distributors and sellers, and then Tatung obstructed Safer's efforts to collect that discovery.  While Tatung did finally submit to the jurisdiction of this Court, it did so only after consuming significant resources of the Court

116

and the parties, and on the eve of depositions ordered by the Court. In a final display of hubris, Tatung has attempted to shift blame to Safer for the unnecessary wheel spinning and litigation costs that resulted directly from Tatung's litigation tactics.

On December 22, 2004, Safer discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer for North America for at least two different monitors for a national computer vendor whose monitors are undeniably sold in Virginia, which means that Tatung's jurisdictional challenge was apparently not brought in good faith.[1] Judge Doumar explicitly warned Tatung that "if all they are doing is running up the costs" with their jurisdictional challenge, "then they're going to pay for it." That is precisely what Tatung has done, despite the Court's express warning, and despite its exclusive North American supply contract with the nationwide computer vendor. Accordingly, Tatung should be ordered to pay Safer's attorneys' fees.

## II.    Background

### A.    The Parties

Plaintiff Safer Display Technology, Ltd. ("Safer") is the owner of U.S. Patent No. 4,270,145 ("the '145 patent") which covers, *inter alia,* computer monitors with on-screen display features. (Complaint (Dkt. No. 1) ¶ 13.) At least 28 corporations have taken a license to practice the valuable on-screen display features covered by the '145 patent, including Sony, Toshiba, Samsung, Sharp, NEC, JVC, LG Electronics, and Phillips Magnavox. In its Complaint, Safer alleges that Tatung Company ("Tatung-Taiwan") and Tatung Company of America, Inc. ("Tatung-U.S.") infringed, or induced others to infringe, the '145 patent by selling and importing

---

[1] Safer has no reason or evidence to believe that this manufacturing contract was cancelled and/or not fulfilled. Safer thus concludes that the exclusive manufacturing relationship indeed existed. In fact, confidential discovery from Tatung-Taiwan and third parties all indicates that Safer is entirely correct in this conclusion. (See Weinstein Decl. ¶¶ 3-17.)

into the U.S. Tatung-Taiwan's computer monitors with on-screen display features during 1998 and 1999. (*Id.* ¶¶ 11, 13.)

Defendant Tatung-Taiwan is a multibillion-dollar manufacturer and self-described "worldwide leader in the design and manufacturing of a vast array of digital consumer products." (www.tatung.com.) Tatung-Taiwan's website lists its subsidiary, Tatung-U.S., as one of its worldwide business locations. (Neal Decl. Supporting Safer's Opposition to Tatung-Taiwan's Motion to Dismiss ("Neal Decl.") (Dkt. No. 11), ¶ 8.) Tatung-Taiwan is a 50% owner of Tatung-U.S., and Tatung-Taiwan's General Manager is also one of the four directors of Tatung-U.S. (*Id.* ¶ 6.) During the years 1998 and 1999 at issue in this lawsuit, Tatung-Taiwan sold over $498,000,000 and $380,000,000 in products into the United States. (*Id.* ¶ 11.) Furthermore, Tatung-Taiwan has sold and continues to sell large numbers of monitors to computer distributors, including Compaq and Hewlett-Packard. (Weinstein Decl. ¶¶ 8, 10, 17.). These computer distributors place their names and model numbers on the monitors and then sell them nationwide, including in Virginia, through national distribution channels.

A large part of Tatung-Taiwan's jurisdictional challenge has been its assertion that, although it admittedly sells its monitors to national computer vendors such as Compaq and Hewlett-Packard, it supposedly did not know whether its monitors were sold in Virginia because it was possible that there were additional monitors made by other manufacturers that were similarly rebranded and resold by Compaq and Hewlett-Packard. Indeed, counsel for Tatung-Taiwan specifically argued that to Judge Bradberry on December 1, 2004 (Weinstein Decl. Tab 33, at 16:9-13 ("we don't know how many manufacturers Hewlett-Packard or Compaq have other than Tatung").) That statement is contradicted by evidence indicating that Tatung-Taiwan

was the exclusive North American manufacturer for a national computer distributor in 1998.

(This confidential relationship is discussed in the Weinstein Decl. ¶¶ 3-17, submitted under seal.)

    **B.**    **Tatung's- Taiwan's Sales of Infringing Monitors in the U.S. is Evident From its Application For FCC Authorization**

        In addition, according to the Federal Communications Commission ("FCC"), the U.S. agency responsible for regulating electronic devices including monitors, Tatung-Taiwan applied for and obtained FCC authorization for certain of its monitors. (Weinstein Decl. ¶ 18.) There would be no reason for Tatung-Taiwan to seek FCC approval for its monitors if Tatung-Taiwan did not intend for its monitors to be sold in the U.S. (*Id.*)

        Furthermore, Safer has recently learned from information from the FCC that Tatung-Taiwan applied for authorization to sell Compaq MV700 color monitors with on-screen display functions during the applicable time period (1998-99). (Weinstein Decl. ¶¶ 18-23.) Safer has further learned from documents recently produced by Circuit City, Ingram Micro, and Office Depot that these companies had significant sales of Compaq MV700 monitors in Virginia during the applicable period. (The specific numbers of monitors sold by these companies are confidential and discussed in the supporting Weinstein Declaration (¶¶ 10-16), submitted under seal.)

        Safer was on the brink of taking depositions to prove that these Compaq MV700 monitors were manufactured by Tatung-Taiwan, and was pursuing similar jurisdictional information from Hewlett-Packard, when Tatung-Taiwan abruptly moved to withdraw its jurisdictional challenge on December 9, 2004. (Dkt. No. 108.) And as explained above, approximately two weeks later, Safer discovered evidence that Tatung-Taiwan was an exclusive manufacturer for North America for at least two monitors sold nationally and in Virginia.

### C.    Tatung-Taiwan's Challenge to Personal Jurisdiction Lacked a Good Faith Basis

Tatung-Taiwan's deadline to respond to Safer's complaint was extended by a stipulated order to July 15, 2004. (Dkt. No. 4). On that date, Tatung-Taiwan filed its Motion to Dismiss, contending—despite its exclusive manufacturing relationship for North America with a national computer vendor, sales of hundreds of million dollars of its consumer electronics products in the U.S., its sales to nationwide vendors like Compaq and Hewlett-Packard, and its 50% ownership and managerial control over Tatung-U.S.—that this Court supposedly lacks personal jurisdiction over Tatung-Taiwan. (Dkt. Nos. 6 and 7.) Tellingly, Tatung-Taiwan did not argue in its papers that its monitors were *not* sold in Virginia, even though Tatung-Taiwan was legally obligated to reasonably investigate whether its defense was valid (see Argument at pp. 17-18 below). Furthermore, Tatung-Taiwan could not argue in good faith that its monitors were not sold in Virginia because it knows, at a bare minimum, that (1) it was the exclusive manufacturer for North America for a national computer vendor in 1998, and (2) that its monitors were sold by Compaq and Hewlett-Packard in nationwide distribution channels to retailers such as Circuit City, Best Buy, and Office Depot, who sell monitors in Virginia. Finally, it defies reason that a sophisticated, global, multi-billion dollar company like Tatung-Taiwan would not know where its monitors and other products are sold in the United States.

Despite its duty to investigate its jurisdictional defense, Tatung-Taiwan argued instead that this action should be dismissed because Safer, without the benefit of any discovery, could not yet prove that accused monitors had been sold in Virginia.[2]  Tatung-Taiwan's motion to

---

[2] In opposing Tatung-Taiwan's motion to dismiss for alleged lack of personal jurisdiction, which was filed prior to jurisdictional discovery, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan for at least two reasons summarized very briefly here. First, the exercise of personal jurisdiction comports with traditional notions of fair play and

dismiss was heard by Judge Doumar on August 25, 2004. The Court rejected Tatung-Taiwan's argument that this case should be dismissed without discovery, noting that "defendant really knows what they're doing, what they're selling, not the plaintiff." (Weinstein Decl. Tab 32 at 33:21-22.) Judge Doumar similarly noted that "the facts establishing jurisdiction are mostly in the knowledge of the defendant, not in the knowledge of the plaintiff." (*Id.* at 16:22-24.) Accordingly, the Court deferred deciding Tatung-Taiwan's motion and granted Safer a limited 60 day period to take jurisdictional discovery. The Court stated that, under the Federal Circuit's *Beverly Hills Fan* decision, Tatung-Taiwan would be found subject to personal jurisdiction if its allegedly infringing monitors had been sold in Virginia. (*Id.* at 33:10-12; 37:15-18.) Judge Doumar warned Tatung-Taiwan that a "Stalingrad defense" would be unacceptable (*Id.* at 40:3-11) and that the Court wanted to "get to what is the real issue in the case." (*Id.* at 9:9-10.)

Judge Doumar also warned Tatung-Taiwan as follows: "Let me be very frank with you. If all [Tatung-Taiwan is] doing is running up the costs, then they're going to have to pay for it." (*Id.* at 26:3-4.) Endeavoring to focus on the "real issues," the Court asked Tatung-Taiwan's counsel whether he was wasting time with jurisdictional discovery because "the fact of the matter is [Safer] could find out how many products were being sold by each of your defendants here, and they could find out which products were sold to whom. It just -- if they're going to turn up with the same answer, *aren't we wasting our time?*" (*Id.* at 11:24-12:3, emphasis added.) Four months later, the answer is a resounding "Yes." Tatung-Taiwan's jurisdictional challenge

---

substantial justice under a "stream of commerce" analysis. (S. Opp. to Mot. Dismiss at 5-9 (Dkt. 11), citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).) Second, Safer explained that this Court has personal jurisdiction over Tatung-Taiwan because Tatung-U.S. is the agent of Tatung-Taiwan, Tatung-Taiwan exerts control over Tatung-U.S., and the conceded jurisdiction over Tatung-U.S. in Virginia for selling products in Virginia, including those made by Tatung-Taiwan. (*Id.* at 9-11; Tatung's Rebuttal Brief in Support of Defendant's Motion for Protective Order (Dkt. No. 42) at 3 ("Tatung U.S. submitted to personal jurisdiction in Virginia as it conducts business in Virginia.").)

has been a colossal and completely unnecessary waste of time and resources for the Court, Safer, and at least nine third parties.

**D.    Tatung-Taiwan Repeatedly Attempted to Obstruct Jurisdictional Discovery and Depositions of Witnesses From Taiwan**

As Safer previously explained to the Court, finding proof that Tatung-Taiwan monitors were sold in Virginia from third party documents was originally a difficult, multi-step process for Safer because Tatung-Taiwan sells its monitors to branded computer vendors, such as Compaq, who place their own names and model numbers on the monitors before they are sold by retailers such as Office Depot.  For Safer to prove that sales of Compaq monitors by Office Depot in Virginia were in fact sales of Tatung-Taiwan manufactured monitors required it to "connect the links" and compare various records from Tatung-Taiwan to the branded vendor to the retailer, which was complicated by the fact that, prior to the date that Tatung-Taiwan withdrew its motion to dismiss, none of the documents received from third party monitor vendors and retailers have specifically identified or tracked Tatung-Taiwan as the manufacturer of rebranded monitors sold in Virginia.  Indeed, Tatung-Taiwan acknowledged the difficulty of this task at the time, going so far as to argue that "connecting the links is a hopeless endeavor" because the third party documents produced so far do not contain Tatung-Taiwan's own product numbers.  (Tatung-Taiwan's Mem. Supporting to Withdraw its Motion to Dismiss (Dkt. 108) at 6.)

For this reason, and also because Safer had not yet received sufficient documents from third parties to take their depositions (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1), Safer had for months been trying to schedule depositions with knowledgeable witnesses from Tatung-Taiwan.  Safer has always believed that people in charge of Tatung-Taiwan's sales and marketing—as opposed to the manager of personnel who was selected to submit a terse

7

declaration supporting Tatung-Taiwan's motion to dismiss—*must* know where the monitors rebranded by Compaq and others are being sold throughout the U.S.[3] Given that Safer had only one 60 day shot at taking jurisdictional discovery, however, it had no choice but to pursue information from third parties as well, including Viewsonic, Compaq, Hewlett-Packard, Best Buy, Office Depot, and Wal-Mart. As explained more fully below, Tatung-Taiwan's counsel have repeatedly stalled and refused to produce witnesses from Taiwan, and once they were ordered by Judge Bradberry to promptly produce witnesses from Taiwan, Tatung-Taiwan withdrew its jurisdictional challenge. Tatung-Taiwan's counsel have also impeded and delayed discovery from third parties, including Safer's attempts to obtain from Compaq its contracts with Tatung-Taiwan. All the while, Tatung-Taiwan has tried to take advantage of the very delays it caused by arguing that personal jurisdiction must not exist because of the time it has taken Safer to collect the evidence. The Court should see this gameplaying for what it is.

On August 27, 2004, two days after the hearing on Tatung-Taiwan's motion to dismiss, Safer served jurisdictional document requests and interrogatories on Tatung-Taiwan and Tatung-U.S. On August 31, 2004, Safer served third party subpoenas seeking relevant jurisdictional documents and testimony from third parties designed to uncover Tatung-Taiwan's distribution network and sales into Virginia. These subpoenas generally sought documents and testimony in mid- to late-September and early October (i.e., well within the 60 day frame).[4] Specifically,

---

[3] The same is apparently not true for employees of Tatung-U.S. because they claim that they do not sell to HP, and presumably other branded vendors. (Supp. Decl. of D. S. J. Chang Supporting Tatung Co.'s Mtn. to Dismiss (Dkt. No. 10), ¶ 5.) Indeed, it appears from discovery from Tatung-U.S. that it sells to much smaller vendors, including in Virginia, than the national vendors like Compaq, Hewlett-Packard, and Viewsonic.

[4] Because Judge Doumar also ordered at the August 25 hearing that Safer could take merits discovery as well as jurisdictional discovery, Safer also pursued merits discovery during this time frame from both defendants and third parties. (Weinstein Decl. Tab 33 at 33:3-5.) Judge Bradberry reviewed that transcript and confirmed that that was the order on October 27,

Safer initially served third party subpoenas on Best Buy, Wal-Mart, eMachines, Office Depot, CompUSA, Circuit City, and Viewsonic.

1.    **Tatung-Taiwan Acted to Dissuade Third Parties From Producing Subpoenas From Discovery**

Tatung-Taiwan moved quickly to block these discovery efforts by Safer.  First, on September 9 and 10, 2004, Tatung-Taiwan wrote individually to the third parties subpoenaed by Safer and falsely told them that there were "ongoing negotiations with plaintiff's counsel concerning the scope and propriety of the subpoenas" (Weinstein Decl. Tab 16), an obvious attempt to dissuade the third parties from producing any discovery.  Tatung-Taiwan's letters further attempted to obstruct discovery by stating that there was an "increasing likelihood" that Tatung-Taiwan would move for a protective order.  (*Id.*)  Safer promptly admonished Tatung-Taiwan that (1) there had been no negotiations regarding the third party subpoenas, (2) Tatung-Taiwan had no standing to challenge the subpoenas, and (3) "your letters have impeded the progress of discovery, and we request that you cease further actions that delay our rightful discovery of these documents."  (Weinstein Decl. Tab 17.)

Unfortunately, however, the damage had been done.  For example, although Compaq located some contracts with Tatung-Taiwan, counsel for Tatung-Taiwan first instructed Compaq that they should not be produced because Tatung-Taiwan had filed a (meritless) motion seeking to limit discovery to televisions, even though monitors and not televisions were specifically

---

2004. (*Id.* Tab 34 at 39:12-23.)  Although the Court subsequently limited discovery to jurisdictional issues on November 16 (*Id.* Tab 35 at 27:13-19), before that date the Court had expressly permitted Safer and defendants to pursue merits discovery.  Accordingly, rather than have to take jurisdictional discovery now and merits discovery later from the same witnesses, Safer originally sought merits discovery from the same witnesses from whom Safer was also seeking jurisdictional discovery.  Although Tatung-Taiwan has repeatedly tried to make an issue out of this, Tatung-Taiwan has no basis for complaint given the two express orders from the Court, and given that Tatung-Taiwan inundated Safer with merits interrogatories, document requests, and requests for admissions during the same time period.

accused of infringing in the complaint (discussed in section D.2 below). Later, apparently after its meritless motion was denied, Tatung-Taiwan instructed Compaq that the contracts were supposedly not responsive to the subpoena because they were executed prior to 1998. (Ottinger Decl. ¶ 6.) In subsequent follow-up efforts by Safer's counsel, however, Compaq advised that the contracts were automatically renewed or renewable on an annual basis, and that they were apparently operative during the relevant 1998-99 timeframe. (*Id.*) Still later, Tatung-Taiwan told Compaq that the contracts should not be produced because Tatung-Taiwan was withdrawing its jurisdictional challenge. (*Id.* ¶ 7.) (Despite these admonitions from Tatung-Taiwan's counsel, Compaq eventually produced these contracts on December 22, 2004, nearly two weeks after Tatung-Taiwan moved to withdraw its jurisdictional challenge. The content of these confidential documents is discussed in the Weinstein Declaration at ¶¶ 6-8.)

In addition, in its letter to Wal-Mart, Tatung-Taiwan's counsel went so far as to say that one of his partners "will be in your offices next week on another matter but will touch base with you." (Weinstein Decl. Tab 16.) Very soon thereafter, Wal-Mart sent Safer a certification that it had no responsive documents. (Weinstein Decl. Tab 18.) Interestingly, Wal-Mart later retracted that certification and, in late November, produced responsive documents after Safer sent a second deposition subpoena seeking testimony regarding Wal-Mart's efforts to locate responsive documents. (*Id.* Tabs 20 and 21.)

## 2.    Tatung-Taiwan Also Blocked Third Party Discovery By Filing a Meritless Motion for a Protective Order

Tatung-Taiwan's letters and communications with the subpoenaed third parties also delayed jurisdictional discovery because the third parties delayed producing documents until after the resolution of Tatung-Taiwan's motion for protective order. (Weinstein Decl. Tab 33 at 17:23-19:1.) On September 17, 2004, soon after it wrote to the third parties, Tatung-Taiwan

filed a motion for protective order asking the Court to, *inter alia,* completely preclude third party

depositions until further notice. (Mem. Supporting Tatung's Motion for Protective Order (Dkt.

No. 27) at 2.) Tatung-Taiwan also moved to block discovery regarding accused products. That

is, Tatung-Taiwan tried to completely prevent discovery of monitors and limit discovery to

televisions, even though monitors are expressly accused of infringing in Safer's complaint and

televisions are not. (*Id.*) The Court predictably denied these meritless requests when the motion

was finally heard on October 27,[5] but during the pendency of that motion, Tatung-Taiwan

blocked discovery for approximately two months because the subpoenaed third parties delayed

producing their documents until after the resolution of the motion. (Weinstein Decl. Tab 33 at

17:23-19:1.) For instance, as of November 10, the only documents received from third parties

was a single spreadsheet from Office Depot, and these were produced only after Office Depot

was informed of the denial of Tatung-Taiwan's meritless motion. (*Id.* Tab 22.) On December 1,

just eight days before Tatung-Taiwan dropped its jurisdictional challenge, Safer's counsel

reported to the Court that, finally, "we're getting documents from those third parties now" and

that Safer had also received documents from Wal-Mart. (*Id.* Tab 33 at 10:20-23.)

### 3.    Tatung-Taiwan's Inadequate Document Production

Tatung-Taiwan blocked jurisdictional discovery on other fronts as well. For instance, as

of October 5, 2004, Tatung-Taiwan had produced only 14 documents, and none of them

sufficiently identified all of the sales and shipments of Tatung-Taiwan video monitors or

customers of Tatung-Taiwan, among other deficiencies. (Weinstein Decl. Tab 23.) On October

---

[5] Tatung-Taiwan disingenuously tries to give the impression that it prevailed in its first motion for a protective order because the Court slightly narrowed the time frame from which documents would be produced in discovery. Given that the Court rejected Tatung-Taiwan's primary tactical requests to block discovery from third parties and discovery regarding monitors (the accused products), the motion can only be viewed as a failure.

11

15, Safer was forced to file a motion for an expedited hearing on its motion to compel because defendants had failed and refused to comply with even the most basic discovery requests (e.g., sales and import records, and the manuals and technical documents relating to on-screen display). (Dkt. No. 48.) Although Tatung-Taiwan later produced summary documents showing sales to certain computer vendors at a high level (Weinstein Decl. ¶ 17 and Tab 10), these are insufficient because they lack the underlying documents' detail regarding key internal numbers for tracking models such as serial numbers. Although Defendants also subsequently produced approximately 7000 pages of documents, nearly all of these were asserted prior art that had absolutely no relevance to jurisdiction. (Weinstein Decl. Tab 24 at 2.)

> ### 4.    Tatung-Taiwan Refused to Produce Knowledgeable Witnesses from Taiwan

Tatung-Taiwan also repeatedly stalled and refused to produce Tatung-Taiwan witnesses for deposition. On September 23, Safer served notices for depositions in early October of David Shun-Juh Chang, the Tatung-Taiwan employee who submitted two declarations supporting its motion to dismiss, as well as a notice for a Rule 30(b)(6) deposition of Tatung-Taiwan. These depositions were set in October in the offices of Safer's counsel in Washington, D.C. Tatung-Taiwan objected and demanded that the depositions proceed in Taiwan. Safer's counsel promptly agreed to travel to Taiwan but, because only two inches of documents had been received from Tatung-Taiwan, Safer suggested pushing the depositions back approximately one week to October 20. (Weinstein Decl. Tab 25.) Tatung-Taiwan's counsel, apparently surprised by Safer's agreement to travel to Taiwan and in search of another excuse, refused to produce the witnesses in Taiwan on October 20. (*Id.* Tab 26.) Tatung-Taiwan now complained that it would be too expensive to take the depositions in Taiwan until after defendants' document production was completed, and that the depositions should not be heard until the Court had ruled on

defendants' motion for a protective order (which was denied two weeks later, as explained above). (*Id.* at 2.) Tatung-Taiwan's counsel requested that the depositions be pushed back a "few weeks" into November. (*Id.*)

Thus, by mid-October, Safer's attempts to obtain jurisdictional discovery were going nowhere, thanks to Tatung-Taiwan. The 60 day period ordered by Judge Doumar would close in less than two weeks. Safer kept trying, however, and on October 14 it noticed depositions in Taiwan for five Tatung-Taiwan witnesses recently identified as knowledgeable in Tatung-Taiwan's responses to Safer's interrogatories. Specifically, Safer noticed the depositions of (1) O. Shaih and Jerry Huang (each identified by Tatung-Taiwan as responsible for sales, marketing, and distribution, and relevant to the stream of commerce jurisdiction analysis); and (2) W.S. Lin, K.Y. Lang, and A.C. Wang (each identified by Tatung-Taiwan as serving on the board of management of Tatung-Taiwan and Tatung-U.S., and relevant to the agency jurisdiction analysis). On October 22, Tatung-Taiwan refused to produce these individuals. (Weinstein Decl. Tab 27.) Although Tatung-Taiwan stated that it would "attempt" to provide a corporate designee to testify regarding a handful of the topics requested by Safer (*id.* at 2), Tatung-Taiwan offered no dates for any depositions. Instead, Tatung-Taiwan filed a second motion for protective order on October 26 (Tatung's Motion to Limit Depositions (Dkt. 57)), and counsel for Tatung-Taiwan refused to schedule depositions in Taiwan until after Tatung-Taiwan's second motion for protective order was heard. (Weinstein Decl. Tab 28 at 2 ("We will not travel to Taiwan until after our motion has been heard.").) This was the same stall tactic that counsel had used while Tatung-Taiwan's first motion for protective order was pending.

Tatung-Taiwan's counsel also insisted that third party depositions be taken before the Tatung-Taiwan witnesses (Weinstein Decl. Tab 29), even though Tatung-Taiwan knew (1) that it

had blocked discovery from third parties with its earlier letters and communications, so that Safer was not yet in a position depose the third parties, and (2) that linking sales of Tatung-Taiwan's monitors with the third party documents alone is an extremely difficult task. Tatung-Taiwan also stated that it would not make any Tatung-Taiwan witnesses available until January or February of 2005 (*id.*), which Safer explained was unacceptable, particularly given that the deposition notices had been pending for months and the Court's admonition to speed the pace of jurisdictional discovery. (*Id.* Tab 30.)

Tatung-Taiwan continued to refuse to produce any witnesses from Taiwan until Magistrate Judge Bradberry's December 1, 2004, order that Tatung-Taiwan witnesses must appear for deposition within the month of December. (Weinstein Decl. Tab 33 at 30:3-4.) Eight days later, Tatung-Taiwan filed a motion seeking leave to withdraw its motion to dismiss. (Dkt. No. 107.) Tatung-Taiwan's stated reasons for moving to withdraw its jurisdictional challenge were clearly pretextual and not supported by the record, as evidenced by the Court's subsequent order that Tatung-Taiwan support its motion by citations to the record. (Dkt. No. 109.)

It is plain that Tatung-Taiwan moved to withdraw the challenge because Safer, after months of effort, was finally getting an opportunity to depose witnesses from Taiwan and was on the verge of proving that Tatung-Taiwan's monitors had been sold in Virginia. For instance, Safer was planning to extensively question Tatung-Taiwan witnesses regarding, *inter alia*, the Compaq MV700 monitor it manufactured for Compaq and its warranty and return records from retailers in Virginia. Safer was also corresponding with Compaq and requesting that its contracts with Tatung-Taiwan be produced when Tatung-Taiwan moved to withdraw its challenge.

E.      **Defendant's Allegations that Safer Was Driving Up Costs Are Baseless**

Defendants have repeatedly but baselessly argued that Safer has attempted to drive up

costs in this litigation. Nothing could be further from the truth. Safer, as the plaintiff in this

case, has every interest in achieving a prompt and cost-effective resolution of defendants'

infringement. Indeed, Safer has agreed upon licenses with 28 parties, including former co-

defendant Jean. Tatung-Taiwan, on the other hand, has an incentive to delay and complicate

these proceedings as it did with its jurisdictional challenge.

As explained in Safer's opposition to defendants' second motion for a protective order

(Dkt. 72 at 1-4), until November 16, the Court had *twice* expressly stated that both parties could

take merits discovery along with jurisdictional discovery, and defendants themselves had served

Safer with interrogatories, document requests, and requests for admissions directed to the merits

of this case. Once Judge Doumar subsequently limited discovery to jurisdictional issues,

however, Safer obviously agreed to abide by that Order (Weinstein Decl. Tab 33 at 19:19-23),

yet Tatung-Taiwan is still arguing about Safer's earlier efforts to obtain merits discovery as a red

herring. Furthermore, Safer did not set 27 or 28 depositions in this case as defendants have

alleged, as explained in our papers. (Dkt. 72 at 1.) Defendants double dipped in arriving at that

number by including depositions noticed in other consolidated cases, including the now settled

case against Jean. In truth, Safer noticed seven depositions for Tatung-Taiwan (one 30(b)(6),

five individuals identified by Tatung-Taiwan as knowledgeable in response to interrogatories,

and a Tatung-Taiwan employee relevant to the agency analysis), and two for Tatung-U.S. (one

30(b)(6) and one individual identified by Tatung-U.S. as knowledgeable in response to

interrogatories). In addition, Safer noticed six potential depositions of third parties in the event

that they would be needed to prove sales in Virginia, but Safer has not yet received sufficient

documents from those third parties and is not ready to take their depositions now. (Weinstein Decl. Tab 33 at 10:17-11:2; 17:23-19:1.)

Importantly, Safer has always told defendants that it might not need to take all of these noticed depositions, and that it would stop once it discovered proof of sales in Virginia, as Safer's counsel confirmed to the Court. (Weinstein Decl. Tab 33 at 4:14-5:3; 10:17-11:2.) As Judge Bradberry pointed out, there were really no more than eight depositions at issue in early December (*Id.* at 11:3-8), and Safer has always needed to proceed with the Tatung-Taiwan witnesses first.

It was also made clear by Judge Bradberry that jurisdictional depositions and discovery would not proceed endlessly as Tatung-Taiwan pretends, but rather that jurisdictional discovery would stop once solid evidence of jurisdiction was discovered. (Weinstein Decl. Tab 33 at 25:1-26:7; 30:3-10; 31:16-25; 39:14-25.) But given the tight time constraints and Tatung-Taiwan's efforts to stymie discovery, Safer had no choice but to notice these potential depositions up front and proceed until it uncovered undisputable evidence of sales in Virginia.

Furthermore, Tatung-Taiwan has driven up the costs in this case with extensive motion practice. In addition to the meritless motions to block discovery of third parties and of accused monitors described above, it also filed a motion for summary judgment asserting that Safer did not own the patent-in-suit. Although the motion was unfounded and summarily denied by Judge Doumar, Safer nevertheless was forced to respond to this theoretically dispositive motion in writing and in Court. Tatung-Taiwan also filed another motion to "correct" an already correct order that was summarily denied by Magistrate Judge Bradberry, but Safer again had to respond and appear in Court to oppose that motion.

16

### III.    Argument

#### A.    Tatung-Taiwan Should be Sanctioned for Unreasonably and Vexatiously Multiplying These Proceedings

As explained above, Tatung-Taiwan has wasted an enormous amount of time and money by raising its unsupported jurisdictional challenge and by continuously interfering with Safer's attempts to obtain jurisdictional discovery from defendants and third parties. This Court has multiple sources of authority to sanction Tatung-Taiwan's unsupported, dilatory, vexatious, and wasteful litigation tactics, including (1) its inherent authority (*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 45-46 (1991) (courts have inherent authority to sanction attorneys and parties who have shown "bad faith by delaying or disrupting the litigation" or who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons")); (2) Rule 11 of the Federal Rule of Civil Procedure; and (3) 28 U.S.C. § 1927 (party's attorney may be ordered to pay opposing party's attorneys' fees if he "multiplies the proceedings in any case so unreasonably and vexatiously").

Although the Court may *sua sponte* order sanctions against a party or attorney under Rule 11 (Fed. R. Civ. P. 11(c)(1)(B)), Safer is apparently precluded from moving for sanctions under that Rule because Tatung-Taiwan has withdrawn its jurisdictional challenge, even though the evidence indicates that the defense was unsupported (Weinstein Decl. at ¶¶ 4-23) and after so much time and money has been wasted over the issue. Fed. R. Civ. P. 11(C)(1)(A). Regardless, Safer may and does move for sanctions, including attorneys' fees, under the Court's inherent power and § 1927, for the many reasons explained above.

Moreover, Tatung-Taiwan had an affirmative duty to reasonably investigate its allegation of no personal jurisdiction before wasting months of time and money litigating the issue, and failure to do so is itself a basis for sanctions. *Continental Air Lines, Inc. v. Group Sys. Int'l Far East, Ltd.,* 109 F.R.D. 594, 597-600 (C.D. Cal. 1986); *Ortho Pharm. Corp. v. Sona Dist., Inc.,*

117 F.R.D. 170, 171-72 (S.D. Fla. 1986).  Thus, even if Tatung-Taiwan can somehow explain

the newly discovered evidence indicating that Tatung-Taiwan was the exclusive manufacturer

for North America for at least two different monitors for a national computer vendor whose

monitors are undeniably sold in Virginia, Tatung-Taiwan should nevertheless be sanctioned for

failing to investigate its asserted defense.

**IV.    Conclusion**

      Safer respectfully requests that the Court sanction Tatung-Taiwan by, among other

things, an award of attorneys' fees incurred in opposing Tatung-Taiwan's motion to dismiss for

lack of jurisdiction and all of the related discovery disputes, motion practice, and hearings that

have flowed therefrom.  Safer conservatively estimates and represents that Tatung-Taiwan's

tactics have cost many tens of thousands of dollars of attorney time.  Safer respectfully requests

that, if deemed necessary, the Court allow Safer a reasonable period of time to make an

evidentiary showing to support its request for attorneys' fees.  Safer also suggests that the Court

should order that Tatung-Taiwan pay a sanction to the Court due to the considerable time and

effort that the Court has had to expend over Tatung-Taiwan's unreasonably duplicative litigation

tactics.

Dated:  December 23, 2004

Respectfully submitted,

John M. Ryan (Va. Bar No. 4301)
Richard H. Ottinger (Va. Bar No. 38842)
VANDEVENTER BLANK LLP
500 World Trade Center
Norfolk, VA   23510
(757) 446-8600

Laura P. Masurovsky (Va. Bar. No. 32379)
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005-3315
(202) 408-4000

Roger D. Taylor
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
3200 SunTrust Plaza
303 Peachtree Street, N.E.
Atlanta, GA   30308
(404) 653-6400

Attorneys for Plaintiff,
Safer Display Technology, Ltd.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that as of the date noted below the original or a true copy of the foregoing pleading was served in the manner indicated upon all parties herein, or their counsel of record, as follows:

Stephen E. Noona
Kristan B. Burch
Kaufman & Canoles, PC
150 W. Main Street
Norfolk, VA 23510
*Counsel for Tatung Company, Tatung Co. of America, Inc..*

Manner of Service:
_____       First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
__X__ Hand Delivery
_____ Other: _____

Mark L. Hogge
Kathryn L. Clune
Greenberg Traurig, LLP
800 Connecticut Avenue, Suite 500
Washington, D.C. 20006
*Counsel for Tatung Company, Tatung Co. of America, Inc..*

Manner of Service:
___X___ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
___X___ Electronically (w/o attachments)
_____ Hand Delivery
_____ Other: _____

Mark Krietzman
Greenberg Traurig LLP
2450 Colorado Ave., Suite 400 E
Santa Monica, CA 90404
(310) 586-7700
*Counsel for Tatung Company, Tatung Co. of America, Inc..*

Manner of Service:
___X___ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
___X___ Electronically (w/o attachments)
_____ Hand Delivery
_____ Other: _____

Rolf Marshall
Preston Gates Ellis & Rouvelas Meeds, LLP
1735 New York Avenue, N.W., Suite 500
Washington, D.C. 20006
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
___X___ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
_____ Hand Delivery
_____ Other: _____

Michael J. Bettinger
Ralph Alldredge
Preston Gates & Ellis, LLP
55 Second Street, Suite 1700
San Francisco, California 94105
*Counsel for Envision Peripherals, Inc.*

Manner of Service:
___X___ First Class US Mail
_____ Overnight Delivery
_____ Facsimile
_____ Electronically
_____ Hand Delivery
_____ Other: _____

Done this date: December 23, 2004

Of Counsel