IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

       Plaintiff/Counterclaim Defendant,

       v.

TATUNG CO.; TATUNG COMPANY OF
AMERICA, INC.; and VIEWSONIC
CORPORATION,

       Defendants/Counterclaim Plaintiffs.

Civil Action No. 04-343 (JJF)

**PLAINTIFF LG.PHILIPS LCD CO., LTD.'S RESPONSE TO DEFENDANT
VIEWSONIC CORPORATION'S OBJECTIONS TO FINDING IN SPECIAL
MASTER'S REPORT AND RECOMMENDATION REGARDING A PORTION
OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO PROVIDE
TECHNICAL DISCOVERY AND MOUNTING RELATED DISCOVERY**

March 15, 2007

THE BAYARD FIRM

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000

Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:

Gaspare J. Bono
Rel S. Ambrozy
Lora A. Brzezynski
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7500

# TABLE OF CONTENTS

**Page**

I.    NATURE & STAGE OF THE PROCEEDINGS ................................................... 1

II.   SUMMARY OF ARGUMENT ............................................................................ 1

III.  STATEMENT OF FACTS .................................................................................. 2

IV.   ARGUMENT ...................................................................................................... 5

    A.    Legal Standards............................................................................ 6

    B.    ViewSonic's OEM Contracts Prove that ViewSonic Controls
        Documents Held by Its OEMs .................................................... 6

    C.    The Special Master Properly Determined that ViewSonic Has a
        Legal Right to Obtain the OEM Documents.............................. 15

V.    CONCLUSION.................................................................................................. 19

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Gerling Int'l Ins. Co. v. Comm'r,*
    839 F.2d 131 (3d Cir. 1988)..................................................................................... 15, 17

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    Civ. Action Nos. 02-272-MPT & 02-477-MPT, 2006 WL 2864586
    (D. Del. Oct 05, 2006) ............................................................................................ *passim*

*Mercy Catholic Medical Center v. Thompson,*
    380 F.3d 142 (3d Cir. 2004).................................................................................... *passim*

*Novartis Pharm. Corp. v. Eon Labs. Mfg., Inc.,*
    206 F.R.D. 392 (D.Del. 2002) ................................................................................. 13, 17

*Rosie D. v. Romney,*
    256 F. Supp. 2d 115 (D. Mass. 2003) ..................................................................... 15, 16

**Rules**

Fed. R. Civ. P. 34(a) ................................................................................................... *passim*

Fed. R. Civ. P. 53............................................................................................................... 1

Fed. R. Civ. P. 53(g) .......................................................................................................... 6

654585-1

Plaintiff LG.Philips LCD Co., Ltd. ("LPL"), through counsel and pursuant to Fed. R. Civ. P. 53, hereby submits its Response to Defendant ViewSonic Corporation's ("ViewSonic") Objections to Finding in Special Master's Report and Recommendation Regarding a Portion of Plaintiff's Motion to Compel Defendant to Provide Technical Discovery and Mounting Related Discovery (D.I. 526) (the "Objections").

## I.    NATURE & STAGE OF THE PROCEEDINGS

This is a patent infringement case. LPL is the owner of U.S. Patent No. 6,498,718 ("the '718 Patent") and U.S. Patent No. 6,501,641 ("the '641 Patent") (collectively, the "Patents-in-Suit"), which relate to mounting systems used in visual display products such as liquid crystal display ("LCD") televisions, computer monitors and laptop computers.

Discovery in this case is ongoing, but the period for non-expert and all third party discovery closes on March 30, 2007. The Defendants began taking depositions of LPL's witnesses on February 26, 2007. LPL began taking depositions of Defendants' witnesses on March 12, 2007. According to the existing Scheduling Order, initial expert reports are due by July 16, 2007. (D.I. 577 at § 5.) The Special Master will conduct a *Markman* hearing on May 30, 2007, (*id.* at § 8), and case dispositive motions are due by September 10, 2007, (*id.* at § 9). This matter is set for a jury trial, beginning on January 21, 2008. (*Id.* at § 12.)

## II.    SUMMARY OF ARGUMENT

ViewSonic controls documents and things that relate to the issues in this case but that are in the custody of its original equipment manufacturers ("OEMs"). ViewSonic controls these documents and things because ViewSonic's contracts with its OEMs contain several express provisions that grant ViewSonic a legal right to obtain those

1

documents and things at any time. ViewSonic's contracts also describe the types of documents and things that its OEMs are likely to have, all of which are likely to not only be relevant, but to lead to the discovery of admissible evidence. The Special Master's Report presented a thorough analysis of applicable legal standards and, based on that analysis and the provisions in ViewSonic's OEM contracts, the Special Master properly recommended that ViewSonic be compelled to produce its OEMs' documents and things. This Court should adopt all of the Special Master's recommendations and order ViewSonic to immediately produce all responsive documents and things now held by its OEM.

## III.    **STATEMENT OF FACTS**

LPL served ViewSonic with LPL's Second Set of Requests for Production of Documents on November 29, 2005. (*See* LPL's 2d Set of Reqs. for Prod'n of Docs., a copy of which is attached as Exhibit 5.) After working unsuccessfully to get ViewSonic to fully comply with its Document Requests for almost one year, LPL filed its Motion to Compel ViewSonic to Provide Technical and Mounting Related Discovery on September 27, 2006 (the "Motion to Compel"). In its Motion to Compel, LPL raised disputes concerning its Document Request Nos. 2-5, 18, 28, 29, 38-41, 46-48 and 51 (the "Document Requests"). All of the Document Requests seek varying types of technical or mounting-related discovery from ViewSonic. (*See* Ex. 5.)

The Special Master set a hearing on the Motion to Compel, and on several other discovery motions that had been filed, for December 28, 2006 (the "December Hearing"). Prior to the December Hearing, ViewSonic produced several agreements between itself and its original equipment manufacturers ("OEMs"). LPL reviewed those agreements

2

and discovered that they contain provisions that give ViewSonic a legal right to obtain

copies of documents and things that relate to the OEMs' performance under ViewSonic's

contracts. LPL advised the Special Master of these contractual provisions during the

December Hearing and in pre- and post-hearing submissions. (*See* Jt. Subm. of Dec. 22,

2006, at 2-4, a copy of which is attached without exhibits as Exhibit 7; Hr'g Tr. at 65:6-

78:11 (Dec. 28, 2006), cited portions of which are attached as Exhibit 2; LPL's Supp.

Subm. of Dec. 29, 2006, a copy of which is attached without exhibits as Exhibit 11.)

Notably, during and after the December Hearing, ViewSonic confirmed that its contracts

with its OEMs are standardized, such that, for purposes of the Special Master's review,

the provisions in each are substantively identical. (*See* Ex. 2 at 72:8-74:12.)

On January 3, 2007, the Special Master heard further argument on the issue of

ViewSonic's control over documents and things held by its OEMs. (*See* Hr'g Tr. at

25:19-56:15 (Jan. 3, 2007), cited portions of which are attached as Exhibit 3.) Notably,

the following exchange between the Special Master and ViewSonic's counsel highlights

the issues here:

> SPECIAL MASTER POPPITI: [...] I don't want to interrupt your thought process, but let me read the next paragraph. "Federal Rules of Civil Procedure 34(a) permits a party to serve a request for production of documents which are within the scope of discovery, and, quote, which are in the possession, custody, or control of the party upon whom the request is served," citing the rule. "If a corporate entity is deemed to be in control of the documents sought, a District Court can compel the production of these documents regardless of whether they are also in the possession and control of a non-party." And then it sites Pennwalt. [...]
>
> Now, I understand that in the context of Novartis, they are talking about contractual arrangements, but they are talking about a contractual arrangement that is different from the one that we have in front of us, is it not?

MR. MILLER: The agreement does provide access to documents for five years following the date of the termination of the agreement.

SPECIAL MASTER POPPITI: Unfettered.

MR. MILLER: The way I interpret that is these agreements are made and then added on for each product, so it would be five years after the termination of the, essentially, the production of a particular product, they would be available, as opposed to building some library if you had a 15-year relationship that would be, you know, at the end of that additional five years, at the end of that 15-year relationship, it would be a seriatim moving five-year period for each product.

SPECIAL MASTER POPPITI: Well, if that's the case, then it may be, and if it is seriatim, it may be that it ends after that five-year -- five years after the product is no longer in production. It is still, however, with respect to each product, five years after the date when you need the information for purposes of producing the product; correct?

MR. MILLER: Well, I am hesitating because "need" is a difficult word there.

SPECIAL MASTER POPPITI: How about want? I said "need." That was not a well thought out word. They want it. They just simply want it.

MR. MILLER: Viewsonic has, you know, as any retailer, as any producer of product does, has warranty obligations that would extend beyond, you know, for the products produced at the end of the life, would continue on beyond the production.

SPECIAL MASTER POPPITI: I understand that. That's not the way the contract reads, is it?

(*Id.* at 41:4-43:14.)

Per ViewSonic's request, the Special Master asked the parties to provide supplemental briefing that would address the issue of ViewSonic's control, or lack thereof, of documents held by its OEMs, pursuant to the contractual provisions that LPL had referenced during the December and January Hearings. (*See id.* at 53:11-56:15.)

4

The parties provided their supplemental briefing on January 10, 2007. (*See* LPL's Supp. Subm., a copy which is attached as Exhibit 8; *see also* Ex. 7, at 2-4 (providing initial discussion of OEM contract issues); Ex. 11.)

On February 14, 2007, the Special Master issued a Report and Recommendation (the "Report") concerning LPL's Motion to Compel as it related to technical and mounting related discovery that is in the custody of ViewSonic's OEMs. (*See* Report, a copy of which is attached as Exhibit 1.) The Special Master reviewed the provisions of ViewSonic's contract with one of its OEMs and determined that several provisions supported a finding that ViewSonic does have a legal right to obtain copies of all documents and things held by its OEMs and related to ViewSonic's products. Accordingly, the Special Master determined that, under Fed. R. Civ. P. 34(a), ViewSonic has control over those documents and things and must produce them to LPL. (*See* Ex. 1 at 9-12.) In doing so, the Special Master distinguished each of the authorities on which ViewSonic relied. (*See id.,* at 2-9.) The Report properly applies law to fact and the Special Master's recommendations should be adopted by this Court.

## IV.   **ARGUMENT**

The issue before the court is the meaning of "control." ViewSonic contends that it does not "control" documents that are in the custody of third party original equipment manufacturers ("OEMs") with whom ViewSonic shares contractual relationships. The operative contracts, however, clearly provide that ViewSonic actually has unlimited and unfettered access to all documents and things held by its OEMs that relate to their performance of their contracts with ViewSonic (the "OEM Documents"). The Special Master properly determined that ViewSonic's contracts with its OEMs provide

5

ViewSonic with the legal right to obtain copies of the OEM Documents and, thus,

ViewSonic has control over those OEM Documents, within the meaning of Fed. R. Civ.

P. 34(a). Accordingly, the Special Master determined that ViewSonic must obtain and

produce any responsive OEM Documents that are held by its OEMs. Because the Special

Master's determinations are factually and legally correct, this Court should adopt and

approve all of the recommendations in the Special Master's February 14, 2007 Report.

### A.    Legal Standards

Pursuant to Rule 53(g), a discovery master's findings of fact and conclusions of

law are reviewed *de novo* by the District Court. The Court may wholly or partly adopt,

modify or reject any of the discovery master's recommendations. *See* Fed. R. Civ. P.

53(g)(1). Under Rule 34(a), "[a]ny party may serve upon any other party a request... to

inspect and copy, any designated documents..., or to inspect and copy, test, or sample

any tangible things... which are in the ***possession, custody, or control of the party upon***

***whom the request is served....***" Fed. R. Civ. P. 34(a) (emphasis added); *Mercy Catholic*

*Medical Center v. Thompson*, 380 F.3d 142, 161 (3d Cir. 2004) (determining that

"control" under Rule 34(a) is the same as a legal right or ability to obtain documents or

things).

### B.    ViewSonic's OEM Contracts Prove that ViewSonic Controls Documents Held by Its OEMs

Through its November 29, 2005 Document Requests, LPL asked ViewSonic to

produce various types of technical documents that relate to the ViewSonic visual display

products that are at issue in this case.[1] ViewSonic asserts that it does not manufacture the

---

[1] The ViewSonic visual display products that are at issue in this case are all of the products that ViewSonic has identified by product number in its responses and supplemental responses to LPL's Interrogatory Nos.

*(Footnote cont'd on next page.)*

visual display products that are at issue in this case. (*See* ViewSonic's Objecs. at 2 (D.I. 526).) Instead, ViewSonic works with OEMs, and these OEMs manufacture and then deliver finished products to ViewSonic. (*See id.*) Because ViewSonic claims that it does not manufacture its own visual display products, ViewSonic claims that it only has possession, custody or control of limited types of technical documents that relate to those products. (*See id.* (claiming that ViewSonic has fulfilled its document production obligations).)

ViewSonic stops short of claiming that it has already produced all responsive technical documents. Instead, ViewSonic claims that the only technical documents in its possession are those that have been "provided to ViewSonic solely at the discretion of its OEM's [sic]" and that ViewSonic has "fulfill[ed] its discovery obligations in this case." (*Id.*) Tellingly, ViewSonic does not claim that it has produced ***all*** responsive technical documents and it does not claim that it has produced ***all*** responsive technical documents held by its OEMs. (*Cf. id.*) The void between all documents that would be fully responsive to LPL's Document Requests and the documents that ViewSonic has actually produced will be substantially filled by ViewSonic's production of the OEM Documents. Additionally, contrary to ViewSonic's representations, LPL has ***not*** conceded that the ViewSonic technical documents produced to date enable LPL to determine infringement. (*See* Objecs. at 2 (citing letter from LPL's counsel).) To be clear, the correspondence referenced in ViewSonic's Objections stated only that the production received from

---

*(Footnote cont'd from previous page.)*

2 and 3. (*See* ViewSonic's Am. Supp. Resps. to LPL's 2d Set of Interrogs., at Interrogs. Nos. 2 and 3, relevant portions attached as Exhibit 6.)

ViewSonic on September 15, 2006 allowed LPL to see that ViewSonic's products *might* infringe and, more importantly, the letter made clear that LPL was expecting to receive full and complete production from ViewSonic so that LPL could try to make conclusive determinations as to infringement.

ViewSonic has produced several of the contracts that govern its relationships with its OEMs ("OEM Contracts"). ViewSonic informed the Special Master that it uses these standardized contracts to formalize its relationships with its OEMs, such that the pertinent provisions of those contracts are essentially the same. (*See* Ex. 2 at 72:8-74:12.) Based on those representations, the Special Master reviewed ViewSonic's OEM Contracts and properly determined that ViewSonic has a contractual right to access any of the documents that its OEMs use to manufacture ViewSonic's visual display products at any time. (*See* Ex. 1 at 9-12.) ViewSonic will not have fulfilled its discovery obligations to LPL, therefore, if these OEM Documents are not produced.

The following provisions from ViewSonic's contract with the Jean Company ("Jean"), (*see* VS025137-226, a copy of which is attached as Exhibit 4), show that ViewSonic does in fact have total control over and unfettered access to any OEM Documents that may be in its OEMs' possession.[2]

- **Supplier shall retain copies of, *and provide ViewSonic access to*, all records created or received during the performance under this Agreement, in hard and/or electronic copies, including records supplied by subcontracted third**

---

[2] As noted above, ViewSonic informed the Special Master that its OEM Contracts are essentially identical, such that the Special Master would not need to review every single contract to determine whether ViewSonic generally has control over its OEM Documents. (*See* Ex. 2 at 72:8-74:12.) LPL relied on that representation but also independently reviewed the OEM Contracts to confirm that they are substantively the same for purposes of the issues now before the Court.

parties, *for five (5) years* **following the date of termination of this Agreement.** (Ex. 4, at § E(10.9) (VS 025147.)[3]

The Special Master focused on this § 10.9 during the January Hearing and in his Report. (*See* Ex. 3 at 40:13-51:4; Ex. 1 at 9-12.) Indeed, the Special Master's emphasis matches LPL's focus on this provision, as LPL maintains that this provision, in particular, shows that ViewSonic has unlimited access to all documents related to Jean's performance under the contract. Further, § 10.9 requires Jean to maintain copies of every document related to its performance both throughout the entire lifespan of the contract and for five full years after the contract is terminated. As the Special Master properly observed, ViewSonic's OEM Contracts "[confer] upon ViewSonic ***broad and unfettered contractual rights of access*** to information and documents from its OEMs." (Ex. 1 at 10 (emphasis added).)

In its Objections, ViewSonic claims that § 10.9 pertains only to situations where the OEM ceases business operations, such that ViewSonic would only have a right to take documents from the OEM if the OEM stopped functioning as an OEM. (*See* Objecs. at 7-8.) The Special Master properly rejected this argument. (*See* Ex. 1 at 11.) Section 10.9 is one of a group of "Miscellaneous" provisions that relate to general performance requirements and, in particular, § 10.9 relates generally to "Document retention" requirements. (Ex. 4 at VS025145-47.) As the Special Master explained, § 10.9 consists

---

[3] *See also* Delta OEM Agreement at VS025238; Innolux OEM Agreement at VS016939; Optoma OEM Agreement at VS025315; Tatung OEM Agreement at SUBVS0041-42; Top Victory OEM Agreement at VS018037; Arima OEM Agreement at VS026027; Top Victory OEM Agreement at VS025965; and VisionBank OEM agreement at VS026168 (all containing similar provisions). LPL has not attached copies of these additional OEM Contracts because of ViewSonic's representations that these agreements contain the same provisions as ViewSonic's agreement with Jean; however, copies can be provided promptly if the Court chooses to review them.

of two separate sentences that pertain to two separate document retention obligations placed on the OEM. (Ex. 1 at 11.) The first sentence, cited above, requires the OEM to keep copies of all documents related to its performance for ViewSonic at all times and for five years after the contract terminates. The second sentence, which ViewSonic improperly tries to blend into the first, separately permits ViewSonic to immediately take possession of the documents described in the first sentence, should the OEM ever cease doing business. (*See* Ex. 4 at VS025147; Ex. 1 at 11.) Contrary to ViewSonic's assertions, the second sentence in § 10.9 does not limit the first, such that the OEM is at all times required to make all documents related to its performance available to ViewSonic. The Special Master properly interpreted § 10.9 and this Court should both adopt the Special Master's interpretation and reject ViewSonic's efforts to misconstrue the plain language of its own agreement.

- **If a lawsuit is instituted against ViewSonic claiming intellectual property infringement, Supplier *shall immediately provide* ViewSonic with acceptable proof of non-infringement.** (Ex. 4, at § E(5.3) (VS025144) (emphasis added).)

　　　　Section 5.3 shows that the Agreement specifically grants ViewSonic the legal right to obtain any evidence or documents necessary for an infringement assessment, which is the exact issue in this case. This provision also demonstrates the common interests of ViewSonic and Jean. Although LPL asserted its patent infringement claims against ViewSonic in May 2004, ViewSonic has not produced any communications from Jean or any other OEM by which the OEM contends that ViewSonic's products do not infringe the Patents-in-Suit.

　　　　Additionally, when read in conjunction with § 10.9 above, § 5.3 illustrates the fact that ViewSonic requires its OEMs to both maintain all documents related to their performance of the contract and to provide ViewSonic with unlimited and unfettered

access to those documents.  The Special Master noted that § 5.3 actually bolsters the language in § 10.9.  (*See* Ex. 1 at fn. 10.)  Moreover, §§ 5.3 and 10.9 combine to protect ViewSonic by requiring the OEM to retain copies of all documents related to the contract so that ViewSonic can later use those documents to defend itself against any infringement lawsuits that may relate to work done by the OEM.  (*See* Ex. 4.)

The interaction of §§ 5.3 and 10.9 also refutes ViewSonic's allegations that the access to documents that ViewSonic enjoys under § 10.9 is somehow limited by the covenant of good faith and fair dealing.  (*See* Objecs. at 7.)  ViewSonic argues that § 10.9 can only be used by ViewSonic "for a business purpose in furtherance of the agreement" and infers that responding to LPL's discovery requests would not satisfy that supposed requirement.  (*See id*.)  Section 5.3 proves that ViewSonic's argument lacks merit, as § 5.3 specifically anticipates that ViewSonic might be hailed into court to face patent infringement allegations and that ViewSonic, in that situation, would need the OEM to promptly provide ViewSonic with any documents necessary to mount a defense.  (*See* Ex. 4.)  Thus, contrary to ViewSonic's allegations, the interrelation between §§ 10.9 and 5.3 shows that ViewSonic and its OEMs anticipated the exact situation that ViewSonic is facing now and crafted contractual provisions accordingly.  Mindful of the potential for future litigation, ViewSonic's pattern OEM Contracts actually impose duties on ViewSonic's OEMs that ***require*** the OEMs to produce the very same documents that LPL seeks now.  Under its own Contracts, all ViewSonic has to do is ask the OEM to provide documents related to infringement claims and, pursuant to § 5.3, the OEM must comply.

- **Supplier shall at all times use commercially reasonable efforts to ensure its partnership support under this Agreement....**  (Ex. 4 at § C(4) (VS025139).)

11

- **During the performance of this Agreement, Supplier may have access to certain technical, financial, or business information, including, but not limited to, Product specifications, Product release schedules, Product pricing, forecasts, new product development, business plans, ViewSonic financial documentation, and customer lists (hereinafter referred to as, "Information") which ViewSonic regards as proprietary and confidential. Supplier acknowledges and agrees that such Information shall remain the property of ViewSonic and will be kept and remain confidential for five (5) years following the termination of this Agreement.** (Ex. 4 at § E(6.1) (VS025144-45).)

Sections C(4) and E(6.1) demonstrate the symbiotic relationship between ViewSonic and its OEMs, in that ViewSonic describes its dealings with its OEMs as a "partnership" and found it necessary to provide its OEMs with access to broad ranges of ViewSonic's confidential business information. This Section also shows the types of ViewSonic documents that are likely to be in each OEM's possession. Pursuant to § 10.9, in addition to its own documents, each OEM is required to maintain copies of all of the types of documents identified in § 6.1 and to make those documents available to ViewSonic anytime ViewSonic requests them, particularly when ViewSonic is facing patent infringement allegations. (*See* Ex. 4 at §§ 5.3, 6.1 and 10.9.) Furthermore, § 6.1 describes, in ViewSonic's own words, the types of documents that ViewSonic concedes are in its own possession. This is a particularly interesting point.

In its Objections, as it has done throughout the discovery period, ViewSonic contends that it has fulfilled its discovery obligations by producing technical documents that ViewSonic describes as "service manuals" and "'Exploded View' diagrams." (Objecs. at 2.) Section 6.1 permits ViewSonic's OEMs to have access to ViewSonic documents described as "Product specifications, Product release schedules, Product pricing, forecasts, new product development, business plans, ViewSonic financial documentation, and customer lists." (Ex. 4 at VS025144.) Access to such a broad range

12

of ViewSonic documents surely facilitates the "partnership arrangement described in § C (4).[4] ViewSonic has resisted producing these same types of documents to LPL, but it appears that ViewSonic does have them because it must provide them to its OEMs. If any of these types of documents are in an OEM's files, then ViewSonic should be required to produce them. Further, it is not clear whether the "Product specifications" identified in § 6.1 consist only of the "service manuals" and "'Exploded View' diagrams" that ViewSonic has produced to date. In short, consistent with the Special Master's determinations, ViewSonic should be compelled to produce all documents that its OEMs use in their performance of work for ViewSonic, regardless of whether those documents consist of technical or non-technical documents, and regardless of whether the documents originated from ViewSonic or from any other source.

- **Supplier will provide, free of charge, an initial RMA swap pool for each new model to be used by ViewSonic to effect timely customer returns.** (Ex. 4, at Exhibit 1 to Agmt., § 5.1 (VS025155).)

This section indicates that Jean has a "pool" of monitors for ViewSonic to use immediately, thus establishing that Jean and ViewSonic's other OEMs have a number of monitors that would also fall under ViewSonic's legal control. While the Special Master did not address this issue directly, LPL did brief it with the Special Master and it relates squarely to the matters now before the Court. (*See* Ex. 8.) Section 5.1 of Exhibit 1 to the Jean Agreement ("Section 5.1") suggests that Jean and ViewSonic's other OEMs are required to maintain an inventory of products for ViewSonic. Presumably, this so-called

---

[4] Other than the cited language in § C(4), LPL has no evidence of a formal or legal partnership between ViewSonic or its OEMs. However, the existence of such a partnership would suggest that ViewSonic and its OEMs have become intertwined and thus would provide further evidence that ViewSonic controls the OEM Documents. *See, e.g.*, *Novartis Pharm. Corp. v. Eon Labs. Mfg., Inc.*, 206 F.R.D. 392, 395 (D.Del. 2002).

13

"swap pool for… customer returns" may be used for emergency shipments, warranty fulfillment, repairs or other product replacements. As relevant here, § 5.1 suggests that ViewSonic's OEMs have samples of ViewSonic's visual display products in their own inventories.

LPL has been struggling to get samples of all of the visual display products that ViewSonic identified in its responses to LPL's Interrogatory Nos. 2 and 3, so that LPL can determine whether any other products infringe the Patents-in-Suit. (*See* Letter from C. Connor to S. Miller (Feb. 14, 2007), a copy of which is attached as Exhibit 9; Letter Motion from R. Kirk to Sp. Mstr. Poppiti (Mar. 9, 2007), a copy of which is attached without exhibits as Exhibit 10.) LPL is concerned that ViewSonic has not preserved samples of its visual display products to use as evidence in this case. (*See* Exs 9-10.) ViewSonic has informed LPL that it no longer has samples for many of its products, meaning that LPL cannot inspect those products to determine whether or not they infringe the Patents-in-Suit. (*See* Ex. 2 at 75:4-76:8 (stating that ViewSonic does not "keep products that have gone out of sale" and does not "maintain a museum… of old inventory").)

If ViewSonic's OEMs are required to maintain an inventory of ViewSonic products, then it is probable that one or more of ViewSonic's OEMs will have a sample of a ViewSonic product that LPL has not yet been able to inspect. Using the same logic that the Special Master properly applied to ViewSonic documents that ViewSonic's OEMs possess, ViewSonic should also be required to produce any product samples that its OEMs are holding in any "swap pool" that is maintained, pursuant to § 5.1, specifically for ViewSonic and its downstream customers.

14

The Court should affirm and adopt the recommendations in the Report and order ViewSonic to promptly produce all responsive documents and product samples now in the custody of its OEMs.

### C.    The Special Master Properly Determined that ViewSonic Has a Legal Right to Obtain the OEM Documents

After considering applicable Third Circuit legal standards, the Special Master properly determined that the OEM Contracts confer "upon ViewSonic the legal right to obtain the requested documents on demand from the OEMs." (Ex. 1 at 9.) Using the same legal standards, this Court should adopt the Special Master's recommendations.

In the Third Circuit and under Fed. R. Civ. P. 34(a), "control is defined as the legal right to obtain required documents on demand." *Mercy Catholic*, 380 F.3d at 161 (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1998) (other citations omitted)). If the party from whom documents are requested "has the ***legal right or ability*** to obtain the documents from another source upon demand, that party is deemed to have control." *Mercy Catholic*, 380 F.3d at 161 (emphasis added); *Gerling*, 839 F.2d at 140. "The location of the documents, whether within the territorial jurisdiction of the court or not, is irrelevant." *Gerling*, 839 F.2d at 140. Further, as is pertinent here, control may be established by a legal right pursuant to a contract provision. *See Mercy Catholic*, 380 F.3d at 161 ("medicare intermediary manual specifically requires the subcontractor's working papers and files be made available . . . at all 'reasonable times'"); *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) (citing *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 928-929 (1st Cir. 1988)); *see also Inline Connection Corp. v. AOL Time Warner Inc.*, Civ. Action Nos. 02-272-MPT & 02-477-MPT, 2006 WL 2864586, *3 (D. Del. Oct 05, 2006) (finding no control by AOL after finding that AOL had no provision

15

in its contract that would have given it the legal right to gain access to the information at issue).

Mercy Catholic is controlling precedent in this Circuit and squarely addresses the issues in this case. As in Mercy Catholic, the cited provisions of ViewSonic's OEM Contracts prove that ViewSonic has a legal, contractual right to have unlimited access to all documents related to each OEM's performance under each OEM Contract. The provisions of ViewSonic's OEM Contracts, therefore, provide it with control over documents that are in the custody of ViewSonic's OEMs. The provisions of ViewSonic's OEM Contracts also show that many, if not most, of these documents would have been provided to the OEM by ViewSonic and that the OEM is required under the contract to maintain those documents throughout the duration of the contract and for five years after the contract ends. (See, e.g., Ex. 4 at §§ 5.3, 6.1 and 10.9.)

In his Report, the Special Master evaluated the facts and holdings from the cases that ViewSonic relies upon to support its position and distinguished each of them from the instant situation. (See Ex. 1 at 2-9.) In particular, the Special Master found that some cases have declined to find control (i) where there was no principal-agent or parent-subsidiary relationship or (ii) where there was no evidence of common control by sister entities or (iii) where the corporate identities had become so intertwined that distinctions proved meaningless. (See id. at 10.) The Special Master properly recognized that these scenarios, however, are **not necessary** to finding control under Rule 34(a). (See id.) See Rosie D., 256 F. Supp. 2d at 119. The Special Master properly reasoned that these three scenarios have only been used by prior decisions to determine that the facts in those cases were insufficient to find control. (See id.) In fact, the Special Master explained during

the January Hearing that, in *Inline Connection Corp.*, this Court declined to find control

in a situation where there was no contractual provision creating a legal right to the

documents at issue but, in doing so, this Court implicitly recognized that, if a contractual

right to the documents had existed, the outcome might have been different. (*See* Ex. 3 at

30:5-37:11.) *Inline Connection Corp.* 2006 WL 2864586 at *3 (no evidence of

contractual provision).

      The cases that ViewSonic cites in its Objections are not dispositive because they

do not involve a contract that provides one party with an express legal right to gain access

to documents or things in the custody of another party.[5] Here, the interrelation of at least

§§ 5.3, 6.1 and 10.9 of ViewSonic's OEM Contracts expressly provide ViewSonic with

an unlimited legal right to obtain copies of every document or thing held by the OEM that

relates to the OEM's work for ViewSonic. (*See* Ex. 4.) Further, as the Special Master

noted, the OEM Contracts have teeth. (*See* Ex. 1 at fn. 11.) Under the OEM Contracts,

ViewSonic and its OEMs agree to litigate any disputes in California – ViewSonic's home

court – and agree that the losing party must pay the prevailing party's attorneys' fees.

(*See* Ex. 4 at §§ 10.2 and 10.4.) Thus, if an OEM refused to provide ViewSonic with

copies of the OEM's documents, failed to keep copies of every document that related to

---

[5] For instance, ViewSonic continues to rely on *Novartis Pharms. Corp. v. Eon Labs Mfg., Inc.*, 206 F.R.D.
392, 395 (D. Del. 2002) even though that case is clearly distinguishable from the present factual situation.
As noted by the Special Master during the January hearing, the Product Royalty Agreement in *Novartis*
merely granted the defendant the right to use the technical information in developing products and was not
as broad as the unlimited contractual provision here. (*See* Ex. 3 at 46.) Additionally, ViewSonic's reliance
on *Gerling* is misplaced. In *Gerling*, the Court determined that the contractual provision at issue did not
provide a legal right to obtain documents because the contract gave only a limited right of access and, more
importantly, the parties to the contract most certainly did not anticipate an audit of a Swiss entity by a
foreign government. *Gerling*, 839 F.2d at 142. Thus, the *Gerling* court found that the contract did not
satisfy the control requirements of Rule 34(a). Here, §§ 5.3 and 10.9 of the OEM Contracts show that
ViewSonic and its OEMs expressly anticipated litigation.

the OEM's performance of its Contract with ViewSonic or failed to provide ViewSonic with proof of non-infringement, then ViewSonic could assert its rights under the contract and sue that OEM in a California court. (*See id.*) Nevertheless, the issue of whether one or more of ViewSonic's OEMs will refuse to provide ViewSonic access to any requested documentation is premature as there is no evidence that any of ViewSonic's OEMs will breach their contractual obligations to ViewSonic.

Third Circuit law provides that a party with a legal right to obtain copies of another party's documents necessarily has control over these documents. The Special Master properly applied the law of this Circuit to the facts of this case and properly determined that ViewSonic has a contractual and legal right to obtain copies of documents and things held by its OEMs. This Court should adopt the Special Master's recommendations.

18

## V.    **CONCLUSION**

The legal and factual determinations in the Special Master's February 14, 2007 Report and Recommendations were entirely correct and this Court should adopt all of those determinations.  In doing so, given the fast-approaching discovery and *Markman* in this case, the Court should order ViewSonic to immediately produce all documents and product samples in the custody of its OEMs that are responsive to LPL's Document Requests.

March 15, 2007

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000
rkirk@ bayardfirm.com
Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Rel S. Ambrozy
Lora A. Brzeznski
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on March 15, 2007, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Jeffrey B Bove, Esq.
Jaclyn M. Mason, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207

Frederick L. Cottrell, III, Esq.
Anne Shea Gaza, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

The undersigned counsel further certifies that copies of the foregoing document

were sent by email to the above counsel on March 15, 2007, and will be sent by hand on

March 15, 2007, and were sent by email on March 15, 2007, and will be sent by first

class mail on March 15, 2007, to the following non-registered participants:

Scott R. Miller, Esq.
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Valerie Ho, Esq.
Mark H. Krietzman, Esq.
Frank C. Merideth, Jr., Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy Roman, Esq.
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

/s/ Richard D. Kirk (rk922)
Richard D. Kirk

571447-1