# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,                    :
                                             :
                    Plaintiff,               :
                                             :
        v.                                   :           Civil Action No. 04-343 JJF
                                             :
TATUNG CO., TATUNG COMPANY                   :
OF AMERICA, INC., and VIEWSONIC              :
CORP.,                                       :
                                             :
                    Defendants.              :

**SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING A
PORTION OF LG.PHILIPS' MOTION TO COMPEL DEFENDANT VIEWSONIC
CORPORATION TO PROVIDE CERTAIN TECHNICAL AND MOUNTING-RELATED
DISCOVERY**

Upon consideration of Plaintiff LG.Philips LCD Co., Ltd.'s (hereinafter, "LPL") Motion

to Compel Defendant ViewSonic Corporation (hereinafter, "ViewSonic") to Provide Certain

Technical and Mounting-Related Discovery (the "Motion") [DM-2b], the Special Master[1]

concludes that, solely with respect to Plaintiff's effort to compel ViewSonic to produce

documents in the possession of certain of ViewSonic's third party original equipment

manufacturers (hereinafter, "OEMs"), the Motion should be granted for the reasons set forth

herein.

## BACKGROUND

This is a patent infringement case brought by LPL against ViewSonic and other

defendants alleging infringement of United States Patent Nos. 6,498,718 (the '718 Patent) and

6,501,641 (the '641 Patent).  The Patents relate to assembly mountings for flat panel display

---

[1] The Order Appointing Vincent J. Poppiti as Special Master was entered on February 25, 2005.  D.I. 178.

monitors used in liquid crystal displays ("LCD") for such products as plasma televisions and computer monitors. D.I. 1.

Having read and considered the original and joint supplemental papers submitted by the parties prior to hearing, having heard and considered the oral arguments made before the Special Master during telephonic hearings conducted on December 28, 2006, and January 3, 2007, and having reviewed the authorities submitted by the parties in connection therewith, and then having read and considered the January 10 and January 11 post-hearing papers and additional case law submitted by the respective parties, the Special Master concludes that ViewSonic possesses the requisite "control" over the documents and therefore recommends that ViewSonic be compelled to produce responsive documents in the possession of its third party OEMs.

## DISCUSSION

On September 27, 2006, LPL filed the Motion. The Motion, *in toto*, was filed with respect to LPL's Document Request Nos. 2-5, 18, 28, 29, 38-41, 46-48, and 51, as well as with respect to Interrogatory No. 2. Shortly before a December 28, 2006, telephonic hearing scheduled on the Motion, LPL supplemented its moving papers to include a request that ViewSonic be compelled to produce technical and mounting-related documents in the actual possession of certain of ViewSonic's third party OEMs.[2] LPL argues that because such documents are under the "control" of ViewSonic within the meaning of Rule 34(a) of the Federal Rules of Civil Procedure, the documents must be produced by ViewSonic.

Fed. R. Civ. P. Rule 34(a) provides, in pertinent part:

---

[2] In the parties' Joint Supplemental Submission dated December 22, 2006, LPL stated its position that ViewSonic had the legal right based upon contractual language to obtain documents in the hands of OEMs like the Jean Co. that were responsive to LPL's pending Document Request Nos. 2-5, 18, 28, and 46-48, which document requests seek documents "related to structural components; assembly; final blueprints; and design documents." (Joint Supplemental Submission, pages 3-4)

> Any party may serve on any other party a request (1) to produce and permit the party making the request, ...to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and <u>which are in the possession, custody, or control of the party upon whom the request is served</u>;...(Emphasis added).

"In the context of Fed.R.Civ.P. 34(a), so long as the party has the legal right or ability to obtain the documents from another source upon demand, that party is deemed to have control." *Mercy Catholic Medical Center v. Thompson*, 380 F.3d 142, 161 (3d Cir. 2004) (*citing Poole v. Textron*, 192 F.R.D. 494, 501 (D. Md. 2000), *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1998), and 8A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2210 (2d ed. 1994). The party seeking production bears the burden of establishing control. *Playboy Entm't Group, Inc. v. United States*, Civ. No. 96-94-JJF, 1997 U.S. Dist. LEXIS 22297, *1 (D. Del. Dec. 11, 1997).

In arguing that ViewSonic has control over the documents in the possession of its OEMs to make such documents subject to production by ViewSonic, LPL primarily relies upon the contractual language found at paragraph 10.9 of the so-called Jean Co. Agreement, which paragraph is sub-titled <u>Document retention</u>:[3]

> [Jean Co.] shall retain copies of, and provide ViewSonic access to, all records created or received during the performance under this Agreement, in hard and/or electronic copies, including records

---

[3] The Special Master has been provided with and has reviewed a copy of one of the OEM agreements at issue, the agreement dated July 25, 2001, between ViewSonic, a Delaware corporation, and Jean Company, Ltd. ("Jean Co."), a Taiwanese corporation. It is believed based upon a colloquoy with counsel during the December 28 hearing that the other OEM agreements at issue are identical or nearly identical with respect to the Jean Co. contractual language discussed herein. (December 28 Hearing Transcript at 72-74). In any event, ViewSonic has had an opportunity to submit other OEM agreements containing relevant but different language on the issue of ViewSonic's access to documents in the possession of its OEMs but no such agreements have been submitted.

> supplied by subcontracted third parties, for five (5) years following the date of termination of this Agreement. In the event that Supplier becomes insolvent or discontinues its business at any point in time while this provision is operative, Supplier shall immediately notify ViewSonic of this situation and provide ViewSonic with immediate access to the documents and the right to take possession, custody or control and remove the documents to a storage facility of ViewSonic's own choosing.

LPL argues from the above language that ViewSonic has "an absolute right to and legal control of Jean's documentation for at least 5 years after the termination of the agreement." (LPL January 10, 2007 Supplemental Submission, page 1).

LPL also relies upon paragraph 5.3 of the Jean Co. Agreement, which falls under Section 5.0 of the agreement titled **Indemnification.**[4]  Paragraph 5.3 provides in pertinent part: "If a lawsuit is instituted against ViewSonic claiming intellectual property infringement, [Jean Co.] shall immediately provide ViewSonic with acceptable proof of non-infringement...".

In its opposition to the Motion, ViewSonic relies upon the cases of *Inline Connection Corp. v. AOL Time Warner Inc., 2006 U.S. Dist. LEXIS 72724 (D. Del. 2006) (Thynge, Magistrate); Novartis Pharmaceuticals Corp. v. EON Labs Mfg., Inc., 206 F.R.D. 392 (D. Del. 2002); and Gerling.* Application of the facts and legal principles of these cases to the instant Motion results in the view of the Special Master that the Motion should be granted with respect to ViewSonic's production of responsive documents in the hands of its OEMs.

A.    **Inline Connection *Corp. v. AOL Time Warner Inc., 2006 U.S. Dist. LEXIS 72724 (D. Del. 2006) (Thynge, Magistrate)***

In *Inline Connection*, a patent infringement action, Magistrate Thynge addressed plaintiff's application for sanctions related to its contentions that because defendants AOL and Earthlink possessed sufficient "control" of the documents in issue, defendants were obligated to

---

[4]    Bolded in the Jean Co. agreement.

4

produce same although they were documents in the custody of third party telephone companies. The Court found (i) there was no parent-subsidiary or principal-agent relationship between one or both of the defendants on the one hand and the telcos on the other hand, *Id.* at *2-3; (ii) there was no showing that the operations of the independent entities were "so intertwined as to render meaningless" their distinct corporate entities, *Id.* at *3, *quoting Novartis*, 206 F.R.D. at 395; and (iii) noteworthy by the Court's reference to same, there was no showing that a contractual relationship between the defendant(s) and the telcos provided the defendant(s) with access to the requested information upon demand, *Id.* at *3-4. Based upon these findings, the court concluded that plaintiff had failed to show the requisite "control" by defendants over the requested information and therefore denied the motion. *Id.* at *4.

**B.    *Novartis Pharmaceuticals Corp. v. EON Labs Mfg., Inc.*, 206 F.R.D. 392 (D. Del. 2002)**

In *Novartis*, also a patent infringement action, the Court addressed (i) plaintiff's motion to compel production by defendant Eon of certain documents and (ii) defendant Eon's companion motion for protective order. Plaintiff sought, in relevant part, production by Eon of the "Hexal File", which was a term used in a technology license agreement between Eon and Hexal AG, a non-party German corporation. *Novartis*, 206 F.R.D. at 394-95.[5] The Court noted that under the agreement, Eon was granted "the right to use Hexal's technical information which comprises of the "Hexal File" in developing products for sale in the United States." *Id.* at 395.

Plaintiff argued that all documents in the Hexal File, whether possessed by Eon or Hexal AG, must be produced by Eon because Eon had a legal right to obtain the documents pursuant to the agreement. *Id.* Eon argued in response that it had satisfied its discovery obligations by

---

[5]      The term "Hexal File" was defined in the agreement as "any and all technology, formulations, regulatory dossiers, technical information, manufacturing processes and other know-how and intellectual property rights,

producing all Hexal File documents in its possession that were used in filing its application for FDA approval and in formulating and developing its accused products. Eon maintained that it need not request (from a non-party, competitor of plaintiff) information that had not been used in connection with the accused products. *Id.*

The *Novartis* Court analyzed the issue under Fed.R.Civ.P. 34(a). First, the court noted that a party deemed to be in "control" of documents in the possession of a non-party may be compelled to produce such documents under Rule 34(a). The court observed that in cases in which a party and non-party are not parent and subsidiary, production by the party of documents in the hands of the non-party is "rarely ordered, unless the respective business operations of each entity 'are so intertwined as to render meaningless their separate corporate identities'". *Id.*, *quoting from Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D. Del. 1979) (Emphasis added).

The *Novartis* Court denied plaintiff's motion, finding that plaintiff had failed to demonstrate the requisite "control" by Eon over the documents in the hands of Hexal because plaintiff had failed to adduce evidence that the respective business operations of Eon and Hexal were "so intertwined as to render meaningless their separate corporate identities." *Id.* The Court's ultimate holding was not tied to any discussion of whether the contractual provision that entitled plaintiff to use Hexal's technical information which comprised the Hexal File in developing products for sale in the United States was sufficient to support a finding of "control", for purposes of Rule 34, on the part of Eon over the documents possessed by the non-party Hexal.

---

including the patents listed on Schedule A hereto, in any way relating to cyclosporine and with respect to which Hexal now has, or hereafter obtains, any right, title, or interest."

C.    *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1998)

In *Gerling*, the Third Circuit addressed an appeal from the United States Tax Court. Gerling International Insurance Company ("GIIC") had appealed from a grant of summary judgment in favor of the Commissioner of Internal Revenue (hereinafter, "IRS") following the imposition of sanctions upon GIIC for failing to produce certain information and documents in discovery.

In 1957, GIIC, a Delaware corporation, entered into a reinsurance contract with Universale Reinsurance Company, Ltd. ("Universale"), a Swiss corporation. Under the contract (or treaty), GIIC was to bear 20% of the losses on the non-life insurance risks assumed by Universale and would receive 20% of any profits Universale made from its non-life insurance risks. *Id.* at 133. Article 8 of the agreement provided as follows:

> [GIIC] shall have the right through an authorized agent to inspect in the office of Universale all the files which affect the risks under this treaty. This right of inspection, however, shall not permit delay in the liquidation of the respective agreed-upon obligations.

Robert Gerling ("Mr. Gerling") was the founder of GIIC. Mr. Gerling served as the president of GIIC, was a director on the GIIC board of directors, and also was the sole stockholder in GIIC until 1973.[6] In addition, Mr. Gerling served as chairman of the board of directors of Universale and was one of its stockholders.

The contract with Universale generally was profitable for GIIC. However, GIIC reported a loss in 1976. The IRS audited GIIC for the tax years 1976-1978 and disagreements between the parties ensued. GIIC filed suit for a redetermination of its tax liability.

In the lawsuit, the IRS sought certain discovery concerning Universale and its stockholders. When GIIC informed Universale that it did not have the information and could not

---

[6]        In 1976, Mr. Gerling was a 10.82% stockholder in GIIC.

obtain it, the IRS sought sanctions. Sanctions were imposed by the Tax Court in the form of a conclusive presumption that Mr. Gerling owned substantially all of the stock of Universale and that, by virtue of such ownership and by virtue of Mr. Gerling's position as chairman of the Universale Board, Mr. Gerling was in a position to cause Universale's books and records to be made available to GIIC. *Id.* at 135-36.

The IRS then renewed its attempts to compel production in the United States (rather than undertaking an inspection in Switzerland, as agreed to by Universale except Universale did not agree with the IRS that the Swiss government should be informed of the inspection) by GIIC of the books and records of Universale. When GIIC again declared it was unable to produce the books and records, the Tax Court issued a second sanctions order precluding GIIC from introducing into evidence several key documents from the records of Universale. *Id.* at 136-37. Summary judgment in favor of the IRS followed shortly, and GIIC appealed.

The Third Circuit reversed. First, the Third Circuit held it was error for the Tax Court to hold GIIC accountable for failing to supply information concerning Mr. Gerling's stockholdings in Universale. "Unless GIIC had a legally enforceable right to secure this information from Gerling **or** the corporate entity of GIIC can be disregarded, it cannot be said that the information was within its control." *Id.* at 138 (Emphasis added).[7] The Third Circuit found that the IRS had failed to make a case on either ground.

Second, the Third Circuit ruled that with respect to GIIC's production of documents in the possession of Universale, the test is whether the party against whom production is sought has the "legal right to obtain the required documents on demand." *Id.* at 140 (citations omitted). "The location of the documents, whether within the territorial jurisdiction of the court or not, is

---

[7] The rule governing production in *Gerling* was T.C. Rule 72(a)(1), which follows Fed. R. Civ. P. 34(a) in respect of a party's production of documents in its "possession, custody, or control". *Gerling*, 839 F.2d at 139.

irrelevant." *Id*. After discussing the line of cases exploring the "control" issue in the case of parent-subsidiary or alter ego entities, the Third Circuit concluded that there was an insufficient record upon which the Tax Court could have concluded that GIIC exercised sufficient control over Universale to require production by GIIC of Universale's books and records. *Id*. at 141.

Finally, the Third Circuit held that sanctions against GIIC based at least in part upon Article 8 of the agreement were unwarranted. While Article 8 may have given GIIC a contractual right to inspect, in the offices of Universale, the files of Universale "affecting the risks under this treaty", the Third Circuit concluded it was "highly unlikely" a Swiss court[8] would have held that this provision conferred upon GIIC the right to require what the IRS wanted to do, i.e. that the IRS (using its own auditors) be permitted to conduct an audit of Universale's books and records in Switzerland, on notice to the Swiss government. *Id*. at 142.

## ANALYSIS

The Special Master concludes that because paragraph 10.9 of the Jean Co. agreement (as well as other agreements between ViewSonic and its OEMS containing the identical or nearly identical language) confers upon ViewSonic the legal right to obtain the requested documents on demand from the OEMs, the Motion should be granted with respect to LPL's request that ViewSonic be required to produce responsive technical and mounting-related documents in the possession of its OEMs.

The cases relied upon by ViewSonic do not stand for the proposition that sufficient "control" by a party litigant over documents possessed by a non-party may only be found to exist in the limited subset of cases involving (i) parent-subsidiary relationships, (ii) subsidiary-parent relationships, (iii) sister entities, perhaps with common control, or (iv) where corporate

---

[8]    The agreement between GIIC and Universale contained a choice of law provision and choice of forum provision in favor of Switzerland.

9

formalities have not been observed by the subject entities or where the operations of both entities are "so intertwined as to render meaningless their separate corporate identities". *Novartis*, 206 F.R.D. at 395. Rather, these kinds of situations, while perhaps <u>sufficient</u> under the relevant cases, are not <u>necessary</u> to find the requisite control under Rule 34. *See e.g. Rosie D. v. Romney*, 256 F.Supp.2d 115, 119 (D. Mass. 2003) (in suit alleging violations of Medicaid Act, order was entered compelling defendant state agency to produce documents in the hands of non-party agencies because sufficient "control" under Rule 34 may be established by a legal right pursuant to a contractual provision), *citing Anderson v. Cryovac, Inc.*, 862 F.2d 910, 928-29 (1st Cir. 1988), *on remand sub nom. Anderson v. Beatrice Foods Co.*, 127 F.R.D. 1, 10 (D. Mass. 1989); *see also Inline Connection*, 2006 U.S. Dist. LEXIS 7274 at *10.

What is necessary, per the teachings of cases like *Mercy Catholic* and *Gerling*, is a conclusion that the party subject to production has a legal right to obtain the documents on demand made to the non-party. The Special Master so concludes ViewSonic has such legal right here by virtue of the plain language of paragraph 10.9 of the subject OEM agreements.[9]

Paragraph 10.9 of the Jean Co. Agreement confers upon ViewSonic broad and unfettered contractual rights of access to information and documents from its OEMs. Such rights extend for a period of five years after termination of the subject agreements.[10] The OEMs are required to retain copies of all records created or received during the performance under the subject agreements, including records supplied by subcontractors, and are required to provide

---

[9]     This, of course, assumes that the paragraph numbering in all of the subject OEM agreements is the same.
[10]     While not determinative of the issues presented by the Motion, in the context of the present litigation, the conclusion that ViewSonic has a legal right to access information and documents possessed by OEMs is bolstered by the mandatory language found in ¶5.3 of the Jean Co. OEM Agreement dealing with the obligation on the part of Jean Co. to provide "acceptable proof of non-infringement" in the event of an intellectual property infringement lawsuit instituted against ViewSonic, supra at p.4.

ViewSonic access to all records. There are no limitations placed on such access by ViewSonic. All ViewSonic need do is make a demand.

To the extent ViewSonic argues that its rights to possession, custody, or control of documents in the hands of its OEMs are limited to cases where the OEM is insolvent or goes out of business, where ViewSonic merely seeks to "enjoy its rights and fulfill its obligations under the OEM agreement", or where ViewSonic has a 'business purpose" to request such documents (*See* ViewSonic's Supplemental Submission dated January 11, 2007, page two), the Special Master rejects such arguments as inconsistent with the plain language of the subject agreements. The agreements are not so limiting. While the second sentence of paragraph 10.9 does provide ViewSonic with the enhanced rights of immediate removal of original documents to a storage facility of ViewSonic's choosing in the event of an OEM's insolvency or discontinuation of business, the Special Master does not read this sentence to somehow limit ViewSonic's unfettered access to records (in hard and/or electronic form) pursuant to the first sentence of paragraph 10.9. The Special Master concludes that a right to remove original documents under certain circumstances is a separate right from the right of access afforded ViewSonic in the first sentence of paragraph 10.9 – "access" is ordinarily defined and commonly understood to include the right to have/make copies (in hard and/or electronic form). *See e.g. Belloise v. Health Management, Inc.,* 1996 Del. Ch. LEXIS 127 (C.A. No. 14955, Allen, C.) (implicitly finding that director's right of access to corporate books and records includes right to obtain copies of such records).

The Special Master also is not persuaded by ViewSonic's argument that production should not be ordered because the third party OEMs, many or all of whom are foreign entities, may refuse to provide the documents following demand made by ViewSonic. (*See* 1/03/07 Hrg.

11

Tr. at 50-53).    Simply stated, that issue is not ripe, indeed, may never become ripe for consideration, and should have no impact upon the resolution of the pending Motion.[11]

### CONCLUSION

For the reasons set forth above, the Special Master concludes that ViewSonic has the requisite control over the documents pursuant to Rule 34 of the Federal Rules of Civil Procedure, which control makes such documents in the hands of OEMs subject to production by ViewSonic. The Special Master recommends that responsive documents must be produced by ViewSonic by the later of (i) February 25, 2007, or (ii) in the event of filed objection(s) pursuant to either Fed. R. Civ. P. 53(g) or other agreement of the parties, ten (10) days from the date of issuance of an order of the Court adopting this Report and Recommendation.

**The Special Master's Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g) or other agreement of the parties.**

ENTERED this
14th day of February, 2007

_____
Vincent J. Poppiti (DSBA No. 100614),
Special Master

---

[11]    It is noted that the Jean Co. agreement contains a choice of law provision and a forum selection clause in favor of California, and that in the event of a dispute between the parties arising out of their respective obligations under the agreement, the non-prevailing party shall pay the prevailing party's costs and expenses, including reasonable attorneys' fees. (Jean Co. Agreement, ¶¶ 10.2, 10.4)

12