# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD,  )
                               )
         Plaintiffs,           )   C.A. No. 04-343(JJF)
                               )
v.                             )
                               )
TATUNG CO., TATUNG COMPANY OF  )
AMERICA, INC., and VIEWSONIC   )
CORPORATION,                   )
                               )
         Defendants.           )

Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Thursday, December 28, 2006, beginning at approximately 11:30 p.m., there being present:

BEFORE: VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

> THE BAYARD FIRM
> RICHARD D. KIRK, ESQ.
>   222 Delaware Avenue, Suite 900
>   Wilmington, Delaware  19899
>   for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 62

1    MR. CHRISTENSON: Thank you, Your Honor.
2    MR. MILLER: That's if I can get the
3  Bates Nos. this week so they can start on it first thing
4  next week, that would be great.
5    SPECIAL MASTER POPPITI: Can you do that
6  with the Bates Nos.?
7    MR. CHRISTENSON: Yeah. I can give the
8  Bates Nos., that's not a problem. It's the sales
9  summaries that were produced by Viewsonic. And I am
10 happy to provide the Bates Nos.
11   MR. MILLER: Thank you, Your Honor.
12   SPECIAL MASTER POPPITI: Next, please.
13 Let's move on, please.
14   MR. CHRISTENSON: Your Honor, what
15 application would your Honor prefer to address next?
16   SPECIAL MASTER POPPITI: Let's go to
17 9/27, 2006, technical and mounting related discovery.
18   MR. AMBROZY: This is Rel Ambrozy. I
19 will be arguing that application for you.
20   SPECIAL MASTER POPPITI: Thank you, sir.
21   MR. AMBROZY: And just -- do you have
22 any questions before I get started, your Honor?
23   SPECIAL MASTER POPPITI: No, sir.
24   MR. AMBROZY: This is a general

Page 63

1  overview. How we got here was LPL had served numerous
2  discovery, both written -- well, discovery requests going
3  to both documents and things as well as interrogatories
4  seeking information about the Viewsonic monitors.
5  Viewsonic -- and these requests were served back in
6  November of '05.
7    Viewsonic took the position that it did
8  not have to give any information except for the VX 900,
9  which was the single monitor mentioned in LPL's
10 complaint, but as LPL spelled out in both its complaint
11 and in all the discovery, the VX 900 was simply intended
12 to act as an exemplar of what we defined as distant
13 products, which included computer monitors, flat screen
14 TVs, and so forth.
15   So, beginning in, I think it was June or
16 July, the parties began to negotiate as to where and what
17 would be produced, and it wasn't until September of '06
18 that Viewsonic decided to back off its objection to just
19 the VX 900 and decided to give what they referred to in
20 some of their supplemental responses as the technical
21 documents.
22   And just for the Court's convenience, if
23 you could put before you tab four out of LPL's Rule
24 7.1.1.

Page 64

1    SPECIAL MASTER POPPITI: And it's tab
2  what?
3    MR. AMBROZY: Tab four, your Honor.
4  Probably the largest binder you have.
5    SPECIAL MASTER POPPITI: I have tab
6  four. Page?
7    MR. AMBROZY: Page 4, your Honor.
8    SPECIAL MASTER POPPITI: And I am
9  looking at what?
10   MR. AMBROZY: Supplemental Responses to
11 Request For Production No. 2.
12   SPECIAL MASTER POPPITI: I have it in
13 front of me.
14   MR. AMBROZY: The very last one in
15 there, Viewsonic refers to service manuals, and I will
16 probably refer to that as well. Basically, Viewsonic
17 agrees to produce service manuals which are the type of
18 -- it's probably a pamphlet that would come when you buy
19 your monitor, and, basically, it shows some detail of the
20 monitor, but -- and this is their position, that that was
21 all the documents that they had in their possession,
22 custody, and control.
23   We have been going back and forth that
24 we believe that there are more documents that they could

Page 65

1  produce to us that have as much or better detail, and we
2  have also been arguing about the production of monitors,
3  actual monitors, themselves.
4    SPECIAL MASTER POPPITI: I am aware of
5  that.
6    MR. AMBROZY: So the point that we have
7  come to is in the California litigation, we learned that
8  Viewsonic had produced OEM contracts, specifically, with
9  Jean.
10   Now, Viewsonic has informed this Court
11 that it produced those long ago, but in reality, most of
12 the OEM contracts were produced shortly after the
13 supplemental submission to this Court. But getting back
14 to the Jean documents in particular, I don't know if
15 Mr. Kirk is on the line.
16   SPECIAL MASTER POPPITI: He should be.
17   MR. KIRK: Yes, I am.
18   SPECIAL MASTER POPPITI: Thank you.
19   MR. AMBROZY: We had provided -- this
20 was only produced, as we said, on December 22nd, so the
21 Court does not have it in front of it, but Mr. Kirk might
22 be able to send it to the Court's attention now, but the
23 point of it is, Viewsonic has taken the position that
24 they don't have any custody or control over documents

### Page 66

other than their service manuals, but we have learned that, in the language of the contract that Viewsonic has signed with Jean, which is their OEM, and I can read this into the record, your Honor, in case you can't get it from Mr. Kirk.

SPECIAL MASTER POPPITI: If you are going to read it, read it slowly. I can get it to Mr. Kirk, but that will require that I go back to another room.

Take your time reading it.

MR. AMBROZY: I am reading from the Jean documents, bates No. VS 025147, "Supplier shall retain copies of and give Viewsonic access to all records created or received during the performance under this agreement for five years after the termination of this agreement." And then other evidence in this document that Viewsonic does have control of these, documents which would give additional views and detail of the monitors.

SPECIAL MASTER POPPITI: Are you still reading?

MR. AMBROZY: No. Now I am reading from VS 025159, quote, "All changes of specifications shall be made only after a written engineering change request

### Page 67

('ECR') is received and approved by the receiving party. All other changes must be submitted to, and approved by, Viewsonic prior to mass production."

And then also from the Jean OEM contract with Viewsonic, I am reading from VS 025170, it states, "During each phase of the design process, Viewsonic expects to receive product samples, test reports, and supporting data evaluation."

And then also from VS 025178, it reads, "Final schematics," and these are in caps, "BOM to be sent to Viewsonic within seven calendar days of PVT approval."

SPECIAL MASTER POPPITI: What's the effective date of the agreement, please?

MR. AMBROZY: July 21st, 2001.

SPECIAL MASTER POPPITI: And is there an end date?

MR. AMBROZY: The end date, I think I just read from VS 25147 -- no, your Honor, I don't know the end date specifically. We can find that out and let you know.

SPECIAL MASTER POPPITI: The 025147, you said five years after end date; correct?

MR. AMBROZY: Correct. So, the point of

### Page 68

this is, just taken in conjunction with depositions that occurred out in California, the California, one of the Jean employees, he is actually a Kaytronics employee which is owned by Jean, was deposed -- and I am not going to bring up anything that would violate the Court's protective order in California -- but the substance of the deposition was that there are highly detailed, what they call "P.E. drawings," which are engineering drawings that the assembly workers on the assembly line use to put screws and mount the flat panel display devices into the housing and basically make these monitors.

So, it's our position, your Honor, that at least under Federal Civil Procedure 34 that Viewsonic does have custody and control of these documents and they should be produced in response to LPL's discovery request.

SPECIAL MASTER POPPITI: Mr. Miller, is there a dispute as to custody and control?

MR. MILLER: Yes, your Honor. The documents are that, A, we have never -- my client does not have those documents. As Mr. Ambrozy points out, they are held by OEMs which are completely independent of Viewsonic. There is an agreement between the parties pursuant to which Viewsonic purchases products that are

### Page 69

made by the OEMs. With the documents that we have produced, the service manuals, which have the exploded view drawings, are the only documents that Viewsonic has that shows the assembly of these products and the manner in which they are put together.

Jean was a party in the California litigation. LPL chose not to make them a party to this case, for whatever reason, and now they are trying to seek, through Viewsonic, discovery that they know Viewsonic doesn't have that are held by third parties.

SPECIAL MASTER POPPITI: Let me ask this question: I mean, I certainly understand that something is in my custody if I can reach over and pick it up and touch it or if I can walk somewhere that I have access to, rightful access to and pick it up and hold it, that's custody, it seems to me, because I have got direct access; doesn't control contemplate, and no one has given me any authority to discuss this other than the sense that "control" means if I have got a contractual right to access a document that is in the custody of someone else and is owned, if you will, by someone else, isn't that control?

MR. MILLER: I think the case law, your Honor, is that it's not.

Page 70

1  SPECIAL MASTER POPPITI: And I have been
2  provided with no case law.
3      MR. MILLER: I think -- first off, this
4  issue is highly premature and only arose, you know,
5  around two or three weeks ago for the first time despite
6  the pendency of this dispute for months and months as
7  Mr. Ambrozy points out.
8      So, there is no real -- there is no
9  recent discovery of this issue by LPL. The cases that
10 they are talking about where these documents were
11 available went to trial, one in July and one in October,
12 and they were co-counsel of record, lead counsel in one
13 and co-lead counsel of record in the other, and, so, they
14 are intimately familiar with these documents, I would
15 venture to say, long before the cases went to trial, but,
16 again, have declined to raise this issue until the 11th
17 hour, and now seek to impose it on this issue, which is
18 not ripe in any fashion for discussion.
19      I can give you a couple of case cites if
20 you would like.
21      SPECIAL MASTER POPPITI: What I would
22 like is, over the course of the break, if you would
23 exchange some case citations with each other and with me.
24      MR. AMBROZY: Whether or not these

Page 71

1  documents were at issue in the other cases is really
2  irrelevant. The one case in Delaware had to do with
3  totally different technology as did the case out in
4  California. These are separate patents from separate
5  technology, and the fact that it only became a recent
6  issue -- and we would be happy to serve supplemental
7  briefing on this for your Honor -- the reason it became
8  an issue is because we only just became aware of the Jean
9  OEM agreement. It was only produced by Viewsonic on
10 December 22nd. And that, in conjunction with the
11 deposition testimony, which we have also only become
12 aware of, is why it's being put before your Honor now.
13     SPECIAL MASTER POPPITI: That's why I
14 asked you for supplemental. I mean, I wanted to know
15 what developments were at hand up through a time period
16 that made sense for purposes of me addressing it. And I
17 think that's what you both did in your supplementals.
18     In any event, if you will provide me
19 with the references, precise references, that is, the
20 language of the Jean document, and I am not looking to
21 study 10 or 15 cases. If you will each submit to me
22 several cases, if they are in the District, that's great;
23 if they are in the Circuit, that's perfect.
24     MR. AMBROZY: Thank you, Your Honor.

Page 72

1  And we might just broaden that, besides just the Jean,
2  there were, I am looking at page 16 of the supplemental
3  submissions where Viewsonic states that they have
4  produced several agreements with suppliers previously in
5  this litigation, but when it's really analyzed, the Delta
6  electronics, the Jean company, and the Optima OEM
7  agreement were really only produced last Friday.
8      SPECIAL MASTER POPPITI: Let me ask this
9  question of Mr. Miller: Can I expect, Mr. Miller, that
10 the agreements are, to a large extent, and I think you
11 referred to this earlier, they are templated, and if I am
12 to be focusing on language that deals with the
13 opportunity to access those documents, can I expect that
14 the language is similar in each of them, or am I going to
15 have to review each document?
16     MR. MILLER: I believe, your Honor, that
17 the documents are templates to begin with. They are
18 negotiated. I have not verified, independently, whether
19 each of the agreements has this similar language, but
20 it's not the kind of language, I wouldn't think, that the
21 parties would ultimately negotiate differently, largely,
22 and, so, I think, you know, from the standpoint of
23 evaluation, we can look at one agreement, and to the
24 extent there are variations in other agreements, we can

Page 73

1  deal with the ones that we know where we are on this one
2  agreement, I think.
3      MR. AMBROZY: Your Honor, that's why
4  we'd like to broaden it a little bit because, as I said,
5  the Jean agreement was only produced on Friday, as well
6  as the other agreement, there is at least two others that
7  were at least just produced on Friday, so we'd like to
8  broaden it beyond what Mr. Miller suggested is just this
9  one agreement.
10     MR. MILLER: I believe the language in
11 the Jean agreement is in the Tatung agreement that was
12 produced in 2005.
13     SPECIAL MASTER POPPITI: That's why I
14 asked the question, whether I am going to have to review
15 each agreement for purposes of focusing on the issue of
16 custody and control. If I don't have to and I can focus
17 on the principle of custody and control, using the
18 language from the Jean agreement, which may be templated
19 throughout the agreements, then I'd prefer to do it that
20 way. If I need to look at each agreement, I am certainly
21 prepared to do that.
22     MR. AMBROZY: Thank you, Your Honor.
23     MR. MILLER: Your Honor, I can't
24 represent to you that they are all the same because I

### Page 74

1  haven't looked at them for that issue, unfortunately.
2      SPECIAL MASTER POPPITI: I understand
3  that. How many agreements to we expect?
4      MR. AMBROZY: We would look through at
5  least the three most recent, your Honor.
6      SPECIAL MASTER POPPITI: And how many
7  are there in the universe of agreements?
8      MR. MILLER: I believe there is probably
9  on the order of a dozen agreements.
10      SPECIAL MASTER POPPITI: Okay. So, you
11  know, the task is not significant to compare that
12  language.
13      MR. AMBROZY: In regard to the rest of
14  the motion, your Honor?
15      SPECIAL MASTER POPPITI: Yeah, please.
16      MR. AMBROZY: We had also sought
17  production of actual monitors.
18      SPECIAL MASTER POPPITI: Right.
19      MR. AMBROZY: And we wanted to just
20  address that with your Honor in that Viewsonic initially
21  provided -- initially agreed that they would provide
22  monitors but only for the accused devices, and as your
23  Honor knows, that started out with the VX 900 and then
24  it, as the case progressed, just recently, LPL has

### Page 75

1  supplemented its interrogatory responses to include, I
2  think it was eight or nine other Viewsonic monitors.
3      SPECIAL MASTER POPPITI: Right.
4      MR. AMBROZY: And we can get into the
5  specifics of that later when we talk about the preclusion
6  application, but the monitors that we are seeking are all
7  the monitors that Viewsonic listed in response to LPL's
8  interrogatory requests, I think it's interrogatory
9  request No. 2 and 3, where we asked them to identify all
10  their monitors. And we were seeking production or at
11  least inspection of those monitors.
12      And in response, I think you have seen
13  from the briefing on this, Viewsonic basically pointed
14  LPL to its web site and said, You can buy whatever you
15  need off the web site. And when we went to the web site
16  and tried to buy those monitors, the sum total that we
17  were able to buy, I think there was only about six
18  percent of the numerous monitors listed in Viewsonic's
19  response that we were able to purchase online.
20      So, we would like some guidance from
21  Your Honor as to how we can work with Viewsonic to attain
22  all those monitors, or at least inspect them.
23      SPECIAL MASTER POPPITI: Mr. Miller.
24      MR. MILLER: Your Honor, Viewsonic, like

### Page 76

1  most companies, doesn't keep products that have gone out
2  of sale in inventory, hopefully, in order to be
3  successful. And, so, we are talking about a list of
4  products that dates back over four years.
5      The only products Viewsonic would have
6  are products that are currently being sold or offered for
7  sale in the United States. It doesn't maintain a museum,
8  if you will, of old inventory.
9      SPECIAL MASTER POPPITI: Well, if you
10  don't have them, you can't give them.
11      MR. MILLER: We told them where they can
12  locate them. And as to new products, we have declined to
13  let them inspect them, we have offered to sell to them
14  because if they open up the package and take them out,
15  start taking them apart, they become a used product and
16  that's a cost that they should bear, not us.
17      With regard to if we have other products
18  that are laying around for one reason or another, that
19  may be a dead product or something, we have -- we are
20  willing to try to collect whatever we can of ancient
21  products and make those available for an inspection as
22  well, but it's only been, from LPL's side, just the
23  intransigents, Just give us everything or nothing, so we
24  have not -- that has not progressed.

### Page 77

1      We are happy to sit down and try to work
2  out a solution if there are, you know, dinosaurs laying
3  around somewhere that they can look at, we are not
4  intending to hide them. We are happy to let them look at
5  them.
6      MR. AMBROZY: I think that's why these
7  documents that Jean are contractually obligated to keep
8  from five years after the termination of that agreement
9  becomes so important.
10      SPECIAL MASTER POPPITI: We will get to
11  Jean in a moment after I have the opportunity to do the
12  work that I suggested I need to do.
13      But with respect to the monitors,
14  themselves, it seems to me what Mr. Miller is saying
15  makes sense. I mean, if they have them, they said they
16  are going to provide them. If they are new product, it
17  seems to me that it is appropriate for you to purchase
18  them. It should be at your cost.
19      If there are dinosaurs laying around,
20  then I will take Mr. Miller at his word that they will do
21  a search, and at the end of that search, they will advise
22  what they have for you to either inspect or even purchase
23  a dinosaur if they are willing to -- if they are willing
24  to let that go, and I would like some time frame as to

Page 78

1 when all of that occurs.
2         I don't hear Mr. Miller saying that they
3 are not going to make these available.
4         MR. AMBROZY: Again, Your Honor, and I
5 agree that they are not -- that he shouldn't be ordered
6 to produce something that he cannot produce.
7         SPECIAL MASTER POPPITI: Right.
8         MR. AMBROZY: But getting back to our
9 point, and I understand we will get back to the Jean, but
10 that does make those documents the best available
11 evidence of the monitors that were previously sold.
12         SPECIAL MASTER POPPITI: It may be. But
13 I want to focus on the hardware, if you will, and I would
14 just like a representation from the both of you as to
15 when you can expect there will be some resolution to the
16 process of what exists, new product that will be
17 purchased, old product that will either be inspected or
18 purchased, and a representation by Mr. Miller that that
19 does constitute the universe of expected -- of available
20 product.
21         MR. MILLER: Your Honor, I am happy to
22 do that with dispassion. I can only make so many demands
23 on my client in terms of the things we have agreed to for
24 the 19th.

Page 79

1         This is going to be a, you know, a
2 looking around for dinosaur kind of project. It's not
3 going to be that straightforward. I am going to need
4 some time, I would think, you know, until the end of
5 January, perhaps, to get that list assembled. I mean,
6 the products that are available for purchase obviously
7 are on our web site and they can get those at any time
8 they choose.
9         SPECIAL MASTER POPPITI: And those that
10 are available for purchase and if they are on the web
11 site, that can be done right away.
12         To search for dinosaurs, I mean, how
13 many are we -- how many exist? Any idea?
14         MR. MILLER: There is 216 products
15 listed on our list, and we are looking through a, you
16 know, five or 600,000 foot facility, which is warehouse
17 and office and it may be on somebody's desk, that we are
18 going to have to try to locate some of these things. So
19 it's not a -- it's not just an easy task, I don't
20 believe.
21         SPECIAL MASTER POPPITI: And are we
22 talking about dinosaurs that are yours or dinosaurs that
23 may be in the possession of the OEMs?
24         MR. MILLER: No. We are talking about

Page 80

1 dinosaurs that are ours.
2         SPECIAL MASTER POPPITI: Right.
3         MR. MILLER: And are in our facilities.
4         SPECIAL MASTER POPPITI: Is the date of
5 the 26th doable?
6         MR. AMBROZY: Just to clarify, Your
7 Honor, when Mr. Miller says that he is looking at
8 Viewsonic, does that include Viewsonic -- I am not sure
9 of the proper name, Scott -- but Viewsonic America or the
10 other entities of Viewsonic?
11         MR. MILLER: I would be looking at
12 Viewsonic America, which would be the only place I would
13 expect to find the U.S. products. I mean, if we are
14 going to expand this to overseas, it's going to take
15 substantially longer.
16         MR. AMBROZY: We will start with the
17 U.S. products, but that brings, Your Honor, brings us to
18 another point --
19         SPECIAL MASTER POPPITI: No new points.
20 We will keep it to what was asked for. I will look at
21 the document that you are going to provide to me over the
22 break, and if it becomes an issue that is looking
23 overseas, we can join that issue at some other point.
24         MR. MILLER: Your Honor, as to the 26th,

Page 81

1 could I ask for the 29th to give me another weekend, if
2 necessary, to scrounge around, please?
3         SPECIAL MASTER POPPITI: 29th is fine.
4 Okay. We are just about at 1:30. Did that finish that
5 particular application?
6         MR. AMBROZY: The only issue remaining,
7 Your Honor, was the fact of the limitation to U.S. sales
8 which we think is improper.
9         We believe that our discovery should be
10 responded to to include monitors that are imported to the
11 U.S. as well as monitors that might go to Mexico, are
12 assembled or put under a different brand name and then
13 make their way into the United States. So just limiting
14 the search to just monitors that are imported by
15 Viewsonic into the United States, we think, is too
16 narrow.
17         SPECIAL MASTER POPPITI: Mr. Miller.
18         MR. MILLER: I think we have retrenched
19 to the motion I thought we had finished which was the
20 information about sales. This was technical documents
21 and those sorts of things.
22         Is that what you are doing, Rel?
23         MR. AMBROZY: No. I am trying to get
24 before his Honor the proper scope of the requests, which