# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD,       )
                                    )
        Plaintiffs,                 )  C.A. No. 04-343(JJF)
                                    )
v.                                  )
                                    )
TATUNG CO., TATUNG COMPANY OF       )
AMERICA, INC., and VIEWSONIC        )
CORPORATION,                        )
                                    )
        Defendants.                 )

    Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Wednesday, January 3, 2007, beginning at approximately 11:37 a.m., there being present:

BEFORE:  VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

    THE BAYARD FIRM
    RICHARD D. KIRK, ESQ.
      222 Delaware Avenue, Suite 900
      Wilmington, Delaware  19899
      for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street    Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 22

1  SPECIAL MASTER POPPITI: That's right.
2  The December 19th application responded to December 28th.
3  MS. MASON: I just wanted to add that
4  the positions that we take in that motion to compel
5  plaintiff to participate in deposition discovery would
6  still be valid. I mean, we would still maintain the
7  position that it is not proper to hold witnesses for
8  deposition dates so close to the end of the discovery
9  period.
10  Obviously, the positions would still
11  remain valid, but given that now Your Honor has made the
12  suggestion to have an ex parte discussion with the Court,
13  that changes the landscape a bit.
14  SPECIAL MASTER POPPITI: Okay.
15  MR. MERIDETH: May I make a suggestion?
16  SPECIAL MASTER POPPITI: Yes, please.
17  MR. MERIDETH: I believe that it would
18  be worthwhile, assuming the potential of your meeting
19  with the Court, I think you said January 12th, that we
20  confer with our clients and each other over potential
21  deposition dates following that date so that at least we
22  know what the availability is and we can resolve issues
23  that are pending.
24  I think we may have some tentative

Page 23

1  agreements, but they have not been finalized as to the
2  place of the depositions, whether some of the depositions
3  that have been noticed are duplicative with respect to
4  the witnesses and how we are going to handle the 30(b)(6)
5  representatives with respect to their individual
6  testimony. All of that can be resolved regardless of the
7  timing.
8  SPECIAL MASTER POPPITI: I would agree.
9  MR. CHRISTENSON: Your Honor, I agree as
10  well. We are, as Mr. Merideth says, in discussions as to
11  location. We have made a proposal on that.
12  We are also going to have discussions
13  regarding objections to 30(b)(6) topics, and, so, those
14  discussions, I agree, should proceed, and hopefully we
15  can resolve as many of those issues as possible and then
16  we can see if the timing issue resolves itself.
17  SPECIAL MASTER POPPITI: Okay. And I am
18  rather optimistic with respect to the timing issues.
19  With respect to issues involving subject
20  matter and location, am I going to need to reserve time,
21  and, if you will, impose deadlines similar to those
22  imposed in the January 3rd, 2007, correspondence?
23  What I don't want to happen is for your
24  meet and confers to be respectful but unproductive and

Page 24

1  then wind up with different applications on my desk and a
2  need to -- a need to shoehorn you in to a hearing date.
3  MS. MASON: I think it would be useful
4  to have Your Honor set a date by which we would report to
5  you as the deadlines you were setting during the
6  teleconference last week.
7  SPECIAL MASTER POPPITI: Any proposal
8  with respect to those deadlines?
9  MS. MASON: I am sorry, Your Honor. You
10  were cut off the beginning of that sentence.
11  SPECIAL MASTER POPPITI: Does anyone
12  have a proposal with respect to what you just suggested
13  because your suggestion makes sense to me?
14  MR. CHRISTENSON: Your Honor, I propose
15  that we have discussions among counsel by no later than
16  next week and then report to you promptly thereafter.
17  SPECIAL MASTER POPPITI: "No later than
18  next week" being the week of the 12th?
19  MR. CHRISTENSON: The week of January 8,
20  Your Honor.
21  SPECIAL MASTER POPPITI: Week of January
22  8th, yeah.
23  MR. CHRISTENSON: Which ends on the
24  12th, that is correct.

Page 25

1  MR. MILLER: Your Honor, I guess,
2  perhaps, we could report to you by noon your time on the
3  11th so that you have it before your meeting with the
4  Court on the 12th to the extent that it's informative to
5  you for any purpose.
6  SPECIAL MASTER POPPITI: It may be
7  informative to me for the purpose of understanding the
8  entire landscape. So let's, you know, why don't you
9  report to me with respect to that issue not later than
10  noon on the 11th.
11  MR. CHRISTENSON: Very well, Your Honor.
12  SPECIAL MASTER POPPITI: And that's both
13  with respect to location and subject matter. Anything
14  else on the application that we have been focused on?
15  MR. MILLER: I think that, as Ms. Mason
16  indicated, I think, at this point, holding it in abeyance
17  until we see what happens vis-a-vis these other issues is
18  probably appropriate.
19  SPECIAL MASTER POPPITI: Hearing no
20  disagreement, let's re-group on several things that I
21  think needed additional -- needed some additional
22  attention.
23  On the issue of control for purposes of
24  focusing on the application dealing with documents that

Page 26

1  are in the possession of OEMs that the defendants suggest
2  that LPL has access to and control over, my question is
3  this: I believe that I have some excerpt quotes from an
4  OEM document, but I do not believe that I have the entire
5  document; is that correct or am I mistaken?
6        MR. KIRK: I just missed, if you were
7  speaking, I missed a bunch of it.
8        SPECIAL MASTER POPPITI: Oh, I was. I
9  am sorry.
10       My question is: Do I have, in these
11 papers, and I suggest I don't think I have, the entire
12 document that was an OEM document referred to as the --
13       MR. KIRK: The Jean OEM agreement, Your
14 Honor?
15       SPECIAL MASTER POPPITI: That's correct.
16       MR. KIRK: I did send that in it
17 entirety in a PDF. I am not sure that -- I should have
18 copied it and sent you a hard copy, and I will do that
19 right now, but I sent it to you on Thursday morning
20 during our call, and I can re-send it right now.
21       SPECIAL MASTER POPPITI: And I apologize
22 for not having retrieved that, Mr. Kirk. I don't know
23 why that I didn't, but if you will send that now.
24       MR. KIRK: I will re-send it right now

Page 27

1  and then I will also copy it. It 90 pages. And we will
2  get it sent to you immediately.
3        SPECIAL MASTER POPPITI: Then let me ask
4  the question, as you are re-sending it: Have you asked
5  me to focus on any other language in that document other
6  than the language that you brought to my attention
7  earlier?
8        MS. BRZEZYSKI: In addition to the
9  language that was brought to your attention earlier in
10 the form of excerpts from the OEM agreement, I also would
11 like to bring to your attention specific language on page
12 3 of that agreement and the Bates No. is VS 025139, and I
13 want to bring to your attention specifically Section P,
14 paragraph four, and that paragraph has some interesting
15 language suggesting a partnership between Viewsonic and
16 its OEMs to manufacture products for Viewsonic pursuant
17 to Viewsonic's specifications.
18       SPECIAL MASTER POPPITI: For purposes of
19 -- how long is the language? Do you want to read it to
20 me now just for purposes of my understanding what you are
21 referring to? I will look at the language. I am not in
22 a room where I have access to a computer right now.
23       MS. BRZEZYSKI: All I want to do is -- I
24 will read you the one clause.

Page 28

1        SPECIAL MASTER POPPITI: That's fine.
2        MS. BRZEZYSKI: Quote, Supplier shall,
3  at all times, use commercially reasonable efforts to
4  ensure its partnership's support under this agreement,
5  end quote. And I bring that to your attention because I
6  think that that language is very telling and it's very
7  indicative of the close relationship between Viewsonic
8  and its OEMs to manufacture Viewsonic's products and to
9  ensure that Viewsonic has the steady supply that it
10 requires. And I think that that language there is very
11 telling of the import of the other excerpts we brought to
12 your attention in that they clearly show an absolute
13 legal right to the documents by Viewsonic.
14       Viewsonic -- you know, this is a
15 Viewsonic form agreement. Viewsonic must have included
16 the custody and control provisions so that it could
17 control the manufacture of its products and have access
18 to all the documents at any time in the ordinary course
19 of its business. And, so, I wanted to bring that
20 partnership language to your attention because I think
21 it's very telling, in particular.
22       That was the only other language I
23 wanted to bring to your attention, in addition to the
24 excerpts already brought.

Page 29

1        I do, when you get the full agreement, I
2  would like it, if you could, Your Honor, look at the
3  entire language that we excerpted. In some respects, we
4  had to, you know, included listings so that it would be
5  shortened for the written document we provided to you.
6        I think the entire document retention
7  language, in paragraph 10.9 of the agreement, is very
8  important for you to read.
9        SPECIAL MASTER POPPITI: So you are
10 suggesting I should open my drawer and take out that
11 tooth comb? I guess not.
12       MS. BRZEZYSKI: I think the --
13 certainly, I think we gave you the most important
14 excerpts for you to read, but within those excerpts,
15 there is some additional words that I think it's
16 important for you to see the entire language.
17       SPECIAL MASTER POPPITI: But by virtue
18 of focusing on the language that you just focused on, are
19 you in any way suggesting that there is a -- that the
20 partnership that you are referring to, you are not
21 suggesting that that is an entity; correct?
22       MS. BRZEZYSKI: No. Your Honor, I am
23 not suggesting that it's a separate entity. We don't
24 have any -- any information to suggest there is a

Page 30

1  separate entity created.
2      SPECIAL MASTER POPPITI: Right.
3      MS. BRZEZYSKI: You know, a separate
4  formal partnership.
5      SPECIAL MASTER POPPITI: Okay. I
6  understand that. And I do have a question, and I expect
7  that, perhaps, Mr. Miller may want to weigh in and
8  perhaps some others. I certainly reviewed the cases that
9  you brought to my attention by Mr. Kirk's December 29,
10 2006, e-mail, and I want you, if you have that available
11 to you, I am looking at the Inline Connection Corporation
12 case that was penned by Magistrate Mary Pat Thynge. If
13 you will take just a moment to access that, that may be
14 helpful.
15     MS. MASON: Your Honor, the Inline case
16 was actually sent by me on behalf of Viewsonic.
17     SPECIAL MASTER POPPITI: Do you want to
18 speak to that?
19     MS. MASON: Yes, Your Honor.
20     SPECIAL MASTER POPPITI: What I'd like
21 -- do you have that up at this point?
22     MS. MASON: I do, Your Honor.
23     SPECIAL MASTER POPPITI: Tell me why you
24 brought Magistrate Thynge's decision to my attention.

Page 31

1      MS. MASON: Your Honor, for a few
2  reasons; the first being that it reiterates the standards
3  in the Third Circuit, that it is LPL's, the plaintiff's,
4  burden to prove legal control, and under the facts and
5  the law in this case, they cannot prove it between
6  Viewsonic and Jean.
7      The most pertinent part of the case,
8  being where Judge Thynge distinguishes the Mercy Catholic
9  decision, it is in the Inline case, which I actually have
10 as a Lexus reported decision, 2006 U.S. District Lexus
11 72724 at star two, and, there, Judge Thynge conducts an
12 analysis of Mercy Catholic and talks about the practical
13 ability to obtain documents as being the same as legal
14 control.
15     Later on in the decision, Judge Thynge
16 conducts an analysis and rejects that practical ability
17 and also cites to a decision where Judge Farnan does as
18 well.
19     It's clear, we believe, under the Inline
20 decision, and under Novartis, which was also cited to
21 Your Honor, that more is required to compel the
22 production of documents.
23     As Judge Thynge makes clear in this
24 decision, you need apparent subsidiary relationships. In

Page 32

1  Novartis, the Court says, It is rare to compel the
2  production of documents in the absence of apparent and
3  subsidiary relationship. There is no such relationship
4  in this case. There is no partnership despite the
5  excerpt of the language that was just cited to Your
6  Honor. And there and under the facts in the law, LPL
7  hasn't met its burden of proving legal control.
8      SPECIAL MASTER POPPITI: Let me ask you
9  this question: I understand that a partner subsidiary
10 relationship may be, and I will use the language of your
11 loyal opposition, it may be sufficient, but not
12 necessary, and the reason why I want to frame it -- my
13 question against that backdrop is this: If you will take
14 a look at page 3, and this is of Magistrate Thynge's
15 decision, what I expect she is saying, when she uses the
16 following language -- let me use the language first and
17 then I will tell you what I expect she is saying and I
18 want you to speak to it.
19     I understand the context in which she
20 says there is no parent subsidiary relationship here. I
21 understand that she says that the Circuit has not
22 accepted the practical access to it as opposed to the
23 absolute right, namely, the control to have access, but
24 she does say, at below -- below note ten, and let me read

Page 33

1  it, please, "In the present case, there is no evidence
2  which suggests that AOL and EarthLink had possession or
3  custody of the RT deployment information. Rather, the
4  gist of InLine's argument is that AOL and EarthLink did
5  not satisfy their discovery obligations by producing
6  information which was purportedly, quote, available,
7  close quote, to them upon request from the TELCOS,
8  T-E-L-C-O-S.
9      "Inline, apparently, relies on
10 deposition testimony of AOL's damage's expert, Julie
11 Davis. According to Ms. Davis, hypothetically, AOL could
12 have obtained the RT deployment information from the
13 TELCOSs by making it part of the contractual
14 arrangement." Then there is a reference to the
15 deposition.
16     She goes on to say, "The fact that AOL
17 hypothetically could have pursued a contractual provision
18 during negotiations which provides AOL a right of access
19 to RT deployment information is irrelevant to the
20 determination of whether AOL and EarthLink presently have
21 or had legal control of the RT deployment information
22 because there is no evidence," and let me emphasize this,
23 "there is no evidence that such a contractual provision
24 exists."

Page 34

1  Now, what I think Magistrate Thynge is
2  saying is, Given the facts of the case that she had
3  before her, there was no contractual provision that would
4  have permitted access, and I think what she is saying is,
5  Had there been one, I think she would have written this
6  decision differently.
7      How do you read her language? And once
8  you describe that, I'd like some response to it from the
9  other side.
10     MS. MASON: Your Honor, I would read her
11 language, continuing down in the paragraph from which
12 Your Honor was just reading, Judge Thynge goes on to say,
13 "Under the law of the Third Circuit, the mere fact that
14 EarthLink may be able to obtain the information, if it
15 had a business or other reason to do so, is irrelevant to
16 the issue of control".
17     SPECIAL MASTER POPPITI: I understand
18 that.
19     MS. MASON: Right. And I believe that
20 that's pertinent to our analysis in this case. We -- the
21 agreement and the excerpt that was sent to Your Honor
22 talks about access to documents from suppliers; however,
23 it's not the same and it doesn't rise to the same level
24 of the legal control the law that states that you have to

Page 35

1  -- you can obtain the documents on demand and that you
2  are so intertwined as to render meaningless the
3  relationship between the companies.
4      SPECIAL MASTER POPPITI: Well --
5      MS. MASON: I believe that's the case
6  that may be missing from this hypothetical situation that
7  Judge Thynge is positing.
8      SPECIAL MASTER POPPITI: But aren't you
9  reading that in the conjunctive as opposed to, as I
10 suggested to you earlier, that it may be sufficient but
11 not necessary? I mean, the contract, as I understand it,
12 and without drilling down through the provision that I am
13 going to review at some point, even after the contract --
14 even after the relationship, even after the -- even after
15 that ends, if memory serves me correctly, there is a
16 five-year period of time when they can pick up the phone,
17 drop an e-mail, write a letter, maybe appear at the
18 offices to say, We want those files. Isn't there an
19 absolute legal right to those files that have nothing to
20 do with the business purpose?
21     And the reason why I say "nothing to do
22 with the business purpose," focusing on Judge Farnan's
23 case in Novartis, I believe that there was a business
24 purpose in Novartis because, as I understand Judge

Page 36

1  Farnan's writing in Novartis, the access there, and I am
2  looking at the first full paragraph right before note
3  ten, "The agreement grants Eon, E-o-n, the right to use
4  Hexal's, H-e-x-a-l-'-s technical information which
5  comprises of the Hexal file in developing products for
6  sale in the United States."
7      Now, as I understand the record in that
8  case, as Judge Farnan described it, records with respect
9  to the Hexal files that were actually used in the
10 development of sale, of products for sale in the United
11 States, had been produced.
12     The question before Judge Farnan was
13 whether all Hexal files should be produced. And he said,
14 No, because there was not the right of full access. And
15 the reason why I think he said that is that it only
16 related to a practical right of access, namely, the right
17 when you are using those files to develop products for
18 sale in the United States.
19     Isn't that what he did in Hexal?
20     MS. MASON: Yes, Your Honor.
21     SPECIAL MASTER POPPITI: So, Hexal
22 really doesn't help us here, does it?
23     MS. MASON: Hexal would help us to the
24 extent that there were the contractual provisions in

Page 37

1  place and then Judge Farnan used that to place limits
2  then on further discovery and obtaining further documents
3  from Eon.
4      SPECIAL MASTER POPPITI: And the Hexal
5  provision, and I don't see that he is quoting it, but he
6  does -- he certainly is tantamount to a quote, The
7  agreement grants Eon the right to use Hexal's technical
8  information which comprises of the Hexal file in
9  developing products for sale in the United States.
10     It sounds to me like it was a limited
11 right; doesn't it to you?
12     MR. MILLER: Your Honor, it's always
13 hard to infer things. I mean, if you look at the
14 decision, it seems -- I guess the way I read the decision
15 originally is the assertion was made that Novartis had
16 the right to access additional documents pursuant to the
17 product royalty agreement. And that was not really
18 challenged.
19     The issue was they produced the
20 documents -- Novartis had produced the documents that
21 were in its possession that it had received at that
22 point, so the way I read this, and because the provision
23 isn't quoted, it's hard to know, but the way I read this
24 was that it was an accepted understanding that additional

Page 38

1   files could have been obtained, I guess, under that
2   royalty agreement if they were sought to be obtained.
3           SPECIAL MASTER POPPITI: For a specific
4   use.
5           MR. MILLER: For a specific use.
6           SPECIAL MASTER POPPITI: And that --
7           MR. MILLER: In the Viewsonic situation,
8   the service manuals that we have produced, for example,
9   and the exploded drawings are the documents that
10  Viewsonic has received under these provisions of the Jean
11  agreement that it has in its possession, custody, or
12  control. It is not sitting on a cash of other documents
13  that Jean has provided to it that show how these products
14  are put together.
15          It has, as Novartis had, I think in this
16  situation, a right to request additional documents for
17  its business purposes, but it hasn't done it, and
18  question then becomes: Do the Federal Rules envision
19  that a party who has a contractual right to obtain
20  documents for its business purposes are compelled to take
21  whatever measures presumably are required, including, I
22  guess, a lawsuit against their supplier, if needed, to
23  obtain those documents in order to respond to a discovery
24  request? And I think what --

Page 39

1           SPECIAL MASTER POPPITI: We are not
2   there yet, though. We don't know whether there would be
3   a lawsuit.
4           MR. MILLER: No, we don't. But the
5   question is -- it seems to me that Judge Farnan was
6   drawing the line here, saying, No, if you have the
7   documents, you have obtained them for business purposes,
8   you need to produce them, and Viewsonic has done that
9   through the service manuals.
10          Those exploded documents and the service
11  manuals came from our suppliers, whether it was Jean or
12  Delta or anybody else, and that service manual came to us
13  from the supplier.
14          SPECIAL MASTER POPPITI: You are right
15  that I don't have the language of the Novartis document
16  in front of me, but even following on, and I think you
17  agreed that this is the case, the following two
18  paragraphs read, and let me look at those for a moment
19  for purposes of sharing with you my thoughts, "Novartis
20  contends that Eon's license to access Hexal file
21  documents makes every Hexal file document discoverable."
22  Makes every one discoverable. "Specifically, Novartis
23  contends that all documents covered by the Hexal file are
24  relevant to this litigation and are within the custody of

Page 40

1   Eon because Eon has a legal right to obtain these
2   documents pursuant to the property royalty agreement.
3           "In opposition, Eon contends that it has
4   produced all Hexal file documents in its possession which
5   were used in filing its application for FDA approval and
6   formulating and developing its accused products.
7           "Additionally, Eon contends that the
8   Novartis motion finds no support in the Federal Rules of
9   Evidence as it demands that Eon request information which
10  has not been used in connection with the accused products
11  from a non-party who is a potential competitor of
12  Novartis in Europe."
13          I guess my question is this: The
14  document that we are working with, and it may be that it
15  is a template and other contracts are similar to this
16  template, even after the business relationship ends, even
17  after it ends, there is a five-year absolute right to
18  access these documents, is there not, without any
19  business purpose at all? Anyone want to --
20          MS. BRZEZYSKI: That is our
21  understanding of our reading of the OEM agreements.
22          SPECIAL MASTER POPPITI: Any comments,
23  then, please?
24          MR. MILLER: I am turning to the section

Page 41

1   to read it.
2           SPECIAL MASTER POPPITI: Yeah. Please.
3   It's at note ten. And even read the following paragraph.
4   While you are reading, I don't want to interrupt your
5   thought process, but let me read the next paragraph.
6   "Federal Rules of Civil Procedure 34(a) permits a party
7   to serve a request for production of documents which are
8   within the scope of discovery, and, quote, which are in
9   the possession, custody, or control of the party upon
10  whom the request is served," citing the rule.
11          "If a corporate entity is deemed to be
12  in control of the documents sought, a District Court can
13  compel the production of these documents regardless of
14  whether they are also in the possession and control of a
15  non-party."
16          And then it sites Pennwalt. And the
17  site for Pennwalt is for the proposition that holding
18  that, quote, This occurs most often when a parent
19  corporation is requested to produce documents of a
20  wholly-owned subsidiary; however, in cases in which the
21  corporate entities are not parent and subsidiary,
22  production is," and it does say "rarely ordered unless
23  the respective business operations of such entity, quote,
24  are so intertwined as to render meaningless their

Page 42

1 separate corporate identities."
2          Now, I understand that in the context of
3 Novartis, they are talking about contractual
4 arrangements, but they are talking about a contractual
5 arrangement that is different from the one that we have
6 in front of us, is it not?
7          MR. MILLER: The agreement does provide
8 access to documents for five years following the date of
9 the termination of the agreement.
10         SPECIAL MASTER POPPITI: Unfettered.
11         MR. MILLER: The way I interpret that is
12 these agreements are made and then added on for each
13 product, so it would be five years after the termination
14 of the, essentially, the production of a particular
15 product, they would be available, as opposed to building
16 some library if you had a 15-year relationship that would
17 be, you know, at the end of that additional five years,
18 at the end of that 15-year relationship, it would be a
19 seriatim moving five-year period for each product.
20         SPECIAL MASTER POPPITI: Well, if that's
21 the case, then it may be, and if it is seriatim, it may
22 be that it ends after that five-year -- five years after
23 the product is no longer in production. It is still,
24 however, with respect to each product, five years after

Page 43

1 the date when you need the information for purposes of
2 producing the product; correct?
3          MR. MILLER: Well, I am hesitating
4 because "need" is a difficult word there.
5          SPECIAL MASTER POPPITI: How about want?
6 I said "need." That was not a well thought out word.
7 They want it. They just simply want it.
8          MR. MILLER: Viewsonic has, you know, as
9 any retailer, as any producer of product does, has
10 warranty obligations that would extend beyond, you know,
11 for the products produced at the end of the life, would
12 continue on beyond the production.
13         SPECIAL MASTER POPPITI: I understand
14 that. That's not the way the contract reads, is it?
15         MR. MILLER: I think Viewsonic has the
16 right to acquire those records as is necessary for its
17 business purposes, and one of those would, obviously, be
18 for filling warranty or servicing obligations post end of
19 production of a product, in my mind. And is this
20 contract different from the contract Novartis had?, I
21 don't know because the Novartis says that the case
22 articulates a circumstance where the party was entitled
23 to more information, had a legal right to obtain these
24 documents pursuant to the product royalty agreement, so,

Page 44

1 for all I know, they had a very broad recitation of
2 rights.
3          And, in my mind, if I am a company
4 that's submitting information to the FDA for approval, I
5 would envision that, if I encountered that expense and
6 gone through that trouble, I would probably have a
7 contract right that would give me rights to more
8 information than what I submitted, but if the FDA
9 required additional backup information, and/or I needed
10 it for my business purpose, I would have a right to get
11 it.
12         SPECIAL MASTER POPPITI: Well, I guess
13 my problem -- and I don't want to beat a dead horse, I
14 think I understand your respective positions, but just an
15 observation -- I understand that it is LPL's burden, in
16 the first instance, but I also understand that if LPL is
17 saying, Look at this language and look at this language
18 in the context of the entire contract, which I will have
19 the opportunity to look at, and if their focus is on
20 particular language and it is unfettered, then doesn't it
21 become your responsibility to point out other language in
22 the contract which suggests that it is only for the
23 practical use of that information?
24         And if you do that and if you can fit

Page 45

1 into language in the contract that suggests that it is
2 only for the practical use, either during production or
3 after production, when there are issues with respect to
4 warranties, then it may be that you fit into the teaching
5 of Novartis.
6          But it seems to me, at some point, the
7 burden shifts back to you to say, You know, Vincent, you
8 need to be looking at other stuff here in this contract,
9 and this other information and the other language in the
10 contract points to access for a practical purpose, that
11 is, a business purpose.
12         MR. MILLER: Your Honor, we are happy
13 to --
14         SPECIAL MASTER POPPITI: You have got
15 the contracts.
16         MR. MILLER: We are happy to do that,
17 sure. I guess the question I have is: Is the standard
18 here, which I had understood the standard, as articulated
19 by Judge Farnan, to be the case where the entity's
20 relationship is so intertwined as to render meaningless
21 their separate corporate identities, because I am happy
22 to submit information that shows that that is the case,
23 or is it just that we have a right to obtain these
24 documents pursuant to this agreement?

Page 46

1    I think those -- to me, those are very
2    different standards and I would look for some guidance in
3    terms of what we are looking for here would be helpful so
4    that if we -- so that we could make a submission that
5    would address your particular needs.
6        SPECIAL MASTER POPPITI: Well, I think
7    the answer is they are certainly different standards,
8    but, in my view, as I suggested earlier in our colloquy
9    here today, I think a focus on the relationship of the
10   entities is sufficient but not necessary.
11       In Novartis, Judge Farnan says, at page
12   -- well, the page isn't going to help you -- at note 11,
13   it is on page 3 of the Lexus site, bottom of the final
14   full paragraph on that page, "Rather, the pertinent issue
15   is whether AOL and EarthLink have the legal right to
16   obtain the information at issue."
17       And I keep coming back to that. That
18   seems to be the benchmark. And if legal right is framed
19   in the context of entity relationships, so be it, but if
20   a legal right is framed in the context of a contractual
21   relationship, how do I ignore the fact that -- and I
22   don't know whether you agree with me or not -- a
23   contract, a valid contract, as between two parties, two
24   entities, confers legal rights. And if the legal right

Page 47

1    that's conferred is unfettered access to documents, not
2    couched in terms of access for a practical business use,
3    why isn't that a legal right to obtain the information at
4    issue?
5        MR. MILLER: Your Honor, I think you
6    were quoting from the Inline case, which was Magistrate
7    Thynge's, in terms of the legal right question?
8        SPECIAL MASTER POPPITI: I was. I am
9    sorry, I was.
10       MR. MILLER: If, by continuing on in the
11   same section from where you were, you are correct, it
12   says, "The pertinent issue is whether AOL and EarthLink
13   have the legal right to obtain the information at issue."
14       SPECIAL MASTER POPPITI: Right.
15       MR. MILLER: The very next paragraph,
16   which flows onto the following page, discusses the fact
17   that the parties deal on a competitive arm's length
18   basis.
19       SPECIAL MASTER POPPITI: Yes, it does.
20       MR. MILLER: And goes on, and, at the
21   very end of that provision, end of that section, down by
22   note 12, it concludes with, "Those facts evidence that
23   the business operations of the TELCOS and AOL and
24   EarthLink are not so intertwined as to evaporate their

Page 48

1    separate corporate identities."
2        I think what magistrate Thynge is saying
3    here, as I read this, is she is looking at the question
4    of: Do they have a right? And once you look at the
5    evaluation of that right, you must put it into the
6    context of whether that right is at a level that it does
7    evaporate to the separate corporate identities based on
8    the nature of the relationship, and these are arm's
9    length transactions.
10       SPECIAL MASTER POPPITI: Let's finish on
11   with, perhaps, her ultimate statement here at the next
12   paragraph, "Moreover, as noted in Novartis, a contract
13   provision which merely authorizes," and I just think that
14   that means practical use, "the party/litigants access to
15   information that is in possession of the non-party
16   without more is insufficient to establish legal control
17   in the Third Circuit."
18       And I am inclined to read her "without
19   more" as referencing back to the fact that there was no
20   contractual provision that provided unfettered access. I
21   don't know how to read it any other way in light of the
22   language that she chose to use at page -- at note ten and
23   then beyond note 12.
24       MR. MILLER: When I read that "without

Page 49

1    more," I read it as referring back to the statement that
2    she concluded that paragraph with, which was that, in an
3    arm's length transaction where the relationships are not
4    so intertwined as to evaporate their separate corporate
5    identities, that's the reference back, in my mind.
6        SPECIAL MASTER POPPITI: I understand,
7    sir.
8        MS. BRZEZYSKI: If I just might add
9    right there, I agree with your reading of that provision,
10   and I also note, in the prior paragraph that Mr. Miller
11   cites to about AOL and EarthLink being not so
12   intertwined, I will suggest that, you know, that
13   paragraph refers to a specific example where two of the
14   telephone companies, the TELCOSs, SBC and Quest actually
15   refused to provide information to AOL. And I think it's
16   in that context that is very much distinguishable from
17   this case where there has been no examples of any refusal
18   by Jean or any other OEM to provide this information.
19   And, here, we don't have Viewsonic competing with Jean or
20   any of its other OEMs. They are closely working together
21   to manufacture these products.
22       SPECIAL MASTER POPPITI: Okay.
23       MR. MILLER: Your Honor, I think that,
24   of course, raises the reason why the evaporation of the

Hearing

14 (Pages 50 to 53)

Page 50

1  corporate separate identities is so important because,
2  otherwise, what's the enforcement mechanism that would be
3  employed if we are compelled -- if Viewsonic or any
4  company is compelled to obtain documents from a
5  recalcitrant supplier if we are not -- if our
6  relationships are not so intertwined as to, essentially,
7  say that there is no separate corporate identity, we
8  can't force those documents into the United States
9  because we don't control Jean.
10         We don't have the ability to dictate to
11  these independent third-party companies, and, certainly,
12  LPL hasn't, you know, submitted any suggestion that we
13  do, to compel them to step forward with this information.
14         SPECIAL MASTER POPPITI: Well, but
15  that's a question that I don't need to answer now, is it?
16  I mean, if -- first of all, posit for me that you have --
17  forget the conversation we have had up to this point, but
18  if I posit to you and you accept the proposition that you
19  have an absolute right to these documents at any time for
20  absolutely no reason whatsoever, and if I conclude that
21  is a contractual right, do I need to be concerned about
22  what happens when that right is asserted?
23         I mean, I don't think I do. I mean, it
24  may very well be that LPL -- that you -- that I direct

Page 51

1  that you assert your right, because you have control of
2  it, and it may very well be that each of your OEMs says,
3  you know, respectfully, Pack sand, we are not going to
4  honor the contract, and I don't know where we are then.
5         MR. MILLER: But I think that's exactly
6  why the standard is, as articulated in both Inline and
7  Novartis, that the relationship has to be so intertwined
8  as to indicate that there is no separate corporate
9  identity and a mere contract provision giving you the
10  right to access those information is not enough under the
11  Third Circuit law because you don't want to put a party
12  in a position of facing potential contempt sanctions
13  because they have a contract right that is not -- that a
14  party won't live up to.
15         SPECIAL MASTER POPPITI: You are not
16  suggesting that if you -- if you comply with a direction
17  to assert your right and your OEM says, Sorry, we are not
18  going to comply, that it would be appropriate to sanction
19  your client, are you?
20         MR. MILLER: That's my great fear, Your
21  Honor. I don't want to be in a situation where I am --
22  my client is facing sanctions because if these documents
23  are in my client's, quote, control, then what is the, you
24  know, what's the justification for not forcing them to

Page 52

1  produce them? That's why I think the standard is what it
2  is, which is this interrelationship between these
3  entities that there is no separateness in order to force
4  a control because, otherwise, I'd be in exactly that
5  paradox.
6         SPECIAL MASTER POPPITI: Let me do this:
7  If you are satisfied with your record at this point, then
8  the record on this issue is closed.
9         If you are inclined to go back and tell
10  me whether there is more focused Third Circuit decisional
11  law dealing with specifically issues of contractual
12  rights and how and whether the Third Circuit
13  distinguishes those from those cases where there are
14  intertwined corporate entities, then I'd like to be aware
15  of it.
16         I do have one question of LPL, and I
17  think I know the answer to it, but: Why didn't you
18  pursue this through third-party discovery?
19         MS. BRZEZYSKI: Your Honor, our first
20  course of action was to attempt to get these documents
21  through Viewsonic. We believe Viewsonic, as stated in
22  our papers and oral argument today, has the absolute
23  right to these documents, that Viewsonic has misstated
24  the standard in the Third Circuit. And I think that

Page 53

1  Viewsonic is really -- is getting ahead of itself where
2  they have not even attempted to request or obtain these
3  documents from its OEMs. You know, by now suggesting
4  that there may be, possibly, a dispute by its OEMs, that
5  has not even been presented yet, is clearly premature.
6         Also, Your Honor, these OEMs are foreign
7  entities in Taiwan, and, certainly, service of
8  third-party subpoenas would be extremely difficult and
9  would likely not be available within the confines of our
10  discovery schedule.
11         SPECIAL MASTER POPPITI: And I expected
12  you would say that. I would make one other observation:
13  If I come down on the side of LPL and propose, in finding
14  and recommendations to the Court, that there is control,
15  and if the Court accepts that, and if an issue winds up
16  back on my desk with respect to the third parties
17  abrogating their responsibility under the contract, the
18  only thing I certainly would expect you would find me
19  asking for is the nature of the request made and expect
20  that the nature of that request is a pure and simple
21  request, and that there is nothing that is in the file or
22  the developed file which would suggest that the -- that
23  Viewsonic was standing in the way of that production
24  and/or suggesting that the OEMs be recalcitrant.

Page 54

1  But, in any event, I will take the
2  matter under advisement and issue a proposed finding and
3  recommendation.
4       MS. MASON: Your Honor, we would like
5  the opportunity to submit the additional case law, as
6  Your Honor suggested, together with the right to identify
7  the additional contract terms.
8       SPECIAL MASTER POPPITI: Yeah. I want
9  you to do that because I put you on a short time frame
10 last week. I think I asked for you to do it in the
11 morning session. You all did me the courtesy of doing it
12 by the lunch break, and I know it was a request under a
13 little bit of pressure.
14      I will want both sides to have the
15 opportunity to give me any further thoughts on it. I'd
16 like it done in rather short order, and I'd like to hear
17 a proposal with respect to that.
18      MS. MASON: Your Honor, I am sorry, I am
19 just pulling out the calendar. Would a week from today
20 be acceptable? And I would propose if it's
21 supplementation, that the parties could make a
22 contemporaneous submission unless Your Honor thinks
23 otherwise.
24      SPECIAL MASTER POPPITI: No,

Page 55

1  contemporaneous makes senses. Let's just talk about the
2  date.
3       MS. MASON: How about January 10th, Your
4  Honor?
5       MS. BRZEZYSKI: Your Honor, I think that
6  we can do this much sooner and I would prefer by Monday,
7  the 8th.
8       Also, Your Honor, I am not aware of any
9  other controlling authority in the Third Circuit, any
10 other cases.
11      SPECIAL MASTER POPPITI: Well, if there
12 isn't, then Miss Mason's submittal will be very short.
13      MS. BRZEZYSKI: I am certainly not aware
14 of any, and I would certainly like the opportunity to
15 respond if Ms. Mason were to come forth with any cases in
16 the Third Circuit or elsewhere, but I am not aware of any
17 other controlling authority from the Third Circuit.
18      SPECIAL MASTER POPPITI: I expect that
19 you all are much more adept at ferreting out, through
20 legal research, Third Circuit cases that apply. You are
21 much better at doing that than the person that's talking
22 to you on this side of the phone, so I am going to
23 require that there be a supplemental and it be
24 simultaneous, and knowing I am going to be in a position

Page 56

1  of writing something, doing it by the 10th is not going
2  to forestall my getting something to you in short order
3  due course. So, the 10th, end of business, is fine.
4       MS. BRZEZYSKI: Your Honor, can we agree
5  on a two-page page limit?
6       SPECIAL MASTER POPPITI: Yeah. I see no
7  reason why you shouldn't be able to do what you have done
8  before, two pages and attach the authority if there is
9  any authority to be had.
10      MS. MASON: Thank you, Your Honor. When
11 you say "close of business," is five p.m. acceptable?
12      SPECIAL MASTER POPPITI: Five p.m. is
13 acceptable.
14      MS. MASON: Thank you.
15      SPECIAL MASTER POPPITI: Thank you.
16 Okay. Let me just go off record for a moment so I can
17 take some stock of where we are, please.
18      (Off the record.)
19      SPECIAL MASTER POPPITI: Counsel, we are
20 back on. I believe that that covers the field of what we
21 intended to accomplish.
22      I know that I have got several matters
23 that I reserved for consideration and ultimate writing on
24 proposed findings of fact and conclusions, and if you all

Page 57

1  agree with me that that is the case, I just want to make
2  sure that we circle back through the January 3rd document
3  and make sure everything is covered that will, of course,
4  be supplemented, and I would ask counsel to do me the
5  courtesy of what you did for January 3 for today.
6       Am I accurate in suggesting that we have
7  accomplished what we set out to do?
8       MR. CHRISTENSON: Your Honor, there are,
9  I believe, two essential follow-up items from our prior
10 discussion. The first was you had indicated that you may
11 want to circle back --
12      SPECIAL MASTER POPPITI: I did.
13      MR. CHRISTENSON: -- to the inducement
14 and damages issues that we discussed.
15      SPECIAL MASTER POPPITI: I did.
16      MR. CHRISTENSON: And, so, I don't know
17 if that's something you want to discuss further or if
18 that's just going to be something that we will hear from
19 you on in your order?
20      SPECIAL MASTER POPPITI: I think I
21 recall asking you whether your respective records were
22 what you wanted them to be, and expecting that that is
23 the case, I just want to deal with that in my ultimate
24 order.