# EXHIBIT 4
# Part 1

ViewSonic Confidential    OEM Agreement, V8.0    July 25, 2001

# OEM Agreement Table of Contents

A. RECITAL ........................................................................................................................ 2

B. AGREEMENT ................................................................................................................ 2

C. REPRESENTATIONS, GRANT OF RIGHTS ........................................................... 3

D. TERM AND TERMINATION ....................................................................................... 3

E. PERFORMANCE ........................................................................................................... 4

F. NOTICE ........................................................................................................................ 11

G. EXHIBITS, APPENDICES & ENCLOSED DOCUMENTS .................................... 13

EXHIBIT 1: GENERAL PROGRAM SUMMARY (GPS) ............................................ 15

EXHIBIT 2: PRODUCT DEVELOPMENT GUIDELINES ......................................... 21

EXHIBIT 3: SUPPLY CHAIN MANAGEMENT .......................................................... 24

EXHIBIT 4: PRODUCT QUALITY POLICY ............................................................... 29

EXHIBIT 5: WORLDWIDE SERVICE AND SPARE PARTS POLICY ..................... 41

EXHIBIT 6: REGIONAL SERVICE AND SPARE PARTS POLICY .......................... 49

EXHIBIT 7: LOGO LICENSE AGREEMENT .............................................................. 56

EXHIBIT 8: REWARDS AND PENALTIES ................................................................. 60

Supplier _____ ; ViewSonic _____

VS025137

ViewSonic Confidential
OEM Agreement, V8.0                                July 25, 2001

## OEM Agreement

between ViewSonic Corporation

and _____ COMPANY

THIS AGREEMENT is made and entered into as of the date of execution (the "Effective Date") by and between ViewSonic Corporation, a Delaware corporation, with offices at 381 Brea Canyon Road, Walnut, California 91789, (hereinafter, "ViewSonic") and Jean Company, Ltd., a Taiwan corporation, with offices located at 7F, 2, Rei Kuang Road, Nei Hu, Taipei, Taiwan, R.O.C. (hereinafter, "Supplier").

## A. Recital

WHEREAS, Supplier is engaged in the design and manufacture of certain computer display products;

AND WHEREAS, ViewSonic desires to purchase from Supplier products as described herein, under the terms and conditions set forth in this Agreement.

## B. Agreement

NOW, THEREFORE, in consideration of the mutual premises and covenants herein contained, the parties hereto agree as follows:

1. All terms and conditions stated in the Exhibits and Appendices attached hereto are hereby incorporated by this reference as though fully set forth herein. This document, including all Exhibits and Appendices attached hereto, are hereinafter collectively referred to as the "Agreement".

2. Whenever used in this Agreement, unless otherwise clearly required by the context, the following terms shall have the meanings set forth in this article and no other:

    a. "ViewSonic" means ViewSonic Corporation, including all subsidiaries, affiliates, and offices worldwide. ViewSonic regional offices are referred to as "VSA" for ViewSonic America, "VSE" for ViewSonic Europe and "VSAP" for ViewSonic Asia.

    b. The term "Product(s)" shall mean those products designed or manufactured by Supplier that are the subject of this Agreement and identified in the General Program Summary (hereinafter, "GPS") previously executed between the parties and attached hereto and hereby incorporated herein as Exhibit I.

    c. The term "Specification(s)" shall mean Product specifications, inspection specifications, packaging specifications, and other written specifications as may be agreed upon from time to time between the parties.

    d. The term "Tooling" shall mean special tooling procured on behalf of, or provided by, ViewSonic for the manufacture of the Products.

Supplier _____ ViewSonic _____

VS025138

e. The term "Parts" shall mean repair and replacement parts, including kits necessary for the repair and alignment of the Products.

f. The term "Penalty" or "Penalties" refer to provision(s) in this Agreement which are important to the business relationship between ViewSonic and the Supplier and which grant to ViewSonic specific contractual remedies in the event that Supplier fails to comply with these provision(s).

g. The term "Quarterly Review Item(s)" refer to provisions which are important to ViewSonic but for which there are no specific penalties for non-compliance by the Supplier; rather, non-compliance will be noted and will be reflected on Supplier's quarterly performance report and will negatively impact Supplier's rating.

## C. Representations, Grant of Rights

1. Supplier hereby represents that it has the exclusive right to grant to ViewSonic worldwide rights to market and sell the Product, that Supplier hereby grants and ViewSonic hereby accepts such grant of worldwide rights to market and sell the Product, under the terms and conditions of this Agreement.
2. Supplier shall support and service the Product in all ViewSonic markets as may be designated from time to time.
3. Supplier shall use its best efforts to avoid any market conflict among all customers, including their own brands, and ViewSonic.
4. Supplier shall at all times use commercially reasonable efforts to ensure its partnership support under this Agreement, and unless due to force majeure or absent the prior written consent of ViewSonic, shall not permit any interrupted supply, including but not limited to mass production schedule delay, shipment cancellation, shipment delays or on hold, and/or reduction of allocation of quantity to ViewSonic, otherwise Supplier shall be responsible for any of ViewSonic's losses resulting therefrom.
5. Supplier, shall upon written request of ViewSonic, promptly execute a waiver as may, from time to time, be required from ViewSonic's lender; it being fully understood that said waiver may, among other things, require Supplier to subordinate its security interest in favor of ViewSonic's lender.

## D. Term and Termination

1. The term of this Agreement shall be for a period of one (1) year, beginning on the Effective Date. Thereafter, this Agreement will automatically renew for successive one (1) year of terms, unless terminated sooner as provided by the terms of this Agreement.
2. Either party may terminate this Agreement without cause, by giving ninety (90) days written notice to the other party.
3. This Agreement may be immediately terminated in whole or in part by either party without notice should either party:

a. Claim or suffer bankruptcy, insolvency, provisional seizure, disposition, compulsory execution or other exigent circumstances reasonably bringing the party's continued ability to perform any provision of the Agreement into doubt;

b. Enter into liquidation, or company rehabilitation;

Supplier ____  ViewSonic ____

   c.  Sell, lease, exchange or otherwise dispose of substantially all of its business or assets;

   d.  Merge or consolidate into another corporate entity; or

   e.  Fail to remedy any breach or non-performance of this Agreement within thirty (30) days of written notice of protest from the non-breaching party that specifies the nature of the breach or non-performance.

4.  In the event of termination by ViewSonic under Section D, Subsection 3, ViewSonic, in its sole discretion will have the option of requiring Supplier to fulfill any or all open purchase orders or to cancel any or all open purchase orders.

5.  Upon termination for any reason, Supplier will continue to provide service and spare parts per the terms of Exhibits 5 and 6 as attached hereto and hereby incorporated.

# E. Performance

**1.0    Tooling**

1.1  If Tooling is required under the terms of this Agreement, the cost shall be negotiated between the parties prior to the issuance of any purchase order or other commitment.

1.2  Supplier hereby acknowledges and agrees that Tooling manufactured pursuant to this Agreement and all associated Tooling documentation shall be considered proprietary to ViewSonic and the sole property of ViewSonic. Tooling documentation shall be archived at Supplier's Corporate office, and be accessible to ViewSonic at all times. Supplier further agrees that it will not use Tooling or Tooling documentation for any purpose other than that contemplated by this Agreement.

1.3  Supplier shall provide proper storage for Tooling during times that it is not in use.  Such proper storage shall provide protection against damage or decay while not in use.

1.4  Supplier shall, at its own cost and expense, provide routine maintenance for the proper operation of the Tooling, during the term of this Agreement.

1.5  The authorization for Tooling manufacture or procurement shall be in the form of a purchase order or written approval issued by ViewSonic to Supplier and setting forth: (a) the description and specification of the Tooling, (b) the previously agreed upon price, (c) the negotiated completion or delivery date, and (d) the payment terms.  Unless otherwise agreed upon in writing between ViewSonic and Supplier, the Tooling cost will be amortized into the Product price.

1.6  Tooling costs that cannot be amortized into the Product price, will be paid by ViewSonic to Supplier at the agreed upon price by means of an official telegraphic transfer remittance following confirmation of the satisfactory results of a mass production run. Final payment shall be authorized only following the shipment and acceptance of the first one thousand (1,000) units.

1.7  In the event of termination of this Agreement, and upon written request from ViewSonic, Supplier shall, at its own expense and using commercially reasonable standards, pack, prepare, and ship Tooling per

Supplier ____; ViewSonic ____

ViewSonic's instructions within thirty (30) days of said written request. If Supplier fails to ship Tooling as instructed by ViewSonic, Supplier shall be responsible for all costs and expenses resulting from such failure. In addition, if Tooling consists of or incorporates ViewSonic's proprietary intellectual property, ViewSonic will be entitled to seek injunctive relief to prevent Supplier from using such Tooling.

1.8 Upon any termination, each party shall promptly return to the other any materials or property in its possession or custody supplied or belonging to the other party in connection with this Agreement.

## 2.0    Price

2.1 Pricing for Products deliverable under this Agreement are specified in Exhibit 1 (General Program Summary), as may be amended by the parties through means of written confirmation. Supplier will provide forward Product pricing on a rolling basis for a mutually agreed upon period of time. Forward Product pricing is intended to facilitate planning for any future price fluctuations in key component materials costs, manufacturing costs, and market dynamics. If Supplier fails to provide forward pricing, ViewSonic may, in its sole discretion, cancel any orders, in whole or in part, that will be subject to any price increase.

2.2 In the event of an increase in Product pricing, Supplier must provide ViewSonic ninety (90) days prior written notice. Such increase shall not apply to orders accepted by Supplier prior to such notice, nor to orders scheduled for shipment within the notice period. Supplier will not increase the cost of the Products purchased by ViewSonic. Under certain situations, such as an industry-wide key component cost increase, ViewSonic is willing to discuss and may agree to the cost increase with less than ninety (90) days notice, provided (1) such increase applies to all of Supplier's customers; (2) ViewSonic is the last (of all of Supplier's customers) to be affected by such increase; and (3) Supplier has demonstrated any such cost increase in writing with documentation satisfactory to ViewSonic. If ViewSonic discovers that Supplier has not complied with the preceding requirement, ViewSonic may request that an independent third party audit Supplier upon reasonable written notice and during normal business hours, in order to determine the lowest price offered by Supplier to its customers similarly situated to ViewSonic. Upon completion of the audit, ViewSonic will advise Supplier of the results and Supplier will adjust the price to the lowest price offered and reimburse or credit ViewSonic for the difference between this price and the price charged to ViewSonic.

2.3 ViewSonic retains the right to cancel or modify any order that will be subject to a price increase, without cost or obligation.

2.4 Supplier may decrease the price for Products at any time and shall provide written notice to ViewSonic within ten (10) business days of any price decrease. Any key component cost savings shall be passed through to ViewSonic. Price decreases shall be effective as of the date stated in the written notice from Supplier and shall apply to all orders accepted but not shipped by Supplier.

2.5 Supplier warrants at all times that the Product prices offered pursuant to this Agreement are the lowest prices available to any customer to whom Supplier sells in same similar specifications, and under same or similar terms and conditions. In addition, upon request from ViewSonic, Supplier will adjust its price to meet any price offered by a competitor. ViewSonic reserves the right to audit Supplier's compliance of this term. In the event that Supplier provides a combination of prices and terms which are more favorable to another of its customers, ViewSonic shall be entitled to a reduction retroactive to the date

Supplier _____ ; ViewSonic _____

VS025141

that the more favorable price and terms were made available to other customers. If ViewSonic discovers that Supplier breached the terms of this provision, ViewSonic, in its sole discretion, will be entitled to offset future purchases to recover the difference in price paid, to deduct the difference from any outstanding invoices, or to require Supplier to pay the price difference.

## 3.0    Payment

3.1 Payment for Product received shall be due as per the terms set in Exhibit 1. The invoice (hereinafter, "Invoice") will include, but not be limited to:

- A signed commercial invoice prepared in duplicate;

- A packing list in duplicate;

- An electronic file and printed list of serial numbers; and

- An original truck Bill of Lading.

3.2 All documents must be original versions. ViewSonic shall not be obligated to make payment against any Invoice unless Supplier has provided the original documents as set forth in Section 3.1, and ViewSonic shall not be deemed in default for non-payment of any Invoice that is submitted without the information required by Section 3.1.

3.3 In the event ViewSonic rejects Product pursuant to this Agreement, or Incoming Quality Control (hereinafter, "IQC") failure occurs, ViewSonic will not be deemed in default for any unpaid Invoice until said Product is repaired or replaced according to the terms of this Agreement. ViewSonic shall have the right to defer payment, and no interest will accrue on such deferred payments until repair or replacement is effected. ViewSonic reserves the right to charge Supplier for any business loss and out of pocket expenses incurred which may result when remedial repair or replacement cannot be completed in a timely manner.

3.4 Unless otherwise agreed upon in writing between the parties, all payments from ViewSonic to Supplier will be made in U.S. dollars.

3.5 Debit memos or other financial documents (e.g. invoices) will be issued for various reasons, including but not limited to non-compliance with the terms of this Agreement. These chargeable amounts will be pre-coordinated with Supplier before ViewSonic issues the debit memo as detailed in this Agreement. If full payment of the debit memo amount is not received within fifteen (15) calendar days, ViewSonic is entitled to deduct the entire amount from any outstanding invoice due to Supplier without further notice. If Supplier disputes any debit memo amount, Supplier shall be entitled to withhold only the amount in dispute until such time as the parties can resolve such dispute. Supplier shall pay the entire undisputed amount within fifteen (15) days of the date of the debit memo or ViewSonic will be entitled to deduct this undisputed amount from any outstanding invoice due to Supplier. ViewSonic will be entitled to 1     (one and one-half percent) interest or the maximum interest permitted by law, whichever is less, accruing from the due date on any disputed amounts that are determined to have been owed by Supplier.

## 4.0    Warranty

Supplier _____; ViewSonic _____

4.1 Supplier warrants that title to Products, when conveyed to ViewSonic is good, that the transfer is lawful and that Products are delivered free from any security interest or encumbrance.

4.2 Supplier warrants and represents that neither the Products nor their use infringe upon any patents, copyrights, trademarks, trade secrets, or other proprietary rights of others, and that there are no suits or proceedings pending or threatened which allege that any Product or the use thereof infringes upon such proprietary rights.

4.3 Supplier warrants that Parts and Products will be free from defects in design, materials and workmanship for the period of time as agreed upon in Exhibit 1, from the date of shipment. Supplier warrants that the Products conform to the Specifications. Supplier agrees that such warranties are made for the benefit of ViewSonic, its distributors, dealers and customers. ViewSonic shall charge Supplier for the costs incurred by ViewSonic for the return and repair of Products within the warranty period.

4.4 In the event Supplier or ViewSonic recalls any or all of the Products due to defects, revisions, or upgrades, each party shall provide reasonable assistance to the other with such recall; provided that Supplier shall pay all of ViewSonic's associated expenses in connection with such recall, including, but not limited to, handling charges for each unit of Product.

## 5.0    Indemnification

5.1 Supplier shall defend, indemnify, and hold harmless ViewSonic, its officers, directors, employees, successors and assigns from and against any claims, demands, liabilities, or expenses (including reasonable attorneys' fees and costs) for any injury or damage, including, but not limited to any personal or bodily injury or property damage, arising out of or resulting in any way from any defect in the Products, or arising out of any use of, or inability to use, the Products. This duty to indemnify ViewSonic shall be in addition to the warranty obligations of Supplier and includes indemnification for the following:

5.1.1 any injury or damage, including, but not limited to any personal or bodily injury or property damage, arising out of or resulting in any way from any defect in the Products, or arising out of any use of, or inability to use, the Products.

5.1.2 all damages and costs incurred by ViewSonic arising from the infringement of any patents, copyrights, trademarks, trade secrets, or other proprietary rights in the manufacture or marketing of the Products.

5.1.3 any and all claims, actions, damages, demands, liabilities, costs and expenses, including reasonable attorneys' fee and expenses, resulting from any act or omission of Supplier or its employees, that causes or results in property damage, personal injury or death.

5.2 If there is a claim made or threatened, Supplier may, at its expense and option, either procure the right to continue using any part of Product, replace same with a non-infringing Product, or modify Product such that it is non-infringing; provided that, if within ninety (90) days after a claim has been made, Supplier has not procured such right, replaced the Product, or modified the Product so that it does not infringe, ViewSonic shall have the right, but not the obligation to: (a) return the unused Product and Supplier shall buy back all such Products at the original purchase price less depreciation calculated on a straight line basis over two (2) years, and/or (b) negotiate independently to obtain a license to render the Product

Supplier _____ ; ViewSonic _____

VS025143

non-infringing and assess the costs, including reasonable attorney's fees, to Supplier.

5.3 If a lawsuit is instituted against ViewSonic claiming intellectual property infringement, Supplier shall immediately provide ViewSonic with acceptable proof of non-infringement. If Supplier is unable to provide such proof, Supplier may, at its option, intervene by substituting itself as a defendant in place of ViewSonic in such suit. If Supplier chooses not to intervene, Supplier shall indemnify ViewSonic for all fees, costs, and expenses incurred by ViewSonic under the following terms:

5.3.1 ViewSonic shall have the right to engage counsel of its choosing that ViewSonic deems, in its sole discretion, to be necessary for a competent defense of the suit.

5.3.2 ViewSonic shall pay all legal fees and expenses incurred in defense of the suit as they become due. Supplier shall reimburse ViewSonic on a quarterly basis for such fees and expenses within thirty (30) days from date of invoice by ViewSonic. After thirty (30) days, ViewSonic will be entitled to deduct any unpaid invoice amount from any amounts owed by ViewSonic to Supplier. If Supplier wishes to dispute any invoice amount, Supplier shall submit payment in the full amount of the invoice and a written notice setting forth the basis for such dispute. If, after investigation, it is determined that Supplier is entitled to a refund of any portion of the invoice amount, ViewSonic will remit such refund to Supplier within fifteen (15) days of the final determination.

5.3.3 Supplier's reimbursement will be based upon its proportionate share of liability. If Supplier's Product is the only product accused, Supplier shall pay one hundred percent (100%) of all fees, costs and expenses incurred by ViewSonic. If Product supplied by other ViewSonic manufacturers is also accused, Supplier shall pay its proportionate share of all fees, costs and expenses based upon the type of remedy or license being sought. For example, if the license or remedy is to be assessed on a per unit basis, Supplier's reimbursement responsibility will be based upon the proportionate number of units sold or purchased by ViewSonic during each quarter expenses are incurred. If the license or remedy is to be assessed on a dollar amount, Supplier's reimbursement responsibility will be based upon the proportionate sales dollar figure for units sold by ViewSonic during each quarter expenses are incurred.

5.3.4 If Supplier decides to intervene after ViewSonic has incurred expenses, Supplier shall be responsible for its proportionate share of the fees, costs and expenses incurred by ViewSonic up to the date that Supplier's Motion to Intervene is granted by the court.

5.3.5 If ViewSonic, in its sole discretion, decides to settle the suit, then ViewSonic will notify Supplier of its decision. Supplier may only object to ViewSonic's decision to settle the suit if Supplier intervenes in the suit prior to ViewSonic's execution of a Settlement Agreement. Supplier shall reimburse ViewSonic for Supplier's proportionate share of any amounts agreed upon in the Settlement Agreement.

**6.0     Confidentiality**

6.1 During the performance of this Agreement, Supplier may have access to certain technical, financial, or business information, including, but not limited to, Product specifications, Product release schedules, Product pricing, forecasts, new product development, business plans, ViewSonic financial documentation, and customer lists (hereinafter referred to as, "Information") which ViewSonic regards as proprietary and confidential. Supplier acknowledges and agrees that such Information shall remain

Supplier _____ ViewSonic _____

the property of ViewSonic and will be kept and remain confidential for five (5) years following termination of this Agreement.

6.2 Supplier shall hold such Information in confidence and shall use at least as great a standard of care in protecting ViewSonic's Information as it uses to protect its own Information of like character, but in no event less than a reasonable degree of care. Supplier shall not disclose such Information to any third party without the prior written approval of ViewSonic, and shall return or destroy all such Information upon request of ViewSonic.

6.3 Supplier hereby acknowledges that this Agreement and the relationship between the parties is considered proprietary Information to ViewSonic, and Supplier agrees that it will exercise the highest degree of care to insure that this Information remains confidential between the parties.

6.4 Supplier will not use the Information to compete directly or indirectly with ViewSonic.

6.5 Supplier agrees that in the event of an unauthorized disclosure, ViewSonic may not have an adequate remedy at law to enforce its rights under this Agreement and therefore may seek injunctive or other equitable relief.

**7.0    Supplier Achievement Review**

Supplier's ability to meet the requirements of this Agreement, including all Exhibits attached hereto, will be reflected on Supplier's Quarterly and Annually achievement review. In addition to any other remedies stated herein, non-compliance with the provisions of this Agreement and any procedures or guidelines referred to in any Exhibit will negatively impact Supplier's rating.

**8.0    Market Conflict Management**

8.1 Supplier is responsible for maintaining an orderly market among Supplier's customers, in compliance with the laws and regulations of each governing country. This includes, but is not limited to, maintaining product differentiation, confidentiality of relationships, and professional discipline in the sales fields.

**9.0    Time Is Of The Essence**

TIME IS OF THE ESSENCE IN SUPPLIER'S SHIPMENT OF PRODUCTS TO VIEWSONIC. Accordingly, Supplier will deliver the Products to ViewSonic no later than the shipment date specified in the applicable Purchase Order.

**10.0    Miscellaneous**

10.1    <u>Force Majeure</u>. In the event of any failures or delays by either party hereto in the performance of all or any part of this Agreement due to acts of God, war, riot, insurrection, national emergency, strike, embargo, storm, earthquake, or other natural forces, or by the acts of anyone not a party to this Agreement, or by the inability to secure materials or transportation, then the party so affected shall be excused from any further performance for a period of time after the occurrence as may reasonably be necessary to remedy the effects of that occurrence, but in no event more than sixty (60) days. If any of the stated events should occur, Supplier shall promptly notify ViewSonic in writing as soon as commercially practicable, but in no event more than ten (10) business days and provide documentation evidencing such occurrence.

Supplier _____; ViewSonic _____

**10.2    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of California. The parties hereby consent to and submit to the jurisdiction of the federal and state courts located in the State of California and any action or suit under this Agreement shall only be brought by the parties in federal or state court with appropriate jurisdiction over the subject matter established or sitting in the State of California. The parties shall not raise in connection therewith, and hereby waive, any defenses based on the venue, the inconvenience of the forum, the lack of personal jurisdiction, the sufficiency of service of process or the like in any such action or suit brought in the State of California.

**10.3    Language.** This Agreement has been executed by the parties hereto in the English Language, and no translated version of this Agreement into other languages shall be controlling or binding upon any of the parties hereto.

**10.4    Attorneys' Fees.** In the event of any litigation between the parties hereto arising out of the obligations of the parties under this Agreement, or concerning the meaning or interpretation of any provision contained herein, the non-prevailing party shall pay the prevailing party's cost and expenses in such litigation or arbitration, including, without limitation, court costs, and reasonable attorneys' fees. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment or award shall also be recoverable against the judgment debtor, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.

**10.5    Severability.** A judicial determination that any provision of this Agreement is invalid, in whole or in part, shall not affect the enforceability of those provisions unaffected by the finding of invalidity.

**10.6    Assignment.** Neither party may assign this Agreement in whole or in part without the express written permission of the other party, which consent shall be in the sole and absolute discretion of the party from whom consent is sought. Any purported assignment made in contravention of this provision shall be deemed void *ab initio*.

**10.7    Non-Waiver.** The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the full rights to require such performance at any time thereafter. The waiver by either party of a breach of any provisions hereof shall not be taken, construed, or held to be a waiver of the provision itself or a waiver of any breach thereafter or a waiver of any other provision hereof.

**10.8    Export Controls.** Neither party will commit any act, or request the other party to omit any act, that would violate either the letter or spirit of the export control laws or regulation of the United States, or other export control laws, rules or regulations, and neither party shall fail to take any action reasonably within its capacity to assure compliance with such laws, rules or regulations. ViewSonic represents and warrants that it will not, either directly or indirectly, export, re-export or transship Products, Parts or technical data furnished in connection with this Agreement (hereinafter, "Commodities") in violation of any applicable export control laws promulgated and administered by the government of any country having jurisdiction over the parties or the transaction(s) contemplated herein. Supplier shall have the right to refuse to accept ViewSonic orders for Commodities, or to deliver Commodities, to fulfill any previously accepted ViewSonic order, if Supplier determines, in good faith, that such proposed sale would result in violation of any applicable export control law or regulation. Supplier shall notify ViewSonic in writing setting forth the basis of such determination and allow ViewSonic a reasonable amount of time to reply. In the event Supplier refuses to deliver Commodities to fulfill previously accepted ViewSonic order(s) as set forth in this Section, or the necessary export or re-export authorizations are not obtained within a reasonable period

Supplier _____; ViewSonic _____

VS025146

of time, Supplier may cancel the order without penalty.

10.9    <u>Document retention.</u> Supplier shall retain copies of, and provide ViewSonic access to, all records created or received during the performance under this Agreement, in hard and/or electronic copies, including records supplied by subcontracted third parties, for five (5) years following the date of termination of this Agreement. In the event that Supplier becomes insolvent or discontinues its business at any point in time while this provision is operative, Supplier shall immediately notify ViewSonic of this situation and provide ViewSonic with immediate access to the documents and the right to take possession, custody or control and remove the documents to a storage facility of ViewSonic's own choosing.

10.10   <u>Survivability.</u> Notwithstanding the termination or expiration of the term of this Agreement or any renewal period thereof, it is acknowledged and agreed that those rights and obligations which by their nature are intended to survive such expiration or earlier termination shall survive, including, without limiting the foregoing, the following provisions: Section D – 4 and 5; and Section E – 1.7, 1.8, 4.0, 5.0, 6.0, 10.2, 10.3, 10.4, 10.6, and 10.8

10.11   <u>Counterparts.</u> This Agreement may be executed in counterparts.

10.12   <u>Entire Agreement.</u>  This Agreement, including all Exhibits and attachments hereto constitute the entire Agreement between the parties pertaining to the subject matter hereof, and fully supersedes any and all prior or contemporaneous written or oral communications or agreements between the parties hereto respecting the subject matter hereof.  In addition, no amendment or modification to this Agreement shall be valid unless set forth in writing and signed by each of the parties.

## F. Notice

1.  All notices, requests, demands and other communications called for or contemplated hereunder shall be in writing and shall be deemed to have been duly given immediately upon personal delivery or five (5) days after mailing by U.S. certified or registered first-class mail prepaid, or the equivalent in Supplier's domicile country; or two (2) days after deposit with any nationally recognized overnight courier, with written verification of receipt, and addressed to the parties at the address set forth below:

To ViewSonic:                          To Supplier:

General Counsel                        *CONTACT NAME*
ViewSonic Corporation                  Jean Company, Ltd.
381 Brea Canyon Road                   7F, #2, Rei Kuang Road
Walnut, California 91789               Taipei, Taiwan, R.O.C.

IN WITNESS WHEREOF, an authorized representative of each party hereto has executed this Agreement as of the date first above written.

ViewSonic Corporation                  Supplier

_____              _____

Page 11 of 63                                          Supplier ___ ViewSonic ___

Signature

_James A. Morgan_
Printed Name

_CFO_
Title

_1-29-02_
Date

Signature

_Robert Wen_
Printed Name

_____
Title

_____
Date

Supplier _RW_; ViewSonic _BL_

VS025148

## G. Exhibits, Appendices & Enclosed Documents

### 1.0    Exhibits

Exhibit 1 – General Program Summary
Exhibit 2 – Product Development Guidelines
Exhibit 3 – Supply Chain Management
Exhibit 4 – Product Quality Policy
Exhibit 5 – Worldwide Service and Spare Parts Policy
Exhibit 6 – Regional Service and Spare Parts Policy
Exhibit 7 – Logo License Agreement
Exhibit 8 – Reward and Penalty Scheme

### 2.0    Appendices

Appendix A – Main Contact List
Appendix B – Product Development Schedule/Vendor Control Chart
Appendix C – Compliance Schedule Follow-up Form
Appendix D – Project Check List
       http://intradoc/intradoc/groups/public/documents/forms/vsc_form_263.pdf
Appendix E – Weekly Project Status
       http://intradoc/intradoc/groups/public/documents/forms/rf-017.pdf
Appendix F – Tooling Status Report
Appendix G – Sample Customs Document
Appendix I – Weekly WQA Report:
       HTTP://intradoc/intradoc/groups/public/documents/forms/wqa_report.pdf
Appendix J – STS Process Capability (Cp-Cpk) Performance Report:
       HTTP://intradoc/intradoc/groups/public/documents/forms/sts_tracking_record.pdf
Appendix K – RMA Process Flow
Appendix L – Electronic Interface Requirement for RMA Process
Appendix M – RMA Screening Report
Appendix N – BER Report

### 3.0    Enclosed Documents

Customer Experience Simulation Test (CEST)
       HTTP://intradoc/intradoc/groups/public/documents/specifications-general/cest_spec.pdf
Quality Policy Manual, Section 10:
       HTTP://intradoc/intradoc/groups/public/documents/policies/qm-10-v1.1.pdf
Quality Procedures Manual, Section 10:
       HTTP://intradoc/intradoc/groups/public/documents/procedures/qp-10-1-v1.1.pdf
       HTTP://intradoc/intradoc/groups/public/documents/procedures/qp-10-2-v1.1.pdf
       HTTP://intradoc/intradoc/groups/public/documents/procedures/qp-10-3-v1.1.pdf
       HTTP://intradoc/intradoc/groups/public/documents/procedures/qp-10-4-v1.1.pdf
Supplier Quality Policy, VCS-SQP-DOC-QC:
       HTTP://intradoc/intradoc/groups/public/documents/procedures/supplier_quality_policy.pdf

Supplier _____; ViewSonic _____

VS025149

Product Inspection Procedures, VSC-QC301:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vsc-qc301-v2.1.pdf

Product Quality Acceptance Criteria, CRT, VSC-QC302:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vsc-qc302-v2.0.pdf

Software Inspection Procedures, VSC-QC303:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vsc-qc303-v1.0.pdf

Parts Packaging Specifications:
> HTTP://intradoc/intradoc/groups/public/documents/specifications-general/parts_packaging_spec.pdf


Product Quality Acceptance Criteria, LCD Products:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/lcd_monitor_pqac.pdf

Product Quality Acceptance Criteria, Projector Products:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/projector-pqac.pdf

Product Quality Acceptance Criteria, Plasma Products :
> (TBD)

Product Quality Acceptance Criteria, Advanced Products:
> (TBD)

Customer Experience Simulation Test (CEST) Specification

Reliability Test Plan

Repair and Defect Code Handbook:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vscrdc001-v1.3.pdf

Service Manual Vendor Requirements Guide (VSCSCPSMVRG 1.1) Specification:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vscspcsmvrg-v1.0.pdf

Service Inventory Stock Specification (B Stock) for CRT Monitors:
> HTTP://intradoc/intradoc/groups/public/documents/specifications/display_product_classification.pdf

Service Inventory Stock Specification (B Stock) for LCD Monitors:
> HTTP://intradoc/intradoc/groups/public/documents/specifications/lcd_service_criteria_(b).pdf

Service Inventory Stock Specification (B Stock) for Projectors:
> HTTP://intradoc/intradoc/groups/public/documents/specifications/projector_service_criteria_(b).pdf

ViewSonic RMA Shipping and Receiving Guidelines:
> HTTP://intradoc/intradoc/groups/public/documents/procedures/vsc-rma--pro-01-v1.1.pdf

Supplier ___; ViewSonic ___

VS025150

ViewSonic Confidential                    OEM Agreement, V8.0                    July 25, 2001

## EXHIBIT 1: GENERAL PROGRAM SUMMARY (GPS)

1.0     PROGRAM ........................................................................................16
2.0     PROGRAM FEES (IF NOT INCLUDED IN THE COST ABOVE)...........................18
3.0     SUPPLY CHAIN MANAGEMENT ..................................................18
4.0     QUALITY ASSURANCE ...........................................................19
5.0     WARRANTY AND SERVICE .....................................................19

Supplier _____; ViewSonic _____

VS025151

# EXHIBIT 1: GENERAL PROGRAM SUMMARY (GPS)

This General Program Summary (hereinafter, "GPS") is an Addendum to the OEM Agreement between the parties and is governed by the terms of the OEM Agreement including all Exhibits thereto. The terms of this GPS are specific to the identified Product. In the event of conflict between the terms of this GPS and the OEM Agreement, the terms of the GPS control.

## 1.0    Program

**Item number/Product:**  _____

**Description/brief spec:**  _____

| Worldwide Models | M | E | P | A | J | G | |
|---|---|---|---|---|---|---|---|
| Geographic coverage | North America | Europe | Asia Pacific | Southern Hemisphere | Japan | Local China Supply | Global |
| Yes/No | | | | | | | |
| Variance | | | | | | | |

**Target Development Dates:**

| Models | M | E | P | A | J | G | Global |
|---|---|---|---|---|---|---|---|
| Mass Production | | | | | | | |
| VSA FCS | | | | | | | |
| VSE FCS | | | | | | | |
| VSAP FCS | | | | | | | |

**Safety-Regulatory Requirements: (*Supplier to apply for all noted requirements. Products not meeting the requirements will be rejected by ViewSonic as non-conforming goods.)**

| M Model | E Model | P, A, J Models | G Model | Option |
|---|---|---|---|---|
| UL | UL | CB | CCIB | NOM |
| FCC-B | FCC-B | VCCI | CCEE | TUV-S/IRAM |
| DHHS | DHHS | BSMI | | SABS |
| CSA/C-UL | CSA/C-UL | PSB | FCC-B | CCIB |
| ICES003 | ICES003 | C-TICK | CB | CCEE |
| CB | CB | Energy Star | | KMI-B |
| Energy Star | EMC/CE | | | MPRII |
| | TUV/GS | | | TCO95 |
| | TUV-ERGO | | | TCO99 |
| | NEMKO | | | Energy 2000 |
| | SEMKO | | | Others (specify) |

Supplier _____; ViewSonic _____

VS025152

ViewSonic Confidential                    OEM Agreement, V8.0                    July 25, 2001

| M Model | E Model | P, A, J Models | G Model | Option |
|---------|---------|---------------|---------|--------|
|         | DEMKO   |               |         |        |
|         | FIMKO   |               |         |        |
|         | Gost-R  |               |         |        |
|         | PCBC    |               |         |        |
|         | SASO    |               |         |        |
|         | ISO13406-1 |            |         |        |
|         | Energy Star |           |         |        |

**Bundled/Optional Accessory Requirements:**

| Accessories | Bundled/Optional |
|-------------|------------------|
| Bird logo plate | |
| Rear Bird Logo label | |
| CD ROM and Quick Start Guide | |
| INF Disk | |
| Mac adapter | |
| Point of Purchase (POP) sticker | |
| Video cards | |
| Projector soft case | |
| Projector remote control | |
| Software diskettes/CD (Please specify) | |
| Power Cable (Please specify) | |
| Video Cable (Please specify) | |
| Others (Please specify) | |

**Terms**        Costs stated below should include product, all bundled accessories and any program and/or development cost unless agreed separately.

**FOB (port)** US$, include all bundled accessories, Net **90** days:

| Models | M | E | P | A | J | G | Global |
|--------|---|---|---|---|---|---|--------|
| Cost   |   |   |   |   |   |   |        |

OR **Ex-hub (location)** US$, include all bundled accessories, Net **75** days:

| Models | M | E | P | A | J | G |
|--------|---|---|---|---|---|---|
| Location | | | | | | |
| Cost | | | | | | |
| Location | | | | | | |
| Cost | | | | | | |

**Warranty Period (Measured in months from date of manufacture):**

| Months | 18 | 27 | 39 | Other |
|--------|----|----|----|-------|

Page 17 of 63

Supplier ____  ViewSonic ____

VS025153

| Yes/No | | | | |
|---|---|---|---|---|
| | | | | |

**Optional accessories:**

| Accessories | FOB/X-hub | Cost | Warranty |
|---|---|---|---|
| - | | | |
| - | | | |
| - | | | |

**Non-binding Forecast (Units of production per month)**

| Months | M1 | M2 | M3 | M4 | M5 | M6 |
|---|---|---|---|---|---|---|
| VSA | | | | | | |
| VSE | | | | | | |
| VSAP | | | | | | |

**2.0     Program Fees (if not included in the cost above)**

| Item | Qty | Cost | Comments |
|---|---|---|---|
| Mock Up Sample | | | |
| EVT Sample | | | |
| DVT Sample | | | |
| DVT Qty for Reliability Verification | | | |
| PVT Sample | | | |
| PVT Qty for Assembly Verification | | | |
| PVT Qty for Reliability Verification | | | |
| Safety-Regulatory Compliance Fees | 1 Lot* | | * Lot identified above |
| Tooling | | | |
| Other development fees (specify) | | | |
| Other bundling accessories cost (specify) | | | |

**3.0     Supply Chain Management**

3.1    Products and samples will be shipped via ViewSonic approved carrier if freight is borne by ViewSonic. If Supplier ships via carrier that has not been approved by ViewSonic, Supplier will pay the difference between the price ViewSonic would have been charged by the approved carrier and the price paid to the non-approved carrier.  In addition, Supplier will bear the risk of loss for any Product carried by a non-approved carrier.

3.2    Destination of Product shipments:

      (A)    FOB
             VSA:
             VSE:
             VSAP:

3.3  ViewSonic will provide a non-binding 6-month rolling forecast and _____ Purchase Order (P.O.) for

Supplier _____; ViewSonic _____

VS025154

products to be purchased under FOB terms. Supplier will confirm shipment within 3 business days from the day of P.O. issuance.

3.4 Supplier will allow the following ramp up flexibility, from the date of ViewSonic's request.

| | |
|---|---|
| 3 - 4 weeks | 50% |
| 5 – 6 weeks | 75% |
| 7 – 8 weeks | 100% |

3.5 Air shipment, at Supplier's expense, is required for any shipment delayed beyond fifteen (15) calendar days from the agreed upon shipment date. ViewSonic reserves the right to cancel orders, without liability, should any delay extend beyond fifteen (15) days.

3.6 Supplier will ensure that shipments and documentation are in compliance with the applicable Customs requirements for the destination country if the Supplier is required to be the Importer of Record. If ViewSonic is assessed any fines or penalties due to Supplier's non-compliance with Customs requirements, Supplier will reimburse ViewSonic for such costs. If delivery of the Product is delayed due to Supplier's non-compliance, Supplier will reimburse ViewSonic for any costs incurred as a result of such delay, including but not limited to, costs of cover and lost profits.

**4.0    Quality Assurance**

4.1 ViewSonic has an established acceptance level for this Product, as follows:

_____ DPPM or less for _____ Products (field return failures measured against the total sales for the quarter in which ViewSonic sold the Product. Refer to OEM agreement Exhibit 4, Section 5.2).

4.2 Supplier shall participate in the Customer Experience Simulation Test (CEST).

Number of first production units in the CEST: _____
DPPM goal in this CEST: _____
(Refer to OEM agreement Exhibit 4, Section 5.4)

**5.0    Warranty and Service**

5.1 Supplier will provide, free of charge, an initial RMA swap pool for each new model to be used by ViewSonic to effect timely customer returns. The quantity of the pool, as detailed in the table below, is based on estimated field return ratios and sales forecasts over a six (6) month period. This pool size must meet ViewSonic's RMA usage for at least one (1) month. If the pool size does not meet ViewSonic's required needs, ViewSonic may pull new Product and debit Supplier as if the Product had been defective.

| RMA Pool Quantity by Model | VSA | VSE | VS AP | VSCN |
|---|---|---|---|---|
| Item number | | | | |

5.2 Each month, Supplier will provide reimbursement to ViewSonic or ViewSonic's ASPs to handle and repair RMA returns under warranty. If payment is not received within thirty (30) days, ViewSonic may

Supplier _____; ViewSonic _____

ViewSonic Confidential
OEM Agreement, V8.0
July 25, 2001

deduct the amount from any outstanding invoice. The following reimbursement rates (Labor, Parts, Freight and Handling included) will apply:

| Region | Reimbursement rate/unit |
|--------|--------------------------|
| VSA    |                          |
| VSE    |                          |
| VSAP   |                          |
| VSCN   |                          |

Supplier _____ ; ViewSonic _____

VS025156

# EXHIBIT 2: PRODUCT DEVELOPMENT GUIDELINES

1.0   NEW PRODUCTS.................................................................................................22

2.0   ENGINEERING CHANGES.....................................................................................23

3.0   PRODUCTION SITE CHANGES...............................................................................23

Supplier _____; ViewSonic _____

VS025157

# EXHIBIT 2: PRODUCT DEVELOPMENT GUIDELINES

### 1.0    New Products

1.1 Supplier shall update ViewSonic on Supplier's product road map each quarter for the term of this Agreement, and shall keep ViewSonic informed of new products or products with new specifications being considered by Supplier for manufacture. If interested in taking advantage of any of the new products or specifications, ViewSonic will advise Supplier in writing.

1.2 Upon request, Supplier shall provide Product specifications and any marketing materials that have been developed for the Product to ViewSonic. Supplier shall advise ViewSonic of any co-marketing opportunities offered by Supplier, Supplier's subcontractors, or Supplier's key component suppliers, and assist ViewSonic's participation in such activities.

1.3 Supplier shall execute the General Program Summary ("GPS") for each new program awarded, before completion of the Design Verification Test ("DVT") stage. "GPS" is intended to facilitate an expeditious start to new products, to identify any potential concerns, and to establish the general business terms of a program for new suppliers. It is not a replacement for the OEM Agreement and/or other applicable contractual agreements. All these documents must be signed before completion of Mass Production Release ("MPR") developmental milestone.

1.4 Supplier shall follow ViewSonic's project development process including "EVT", "DVT", "PVT", and "MPR". Accordingly, Supplier shall submit the following weekly reports to ViewSonic:

- Product Development Schedule/Vendor Control Chart – in Microsoft Project (Appendix B)

- Compliance Schedule Follow-up Form (Appendix C)

- Project Check List (Appendix D)

- Weekly Project Status (Appendix E)

- Tooling Status Report (Appendix F)

1.5 Supplier shall provide all "EVT" and "DVT" evaluation units at no charge to ViewSonic. If any evaluation unit fails, making it impractical for ViewSonic to evaluate the unit at any stage of the process, Supplier will provide a replacement sample at no cost to ViewSonic.

1.6 All Specifications must be agreed upon by both parties and finalized in writing by the "DVT" stage. Any subsequent revisions to the Specifications will be mutually agreed upon in writing prior to implementation. Product manufactured to Specifications not mutually agreed upon in writing will be rejected by ViewSonic as non-conforming goods.

1.7 Supplier shall amortize into the Product price all Product development fees including, but not limited to, tooling development and compliance application fees. Amortized costs and the amortization period shall be provided to ViewSonic upon request.

Supplier ____; ViewSonic ____

VS025158

**2.0    Engineering Changes**

2.1 All communications regarding Specifications shall be in writing.

2.2 All changes of Specifications shall be made only after a written Engineering Change Request (hereinafter, "ECR") is received and approved by the receiving party. All other changes must be submitted to, and approved by, ViewSonic prior to mass production.

**3.0    Production Site Changes**

3.1 Supplier must obtain prior written authorization from ViewSonic at least three (3) months in advance of any change in production site for previously approved Products. ViewSonic may reasonably withhold approval if the change will affect the quality of or market for the Product.

3.2 Authorization of a change in location must be obtained from ViewSonic's Engineering and Corporate Quality groups. ViewSonic shall have the right to conduct a factory survey, an audit and approve the product development cycle before rendering a decision to authorize a change in any production site. All ViewSonic regional offices must coordinate production site changes with Corporate Quality.

3.3 ViewSonic reserves the right, in its absolute and sole discretion, to reject any production site transfer requests.

Supplier _____ /ViewSonic _____

VS025159

OEM Agreement, V8.0

# EXHIBIT 3: SUPPLY CHAIN MANAGEMENT

| | | |
|---|---|---|
| 1.0 | GENERAL | 25 |
| 2.0 | PURCHASE FORECAST | 25 |
| 3.0 | ORDER PROCEDURE | 25 |
| 4.0 | SHIPMENT & DELIVERY | 26 |
| 5.0 | REGIONAL REQUIREMENTS: VSA | 27 |
| 6.0 | REQUIREMENTS: VSE | 27 |
| 7.0 | REGIONAL REQUIREMENTS: VSI (TBS) | 28 |

Supplier ____; ViewSonic ____

VS025160

# EXHIBIT 3: SUPPLY CHAIN MANAGEMENT
## GLOBAL REQUIREMENTS

**1.0     General**

1.1 Supplier agrees to carry two weeks of raw materials and to reserve an extra two (2) weeks capacity based upon ViewSonic's six (6) month average forecast for each region for the purpose of responding to any production demand increases. Such materials shall be purchased and maintained at Supplier's expense.

1.2 This paragraph intentionally left blank.

1.3 ViewSonic may request Supplier to provide a certain quantity of Products for demonstration purposes in support of its worldwide sales channel. Prices for such Product will be negotiated at the time of order.

1.4 Upon termination of the Agreement, Supplier shall be obligated to fulfill all purchase orders outstanding at the time of termination, unless ViewSonic and Supplier should agree in writing to the contrary. Notwithstanding the foregoing, Supplier is not obligated to fulfill outstanding purchase orders if this Agreement has been terminated for cause based upon ViewSonic's unexcused and unjustified failure to pay its invoices.

**2.0     Purchase Forecast**

2.1 VSA will be responsible for consolidating all forecast quantities from each region and submitting a worldwide buying plan to Supplier on or before the last business day of each month. The forecast will detail required monthly quantities of each Product by Stock Keeping Unit ("SKU"), and will include the quantities actually purchased since the beginning of the year and a six (6) month rolling forecast for each region. Supplier agrees that such forecasts do not obligate ViewSonic to purchase any or all of the forecasted quantity.

2.2 For discontinued or End Of Life ("EOL") Products, ViewSonic will provide notification to Supplier at least sixty (60) days prior to the desired date of final production for each region.

2.3 Upon EOL notification from ViewSonic, Supplier will inventory any unique materials and cancel any surplus if such quantity exceeds ViewSonic's last buy quantity. ViewSonic will not be liable for unique materials that are purchased in excess of the forecast provided by ViewSonic.

**3.0     Order Procedure**

3.1 For CRT Products, ViewSonic will issue purchase orders by the last business day of each month, detailing weekly quantity breakdowns for the second month following..

3.2 For LCD Products - ViewSonic will issue purchase orders, by the 15th day and 30th day of each month, one (1) month in advance detailing weekly quantity breakdowns.

Supplier _____ ; ViewSonic _____

3.3 Purchase orders will be sent via facsimile transmission or electronic mail. A confirming hard copy of the purchase order will be sent via regular mail within five (5) business days of "Day of Issue". Such transmissions shall be deemed "received" on the same day. The purchase order will constitute ViewSonic's only obligation to purchase Product. Notwithstanding the foregoing or anything else herein to the contrary, ViewSonic may, from time to time, change the shipping schedule as business needs dictate.

3.4 ViewSonic's weekly orders will include the following information:
- Item number
- Product description
- Model revisions per engineering changes/specifications
- Quantity
- Requested ETD/FOB
- Unit price
- Extended price
- Shipping mode
- Destination and other unique delivery conditions, if applicable

3.5 Supplier must confirm the receipt of the purchase orders within two (2) business days of Day of Issue. Refusal to accept any purchase order must be in writing and must be received by ViewSonic within two (2) business days from purchase order Day of Issue. All shipping schedules must be confirmed in writing by Supplier within three (3) business days from Day of Issue. Supplier will be obligated to manufacture products pursuant to ViewSonic's purchase order.

3.6 Supplier will provide ViewSonic with a detailed shipping schedule report on a weekly basis. Weekly updates must be forwarded to ViewSonic electronically every Friday. All information contained on the scheduled report shall be treated as confidential by ViewSonic.

3.7 In the event Supplier must allocate parts, components or resources, Supplier warrants that ViewSonic shall receive the highest priority and allocation percentage. VSA will allocate the quantity among all regions.

3.8 On a weekly basis, Supplier shall provide ViewSonic with production planning reports for the following four (4) weeks. Supplier will provide parts/and components' delivery schedule to ViewSonic upon request.

**4.0    Shipment & Delivery**

4.1 Supplier shall ship Product only pursuant to ViewSonic's purchase orders received by Supplier. Product will be shipped according to the terms of the purchase orders with title and risk of loss or damage passing to ViewSonic from Supplier according to said terms.

4.2 Supplier shall use commercially reasonable efforts to determine and ensure that all packing is secure, strong and in accordance with highest commercial standards for ground, air, or sea transport. Supplier shall inspect all outgoing pallets and containers prior to shipment to ensure compliance with this provision.

4.3 Supplier shall use commercially reasonable efforts to ship in accordance with ViewSonic's requested

Supplier ____; ViewSonic ____

VS025162

shipping dates. Supplier will notify ViewSonic immediately of any unexpected delays, and provide a revised shipping date. Supplier shall make every effort and take all reasonable actions to keep such delays to a minimum. ViewSonic may request air shipment of delayed orders at Supplier's cost and expense as set forth in Section 4.4 of this Exhibit.

Air shipment, at Supplier's expense, is required for any shipment delayed beyond fifteen (15) calendar days from the agreed upon shipment date. ViewSonic reserves the right to cancel orders without liability should any delay extend beyond fifteen (15) days. Supplier shall prepay, air freight charges, as well as any administrative costs incurred by ViewSonic to expedite shipment. If expediting is not possible, Supplier will reimburse ViewSonic for any lost profit and/or additional costs that result from such delays and that ViewSonic shall have the right to deduct such charges and losses by means of debit memo. 4.5 ViewSonic will have the right to cancel or reschedule any shipment, without penalty, if the shipment will be delayed more than thirty (30) days from the originally scheduled ship date. 4.6 Supplier shall ensure that all information shown on the shipping documents (Invoice, Packing List, Bill of Lading) is correct and legible. If any shipping document contains an error, Supplier shall submit a corrected version within twenty-four (24) hours. Original documents must be received by ViewSonic within ten (10) working days from the on board date.

4.7 Supplier will electronically provide to ViewSonic a serial number list for each container. This list will identify the ViewSonic Item or Model number, rather than the Supplier's model number.

4.8 Supplier shall include a Certificate of Origin for all shipments, except drop shipments to countries that do not have a diplomatic relationship with the country in which Supplier's factory is located.

## 5.0   REGIONAL REQUIREMENTS: VSA

5.1   VSA will provide a weekly Product Workbench report, by SKU, to Supplier detailing the most current inventory on hand and sales forecasts for the following twenty (20) weeks. Supplier will use this information as a reference to procure raw materials and plan production schedules.

5.2   Supplier will prepare shipping documents in full compliance with United States Customs requirements as requested by VSA. A preferred sample form showing all the requirements is provided in Appendix G attached hereto. Any non-compliance will result in the assessment of a one hundred and fifty-dollar (US$150.00) handling fee per document for each occurrence.

5.3   Supplier will be responsible for all demurrage charges if the complete set of shipping documents does not arrive prior to the vessel arrival date.

5.4   Supplier must issue a seaway bill for all ocean shipments.

5.5   If applicable, Supplier is required to show purchase order numbers issued by ViewSonic for tooling, development costs, translation costs, accessories, safety compliance and/or other Product related cost, including details and amount, on the commercial invoice of the first shipment. For any additional tooling or safety purchase orders issued after Mass Production, Supplier is also required to show the tooling and safety purchase order number with amounts and details on the first subsequent shipment's commercial invoice.

## 6.0   REQUIREMENTS: VSE

6.1   VSE will provide a weekly Product Workbench report, by SKU, to Supplier detailing the most current inventory on hand and sales forecasts for the following twenty (20) weeks. Supplier will use this information as a reference to procure raw materials and plan production schedules.

Supplier ____; ViewSonic ____

VS025163

ViewSonic Confidential    OEM Agreement, V8.0    July 25, 2001

6.2 Supplier will prepare shipping documents in accordance with the format and information as requested by VSE from time to time. Any non-compliance in documentation will result in a one hundred and fifty dollar (US$150.00) handling fee assessed per document for each occurrence.

6.3 Supplier shall be responsible for all demurrage charges if the complete set of shipping documents does not arrive prior to the vessel arrival date.

6.4 Supplier must issue a seaway bill for all ocean shipments except for drop shipments from Supplier's factory to any VSE customer where an ocean bill of lading is required.

Supplier ___  ViewSonic ___

VS025164

ViewSonic Confidential                     OEM Agreement, V8.0                          July 25, 2001

# EXHIBIT 4: PRODUCT QUALITY POLICY

1.0   SCOPE.................................................................................................................30

2.0   PURPOSE .............................................................................................................30

3.0   REFERENCES ......................................................................................................30

4.0   DEFINITIONS.......................................................................................................30

5.0   QUALITY REQUIREMENTS...............................................................................32

6.0   TOTAL QUALITY ASSURANCE OVERVIEW ...................................................34

7.0   SUPPLIER RESPONSIVENESS...........................................................................39

8.0   TQA  METRICS ....................................................................................................40

Supplier _KN_; ViewSonic _BL_

VS025165

# EXHIBIT 4: PRODUCT QUALITY POLICY

## 1.0    SCOPE

The scope of this Exhibit is to define the applicable terms and conditions, and identify policies, procedures, and penalties associated with the receipt, inspection, operation and documentation of Products, as defined in the OEM Agreement.

## 2.0    PURPOSE

The purpose of this Exhibit is to define a Product Quality Policy that establishes clear guidelines for both ViewSonic and Supplier. The Supplier will be provided with the latest released versions of the associated documents, listed in Section 3.0 of this Exhibit, at the time of execution of the OEM Agreement.

## 3.0    REFERENCES

Refer to the Attached Documents section of the OEM Agreement, page 4.

## 4.0    DEFINITIONS

This section contains a variety of definitions for terms used by ViewSonic Corporation in conducting its business operations. Specifically, the "Classification of Defects" is the process of examining or comparing the Product with a given set of Specification (and limit sample as necessary) and workmanship requirements leading to an evaluation of the "degree of fitness for use".

Classifying defects is the rating of possible faults of the Product according to the seriousness of the defect. A defect is a non-conformance of the Product to specified requirements, and is further defined as Critical, Major, or Minor. Specific Product-unique criteria for Major and Minor defects are identified in the Product Quality Acceptance Criteria document, VSC-QC30X, and may vary by Product type (*i.e.* CRT, LCD, Projector, Plasma, and Display System Products).

### 4.1    Product Quality Failures

The field failure data will be reviewed quarterly by the parties or as required by ViewSonic. Any quality failure may cause catastrophic damage to ViewSonic's brand in the marketplace since product recalls, customer site repairs visits and similar damage-control measures may be required. The Supplier should provide corrective action/rework to the said rejected Product(s). All rework costs related to any quality failure to include but not be limited to stopping of factory production, Product recall, on-site rework if recall is not possible, shipping of replacement units, pickup and return of damaged units and rework of returned units.

Supplier _____; ViewSonic _____

## 4.2    Critical Defect

A critical defect is a defect that judgment and experience indicate will likely result in hazardous or unsafe conditions for individuals using the Product. Any errors in a finished Product that can damage ViewSonic's image in the market, such as the wrong company name on the bezel or manual, or wrong manufacturer name, model name, or ID code in DDC data, are considered critical.

## 4.3    Major Defect

A major defect is a defect that is likely to result in a failure or reduction of the usability of the unit for its intended purposes (*i.e.* no power, no video, out-of-sync, out-of-focus, damaged case, purity, pincushion).

## 4.4    Minor Defect

A minor defect is a defect that is not likely to reduce the usability of the Product for its intended purpose or has little bearing on the effective use or operation of the unit (*i.e.* poor printing of logo, incorrect color of carton, incorrect color of cable).

## 4.5    Defective Parts per Million ("DPPM")

ViewSonic tracks Product field failures using a monthly lot DPPM methodology. The serial numbers of the confirmed defective units are matched to the production lot to measure DPPM performance. Supplier performance relative to these goals will be reflected through the Supplier Performance Scorecard process. These DPPM goals will be evaluated each quarter as part of ViewSonic's Continuous Improvement Process, where said DPPM goals are tightened to improve the quality of our products. Definitions are as follows:

- DPPM - Number of defective units per one million (1,000,000) units produced. The Factory DPPM goals and Field DPPM goals are based on hard failures only. The calculation excludes shipping damage, ECO incorporation, adjustments after repair, and No Problem Found (NPF) units.

- Field Return Rate – The accumulated number of units returned to ViewSonic divided by the accumulated number of units sold. Data is accumulated monthly.

- Field Defect Rate – The accumulated number of confirmed defective units divided by the accumulated number of units sold. The Field Defect Rate ("FDR") is used to calculate the Quarterly Defect Penalty ("QDP"), as described in Section 5.3. The Field Defect Rate is based on hard failures only. The calculation excludes shipping damage, ECO incorporation, adjustments after repair, and No Problem Found (NPF) units.

## 4.6    Dead On Arrival (DOA)

DOA is defined as a defect that prevents the full use of the Product when first unboxed or first operated. A DOA Product shall mean a Product that fails or is damaged within thirty (30) days of purchase by a ViewSonic end-user, or within sixty (60) days of receipt by ViewSonic from Supplier, whichever date is longer.

## 4.7    Quality Management (ISO9001) System

All Suppliers' factories will be ISO 9001 or ISO 9002 certified by an approved Third Party Registrar. Copies of the Suppliers ISO certification will be provided to ViewSonic at the start of the business relationship, and as the

Supplier RN; ViewSonic

VS025167

certificates are renewed.  Negative results of Independent Third Party Registrar audits shall be made available to ViewSonic Corporation.  Suppliers will convert to the ISO 9000:2000 standard within two years of formal release.

## 4.8    Environmental Management (ISO 14001) System

If the Supplier is not already ISO 14001 certified, a certification plan with timelines will be required during the course of the business relationship with ViewSonic.

## 4.9    Supplier Warnings

At such time as the Supplier's quality level fails below an acceptable level, the Supplier will first be given a verbal warning, followed by a written warning, followed by a period of probation during which no new projects will be launched with the Supplier.  Failure to improve after probation will result in the termination of the OEM Agreement.

## 5.0    Quality Requirements

## 5.1    Quality Requirement Specifications

### 5.1.1    AQL Requirements (as defined in the PQAC document)

- AQL LCD Products:                0% Critical, 0.25% Major, 1.0% Minor
- AQL CRT Products:                0% Critical, 0.25% Major, 1.0% Minor
- AQL Projector Products:          0% Critical, 1.00% Major, 1.5% Minor
- AQL Large Screen Products:       0% Critical, 0.40% Major, 1.0% Minor
- AQL Visual Gateway™ Products:    0% Critical, 0.40% Major, 1.0% Minor
- AQL Wireless Products            0% Critical, 0.25% Major, 1.0% Minor

### 5.1.2    Factory DPPM Targets

- Auto Insertion Process           2,000 DPPM, all products
- Manual Insertion Process         3,000 DPPM, all products
- Encasing Process                 3,500 DPPM, all products
- Final Quality Control Process     2,500 DPPM, all products
- Outgoing Quality Assurance       2,500 DPPM, all products
- CEST Testing (1000 units)        2,000 DPPM, all products

### 5.1.3    Initial Field Return DPPM Goals (First 3 months total of the Supplier Warranty Period)

- 1,500 DPPM or less for LCD, CRT and Wireless Products
- 2,500 DPPM or less for Large Screen, Projector and Visual Gateway™ Products

### 5.1.4    Sustaining Return DPPM Goals (Month 4 to month 39 of the Supplier Warranty Period):

- 15,000 DPPM or less for LCD, CRT and Wireless Products over the warranty period, and not more than 1250 DPPM quarter per quarter during the remaining 36 months of Supplier warranty period.
- 25,000 DPPM or less for Large Screen, Projector and Visual Gateway™ Products over the warranty period, and not more than 2100 DPPM quarter per quarter during the 36 months of Supplier

Supplier ____; ViewSonic ____

VS025168

warranty.

## 5.2    Quarterly Compensation for Excessive Quality Defects:

The Factory DPPM rates (5.1.2) and Initial Launch (3 month) Field Failure rate data (5.1.3) will be reviewed quarterly by the parties after the start of production in alignment with the established goals identified in section 5.1.x above. Should the goals be exceeded, ViewSonic shall consider the failures as part of the Supplier Quarterly Evaluation process.

In the event that the accumulated quarterly defects (5.1.4) for a **single model of CRT or LCD monitor** exceeds 0.25% **or a 2500 DPPM threshold** of the total quarterly quantity shipped (of that single model), or a single model of wireless, projectors, or large screen (larger than 23") products exceeds **0.25%, or a 2500 DPPM threshold,** ViewSonic shall be entitled to a credit equal to the excess over the threshold percentage requirement. The credit shall be computed as a per unit compensation from the table below for the excess over the threshold percentage requirement.

For example, if the quarterly sales are 100,000 (15") CRT units, and the field defect rate is (0.5%), the Supplier shall pay ViewSonic a compensation of: 0.375% of 100,000 = 375 units times the per unit compensation cost ($25), based on type and size of the product.  ViewSonic shall have the right, but not the obligation, to either debit the Supplier or deduct payments from outstanding invoices from ViewSonic's Accounts Payable.

| Product | Quarterly Defect Per Unit Penalty |
|---|---|
| 14-15" CRT | $25.00 |
| 17" CRT | $35.00 |
| 19" CRT | $50.00 |
| 20-22" CRT | $70.00 |
| 14-15" LCD | $50.00 |
| 17" – 19" LCD | $75.00 |
| 20" -23" LCD | $100.00 |
| Projectors | $250.00 |
| > 23" | $250.00 |
| ViewPad | $150.00 |
| Others TBD | |

ViewSonic is willing to waive the above compensation should Supplier has tried its best effort to improve the product quality.

ViewSonic shall also assess the Supplier's overall performance for **all products** by category (i.e. CRT, LCD, Projector, Wireless, Large Screen, etc.) to ensure that the overall product quality continues to improve from the beginning of production through the end of the 39 month warranty period.  The end of life warranty period Field Defect Rate shall be within the 15,000 DPPM and 25,000 DPPM goals identified in paragraph 5.1.4 above.  This assessment of all products by category shall be reflected in the Supplier's Quarterly Scorecard in such a manner as to reward, or penalize, the Supplier based on the quality improvement trend.  Taken on a composite level, the Supplier can be granted a reduction in the Quarterly Compensation for Excessive Quality Defect should the majority of his products perform well within the quarterly limits.  For example, of 10 models evaluated over a quarter, 7 of 10 are well below the quarterly threshold, while the remaining 3 of 10 exceed the threshold.  The Quarterly Defect Penalty would be calculated on 3 of 10 models, and would then be reduced by some factor after considering the other product's performance.

Supplier _____; ViewSonic _____

VS025169

- 5.3                    This paragraph intentionally left blank.

## 5.4    Customer Experience Simulation Test (CEST).

The Supplier shall participate in the Customer Experience Simulation Test (CEST) designed to evaluate the first 1000 units (or otherwise specified in the GPS) of production, to ensure that no more than two (2) major failures (2,000 DPPM of the CEST sample) occur during operation, thereby ensuring that the customer's initial experience of installing and using the product will be satisfactory.  ViewSonic shall pay the cost of the first one thousand (1000) units, or otherwise specified in the GPS, subjected to CEST inspection, providing the lot passes.

Should the lot fail, the Supplier shall pay for the CEST inspection costs for not only the first one thousand (1000) (or otherwise specified in the GPS) units, but an additional equivalent lot of units. If after two lot evaluation attempts the failure rate exceeds eighty percent (80%) of the DPPM goal, a 100% screen of the product or Source Inspection ("SI") sampling plan will be implemented until the defect level falls below established goals. ViewSonic CQA and Sourcing will contact the Supplier on cost of screening units, corrective action, and estimated date when screening or SI can be terminated.  Further failures and associated penalties, together with the testing requirements, are identified in the CEST specification referenced in this agreement.

## 6.0    Total Quality Assurance Overview

ViewSonic's success is built on its Total Quality Assurance ("TQA") system, which consists of three critical phases: Design Quality Assurance ("DQA"), Manufacturing Quality Assurance ("MQA") and Service Quality Assurance ("SQA").  The Supplier's performance in these three (3) phases is the foundation for quarterly Supplier Performance Scoring and future business awards.

## 6.1    Design Quality Assurance (DQA)

## 6.1.1    Planning

A DQA Plan shall be developed by the Supplier and approved by ViewSonic within one week after project award to the Supplier. The DQA plan shall contain the timeframe of DQA activity, beginning with EVT, and continuing through DVT, PVT and ending with MPR. The DQA plan shall contain the Supplier's reliability testing and evaluation, performance testing and evaluation, and Safety/EMI evaluation, in sufficient detail for ViewSonic to determine the adequacy of the Supplier's DQA effort.

## 6.1.2    Design Review Process

ViewSonic follows a structured development cycle that includes EVT, DVT, PVT, and MPR decision points that must be achieved to ViewSonic's satisfaction before proceeding to subsequent phases leading to production.  During each of these phases, ViewSonic expects to receive Product samples, test reports, and supporting data for evaluation.  Successful completion of each phase's checklist is the criteria to advance to the next phase. Please refer to Appendix D, New Project Checklist as attached hereto.

ViewSonic requires that each Supplier conduct Design Reviews of its Product and provide the results of the reviews to ViewSonic. Should the Design Review results be questionable, or not meet ViewSonic standards, ViewSonic reserves the right to have an independent Third Party perform the Design Review, with all costs for

Supplier _____; ViewSonic _____

such review and testing borne by the Supplier.

In order to verify that the design maturity is sufficient to meet the "Design For Assembly" guidelines, the minimum quantity of PVT units shall be determined at product award, based upon the type of Product, its maturity, and the market schedule to launch the Product. The quantity of PVT units will be identified on a standard P.O. from ViewSonic to the Supplier.

### 6.1.3   "Bug" List

During each of the DQA phases, the Supplier shall provide to ViewSonic Corporate Quality a "bug" list, identifying which components failed during that phase of design. Each failure shall be accompanied with the root cause of failure, and corrective action taken by the Supplier to prevent future failures. As the design moves from one phase to the next, ViewSonic shall verify the "bug" list to ensure that effective corrective action has been taken by the Supplier.

### 6.1.4   Timing of MP Release and Chassis Build

All mass production activity begins with the issuance of a ViewSonic MPR Certificate. In some cases, a Conditional Release Notice ("CRN") will be issued where specific items must be accomplished by the Supplier prior to full production. This allows a limited rate of production to complete the conditions needing to be cleared for full production. In both cases, the MPR or CRN Certificates trigger the start of production. The Supplier shall not commence chassis build until the MPR or CRN Certificates are received, thereby ensuring that all required changes are incorporated into the line prior to manufacturing.

In case the CRN cannot be closed as indicated on the CRN due to the Supplier's fault, the Supplier will be charged three percent (3%) of the current FOB price per unit for the quantity produced in excess of the CRN product limit. For example, if the initial production of Product is authorized for one thousand five hundred (1,500) units under the terms of the CRN, any units produced above 1,500 will be subject to the three percent (3%) current FOB penalty.   ViewSonic shall issue an MPR Certificate to the Supplier when all terms and conditions of the CRN have been corrected to ViewSonic's satisfaction.

### 6.2   Manufacturing Quality Assurance (MQA)

### 6.2.1   First Lot On-Site Inspection

ViewSonic's Quality Engineers or third party source inspectors may perform first lot inspection of new Products in the Supplier's factory to ensure that the expected quality and performance of the Products is achieved, prior to Product shipment. The first lot inspection is for new Products built immediately following mass production release. The units inspected under first lot inspection shall be within the limits of the Product Specification, related to the design model limit samples, and judged by a jury of experts. The Supplier shall not ship Product that contains components that have been previously rejected by another customer, without prior notification to ViewSonic. ViewSonic will be under no obligation to accept such Product, and, if accepted by ViewSonic, will carry the same warranty as Product containing components that have not been rejected.

### 6.2.2   Outgoing Inspection by Supplier

Outgoing factory inspections, by qualified inspectors who have good knowledge of the meaning "fitness for use", must be carried out by Supplier prior to Product shipment from the factory. The inspection must be based upon the assembled Product and all accessories packed for shipment. When more defects appear with the same

Supplier _____ ViewSonic _____

VS025171

cause, the most serious defect must be taken into account and recorded on appropriate inspection forms, which are subject to ViewSonic monitoring during in-process or final inspection visits to the factory. Defects found in accessories packed with the Product are included in the complete Product evaluation.

Prior to shipment of the Products to ViewSonic, Supplier shall inspect any lot for defects of both electrical and mechanical components and/or assemblies. Immediately after the outgoing inspection, Supplier shall notify ViewSonic in writing of the result thereof in a manner satisfactory to ViewSonic; provided, however, that said outgoing inspection shall not be deemed ViewSonic's final acceptance or assurance of the quality of the Products. Should the Supplier provide inaccurate information that is later determined to support a lot rejection, the Supplier shall bear all costs related to the recovery and replacement of the defective Product which was accepted by ViewSonic or its agent on the basis of the inaccurate information provided by the Supplier.

If the defect rate of a lot of Products exceeds the acceptable level, Supplier shall inform ViewSonic thereof and provide ViewSonic with a description and evidence of the defect. ViewSonic shall evaluate the description and the evidence and confirm the diagnosis of defects. Appropriate corrective action will be mutually agreed upon between ViewSonic and the Supplier.

### 6.2.3    Source Inspection

Depending on the Product's continuing quality level, ViewSonic, upon 24-hour's notice to Supplier, reserves the right to impose Third Party Source Inspection at the Supplier's factory. The costs of such inspection will be charged to the Supplier, should the Source Inspection DPPM levels not meet the goals. When the Supplier's outgoing quality level meets the specified DPPM limits, Source Inspection will cease to be charged to the Supplier. ViewSonic reserves the right to continue to use Third Party Source Inspection regardless of Supplier's outgoing quality level.

### 6.2.4    Weekly WQA Reporting to VSC

The Supplier shall provide weekly WQA data to ViewSonic Corporate Quality, in ViewSonic's standard format (Appendix I), for ViewSonic evaluation. The data will be extracted from key manufacturing process checkpoints for each Product produced for ViewSonic.

### 6.2.5    Incoming Product Inspection at VSC

Inspection by ViewSonic, or its designated Third Party Warehouses, of new Product (not yet qualified in the STS program), shall be done by lot, in accordance with the:

- Product Quality Acceptance Criteria (PQAC), for different Product categories
- Product Inspection Procedures (VSC-QC301)
- Software Inspection Procedures (VSC-QC303), and
- ASQC Z 1-4-1993, (supersedes MIL-STD 105E) single sampling plan.

If Products fail to perform in accordance with the Product Acceptance Criteria, AQL and other Specifications, ViewSonic shall notify the Supplier. Supplier warrants that it has established a zero-defect goal for ViewSonic Products. Products which fail lot inspection shall be subject to one hundred percent (100%) sorting or rework (purging) by the Supplier and should start within twenty-four (24) hours after notice. If, for any reason, Supplier cannot react accordingly, ViewSonic, in its sole discretion, may conduct the purging operation or have it done by a third party designated by ViewSonic, with sorting costs passed to the Supplier. ViewSonic will try to minimize the cost, and in return, the Supplier shall accept the sorting and rework costs without objection. The

Supplier _____; ViewSonic _____