# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LG.PHILIPS LCD CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> TATUNG COMPANY; TATUNG COMPANY OF AMERICA, INC.; and VIEWSONIC CORPORATION, <br><br> Defendants. | Civil Action No. 04-343-JJF |

### PLAINTIFF'S THIRD SUPPLEMENTAL OBJECTIONS AND ANSWERS TO DEFENDANT TATUNG COMPANY'S FIRST SET OF INTERROGATORIES

Plaintiff LG.Philips LCD Co., Ltd. ("LPL" or "Plaintiff," also referred to in Interrogatories as "LGP"), pursuant to Fed. R. Civ. P. 33, objects and responds as follows to Defendant Tatung Company's ("Tatung") First Set of Interrogatories.

### PRELIMINARY STATEMENT & GENERAL OBJECTIONS

LPL hereby incorporates its Preliminary Statement and its General Objections from Plaintiff's Objections and Answers to Defendant Tatung Company's First Set of Interrogatories. Those general objections apply to each Interrogatory herein and thus, for convenience, are not repeated after each Interrogatory, and are hereby incorporated into each response.

This set of Objections and Responses incorporates into this single document all of LPL's previously-submitted supplemental objections and responses to Defendant Tatung Company's First Set of Interrogatories as well as any of LPL's previous supplemental responses. Through this set of supplemental objections and responses, LPL supplements its objections and responses to Interrogatory No. 1.

1

## INTERROGATORIES

### INTERROGATORY NO. 1:

For each of the Patents-in-Suit, identify each and every TATUNG and TATUNG USA product by model number and/or other TATUNG or TATUNG USA designation made, used, offered for sale, sold in the U.S., or imported into the U.S. which LGP contends infringes the Patents-in-Suit (herein after, "Accused Product(s)") and identify each claim of each of the Patents-in-Suit that LGP contends is infringed by each Accused Product and where in each Accused Product the claim elements are located.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as

vague and ambiguous, including with respect to the terms "TATUNG product" and "TATUNG

USA product." LPL further objects to this Interrogatory because Tatung mischaracterizes as one

interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL

counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory as

seeking information on claim construction and infringing products that is premature and

unavailable, including because LPL is awaiting discovery from defendants. Further, LPL objects

to this Interrogatory as calling for legal conclusions. Subject to and without waiving these

objections and the general objections, and based upon the information presently available, LPL

states as follows:

LPL cannot currently identify all infringing Tatung brand and other products and

defendants have failed to provide discovery sufficient for LPL to make such an assessment. LPL

is aware of products that infringe the Patents-in-Suit, including Tatung L17AMTN monitors.

Tatung's liability and TATUNG USA's liability, however, includes any type of unlawful

conduct related to any infringing products, whether direct infringement, contributory

infringement, and/or inducing infringement by others. Tatung and TATUNG USA, for example,

have at least made, sold, offered for sale, and/or imported infringing products such as the

L17AMTN monitor.

With respect to the L17AMTN monitor, the infringed claims include, at least, claims 35,

36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent, which are

infringed literally. The following charts show infringement by comparing the claims of the

Patents-in-Suit with the Tatung L17AMTN monitor (*see* corresponding Exhibit A, which is

attached to these Interrogatory answers):

| Claim in the '641 Patent | Tatung L17AMTN Monitor |
|---|---|
| 35. A rear mountable flat panel display device capable of being mounted to a data processing device, the flat panel display device comprising: | The Tatung L17AMTN monitor contains a Chi Mei LM170E4-L02 flat panel TFT LCD module K. The LCD module K, in conjunction with the first support frame C, is rear mounted within the monitor.<br><br>The monitor is a data processing device as it contains a video processor for processing video data. The monitor is also part of (i.e., a component of) a computer system, where a computer system constitutes a data processing device or system. |
| a backlight unit including a first frame having a fastening part at a rear surface of the first frame, a flat display panel adjacent to the backlight unit; and | The Chi Mei module K contains a backlight unit and an LCD panel. The LCD panel is a flat display panel that is located immediately in front of the backlight unit.<br><br>The Chi Mei module K and, therefore, the backlight unit in the Chi Mei module K, are supported by the first support frame C. The first support frame C has screw holes D through its rear surface. Each of the screw holes D through the rear surface of the support frame C constitutes a fastening part, or at least a portion of a fastening part at the rear surface of a first frame. |
| a second frame; | The Tatung monitor has a front or second support frame M. |
| wherein the flat display panel is between the first frame and the second frame, the first frame of the backlight unit capable of being fixed to a housing of the data processing device through the fastening part at the rear surface of the first frame. | Because the flat LCD panel is contained in the Chi Mei module K, the flat LCD panel must be positioned between the first support frame C and the second support frame M.<br><br>The four screw holes D through the rear surface of the first support frame C, together with the four screws B, |

| Claim in the '641 Patent | Tatung L17AMTN Monitor |
|---|---|
| | fix the first support frame C to the rear housing A.<br><br>The rear housing A protects the monitor, and in particular, the components located behind or to the rear of the first support frame C, including the data processing circuitry. As the Tatung monitor is a data processing device, or a component of a computer (i.e., a data processing device), the housing associated with the monitor constitutes a housing of a data processing device. |
| 36. The rear mountable flat panel display device according to claim 35, wherein the fastening part includes a fastening hole. | Each of the screw holes D through the rear surface of the first support frame C constitutes a fastening hole. |
| 55. A rear mountable flat panel display device comprising: | The Tatung L17AMTN monitor contains a Chi Mei LM170E4-L02 flat panel TFT LCD module K. The LCD module K, in conjunction with the first support frame C, is rear mounted within the monitor. Thus, the Tatung monitor contains a rear mountable flat panel display device. |
| a first frame having a fastening part at a rear surface of the first frame; | The first support frame C has four screw holes D through its rear surface. Each of the four screw holes D constitutes a fastening part, or at least a portion of a fastening part at the rear surface of a first frame. |
| a second frame; and | The Tatung monitor employs a front frame M located at the front of the LCD module K. This front frame M constitutes a second support frame. |
| a flat display panel between the first and second frames; | The Chi Mei module K contains a flat LCD panel. Therefore, the flat LCD panel in the Chi Mei module K must be located between the first support frame C and the second support frame M. |
| wherein the first frame is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame. | When the four screws B are installed, the four screws B, together with the four screw holes D through the rear surface of the first support frame C, fix the first support frame C to the rear housing A.<br><br>The rear housing A protects the monitor, and in particular, the components located behind or to the rear of the first support frame C, including the data processing circuitry. As the Tatung monitor is a data processing device, or a component of a computer (i.e., a data processing device), the housing associated with the monitor constitutes a housing of a data processing device. |

| Claims in the '718 Patent | Tatung L17AMTN Monitor |
|---|---|
| 33. A method of assembling a rear mountable flat panel display device capable of being mounted to a housing, comprising: | The Tatung L17AMTN monitor includes a Chi Mei LM170E4-L02 flat panel TFT LCD module K, a first support frame C and a rear housing A. The Chi Mei module K and the support frame K are rear mounted to the rear housing A. The Tatung monitor was therefore assembled in accordance with a method of rear mounting a flat panel display device to a housing. |
| placing a flat display panel on a top surface of a backlight unit having a first frame, the first frame having a fastening element for fastening the first frame to the housing, said fastening element being located on a rear surface opposite the top surface of the backlight unit where the flat display panel is placed; | The Chi Mei module K contains a flat LCD panel and a backlight unit. It is understood that the LCD panel is in front of (i.e., on top of) the backlight unit. It can thus be said that the Chi Mei module K is assembled by placing a flat LCD panel on top of a backlight unit.

Just behind and providing support for the Chi Mei module K is the first support frame C. The first support frame C has four fastening elements that at least partially involve the four screw holes D. The screw holes D are used in fastening the first frame C to the rear housing A.

Screw holes D go through the rear surface of the first support frame C and, therefore, it can be said that they are located on a rear surface of the first support frame C opposite the top surface (i.e., the front surface) of the backlight unit. |
| placing a second frame on the flat display panel; and | The Tatung monitor includes a front or second support frame M. It is located at the front of the Chi Mei module K. It can therefore be said that the second frame M is placed on the flat display panel. |
| fixing the flat display panel between the first frame of the backlight unit and the second frame. | Because the flat LCD panel is contained in the Chi Mei module K, the flat LCD panel must be positioned between the first support frame C and the second support frame M. Thus, it can be said that the Tatung monitor was assembled in accordance with a method that involved fixing the flat LCD panel, contained in the Chi Mei module K, between a first support frame C and a second support frame M. |
| 34. The method of claim 33, wherein the fastening element comprises a fastening hole. | Each of the four screw holes D are fastening holes that constitutes a fastening element, or at least a portion of a fastening element. |
| 35. The method of claim 33, wherein the fastening element comprises a screw hole. | Each of the four screw holes D constitutes a fastening element, or at least a portion of a fastening element. |

| Claims in the '718 Patent | Tatung L17AMTN Monitor |
|---|---|
| 40. A rear mountable method of assembling a liquid crystal display (LCD) device comprising: | The Tatung L17AMTN monitor includes a Chi Mei LM170E4-L02 flat panel TFT LCD module K, a first support frame C and a rear housing A. The Chi Mei module K and the support frame C are rear mounted to the rear housing A. accordingly, the Tatung monitor was assembled in accordance with a rear mountable method of assembling a LCD device. |
| arranging the LCD device on a inner surface of a display case, wherein the display case has an inner surface and back; | The Chi Mei module K and the first support frame C are located just in front of the rear housing A. Therefore, the Chi Mei module K and the first support frame C are arranged on an inner surface of the rear housing A, where the rear housing A constitutes a display case. |
| attaching the LCD device to the display case from the back of the display case. | The Chi Mei module K and the first support frame C are attached to the rear housing A from the back of the rear housing A, in that the Chi Mei module K is supported by the first frame C, which is rear mounted to the rear housing A by the four screws B passing through the rear surface of the rear housing A and through the screw holes D at the rear surface of the first support frame C. |

LPL will provide more detailed information regarding the infringing products and asserted claims at the appropriate time and based on further discovery, possibly including, for example, in expert reports and/or *Markman* briefing. LPL reserves the right to address the doctrine of equivalents if and when appropriate, and reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### SUPPLEMENTAL RESPONSE & OBJECTION:

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Defendants mischaracterize as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL

objects to this Interrogatory at least because it is premature in that it seeks information pertaining to or requiring claim construction, and because it seeks information pertaining to infringing products that are presently unavailable because LPL is still awaiting discovery from Tatung on such products. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

Tatung has refused and/or failed to provide discovery that would enable LPL to fully respond to this Interrogatory. The Tatung products that LPL is currently aware of that infringe the Patents-in-Suit include the: Tatung L17UCCT ("L17UCCT"), Tatung L17AMTN ("LTAMTN"), and Tatung L1705 ("L1705") monitors. Tatung's liability, however, includes any type of improper conduct related to any infringing products, whether by direct infringement, contributory infringement, and/or inducing infringement by others. Tatung, for example, has at least sold, offered for sale, and/or imported infringing products such as the L17UCCT, LTAMTN, and L1705 monitors.

With respect to the L17UCCT monitors, the infringed claims include, at least, claims 35, 36, 38, 40-43, and 55-56 of the '641 Patent and claims 33-35 and 39-40 of the '718 Patent, which are infringed literally, or, in the alternative, under the doctrine of equivalents.

With respect to the LTAMTN monitors, the infringed claims include, at least, claims 35, 36, 38-43, 55-56 of the '641 Patent and claims 33-35 and 39-40 of the '718 Patent, which are infringed literally, or, in the alternative, under the doctrine of equivalents.

With respect to the L1705 monitors, the infringed claims include, at least, claims 35, 36, 38, 40-45, 55-56 of the '641 Patent and claims 33-35 and 39-40 of the '718 Patent, which are infringed literally, or, in the alternative, under the doctrine of equivalents.

The following charts show infringement by comparing the claims of the Patents-in-Suit with the L17UCCT, L17AMTN, and L1705 monitors:

| Claims in the '641 Patent | Tatung Monitors |
|---|---|
| 35.  A rear mountable flat panel display device capable of being mounted to a data processing device, the flat panel display device comprising: | The L17UCCT, L17AMTN, and L1705 are each a rear mountable flat panel display device capable of being mounted to a data processing device, the flat panel display device comprising the following elements. |
| a backlight unit including a first frame having a fastening part at a rear surface of the first frame, a flat display panel adjacent to the backlight unit; and | The L17UCCT, L17AMTN, and L1705 each have a backlight unit including a first frame having a fastening part at a rear surface of the first frame, a flat display panel adjacent to the backlight unit. |
| a second frame; | The L17UCCT, L17AMTN, and L1705 each have a second frame. |
| wherein the flat display panel is between the first frame and the second frame, the first frame of the backlight unit capable of being fixed to a housing of the data processing device through the fastening part at the rear surface of the first frame. | The L17UCCT, L17AMTN, and L1705 each have a flat display panel that is between the first frame and the second frame, the first frame of the backlight unit capable of being fixed to a housing of the data processing device through the fastening part at the rear surface of the first frame. |
| 36.  The rear mountable flat panel display device according to claim 35, wherein the fastening part includes a fastening hole. | In addition to the elements listed above that pertain to the limitations of claim 35, the L17UCCT, L17AMTN, and L1705 each have a fastening part that includes a fastening hole. |
| 38.  The rear mountable flat panel display device according to claim 36, wherein the fastening part includes at least two fastening holes at two corners of the first frame. | In addition to the elements listed above that pertain to the limitations of claim 36, the L17UCCT, L17AMTN, and L1705 each have fastening parts that include at least two fastening holes at two corners of the first frame. |
| 39. The rear mountable flat panel display device according to claim 36, wherein the fastening part includes four fastening holes at four corners of the first frame. | In addition to the elements listed above that pertain to the limitations of claim 36, the L17AMTN has fastening parts that include four fastening holes at four corners of the first frame. |

| Claims in the '641 Patent | Tatung Monitors |
|---|---|
| 40. The rear mountable flat panel display device according to claim 35, wherein the backlight unit comprises: | In addition to the elements listed above that pertain to the limitations of claim 35, the L17UCCT, L17AMTN, and L1705 each have a backlight unit comprising the following elements. |
| a reflector unit adjacent the first frame; | The L17UCCT, L17AMTN, and L1705 each have a reflector unit adjacent the first frame. |
| a light source unit adjacent the reflector unit; and | The L17UCCT, L17AMTN, and L1705 each have a light source unit adjacent the reflector unit. |
| a light guide unit adjacent the light source unit. | The L17UCCT, L17AMTN, and L1705 each have a light guide unit adjacent the light source unit. |
| 41. The rear mountable flat panel display device according to claim 40, further comprising a diffuser unit and a prism unit. | In addition to the elements listed above that pertain to the limitations of claim 40, the L17UCCT, L17AMTN, and L1705 each have a diffuser unit and a prism unit. |
| 42. The rear mountable flat panel display device according to claim 35, wherein the fastening part is not visible from a viewing direction of the flat display panel. | In addition to the elements listed above that pertain to the limitations of claim 35, the L17UCCT, L17AMTN, and L1705 each have a fastening part that is not visible from a viewing direction of the flat display panel. |
| 43. The rear mountable flat panel display device according to claim 35, wherein the flat panel display device only shows the flat display panel and the second frame when viewed from a viewing direction of the display panel. | In addition to the elements listed above that pertain to the limitations of claim 35, the L17UCCT, L17AMTN, and L1705 each have a flat panel display device that only shows the flat display panel and the second frame when viewed from a viewing direction of the display panel. |
| 44. The rear mountable flat panel display device according to claim 35, wherein the fastening part includes a protruding portion protruding away from the flat display panel. | In addition to the elements listed above that pertain to the limitations of claim 35, the L1705 has a fastening part that includes a protruding portion protruding away from the flat display panel. |
| 45. The rear mountable flat panel display device according to claim 44, wherein the protruding portion includes a peg having a fastening hole. | In addition to the elements listed above that pertain to the limitations of claim 44, the L1705 has a protruding portion that includes a peg having a fastening hole. |

9

| Claims in the '641 Patent | Tatung Monitors |
|---|---|
| 55. A rear mountable flat panel display device comprising: | The L17UCCT, L17AMTN, and L1705 are each a rear mountable flat panel display device, the rear mounted flat panel display device comprising the following elements. |
| a first frame having a fastening part at a rear surface of the first frame; | The L17UCCT, L17AMTN, and L1705 each have a first frame having a fastening part at a rear surface of the first frame. |
| a second frame; and | The L17UCCT, L17AMTN, and L1705 each have a second frame. |
| a flat display panel between the first and second frames; | The L17UCCT, L17AMTN, and L1705 each have a flat display panel between the first and second frames. |
| wherein the first frame is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame. | The L17UCCT, L17AMTN, and L1705 each have a first frame that is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame. |
| 56. A rear mountable flat panel display device comprising: | The L17UCCT, L17AMTN, and L1705 are each a rear mountable flat panel display device, the flat panel display device comprising the following elements. |
| a first frame having a fastening part at a rear surface of the first frame; | The L17UCCT, L17AMTN, and L1705 each have a first frame having a fastening part at a rear surface of the first frame. |
| a second frame; | The L17UCCT, L17AMTN, and L1705 each have a second frame. |
| and a flat display panel between the first and second frames; | The L17UCCT, L17AMTN, and L1705 each have a flat display panel between the first and second frames. |
| wherein the first frame is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame and the flat display panel is rear mounted. | The L17UCCT, L17AMTN, and L1705 each have a first frame that is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame and the flat display panel is rear mounted. |

| Claims in the '718 Patent | Tatung Monitors |
|---|---|
| 33. A method of assembling a rear mountable flat panel display device capable of being mounted to a housing, comprising: | The L17UCCT, L17AMTN, and L1705 are each assembled via a method of assembling a rear mountable flat panel display device capable of being mounted to a housing, that method includes the following steps. |
| placing a flat display panel on a top surface of a backlight unit having a first frame, the first frame having a fastening element for fastening the first frame to the housing, said fastening element being located on a rear surface opposite the top surface of the backlight unit where the flat display panel is placed; | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes placing a flat display panel on a top surface of a backlight unit having a first frame, the first frame having a fastening element for fastening the first frame to the housing, the fastening element being located on a rear surface opposite the top surface of the backlight unit where the flat display panel is placed. |
| placing a second frame on the flat display panel; and | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes placing a second frame on the flat display panel. |
| fixing the flat display panel between the first frame of the backlight unit and the second frame. | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes fixing the flat display panel between the first frame of the backlight unit and the second frame. |
| 34. The method of claim 33, wherein the fastening element comprises a fastening hole. | In addition to the steps and/or elements listed above that pertain to the limitations of claim 33, the L17UCCT, L17AMTN, and L1705 each have a fastening element that comprises a fastening hole. |
| 35. The method of claim 33, wherein the fastening element comprises a screw hole. | In addition to the steps and/or elements listed above that pertain to the limitations of claim 33, the L17UCCT, L17AMTN, and L1705 each have a fastening element that comprises a screw hole. |
| 39. A rear mountable method of assembling a liquid crystal display (LCD) device comprising: | The L17UCCT, L17AMTN, and L1705 are each assembled via a rear mountable method of assembling a liquid crystal display (LCD) device, that method includes the following steps. |
| arranging a first frame on a light guide, the first frame having holes for coupling a LCD panel to a supporting | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes arranging a first frame on a light guide, the first frame having holes for |

| Claims in the '718 Patent | Tatung Monitors |
|---|---|
| frame, the supporting frame having a front surface and a rear surface; and | coupling an LCD panel to a supporting frame, the supporting frame having a front surface and a rear surface. |
| coupling the LCD panel, the light guide to the first frame from the rear surface of the supporting frame. | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes coupling the LCD panel, the light guide to the first frame from the rear surface of the supporting frame. |
| 40. A rear mountable method of assembling a liquid crystal display (LCD) device comprising: | The L17UCCT, L17AMTN, and L1705 are each assembled via a rear mountable method of assembling a liquid crystal display (LCD) device, that method includes the following steps. |
| arranging the LCD device on an inner surface of a display case, wherein the display case has an inner surface and back; | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes arranging the LCD device on an inner surface of a display case, wherein the display case has an inner surface and back. |
| attaching the LCD device to the display case from the back of the display case. | The method of assembling each of the L17UCCT, L17AMTN, and L1705 includes attaching the LCD device to the display case from the back of the display case. |

LPL will provide more detailed information regarding the infringing products and asserted claims at the appropriate time and based on further discovery, possibly including, for example, in expert reports and/or *Markman* briefing. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 2:

For each claim of each of the Patents-in-Suit identified in response to Interrogatory No. 1, state whether the alleged infringement by each Accused Product is literal or by the doctrine of equivalents and explain in detail how LGP contends each Accused Product infringes each claim.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as duplicative of Interrogatory No. 1. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory as seeking information regarding the doctrine of equivalents, claim construction, and infringing products that is premature and unavailable, including because LPL is awaiting discovery from Tatung. Further, LPL objects to this Interrogatory as calling for legal conclusions. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

As stated in response to Interrogatory No. 1, with respect to the L17AMTN monitor, the infringed claims include, at least, claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent, which are infringed literally or, in the alternative, under the doctrine of equivalents. The answer to Interrogatory No. 1 describes how the Tatung L17AMTN monitor literally infringes claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent. LPL will provide more detailed information regarding the asserted claims at the appropriate time and based on further discovery, possibly including, for example, in expert reports and/or *Markman* briefing. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 3:

If LGP alleges that any Accused Product infringes by literal infringement, separately apply each claim identified in response to Interrogatory No. 1 to each Accused Product element by element (including terms and limitations within each element), and provide specific references by document, page and line number to the specification, prosecution history or other

13

matter supporting LGP's application of those claims to the Accused Products. Apply each element of each asserted claim in a separate paragraph and identify specifically the support for each claim construction given.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as duplicative of previous Interrogatories. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory as seeking information on claim construction and infringing products that is premature and unavailable, including because LPL is awaiting discovery from Tatung. Further, LPL objects to this Interrogatory as calling for legal conclusions. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

The answer to Interrogatory No. 1 describes how the Tatung L17AMTN monitor literally infringes claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent. The tables below include claims 35, 36 and 55 of the '641 patent and claims 33, 34, 35 and 40 of the '718 patent, and, for each of these claims, provide examples of representative portions of the disclosure from each patent that provide support for the claim language:

| Claims in the '641 Patent | Representative Support for the claims from the '641 Patent Disclosure |
|---|---|
| 35. A rear mountable flat panel display device capable of being mounted to a data processing device, the flat panel display device comprising: | "The present invention relates to a flat panel display device, and more specifically, to a flat panel display device mounting structure and a method of mounting the flat panel display device to a computer." Col. 1:11-15.<br><br>"Accordingly, the present invention is directed to a ... computer and method for mounting a flat panel display |

| Claims in the '641 Patent | Representative Support for the claims from the '641 Patent Disclosure |
|---|---|
| | device thereon...." Col. 2:41-43.<br><br>"To achieve these and other advantages and in accordance with the purpose of the present invention, as embodied and broadly described, a portable computer includes a body ... a case coupled to the body and having inner and outer surfaces; and a flat panel display device having a display surface and a rear surface, the rear surface being fixed to the inner surface of the case." Col. 2:59-65.<br><br>"The present invention provides ... a back mounting structure for a panel display device in a portable computer." Col. 4:6-10. |
| a backlight unit including a first frame having a fastening part at a rear surface of the first frame, a flat display panel adjacent to the backlight unit; and | "Referring to FIGS. 4A and 4B, the LCD device 10 has ... a backlight unit 14...." Col. 4:12-14.<br><br>"Referring to FIG. 4C, the LCD device 10 has a first frame 14g ... [a]t each corner of the first frame 14g a screw hole 15 is preferably formed. Although FIG. 4C shows the first frame 14g as part of the backlight unit 14, the first frame 14g can act as the supporting frame 16." Col. 4:16-25.<br><br>See also, FIG. 4C, reference nos. 12, 14a-g and 15 [where the flat display panel 12 is adjacent to the backlight unit 14 and the fastening part 15 is at the rear surface of the first frame 14g]. |
| a second frame; | "Referring to FIGS. 4A and 4B, the LCD device 10 has ... a supporting frame 16." Col. 4:12-14.<br><br>"The first frame 14g is coupled to a second frame or supporting frame 16." Col. 4:21-22. |
| wherein the flat display panel is between the first frame and the second frame, the first frame of the backlight unit capable of being fixed to a housing of the data processing device through the fastening part at the rear surface of the first frame. | "The computer includes a body 20 ... and a ... case 21." Col. 4:44-46.<br><br>"Together, the case 21 and the body 20 may be referred to as a housing, or a similar conveniently descriptive term." Col. 4:48-49.<br><br>"According to a further aspect of the present invention, an LCD device coupled to an outer case includes an LCD panel ... a backlight device having a first surface ... and a second surface attached to the outer case...." |

| Claims in the '641 Patent | Representative Support for the claims from the '641 Patent Disclosure |
|---|---|
|  | Col. 3:14-20. |
|  | Referring to FIG. 4C, the LCD device 10 has a first frame 14g...." |
|  | At each corner of the first frame 14g a screw hole 15 is preferably formed." Col. 4:11-25. |
|  | See also, FIG. 4C, reference nos. 12, 14a-g, 15 and 16 [which shows the flat display panel 12 between the first frame 14g and the second frame 16, as well as fastening holes 15 at the rear surface of the first frame 14g]. |
|  | "To mount the LCD device 10 to the display case 30 (FIG. 8), the LCD device 10 is placed on the inner surface of the display case 30. Then, the case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30." Col. 4:26-36. |
| 36. The rear mountable flat panel display device according to claim 35, wherein the fastening part includes a fastening hole. | At each corner of the first frame 14g a screw hole 15 is preferably formed. Col 4:21-23. |
|  | "[T]he case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30. Col. 4:29-36 |
|  | "To mount the LCD device 10 to the case 21, the LCD device 10 is placed on the inner surface of the case 21 such that the positions of the holes 21a and the holes 15 coincide with each other, and screws 18 (fastening elements or fastening parts) are inserted into the holes 21a and 15 (which may be referred to as fastening holes |

16

| Claims in the '641 Patent | Representative Support for the claims from the '641 Patent Disclosure |
|---|---|
| | or a similar conveniently descriptive term, and which together with the material defining the holes each may be referred to as a fastening element or fastening part) from the back of the case 21." Col. 4:56-67. |
| 55. A rear mountable flat panel display device comprising: | "The present invention relates to ... a flat panel display device mounting structure...." Col. 1:11-14.<br><br>"The present invention provides ... a back mounting structure for a panel display device...." Col. 4:6-10. |
| a first frame having a fastening part at a rear surface of the first frame; | "Referring to FIG. 4C, the LCD device 10 has a first frame 14g ... [a]t each corner of the first frame 14g a screw hole 15 is preferably formed." Col. 4:16-23.<br><br>See also, FIG. 4C, reference nos. 14g and 15 [where fastening parts or fastening holes 15 pass through the rear surface of the first frame 14g]. |
| a second frame; and | "Referring to FIGS. 4A and 4B, the LCD device 10 has ... a supporting frame 16." Col. 4:12-14.<br><br>"The first frame 14g is coupled to a second frame or supporting frame 16." Col. 4:21-22.<br><br>See also, FIG. 4C, reference no. 16. |
| a flat display panel between the first and second frames; | Referring to FIG. 4C, the LCD device 10 has ... a first frame 14g, ... and the LCD panel 12. The first frame 14g is coupled to a second frame or supporting frame 16. Col. 4:11-21.<br><br>See also FIG. 4C, reference nos. 12, 14g and 16 [where flat display panel, i.e., LCD panel 12, is positioned between the first frame 14g and the second frame 16]. |
| wherein the first frame is capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame. | "The computer includes a body 20 ... and a ... case 21." Col. 4:44-46.<br><br>"Together, the case 21 and the body 20 may be referred to as a housing, or a similar conveniently descriptive term." Col. 4:48-49. |

| Claims in the '641 Patent | Representative Support for the claims from the '641 Patent Disclosure |
|---|---|
| | "According to a further aspect of the present invention, an LCD device coupled to an outer case...." Col. 3:14-15.<br>"At each corner of the first frame 14g a screw hole 15 is preferably formed." Col. 4:21-23.<br><br>"[T]he case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30." Col. 4:29-37.<br><br>See also FIG. 4C, reference nos. 14g and 15 [where the fastening holes 15 pass through the rear surface of first frame 14g].<br><br>See also, FIG. 5, reference nos. 15, 18, 21 and 21a [where the first frame 14g is fixed to the housing, i.e., case 21, using the fastening holes 15 on the rear surface of first frame 14g]. |

| Claims in the '718 Patent | Representative Support for the claims from the '718 Patent Disclosure |
|---|---|
| 33. A method of assembling a rear mountable flat panel display device capable of being mounted to a housing, comprising: | "The present invention relates generally to a flat panel display device, and more specifically ... a method of mounting the flat panel display device to a computer." Col. 1:14-17.<br><br>"Accordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon...." Col. 2:45-47. |
| placing a flat display panel on a top surface of a backlight unit having a first frame, the first frame having a fastening element for fastening the first frame to the housing, said | "According to a further aspect of the present invention, an LCD device coupled to an outer case includes an LCD panel having a display surface and a rear surface; a backlight device having a first surface facing the rear surface of the LCD panel and a second surface attached |

| Claims in the '718 Patent | Representative Support for the claims from the '718 Patent Disclosure |
|---|---|
| fastening element being located on a rear surface opposite the top surface of the backlight unit where the flat display panel is placed; | to the outer case; and a supporting frame for assembling the LCD panel and the backlight device." Col. 3:19-25.<br><br>"To mount the LCD device 10 to the display case 30 (FIG. 8), the LCD device 10 is placed on the inner surface of the display case 30. Then, the case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw-hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30." Col. 4:33-43.<br><br>See also, FIG. 4C, reference nos. 12, 14a-g and 15. |
| placing a second frame on the flat display panel; and | "Referring to FIG. 4C, the LCD device 10 has a first frame 14g ... [t]he first frame 14g is coupled to a second frame or supporting frame 16." Col. 4:21-27.<br>See also, FIG. 4C, reference nos. 12 and 16 [where the second frame 16 is placed on the flat display panel 12]. |
| fixing the flat display panel between the first frame of the backlight unit and the second frame. | See FIG. 4C, reference nos. 12, 14a-g and 16 [where the flat display panel 12 is fixed between the first frame 14g associated with the backlight unit 14 and the second frame 16]. |
| 34. The method of claim 33, wherein the fastening element comprises a fastening hole. | "Then, the case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30." Col. 4:35-43.<br><br>"To mount the LCD device 10 to the case 21, the LCD device 10 is placed on the inner surface of the case 21 such that the positions of the holes 21a and the holes 15 coincide with each other, and screws 18 (fastening elements or fastening parts) are inserted into the holes 21a and 15 (which may be referred to as fastening holes or a similar conveniently descriptive term, and which together with the material defining the holes each may be |

19

| Claims in the '718 Patent | Representative Support for the claims from the '718 Patent Disclosure |
|---|---|
| | referred to as a fastening element or fastening part) from the back of the case 21." Col. 4:62 - 5:3. |
| 35. The method of claim 33, wherein the fastening element comprises a screw hole. | "At each corner of the first frame 14g a screw hole 15 is preferably formed." Col 4:27-28.<br><br>"Then, the case 30 and the LCD device 10 are attached to one another by bolts 18 (which may be referred to as fastening elements, fastening parts, or a similar conveniently descriptive term) into the screw hole 15 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred to as a fastening element or fastening part) from the back of the display case 30." Col. 4:35-43.<br><br>"To mount the LCD device 10 to the case 21, the LCD device 10 is placed on the inner surface of the case 21 such that the positions of the holes 21a and the holes 15 coincide with each other, and screws 18 (fastening elements or fastening parts) are inserted into the holes 21a and 15 (which may be referred to as fastening holes or a similar conveniently descriptive term, and which together with the material defining the holes each may be referred to as a fastening element or fastening part) from the back of the case 21." Col. 4:62 - Col. 5:3. |
| 40. A rear mountable method of assembling a liquid crystal display (LCD) device comprising: | "The present invention relates generally to a flat panel display device, and more specifically ... a method of mounting the flat panel display device to a computer." Col. 1:14-17.<br><br>"Accordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon...." Col. 2:45-47.<br><br>"Flat panel display devices include liquid crystal display devices (LCD)...." Col. 1:20-21.<br><br>"For convenience of explanation, the present invention will be discussed with respect to the LCD as an example of the flat screen type display devices...." Col. 1:24-26. |
| arranging the LCD device on a inner surface of a display case, wherein the display case has an inner surface and back; | "To achieve these and other advantages and in accordance with the purpose of the present invention ... a case ... having inner and outer surfaces; and a flat panel display device having a display surface and a rear |

20

| Claims in the '718 Patent | Representative Support for the claims from the '718 Patent Disclosure |
|---|---|
| | surface, the rear surface being fixed to the inner surface of the case." Col. 2:63 - Col. 3:2.<br><br>"According to a further aspect of the present invention, an LCD device coupled to an outer case includes an LCD panel having a display surface and a rear surface; a backlight device having a first surface facing the rear surface of the LCD panel and a second surface attached to the outer case...." Col. 3:19-23.<br><br>To mount the LCD device 10 to the display case 30 (FIG. 8), the LCD device 10 is placed on the inner surface of the display case 30." Col. 4:33-35. |
| attaching the LCD device to the display case from the back of the display case | "Then, the case 30 and the LCD device 10 are attached to one another ... from the back of the display case 30." Col. 4:35-43.<br><br>"To mount the LCD device 10 to the case 21, the LCD device 10 is placed on the inner surface of the case 21 such that the positions of the holes 21a and the holes 15 coincide with each other, and screws 18 (fastening elements or fastening parts) are inserted into the holes 21a and 15 (which may be referred to as fastening holes or a similar conveniently descriptive term, and which together with the material defining the holes each may be referred to as a fastening element or fastening part) from the back of the case 21. The through-hole 21a is preferably a stepped hole so that the head of the screw 18 will not protrude from the outer surface of the case 21." Col. 4:62 - Col. 5:3. |

LPL will provide more detailed information regarding the asserted claims at the appropriate time and based on further discovery, possibly including, for example, in expert reports and/or *Markman* briefing. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

**INTERROGATORY NO. 4:**

If LGP alleges that any Accused Product infringes by the doctrine of equivalents, state in detail how each Accused Product infringes under the doctrine of equivalents, including without

limitation, how each element of each alleged infringed claim is literally the same as, or the equivalent under the doctrine of equivalents, to a component or part of the Accused Product.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as duplicative of previous Interrogatories. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory as seeking information regarding the doctrine of equivalents, claim construction, and infringing products that is premature and unavailable, including because LPL is awaiting discovery from Tatung. Further, LPL objects to this Interrogatory as calling for legal conclusions. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

As stated in response to Interrogatories No. 1 and 2, with respect to the L17AMTN monitor, the infringed claims include, at least, claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent, which are infringed literally, or, in the alternative, under the doctrine of equivalents. The answer to Interrogatory No. 1 describes how the Tatung L17AMTN monitor literally infringes claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent. LPL will provide more detailed information regarding the asserted claims at the appropriate time and based on further discovery, possibly including, for example, in expert reports and/or *Markman* briefing. LPL reserves the right to address the doctrine of equivalents if and when appropriate, and reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 5:

For each claim of the Patents-in-Suit identified above in response to Interrogatory No. 1 that includes limitation written in means-plus-function format, separately correlate the structure disclosed in the specification and drawings of the Patents-in-Suit for each means-plus-function clause recited in the asserted claims of the Patents-in-Suit to the specific component(s), Part(s), or feature(s) in the Accused Products that LGP alleges correspond to the specific structure disclosed in the specification and drawings of the Patents-in-Suit.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory as seeking information on claim construction and infringing products that is premature and unavailable, including because LPL is awaiting discovery from Tatung. Further, LPL objects to this Interrogatory as calling for legal conclusions. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states:

LPL does not contend that claims 35, 36, and 55 of the '641 patent and claims 33, 34, 35, and 40 of the '718 patent include a limitation written in means-plus-function format. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 6:

State all facts which support or upon which LGP intends to rely in support of LGP's contentions that TATUNG and TATUNG USA has each directly infringed or directly infringes, contributorily infringed, or contributorily infringes, and/or actively induced or actively induces infringement of the Patents-in-Suit, including but not limited to, the identity of each party involved in any act of direct infringement, contributory infringement, or inducement and the act of each such party which constitutes direct infringement, contributory infringement, or inducement and identify all documents that evidence or otherwise support such facts.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as overly broad and unduly burdensome (for example, calling for "all facts" that may support legal contentions on several different issues, and seeking identification of "each party involved in any act," each "act", and "all documents"). LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL also objects to this Interrogatory as premature and seeking information in defendants' possession and that is the subject of LPL's discovery requests. Further, LPL objects to this Interrogatory as calling for legal conclusions. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

Tatung's and TATUNG USA's direct infringement of the Patents-in-Suit includes, for example, making, offering for sale, importing, and/or selling products under the Tatung brand (for example, L17AMTN monitors) and other brands that infringe multiple claims of the Patents-in-Suit. Further, LPL alleges that Tatung and/or TATUNG USA have supplied and transacted business with other parties and third-parties, such as U.S. retailers and distributors, and intentionally promoted and encouraged the importation, use, offering for sale, and/or sale of infringing products in and to the U.S. LPL reserves the right to supplement this Interrogatory response, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 7:

Identify each communication, whether oral or written, concerning any study, investigation, opinion, test or other evaluation of the validity, invalidity, enforceability, unenforceability, infringement or non-infringement of any claims of the Patents-in-Suit, including without limitation any alleged infringement by TATUNG and by TATUNG USA,

24

whether conducted by, or on behalf of LGP or by a third party, and identify each person who has knowledge of each such study, investigation, opinion, test or other evaluation.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. LPL also objects to this Interrogatory on the ground that it is overbroad and unduly burdensome because, for example, it seeks "each communication, whether oral or written," concerning every unspecified "study, investigation, opinion, test or other evaluation" without any limitation as to context or time period. To the extent this Interrogatory seeks expert discovery, LPL further objects to this Interrogatory as premature. Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL's representatives have had confidential meetings with representatives of Fujitsu, and representatives of Sharp Corporation, regarding infringement of the Patents-in-Suit. During their meetings, LPL's representatives made an electronic presentation. LPL does not have any written communications or materials from Fujitsu or Sharp, nor did they cite any alleged prior art. LPL reserves the right to supplement this Interrogatory response, if appropriate, when and if additional information becomes available, or otherwise.

## SUPPLEMENTAL OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. LPL also objects to this Interrogatory on the ground that it is overbroad and unduly burdensome because, for example, it seeks "each communication, whether oral or written," concerning every unspecified "study, investigation, opinion, test or other evaluation" without any limitation as to context or time period. To the extent this Interrogatory seeks expert discovery, LPL further objects to this Interrogatory as premature. LPL further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory to the extent that the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive, and because the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Subject to and without waiving these objections and the general objections, and based on the information presently available, LPL states as follows:

LPL's representatives have had confidential meetings with representatives of Fujitsu, and representatives of Sharp Corporation, regarding infringement of the Patents-in-Suit. In preparations for those meetings, LPL's representatives created and presented materials regarding such infringement. LPL does not have any written communications or materials from Fujitsu or Sharp, nor did they cite any alleged prior art.

LPL's representatives attended confidential meetings with representatives of Fujitsu on May 20, 2003, at LG.Philips LCD Japan Office in Tokyo. LPL met with representatives of Fujitsu's IP licensing department, Patent Department IV, and Technology Alliance Department 1. These meetings were attended by the following people: Jong Hwan Lee (LPL), Ho Lee (LPL), Young Woo Cho (LPL), Won Jun Choi (LPL), Myeong Jo Seo (LPL), Kakegawa (Fujitsu), Koyasu (Fujitsu), Miyake (Fujitsu), Ozawa (Fujitsu), Nakamura (Fujitsu), Yamaguchi (Fujitsu), sato (Fujitsu), Ohashi (Fujitsu), Sakoda (Fujitsu), and Hoshino (Fujitsu). Jong Hwan Kim (LPL) has knowledge of these meetings. LPL and Fujitsu discussed the FujitsuSiemens 5110FA monitor and the Fujitsu Monitor VL1700SS. Fujitsu did not make a presentation to LPL, nor did it distribute any documents at these meetings.

LPL's representatives attended confidential meetings with representatives of Sharp on November 7, 2003, at LG.Philips LCD in Anyank, Korea. LPL met with representatives of Sharp's Licensing department and Patent department. These meetings were attended by the following people: Ho Lee (LPL), Jong Hwan Kim (LPL), Young Woo Cho (LPL), Won Jun Choi (LPL), Kubota (Sharp), Himeno (Sharp), Masanori (Sharp), and Hirashi (Sharp). Jong Hwan Kim (LPL) has knowledge of these meetings. LPL and Sharp discussed the SharpLL-T1620-H and the LC-20B4U-S. Sharp did not make a presentation to LPL, nor did it distribute any documents at these meetings.

LPL reserves the right to supplement this Interrogatory response, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 8:

If LGP has ever claimed or otherwise asserted that any other persons(s), other than Defendant Viewsonic Corporation in this litigation, infringed any claim of any of the Patents-in-Suit, either literally or by the doctrine of equivalents, identify the person(s), the accused product(s) of the other person(s), the patent(s) and claim(s) allegedly infringed, the nature of the claim and, if the claim resulted in litigation, the nature, the location, the parties to and the date of all such litigation(s), and identify all documents relating or referring to such claim or assertion.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL's positions concerning any third parties and third party products in anticipation of litigation, and/or any related attorney work or communication, for example, are not relevant or discoverable. LPL also objects to this Interrogatory as duplicative of previous Interrogatories. LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

As stated in response to Interrogatories No. 1 and 2, for example, LPL alleges that Tatung and TATUNG USA infringe the Patents-in-Suit. Also, LPL has identified Fujitsu and Sharp Corporation (and any affiliated entities, distributors, and resellers that import, offer to sell, or sell their infringing products) as third parties that may infringe the Patents-in-Suit. LPL has not filed any other lawsuits alleging infringement of the Patents-in-Suit. LPL reserves the right to assert infringement claims against additional defendants in this or other cases. LPL reserves the right

to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### SUPPLEMENTAL RESPONSES AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL's positions concerning any third parties and third party products in anticipation of litigation, and/or any related attorney work or communication, for example, are not relevant or discoverable. LPL also objects to this Interrogatory as duplicative of previous Interrogatories. LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. LPL further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory to the extent that the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive, and because the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

As stated in response to Interrogatories No. 1 and 2, for example, LPL alleges that Tatung and TATUNG USA infringe the Patents-in-Suit. Also, LPL has identified Fujitsu and Sharp Corporation (and any affiliated entities, distributors, and resellers that import, offer to sell, or sell

their infringing products) as third parties that may infringe the Patents-in-Suit. LPL has not filed any other lawsuits alleging infringement of the Patents-in-Suit.

LPL's representatives have had confidential meetings with representatives of Fujitsu, and representatives of Sharp Corporation, regarding infringement of the Patents-in-Suit. In preparations for those meetings, LPL's representatives created and presented materials regarding such infringement. LPL does not have any written communications or materials from Fujitsu or Sharp, nor did they cite any alleged prior art.

LPL's representatives attended confidential meetings with representatives of Fujitsu on May 20, 2003, at LG.Philips LCD Japan Office in Tokyo. LPL met with representatives of Fujitsu's IP licensing department, Patent Department IV, and Technology Alliance Department 1. These meetings were attended by the following people: Jong Hwan Lee (LPL), Ho Lee (LPL), Young Woo Cho (LPL), Won Jun Choi (LPL), Myeong Jo Seo (LPL), Kakegawa (Fujitsu), Koyasu (Fujitsu), Miyake (Fujitsu), Ozawa (Fujitsu), Nakamura (Fujitsu), Yamaguchi (Fujitsu), sato (Fujitsu), Ohashi (Fujitsu), Sakoda (Fujitsu), and Hoshino (Fujitsu). Jong Hwan Kim (LPL) has knowledge of these meetings. LPL and Fujitsu discussed the FujitsuSiemens 5110FA monitor and the Fujitsu Monitor VL1700SS. Fujitsu did not make a presentation to LPL, nor did it distribute any documents at these meetings.

LPL's representatives attended confidential meetings with representatives of Sharp on November 7, 2003, at LG.Philips LCD in Anyank, Korea. LPL met with representatives of Sharp's Licensing department and Patent department. These meetings were attended by the following people: Ho Lee (LPL), Jong Hwan Kim (LPL), Young Woo Cho (LPL), Won Jun Choi (LPL), Kubota (Sharp), Himeno (Sharp), Masanori (Sharp), and Hirashi (Sharp). Jong Hwan Kim (LPL) has knowledge of these meetings. LPL and Sharp discussed the SharpLL-

T1620-H and the LC-20B4U-S. Sharp did not make a presentation to LPL, nor did it distribute any documents at these meetings.

LPL reserves the right to supplement this Interrogatory response, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 9:

If any person has ever stated or argued that any Patent-in-Suit or any claim of any Patent-in-Suit is invalid or unenforceable, identify such patent and claim, the person who has so stated or argued, the date, time, place and manner such statement or argument was made, including the complete identity of the litigation if the argument was made in that context, the basis for such statement or argument, and all document relating to, referring to or containing such statement or argument.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory to the extent that it seeks information already known to Defendants, such as statements or arguments of their affiliated entities in litigation in the U.K. LPL further objects to this Interrogatory because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

No such communications are currently known. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 10:

Identify all persons with knowledge of relevant facts pertaining to TATUNG's and TATUNG USA's alleged infringement in this case, including without limitation, all individuals who assisted in the preparation of LGP's responses to TATUNG's and TATUNG USA's Interrogatories and Requests for Product [sic] and generally summarize the relevant knowledge each such individual possesses.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL further objects to this Interrogatory because it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Also, LPL objects to this Interrogatory as seeking information that is premature and unavailable, including because LPL has not yet identified all of its fact and/or expert witnesses. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

LPL does not know the identity of every person with knowledge relevant to the claims and issues in this case, nor does LPL know the specific knowledge of each such person. LPL believes, however, that at least the following are likely to have information that is relevant to LPL's claims concerning the Patents-in-Suit: (1) current and former employees, officers, and/or directors of Tatung and TATUNG USA; (2) current and former affiliates, distributors, suppliers, and/or customers of Tatung and TATUNG USA (including, for example, retailers that sell or have sold accused products); (3) current and former employees, officers, and/or directors of ViewSonic Corp.; (4) Mr. Jong Hwan Kim of LPL; (5) Mr. Young Woo Cho of LPL; and (6) Mr.

William Bohannon, expert witness. LPL reserves the right to supplement this Interrogatory

answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 11:

State separately for each patent allegedly infringed, the dollar amounts of monetary
damages LGP seeks to recover each from TATUNG and from TATUNG USA, and the legal and
factual bases for such claims, including without limitation, whether LGP seeks to recover lost
profits and/or reasonable royalties, and the method used to calculate such amounts, and identify
all documents that LGP contends support its damages claims.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. Also, LPL objects to this Interrogatory as

seeking information on damages that is premature and unavailable, including because LPL is

awaiting discovery from defendants and expert disclosures are not due. LPL further objects to

this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories

on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple

interrogatories. Further, LPL objects to the extent that Tatung seeks identification of documents

produced by LPL, which Tatung can just as easily identify by its own review. LPL also objects

to this Interrogatory as calling for a legal conclusion. Subject to and without waiving these

objections and the general objections, LPL states as follows:

Pursuant to 35 U.S.C. § 284, LPL seeks all damages and relief to which it is entitled,

including, but not limited to, compensatory damages, enhanced damages, and a reasonable

royalty sufficient to compensate LPL for Tatung's infringement, together with interest and costs,

and attorneys' fees. LPL is aware of sales of infringing products imported, made, sold, and/or

offered for sale by or for Tatung, TATUNG USA, and/or by others whose infringing conduct

was induced and/or contributed to by Tatung and/or TATUNG USA, for all of which Tatung

and/or TATUNG USA are liable. LPL does not yet know all infringing products or the full

33

scope of infringing conduct. Further, LPL cannot currently state the total amount of damages

and other sums for which Tatung and TATUNG USA are liable. LPL will provide more detailed

information regarding infringing products and damages at the appropriate time and based on

further discovery, possibly including, for example, in expert reports. LPL reserves the right to

supplement this Interrogatory answer, if appropriate, when and if additional information

becomes available, or otherwise.

### INTERROGATORY NO. 12:

With respect to any secondary considerations that are relevant to the issue of obviousness
under 35 U.S.C. section 103, for each alleged invention described in each claim of the Patents-
in-Suit that LGP alleges TATUNG and TATUNG USA infringes and identify all such secondary
considerations, state and describe all of the facts and circumstances that establish or support each
such secondary consideration, and identify all persons having knowledge of the facts and
circumstances in regard to each such secondary consideration, and identify all documents
concerning such secondary considerations.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory

as calling for legal conclusions. LPL also objects to this Interrogatory as premature and seeking

information in Tatung's possession and that is the subject of LPL's discovery requests. Subject

to and without waiving these objections and the general objections, and based upon the

information presently available, LPL states as follows:

LPL continues to investigate any secondary considerations. LPL reserves the right to

supplement this Interrogatory answer, if appropriate, when and if additional information

becomes available, or otherwise.

### SUPPLEMENTAL RESPONSES AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the word product doctrine. LPL further objects to this Interrogatory

34

as calling for legal conclusions. LPL also objects to this Interrogatory as premature and seeking information in Tatung's possession and that is the subject of LPL's discovery requests. LPL further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory to the extent that the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive, and because the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows: evidence of commercial success includes the fact that the technology protected by the Patents-in-Suit is, to LPL's knowledge, widely employed in the industry, and that users of the technology include competitors of both Tatung and ViewSonic. Moreover, LPL will later supplement its responses after Defendants produce the information sought by LPL's written discovery requests and after LPL conducts its oral examination of Defendants' witnesses.

LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 13:

Identify all foreign patent applications and patents based in whole or in part on the applications for or disclosure of the Patents-in-Suit, and identify all documents related thereto.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because it is vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence (for example, in calling for the identification of "all documents related thereto."). Subject to and without waiving those objections, LPL states as follows:

| Patent / Application Number | Filing Date | Issued / Published | Country |
|---|---|---|---|
| 6,501,641 | April 2, 1999 | December 31, 2002 | US |
| 6,498,718 | November 22, 1999 | December 24, 2002 | US |
| 10/294,548 | November 15, 2002 | April 10, 2003 (publication, abandoned) | US |
| 10/787,933 | February 27, 2004 | August 26, 2004 (publication) | US |
| 11/096,080 | April 1, 2005 | September 8, 2005 (publication) | US |
| 11/096,079 | April 1, 2005 | August 4, 2005 (publication) | US |
| 10/294/753 | November 15, 2002 | April 10, 2003 (publication, abandoned) | US |
| 10/799,662 | March 15, 2004 | N/A | US |
| 11-298916 | October 20, 1999 | May 12, 2000 | Japan |
| 3749516 | December 20, 2002 | December 9, 2005 | Japan |
| 0303067 | October 23, 1998 | July 9, 2001 | Korea |
| 0424936 | October 27, 1998 | March 17, 2004 | Korea |
| 2346464 | October 22, 1999 | January 3, 2001 | Great Britain |

LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## INTERROGATORY NO. 14:

Identify all facts establishing the chain of title or ownership of each invention claimed in each of the Patents-in-Suit (*i.e.* date of transfer, consideration paid, parties participating in the transfer, and identification of terms of all agreements transferring title or ownership) from the conception date to the present.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence, including, for example, because LPL's ownership and standing is not in contention, and, moreover, foreign patent ownership and interest are not relevant. Subject to and without waiving these objections and the general objections, and based on LPL's current knowledge, LPL states as follows:

On or about February 22, 1999, the inventors, Jong Hwan Kim and Young Woo Cho, assigned their rights and interests in the invention covered by the '641 patent, and any related reissue, divisional, and continuing U.S. and non-U.S. applications and/or patents, to LG LCD Inc., now known as LG Philips LCD Co., Ltd. This assignment was recorded with the U.S. Patent and Trademark Office on or about April 2, 1999. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 15:

Identify each and every product by model number and/or other LGP designation made, sold, offered for sale, or imported into the United States by or on behalf of LGP which is covered by, incorporates or embodies any claim of the Patents-in-Suit, identify each such claim, state with specificity how each product is covered by such claim and where each claim limitation is found within each such product, state the time period during which such product was manufactured, sold, offered for sale or imported into the United States and identify all documents relating or referring to how each such product, component or part is covered by such claim.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because it is vague, overly broad, unduly burdensome and not reasonably calculated to lead to

the discovery of admissible evidence. LPL further objects to this Interrogatory because Tatung

mischaracterizes as one interrogatory multiple interrogatories on separate subjects. Subject to

and without waiving those objections, and based on LPL's current knowledge, LPL states as

follows:

LPL is not aware of any such products. LPL reserves the right to supplement this

Interrogatory answer, if appropriate, when and if additional information becomes available, or

otherwise.

### INTERROGATORY NO. 16:

Identify in spreadsheet format on a monthly or quarterly basis from May 27, 1998 to the
present, all sales of each product identified in response to Interrogatory No. 15 the number of
units sold, price per unit, net sales revenue, gross profit per unit, net profit per unit, date of first
sale, and party to whom sold.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory to

the extent that it purports to dictate an answer in "spreadsheet format." LPL further objects to

this Interrogatory because it is vague, overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence. LPL further objects to this

Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on

separate subjects. Subject to and without waiving those objections, and based on LPL's current

knowledge, LPL states as follows:

As stated in response to Interrogatory No. 15, LPL is not aware of any such products.

LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if

additional information becomes available, or otherwise.

### INTERROGATORY NO. 17:

Identify in spreadsheet format on a monthly or quarterly basis from May 27, 1998 to the present, all costs incurred by LGP (including without limitation all marginal costs, fixed costs, sunk costs, development costs, and marketing costs) in connection with the manufacture and sale of the products identified in response to Interrogatory 13.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory to

the extent that it purports to dictate an answer in "spreadsheet format." LPL also objects to this

Interrogatory as vague and ambiguous, including, for example, with respect to the terms

"marginal costs," "sunk costs," and "development costs." LPL further objects to this

Interrogatory because it is overly broad, unduly burdensome and not reasonably calculated to

lead to the discovery of admissible evidence. LPL also objects to this Interrogatory as

unintelligible because Interrogatory No. 13 does not request identification of products;

presumably, the reference should be to Interrogatory No. 15. LPL further objects to this

Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on

separate subjects. Subject to and without waiving these objections, and based on LPL's current

knowledge, LPL states as follows:

As stated in response to Interrogatory No. 15, LPL is not aware of any such products.

LPL reserves the right to supplement this Interrogatory response, if appropriate, when and if

additional information becomes available, or otherwise.

### INTERROGATORY NO. 18:

Identify and describe in detail LGP's efforts to license any of the Patents-in-Suit to any person (including without limitation Tatung), including without limitation any communications regarding proposed royalty rates, inquiries about or offers to license, and all license agreements, cross-license agreements, joint venture agreements, purchase agreements or other agreements relating to licensing.

## OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL also objects to this Interrogatory to the extent that it seeks information already known to defendants. LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. Subject to and without waiving these objections and the general objections, and based on LPL's current knowledge, LPL states as follows:

LPL's representatives have had confidential meetings with representatives of Fujitsu, and representatives of Sharp Corporation, regarding infringement of the Patents-in-Suit. During their meetings, LPL's representatives made an electronic presentation. LPL does not have any written communications or materials from Fujitsu or Sharp, nor did they enter into any license agreements regarding the Patents-in-Suit. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

## SUPPLEMENTAL RESPONSES AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory because Tatung mischaracterize as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL also objects to this Interrogatory to the extent that it seeks information already known to defendants.

LPL further objects to this Interrogatory as overly broad and because any confidential pre-suit negotiations and settlement discussions are not reasonably calculated to lead to discovery of admissible evidence and are not discoverable. LPL further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the parties' claims or defenses nor reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory to the extent that the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive, and because the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Subject to and without waiving these objections and the general objections, and based on LPL's current knowledge, LPL states as follows:

LPL's representatives have had confidential meetings with representatives of Fujitsu, and representatives of Sharp Corporation, regarding infringement of the Patents-in-Suit. In preparations for those meetings, LPL's representatives created and presented materials regarding such infringement. LPL does not have any written communications or materials from Fujitsu or Sharp, nor did they cite any alleged prior art.

LPL's representatives attended confidential meetings with representatives of Fujitsu on May 20, 2003, at LG.Philips LCD Japan Office in Tokyo. LPL met with representatives of Fujitsu's IP licensing department, Patent Department IV, and Technology Alliance Department 1. These meetings were attended by the following people: Jong Hwan Lee (LPL), Ho Lee (LPL), Young Woo Cho (LPL), Won Jun Choi (LPL), Myeong Jo Seo (LPL), Kakegawa (Fujitsu), Koyasu (Fujitsu), Miyake (Fujitsu), Ozawa (Fujitsu), Nakamura (Fujitsu), Yamaguchi

(Fujitsu), sato (Fujitsu), Ohashi (Fujitsu), Sakoda (Fujitsu), and Hoshino (Fujitsu). Jong Hwan

Kim (LPL) has knowledge of these meetings. LPL and Fujitsu discussed the FujitsuSiemens

5110FA monitor and the Fujitsu Monitor VL1700SS. During these meetings, LPL and Fujitsu

discussed royalty rates. Fujitsu did not make a presentation to LPL, nor did it distribute any

documents at these meetings.

LPL's representatives attended confidential meetings with representatives of Sharp on

November 7, 2003, at LG.Philips LCD in Anyank, Korea. LPL met with representatives of

Sharp's Licensing department and Patent department. These meetings were attended by the

following people: Ho Lee (LPL), Jong Hwan Kim (LPL), Young Woo Cho (LPL), Won Jun

Choi (LPL), Kubota (Sharp), Himeno (Sharp), Masanori (Sharp), and Hirashi (Sharp). Jong

Hwan Kim (LPL) has knowledge of these meetings. LPL and Sharp discussed the SharpLL-

T1620-H and the LC-20B4U-S. During these meetings, LPL and Sharp discussed licensing.

Sharp did not make a presentation to LPL, nor did it distribute any documents at these meetings.

LPL reserves the right to supplement this Interrogatory response, if appropriate, when

and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 19:

For each allegedly infringing TATUNG and TATUNG USA product identified in
response to Interrogatory No. 1, identify the circumstances under which LGP first considered
that each such product might infringe any claim of one or more of the Patent-in-Suit, including
the dates LGP first learned of the product, any efforts to verify whether or not the product
infringes, the names of the LGP employees who learned of or investigated the alleged
infringement, and the date, place, and reasons that any of these events occurred.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as

vague and ambiguous, including, for example, with respect to the terms "first considered" and

"first learned" because, for example, it cannot be determined when each and every employee of LPL first became aware of and/or purchased for any purpose an infringing product; the terms "TATUNG product" and "TATUNG USA product" are also unclear. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Subject to and without waiving these objections and the general objections, LPL states as follows:

As stated in response to Interrogatory No 1, LPL cannot currently identify all Tatung and other brand products that infringe, and LPL is seeking discovery from Tatung relevant to this issue. LPL first considered that the Tatung L17AMTN monitor infringed in December 2003, based on analysis by counsel, which is protected by attorney-client privilege and the work product doctrine. LPL retained an expert, Mr. William Bohannon, to analyze the Tatung L17AMTN monitor for infringement. Mr. Bohannon first analyzed a Tatung L17AMTN monitor in January 2004. Mr. Bohannon continued to analyze the Tatung L17AMTN monitor and he completed a declaration in May 2004. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 20:

Identify all materials that were analyzed and/or investigated by you or on your behalf or communicated to you prior to filing this lawsuit which show the mounting of an LCD in a Tatung product including but not limited to each and every TATUNG and TATUNG USA product, assembly drawings, disassembly drawings, photographs, digital media or video media, and identify who conducted each such analysis and/or investigation and when.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. For example, the scope of LPL's

counsel's work in preparing for this case, including any analysis and/or investigation, is not discoverable. LPL also objects to this Interrogatory as vague and ambiguous, including with respect to the terms "TATUNG product" and "TATUNG USA product." LPL further objects to this Interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence, including, for example, because it does not have any limit as to initial time frame, purpose, or context concerning any analysis and/or investigation of materials. Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL, through its counsel, had purchased the Tatung L17AMTN monitor before the filing of LPL's complaint in this case. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### SUPPLEMENTAL OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. For example, the scope of LPL's counsel's work in preparing for this case, including any analysis and/or investigation, is not discoverable. LPL also objects to this Interrogatory as vague and ambiguous, including with respect to the terms "TATUNG product" and "TATUNG USA product." LPL further objects to this Interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence, including, for example, because it does not have any limit as to initial time frame, purpose, or context concerning any analysis and/or investigation of materials. Subject to and without waiving these objections and the general objections, LPL states as follows:

Prior to May 27, 2004, LPL had in its possession the following monitors, all of which LPL believes to have been manufactured and/or distributed by TATUNG and/or TATUNG USA:

- L17AMTN-U01

- V17AFTW

- LT17A

### INTERROGATORY NO. 21:

Identify all materials you have currently have [sic] in your possession custody or control which show the mounting of an LCD in a TATUNG and TATUNG USA product including but not limited to each and every TATUNG and TATUNG USA product, assembly drawings, disassembly drawings, photographs, digital media or video media that you currently have in your possession, custody, or control.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. For example, the scope of LPL's counsel's work in preparing for this case, including any materials in its possession, is not discoverable. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL also objects to this Interrogatory as vague and ambiguous, including with respect to the terms "TATUNG product" and "TATUNG USA product." LPL further objects to this Interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence, including, for example, because it does not have any limit as to initial time frame, purpose, or context concerning any possession, custody, or control of materials. Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL, through its counsel, has possession of the Tatung L17AMTN monitor. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### SUPPLEMENTAL OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. For example, the scope of LPL's counsel's work in preparing for this case, including any materials in its possession, is not discoverable. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. LPL also objects to this Interrogatory as vague and ambiguous, including with respect to the terms "TATUNG product" and "TATUNG USA product." LPL further objects to this Interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence, including, for example, because it does not have any limit as to initial time frame, purpose, or context concerning any possession, custody, or control of materials. Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL currently has in its possession the following monitors, all of which LPL believes to have been manufactured and/or distributed by TATUNG and/or TATUNG USA:

- L17AMTN-U01
- V17AFTW
- LT17A
- V20KQDX-U02
- L17UCCT-U02

- L17AMTN
- Telart NT19S (Tatung 17121)
- TLM 1705
- TLM 1905

- TLM 1503

At the Defendants' request, LPL's counsel in the instant action, McKenna Long & Aldridge LLP, contacted LPL's counsel, Morgan Lewis LLP ("Morgan Lewis"), in a separate action pertaining to separate patents that is now pending in California. LPL's counsel contacted Morgan Lewis in order to determine whether Morgan Lewis has any products in its possession that are responsive to this Interrogatory. Morgan Lewis informed LPL that they have the following monitors, which appear to have been manufactured and/or distributed by TATUNG and/or TATUNG USA:

| | |
|---|---|
| - TLM 1503 | - L5CTSDP-U01 |
| - TLM 1703 | - L5CDS |
| - TLM 1705 | - L5CDSDP-U21 |
| - TLM 1905 | - L17AMTN-U01 |

### INTERROGATORY NO. 22:

State all material facts that support your contention that TATUNG's and TATUNG USA's alleged infringement of each of the Patents-in-Suit is now and has been willful.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects to this Interrogatory as premature and seeking information in defendants' possession and that is the subject of LPL's discovery requests. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects and defendants; in responding, LPL counts this Interrogatory as multiple interrogatories. Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

Tatung and TATUNG USA. are infringing and/or have infringed the Patents-in-Suit, by,

for example, making, importing, offering for sale, and/or selling products known to infringe the

Patents-in-Suit, and continuing to do so, including after LPL filed this lawsuit. The conduct of

Tatung and TATUNG USA, in disregard of LPL's allegations and patent rights, is willful, and

the totality of this conduct by Tatung and TATUNG USA, which is the subject of ongoing

investigation and discovery, warrants enhanced damages, attorneys' fees, and other appropriate

relief. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and

if additional information becomes available, or otherwise.

### INTERROGATORY NO. 23:

If any of your responses to any of TATUNG's and TATUNG USA's Requests for
Admissions to you is anything other than an unqualified admission, state in detail all material
facts on which you based any part of your response that was not an unqualified admission,
identify all documents memorializing each such fact, and identify all persons with knowledge of
each such fact.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory because no such Requests for Admission have been

served on LPL. Accordingly, this Interrogatory is premature, unintelligible, and improper.

### INTERROGATORY NO. 24:

Describe in detail the circumstances surrounding the formation of LGP, including without
limitation, the reasons for its formation; the identity of all entities with any ownership and/or
management interest in LGP; where LGP fits within the organizational structure of LG Corp.;
LGP's internal organizational structure; all employees, officers and directors of LGP; and
identify all LGP's employees, officers and directors both current and former that have in the past
or now work for any other LG entity, including without limitation LG Electronics Inc., and the
identity of such LG entity and their job title at that LG entity.

### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory

because it is overly broad, unduly burdensome and not reasonably calculated to lead to the

discovery of admissible evidence, in that this Interrogatory seeks detailed information regarding LPL (including as to corporate history, organization, relationships, employees, etc.) and third parties that is harassing and not relevant. LPL further objects to this Interrogatory because Tatung mischaracterizes as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this Interrogatory as multiple interrogatories. Also, LPL objects to this Interrogatory to the extent that it seeks information that is publicly available. Subject to and without waiving these objections and the general objections, and based on LPL's current knowledge, LPL states as follows:

As stated in LPL's July 21, 2005 prospectus: "At the end of 1998, LG Electronics and LG Semicon transferred their respective TFT-LCD-related businesses to LG Soft, Ltd., a subsidiary of LG Electronics, which, as part of the business transfer, changed its name to LG LCD Co., Ltd. In July 1999, LG Electronics entered into a joint venture agreement with Philips Electronics pursuant to which Philips Electronics acquired a 50% interest in LG LCD. In connection with this transaction, LG LCD transferred its existing software-related business to LG Electronics in order to focus solely on the TFT-LCD business. In addition to the contribution of TFT-LCD-related businesses from LG Electronics and LG Semicon, the joint venture also benefited from Philips Electronics' management skills, brand recognition and experience in research and development relating to TFT-LCD products. The joint venture, which was renamed LG.Philips LCD Co., Ltd., was officially launched in September 1999." LPL also is producing documents regarding its organizational structure. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 25:

Identify each and every Visual Display Product that is made or sold by LGP, by model number and/or other LGP designation which have a rear mounting hole(s) like those shown in Figures 4A-5 and 8-16 of the Patents-in-Suit.

#### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory

because it is overly broad, unduly burdensome and not reasonably calculated to lead to the

discovery of admissible evidence. LPL further objects to this Interrogatory as calling for legal

conclusions. LPL also objects to this Interrogatory as premature and prior to the time for

*Markman* definitions or briefing. LPL further objects to this Interrogatory because it is vague

and ambiguous, including, for example, with respect to the term "rear mounting hole(s)". LPL

will provide more detailed information regarding the asserted claims at the appropriate time and

based on further discovery, possibly including, for example, in expert reports and/or *Markman*

briefing. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when

and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 26:

Identify each and every Visual Display Product by model number and/or other designation of which LGP is aware, which is or has been marked with any of the Patents-in-Suit and state the date on which each such product was first marked and the patent number(s) with which it was marked.

#### OBJECTIONS AND ANSWER

LPL objects to this Interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine. LPL further objects to this Interrogatory

because it is vague, overly broad, unduly burdensome and not reasonably calculated to lead to

the discovery of admissible evidence. Subject to and without waiving those objections, and based on LPL's current knowledge, LPL states as follows:

LPL is not aware of any products marked with the numbers of the Patents-in-Suit. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

November 10, 2006

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-2306
(302) 655-5000
rkirk@bayardfirm.com
Attorneys for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Lora Brzezynski
Matthew T. Bailey
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
(202) 496-7500