# CASE 2

Westlaw.

193 F.3d 47                                                                                                               Page 1
193 F.3d 47, 44 Fed.R.Serv.3d 1196, 39 UCC Rep.Serv.2d 609
(Cite as: 193 F.3d 47)

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
First Circuit.
JOM, INC., d/b/a Chipco International, Ltd.,
Plaintiff, Appellee,
v.
ADELL PLASTICS, INC., Defendant, Appellant.
No. 97-2131.

Heard March 4, 1998.
Decided Oct. 4, 1999.

Manufacturer of casino gaming chips brought breach of contract and other claims against seller of resin used to make chips after manufacturer was required to replace chips because of complaints about their quality. Seller counterclaimed for balance due on account receivable against manufacturer. Following jury trial, the United States District Court for the District of Maine, David M. Cohen, United States Magistrate Judge, entered judgment for manufacturer in net amount of $884,322. Seller appealed. The Court of Appeals, 151 F.3d 15, affirmed in part, vacated in part, and remanded. On rehearing en banc, the Court of Appeals held that: (1) admission of evidence that chips returned by manufacturer's customers were manufactured with the seller's resin was not an abuse of discretion; (2) admission of "chip replacement binder" (CRB), containing customer complaint information maintained by the manufacturer, was not an abuse of discretion; and (3) manufacturer's silence regarding seller's damages limitations clause did not necessarily exclude that term.

Affirmed in part, and remanded.

West Headnotes

**[1] Federal Civil Procedure** ⟸1636.1
170Ak1636.1 Most Cited Cases
Casino gaming chip manufacturer's destruction of chips returned by customers did not unfairly prejudice resin seller under the circumstances, and thus, admission of evidence that the returned chips were manufactured with the seller's resin was not an abuse of discretion; despite knowing of the chip destruction program, seller inexplicably failed to ask the district court to intervene, but instead lay in wait until the eve of trial before moving to exclude the evidence, and jury was instructed that it could draw an inference adverse to manufacturer if it found the chips were destroyed for other than an "innocent reason." Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[2] Federal Civil Procedure** ⟸1636.1
170Ak1636.1 Most Cited Cases
District court, in its discretion, may exclude related evidence by way of sanctioning a willful or negligent destruction or alteration of physical evidence which causes unfair prejudice to another party.

**[3] Federal Civil Procedure** ⟸1636.1
170Ak1636.1 Most Cited Cases
Denial of an eve-of-trial motion in limine to exclude from evidence a "chip replacement binder" (CRB), containing customer complaint information maintained by a manufacturer of casino gaming chips, was not an abuse of discretion in manufacturer's suit against seller of resin allegedly used to produce chips returned by customers, despite claim that manufacturer should have produced the customer files in their entirety; seller should have sought to obtain voluntary disclosure by manufacturer during discovery, failing which it should have moved to compel production well in advance of trial. Fed.Rules Civ.Proc.Rule 37(a)(2)(A), 28 U.S.C.A.

**[4] Federal Courts** ⟸628
170Bk628 Most Cited Cases
Party claiming prejudice resulting from its belated receipt of evidence is poorly positioned on appeal if it elected to forego a request for continuance below.

**[5] Sales** ⟸23(4)
343k23(4) Most Cited Cases
Resin buyer, who was silent regarding seller's damages limitations clause, could not invoke the Uniform Commercial Code (UCC) section pursuant to which additional terms do not become part of a contract if notification of objection is given, despite buyer's assertion that its silence signaled implicit preference for the UCC's gap-filler terms. U.C.C. § 2-207(2)(c).

**[6] Federal Courts** ⟸611
170Bk611 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Although unpreserved claims normally are reviewed for plain error, the waiver rule is not rigidly applied, particularly where there is language in the trial court order which sounds sufficiently "final" that it could reasonably have misled the party seeking to challenge the ruling on appeal.

[7] Sales ⇐23(4)
343k23(4) Most Cited Cases
Under the Uniform Commercial Code (UCC), if the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made "expressly conditional" on the buyer's assent to any additional or different terms in the invoice, a contract is formed, and its precise terms are determined through recourse to the three-part test set forth in the UCC. U.C.C. § 2-207.

[8] Sales ⇐23(4)
343k23(4) Most Cited Cases
Under the Uniform Commercial Code (UCC), if seller makes its acceptance expressly conditional on the buyer's assent to any additional or divergent terms in the seller's invoice, the invoice is merely a counteroffer, and a contract is formed only when the buyer expresses its affirmative acceptance of the seller's counteroffer. U.C.C. § 2-207.

[9] Sales ⇐23(4)
343k23(4) Most Cited Cases
Under the Uniform Commercial Code (UCC), unlike the "mirror image" rule at
common law, a seller's invoice is not deemed "expressly conditional" merely because its terms do not match the terms of the buyer's offer, but rather, to be deemed "expressly conditional," the seller's invoice must place the buyer on unambiguous notice that the invoice is a mere counteroffer. U.C.C. § 2-207.

[10] Sales ⇐33
343k33 Most Cited Cases
Under the Uniform Commercial Code (UCC), where for any reason the exchange of forms does not result in contract formation, a contract nonetheless is formed if parties' subsequent conduct demonstrates that the parties believed a binding agreement had been formed. U.C.C. § 2-207(2, 3).

[11] Constitutional Law ⇐70.3(3)
92k70.3(3) Most Cited Cases

[11] Constitutional Law ⇐72
92k72 Most Cited Cases

When called upon to interpret a statute, Court of Appeals is constrained in the first instance by the policymaking prerogatives of the legislative and executive branches as expressed or implied in the statute itself.

[12] Statutes ⇐211
361k211 Most Cited Cases
Uniform Commercial Code (UCC) Official Comments do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the UCC. U.C.C. § 1-101 et seq.

*48 John M.R. Paterson, with whom Mary Elizabeth Fougere and Bernstein, Shur, Sawyer & Nelson were on brief for appellant.

Catherine R. Connors, with whom Peter W. Culley, Geraldine G. Sanchez and Pierce Atwood were on brief for appellee.

Before TORRUELLA, Chief Judge, SEYLA, BOUDIN, STAHL, LYNCH and LIPEZ, Circuit Judges, COFFIN and CYR, Senior Circuit Judges.

*49 OPINION EN BANC

PER CURIAM.

Adell Plastics, Inc. ("Adell") appealed from a district court judgment awarding JOM, Inc., d/b/a Chipco International, Ltd. ("Chipco"), $884,322 in compensatory damages for breach of contract. The panel opinion affirmed the liability ruling, but remanded to the district court for a recalculation of damages in accordance with a contractual damages-limitation clause. Chipco's motion for rehearing *en banc* having been granted, we vacate the panel opinion. Having concluded that oral argument is unnecessary, we rely instead on the parties' written submissions. We now reinstate that portion of the panel opinion affirming the district court's liability ruling, but remand to the district court for its determination as to whether the damages cap constituted a "material alteration" excludable from the contracts of the parties.

I
BACKGROUND
Chipco produces and sells casino gaming chips manufactured from pelletized polyester resin. From 1986 to 1994, Chipco acquired its resin exclusively from General Electric. In September 1994, Chipco decided to purchase a less expensive resin produced by Adell, which Adell represented to be equal or

superior in quality to the resin supplied by General Electric. The purchase orders which Chipco forwarded to Adell contained no language relating to warranties or remedies in the event of breach. In contrast, the reverse side of the invoices Adell forwarded to Chipco with each resin shipment listed numerous conditions of sale, one of which the "damages-limitation clause" ("No claim of any kind ... shall be greater in amount than the purchase price of the materials in respect of which damages are claimed.") is central to the present appeal.

After July 1995, Chipco bought all its resin from Adell. Before long, however, Chipco's casino customers began to complain that the new gaming chips were less attractive and durable than those produced with the General Electric resin. Consequently, in accordance with its two-year unconditional product warranty Chipco had to replace more than one million chips due to defects attributable to their chemical composition. Since Adell was unable to correct its defective resin, by February 1996 Chipco had resorted to another resin supplier.

Chipco brought suit against Adell in federal district court, alleging breach of contract, breach of warranties, negligence, and fraudulent or negligent misrepresentation. Chipco demanded past and future damages for its chip-replacement costs and lost profits. Adell counterclaimed for the balance due on its account receivable against Chipco. The district court (Hornby, J.) granted Adell partial summary judgment on the ground that the damages-limitation clause in its invoices formed part of the sales contract and established the resin purchase price as the cap on damages recoverable by Chipco. The remaining issues were scheduled for trial on June 24, 1997, before United States Magistrate Judge Cohen ("trial judge").

On the eve of trial, Adell filed several motions *in limine*, seeking to exclude from evidence (i) proof relating to the defective condition and replacement cost of thousands of gaming chips which had been destroyed by Chipco during discovery and (ii) various documents which Chipco had culled from its business records for use in proving liability and damages, on the ground that Chipco had failed to produce the more complete business records Adell had requested during discovery. The trial judge denied both motions.

In addition, consistent with the earlier grant of partial summary judgment by Judge Hornby, Adell sought to exclude all evidence of damages over and above the purchase price of the resin. The trial judge denied this motion *in limine* as well, on the ground that our intervening decision *50 in Ionics, Inc. v. Elmwood Sensors, Inc., 110 F.3d 184 (1st Cir.1997), effectively displaced Judge Hornby's summary judgment ruling as the law of the case, thereby precluding as a matter of law any consideration of the damages-limitation clause in construing the sales contracts between Adell and Chipco.

After Chipco rested its case at trial, Adell successfully moved for judgment as a matter of law on the negligence and fraudulent misrepresentation counts, *see* Fed.R.Civ.P. 50(a)(1), but elected not to renew its Rule 50 motion as to the remaining counts following the close of the evidence. The jury returned a special verdict totaling $961,658 on Chipco's breach of contract and warranty claims, and for $77,336 on Adell's counterclaim. The district court accordingly entered final judgment for Chipco in the net amount of $884,322, from which Adell has appealed.

II

DISCUSSION

A. *Evidentiary Rulings Relating to Adell's Liability*

1. *The Destroyed Chips*

[1] At the outset Adell argues that it was error to admit evidence that Chipco's casino customers had returned thousands of chips manufactured with Adell resin, since Chipco conceded that it had destroyed all but a small sampling of the returned chips prior to trial, thereby depriving Adell of any opportunity to discover independent proof that the destroyed chips had been manufactured from General Electric resin, rather than Adell resin. Adell further contends that Chipco continued to destroy the returned chips even after Adell had made its discovery request that Chipco turn over all returned chips to Adell.

[2] We review the denial of the motion *in limine* only for abuse of discretion. *See Gonzalez-Marin v. Equitable Life Assurance Soc'y of the U.S.*, 845 F.2d 1140, 1147 (1st Cir.1988); *see also Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1158 (1st Cir.1996). The district court, in its discretion, may exclude related evidence by way of sanctioning a willful or negligent destruction or alteration of physical evidence which causes unfair prejudice to another party. *See Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir.1997). We discern no abuse of discretion by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trial judge.

Unlike most types of physical evidence, casino chips are a form of quasi-currency, which State gaming laws commonly require the casino or chip manufacturer to destroy upon removal from service. *See, e.g.,* N.J. Admin. Code, tit. 19, ch. 46, § 19:46-1.6 (Inventory, Security, Storage and Destruction of Gaming Chips). Yet early in the discovery process, after Chipco had informed Adell of this ongoing chip destruction program, Adell inexplicably failed to ask the district court to intervene. *See* Fed.R.Civ.P. 37; *R.W. Int'l Corp. v. Welch Foods, Inc.,* 937 F.2d 11, 18- 19 (1st Cir.1991) (noting that [Federal Civil] Rule 37 is a "case management tool" which "sets forth a clear path to be followed if a party believes that another litigant is not cooperating in the discovery process," and that "defendants should have filed a motion to compel production"). Instead, Adell lay in wait until the eve of trial before filing its motion *in limine.*

In these circumstances the district court fairly could infer that Adell had bided its time in order to exploit the incurability of the alleged discovery violation by Chipco, rather than undertake its own chemical analysis of the resin content of the sample chips proffered by Chipco at trial. Furthermore, Chipco adduced trial testimony that its customers had never complained about defective chips between 1986 and 1994 while Chipco was using General Electric resin but only after Chipco began using Adell resin. Adell cross-examined these witnesses at length.

Finally, the trial judge instructed the jury that it could draw an inference adverse *51 to Chipco if it were to find that Chipco had destroyed the chips for other than an "innocent reason." *See* Blinzler, 81 F.3d at 1159 (endorsing similar instruction). As the destruction of chips did not unfairly prejudice Adell in these circumstances, the denial of its motion *in limine* did not constitute an abuse of discretion. *See* Gonzalez-Marin, 845 F.2d at 1147.

**2.** *The Business Records*

[3] Adell next challenges the denial of its motion to exclude from evidence the so-called "chip replacement binder" ("CRB") maintained by Chipco. In November 1996, Adell sought to discover any "customer file folders" containing customer complaints received by Chipco relating to chips manufactured from Adell resin. Rather than provide Adell with the entire contents of its customer files, Chipco produced the documents it considered relevant to the claims in litigation and compiled them in the CRB. These documents included the original customer-order forms, the Chipco invoices, and a "Job Production Cost Summary" detailing what it cost Chipco to manufacture both the original and the replacement chips. Early in 1997 Adell exhaustively deposed Chipco officials regarding the contents of the CRB. In due course Chipco included the CRB on the Joint Exhibit List.

Once again on the eve of trial, Adell filed a motion *in limine* urging for the first time that the CRB be excluded because Chipco had not produced the customer files in their entirety. Since the chips returned by customers bore no distinctive markings which would permit a visual determination as to whether they had been manufactured from resin supplied by Adell or by General Electric, Adell surmised that other documents in the customer files might have enabled it to trace individual returned chips back to Chipco's original customer invoices, and thereby establish that particular chips had been manufactured at a time Chipco was using only General Electric resin.

The trial judge denied the motion on the ground that Adell's objection should have been raised during discovery. We agree. [FN1] Whatever the breadth of its original document request, had Adell truly been concerned that Chipco either misinterpreted or willfully failed to comply with the discovery request, it should have conferred in a timely manner with a view to obtaining *voluntary* disclosure by Chipco, *see* Fed.R.Civ.P. 37(a)(2)(A) (requiring certification of movant's good-faith consultation), failing which it should have moved to compel production, *see id.,* well in advance of trial. *See* DesRosiers v. Moran, 949 F.2d 15, 22 n. 8 (1st Cir.1991) (noting that "courts have often deemed discovery violations to have been waived" where parties fail "to bring the matter of non-production to the court's attention at the pretrial hearing or in some other timely fashion"); Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17, 23 (1st Cir.1981) (noting that party which deliberately passes up available discovery remedies "cannot wait for trial and then seek close to a declaration of victory on the issue"); Clinchfield R.R. Co. v. Lynch, 700 F.2d 126, 132 (4th Cir.1983) (same); *see also* Jackson v. Harvard Univ., 900 F.2d 464, 469 (1st Cir.1990) ("Preclusion and negative inference are grave steps, 'by no means an automatic response to a delayed disclosure ... [or] where failure to make discovery [is] not willful.' ") (citation omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 F.3d 47  
193 F.3d 47, 44 Fed.R.Serv.3d 1196, 39 UCC Rep.Serv.2d 609  
**(Cite as: 193 F.3d 47)**

Page 5

FN1. We assume *arguendo* that the CRB was material to Chipco's breach of contract claim (*i.e.*, evidence that the condition of the returned chips violated express or implied warranties) as well as to damages (*i.e.*, evidence of replacement costs). Of course, to the extent the CRB was relevant to establish a measure of damages in excess of the cost of the Adell resin, its admission in evidence would have been harmless error as well. *See* Fed.R.Civ.P. 61; *infra* Section II.B.

[4] Moreover, it is important to note that Adell does not suggest that it acquired any new information regarding the contents of the CRB between April 1997 *52 and the commencement of trial. Coupled with its procrastination after learning of the ongoing destruction of returned chips, *see supra* Section II.A.1, its failure to move to compel production of the complete customer file folders until the eve of trial gave rise to a virtually inevitable inference that Adell was not so much interested in obtaining the customer folders to disprove its contract liability, as to hold in abeyance a putative discovery violation with which to prevent Chipco from introducing at trial the highly prejudicial evidence contained in the CRB. For these reasons, we reject the contention that the trial judge abused his discretion in treating Adell's stratagem as yet another instance of unfair brinkmanship. [FN2]

FN2. Adell also contended, for example, that Chipco failed to produce certain artwork depicting the distinctive designs Chipco printed on the chips it produced for individual casinos. It argues that the artwork might have been matched to the various invoices in the CRB, so as to belie the trial testimony that all chips returned to Chipco were manufactured with Adell resin. Adell acknowledges that it made no specific request to produce the artwork at any time prior to its motion *in limine*. Moreover, its oblique and convoluted "matching" technique was not so patently obvious a method of proving the resin content of the returned chips as to place Chipco on fair notice of Adell's desire to obtain the artwork. Further, though Chipco nonetheless offered to produce the artwork on the first day of trial, Adell declined its offer. Adell now characterizes Chipco's offer as "too little, too late," because the court would not have countenanced a motion to continue the trial. As we have observed repeatedly, however, a party claiming prejudice resulting from its belated receipt of evidence is poorly positioned on appeal if it elected to forego a request for continuance below. *See* Newell Puerto Rico, Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 20 (1st Cir.1994); DesRosiers, 949 F.2d at 22. Finally, the other evidentiary challenges Adell poses to financial records, physical evidence, and expert testimony neither demonstrate reversible error nor warrant separate discussion.

**B.** *Evidentiary Ruling Relating to Damages*

**1.** *UCC Section 2-207(2)(c)*

[5][6] Adell next challenges the denial of its motion *in limine* to preclude evidence of contract damages over and above the resin purchase price based on the damages-limitation clause cap. [FN3] Although Judge Hornby had granted Adell partial summary judgment on this issue earlier, the trial judge thereafter ruled that our intervening decision in Ionics, 110 F.3d at 184, required a different result. *See* Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 n. 6 (1st Cir.1997) (if governing law changes, court may revisit law of the case).

FN3. At trial, Adell did not renew the substance of its motion *in limine*, presumably because it did not understand that the earlier ruling was provisional only. *Cf.* Waukesha Foundry, Inc. v. Industrial Eng'g, Inc., 91 F.3d 1002, 1006 (7th Cir.1996) (treating comparable motion *in limine* as one for summary judgment). Although unpreserved claims normally are reviewed for "plain error," *see* Gill v. Thomas, 83 F.3d 537, 540-41 (1st Cir.1996), the waiver rule is not rigidly applied, particularly where there is language in the trial court order which sounds sufficiently "final" that it could reasonably have misled the party seeking to challenge the ruling on appeal, here Adell, *see, e.g.,* Fusco v. General Motors Corp., 11 F.3d 259, 262-63 (1st Cir.1993). *See* JOM, Inc. v. Adell Plastics, Inc., No. 96-156, slip op. at 1 (D.Me. Aug. 22, 1997) ("determining as a matter of law that the disputed term is not part of the contract"). We therefore review the present objection by Adell for abuse of discretion only.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The instant claim turns on an interpretation of section 2-207 of the Uniform Commercial Code ("UCC"), whose drafters intended to address "the sad fact that many [modern] sales contracts are not fully bargained, not carefully drafted, and not understandingly signed by both parties." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 1-3, at 6 (4th ed.1995) [hereinafter: "White & Summers"]. Thus, contracting merchants commonly exchange "canned" forms: typically, the prospective buyer forwards a purchase order to a prospective seller after filling in the quantity and price; then the seller delivers the goods to the buyer, along with *53 an invoice. [FN4] It is not at all uncommon, of course, for the purchase order and invoice to prescribe quite different conditions of sale, normally as prompted by the perceived self-interest of the proponent.

> FN4. In some cases, of course, the seller--rather than the buyer--may initiate the "battle of forms." For ease in reference, however, we adhere to the format and labels set out in the text.

Under the so-called "mirror image" rule which prevailed at common law, an invoice from the seller containing terms materially different from those in the buyer's offer would be considered a mere counteroffer, rather than an acceptance of the offer. Thus, no contract came into existence unless the buyer subsequently accepted the counteroffer, either expressly or impliedly (*e.g.*, by accepting delivery of the goods). UCC § 2-207 was designed to address the rigidity of the common-law rule by severely restricting the circumstances in which the "mirror image" rule would be allowed to defeat the formation of a contract of sale:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Title.
> UCC § 2-207. [FN5]

> FN5. As there is no contention that the transactions at bar would be accorded divergent treatment under the law of Maine, Maryland or Massachusetts, we apply the UCC § 2-207 interpretation laid down in *Ionics.* See *Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1094 (1st Cir.1989) (court may bypass choice-of-law issue where result would be same in either jurisdiction).

[7] Section 2-207 thus affords three main avenues to contract formation. *See generally* White & Summers § 1-3, at 19-20. First, if the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made "expressly conditional" on the buyer's assent to any additional or different terms in the invoice, a contract is formed, and its precise terms are determined through recourse to the three-part test in § 2-207(2).

[8][9] Second, if the seller does make its acceptance "expressly conditional" on the buyer's assent to any additional or divergent terms in the seller's invoice, the invoice is merely a counteroffer, and a contract is formed only when the buyer expresses its affirmative acceptance of the seller's counteroffer. Unlike the "mirror image" rule at common law, however, the seller's invoice is not deemed "expressly conditional" under § 2-207 merely because its terms do not *match* the terms of the buyer's offer. Rather, to be deemed "expressly conditional," the seller's invoice must place the buyer on unambiguous notice that the invoice is a mere counteroffer. *See id.* at 20 (noting that "express conditionality" is "*not* easily invoked").

*54 [10] Finally, where for any reason the exchange of forms does not result in contract formation (*e.g.,* the buyer "expressly limits acceptance to the terms of [its offer]" under § 2-207(2)(a), or the buyer does not accept the seller's counteroffer under the second clause of § 2-207(1)), a contract nonetheless is formed if their *subsequent conduct*--for instance, the seller ships and the buyer accepts the goods--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 F.3d 47                                                                                                              Page 7
193 F.3d 47, 44 Fed.R.Serv.3d 1196, 39 UCC Rep.Serv.2d 609
**(Cite as: 193 F.3d 47)**

demonstrates that the parties *believed* that a binding agreement had been formed. The terms of their agreement would then be determined under the "default" test in § 2-207(3), which implicitly incorporates the criteria prescribed in § 2-207(2).

The present controversy implicates the very different interpretation of § 2-207 announced more than three decades ago in *Roto-Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir.1962). *But see Ionics*, 110 F.3d at 187 (overruling § 2-207 interpretation announced in *Roto-Lith* ). There, Roto-Lith sent Bartlett a purchase order which did not mention warranties. Bartlett returned an invoice expressly excluding all warranties and limiting Roto-Lith's remedies for breach of contract to the replacement cost of any goods which differed materially from specified samples. The Bartlett invoice further required that Roto-Lith notify it "at once" in the event the additional conditions in the invoice were unacceptable. Instead, Roto-Lith accepted delivery of the goods and remained silent. When the goods proved defective, Roto-Lith brought an action for breach of contract against Bartlett. *See id.* at 498-99.

At trial, Bartlett moved for directed verdict on the ground that its invoice was an "acceptance ... expressly made conditional on assent to [its] additional or different terms," and therefore constituted a mere counteroffer under the *second* clause of § 2-207(1), rather than an acceptance which formed a binding contract. Bartlett argued that (i) a binding contract thereafter was formed when Roto-Lith accepted delivery of the goods without objecting to Bartlett's exclusion of warranties, (ii) all terms of the invoice then became part of the sales contract by operation of the common-law "mirror-image" rule, and (iii) therefore the statutory criteria for determining the terms of the contract *i.e.*, subsections 2-207(2) and (3) were rendered inapposite. *See id.* at 499-500.

Roto-Lith responded that notwithstanding the divergent term in the Bartlett invoice excluding all warranties, the invoice did not announce itself as a counteroffer; hence, the invoice qualified as an "acceptance" within the meaning of the *first* clause of § 2-207(1), and a contract was formed. Further, Roto-Lith argued, since the warranty exclusion in the Bartlett invoice "materially altered" the terms of the Roto-Lith offer, § 2-207(2)(b) controlled and precluded the warranty exclusion from becoming a contract term. *Id.*

The district court accepted Bartlett's interpretation, holding that the drafters did not intend that the UCC displace the common law tests applicable to these everyday commercial transactions. We affirmed. *See id.* at 500 (holding that "a response [*viz.*, an invoice] which states a condition materially altering the obligation solely to the disadvantage of the offeror is an 'acceptance ... expressly conditional on assent to the additional terms' "); *see also Ionics*, 110 F.3d at 185 (noting that *Roto-Lith* abandoned subsections 2-207(2) and (3), and "reverted to the common law").

Thirty-five years later, *Ionics* displaced *Roto-Lith*. There, Ionics had sent Elmwood a purchase order expressly reserving all "remedies provided by law or equity" and insisting that "[a]cceptance by [Elmwood] of this order shall be upon the terms and conditions set forth [herein] ... [and][n]o terms which are in any manner additional to or different from those herein set forth shall become a part of, alter or in any way control the terms and conditions herein set forth." *Id.* Elmwood returned an invoice which excluded all warranties not "expressly set forth herein," disclaimed any liability for consequential or *55 incidental damages, and limited Ionics's remedy for breach to a refund of the purchase price upon return of the goods. *Id.* at 186. After Ionics accepted delivery, the goods proved defective and Ionics sued Elmwood for contract damages. Relying on *Roto-Lith*, Elmwood moved for partial summary judgment, contending that the express exclusion of any implied warranty of fitness contained in its invoice became part of the contract which was formed when Ionics accepted Elmwood's "counteroffer" by taking delivery of the goods without any objection to its divergent terms.

The district court denied the Elmwood motion for summary judgment. *Ionics, Inc. v. Elmwood Sensors, Inc.*, 896 F.Supp. 66 (D.Mass.1995). It distinguished *Roto-Lith* on the ground that the Roto-Lith purchase order had been *silent* in regard to warranties, whereas the Ionics purchase order expressly reserved all implied warranties "provided by law," thus directly contradicting and precluding *ab initio* the subsequent proposal in the Elmwood invoice to exclude all implied warranties. "If *Roto-Lith* applied in [both types of] cases [*viz.*, to objecting and 'silent' buyers alike] ..., § 2- 207(3) would be preempted entirely" by the "mirror image" rule. *Id.* at 69. The district court then certified its partial summary judgment ruling for immediate appeal.

In the ensuing appeal by Elmwood, we rejected the attempts by Ionics and the district court to distinguish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

193 F.3d 47                                                                                                    Page 8
193 F.3d 47, 44 Fed.R.Serv.3d 1196, 39 UCC Rep.Serv.2d 609
(Cite as: 193 F.3d 47)

*Roto-Lith* on its facts: "It would be artificial to enforce language [*viz.*, the warranty disclaimer in the *Roto-Lith* invoices] that conflicts with *background legal rules* while refusing to enforce language [*viz.*, the warranty disclaimer in the *Ionics* invoices] that conflicts with the express terms of the contract." *Ionics, 110 F.3d at 188* (emphasis added). From a policy standpoint, we observed that such distinctions also would "lead parties to include more of the background [legal] rules in their initial forms, making forms longer and more complicated," which in turn would have the perverse effect of discouraging the contracting parties from reading the forms exchanged between them. *Id.*

Finding no principled basis on which to distinguish the circumstances in *Ionics* and *Roto-Lith*, we overruled *Roto-Lith*. See *id.* at 189. Shifting our focus from the common-law "mirror image" rule to the UCC, we noted that the Ionics-Elmwood transaction fit squarely within the ambit of Comment 6 to § 2-207:

> Where clauses on confirming forms sent by both parties conflict[,] each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2)[ (c) ] is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).

UCC § 2-207 cmt. 6.

We thus rejected the *Roto-Lith* "mirror image" rule that the mere proposal of an additional or different material term by the seller would make its invoice a counteroffer to the buyer's purchase offer (*i.e.*, an "acceptance ... expressly made conditional on [the buyer's] assent"), rather than an outright acceptance of the buyer's purchase offer. Instead, the forwarding of such an invoice gives rise to a binding contract and in the event of a contract dispute the terms of the contract are determined under the test set forth in § 2- 207(3), which in turn implicitly incorporates the criteria in § 2-207(2). *Ionics, 110 F.3d at 189.*

Chipco urges--as the trial judge held--that *Ionics* controls the present dispute even though the Chipco purchase orders contained no express objection to a damages-limitation clause, on the ground that our "background legal rules" discussion in *Ionics* necessarily implied that all so-called *56 UCC "gap-fillers"--those UCC provisions designed to supply necessary default terms where the parties' contract is silent--must be read into all "silent" purchase orders, and thus serve as the buyer's "[prior] notification of objection" under § 2-207(2)(c). According to Chipco, these gap-fillers include not only a reservation of the implied warranties, *see, e.g.*, UCC §§ 2-314 (implied warranty of merchantability) & 2-315 (implied warranty of fitness for a particular purpose), which were at issue in *Roto-Lith* and *Ionics*, but also the buyer's presumptive right to recover in full measure all contract damages attributable to the seller's breach, *see id.* §§ 2-714 (damages for breach) & 2-715 (recovery of incidental and consequential damages). We conclude that the reading given our "background legal rules" discussion by the trial judge is more expansive than its context warranted.

The "background legal rules" discussion in *Ionics* addressed Ionics' attempt to hypothesize a factual distinction between its case and *Roto-Lith*. Assuming *arguendo* that the *Roto-Lith* rule were to remain intact as controlling circuit precedent, we posed the very narrow question whether it would make sense to establish an exception to *Roto-Lith* 's "mirror image" rule where the buyer expressly excludes *ab initio*, in its purchase order, the seller's additional terms, while withholding that same protection to a buyer-- like Roto-Lith--which reasonably may have presumed that the court would use the UCC as its baseline guide for determining the buyer's contract expectations. For the policy reasons already noted, *see supra*, we were persuaded that engrafting a common-law exception (*i.e.*, when the purchase order expressly forecloses the seller from proposing particular divergent terms) onto the common-law rule announced in *Roto-Lith* was not warranted.

[11] In fashioning common-law rules--like the broad common-law exception to § 2-207 carved out in *Roto-Lith*--courts almost invariably weigh public policy considerations, often on their own motion if need be. See, e.g., *Claypool v. Levin*, 209 Wis.2d 284, 562 N.W.2d 584, 588 (1997). It is hardly surprising, therefore, that our opinion in *Ionics* discussed the policies which would be fostered were we to refine and perpetuate the common-law rule established in *Roto-Lith*. On the other hand, when called upon to interpret a statute, we are constrained in the first instance by the policymaking prerogatives of the legislative and executive branches as expressed or implied in the statute itself. See, e.g., *Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 456 A.2d 894, 903 (1983) (noting that "declaration of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public policy of [the State] is normally the function of the General Assembly," which is fully empowered to abrogate common-law rules).

Once we determined that *Roto-Lith* and *Ionics* could not be distinguished in a principled manner, however, the "background legal rules" discussion in *Ionics* went by the wayside with the common-law hypothetical from which it emerged, which explains why the phrase is never again mentioned in the *Ionics* decision. Instead, after concluding that routine recourse to common-law rules is not required by the second clause of UCC § 2-207(1), we turned to the more constringent task of statutory interpretation. Presented with a clean statutory slate, we announced the narrow holding that the UCC expressly protects a buyer, like Ionics, whose purchase order *expressly forewarns* the seller of particular contract terms which the buyer would find objectionable--pursuant to the "[prior] notification of objection" clause in § 2-207(2)(c). *Ionics,* 110 F.3d at 189. Indeed, given the emphatic language in its purchase order, it is likely that Ionics was entitled to the protection of § 2-207(2)(a) as well.

Further conclusions of law were not required. It was Elmwood which had sought *partial summary judgment* based on the *per se* rule announced in *Roto-Lith* that all new terms in a seller's "counteroffer" *57 automatically become contract terms where the buyer remains silent and renders performance under the contract. Once the common-law rule in *Roto-Lith* became defunct, it necessarily followed that Elmwood was not entitled to judgment as a matter of law under Rule 56, and its appeal failed. Since Ionics was *not* a "silent" buyer of the Roto-Lith type, nor had it moved for summary judgment, we were not required to consider whether a "silent" buyer, such as Roth-Lith or Chipco, also would be protected by § 2-207(2)(c) or by any other provision in section 2-207. In other words, *Ionics* simply announced that both types of buyers were relieved from the *per se* common-law rule of inclusion laid down in *Roto-Lith,* and *not* that a Roto-Lith-type "silent" buyer may invoke § 2-207(2)(c). As Chipco is a "silent" buyer, however, we now address that unresolved issue.

[12] After rejecting the *Roto-Lith* common-law "mirror image" rule of offer and counteroffer, we noted in *Ionics* that the transaction between Ionics and Elmwood came within the literal language of Official Comment 6 to § 2-207, [FN6] which excludes from the contract a new term proposed by a seller where "*clauses* on confirming forms sent by both parties conflict." (Emphasis added.) Of course, where the buyer's purchase order includes no term relating to the subject matter dealt with in the new term proposed by the seller (*i.e.,* the purchase order is "silent"), it literally cannot contain a "clause" with which the seller's invoice could conflict.

> FN6. UCC Official Comments "do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the [UCC]." *LTV Energy Prods. Co. v. Northern States Contracting Co. (In re Chateaugay Corp.),* 162 B.R. 949, 955 n. 5 (Bankr.S.D.N.Y.1994) (citing White & Summers § 4, at 12).

Whatever its policy implications, the rationale underlying this distinction is readily discernible. The buyer which explicitly includes a particular term in its purchase order--even a UCC gap-filler--presumably demonstrates that it has considered the allocation of business risks associated with the term, and, for example, has determined that it is unwilling to accept greater risk. Thus, as is the case with "restricted offers" under § 2-207(2)(a), it is appropriate to treat the buyer's explicit prior objection as a term which is "material," *per se,* to the formation of any contract.

On the other hand, although the "silent" buyer *may be* signaling its implicit preference for the UCC's gap-filler terms, its silence alone provides no reliable basis for a *per se* rule of exclusion since it leaves open the key question whether the buyer regarded any particular gap-filler term as especially "material" in the circumstances of the transaction at hand. For instance, its purchase order may have omitted a clause precluding any damages-limitation clause, not because the buyer meant to insist that no such term be precluded, but rather, for example, because the parties' course of performance or course of dealing, or the relevant trade usage, establishes that a damages-limitation clause is presumptively included as an implicit term in the contract. *See* White & Summers § 1-3, at 18 (noting that the § 2-207(2)(b) "materiality" test may turn, *inter alia,* on course of dealing or performance, or trade usage); UCC § 1-205 ("Course of Dealing and Usage of Trade"); § 2-208 ("Course of Performance or Practical Construction"). In such a setting, the buyer's silence may simply reflect that it considers a damages-limitation clause "immaterial" to contract formation. *See, e.g., Dale R. Horning Co. v. Falconer Glass Indus.,* 730 F.Supp. 962, 966 (S.D.Ind.1990); *see also Bergquist Co. v. Sunroc Corp.,* 777 F.Supp. 1236, 1246 (E.D.Pa.1991).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The context of UCC § 2-207 conclusively confirms that its drafters intended to accord distinctive treatment to sales transactions involving "silent" buyers. Official Comments 4 and 5 set forth examples of the additional or different terms which **\*58** may give rise to "material" and "immaterial" alterations under 2-207(2)(b). [FN7] Comment 5 lists, as an example of an "immaterial" alteration, "a clause ... otherwise limiting remedy in a reasonable manner (*see* Sections 2-718 and 2-719)." Section 2-719 envisions that contracting parties may agree to limit recoverable damages otherwise available under § § 2-714 and 2-715. Thus, if Chipco's interpretation of *Ionics* were correct, and all UCC gap-fillers (like § § 2-714 and 2-715) were to be read into every "silent" purchase order, then damages-limitation clauses *invariably* would be excluded from the contract under 2-207(2)(c), whether or not the purchase order expressly objected to such a limitation clause, and the "materiality" inquiry at the very core of UCC § 2-207(2)(b) and Comment 5 would become wholly superfluous. *See, e.g., Costos v. Coconut Island Corp.,* 137 F.3d 46, 49 (1st Cir.1998) (" 'Nothing in a statute may be treated as surplusage if a reasonable construction supplying meaning and force is otherwise possible.' ") (citation omitted). Thus, under the only harmonious interpretation available in the present context, these UCC provisions require that the "silent" buyer establish that it would have rejected a damages-limitation clause as a "material alteration," within the meaning of § 2-207(2)(b), given all the circumstances surrounding the transaction. *See supra* note 7; *infra* Section II.B.2.

> FN7. Comment 4 provides:
> Examples of typical clauses which would normally "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: *a clause negating such standard warranties* as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

UCC § 2-207 cmt. 4 (emphasis added).
Comment 5 provides:
Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; *a clause* limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or *otherwise limiting remedy in a reasonable manner (see Sections 2-718 and 2-719).*
UCC § 2-207 cmt. 5 (emphasis added).

Nevertheless, Chipco has not cited--and we cannot find--any case which endorses its reading of § 2-207(2)(c) and *Ionics.* Rather, the courts which have interpreted § 2-207(2)(c) do not read UCC gap-fillers into purchase orders as a matter of law, but insist that a merchant-buyer prove, for example, that a given invoice term worked a "material alteration" to the contract. *See, e.g., LTV Energy Prods. Co. v. Northern States Contracting Co. (In re Chateaugay Corp.),* 162 B.R. 949, 952, 957-58 (Bankr.S.D.N.Y.1994) (summarizing extant case law supporting proposition that, where "[buyer's] Purchase order ... did not contain any general terms or conditions of sale," and "where UCC § 2-207(2)(a) and (2)(c) [thus] *do not apply,"* the non-assenting party must prove, *inter alia,* that the seller's clause limiting the buyer's remedy to repair and replacement of the goods was a "material alteration") (emphasis added).

In summary, *Ionics* does not support the proposition that a "silent" buyer is presumed to have objected in advance to **\*59** any seller-term that conflicts with a UCC gap-filler provision. Instead, *Ionics* merely relieved the buyer of the burden imposed by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

automatic rule announced in *Roto-Lith,* which, by removing the case entirely from UCC § 2-207 and relying on the common law, precluded a buyer who had performed under the contract from demonstrating at trial that the adverse seller-term at issue did not become part of the contract. But if the "silent" buyer's purchase order neither "expressly limits acceptance to the terms of the offer" under § 2-207(2)(a), nor necessarily constitutes "[prior] [n]otification of objection to [any new terms added by the seller]" under § 2-207(2)(c), the buyer must look to some other UCC provision to exclude the new seller-term.

As *Ionics* is inapposite, and Adell's damages-limitation clause is not excludable under § 2-207(2)(c), Chipco could prevail only if the damages-limitation clause (i) effected a "material alteration" to the contract, *see* UCC § 2-207(2)(b), (ii) was "unconscionable," *id.* § 2-719(3), or (iii) failed of its essential purpose, *id.* § 2-719(2). *See LTV Energy Prods.,* 162 B.R. at 957-58.

**2.** *UCC Section 2-207(2)(b): Materiality*

Where, as here, both contracting parties are merchants (*viz.,* non-"consumers"), *see* UCC § 2-104(1) (defining "merchant"), UCC § 2-207(2) provides that any additional or different terms proposed by the seller become part of the sales contract "*unless* " the party which opposes the presumption of inclusion here, Chipco can show that at least one of the three preconditions specified in § 2-207(2) was met. *See, e.g., Avedon Eng'g, Inc. v. Seatex,* 126 F.3d 1279, 1284 (10th Cir.1997); *Comark Merch'g, Inc. v. Highland Group, Inc.,* 932 F.2d 1196, 1201-02 (7th Cir.1991); *Dale R. Horning, 730 F.Supp.* at 966 n. 2; *LTV Energy Prods.,* 162 B.R. at 956.

Section 2-207(2)(b) allows the buyer to show that a damages-limitation clause proposed by the seller did not become part of the contract, even though not objected to by the buyer, because its inclusion would work a "material alteration." Although the UCC does not define "material alteration," Official Comments 4 & 5 advise that a new term proposed by the seller is a "material alteration" where it would "result in [unreasonable] *surprise* or *hardship* [to the buyer] if incorporated without [the buyer's] express awareness." UCC § 2-207 cmt. 4 (emphasis added). Of course, Comments 4 and 5 are illustrative only and the UCC provides no further elucidation of the terms "surprise" or "hardship."

**III**
**CONCLUSION**

The panel opinion concluded that Chipco, in the summary judgment proceedings before Judge Hornby, had not preserved the issue as to whether the damages-limitation clause constituted a "material alteration," hence that Chipco was not entitled to a new trial. As the *en banc* court, excepting two members of the original panel, has determined that the highly idiosyncratic circumstances and travel of this case so warrant, a remand for further proceedings shall be ordered to permit Chipco an opportunity to establish that the contractual damages cap worked a "material alteration." As this "material alteration" question was never briefed or argued, either below or on appeal, we leave its consideration to the district court in the first instance. [FN8]

> FN8. Since Chipco's $884,322.39 damages award may not survive remand, it is not necessary at this juncture to address Adell's remaining arguments on appeal, relating to the jury award of future damages and lost profits.

*The judgment of liability in favor of Chipco is affirmed; the case is remanded for further proceedings in accordance \*60 with this opinion. The parties shall bear their own costs.* **SO ORDERED.**

193 F.3d 47, 44 Fed.R.Serv.3d 1196, 39 UCC Rep.Serv.2d 609

**Briefs and Other Related Documents (Back to top)**

• 1998 WL 34299807 (Appellate Brief) Reply Brief of Appellant (Feb. 04, 1998)Original Image of this Document with Appendix (PDF)

• 1998 WL 34299808 (Appellate Brief) Brief of Appellee (Jan. 22, 1998)Original Image of this Document with Appendix (PDF)

• 1997 WL 33768453 (Appellate Brief) Brief of Appellant (Dec. 01, 1997)Original Image of this Document with Appendix (PDF)

• 97-2131 (Docket) (Oct. 10, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.