# EXHIBIT 21

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD,    )
                                 )
              Plaintiffs,        )    C.A. No. 04-343(JJF)
                                 )
v.                               )
                                 )
TATUNG CO., TATUNG COMPANY OF    )
AMERICA, INC., and VIEWSONIC     )
CORPORATION,                     )
                                 )
              Defendants.        )

          Hearing of above matter taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of BLANK
ROME, LLP, 1201 North Market Street, Wilmington,
Delaware, on Thursday, December 28, 2006, beginning at
approximately 11:30 p.m., there being present:

BEFORE:  VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

          THE BAYARD FIRM
          RICHARD D. KIRK, ESQ.
            222 Delaware Avenue, Suite 900
            Wilmington, Delaware  19899
            for Plaintiffs

                CORBETT & WILCOX
          Registered Professional Reporters
    230 North Market Street     Wilmington, DE 19899
                 (302) 571-0510
              www.corbettreporting.com
          Corbett & Wilcox is not affiliated
        with Wilcox & Fetzer, Court Reporters

Hearing

2 (Pages 2 to 5)

Page 2

APPEARANCES (Continued):
MCKENNA, LONG & ALDRIDGE, LLP
CASS W. CHRISTENSON, ESQ.
REL S. AMBROZY, ESQ.
JESSE KOKRDA, ESQ.
CORMAC CONNOR, ESQ.
    1900 K Street, N.W.
    Washington, D.C. 20006
    for Plaintiffs

RICHARDS LAYTON & FINGER
FREDERICK L. COTTRELL, III
    One Rodney Square
    Wilmington, Delaware 19801
    for Defendant Tatung Co.

GREENBERG TRAURIG LLP
FRANK MERIDETH, ESQ.
    2450 Colorado Avenue, Suite 400E
    Santa Monica, California 90404
    for Defendant Tatung Company of America, Inc.

CONNOLLY BOVE LODGE & HUTZ LLP
JEFFREY B. BOVE, ESQ.
JACQUELINE MASON, ESQ.
    1007 North Orange Street
    Wilmington, Delaware 19899
    for Defendant Viewsonic Corporation
BINGHAM McCUTCHEN LLP
SCOTT R. MILLER, ESQ.
    355 South Grand Avenue
    Los Angeles, California 90071-3106
    for Defendant Viewsonic Corporation

Page 3

1          MR. BOVE: Your Honor, this is Jeff Bove
2   from Connolly Bove representing Viewsonic, along with
3   Jacqueline Mason and my partner Scott Miller from
4   Los Angeles.
5          MR. COTTRELL: And, your Honor, Fred
6   Cottrell at Richards Layton in Wilmington for Tatung, and
7   on the phone from Greenberg Traurig, Frank Merideth.
8          SPECIAL MASTER POPPITI: Next, please.
9          MR. KIRK: Dick Kirk from The Bayard
10  Firm here in Wilmington for the plaintiff LG Phillips LCD
11  Company, Ltd., and with me on the line from Washington,
12  and perhaps elsewhere, from McKenna Long & Aldridge are
13  Cass Christenson, Rel, R-e-l, Ambrozy, Derek Auito, and
14  Jesse Kokrda, K-o-k-r-d-a, and Cormac Connor,
15  C-o-r-m-a-c.
16         SPECIAL MASTER POPPITI: Thank you,
17  Mr. Kirk.
18         Then thank you, counsel, and good
19  morning as we come up shortly to noon.
20         Let's do some housekeeping first, if you
21  will, with respect to today's proceeding.
22         I would propose that, for purposes of
23  making sense of what I expect is going to be a fairly
24  healthy workday with you all, that we go for a period of

Page 4

1   approximately two hours so that we can take a break and
2   make sure that anyone who needs to refresh themselves can
3   do that.  And that break, I would expect a half hour,
4   unless someone suggests that we are going to need more
5   time than a half hour.  So I would be looking to break
6   around 1:30.
7          Does anyone have any problem with that?
8          MR. BOVE: Jeff Bove for Viewsonic.
9   That's fine, your Honor.
10         MR. COTTRELL: Fred Cottrell.  I have
11  another call at 2:00, which won't go very long, so I can
12  just jump back in, hopefully, only a few minutes after
13  our break.
14         SPECIAL MASTER POPPITI: Thank you.
15  That's fine.
16         MR. BOVE: Jeff Bove.  Also, since I
17  have Jacqueline Mason with me, with the Court's
18  permission, once we got started, I was going to request
19  your Honor's permission to be excused.  I am next door
20  and am available, but I will not be arguing today.  Scott
21  Miller will be.
22         SPECIAL MASTER POPPITI: I have no
23  problem with that at all.
24         MR. BOVE: Your Honor, one --

Page 5

1          SPECIAL MASTER POPPITI: Please identify
2   yourselves each time.
3          MR. BOVE: Jeff Bove again.
4          SPECIAL MASTER POPPITI: Thank you,
5   Mr. Bove.
6          MR. BOVE: One other point of
7   housekeeping, and I am sure everyone will want to weigh
8   in on this, particularly your Honor, which is the manner
9   in which the Court would propose to tackle these motions
10  today.
11         Obviously, from Viewsonic's standpoint,
12  we have been thinking about it, and would toss the
13  proposal out for your Honor's consideration, obviously
14  for comment by all on the phone, which is to go, frankly,
15  motion by motion, request by request.
16         As I understand, the Court does have
17  rather extensive written submissions of the parties, and
18  we were thinking, again, obviously, subject to your
19  Honor's views, that perhaps some reasonable closure on
20  oral argument, per discovery requests, might be
21  appropriate in order to give hope of completing the task
22  today.
23         I simply offer that as a suggestion,
24  and, obviously, defer completely to your Honor's view.

Hearing

26 (Pages 98 to 101)

Page 98

1    Mr. Christenson.
2        MR. CHRISTENSON: Your Honor, it's
3    correct to say that they have not alleged it, I don't
4    believe, as an affirmative defense, and the time to --
5    things have expired under the scheduling order.
6        SPECIAL MASTER POPPITI: I understand
7    that.
8        MR. CHRISTENSON: And I guess, you know,
9    from our standpoint, we had expected to obtain prompt
10   discovery to the extent this was an issue in the case,
11   but to the extent it's not an issue in the case, then I
12   think the appropriate way to approach it would be to, if
13   and when there is any attempt to bring it into the case
14   in the future, given where we are and given our upcoming
15   deposition schedule, etcetera, we would, obviously,
16   oppose it based, in part, on the pressures resulting from
17   where we are in the case.
18       SPECIAL MASTER POPPITI: Well, there is
19   no question that I have the authority to draw the
20   parameter around what is appropriate discovery going
21   forward. And given the state of this record, without
22   making a determination on this issue, it seems to me it
23   would be an uphill climb for Viewsonic to -- for there to
24   be any discovery on this issue if it's not properly pled.

Page 99

1        I am looking at the scheduling order,
2    Mr. Christenson. Let me -- and I know it's been
3    modified. Let me just look here.
4        What paragraph are you referring to with
5    respect to amending the pleadings?
6        MR. CHRISTENSON: I apologize, Your
7    Honor. I do not have that at my fingertips, but it was
8    in the -- the date is in the original --
9        SPECIAL MASTER POPPITI: It's in the
10   original?
11       MR. CHRISTENSON: Yes, sir.
12       MR. MILLER: It's in paragraph seven,
13   Your Honor.
14       SPECIAL MASTER POPPITI: I am getting
15   there. I see it. Thank you, Mr. Miller.
16       Yeah, it says, "All motions to amend the
17   pleadings shall be filed on or before January 17th,
18   2006." We are coming up to an anniversary.
19       I mean, I -- this matter is not ripe for
20   consideration because the -- the pleadings do not join
21   the issue, and if it needs to be raised with Judge
22   Farnan, my sense is you better do it -- you better do it
23   quickly. But my ruling will be that it is not ripe for
24   consideration given the parameters of the issues that

Page 100

1    have been pled.
2        MR. MILLER: Thank you, Your Honor.
3        SPECIAL MASTER POPPITI: Thank you, sir.
4    Let me just get some papers out of my way. Thank you.
5    Next. I promised the court reporter we'd be out of here
6    by midnight and she was very skeptical until we just
7    dealt with that last issue.
8        MR. CHRISTENSON: I am glad we are
9    making progress.
10       MR. MILLER: That's a joke, too, Your
11   Honor.
12       SPECIAL MASTER POPPITI: That's a joke
13   as well, yes. Thank you.
14       MR. MILLER: Your Honor, I think --
15       SPECIAL MASTER POPPITI: Yes,
16   Mr. Miller.
17       MR. MILLER: The next chronological
18   motions would be those filed by Viewsonic, I believe.
19       SPECIAL MASTER POPPITI: That is
20   correct. The next motion would be Viewsonic's Motion to
21   Compel LG, Re: Components, etcetera. It's dated 10/3,
22   2006, and the response was 10/25, 2006.
23       MR. MILLER: Let me -- we have been
24   discussing a lot of the requests kind of in categories

Page 101

1    and I will do the same here to see if we can at least
2    focus the issues.
3        These first set of requests deal with
4    mounting methods and structures that are -- that
5    Viewsonic seeks to discover vis-a-vis LPL.
6        SPECIAL MASTER POPPITI: Mr. Miller,
7    before you -- before you launch here, let me just remind
8    myself of something that I made a note on. Just one
9    moment, please. Just give me one -- give me the courtesy
10   of putting you on hold again. I have got to find the
11   document. I made the note but I can't find the document.
12   Hold one sec.
13       (Off the record.)
14       SPECIAL MASTER POPPITI: Counsel, I am
15   not having the kind of success that I should have, but I
16   do recall it was either correspondence or it was in the
17   submittal that Miss Mason filed. My note reads, to
18   myself, at page 10, I had some impression that LPL was --
19   well, that would make sense -- was willing to produce the
20   documents. So wait a minute. I am looking -- I am
21   looking at the wrong document. Hold one sec. Actually,
22   this is Mr. Kirk's, but it was in response to
23   Ms. Mason's.
24       If, counsel, you will look at Plaintiff

Page 102

1    LG Phillips' response, page 10, footnote eight.
2          MR. MILLER: Yes, Your Honor.
3          SPECIAL MASTER POPPITI: I mean, does
4    that not cover the ball park?
5          MR. CHRISTENSON: Would you like to hear
6    first from Mr. Miller?
7          SPECIAL MASTER POPPITI: Sure.
8          MR. MILLER: Your Honor, when you say
9    "LPL's response," you are talking about their opposition
10   to the motion?
11         SPECIAL MASTER POPPITI: Yeah. I am
12   looking at their opposition to the motion and what --
13   what I found interesting was the footnote seemed to
14   suggest to me that LPL -- I will read it, "LPL has
15   already produced documents responsive to categories one
16   and two, which include LPL invention disclosure documents
17   and internal files pertaining to the patents in suit.
18   LPL is willing to produce documents concerning the
19   remaining three categories," and I see the qualifier, "to
20   the extent responsive non-privileged documents exist."
21         And my note was: Doesn't that say that
22   -- is it moot? Do I need to hear what the agreement is?
23         MR. MILLER: If you are referring to an
24   agreement to limit the response, there was no agreement.

Page 103

1    We discussed, in the meet and confer, that if they would
2    produce these kinds of materials, we would look at them
3    and then determine what else we needed.
4          SPECIAL MASTER POPPITI: Okay.
5          MR. MILLER: Those materials were not
6    produced, and, just to be clear, the materials that we
7    are seeking are materials that relate to the, what they
8    already admit is prior art. As I was starting to say
9    before, this case, as we know, deals with what's called
10   rear mounting --
11         SPECIAL MASTER POPPITI: Right.
12         MR. MILLER: -- mounting these devices
13   from the back. There are two admitted types of prior
14   art, one is side mounting and one is front mounting.
15         We are confident that, contrary to what
16   LPL tells Judge Farnan its claim construction brief, that
17   it's not possible to merely slap a threaded insert on the
18   back of one of these LCD devices anywhere, and that LPL
19   knows, from its experience in developing side mounting
20   and front mounting panels, and has warned its customers
21   in conjunction with those panels to only use the specific
22   mounting structures that are provided because these
23   devices are fragile.
24         So what we are seeking is information

Page 104

1    from LPL that relates to the development and
2    investigation of these mounting technologies and the
3    limitations on these mounting technologies, whether they
4    be front mounted or side mounted technologies, because,
5    obviously, they are going to be applicable to the
6    limitations on rear mounting, and they will go directly
7    to the issues, for example, if the patent is construed in
8    a manner that you can put a fastening element anywhere on
9    the back, is that claim enabled because if there are
10   limitations in terms of -- that have to be made to the
11   LCD panel in order to mount it that way, they certainly
12   really not disclosed in the patent.
13         It will go to the issues of
14   inventorship, the side mount patents, where the side
15   mounting, or the technology that was developed both by
16   IBM and also by LPL in conjunction with dec. and was the
17   subject of a lawsuit here in California, the Court here
18   recently determined that LPL did not have standing to
19   assert those patents because it wasn't the proper owner
20   of those patents, having not been the proper inventor of
21   those patents.
22         SPECIAL MASTER POPPITI: Mr. Miller, I
23   understand your argument, and, even before hearing from
24   Mr. Christenson, understand the strength of it.

Page 105

1          I guess my question is the recitation of
2    what is stated on page 10 of their response, are you
3    suggesting it's not accurate? For example, I am looking
4    at page 10, in the body of the submittal, and it says, at
5    the -- in the first full sentence, "Viewsonic's counsel
6    identified five such categories." Then it threw me into
7    the footnote which recited five categories, I expect, and
8    there is a quote, so I expect that they are the
9    categories that you may have identified, and then I
10   understood LPL to say that they were going to produce.
11         MR. MILLER: And to the extent that the
12   argument by LPL is that that was an agreement to take
13   those documents and nothing further, that was not an
14   agreement ever reached.
15         SPECIAL MASTER POPPITI: Okay.
16         MR. MILLER: Part of the meet and
17   confer, we indicated that if they would produce documents
18   -- if they could produce documents in stages and that
19   these would be the things that we would be the most
20   interested in, and if they would produce those first, we
21   are happy to get those and then discuss with them what
22   other documents need to be produced.
23         SPECIAL MASTER POPPITI: Have you gotten
24   that production yet?

Hearing

28 (Pages 106 to 109)

Page 106

1    MR. MILLER: No.
2        SPECIAL MASTER POPPITI: Would it be --
3    and I ask this of both counsel, not that I want to avoid,
4    because I won't avoid making a decision, it is, however,
5    more important for me if I understand that there is an
6    agreement, and that's rather obvious, if there is an
7    agreement, you do it right away, you don't have to wait
8    for a written document from me, you then don't have to
9    wait for some judgment on the part of Judge Farnan after
10   one or the both of you file up exceptions.
11       So, my question is this: If you agree
12   that the five categories are categories that should be
13   produced right away, whatever that means, and if there is
14   agreement that Viewsonic has the opportunity to evaluate
15   that production, then go back to the meet and confer
16   table for purposes of saying, We need three more
17   categories or we need so many more documents in each of
18   the categories, isn't that the better way to approach
19   this?
20       MR. MILLER: Your Honor, I guess,
21   conceptually, I would say yes. One of the problems is
22   the recitation here of this interchange is not accurate.
23   It was not ever intended that categories one and two
24   would relate to the invention disclosure documents or

Page 107

1    technical development documents of the patents in suit
2    but were directed to what the requester directed to,
3    which is side mounting and/or front mounting technologies
4    that they have employed.
5        They have not produced any of that. In
6    fact, they have taken the position that side mounting and
7    front mounting either require claim construction or are
8    not relevant to this case.
9        And it's notable, in my mind, that those
10   technologies are the subject of the discovery in the
11   California case that now, you know, as of ten days ago,
12   LPL has decided they want to bring over wholesale after
13   stiff arming us for months about those materials.
14       So they haven't even produced the
15   documents under categories one and two for the related
16   technologies, and their footnote indicates they are
17   producing it only for the patents in suit.
18       There is another sort of catch 22 here
19   that you need to understand that LPL is trying to set up.
20   They have taken the position that they don't produce
21   products that employ the technology of the patents in
22   suit, and, yet, they have advised Viewsonic that
23   Viewsonic products that use LPL modules likely infringe
24   the patents in suit.

Page 108

1        And, so, we need to be able to get
2    complete discovery from them with regard to these
3    mounting technologies that they acknowledge are out there
4    and that they have long since used, some of which they
5    claim to have developed themselves, so that we can really
6    put these patents and the supposed invention of these
7    patents into the proper perspective.
8        And, so, we can't -- you know, that's
9    where I am today.
10       SPECIAL MASTER POPPITI: I mean, if you
11   can't forge an agreement that makes sense, then I am
12   certainly not going to waste everyone's time seeing if
13   that can occur.
14       MR. CHRISTENSON: Your Honor, I feel
15   that your suggestion would be very productive because it
16   would allow us to focus on a fixed target and understand
17   and deal with things in a specific and concrete way.
18       And I -- I certainly dispute
19   Mr. Miller's statements that we haven't produced
20   documents. We have produced, for example, all of LPL's
21   documents concerning the patents in suit and concerning
22   the inventions that are the subject of this case that
23   relate to rear mounting of products.
24       We have produced internal patent files

Page 109

1    from LPL. We have produced documents from our own patent
2    prosecution files. We have produced third-party
3    documents, or documents related to third-party products.
4    We have produced the invention disclosure forms, for
5    example. We have done a very comprehensive, and many
6    months ago, of production.
7        To the extent they are seeking now to
8    bring documents and discovery in from the side mount case
9    and issues, which are a different set of patents in the
10   California case, I don't understand what it is that they
11   are seeking.
12       They haven't explained to us why we
13   should be bringing discovery or producing documents in
14   this case that relate to discovery in the -- in different
15   patents, side mount patents in the California case.
16       So, it's difficult to respond to that
17   specifically because it's not framed specifically, but,
18   generally, there is just no basis for them to be trying
19   to go outside the scope of this invention and raise
20   issues concerning other inventions.
21       The question here is: What is our
22   invention and do the products that are accused of
23   infringing infringe? Do they copy our invention? And
24   they are seeking wholesale discovery on all of LPL's

Page 110

1  products which are -- which LPL, as Mr. Miller said, does
2  not assemble visual display products that use LPL's
3  products. LPL makes a component, a module, that goes
4  into the --
5            SPECIAL MASTER POPPITI:  I understand
6  that.  Maybe what I -- I thought I understood Mr. Miller
7  to say that there is -- there will be a lot of discussion
8  about prior art.  That's the first thing I understood him
9  to say; correct, Mr. Miller?
10           MR. MILLER:  Yes, Your Honor.
11           SPECIAL MASTER POPPITI:  And I also
12 understood him to say that they expect that, in prior art
13 that deals with other mounting methodologies, there is
14 language that suggests -- in the nature of warnings;
15 correct, Mr. Miller?
16           MR. MILLER:  Yes, Your Honor.
17           SPECIAL MASTER POPPITI:  And would you
18 remind me again precisely what you said about those
19 warnings?
20           MR. MILLER:  That they restrict the
21 mounting of these products solely to the mounting holes
22 and it's not possible to merely just put a mounting
23 structure anywhere in conjunction with this product that
24 they sell.

Page 111

1            SPECIAL MASTER POPPITI:  It seems to
2  me --
3            MR. MILLER:  And they take the position
4  that the patents in suit enable a mounting structure
5  anywhere on the back surface, and, yet, there is no
6  discussion about the technical aspects or requirements
7  that that necessitates.
8            One of the issues, as Mr. Christenson's
9  comments illuminate to me, at least, is that it's
10 difficult to reach an agreement in a patent case when
11 your opponent says, I will tell you about the patents but
12 I won't tell you anything we know about the prior art,
13 and that's essentially what he is telling us.
14           SPECIAL MASTER POPPITI:  That's not
15 going to happen here.  I am going to require, because you
16 can't forge an agreement, that the -- that the request --
17 that there be production with respect to the request, and
18 what I -- understanding that this represents an order as
19 opposed to an agreement which will be ordered.  It will
20 be in the nature of a finding and recommendation, which I
21 will have to make at -- in due course, and what I would
22 like from you is a suggestion as to when that production
23 occurs, understanding that it's either going to occur
24 within so many days of your having the right to take

Page 112

1  exception and you don't, or so many days, at least a
2  proposal to Judge Farnan, so many days after he has the
3  opportunity to review whatever I do if asked to.
4            And you all know what that means.  That
5  just pushes it out there in terms of -- not in terms of
6  when the Court acts.  It just pushes it out there because
7  I have got to do some work on this end.  You will have
8  the opportunity to do something with my work at your end.
9  And then Judge Farnan ultimately will have it on his
10 desk, and we all know that that process, I don't believe
11 we shortened the time frame in this case, have we,
12 counsel?
13           MR. MILLER:  Not as to these motions, we
14 didn't.
15           SPECIAL MASTER POPPITI:  Not as to these
16 motions.  So we are out there over a month.
17           MR. MILLER:  I would hope that we would
18 do it, given that inherent time frame, that we could do
19 it within a week of either of those events transpiring.
20           SPECIAL MASTER POPPITI:  Is that
21 acceptable, one week, five business days?
22           MR. CHRISTENSON:  Could we make it two
23 weeks?
24           MR. MILLER:  I wouldn't object to two

Page 113

1  weeks if they don't appeal, but one week if they do, I
2  guess.
3            SPECIAL MASTER POPPITI:  Is that
4  acceptable?  Because you will have the time.
5            MR. CHRISTENSON:  Right.  I think we
6  probably could live with that.
7            SPECIAL MASTER POPPITI:  Okay.  Then it
8  will be two weeks if there is no appeal and one week
9  after Judge Farnan rules, and, of course, he maintains
10 the ultimate authority to adjust that one week.  But I
11 will indicate that it will be one week by agreement, so
12 it's likely that he would -- I would anticipate he would
13 accept that.
14           MR. MILLER:  The next set of requests
15 deal with information relating to flat panel display
16 devices, not directed specifically to mounting structures
17 but to LCD products or plasma products, for example.
18           Again, these -- these patents in suit
19 discuss how you mount a conventional component inside of
20 a housing, and what we have sought are the documents and
21 information relating to separate components of a flat
22 panel display device.
23           The patents describe how certain of the
24 components that are used in the invention, the frames,

Hearing

30 (Pages 114 to 117)

Page 114

1  for example, assemble these components, and, so, we are
2  seeking some information about conventional products and
3  what would be known to one of ordinary skill in the art
4  at the time of this invention that relates to these
5  devices that the invention supposedly applies to.
6        The only response we have gotten back
7  from LPL is that they will respond when we agree to
8  narrow them, without any suggestion about why they are
9  overbroad or how they should be narrowed.
10       Again, we believe that this is clearly
11 information that is relevant to a variety of issues in
12 this case and that it should be produced forthwith.
13       SPECIAL MASTER POPPITI: Why don't you
14 articulate for the record the relevance with respect to
15 the variety of issues?
16       MR. MILLER: Well, the variety of issues
17 would be, again, the issue of enablement, whether or not
18 the patents sufficiently disclose how these components go
19 together, or whether what one ordinarily skilled in the
20 art would know, the nature of whether or not the
21 difference between other prior art that we have located
22 and the disclosure and the patents would be obvious to
23 one skilled in the art based on how these components
24 interact and what they do, the, you know, the relative

Page 115

1  value of this invention, potentially, from the standpoint
2  of a reasonable royalty and how easy it is to design
3  around based on one of ordinary skill in the art of
4  knowledge of these components and how they work together
5  for mounting, which was, obviously, done prior to this
6  invention, but how they work together for mounting in
7  these kinds of products.
8        So, those would be the three that I
9  know, with a high degree of certainty, are applicable,
10 and there may be others.
11       SPECIAL MASTER POPPITI: Thank you.
12 Mr. Christenson.
13       MR. CHRISTENSON: Your Honor, the
14 requests that they have propounded would call for LPL to
15 produce all sorts of documents going back to 1997 to the
16 present for every LCD module that LG Phillips has made
17 and all the components that relate to every one of those
18 modules. It's just a remarkably overbroad set of
19 requests and it's not calculated within reason to lead to
20 discovery of admissible evidence, and it's not -- it's
21 just not relevant to the issues in the case, including
22 the issues that Mr. Miller just discussed.
23       SPECIAL MASTER POPPITI: Why isn't it
24 relevant to the issues that he just discussed?

Page 116

1        MR. CHRISTENSON: For example, the issue
2  of enablement is a question that can be resolved by
3  looking at the patent and understanding whether the
4  patent sufficiently discloses aspects of the invention.
5  Whether the written description in the patent is
6  sufficient is not something that's going to be informed
7  by all the documents related to all the manufacturing
8  that LPL has done, since 1997, of modules. And the
9  claims at issue, Your Honor, don't refer to LCD modules.
10 They refer to a certain type of mounting and assembly of
11 a display device to a case, and that's not -- LPL doesn't
12 have those documents because it doesn't do that.
13       So, this is really -- these are kitchen
14 sink requests that aren't going to get anybody anywhere
15 with respect to the claims and defenses in this case.
16       SPECIAL MASTER POPPITI: I understand
17 your position with respect to enablement. Talk about the
18 prior art.
19       MR. CHRISTENSON: Again, Your Honor, the
20 prior art issue is: Was this invention obvious or was it
21 anticipated by -- it had already been invented; was it
22 already out in the public realm? And there is nothing
23 that's going to be learned from LPL's manufacturing
24 yesterday and a year ago and for the past ten years of

Page 117

1  all different sorts of modules that are later assembled
2  by a different company that buys the modules into -- into
3  finished devices.
4        SPECIAL MASTER POPPITI: Who's to say
5  that? How can I be assured that that isn't the case? I
6  mean, it may be, and I will listen to your discussion of
7  overbroad, I haven't seen anything that describes what
8  that means, but how can I be, to the extent that there
9  should be some degree of certainty here, how can I be
10 certain, because that's what you are saying, that no
11 information that is being requested would lead to the
12 discovery of relevant evidence as it relates to prior
13 art/obviousness?
14       MR. CHRISTENSON: Your Honor, I
15 understand your concern, and I -- the only way I can
16 respond to that is to say if you -- what I have done is
17 looked at the -- what documents have been requested, and
18 the documents that they have requested don't -- are not
19 -- are not focused on any of these issues that are being
20 discussed, including the prior art issues, and maybe it
21 would be helpful to look at some of these specific
22 requests, but -- and I am happy to do that if that's --
23       SPECIAL MASTER POPPITI: I think that's
24 going to be important to do that.

## Page 118

1    MR. CHRISTENSON: All right.
2    SPECIAL MASTER POPPITI: You know,
3 Mr. Miller is saying --
4    MR. MILLER: Your Honor, I think we
5 start at 82 on these.
6    SPECIAL MASTER POPPITI: Just give me a
7 second.
8    MR. CHRISTENSON: Your Honor, I believe
9 that you could turn to Exhibit 4 to LPL's opposition, and
10 that should set forth the requests and the responses.
11    SPECIAL MASTER POPPITI: It does. And
12 which one? 82?
13    MR. MILLER: 82, that's where we start.
14    SPECIAL MASTER POPPITI: Mr. Miller,
15 it's your request, so have at it.
16    MR. MILLER: And this seeks information
17 that our bills and materials for an LCD module made by
18 LPL from the date prior -- one year prior to the priority
19 date to understand what these components are and how --
20 whether or not they were -- what functions they have.
21 You will see there is bill of materials requests for
22 different components.
23    SPECIAL MASTER POPPITI: I see that.
24    MR. MILLER: So that we can ascertain,

## Page 119

1 because the patent merely describes these components as
2 part of a first embodiment of the invention, and what we
3 need to do is to be able to, very clearly, understand and
4 know, to be able to point out to the Court and the jury,
5 what's the difference between the structure described in
6 the first embodiment of the invention and what is truly
7 the prior art? And, so, we felt these bill of materials
8 was the least intrusive kind of thing we could ask for
9 that would relate to these products as opposed to asking
10 for every document that shows every component of the
11 module.
12    SPECIAL MASTER POPPITI: Well, you are
13 certainly not asking for every document that shows every
14 component of the module. You are asking for something
15 more narrow than that. It's -- you made an effort to
16 restrict the request and reduce the universe.
17 Mr. Christenson.
18    MR. MILLER: Then if you go down to,
19 like, No. 84, for example, we ask for documents
20 sufficient to identify --
21    MR. CHRISTENSON: Are we going to go in
22 order, or are some of these now off the table?
23    SPECIAL MASTER POPPITI: No, they are
24 not off the table.

## Page 120

1    MR. CHRISTENSON: 82 and 83 are bill of
2 material requests.
3    SPECIAL MASTER POPPITI: Right.
4    MR. CHRISTENSON: May I respond?
5    SPECIAL MASTER POPPITI: Yes.
6    MR. CHRISTENSON: On No. 82, if we are
7 talking prior art, the priority date in this case would
8 be October 1998. So, you go -- that's the conception
9 date. If you go back the year before that, it's October
10 1997. So, they would need to show that something
11 happened to invalidate the patent, they would have to
12 show something related to that time period of before
13 October of 1997, and, yet, the unrestricted time period
14 for the request is January 1, 1997, to the present.
15    SPECIAL MASTER POPPITI: Mr. Miller.
16    MR. MILLER: That's certainly a
17 fundamental issue that we have that relates, I think,
18 generally to these requests.
19    SPECIAL MASTER POPPITI: Well, let's
20 talk about the date, then.
21    MR. MILLER: We picked January 1 because
22 it was a date that was, you know, several months prior to
23 the one year prior to the foreign priority date because
24 we are trying to ascertain what is the knowledge of one

## Page 121

1 ordinary skilled in the art. And we are happy to agree
2 to some reasonable cutoff date. If -- if LPL believes
3 that we should have a cutoff date, you know, of the
4 patent issuance date, or we can pick some other date that
5 would make sense, you know, we are happy to do that. But
6 that, of course, has never been proffered.
7    SPECIAL MASTER POPPITI: Because
8 Mr. Christenson wanted to focus on the date, let's do
9 that, and why don't you propose or discuss an appropriate
10 date expecting that I am going to -- I am going to order
11 the production. Or perhaps by virtue of agreeing on the
12 date, you will agree to the production.
13    MR. CHRISTENSON: I think that would be
14 -- we may be able to resolve some of these issues. I
15 don't expect we will resolve all the issues, Your Honor.
16    SPECIAL MASTER POPPITI: I understand
17 that.
18    MR. CHRISTENSON: We can resolve the
19 date issue, but I think that would make substantial
20 progress.
21    SPECIAL MASTER POPPITI: Let's take the
22 time to -- do you want to take the time to do that now
23 because it makes sense? Mr. Miller?
24    MR. MILLER: The patent issuance date

Hearing

32 (Pages 122 to 125)

Page 122

1  was December 22, 2002, was it, Cass?
2          MR. CHRISTENSON: Yeah. I think that's
3  -- I don't think that has any bearing on prior art. For
4  art to be prior and to be evidence that would support
5  invalidation, we would have to be talking about something
6  back in the time period of the critical date. So, again,
7  that's going back to October '97.
8          MR. MILLER: Well, there is a question
9  of the filing date in the U.S. was October of '98, so, I
10 mean, I am happy to go to -- I just tried to pick a date
11 that would have some significance in the case.
12         MR. CHRISTENSON: The end of 1998, is
13 that appropriate?
14         SPECIAL MASTER POPPITI: What did you
15 just say, December of 1998?
16         MR. CHRISTENSON: Yes.
17         SPECIAL MASTER POPPITI: Mr. Miller?
18         MR. MILLER: That's fine, Your Honor.
19         SPECIAL MASTER POPPITI: And that would
20 be with respect to request for production No. 82 and 83.
21         MR. CHRISTENSON: I assume that would
22 apply to this set?
23         SPECIAL MASTER POPPITI: The entire set,
24 yes.

Page 123

1          Mr. Miller, is that agreeable?
2          MR. MILLER: Yes.
3          SPECIAL MASTER POPPITI: So, then let me
4  re-ask the question: Your having agreed on the date, may
5  I have your agreement with respect to the production?
6          MR. CHRISTENSON: Your Honor, we will
7  agree to produce, in response to No. 82, subject to that
8  date limitation.
9          SPECIAL MASTER POPPITI: Okay.
10         MR. CHRISTENSON: To the extent there is
11 documents. I have to check on the availability.
12         SPECIAL MASTER POPPITI: Sure. I
13 understand that. And would it make sense to do with, and
14 I realize we are only on 82, but would it make sense to
15 do with LPL what we have done with Viewsonic and focus on
16 a date for that production?
17         MR. CHRISTENSON: I think that's only
18 fair, Your Honor, and I think what we would -- what we
19 should try to do is to try to meet the date that
20 Viewsonic has selected for its production, supplemental
21 productions.
22         SPECIAL MASTER POPPITI: That would be
23 the 19th?
24         MR. CHRISTENSON: Was that the 19th, did

Page 124

1  you say?
2          SPECIAL MASTER POPPITI: Yes. Wasn't
3  it?
4          MR. CHRISTENSON: Right.
5          MR. MILLER: Yes, January 19th.
6          SPECIAL MASTER POPPITI: January 19th is
7  a Friday.
8          MR. CHRISTENSON: We will put that date
9  down and respond by that date, and if there is some
10 extenuating circumstances, of which I am not aware, I am
11 confident we can work that out among counsel. We will
12 expect to investigate and produce the documents by
13 January 19th, Your Honor.
14         MR. MILLER: Cass, let me ask one
15 question, if I might, please.
16         SPECIAL MASTER POPPITI: Please do.
17         MR. MILLER: When was -- LPL is a
18 continuation of the business of LG Electronics when it
19 did a joint venture with Phillips Electronics. Are we at
20 a date and point here where you are going to take the
21 position that LPL doesn't have any documents because it
22 was LG Electronics' documents if we pick a December 1998
23 date?
24         MR. CHRISTENSON: I am not picking any

Page 125

1  date with any intent of avoiding discovery. I don't know
2  what the facts are on that, Scott. I just don't know the
3  answer to that. But, you know, if the company has
4  documents that are responsive, then we have agreed to
5  produce those documents.
6          MR. MILLER: I guess my only point is
7  that if there are documents -- I guess if you don't have
8  any documents that relate to products that were sold
9  during this time period, and I guess I want to be clear
10 that if you took over the business from LG Electronics
11 and continued to sell products but those sales took place
12 outside the scope of this but they are the same products,
13 I would expect those documents, the technical documents
14 to be produced with regard to that even if you didn't
15 sell them during this time period if the products were
16 the same; do you understand that to be -- is that
17 consistent with your understanding, Cass?
18         MR. CHRISTENSON: My understanding is
19 that we are going to respond to your request 82, which is
20 bills and materials for the modules, and if LPL has those
21 documents, then we will produce those documents.
22         MR. MILLER: Your Honor, I guess -- I
23 don't want to backtrack, but I am very concerned about a
24 December 1998 date as opposed to some date when I know

Page 126

1  that LPL was in existence and was actually selling
2  products and would propose, then, a date in 2000, just to
3  be sure that we don't end up getting nothing out of this
4  because of some fine point on the question of whether the
5  products were sold during the time period.
6          If they are substantively the same as
7  the products that were sold by your predecessor and that
8  business was transferred to you, I would expect to get
9  those documents.
10         SPECIAL MASTER POPPITI: I certainly
11 want the production to encompass the concern that you
12 have just raised.
13         MR. CHRISTENSON: Your Honor, we have no
14 -- I can assure -- we don't have any intention of denying
15 the existence of documents under some sort of, you know,
16 technical basis that Mr. Miller is raising.
17         We have identified the date that's much
18 more appropriate than the date that was in the request.
19         SPECIAL MASTER POPPITI: Let's do it
20 this way: I will -- you are an officer of the Court, I
21 will accept you at your word, and if there becomes an
22 issue at a later point in time, I will deal with it
23 rather than directly and forcefully.
24         MR. MILLER: Thank you, Your Honor.

Page 127

1          MR. CHRISTENSON: With that
2  understanding, we can -- that is acceptable.
3          MR. AMBROZY: Your Honor, a point of
4  reference.
5          SPECIAL MASTER POPPITI: Yes, please.
6          MR. AMBROZY: We had raised a similar
7  issue with Viewsonic earlier that Viewsonic has different
8  entities but Mr. Miller continued to restrict all his
9  document production regarding technical documents just to
10 Viewsonic America, and I am just curious how that cuts
11 with his request that LPL would request, of all its other
12 subsidiaries, that those documents be produced?
13         MR. CHRISTENSON: I don't think that's
14 what he was saying.
15         SPECIAL MASTER POPPITI: Is something
16 like that before me at this point?
17         MR. MILLER: No, I don't think so, Your
18 Honor.
19         SPECIAL MASTER POPPITI: Well, then, you
20 may want to discuss that on your -- and I say this,
21 again, respectfully -- on your own meet and confer.
22         MR. AMBROZY: Thank you, Your Honor.
23         MR. CHRISTENSON: My understanding is we
24 are talking about LPL and its predecessors and any

Page 128

1  documents within LPL's custody, possession, and control,
2  and we are going to abide by that.
3          SPECIAL MASTER POPPITI: Yes. Okay.
4  Next, please.
5          MR. MILLER: Next would be No. 83 would
6  be the next request, which is the bill of materials for
7  LCD modules. And, again, we would, with the history of
8  the discussion, we would accept the same date of
9  parameters that we have discussed.
10         SPECIAL MASTER POPPITI:
11 Mr. Christenson.
12         MR. CHRISTENSON: Yes, Your Honor.
13         SPECIAL MASTER POPPITI: I feel like I
14 should be doing "Mutiny on the Bounty" when I refer to
15 you, sir, but that would be, that's a great part, but in
16 any event, is there agreement with respect to 83?
17         MR. CHRISTENSON: With respect to 83,
18 they are now asking for bills and materials, I guess, for
19 modules made by companies other than LPL, and I am not
20 sure I understand what it is they are seeking there.
21         MR. MILLER: I think what I am seeking
22 is if you have possession, custody, or control over bills
23 and materials from your competitor's products or someone
24 else's products for the relevant time period, we want --

Page 129

1  we would like them.
2          SPECIAL MASTER POPPITI: And your
3  definition of "custody and control" may be more narrow
4  than Mr. Christenson's, but we will deal with that at
5  some other point. I expect I understand what you are
6  asking for.
7          Mr. Christenson, do you?
8          MR. CHRISTENSON: I think I do. So I
9  guess we are just going to make this broadly bills and
10 materials for whatever products. So 82 and 83, we will
11 take together.
12         SPECIAL MASTER POPPITI: Okay.
13         MR. MILLER: 84 would be next.
14         SPECIAL MASTER POPPITI: Yes, please.
15         MR. MILLER: And they are documents
16 sufficient to identify the parts of an LCD module and the
17 structure, function, source, and/or assemblage of those
18 parts, again, from January 1, '97, we would again, with
19 date parameters we have discussed, we would be willing to
20 accept that same date parameters.
21         SPECIAL MASTER POPPITI:
22 Mr. Christenson.
23         MR. CHRISTENSON: Your Honor, it seems
24 to me, if we are already dealing with bills of materials,

Hearing

34  (Pages 130 to 133)

|  | Page 130 | | Page 132 |
|---|---|---|---|

Page 130

1   I am not sure what documents would be necessary in
2   response to this where they are talking here about parts
3   of a module.
4          SPECIAL MASTER POPPITI: I mean, you may
5   be suggesting duplication. I don't know whether it does
6   duplicate. Is that what you are suggesting?
7          MR. CHRISTENSON: Well, I am suggesting
8   that, among other things. I also don't see what, you
9   know, what -- what documents would be responsive more
10  generally and I don't see why they would need those
11  documents.
12         Viewsonic is well aware of -- of LPL
13  modules and the parts of LPL modules, but once we have
14  produced the bills and materials, I would think this
15  would be redundant.
16         MR. MILLER: Your Honor, it's not
17  redundant because these are documents that relate to the
18  structure, the function, and how those components are
19  assembled. The bill of material, in my experience,
20  merely just identifies the particular components.
21         Obviously, we are not looking for them
22  to reproduce it. This was a request limited by documents
23  sufficient to identify and not all documents, again,
24  relating to these components.

Page 131

1          SPECIAL MASTER POPPITI: I see that.
2   Yeah. I can understand the expected difference between
3   documents requested in 84 and the ones that we have just
4   talked about.
5          MR. CHRISTENSON: The other issue that's
6   raised here is if we are talking about now assembly of
7   the different parts, again, the modules and the claims --
8   the claims in this case do not have to do with modules
9   and they don't have to do with assembly of modules, so we
10  are going to get into a lot of, basically, all of the
11  manufacturing records in the company that have to do --
12  that have nothing to do with the issues in the case
13  because they are going to deal with assembling components
14  and subcomponents used within a module.
15         SPECIAL MASTER POPPITI: Mr. Miller,
16  would you address that, please?
17         MR. MILLER: Sure. I guess the first
18  frame and second frame, which are critical components of
19  the alleged invention of the patents in suit. The
20  patents each are used for assembling the components, and
21  how these components interact and what they do and what
22  was known in the art at the time, again, goes to the
23  issues that we have discussed previously. And, so, I
24  think they are clearly different and they are clearly

Page 132

1   relevant.
2          MR. CHRISTENSON: Your Honor, we
3   disagree. One of the terms for the Court to construe in
4   this case is a flat panel display device and what that
5   means and what it includes. So this goes far, far
6   afield, and just asks us to produce everything --
7   documents related to every part of the module and every
8   aspect of assembly of every part of the module.
9          SPECIAL MASTER POPPITI: Mr. Miller, is
10  there any way to more tightly focus the request?
11         MR. MILLER: Without seeing the bill of
12  materials, it's a little hard to know.
13         SPECIAL MASTER POPPITI: Maybe that's --
14  maybe that's the point.
15         MR. MILLER: That's part of the problem.
16  And, you know, Mr. Christenson, all due respect,
17  Viewsonic is not in the LCD module business and really
18  does not focus its energies on LCD modules, so we are
19  trying to take discovery to be able to defend this case
20  and that's what this is directed towards.
21         SPECIAL MASTER POPPITI: Any other
22  comments with respect to 84?
23         MR. CHRISTENSON: No, Your Honor. My
24  only comment, last comment is that Viewsonic may not make

Page 133

1   the LCD modules, but they buy these modules in vast
2   quantities to be used in their products and they know how
3   the products are assembled. The products are assembled
4   for Viewsonic and that's the type of assembly that the
5   package claims really address. They don't address
6   assembly of the modules or the subcomponents in the
7   modules.
8          SPECIAL MASTER POPPITI: Well, I am -- I
9   am going to grant the production of, by agreement, the
10  date will be adjusted to the date that you have selected,
11  and I will issue appropriate findings and recommendations
12  if you tell me that you are not agreeing.
13         MR. CHRISTENSON: I think that would be
14  helpful, Your Honor, just to get your guidance on what it
15  is you think we should be producing.
16         SPECIAL MASTER POPPITI: Thank you.
17  No. 85, please.
18         MR. MILLER: 85 is the -- those
19  components of an LCD module that are or can be used for
20  mounting the module to the external case of a product.
21         Again, this is -- this is a, I guess, a
22  subset 84, to some extent, but it is more focused on the
23  mounting side of it to make sure that we understand what
24  was known, and, again, we would be amenable to the

Page 134

1  discussed date parameters.
2      SPECIAL MASTER POPPITI:
3  Mr. Christenson, this certainly is more, I will accept
4  Mr. Miller's word, more focused than 84. Any objection
5  to this with the amended date?
6      MR. CHRISTENSON: What I am trying to
7  determine is whether -- is 85 subsumed within 84?
8      SPECIAL MASTER POPPITI: Is 85 subsumed
9  within 84? Well, from my perspective, it looks like it
10  could be, but it's Mr. Miller's request. Mr. Miller.
11      MR. MILLER: Again, I am not sure that
12  it's completely subsumed because I don't know how LPL
13  defines the edges of the module and what is part of the
14  module components and what is a structure that is used
15  for mounting. And, so, you know, my guess would be that
16  it is subsumed, but I don't know that for a fact because
17  I don't know how, as I said, how LPL defines the edge of
18  the module and what is or isn't part of it.
19      SPECIAL MASTER POPPITI: You are not
20  going to know it until you see it.
21      MR. MILLER: That's the problem.
22      SPECIAL MASTER POPPITI: I understand.
23  I will treat it separately in light of counsel's
24  representation.

Page 135

1      And, again, my question is,
2  Mr. Christenson: Do you agree to 85?
3      MR. CHRISTENSON: Well, given Your
4  Honor's ruling on request 84, we will agree to 85 --
5      SPECIAL MASTER POPPITI: Thank you.
6      MR. CHRISTENSON: -- with the date
7  limitation.
8      And, Your Honor, if we are going to be
9  providing a more, you know, a more comprehensive set of
10  documents for which we need to investigate, I would ask
11  that we maybe be given until the other date that
12  Viewsonic had mentioned, I think maybe it was the 29th?
13      SPECIAL MASTER POPPITI: Yeah, it was
14  the 29th.
15      MR. CHRISTENSON: And I don't intend to
16  wait until the last day. I am happy to do this on a
17  rolling basis.
18      SPECIAL MASTER POPPITI: I understand.
19      Mr. Miller, any problem with the 29th,
20  then?
21      MR. MILLER: Only that we are -- that it
22  really pushes us out in terms of our depositions. You
23  know --
24      SPECIAL MASTER POPPITI: It would be the

Page 136

1  same understanding, and I understand that, that, unless
2  you have this information, you are going into -- it makes
3  no sense to go into deposition.
4      MR. MILLER: Right.
5      SPECIAL MASTER POPPITI: So the 29th,
6  then.
7      This is 86.
8      MR. MILLER: Yes.
9      SPECIAL MASTER POPPITI: Mr. Miller.
10      MR. MILLER: I think 86 is probably
11  subsumed within 85 if they are going to produce on 85.
12      SPECIAL MASTER POPPITI: Yeah. I am
13  flipping, paging back and forth and I am having to blink
14  to see the difference.
15      Mr. Christenson.
16      MR. CHRISTENSON: Yeah. The wording is
17  a little bit different.
18      SPECIAL MASTER POPPITI: The wording is
19  a little bit different.
20      MR. CHRISTENSON: I can't articulate the
21  difference offhand. I am happy to focus on 85 and treat
22  86 as moot if that's agreeable.
23      MR. MILLER: That's fine, Your Honor.
24      SPECIAL MASTER POPPITI: That's fine.

Page 137

1  Thank you.
2      MR. MILLER: And now we are back to 87,
3  is a bill of materials for the back light unit, which is
4  a -- a particular component described in the patent of
5  these modules.
6      SPECIAL MASTER POPPITI: And the rest of
7  them deal with the back light unit?
8      MR. MILLER: Yes.
9      SPECIAL MASTER POPPITI:
10  Mr. Christenson.
11      MR. CHRISTENSON: Well, yeah, 87, I
12  believe, and 88 deal with a back light unit. And then I
13  believe, Your Honor, that there is a continuing series of
14  requests that, essentially, scroll through all manner of
15  different subcomponents that are used to assemble LCD
16  products. And, you know, we started off more broadly
17  with what we discussed, I think, so far, and it seems to
18  me that this is just unnecessary for us to go through
19  each sub component like this in all manner of records, so
20  we object to these requests.
21      MR. MILLER: To the extent that these
22  are included in 82 or 83, I mean, obviously, they just
23  need to refer back and they don't have to produce them
24  more than once.

36 (Pages 138 to 141)

Page 138

1          To the extent they are not, which
2    Mr. Christenson's response leads me to think they may not
3    be, in his mind, then they, independently, should be
4    produced.
5          SPECIAL MASTER POPPITI: For the same
6    reasons that you articulated earlier?
7          MR. MILLER: Absolutely.
8          MR. CHRISTENSON: And, Your Honor, I
9    cannot say how the bills of materials are formatted or
10   what is or is not included in the bill of materials
11   related to a module, for example. That may have a line
12   item for a back light unit. I don't know if there is a
13   separate set of documents and records that would break
14   out additional subcomponents for each component; for
15   example, a back light unit bill of materials that then
16   lists other subcomponents. I just don't know the answer
17   to that.
18         SPECIAL MASTER POPPITI: If it doesn't,
19   you know, you don't have it to give. If it does, you
20   have it.
21         MR. CHRISTENSON: Right. I don't know
22   if it exists and I just dispute the relevance of that
23   discovery, Your Honor.
24         SPECIAL MASTER POPPITI: Do you want to

Page 139

1    make any further record, Mr. Miller, on relevance?
2          MR. MILLER: Excuse me?
3          SPECIAL MASTER POPPITI: Do you want to
4    make any further record on relevance?
5          MR. MILLER: No. The only thing I would
6    say, just to pinpoint it, is that the patents discuss the
7    first frame, which is a critical component, as being a
8    component of the back light unit in certain
9    circumstances, and, therefore, the back light unit also
10   has particular interest in this matter.
11         SPECIAL MASTER POPPITI: Okay. I am
12   satisfied that the record is similar to my ruling on
13   other discussions, and with respect to, then, to 87 and
14   those requests that follow relating to the -- the back
15   light unit and/or its components, unless you tell me that
16   there is agreement, I will issue a finding and
17   recommendation with respect to that.
18         MR. CHRISTENSON: Yes, Your Honor. I
19   think we are in dispute on that, but I understand your
20   ruling, obviously.
21         SPECIAL MASTER POPPITI: Okay. And it
22   will be structured in the fashion that we have talked
23   about earlier in terms of providing it within so many
24   days after either I issue my findings and recommendations

Page 140

1    without exception or after Judge Farnan finally rules.
2          Next, please.
3          MR. CHRISTENSON: Yes, Your Honor. And
4    by the way, some of this may not be -- some of this we
5    may be able to work through depending on the formatting
6    of the documents and depending on what level of detail
7    turns out to be satisfactory.
8          SPECIAL MASTER POPPITI: That's fine. I
9    would hope that, in light of even the findings and
10   recommendations, that you would take the opportunity to
11   see if you can't forge some agreements so that we can,
12   you know, continue on track without having to sidetrack
13   the Court.
14         MR. CHRISTENSON: Yes, Your Honor.
15         SPECIAL MASTER POPPITI: Next, please.
16         MR. MILLER: Your Honor, one, I guess,
17   point of housekeeping, looking at my notes, I see that
18   the only request to which they actually agreed to produce
19   documents were 82, 83, and 85, and I guess, in light of
20   that, I am not sure that, you know, I am -- I guess I'd
21   re-raise the issue of whether the 29th is an improper
22   date or whether they can be -- do it earlier so we can at
23   least get those documents, these materials that are going
24   to be subject to an order that we are not going to get

Page 141

1    until February, probably.
2          I'd at least like to start being able to
3    get some of these materials to move this case forward.
4    Whether we could go back to the 19th on those, to the
5    three they have agreed to --
6          SPECIAL MASTER POPPITI: I understand
7    what you have just said.
8          Mr. Christenson, is there any give on
9    the agreement date?
10         MR. CHRISTENSON: I'd like to be as
11   cooperative as we can, Your Honor. I am just trying to
12   avoid being unrealistic. I think that -- I don't have my
13   calendar right in front of me. Is the 19th a Friday?
14         SPECIAL MASTER POPPITI: The 19th is a
15   Friday.
16         MR. CHRISTENSON: What if we had until
17   that following Monday?
18         SPECIAL MASTER POPPITI: The 23rd?
19         MR. CHRISTENSON: Right.
20         SPECIAL MASTER POPPITI: Mr. Miller. I
21   am sorry, the 22nd.
22         MR. MILLER: That's fine, Your Honor.
23   We can do it then.
24         SPECIAL MASTER POPPITI: Then let's do

## Page 142

1  the 22nd. Thank you. And that's with respect to each of
2  the requests that Mr. Christenson has agreed to.
3      Next, please.
4      MR. MILLER: Next, I believe, is request
5  No. 101, and this deals with the, what the patent in suit
6  defines as the reduction of side space. That seeks
7  documents referring or relating or evidencing
8  communications that mention the reduction of side space
9  as expressed in the patent, and there is a citation in
10  the patent line and column number.
11      And, obviously, this idea is at the
12  heart of the supposed invention of these patents in suit
13  and obtaining non-privileged communications with regard
14  to what it seems to me is directly relevant to be able to
15  put the supposed invention into the proper light of how
16  it achieves whatever it achieves vis-a-vis the prior art,
17  which also sought to address the same issues. The side
18  mounting sought to eliminate side space as well.
19      SPECIAL MASTER POPPITI:
20  Mr. Christenson.
21      MR. CHRISTENSON: Yes, Your Honor. This
22  is a request that relates to a reference in the ,641
23  Patent to a reduction of side space, and we
24  investigated this and we have informed Viewsonic that we

## Page 143

1  don't have any responsive documents.
2      SPECIAL MASTER POPPITI: That would do
3  it, would it not, Mr. Miller?
4      MR. MILLER: That would do it. I was
5  not aware of that communication, but -- but that that's
6  -- if we got a firm representation to that effect, that
7  will do it. I appreciate that.
8      SPECIAL MASTER POPPITI: Thank you.
9  Next, please.
10      MR. MILLER: The next issue are, I
11  believe, our requests 102, 103, which deal with
12  agreements pursuant to which the methods of mounting flat
13  panel display device, other than front mounting, was
14  considered, discussed, analyzed, conceived, invented,
15  developed, or used. Again, this relates to discovery of
16  any joint venture products that, or technologies that may
17  have been developed.
18      We know that the side mounting was
19  developed as a result of a joint technology venture
20  between LPL and Digital Equipment Corporation and that
21  that ultimately resulted in the Court finding that LPL
22  did not have standing to enforce those patents, and we
23  are seeking similar kinds of agreements that would relate
24  to that technology and/or the rear mounted technology so

## Page 144

1  that we can investigate their true ownership of these
2  patents.
3      SPECIAL MASTER POPPITI:
4  Mr. Christenson.
5      MR. CHRISTENSON: Your Honor, the
6  documents that Mr. Miller is referring to, specifically,
7  the dec. agreement, which is an agreement between LPL and
8  another company, arose in the context of the California
9  case, and there was protracted litigation that we don't
10  need to get into here related to that agreement. But I
11  don't know that there is any allegation, I have never
12  seen an allegation, that that agreement has anything to
13  do with the technology in this case. And I am not aware
14  of any joint venture related to the technology at issue
15  in this case, and I am not aware of any defense that's
16  ever been alleged related to inventorship or ownership
17  with respect to these patents.
18      So I think they are trying to import an
19  issue from another case into this case that just doesn't
20  apply.
21      LPL owns these patents, it always has
22  owned these patents, and we have -- we have provided the
23  invention disclosure forms from LPL's employees.
24      SPECIAL MASTER POPPITI: Mr. Miller.

## Page 145

1      MR. MILLER: All I can say is that LPL,
2  my understanding, I wasn't present in the California
3  case, but LPL made the exact same statements there, and
4  until these documents were unearthed, you know, they
5  contended, as affirmatively as Mr. Christenson does here,
6  that they own those patents and probably still contend
7  that on appeal.
8      So, their joint venture relationship
9  with third parties, I haven't seen the dec. agreement, so
10  I can't tell you whether or not it relates to mounting
11  activities, I don't know what R and D work they did with
12  third parties that may well have done this. I understand
13  that there were invention disclosure forms for the side
14  mount patents that were produced in the California case
15  that it turned out to have been after the work was done
16  as part of this joint venture agreement.
17      So, I am not casting aspersions, but I
18  am trying to seek discovery into legitimate issues, and,
19  no, we did not seek to assert affirmative defenses and
20  claims that we didn't have any justiciable basis to
21  assert, but, obviously, if these documents, you know,
22  deliver some information, we will be back in front of
23  Judge Farnan forthwith seeking to introduce the issuance
24  into the case as an appropriate one.

Hearing

38 (Pages 146 to 149)

Page 146

1  SPECIAL MASTER POPPITI: Well, let me
2  see if I understand what you just said.
3  Are you suggesting that you have not
4  pled an issue that touches on the issue of validity,
5  which I expect implicates ownership?
6  MR. MILLER: No. We have clearly
7  asserted issues with regard to validity and
8  enforceability of the patent, both of which would be
9  issues --
10  SPECIAL MASTER POPPITI: Involving
11  ownership.
12  MR. MILLER: -- involving ownership,
13  yes. We have not made -- as Mr. Christenson said, we
14  have not made a specific charge that they don't own these
15  patents at this point, but we clearly have raised issues
16  that raise the specter of whether or not ownership is
17  proper.
18  SPECIAL MASTER POPPITI: Well, it's
19  notice.
20  MR. MILLER: Yes.
21  SPECIAL MASTER POPPITI:
22  Mr. Christenson, with that, is there any agreement with
23  respect to 102 and 103?
24  MR. CHRISTENSON: Well, I guess, if you

Page 147

1  are talking about the specific documents, you referred to
2  the dec. agreement, and then he said that he hasn't seen
3  the dec. agreement, so I don't know if that's the
4  agreement he wants us to produce. We could produce that
5  agreement.
6  SPECIAL MASTER POPPITI: Mr. Miller, is
7  there -- can you better define the universe as you know
8  it?
9  MR. MILLER: The only agreement I know
10  of is what I have read in the news releases about the
11  dec. agreement, but what we are seeking are agreements
12  between LPL and third parties regarding the development
13  of mounting technology as expressly set forth in these
14  requests.
15  SPECIAL MASTER POPPITI:
16  Mr. Christenson, I think that describes what counsel is
17  looking for, so, certainly, it encompasses a dec.
18  agreement and any other agreements. I think you just
19  said that you were not aware of any others, and that may
20  be -- that may be the answer, but certainly it does
21  encompass a dec. agreement.
22  MR. CHRISTENSON: If we are talking
23  about validity and enforceability, I assume we are
24  talking about the same time frame that we were addressing

Page 148

1  earlier? In other words, I think Mr. Miller's contention
2  is, perhaps, somewhere out there, is some agreement that
3  prior to the time we invented rear mounting, we were
4  engaged in a joint venture and that joint venture
5  actually developed a rear mounting, which would mean we
6  would be going back to the critical date period as of
7  December, '98, or earlier.
8  SPECIAL MASTER POPPITI: Mr. Miller, do
9  you agree?
10  MR. MILLER: We can -- yes. We can look
11  at that, the date parameter that we discussed earlier.
12  MR. CHRISTENSON: We will agree to
13  respond, given that limitation, Your Honor.
14  SPECIAL MASTER POPPITI: Thank you. And
15  that covers 102.
16  MR. MILLER: Your Honor, if I may be
17  heard a little bit further on that?
18  SPECIAL MASTER POPPITI: Yeah, please.
19  MR. MILLER: It occurs to me that if
20  there was an agreement that was entered into after that
21  date, which affects these mounting patents, I wouldn't
22  want that to be excluded, and, so, I am nervous, you
23  know, being asked to take something on blind faith that
24  that's the proper date range because I just don't know

Page 149

1  what agreements may have been entered into, you know,
2  after December 1998 that could affect these mounting of
3  technologies.
4  So I guess I am asking to allow the
5  request to run the full breadth of the time because there
6  could well be a post 1998 agreement that implicates the
7  ownership.
8  MR. CHRISTENSON: Your Honor, I think
9  there are two different sorts of issues that are swimming
10  around there. One is the one we have been focusing on,
11  and I think the one that request 102 focuses on, which is
12  who invented the invention.
13  SPECIAL MASTER POPPITI: Right.
14  MR. CHRISTENSON: There is a second
15  issue, I think, that Mr. Miller is alluding to, which is,
16  at some point, there was some transfer of interest in the
17  patent.
18  SPECIAL MASTER POPPITI: Right.
19  MR. CHRISTENSON: And I think the second
20  issue is foreclosed clearly by interrogatory responses
21  where that issue was raised and responded to, and the
22  answer is that there is no transfer of interest.
23  MR. MILLER: With that, then, Your
24  Honor, I am accepting that as the date.

Page 150

1          SPECIAL MASTER POPPITI:  Thank you.  So
2     there is agreement with respect to 102, and I expect that
3     also relates to 103, does it not?
4          MR. MILLER:  From my standpoint, it
5     does, Your Honor.
6          SPECIAL MASTER POPPITI:
7     Mr. Christenson.
8          MR. CHRISTENSON:  Well, if we are
9     talking about documents concerning mounting technology
10    developed and invented by LPL between the January 1, '97,
11    and the December, '98, we can agree.
12         SPECIAL MASTER POPPITI:  Mr. Miller.
13         MR. MILLER:  I don't know why I would be
14    limited to documents about an invention by LPL when -- if
15    LPL has documents that show it was invented by someone
16    else, I shouldn't be -- I should be entitled to those as
17    well.
18         MR. CHRISTENSON:  That's fine, Your
19    Honor.
20         SPECIAL MASTER POPPITI:  Thank you.
21    Next, please.
22         MR. MILLER:  Next would be request No.
23    119, which are documents that refer, reflect, or evidence
24    use of a flat panel display product of the element which

Page 151

1     LPL has identified as frame C in pleadings in this Court.
2     And what we are interested is in documents that LPL has
3     in its possession, custody, or control that show the
4     utilization of that structure because that is a critical
5     element of what they contend to be the infringing
6     structure of the Viewsonic product, and to the extent
7     they have information about that structure being used by
8     themselves or others, it clearly would be relevant here.
9     And, obviously, the dates of that use would be highly
10    relevant if it precedes any of the filing dates of the
11    patent.
12         SPECIAL MASTER POPPITI:
13    Mr. Christenson.
14         MR. CHRISTENSON:  Your Honor, as I
15    understand request 119, it's focused on a, what's
16    referred to as frame C, a declaration of an expert, and
17    that's Mr. Bohannon, LPL's expert, and he is the one that
18    made the designation in frame C in an exhibit to a
19    declaration, and we have produced to Viewsonic all of the
20    documents from Mr. Bohannon related to that issue and
21    related to frame C and we have produced all of our patent
22    files, as I mentioned earlier.
23         So, I don't know if there is anything
24    else, at this point, that we would have to produce.

Page 152

1     There is nothing that I am aware of.  But if there is
2     something that Mr. Miller is thinking of, in particular,
3     I am happy to address that.
4          SPECIAL MASTER POPPITI:  Mr. Miller.
5          MR. MILLER:  Your Honor, we are not
6     seeking to see what Mr. Bohannon identified as Exhibit C.
7     Obviously, that's been produced.  What we are asking for
8     is the element in the product which he identified as C.
9     We are trying to make this as clear as possible so that
10    it wouldn't be a misconstruction, and I think we are
11    getting an overly narrow reading of this request by
12    plaintiff.
13         What we are seeking is information
14    regarding, in a flat panel display device product, that
15    element which they chose to identify as element C in
16    those products, not just what Mr. Bohannon happened to
17    do, but in their possession, custody, and control
18    generally because it clearly relates to the central
19    issues of infringement in this case.
20         SPECIAL MASTER POPPITI:  Based on your
21    description, it certainly is broader than what
22    Mr. Christenson said that they have already produced.
23         MR. CHRISTENSON:  Is it related
24    specifically to the VX 900?

Page 153

1          MR. MILLER:  Cass, it's related to the
2     tray, what's been called the tray, and what you call the
3     first frame, and the use of that structure in other
4     products.  I can't be any more clearer than that, and I
5     think the request is pretty clear that it's not limited
6     to the VX 900 and it's not limited to a component that
7     Mr. Bohannon happened to put a little sticky on that said
8     "C."  It's addressed to the structure of the product and
9     the structure that's in the product that you are accusing
10    infringement.
11         SPECIAL MASTER POPPITI:  Well,
12    Mr. Christenson, you just asked a question whether it was
13    limited to VX 900; right?
14         MR. CHRISTENSON:  Yeah.  The answer, I
15    think, is no.
16         SPECIAL MASTER POPPITI:  Right.
17         MR. AMBROZY:  Our question, Your Honor,
18    is Mr. Miller discusses he is interested in the frame as
19    it pertains to infringement, but, again, we are the
20    patent holder so why would we be worried about the
21    infringement?
22         SPECIAL MASTER POPPITI:  Mr. Miller.
23         MR. MILLER:  Your Honor, to the extent
24    that they have documents that show this structure as

Hearing

40 (Pages 154 to 157)

Page 154

1  being a common element of every LCD product that's sold
2  out there and they have not taken the position that
3  infringes elsewhere, that's evidence that should go
4  before a jury.
5        To the extent that they make this
6  product themselves, that they have identified this
7  component, or others have identified this component as
8  something other than the first frame, which they tried to
9  shoehorn it in this case as being, that would be relevant
10  to the trier of fact as well.
11        It's just a plethora of issues where the
12  structure of the product and the equivalent structure in
13  other components would be relevant to. And this request
14  seeks to get their -- information they have in their
15  possession, custody, or control that relates to the use
16  of a particular component that they have identified as
17  component C in the VX 900 in other flat panel display
18  products.
19        SPECIAL MASTER POPPITI:
20  Mr. Christenson, I certainly understand the request and
21  the strength of it. Any --
22        MR. CHRISTENSON: Your Honor, Cass
23  Christenson. Given that comment, I think it's now more
24  clear what they are after. And it's disconcerting

Page 155

1  because it sounds like what they want is any documents
2  that exist related to or analyzing products that may
3  infringe, and there are really two categories of
4  documents.
5        One category are the documents that LPL
6  has that are not privileged, and those documents have
7  already been produced, including documents regarding
8  third-party products.
9        The other category are documents that,
10  you know, relate to any analysis done by outside counsel
11  for LPL, which we would deem privileged and work product.
12        SPECIAL MASTER POPPITI: Well, I
13  understand -- now that you understand the request, and
14  you are responding to the request as you now understand
15  it, I don't have that response in writing for purposes of
16  protecting your record, but if the --
17        MR. CHRISTENSON: Perhaps one way to
18  clarify this is: Are they talking about the same time
19  period that we were talking about earlier?
20        SPECIAL MASTER POPPITI: Mr. Miller?
21        MR. MILLER: No.
22        SPECIAL MASTER POPPITI: I understood it
23  was longer.
24        MR. AMBROZY: Okay. Then going back to

Page 156

1  the point about infringement, Your Honor, whether the
2  frames are important and whether we have asserted
3  infringement against another party that sells similar
4  frames, that's irrelevant. There is multiple defendants,
5  we will get to them as we get to them, but just because
6  someone else or we know of someone else that might be
7  selling a product that has this frame labeled as "C,"
8  it's irrelevant to the production.
9        We are willing to produce documents
10  pertaining to the critical date, but anything after that,
11  as it pertains to infringement, is irrelevant for the
12  purposes of Viewsonic's case.
13        MR. MILLER: Your Honor, I would
14  disagree. I mean, Mr. Ambrozy takes upon himself the
15  rights of the jury to decide what is or isn't important
16  in terms of the construction that's being offered here
17  and whether or not there's infringement.
18        SPECIAL MASTER POPPITI: I understand
19  the argument with respect to relevance and what the jury
20  may be entitled to listen to and what they may have to do
21  with it. But I am concerned about -- or I am struck by
22  the claim of privilege, and I understand that the -- that
23  the practice in the case has been not to develop a
24  privilege log, and I am not sure what that means for

Page 157

1  purposes of my dealing with 119 and a claim of privilege
2  with respect to dates up to the current time.
3        MR. MILLER: I don't think that this
4  request was structured to try to get at memos they have
5  written about infringement or not. It was structured to
6  get at, you know, products that they are -- that they --
7  that use these components and the underlying products.
8        I am not asking them to, through this
9  request, to admit or deny that they infringed. To me, it
10  doesn't seem like it implicates a privilege, if read so
11  broadly, that it would pick up documents that are their
12  analyses, then, you know, that's not something that we
13  are seeking to compel here.
14        SPECIAL MASTER POPPITI: Well, certainly
15  if there are documents that don't implicate the
16  privilege, then unless there is an agreement, I expect
17  that I would rule that these should be produced.
18        If there is a claim of privilege with
19  respect to certain documents, Mr. Miller, are you
20  suggesting that given the practice in this case, that you
21  will -- well, how do you intend that that be dealt with?
22        MR. MILLER: Well, one problem we have
23  in that regard is that, previously, LPL took the position
24  that the mere fact that they had a product was

Page 158

1    privileged, and Your Honor overruled that.
2        SPECIAL MASTER POPPITI: I did.
3        MR. MILLER: If we are going to get the
4    documents that show, you know, the use of this structure
5    in other products, that's what we are looking for. I
6    mean, in terms of memos and those sorts of things --
7        SPECIAL MASTER POPPITI: You are not
8    interested?
9        MR. MILLER: I am not interested. In
10   the normal case, I'd be inclined to just accept my
11   opposing counsel's representation that they have not
12   produced, you know, particular memos that were done post
13   filing of the litigation that relate to infringement
14   analyses so long as I had confidence I was getting the
15   underlying materials, whether it be the inspection of the
16   product or photographs or whatever or brochures or
17   whatever it is they have that relate to those products.
18       I, unfortunately, don't have that sense
19   of warm and fuzzy in this case, and, so, you know, I
20   would look for your guidance in terms of --
21       SPECIAL MASTER POPPITI: Well, the
22   guidance is easy. I mean, if there is a claim of
23   privilege, the burden is on the party that claims
24   privilege to, No. 1, assert it, which I think has been

Page 159

1    asserted, not in writing, but certainly on the record,
2    and, No. 2, carry the burden forward to prevail on the
3    privilege.
4        In order to do that, I am going to need,
5    to the extent the documents exist, a log of those
6    documents. You will be entitled to see the log,
7    obviously, and then I will have to take those documents
8    and review them in camera.
9        I don't see -- I don't see any other way
10   that I can come at that.
11       MR. MILLER: I don't either, Your Honor.
12       SPECIAL MASTER POPPITI:
13   Mr. Christenson, any suggestions different from what I
14   think I am required to do?
15       MR. CHRISTENSON: I think what you have
16   said is clear, Your Honor. In the -- up to this point,
17   counsel have been relying on each other, you know, to not
18   have to log documents created since the inception of the
19   case, but it sounds like we are now retreating from that,
20   so I assume that's going to apply to everyone.
21       SPECIAL MASTER POPPITI: I don't see --
22   and I understand what you just said. I don't see any
23   other way to handle it other than to ask, now that you
24   understand the scope of 119, if you agree to 119, with

Page 160

1    the understanding that you will be, consistent with the
2    practice in the case, permitted to represent that there
3    are privileged documents that you are not going to give
4    up.
5        Mr. Miller just said he is not
6    comfortable with that, but maybe, Mr. Miller, you would
7    be more comfortable if you knew that the 119 was not
8    going to be contested, I was not going to have to enter a
9    finding and recommendation, and you would be getting the
10   documents by agreement in due course?
11       MR. MILLER: I would agree to accept
12   that, you know, with my understanding that the privilege
13   is not so broad as to where you overruled it previously
14   in terms of the existence of the products or the products
15   themselves is privileged, but, obviously, their analyses
16   is, I'd be -- I would be willing to accept that by
17   agreement.
18       MR. CHRISTENSON: Your Honor, I am just
19   concerned about the posture in this and all the
20   discussion that we had about privilege and how it's
21   potentially implicated here. I think our preference
22   would be -- we will certainly go back and look at this
23   again and see if we can try to work through it now that
24   we have a better understanding of what is involved --

Page 161

1    but, at the same time, I do think we need to preserve our
2    objections and our privileges, and maybe this is a good
3    time to just briefly discuss the issue of privilege logs.
4        It's an issue we have discussed among
5    counsel several times, and it sort of fell by the way
6    side given all the other activity in the case, and I
7    think, to protect everyone's interests, it might be
8    helpful to agree that -- and there have been privilege
9    logs changed in the case, but they are somewhat stale at
10   this point.
11       I think everyone should agree on a date
12   where we submit new privilege logs addressing the
13   documents that are being withheld on a privileged basis
14   since before suit was filed, and then, as we understand
15   it, we should also address documents specifically
16   responsive to the requests that are being -- that we are
17   being required to further produce under. And I think
18   that would be in everyone's best interest.
19       Certainly, it would meet with your
20   expectations that you would need a record on which to
21   rule to the extent that becomes necessary.
22       SPECIAL MASTER POPPITI: Well, if I
23   understood you correctly, then let's do -- let me propose
24   this without focusing on the date until you suggest a

Hearing

42 (Pages 162 to 165)

Page 162

1  date.
2        It seems to me, perhaps, an efficient
3  way to deal with 119, and those following requests that
4  are similar to 119, it may be that I should forestall
5  entering any order with respect to that -- by "order," I
6  mean finding and recommendations -- and permit you to
7  have brief, a brief opportunity to further discuss it.
8        If you can reach agreement with respect
9  to 119 and those similar to 119, then I don't need to
10  deal with a privilege log in the context of 119 and begin
11  that process of you logging them, you exchanging the log,
12  and me going into an in camera review as it relates to
13  119. That's my first observation.
14        The second is: Please make a note that
15  we should go back and discuss the issue of privilege logs
16  at the end of our business either today, or if we have to
17  reconvene briefly tomorrow or in the new week, but my
18  thought is rather than cloud what could be done with 119,
19  if you can reach agreement and I don't have to deal with
20  privilege issues, that may be a wise thing to do.
21        Does that make sense or does it not?
22        MR. CHRISTENSON: I think it does make
23  sense. I think it sort of ultimately comes down to
24  Mr. Miller's position because --

Page 163

1        SPECIAL MASTER POPPITI: Well, his
2  comfort level, as I understand it.
3        MR. CHRISTENSON: Correct.
4        SPECIAL MASTER POPPITI: Mr. Miller.
5        MR. MILLER: I guess I wouldn't mind a
6  forbearance, but I guess I'd like to have, you know, a
7  date by which, if there is no resolution of this by
8  agreement, that we -- we proceed forward.
9        SPECIAL MASTER POPPITI: I agree.
10        MR. MILLER: And I'd like that to be a
11  fairly short order date, something like the 10th of
12  January, at the latest, perhaps.
13        SPECIAL MASTER POPPITI: I was even
14  thinking of a time sooner than that.
15        MR. MILLER: I was, too, originally, but
16  I was trying to be kind.
17        SPECIAL MASTER POPPITI: No. I don't --
18  I don't see why we can't look at a date sometime next
19  week when, with respect to 119 and others that are
20  similar to 119, you advise me not later than -- didn't we
21  pick a date next week for something, or was it the 8th?
22  We used the 8th for something. I am going to have to go
23  back and look through the transcript.
24        MR. CHRISTENSON: We can work off of the

Page 164

1  8th.
2        SPECIAL MASTER POPPITI: So, not later
3  than the 8th, advise me as to whether or not you have
4  reached agreement on 119 and those similar to that.
5        MS. MASON: Your Honor, you set January
6  8th as the date for us to report to you regarding the
7  meet and confer on inspection of the bills of lading.
8        SPECIAL MASTER POPPITI: That's perfect,
9  then. Then this would be -- thank you for doing that.
10  This would be using the same date for purposes of this
11  meet and confer on 119 and others similarly situated.
12        MR. MILLER: That would be fine, Your
13  Honor.
14        MR. CHRISTENSON: Just as a point of
15  clarification, Scott, are there others that you would
16  like us to group under this when we say, "others similar
17  to 119"? Just to help us understand if there are any
18  others that fall in here?
19        MR. MILLER: I don't know of any others
20  that are the subject of that yet, but we have a couple of
21  upcoming ones that may -- we will have to see.
22        SPECIAL MASTER POPPITI: That's why I
23  reserved on "others."
24        Next.

Page 165

1        MR. MILLER: Next, I think, is the group
2  that is from 71 to 74, and these are -- I am sorry.
3        (Discussion off the record.)
4        SPECIAL MASTER POPPITI: Counsel, are
5  you there?
6        MR. MILLER: Yes.
7        SPECIAL MASTER POPPITI: I was just
8  looking at the clock and talking to the court reporter.
9  We should take maybe a ten- or 15-minute break, not now,
10  but perhaps at 4:30, hopefully we can get everything
11  wrapped up not later than 6:00 unless someone proposes
12  that we should cut it off sooner than that and reconvene
13  for purposes of dealing with matters that are left to be
14  dealt with.
15        MR. CHRISTENSON: Your Honor, I am
16  cautiously optimistic we can get -- that we can complete
17  our work or get very close to completing it.
18        SPECIAL MASTER POPPITI: Then let's
19  push.
20        MR. MILLER: Okay. 71 through 74 are
21  documents that relate to the use of products or practices
22  of any of the inventions claimed in the patents in suit,
23  and this is where I alluded to earlier a sort of catch 22
24  that's out there and that LPL contends that they don't

Page 166

1    make any products which practice these patents, but then
2    accuse products that use their modules that are side
3    mounted as infringing the patents.
4        So I am not sure, given that the patents
5    talk about, and certain of the claims within it talk
6    about a module that is, quote, capable of being rear
7    mounted, I am not sure how we are to understand LPL's
8    position when they charge products using their own
9    modules of infringing their own patents?
10       SPECIAL MASTER POPPITI: I missed
11   something there. Say what you just said again, please.
12       MR. MILLER: Viewsonic has products that
13   it sells that use an LPL module.
14       SPECIAL MASTER POPPITI: Right.
15       MR. MILLER: That module is, I believe,
16   a side mounted module. LPL has advised us that they
17   contend that those products potentially infringe the
18   patents in suit. Yet, LPL takes the position that they
19   don't make any products and none of their products, that
20   they have produced no samples of any products that
21   utilize or practice any of the inventions disclosed in
22   the patents.
23       And, so, at one point, they represent we
24   were -- we felt that representation, which came only

Page 167

1    after we filed the motion, might be sufficient, but we
2    are faced with a conundrum of a situation where they
3    accuse products of Viewsonic that use their modules of
4    infringing the patents. And, so, we are not sure how to
5    square their representation that they don't make products
6    that practice the technology of the patents, and, yet,
7    accuse products that use their modules of infringement.
8        MR. AMBROZY: I think I can cut through
9    that.
10       SPECIAL MASTER POPPITI: Please.
11       MR. AMBROZY: The patents all claim, and
12   they claim a flat panel display device and that flat
13   panel display device has a flat display panel, which is
14   the glass, electronic circuitry, liquid crystal -- for
15   lack of a better term, it's the flat glass that everyone
16   understands -- and then you have the back light, itself,
17   which is attached to that. That is sometimes referred to
18   as an LCD module.
19       But the patent also has claims -- I am
20   sorry, has limitations to frames, so you have the flat
21   panel display device, which is the flat display package,
22   the back light unit, and then frames. All LPL sells is
23   the module, itself, which is the back light unit and the
24   display panel.

Page 168

1        So, we are not accusing Viewsonic of
2    infringing simply because they use a sub component of
3    something that LPL sells. Viewsonic is accused of an
4    infringement because it has a flat panel display device,
5    and that is, in turn, connected to a housing, which is a
6    much more complex device than just what LPL sells as
7    Mr. Miller refers to an LCD module.
8        So, that's why there is the conundrum.
9        MR. MILLER: The patent claims, certain
10   of the patent claims speak of a flat panel display device
11   which is, quote, capable of, closed quote, being mounted,
12   and I would presume that all of their products are
13   capable of being mounted, and if any -- if a side
14   mounting module is capable of being mounted through rear
15   mounting, which is what they, essentially, contend by
16   charging that product with infringement, then there
17   should be documents and materials that are the subject
18   matter of these requests because they practice the
19   invention is claimed by the device.
20       MR. AMBROZY: The point of it is, if you
21   read the patent limitations, it talks about fastening
22   parts on the rear surface of a first frame, and the
23   devices that LPL sells does not have that first frame,
24   therefore, it doesn't have the fastening parts,

Page 169

1    therefore, it's not capable of being mounted.
2        SPECIAL MASTER POPPITI: Mr. Miller.
3        MR. MILLER: Your Honor, I mean, that's
4    an interesting -- you know, we will know a lot more about
5    that argument once we get the bills of materials and the
6    other materials you have ordered them to produce to us
7    because, you know, again, I am somewhat in the dark
8    because I don't have any other discovery to know how to
9    judge that argument.
10       SPECIAL MASTER POPPITI: Well, and, so,
11   how does that -- I mean, how does that relate to the
12   request of 71?
13       MR. MILLER: I guess if they are
14   representing on the record that they don't have --
15       SPECIAL MASTER POPPITI: That's what
16   they are saying.
17       MR. MILLER: -- any of these materials,
18   then we will have to accept that representation and --
19       SPECIAL MASTER POPPITI: You accept
20   until you see what other production they have.
21       MR. MILLER: Until we see what other
22   opportunities there are to address it.
23       SPECIAL MASTER POPPITI: Okay.
24       MR. MILLER: And we may be able to speed

Hearing

44 (Pages 170 to 173)

Page 170

1   through 72, 73, and 74, I think are --
2           SPECIAL MASTER POPPITI:  They are all
3   the same.
4           MR. MILLER:  They are all the same
5   concept.
6           The question is:  Are they subject to
7   the same representation?
8           SPECIAL MASTER POPPITI:  Mr. Ambrozy.
9           MR. AMBROZY:  Your Honor, subject to the
10  same representation, and I am definitely going to check
11  with our client just to make sure we are all on the same
12  page, and I apologize if we have to revisit this issue,
13  but my understanding is my representation is accurate.
14          SPECIAL MASTER POPPITI:  Well, I want
15  you to make sure we close circle on that.  Let's use the
16  same date of January 8, if not sooner.
17          MR. AMBROZY:  Thank you, Your Honor.
18          SPECIAL MASTER POPPITI:  Thank you.
19          MR. CHRISTENSON:  One other point
20  related to these requests, and that is, that, as we
21  discussed at the outset, there is a footnote 8 in our
22  opposition where we had talked about specific categories.
23          SPECIAL MASTER POPPITI:  Yes.
24          MR. CHRISTENSON:  And we are certainly

Page 171

1   abiding by our agreement to produce those categories of
2   documents, and I just wanted to note that we have looked
3   into it and we believe we have produced all the documents
4   except for one additional subset that we have discovered,
5   and we will be producing those shortly.
6           SPECIAL MASTER POPPITI:  Mr. Miller, any
7   need to follow onto that?
8           MR. MILLER:  Not, I guess, until I see
9   the document.
10          SPECIAL MASTER POPPITI:  That was just
11  informational.  Thank you, Mr. Christenson.
12          MR. CHRISTENSON:  You are welcome.
13          SPECIAL MASTER POPPITI:  Next, please.
14          MR. MILLER:  And then 118, I think, is
15  the last one, which is similar to 71 through 74, and may
16  be able to be dealt with in the same way.
17          That deals with the similar kinds of
18  things where we are asking for products by model number
19  and other designations that would utilize the disclosed
20  patents, the technology, but based on -- if the similar
21  representation is applicable to this one, then I guess we
22  will have to wait and see.
23          SPECIAL MASTER POPPITI:  Mr. Ambrozy?
24          MR. AMBROZY:  We will investigate and

Page 172

1   get back to you by that same date.
2           SPECIAL MASTER POPPITI:  So the
3   representation is the same unless there is a difference
4   when you get back to me?
5           MR. AMBROZY:  Yes, Your Honor.
6           SPECIAL MASTER POPPITI:  Thank you, sir.
7           Next, please.
8           MR. MILLER:  That concludes these -- oh,
9   we have one more motion on the discovery questions, and
10  that is, request Nos., I think it is 74 and 75, which
11  deal with documents provided to a draftsperson for the
12  drawings that are part of the patents in suit.  I got the
13  numbers wrong.
14          SPECIAL MASTER POPPITI:  Let's -- why
15  don't we break now.  It just makes good sense to break
16  now.  Let's take ten minutes, please.
17          (Recess taken.)
18          SPECIAL MASTER POPPITI:  Counsel, we are
19  back on.  I am just moving aside some of the things we
20  have dealt with.
21          Next, please.
22          MR. MILLER:  Your Honor, Scott Miller
23  back.  Excuse me.  The next issue --
24          SPECIAL MASTER POPPITI:  Is it 75 and

Page 173

1   76?
2           MR. MILLER:  It's request No. 75 and 76.
3           SPECIAL MASTER POPPITI:  Yeah.  That's
4   10/3/06 and the response was 10/18/06.  That's No. 4.
5   Okay.
6           MR. MILLER:  This deals with
7   communications between each draftsperson for the drawings
8   and the patents in suit and the instructions that they
9   were given and the materials that they were given,
10  samples, prototypes, etcetera, and the drawings in this
11  case are an interval part of the disclosure and have
12  formed the basis of numerous arguments by what they do
13  and don't show, and we believe that we are entitled to
14  collect from the materials that were provided to the
15  draftsman, presumably, from the inventor, that show the
16  invention that was to be illustrated.
17          SPECIAL MASTER POPPITI:  Well, let me
18  ask a question that I -- is prompted by the last
19  paragraph in Miss Mason's letter of October 3 of 2006.  I
20  may perhaps state it differently, in the last sentence,
21  the request is that, pursuant to 37(c)(1), that LPL be
22  barred, I guess framing it differently, does LPL intend
23  to present such evidence?  Because if --
24          MR. CONNOR:  This is Cormac Connor for

Page 174

1 LPL. I am working out of a home phone here.
2        SPECIAL MASTER POPPITI:  Okay.
3        MR. CONNOR:  To begin with, as we state
4 in our response brief and documents that.
5        MR. CHRISTENSON:  Your Honor, I think,
6 Cormac, did you hear the question?  I think the first
7 question was to the extent to which there is evidence
8 that needs to be addressed?
9        MR. CONNOR:  And I was about to get into
10 that.
11        SPECIAL MASTER POPPITI:  Do you intend
12 to use it?
13        MR. CONNOR:  Right.  Frankly, there is
14 no evidence, Your Honor.  We have investigated, as we
15 described in our response brief, we have spoken with the
16 NEIT firm which is based in Korea, spoken with attorneys
17 at that firm to determine whether or not they have any
18 documents that even might be responsive to these two
19 requests.  They have confirmed that they do not.
20        Over and above our objections to the two
21 requests as calling for attorney/client privilege
22 information and work product information, there is simply
23 nothing responsive that we have found.
24        SPECIAL MASTER POPPITI:  Well, if there

Page 175

1 is nothing there, the privilege can't cover anything.
2 It's a bare bed.
3        Mr. Miller.
4        MR. CONNOR:  That's correct, Your Honor.
5 And to the extent there is something that comes up with
6 further investigations, which we are comfortable in
7 saying that there will not be, based on our discussions
8 with NEIT lawyers, you would have them identified on
9 privilege logs.
10        SPECIAL MASTER POPPITI:  Let me ask
11 Mr. Miller, to close circle on your comment, or your
12 representation that there are no documents, that would
13 answer the question, would it not, Mr. Miller?
14        MR. MILLER:  Yeah.  Obviously, I can't
15 get something that doesn't exist.
16        SPECIAL MASTER POPPITI:  Right.  If
17 something pops up, if you will, and you intend to put it
18 on a privilege log, I want to make sure that I have a
19 clear understanding as to what privilege it is you will
20 be asserting and under what controlling law you will be
21 asserting it.
22        MR. AMBROZY:  We will make that clear,
23 Your Honor.
24        SPECIAL MASTER POPPITI:  Because I don't

Page 176

1 know, in the context of what I have already seen -- and I
2 don't want any discussion on it because it's not before
3 me -- I don't know whether it's Korean law that applies
4 or whether it would be United States law that would
5 apply.
6        MR. AMBROZY:  We will make that clear,
7 Your Honor.
8        SPECIAL MASTER POPPITI:  Thank you.
9 Mr. Kirk certainly knows that if we have to go down the
10 path of talking about foreign law, it's an interesting
11 journey, isn't it, Mr. Kirk?
12        MR. KIRK:  "Interesting" is not the word
13 I would necessarily use, Your Honor.
14        SPECIAL MASTER POPPITI:  I certainly
15 don't speak French.  I hope a learned a little bit about
16 French law and I definitely don't have any facility for
17 Korean.  But, in any event, it will be an issue that we
18 may have to address.
19        That being said, I think we are back to
20 LPG.
21        MR. CHRISTENSON:  Right, Your Honor.
22        SPECIAL MASTER POPPITI:  The filing is
23 to compel Tatung samples of visual display products,
24 filed on 10/6, 2006, and the response was 10/23, 2006.

Page 177

1        MR. CHRISTENSON:  That's correct, Your
2 Honor.
3        SPECIAL MASTER POPPITI:  For our court
4 reporter's benefit, long about 4:30, the air-conditioning
5 system changes throughout the building, and I can feel
6 it.  I apologize for the coughing, counsel.
7        MR. AMBROZY:  We will try to go as
8 quickly as possible, Your Honor.
9        SPECIAL MASTER POPPITI:  That's okay.
10 Just send oxygen.
11        Go ahead, please.
12        MR. AMBROZY:  The overarching, I think,
13 thing this Court should be aware of in regard to this
14 motion is that, initially, there was a contested by
15 Tatung as to whether this motion was properly in front of
16 the Court, and I think it's correct that we could bypass
17 that and go right to the heart of the motion given that
18 Tatung has, since the motion has been filed and issue has
19 been raised about whether it was properly brought, Tatung
20 has come full circle and has now agreed to produce
21 monitors.
22        And our point is that --
23        SPECIAL MASTER POPPITI:  Let's make sure
24 that that is the correct understanding.