# EXHIBIT 1

Friday, March 2, 2007

SHEET 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4   L.G. PHILIPS LCD COMPANY          :   CIVIL ACTION
     LTD.,                             :
 5                                     :
            Plaintiffs,                :
 6                                     :
            v.                         :
 7                                     :
     TATUNG COMPANY, TATUNG            :
 8   COMPANY OF AMERICA, INC.; and     :
     VIEWSONIC CORPORATION,            :
 9                                     :
            Defendants.                :   NO. 04-343 (JJF)
10
                                 - - -
11
              Special Master's Hearing taken at the Law
12   Offices of Blank Rome, LLP, 1201 North Market Street,
     Suite 800, Wilmington, Delaware, beginning at 11:30 a.m.,
13   on Friday, March 2, 2007, before Brian P. Gaffigan,
     Registered Merit Reporter.
14
                                 - - -
15
     BEFORE:   HONORABLE VINCENT J. POPPITI, SPECIAL MASTER
16
                                 - - -
17   APPEARANCES:

18
              THE BAYARD FIRM
19            BY:  RICHARD D. KIRK, ESQ.

20                   and

21            McKENNA LONG & ALDRIDGE, LLP
              BY:  GASPARE J. BONO, ESQ.,
22                 CASS W. CHRISTENSON, ESQ., and
                   REL S. AMBROZY, ESQ.,
23                 (Washington, District of Columbia)

24                        Counsel for LG.Philips LCD Co. Ltd
```

SHEET 23

86

1    MR. MILLER:  And so it's going to be a
2  natural evolution.  As the list that we get from LPL
3  grows, the list from our people will grow.
4    THE SPECIAL MASTER:  Can I expect,
5  commensurate with that -- and I understand why we're
6  where we are with respect to how that list is growing.
7  Can I expect there is also going to be an opportunity to
8  accommodate the appropriate deposition of those newly
9  identified witnesses?
10    MR. MILLER:  As best as we can,
11  absolutely, Your Honor.
12    THE SPECIAL MASTER:  I understand what
13  you say, "as best as you can."  You have some deadlines
14  you are having to live with and maybe there are going to
15  be a lot of busy days out there, but in the course of
16  your discussions, and I expect those discussions will be
17  ongoing, either as a result of continued production, as a
18  result perhaps of decisions that I'll be making in the
19  next course of the next week, I expect accommodations
20  will be made when there are newly identified, newly
21  accused products, therefore, newly identified witnesses
22  and therefore a need to create dates within the dates
23  I've already set.
24    MR. AMBROZY:  Your Honor, it's Rel

87

1  Ambrozy.  If I might jump in there.
2    ViewSonic just I think it was yesterday,
3  has taken issue with your order that they produce the OEM
4  documents, for example.
5    THE SPECIAL MASTER:  I understand.
6    MR. AMBROZY:  By the time that gets
7  resolved, and let's just say that it's found in LPL's
8  favor that those documents should have been produced
9  but that order is not handed down until after the close
10  of discovery in March, and I believe we talked about this
11  earlier, but Your Honor is willing to accommodate further
12  depositions after the close of discovery?
13    THE SPECIAL MASTER:  I mean I understand
14  the reality of the process we're all involved in and
15  that reality is that I don't have the authority to issue
16  an order that stands up to the date and through the
17  trial.  That's Judge Farnan's ultimate decision.  And I
18  understand the impact that can have on any scheduling
19  order.
20    MR. CHRISTENSON:  Your Honor, Cass
21  Christenson.  I would like to clarify one thing to make
22  sure I understood Mr Miller correctly.  I just want to
23  make sure
24    As I understood Mr. Miller, his

88

1  representation today is that the newly identified
2  witnesses are witnesses that are identified solely with
3  respect to having knowledge about newly accused products.
4  Is that right?
5    MR. MILLER:  Yes, they have been added
6  to the list as people who have information -- well, there
7  are two sets of people there, Cass.  One is, the first
8  we're putting up is Kim Stepson (phonetic) that we're
9  putting up as a 30(b)(6) witness.  She is someone I
10  learned is more qualified than the person that had
11  previously been discussed with about it and so we put her
12  on the list and you are going to depose her.
13    The other people are technical people
14  who have had dealings with new products.  You asked for a
15  successor to one of the people who was on the list
16  originally who have since left and they are successors to
17  that function that was handled by that person.
18    MR. CHRISTENSON:  Okay.  I guess my only
19  follow-up sought on this, Your Honor, is that I really
20  don't think that given the fact we are already double
21  tracking defense, defendants' witnesses in some cases,
22  I think it's really not feasible for us to be able to
23  work these additional depositions into the schedule and
24  complete them before March 30 particularly.

89

1    THE SPECIAL MASTER:  Well, we'll get to
2  that when we come to it.
3    MR. CHRISTENSON:  Okay.  Very well.
4    THE SPECIAL MASTER:  That's why it's
5  important to talk about it.
6    Okay   Next please.
7    MS. ROMAN:  Your Honor, this is Tracy
8  Roman again.  If there is nothing further on deposition
9  issues, I'd like to remove from the record the people
10  here in the D.C. office and let us sign-off.
11    THE SPECIAL MASTER:  Please do.
12    MS. ROMAN:  So removing from the hearing
13  is Tracy Roman of Raskin Pet, Scott Miller of Connolly
14  Bove, Frank Merideth of Greenberg Traurig, Derrick Aiuto
15  of McKenna Long and Gap Bono of McKenna Long.
16    THE SPECIAL MASTER:  Thank you, all.
17    (The attorneys respond, "Thank you, Your
18  Honor.")
19    THE SPECIAL MASTER:  Okay.  Who is
20  marshaling the rest of the issues?
21    MR. NELSON:  This is Manuel Nelson, Your
22  Honor.
23    THE SPECIAL MASTER:  Mr. Nelson.
24    MR. NELSON:  If we're prepared to begin

SHEET 24

**90**

1  with the motion that was scheduled to be viewed today,
2  ViewSonic's Motion to Compel LPL to Provide Technical and
3  Mounting Related Documents. I'll be handling that on
4  behalf of ViewSonic.
5           THE SPECIAL MASTER: Okay. Just give me
6  one moment, please.
7           (Pause.)
8           THE SPECIAL MASTER: Okay. Let's
9  proceed with that then, please.
10          MR. NELSON: As Your Honor I'm sure
11 recalls, in December of 2006 we had a hearing on several
12 motions, including ViewSonic's motion to compel similar
13 documents, and during that hearing and prior to that
14 hearing, there had been representations that LPL does not
15 use or implement the claimed invention. And based upon
16 those facts, there was certain --
17          THE SPECIAL MASTER: Agreements.
18          MR. NELSON: -- certain agreements made
19 as well as -- certain agreements were made regarding
20 discovery that was to be produced and certain discovery
21 became also not relevant based upon those represent-
22 ations. It had since been revealed that whether it was
23 due to inadvertence or mere mistake or perhaps advocacy
24 or something less, we learned that LPL does indeed

**91**

1  practice the invention that is claimed or that is
2  described in the patent in suit.
3           THE SPECIAL MASTER: Let me ask the
4  question as you proceed.
5           MR. NELSON: Okay.
6           THE SPECIAL MASTER: Do both of you
7  agree with me that if I determine that LPL has complied
8  with the agreement that was forged and that the
9  information either provided during the course of the
10 hearing was accurate and/or the information that LPL
11 said they would gather after the hearing and provide to
12 you, if that was accurate, and I ultimately make a
13 determination that therefore LPL complied, gave accurate
14 information and complied with the agreement, then there
15 is really nothing else yet to do; correct?
16          MR. NELSON: No. If we were in a
17 position where there are no new facts, that we're just
18 looking at the December 28th hearing, no, we would still
19 be seeking documents that were promised to be produced
20 during that hearing. In other words, the scope of this
21 motion would be far smaller.
22          THE SPECIAL MASTER: I understand that.
23 But it would be a function of saying documents were
24 expected to have been produced -- and I know you will

**92**

1  drill me down on my own memory -- by the end of January,
2  and if they haven't been, then the application is more
3  narrow because you are going to be asking me: They've
4  agreed to produce the documents. The time frame in which
5  they said they would produce them has passed. We want
6  them now.
7           MR. NELSON: Right.
8           THE SPECIAL MASTER: Is that it?
9           MR. NELSON: May I ask for some
10 clarification, Your Honor?
11          THE SPECIAL MASTER: Sure.
12          MR. NELSON: Are we breaking ViewSonic's
13 motion into two parts? One, dealing with the documents
14 that were promised to be produced but perhaps have not
15 been produced; and, two, a set of documents for which
16 there was never any agreement for production?
17          THE SPECIAL MASTER: Yes.
18          MR. NELSON: Okay. I think I understand
19 that.
20          THE SPECIAL MASTER: I mean I think that
21 is the most efficient way to do it.
22          MR. NELSON: Yes, although I think we
23 can probably just address the motion regarding the full
24 scope of the documents because the ones that weren't

**93**

1  produced are subsumed within the full scope of discovery
2  that we seek through our present motion.
3           THE SPECIAL MASTER: Well, I'm not
4  going to tell you how to argue it. I told you the way I
5  approached it. I kind of told you how I approached
6  reading it, so you do it the way you think it is most
7  efficient to hold my attention.
8           MR. NELSON: Okay. Well, then I'll
9  start with specifically in terms of we're actually
10 looking at the status report rather than the motion. And
11 so I think with that being the case, I would turn to ...
12          THE SPECIAL MASTER: Status report of
13 what date?
14          MR. NELSON: Status report of February
15 26th, 2007.
16          THE SPECIAL MASTER: I have it in front
17 of me.
18          MR. NELSON: And I think here we're
19 dealing with I think on page three, the last full
20 paragraph and the paragraph that spans page three to page
21 four.
22          THE SPECIAL MASTER: Page three.
23          MR. NELSON: Page three of the February
24 26, 2007 status report.

94

1      THE SPECIAL MASTER:  Yes, beginning with
2  "both LPL and ViewSonic filed?"
3      MR. NELSON:  No, the paragraph above
4  that, the last full paragraph.  "LPL confirms that."
5      THE SPECIAL MASTER:  I see it.  Okay.
6      MR. NELSON:  So we have a disagreement,
7  and this is one of those issues that maybe can't be
8  resolved without bringing the documents in front of
9  Your Honor, but they produced a paper printout of an
10 agglomeration of information that probably corresponds to
11 bill of materials for the entire manufacturing process of
12 their product beginning with the gases that are used and
13 the glass that is used to make the thin film transistors
14 on the flat panel itself, all the way up to the pallets
15 and boxes that are used to ship the flat panel display
16 products.
17      And while I can quibble about the
18 sufficiency of that, I think that that was bearing on
19 all the bill of materials that we actually sought which
20 was the bill of materials for the liquid crystal display
21 modules.
22      That being said, I can actually probably
23 sift through all that information and come up with the
24 bill of materials for the liquid crystal display modules.

95

1  However, the LPL status report says they produced
2  document responses to 82, 84, 85 and 87.
3      Your Honor, that is just not true.  That
4  is just not correct.  I'm sorry.  Let me take a step
5  back.  That is not correct because Document Request No.
6  84, if you will recall from the hearing, you actually
7  pointed out that that was actually a narrower request
8  asking for documents sufficient to identify not only the
9  parts of an LCD module but the structure, function and
10 assemblage of an LCD module.  And those materials may
11 identify the parts of an LCD module but certainly do not
12 identify the structure or the assembly of those parts.
13 So that would be my first point.
14      The second point would be.  The second
15 point would be 85.  Their status report says that they
16 also, their bill of materials information would be
17 responsive to 85.  85 seeks documents sufficient to
18 identify each part of an LCD module that can be used for
19 mounting an LCD module.  A bill of materials does not
20 indicate anything regarding what particular structure or
21 what particular component can be used for mounting that
22 structure or that component or the LCD module to any
23 other structure.  So bill of materials, even assuming
24 what they produce was the correct bill of materials, does

96

1  not provide any information responsive to 85.  So we are
2  talking about 84 and 85.
3      I presently don't have 87 in front of
4  me.  Please give me a moment.  I will.
5      THE SPECIAL MASTER:  Yes, and just a
6  moment.  I'll do the same.
7      That's any and all bill of materials for
8  the backlight unit.
9      MR. NELSON:  Yes.  So I think the bill
10 of materials that I called an agglomeration of all bill
11 of materials from, say, the gases and etches and the
12 cleaners and everything all the way up to the pallets and
13 the boxes, I would say that all materials don't include
14 bill of materials of the backlight unit but it certainly
15 is a way to hide all the information.  So I guess that
16 87 --
17      THE SPECIAL MASTER:  Well, I mean I
18 guess --
19      MR. NELSON:  -- supplied with.
20      THE SPECIAL MASTER:  -- that is the old
21 adage be careful what you ask for.
22      MR. NELSON:  Your Honor, if you look at
23 what we did ask for -- okay.  Well, if I'm going to
24 address the merits, you are going to let me.

97

1      THE SPECIAL MASTER:  Yes, I will.
2      MR. NELSON:  You pointed out if I ask
3  for the world, I'll be given a universe of information
4  from which it's difficult to sift the relevant
5  information.  And the fact of the matter is Request For
6  Production 82 does not ask for all bill of materials for
7  each subset, subcomponent or part of an LCD module.  It
8  asks for the bill of materials for the final LCD module,
9  if you have request for production in front of you.
10      THE SPECIAL MASTER:  I do.  Any and all
11 bill of materials for each LCD module made by LPL from
12 January 1, 1997 to the present.
13      MR. NELSON:  Certainly, Your Honor.  And
14 from just a common sense perspective, that would not
15 include the bill of materials for the boxes that store in
16 which all the LCD modules are shipped.  It would not
17 include the foam or the pallets in which the LCD modules
18 are shipped.  That is post-production, for sure.
19      And I submit to you, Your Honor, that
20 that would not include the bill of materials for each
21 subcomponent of each LCD module.  In other words, the
22 LCD is built by putting together some finite set of
23 components and they've certainly don't use the gases, the
24 etchings, the cleanants, the masks to make the thin film

SHEET 26

**98**

1 transistors. The thin film transistors already exist in
2 what we call a panel, a flat panel. That panel is,
3 itself, a component of the LCD module. That is how you
4 build the panels, not really within the bill of materials
5 for each LCD module.
6 That being said, Your Honor, I think I
7 can probably figure out from that universe of information
8 the bill of materials for the LCD module. But since are
9 you saying I have to be careful for what I ask for, I
10 just want to point out that really they just dumped on us
11 bill of materials for a tremendous assortment of steps
12 that are beyond what was requested.
13 THE SPECIAL MASTER: Assume for the
14 moment, because I don't have that truckload of materials
15 sitting here with me. First of all, what are you asking
16 me to do?
17 MR. NELSON: I'm asking you to, since
18 they're reporting that they have produced documents in
19 response to Document Requests 84 and 85, I'm actually
20 willing to accept the documents they produced in response
21 to the agreement reached which had a temporal limitation,
22 the temporal limitation of December 28th, 2006. I'm
23 willing to accept that bill of material information in
24 response to 82. But in response to 84 and 85, we

**99**

1 received nothing contrary to what they say in their
2 status report.
3 THE SPECIAL MASTER: Let's talk then
4 about 84 and 85, please. If I may hear your response.
5 There is an acceptance with response to 82, notwithstand-
6 ing the claim that you gave more than you needed. Let's
7 talk about 84 and 85, please.
8 MR. CHRISTENSON: And, Your Honor, I
9 don't know at what point you want me to respond. But I
10 want to respond, I can assure you.
11 THE SPECIAL MASTER: Well, what I just
12 heard, there was an agreement, correct me if I'm wrong,
13 with respect to 82. Whether it was too broad or whether
14 it was appropriate, the characterization is that it was
15 too broad. I don't need to be concerned about my
16 characterization of it if I've heard what I just heard,
17 and that is they're going to work with that document,
18 they're going to accept it as a bill of materials that
19 was covered by Document Request 82.
20 MR. NELSON: With --
21 THE SPECIAL MASTER: So I don't need
22 you -- "with" what?
23 MR. NELSON: I'm sorry, Your Honor.
24 With the understanding that that has a date limitation

**100**

1 that was imposed upon an agreement that was reached on
2 December 28th, 2006. So when we're saying we accept what
3 was produced in response to 82, that is based upon an
4 agreement that cut off the document production at a
5 particular point that it shouldn't have been cut off.
6 THE SPECIAL MASTER: Well, I'll make
7 some determination as to whether the agreement was
8 breached in such a fashion that the date should be
9 obviated but I'll do that at some other point.
10 MR. NELSON: I understand.
11 THE SPECIAL MASTER: Okay. So what I
12 would like LPL to respond to is 84 and 85.
13 MR. CHRISTENSON: Thank you, Your Honor.
14 Cass Christenson.
15 THE SPECIAL MASTER: Please.
16 MR. CHRISTENSON: I'll respond to this
17 issue. And I understand that you don't need for purposes
18 of your determination today a complete response for all
19 the points just raised. I'll make some very concise
20 points.
21 First of all, we produced a 299-page
22 document that contains very detailed and complete bill of
23 material information that was requested by ViewSonic and
24 may have additional information there but it certainly

**101**

1 covers everything that ViewSonic requested.
2 THE SPECIAL MASTER: That is with
3 respect to 84 and 85?
4 MR. CHRISTENSON: With respect to
5 Document Request 84, Your Honor, that is a request
6 dealing with documents sufficient to identify the parts
7 of an LCD module first and then the structure, function,
8 et cetera, of those parts. LPL is not aware of documents
9 specifically that addressed those issues. I think that
10 the 299-page document that we produced is responsive at
11 least in part to that request.
12 There was a discussion I believe at the
13 hearing, I think it was at page 133 of the transcript,
14 where we were hoping that if there was some other more
15 specific type of document that was deemed to be
16 responsive by you to that request, you were essentially
17 going to alert us to that in a ruling but we are not
18 holding back documents that respond to that.
19 It really gets back to the point that a
20 royalty on what its business is and what business it does
21 not do. And many of these requests, the issue is they're
22 asking us to produce information in discovery about
23 something we just don't do which is putting together a
24 finished product using a module. We make and sell the

SHEET 27

**102**

1 module and then others use that module, assemble it and
2 attach it within another finished product. So, it's
3 really a question of what information do we have to give
4 and we can't give what we don't have.
5        Request 84 was a disputed request. And
6 I don't know if, I don't think you had an opportunity
7 yet to issue a specific ruling, although you clearly
8 indicated at the hearing that you were going to grant
9 that request with the date limitation that was agreed to
10 by counsel.
11        THE SPECIAL MASTER: That's what I said.
12        MR. CHRISTENSON: And we are not aware
13 of additional documents, specific documents responsive to
14 that.
15        THE SPECIAL MASTER: Well, if the
16 representation is that you have given all that you have
17 and that you are aware of, I take that representation to
18 mean that you have done what you are required to do under
19 the rule, determine what is responsive, produce it if it
20 is responsive, and you are saying you don't have
21 anything.
22        MR. CHRISTENSON: That's true, Your
23 Honor, although, because we haven't received a specific
24 ruling from you, I would want to make sure. I would like

**103**

1 to go back to my client just to double-check and make
2 sure that there is not anything else there to produce.
3        THE SPECIAL MASTER: Well, let's do it
4 this way. Rather than waiting for any written finding
5 and recommendation with respect to 84, since we're
6 dealing with it now, you all did forge an agreement with
7 respect to deadline, with respect to date.
8        MR. CHRISTENSON: Yes.
9        THE SPECIAL MASTER: Mindful of that
10 date, I have ordered, 84, documents sufficient to
11 identify the parts of an LCD module, et cetera, to be
12 produced. And I did it for the reasons that I expect I
13 stated on the record. Consider this, the order and
14 consider the transcript of before and now what you would
15 need to re-ask your client and make any determination you
16 may want to make with respect to what you need to do or
17 not do with Judge Farnan.
18        MR. CHRISTENSON: I'm sorry, Your Honor.
19 Could you just say the last part?
20        THE SPECIAL MASTER: You got my ruling
21 and the transcript is the order, if you will.
22        MR. CHRISTENSON: Yes, okay. I
23 understand.
24        MR. NELSON: I'm sorry. I didn't quite

**104**

1 capture that. Are you ruling that --
2        THE SPECIAL MASTER: What I understood
3 Mr. Christenson just to say is that as far as he knows,
4 there are no documents that have not otherwise been
5 produced responsive to Request For Production No. 84. He
6 also said, however, that until he understood that I've
7 actually ordered it, he will go back to his client,
8 re-ask if there are any documents that are responsive to
9 Request For Production No. 84. And that is why I said I
10 ordered it. Your transcript is the record.
11        MR. NELSON: I appreciate that, Your
12 Honor.
13        I was listening very carefully to what
14 Mt. Christenson was saying, and he basically parsed 84
15 into two parts. One was the part of 84 that requests
16 simply an identification of the part of an LCD module
17 versus the rest of the request which is the structure,
18 function and, most critically, the assemblage of those
19 parts.
20        THE SPECIAL MASTER: I see what it says.
21        MR. NELSON: I know. And so, Your
22 Honor, frankly it's very easy to see that the assemblage
23 actually corresponds to an assembly drawing. It would
24 never be a bill of materials, it would be an assembly

**105**

1 drawing.
2        THE SPECIAL MASTER: Well, is there an
3 assembly drawing?
4        MR. CHRISTENSON: Your Honor, that is
5 one of the things I can confirm. I'm not trying to avoid
6 the request.
7        THE SPECIAL MASTER: No, I understand
8 that. Well, I would like that to be confirmed forthwith.
9        MR. CHRISTENSON: We will do so, Your
10 Honor.
11        THE SPECIAL MASTER: Thank you.
12        MR. NELSON: And, Your Honor?
13        THE SPECIAL MASTER: Yes.
14        MR. NELSON: Does your present order,
15 it does include the date limitation that was agreed upon
16 during the December 28th hearing; is that correct?
17        THE SPECIAL MASTER: That's correct,
18 unless I change it.
19        MR. NELSON: With respect to
20 Request 85, Your Honor, that was one that we had agreed
21 to produce documents in response to.
22        THE SPECIAL MASTER: Yes, as I remember
23 it.
24        MR. CHRISTENSON: And we have checked

SHEET 28

**106**

1  and we have produced the documents that we have. We've
2  produced documents regarding accused products. We've
3  produced communications with third parties concerning
4  their products that may infringe. We've produced
5  documents exchanged with a standards organization in the
6  industry. So we've produced whatever we have and we've
7  produced documents beyond the 1997 to 1998 time frame.
8  But, again, because we're not a company that puts these
9  things together or does the actual mounting, the
10  documents we have would be very limited.
11              MR NELSON: Your Honor?
12              THE SPECIAL MASTER: Yes.
13              MR. CHRISTENSON: I do think also, bill
14  of material information that we produced is partially
15  responsive to this request as well because it addresses
16  all the parts of an LCD module, and I don't think there
17  is any dispute about that.
18              I would also just like to note that the
19  requests that we were served with did not relate just to
20  the final module based on they sought no material inform-
21  ation on any component and subcomponents of the module,
22  Your Honor. And this is an issue that we discussed at
23  the hearing and I said I didn't think it was relevant.
24  I didn't understand why they wanted it, but they insisted

**107**

1  on it and they got it.
2              MR. NELSON: May I respond, Your Honor?
3              THE SPECIAL MASTER: Sure.
4              MR. NELSON: Okay. So I understand
5  Mr. Christenson has reverted back to the bill of material
6  information but originally he was speaking to Document
7  Request No. 85. 85 is directed to documents that
8  identify each part of an LCD module that can be used for
9  mounting. So it must actually provide some information
10  about the mounting
11              We've actually provided to Your Honor,
12  as one of our exhibits, I believe a couple product specs
13  that we had to find on our own through the Internet that
14  those product specs are LPL products.
15              THE SPECIAL MASTER: Well, let me repull
16  those. Just a moment. If I recall correctly, they are
17  television monitors and the date for the document, the
18  date at least on the bottom of the specification for
19  approval, I'm looking at Exhibit 11 to your February 16,
20  2007 motion.
21              The first product is 23.0 WXGA DFT LCD,
22  and the date of that specification is December 10, 2003.
23  The next document, which is your Exhibit 12 to that same
24  motion, is 12.0, and it does have inches after that,

**108**

1  WUXGA TFT LCD, and the date of that specification is
2  April 6th of 2004.
3              Those are the drawings or the specs that
4  you are referring to?
5              MR. NELSON: Yes, Your Honor. And at
6  the time, our research was incomplete, but those are two
7  we were able to pull up that showed mounting features,
8  the document itself. And I'm presently going through the
9  electronic version and I'm going to direct you to some
10  pages in Exhibit 11.
11              THE SPECIAL MASTER: Just one moment.
12  Let me get back to it again. I was flipping. Go ahead.
13              MR. NELSON: If you want to stick with
14  Exhibit 12, I'm glad to stick with that one.
15              THE SPECIAL MASTER: No, either one.
16  Whatever is easiest for you.
17              MR. NELSON: The problem is --
18              THE SPECIAL MASTER: What page?
19              MR. NELSON: On Exhibit 11, the pages
20  would be 23 of 29, and 24 of 29.
21              THE SPECIAL MASTER: Just a moment.
22              All right. I'm looking at 23 and 29.
23              MR. NELSON: These are the type of
24  documents that we would need to be able to ask questions

**109**

1  during a 30(b)(6) deposition because we have, on page --
2  I'm sorry. You're on page 23 of 29; is that correct?
3              THE SPECIAL MASTER: Yes, that's
4  correct, sir.
5              MR. NELSON: So that is a front view
6  of a module and also some side or profile views of the
7  module. And you see some user holes. On the right side
8  of the document, there is a side view and you actually
9  see the label, 150 user hole. Do you see that, Your
10  Honor?
11              THE SPECIAL MASTER: Wait just one
12  moment.
13              I do.
14              MR. NELSON: User holes are very likely
15  mounting holes and so the problem is that it may not use
16  the word "mounting" but there is actually a user hole
17  that is intended to mount the module that someone else is
18  going to mount the module. LPL makes this product, it
19  has the holes and they're right there for mounting, but
20  we can go a step further.
21              THE SPECIAL MASTER: Let me ask you this
22  question. I'm not sure where you're headed with this but
23  I'm mindful of -- just a moment, please.
24              In Mr., is it Auito, A-U-I-T-O?

SHEET 29

**110**

1   MR. CHRISTENSON: He is with McKenna
2  Long & Aldridge, Your Honor.
3   THE SPECIAL MASTER: Yes. In his
4  correspondence to Mr. Miller dated January 9 of 2007,
5  there is a reference. I expect it would be important
6  to read it.
7   This is not reading the whole paragraph
8  there: "We have also determined that LPL sells LCD
9  modules for televisions that have a different structure.
10  Specifically, LPL recently has been selling LCD modules
11  for televisions that could be used by third-party
12  assemblers in a way that practices LPL rear-mounting
13  technology claimed in the patents in suit, depending upon
14  the construction of the claims and how third parties
15  assemble finished products that incorporate LPL modules
16  LPL will promptly search for and produce any responsive
17  discovery. We anticipate that LPL will produce any such
18  discovery on a rolling basis to be completed by January
19  31, 2007."
20   So go ahead. I'm not sure. Make your
21  point.
22   MR. NELSON: Well, Your Honor, they
23  already are interpreting their way out of the document
24  request. They're saying that they make products that

**111**

1  might be used by someone else in a way that infringes
2  their patent, but that is not what our document request
3  seeks. We seek any document -- and now we're going to go
4  back to 85.
5   THE SPECIAL MASTER: Well, first of all,
6  they didn't say that they didn't infringe the patent.
7   MR. NELSON: I'm sorry. They said that
8  they might be used by third parties --
9   THE SPECIAL MASTER: Correct.
10   MR. NELSON: -- in a fashion that
11  infringes, that might infringes the patent; is that
12  correct?
13   THE SPECIAL MASTER: You're asking?
14   MR. NELSON: I don't have the letter in
15  front of me but I'm very familiar with the letter.
16   THE SPECIAL MASTER: Okay.
17   MR. NELSON: They're saying they don't
18  make rear mountable products, but the products are then
19  used by third parties in a way that may in fact practice
20  the invention.
21   THE SPECIAL MASTER: That is what it
22  says.
23   MR. NELSON: Right, but that interprets
24  there way right out of the document request because we're

**112**

1  not asking how third parties used it, used their modules,
2  we're asking them for documents regarding how their
3  modules can be mounted. And here we have, Your Honor,
4  I'm trying to show you a profile of a drawing that has
5  some user holes and I'm going to get to that point how
6  those user holes probably are used, but they have to be
7  fair. We have to have access to those documents so we
8  can ask questions of their 30(b)(6) witnesses.
9   Without the documents that are the
10  subject of our motion, Your Honor, we can't complete our
11  30(b)(6) deposition. I need to bring that up front.
12   But now if you go to the next page of
13  that particular exhibit, we are at 23 of 29 and I pointed
14  out a couple user holes. Was Your Honor able to see
15  that?
16   THE SPECIAL MASTER: I did.
17   MR. NELSON: So I'm going to represent
18  to you that I think, and I'm not LPL's witness but I'm
19  pretty sure those are actually screw holes.
20   Now if we go to the next drawing, page
21  24 of 29, do you see the profile?
22   THE SPECIAL MASTER: Slow down a little
23  bit for us, please.
24   MR. NELSON: I'm sorry.

**113**

1   THE SPECIAL MASTER: That's okay. I'm
2  on 24 of 29.
3   MR. NELSON: 24 of 29 is a rear view and
4  again some profiles. And now, I'm not an expert at
5  readings these drawings but if you look at the right side
6  of the page, there is a profile. Do you see that, Your
7  Honor?
8   THE SPECIAL MASTER: I do.
9   MR. NELSON: That profile has a little
10  profusion at the upper part of the profile and there is
11  actually a blowup of that profusion. It says section BB.
12  Do you see that, Your Honor?
13   THE SPECIAL MASTER: I do.
14   MR. NELSON: So, again, we would need
15  deposition testimony from an LPL witness regarding what
16  that is. That looks like it's rear mountable capable.
17  It's capable of being rear mounted. So this particular
18  module practices side mounting and perhaps rear mounting.
19  Okay?
20   MR. AMBROZY: Your Honor, if I may
21  interject? This is Rel Ambrozy.
22   THE SPECIAL MASTER: Yes.
23   MR. AMBROZY: This gets to the whole
24  crux of the issue, Your Honor. Whether something is

SHEET 30

114

1  capable of being rear mounted necessarily requires that
2  there be a housing.
3            MR. NELSON:  Your Honor, that --
4  (Inaudible.)
5            THE SPECIAL MASTER:  Wait, wait.
6  Counsel, hold on just a second.  There are too many
7  people talking, number one, and there is a phone ringing
8  or there was at least in the background.
9            MR. AMBROZY:  That was it a distraction,
10 Your Honor.  In regard to the claim, it's not so much of
11 a claim construction issue, Your Honor, it is specific-
12 ally whether a product is covered by the patents in suit
13 and whether the products are covered by the patents in
14 suit requires that there be a housing and ViewSonic has
15 taken that exact position in its Markman brief when it
16 represented to Your Honor, and this is in your letter of
17 February 23, a paragraph on February 23.  ViewSonic, and
18 I'll read, I'll quote from their brief:
19            "At claims 35 and 55 of the '614 patent
20 each require the rear mountable flat panel display device
21 be mounted through the housing."  And none of the
22 products that LPL sells has a housing.
23            Moreover, Mr. Aiuto's letter to
24 Mr. Miller earlier specifically stated that LPL makes the

115

1  module, does not make a monitor and the module might have
2  fastening parts on their rear surface but there is no way
3  for LPL to know what OEM s do with LPL's module down the
4  road.  Although it has mounting fastening parts on the
5  back of the module, those could actually be used to have
6  the first frame attached to the module.
7            There is no indication, and ViewSonic
8  has given no evidence and no proof, although they cited
9  these attachments to their brief, there is no evidence
10 that any of those fastening parts on the LPL module are
11 used to attach the housing and that's the requirement.
12 That the fastening parts be used, as they say in their
13 brief, the rear mountable flat display device be mounted
14 through the housing.
15            So all they have shown you is the rear
16 surface and sometimes only a side view of modules that
17 have some fastening or some screw holes on their back.
18 There is absolutely nothing before Your Honor that points
19 out that these fastenings are used to mount that.
20            THE SPECIAL MASTER:  Are you conceding
21 that if it did, I mean if the drawing itself said that --
22 and I'll adopt your language for purposes of asking the
23 question -- if the spec specifically said that that was
24 used, those holes were used for the specific purpose of

116

1  mounting the housing, then talk to me about whether you
2  agree that documents with respect to product showing that
3  fall within the appropriate scope of discovery.  I think
4  I heard you say it would.
5            MR. CHRISTENSON:  Your Honor, this is
6  Cass Christenson.  I think the answer actually is that it
7  would not.  And I have a couple of points I would like to
8  make on that subject.
9            THE SPECIAL MASTER:  Please.
10           MR. CHRISTENSON:  First of all, Your
11 Honor, we have just received two new sets of document
12 requests from ViewSonic served in late February that are
13 targeting LPL's modules.  Most of the discovery requests
14 that were originally served by ViewSonic, including most
15 of the requests that are before you in the February 16
16 motion that we're talking about, are requests that we're
17 directed to flat panel display products, Your Honor.
18 And that is significant because the flat panel display
19 product is defined by ViewSonic for discovery purposes as
20 the finished product.  It's the product that is, if you
21 will, assembled and mounted.
22           The discovery that they're now trying
23 to shift into is discovery with respect to all of LPL's
24 modules.  The modules themselves do not practice the

117

1  invention and they never originally argued that they did.
2  But now they're trying to back all this discovery into
3  the prior request under the guise that somehow this
4  invention is broad enough to cover just the module
5  itself.  And if you turn it around, Your Honor, it would
6  mean we would be looking for discovery from the defend-
7  ants for all the modules that they purchased and use
8  in their products regardless of whether the product is
9  ultimately assembled in a way that practices our
10 invention.
11           THE SPECIAL MASTER:  Now, you've said
12 that in your filing.
13           MR. CHRISTENSON:  Right.  And I'm just
14 very concerned about them now saying we want specific-
15 ations for modules in 2003 and 2004, which, by the way,
16 would not be responsive to request 85 in the '97-98 time
17 frame in any event.  But what they're suggesting, and I'm
18 hearing this for the first time, is that they want all
19 the specifications for all of our modules with no time
20 limitation, Your Honor, and they want to actually go
21 through those with one of our witnesses.  To what end?
22 It has no bearing on validity.  It has no bearing on
23 whether the accused product infringe our patent.  It has
24 no bearing on damages.  It's just a completely

SHEET 31

**118**

1  inappropriate event from a discovery perspective.
2          THE SPECIAL MASTER:  That's what I want
3  to turn to in terms of addressing the issue more broadly.
4  And the questions are for counsel for ViewSonic.  I have
5  a series of questions and I expect that you are in a
6  position to address them now.
7          How do LPL's product specs for its own
8  LCD modules relate to the defense of invalidity?  And
9  what is your authority for that proposition?
10         MR. NELSON:  Okay.  I'm glad you
11 asked that because there were several points made by
12 Mr. Ambrozy and Mr. Christenson that are actually again
13 shifting from the document request themselves to other
14 arguments.  But to respond directly to Your Honor, you
15 asked me how --
16         THE SPECIAL MASTER:  I am going to go
17 one at a time through the things that you have said.
18         MR. NELSON:  Right.  I'll deal with the
19 issues one at a time.
20         THE SPECIAL MASTER:  Please.
21         MR. NELSON:  The first part is their
22 practice of the invention is relevant for invalidity.
23 And this is, if the product spec --
24         THE SPECIAL MASTER:  I meant to say

**119**

1  invalidity.  If I didn't, that's what I meant.
2          MR. NELSON:  That's okay.
3          There is two date ranges we need to look
4  at:  the date ranges that would be prior art and the date
5  ranges that would not be prior art.  Okay?  That is what
6  happened.  During the December 28th hearing, because of
7  certain representations made by LPL, the December 28th
8  hearing was limited to documents from 1998 backwards.
9  So when Mr. Christenson referred to product specs from
10 between 1997 to 1998 and then said the exhibit is 2003,
11 he is actually going back to the agreement that was made
12 during the December 28th hearing.
13         Invalidity has to two aspects to it.
14 The first is the products spec is dated prior to the
15 effective filing date of the U.S. patents, and I think
16 we're going to end up in a dispute regarding what is the
17 effective filing date.  But in any event, on the face
18 of the patent, what we have is, I'm turning to it right
19 now, we have an April 2nd, 1999 U.S. filing date and
20 an October 23rd, 1998 foreign filing date.  So if the
21 product spec is dated prior to April 2nd, 1999, it would
22 have to do with, it would be relevant for invalidity
23 without any argument regarding dates.
24         THE SPECIAL MASTER:  I agree.

**120**

1          MR. NELSON:  Even if the product spec
2  is dated after 1999, there are secondary obviousness
3  considerations regarding the practice of the alleged
4  invention.  And so the practice of the invention in 2003
5  is relevant under the Graham factors, and I think we
6  cited those in Graham v John Deere.  We cited in that
7  footnote one of Ms. Mason's January 24th, 2007 letter.
8          THE SPECIAL MASTER:  January when?
9          MR. NELSON:  January 24, 2007.
10         Secondarily, one of the arguments
11 we're going to be making is that LPL's patent is invalid
12 because it's obvious.  And one of the obviousness
13 considerations is the success or use of the invention
14 after the filing date.  And we cannot tell whether the
15 alleged invention is commercially successful for LPL
16 unless we know that they're actually practicing the
17 alleged invention.  And the only way to know that is to
18 get the documents that show they're mounting structures
19 after the date.
20         But I'm not done.  With respect to
21 invalidity of the patents, again going back to prior to
22 the filing date, even variations, a variation of the
23 alleged invention, in our perspective, that would be side
24 mounting.  Any product that practices a variation of the

**121**

1  alleged invention is actually relevant for obviousness as
2  well.  How obvious is it to move something from the side
3  of a module to the rear of the module?  Again, that is
4  not for me to decide, for Mr. Christenson to decide.  It
5  would be perhaps for Your Honor to decide with perhaps
6  the help of some experts.
7          THE SPECIAL MASTER:  Right.
8          MR. NELSON:  So that is why mounting the
9  structures that are causally related to rear mounting are
10 also relevant for invalidity and now we're back to prior
11 to the effective date.
12         And then with respect to the damages,
13 mounting structures that are variations to the rear
14 mountable are relevant for design alternatives.  So if
15 there is an alternative design that can be used, that
16 would greatly reduce the value of the alleged invention.
17         So you see, Your Honor, there is no way
18 to limit this to documents dated prior to the effective
19 filing date.
20         MR. CHRISTENSON:  Your Honor, if I may
21 respond?
22         THE SPECIAL MASTER:  The only thing I
23 don't have in front of me, and I apologize for not having
24 it here, is the January 29 correspondence from Ms. Mason.

SHEET 32

122

1  I mean I have it but I don't have it.
2           MR. NELSON:  January 24th, Your Honor.
3           THE SPECIAL MASTER:  January 24th,
4  right.  I don't have that, I don't think.
5           MR. CHRISTENSON:  Your Honor, those
6  were supplemental submissions made the same date by
7  both ViewSonic and LPL and an issue addressed there was
8  whether ViewSonic should be able to undo the agreement
9  and seek a discovery for a broader time frame on Requests
10  71 through 74 and 118.  And then they've essentially,
11  since that time, continuously added on to that list and
12  sought additional discovery.
13           THE SPECIAL MASTER:  Right.
14           MR. NELSON:  Right.  One last
15  relevancy factor is that the documents both prefiling
16  or post-filing are relevant under the Georgia-Pacific
17  factors.  I would cite not only the Factors 8, 10 and 12
18  cited by Ms. Mason in her January 24th, 2007 submission
19  but also Factors 9 and 11.
20           THE SPECIAL MASTER:  Okay.
21           MR. CHRISTENSON:  Your Honor, if I may
22  respond?
23           THE SPECIAL MASTER:  Yes.
24           MR. CHRISTENSON:  This is Cass

123

1  Christenson.  First of all, I need to address the issue
2  of this continued assertion that we somehow made some
3  sort of a misrepresentation and also the idea that this
4  purported misrepresentation related to our date limit-
5  ation agreement.  The transcript, in just looking at the
6  transcript, I think rebuts that.
7           THE SPECIAL MASTER:  Direct me to the
8  transcript, please.
9           MR. CHRISTENSON:  The agreement, Your
10  Honor, where we discussed the time frame limitation was
11  at pages 120 to approximately 123 of the December 28th
12  transcript.
13           THE SPECIAL MASTER:  I have that.
14           MR. CHRISTENSON:  And if your Honor
15  recalls, we were discussing the reasons why they wanted
16  discovery with respect to some of these requests.  And
17  again, as now, we were arguing then these are related
18  to validity and Mr. Miller conceded at that time that
19  because, by its very nature, a validity defense calls
20  into question a specific time frame and so it would have
21  to be a time frame that would have been an early time
22  frame.  And we went through that in detail and this is
23  before we got into any representations about whether we
24  practiced the invention.  We were just focusing on this

124

1  from a legal standpoint and what is the proper scope of
2  discovery for validity purposes.  We reached a very
3  common sense agreement that the time frame should be to
4  the end of 1998.
5           THE SPECIAL MASTER:  Well, I have the
6  transcript in front of me.  It certainly was my
7  recollection of the transcript that that is what was
8  done.  In fact, that is what it says.
9           MR. CHRISTENSON:  Now, almost 50
10  pages later in the transcript, Your Honor, at page 165,
11  there was, long after that agreement had been made for
12  completely separate purposes, the discussion arose as
13  to whether or not LPL practices its invention and
14  Mr. Ambrozy discussed whether LPL has any products that
15  would have rear surface holes.  And at that point, this
16  is where this confusion arose because Mr. Miller started
17  to equate subtly the idea for the first time that prac-
18  ticing our invention could be the same thing as having a
19  module with some holes in the back of it.  And even under
20  that approach, if we didn't have any module holes in the
21  back, then even under that idea we wouldn't practice the
22  invention.
23           It turns out there are modules that have
24  holes in the back.  We don't know of instances where

125

1  those have actually been used to mount those holes in
2  the rear, but in any event that does not practice the
3  invention and that is important because the discovery
4  requests are focused on what products LPL has or what
5  discovery it has about actually practicing the invention
6  and/or about finished flat panel display products.
7           MR. NELSON:  Okay.  Your Honor, we're
8  back --
9           THE SPECIAL MASTER:  Wait just a moment.
10  Go ahead, Mr. Christenson.
11           MR. CHRISTENSON:  And so we don't have
12  that type of discovery, Your Honor.  And with respect to
13  the point that Mr. Nelson made about asking questions at
14  a deposition, they can ask questions about obviousness.
15  They can ask questions about design alternatives.  Having
16  all the specifications or technical documents for every
17  one of LPL's modules is not going to advance that cause,
18  and they don't need it for that purpose.  Whether or not
19  it was obvious to create the invention that we ultimately
20  obtain a patent for does not depend upon what module
21  specification LPL has for last year or two years ago or
22  some other irrelevant time period, Your Honor.
23           THE SPECIAL MASTER:  Are there any other
24  comments, please?

126

1    MR. NELSON:  Yes.  I think we're far
2  from done on this.  Are we actually -- I'm confused
3  whether we're arguing about the December 28 hearing or
4  actually about the present motion that ViewSonic filed.
5    THE SPECIAL MASTER:  Well, I think it's
6  both.  I think Mr. Christenson was wanting me to go back
7  and frame it a little bit differently because of the way
8  of the conversation that I had and that you all had with
9  respect to the issue of obviousness.
10    MR. NELSON:  Okay.  With respect to the
11  proceedings during December 28th, where Mr. Miller made
12  an agreement and then Mr. Christenson said there was
13  nothing about any representations until after that
14  agreement was made is incorrect.  The representations
15  that were made started in September 2006, Your Honor, and
16  there is reference to those representations earlier in
17  the transcript.  And I'm looking for them right now.
18    THE SPECIAL MASTER:  Take your time.
19  Just a moment.
20    (Pause.)
21    THE SPECIAL MASTER:  Did you find it?
22  Have you found it?
23    MR NELSON:  Yes, sir.  I'm looking at
24  page 107, lines 20 through 24, where what you have there,

127

1  Your Honor, is --
2    THE SPECIAL MASTER:  Wait just a moment.
3    (Pause.)
4    THE SPECIAL MASTER:  I'm at page 107,
5  line 20.
6    MR. NELSON:  Through 24.  And you see
7  there where there was a reliance on the prior
8  representation of LPL.
9    THE SPECIAL MASTER:  This is the 28th?
10    MR. NELSON:  Yes.
11    THE SPECIAL MASTER:  Page 107?
12    MR. NELSON:  Yes.
13    THE SPECIAL MASTER:  Line 24, "They have
14  taken the position."
15    MR. NELSON:  Yes, "They have taken the
16  position they don't produce the products that apply the
17  technologies of the patents in suit."  So Mr Christenson
18  said the agreement that was reached with Mr. Miller had
19  nothing to do with the representations regarding whether
20  or not LPL practiced the alleged invention.  That is the
21  context.  That representation had already been made
22  months earlier so that is in the back of Mr. Miller's
23  mind the whole time, so for people to say that date
24  agreement had nothing to do with that representation is

128

1  not correct.
2    THE SPECIAL MASTER:  Okay.
3    MR. NELSON:  The second part being that
4  the validity considerations are only limited to products
5  that are made prior to the filing date, that also is an
6  incorrect statement of the law, Your Honor.  That is an
7  incorrect statement of the law.  And, furthermore, we're
8  not seeking it solely for invalidity, we're also seeking
9  it for purposes of evaluating the damages, so I don't
10  think we are limited to documents dated January 1998 and
11  before.
12    And I want to say one other thing.  We
13  heard several times from Mr. Ambrozy and from
14  Mr. Christenson that our document requests are directed
15  to the claims, and some of them are, but when we started
16  this discussion, Your Honor, we started with 85.  And if
17  you look at Document Request No. 85, it actually talks
18  about how you can use a particular structure to mount
19  the LCD module on an external case.  It's not how it is
20  mounted, it's how it can be used to identify the part
21  that can be used for mounting, which led us to some
22  exhibits which we had submitted and we weren't finished
23  with reviewing those exhibits.
24    THE SPECIAL MASTER:  And let me ask you

129

1  to be a little bit more specific from your perspective on
2  how products made after a patent issues speak to
3  obviousness.
4    MR. NELSON:  Okay.  If a product, if
5  an alleged invention is novel, it's expected to have a
6  great deal -- it's expected to have commercial success.
7  And so that is an examination after the filing date,
8  commercial success or not of the alleged invention.  And
9  so if a product does not have the alleged -- in other
10  words, if something is revolutionary, one would expect
11  it to have quite a bit of commercial success.  If
12  something is not so revolutionary, after the filing date
13  you would determine whether it had that tremendous
14  commercial success.  The lack of commercial success is a
15  secondary indicia of obviousness.  The only way you can
16  tell whether they're having commercial success or not is
17  to look at the actual module, the module being sold by
18  LPL where the holes are for mounting.
19    MR. AMBROZY:  Your Honor, Rel Ambrozy.
20    THE SPECIAL MASTER:  No, he wasn't
21  finished.
22    MR. AMBROZY:  I'm sorry.
23    MR. NELSON:  So in comparison of the
24  commercial success of that product, you have to have a

Friday, March 2, 2007

SHEET 34

130

1  reference point. What was the reference point? You have
2  to know whether the commercial success of rear mounting
3  is real. In other words, if they say here, I'm going to
4  give you, Manuel, or ViewSonic, I'm going to give you
5  just the documents that relate to rear mountable products
6  and here is our economic information, that there is no
7  other reference points.
8       We need to know whether the products
9  practice side mounting, whether the products practice
10 front mounting, and we get to compare the actual commer-
11 cial success of all three of those. That is the only way
12 to measure the commercial success of rear mounting, and
13 that is the secondary indicia of obviousness.
14      THE SPECIAL MASTER: Okay.
15      MR NELSON: Okay?
16      THE SPECIAL MASTER: Yes.
17      MR. NELSON: That is plays into damages.
18 It's difficult to parse them you'll see that they overlap
19 if you look at the Georgia-Pacific factors 8, 9, 10, 11
20 and 12 which are all related to reasonable royalty
21 factors. Again, it's post-filing date.
22      THE SPECIAL MASTER: Oh, I understand
23 that.
24      MR. NELSON: Okay. So the secondary

131

1  indicia of obviousness does deal with material that is
2  after the filing date of the patents.
3       MR. AMBROZY: Your Honor, if I may?
4       THE SPECIAL MASTER: Yes, please. And I
5  want you to tell me whether you are finished making your
6  record. I won't make a ruling today, but I will likely
7  come back to you on Monday and actually issue a ruling
8  with respect to this motion; but keep going, please.
9       MR. AMBROZY: Your Honor, as you can
10 tell throughout Mr. Nelson's discussion that he just
11 ended, he continuously references whether the inventions
12 are covered by the patents in suit. And, you know, he
13 talks about the invention. Well, what is the invention?
14 The invention is not a module. The invention is a flat
15 panel display device that has fastening parts that are
16 mounted to a housing or being an capable of mounting to a
17 housing, that requires a housing that requires a first
18 frame that requires fastening parts.
19      And if you are going to measure second-
20 ary considerations, and he keeps saying to me he measures the
21 value of the invention. Well, the invention necessarily
22 requires the housing. The invention necessarily requires
23 that first frame. And as we've been continuously telling
24 this Court, we, LPL makes modules only. Those modules

132

1  have fastening parts. There is no evidence that
2  Mr. Nelson can point to that those fastening parts are
3  used to mount to a housing. They could be used to mount
4  to the first frame. They could be used to mount the
5  bracket. There is no evidence in front of us right now
6  that LPL module practices the invention.
7       MR. NELSON: May I please respond to
8  that, Your Honor?
9       THE SPECIAL MASTER: Yes, you may. And
10 I expect that once that is done that your record with
11 respect to this part of the issue is complete.
12      MR. NELSON: I'm not so sure about that
13 either.
14      THE SPECIAL MASTER: Oh, sure, but go
15 ahead.
16      MR. NELSON: With respect to
17 practicing the invention, that begs the question of
18 claim construction.
19      THE SPECIAL MASTER: Well, that is what
20 I was going to ask you.
21      MR. NELSON: So LPL is assuming that
22 they've won their claim construction and so it would be
23 capable of being mounted is all that is needed in terms
24 of this commercial success, but let's go back to the

133

1  request for production again, Your Honor. No. 85 does
2  not talk about --
3       THE SPECIAL MASTER: I have it in front
4  of me again.
5       MR. NELSON: It talks about the part of
6  the module that can be used for mounting LCD modules.
7  It's not about the claims, it's actually quite specific.
8  And really I have to go through a quite a few document
9  requests because I have a sense here you don't view this
10 request too kindly right now because we are asking for a
11 lot of materials.
12      THE SPECIAL MASTER: Oh, I don't want
13 you to take my questions to mean anything other than I
14 want you to make a full record so that when I make my
15 judgment, Judge Farnan will have the benefit of your view
16 and ultimately my recommendation.
17      MR. NELSON: Okay. I understand that.
18 So when we look at the product spec, and I don't care if
19 we're on Exhibits 11 or 12 that we submitted to you, and
20 that happens to be what we had at that time. Since that
21 time, Your Honor, we've actually been able to find 100
22 product specs. They actually are talking about a first
23 frame, talking about fastening the module to a first
24 frame. They're assuming that they're going to win on the

SHEET 35

134

1  first frame argument. They're assuming that the first
2  frame actually is not in the product spec right there.
3           Can you look at that? Could you tell me
4  if you have one of those exhibits in front of you?
5           THE SPECIAL MASTER:  The ones we were
6  talking about?
7           MR. NELSON:  Yes.
8           THE SPECIAL MASTER:  Yes, I do.  Tell me
9  which one.
10          MR. NELSON:  Why don't we do 11.
11          THE SPECIAL MASTER:  I'm on 11.
12          MR. NELSON:  Why don't we go to again
13  the same two pages, 23 of 29 and 24 of 29.
14          THE SPECIAL MASTER:  I'm at 23.
15          MR. NELSON:  It's difficult to see from
16  this particular drawing, Your Honor, but if you're on 23,
17  this is a front view so that you are looking at the
18  viewable side.  The viewable side of the module.  If you
19  look at the profile here, you will actually get an idea
20  of a frame actually around the module.  It's in the
21  profile there and that, in our mind, is actually the
22  first frame.  That is the first frame and it is part
23  of the module, and so when they talk about fastening
24  elements --

135

1           THE SPECIAL MASTER:  Go back to what you
2  just said.  And, again, please slow down for me.
3           MR. NELSON:  Okay.
4           THE SPECIAL MASTER:  I mean I understand
5  this is the front view.  I understand that I'm looking at
6  the display, if you will.
7           MR. NELSON:  Right.  And if you look at
8  the profile views; and why don't we look at the same part
9  that had the user holes, Your Honor.
10          THE SPECIAL MASTER:  I see.  That would
11  be at the top or the left side.
12          MR. NELSON:  The left side and then the
13  right side.
14          THE SPECIAL MASTER:  Left side and right
15  side user holes are designated 150, 200 and 150.
16          MR. NELSON:  Right.  SO those user holes
17  are what we think are in the second frame and then the
18  back, you see there is a little lip.  There is actually
19  a back portion.  It's hard to see in the drawing.  But
20  there's actually the first frame where the fastening
21  elements on the rear surface are displayed there, too.
22  It's difficult to see.  You see where on the profile, it
23  ends at the top.  It ends at the top, and there is a
24  piece that is clearly not part of that side frame.  It's

136

1  not part of the edge.
2           THE SPECIAL MASTER:  Well, you are going
3  to have to help me with it a bit.
4           MR. NELSON:  That's difficult to do.
5           THE SPECIAL MASTER:  I understand that.
6  But I can try.
7           MR. NELSON:  You see a profile view.
8  And let me submit to you, perhaps on the other side, on
9  the left side, what you see looks like almost a very long
10  thin U, turned sideways.
11          THE SPECIAL MASTER:  Yes.
12          MR. NELSON:  Yes, that would be --
13  again, you would have to actually ask questions of the
14  LPL designee or get assembly drawings that would show
15  this more clearly  That is the first frame.  The U part,
16  the side, the edge of it is actually the second frame.
17          THE SPECIAL MASTER:  The side being?
18          MR. NELSON:  The side being the part
19  with the holes, on this view, on this front view.  The
20  edge.  Excuse me.  Let's use the word edge.  Let me use
21  the words front, rear and edge and edge meaning left
22  edge, right edge, top edge, bottom edge.
23          THE SPECIAL MASTER:  Okay.
24          MR. NELSON:  So here, where you saw the

137

1  user holes, those are on the edge, but on the left side
2  of this drawing, this is a long elongated U-shaped thing.
3  And I'm going to submit to you that is actually a first
4  frame.  It's behind the module.  It's a profile view.
5  It's a cutout of the profile view.  It's behind the
6  module, Your Honor.
7           THE SPECIAL MASTER:  I see.
8           (Inaudible.)
9           MR. NELSON:  I'm not done.  I'm not
10  done
11          THE SPECIAL MASTER:  Wait a minute.
12          MR. NELSON:  I'm not done, counsel.
13          MR. CHRISTENSON:  For clarification
14  only, I'm trying to figure out what you are calling the
15  U.
16          THE SPECIAL MASTER:  The U as I see it
17  is on the left edge.  It looks like, it looks like a
18  window squeegee.
19          MR. NELSON:  Yes, that's right.  There
20  are actually two frames there.  It's very hard to see
21  there, but there are two pieces of material there and
22  it's difficult to see.
23          THE SPECIAL MASTER:  I see.  I mean I
24  think I understand what you are saying.

SHEET 36

138

1    MR. NELSON:  Now, let me go to the next
2    page, Your Honor.  The next page is 24 of 29.
3    THE SPECIAL MASTER:  Yes, I'm there.
4    MR. NELSON:  Now we're looking at the
5    rearview.  This is the rear surface, what I'm going to
6    claim is the first frame.  But again, it depends upon
7    claim construction, but there is no reason for discovery
8    to be stopped because LPL decides what the claim means or
9    because I decide.  This can lead to the discovery of
10   admissible evidence.  That is the standard under Rule 26.
11   THE SPECIAL MASTER:  It is.
12   MR. NELSON:  We have the right to
13   this discovery, and they have stiff-armed us from the
14   beginning of this case.  And, yes, I have some emotion
15   in my voice because it's really been a contentious case.
16   This particular first frame, Your Honor, when I was
17   interrupted before, I had shown you the little portion on
18   the right that said Section BB.  I had shown you that
19   actually shows a little protrusion that is probably a
20   screw hole.  Do you recall that, Your Honor?
21   THE SPECIAL MASTER:  Yes, I'm looking at
22   it again.  I circled it.
23   MR. NELSON:  Okay.  If you go down below
24   that, there is the detail C.  Do you see that, detail of

139

1    C?
2    THE SPECIAL MASTER:  I do.
3    MR. NELSON:  That M3 machine, that is
4    actually, again, a mechanical engineer would understand
5    that.  That is actually a screw designation, a screw hole
6    designation, and a M3 machine screw is going to go into
7    that hole.  So that is another mounting hole.
8    And if you see this blowup of C, you now
9    go to the -- actually, if you move to the left, you will
10   see that C is circled a couple times.  Do you see that?
11   THE SPECIAL MASTER:  C is circled a
12   couple times.  Yes
13   MR. NELSON:  You actually have to find
14   the reference C.  Let me actually --
15   THE SPECIAL MASTER:  Wait just a second.
16   MR. NELSON:  There are actually four
17   items on the rear surface there that are designated C.
18   THE SPECIAL MASTER:  I see them.
19   MR. NELSON:  There are four.
20   THE SPECIAL MASTER:  I see them.  And
21   the detail is --
22   MR. NELSON:  -- is C.
23   THE SPECIAL MASTER:  Yes, I see it.
24   MR. NELSON:  And the same with B.  There

140

1    are several B mounting holes in the details in B.  And I
2    submit to you, Your Honor, that that is flat surface
3    there.
4    THE SPECIAL MASTER:  Let me look at B
5    again, please.  And I want to see the detail of B.
6    MR. NELSON:  Is that a question for me,
7    Your Honor?
8    THE SPECIAL MASTER:  No, I'm talking to
9    myself.
10   (Pause.)
11   THE SPECIAL MASTER:  Counsel, what I
12   expect, I'm seeing two Bs.  Is that on either side of the
13   top C?
14   MR. NELSON:  What is showing, Your
15   Honor, that those two Bs with arrows there --
16   THE SPECIAL MASTER:  Yes, I see those.
17   MR. NELSON:  -- what that is telling the
18   reader, that is telling the reader there is going to be a
19   cross-reference drawing of that portion and that is what
20   Section BB is.
21   THE SPECIAL MASTER:  I see.
22   MR. NELSON:  You see, there is a
23   relationship between C and B, they're actually the same
24   in sync.  Am I making sense there?

141

1    THE SPECIAL MASTER:  I understand what
2    you are saying.
3    MR. NELSON:  So they're providing detail
4    of C provides a different aspect of that screw hole C.
5    The Section BB is a section slice or section drawing of
6    C.
7    THE SPECIAL MASTER:  Okay.
8    MR. AMBROZY:  Your Honor, if I may?
9    It's Rel Ambrozy.
10   MR. NELSON:  I'm not done yet,
11   Mr Ambrozy.
12   THE SPECIAL MASTER:  Just a moment.
13   Okay.  Go ahead, sir.
14   MR. NELSON:  Okay.  At the back of this
15   product spec, Your Honor ...
16   THE SPECIAL MASTER:  What page?
17   MR. NELSON:  I'm going to direct you to
18   page 28 of 29.
19   THE SPECIAL MASTER:  Okay.
20   MR. NELSON:  9-1, mounting precautions.
21   They sell this module and they're selling it to customers
22   to be mounted.  There is absolutely no doubt it must be
23   mounted somewhere to be used.  And 9-1(1), you must mount
24   module using holes arranged in four corners or four

SHEET 37

142

1 sides. If Your Honor recalls, I showed you the word user
2 holes but there was no clear indication in the drawing
3 that those user holes were mounting holes. That I think
4 this seals the deal. The side holes are actually the
5 mounting holes and the rear holes are also mounting
6 holes.
7           THE SPECIAL MASTER: Okay.
8           MR. NELSON: Okay?
9           THE SPECIAL MASTER: Yes.
10           MR. NELSON: So my point is, Your Honor,
11 this is stuff we had to fight for to get ourselves
12 through the research on the Internet. They have these
13 documents and we want them. The fact of the matter is we
14 want the assembly drawings because that will eliminate
15 any doubt what is the first frame.
16           And there are also some problems that
17 are occurring during the 30(b)(6) deposition of LPL. We
18 actually presented the witness with some of their own
19 specs and they decided they weren't able to determine
20 some of the other structural features that are actually
21 at issue with respect to the claim and they said that the
22 details of these product specs weren't sufficient. So we
23 need the assembly drawings.
24           And, Your Honor, I actually I want to

143

1 make sure, if you aren't, how shall I say it, if you are
2 not convinced that documents that are post-filing date,
3 after the filing date, if you are not convinced documents
4 that were generated after the filing date of this, of
5 the patents in suit are relevant, I would like the
6 opportunity to supplement that briefing.
7           THE SPECIAL MASTER: No, you provided
8 me with your position and you provided me with case
9 reference as it relates to the issue of obviousness. I
10 certainly understand what you are suggesting as it
11 relates to commercial success and damages. And what I
12 will do is I'll want to revisit some of those between now
13 and Monday. If you see the need to supplement, you are
14 going to have to do it quickly.
15           MR. NELSON: Okay. Because really I'm
16 looking at the items that practice the invention deal
17 with invalidity if it's prior.
18           THE SPECIAL MASTER: Right, I understand
19 that.
20           MR. NELSON: Invalidity is after the
21 filing date because of the secondary obviousness
22 consideration and damages regarding the Georgia-Pacific
23 factors. Items that don't practice the invention,
24 drawings and product specs that don't practice the

144

1 invention are relevant for invalidity if they're prior to
2 the effective filing date because they may be obvious to
3 the alleged invention and items that don't practice the
4 invention are relative to damages if it's after the
5 effective date as legitimate design alternatives.
6           THE SPECIAL MASTER: Well, you've made
7 your record. And if you want to be supplementing the
8 January 24 correspondence --
9           MR. NELSON: I don't really feel
10 compelled if those five factors I highlighted are clear.
11           THE SPECIAL MASTER: I understand your
12 position and you will have my view once we get through
13 this record at the Monday hearing.
14           MR. NELSON: Then to cut to the chase,
15 instead of going through all the requests for production
16 that I believe call for products specs and assembly draw-
17 ings, and, you see, Your Honor, I've tried to be a little
18 more narrow now because I realize we're at the end of
19 the case and ViewSonic is extremely prejudiced because we
20 actually had five days or four days with an LPL designee
21 and we didn't have any of this information available to
22 question him so that prejudiced ViewSonic tremendously
23 and I foresee we're going to get dumped on.
24           We identified at least 300 LPL products,

145

1 maybe it will be more than that, I don't know. But for
2 us to have to sift through all of this information with
3 what little time is left is tremendous prejudice, but we
4 want the information or otherwise we're going to be
5 seeking preclusion but that is for another day.
6           THE SPECIAL MASTER: I understand that.
7           MR. NELSON: But what I really want to
8 make sure I'm making clear we seek, we seek the product
9 specs, the product specs for all of their products.
10 Because some of the drawings I was provided, we had to
11 get those off the Internet. They have all of the product
12 specs for all of their products since 1977.
13           Number two, I want the assembly drawings
14 because I don't want any dispute from LPL regarding
15 whether or not the product actually shows what we needed
16 it to show. It clearly shows mounting holes, in our
17 opinion, although the designee may not agree with me and
18 we want to eliminate any disputes from LPL-designated
19 witness.
20           We also want all documents relating to
21 the instructions, all mounting and fixing and attaching
22 that LCD module -- the LCD modules they make -- all the
23 instructions they give to customers how to attach to any
24 of structure, whether it be a housing or a case or a

SHEET 38

146

1  computer or a laptop or a monitor. It doesn't matter
2  because that is all relevant.
3            And so we want all documents relating
4  to any instruction that they give to their customer
5  regarding, mounting, affixing, attaching an LCD module.
6            And then last but not least, in fact,
7  probably the one they're going to resist the most, we
8  want samples, Your Honor. Just like they seek them from
9  us, we want samples. Now, if you would like me to just
10 run through?
11           THE SPECIAL MASTER: I want you to talk
12 about samples for a moment.
13           MR. NELSON: Okay.
14           THE SPECIAL MASTER: Why don't you tell
15 me what you mean in terms of samples.
16           MR. CHRISTENSON: Your Honor, I
17 apologize for interrupting. Cass Christenson.
18           THE SPECIAL MASTER: Yes.
19           MR. CHRISTENSON: I'm sort of losing
20 track here of all the things we're going to have to
21 respond to. I would respectfully request we be permitted
22 to respond to some of what was just said before we get
23 into samples as a new issue.
24           THE SPECIAL MASTER: All right. Sure.

147

1  Then let's bite it off for samples.
2            MR. CHRISTENSON: With respect to the
3  product specifications for all of LPL's modules, as I
4  understand Mr. Nelson, they are now seeking every
5  specification for every LPL module which he counts as
6  well above 300 products. And that is probably a very
7  conservative number. I would point out to Your Honor it
8  took us many, many months, a process that continues, for
9  us to get specifications from the defendants for their
10 products.
11           As of right now, none of the defendants,
12 Your Honor, has produced any specifications for any of
13 the modules that they use in their products. So if this
14 is such important discovery, it is clearly a two-way
15 street, Your Honor.
16           MR. NELSON: Your Honor, we don't make
17 modules. That has been clear to Mr. Christenson and
18 Mr. Ambrozy since Day One. We don't make modules. We
19 actually just sell the product.
20           MR. CHRISTENSON: Your Honor, if I may
21 finish?
22           THE SPECIAL MASTER: Yes.
23           MR. CHRISTENSON: Mr. Nelson, please let
24 us finish.

148

1            THE SPECIAL MASTER: Yes.
2            (Inaudible.)
3            THE SPECIAL MASTER: Counsel, just a
4  moment. I tuned you out, and that's not a good thing.
5  I don't usually do that but I can't listen to more than
6  one voice at a time. So I was paying attention to
7  Mr. Christenson and I intend to continue to do that
8  without interruption.
9            MR. NELSON: I apologize to all of you.
10           MR. CHRISTENSON: Thank you, Your Honor.
11           So if monitor specifications are
12 appropriate discovery, and I submit, Your Honor, they are
13 not appropriate discovery, then that is discovery that
14 needs to be produced by all parties and all parties have
15 in their possession, custody and control discovery con-
16 cerning modules and module specifications. But that is
17 discovery that would take tremendous effort and burden to
18 produce as again we saw when it took months to get the
19 discovery from the defendants, their relevant product
20 specification. If we look back at Request 85.
21           THE SPECIAL MASTER: Well, I was just
22 going to go back to that a minute, as you were speaking.
23 Just a moment.
24           MR. CHRISTENSON: Thank you.

149

1            THE SPECIAL MASTER: And the way I'm
2  going back to it, I'm not going back to the raw request,
3  I'm going back to the request as it appears in the
4  February 16th submittal so it's not the raw request. Go
5  ahead, please.
6            MR. CHRISTENSON: Yes, thank you. The
7  request, Your Honor, is a very limited request on its
8  face. It's a request that talks about what parts might
9  be relevant to mounting with respect to an LCD module.
10 It's not a request as Mr. Nelson implied that would call
11 for us to produce in response, Exhibit 11, Exhibit 12 or
12 hundreds of other module specifications. That is far
13 afield, Your Honor. And I would also point out, looking
14 back at Exhibits 11 and 12 and not spending more time
15 because I don't think it's necessary to do so, you have
16 exhibits, but I would just submit respectfully that us
17 producing hundreds of specifications similar to Exhibits
18 11 and 12 would make no progress in this case with
19 respect to obviousness issues and would do nothing to
20 advance the records with respect to damages issues.
21           The supplemental submissions of January
22 24 where ViewSonic argues that they needed further
23 discovery with respect to damages, they pointed to three
24 Georgia-Pacific factors, Your Honor. Those factors focus

SHEET 39

**150**

1  on the use of the invention and the profitability
2  associated with that use or that invention.
3          THE SPECIAL MASTER:  Right.
4          MR. CHRISTENSON:  We discussed, Your
5  Honor, that we don't make or use the invention, we make
6  modules and the modules are not the invention.  But in
7  any event, in good faith, as we pointed out in our
8  January 24th submission to Your Honor, we have provided
9  and created a list of modules that have holes at the back
10 of the modules and we have also provided sale summaries
11 for all of LPL's modules all the way through the end of
12 2006 and if they want to try to make some sort of an
13 argument that some sales of some modules are somehow
14 relevant to damages, they have what they need to make
15 those arguments.
16          But I also pointed out in our submission
17 to you in our submission of January 24 that the hypothet-
18 ical negotiation under Georgia-Pacific takes place at the
19 time of the first infringement, so we've get back to the
20 2002 and earlier time period, not this wide open all
21 products made by LPL time period that we're now talking
22 about.
23          So I wanted to make sure that we were
24 able to address those points before we moved into any new

**151**

1  subjects.
2          THE SPECIAL MASTER:  Okay.  Thank you.
3          MR. CHRISTENSON:  If I may, I'll be very
4  quick.
5          I think it's ironic that ViewSonic is
6  now requesting documents they forced LPL to go to great
7  lengths to get to the point where now Your Honor has
8  ordered they obtain them from the OEMs, but what is also
9  important to note is that ViewSonic has not bought any of
10 these monitors to match up to the specifications that
11 they put before Your Honor in Exhibit No. 11 and No. 12.
12 If they did, I'm sure they would find that the holes that
13 they're calling mounting holes are used to mount to
14 something other than the housing.
15          And although Your Honor did allude to
16 the fact that some of this does come down to claim
17 construction, I would point out to Your Honor again in
18 our February 23rd letter, we cite from ViewSonic's claim
19 construction brief where we say, "Claims 35 and 55 of the
20 '601 patent each require the rear mountable flat display
21 panel be mounted to the housing.  And in the
22 specifications they put before you in Exhibits 11 and 12,
23 there is no housing.  So it's not a question of claiming.
24 I think it's an undisputed question of claim

**152**

1  construction.  Both LPL and ViewSonic take the position
2  that the housing is a required limitation and required
3  element in the infringing device.  LPL doesn't make a
4  product with a housing.  Therefore, I think it is all
5  moot.
6          MR. NELSON:  Your Honor?
7          THE SPECIAL MASTER:  I think it was Mr.
8  Nelson suggested --
9          MR. NELSON:  Your Honor, may I please
10 respond to that?
11          THE SPECIAL MASTER:  Well, let me tell
12 you what I think you said without my going back with a
13 fine tooth comb now and looking at the drawings.  I'll
14 probably need the transcript to help me review that
15 again.
16          Mr. Nelson said in his presentation as
17 he walked through the spec that he identified something
18 that he would call a housing.  Did you not, sir?
19          MR. NELSON:  A frame.
20          THE SPECIAL MASTER:  A frame.
21          MR. NELSON:  A frame.  And, Your Honor,
22 they are now citing our claim construction basis.  And
23 let me, with kind of tongue in cheek, just say if LPL is
24 willing to concede that Viewsonic's claim construction is

**153**

1  right, we can all go home and I don't think they concede
2  that we're right on our claim construction.
3  Mr. Christenson or Mr. Ambrozy, do you concede that we're
4  correct in our claim construction?
5          THE SPECIAL MASTER:  They don't need to
6  answer that, sir.
7          MR. NELSON:  Yes.  Well, okay.  So,
8  anyways, I think the fact they're using our claim
9  construction, I might as well cite your Honor to their
10 claim construction brief, pages 30 and 31, where they say
11 capable means just that, just having the capability of
12 being mounted.  Clearly, their product specs are capable
13 of being mounted.
14          Again, it's not about whether the claim
15 construction that ViewSonic proposes or LPL proposes
16 is correct.  It's whether we have the right to this
17 information, whether it will lead to the discovery of
18 admissible evidence.
19          THE SPECIAL MASTER:  I understand.
20          MR. CHRISTENSON:  Your Honor?
21          MR. NELSON:  Now, we went to back to RFP
22 85, Your Honor.  And the reason we started with RFP 85
23 is because it had to do with the status report of their
24 production.  That is how we started here.  And we started

SHEET 40

154

1  with 85 because I said their bill of materials doesn't
2  say anything about mounting. As a matter of fact, their
3  witness today has testified that their bill of materials
4  had nothing to do with mounting the LCD module, but I
5  think for the record to be clear, I need to highlight all
6  of the RFPs that are tied to my request for production
7  specs, assembly drawings and instructions and samples and
8  I know we haven't dealt with samples yet. Forgive me for
9  adding that but I need to highlight all the RFPs because
10 it's not limited to 85 as Mr. Christenson and Mr. Ambrozy
11 suggests.
12         Okay? No. 17 deals with the best mode
13 of practicing the invention. That would deal with all
14 the product specs prior to the filing date.
15         No. 18 is the each mode --
16         MR. CHRISTENSON: I'm sorry for
17 interrupting. Are those requests referenced in the
18 motion?
19         MR NELSON: They're -- you know, I'm
20 going to say this. I'm not sure that every one of the
21 requests I'm going to highlight right now is in the
22 motion but they're relevant to the documents. They are
23 pending requests.
24         THE SPECIAL MASTER: Look, I'll permit

155

1  you to make the record but let's do without being rabid
2  about it. Let's be ginger, please.
3         MR. NELSON: Okay. 17 relates to the
4  best mode of practicing the invention.
5         18 relates to each mode of practicing
6  the invention.
7         25, the documents identified to LPL.
8  It's documents identified by us to LPL as prior art
9  That would actually include all the product specs because
10 we always said they're prior art. Their side mounting
11 and front mounting is prior art and relevant prior art to
12 these claims.
13         29 is actually critical. It's RFP 29
14 relates to the design, development and commercialization
15 of the subject of the patents in suit. RFP 29, the
16 design, development and commercialization of the subject
17 of the patents in suit.
18         33 is related to the commercialization
19 of the patents in suits. Again, see how I'm getting
20 those post-filing dates now.
21         36, all documents related to obviousness
22 or nonobviousness.
23         37, it's documents related to commercial
24 success. Again, it's post-filing date.

156

1         38, closely related to 37.
2         And 39 is any nexus or lack of nexus to
3  the commercial success of the patents in suit.
4         On these products specs, Your Honor,
5  there is some indication of whether or not the patents
6  are marked. And marking is actually an issue because
7  it actually perhaps ties to whether or not LPL even
8  believes that certain products are or are not in this
9  patent in suit. They clearly mark some, clearly do not
10 mark others, and so these product specs when it is side
11 mounting include the side mounting patents, others do
12 not. That is relevant to marking and the frequency of
13 marking. That is RFP 40 and RFP 53.
14         57 has to do with the utility and
15 advantage of the patent, and that has to do with the
16 advantages of side mounting, front mounting or rear
17 mounting or, more specifically, the advantages of rear
18 mounting over side mounting, the advantages of rear
19 mounting over front mounting. And, again, that brings in
20 front mounting and side mounting into play.
21         No. 58 is critical. It is the
22 noninfringing substitutes. And, again, front mounting
23 and side mounting would be relevant and noninfringing
24 substitutes.

157

1         63 and 65 are documents related to rear
2  mounted or rear mounting technology.
3         71, I've got bolded here, all documents
4  related to flat panel display products that use or
5  practice any invention disclosed or claimed in the patent
6  in suit.
7         No. 73 is all documents related to flat
8  panel display products that use or practice any invention
9  disclosed or claimed the foreign counterparts to the
10 patent in suit and the foreign counterparts in Korea
11 actually deal with side mounting.
12         No. 77 is relating to the instructions,
13 directions or information related to mounting an LCD
14 module, including manuals, instructions, specifications
15 and drawings. And that's related to the product specs
16 because the product specs give instructions for mounting
17 and that also relates to any other documents that they
18 get to their customers that LPL gives to its customers
19 that provide any type of mounting information.
20         78 is similar to 77 except instead of
21 seeking documents relating to an LCD module, it seeks
22 documents relating to a flat panel display device in case
23 LPL is trying to get around the definition of an LCD
24 module.

SHEET 41

**158**

1  79 relates to documents regarding
2  mounting other than front mounting. It captures side
3  mounting as well as rear mounting.
4  84, 85 and 86 are requests relating to
5  the structure, function and assemblage of LCD modules. I
6  know we spent a lot of time on 85 today, but 84 is also
7  relevant and 86 is perhaps the broadest, seeking all
8  documents from January 1st, 1997 relating to parts of an
9  LCD module that can be used for mounting.
10  And then 103, it will be the last one,
11  all documents from January 1st, 1997 forward relating to
12  any method of mounting flat panel displays other than
13  front mounting that LPL has used. So that would capture
14  all the side mounting as well as rear mounting.
15  So, Your Honor, I think we have already
16  discussed the relevance earlier and now I have actually
17  highlighted, I don't know, 15-20 RFPs that capture the
18  documents that we seek. And I've tried, instead of going
19  through the RFPs, I'm willing to limit it to product
20  specs, assembly drawings and all documents that relate
21  to mounting, fixing or attaching an LCD module to any
22  structure, including mounting instructions provided to
23  customers and that only leaves samples of the last topic.
24  THE SPECIAL MASTER: Okay.

**159**

1  MR. AMBROZY: Your Honor, it's Rel
2  Ambrozy. I think the request is way too broad.
3  THE SPECIAL MASTER: I understand. Let
4  me do this. Let me do your record for a moment and see
5  if I can see if that is satisfactory.
6  The record will reflect those RFPs that
7  counsel believes are implicated. I have the motion in
8  front of me which describes the RFPs that Mr. Heisman
9  said were at issue, and I will make some sense of it.
10  Mr. Christenson.
11  MR. CHRISTENSON: Yes. Thank you, Your
12  Honor. I just wanted to point out that a couple quick
13  points.
14  First, as a general matter
15  fundamentally, if Your Honor were to determine that the
16  scope of discovery and trial in this case should include
17  not only inventions, the patents in suit with respect to
18  rear mounting but also front mounting and side mounting
19  issues, we will be doing discovery for a long time and we
20  should start talking about a new trial date because that
21  is not the scope of discovery that any party so far has
22  understood to be proper. And as you know, Your Honor,
23  Tatung Company is resisting aggressively producing any
24  information for the most part except for with respect to

**160**

1  accused rear mounted products.
2  MS. HO: Your Honor, that is not true as
3  set forth in a letter we submitted today. That is just
4  absolutely not true.
5  THE SPECIAL MASTER: A letter submitted
6  when?
7  MS. HO: Today, this morning to Your
8  Honor.
9  MR. CHRISTENSON: Your Honor, I'm just
10  giving the background.
11  THE SPECIAL MASTER: Yes, go ahead.
12  MR. NELSON: And, Your Honor, regarding
13  the fact that there is a representation that ViewSonic
14  never sought this information before, ViewSonic has --
15  THE SPECIAL MASTER: Counsel, what I
16  really don't need is for you to be going back and forth.
17  It's just not going to be helpful.
18  MR. NELSON: Well, LPL is saying we
19  never sought the information before, Your Honor.
20  THE SPECIAL MASTER: I understand.
21  MR. NELSON: It's the plaintiffs don't
22  need this information because their burden is not to
23  show invalidity. So the documents that a defendant in a
24  patent infringement suit are far different than the

**161**

1  documents that a patentee will seek. They're not going
2  to be the exact same scope of documents.
3  MR. CHRISTENSON: Your Honor, Cass
4  Christenson. I wasn't finished earlier.
5  THE SPECIAL MASTER: Yes, I know.
6  MR. CHRISTENSON: If this is something,
7  for example, that goes to damages that ViewSonic argues,
8  then I think that is something that relates to everyone.
9  But in any event, I don't think it's a proper scope of
10  discovery. I think these are going far afield. Clearly
11  the scope of discovery under the federal rules is broad
12  and permissive but I think here we have an instance
13  where we are getting outside the reasonable bounds of
14  discovery.
15  THE SPECIAL MASTER: I understand your
16  position.
17  MR. CHRISTENSON: And, Your Honor, I
18  would also like to ask a question, if I may, which is
19  there was some focus about this issue as to whether a
20  module that is capable of being rear mounted practices
21  the invention. And, Your Honor, my question is whether
22  Your Honor thinks that is an important point? Because if
23  you do, I would like to submit something you don't have
24  in your record which is a copy of ViewSonic's most recent