# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| L.G. PHILLIPS LCD CO., LTD., | |
| Plaintiff, | C. A. No. 04-343-JJF |
| TATUNG COMPANY; TATUNG COMPANY OF AMERICA, INC.; AND VIEWSONIC CORPORATION, | **REDACTED--PUBLIC VERSION** |
| Defendants | |

## AMENDED
## DEFENDANTS TATUNG COMPANY'S AND TATUNG COMPANY OF AMERICA, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

Of Counsel:
Frank E. Merideth, Jr.
Mark H. Krietzman
Allan Jansen
Valerie W. Ho
Steve Hassid
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
(310) 586-7700

Dated: May 21, 2007

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
*Attorneys for Defendants Tatung Co. and Tatung Company of America, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.    INTRODUCTION ............................................................................................... 0

II.   ARGUMENT ...................................................................................................... 3

    A.    LPL's Proposed Construction For "Rear Mountable" Is Not
        Supported By The Intrinsic Record.......................................................... 3

        1.    LPL's Proposed Construction Would Eviscerate The Stated
            Purpose Of The Invention.......................................................... 3

        2.    LPL's Proposed Construction Is Not Supported By The
            Claims Or The Specification...................................................... 8

        3.    LPL's Proposed Construction Is Premised On A Secretly
            Altered Drawing...................................................................... 13

    B.    LPL's Proposed Construction For "First Frame" Is Based On A
        Complete Mischaracterization Of The Intrinsic Record......................... 16

        1.    LPL Ignores Important Teachings In The Patents........................ 17

        2.    LPL's Proposed Construction Has No Intrinsic Support ............. 19

    C.    LPL's Proposed Constructions for Second Frame Ignores The
        Intrinsic Record ..................................................................................... 19

    D.    LPL's Proposed Construction For "Flat Panel Display Device"
        Ignores The Context of the Invention .................................................... 20

        1.    LPL's Proposed Construction Ignores The Explicit
            Teachings Of The Patents......................................................... 21

        2.    LPL's Proposed Construction Introduces Subjectivity And
            Ambiguity ............................................................................... 21

        3.    A "Module" Is Disclosed In The Intrinsic Record ..................... 22

    E.    LPL's Proposed Construction Of Backlight Unit Is Fatally Flawed....... 23

        1.    LPL's Proposed Construction Ignores The Teachings Of
            The Patents............................................................................... 23

        2.    LPL's Proposed Construction Has No Intrinsic Support ............. 24

F    LPL's Proposed Construction For "Fastening Element/Part" Is Inconsistent With The Intrinsic Record ................................................... 25

G.    LPL's Proposed Construction Of "Fastening Hole" Is Inconsistent With The Intrinsic Record ................................................................ 28

H.    LPL's Proposed Construction For "Corners Of The First Frame" Is Contrary To The Plain Meaning Of The Words And Has No Intrinsic Support ....................................................................................... 29

     1.    LPL Ignores The Ordinary and Customary Meaning ................ 30

     2.    LPL's Proposed Construction Has No Intrinsic Support ........... 31

I.    LPL's Proposed Construction For "First Frame Having A Fastening Element/Part" Is Unnecessary And Not Supported By The Intrinsic Record ................................................................................. 31

J.    LPL's Proposed Construction For "Housing" Ignores The Definition Provided During Prosecution ............................................ 32

K.    LPL's Proposed Construction For "Display Case" Has No Intrinsic Support ........................................................................................ 33

L.    LPL's Proposed Construction For "Data Processing Device" Ignores The Intrinsic Record ......................................................... 35

     1.    The Only Disclosure For A "Data Processing Device" Relates To That Of A Computer Or Portable Computer ............ 35

     2.    If A "Data Processing Device" Is Not The Central Processing Unit Of A Computer, Then The Term Does Not Meet The Written Description Requirement ............................... 36

M.    "The Flat Display Panel Is Rear Mounted" Fails To Satisfy The Written Description Requirement ..................................................... 37

N.    The Remaining Terms Do Not Require Construction And Should Be Accorded Their Common And Ordinary Meaning ........................ 38

III.    CONCLUSION .............................................................................................. 39

# TABLE OF AUTHORITIES

**Federal Cases**

*Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*,
    467 F.3d 1370 (Fed. Cir. 2006) ................................................................... 32

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) ................................................................... 36

*Allen Engineering Corp. v. Bartell Industries, Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002) ..................................................................... 7

*Franklin Elec. Co., Inc. v. Dover Corp.*,
    2007 WL 634430 (Fed. Cir. 2007) ......................................................... 11, 12

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
    423 F.3d 1343 (Fed. Cir. 2005) ................................................................... 27

*Gentry Gallery, Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998) ................................................................... 37

*Hockerson-Halberstadt Inc. v. Avia Group Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) ............................................................... 11, 12

*Intermatic Inc. v. Lamson & Sessions Co.*,
    273 F.3d 1355 (Fed. Cir. 2001) ................................................................... 27

*KSR Int'l Co. v. Teleflex Inc.*,
    127 S.Ct. 1727 (2007) ................................................................................. 5

*Liebel-Farsheim v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ..................................................................... 27

*McClain v. Ortmayer*,
    141 U.S. 419 (1891) ..................................................................................... 19

*O.I. Corp. v. Tekmar Co., Inc.*,
    115 F.3d 1576 (Fed. Cir. 1997) ..................................................................... 8

*Philips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................... 23, 25, 29

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems*,
    242 F.3d 1337 (Fed. Cir. 2001) ..................................................................... 8

LA 126796973v15 5/16/2007

*Vas-Cath Inc. v. Mahurkar,*
  935 F.2d 1555 (Fed. Cir. 1991) ................................................................ 12


**Federal Statutes**

35 United States Code § 112 .................................................................... 12, 36

*LA 126796973v15 5/16/2007*

## I.    INTRODUCTION

The Patents-in-Suit are simple mechanical patents. The disclosure is short and uncomplicated.[1] The so-called "invention" can be summarized by three words: **Eliminate and relocate.** The so-called invention of the Patents-in-Suit requires 1) the *elimination* of the prior art front and/or side mounting features (Figures A and B (shown in red)) which, according to the Patents, are problematic as they unnecessarily waste space and reduce the display area (shown in yellow); and 2) the *relocation* of these features to the rear surface of the flat panel display device. *Elimination* and *relocation* allow a larger display device (Figures C and D) to be mounted in the same space as the prior art smaller display device, only if it is mounted via the relocated fastening parts.



The Patents-in-Suit and the intrinsic record teach the interdependent relationship of *"eliminate"* and *"relocate"* as the fundamental basis of the so-called invention.

---

[1] Although in some instances it provides only ambiguous and confused disclosure.

Often a point of reference is helpful to understand what was new and what was old. The below photographs of two DEC Ultra HiNote 2000 laptop computers[2] (FIG. E) have the same exterior



case size. The product on the left contains a front mounted LPL module with the display area colored red. The laptop on the right has a side mounted LPL module and the green region shows the increased display area as compared to the red insert (which is the display area of the front mounted variant). The ratio of display area to case is undeniably improved. Side mounting taught the elimination of front mounting features and the relocation of mounting holes to the sides of the LCD module to achieve the larger display area.

Tatung's approach to claim construction respects the context of the invention. It is only by both *eliminating* the "wasted space" associated with prior art mounting methods and by *relocating* all of the fastening parts to the rear of the display device that the object of the invention and the patent determinative limitation "rear mountable" are achieved. In contrast, LPL's approach to claim construction is fundamentally flawed. LPL not only ignores the patent specification but offers altered figures which LPL refers to repeatedly as if it were part of the intrinsic record.[3]

---

[2] The barcode numbers of the laptops are: FR-PF3W1-AA and FR-PG6WK-AA and the LPL modules are barcode numbers: 361217N11082 and 36418563223. Both laptops were inspected by LPL's expert Mr. Bohannon on May 1-2, 2007.

[3] The secretly altered Figure 10 in LPL's opening and supplemental briefs and all arguments relying on this altered figure must be ignored because it is extrinsic evidence with no foundation.

2

*LA 126796973v15 5/16/2007*

Much of LPL's claim construction argument is founded upon the inclusion of the phrase "on or inside the border." However, the phrase "on or inside the border" is wholly absent from the intrinsic record. Nonetheless, the phrase is repeated by LPL no less than 20 times in LPL's opening briefs as if the volume of repetition alone would cause the phrase to be a part of the intrinsic record. In addition, LPL uses illusion by placing before the Court, on eight (8) separate occasions, an altered figure that it represents to be Figure 10 of the Patents

At all times contemporaneous with the conception and prosecution of the Patents-in-Suit, LPL could simply have stated that "on or inside the borders" had a connection with the so-called invention – LPL did nothing. In fact, the inventors did exactly the opposite, in the original invention disclosure:

> "Mounting areas could be anywhere on the back of the LCD module as they do not interfere with the display area "

LPL's arguments that "on or inside the border" is fundamental to the invention is simply not true or credible.

## II.    ARGUMENT

**A.    LPL's Proposed Construction For "Rear Mountable" Is Not Supported By The Intrinsic Record.**

### 1.    LPL's Proposed Construction Would Eviscerate The Stated Purpose Of The Invention.

In its opening brief, LPL concedes that "rear mountable" is a claim limitation. (LPL's Opening Brief at 11.) LPL also admits that the stated object of the invention must be considered in construing "rear mountable." (*Id.* at 9-10.) LPL further concedes that the object of the invention was to eliminate the wasted space traditionally used for mounting a flat panel display device. (*Id.*) Having no choice but to capitulate on these

points, LPL resorts to mischaracterizing its own proposed construction in an effort to
show that its construction is consistent with the stated object of the invention. LPL's
position can only be characterized as an attempted bait and switch.

LPL claims in its opening brief that "positioning those fastening parts on or inside
the border of the flat display panel achieves the purpose of the invention – eliminating the
side flanges and thus the unnecessary side space " (LPL's Opening Brief at 14.) LPL's
own proposed construction for "rear mountable," however, permits side flanges and the
unnecessary wasted space the invention states it eliminated. In a rare moment of candor,
LPL admits that its construction would allow for other fastening elements outside the
border of the first frame, thereby occupying the very space the invention was intended to
eliminate. (LPL's Opening Brief at 15: "Thus, there is no specific prohibition in the
claims against having other or additional fastening parts positioned outside the border of
the first frame of the flat display panel ")

Although LPL acknowledges that *rear mountable* is a limitation on claim scope,
LPL's proposed definition does not apply the limitation – making the limitation
meaningless. LPL's proposed definition for "rear mountable (flat panel display device)"
is "a flat panel display device that is *capable of being mounted* to the rear housing *via
fastening part(s) located on the rear surface of the first frame and positioned on or inside
the border of the flat display panel.*" (Emphasis added ) Notably, LPL's proposed
definition does not require that **all** fastening parts be located behind the first frame. It
requires only that one fastening part to be located behind the first frame. Under LPL's
construction, the scope of the claims would extend to a flat panel display device with
fastening parts for front or side mounting even though such a device would suffer from

4

all of the deficiencies which the Patents identify as the problem with the prior art --

deficiencies which the invention purportedly

solved.



FIG. H1

LPL's twist to the prior art would be a

single fastening part located on the rear

surface of the first frame and positioned on or

inside the border of the flat display panel in

addition to the space-wasting prior art

fastening parts. Under LPL's definition the

outside perimeter or dimensional outline of a prior art device, and a device within the

claims of the Patents, could be identical. Such a design achieves none of the stated

objects of the invention. As depicted in the hypothetical Figure H1, a device which the

claim scope would extend to, under LPL's definition, is indistinguishable from the prior

art device because it still has flanges for front mounting which take up space "D," the

very space the invention purported sought to eliminate. LPL's proposed construction for

"rear mountable (flat panel display device)" would cover the hypothetical device depicted

in Figure H1. Under LPL's proposed construction, unnecessary space is not eliminated

and the viewing area relative to the size of the display case is not increased.

The purported invention according to LPL's construction merely consisted of

taking a prior art flat panel display device and adding a fastening part on the back of the

device. Merely adding a fastening hole on the back of the prior art device would have

been obvious to one skilled in the art and would not have been patentable. *See KSR Int'l

Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1739-40 (2007) ("This is a principal reason for

declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result [Citation omitted]."). Moreover, LPL's claim construction is simply not consistent with the stated purpose of the invention. ('641 Patent, 7:31-35, JA00021 at Exh. A ("the mounting method according to the present invention does not require unnecessary side space for mounting the LCD device on the computer  Thus, the ratio of the display of the LCD device to the display case can be improved and maximized."))[4]

In contrast, Tatung's proposed construction for "rear mountable (flat panel display device)" is consistent with the stated object of the invention and the prosecution history  Tatung's proposed definition for "rear mountable (flat panel display device)" is "a flat panel display device, with no fastening element for front or side mounting, having fastening elements only at the rear of its first frame." Under Tatung's construction, prior art fastening features (as depicted in Prior Art Figure 3B), which require unnecessary space, would be eliminated. ('641 Patent, 2:29-38, JA00018 at Exh. A and 7:31-35, JA00021 at Exh. A.) In addition, the protrusions inherent in side mounting, *i.e.*, the fastening elements that extend through and protrude past the side edges of the device (as taught by the Yun Reference), similarly would be eliminated. ('641 File History, Fig. 6-7, JA00344-45 at Exh. G.) It is only by eliminating front and side fastening elements and relocating all of the fastening elements to the rear of the first frame that the stated object of the invention is achieved. In fact, in all of the embodiments disclosed in the Patents-

[4] All citations are to the Joint Appendix unless otherwise noted

in-Suit, all of the fastening parts for mounting the flat panel display device to the housing are located exclusively behind the first frame of the device. (*See, e.g.*, '641 Patent, Fig 4A-14, JA00006-16 at Exh. A.)

Tatung's proposed construction also is consistent with LPL's own invention disclosure.

REDACTED

( LG Electronics Invention Disclosure Form, No. AW98-221 and AW222, dated October 10, 1998, LPL-01568 at Tatung Exh. 8.) [5] In short, the invention contemplated by the inventors clearly did not include front or side mounting elements. *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F. 3d 1336 (Fed. Cir. 2002) (Stating that claims must point out what the inventor regards as his invention.)

LPL argues that "the claim language does not require the absence of any other types of fastening elements." (LPL's Opening Brief at 15.) Tatung submits that "rear mountable" is that prohibition. In order to distinguish the invention from the cited prior art, including the Yun Reference which taught side mounting, LPL was required to add the term "rear mountable" to the preamble of every independent claim. Therefore, the claimed invention necessarily cannot include prior art front or side mounting elements.

---

[5] This exhibit is being filed under seal.

7

LPL also argues that Tatung's proposed construction "improperly read a negative limitation into the asserted claims by requiring that the first frame have . . . no fastening elements for front or side mounting." (LPL's Opening Brief at 15.) LPL is wrong. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Systems, Inc v. Advanced Cardiovascular Systems*, 242 F. 3d 1337, 1341 (Fed. Cir. 2001).

*O I Corp. v. Tekmar Co., Inc.*, 115 F. 3d 1576, 1581-82 (Fed. Cir. 1997) is directly on point. There, the Court construed "passage" to "not encompass a smooth-walled, completely cylindrical structure." The Court reasoned that in the written description, the patentee distinguished its invention from the prior art by explaining that the prior art structures were "smooth-walled." The Court found that "[a]ll of the 'passage' structures contemplated by the written description are thus either non-smooth or conical."

Here, as in *SciMed* and *Tekmar*, LPL expressly disclaimed front mounting features in the specification and expressly disclaimed side mounting features during prosecution of the Patents. Accordingly, the "rear mountable" limitation has to be construed as "having no fastening elements for front or side mounting."

### 2. LPL's Proposed Construction Is Not Supported By The Claims Or The Specification.

The requirement that at least one fastening part be "positioned on or inside the border of the flat display panel" is not disclosed anywhere in the intrinsic record and is manufactured by LPL in order to camouflage the real issue, namely, that the "rear

mountable flat panel display device" at the core of the invention must be more than just the prior art device with a screw hole added to the back. The phrase "on or inside the border" is completely absent from the claims of the Patents, the written description, the file histories, the Korean parent applications, and the invention disclosure prepared by the purported inventors. (*See generally,* '641 File History, Exh. G; '718 File History, Exh. H; '973 Application, Tatung Exh. 1; '475 Application, Tatung Exh. 4, and the Invention Disclosure Forms, Tatung Exh. 8.) In the Notice of Allowance, for example, the Examiner makes no mention of "on or inside the border." Rather, the Examiner states:

> The following is an examiner's statement of reasons for allowance: The best prior art of record, Abell Jr. et al. (US 5,268,816) and Yun et al. (US 5,835,139), taken alone or in combination fails to teach or suggest a portable computer comprising a rear mountable display device having a fastening element at **a rear surface of the rear mountable display device** attached to a case through the fastening element as claimed . . . .

('641 File History, JA00402-404 at Exh. G (emphasis added).) Accordingly, the Examiner understood that the fastening element can be anywhere on the "rear surface of the rear mountable display device." Not once during prosecution of the Patents did the patentee remotely suggest that the fastening element had to be positioned specifically behind the flat display panel.

LPL's invention disclosure also shows that the inventors shared the Examiner's understanding.

REDACTED

(Invention

Disclosure Forms, LPL-01570 at Tatung Exh. 8 (emphasis added).)

9

In a desperate attempt to support its position that a fastening part has to be located "on or inside the border of the flat display panel," LPL asks the Court to infer that Figure 4C demonstrates this non-existing requirement. LPL's desperate reliance on Figure 4C is misplaced for several reasons. First, neither Figure 4C, nor any other Figure in the Patents shows the fastening parts as being located "on or inside the border of the flat display panel." Rather, Figure 4C (shown with highlighting indicates a "broken line," an unreliable artifact from which to draw any conclusions. At best, the broken line indicates the assembly and coupling of the first and second frames which sandwich the layers together. However, the broken line does not support LPL's conclusions.

Second, the intrinsic record does not mention "border" whether it be on, inside or outside. This portion of LPL's argument lacks credibility and support. According to the written description, Figure 4C merely depicts a detailed structure of an LCD device and

Figure 10 depicts an embodiment of the hinge arm. ('641 Patent, 4:12-26; 6:16-29, JA00007-20 at Exh. A.) Notably, in discussing Figure 10, the Patents do not mention anything about a fastening part location being in anyway connected to the flat display panel. Figure 10 is described as "a front view showing the structure of FIG 9." Figures 9 and 10 placed side by side (see Figure "I" below) provide further evidence



that LPL's conjecture is untrustworthy. The artifact (in the red square) is not one of the mounting holes "15" on the corners of the LCD module shown in Figure 9 (circled in

10

green)  The mounting holes "15" are shown on the corners of the LCD device "10." If

the ambiguous, un-described artifact relied on by LPL displayed a fastening element, that

fastening element would be located at the blue symbol "ɔ"  Because the specification is

completely silent about the artifact and because patent drawings are not engineered

drawings, it is sheer speculation to guess 1) whether the artifact includes a fastening

element; 2) whether the fastening part is used for attaching the flat display panel to the

housing (as opposed to attaching the hinge arm to the housing); and 3) the specific

location of the fastening elements relative to internal layers of the device (*i.e.*, the flat

display panel).



FIG. 1

Under these circumstances, the Federal Circuit repeatedly has refused to permit the

drawing of inferences based on ambiguous figures where the specification is silent.  *See*

*Hockerson-Halberstadt Inc v. Avia Group Int'l, Inc.*, 222 F. 3d 951, 956 (Fed. Cir. 2000);

*Franklin Elec. Co., Inc. v. Dover Corp.*, Slip Copy, 2007 WL 634430 at *6 (Fed. Cir.

2007).  In *Hockerson*, the Court stated:

> The '792 patent is devoid of any indication that the proportions of the
> groove and fins are drawn to scale. HHI's argument thus hinges on an
> inference drawn from certain figures about the quantitative relationship
> between the respective widths of the groove and fins. **Under our
> precedent, however, it is well established that patent drawings do not
> define the precise proportions of the elements and may not be relied
> on to show particular sizes if the specification is completely silent on
> the issue.** [Citations omitted.]

*Hockerson*, 222 F.3d at 956 (emphasis added). Similarly, in *Franklin*, the Court ruled:

> The only arguable contact in that portion of the figure is provided by an
> ambiguous line extending from the top of the upward extension to the side
> of the spill collector. That line might have intended to indicate a
> connection, it might have been accidental, or it might have been intended
> to indicate something else altogether.
>
> We need not resolve the ambiguity here because patent figures are
> generally not intended to convey such detail. [Citation omitted.]

*Franklin*, 2007 WL 634430 at *6. Accordingly, the inferences LPL is asking the Court to

draw based on the ambiguous perspective line in Figure 4C and the ambiguous artifact in

True Figure 10 are prohibited by Federal Circuit case law.[6]

Third, even if Figures 4C and 10 clearly show fastening parts located "on or

inside the border" (and they do not) and even if the specification discusses this

requirement (and it does not), Figures 4C and 10 at most are two preferred embodiments.

Importing a claim limitation from two preferred embodiments, as LPL is attempting to do

here, is improper. *See Franklin*, 2007 WL 634430 at *6 ("[E]ven if figure 7

unambiguously depicted contact between the upward extension and the left side of the

spill collector . . ., we would not necessarily conclude that such contact is a required

---

[6] LPL's reliance on *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991), is
misplaced. Vas-Cath merely holds that under certain circumstances, drawings alone may provide
a written description of an invention as required by 35 U.S.C. § 112. *Vas-Cath*, however, does
not stand for the proposition that claim limitations can be inferred from ambiguous drawings,
especially when the specification is silent.

12

limitation of the claims because figure 7 is merely a preferred embodiment of the invention "

### 3. LPL's Proposed Construction Is Premised On A Secretly Altered Drawing.

As explained above, LPL's "on or inside the border" argument has absolutely no support in any of the claims, the specification, the file histories, the Notice of Allowance, and the inventors' invention disclosure. Beyond grasping at straws, the only alleged evidence that LPL could cite to support its construction is the undescribed, ambiguous artifact found in Figure 10 of the Patents. Even though True Figure 10 only depicts an embodiment of the hinge arm and the specification is completely silent as to the significance of the artifact relied on by LPL. Throughout its brief, LPL repeatedly relies on what LPL describes as "which is Fig. 10 from the '641 Patent" or "figure 10 of the Patents-In-Suit..." (LPL's Opening Brief at 10 and 17.) Indeed, Figure 10 is the centerpiece of several of LPL's proposed definitions, which characterize "on or within the border" as meaningful. (LPL's Opening Brief at 4-5, 10, 14, 17, 29 and 37.)

LPL fails to inform the Court, however, that all of the Figure 10s reproduced in LPL's opening brief are in fact not accurate reproductions of Figure 10 in the Patents. Below is a comparison of the Figure 10 in LPL's brief (the "Altered Figure 10") and Figure 10 from the Patents (the "True Figure 10")

Altered Figure 10                        True Figure 10



When the true Figure 10 (at the right) is placed next to the altered figure (at the left), the material alterations become clear. In LPL's Altered Figure 10, the relative width of the hinge arm 24b (shown in black above) has been reduced in size and is made to appear to the right of a green zone. Depicted below are drawings which identify the problems with LPL's Altered Figure 10.

14



Hinge arms 24b have been reduced in size relative to other parts.

The green zone is a fabrication. The black and purple zones are fabrications

30

22

20    26    10    24a    24    24b    FIG. 10

The placement of the edge of the green zone inside part of the orange frame is a fabrication.

Even if the artifact relied on by LPL can be understood to be a fastening part (and even that is unclear), in a colored-in blow up of the artifact from the True Figure 10 (to the right), the size of the hinge arm makes it at best ambiguous as to whether a fastening part is used to fasten the hinge arm (shown in red) to the housing or whether a fastening part does not attach or pass through the hinge arm and is used to fasten the flat panel display device to the housing (which is what LPL contends). Of course, in order for LPL to be able to point to the location of the artifact to support its proposed constructions requiring *the fastening part used for mounting the flat panel display device to the housing* to be located "in or on the border," LPL desperately needs the artifact to include a fastening part, and that fastening part needed to be the



Color Blow Up

"right" part, namely, the one that mounts the flat panel display device to the housing, and not just to the hinge arm. By deliberately altering the relative size of the hinge arm and thereby relocating it to the right of the newly created green zone and to the right of what LPL claims is the fastening part, LPL attempts to eliminate at least this ambiguity from the True Figure 10. At a minimum, LPL's alteration to Figure 10, of course, highlights the very problem associated with attempting to draw inferences from unclear drawings. It is simply unclear from the True Figure 10 whether the artifact relied on by LPL includes a fastening part, whether that fastening part is used to attach the flat panel display device to the housing, and whether that fastening part is positioned on or inside the border of the panel. Accordingly, the only so-called intrinsic evidence LPL can point to does not support its proposed construction for "rear mountable." [7]

**B.    LPL's Proposed Construction For "First Frame" Is Based On A Complete Mischaracterization Of The Intrinsic Record.**

LPL proposes to construe "first frame" as "a structure enclosed by the housing for firmly supporting the flat display panel." The correct construction for "first frame" in view of the Patents is "the rear (back) structure of a flat panel display device that, alone or in combination with the second frame, sandwiches and assembles the layers to form the device."

LPL's proposed constructions for "first frame" and "second frame" are wrong for at least three independent reasons: 1) LPL once again ignores the context of the invention, in this instance attempting to replace clear and consistent disclosure of a function with a dictionary definition in the very fashion disapproved by *Phillips*; 2) LPL

_____

[7] Because the Altered Figure 10 is not part of the intrinsic evidence and no foundation has been offered for its receipt into evidence, the portions of LPL's brief that rely on Altered Figure 10 should be stricken or disregarded.

16

ignores the specification and the assembly function of the frames; and 3) LPL again uses

Altered Figure 10 to wrongly conclude that the silent artifact (in addition to teaching the

phrase "on or inside the border" which does not appear anywhere in the Patents) is also

the intrinsic support for yet another one of its proposed constructions. The altered figure

is deceptive and completely unreliable.

### 1.    LPL Ignores Important Teachings In The Patents.

The intrinsic record overwhelmingly recognizes that one function of the first

and/or second frame is to assemble the flat panel display device. The specification

indicates that a "supporting frame" is for "assembling" the liquid crystal display device:[8]

> "The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the
> back of the LCD panel 132, and a **supporting frame 136 for assembling the
> LCD panel 132 and the backlight device 134 along the edge**." ('641 Patent,
> 1:44-45, JA00018 at Exh.A)

> The LCD panel 112 and the backlight device **are assembled by a supporting
> frame** 114 along the edges. ('641 Patent, 2:5-6, JA00018 at Exh.A)

As depicted in Figure 4C, reproduced below, the specification also teaches that

the liquid crystal display device is a sandwich of sequential layers consisting of a liquid

crystal display panel 12 (shown in red); a backlight unit 14 (shown in yellow) comprising

a diffuser or protecting film 14a, a second prism sheet 14b, a first prism sheet 14c, a

diffuser or protecting film 14d, a reflector 14f; and a first frame 14g. ('641 Patent, 4:26-

37, JA00019 at Exh. A.)

---

[8] The liquid crystal display device is the only flat panel display device that is discussed in any
detail in the Patents.

The Patents further teach that the "first frame" is a structure of the flat panel display device that assembles the layers to form the device. In other words, the first frame clearly is a part of, or integral to, the device. For example, claim 35 of the '641 Patent recites a "backlight unit including a first frame . . . " ('641 Patent, JA00022 at Exh. A.) Claim 33 of the '718 Patent recites a "backlight unit having a first frame . . . " ('718 Patent, JA00045 at Exh. B.) The first frame, therefore, is integral to the backlight unit that is part of the liquid crystal display device.



Fig. 4C

Indeed, LPL admits that the frame(s) does more than merely support. LPL states in its Opening Brief: "One skilled in the art would understand that the display panel itself does not and cannot exist without the assistance of some other structural component, such as a **frame or frames, which hold the flat display panel in place.** (LPL's Opening Brief, FN 1, at 3 (emphasis added).) LPL, therefore, recognizes that the frames hold together the internal components of the flat panel display device. Yet, LPL criticizes Tatung's construction for its explicit recognition of this fact, *i.e.*, that the first frame sandwiches, assembles and holds together the layers of the flat panel display device.

In short, whereas LPL's proposed construction completely ignores the Patents' teachings, Tatung's construction is overwhelmingly supported by the claims, the specification and the drawings.

### 2.    LPL's Proposed Construction Has No Intrinsic Support.

Because the claims and the specification completely support Tatung's proposed construction, LPL relies instead on a dictionary definition of "frame" that appears to be almost identical to LPL's dictionary definition of "housing." Moreover, even if the plain meaning of "frame" is "a case or enclosure made for admitting, enclosing, or supporting something," LPL fails to explain why this necessarily means that the component that is supported by the first frame is the flat panel display device (as LPL claims in its Opening Brief at pg. 28). Indeed, LPL's own definition of "first frame" does not suggest it supports the flat panel display device. Instead, LPL's definition merely requires that the "first frame" support the flat display panel.

LPL's construction also permits the reshuffling of elements which would result in utter chaos. For example, under LPL's proposed construction, a hinge arm, or a PCB board, or a heat shield, or an internal bracket could be a "first frame" and therefore become a part of the flat panel display device. Any part inside a housing that is connected to another part within that housing arguably supports other interior parts such as the flat display panel and therefore can be a "first frame." As a result, even identifying the first frame would be difficult. The lack of clarity such a construction would introduce violates the notice function that the Patents must serve. *See McClain v. Ortmayer*, 141 U.S. 419, 424 (1891) ("The object of the patent law in requiring the patentee [to distinctly claim his invention] is not only to secure to him all to which he is entitled, but to apprise the public of what is still open to them.").

### C.    LPL's Proposed Constructions for Second Frame Ignores The Intrinsic Record.

LA 126796973v15 5/16/2007

LPL proposes to construe "second frame" as "a structure disposed in relation to the first frame such that the flat display panel is between the first frame and the structure." The proper construction for "second frame" is "the front (top) structure of a flat panel display device that, together with the first frame, sandwiches and assembles the layers to form the device."

LPL mistakenly refers to the claims in a vacuum and completely ignores the specification. While it is true that the flat display panel is depicted in Figure 4C as between the first and second frames, the Patents consistently describe the second frame as the front (top) structure of a flat display device that, together with the first frame, sandwiches and assembles the layers to form the device. For instance, in Figures 4C and 5-16, there is no second frame shown that is remote or unconnected to the flat panel display device 10. The Patents also disclose that the first and second frames are coupled to each other to form the device: "The first frame 14g is **coupled** to a second frame or supporting frame 16." ('641 Patent, 4:24-25, JA00019 at Exh. A (emphasis added).) Therefore, Tatung's proposed construction is supported by the intrinsic record.

LPL's proposed construction, on the other hand, is too vague. Under LPL's construction of "second frame," the second frame could be physically and spatially divorced from the first frame. This construction simply ignores the entire context of the invention.

**D.    LPL's Proposed Construction For "Flat Panel Display Device" Ignores The Context of the Invention.**

LPL proposes to construe "flat panel display device" as "an apparatus having at least a liquid crystal display panel and supporting frame(s)." The proper construction is

20

"a stack or sandwich of layers, including a liquid crystal display panel, fixed together by at least a first frame to assemble a module."

### 1.    LPL's Proposed Construction Ignores The Explicit Teachings Of The Patents.

Like its proposed construction of "first frame," LPL's proposed definition of "flat panel display device" ignores that the flat panel display device contains layers of components which are assembled or held together by a frame or frames. The Patents clearly disclose that the liquid crystal display device[9] is assembled by at least one frame:

> "The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a **supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.**" ('641 Patent, 1:44-45, JA00018 at Exh.A)

> The LCD panel 112 and the backlight device **are assembled by a supporting frame** 114 along the edges. ('641 Patent, 2:5-6, JA00018 at Exh A)

The Patents also describe the layers of the liquid crystal display device: "[T]he LCD device 10 has a first frame 14g, preferably made of plastic, a reflector 14f on the frame 14g, a light guide film 14e, a diffuser or protecting film 14d, a first prism sheet 14c, a second prism sheet 14b, another diffuser or protecting film 14a, and the LCD panel 12." ('641 Patent, 4:17-21, JA00019 at Exh. A.)

### 2.    LPL's Proposed Construction Introduces Subjectivity And Ambiguity.

The intrinsic record recognizes that the flat panel display device is an integrated unit within a housing or case. ('641 Patent, Figs. 2, 34C, 8-9 & 12-14, JA00003-10 at

---

[9] The Patents do not include any discussion or disclosure concerning the structure of any flat panel display device other than the liquid crystal display device (*See, e.g.*, '641 Patent, 1:16-24 & 7:36-42, JA00018 & JA00021 at Exh A.) The other types of flat panel display devices which the Patents identify are Field Emission Displays ("FED") and Plasma Display Panels ("PDP").

21

Exh. A.) LPL's proposed construction ignores this intrinsic evidence and is hopelessly vague. An "apparatus" is ambiguous and unworkable because it could refer to anything. It could be the flat panel display device (or module as commonly understood by one skilled in the art) or the entire portable computer.

### 3.    A "Module" Is Disclosed In The Intrinsic Record.

LPL objects to Tatung's proposed construction on the grounds that "module" is not disclosed in the intrinsic record. LPL is wrong. First, "module" is mentioned in the prosecution history. Although LPL deleted the word "module" from the specification of the Patents, the prosecution files show that LPL initially used the word "module" to refer to the liquid crystal display device. ('641 File History, 3:5, JA00106 at Exh. G.)

Second, "module" is used in the Korean parent applications. The '475 and '973 Applications were expressly incorporated by reference into the '641 and '781 Patents. LPL freely uses the term "module" in that portion of the intrinsic record. (See, e.g., '475 Application, VS024375-VS024377 at Tatung Ex. 4 (describing Claim 13 as "[t]he flat panel display device module according to the claim 12, wherein the flat panel is a liquid crystal display panel"; describing Claim 20 as "[t]he flat panel display device module according to the claim 17, 18, or 19 wherein the outside member is a case of a portable computer"); see also '973 Application, VS024432 at Tatung Ex. 1 ("In this application, a liquid crystal display device module, or a flat panel display device module is defined as the liquid crystal display device having the support frame.").)

Third, "module" is used by the inventors to refer to the liquid crystal display device. In LPL's invention disclosure form,

REDACTED

REDACTED

(Invention Disclosure Forms, LPL-015067 at Tatung Exh. 8.) In short, LPL's objections to Tatung's construction of "flat panel display device" has no merit. Tatung's construction should be adopted because it has overwhelming support in the entire intrinsic record.

### E.    LPL's Proposed Construction Of Backlight Unit Is Fatally Flawed.

LPL proposes to construe "backlight unit" as "an assembly that includes at least a backlight." The proper construction of "backlight unit" in view of the teachings of the Patents is "layers of an LCD module from the first (rear) frame to the back of the liquid crystal display panel."

### 1.    LPL's Proposed Construction Ignores The Teachings Of The Patents.

The backlight unit is an element specific to liquid crystal display devices. Not even LPL can dispute that the Patents' detailed description of backlight unit and liquid crystal display device must inform the Court's construction of "backlight unit." *See Phillips*, 415 F. 3d at 1315.

LPL's proposed definition is flawed because it completely ignores the claims and the specification, which overwhelmingly support Tatung's proposed construction. For example, claim 35 of the '641 Patent recites "a backlight unit including a first frame having a fastening part at a rear surface of the first frame, a flat display panel adjacent to the backlight unit." Claim 47 further provides that the backlight unit comprises "a first frame having a fastening part at a rear surface of the first frame; a reflector unit adjacent the first frame; and a light guide unit adjacent the light source unit; a flat display panel adjacent the backlight unit . . . ." ('641 Patent, JA00022 at Exh. A.) The claims,

therefore, clearly indicate that the "backlight unit" consists of layers behind the liquid crystal display panel. The "backlight unit" operates from behind the liquid crystal display panel to light the device.

The specification also confirms that Tatung's proposed construction is correct. The specification discloses that the stack of layers shown in Figure 4C (reproduced above) called out as 14a-14g are the "backlight unit." Therefore, Tatung's proposed construction of "backlight unit" as "layers of an LCD module from the first (rear) frame to the back of the LCD panel" is supported by the intrinsic evidence.

LPL's argues that the backlight unit cannot include the first frame because it would create redundancy in the claims. This is pure nonsense. The plain language of claim 35 of the '641 Patent, which recites "a backlight unit including a first frame . . . " actually compels the conclusion that the backlight unit includes a first frame. ('641 Patent, JA00022 at Exh. A.) Claim 33 of the '718 Patent also supports this conclusion because it recites a "backlight unit having a first frame . . . ." ('718 Patent, JA00045 at Exh. B.) Figure 4C, reproduced above, also depicts the first frame 14g as a bottom layer of the backlight unit 14. The first frame, therefore, is a part of and is integral to the backlight unit.

LPL also argues that "liquid crystal display module" is not found in the intrinsic record. LPL is wrong for the reasons stated above. The prosecution files, the Korean parent applications and LPL's own invention disclosure form are filled with references to an "LCD module."

## 2.    LPL's Proposed Construction Has No Intrinsic Support.

Ignoring the claims, drawings and specification, LPL relies solely on a dictionary definition of "unit" to support is proposed construction of "backlight unit." By using

24

"backlight" to define "backlight unit," LPL again introduces ambiguity into the claims. Neither the Patents, nor the file histories, provide a definition of "backlight" as separate from "backlight unit." Without exception, "backlight" always is followed immediately by "device" or "unit." There is no support in the intrinsic record for a "backlight." Contrary to LPL's contention that Tatung is importing a limitation from a preferred embodiment, Tatung's proposed definition is the only one that makes sense in view of the claims, the specification, the drawings and the prosecution history.

F.    **LPL's Proposed Construction For "Fastening Element/Part" Is Inconsistent With The Intrinsic Record.**

LPL contends that "fastening element/part" should be construed as "a part(s)/element(s) that provides the capability for mounting one component to another component(s)." LPL's proposed construction is wrong because the intrinsic record does not indicate that a "fastening element/part" must serve a mounting function.[10] To support its extremely narrow construction of "fastening element/part," LPL asks the Court to ignore "the specification, drawings, and prosecution history [which] discuss many types of fastening elements located on various structural features of different preferred embodiments" and to consider only the "fastening elements" on the rear surface of the first frame. (LPL's Opening Brief at 23.) This type of misplaced reliance on selectively chosen claim language that is completely divorced from the specification has been discredited by the Federal Circuit. *See Philips v AWH Corp*, 415 F. 3d 1303, 1313 (Fed. Cir. 2005) ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

---

[10] The parties agreed that "mounted" means "attached firmly or fixed securely so as to be supported."

Unfortunately for LPL, the specification discusses, and the drawings depict, fastening parts that are not located on the rear surface of the first frame. The drawings depict, for example, fastening elements on the hinge arm and the case. ('641 Patent, Figs 5-6, 8-9, 12-15, JA00008-21 at Exh. A.) In addition, the Patents specifically identify a number of different fastening elements/parts, some of which may have a mounting function while others may not. For example, the specification describes "mounting holes," "screw holes" and "through holes." All of these elements are referred to as "fastening elements" or "fastening parts." ('641 Patent, 5:52-6:15, JA00020 at Exh. A.) The specification recognizes that "mounting holes" are merely a subset of "fastening elements/parts." Therefore, LPL's attempt to read a mounting function into all "fastening elements/parts" is completely contradicted by the specification.

In contrast, Tatung's proposed construction for "fastening element/part" is supported by the intrinsic evidence. Tatung believes that this term should be construed as "fastening hole together with the material defining the hole, pegs, screws, hooks, bolts, ribs, nails, adhesive tape or similar fasteners including a fastener with a compressible head." Holes, pegs, screws, hooks, bolts, ribs, nails, and fasteners with a compressible head are expressly disclosed in the specification as "fastening elements." ('641 Patent, 4:29-32, 4:32-33, 4:58-59, 5:10-13, 5:21, 5:59-61, 6:14-15, JA00019-20 at Exh. A.) In addition, the Yun '139 Reference teaches the use of "adhesive tape" as an alternative to screws and screw holes. ('139 Patent, 4:66-5:5, JA00069-70 at Exh. D.)

LPL argues that Tatung's proposed definition violates the doctrine of claim differentiation because the Patents contain dependent claims directed to a screw, peg or hook, for example. LPL's argument is based on a misguided understanding of claim

differentiation. "The doctrine of claim differentiation 'create[s] a presumption that each claim in a patent has a different scope.' [Citation omitted.] The difference in meaning and scope between claims is presumed to be significant '[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous.'" *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F. 3d 1343, 1351 (Fed. Cir. 2005) (ruling that "dependent claims limiting the claim to a single cable confirm that the independent claims may encompass more than one cable.").

Tatung agrees that the law supports the proposition that the **addition** of a particular limitation in a dependent claim gives rise to a presumption that the limitation is not present in the parent independent claim, see, *Liebel-Farsheim v. Medrad, Inc.*, 358 F. 3d 898, 910 (Fed. Cir. 2004), but this is significantly different from the present situation. In this case, the dependent claims are **further defining an existing limitation**, as dependent claims often do, and thus the doctrine of claim differentiation is inapplicable. The doctrine of claim differentiation does not apply here because under Tatung's proposed construction, the independent claims requiring a "fastening element" or "fastening part" would be broader and would not have the same scope as the dependent claims, which merely provide examples of some but not all of the "fastening elements." Construing "fastening element/part" as Tatung proposes is entirely consistent with dependent claim 36 of the '641 Patent which recites "wherein the fastening element comprises a fastening hole" and all of the other dependent claims cited by LPL.[11]

---

[11] *Intermatic Inc. v. Lamson & Sessions Co.*, 273 F. 3d 1355, 1364 (Fed. Cir. 2001), cited by LPL, is not on point. *Intermatic* merely stands for the proposition that a limitation from a dependent claim should not be read into an independent claim where that limitation is the only meaningful difference between the two claims and the dependent claim would be rendered superfluous. Here, adopting Tatung's construction for "fastening element/part" would not render superfluous any of the dependent claims that merely recite single examples of fastening parts.

27

G.    LPL's Proposed Construction Of "Fastening Hole" Is Inconsistent With The Intrinsic Record.

LPL proposes to construe "fastening hole" as "an opening, together with the material defining the opening, that provides one component with the capability of being mounted to another component(s)." LPL eagerly points to the dictionary definition of "hole" but completely ignores the entire specification, which defines "fastening hole" as a hole, a screw hole, a through-hole, a mounting hole, and a stepped hole -- precisely the definition proposed by Tatung. ('641 Patent, 4:32-33, 4:51-52, 4:60-62, 5:60-63, 7:3-5, JA00019-21 at Exh. A.)

LPL takes issue with Tatung's proposed construction on the grounds that "a through-hole cannot be a fastening hole." (LPL's opening brief at 27.) LPL's position is contradicted by the plain language of the Patents. The Patents unambiguously provide that a through-hole can be a "fastening hole."

> To mount the LCD device 10 to the case 21, the LCD device 10 is placed on the inner surface of the case 21 such that the positions of the holes 21a and the holes 15 coincide with each other, and screws 18 (fastening elements or fastening parts) are inserted into the **holes 21a** and 15 **(which may be referred to as fastening holes or a similar conveniently descriptive term, and which together with the material defining the holes each may be referred to as a fastening element or fastening part)** from the back of the case 21. The **through-hole 21a** is preferably a stepped hole so that the head of the screw 18 will not protrude from the outer surface of the case 21. ('641 Patent, 4:56-67, JA00019 at Exh. A (emphasis added).)

> In the display case 30, a hole such as a **through hole 30 (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be referred be referred to as a fastening element or fastening part)** may be formed. ('641 Patent, 5:63-6:2, JA00020 at Exh. A (emphasis added).)

> In the flat portion 24b of the hinge arm 24 (referred to a display device support member), at least one corresponding **through-hole (which may be referred to as a fastening hole or a similar conveniently descriptive term, and which together with the material defining the hole may be**

28

**referred to as fastening element or fastening part)** is formed. ('641
Patent, 6:64-7:2, JA00021 at Exh. A (emphasis added).)

LPL argues that the claimed "fastening hole" must be construed in the context of
the claims, which provide for the mounting of a flat panel display device to a housing.
However, it is precisely in the context of discussing the mounting of a liquid crystal
display device to a case that the Patents refer to a through hole as a "fastening element."
('641 Patent, 4:56-67, JA00019 at Exh. A.) Moreover, while the claims should be
considered, the specification cannot be ignored. *See Philips*, 415 F. 3d at 1315.

Finally, LPL's argument that a "through-hole lacks any 'fastening' ability'" defies
common sense. (LPL's Opening Brief at 27.) A through hole (together with the material
defining the hole) provides a channel for a screw to pass into a threaded hole and fastens
elements together by engaging the head of the screw. Accordingly, LPL's arguments
should be rejected. The Court should adopt Tatung's proposed construction for
"fastening hole" because it is the only construction that is supported by the intrinsic
record.

**H.    LPL's Proposed Construction For "Corners Of The First Frame" Is
Contrary To The Plain Meaning Of The Words And Has No Intrinsic
Support.**

LPL proposes to construe "corners of the first frame" as "areas located in or near
the edges of the first frame and positioned on or inside the border of the flat display
panel." The correct construction for "corners of the first frame," in view of its ordinary
meaning and the intrinsic record, is "the area (region) at the back surface of the flat panel
display device near the intersection of any two side edges of the flat panel display
device." LPL's proposed construction for "corners of the first frame" is incorrect for at
least three independent reasons: 1) LPL ignores the ordinary and customary meaning of

29

"corners" to one of ordinary skill in the art; 2) the intrinsic record does not support LPL's proposed construction; and 3) LPL's proposed construction would allow "corners of the first frame" to include areas nowhere near any "corner."

### I.    LPL Ignores The Ordinary and Customary Meaning.

The term "corners of the first frame" should be accorded its ordinary and customary meaning  Tatung proposes the ordinary dictionary definition where "corners" are near the intersection of any two side edges of the flat panel display device. LPL, on the other hand, proposes a definition requiring the "corners" to be "in or near the edges of the first frame and positioned on or inside the border of the flat display panel." As discussed in Tatung's Supplemental Opening Brief, the American Heritage Dictionary defines "corner" as "[t]he position as which two lines, surfaces, or edges meet and form an angle: *the four corners of a rectangle*" American Heritage Dictionary, http://www/bartleby.com/61/79/C0647900.html. (Exhibit A to Tatung's Supp  Opening Brief.)  Similarly, www.dictionary.com defines "corner" as:

1    the place at which two converging lines or surfaces meet.
2.    the space between two converging lines or surfaces near their intersection; angle: *a chair in the corner of the room.*

Dictionary.com, http://dictionary.reference.com/browse/corner.  (*Id.* at B.)  LPL's proposed definition ignores the ordinary and customary meaning of "corners."  The ordinary meaning of "corners" to a person of ordinary skill would not include "any area located in or near the edges of the first frame."  As the various dictionary definitions indicate, a corner is whether two lines or surfaces converge or intersect  A corner is not "any area located in or near any "edges of a first frame."  Under LPL. proposed construction, "corners of the first frame" would include the middle portions of the edges

of the first frame  In short, whereas LPL's proposed construction completely ignores the ordinary and customer meaning of "corners of the first frame," Tatung's construction comports with the ordinary and customary meaning of those terms.

       2.     **LPL's Proposed Construction Has No Intrinsic Support.**

LPL also claims that the specification of the '641 Patent supports its proposed construction. LPL argues that Figures 4C and 10 of the specification "show that the fastening holes at the corners of the first frame 14g are located in or near the edges of the first frame, and positioned on or inside the border of the flat display panel." (*Id.* at 6) For all of the same reasons discussed in the Section regarding "rear mountable," LPL's "on or inside the border" argument has no merit. Accordingly, the Court should adopt Tatung's proposed construction for "corners of the first frame."

**I.     LPL's Proposed Construction For "First Frame Having A Fastening Element/Part" Is Unnecessary And Not Supported By The Intrinsic Record.**

The phrase "first frame having a fastening element/part" does not require construction. The parties already have proposed constructions for "first frame" and "fastening element/part." The term "having a" simply should be accorded its plain and ordinary meaning.

In any event, LPL's proposed construction for "first frame having a fastening element/part" as "a first frame having a fastening part(s)/element(s) positioned on or inside the border of the flat display panel" is flawed for the same reasons that its proposed construction for "rear mountable" is flawed. LPL argues that "first frame having a fastening element/part" must be read in context with "rear mountable." However, LPL's proposed construction for "rear mountable" is not supported by a shred of reliable intrinsic evidence, as discussed above. There is simply nothing in the claims,

drawings, specification, file histories, or invention disclosure that require the fastening element to be positioned on or inside the border of the flat display panel. Indeed, claim 35 of the '641 Patent merely recites in part "a backlight unit including **a first frame having a fastening part at a rear surface of the first frame**, a flat display panel adjacent to the backlight unit." ('641 Patent, 9:65-67, JA000225, at Exh. A (emphasis added).). The claim merely requires the fastening part to be located on "the rear surface of the first frame," but makes no mention of the "on or inside the border" limitation. Accordingly, LPL's proposed construction for "first frame having a fastening element/part" should be rejected.

## J.    LPL's Proposed Construction For "Housing" Ignores The Definition Provided During Prosecution.

LPL argues that "housing" should be given its plain and ordinary meaning. LPL claims that the term "housing" is understood by one skilled in the art to be "an outer casing or enclosure." However, a patentee can "'act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning.'" *Abraxis Bioscience, Inc v Mayne Pharma (USA) Inc*, 467 F 3d 1370, 1376 (Fed. Cir. 2006) (finding that district court properly concluded that "patentees acted as their own lexicographers by defining 'edetate' in the specification.").

Here, LPL acted as its own lexicographer when it gave "housing" a meaning that is different from its plain and ordinary meaning. During prosecution of the '641 Patent, LPL explained that "housing" is the case and body of a portable computer. For example, following a Section 112 rejection, LPL amended the specification of the '641 Patent to include the following language: "Together, the case 21 and the body 20 may be referred to as a housing, or a similar conveniently descriptive term." ('641 File History, JA00305

32

at Exh. G.) In addition, the Patents disclose: "To mount the LCD device 10, the body 20 (first portion) and the display case 30 (second portion) (collectively referred to as a housing) are connected by the pin portion 24a on the hinge mount 22." ('641 Patent, 6:6-8, JA00020 at Exh. A.)

The reasons provided by the Examiner for allowance also support Tatung's proposed construction of "housing." Specifically, the Examiner explained:

> The best prior art of record, Abell Jr. et al. (US 5,268,816) and Yun et al (US 5,835,139), taken alone or in combination **fails to teach or suggest a portable computer** comprising a rear mountable display device having a fastening element at rear surface of the rear mountable display device attached to a case through the fastening element as claimed . . . .

('641 File History, JA00403 at Exh. G). Accordingly, the Examiner understood that the invention relates to portable computers. LPL's proposed construction for "housing" is simply too broad in view of the prosecution history.

LPL's own invention disclosure form further compels the conclusion that the invention relates to a portable computer.


REDACTED


(Invention Disclosure Forms, LPL-01567 at Tatung Exh. 8.)[12]

**K.    LPL's Proposed Construction For "Display Case" Has No Intrinsic Support.**

LPL proposes to construe "display case/case" as "a rear housing." The proper

---

[12] Moreover, LPL's proposed construction is not supported by the dictionary definition it cites. According to LPL, the McGraw-Hill Dictionary of Engineering merely defines "housing" as "a case or enclosure to cover and protect a structure . . ." The word "outer" is not found anywhere in this definition.

construction for "display case/case" is "the portions of the housing that enclose the display device."

Once again, LPL has reached a faulty conclusion notwithstanding a clear and simple intrinsic record. Specifically, LPL states, "For example, all of the Figures of the '718 Patent show the display case as <u>a portion</u> of the housing that is positioned at the rear of the flat panel display device. (LPL Opening Brief at 30.) LPL's conclusions are contradicted by the Patents themselves. Prior Art Figure 2 of the Patents is reproduced to the right. Not only does Figure 2 show and call out in the specification a "display case 122" which has "rear case 123 and a front case or frame 121," but the specifications and figure identify both parts (elements "121" and "123") as "the display case 122." ('641 Patent, 1:37, JA00018 at Exh. A.) Contrary to LPL's construction, a "display case" includes both the front and rear structures.



[PRIOR ART]
FIG. 2

Further, when discussing Figure 5 in the specification of the Patents, LPL states, "Although not shown in FIG. 5, **a front case such as shown in FIG. 2 is preferably assembled with a display case 21** for covering the edges of the LCD device . . . ." ('641 Patent, 5:1-2, JA00020 at Exh. A (emphasis added).) LPL, now armed with hindsight, has determined it would rather exchange "display case" (which includes the front case

34

and rear case) for "rear housing" and is improperly seeking to rewrite the Patents through this claim construction process.

Tatung's proposed construction, on the other hand, is supported by the intrinsic record. Figure 5, for example, depicts the "case 21" as a top portion of the housing of the portable computer that encloses the display device. The bottom portion of the housing is the body 20 that encloses the information input device (commonly known as the keyboard). ('641 Patent, 4:42-54, JA00019 at Exh. A.) Accordingly, "display case/case" should be construed as "the portions of the housing that enclose the display device."

## L.    LPL's Proposed Construction For "Data Processing Device" Ignores The Intrinsic Record.

### 1.    The Only Disclosure For A "Data Processing Device" Relates To That Of A Computer Or Portable Computer.

Tatung and LPL agree that "data processing device" should be accorded its ordinary and customary meaning. The parties simply disagree as to what that meaning is. LPL contends that a "data processing device" is "an apparatus that performs an operation or combination of operations on any type of data." Tatung proposes that "data processing device" is "the central processing unit of a computer."

Unlike Tatung's proposed construction, LPL's construction completely ignores the context of the claims and the intrinsic evidence. In the claims of the '641 Patent, "data processing device" is preceded by "housing of." (See, e.g., '641 Patent, claims 35, 55, 56 at Exh. A.) As explained in the previous section, LPL defined "housing" to mean the case and body of a portable computer. When viewed in the context of the patents, including the term "housing of," "data processing device" can only be understood as part of a computer or portable computer. LPL mistakenly contends that Tatung is attempting to import a limitation from the specification. Contrary to LPL's contention, Tatung's

35

proposed construction properly takes into account the context of the patents. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). Indeed, the Notice the Allowance demonstrates that the invention at issue relates to portable computers. ('641 File History, JA00403 at Exh. G.)

Whereas LPL relies solely on the dictionary definition of "data processing," Tatung's proposed construction does not conflict with the dictionary definition, but relies on the intrinsic record. Webster's Third New International Dictionary defines "data processing" as "the conversion of raw data to machine-readable form and its subsequent **processing** (as storing, updating, combining, rearranging, or printing out) **by a computer.** " (Exhibit 3 to Tatung's Opening Brief (emphasis added).) The Korean parent applications, which are incorporated by reference into the Patents-in-Suit, further support Tatung's definition. ('973 Application, VS024434 at Tatung Exh. 1; '473 Application, VS024359 at Tatung Exh. 4.) In short, the Korean parent applications describe what was commonly known as the central processing unit of a computer. Tatung's proposed construction for "data processing device" should be adopted because it has support in the intrinsic record.

> 2.    **If A "Data Processing Device" Is Not The Central Processing Unit Of A Computer, Then The Term Does Not Meet The Written Description Requirement.**

35 U.S.C. § 112 provides in relevant part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the

36

same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"To fulfill the written description requirement, the patent specification 'must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998).

Here, the invention relates to mounting a flat panel display device in a portable computer. According to the Patents, "the present invention is directed to a portable computer and method for mounting a flat panel display device thereon that substantially obviates one or more of the problems due to limitations an disadvantages of the related art." ('641 Patent, 2:41-45, JA00018 at Exh. A.) The Patents further state: "The present invention provides a back mounting method and a back mounting structure for a panel display device in a portable computer." ('641 Patent, 4:6-8, JA00019 at Exh. A.) Therefore, "data processing device" must be of a computer or portable computer. The specification does not provide notice to one of ordinary skill in the art that "data processing device" is anything other than the central processing unit of a computer or portable computer. If "data processing device" can be construed as anything else, then the term does not comply with the written description requirement and claims 35, 55 and 56 are invalid.

## M.    "The Flat Display Panel Is Rear Mounted" Fails To Satisfy The Written Description Requirement

LPL cites to piecemeal portions of other claim terms that have been construed and takes various words from those terms to argue that "the flat display panel is rear mounted" "does not need to be construed." Knowing that this claim term does not meet the written description requirement and having absolutely no response to Tatung's

37

position that it does not meet the written description requirement, LPL instead pleads that this Court not construe the terms. The parties agree that the flat display panel is a component within the flat panel display device. The intrinsic record is completely silent regarding rear mounted or rear mounting a flat display panel. Having reviewed the intrinsic record, one of ordinary skill would have no idea how to rear mount a flat display panel. Accordingly, one of ordinary skill in the art could not have recognized that the inventors of the Patents invented anything having to do with a rear mounted flat display panel. Therefore, claim 56, which contains the term "the flat display panel is rear mounted," is invalid for failing to meet the written description requirement.

In any event, the intrinsic records supports Tatung's construction. Tatung's proposed construction for "the flat display panel is rear mounted" is the flat display panel having only rear fastening elements mounted to a housing via those fastening elements." Tatung's construction should be adopted for the reasons discussed above.

N.    **The Remaining Terms Do Not Require Construction And Should Be Accorded Their Common And Ordinary Meaning.**

The remaining claims terms, "capable of," "stepped hole," "peg," and "protruding portion" do not require construction and should be accorded their plain meaning.

### III.    CONCLUSION

For the reasons stated above, Tatung respectfully requests that the Court adopt its proposed constructions of the claim terms in dispute.

Of Counsel:
Frank E. Merideth, Jr.
Mark H. Krietzman
Valerie W. Ho
Steve Hassid
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
310-586-7700

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
*Attorneys for Defendant Tatung Company and
Tatung Company of America*

Dated: May 21, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2007 I caused to be served by electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Richard D. Kirk, Esquire
The Bayard Firm
222 Delaware Avenue #900
Wilmington, DE 19899

Jeffrey B. Bove, Esquire
James Heisman, Esquire
Jaclyn M. Mason, Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

I hereby certify that on May 21, 2007 I caused to be sent the foregoing document by electronic mail to the following non-registered participants:

Gaspare J. Bono, Esquire
Rel S. Ambrozy, Esquire
Lora A. Brzezynski, Esquire
Cass W. Christenson, Esquire
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington D.C. 20006

Tracy R. Roman, Esquire
Raskin Peter Rubin & Simon LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

Scott R. Miller, Esquire
Connolly Bove Lodge & Hutz LLP
355 South Grand Avenue
Suite 3150
Los Angeles, CA 90071

Anne Shea Gaza (#4093)
Gaza@rlf.com

RLF1-2967131-1