IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

Plaintiff,

v.

TATUNG CO.;
TATUNG COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

Defendants.

CIVIL ACTION NO. 04-343-JJF

**REDACTED –
PUBLIC VERSION**

## DEFENDANT VIEWSONIC CORPORATION'S
## RESPONDING CLAIM CONSTRUCTION BRIEF

CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey B. Bove (#998)
James D. Heisman (#2746)
Jaclyn M. Mason (#4737)
The Nemours Building, 8th Floor
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141

*Attorneys for ViewSonic Corporation*

OF COUNSEL:
Connolly Bove Lodge & Hutz LLP
Scott R. Miller
Manuel Nelson
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071
(213) 787-2500

Tracy R. Roman
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 277-0010

Dated: May 16, 2007

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LPL's CONSTRUCTIONs SHOULD BE REJECTED AS UNSUPPORTED OR
INCONSISTENT WITH THE INTRINSIC RECORD....................................................... 3

   A.   LPL's Proposed Construction Of "Rear Mountable" Finds No Support In The
   Intrinsic Record And Contradicts The Teachings Of The Patents................................... 3

   B.   LPL's Constructions Of *"Housing,"* *"Case/Display Case"* And *"Data Processing
   Device"* Ignore The Inventors' Express Definitions And Are Unsupported By The
   Intrinsic Evidence. ...................................................................................................... 11

   C.   LPL's Constructions Of *"First Frame"* And *"Second Frame"* Contradict The
   Intrinsic Evidence. ...................................................................................................... 19

   D.   LPL's Construction Of *"Backlight Unit"* Ignores The Intrinsic Evidence. .......... 21

   E.   LPL's Constructions Of *"Flat Panel Display Device"* And *"LCD Device"* Ignore
   The Intrinsic Evidence And Are Written To Read On Infringement. ........................... 24

   F.   LPL's Construction Of *"Fastening Part"* And *"Fastening Element"* Contradicts
   The Intrinsic Evidence. ................................................................................................ 28

   G.   LPL's Construction Of *"Fastening Hole"* Contradicts The Intrinsic Evidence and
   the Teachings of the Patents. ....................................................................................... 30

   H.   LPL's Construction Of *"First Frame Having A Fastening Part"* And *"First
   Frame Having A Fastening Element"* Is Not Supported By The Intrinsic Evidence. .. 34

   I.    Construction Of *"Capable of Being Mounted"* And *"Capable of Being Fixed"* Is
   Not Needed. ................................................................................................................. 35

   J.    Construction Of *"Peg,"* *"Protruding Portion,"* And *"Stepped Hole."* ................. 36

   K.   LPL's Proposed Construction Of *"Corners of the First Frame"* Is Contrary To
   The Teachings Of The Patent And The Intrinsic Record. ............................................ 36

   L.   LPL's Construction Of *"Flat Display Panel Is Rear Mounted"* Is Another Attempt
   To Improperly Rewrite The Claim. ............................................................................. 37

III.  CONCLUSION................................................................................................. 40

i

TABLE OF AUTHORITIES

**Cases**

*Affymetrix, Inc. v. Illumina, Inc.,*
   446 F.Supp.2d 277 (D. Del. 2006) ................................................................................. 6

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
   388 F.3d 858 (Fed. Cir. 2004) ............................................................................. 15, 35

*CUI/Beta Ventures, Inc. v. Tura LP,*
   112 F.3d 1146 (Fed. Cir. 1999) ............................................................................. 6, 7

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
   438 F.3d 1374 (Fed. Cir. 2006) ......................................................................... 30, 36

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,*
   350 F.3d 1327 (Fed. Cir. 2003) ................................................................................ 30

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 234 F.3d 558 (Fed. Cir. 2000),
   rev'd by 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) ................................ 15

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.,*
   93 F.3d 766 (Fed. Cir. 1996) ................................................................................... 25

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
   452 F.3d 1312 (Fed. Cir. 2006) ...................................................................... 15, 18, 23

*Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
   802 F.2d 1367 (Fed. Cir. 1986) ................................................................................ 21

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
   381 F.3d 1111, 1117 (Fed. Cir. 2004) ................................................................. 14, 22

*Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.,*
   450 F.3d 1350 (Fed. Cir. 2006) ......................................................................... 23, 28

*LG.Philips LCD Co. Ltd. v. Tatung Co.,*
   434 F. Supp. 2d 292 (D. Del. 2006) .................................................................. passim

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004) .................................................................................. 11

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004) ................................................................................ 15

*Modine Mfg. Co. v. United States Int'l Trade Comm'n,*
   75 F.3d 1545 (Fed. Cir. 1996) .................................................................................. 15

*Nystrom v. TREX Co., Inc.,*
   424 F.3d 1136 (Fed. Cir. 2005) ......................................................................... 21, 31

*Optical Disc Corp. v. Del Mar Avionics,*
    208 F.3d 1324 (Fed. Cir. 2000) .......................................................................... 19, 25

*Pause Tech., LLC v. Tivo, Inc.,*
    419 F.3d 1326 (Fed. Cir. 2005) .......................................................................... 23

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... passim

*Pickholtz v. Rainbow Tech., Inc.,*
    284 F.3d 1365 (Fed. Cir. 2002) .......................................................................... 18

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.,*
    422 F.Supp.2d 446 (D. Del. 2006) ...................................................................... 7, 17

*Process Control v. HydReclaim Corp.,*
    190 F.3d 1350 (Fed. Cir. 1999) .......................................................................... 39

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001) .......................................................................... 28, 33

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) .......................................................................... 14

*Southwall Techs. Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) ............................................................................ 4

*Spectrum Int'l Inc. v. Sterilite Corp.,*
    164 F.3d 1372 (Fed. Cir. 1998) .......................................................................... 31

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) .......................................................................... 16

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,*
    308 F.3d 1167 (Fed. Cir. 2002) .......................................................................... 11

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................ 16, 23

*Watts v. XL Sys., Inc.,*
    232 F.3d 877 (Fed. Cir. 2000) ............................................................................ 9, 20

**Statutes**

35 U.S.C. § 112 ...................................................................................................... 38

## I.    INTRODUCTION

According to Plaintiff ("LPL"), the crux of its invention is that the fastening elements used to rear mount the flat panel display device must be located "on or inside the border of the flat display panel." [1]  This feature is so important that LPL says it is the only way to achieve the Patents' object of eliminating unnecessary side space.  This limitation is so essential that LPL (i) repeats it 46 times between its opening and supplemental briefs, underlining it many times for emphasis; and (ii) incorporates it into not one, but five of its proposed constructions.  One cannot help but notice that LPL goes to extraordinary lengths to ensure that this Court knows the importance of this language to the invention.

The two patents-in-suit ("Patents"), however, which were written and prosecuted by the same law firm as the brief, never once mention those words or even implicitly disclose this critical requirement.  This language is not found in the claims.  It is not found in the specification.  It was not used in response to any office actions rejecting the claims – not even when the inventors had to distinguish their invention from the prior art.  It does not appear anywhere in the certified English translations prepared by LPL of the Korean parent applications from which the Patents claim priority or the original invention disclosures handwritten by the inventors themselves.  Likewise, this critical limitation was not advanced by LPL in its failed attempt to obtain a preliminary injunction in this case.  Nor did it appear in LPL's interpretation of these same claims when LPL identified the supposedly infringing structure of a Fujitsu-Siemens monitor in 2003.  Clearly, this "Johnny come lately" limitation is not the creation of the inventors of the Patents.

Indeed, this allegedly key feature of the invention appeared for the *first time* after defendants had disclosed to LPL prior art references in conjunction with the UK litigation which were used by the UK Patent Court to invalidate the corresponding UK patent.[2]  Only then did

---

[1]  The parties have stipulated that the flat display panel is the internal component of the flat panel display device on which an image is depicted.

[2]  This Court is the second to consider LPL's request to rewrite the specification of patents held by LPL to include this limitation.  LPL's first attempt was in connection with UK Patent No. 2346464.  The specifications of the UK Patent and the U.S. Patents were substantively identical when first filed.  Exhibit

LPL begin its campaign to rewrite its rear mounting patents. The Patents do not teach – and the claims do not require – that the fastening element be behind the flat display panel. Rather, the Patents do teach – and the claims do require – that the fastening elements be anywhere on the rear surface of the flat panel display device and, further, that that flat panel display device has no front or side mounting fastening elements (*i.e.,* no fastening element that extends through, from or protrudes beyond any of the four side edges of the device).

The problems with LPL's proposed constructions do not end with its attempt to insert this unfounded limitation into five different terms. Viewed as a whole, LPL's proposed claim constructions are internally inconsistent, ignore the intrinsic record, and rely on arguments contrary to binding legal precedent. LPL's arguments also rely on unfaithful reproductions of drawings and misleading statements seeking to obscure the truth – that its proposed constructions are legal fiction, not the teachings of the Patents.

Likewise, LPL's arguments seeking to discredit the defendants' constructions expose LPL's overreaching positions. For example, while LPL persists that the fastening elements must be "on or inside the border of the flat display panel" as the only way to eliminate side space as required by the invention, it simultaneously insists that one need not reduce side space one iota to practice the invention. Specifically, LPL opposes ViewSonic's construction of rear mountable arguing that a proper claim construction must cover the mere addition of one fastening element to the back of a conventional "front mountable" flat panel display device which has the side-space consuming flanges illustrated in Figs. 2 and 3.[3] LPL is silent, of course, about how adding a single fastening element on the back of a flat panel display device "on or inside the border of the flat display panel" to a conventional front mounted flat panel display device will in any way

---

8 to the Declaration of James D. Heisman in Support of Responding Brief ("Heisman Resp. Decl.") LPL later amended the U.S. specification to, *inter alia,* specifically define "housing" as the case or enclosure of a portable computer in response to the requirement of the USPTO Examiner. In September, 2005, the Patent Court in London rejected LPL's attempt to amend the patent to say "behind the flat display panel" and found the patent to be invalid over the prior art. This decision was affirmed by the UK Court of Appeal in December, 2006. See Heisman Resp. Decl., Exs. 9 and 10.

[3] LPL Opening Brief at 15 (hereafter "LPL Op. Br. at ___").

meet the defining requirement of eliminating unnecessary side space. Obviously, if a fastening element is merely added to the prior art structure, no side space will be conserved. The claims of the Patents must be construed in a consistent manner across both Patents in accordance with the intrinsic record. The constructions of ViewSonic draw from and are consistent with the intrinsic record, and should be adopted by the Court.

## II.    LPL'S CONSTRUCTIONS SHOULD BE REJECTED AS UNSUPPORTED OR INCONSISTENT WITH THE INTRINSIC RECORD

### A.    LPL's Proposed Construction Of "Rear Mountable" Finds No Support In The Intrinsic Record And Contradicts The Teachings Of The Patents.

It is uncontroverted that the "rear mountable" limitation was inserted by LPL to differentiate the supposed invention from the prior art, which invention eliminates the side space used by the prior art mounting techniques of "front mounting" and "side mounting." Yet, LPL's proposed construction – "capable of being substantially supported with the rear housing via a fastening part(s) located on the rear surface of the first frame and positioned on or inside the border of the flat display panel" – improperly limits the position of the fastening part on the back of the device and improperly expands the claims to cover a prior art flat panel display device having "front mounting" flanges or "side mounting" fasteners and on which a single fastening part is added to the back of the device. While today the parties' positions diverge as to the meaning of rear mountable, an examination of the intrinsic record, as well as compelling confirmatory extrinsic evidence, shows that it was not always so. LPL's attempt to improperly expand the scope of the Patents through its proposed claim constructions should be rejected.

LPL's arguments in favor of its construction brings to mind the old adage "when neither the law nor the facts support your position, pound the table." Over and over again, LPL insists that rear mountable includes the limitation that the fastening element is "on or within the border of the flat display panel." Surely the inventors would have taken the time and opportunity to explain this critical component of their invention had they conceived of it at the time the Patents were filed. Instead, the Patents are deafeningly silent on this point. So too are the Korean patent applications, on which the Patents claim priority, and the inventors' invention disclosure

statements, which are the sole record of the conception of the underlying inventions.[4] LPL's continual emphasis on, and regurgitation of, this phrase throughout its briefs cannot supplant what is missing from the intrinsic record. *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for purposes of litigation that would alter the indisputable public record consisting of the claims, the specification, and the prosecution history, and treat the claims as a 'nose of wax.'"). The intrinsic record provides no support for LPL's proposed construction of rear mountable, unless the Court imports the limitations of one of the disclosed embodiments to the exclusion of other embodiments. As this Court has made clear, doing so is not proper for claim construction. *See LG.Philips LCD Co., Ltd. v. Tatung Co.*, 434 F.Supp.2d 292, 298 (D. Del. 2006).[5]

Other than its repeated underlining of the proposed limitation of "on or inside the border of the flat display panel," LPL argues that intrinsic support for this limitation can be found in two locations – Figs. 10 and 4C. It simply is not so. Fig. 10 shows one of the several disclosed embodiments. In what appears to be a cut-away view of a flat panel display device installed into a portable computer, the fastening parts look to be behind the viewing area of the flat panel display device. From this LPL concludes it must be "on or inside the border of the flat display panel." This is, however, only one embodiment, and therefore cannot limit the claims. *Id.* Moreover, Fig. 10 does not show the details LPL contends in its altered reproduction. As discussed more fully by the Tatung defendants, LPL has been unfaithful in its reproduction of Fig. 10, including inaccurately locating the disclosed components.[6] This manipulated version of Fig. 10 should be completely disregarded.

---

[4] LPL prepared and submitted certified translations of the Korean priority applications to the UK patent office and the Patent Court and likewise had prepared and submitted to the UK court certified translations of the invention disclosure statements. Heisman Resp. Decl., Exs. 11-17; Ex. 18 (Cho) at 214:7-215:6; 74:5-75:12; 71:12-72:21; 94:1-94:22; 97:2-9; 176:22-179:9; 20:23-21:7; 29:3-13; 119:6-21; Ex. 19 (Kim) at 160:17-161:12; 258:6-17; 856:10-863:7; 435:20-440:15; 654:22-657:18.. Language supporting the now proposed limitation is found nowhere in the Patents or these documents.

[5] Notably, LPL freely and falsely criticizes ViewSonic for this practice, but blithely demands the Court engage in this very practice when it suits its position.

[6] Compare JA at Ex. A, '641 Pat., Fig. 10, with LPL Op. Br., p. 4.

Rather than admit the obvious, LPL brazenly asserts that the fastening elements in Fig. 4C "correspond to" the fastening elements shown in the actual Fig. 10. As mentioned above, however, the Patents clearly and unequivocally state that Figs. 4C and 10 relate to <u>different embodiments</u>. A casual observer can tell that the fasteners in each figure are not at corresponding locations.[7] In an effort to further confuse the disclosure of Fig. 4C, LPL then directs the Court to the dashed line therein, arguing that this line confirms that the fastening elements (15) shown in Fig. 4C are on or inside the border of the flat display panel (12). Once again, this is legal fiction rather than the teaching of the Patents.

In every case where the Patents use a line to communicate the position or alignment of components, it depicts that line in a "center-line" format of a series of long and short dashes.[8] The line referred to by LPL, however, does not follow this format. Instead, it is a series of equal-length dashed lines. This simply indicates that the displayed components are assembled together as a single device – just as the Patents state – not that the fastening elements (15) are on or inside the border of the flat display panel (12), which the Patents never say.

The fallacy of LPL's position with regard to Fig. 4C is further illustrated by Exhibit 6 hereto in which similar dashed lines with arrows have been added by ViewSonic from two corners of the first frame 14g to the corresponding corners of the second frame 16.[9] Clearly, the corners of components 12 and 14a-f do not align with the corners of components 14g and 16. As is illustrated in VS Ex. 6, the second frame (16) and the first frame (14g) are larger than the other components of the flat panel display device (10), and the fastening parts 15 are not on or inside the border of the flat display panel 12.

What Fig. 4C also shows is that the location of the fastening elements is located on the back of the flat panel display <u>device</u>, independent of the border of the flat display <u>panel</u>. Indeed, nowhere do the Patents disclose the location of the "border" of the flat display panel. Instead,

---

[7] JA at Ex. A, '641 Pat., Figs. 4C and 10.

[8] JA at Ex. A, '641 Pat., Figs. 2-3, 5, 8-9, 12-14.

[9] Heisman Resp. Decl., Ex. 6.

what Fig. 4C shows it, when assembled into a device, there is a space or gap between the border of the flat display panel (12) and the inner surface of the side of the second frame (16). As discussed at pp. 33-34, *infra*, it is this gap which enables a fastening element (such as a screw) to couple the first and second frames together and to be seen from the viewing side of the flat panel display device as envisioned by Claims 31, 37 and 42 of the '641 patent. Clearly, the fastening element can be on the rear surface of the flat panel display device and also be outside the border of the flat display panel.

The presence of this gap, and the uncertainty it creates as to the location of the border of the flat display panel, is confirmed by compelling extrinsic evidence such as

Redacted                    [11] All of this evidence further compels the conclusion that LPL's construction, which limits the fastening elements to a location "on or inside the border of the flat display panel," is not taught by the Patents and was not what the inventors actually invented. As this Court has noted, "A claim term can be given its correct construction only within the context of 'what the inventors actually invented and intended to envelop with the claim.'" *Affymetrix, Inc. v. Illumina, Inc.*, 446 F.Supp.2d 277, 281 (D. Del. 2006), quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) . *See also CUI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1999) (noting need to

---

[10] Heisman Resp. Decl., Ex. 19 at 680:10-683:9, Ex. 18 at 179:10-181:14; 215:7-218:15. LPL's expert Redacted                          . Heisman Resp. Decl., Ex. 25 at 38:13-29:13; 82:17-83:13; 102:24-103:5.

[11] *See* Heisman Decl., Ex. 4; Heisman Resp. Decl., Ex. 19 at 774:15-782:14; 786:8-790:24; Ex. 22.

construe claims consistent with the purpose of the invention). LPL's lawyer-conceived limitation should be rejected by this Court.[12]

The remainder of LPL's proposed rear mountable construction is similarly flawed. Rather than remain faithful to the intrinsic record, LPL's construction also seeks to improperly extend the claim to cover a configuration where one or more fasteners are <u>added</u> to the back of the flat panel display device <u>in addition to</u> the prior art front mount or side mount fastening elements. LPL's construction effectively eliminates the invention because merely adding a fastening element to the back of a flat panel display device that has the prior art side-protruding flanges does nothing to achieve the reduction or elimination of unnecessary side space. As such, it cannot be a proper construction. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 422 F.Supp.2d 446, 454 (D. Del. 2006); *CUI/Beta Ventures*, 112 F.3d at 1160. In *Power Integrations*, this Court construed the claim term "frequency jittering" to include the object of the invention, "varying the switching frequency of a switch mode power supply about a target frequency *in order to reduce electromagnetic interference*." *Id.* Rejecting the other construction as overly broad, the Court noted that "the express purpose of the invention, to reduce EMI noise, cannot be achieved if the jittering is not controlled and predetermined." *Id.* at 455. The Court further explained that the advantages of the claimed invention in reducing EMI over the prior art was due to the "fixed and controlled manner" of the jittering. *Id.* Thus, the Court construed the term in accordance with the intended purpose of the invention. A similar result is compelled here.

First, LPL admits throughout its brief that neither the invention nor the claims of the Patents can properly be construed in a manner which permits the claims to cover a prior art front mounted or side mounted flat panel display device.[13] Second, LPL admits the express purpose of

---

[12] LPL seeks to include its "on or inside the border . . ." limitation as part of the terms "rear mountable", "rear mounted", "corners of the first frame", "first frame having a fastening element," and the flat display panel is rear mounted. It is unsupported in each of these contexts for the reasons discussed here.
[13] For example, at page 4 of its opening brief, LPL argues "thus, the problem with the prior art mounting technology is the necessity of using flanges or through holes, <u>positioned outside the border of the flat display panel</u>, because such positioning results in the creation of unnecessary side space. Thus, one novel

the invention is to eliminate unnecessary side space and that the purpose is essential to the meaning of "rear mountable." Third, the Patents explain that this purpose cannot be achieved if any type of side-protruding flanges or fasteners are used. Finally, the specification explains the advantage of rear mounting over the prior art is due to the elimination of the Space "D" taken by side-protruding fasteners.[14] This evidence alone is enough under *Power Integrations* to adopt ViewSonic's construction. But the intrinsic evidence does not end there.

The express disclosure of the Korean patents on which the Patents claim priority, as well as the positions and arguments advanced by LPL during prosecution of the Patents, further support ViewSonic's construction over LPL's. As is expressly shown in Fig. 3 of the priority Korean application no. 44475, the present invention eliminates the side space "t" associated with side mounting a flat panel display device to a housing.[15] Similarly, on January 9, 2001, counsel for LPL had a first of two personal interviews with the Examiner concerning the Patents. The Examiner later confirmed what LPL specifically told the Examiner during that interview:

> "one of the key inventions of this application is to have the display device 10 fastened to the display case 21 be a fastening means at the rear surface of the display device and a fastening means on the display case as indicated in Fig. 5."[16]

Thereafter, LPL differentiated the supposed invention from the prior art. In so doing, LPL advised the Examiner:

> "[Abell] does not have a fastening element **on a rear surface of the display device** for fastening to a housing case. Abell is directed to a computer with a front mounting technique . . . **Therefore, Abell cannot provide the advantages of the claimed invention.**"

\*\*\*\*\*\*

---

aspect of the inventions claimed in the Patents-in-Suit results from positioning the fastening parts on the rear of the flat panel display device – thus allowing the flat panel display device to be 'rear mountable.' This rear-mounting capability significantly increases the viewing area relative to the total monitor area by eliminating the 'unnecessary side space' caused by the prior art flanges." Additional examples are quoted in Heisman Resp. Decl., Ex. 7.

[14] *See, e.g.*, JA at Ex. A, Col. 1:54-64; Co. 2:13-24; Col. 2:29-51; Col. 2:59-Col. 3:20; Col. 4:6-55.

[15] Heisman Resp. Decl., Exs. 11, 13, and 14.

[16] JA at Ex. G, VS5005536.

> "In contrast to Claims 35, 47 and 55, Yun is directed toward a **side mounted** flat panel display device with fastening elements on the side surfaces of the frame (see elements 410a and 410b of Fig. 6 of Yun). Yun does not disclose any fastening elements on a **rear surface of the frame** as disclosed in claims 35, 47 and 55.[17]

The understanding LPL conveyed to the Examiner is clear: no fasteners are allowed other than fastening parts on the rear or back of the flat panel display device. The Examiner confirmed that this was his understanding during the prosecution of the Patents and why he allowed the claims to issue. In the summary of the second personal interview on February 26, 2002, the Examiner indicated:

> "independent cflaims [*sic*] are to be amended with limitation 'back mounted display' or the equivalent and pending further approval."[18]

This amendment was necessary because the claim language "a fastening element at a rear surface of the first frame" was insufficient to distinguish the prior art. Instead, the claims had to disavow front and side mounting – which "rear mountable" does. In the Notice of Allowance dated April 5, 2002, the Examiner stated

> "the best prior art of record . . . taken alone or in combination fails to teach or suggest a portable computer comprising a rear mountable display device having a fastening element at a rear surface of the rear mountable display device attached to a case through the fastening elements as claimed . . ."[19]

Clearly, the Examiner understood that the fastening elements for mounting the flat panel display device in a portable computer would be located only on the back of the flat panel display device and relied on that understanding to allow the claims. Compare *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882-3 (Fed. Cir. 2000) (including limitation where used in prosecution to distinguish over prior art).

Lest there be any doubt in his position, the same Examiner reiterated his understanding clearly and unequivocally during the prosecution of two continuation applications of the Patents. On November 15, 2002, LPL submitted continuation applications for consideration by the same

---

[17] JA at Ex. G, VS5005511, VS50013. Emphasis in original and added.
[18] JA at Ex. G, '641 File History, VS5005608-VS5005610, at VS5005609.
[19] JA at Ex. G, '641 File History, at VS 5005645.

Examiner who had examined the Patents. Those applications contained a single claim, identical to Claim 1 of the '641 patent and Claim 1 of the '718 patent, with the exception that the limitation "rear mountable" was not included. The Examiner rejected each of those claims over the same prior art relied upon in the prosecution of the Patents[20] The Examiner concluded that the applicant-admitted prior art (*e.g.,* Fig. 2) shows a fastening element at a rear surface of the first frame (element 136a) just as recited in the claim without the "rear mountable" limitation. Thus, all the intrinsic evidence shows the addition of the limitation "rear mountable" means that the fastening element at a rear surface of the first frame must be on the back of the flat panel display device and that the flat panel display device cannot have front mounting or side mounting fastening parts.

LPL's contention to the contrary is also belied by the fact that both of the inventors in the Patents are also identified as inventors of USPN 6,411,501 (the "'501 patent").[21] The '501 patent is directed to using the combination of back and side mounting a flat panel display device. Had the Patents covered both back and side mounting, LPL should have disclosed to the Examiner during the prosecution of the '501 patent that it had another patent pending which would cover the same subject matter, such that a double patenting terminal disclaimer would need to be filed.

Simply put, the intrinsic evidence expressly confirms what the Patents themselves disclose –that a rear mountable flat panel display device can only have fastening parts on the back of the device (*i.e.,* cannot have front or side mounting fastening components), because devices with those fasteners "cannot provide the advantages of the present invention." Thus, ViewSonic's proposed construction which requires the <u>substitution</u> of fastening elements on the back of the flat panel display device for the prior art front or side mounting fastening elements is the correct interpretation. Only defendants' constructions are directed to a structure that will

---

[20] JA at Ex. J, at VS5000260, and Ex. L at VS5000118. *See also* Ex. G, VS5005644-VS5005648, at VS5005645.

[21] Heisman Resp. Decl., Ex. 23.

result in the elimination of unnecessary side space and a maximization of the viewing area relative to the overall size of the flat panel display device as required by the Patents.

**B.    LPL's Constructions Of "*Housing*," "*Case/Display Case*" And "*Data Processing Device*" Ignore The Inventors' Express Definitions And Are Unsupported By The Intrinsic Evidence.**

- LPL's construction of "*Housing*" ignores the inventors' express definition given the term by amendment, ignores the entirety of the intrinsic evidence, and improperly relies exclusively on extrinsic evidence.

LPL proposes that "housing" should be given its ordinary meaning of "an outer casing or enclosure" because, it states, "all of the intrinsic evidence is consistent with this ordinary meaning."[22] Yet, LPL fails to point to one single bit of intrinsic evidence to support this statement. Instead, LPL relies solely, and improperly, on the dictionary. LPL's assertion is surprising since the inventors expressly defined housing as something other than this ordinary meaning in the specification – not once, but twice. Specifically, the inventors expressly and unambiguously defined "housing" as "the case and body of a portable computer".[23] Thus, under the rules of claim construction, the term must be given this definition. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (noting that when the patentee expressly defines a claim term, "the inventor's lexicography governs."); *see also Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1177-78 (Fed. Cir. 2002); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-09 (Fed. Cir. 2004) (holding patentee who notifies public that claim term is limited beyond its ordinary meaning is bound by that notification even if it was unintended).

This express definition carries even more weight because it was added by amendment to overcome the Examiner's rejection of certain claims as lacking in an antecedent basis for certain terms, including housing, in the specification. The Examiner required the inventors to amend the specification to include a definition of these deficient terms, and they added this definition for

---

[22] LPL Op. Br., p. 18.
[23] JA at Ex. A, '641 Pat., Col. 4:44-50; Col. 6:6-9; JA at Ex. G, '641 File History, at VS5005544, VS5005547.

"housing" in response.[24]  This begs the question why, when given the opportunity to clearly explain what "housing" meant, did the inventors choose to define it as something other than the supposedly well-known ordinary meaning?  Ignoring this question, LPL argues that when a recited term is well-known in the art, there is no need to explicitly define the term in the intrinsic record.[25]  Perhaps LPL might have argued this to the Examiner, but it did not.  Rather, the inventors _did_ explicitly define the term differently in the intrinsic record, and LPL cannot retreat from that definition now.

LPL attempts to counter the express definition by arguing that the Patents are not restricted to portable computers as that is merely a preferred embodiment.  LPL thus contends that the Patents also apply to other products such as desktop monitors.  As its sole support for this position, LPL points to a single statement in the specification that says "the LCD is widely used in portable computers and flat screen monitors."[26]  Pulled out of context, as LPL has done, one might mistakenly conclude this supports LPL's argument.  But read in its full context – and against the entirety of the Patents – it is easy to see that this statement is not at all what LPL tries to make of it.

1.    Field of the Invention

The present invention relates generally to a flat panel display device, and more specifically, to a flat panel display device mounting structure and a method of mounting the flat panel display device to a _computer_.

2.    Description of the Related Art

Flat Panel display devices include liquid crystal display devices (LCD) which are being used widely, plasma display panels (PDP), and field emission displays (FED) which have been studied recently and _may be applied to computers_ in the near future. _For convenience of explanation, the present invention will be discussed with respect to the LCD as an example of the flat screen type display devices and a portable computer mounted with the LCD._

---

[24]  JA at Ex. G, '641 File History, at VS5005534.
[25]  LPL Op. Br., p. 19.
[26]  LPL Op. Br., p. 20.

> Referring to FIG. 1, *a general portable computer such as a laptop or notebook computer typically includes* a body, a flat panel display device assembly coupled to the body via a hinge mechanism. The flat panel type display device assembly has a flat panel display device and a display case supporting the flat panel display device. The body has an input device such as a keyboard. *As a flat panel type display device, the LCD is widely used in portable computers and flat screen monitors.*[27]

This part of the specification discusses a conventional portable computer having an LCD device mounted in it. Against that context of describing the prior art "general portable computers," the Patents mention that LCD devices are widely used in portable computers and flat screen monitors. Glaringly absent from this statement – and the entirety of the Patents – is any statement that the invention is intended to apply to flat screen monitors as LPL asserts. For example, while the above language is careful to point out that "the present invention will be discussed with respect to the LCD device as an example of the flat screen type display devices," it does not continue to say, "and with respect to the portable computer as an example of the device to which an LCD is mounted." Such additional language might have provided at least some connection between the reference to monitors and the present invention. Instead, the Patents make clear that the present invention is a structure and method for mounting flat panel display devices *solely* in portable computers.[28] The statement which follows the description of the embodiments is further illustrative:

> "In the above embodiments of the present invention, although the LCD device has been used as one type of flat panel display device, other flat panel display devices such as plasma display panels (PDP) and field emission displays (FED) may be used in accordance with the present invention. Moreover, in the above embodiments, other hinge mechanisms may be used such as a gear hinge as disclosed, for example, in US application Ser. No. 08/937,801 filed on Sep. 25, 1997 entitled, "DISPLAY WITH GEAR TYPE HINGE," which is incorporated herein by reference.
>
> It will be apparent to those skilled in the art that various modifications and variation can be made *in the portable computer* and method for mounting a flat panel display device *thereon of the present invention* without departing from the spirit or scope of the invention."

---

[27] JA at Ex. A, '641 Pat., Col. 1:16-34. (Emphasis added.)
[28] *See* Ex. 1 to Opening Brief.

The only alternatives the inventor expressed for its invention were the type of flat panel display device and type of hinge mechanism. No alternatives were given to using a portable computer. The last statement in particular leaves no doubt that a person skilled in the art would conclude that the invention has only one use – mounting a flat panel display device to a portable computer. *Compare SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) (holding that statement indicating a specific structure was the "basic sleeve structure for all embodiments of the present invention contemplated and disclosed herein" limited scope of claims to that basic sleeve structure).

LPL's reliance on *Innova/Pure* to argue otherwise is misplaced. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). In *Innova*, the court rejected the defendant's attempt to limit the claim term "operatively connected" to requiring a tenacious fixed connection. *Id.* at 1120. The defendant argued that all the embodiments and the specification showed only a tenacious fixed connection. *Id.* at 1120-1121. But the court disagreed. It found the specification read as a whole reflected a broader meaning, and that it disclosed the connection could be "mechanical" which the court read as broad enough to cover non-fixed connections. *Id.* at 1121. Finally, the court found no language similar to that in *SciMed* indicating the patentee intended to restrict the scope of the invention. *Id.* As shown above, the instant case is highly distinguishable from the circumstances in *Innova*.

Here, the inventors expressly defined "housing" as the case and body of a portable computer. The only meaning that can be gleaned from the specification is that "housing" is limited to a portable computer. The Patents do not disclose anything other than a portable computer when discussing the invention. And the traditional catch-all paragraph immediately preceding the claims limits the invention to a portable computer. In sum, when "housing" appears in a claim, the claim is limited to a flat panel display device for mounting to the "case and body of a portable computer."

LPL's argument that ViewSonic's definition restricts "housing" to a preferred embodiment is equally unavailing, and should be rejected just as the Federal Circuit rejected the

similar argument in *Honeywell*. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). The inventors here did not characterize a housing of a portable computer as merely a preferred version of all possible embodiments, but as *the only* embodiment. All nine embodiments and related descriptions depict the housing exclusively as the case and body of a portable computer. *See also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865-69 (Fed. Cir. 2004); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004). The Patents refer to the invention as a portable computer more than a dozen times. (VS Ex. 1.) *See Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996), abrogated on other grounds by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000), rev'd by 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.") Claims 1-34 claim a "housing" that has both a first section and a second section, which the specification identifies as, respectively, the body and case of a portable computer.[29] The asserted claims 35, 55, and 56 each require the rear mountable flat panel display device be mountable to the housing of a data processing device, which, in light of the express definition of housing, can only be a portable computer. And in the Notice of Allowance, the Examiner too set forth his express understanding that the invention was limited to a portable computer.[30] This is stronger evidence than was present in *Honeywell v. ITT, supra*, where the Federal Circuit restricted the claim term "fuel injection system component" to a "fuel filter" including no other component in light of the specification and embodiments.

In that case, Honeywell argued that the district court improperly imported a limitation from a preferred embodiment into the claims. *Id*. at 1317. Like LPL's argument with "monitors" here, Honeywell pointed to a statement referring to "the metallic components used in prior art systems" to argue the term "component" was broader. *Id*. Unlike here, the Title and

---

[29] JA at Ex. A, '641 Pat., Claims 1-34, Col. 4:48-49; *id.* Col. 6:6-8.
[30] JA at Ex. G, '641 File History, at VS5005645.

Abstract of the patent there also supported Honeywell's argument because they summarized the invention using the term "component." *Id.* The Federal Circuit affirmed the district court's limited construction finding that the "written description uses language that leads us to the conclusion that a fuel filter is the only "fuel injection system component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment." *Id.* at 1318. The evidence the Federal Circuit found so compelling included: (i) on four occasions the patent referred to the fuel filter as "this invention" or "the present invention"; (ii) the fuel filter was the only component the specification disclosed as having the requisite features; and (iii) the detailed discussion the prior art problem addressed by the invention related to leakage caused by non-metal fuel filters. *Id.* at 1318.

Disregarding the overwhelming intrinsic evidence, LPL relies exclusively on extrinsic evidence – the McGraw Hill Dictionary of Engineering – to support its own construction. As the Federal Circuit made clear in *Phillips*, extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. The intrinsic record clearly defines "housing," so there is no need to consult a dictionary. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Obviously the Examiner believed the inventors' amendment had described housing with "reasonable clarity, deliberateness, and precision." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325-26 (Fed. Cir. 2002). Otherwise, the claims would not have been allowed. The Court should reject LPL's construction because it has no support in the intrinsic record and plainly ignores the express definition the inventors chose to give this term.

- LPL's construction of *"Case or Display Case"* improperly imports a limitation from the preferred embodiments and ignores the intrinsic evidence.

As the sole support for its proposed construction, LPL argues that "all of the figures" show the display case as positioned at the rear of the flat panel display device.[31] Interestingly, as

---

[31] LPL Op. Br., p.30.

discussed in the above section, whenever ViewSonic cites the figures as support for its constructions, LPL argues that ViewSonic is improperly trying to import a limitation from a preferred embodiment into the claims. The difference between the parties' use of the figures, however, is that ViewSonic's reliance on the figures is consistent with the text of the specification, while LPL's is not.

In looking at the figures, LPL disregards the specification's express statement that the "case" is comprised of _both_ a front case 121 and a rear case 123.[32] Yet none of the claims specify the rear case as opposed to the front case – even though the inventors clearly knew the difference. Nor does the specification disclose or claim a new portable computer where the display case only has a rear portion and no front portion that covers the front of the flat panel display device. In light of the text of the claims and the specification, it would be improper to limit "case" to just the "rear case" as LPL proposes. LPL's construction should be rejected.

- LPL's construction of "_Data Processing Device_" again ignores the intrinsic evidence.

LPL construes this term to mean "an apparatus that performs an operation or combination of operations on any type of data." Neither this definition – nor, for that matter the term "data processing device" – appear anywhere in the Patents. Instead, LPL once again pulls it from unreliable extrinsic evidence – the dictionary.[33] Extrinsic evidence is not the proper starting point, and is "less reliable and less useful in claim construction than the patent and its prosecution history." *Power Integrations*, 422 F.Supp.2d at 449; *Phillips*, 415 F.3d at 1319. The proper starting point is the intrinsic evidence. Just as the intrinsic evidence compels the conclusion that the housing is a component of a portable computer, so too does the evidence compel the conclusion that the element "data processing device" is a portable computer including the central processing unit there.

---

[32] JA at Ex. A, '641 Pat., Col. 1-37-39.
[33] — - - - .   . .   ···   LPL's expert. Heisman Resp. Decl., Ex. 25 at 90:20-91:19.

Redacted

The detailed arguments presented with regard to "housing" are equally applicable here, and therefore will not be repeated in full. Briefly, though, the claims recite "capable of being fixed to a housing of the data processing device." Because the inventors defined "housing" as the "case and body of a portable computer," the data processing device can only be construed as a portable computer for the claims to make sense.

The specification teaches nothing to the contrary. It does not contain the words "data processing device." The only such device disclosed in the context of the invention is a portable computer. The simple fact is that the inventors had ample opportunity to identify some device other than a portable computer as a data processing device, but they chose not to. Instead, the Patents use the terms "data processing device" and "portable computer" as synonyms, neither explaining their relationship nor indicating any difference in meaning. *See, e.g., Pickholtz v. Rainbow Tech., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002) (construing claim term "computer" as synonymous to "computer system" from written description, even though court normally would give meaning to the word "system," because patent used the terms interchangeably). As the Federal Circuit found in *Honeywell*, the written description leads one to the conclusion that a portable computer is the only "data processing device" that the claims cover, and that a portable computer was not merely a discussed as a preferred embodiment. *Honeywell*, 452 F.3d at 1318-1319.[34]

This is precisely what the Examiner understood the invention to be. In the Notice of Allowance, he characterized the allowed claims – including all of the Asserted Claims – as directed to a portable computer:

> "The best prior art of record . . . fails to teach or suggest *a portable computer* comprising a rear mountable display device . . . as claimed in Claims 1, 30, 35, 47, 55, and 56."[35]

LPL offers no intrinsic evidence to rebut this strong confirmatory evidence that both LPL and the Examiner understood that the Patents were limited to a portable computer, not a desktop monitor

---

[34]    Redacted    LPL's expert. Heisman Resp. Decl., Ex. 25 at 92:15-93:9.
[35]  JA at Ex. G, '641 File History at VS5005645.

or television set as LPL argues today. Thus, the Court should construe "data processing device" as being a "portable computer."

**C.    LPL's Constructions Of *"First Frame"* And *"Second Frame"* Contradict The Intrinsic Evidence.**

Despite the clarity of the Patents, LPL seeks to blur, confuse or ignore the teachings of the Patents regarding the terms "first frame" and "second frame." LPL proposes these terms mean "a structure enclosed by the housing for firmly supporting the flat display panel" and "a structure disposed in relation to the first frame such that the flat display panel is between the first frame and the structure," respectively. Under its construction, nearly anything can be considered a first frame and second frame, even structures that the Patents clearly teach are not those elements. LPL does this in an improper attempt to expand the Patents to match its infringement contentions rather than trying to accurately capture the scope of what was actually invented.[36] This is not a proper practice for claim construction. *See Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1333 (Fed. Cir. 2000) (holding "the claim scope is determined without regard to the accused device.") As *Phillips* mandates, the Court must keep in mind the invention "the inventors actually invented and intended to envelop within the claim." *Phillips*, 415 F.3d at 1316.

The specification clearly instructs what structures <u>are</u> the first and second frames, and structures <u>are not</u> the first and second frames. The Patents teach that the first frame and the second frame are particular structures located at the front and the back of the flat panel display device that are <u>coupled together</u> and that <u>assemble the components</u> into the device.[37] It is critical to not ignore, as LPL seeks to do, that the Patents expressly distinguish a flat panel display device from a flat panel display device <u>assembly</u> when another component is added to the flat

---

[36] The impact of LPL's construction would be to transform the Patents to cover attaching any structure outside of the housing to any structure located inside the housing without regard for whether the fastening parts are attached to what the Patents define as a flat panel display device and without requiring the fastening part to be the component that directly mounts the flat panel display device to the housing.

[37] JA at Ex. A, '641 Pat., Col. 4:12-24; Col. 3:14-20.

panel display device.[38] The first and second frames are the structures which assemble the parts of the flat panel display device into a device, and must not include components that transform the "device" into a "device assembly."

Indeed, the Patents expressly teach structures that <u>specifically are not</u> the first or second frame even though they might be located between the housing and the display device. For example, the Patents teach support structures (*e.g.,* flat panel display device support member 24 shown in Figs. 8-14) they expressly differentiate from the first and second frames. Still, LPL seeks to override these teachings with definitions that would allow the resulting flat panel display device to include components that the Patents expressly teach are not properly considered part of the flat panel display device or the first or second frames. Under LPL's definition, the flat panel display support members (24) would be the first frame –and the front case or bezel would be the second frame – in each case directly contrary to the Patents teachings. Because the inventors consistently used first frame to be that structure identified as 14g and second frame as the structure identified as 16 in Fig. 4C, the claim should be construed consistently. *See LG.Philips,* 434 F.Supp.2d at 296 ("The consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim.")

The prior art in the intrinsic record also undermines LPL's definitions of first and second frame. LPL admits that "brackets" used to mount a flat panel display device to a housing are excluded from the scope of the Patents as they are part of the teaching of the prior art.[39] Fujimori, USPN 5,379,182 teaches brackets mounted to the front portion of the housing while Kurihara, USPN 5,946,061, teaches brackets attached to the rear housing.[40] Each of these structures <u>must be excluded</u> from the definitions of first frame and second frame. *See Watts,* 232 F.3d at 882. LPL nonetheless urges this Court to turn a blind eye to these teachings, limitations and admissions, and instead invites it to adopt a broad construction of first frame as "[a] structure

---

[38] JA at Ex. A, '641 Pat., Col. 1:25-34; Col. 2:1-12.

[39] LPL Op. Br. at 28.

[40] Heisman Resp. Decl., Ex. 24, Fujimori '182 Pat. and JA, Ex. E, Kurihara '061 Pat., Item 13 in Figs. 2, 3, 5, 6.

enclosed by the housing for firmly supporting the flat display panel" based again, improperly, on a dictionary definition of the word "frame." ViewSonic submits that it would be wrong to accept this invitation as it is contrary to the law and the teachings of the Patents. *See, e.g., Phillips*, 415 F.3d at 1319, 1322-23 (noting that extrinsic evidence such as dictionaries are unreliable and cautioning against using a dictionary definition that contradicts "any definition found in or ascertained by a reading of the patent documents.")

LPL's criticism of ViewSonic's proposed construction as a structure that sandwiches together layers of the device simply again ignores the Patents and the prior art of record. The whole of the intrinsic record teaches a flat panel display device having a stack of layered components assembled together by the first and second frames.[41] (*See, e.g.,* Fig. 4C of the Patents; Figs. 1 and 6 of Yun.) Indeed, there is no teaching whatsoever of a flat panel display device, or its frames, not having this configuration. The Patents are directed to the relocation of the fastening components on a conventional flat panel display device, not to a new flat panel display device having a different internal construction or assembly from that described in the Patents and disclosed by the prior art. This speaks directly to the rejection of LPL's proposed construction and the adoption of the construction proposed by ViewSonic. *See Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (holding it is improper to read claim term to encompass a broader definition than is "revealed by the context of the intrinsic record" simply because it may be found in a dictionary.)

### D.    LPL's Construction Of *"Backlight Unit"* Ignores The Intrinsic Evidence.

As LPL oft quotes in its Opening Brief, "when a recited term is well-known in the art, there is no need to explicitly define the term in the intrinsic record because a skilled artisan would readily understand the term to have its ordinary and customary meaning." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986). The inquiry into what one of ordinary skill in the art would understand a term to mean is an objective one. As such, the

---

[41] JA at Ex. A, '641 Pat., Col. 1:42-45; Col. 2:1-6; Col. 3:14-20; Col. 4:12-22; Fig. 4C; JA at Ex. D, Yun '139 Pat., Figs. 1, 6.

Court must look "to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova* 381 F.3d 1111 at 1116. Those sources are the claims, the specification, and the prosecution history. *Id.* If those sources are insufficient, the Court can then look to extrinsic evidence. *See Phillips*, 415 F.3d at 1319.

Except for describing the components of a backlight unit in regards to the first embodiment, the Patent do not define this term.[42] No definition was necessary, however, because the term "backlight unit" has an express meaning in the art, as explained in the cited prior art of Yun. Yun explains that a backlight unit had the following structure:

> The *back light unit* is comprised of a luminescent *lamp* 11, a *lamp housing* 12 having a U-shape and surrounding the lamp 11, a *light guide* 13, a *reflector* 14 reflecting the incident light from the horizontal direction to the vertical direction, a protection sheet 15 contacting the light guide, a *first prism sheet* 16 and a *second prism sheet* 17 set on the protecting sheet (diffuser) 15 and condensing the incident light from the light guide 13 to some direction, a *diffuser* 18 diffusing the light from the first and second prisms 16 and 17 to a viewing area 21 of the liquid crystal panel 20 with a certain viewing angle, and a *first supporting frame* 19 supporting these elements.[43]

Fig. 4 of the Patent describe "backlight unit" consistently with this prior art definition.[44] Accordingly, it is the meaning that should be adopted here. *See Phillips*, 415 F.3d at 1313 (ordinary meaning is that which the term would have "at the time of the invention.")

Although Fig. 4 is described as an "embodiment," the only distinction between it and Fig. 6 in the Yun prior art, is the location of the mounting holes on the first frame.[45] Thus, what makes Fig. 4 an "embodiment" is not any unique structure to the backlight unit, but is simply that the mounting holes are located on the back corners of the first frame. Thus, contrary to LPL's assertion, ViewSonic is not importing a limitation from a preferred embodiment. Rather,

---

[42] JA at Ex. A, '641 Pat., Col. 4:12-22; Fig. 4C.

[43] JA at Ex. D, Yun, Fig. 1 and Col. 1:16-32 (emphasis added); *see also* Col. 2:4-7 ("According to the structure described above, the LCD device operates as follows. The light from the luminescent lamp is incident on the rear surface of the liquid crystal panel through the *back light unit*.") (emphasis added).

[44] JA at Ex. A, '641 Pat., Col. 4:12-21.

[45] See VS Ex. 2 and Heisman Resp. Decl., Ex. 26. Fig. 4 in the patents also does not expressly identify the lamp or lamp housing. Accordingly, ViewSonic did not include that feature in its construction, despite its obvious presence in the prior art.

since the specification does not offer a definition different than the term's established meaning as evidenced by the cited prior art, ViewSonic contends it is _that definition_ that the term should be given. *See Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-57 (Fed. Cir. 2006), (where intrinsic evidence consistently describes claim term as having one structure, that should be its meaning.); *Honeywell*, 452 F.3d at 1318.[46]

Ignoring this clear intrinsic evidence, LPL proposes backlight unit should mean "an assembly that includes at least a backlight." This construction does nothing more to define the term than does the term itself. LPL first argues that this construction is derived from the claim language, because "backlight unit" consists of "at least a backlight."[47] Although the claims do not expressly state that, common sense certainly indicates that a backlight unit will have at least a backlight. What LPL ignores is that the claim language does expressly state that the backlight unit includes "a first frame."[48] Without explanation, LPL's proposed construction excludes this feature. LPL cannot pick and choose which part of the claim language to use and which to discard. *Pause Tech., LLC v. Tivo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (rejecting patentee's argument to ignore language appearing later in claim when construing claim term because '[p]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation'")(citation omitted); *id.* at 1334 (noting that each claim term must be given the respect is it due). The claim term must be viewed in light of the entire claim, not just a portion of the claim. LPL's only other support for its construction is, once again, the

---

[46]      Redacted      LPL's technical expert ⟨     Redacted
. Heisman Resp. Decl., Ex. 25 at 96:19-97:3; 102:8-18; 172:17-173:1. If a term is used in the claims in a manner somewhat different from its ordinary meaning to one of skill in the art, the only guidance as to how the Court should construe the term is how it is used in the single embodiment in which it appears. *LG.Philips*, 434 F.Supp.2d at 299. *See also* Heisman Resp. Decl., Ex. 25 at 94:3-10; 96:25-97:35.

[47] LPL Op. Br., p. 32.

[48] Thus *Vitronics* (cited by LPL at opening brief page 32) actually supports ViewSonic's position and not LPL's position. In *Vitronics*, the claim language expressly required that the device be maintained below a certain temperature, just as the language of independent claim 35 expressly requires the backlight to include a first frame.

dictionary. As with LPL's other constructions, reliance on the dictionary for "backlight unit" is improper because it contradicts the clear intrinsic evidence. *Phillips*, 415 F.3d at 1319.

ViewSonic's construction, by contrast, tracks the meaning provided in the intrinsic record. LPL's assertion that ViewSonic's construction violates the doctrine of claim differentiation is wrong. As LPL asserts in its own proposed construction, the plain and ordinary meaning of the term "unit" is an "assembly," which means it has *more than one* part.[49] ViewSonic's constructions are in accord. That a backlight unit can have two diffusers or two prism sheets, for example, is expressly called out in the prior art and the preferred embodiment Fig. 4C. ViewSonic's construction requires only one of each structure, and also does not dictate the locations of these structures in the assembly. Thus, under ViewSonic's construction, Claim 35 is still differentiated from Claims 40 and 41.

### E. LPL's Constructions Of *"Flat Panel Display Device"* And *"LCD Device"* Ignore The Intrinsic Evidence And Are Written To Read On Infringement.

As mentioned above, LPL does not contend that the invention at issue is a *new* flat panel display device. Rather, the invention is the *relocation* of the mounting elements on a flat panel display device. Other than these mounting elements, nothing in the claims or specification teaches a flat panel display device having a basic structure that is different from the then-known structure of a conventional flat panel display device. And as the Patents state, that basic structure is: "The LCD device has an LCD panel, a backlight device *fixed to the back* of the LCD panel, and a supporting frame for *assembling* the LCD panel and the backlight device *along the edge*."[50] Yet, in its effort to have these terms construed to read on infringement, LPL ignores this intrinsic evidence, instead proposing the construction be "an apparatus having at least a flat display panel, and supporting frame(s)." This construction is too vague and sweeps too broadly and it should be rejected. *See Power Integrations*, 422 F.Supp.2d at 454-55 (rejecting broad construction that is inconsistent with intrinsic record).

---

[49] LPL Op. Br., p. 32.
[50] JA at Ex. A, '641 Pat., Col. 1:42-45.

As discussed above, the Patents draw a clear distinction between a flat panel display device and a flat panel display device assembly. This also differentiates the device from the next component to which it is mounted, i.e., a portable computer. Under LPL's construction, however, a portable computer itself can be a flat panel display device; as it is an apparatus having at least a flat display panel and supporting frames. This renders the term "a portable computer" found in many of the claims of the Patents superfluous, which claim construction should not do. *See Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996). Likewise, LPL's construction does not allow for any distinction to be made between the flat panel display device and other structures that may be attached to it.

The Patents teach fixing display device support members to the flat panel display device. While the Patents clearly distinguish these two components, LPL's construction would allow this entire assembly to be called a flat panel display device – even though it is not. Instead, the Patents call this a "flat panel display device <u>assembly</u>."[51] LPL's construction contradicts the teachings of the Patents about where the flat panel display device ends and a different component such as a flat panel display device begins. The reason LPL wants this result is to assist it in proving infringement. The law is clear, though, that claim scope is not to be determined with regard to the accused device. *Optical Disc*, 208 F.3d at 1333.

There are other flaws with LPL's construction. First, it is improper to substitute the ambiguous term "apparatus" for "device." "Apparatus" is not found anywhere in the Patents and it less clear, not more. Second, under LPL's construction, both frames could be behind the panel or in front of the panel where the Patents require that the flat display panel be between the supporting frame(s). Third, although one line in the specification says "the first frame can act as the supporting frame," the claims expressly distinguish between the "first frame" and the "supporting frame" which the specification clearly identifies as the "second frame."[52] Finally,

---

[51] *See, e.g.*, JA at Ex. A, '641 Pat., Col. 1:27-31 (using "flat panel display device assembly" to refer to combination of flat panel display device and display case); Col. 2:1-6 (same).

[52] JA at Ex. B, '718 Pat., Claim 39 "the first frame having holes for coupling a a [*sic*] LCD panel to a supporting frame. . . ."

this construction provides no clarity to the claim term because it does not explain what is meant by "supporting" frame(s). Because LPL's construction ignores the intrinsic evidence, renders many claim terms superfluous, and merely introduces ambiguity and uncertainty, it should be rejected.

ViewSonic's construction, by contrast, stays true to the intrinsic evidence. ViewSonic proposes a flat panel display device is: "a stack of components, including a flat display panel, assembled as a device along the edges by the first and second frames." In opposition, LPL argues: (1) "the limitation 'device' is unclear and ambiguous since it is not found anywhere in the claims or specification"; and (2) "[t]here is no support" for "the stack of components be assembled as a device along the edges by the first and second frames." Both arguments are wrong.

The Court can quickly dispense with the first argument. The Asserted Claims recite a "rear mountable flat panel display device" or "rear mountable LCD device." The unasserted claims likewise recite a "rear mountable display device."[53] Throughout the specification, the term "device" is used a whopping 163 times. The Patents even distinguish between the "device" and a "device assembly."[54] LPL's first argument is simply frivolous.

LPL's second argument again ignores the intrinsic evidence, all of which supports ViewSonic's contention that the components of a flat panel display device are stacked and assembled by frames along the edges. There is no disputing that the Patents say the LCD device — as it was known at the time of the invention — was assembled by a frame along the edges: "The LCD device has an LCD panel, a backlight device fixed to the back of the LCD panel, and a supporting frame for _assembling_ the LCD panel and the backlight device _along the edge_."[55] Nor can there be any doubt that the flat panel display device the inventors were claiming was

---

[53] _See, e.g._, JA at Ex. A, '641 Pat., Claims 1 and 30.

[54] JA at Ex. A, '641 Pat., Col. 1:27-31 (using "flat panel display device assembly" to refer to combination of flat panel display device and display case); Col. 2:1-6 (same).

[55] JA at Ex. A, '641 Pat., Col. 1:42-45; _see also_ Col. 2:4-6 ("The LCD panel and the backlight device are assembled by a supporting frame along the edges.")

assembled the exact same way. Every embodiment in the Patents show the flat panel display device assembled as a device by the frames. When providing the only detailed description of the flat panel display device, the Patents say the "first frame is coupled to a second frame or supporting frame."[56] Indeed, everything evidences that the inventors were not inventing a new flat panel display device, merely a new way to mount a conventional "assembled along the edges" flat panel display device.

The Patents illustrate and the cited prior art expressly teaches that the components in a flat panel display device are stacked. Fig. 4C from the Patents is the only detailed illustration these Patents provide of the flat panel display device.[57] As explained in detail in Tatung's Opening Brief on Claim Construction, for purposes of defining a flat panel display device, Fig. 4C is identical in all material respects to Fig. 6 of the cited prior art – Yun. For convenience, the figures are shown side by side in Exhibit 26 hereto.[58]

As the Court can see, both figures show the LCD panel is stacked on top of the various layers of the backlight unit which are also stacked, one on top of the other, and that these components are assembled along the edges by the first and second frames. Indeed, Yun expressly states that these layers of the backlight device and LCD panel are "stacked sequentially."[59] The text corresponding to Fig. 4 is in accord with this express teaching of Yun. Specifically, "the LCD device has a first frame . . . a reflector *on* the first frame, a light guide *film*, a diffuser or protecting *film*, a first prism *sheet*, a second prism *sheet*, another diffuser or protecting *film*, and the LCD panel. The first frame *is coupled* to the second frame or supporting frame." One of ordinary skill in the art reading this description and looking at Fig. 4C would understand it means the components are stacked and assembled along the edges by the frames.

---

[56] JA at Ex. A, '641 Pat., Col. 4:21-22.
[57] In the "Brief Description of the Drawings," Figs. 4A-C are described as showing "the LCD device according to a first embodiment of the present invention." JA at Ex. A, '641 Pat., Col. 3:41-42. Every other drawing is described as showing a mounting structure – not the LCD device. *Id.* at Col. 3:43-67.
[58] Heisman Resp. Decl., Ex. 26.
[59] JA at Ex. D., Yun, Col. 4:38-43, describing Fig. 6.

The claims further confirm this understanding. For example, Claim 33 of the '718 patent requires: "placing a flat display panel on a top surface of a backlight unit having a first frame, . . . placing a second frame on the flat display panel. . . ." What does "placing" the components of a flat panel display device on top of each other mean if not "stacking?" Claim 33 further provides, "fixing the flat display panel between the first frame of the backlight unit and the second frame." This language means the stacked components are assembled by the frames.[60]

Because the entire intrinsic record describes a flat panel display device as having one structure, that is the construction it should be given. *See Inpro II,* 450 F.3d at 1354-57. Moreover, describing the components of a flat panel display device as a stack is purely common sense given that an LCD panel is flat glass, and the backlight device is comprised of various flat films and sheets layered on top of each other. In sum, one of ordinary skill in the art reading the Patents would understand that a flat panel display device is precisely what the Patents and cited prior art teach, and what ViewSonic proposes, "a stack of components, including a flat display panel, assembled as a device along the edges by the first and second frames."

### F.    LPL's Construction Of *"Fastening Part"* And *"Fastening Element"* Contradicts The Intrinsic Evidence.

These terms are used repeatedly and consistently throughout the claims as features found on the rear mountable display device, the first frame, the display device support member, and the housing.[61] The Patents make no distinction between fastening parts based upon which component they are located. As far as the Patent are concerned, a "fastening part" on the housing has the same meaning and scope as a "fastening part" on the first frame. As such, the laws of claim construction require that these terms be construed consistently. *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001).

LPL proposes "a part(s)/element(s) that provides the capability for mounting one component to another component(s)." In support of this construction, however, LPL asks the

---

[60] Additional examples can be found in Claim 39 of the '718 Patent and Claims 35, 37 and 40 of the '641 Patent.

[61] JA at Ex. A, '641 Pat., Claims 1, 4, 10, 30.

Court to throw out this law of claim construction and to construe these terms as having different meanings depending on which component the fastening part is located. LPL argues that "it is only the {sic} those fastening elements located on the rear surface of the first frame that are relevant to claim construction."[62] LPL is simply wrong. The construction of fastening element must fit the context of every claim in which it is used, whether it is on a case or a hinge arm. *Id.* LPL's construction does not allow for consistent application of this claim term, and therefore it should be rejected.

The Court should also reject LPL's construction because it inserts redundancy and improperly converts this claim term into a means-plus-function form, which it is not. The claims already explain that the fastening part is used to mount one component to another component.[63] Because that feature is already expressed in the claims, there is no need to include it within the construction as LPL proposes. *See LG.Philips*, 434 F. Supp. 2d 292 at 299 ("If a feature is specifically claimed, then the Court will not include it in the definition because it is 'both unnecessary' and 'redundant.'").

Finally, LPL's construction is too broad because it can sweep in structures that are not the types of fasteners the Patents identify as fastening parts, such as screws, bolts, nails, fasteners with compressible heads, and fastening holes together with the material defining the hole. Reading these examples, one of ordinary skill in the art would understand a fastening part to be a conventional fastener, not just <u>any</u> part that mounts one component to another. Yet, under LPL's construction, one could argue that the hinge shown in the Patents is a fastening part, as it is a "part that provides the capability for mounting one component [the case] to another component [the body]." But the Patents do not include the hinge as a fastening part. LPL's construction is again inconsistent with what the Patents teach, and it should be rejected.

ViewSonic's proposed construction, on the other hand, stays true to the Patents by letting a fastening part be any fastener similar to, and including, those enumerated in the Patents. LPL

---

[62] LPL Op. Br., p. 23.
[63] *See, e.g.*, JA at Ex. A, '641 Pat., Claims 35, 55, and 56.

incorrectly asserts that ViewSonic's construction violates the doctrine of claim differentiation. "Claim differentiation 'refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim.'" *LG.Philips*, 434 F.Supp.2d at 299 (quoting *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006)). Under ViewSonic's construction the independent claims are still not limited to a specific type of fastener while the dependent claims are limited. Thus, for example, in claim 33 of the '718 patent, the fastening part can be any type of fastener but need not be a hook, while in claim 38, the fastening part is limited to a hook. Because ViewSonic's construction is supported by the claims and the entire intrinsic evidence, it should be adopted.

### G.    LPL's Construction Of *"Fastening Hole"* Contradicts The Intrinsic Evidence and the Teachings of the Patents.

Once again, LPL proposes a construction that is driven by its aspirations to establish infringement rather than the intrinsic record or the teachings of the Patents. LPL's approach should be rejected. *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1337, 1340 (Fed. Cir. 2003). LPL's proposed construction of "fastening hole" is "an opening, together with the material defining the opening, that provides one component with the capability of being mounted to another component(s)." This construction contradicts the definition provided in the specification, adds redundancy so as to make the remaining claim language superfluous, and allows LPL to argue that the term has different meaning depending on the component in which a fastening hole is provided. Each of these factors weighs against LPL.

The first part of this definition, "an opening, together with the material defining the opening," merely redefines a "fastening hole" as a "fastening part," despite the fact that the Patents expressly differentiate between a fastening part and a fastening hole.[64] By definition, the fastening hole *does not* include the material defining the hole. And by definition, the fastening

---

[64] JA at Ex. A, '641 Pat., Col. 4:32-36 ("which may be referred to as a *fastening hole* or a similar conveniently descriptive term, *and which together with the material defining the hole* may be referred to as a fastening element or fastening part)" (emphasis added); Col. 4:51-54 (same); Col.4:60-64 (same); Col. 5:53-56 (same); Col. 5:65-6:1 (same); Col. 6:65-7:2 (same); and Col. 7:3-7 (same).

hole is simply not a fastening element or part. Accordingly, LPL's substitution of "fastening hole" for "fastening element" in Claim 35 to support its construction could not be more wrong. When a dependent claim – such as Claim 36 – says "wherein the fastening part includes a fastening hole" it is plainly not, as LPL contends, claiming a fastening hole *is* the fastening part. Rather, it is saying the fastening part *includes* a fastening hole, and according to the Patents, it also *includes* the material defining the hole. This flagrant attempt to override the express on point teaching of the Patents should be rejected.

LPL's construction also ignores the prosecution history. On February 9, 2001, the Examiner objected to the claims stating that "fastening hole" could not, in and of itself, be a fastening part or fastening element because a hole by definition was empty space.[65] To overcome this objection, the inventors amended the specification to include the language "and which together with the material defining the hole may be referred to as a fastening element or fastening part." LPL's attempt to import the language of the amendment defining fastening element into the definition of a fastening hole is wrong. *Spectrum Int'l Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998).

Likewise, LPL's proposed construction seeks to substitute the word "opening" for the word "hole," again without any support in the Patents. Notably, the Patent do not use the term "opening" as a substitute for "hole." While a "hole" might be a type of opening, the term "hole" signifies to one of ordinary skill in the art that the opening has a particular shape and size. *Nystrom*, 424 F.3d at 1145 (holding it is improper to read a term to encompass a broader definition than the intrinsic record provides simply because it can be found in a dictionary). In other words, not all "openings" are "holes." Thus, by defining "hole" as an "opening," LPL is broadening the plain and ordinary meaning of "hole" into something that is not supported by the Patents. This unsupported substitution should be rejected.

---

[65] JA at Ex. G, '641 File History, VS5005535.

The second part of LPL's definition, "that provides one component with the capability of being mounted to another component(s)" – like above – adds redundancy and is similarly at odds with the intrinsic evidence. There is no need to import this function into the definition of "fastening hole" because the function is already set forth as an element of the claims. For example, Claim 36 provides that the fastening part in asserted Claim 35 includes a "fastening hole." Claim 35, in turn, provides that the "first frame of the backlight unit [is] capable of being fixed to a housing of the data processing device through the *fastening part.* . . ." The construction proposed by LPL improperly adds the mounting capability to the definition of "fastening hole" when it is already in the claim as written. *See LG.Philips*, 434 F. Supp. 2d at 299 ("If a feature is specifically claimed, then the Court will not include it in the definition because it is 'both unnecessary' and 'redundant.'").

LPL further argues that since the parties agree that the term "fastening" – as a _stand alone_ claim term – means "attaching firmly or fixing securely so as to be supported," then the fastening hole "must 'fasten' one component to another."[66] By this assertion, LPL seeks to narrow the term to exclude a through-hole from being a fastening hole.[67] Unfortunately for LPL, the Patents do not preclude any hole (including a through-hole) from being a fastening hole, and in fact, they expressly state that a "through-hole" _is_ a fastening hole:

> A through-hole (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .)

> The holes (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .);

> At each end of the flat portion, a hole such as a through-hole (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .)

---

[66] LPL Op. Br., p. 26.

[67] LPL Op. Br., p. 26. LPL's position is also evidenced by its argument regarding the claim term "fastening part" that the Court should simply ignore that the claims call out fastening parts on various components and should instead only construe those fastening parts on the first frame. In this way, LPL is trying to say that while the fastening part on the case or display device support member might be a through-hole, the fastening part on the first frame cannot be a through-hole.

> To facilitate the disassembly or release of the fastener from the
> [stepped] hole through the rear of the case, the [stepped] hole is
> preferably a through-hole. . . . Alternatively, the fastener can be
> formed on the case and the stepped hole can be formed at the rear
> face of the LCD device to achieve similar results. [68]

Though LPL admits that "the specification teaches that a through-hole may be referred to as a 'fastening hole,'" it argues that this does not mean that <u>all</u> through-holes are fastening holes. [69] According to LPL, we should not believe what the Patents expressly say. To support this argument, LPL asserts that when the specification describes a through-hole as a fastening hole it is with respect to holes on the display case and the display device support member. LPL contends that one of ordinary skill in the art would not understand the hole at the rear surface of the first frame, by contrast, to be a through-hole, "primarily because that 'hole' is described in the claims as a <u>fastening</u> hole." But LPL's circular argument is again contrary to the express teachings of the Patents and contrary to law. *See Rexnord*, 274 F.3d at 1342..

The Patents teach that the flat panel display device can be attached by a fastening part (*e.g.*, a compressible head on a protruding portion or a screw) that is attached to the rear case of the portable computer housing and is secured in the flat panel display device. Claim 36 of the `641 patent permits the fastening part on the first frame to include a through-hole to receive the compressible head or a threaded hole to receive the screw. Similarly, Claim 37 requires that the fastening part also couple the first frame to the second frame. As such, in the case of a compressible head fastening part, this permits the first frame and second frames to have aligned through-holes such that the compressible head locks the panel in place, and couples the first and second frames together, by extending through both through-holes and having the wing portions of the compressible head sit on top of the second frame, visible from the viewing direction. Likewise, for a screw fastening part, Claim 37 permits the screw to pass through a through-hole in the first frame and be secured by the threaded hole in the second frame. In each case, the

---

[68] JA at Ex. A, `641 Pat., Col. 4:51-52; 4:60-62; Col.5:52-55; Col.7:9-11 and 7:28-30, respectively.
[69] LPL Op. Br., p. 27.

through-hole in the first frame would meet the definition of fastening hole, and that hole –

together with the material defining the hole – is a fastening part.

LPL's construction would also preclude Claims 31 and 42, both of which state that the

fastening part "is not visible" from the viewing direction of the display device. For these claims

to have any meaning, the fastening part in the independent claims 30 and 35 must – under some

circumstance – be visible from the viewing direction of the display device. This further supports

configurations such as those discussed above where the fastening element on the first frame is a

through-hole. Clearly, the inventors anticipated that the "fastening hole" in the first frame could

be a through-hole, and LPL's attempt to rewrite it must be rejected. LPL cannot now be

permitted to revise the definition supplied by it for this term during the prosecution of the Patents

as required by the Examiner. Neither the claims, the specification, nor the prosecution history,

make any distinction between the fastening holes – or for that matter the fastening parts –

regardless of whether they are located on the case, the hinge arm, or the display device, and it

would be improper for the Court to create such a distinction now.[70]

### H.    LPL's Construction Of *"First Frame Having A Fastening Part"* And *"First Frame Having A Fastening Element"* Is Not Supported By The Intrinsic Evidence.[71]

ViewSonic agrees with LPL that considering the purpose of this invention is essential to

construing the claim terms. ViewSonic also agrees with LPL that the stated purpose is to

eliminate unnecessary side space used when mounting the flat panel display device. But

ViewSonic does not agree with LPL's assertion that the "only way" to eliminate the unnecessary

side space is to locate the fastening part on or inside the border of the flat display panel.

As set forth in its Opening Brief, ViewSonic contends these two phrases need not be

construed, particularly since "first frame" and "fastening part/element" are already being

separately construed. Even if the words "having a" did not have a common ordinary meaning –

---

[70]    LPL's expert    Redacted    Heisman Resp. Decl., Ex. 25 at 99:9-25.

[71]    These phrases appear in Claims 35 and 55 of the '641 Patent and Claim 33 of the '718 Patent.

which they clearly do – the construction LPL proposes improperly limits the claim with no support from the Patents.

LPL proposes that these phrases be construed as a "first frame having a fastening part(s) positioned on or within the border of the flat display panel." As the Court can see, LPL is not even construing the very phrase at issue. Rather, LPL is merely adding a physical location limitation that does not appear anywhere in these phrases and is contrary to the claim language, which already recites the position of the fastening part as being "at a rear surface of the first frame." As detailed in the discussions of "rear mountable" and "first frame," nothing in the Patents support LPL's "on or within the border of the flat display panel" limitation. Rather than repeat those argument in detail here, ViewSonic will simply remind the Court of two points. First, Fig. 10 is a preferred embodiment, and therefore it is improper for LPL to limit the claims to a preferred embodiment. *See LG.Philips*, 434 F.Supp. at 298. Second – contrary to LPL's bold assertion – Fig. 4C does not "clearly teach" the fastening parts are on or inside the border of the flat display panel.[72] Those words do not appear in the text describing what Fig. 4C shows, and the only thing the drawing "clearly teaches" is that the fastening part is formed at the corner of the first frame – just like the specification shows. Because LPL's construction improperly imports limitations from the specification and preferred embodiment, it should be rejected.

## I.    Construction Of *"Capable of Being Mounted"* And *"Capable of Being Fixed"* Is Not Needed.

As ViewSonic argued in its Opening Brief, these two phrases need not be construed because "capable of" has an ordinary, understood meaning. LPL, on the other hand, proposes substituting "having" for "capable of." This is merely substituting synonyms which the Federal Circuit counsels against. *C.R. Bard*, 388 F.3d at 863. Because LPL's construction provides no greater insight to its meaning than the claim term itself, it should be rejected.

---

[72] LPL Op. Br., p. 17.

J.    **Construction Of** *"Peg," "Protruding Portion,"* **And** *"Stepped Hole."*

These terms appear in the newly asserted claims. Accordingly, ViewSonic addressed its arguments on these terms in the Supplemental Opening Brief. LPL did not address those terms again in its Supplemental Opening Brief. Therefore, absent any newly-raised arguments by LPL, ViewSonic believes no further briefing on these terms is required.

K.    **LPL's Proposed Construction Of** *"Corners of the First Frame"* **Is Contrary To The Teachings Of The Patent And The Intrinsic Record.**

LPL proposes that "corners of the first frame" should be construed to mean "areas located in or near the edges of the first frame and positioned on or inside the border of the flat display panel." As discussed in ViewSonic's Supplemental Opening Brief and above, there is no basis for importing a limitation of "positioned on or inside the border of the flat display panel" into the claims.

The "corners of the first frame" are shown in the particular embodiment depicted in Figs. 4A-C. The Court cannot be misled by LPL's mischaracterization of the relationship between Fig. 4C and Fig. 10 of the Patents, asserting that the fastening elements shown in Fig. 4C "correspond to the fastening parts shown [in Fig. 10]."[73]

Moreover, LPL's proposed construction is prohibited by the doctrine of claim differentiation. "Claim differentiation 'refers to the presumption than an independent claim should not be construed as requiring a limitation added by a dependent claim.'" *LG.Philips*, 434 F.Supp. at 299 (quoting *Curtiss-Wright*, 438 F.3d at 1380). For example, under LPL's proposed construction, Claim 29 of the '641 patent would be. This claim requires that the fastening element be "located at a position corresponding to a display area of the rear mountable display device." LPL acknowledges that the edge of the flat display panel can be at the border of the display area.[74] Thus, if the fastening element must already be located on or inside the border of the flat display panel, this limitation no longer has any meaning.

---

[73] LPL Op. Br., p. 5.
[74] Heisman Resp. Decl., Ex. 19 at 680:10-683:9.

Finally, LPL seeks to incorporate its definition of the term "at" into the phrase "corners of the first frame."[75] LPL's reliance on the term "at" is equally misplaced. First, the term "at" is not a part of the term the parties submitted to the court for construction. Indeed, it was never even proposed by LPL or any other party. Second, claim terms must be interpreted in the context of the invention actually made. *Phillips*, 415 F.3d at 1316. While it may be true that an appointment to meet someone at a particular time includes the expectation of some leeway, the location of a structural component in a precision oriented technology product involves far less tolerances for deviation. The intrinsic record, as well as the claims themselves, clearly support the definition proffered by ViewSonic of the places on the first frame where two side edges of the first frame intersect.[76]

## L.     LPL's Construction Of *"Flat Display Panel Is Rear Mounted"* Is Another Attempt To Improperly Rewrite The Claim.

Whether as part of its attempt to find nonexistent support for its definition of the various terms including rear mountable and first frame, or otherwise, throughout its opening and supplemental briefs, LPL repeatedly draws a distinction between the flat display panel and the flat panel display device. Suddenly, however, LPL asks the Court to look past this distinction and read the limitation "the flat display panel is rear mounted" as though it said "the flat panel display device is rear mounted." The intrinsic record, and common sense, forbids this attempted shell game.

Despite LPL's protestations to the contrary, the parties have never agreed that Claim 56 is directed to a flat panel display device rather than a flat display panel. The parties do agree, and ViewSonic's proffered construction is entirely consistent with, the idea that a flat display panel which is rear mounted would comply with the same structural requirements of a rear mountable flat panel display device, except that the mounted element (a flat display panel) would actually be mounted rather than being merely capable of being mounted. Having a rear mounted

---

[75] LPL's Supp. Opening Br., p. 5.
[76]                    LPL's expert                    Redacted
Heisman Resp. Decl., Ex. 25 at 102:19-103:5.

flat display panel would seem to be the optimum implementation of the supposed invention and LPL's acknowledged requirement that the claims be construed in a manner which eliminates unnecessary side space.

LPL's critique of the constructions proposed by Tatung and ViewSonic is, in sum, that the Patents do not teach or contain any description of fastening elements on the rear surface of a flat display panel, and thus those proffered constructions add undisclosed limitations to the Patents. If that is the case, then the Court must find that Claim 56 is invalid because the claim limitation of the "flat display panel is rear mounted" lacks an adequate disclosure in the specifications to construe it. 35 U.S.C. § 112, ¶ 1.

ViewSonic submits that it is true that when a flat display panel of a flat panel display device is rear mounted, the flat panel display device can also be considered to be rear mounted. There is simply no support anywhere in the intrinsic record, however, to suggest that when a flat panel display device is rear mounted, it independently means the flat display panel is rear mounted as well. LPL's failure to cite to any intrinsic evidence to support this whole-cloth proposition is telling. There is a complete absence of support in the Patents and the prior art of record for concluding the flat display panel is "front mounted" or "side mounted" when a flat panel display device employs one of the prior art mounting techniques. Instead, the Patents explicitly teach that in a typical configuration, a flat display panel is assembled with the other components into a flat panel display device by the first and second frames.[77] Accordingly, either claim 56 fails for lack of an adequate written description under 35 U.S.C. § 112, ¶ 1, or the Court must interpret the claim to mean what it says.

The structure claimed by claim 56 includes one or more fastening elements on the back of the flat panel display device that could be used for mounting, be they in the corners of the device (as illustrated in Figs. 4B and 4C), in the center of the back of the device (as illustrated in Fig. 14), or somewhere in between, as illustrated in various other figures. Likewise, since the

---

[77] JA at Ex. A, '641 Pat., Col. 1:42-45; Col. 2:1-6; Col. 3:14-20; Col. 4:12-24; Fig. 4C.

claim also requires the flat display panel to be "rear mounted," the claim necessitates that the flat display panel is actually mounted to the housing by fastening elements, all of which are on the rear or back surface of the flat display panel. Any other interpretation would be a wholesale rewriting of the claim directly contrary to the dictates of applicable case law. *See, e.g., Process Control v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999).

LPL's argument comes full circle when it closes with additional misleading citations to the Patents and the prosecution history. LPL points to Fig. 5 as illustrating that a flat display panel is mounted to the rear housing via fastening parts as disclosed in the invention. In fact, however, Fig. 5 shows the mounting of a flat panel display device – not a flat display panel – and the specification does not indicate that Fig. 5 illustrates the mounting of a flat display panel.[78]

It is notable that LPL also relies on the statement of the Examiner in the Notice of Allowance, just as ViewSonic does in connection with "housing" and "data processing device." In allowing the claims of the Patents to issue, the Examiner referenced a rear mountable display device that is rear mounted.[79] LPL again asks the Court to misinterpret the intrinsic evidence in support of its unfounded claim constructions. The Examiner did not confuse a rear mountable flat panel display device with a rear mounted flat display panel. Instead, the Examiner demonstrated his complete understanding of the arguments made by LPL during prosecution and the scope of the claims that were being allowed. As the Examiner noted, the invention sought to be claimed was a portable computer in which, once installed, the flat panel display device would be mounted to a housing solely from the back of the device an in a manner which will allow the user to achieve he advantages of the invention – the elimination of unnecessary side space.

In sum, ViewSonic submits that the plain language of the claim itself, together with the teachings of the Patents, support a construction of the phrase "the flat display panel is rear

---

[78] JA at Ex. A, '641 Pat., Col. 3:43-44; Col. 4:41-67.) Indeed, the patent explicitly states that Fig. 5 "shows the assembly of the LCD device 10 to the display case 21." The Court must not be misled by the liberties LPL takes with its characterization of the teachings of the patent and the prosecution history.
[79] JA at Ex. G, '641 File History, at VS5005645.

mounted" as the flat display panel is rear mounted, not the flat panel display device is rear mounted.

## III.    CONCLUSION

For the foregoing reasons, ViewSonic respectfully requests that the Court adopt its proposed constructions, and reject LPL's proposed constructions, for the disputed claim terms.

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ LLP

Dated:  May 16, 2007

By:  */s/  James D. Heisman*
    Jeffrey B. Bove, Esq. (#998)
    James D. Heisman, Esq. (#2746)
    Jaclyn M. Mason, Esq. (#4737)
    The Nemours Building, 8th Floor
    1007 North Orange Street
    Wilmington, DE  19801
    Telephone:  (302) 658-9141
    Facsimile:   (302) 658-5614

    Scott R. Miller, Esq.
    355 South Grand Avenue, Suite 3150
    Los Angeles, CA  90071
    Telephone:  (213) 787-2500
    Facsimile:   (213) 687-0498

    *Attorneys for ViewSonic Corporation*

OF COUNSEL:

Tracy R. Roman, Esq.
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone:  (310) 277-0010
Facsimile:   (310) 277-1980

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2007, a true copy of the foregoing document was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following and the document is

available for viewing and downloading from CM/ECF:

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Anne Shea Gaza
Frederick L. Cottrell III
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801

I hereby certify that on May 16, 2007, I have sent by email the foregoing document to the

following non-registered participants:

Cass W. Christenson
Lora A. Brzezynski
Rel S. Ambrozy
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

Mark H. Krietzman
Valerie W. Ho
Frank E. Merideth, Jr.
Steve P. Hassid
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy R. Roman
Raskin Peter Rubin & Simon
1801 Century Park East 23rd Floor
Los Angeles, CA 90067

By: /s/ James D. Heisman
    James D. Heisman (#2746)
    jheisman@cblh.com

534937_1.doc