IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

Plaintiff,

v.

TATUNG CO.;
TATUNG COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

Defendants.

CIVIL ACTION NO. 04-343-JJF

**REDACTED –
PUBLIC VERSION OF D.I. 709**

## DEFENDANT VIEWSONIC CORPORATION'S OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING CLAIM CONSTRUCTION

CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey B. Bove (#998)
James D. Heisman (#2746)
Jaclyn M. Mason (#4737)
The Nemours Building, 8th Floor
1007 North Orange Street
Wilmington, DE  19801
(302) 658-9141

*Attorneys for ViewSonic Corporation*

OF COUNSEL:
Connolly Bove Lodge & Hutz LLP
Scott R. Miller
Manuel Nelson
333 South Grand Avenue, Suite 2300
Los Angeles, CA  90071
(213) 787-2500

Tracy R. Roman
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 277-0010

Dated:  July 6, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

               Plaintiff,

      v.

TATUNG CO.;
TATUNG COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

              Defendants.

CIVIL ACTION NO. 04-343-JJF

**FILED UNDER SEAL**

## DEFENDANT VIEWSONIC CORPORATION'S
## OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND
## RECOMMENDATION REGARDING CLAIM CONSTRUCTION

CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey B. Bove (#998)
James D. Heisman (#2746)
Jaclyn M. Mason (#4737)
The Nemours Building, 8th Floor
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141

*Attorneys for ViewSonic Corporation*

OF COUNSEL:
Connolly Bove Lodge & Hutz LLP
Scott R. Miller
Manuel Nelson
355 South Grand Avenue, Suite 3150
Los Angeles, CA 90071
(213) 787-2500

Tracy R. Roman
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 277-0010

Dated: July 6, 2007

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................... 1

II.   SUMMARY OF THE ARGUMENT ...................................................... 1

III.  LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ......................... 2

IV.   STATEMENT OF THE FACTS ............................................................. 5

V.    PROPER CONSTRUCTIONs are compelled by the intrinsic record and SHOULD
      BE adopted ............................................................................................. 8

      A.    *"Flat Panel Display Device," "First Frame," "Second Frame," And*
            *"Backlight Unit."* .......................................................................... 9

      B.    *"Corners Of The First Frame"* ................................................... 15

      C.    *"Fastening Hole"* ....................................................................... 17

      D.    *"Housing"* And *"Data Processing Device"* Must Follow The Inventors'
            Express Definitions As Supported By The Intrinsic Evidence. ............... 19

      E.    *"Data Processing Device"* is a portable computer. ..................... 25

VI.   CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

Page

*Advanced Medical Optics, Inc. v. Alcon, Inc.*
   361 F. Supp. 2d 370 (D. Del. 2005)..................................................................... 5

*Affymetrix, Inc. v. Illumina, Inc.*
   446 F. Supp. 2d 277 (D. Del. 2006)..................................................................... 3

*Bell Comms. Research, Inc. v. Vitalink Comms. Corp.*
   55 F.3d 615 (Fed. Cir. 1995) .............................................................................. 13

*C.R. Bard, Inc. v. U.S. Surgical Corp.*
   388 F.3d 858 (Fed. Cir. 2004) ......................................................................... 4, 19

*CVI/Beta Ventures, Inc. v. Tura LP*
   112 F.3d 1146 (Fed. Cir. 1997) ........................................................................ 16

*Ekchian v. Home Depot, Inc.*
   104 F.3d 1299 (Fed. Cir. 1997) .......................................................................... 5

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*
   222 F.3d 951 (Fed. Cir. 2000) ............................................................................ 5

*Honeywell v. ITT*
   452 F.3d 1312 (Fed. Cir. 2006) .......................................................... 3, 20, 21, 25

*Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.*
   450 F.3d 1350 (Fed. Cir. 2006) ..................................................................... 13, 15

*LG.Philips LCD Co., Ltd. v. Tatung Co*
   434 F.Supp.2d 292 (D. Del. 2006).....................................................................15

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004) .......................................................................... 21

*Lucent Techs., Inc. v. Extreme Networks, Inc.*
   367 F. Supp. 2d 649 (D.Del. 2005)...................................................................... 5

*Markman v. Westview Instruments, Inc.*
   52 F.3d 967 (Fed. Cir. 1995) ......................................................................... 2, 3, 4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*
   357 F.3d 1340 (Fed. Cir. 2004) ................................................................. 4, 10, 19

*MicroStrategy Inc. v. Business Objects Americas*
   410 F. Supp. 2d 348 (D. Del. 2006)..................................................................... 4

*Nystrom v. TREX Co., Inc.*
   424 F.3d 1136, 1145 (Fed. Cir. 2005) ................................................................18

*Phillips v. AWH Corp.*
　415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 3, 4, 5, 21

*Pickholtz v. Rainbow Tech., Inc.,*
　284 F.3d 1365 (Fed. Cir. 2002) ................................................................... 25

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*
　422 F. Supp. 2d 446 (D.Del. 2006) ............................................................... 4

*Renishaw PLC v. Marposs Societa' per Azioni*
　158 F.3d 1243 (Fed. Cir. 1998) ..................................................................... 4

*Rexnord Corp. v. Laitram Corp.*
　274 F.3d 1336 (Fed. Cir. 2001) ................................................................... 18

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*
　242 F.3d 1337 (Fed. Cir. 2001) .............................................................. 4, 24

*SeaChange Int'l, Inc. v. C-Cor, Inc.*
　413 F.3d 1361 (Fed. Cir. 2005) ..................................................................... 5

*Southwall Techs., Inc. v. Cardinal IG Co.*
　54 F.3d 1570 (Fed. Cir. 1995) ....................................................................... 5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
　299 F.3d 1313 (Fed. Cir. 2002) ................................................................... 22

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*
　308 F.3d 1167 (Fed. Cir. 2002) ................................................................... 21

*Vitronics Corp. v. Conceptronic, Inc.*
　90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 3

*Watts v. XL Sys., Inc*
　232 F.3d 877 (Fed. Cir. 2000) ..................................................................... 13

## I.      INTRODUCTION

For the reasons set forth below, Defendant ViewSonic Corporation ("ViewSonic") hereby objects to certain proposed constructions of claim terms contained in the Report and Recommendation of the Special Master, issued June 15, 2007 (the "Report").

## II.     SUMMARY OF THE ARGUMENT

The terms at issue in this Objection can be discussed in two groups. The terms in the first group are those that Plaintiff LG.Phillips LCD Co., Ltd. ("LPL") has indicated it contends are susceptible to a meaning different from that expressed in the Report and for which clarification should be provided. These terms include *flat panel display device*, *first frame*, *second frame*, *backlight unit* and *fastening hole*. The second group of terms consists of those for which the Special Master accepted LPL's dictionary-based definitions which rely on the words of the claims without consideration of the context required by the actual invention described in the specification. These terms include *housing*, *data processing device*, and *corners of the first frame*. Each of the terms at issue in this Objection appear in one or more asserted claims in both of the Asserted Patents. As the '718 patent is a continuation of the '641 patent, the terms should also be construed the same for both patents.

By way of example, looking first at flat panel display device, first frame, second frame and backlight unit, the Report appears to recognize that the *flat panel display device* is not an unassembled stack of components but rather is a unitary structure formed by the particular structures that the patent identifies as the first frame and the second frame. In so doing, the Special Master properly rejected the contention that the first frame and second frame can be any supporting structure inside the housing. While ViewSonic believes the recommended constructions likely seek to convey these meanings, they do not expressly require it.

As a result, LPL has indicated its intent to interpret these constructions in a manner that, for example, allows the first and second frames to be any structure attached to the front or back of what the patent teaches is a flat panel display device, such that the boundaries of the device are constantly changing. Such an interpretation, however, lacks a written description in the

specification and eviscerates the limitations of "rear mountable" as well as the determination that the first and second frames are not any support structure in the housing but are the structures identified by the specification as these components. The patents draw a clear distinction between the structure that is the *"flat panel display device"* and other structures attached to the front or back of that device. ViewSonic submits that the proper construction of each of these terms must accord with the intrinsic evidence and preclude the arguments LPL promulgates.

The second grouping of terms includes housing, data processing device and corners of the first frame. As to these terms, the Special Master's recommendation is to adopt the dictionary-based definitions proposed by LPL which are inconsistent with the teachings of the specification. By way of example, the intrinsic record necessitates a construction for the terms "housing" and "data processing device" that recognizes their relationship to a portable computer. The specification repeatedly explicitly links and ties the "invention" to a portable computer. The inventors amended the patent specification during prosecution to expressly define housing as the case and body of a portable computer. Moreover, the patents exclusively describe and show the housing as a part of a portable computer. The only type of data processing device the patents disclose is a portable computer. Thus, ViewSonic submits that the proper construction of these terms cannot merely focus on a common definition of the words as used in the claim but rather it must recognize this express relationship established by the specification to a portable computer. Only that construction allows the public to take the inventors at their word and stay true to the claim language that most naturally aligns with the patent's description of the invention as *Philips* and its progeny make clear is required.

## III.    LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995). Claim terms "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). More specifically, the "ordinary meaning" is the meaning the term would have to a person of ordinary skill in the art

"at the time of the invention." *Id.* at 1313; *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277, 281 (D. Del. 2006).

A claim term can be given its correct construction only within the context of "what the inventors actually invented and intended to envelop within the claim." *Phillips*, 415 F.3d at 1316. To determine the correct construction, a court should first look to the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the language of the claims, the remaining specification, and the prosecution history. *Markman*, 52 F.3d at 979. While the context of both the asserted claims and the unasserted claims is instructive as to the meaning of a claim term, the significance of the specification cannot be understated. *Phillips*, 415 F.3d at 1314.

The specification is the patentee's description of his invention and sets the scope and outer boundary of the claims. *Id.* at 1313-14. Indeed, the specification is usually "'dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The Federal Circuit has uniformly made clear in its recent post-*Phillips* cases that the claims must be construed in accordance with the teachings of the specification so that the public knows what the patent covers -- and what it does not cover -- as the claims of a patent are limited to the actual invention as is described in the patent specification. *Honeywell Int'l, Inc. v. ITT*, 452 F.3d 1312 (Fed. Cir. 2006).

In *Honeywell*, the words of the claims stated a "fuel injection system component." But the District Court limited the claims to a fuel filter despite recognizing that the ordinary meaning of the term "fuel injection system component" is "any constituent part of the fuel injection system of a motor vehicle including, for example, fuel filters, fuel lines, and connectors." *Id.* at 1315-16. In reaching this conclusion, the District Court relied on the specification which only described the elements and operation of a fuel filter. No other fuel injection system parts or components were described. The Federal Circuit affirmed, stating:

> Here the written description uses language that leads us to the
> conclusion that a fuel filter is the only single "fuel injection system

component" that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment.

*Id.* at 1318.  Of particular importance to the Federal Circuit was the written description's reference to a fuel filter as "this invention" or "the present invention" on four separate occasions. The Federal Circuit noted, *"[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." Id.*

Many pre-*Phillips* decisions likewise recognized the need to read the claims "'in view of the specification, of which they are a part.'" *MicroStrategy Inc. v. Business Objects Americas*, 410 F. Supp. 2d 348, 353 (D. Del. 2006) (quoting *Markman*, 52 F.3d at 979.)  If the specification "'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, *read without reference to the specification*, might be considered broad enough to encompass the feature in question.'" *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

Sometimes the specification reveals that the inventor gave a claim term a special definition that differs from the meaning it would otherwise have. *Phillips*, 415 F.3d at 1316.  In that event, "the inventor's lexicography governs." *Id.*; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 449 (D. Del. 2006).  Other times, the specification reveals that the inventor intentionally disclaimed or disavowed a claim scope. That, too, is considered dispositive. *Phillips*, 415 F.3d at 1316 (citing *SciMed Life Sys.*, 242 F.3d at 1343-44).  In sum, "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The prosecution history is likewise important as it evidences how the inventor, and the Patent Office, understood the patent. *Phillips*, 415 F.3d at 1317.  "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of

the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *SeaChange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)).  A proper examination looks at the entire prosecution history, including amendments and arguments the inventor made to overcome any refusal by the Examiner to allow the claims. *SeaChange*, 413 F.3d at 1372.  Like the specification, the prosecution history may reveal that the patentee narrowed the scope of claim terms by disclaiming or disavowing subject matter to overcome prior art. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).

The law is equally clear, however, that extrinsic evidence -- such as expert testimony and dictionaries -- is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319; if extrinsic evidence is consulted, <u>it cannot be used to contradict the import of the intrinsic record</u>. *See Advanced Medical Optics, Inc. v. Alcon, Inc.*, 361 F. Supp. 2d 370, 376 (D. Del. 2005); *Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649, 653 (D. Del. 2005).

## IV.    STATEMENT OF THE FACTS

LPL alleges that various ViewSonic desk-top computer monitors and televisions infringe Claims 35, 36, and 55 of U.S. Patent No. 6,501,641 (the "'641 Patent") and Claims 33, 34, 35, and 40 of U.S. Patent No. 6,498,718 (the "'718 Patent") (collectively referred to as the "Asserted Patents").  The '641 Patent is entitled *"Portable Computer Having A Flat Panel Display Device."*  The '718 Patent is a continuation of the '641 Patent, entitled *"Portable Computer And Method For Mounting A Flat Panel Display Device Thereon."*  The written descriptions of both patents are identical except for a few apparent typographical errors.[1]  The application that resulted in the '641 Patent was filed on April 2, 1999; the filing date of the '718 Patent is

---

[1]  Because the specifications of the Asserted Patents are nearly identical, citations will be made only to the '641 Patent, unless otherwise specifically noted.

November 22, 1999. Both claim priority from, and incorporate by reference the disclosures of, two Korean patent applications -- KR 98-44475 (filed October 23, 1998) and KR 98-44973 (filed October 27, 1998).

To construe the claim terms, it is important to differentiate what the supposed invention is and what it is not. Most importantly, the patents do not disclose or claim a new flat panel display device or technology. Rather they merely modify the mounting features of the prior art flat panel display device and the method by which these devices are mounted into a housing.

**REDACTED –**
**PUBLIC VERSION**

It is in this context that the claim terms must be construed.

The patents detail one of the conventional prior art mounting structures and methods, which the patents identify as "front mounting":

> Referring to FIG. 2 which shows conventional assembly structure of the LCD device applied to a conventional portable computer, the display case 122 has a rear case 123 and a front case or frame 121 for mounting the LCD device 130. The rear case or frame 123 has an outer surface and an inner surface and connecting ribs 123a are formed at the corners.
>
> The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.
>
> At the corners of the supporting frame 136, corresponding to the positions of the ribs 123a of the rear case 123, a plurality of protrusions 136a having holes are formed.

---

[2] Ex. 29 to the accompanying Declaration of James D. Heisman in Support of Objections ("Heisman Obj. Decl.") at 506:9-509:24, particularly at 509:5-24.
[3] Heisman Obj. Decl., Ex. 29, 509:13-24.

> For mounting the LCD device 130 to the display case 122, the LCD device 130 is placed on the rear case 123 and the holes of the supporting frame 136 and the ribs 123a are fastened together preferably by screws 138. The front case 121 is coupled to the rear case 123.
>
> Hereinafter, the way in which the LCD device is mounted to the case from the front toward the rear direction is defined as *the front mounting method,* and the assembled structure of the LCD device and the case formed through the front mounting method is defined as *the front mounting structure.*[4]

As it relates to the subject matter here, the most notable features of front mounting is the presence of mounting holes and/or flanges or protrusions (*e.g.,* 136a) extending into the area beyond what would otherwise be the edge of the LCD display device. The problem with front mounting, according to the Asserted Patents, is that it uses unnecessary side space, thereby minimizing the amount of display area available when mounting the device into a portable computer.

In a portable computer, the size of the case in which a display is mounted is fixed by the overall size of the housing.[5] Using side flanges or protrusions to mount the LCD device to the case consumes space that could otherwise be used to display an image.[6] The specification explains this problem, as follows:

> In the front mounting structure of the LCD device, since the protrusions 136a require additional space corresponding to the protruded width d, the display area of the LCD device is reduced in comparison to the fixed size of the display case 122.[7]
>
> * * *
>
> In the mounting structure shown in FIG. 3B, the supporting frame 114 requires side spaces for the flanges 114a and 114b. Therefore,

---

[4] Reference is to the Joint Appendix of Exhibits in the Joint Submission of Intrinsic Evidence ("JA") (D.I. 388, 391-393) that includes the applicable intrinsic evidence cited in the parties' November 16, 2006 Joint Submission. *See* D.I. 388, JA at Ex. A, '641 Pat., Col. 1:35-58 (emphasis added).

[5] The patent confirms that there is a maximum acceptable size for a display to which the invention may be applicable. "Moreover, as the display size increases, the display case becomes undesirably large, especially for a portable computer such as a laptop computer." D.I. 388, JA at Ex. A, '641 Pat., Col. 2:34-36.

[6] Heisman Obj. Decl., Ex. 28.

[7] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:59-63.

the side space D (d1+d2) results in a reduction of the display area
of the LCD panel 112 relative to the display case 122.[8]

The inventors here sought to eliminate the use of side space when mounting a common LCD

device in a portable computer in order to maximize the size of the display viewing area.

One of the cited prior art references, Yun et al., also sought to save side space when

mounting a conventional LCD device.[9] Yun's solution is to use fasteners inserted from the

exterior side edge of the rear case of the portable computer and through the side edges of the two

frames (called "first frame" and "second frame") that assemble the components of the LCD

device.[10] Not surprisingly, this method of mounting is referred to as "side mounting." During

the prosecution of the Asserted Patents, the inventors expressly distinguished these side

mounting structures from the invention sought to be claimed.[11]

Another of the cited prior art references, Kurihara, observed that side mounting also uses

side space, although less than is used by front mounting.[12] To improve upon Yun, the Kurihara

solution, best shown in its Fig. 2 (*reproduced at* VS Ex. 27), uses a "support body 13" having a

rear surface 13a and a side surface 13b. The support body is mounted to the rear case behind the

display and attached to tabs on the sides of the LCD display.[13] Kurihara discusses the superiority

of its structure to both front and side mounting, stating "it becomes possible to reduce dead space

compared with the aforementioned conventional methods."[14]

## V.    PROPER CONSTRUCTIONS ARE COMPELLED BY THE INTRINSIC RECORD AND SHOULD BE ADOPTED

To ensure that the construction of these terms conforms to the teachings of the

specification and precludes arguments such as those asserted by LPL, ViewSonic hereby raises

this Objection to certain of the constructions recommended in the Report.

---

[8] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:29-34; *see also*, Figs. 2, 3A and 3B.
[9] D.I. 388, JA at Ex. D, Yun, Col. 1:65-2:3, Col. 2:39-44; and Col. 2:57-63; *see also* Abstract, Col. 3:6-17, Col. 3:35-50; Col. 4:31-33; Col. 4:39-5:28.
[10] *See, e.g.*, D.I. 388, JA at Ex. D, Yun, Figs. 6, 7 and 9.
[11] D.I. 388, JA at Ex. G, '641 File History, at VS5005460, VS 5005512-VS5005513, VS5005556, VS5005605, VS5005614, JA 00268-271, JA00362; Markman Hearing Transcript at 88-93.
[12] D.I. 388, JA at Ex. E, Kurihara, Col. 1:26-37, Col. 3:45-51.
[13] D.I. 388, JA at Ex. E, Kurihara, Col. 2:53-3:21, Figs. 2, 3, 3a and 4.
[14] D.I. 388, JA at Ex. E, Kurihara, Col. 3:45-58.

A.    **"Flat Panel Display Device," "First Frame," "Second Frame," And "Backlight Unit."**

The Special Master recommends that "*flat panel display device*" be construed to mean:

> "A display device having at least a flat display panel sandwiched by the first and second frames."

He further recommends that "*first frame*" and "*second frame*" be respectively construed as:

> "The structure at the back of the flat panel display device that together with the second frame structure sandwiches at least the flat display panel" and

> "The structure at the front of the flat panel display device that together with the first frame structure sandwiches at least the flat display panel."

ViewSonic believes the Special Master's use of "device" and "sandwiched by" in these constructions acknowledges the patents' requirement that the first and second frames work together to form and assemble the flat panel display device into a device. In other words, without the first and second frames sandwiching the remaining components of at least the flat display panel, there would be no "device." Instead, there would merely be a loose stack of components" placed in proximity to each other. This configuration is contrary to the express language of the claims, which require the "device" to be mounted to the housing by the fastening element(s) on the rear surface of the first frame. If the "device were merely a loose stack of components, only the first frame would be mounted to the housing, not the entirety of the device.

Figure 4C shows a flat panel display device (10) with its components disassembled to particularly point out the structures that are critical to the patent claims, namely, the first frame (14g), the second frame (16), the flat display panel (12) and the backlight unit (14). In contrast, Figures 5-16 each show the fully assembled flat panel display device (10), which includes the first frame (14g), second frame 916) and at least the flat display panel (12) shown in Figure 4C.

Consistent with the demands of the claims, the specification explains that the elements of a conventional flat panel display device (e.g., an LCD device) are assembled together into a device. "The LCD device has an LCD panel, a backlight device *fixed to the back* of the LCD

panel, and a supporting frame for _assembling_ the LCD panel and the backlight device _along the edge._"[15] And, "[t]he LCD panel and the backlight device are _assembled_ by a supporting frame _along the edges._"[16] In short, other than the location of the mounting elements, the patents do not teach – and LPL does not argue – that a flat panel display device has a basic structure that is different from the structure of a conventional flat panel display device described by the specification and illustrated in Fig. 4C.[17] Indeed, LPL admitted as much at the _Markman_ hearing by acknowledging that the flat panel display device 10 shown in each of the figures 5-16 has the same construction.[18]

The '718 patent confirms that the flat panel display device components are always assembled or connected together into a unitary structure. The claims of the '718 patent are directed to either attaching a rear mountable flat panel display device to a housing or assembling a rear mountable flat panel display device. Each of the claims that addresses the assembly of a rear mountable flat panel display device (i.e., 33-39) require the internal components of the device to be attached to or fixed between the first and second frames. Notably, the specification does not anywhere else describe, nor do any of the remaining claims require, the step of securing the components of the flat panel display device together, which would be necessary for these other claims to have meaning if the device was not already assembled as a unit. Everything evidences that the inventors were not inventing a new flat panel display device, but merely a new way to mount an otherwise conventional flat panel display device. Every embodiment in the Patents show the flat panel display device assembled as a device by the frames. The description

---

[15] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:42-45.
[16] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:4-6.
[17] This, of course, is because any suggestion that a flat panel display device such as a PDP or FED has a first and second frame structure than does not perform the functions of the first and second frames described in the specification would be contrary to the teachings of the patents and invalid for lack of written description and/or lack of enablement.
[18] Markman Hearing Transcript at 11:4-12:5. _See also_ 76:4-77:13.

of the structure of the flat panel display device in the specification requires the first frame to be coupled to a second frame or supporting frame.[19]

The remainder of the specification is in accord, as is common sense. If the components of a flat panel display device are not assembled together as a device through the first and second frames in some fashion, they could not appear as a single unit as shown in Figures 5-16. Indeed, in the absence of this assembly, only the first frame could be mounted to the housing, and all of the remaining components would fall out of the portable computer even when the flat panel display device is called out as being mounted to the housing. These parts must be assembled together into a device by or through the first and second frames. It is these components then, that also form the beginning and the end of the flat panel display device.

To circumvent the limitations of the claims and the teachings of the specification, LPL argues that the existing definitions allow one to attach other structures to the front or back of an existing flat panel display device and still call the resulting assembly a flat panel display device, with the newly added structures assuming the identities of the first and second frames. Specifically, LPL argues that the first frame need not be that frame which, together with the second frame, actually fixes the flat display panel to form a device. Instead, LPL argues the first frame can be any structure toward the back of the device that has a fastening part on its rear surface. Thus, according to LPL, you can take a flat panel display device that looks exactly like those shown in Figures 2, 3 or 4, attach a component that covers some or all of the back of that device and "presto-change-o," that new component becomes the first frame. The structure that the specification expressly identifies as the first frame now becomes just an extra frame, and the flat panel display device is redefined to include the new component. This eviscerates the construction and rationale articulated by the Special Master in the Report as to these terms, the limitations on other terms such as rear mountable and is contrary to the express teachings of the patent specification.

---

[19] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:21-22. *See, e.g., Microsoft,* 357 F.3d at 1349 (limiting scope of claims because specification "repeatedly and consistently describes" claimed invention as limited).

The Patents draw a clear line between a flat panel display device and other components that are mounted to the back of the device. For example, the Patents teach fixing "display device support members 24" to the back of the flat panel display device.[20] When so fixed, the display device support members are not transformed into the first frame, nor does it become any part of the flat panel display device. Instead, according to the patents, they remain separate, independent elements. Claim 1 illustrates this point:

> A portable computer comprising: . . .
>
> a *rear mountable display device* including a second fastening element at a rear surface of the rear mountable display device, the case and the rear mountable display device being attached through the first and second fastening elements; . . .
>
> a *display device support member* having a third fastening element, the display device support member being *attached to the rear mountable display device* through the third fastening element.

If the display device support member (24) became part of the rear mountable display device once attached, this claim would have simply read "a rear mountable display device including a display device support member and a second fastening element at a rear surface of the rear mountable display device." By claiming these elements separately, however, the patents preserve their distinct identity, regardless of whether or how they are attached together. In fact, when something such as a support member is attached to the flat panel display device, the patents call it a "flat panel display device <u>assembly</u>."[21] This differentiates the flat panel display device from the next component to which it is mounted, i.e., a housing of a portable computer, and tells one of ordinary skill in the art where the flat panel display device begins and ends.

Indeed, LPL concedes that the display device support member is not properly construed to be the first frame, yet that is exactly what it argues is allowed by the construction in the Report.[22] Likewise, LPL admits that the brackets shown in the prior art in the intrinsic record

---

[20] *See, e.g.*, D.I. 388, JA at Ex. A, '641 Pat., Abstract and Col.5:35-7:11.
[21] *See, e.g.*, D.I. 388, JA at Ex. A, '641 Pat., Col. 1:27-31 (using "flat panel type display device assembly" to refer to combination of flat panel display device and display case); Col. 2:8-12 (same).
[22] D.I. 667, LPL's Claim Construction Answering Brief at 30-31.

used to mount a flat panel display device to a housing are not properly construed to be the first frame.[23] Specifically, Fujimori, USPN 5,379,182 teaches brackets mounted to the front portion of the housing while Kurihara, USPN 5,946,061, teaches brackets attached to the rear housing.[24] Each of these bracket structures <u>must be excluded</u> from the definitions of first frame and second frame. *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000). To do so, the constructions must provide a clearer understanding that the first and second frames are static elements bearing a specific relationship to the flat display panel, and they are not dynamic elements that change as necessary to match LPL's infringement contentions.

To assemble a rear mountable flat panel display device, Claims 33 and 39 of the '718 patent direct that the first and second frames are the structures at the front and back of the device that secure the flat display panel in place. Together, they assemble the components into a device. There is no mention of other frames or structure besides the display device support members in the specification, nor is there any mention of how attaching the support members to the structures identified as the first and second frames converts the support members in to the first or second frame. That is because any such added component would not assemble the components into a device.[25]

Because the entire intrinsic record describes a flat panel display device, first frame and second frame as forming and constituting a single unitary structure, those are the constructions these terms should be given. *See Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-57 (Fed. Cir. 2006). First frame and second frame must be construed consistently with this understanding of what constitutes a flat panel display device. Read out of context, it is easy to suggest that "first frame" and "second frame" relate to a generic structure where the labels "first" and "second" are terms of serendipity, having no significance. Claim terms must be construed in context, however. *See Bell Comms. Research, Inc. v. Vitalink Comms. Corp.*, 55

---

[23] LPL Op. Br. at 28.
[24] D.I. 665, Heisman Resp. Decl., Ex. 24, Fujimori '182 Pat.; D.I. 388, JA, Ex. E, Kurihara '061 Pat., Item 13 in Figs. 2, 3, 5, 6.
[25] Claims 35, 37 and 40 of the '641 Patent are in accord.

F.3d 615, 621 (Fed. Cir. 1995). Read in context, the specification clearly instructs what structures are the first and second frames, and what structures are not the first and second frames. It shows that the first frame and the second frame are the structures at the rear and front, respectively, of the stack of constituent elements (i.e., at least a flat display panel) that are contained in a flat panel display device. As illustrated in figures 4A-C, the "second frame" 16 (also called "support frame 16") is like an open bottom box – it has an opening for the display area and has sides that surround components of the flat panel display device 10.[26] The first frame 14g is the structure at the bottom of the stack of constituent elements and forms the back of the flat panel display device. It engages with the structure that is the second frame components to assemble and form the flat panel display device 10. The specification discloses that the first frame 14g is connected to the second frame 16 in order to assemble the components as a flat panel display device 10.[27]

Because the inventors consistently used first frame to be that structure identified as 14g and second frame as the structure identified as 16 in Fig. 4C, the claim should be construed consistently. *See LG.Philips LCD Co., Ltd. v. Tatung Co.*, 434 F.Supp.2d 292, 296 (D. Del. 2006) ("The consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim."). That is particularly true here where these components are the elements that are used by the supposed invention of the patents to overcome the limitations of the prior art. *Inpro II*, 450 F.3d at 1354-57 (Court limited claim meaning because specification, embodiments, and prosecution history consistently described claim element as having one structure, and specification emphasized the importance of that structure in solving the problems of the prior art structure).

Finally, ViewSonic submits that a proper construction of first frame will be achieved by recognizing that the first frame is a component of the backlight unit when a backlight unit is present. Throughout the patents, the backlight unit is identified as including the first frame as an

---

[26] D.I. 388, JA at Ex. A, '641 Pat.
[27] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:20-21.

integral element.[28] The intrinsic prior art of record also defines a backlight unit as including the first frame.[29]

To ensure that a proper construction of these terms is achieved and to eliminate any room for arguments of the nature raised by LPL based on the constructions proposed in the Report, ViewSonic requests that the construction of *flat panel display device* be amended to read "A display device having at least a flat display panel sandwiched and assembled into a device by the first and second frames." Similarly, the constructions of "*first frame*" and "*second frame*" should be respectively amended to be: "The structure at the back of the flat panel display device that together with the second frame structure sandwiches and assembles at least the flat display panel into a device" and "The structure at the front of the flat panel display device that together with the first frame structure sandwiches and assembles at least the flat display panel into a device." Finally, ViewSonic requests that the construction of *backlight unit* be amended to read: "The first frame and the layers of the flat panel display device which illuminate the flat display panel (or LCD panel) from behind." Each of these amendments properly respects the teachings of the specification and the invention actually disclosed by the patents. These proposed amendments to the constructions contained in the Report stay true to the intrinsic evidence and he invention actually invented and described.

**B.    *"Corners Of The First Frame"***

The Report recommends that the term "corners of the first frame" be construed to mean "The places at the rear surface of the first frame near the intersection of any two side edges of the first frame." ViewSonic believes that this definition introduces a fatal uncertainty and ambiguity into the claim. This construction also may permit arguments that effectively eliminate this

---

[28] D.I. 388, JA at Ex. A., '641 Pat., Fig. 4C; Col. 4:12-25. Claims 35 and 47 of the '641 patent, and 33 of the '718 patent, each also require that the "first frame" be a part of the backlight unit.

[29] D.I. 388, JA at Ex. D, Yun, Fig. 6 and Col. 1:16-32 (emphasis added); *see also* Col. 2:4-7 ("According to the structure described above, the LCD device operates as follows. The light from the luminescent lamp is incident on the rear surface of the liquid crystal panel through the *back light unit*.") (emphasis added).

limitation from the claims. For each of these reasons, the construction should be amended to: "The places on the first frame where two side edges of the first frame intersect."

The use of the term "near" as part of this construction was proposed by LPL. It is hopeless vague and is contrary to the teaching of the specification and the requirements of the claims. The corners of the first frame are clearly identified in the specification at column 4, lines 22-24, which instructs the reader that the corners of the first frame contain fastening holes located as shown in Figures 4A-C. Those figures show the fastening parts at the places where the two side edges of the first frame intersect. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997) (noting relevance of drawings to claim interpretation).

The term "near" is nowhere to be found in the patent specification in conjunction with the "corners of the first frame" or the location of any other component. What then, is the definition of the term "near"? Is it the area within a certain multiple of the diameter of the hole used for fastening as shown in Figs. 4B and C? Does "near" cover the entire area that is closer to the intersection of one set of side edges than the intersection of two other side edges? It is simply impossible to tell.

Moreover, the proposed construction is contradicted by the doctrine of claim differentiation. Claims 38 and 39 of the `641 patent require that the fastening elements be "at" an enumerated number of corners of the first frame. If the corner includes all of the area of the back that is "near" the intersection, it is impossible to tell if something is "at" the corner or not. This construction rewrites this claim from "at" the corner to "near" the corner, without any definition of what that means. Moreover, under the doctrine of claim differentiation, the broader independent claim must include fastening elements that are not "at" the corner. Under the claim term as construed, that means that the fastening element need not be "near" the corner, but instead they now may be "far away" from or "not near" the corner. This too is nowhere disclosed in the patents, and leaves the public to guess when it may practice the invention. The intrinsic record, as well as the claims themselves, instead supports construing the "corners of the

first frame" to be "the places on the first frame where two side edges of the first frame intersect."[30]

The inventors had every opportunity to provide define that was meant by the "corners of the first frame" other than what is depicted in Figs. 4B and C. But they chose not to do so. It should not fall to the public to guess what this means, when the "corners of the first frame" can be explicitly and definitively defined in a proper construction.

### C.     *"Fastening Hole"*

The Report recommends that *"Fastening Hole"* be construed to mean "an opening, together with the material defining the opening, that provides the capability for attaching firmly or fixing securely so as to be supported, one component to another." This construction, adopted at the urging of LPL, is contradicted by the specification and appears to a have a special meaning to LPL that is contrary to the language used. Accordingly, ViewSonic requests that the construction be amended to read: "An opening. When combined with the material defining the opening, a fastening hole is a Fastening Part."

The patent specification clearly states that a "through hole" is a type of "fastening hole."[31] Yet, when LPL proposed the language that the Special Master adopted for the construction of "fastening hole," it argued that a "through hole" is not a "fastening hole." [32] If this construction supports an argument that a through hole is not a fastening hole, then it directly contradicts the express teaching of the patent specification, and must be wrong. The Patents expressly differentiate between a "fastening part" and a "fastening hole." [33] According to the specification, a fastening hole *does not* include the material defining the hole. Instead, a

---

[30] The testimony of LPL's expert in discussion Fig. 4C also supports ViewSonic's interpretation. Heisman Resp. Decl., Ex. 25 at 102:19-103:5 [D.I. 665].

[31] D.I. 388, JA at Ex. A, `641 Patent at Col. 5:52-55, 5:63-66, 6:66-67.

[32] D.I. 667, LPL's Claim Construction Answering Brief at 58.

[33] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:32-36 ("which may be referred to as a *fastening hole* or a similar conveniently descriptive term, *and which together with the material defining the hole* may be referred to as a fastening element or fastening part)" (emphasis added); Col. 4:51-54 (same); Col.4:60-64 (same); Col. 5:53-56 (same); Col. 5:65-6:1 (same); Col. 6:65-7:2 (same); and Col. 7:3-7 (same).

fastening hole is a hole.  A fastening hole only becomes a fastening part when it is combined with the material defining the hole. *Id.*  Thus, it was error for the Special Master to adopt LPL's proffered construction which contradicts the patent specification.

Likewise, the substitution of the word "opening" for the word "hole" in the construction of this term is again without any support in the Patents.  Notably, it is common knowledge that any hole would be considered to be an opening, but not every opening is considered to be a hole.  The Patent do not use the term "opening" as a substitute for "hole," And neither should the Court. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (holding it is improper to read a term to encompass a broader definition than the intrinsic record provides simply because it can be found in a dictionary).

As discussed above, LPL seeks to narrow this term to exclude a through-hole from being a fastening hole.[34]  The Patents, however, do not preclude any hole (including a through-hole) from being a fastening hole, and in fact, they expressly state that a "through-hole" *is* a fastening hole:

> A through-hole (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .)
>
> At each end of the flat portion, a hole such as a through-hole (which may be referred to as a fastening hole or a similar conveniently descriptive term . . .)[35]

Though LPL admits that "the specification teaches that a through-hole may be referred to as a 'fastening hole,' it argues that this does not mean that all through-holes are fastening holes.[36]  But the specification does not distinguish between a through hole that LPL likes and a through hole that it does not like.  LPL's circular argument is contrary to the express teachings of the Patents and contrary to law.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

---

[34] D.I. 370, LPL Op. Br., p. 26.
[35] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:51-52; 4:60-62; Col.5:52-55; Col.7:9-11 and 7:28-30, respectively.
[36] D.I. 370, LPL Op. Br., p. 27.

The inventors anticipated that the "fastening hole" in the first frame could be a through-hole, and LPL's attempt to rewrite it must be rejected. LPL cannot now be permitted to revise the definition supplied by it for this term during the prosecution of the Patents as required by the Examiner. Neither the claims, the specification, nor the prosecution history, make any distinction between the fastening holes – or for that matter the fastening parts – regardless of whether they are located on the case, the hinge arm, or the display device, and it would be improper for the Court to create such a distinction now.[37]

Accordingly, ViewSonic submits that the construction of this term should be amended to eliminate this issue, either by expressly confirming that the construction includes a through hole, or by using the language of the patent specification to define this element, assuming a definition is even needed. To that end, ViewSonic proposes that the term 'fastening hole" be construed to mean "An opening. When combined with the material defining the opening, a fastening hole is a Fastening Part."

**D.**　　***"Housing"* And *"Data Processing Device"* Must Follow The Inventors' Express Definitions As Supported By The Intrinsic Evidence.**

The recommended construction for "housing" is "an outer casing or enclosure." The construction is based on the dictionary definition for "housing" that LPL provided the Special Master. But the claims, the specification and prosecution history make clear here that the term "housing" is not used in its ordinary sense and a simple dictionary definition is not proper.

In *Phillips* and its decisions thereafter, the Federal Circuit has repeatedly made clear that the claims of a patent are limited to the actual invention as is described in the patent specification. That does not mean that a patent is automatically limited to the preferred embodiments but rather the Court must look to the specification and the file history to determine if and how the inventors used what might otherwise be common terms in a particular way in the context of defining the scope of the invention that the patent seeks to protect. All nine

---

[37] LPL's expert is again in accord. D.I. 665, Heisman Resp. Decl., Ex. 25 at 99:9-25.

embodiments and related descriptions depict the housing exclusively as the case and body of a portable computer. *See C.R. Bard*, 388 F.3d at 865-69; *Microsoft*, 357 F.3d at 1348.

As discussed above, one such post-*Phillips* decision that has particular applicability to the facts of the instant case is *Honeywell v. ITT*, 452 F.3d 1312 (Fed. Cir. 2006). In *Honeywell*, the face of the patent claims sought to claim a component for a fuel injection system. The District Court expressly recognized that the ordinary meaning of the term "fuel injection system component" is "any constituent part of the fuel injection system of a motor vehicle including, for example, fuel filters, fuel lines, and connectors." *Id.* Still, both the District Court and the Federal Circuit agreed that the claims were properly limited to a fuel filter. *Id.* at 1315-16. In so doing, the Courts relied on the specification which only described the elements and operation of a fuel filter. No other fuel injection system parts or components were described. The Federal Circuit also focused on the written description's reference to a fuel filter as "this invention" or "the present invention" on four separate occasions. The Court noted, "[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id.*

To invoke Yogi Berra, the patents here are more like the patent in *Honeywell* than the patent in *Honeywell*. First, the patents repeatedly describe the "invention" as either applicable to, a component of, or directed to a "portable computer." Here, as in *Honeywell*, the patentee failed to describe a housing in any manner other than as a portable computer. Indeed, it is striking that the patentee expressly noted that LCD devices are used in portable computers *and monitors*,[38] but chose to exclusively and repeatedly describe the invention sought to be protected by these patents *solely in connection with a portable computer*.

Filed herewith is a detailed recitation of more than a dozen instances where the Asserted Patents describe or depict the invention as a portable computer.[39] Highlights from that exhibit

---

[38] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:32-34.
[39] Heisman Obj. Decl., Ex. 28.

include the titles of the patents,[40] the Abstract ("a portable computer including a housing having first and second sections . . ."), the Summary of the Invention ("[a]ccordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon . . ."), and various places throughout the body ("[t]he present invention provides a back mounting method and a back mounting structure for a panel display device in a portable computer"). Indeed, at the conclusion of the specification when seeking to ensure that one of ordinary skill in the art would appreciate the full scope of what was disclosed, the inventors once again confirmed that the present invention is directed to a portable computer, to wit:

> It will be apparent to those skilled in the art that various modifications and variation can be made *in the portable computer and method for mounting a flat panel display device thereon of the present invention* without departing from the spirit or scope of the invention.[41]

Applying the words of the Federal Circuit, "if the written specification could talk, it would say" a "housing" is the case and body of a portable computer. *Id.* at 1320. Certainly, this is what the inventors said time and again. The specification and the prosecution history here, however, are even more compelling than that presented in Honeywell.

Here, the inventors actually amended the specification to define "housing" as the case and body of a portable computer – not once, but twice.[42] When the patentee expressly defines a claim term, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316; *see also Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1177-78 (Fed. Cir. 2002); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-09 (Fed. Cir. 2004) (holding patentee who notifies public that claim term is limited beyond its ordinary meaning is bound by that notification even if it was unintended).

---

[40] D.I. 388, JA at Ex. A, '641 Pat., VS015074 ("Computer Having a Flat Panel Display Device"); *id.*, at Ex. B, '718 Pat., VS014789 ("Portable Computer and Method for Mounting a Flat Panel Display Device Thereon").

[41] D.I. 388, JA at Ex. A, '641 Pat., Col. 7:46-50 (emphasis added).

[42] D.I. 388, JA at Ex. A, '641 Pat., Col. 6:6-9, and Col. 4:44-50; D.I. 388, JA at Ex. G, '641 File History, at VS5005544, VS5005547.

The Examiner refused to allow various claims as lacking in an antecedent basis for certain terms in the specification. One of those terms was "housing."[43] Rather than taking that opportunity to clearly inform the public that "housing" is "an outer casing or enclosure," the inventors amended the specification in two places to expressly recite that "housing" is the case and body of a portable computer. To wit:

> To mount the LCD device 10, the body 20 (first portion) and the display case 30 (second portion) (*collectively referred to as a housing*) are connected by the pin portion 24a on the hinge mount 22.[44]

> The computer includes a body 20 or first section having an information input device and a second section including the case 21. The case 21 may cover the body 20 and is coupled to the body through a hinge mechanism. *Together, the case 21 and the body 20 may be referred to as a housing,* or a similar conveniently descriptive term.[45]

Significantly, these amendments are the _only two places_ where the specification articulates the meaning of "housing." And the amendments worked. The Examiner thereafter allowed the claims containing housing. Obviously the Examiner believed the inventors described housing with "reasonable clarity, deliberateness, and precision." *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325-26 (Fed. Cir. 2002). Indeed, the Examiner was certainly not left with any confusion about the invention to be protected here – stating in his statement of record for reasons of allowance:

> The best prior art of record . . .taken alone or in combination fails to teach or suggest *a portable computer comprising* a rear mountable display device . . . as claimed in Claims 1, 30, 35, 47, 55 and 56.[46]

By these amendments, the inventors again expressly advised the public of the scope of their invention, thereby conclusively redefining the meaning of "housing." This is not an

---

[43] D.I. 388, JA at Ex. G, '641 Pat. file history, at VS5005534.
[44] D.I. 388, JA at Ex. A, '641 Pat., Col. 6:6-9; JA at Ex. G, '641 Pat. file history, at VS5005544, VS5005547).
[45] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:44-50.
[46] D.I. 388, JA at Ex. G, '641 Pat. file history, VS5005645; *see also*, D.I. 392, JA at Ex. H, '718 Pat. file history, VS015043.

isolated instance pulled out of context to support a position, but rather the express and repeated teaching of the patent specification. Thus, ViewSonic submits that "housing: should be construed to mean a "case and body of a portable computer," just as the inventors intended.

LPL has argued against this express definition, saying a portable computer is merely a preferred embodiment. LPL thus contended that the patents also apply to other products such as desktop monitors. As its sole support for this position, LPL points to a single statement in the specification that says "the LCD is widely used in portable computers and flat screen monitors."[47] Pulled out of context, as LPL has done, one might mistakenly conclude this supports LPL's argument. But read in its full context – and against the entirety of the patents – it is easy to see that this statement is not at all what LPL tries to make of it.

> 1.    Field of the Invention
>
> The present invention relates generally to a flat panel display device, and more specifically, to a flat panel display device mounting structure and a method of mounting the flat panel display device to a *computer*.
>
> 2.    Description of the Related Art
>
> Flat Panel display devices include liquid crystal display devices (LCD) which are being used widely, plasma display panels (PDP), and field emission displays (FED) which have been studied recently and *may be applied to computers* in the near future. *For convenience of explanation, the present invention will be discussed with respect to the LCD as an example of the flat screen type display devices and a portable computer mounted with the LCD.*
>
> Referring to FIG. 1, *a general portable computer such as a laptop or notebook computer typically includes* a body, a flat panel display device assembly coupled to the body via a hinge mechanism. The flat panel type display device assembly has a flat panel display device and a display case supporting the flat panel display device. The body has an input device such as a keyboard. *As a flat panel type display device, the LCD is widely used in portable computers and flat screen monitors.*[48]

This part of the specification discusses a conventional portable computer having an LCD device mounted in it. Against that context of describing the prior art "general portable computers," the

---

[47] LPL Op. Br., p. 20.
[48] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:10-34. (Emphasis added.)

patents mention that LCD devices are widely used in portable computers and flat screen monitors.

Glaringly absent from this statement – and the entirety of the patents – is any statement that the invention is intended to apply to flat screen monitors as LPL asserts. For example, while the above language is careful to point out that "the present invention will be discussed with respect to the LCD device as an example of the flat screen type display devices," it does not continue to say, "and with respect to the portable computer as an example of the device to which an LCD is mounted." Such additional language might have provided at least some connection between the reference to monitors and the present invention. Instead, the Patents make clear that the present invention is a structure and method for mounting flat panel display devices *solely* in portable computers.[49]

The statement which follows the description of the embodiments is further illustrative:

> "In the above embodiments of the present invention, although the LCD device has been used as one type of flat panel display device, other flat panel display devices such as plasma display panels (PDP) and field emission displays (FED) may be used in accordance with the present invention. Moreover, in the above embodiments, other hinge mechanisms may be used such as a gear hinge as disclosed, for example, in US application Ser. No. 08/937,801 filed on Sep. 25, 1997 entitled, "DISPLAY WITH GEAR TYPE HINGE," which is incorporated herein by reference.
>
> It will be apparent to those skilled in the art that various modifications and variation can be made *in the portable computer* and method for mounting a flat panel display device *thereon of the present invention* without departing from the spirit or scope of the invention."

The only alternatives the inventor expressed for its invention were the type of flat panel display device and type of hinge mechanism. No alternatives were given to using a portable computer. The last statement in particular leaves no doubt that a person skilled in the art would conclude that the invention has only one use – mounting a flat panel display device to a portable computer. *Compare SciMed*, 242 F.3d 1337 (Fed. Cir. 2001) (holding that statement indicating a

---

[49] *See* Ex. 1 to Opening Brief.

specific structure was the "basic sleeve structure for all embodiments of the present invention contemplated and disclosed herein" limited scope of claims to that basic sleeve structure). The entirety of the specification provides substantial support for ViewSonic's amended construction. Certainly, the public – like the Examiner – is entitled to rely on what the inventors said when they spoke on this matter, over and over again.

### E.    *"Data Processing Device"* is a portable computer.

Just as the intrinsic evidence compels the conclusion that the housing is a component of a portable computer, so too does the evidence direct the conclusion that the element "Data Processing Device" is a portable computer. No matter how hard one looks or listens, the specification simply does not say anything else.

The detailed arguments presented with regard to "housing" are equally applicable here, and therefore will not be repeated in full. Briefly, though, the claims recite "capable of being fixed to a housing of the data processing device." Because the inventors defined "housing" as the "case and body of a portable computer," the data processing device can only be construed as a portable computer for the claims to make sense.

The specification teaches nothing to the contrary. It does not contain the words "data processing device." The only such device disclosed in the context of the invention is a portable computer. The simple fact is that the inventors had ample opportunity to identify some device other than a portable computer as a data processing device, but they chose not to. Instead, the Patents use the terms "data processing device" and "portable computer" as synonyms, neither explaining their relationship nor indicating any difference in meaning. *See, e.g., Pickholtz v. Rainbow Tech., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002) (construing claim term "computer" as synonymous to "computer system" from written description, even though court normally would give meaning to the word "system," because patent used the terms interchangeably). As the Federal Circuit found in *Honeywell*, the written description leads one to the conclusion that a portable computer is the only "data processing device" that the claims cover, and that a portable

computer was not merely a discussed as a preferred embodiment. *Honeywell*, 452 F.3d at 1318-1319.[50]

This is precisely what the Examiner understood the invention to be. In the Notice of Allowance, he characterized the allowed claims – including all of the Asserted Claims – as directed to a portable computer:

> "The best prior art of record . . . fails to teach or suggest *a portable computer* comprising a rear mountable display device . . . as claimed in Claims 1, 30, 35, 47, 55, and 56."[51]

LPL offers no intrinsic evidence to rebut this strong confirmatory evidence that both LPL and the Examiner understood that the Patents were limited to a portable computer, not a desktop monitor or television set as LPL argues today. Thus, the Court should construe "data processing device" as being a "portable computer."

## VI.    CONCLUSION

For the foregoing reasons, ViewSonic respectfully requests that the Court adopt its proposed amended constructions. Those amended constructions are:

*flat panel display device* be amended to read: "A display device having at least a flat display panel sandwiched and assembled into a device by the first and second frames."

*first frame* and *second frame* be amended to read: "The structure at the back of the flat panel display device that together with the second frame structure sandwiches and assembles at least the flat display panel into a device" and "The structure at the front of the flat panel display device that together with the first frame structure sandwiches and assembles at least the flat display panel into a device," respectively.

*backlight unit* be amended to read: "The first frame and the layers of the flat panel display device which illuminate the flat display panel (or LCD panel) from behind."

*corners of the first frame* be amended to read: "the places on the first frame where two side edges of the first frame intersect."

---

[50] This too is confirmed by LPL's expert. Heisman Resp. Decl., D.I. 665, Ex. 25 at 92:15-93:9.
[51] D.I. 388, JA at Ex. G, '641 File History at VS5005645.

*Housing* be amended to read: "the case and body of a portable computer."

*Data Processing Device* be amended to read: "a portable computer."

*Fastening Hole* be amended to read: "an opening.  When combined with the material defining the opening, a fastening hole is a 'fastening part.'"

Each of these amendments will ensure that that the patent claims are properly directed to any invention actually invented, and as described by the inventors.

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ LLP

Dated:  July 6, 2007          By:  */s/   James D. Heisman*
                                  Jeffrey B. Bove, Esq. (#998)
                                  James D. Heisman, Esq. (#2746)
                                  Jaclyn M. Mason, Esq. (#4737)
                                  The Nemours Building, 8th Floor
                                  1007 North Orange Street
                                  Wilmington, DE  19801
                                  Telephone:  (302) 658-9141
                                  Facsimile:  (302) 658-5614

                                  Scott R. Miller, Esq.
                                  355 South Grand Avenue, Suite 3150
                                  Los Angeles, CA  90071
                                  Telephone:  (213) 787-2500
                                  Facsimile:  (213) 687-0498

                                  *Attorneys for ViewSonic Corporation*

OF COUNSEL:

Tracy R. Roman, Esq.
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone:  (310) 277-0010
Facsimile:  (310) 277-1980

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2007, a true copy of the foregoing document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following and the document is available for viewing and downloading from CM/ECF:

Richard D. Kirk
Ashley Blake Stitzer
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Anne Shea Gaza
Frederick L. Cottrell III
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801

I hereby certify that on July 6, 2007, I have sent by email the foregoing document to the following non-registered participants:

Cass W. Christenson
Lora A. Brzezynski
Rel S. Ambrozy
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

Mark H. Krietzman
Valerie W. Ho
Frank E. Merideth, Jr.
Steve P. Hassid
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy R. Roman
Raskin Peter Rubin & Simon
1801 Century Park East 23rd Floor
Los Angeles, CA 90067

By: /s/ James D. Heisman
James D. Heisman (#2746)
jheisman@cblh.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2007, a true copy of the foregoing document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following and the document is available for viewing and downloading from CM/ECF:

Richard D. Kirk
Ashley Blake Stitzer
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Anne Shea Gaza
Frederick L. Cottrell III
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801

I hereby certify that on July 13, 2007, I have sent by email the foregoing document to the following non-registered participants:

Cass W. Christenson
Lora A. Brzezynski
Rel S. Ambrozy
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

Mark H. Krietzman
Valerie W. Ho
Frank E. Merideth, Jr.
Steve P. Hassid
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Tracy R. Roman
Raskin Peter Rubin & Simon
1801 Century Park East 23rd Floor
Los Angeles, CA 90067

By: /s/ James D. Heisman
James D. Heisman (#2746)
jheisman@cblh.com