# EXHIBIT C

Teleconference

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


L.G. PHILLIPS LCD      )
CO., LTD.,             )
                       )
         Plaintiff,    )   Civil Action No.
                       )   04-343-JJF
v.                     )
                       )
TATUNG COMPANY;        )
TATUNG COMPANY OF      )
AMERICA, INC.; and     )
VIEWSONIC              )
CORPORATION,           )
                       )
         Defendants.   )


         A teleconference was taken pursuant to notice
before Ellen Corbett Hannum, Registered Merit Reporter,
in the law offices of Blank Rome, 1201 N. Market Street,
Suite 800, Wilmington, Delaware, on Wednesday, May 23,
2007, beginning at approximately 2:30 p.m., there being
present:
BEFORE:  SPECIAL MASTER VINCENT L. POPPITI
APPEARANCES:

                    RICHARD D. KIRK, ESQ.
                    The Bayard Firm
                       Wilmington, Delaware   19801
                            and
                    CASS W. CHRISTENSON, ESQ.
                    REL S. AMBROZY, ESQ.
                    CORMAC T. CONNOR, ESQ.
                    McKenna Long & Aldridge LLP
                       Washington, D.C. 20006
                    For the Plaintiff
                    CORBETT & WILCOX
              Registered Professional Reporters
         The Parcels Building - 230 N. Market Street
                  Wilmington, DE 19801
                    (302) 571-0510
                  www.corbettreporting.com
      Corbett & Wilcox is not affiliated with Wilcox & Fetzer,
                    Court Reporters

Page 2

```
 1   APPEARANCES (CONTINUED):

 2                      JAMES A.L. TWEEDIE, ESQ.
                       Richards, Layton & Finger
 3                        Wilmington, Delaware 19801
                                       and
 4                      VALERIE W. HO, ESQ.
                       FRANK E. MERIDETH, JR., ESQ.
 5                      MARK H. KRIETZMAN, ESQ.
                       Greenberg Traurig LLP
 6                        Santa Monica, California 90404
                       For the Defendants Tatung Co. and
 7                      Tatung Company of America, Inc.

 8                      JAMES D. HEISMAN, ESQ.
                       SCOTT MILLER, ESQ.
 9                      Connolly Bove Lodge & Hutz LLP
                         Wilmington, Delaware  19801
10                      For the Defendant ViewSonic
                       Corporation
11

12                      - - - - -

13              SPECIAL MASTER POPPITI:  Let's do roll

14   call.

15              MR. KIRK:  This is Richard Kirk from The

16   Bayard Firm.  And with me on the line from McKenna Long &

17   Aldridge in Washington are Cass Christenson, Rel Ambrozy,

18   and Cormac Connor.

19              SPECIAL MASTER POPPITI:  Thank you.

20              MR. HEISMAN:  Jim Heisman from Connolly

21   Bove on behalf of ViewSonic, with me on the phone, also

22   from Connolly Bove, is Scott Miller.

23              SPECIAL MASTER POPPITI:  Thank you,

24   Mr. Heisman.
```

1                      MR. TWEEDIE:  Jameson Tweedie on behalf

2    of the Tatung defendants, with me are Frank Merideth and

3    Valerie Ho of Greenberg Traurig, and, I think, Mark

4    Krietzman also; is that correct?

5                      MS. HO:  That's correct.

6                      SPECIAL MASTER POPPITI:  Yes.  Thank

7    you, Mr. Tweedie.

8                      Let's do a couple of things.  First of

9    all, I have, I am mindful of the status letter that

10   Mr. Kirk sent to me on May 10th of 2007.  And my review

11   of that suggests that that is in fact just status, that

12   there is nothing that we will be dealing with today in

13   relation to that letter.  Is that correct?

14                     MR. KIRK:  Cass, do you want to speak

15   for us.

16                     MR. CHRISTENSON:  Your Honor, is that

17   the letter that references the status of certain

18   third-party discovery?

19                     SPECIAL MASTER POPPITI:  It is.  It's a

20   letter that references the status of subpoenas, Hewlett

21   Packard is mentioned, WalMart stores, Sam's Club and

22   there may be a few other issues that are raised in the

23   letter, but it looks like it deals with third-party

24   issues.

Page 4

1                      MR. CHRISTENSON:  Your Honor, our intent

2    in submitting that was merely to update you and to let

3    you know that there were a few third parties that were

4    continuing to produce discovery.  And with respect to

5    those specific third parties, as I understand it, there

6    is not a dispute currently that would need to be

7    addressed by you, we just wanted to give you an update.

8                      SPECIAL MASTER POPPITI:  Okay.  That's

9    great.  Thank you.

10                     MR. CHRISTENSON:  You are welcome.

11                     SPECIAL MASTER POPPITI:  Then with that,

12   let me first turn to something that came in only recently

13   and that would have been yesterday, correspondence from

14   Ann Gaza advising me of the status of Tatung's quest to

15   inspect Tatung products or alleged Tatung products in

16   LPL's possession.  I reviewed that.  I know that there

17   has not been a response to that.  And I am wondering

18   whether we can't deal with that today or whether LPL

19   intends to file a formal response and we will have to

20   deal with it at another time.

21                     Are you mindful of the letter?

22                     MR. CONNOR:  Yes, we are.  We would like

23   the opportunity to respond to that letter, if we could.

24   And it's something that we could do in fairly short order

Page 5

1  but, again, as I am sure you also received it just

2  yesterday.

3              SPECIAL MASTER POPPITI:  I did.  It's

4  short and to the point.

5              MR. CONNOR:  Yes.

6              SPECIAL MASTER POPPITI:  Would there be

7  any benefit to simply asking the parties to discuss it

8  for the next ten minutes or so?

9              MS. HO:  I believe so, Your Honor.  This

10  is Valerie Ho.  I don't see why this issue would need to

11  be put off for another day.  It's pretty simple, and I

12  think if we had a few minutes to discuss it with the

13  counsel for LPL that we may come to some kind of

14  agreement.

15              SPECIAL MASTER POPPITI:  I would prefer

16  that we do that, only because I certainly know that your

17  time will be committed between now and the middle of next

18  week.  And even beyond that, it's going to be important

19  to be focused on all the issues remaining but I think

20  this one -- I would hope you could come to some

21  resolution.  So why don't we do that now.  I will simply

22  put you all on hold and rejoin you all at -- because I

23  think I can do that, right, Mr. Kirk?

24              MR. KIRK:  Yes, Your Honor.  I have one

Teleconference

Page 6

1    issue, Your Honor.

2                   SPECIAL MASTER POPPITI:  Yes.

3                   MR. KIRK:  If I might.

4                   SPECIAL MASTER POPPITI:  Please.

5                   MR. KIRK:  I had thought LPL wanted to

6    raise it.  We thought it was a simple, discrete and non-

7    substantive regarding claim construction, since the

8    hearing is now less than a week away, we felt it

9    important to raise today.

10                   SPECIAL MASTER POPPITI:  Okay.

11                   MR. KIRK:  The defendant's answering

12   briefs have correctly noted a problem with a figure,

13   Figure 10 from the patent that has appeared in some of --

14   in all of LPL's briefs.

15                   SPECIAL MASTER POPPITI:  I'm aware of

16   the comments and the asserted problem.

17                   MR. KIRK:  And if I could just offer a

18   bit of explanation, we want to correct that.  Figure 10

19   is from the patent, rather than just physically

20   duplicating or reproducing that, we actually used an

21   animator, a graphic artist, and he did just more than

22   Figure 10, but he did a lot of animations for us.  And in

23   recreating Figure 10 the graphic artist misjudged one of

24   the dimensions in Figure 10 and we didn't catch that

Page 7

1    error until we read defendant's brief.

2                    Now, remember, we had filed an opening

3    brief and a supplemental opening brief and then we filed

4    an answering brief at the same time that the defendants

5    filed their answering brief.

6                    SPECIAL MASTER POPPITI:  Yes.

7                    MR. KIRK:  So that was the first time we

8    noticed that ourselves, when we had already filed three

9    briefs with that incorrect figure in it.  We would like

10   to correct that.  And our question really was just

11   guidance whether it would be more useful to the Court to

12   have entire new sets of briefs or corrected pages,

13   corrected only by changing that figure.  There were, I

14   think, seven instances of that figure in the opening

15   brief and then one each in the supplemental opening brief

16   and the answering brief.  And I didn't know whether Your

17   Honor had already begun to mark the briefs and might not

18   find it convenient to have new sets of briefs or simply

19   substitute pages.

20                   SPECIAL MASTER POPPITI:  Any comment,

21   please, with respect to the request?

22                   MR. MERIDETH:  Yes, this is Frank

23   Merideth, Your Honor.  I believe the problem is more

24   complex than merely replacing the figure itself because

Page 8

1    if the figure were corrected, the references in the text

2    of the brief and the conclusions drawn based upon the

3    altered Figure 10 would also have to be changed.   In

4    other words, what is referred to as green would be red or

5    vice versa and the text would not correspond to the

6    correct Figure 10 and the conclusions that are drawn,

7    based upon the altered Figure 10, in my view, would have

8    to be reconsidered.

9                      MR. MILLER:   Your Honor, this is Scott

10   Miller.

11                     My view on this is this is an issue that

12   should be raised at the claim construction hearing with a

13   slide or whatever LPL wanted to do with the corrected

14   figure.   It's a matter that was the substance of the

15   briefing and really doesn't belong outside of the Markman

16   Hearing procedure, it didn't seem to me.

17                     Defendants used pages in their

18   responding brief that they could have used for other

19   things, if this was merely a draftsman's error.   And I

20   think we are all better served just by having the

21   explanation presented at the hearing and responding to it

22   at that time.

23                     MR. AMBROZY:   Rel Ambrozy, if I may.

24                     On Mr. Merideth's comments, Mr. Merideth

Teleconference

Page 9

1    has not seen the corrected figures, so I think he is

2    unaware of what actually would be corrected, but all it

3    is is the lower hinge arm.  None of what he described,

4    the red color or the green color or the description that

5    goes along with that, changes.  The only piece that

6    changes is the lower portion of the hinge arm which is

7    not anywhere in the discussion or discussed in the text

8    of the brief.  So none of the colors change, none of the

9    discussion changes, none of the conclusions change.

10                   And in regards to Mr. Miller's comment,

11   we believe that it's more appropriate for Your Honor and

12   for the parties to consider the correct versions, rather

13   than spend time and waste the Court's time on -- I think

14   the phrase was secretly altered figures -- which is

15   totally inappropriate and it's an incorrect statement.

16                   SPECIAL MASTER POPPITI:  Well, let me

17   remind myself and everyone else as well that there was --

18   and I don't have the specifics in front of me because

19   the, I'm not sitting with the Markman briefing.  And yes,

20   they have been rather marked up and chewed on, if you

21   will, so I would prefer that if the document itself is

22   going to be altered at all, it only be that part of the

23   documents that has the figure in them.  Number 1.

24                   Number 2, I believe it was last week,

Page 10

1    shortly after the filing of the final briefs, that

2    ViewSonic did substitute the entire brief for purposes of

3    correcting one of the figures.  And, again, without my

4    being in front of the briefing, I can't be more specific

5    than that.

6                    It seems to me to have the document

7    corrected now, where there is going to be no change to

8    the substance of the document and/or no change to the

9    conclusion, that changing it now make sense so we don't

10   have to spend time during the course of the Markman to

11   talk about the change.  It may be important to talk about

12   it, but substantively I think it's an easy thing to do.

13   I'm going to permit substitution of pages.

14                   MR. KIRK:  Thank you, Your Honor.  We

15   will take care of that very shortly.

16                   SPECIAL MASTER POPPITI:  All right.

17   Thank you.

18                   MR. MILLER:  Just so the record is clear

19   I believe it was Tatung not ViewSonic who substituted.

20                   SPECIAL MASTER POPPITI:  Thank you for

21   doing that.  I apologize for not being more -- I knew

22   there was a substitution and I don't have it readily in

23   mind, but I appreciate your correcting the record.

24                   All right.  Let's do this.  I do want

Teleconference

Page 11

1    you to take a look at the May 22nd, if we are saying it's

2    going to take no longer than ten minutes, why don't we

3    all get back on the line at a little -- it's a little bit

4    beyond a quarter to 3:00, so let's look at a little bit

5    beyond 5 minutes to 3:00.

6                    MR. MERIDETH:  If I could just ask a

7    couple of questions in terms of how we are going to ham

8    this page substitution.

9                    SPECIAL MASTER POPPITI:  Yes.

10                   MR. MERIDETH:  The figure is going to be

11   changed and how soon would we get those pages.

12                   MR. KIRK:  I could tend you the pages

13   this afternoon.

14                   MR. MERIDETH:  Would we have an

15   opportunity to comment on the change?

16                   MR. KIRK:  I don't know the need to

17   comment on the change because the change is making the

18   correction that you all pointed out.

19                   MR. MERIDETH:  Well, I don't know

20   because from the description that was given, if you are

21   only going to address the lower part of the hinge arm,

22   that's not a problem that we see with respect to Figure

23   10, or the altered Figure 10.  So, I mean, I can't say

24   until I see what it is that you are going to do whether

Teleconference

Page 12

1    we would have something to say about it.  And I suppose

2    it would be better for us to say it and have everybody

3    understand what our position is before we start the

4    hearing.

5                    SPECIAL MASTER POPPITI:  I would agree

6    with that.  So what are you proposing?

7                    MR. MERIDETH:  When we get the drawing,

8    if we get the page, the pages, then maybe by Friday

9    morning we could file any commentary that we have, if

10   there is any.

11                   SPECIAL MASTER POPPITI:  Any comments,

12   please?

13                   MR. KIRK:  Your Honor, we are not

14   opposed to giving him the opportunity to do that, but I

15   don't believe that it would require much additional

16   briefing if we could get a one or one and a half page

17   limit, if necessary.

18                   MR. MERIDETH:  I don't know until I see

19   -- I would be happy to discuss it with you once we have

20   an opportunity.

21                   SPECIAL MASTER POPPITI:  I would prefer

22   you do it that way, and if there is a dispute you know

23   how to get in touch with.

24                   MR. KIRK:  Yes, Your Honor.

Page 13

1                    MR. CHRISTENSON:  So, Frank, we can talk

2    tomorrow.

3                    MR. MERIDETH:  Yes.

4                    SPECIAL MASTER POPPITI:  Let's take the

5    time to look at the May 22nd, and we will do 3 o'clock

6    now.

7                    (Discussion off the record.)

8                    SPECIAL MASTER POPPITI:  Are we ready?

9                    MR. CHRISTENSON:  We are ready.

10                   SPECIAL MASTER POPPITI:  Any resolution

11   on the May 22nd.

12                   MR. CONNOR:  It does not appear so. If

13   you prefer, I can state LPL's position on this issue.

14                   SPECIAL MASTER POPPITI:  Yes.  I would

15   prefer we deal with it now if you agree to do it in that

16   fashion.

17                   MR. CONNOR:  Part of our discussion

18   offline was the need for this inspection, the issue

19   being, as pointed out in their submission to Your Honor,

20   that they do not believe that the serial number that we

21   identified as the sample that we have in our office is in

22   fact a Tatung manufactured product.

23                   SPECIAL MASTER POPPITI:  Right.

24                   MR. CONNOR:  And if that's the case,

Page 14

1    then there are several reasons for us to wonder why an

2    inspection is necessary.  First of all, if -- I ask if

3    Tatung is suggesting that a different OEM other than

4    Tatung makes the same product number for HP would perhaps

5    manufacture it differently or if there are technical

6    specifications that would suggest that the product is

7    manufactured differently or if there is some, even some

8    piece of the product, they were saying that the

9    photographs we have sent already don't allow them to

10   conclusively determine whether or not this product is a

11   Tatung product, I asked if we could provide pictures of

12   those parts.  And Ms. Ho is not able to identify and

13   insisted on inspection.

14               Furthermore, as we discussed during the

15   prior hearing, and this pertinent point is at page 24 and

16   page 27 of the April 17th hearing.

17               SPECIAL MASTER POPPITI:  Wait just a

18   second.

19               MR. CONNOR:  Your Honor ordered Tatung

20   to determine whether or not product was available either

21   in its own inventory or on the open market.  And I can

22   represent to Your Honor that when I got the copy of the

23   letter last night, I look, did a quick Google search for

24   that product number and was able to find two of them for

Teleconference

1    sale at a Web site called PriceGrabber.com.  And so our

2    question is if Tatung is saying that the product we have,

3    first of all, is not a Tatung product, then maybe we need

4    to go out and get another one or maybe they need to get

5    another one or something like that and explain how it's

6    different and how the product that we have is not

7    representative of a product manufactured by Tatung.

8              Basically, we just don't find that

9    inspection is going to be a useful expenditure of

10   everyone's time.

11             MS. HO:  This is Valerie Ho.

12             May I respond?

13             SPECIAL MASTER POPPITI:  Please.

14             MS. HO:  Your Honor, as you will,

15   recall, at the last hearing when Tatung's motion for

16   inspection came up, Your Honor did rule that LPL should

17   provide the serial numbers of the alleged Tatung product

18   in LPL's possession so that Tatung could compare those

19   serial numbers with their own records to determine if

20   those products are in fact Tatung products.

21             SPECIAL MASTER POPPITI:  Right.

22             MS. HO:  We have done and that and there

23   is one product that, based on the serial number alone, it

24   does not appear to be a Tatung product, at least from the

Teleconference

Page 16

1    records that we have.

2                    The other thing we have done is we have

3    tried to go out and see if this product is available in

4    the open market.  And we were told by HP that this

5    product has been discontinued and, therefore, we were not

6    able to obtain it from HP.

7                    Now, having said that, I do not believe

8    that even if we were to go out and purchase the same

9    model number, that is the HPFP7317 that that would be

10   helpful because, as Your Honor will recall, HP sources

11   the same product, that is, the same model number from

12   different OEMs potentially.  So even if we were to get

13   this product from the open market, it may not be the same

14   product that is in LPL's possession.

15                   And so the only product that we would

16   need to inspect is the one that LPL has, because that's

17   the one that it is accusing of infringing the patents in

18   suit.  As for what we could potentially learn from an

19   inspection, it's hard to say because we don't have the

20   product in front of us.  But I can tell Your Honor that

21   from looking at the photographs that were provided by LPL

22   it is very unclear whether that product is a product that

23   was made by Tatung.

24                   For example, there is what we call a

Teleconference

1   tray that we use in a lot of our monitor products, and

2   that's a tray that, in which the LCD module is placed.

3   And sometimes we call it a tray, sometimes we call it a

4   meadow tray, sometimes we call it a main frame.  The main

5   frames that we use generally tend to be the same, so

6   that's one thing that we would look at to determine if

7   perhaps it is in fact a Tatung product or not.

8                 From the photographs it is impossible to

9   tell, simply put.  We really do need to see the actual

10  product itself.

11                In addition to that, there may be other

12  markings on the product that would tell us one way or the

13  other as to whether it is a Tatung product.  That is just

14  not a determination that I can make based on the

15  photographs that LPL has provided at this point.

16                SPECIAL MASTER POPPITI:  Let me ask a

17  question, though, Ms. Ho.

18                With the identification of two products

19  that are available that carry the same serial number, how

20  long do you expect it would take to secure one or both of

21  those products, at what expense, and how long would it

22  take to conduct whatever inspection work you would need

23  to do to make either a determination that it is, that

24  they are Tatung products, that they aren't Tatung

Teleconference

Page 18

1    products or that you can't tell because of the very

2    issues that you have just identified?  How long would

3    that process take?

4                    MS. HO:  The inspection, I believe,

5    would take half an hour to 45 minutes.

6                    SPECIAL MASTER POPPITI:  Okay.

7                    MS. HO:  And the reason for that is

8    because we would have to disassemble the product and

9    inspect it and perhaps photograph it and then reassemble

10   it.  And that takes some time.

11                   SPECIAL MASTER POPPITI:  Okay.

12                   MS. HO:  As for obtaining the product, I

13   was not aware that this product is available on a

14   different Web site.  Obviously, it wouldn't take very

15   long to purchase it, but I do not believe that the two

16   products that Mr. Connor referenced would have the same

17   serial number as the one that LPL has because, as I

18   understand it, all of these products would have different

19   serial numbers.  So they would have the same model

20   number, but they will all have different serial numbers.

21                   SPECIAL MASTER POPPITI:  Say what you

22   just said again.  They would all have the same model

23   number but different serial numbers?

24                   MS. HO:  Right, Your Honor.

Teleconference

Page 19

1                    SPECIAL MASTER POPPITI:  And what

2      implication does that have?

3                    MS. HO:  Well, the difference is that HP

4      would have a product that would have a certain model

5      number, for example, the HPFP7317, and that's just the HP

6      model number.  And HP may source that product from

7      different OEMs, including Tatung and perhaps L.G.

8      Phillips.  And each of the products that are made by the

9      different OEMs would have a different serial number, even

10     though the products share the same model number.

11                   SPECIAL MASTER POPPITI:  And you won't

12     know that until you see it; correct?

13                   MS. HO:  Correct.

14                   MR. CONNOR:  This is Cormac Connor.

15                   I believe what Tatung's concern is that

16     they don't believe that the product that LPL has in its

17     possession was manufactured by Tatung.

18                   SPECIAL MASTER POPPITI:  I understand

19     that.

20                   MR. CONNOR:  And to point out, first of

21     all, that the only reason -- the first that we learned of

22     the FP7317 was in a March 1st letter from Tatung's

23     counsel that linked a Tatung product -- actually two

24     Tatung product numbers, to a corresponding HP product

Teleconference

Page 20

1    number.  And it was only then that we were able to go out

2    and that purchase that product for ourselves.

3                    Now, that said, what we have done since

4    then is to inspect it and made that product as part of

5    our list of accused products.  And the follow-on question

6    is whether Tatung has done the investigation to determine

7    whether it has its own product numbers.  And I will read

8    them into the record just so we are clear.  These are

9    coming from letters that we received, first, from

10   Tatung's counsel on March 1st and then a follow-up letter

11   on March 7th, but the product number identification is

12   the same.  Again, this is the corresponding, the HP

13   product number FP7317 to Tatung's product numbers -- the

14   following two products.  The first is:  L17EMBQ-U08 and

15   the second product number was L17KMBQ-U08.

16                    SPECIAL MASTER POPPITI:  Do those

17   numbers again, please, for the record.

18                    MR. CONNOR:  The first one was

19   L17EMBQ-U08, the second Tatung product number is

20   L17KMBQ-U08.

21                    SPECIAL MASTER POPPITI:  Okay.

22                    MR. CONNOR:  If both of those were

23   linked by Tatung's counsel to the HP product that we have

24   been discussing, and that was a product that upon

Teleconference

Page 21

1    receiving that identification, we went out and purchased

2    an FP7317 on the open market, that, again, is an issue

3    that apparently Tatung has not done.  As Ms. Ho stated,

4    she was not aware that the product was available from

5    anyone else because apparently they didn't look anywhere

6    beyond HP.  And that's not the open market, which is what

7    we did to obtain this product.

8              If what Tatung is going to say is that

9    different OEMs manufactured the same product that is

10   sourced by HP -- and keep in mind this is an issue that

11   we discussed with HP at deposition about a week ago, and

12   they confirmed that they do source their products out to

13   multiple OEMs to make sure that they have sufficient

14   inventory, but the products, as we understood it, are

15   made the same way.  So if Tatung is claiming that they

16   make their products differently from the way a different

17   OEM might make this same FP7317 product, then that's an

18   argument to be made.

19             But at this point I don't see why any of

20   the parties should be forced to incur the expense related

21   to an inspection -- however short it may be, forced to

22   incur that expense and expenditure of time if all we are

23   trying to determine is that this is or is not a Tatung

24   product.  And if that's the case, then that's an argument

Page 22

1    that Tatung can make.

2                    SPECIAL MASTER POPPITI:  Well, let me do

3    this:  The approach that I required before I would

4    consider the opportunity to inspect the product that is

5    in LPL's possession should be no different today than it

6    was when I directed that that approach be taken.

7                    I now understand that Tatung did check

8    its own inventory to see if the product was available in

9    its inventory.  I understand that Tatung asked HP whether

10   it was available.  HP advised that it was not.  And now

11   we all understand that there are two products that are

12   available on the market, if you will.  It may be at some

13   point that an inspection will occur if Tatung comes up

14   dry after it does the inspection of one or both of these

15   products.  But I will require that that occur first and

16   that the issue then raised in the May 22nd

17   correspondence, which is a follow on to the motion that

18   was heard on April the 17th, be forestalled for final

19   decision at some later point.

20                    MS. HO:  Your Honor, this is Valerie Ho.

21   If I may address the issue of, relating to obtaining the

22   product --

23                    SPECIAL MASTER POPPITI:  Yes.

24                    MS. HO:  -- in the open market.  That is

Teleconference

Page 23

1   not going to help us for the reason that I stated

2   earlier, which is that those two products, even though

3   they have the same HP model number may not be the same

4   product that LPL has in its possession and is accusing of

5   infringement.  And that is because the same HP product is

6   sourced to different manufacturers and have different

7   serial numbers and may be different.

8               SPECIAL MASTER POPPITI:  And you are not

9   going to be able to tell that by measuring -- help me

10  with this.  You are not going to be able to tell that by

11  securing the product -- because that's what we talked

12  about before, securing the product, inspecting it, and

13  comparing it to the information you already have with

14  respect to 7317?

15              MS. HO:  You mean the photographs that

16  LPL provided?

17              SPECIAL MASTER POPPITI:  Exactly.  It

18  may be at the end of this that you don't have the

19  information that you need to make that judgment.  And if

20  at the end of the process that I set up you don't have

21  sufficient information, it seems to me that it's

22  appropriate to permit the process to come to conclusion.

23  You have described for me essentially what it's going to

24  take in order for you to accomplish that.  Namely, it's

Teleconference

Page 24

1   not going to take you long to purchase one or both of the

2   products.  It's going to take you approximately a half an

3   hour to 45 minutes to do the inspection/and comparison.

4   And at the end of that time, whenever that occurs, if you

5   don't have sufficient information then you will get a

6   very responsive ear when you next ask for the opportunity

7   to look at the FP7317 that is in LPL's possession.

8                    MS. HO:  I understand that, Your Honor,

9   but I guess my point is, our inspection of the product

10  that Mr. Connor says is available on another Web site is

11  not going to give us the information we need regarding

12  the accused product that is in LPL's possession because

13  they are two different products.

14                    SPECIAL MASTER POPPITI:  Let me ask

15  Mr. Connor the question.

16                    Do you agree with Ms. Hoe's assertion?

17                    MR. CONNOR:  Generally, no, Your Honor.

18  And the reason is that we are accusing a model number,

19  not a serial number.  As Ms. Ho pointed out, each

20  individual unit has a unique serial number.  We have

21  accused not the serial number, not a single identifiable

22  product but an entire range of a model.  And there is

23  nothing that Tatung has ever given us to suggest that

24  their model, their version of the FP7317 is different

Teleconference

1   from any other OEM's version of the very same product

2   that was built for HP using HP's directives.

3               And, frankly, if Tatung is able to go

4   out and buy a different product and determine

5   conclusively, for example, that the product that they

6   have is different from the product that we have, that's

7   an entirely different issue and that's something that we

8   definitely need to explore.  But if they go out and buy a

9   different product and it turns out it looks just like our

10  product, even if it's not made by Tatung, then what have

11  we done?  We have just established that the product is

12  made the same way no matter who makes it.  And for either

13  of the parties to prove a negative, to say that without

14  -- Tatung has still not given any representations as to

15  how they are going to determine that our product, if in

16  fact it is not a Tatung-manufactured product, is

17  different.

18               I mean, they haven't pointed to any

19  technical specifications, they haven't pointed to any

20  drawings, they haven't pointed to any objective

21  measurement by which they are going to compare the sample

22  that we have in our possession to their wealth of

23  knowledge.

24               SPECIAL MASTER POPPITI:  But you would

Page 26

1   agree with me at some point it's going to be critically

2   important to make that determination, is it not?

3                   MR. CONNOR:  I agree.  But that

4   determination will be wrapped up in part -- and I would

5   say in large part -- with the determination as to whether

6   or not the FP7317 is made differently by different OEMs.

7   And if Tatung can demonstrate they make theirs

8   differently from any other OEM, that's an issue we need

9   to get into.  But if they are all made the same way, then

10  that proves its own point, that the product is what it is

11  and it's assembled the same way from one OEM to another.

12                  SPECIAL MASTER POPPITI:  I understand

13  your respective positions.  I will require what I said I

14  would require, and I will permit the revisit of the issue

15  once the inspection of those products occurs.

16                  MR. CONNOR:  Thank you, Your Honor.

17                  SPECIAL MASTER POPPITI:  Okay.  Let's

18  start with what I have numbered 4 for my purposes.  I

19  have numbered this No. 23.  And what I have in front of

20  me is March 30th correspondence from Mr. Cottrell and a

21  response to that March 30th correspondence dated May 8th

22  from Mr. Kirk.  The issue that is addressed in there is,

23  they are issues related to prior art.

24                  Do you have those documents in mind?

Page 27

1            MR. CONNOR:  Yes, Your Honor.  This is

2    Cormac Connor for LPL.

3            SPECIAL MASTER POPPITI:  Not hearing

4    from anyone else --

5            MS. HO:  Yes, Your Honor.  I have that.

6            SPECIAL MASTER POPPITI:  Good.  It's an

7    application to extend.  Correct?  I mean, take your time

8    to do this because I know that these are not -- they

9    weren't agenda'd on a status report, but it seems to me

10   these are the matters that need to be addressed today.

11           MR. MILLER:  Your Honor, this is Scott

12   Miller.

13           SPECIAL MASTER POPPITI:  Mr. Miller.

14           MR. MILLER:  My understanding is it was

15   a request for -- if I am thinking of the right thing it's

16   a supplementation of prior art based on third-party

17   discovery, which extended union the cut-off date for

18   interparty discovery, if you will.

19           SPECIAL MASTER POPPITI:  Right.

20           MR. MILLER:  I understood it, I guess

21   not as a request to extend but more of a request for

22   clarification, but perhaps that's just a matter of

23   semantics.

24           SPECIAL MASTER POPPITI:  Okay.  Do you

Page 28

1    want to discuss it, then, please, for me?

2                    MR. MILLER:  Yes.  My understanding is

3    that the defendants were seeking clarification about

4    their ability to supplement their interrogatory responses

5    with prior art and information learned from the

6    third-party discovery.

7                    SPECIAL MASTER POPPITI:  Right.

8                    MR. MILLER:  My understanding of LPL's

9    position is that they wanted a reciprocal right to be

10   able to do the same.  There was a concern expressed by

11   the Tatung defendants, I believe -- and I will let

12   Valerie speak to that -- that LPL shouldn't have a

13   reciprocal right because their third-party discovery was

14   limited by Your Honor to accused products.  And so there

15   wouldn't seem to be a need for a reciprocal right.

16                   MS. HO:  Excuse me.  Sorry.  That issue

17   already had been addressed at the last hearing.

18                   SPECIAL MASTER POPPITI:  So we are

19   resolved on this; correct?

20                   MR. CONNOR:  That's not my

21   understanding, Your Honor.

22                   MS. HO:  Yes, it was raised at the last

23   hearing and it was resolved.

24                   SPECIAL MASTER POPPITI:  Let's revisit

Teleconference

Page 29

1   it, please, because for some reason I have this down as

2   not completely resolved.  I have got the transcript of

3   the last hearing being May 4th; correct?

4                  MR. CHRISTENSON:  Yes, Your Honor.  I

5   think I can clarify.  The request by LPL for a time

6   period by which to supplement was addressed at the prior

7   hearing.

8                  SPECIAL MASTER POPPITI:  Right.

9                  MR. CHRISTENSON:  However, the open

10  issue is whether the defendants should have a time period

11  to supplement.  That issue has not been addressed.

12                 SPECIAL MASTER POPPITI:  And that's the

13  March 30 request?

14                 MR. CHRISTENSON:  Yes, Your Honor.  I

15  think what had happened was you said we should have an

16  opportunity to respond and join the issue, which we

17  recently did on May 8th.

18                 SPECIAL MASTER POPPITI:  All right.  Do

19  you want to address it, then, please?

20                 MR. CONNOR:  I will be happy to do that.

21  Our possession is that there is no need to extend and, in

22  fact, additional supplementation of the defendants'

23  interrogatories responses concerning prior art should be

24  limited to information that they learned, if at all, only

Teleconference

Page 30

1    after the deadline for supplementation passed.  And as we

2    noted in our May 8th submission, much of the

3    documentation that LPL learned about, within just a few

4    days of several of the third-parties' depositions, had

5    been in defendant's position for months if not more than

6    a year.  And for that reason LPL's position is that there

7    is no need for additional supplementation based on

8    documents that defendants had in their possession prior

9    to March 30th, but chose for whatever reason not to

10   include them in its supplemental interrogatory responses

11   that were served at approximately that time.

12                   And what we propose is a standard that

13   would apply to both sides; that being if defendants, for

14   example, learn of new information today, that's something

15   that they could supplement.  The same would go for LPL.

16   If we were to discover through a third-party deposition

17   that there is product out there that we didn't know about

18   and that should in fact be an accused product that we

19   would also be entitled to supplement.  However, if it's

20   information that either side had in its possession before

21   March 30th and, for whatever reason, chose not to include

22   it in its interrogatory responses, then that issue is

23   closed.

24                   SPECIAL MASTER POPPITI:  Who is going to

Page 31

1    speak, Mr. Miller?

2            MR. MILLER:  I will speak on behalf of

3    ViewSonic, Your Honor.  And I think the issue was

4    originally raised by Mr. Cottrell because there was no

5    clarity in terms of -- there was a period of time where

6    third-party discovery was being allowed, but there was no

7    clarity about how the defendants could process that

8    information and make sure it got into their interrogatory

9    responses on a seasonable basis.  And rather than just

10   supplement and serve them, a decision was made that it

11   would be appropriate to seek guidance from Your Honor

12   with a proposed cut-off date, which was at the end of

13   this month, to be able to utilize that information and

14   put it into the form of a supplemental interrogatory

15   response coming from the third-party discovery.  We have

16   had depositions as late as this week which have been

17   significant in terms of identifying aspects of prior art

18   that need to be incorporated into discovery responses.

19   And we, for ViewSonic, are certainly diligently working

20   on it and expect to get something out by the end of this

21   week or early next week; obviously, by the end of the

22   month.

23           SPECIAL MASTER POPPITI:  Well, if it's a

24   function of looking for guidance, and I don't want to

Page 32

1    sound trite, but I know that discovery is ongoing.  I

2    know that we could perhaps even expect that there would

3    be additional discovery depending upon what happens with

4    respect to the Markman decision.  And I think it's fair

5    to say that any additional information that is

6    discoverable is appropriately subject to supplement from

7    the information that you have gathered.

8                    If what you are asking for is a date

9    certain when that supplemental discovery should be filed,

10   then certainly let's talk about it.  I don't think my

11   guidance is any different than the expectation from the

12   rules themselves.  You learn something new, you have an

13   obligation to supplement based on the new information

14   that you have learned.  If it is something that you've

15   had and you are late identifying it, then it is likely

16   not to be supplemental.  I mean, I expect that that's a

17   fair way to characterize what you are asking for, and I

18   think it's not -- it's consistent with the rule, is it

19   not?

20                    MR. MILLER:  I believe it is, Your

21   Honor.  And that's completely consistent, that would be

22   all that we would have looked for from Your Honor.  I

23   don't know if Tatung is looking for something more or LPL

24   is looking for something more.

Teleconference

Page 33

```
 1                    MS. HO:  This is Valerie Ho, Your Honor.
 2                    No, we are not looking for anything
 3   more.  That was precisely our theme.
 4                    SPECIAL MASTER POPPITI:  So you are not
 5   looking for any deadline?  You initially were.  I think
 6   the deadline that was proposed would be extended until
 7   May 30th.
 8                    MS. HO:  And that was just to provide a
 9   date.
10                    SPECIAL MASTER POPPITI:  Sure.
11                    MS. HO:  By which we would supplement
12   our interrogatory responses to include information that
13   we learned from the third-party discovery --
14                    SPECIAL MASTER POPPITI:  Right.
15                    MS. HO:  -- that was being conducted in
16   May.
17                    SPECIAL MASTER POPPITI:  Is that date,
18   then, something that is still on the table for purposes
19   of my considering it?
20                    MR. MILLER:  Your Honor, this is Scott
21   Miller.
22                    We don't have any objection to setting a
23   date, I think the whole idea of setting a date was to
24   have a date by which we would do something so that we
```

Page 34

 1    wouldn't be late or having additional motions to strike

 2    or other things, just as a matter of clarification.

 3                    SPECIAL MASTER POPPITI:  I think a date

 4    makes sense.

 5                    MR. MILLER:  So we are happy to have a

 6    date set, whether it's the end of the month.  There is

 7    still some third-party discovery ongoing right now and

 8    some party discovery that's going to take place in June.

 9    So I don't know if we want to set an interim date or we

10    want to set a complete date.

11                    SPECIAL MASTER POPPITI:  Or does it make

12    sense -- and I am happy for you all to have that

13    conversation now, or does it make sense for you to have

14    that conversation in light of the upcoming discovery

15    offline?

16                    MR. CONNOR:  Your Honor, this is Cormac

17    Connor for LPL.

18                    I guess as a point of clarification, I

19    believe what Your Honor was instructing the parties was

20    that if this is information that is new, then, it is

21    probably properly supplemented.  However, if it is, for

22    example, as we identified in our May 8th submission,

23    information that has been in any of the parties'

24    possession for lengthy periods of time, that it is no

Teleconference

1    longer -- then providing a supplement at this point is

2    not seasonable and, therefore, improper.

3                 SPECIAL MASTER POPPITI:  Well, that's

4    not my issue now.  That's simply what the rules are.

5                 MR. CONNOR:  Right.

6                 SPECIAL MASTER POPPITI:  There is no

7    application before me to deal with that circumstance.

8                 The application, as I understand it, is

9    to, No. 1, receive some guidance -- and I hope the

10   guidance is clear, if it's not please ask me again.  And

11   following that guidance, the application is for there to

12   be a date certain so that all issues, if you will, with

13   respect to supplementation can be expected to be joined

14   as of a certain date or a timely beyond that date.

15                MR. CONNOR:  This is Cormac Connor

16   again.

17                Your Honor, I'm sorry, would that date

18   apply to all parties?

19                SPECIAL MASTER POPPITI:  It would apply

20   to all parties.

21                MR. CONNOR:  All right.

22                SPECIAL MASTER POPPITI:  Does everyone

23   agree?

24                MR. MILLER:  I have no objection to

Teleconference

Page 36

1    that, Your Honor.

2                    SPECIAL MASTER POPPITI:  Does someone

3    want to suggest a date that is going to be meaningful so

4    that we don't have to revisit it, please?

5                    MR. MILLER:  This is Scott Miller.

6                    Perhaps what we could do is, for the

7    discovery that's taking place during the month of May and

8    the third-party discovery that's taking place in April

9    and May set a date of June 8th.  Would that be soon

10   enough?  So we have a date for that and then as we have

11   additional third-party discovery in June, we may have to

12   revisit the issue again given the expert upcoming time

13   frames, but this would allow us to do it on a time that

14   would be seasonable and still make it usable by

15   everyone's experts.

16                   SPECIAL MASTER POPPITI:  It makes sense

17   to me.  Do I have a response?

18                   MS. HO:  That's acceptable to the

19   Tatung's defendants.

20                   MR. CONNOR:  We can to that too, Your

21   Honor.  This is Cormac Connor for LPL.

22                   SPECIAL MASTER POPPITI:  Okay.  Then

23   let's approach it in that way.  And I think it would be

24   important, not just to rely on record here, if local

Teleconference

Page 37

1   counsel could assist with a stipulation to accomplish

2   that two-step approach, if you will, a date certain,

3   namely, June 8th for third party that has been --

4   third-party discovery that has been conducted in April

5   and May; then an opportunity to meet and confer, if you

6   will, on other discovery with another deadline consistent

7   with the expectation that it should be in a fashion that

8   is seasonable so that you can use in it conjunction with

9   the development of the expert reports.

10                  MR. KIRK:  Yes, Your Honor.

11                  SPECIAL MASTER POPPITI:  Okay.

12                  MR. KIRK:  We will work together.

13                  SPECIAL MASTER POPPITI:  Thank you.

14                  The next I have is marked for my

15  purposes DM 26.  It is correspondence from Jim Heisman

16  dated May 10th.  It deals with the database summary sales

17  information for U.S. sales.  The response to

18  Mr. Heisman's letter was dated May 8th from Mr. Kirk.

19                  And unless you have all resolved that

20  issue I think that's the next one.

21                  MR. CHRISTENSON:  This is Cass

22  Christenson for LPL.

23                  The May 8th is a supplement to a

24  March 30th letter we submitted to you, and so we

Teleconference

Page 38

 1    supplemented on May 8th.

 2                     SPECIAL MASTER POPPITI:  Yes.

 3                     MR. CHRISTENSON:  And ViewSonic, as you

 4    know, supplemented on May 10th in opposition.

 5                     SPECIAL MASTER POPPITI:  Yes.  I

 6    apologize.  I had the dates backwards, but the

 7    correspondence right.

 8                     MR. CHRISTENSON:  Those are the right

 9    submissions.

10                     And our supplement of May 8th raises

11    three issues that we wanted to follow-up on.  The first

12    issue, as you noted, is whether ViewSonic should submit

13    to us a report generated from a database that shows

14    shipments of accused products by ViewSonic, specifically

15    to U.S. addresses.  In other words, a report that

16    specifically shows and isolates U.S. sales.  As quick

17    background, we discussed previously that ViewSonic has

18    produced, I believe that there are summaries of sales to

19    what ViewSonic calls the Americas.

20                     SPECIAL MASTER POPPITI:  Yes.

21                     MR. CHRISTENSON:  Which includes, but is

22    not limited to, U.S. sales and shipments.  And they also

23    produced some nonU.S. sales and shipments in that region.

24    And my understanding is that you could somehow take the

Page 39

1    nonU.S. and somehow deduct it from the U.S. and you would

2    be able to then presumably calculate the U.S.-specific

3    sales.

4                    The issue that we are addressing is we

5    believe we are entitled to reports that ViewSonic can

6    generate that show and isolate specifically the U.S.

7    sales rather than forcing us to do the cumbersome task of

8    trying to sort that out through comparing different

9    documents.

10                   And the dispute primarily is whether

11   that should have to be done by ViewSonic.  And we have

12   submitted -- we have cited some deposition testimony from

13   a prior case, we had discussed this with you in a prior

14   hearing.  And the idea was that we would offline have

15   discussions to determine whether ViewSonic was able to

16   provide U.S.-specific information, and if so whether it

17   would do so in this case as it did previously.  And we

18   are at an impasse on that, but we cited deposition

19   testimony that shows that ViewSonic's witness, a rule

20   30(b)(6) witness in a prior case testified that ViewSonic

21   is able to generate reports showing specifically U.S.

22   shipments.

23                   And as I understand ViewSonic's

24   position, those reports would show U.S.-specific

Teleconference

Page 40

1    shipments by customer rather than by model number

2    specifically, and ViewSonic does not want to have to do

3    the math step of adding up for each customer the total

4    for a given product.  And I don't think that's what we

5    are asking.  We are just asking for the report and the

6    way they can generate it.  If the way they can generate

7    it is specifically, you know, customer by customer with

8    all the accused products in there, we can add the sales

9    up for each customer and come to the total.  That would

10    be much easier for us to do, I think, than what we can do

11    with what we have right now.

12                 So we are asking that information be

13    produced.  That a report be run showing the specific U.S.

14    shipments for accused products, customer by customer, and

15    that that be produced to us.  That's the first issue.

16                 I don't know if you want me to address

17    each of the three issues separately or you just want me

18    to keep going.

19                 SPECIAL MASTER POPPITI:  Let's do one at

20    a time, please.

21                 MR. HEISMAN:  Your Honor, Jim Heisman on

22    behalf of ViewSonic.

23                 What Mr. Christenson is essentially

24    asking for is a summary of import-type documents.  That

Page 41

1    was the subject of a prior hearing before Your Honor on

2    12/28, and Your Honor specifically ruled at that time

3    that ViewSonic was not required to produce those types of

4    summaries to LPL, primarily because their request for

5    production did not request summaries, No. 1.  And No. 2,

6    because these are not the types of documents that are

7    kept in the ordinary course of business.

8                    Mr. Christenson had referenced some

9    documents, I believe, that were previously produced by

10   ViewSonic in distinct and different litigation to show

11   that ViewSonic is somehow withholding documents from

12   production.  Mr. Christenson had disclosed to us which

13   Bates-numbered documents that he was referring to.  And

14   in ViewSonic's response that we submitted to Your Honor

15   on May 10th, we pointed out that in fact these were

16   documents specifically prepared by ViewSonic's outside

17   counsel for purposes of that other litigation.  Putting

18   aside --

19                    SPECIAL MASTER POPPITI:  And that's the,

20   I believe that's in the deposition testimony of Ms.

21   Uphold and --

22                    MR. HEISMAN:  Miss Uphold and that would

23   be Exhibit 1 to ViewSonic's supplemental opposition.

24                    SPECIAL MASTER POPPITI:  And Ms. Wang.

Page 42

 1                    MR. HEISMAN:  And there was also some

 2    testimony from Ms. Wang as well that confirmed

 3    Ms. Stetson's testimony that in fact ViewSonic cannot

 4    merely generate summaries of U.S. sales.  What we can do,

 5    however, is generate summaries by the Americas to

 6    generate.  And isolate the U.S. we would need to

 7    undertake a burdensome task and do it on

 8    a customer-by-customer basis and create a special report

 9    merely for purposes of litigation, which is something

10    that ViewSonic does not keep in the ordinary course of

11    business.

12                    We believe that Your Honor has ruled on

13    this issue several times.  We have seen nothing new that

14    that should change Your Honor's calculus and request that

15    the application be denied.

16                    SPECIAL MASTER POPPITI:  I guess my

17    question is:  What has changed since I've ruled on this

18    before?

19                    MR. CHRISTENSON:  Your Honor, Cass

20    Christenson.

21                    A couple of things:  First of all, I

22    disagree with ViewSonic that this is another request for

23    import information.  This has nothing to do with import

24    information, which is an issue we specifically addressed

Page 43

1   previously.  This is an issue of whether we are entitled

2   to reports and data compilations regarding U.S.-specific

3   shipments.

4                    And the reason that's important is --

5   that it's different is important is that previously you

6   concluded that we had requested documents sufficient to

7   determine the amount of imports.  The document requests

8   that are at issue now are different document requests,

9   and they specifically call for this type of a report.

10  So, for example, if you have our Rule 7.11 submission.

11                   SPECIAL MASTER POPPITI:  Just going to

12  have to give me a moment.  One sec.  I have it.

13                   MR. CHRISTENSON:  Your Honor, Exhibit 11

14  to our Rule 7.11 submission.

15                   SPECIAL MASTER POPPITI:  Okay, I'm

16  there.

17                   MR. CHRISTENSON:  That's LPL's second

18  set of requests for production.  If you will, please,

19  turn to request No. 17 on page 5.  We specifically

20  requested -- I will just read it for the record:  "All

21  reports and data compilations showing actual monthly

22  sales in units and U.S. dollars by or for you since

23  January 1, 2002 concerning each type of digital display

24  product responsive to interrogatory No. 2."

Page 44

1                    And so this is the request that

2    specifically called for this type of report or data

3    compilation.

4                    SPECIAL MASTER POPPITI:  Let me ask this

5    question.  I would expect that even though you suggest we

6    are talking about something different than I ruled on

7    before, and I will want to hear about that if there is a

8    different view, when you are looking for all reports and

9    data compilations, the way I would read that, given the

10   ruling that I have already made and given what I would

11   expect should be a consistent ruling with respect to this

12   different data -- and I will accept your characterization

13   of it for purposes of making the point -- in my view it

14   is all reports and data compilations that are generated

15   in the ordinary course of business.

16                    Now, I mean, I realize we live in a

17   little bit of a different world than we lived in when we

18   were -- when we were pulling paper and compiling

19   information and reports in that fashion.  But I'm not

20   aware of any different guidance, if you will, from either

21   this District or this Circuit which says simply because

22   we live in a different world and you've got the talent to

23   go into a database and create something that is new and

24   snappy and more clear and more cogent and more focused,

Teleconference

Page 45

1    if that's not done in the ordinary course of business and

2    it is only done -- or only done against the backdrop of a

3    litigation request, it's something that the Court is not

4    going to direct.

5              So having said that, let's look at what

6    we are talking about here because I do not intend to

7    require any party to do, other than what they -- or

8    provide or produce or create anything that they don't do

9    in the ordinary course, even if it is easy to go in and

10   press some buttons and get that report you are looking

11   for.

12             MR. HEISMAN:  Judge, this is Jim Heisman

13   for ViewSonic.

14             LPL has not come forward with a

15   scintilla of evidence that ViewSonic has ever prepared

16   these type of summary documents that they are now

17   requesting in the ordinary course of business.  They

18   cited to you some snippets that indicated, yeah, it may

19   be possible and, as Your Honor has correctly observed, in

20   the digital world anything may be possible with the

21   appropriate database manipulation.  But this is simply

22   not the case here.

23             What we are talking about are documents

24   that ViewSonic simply does not use in its business and

Page 46

1    that they would have to create solely for purposes of

2    responding to a discovery request.  And we believe that's

3    entirely inappropriate.

4                      SPECIAL MASTER POPPITI:  Mr.

5    Christenson.

6                      MR. CHRISTENSON:  Your Honor, to respond

7    to your point, I do understand your point, my response is

8    twofold first, with regard to Rule 34 -- I'm going by

9    recollection here, I apologize, I don't have it in front

10   of me.

11                     SPECIAL MASTER POPPITI:  Yes.

12                     MR. CHRISTENSON:  My recollection is

13   that it's clear in the committee, though, that it can be

14   appropriate for a party to produce data, to produce a

15   report or a compilation of data that exists within the

16   company's database or computer system as maintained in

17   the ordinary course of business.

18                     And as I understand it, as the second

19   point, is that's exactly what we are talking about, that

20   we are talking about data that ViewSonic maintains in the

21   ordinary course of business.  Now if you are asking me --

22                     SPECIAL MASTER POPPITI:  But what you

23   are asking them to do is something you can do with the

24   data.  You have just said you can do it.  They have given

Page 47

1    you the information, at least this is my understanding.

2    They have given you information that you can work with.

3    And I think it was said in an earlier hearing, isn't that

4    the purpose of gathering information that you can work

5    with?

6                    Now, if you are suggesting to me that

7    there is some guidance in this District or in this

8    Circuit that suggests that a party should be required to

9    go in and, for the ease and sake of the requesting party,

10   manipulate data and produce a report that the other party

11   is asking for, I would like to see that.  And I'm happy

12   to review it.

13                   MR. CHRISTENSON:  Very well, Your Honor.

14                   SPECIAL MASTER POPPITI:  I will be the

15   first to admit if I'm wrong, I will tell you I'm wrong.

16   So if there is something there that I should be looking

17   at, then make me aware of it.

18                   MR. CHRISTENSON:  Yes, sir.

19                   May I proceed to the second point?

20                   SPECIAL MASTER POPPITI:  Yes, please.

21                   MR. CHRISTENSON:  The second and third

22   issue, Your Honor, are issues that are supplemental to

23   issues that we had raised in motions that were argued

24   back in December of 2006.  They are not issues that were

Teleconference

Page 48

1  specifically raised in our March 30th submission, and I

2  have sent a letter to counsel for ViewSonic on April 24

3  raising these issues because we are seeking some

4  information that we feel we need to prepare for

5  depositions of ViewSonic's witnesses in June.  And we

6  only recently realized that there may be information that

7  we don't have that in ViewSonic's possession.

8                  We recently talked to ViewSonic about

9  these other two types of documents -- and I was not on

10 the call, but as I understand it, ViewSonic's position is

11 that because there was never any specific ruling from

12 Your Honor that directed ViewSonic to produce these types

13 of documents, then ViewSonic did not have a duty to

14 produce these documents.  Our position is that we had

15 never understood that documents had not been produced.

16 We thought we had received these types of documents, and

17 we only recently realized that there is apparently a

18 dispute about these type of documents.

19                  The first type is --

20                  SPECIAL MASTER POPPITI:  Direct me to

21 specifically where you are referring in your

22 correspondence, please.

23                  MR. CHRISTENSON:  Yes, Your Honor.  This

24 is, on page 2 of our May 8th submission.

Teleconference

Page 49

1                    SPECIAL MASTER POPPITI:  Right.

2                    MR. CHRISTENSON:  We first talked about

3    documents that refer to mounting technology used in

4    ViewSonic's products.  Specifically, of course, we are

5    positive more interested in rear-mounting technology.  So

6    we would want any documents that reference the use of

7    rear-mounting technology.  And we have pointed to some

8    documents where ViewSonic's suppliers refer to the use of

9    either front- or side-mounting technologies of

10   ViewSonic's products.

11                   So that caused us to believe that there

12   may be documents that refer specifically to rear-mounting

13   technology.  And if there are, we would like to receive

14   those documents as soon as possible to use in ViewSonic's

15   depositions.  That's the first issue.

16                   The second issue is --

17                   SPECIAL MASTER POPPITI:  Let's focus on

18   that one for a moment, please.

19                   MR. MILLER:  Scott Miller, I will speak

20   to this one.

21                   SPECIAL MASTER POPPITI:  Please.

22                   MR. MILLER:  Two issues, I guess, that

23   come as a result of this.  These are matters for which

24   there was not a meet and confer in advance of filing the

Teleconference

Page 50

1    motion with Your Honor.  There was a letter sent after

2    the cut off -- I'm struck by Mr. Connor's earlier

3    statements with regard to if the discovery was closed and

4    that was the end of it and Mr. Connor and I had the

5    telephone call that Mr. Christenson referred to earlier

6    this week, or last week I guess it was, but ViewSonic's

7    position is that the time for meet and conferring on

8    discovery that was served in 2005 and 2006 is over.

9              And we are not going to have a record

10   here and an opportunity to come back in and file new

11   motions and meet and confer.  We did not understand that

12   to be the situation.  If it is the situation, then we

13   need to meet and confer on these two requests that

14   Mr. Christenson is going through.  And we will also send

15   some letters to LPL to meet and confer on discovery

16   requests that we served and would like to meet and confer

17   on and file motions on now.

18              SPECIAL MASTER POPPITI:  Well, there is

19   a purpose to calling everything at end.

20              MR. MILLER:  That was my understanding.

21   And so we did not respond to his letter raising new

22   issues because we believed the matter was over.

23              MR. CHRISTENSON:  Your Honor, Cass

24   Christenson, a couple of quick points.

Page 51

1                  First, we are not reopening kitchen

2    sink, all issues.  What we are trying to do is follow-up

3    on issues that we thought had been resolved and were

4    raised back in December 2006 in a hearing, but apparently

5    which were never ruled on specifically.  And as a result

6    of the lack of a ruling, ViewSonic has now produced

7    documents to us.  These are documents that we need for

8    depositions of ViewSonic's witnesses.  The depositions

9    under the original schedule would have been included by

10   March 30th, but by cooperation and agreement we extended

11   the dates for ViewSonic's witnesses to be deposed.  And

12   that brings now with it a sharp -- a couple of discrete

13   issues where we feel documents should be produced that we

14   thought we had already received.

15                  SPECIAL MASTER POPPITI:  Let me do this.

16   As careful as I hope everyone has been in terms of the

17   process that was set up to deal with discovery disputes,

18   part of that process contemplating status reports which

19   would remind everyone what was done, what yet needed to

20   be done, developments in the case that were just

21   important for purposes of understanding where discovery

22   was; notwithstanding all of that effort, I have to

23   expect, because I have acknowledged to you during the

24   course of at least one teleconference -- I can't think of

Page 52

1    the date of it, but there was no question that I had

2    intended to do something, it didn't get done and I made

3    the ruling on the record in the context of telling you

4    that it didn't happen.

5                      If what you are saying, with respect to

6    either or both of these, is that there was an expectation

7    that there was to have been a ruling, either on the

8    record or otherwise, and there was no ruling, and by

9    virtue of that something fell through a crack, then it

10   seems to me it would be unfair to saddle any party with a

11   failure on my part.

12                     So what I am going to need to have done

13   is -- I understand that there was a letter filed April

14   the 24th, which is in fact after the date that the

15   underlying motion was filed.  I now have some better

16   sense as to what all that means, and I am going to need

17   you all to revisit it in terms of a meet and confer.  And

18   if you can not resolve it and it was something that

19   should have been resolved before, I need to be aware of

20   it.

21                     It's a little bit of a different

22   circumstance, Mr. Miller, than the one you have just

23   described.  I do not intend to open up the process again,

24   but I certainly want to make sure that every discrete

Page 53

1    issue that was raised is ultimately resolved.

2                    MR. MILLER:  Your Honor, this is Scott

3    Miller.

4                    That's fine.  There were some issues, I

5    believe, from the December hearing that were raised by

6    each party in motions that have never been the subject of

7    a final formal ruling.  We can certainly meet and confer

8    with LPL.

9                    SPECIAL MASTER POPPITI:  Yes.  Please do

10   that.  Because I had anticipated that it was either the

11   subject of an oral ruling or that you had resolved it.

12   At least that's what my record keeping shows.  If there

13   is a mistake, I need to be told of that so that I can

14   back up and do what needs to get done.

15                   MR. MILLER:  That's fine, Your Honor.  I

16   do believe though -- and we will meet and confer with LPL

17   on this, but these new requests are outside of the scope

18   of those prior motions.

19                   SPECIAL MASTER POPPITI:  If that's the

20   case, then they are late.

21                   MR. MILLER:  Okay.  That's fine, Your

22   Honor.  We will be happy to sit down and with them and

23   address these issues on matters that are outstanding from

24   those original filings and hearing back in December.

Teleconference

Page 54

1                    SPECIAL MASTER POPPITI:  Okay.

2                    Does that cover the third part as well,

3    Mr. Christenson?

4                    MR. CHRISTENSON:  It does, Your Honor.

5    It's the same circumstance.  The third part is also an

6    issue that's outstanding from a previous motion practice.

7    My only concern is I would like to bring this to a close

8    as quickly as we can to get these documents before the

9    depositions of ViewSonic's witnesses.

10                   SPECIAL MASTER POPPITI:  They start

11   when?

12                   MR. CHRISTENSON:  -- I don't have the

13   schedule in front of me.  I believe it's the second week

14   in June.

15                   SPECIAL MASTER POPPITI:  All right.

16   Then what we should do is before we wrap up today is get

17   a calendar that makes some sense in the next several

18   weeks.

19                   MR. MILLER:  Very well, Your Honor.

20                   The next is what I have marked as DM 29.

21   There was a filing from Mr. Kirk dated May 8th,

22   supplemental to the March 30th motion to compel, and

23   there was a response to that dated March 10th.

24                   MR. CHRISTENSON:  Yes, Your Honor.  I

Teleconference

Page 55

1    believe you are referring to LPL's May 8th supplemental

2    submission concerning Tatung and Tatung's May 10th

3    response.

4                    SPECIAL MASTER POPPITI:  That's correct.

5                    MR. CHRISTENSON:  Cass Christenson,

6    again, Your Honor, again for LPL.

7                    This is similarly a supplemental

8    submission to you following our March 30th submission

9    that raises several issues, discrete issues that we would

10   like to revisit with you because we are concerned that

11   there may be some gaps in the discovery that we have

12   received from Tatung.

13                   After we filed our March 30th motion, we

14   have received additional document production from Tatung

15   that has resulted in some of the issues that we have

16   raised.  And so what we have summarized in the May 8th

17   submission are the remaining concerns that we have.  On

18   page 2 of our submission, May 8th submission there is a

19   list of types of documents that we would like to discuss

20   and that we believe should be produced.

21                   SPECIAL MASTER POPPITI:  I have that.

22                   MR. CHRISTENSON:  The first type of

23   document, Your Honor, are trip reports.  These are

24   reports that summarize and memorialize visits by Tatung

Page 56

1    company personnel to the United States to visit with

2    customers for the purpose of sales and marketing of

3    display products for those customers to import and sell

4    in the United States.

5              And my understanding is that Tatung

6    acknowledges that there are such reports.  However,

7    because those reports do not specifically refer to

8    accused products, Tatung is not going to produce those

9    reports to us.  And this goes back to an agreement that

10   we had with Tatung that is memorialized in a January

11   hearing, where there was an agreement that we would be

12   entitled to discovery from Tatung reflecting sales and

13   marketing efforts for the U.S. market generally because

14   those -- as I explained at the time, that discovery shows

15   Tatung's efforts to communicate and sell to customers for

16   products generally, which would include implicitly

17   accused products.  But obviously many, many

18   communications that relate to sales and marketing don't

19   specifically mention any particular model number of a

20   product, but they are made to support and encourage and

21   induce sales all different products, including accused

22   products.

23              And so there was an agreement that sales

24   and marketing for the U.S. market generally would be

Page 57

1    something that would be produced.  And we do have some of

2    that discovery.  For example, Tatung has produced supply

3    agreements with customers that don't mention any

4    particular model numbers but are clearly relevant because

5    they were, under those agreements, accused products were

6    sold as well as other product.  So we believe these trip

7    reports are discoverable under that agreement, even if

8    they don't specifically refer to an accused product's

9    model number.

10                   SPECIAL MASTER POPPITI:  Mr. Merideth.

11   Who is going to speak?

12                   MS. HO:  This is Valerie Ho.  I

13   apologize.  I thought Mr. Christenson was going to go

14   through the other remaining portions.

15                   SPECIAL MASTER POPPITI:  No. And I

16   apologize for saying Mr. Merideth.  I realized that I was

17   looking down at the transcript when I did that.

18                   MS. HO:  That's all right, Your Honor.

19                   Your Honor, the issue is, the issue here

20   is that the parties did have an agreement.

21                   SPECIAL MASTER POPPITI:  Right.

22                   MS. HO:  And that agreement was that --

23   and that's memorialized in the letter that I sent to

24   Mr. Christenson, that is attached to our supplemental

Page 58

1    motion.

2                    SPECIAL MASTER POPPITI:  This is your

3    letter of April 4th?

4                    MS. HO:  Yes, Your Honor.  And

5    specifically item No. 2 on the first page.

6                    SPECIAL MASTER POPPITI:  Okay.

7                    MS. HO:  And what I agreed to do,

8    contrary to what Mr. Christenson had said, is I agreed to

9    search for trip reports that referred to the accused

10   products, either by model number or by product size.  And

11   at the time when we had our meet and confer, I thought

12   that the agreement was pretty clear that we would not be

13   producing trip reports relating to unaccused products,

14   and that was always our position.  And I thought it was

15   pretty clear to Mr. Christenson what we had agreed to

16   provide versus what we were not going to provide.

17                    So after we had our meet and confer and

18   after I sent that letter, I did speak with my client, and

19   they went and they searched for trip reports to see if

20   there were any trip reports that referenced the accused

21   products.  They did not find any trip reports that

22   mentioned the accused products by size or by model

23   number.  And so our position is we have done exactly what

24   we said we would do, and we have advised LPL that we just

Page 59

1    don't have any responsive documents.

2                    Now Mr. Christenson is now taking the

3    position that the trip reports somehow relate to general

4    marketing or sale of products, but that was never the

5    parties' agreement to begin with.  And in fact, Your

6    Honor, at the April 13th hearing --

7                    SPECIAL MASTER POPPITI:  Wait just a

8    moment.  Let me pull that, please.  Okay.  I got that.

9                    MS. HO:  And that was the hearing during

10   which LPL's motion to compel first came up.  And in

11   particular I am looking at page 154 and it goes through

12   156.  That's where we were first -- we discussed LPL's

13   motion to compel.  And both Mr. Christenson and I

14   recognized that LPL's motion as drafted, when it was

15   filed on March 30th, was pretty broad in that it

16   encompassed not just documents that related to the

17   accused products, but LPL essentially was asking for all

18   documents relating to all products.  And subsequent to

19   March 30th, Your Honor issued your written recommendation

20   limiting nontechnical discovery to the accused products.

21                   SPECIAL MASTER POPPITI:  Right.

22                   MS. HO:  And as a result, I believe,

23   Mr. Christenson and I recognized that LPL's motion to

24   compel would be limited to just the accused products.

Teleconference

Page 60

1    And specifically I am looking at page 154, line 14,

2    through 156, line 7.  Where Mr. Christenson states --

3                SPECIAL MASTER POPPITI:  Read that for

4    the record, please.

5                MS. HO:  Yes.

6                "MR. CHRISTENSON:  And I believe that we

7    have a common understanding that that entitles LPL to

8    discovery that either specifically refers to an accused

9    product or discovery that generally refers to products

10   that could include accused products, but it doesn't, it

11   does not include nonaccused products.  So we are not

12   seeking a reconsideration of your report and we are not

13   seeking to expand discovery to nonaccused products."

14               And then later on on page 155, I sort of

15   reiterate.

16               MR. CHRISTENSON:  Your Honor, I go on

17   and continue there.  If we can just complete the record.

18               SPECIAL MASTER POPPITI:  Oh, sure.

19   Ms. Ho, do you want to read that into the record?

20               MS. HO:  Yes, Your Honor.

21               "SPECIAL MASTER POPPITI:  Okay.

22               "MR. CHRISTENSON:  And your report

23   specifies that our prior agreement between counsel that

24   allows us to get discovery related generally to the U.S.

Page 61

1   market sales and marketing generally or the U.S. market

2   as to product generically is within the scope of

3   discovery.  And you specifically state that agreement

4   will remain in force.

5               "SPECIAL MASTER POPPITI:  Yes.

6               "MR. CHRISTENSON:  Do I think it makes

7   the most sense for us to table this and then see later if

8   there is anything that we need to revisit?"

9               So I go on to say:  Just to clarify one

10  point.  And then I say:

11              "MS. HO:  In LPL's motion to compel, LPL

12  did ask for documents that relate to unaccused products

13  or all visual display products, but pursuant to my

14  discussions with Mr. Christenson, our understanding is

15  that LPL will not be seeking a reconsideration of Your

16  Honor's written recommendation limiting nontechnical

17  discovery to the accused products.

18              "SPECIAL MASTER POPPITI:  That's what I

19  understood him to say."

20              And then I say:  So that portion of the

21  motion is no longer at issue.

22              SPECIAL MASTER POPPITI:  Okay.

23              MS. HO:  And so, Your Honor, my point

24  simply was that Mr. Christenson acknowledged, I believe,

Teleconference

Page 62

1    at that hearing that LPL's motion to compel would be

2    limited to the accused products because of Your Honor's

3    ruling.

4                    SPECIAL MASTER POPPITI:  Okay.

5    Mr. Christenson.

6                    MR. CHRISTENSON:  Thank you, Your Honor.

7                    I think it's quite clear in the record,

8    the part that Ms. Ho initially did not read, I made it

9    very clear that our possession was that we intended to

10   continue to enforce the agreement that was in place,

11   which specifically was -- and the agreement I am

12   referring to both in this transcript at page 155 and in

13   my earlier argument today is the agreement that was

14   confirmed in the January --

15                   SPECIAL MASTER POPPITI:  22nd.

16                   MR. CHRISTENSON:  I believe it's 22nd.

17                   SPECIAL MASTER POPPITI:  Yes.  I think

18   it is.  And if you will give me a moment to get to that

19   transcript.

20                   MR. CHRISTENSON:  Your Honor, it's part

21   of an exhibit to our May 8th submission, if that's

22   helpful.

23                   SPECIAL MASTER POPPITI:  It is.  Thank

24   you.  Go ahead.  I have the full transcript and I have

Teleconference

Page 63

1    your exhibit.

2                    MR. CHRISTENSON:   That agreement, Your

3    Honor, is an agreement that's memorialized, it's on pages

4    14 and 15 of the transcript.   And I raised an issue that

5    had been discussed in a prior hearing confirming that LPL

6    was seeking discovery concerning indirect infringement

7    and relationships between Tatung Company and U.S. brands

8    for customers, as well as products that entered the

9    market and are sold through and to those customers and

10   brands in the U.S.

11                   As an example I gave the example of

12   correspondence between Tatung and ViewSonic or between

13   Tatung and other U.S. market customers.   And I say that

14   we were concerned that Tatung's position was that they

15   would limit production to documents that specifically

16   refer to a specific accused product.   And our concern, as

17   I expressed, is that the documents could refer generally

18   to relationships and the evidence of inducement as to

19   products generally and, therefore, be very relevant and

20   admissible in the case.   And if we just limit it to

21   things that specifically refer to an accused product,

22   it's going to be too narrow because that's really not the

23   way that Tatung conducts its business.

24                   And just as a follow-on to that, I

Teleconference

Page 64

1    haven't seen the trip reports yet because they haven't

2    been produced, but I suspect they may not cite any

3    accused product model numbers because that's just not

4    something that goes into those reports, even though,

5    clearly, those trips would not have all been only to

6    discuss nonaccused products.

7                    But anyway, going back to the hearing on

8    page 15 of the transcript.

9                    SPECIAL MASTER POPPITI:  I am right

10   there.

11                   MR. CHRISTENSON:  Mr. Merideth states:

12   "I thought we covered this Friday.  My specific

13   recollection was that, to the extent there was general

14   correspondence for sales and marketing in the United

15   States generally, for example, was discussed without any

16   particular model number being referenced that, you know,

17   I accepted you are entitled to discovery of that.  The

18   limitation is where there is communication between Tatung

19   and ViewSonic about products that are, specifically about

20   products that are not accused, that that information

21   should not be provided."

22                   And then Your Honor confirms to me:

23   "That's what I understood to be the discussion,

24   Mr. Christenson."  And I say:  "I appreciate that

Page 65

1    clarification."

2                          So I think it's clear that that was

3    intended to be the agreement, and I think that obviously

4    is a different scope of discovery that what Tatung is now

5    trying to enforce.  And they referenced your ruling on

6    nontechnical discovery, Your Honor, which I also included

7    as an exhibit.  That's Exhibit 3 to our May 8th

8    submission.

9                          And at the very end, in your conclusion,

10   on page 10 --

11                         SPECIAL MASTER POPPITI:  I remember it.

12                         MR. CHRISTENSON:  Your Honor, I don't

13   think I need to read it for the record, but Your Honor

14   specifically confirms that your ruling is in no way is

15   intended to detract from prior agreements between parties

16   concerning the scope of discovery.

17                         SPECIAL MASTER POPPITI:  Right.

18                         MR. CHRISTENSON:  So that has always

19   been my understanding of the scope of discovery.  And I

20   think I confirmed it very clearly in the hearing

21   transcript that Ms. Ho referred to, and I also confirmed

22   my understanding of the discussion that I had with Ms. Ho

23   in my April 3rd letter.  She mentioned her April 4th

24   letter.  We have differing recollections of our

Page 66

1     discussion, but I will just note for the record that in

2     my April 3rd letter, which is also Exhibit 7 to the

3     submission, at the bottom of the first page, I state my

4     recollection of our discussion, which was that Tatung's

5     production would include discovery that could relate to

6     accused products in addition to discovery that relates

7     specifically or expressly to accused products.  And I

8     say:  As we discussed, for example, if a trip report

9     relates to products generally marketed to a U.S.

10    customer, that purchased accused products, those trip

11    reports are discoverable regardless of whether they refer

12    to any specific accused product size or model number.

13    Assuming that they do not relate solely to nonaccused

14    products.  The scope of nontechnical discovery includes

15    discovery that relates to accused products, whether

16    specifically or more generally.

17                      And as she noted, she wrote back and

18    then disputed that, but -- so we have a difference of a

19    recollection about our discussion at that point.  But I

20    think the record is clear as to what the agreement was.

21    I think the record is clear that you had intended to

22    preserve that agreement.  And I think the record is clear

23    that I had intended to preserve that agreement.  And so

24    if these trip reports refer to or reflect sales and

Page 67

1   marketing generally without reference to specific

2   products, I think that they are within the scope of that

3   discovery.

4              SPECIAL MASTER POPPITI:  Miss Ho.

5              MS. HO:  Your Honor, first of all, I do

6   not agree that no agreement was reached during my meet

7   and confer with Mr. Christenson.  During that meet and

8   confer it was very clear to me that we did reach an

9   agreement as to the trip reports.  And the agreement was

10  if the trip reports referred to the accused product by

11  size or by model number, then those reports would be

12  produced.  And I remember this very specifically because

13  Mr. Christenson raised the issue of, Well, what if there

14  is a trip report that didn't specifically have a model

15  number reference in the report, but that we know from the

16  size of the product that that product is an accused

17  product?

18             SPECIAL MASTER POPPITI:  Let me do this,

19  though, before you get into that discussion with respect

20  to what you expected was your agreement with respect to

21  trip reports.  Let me back up for a moment to the

22  discussion that did occur on January the 12th.

23             MS. HO:  Yes, Your Honor.

24             SPECIAL MASTER POPPITI:  Now, I did not,

Page 68

1    for purposes of today, go back to the reference that

2    Mr. Merideth made to what we covered the Friday before

3    the 12th, which was a Monday.  But looking at

4    Mr. Merideth's recitation of what he understood to be the

5    agreement, looking at what both I said and what

6    Mr. Christenson said, I expect that it is rather clear

7    with respect to what Mr. Merideth said.  And that is, to

8    the extent that there was general correspondence where

9    sales and marketing in the United States -- and then he

10   goes on.  Someone please help me fill in the blank with

11   what occurred the Friday before, if it's important,

12   because what I see here is an agreement with respect to

13   general correspondence.

14                    And I gather that there was some

15   additional -- I know that Ms. Ho would prefer me to call

16   it at this juncture different, but there was some

17   discussion as it related to trip reports.  Now, I don't

18   believe, and please correct me if I am wrong, I know you

19   will, that when we were talking on January the 12th and

20   when there was an agreement that was re-recited from the

21   Friday before, that we were talking about trip reports.

22   Were we?

23                    MR. CHRISTENSON:  Your Honor --

24                    MS. HO:  No, we were not, Your Honor.

Page 69

1           MR. CHRISTENSON:  -- at the January 19th

2  hearing I was specifically raising the scope of discovery

3  in general --

4           SPECIAL MASTER POPPITI:  I said

5  January 12th, I meant the 22nd.

6           MR. CHRISTENSON:  I was clearly talking

7  generally about the scope of discovery related to

8  inducement.  And I didn't go through the litany of every

9  type of document that could include.  And I gave as an

10  example, and I used the word specifically as an example

11  of the example of correspondence.  But what I was

12  establishing at that hearing was what would be the

13  appropriate scope of discovery and would discovery have

14  to refer specifically to an accused product?  And I think

15  it's very clear that the agreement was that it would not

16  have to refer specifically to an accused product.

17           SPECIAL MASTER POPPITI:  Well, that's

18  what I need to see.  I am, again -- I looked at the 22nd

19  because that's the transcript that you called out.  I

20  should have been diligent enough to go back through the

21  Friday transcript, and I am confessing to you that I

22  didn't do that.  So I think it is important, then, for me

23  to understand more precisely the context of the

24  transcript of the 14th.  Because what I intend to do is

Teleconference

Page 70

1   what I intended to do.  And that is to require that you

2   honor your respective agreements.

3                    If the agreement is as broad as

4   Mr. Christenson says it is, then Ms. Ho, without

5   conceding anything, would you not agree that if it is as

6   broad as he suggests, there would have been no need to

7   discuss any different arrangement with respect to trip

8   reports?  Is that fair or am I asking you to concede

9   something you don't want to concede?

10                   MS. HO:  No. I think that's fair.  And

11  the point is we did specifically discuss trip reports.

12                   SPECIAL MASTER POPPITI:  I just simply

13  need to get back, if you are mindful of where that was

14  discussed on the Friday before the --

15                   MS. HO:  I am searching for that.

16                   SPECIAL MASTER POPPITI:  I have papers

17  in front of me.

18                   MR. CHRISTENSON:  I will look as well,

19  Your Honor.

20                   SPECIAL MASTER POPPITI:  I am doing it

21  like a dinosaur.  I have papers in front of me.  I can

22  expect that you are probably searching on screens, and I

23  admire you all for that, truly.

24                   MR. CHRISTENSON:  I am actually working

Page 71

1    with a hard copy myself.

2                    MS. HO:  I am too, Your Honor.

3                    SPECIAL MASTER POPPITI:  Then I'm glad.

4    It's January 19th, and I don't remember whether that was

5    a Min-U-Script.  Fortunately, it is.

6                    I mean, would it be to our benefit now

7    to look at that or would it suffice for me to suggest

8    that if the agreement or the context of the

9    re-recitation, if you will, of the agreement -- even

10   though the context says general correspondence, if the

11   context of the use of the phrase general correspondence

12   was for purposes of using an example, and if the

13   agreement that was actually forged the Friday before the

14   Monday was broader than that, then it seems to me that

15   that would encompass trip reports.  If that is the case,

16   then I can do the template or you can do the template,

17   it's the same rule.

18                    MS. HO:  Your Honor, just to clarify,

19   what Mr. Merideth had said at the January 22nd hearing

20   was not just limited to general correspondence, it was,

21   what he said was to the extent that there are general

22   correspondence where sales and marketing in the United

23   States generally --

24                    SPECIAL MASTER POPPITI:  Yes, I

Teleconference

Page 72

1    understand that.

2                    MS. HO:  I think that's an important

3    distinction, because I believe what Mr. Merideth said --

4    and I'm still searching through the transcript, but I

5    believe what he meant was if there are general

6    correspondence that discusses sales and marketing in

7    general in the United States, that do not refer to any

8    accused products or do not pertain to any accused

9    products.

10                   SPECIAL MASTER POPPITI:  Then you get

11   that.

12                   MS. HO:  For example, if there is a

13   document from Tatung that says, you know, this is how we

14   will market our products to customers in the United

15   States or this is how we will target the United States

16   market, then those documents would be produced.

17                   SPECIAL MASTER POPPITI:  Okay.  And then

18   there is a second category; correct?  And that is the

19   same description of document except that it calls out an

20   accused product, that would be produced as well?

21                   And the only carveout, if I understood

22   what you just said, Ms. Ho, in terms of completing where

23   I expect you were going, the only carveout would be the

24   same type of correspondence that calls out accused

Page 73

1   products; right?  -- unaccused, and they would not be

2   discoverable?

3                    MS. HO:  Correct, Your Honor.  So there

4   would be documents, for example, that would call-out,

5   that would have a call-out for accused products.

6                    SPECIAL MASTER POPPITI:  Yes.

7                    MS. HO:  And those have been produced.

8   There may be documents that --

9                    SPECIAL MASTER POPPITI:  Were generic.

10                    MS. HO:  -- refer to the U.S. market

11   that do not mention any accused products.

12                    SPECIAL MASTER POPPITI:  They are

13   produced.

14                    MS. HO:  They have been produced.

15                    SPECIAL MASTER POPPITI:  Okay.

16                    MS. HO:  So the only issue is, do we

17   have to produce documents that we know relate to

18   unaccused products?  And that issue I thought already had

19   been addressed at the April 13th hearing, by what

20   Mr. Christenson said, that issue was addressed at our

21   meet and confer that I had with Mr. Christenson, I

22   thought, and apparently now I am told that that issue

23   hasn't been addressed.

24                    MR. CHRISTENSON:  Just to be clear, we

Teleconference

Page 74

1    are not seeking -- we have consistently not sought

2    discovery related solely to nonaccused products, and we

3    are not trying to get that discovery now.  We understand

4    that if a document specifically references an accused

5    product, obviously that's within the scope of discovery.

6                    I think where the dispute exists is,

7    based on the history of the case, it was clear to me --

8    and I think it's clear in the record -- that there was an

9    understanding that the scope of discovery would include

10   discovery related to sales and marketing of products

11   generally because that general sales and marketing

12   context would relate to accused products as well as other

13   products.  And so it would relate in part to accused

14   products.

15                   SPECIAL MASTER POPPITI:  I thought

16   Ms. Ho just said that that's been produced.

17                   MR. CHRISTENSON:  I think as we apply

18   that concept to the trip reports, I don't think they have

19   been produced because I think Ms. Ho's position is that

20   they don't specifically refer to accused products.  And

21   again, my concern is that we are now backtracking from

22   the agreement and because they relate to -- there is

23   nothing to suggest those trips were not for sales and

24   marketing of products including accused products and,

Page 75

1    therefore, I believe they should be produced.

2                    MS. HO:  Well, see, Your Honor, the

3    problem is that LPL assumes that, one, these documents

4    exist.  And two, it assumes that it knows what is

5    contained in these documents.

6                    First of all, there is no suggestion and

7    no evidence that the trip reports even relate to sales

8    and marketing to begin with.  So Tatung employees may

9    have visited the United States for other reasons other

10   than to sell a product or to market a product.  So that's

11   the first point.

12                   The second point is, some of these

13   reports do refer to products, but they are not the

14   accused products, and they may not even be visual display

15   products.

16                   SPECIAL MASTER POPPITI:  Well, then they

17   don't get produced.

18                   MS. HO:  Correct.  And that is why we

19   have performed the search, and we have informed LPL that

20   we have not been able to locate any responsive documents.

21                   SPECIAL MASTER POPPITI:  Well, I don't

22   know how to get any more precise information than what I

23   think I already have.  And I think what I understand

24   Ms. Ho to say is that she is not quibbling with the

Page 76

1    phrase general correspondence for sales and marketing in

2    the United States generally.  She is not suggesting that

3    that excludes trip reports.  If I understand what she is

4    saying correctly is that the agreement encompasses trip

5    reports, that the agreement with respect to trip reports

6    is no different than the agreement with respect to the

7    example used general correspondence.

8                        Is that correct, Ms. Ho?

9                        MS. HO:  Yes, Your Honor.

10                       SPECIAL MASTER POPPITI:  Well, with that

11   understanding, if the representation is that what has

12   been produced is all that there is, I can't do any more

13   than that.

14                       And that's the representation of

15   counsel.  Correct?

16                       MS. HO:  Yes, Your Honor.

17                       SPECIAL MASTER POPPITI:  Okay.

18   Mr. Christenson.

19                       MR. CHRISTENSON:  Yes, thank you, Your

20   Honor.

21                       So I understand it, the representation

22   is there are no trip reports that relate to sales and

23   marketing of unspecified display products?

24                       SPECIAL MASTER POPPITI:  That's what I

Page 77

1    understood Ms. Ho to say.

2                    MR. CHRISTENSON:  Very well, Your Honor.

3                    The next issue that we raised is the

4    issue of presentation materials regarding display

5    products.  And this refers to documents that Tatung has

6    provided to its customers and brands in the U.S.

7    regarding display products that Tatung could supply,

8    which includes -- those presentation include information

9    generally about Tatung Company, sales-and-marketing-type

10   information to promote Tatung's products generally which,

11   again, would be the within the scope of the agreement we

12   just discussed.  And in some cases there is some partial

13   model information as well.

14                   We recently received document

15   productions from third parties, Your Honor, including

16   Hewlett Packard and Tatung Science and Technology, Inc.

17   or TSTI, which is a Tatung subsidiary company in

18   California, that Tatung uses as a sales agent to work

19   with companies, including, for example, WalMart.  And we

20   have asked for -- we want to make sure that we have all

21   of the presentation materials that Tatung has given to

22   its customers that refer generally to sales and marketing

23   for display products for the U.S. or refer specifically

24   to accused products.  And to give you an idea of what

Teleconference

Page 78

1    this looks like, Exhibit 6 to our May 8th submission --

2                    SPECIAL MASTER POPPITI:  I have it.

3                    MR. CHRISTENSON:  As an example, Your

4    Honor.  This is a document that was produced by HP, dated

5    January 20, 2006.  It's a Tatung document.  The title is

6    Tatung Display Business Update.  And this gives some

7    general sales and marketing information to the customer.

8    And then it also gives some references to specific Tatung

9    product numbers.  For example, if you would turn to,

10   please, page HP58627.

11                   SPECIAL MASTER POPPITI:  I have it.

12                   MR. CHRISTENSON:  There is a reference

13   there, on the left-hand side, to the product No. L17AMTM.

14   You may recall that was a product that we specifically

15   identified in our complaint in this case as an accused

16   product.

17                   SPECIAL MASTER POPPITI:  Just one

18   moment.  58626?

19                   MR. CHRISTENSON:  27, Your Honor.  I'm

20   sorry.

21                   SPECIAL MASTER POPPITI:  I see it now.

22                   MR. CHRISTENSON:  There is a reference

23   to the L17AMTN, which is an accused product.  If you

24   would turn a couple of pages over, page 58629, for

Page 79

1    example.  There is a reference to a -- in the middle of

2    the page it says L20W.

3                    SPECIAL MASTER POPPITI:  I see that.

4                    MR. CHRISTENSON:  Under that it says

5    20.1-inch, that refers to a 20-inch or 20.1-inch LCD

6    monitor product.  And Tatung specifically has supplied a

7    monitor of that size with that same WSXGA, I believe,

8    resolution that's indicated there, presumably the same

9    thing that's being marketed in this document.  And that's

10   a product that we have accused of infringing.  I think

11   the HP product number is HPL2045W. But that's a product

12   that is addressed here.

13                   And then one final place to look.  If

14   you could turn, please, to page 58651.

15                   SPECIAL MASTER POPPITI:  Okay.

16                   MR. CHRISTENSON:  At the top it says:

17   Quotation for North America.  It's giving price quotes to

18   HP from Tatung, prices at which Tatung would supply

19   products.

20                   The third column heading shows that the

21   delivery of the product would be to Fort Worth, Texas,

22   which is an HP location.  And one of the products listed

23   on the left is a 20.1-inch wide LCD monitor.  And this is

24   a good example, Your Honor, of why it was important for

Page 80

 1    us to get the agreement that we obtained, which avoided

 2    the need to get a ruling from you that the scope of

 3    discovery wouldn't be limited to something that had a

 4    specific model number, because here, if you look at this

 5    in context, you can see that there is an accused product

 6    referenced here, but it doesn't have the HP accused

 7    number here.  And in the quotation section it's got the

 8    size listed, but not the model number listed.

 9                    SPECIAL MASTER POPPITI:  I understand.

10                    MR. CHRISTENSON:  So this is the type of

11    document that we would like to receive.  And we realized

12    that we didn't have all of these documents apparently

13    after we received productions from HP.  And we found

14    documents such as this.

15                    So we would like to get a supplemental

16    production to make sure that we have got all of the

17    responsive documents.

18                    MS. HO:  Your Honor, may I respond?

19                    SPECIAL MASTER POPPITI:  Yes, please.

20                    MS. HO:  The fact of the matter is we

21    have searched for presentation materials and we have

22    provided those materials to LPL. Some of those documents

23    refer to specific model numbers, some of those documents

24    merely refer to the products by size.  Regardless, we

Page 81

1   have provided the documents we have been able to locate.

2                    Upon receiving LPL's supplemental brief

3   and the HP document that is referenced as --

4                    SPECIAL MASTER POPPITI:  I just missed

5   you, Ms. Ho, there was something interrupting.  If you

6   will go back.  You were referencing HP.

7                    MS. HO:  Upon receiving LPL's

8   supplemental brief and the document that is attached as

9   Exhibit 6, the document that HP produced.

10                    SPECIAL MASTER POPPITI:  Yes.

11                    MS. HO:  We went back to Tatung and we

12   asked them to search for this document.  This document

13   could not be located upon performing a diligent search by

14   Tatung.  And so the simple response is this document

15   wasn't produced because we didn't have it to be produced.

16                    Now, Mr. Jackson Chang, who is, who was

17   one of the Tatung witnesses who was deposed, did testify

18   in his deposition that often times presentation materials

19   would be -- and I think he used a word refreshed, but

20   what he meant was saved over.  So, basically, the

21   presentation materials are similar but, you know, certain

22   portions would be added or deleted, depending on the

23   presentation and depending on who the presentation was

24   being made to.

Teleconference

Page 82

1                    So it's entirely possible that this

2    document was saved over and that's why it hasn't been

3    located.  But we have asked the client to search for it

4    and they have been unable to locate it.

5                    SPECIAL MASTER POPPITI:  Well, then, if

6    I understand you, correctly, with respect to presentation

7    documents you have looked for and you have produced

8    everything that you have that -- when you became aware of

9    the fact that a document that was produced by HP was

10   something that you did not produce, you searched, you

11   couldn't find it.

12                   MS. HO:  Correct.

13                   SPECIAL MASTER POPPITI:  And,

14   Mr. Christenson, I'm not sure what else there is to do

15   other than I have counsel representing that they have

16   produced all that they have.

17                   MR. CHRISTENSON:  Your Honor, I hear

18   what is being said.  And my only thought is, I guess, I

19   don't know, No. 1, whether the inquiry back to Tatung was

20   limited to see whether this document that we already have

21   should have been produced by Tatung, because if that's

22   the case, I would like it to be broadened.

23                   For example, there are 42-inch plasma

24   televisions that Tatung has supplied to HP that are

Teleconference

Page 83

1    accused, and I don't think we have received any sales and

2    marketing materials that reference that product.  I can't

3    say that for sure, I don't recall that.

4                    SPECIAL MASTER POPPITI:  Ms. Ho.

5                    MS. HO:  I can't speak to that because I

6    don't have our entire document production in front of me,

7    but to the extent that counsel is referring to a newly

8    accused product, and by "newly accused," I mean a product

9    that was accused as of several weeks ago, then he is

10   correct.  We haven't produced documents relating to those

11   products because we are still in the process of searching

12   for those documents.

13                   SPECIAL MASTER POPPITI:

14   Mr. Christenson, you have your answer, I believe.

15                   MR. CHRISTENSON:  It sounds like there

16   is further supplement that may will include that product.

17   I don't know that's a newly identified product.  But in

18   any event, I am assuming that any leftover documents will

19   be rolled into this upcoming production.  And I guess

20   with respect to whether they have these documents, I am

21   assuming they would have them somewhere because, for

22   example, the one I just referenced was dated

23   January 2006, which was well after we filed the lawsuit.

24   And so I am assuming those documents would exist, but we

Page 84

1    will look for that in the supplemental production.

2                    SPECIAL MASTER POPPITI:  Okay.  Next

3    issue, please.

4                    MR. CHRISTENSON:  Yes, Your Honor.

5                    The next issue relates to correspondence

6    and communications with certain customers.  After we

7    filed our March 30th motion, there was substantial

8    additional production from Tatung that included some

9    additional correspondence and e-mails, for example.  And

10   that was how we learned that we didn't have some of the

11   communications between ViewSonic and Tatung that I

12   mentioned earlier that we would like to obtain from

13   ViewSonic.

14                   But one of the things that we don't

15   still have, I think, are communications between Tatung

16   and Hitachi and communications between Tatung and

17   WalMart.  Tatung has supplied WalMart with many products

18   that we accused of infringing and that we have accused of

19   infringing for some time.  And as I understand Tatung's

20   motion, they said that those documents would be produced

21   -- documents reflecting communications related to accused

22   WalMart products would be produced by TSTI, the

23   subsidiary.  And you indeed TSTI, the subsidiary,

24   produced many responsive documents recently and I deposed

Page 85

1    the representative for TSTI.  But I don't think that any

2    production by TSTI should excuse Tatung's separate

3    obligation to produce its own responsive documents.

4                    So I would like to receive what

5    discovery Tatung also has.

6                    SPECIAL MASTER POPPITI:  Ms. Ho.

7                    MR. CHRISTENSON:  Regardless of what

8    TSTI may or may not have in its custody or control.

9                    SPECIAL MASTER POPPITI:  Ms. Ho.

10                   MS. HO:  Your Honor, first of all, with

11   respect to Hitachi, we have produced correspondence

12   between Tatung and Hitachi relating to the accused

13   products or the one accused product that we were aware of

14   until recently.  I believe LPL may have accused

15   additional Hitachi products, and to the extent it has we

16   will be supplementing --

17                   SPECIAL MASTER POPPITI:  Okay.

18                   MS. HO:  -- relating to those newly

19   accused products.

20                   With respect to WalMart, we have already

21   explained this to LPL and LPL knows this because

22   Mr. Christenson did depose TSTI.  It is TSTI that has the

23   majority of the communications or most of the

24   communications with WalMart.  And that is why we informed

Page 86

1    LPL that TSTI would be the party that will be producing

2    that correspondence, not Tatung.  And that correspondence

3    already has been produced.  So it's sort of a nonissue

4    here, Your Honor, because LPL already has all of those

5    documents that it claims it needs.

6                    SPECIAL MASTER POPPITI:  So what I think

7    Mr. Christenson was asking for was whether you have

8    documents, whether Tatung has documents related to

9    WalMart that are discoverable and that should be produced

10   independent of those documents that are in the possession

11   and control of TSTI.

12                    And I think you have just said, in so

13   many words, that Tatung does not.  Is that correct?

14                    MS. HO:  Well, most of the

15   communications would be between TSTI and WalMart.

16                    SPECIAL MASTER POPPITI:  Okay.  Well,

17   when you say most, does that suggest that there are

18   documents?

19                    MS. HO:  I say most, because I don't

20   have the documents in front of me.

21                    SPECIAL MASTER POPPITI:  Okay.

22                    MS. HO:  But from what I recall, based

23   on my review of the TSTI production, was that all of the

24   correspondence -- I don't want to say all, because I

Teleconference

Page 87

1    don't have it in front of me; but I can't recall one

2    e-mail that was between Tatung and WalMart as opposed to

3    TSTI and WalMart. And based on my review of the TSTI

4    documents, I believe the communications were really

5    between TSTI and WalMart.

6                   SPECIAL MASTER POPPITI:  Okay.

7    Mr. Christenson.

8                   MS. HO:  And in any event, all of those

9    up documents already have been produced, weeks ago.

10                  MR. CHRISTENSON:  Your Honor, this is

11   Cass Christenson.

12                  From what I understand was said, most of

13   the majority of communications related to the accused

14   WalMart products involved TSTI. And I can confirm, from

15   reviewing TSTI's production, that TSTI and Tatung both

16   have employees as e-mail participants, for example, in

17   the documents that were produced. But there is nothing

18   to suggest that I am aware of that Tatung has not had

19   communications independently with WalMart or that we have

20   received all of the responsive documents from TSTI, which

21   could include documents that TSTI was not able to locate.

22                  So all I'm asking is that documents that

23   Tatung does have be produced, if they are responsive.

24                  SPECIAL MASTER POPPITI:  Well, I would

Teleconference

Page 88

1    expect that they would be produced if they are

2    responsive.  Ms. Ho.

3                    MS. HO:  Yes, Your Honor.  And I'd agree

4    with that to the extent they relate to the accused

5    product.

6                    SPECIAL MASTER POPPITI:  Right.

7                    MS. HO:  As far as I'm aware, I am not

8    aware of any communications that Tatung had with WalMart,

9    and that's Tatung, not TSTI, relating to the accused

10   products.  But I will go back and check again, just to

11   make sure.

12                   SPECIAL MASTER POPPITI:  All right.

13   Then I can expect that you will go back, check again, and

14   that someone should advise me of the status of that,

15   please.

16                   MR. CHRISTENSON:  Your Honor, when would

17   you like a status report?

18                   SPECIAL MASTER POPPITI:  Well, let's

19   wrap that into whatever dates we are going to establish

20   for what other work we have beyond Markman.  Okay?

21                   MR. CHRISTENSON:  Yes, sir.

22                   SPECIAL MASTER POPPITI:  Thank you.  I

23   think that deals with everything in the May 8th, does it

24   not?

Page 89

1                    MR. CHRISTENSON:  There are a couple of

2    minor housekeeping issues left there, Your Honor.  We

3    received a customer list that shows what is called the

4    U.S.A. customer number for various display products of

5    Tatung.  And that list, which we received from Ms. Ho's

6    firm has a heading at the top that says TAMIS code, and I

7    have asked repeatedly for just an explanation of what the

8    TAMIS code is, but that's something that we haven't been

9    able to resolve.  So I would like to see if I can just

10   get an explanation of what that refers to so I can

11   understand what that heading is.

12                   SPECIAL MASTER POPPITI:  Did someone

13   just join us or did we lose someone?

14                   MR. KIRK:  Your Honor, it's Dick Kirk.

15   I apologize, I dropped off and just rejoined.

16                   SPECIAL MASTER POPPITI:  Thank you very

17   much.

18                   Ms. Ho, do you have an explanation or

19   will one be forthcoming?

20                   MS. HO:  Your Honor, there was no

21   agreement to provide additional deposition answers

22   relating to these documents.  I mean, our position, to

23   begin with, is that that document is not relevant,

24   period, because all it shows are the internal customer

Teleconference

Page 90

1    numbers that Tatung uses to refer to certain U.S.

2    customers.

3              And as we explained in our opposition to

4    LPL's motion to compel, those numbers don't provide any

5    sort of useful information to LPL whatsoever, because

6    they don't tell LPL whether the customers bought the

7    products or the U.S. market as opposed to the Mexico

8    market or the European market.  They don't tell LPL which

9    customers bought which accused products.

10             That list has no relevant information

11   whatsoever.  And as for the information that LPL claims

12   it needs, for example, which U.S. customers bought which

13   accused products, we have already provided that

14   information to LPL.

15             So this is really a nonissue and for LPL

16   to now demand additional information is just -- to us,

17   it's harassment at this point, to be honest, Your Honor,

18   because it really provides no relevant information that

19   could remotely be useful to LPL.

20             SPECIAL MASTER POPPITI:  All right.

21   Mr. Christenson.

22             MR. CHRISTENSON:  Yes, Your Honor.  This

23   is a list I did not have until after the depositions of

24   the Tatung witnesses, but my concern is that there must

Page 91

1    be some meaning to the heading TAMIS code above the

2    customer numbers, and I don't want to be -- I think it's

3    unfair for them to produce this with that heading, after

4    the deposition, and then tell me they know what it means

5    and I don't.  And I think it could put me in an unfair

6    position at some point if they are going to rely on

7    something that means -- you know, for example, at trial

8    when there is a witness testifying about this document

9    and I was never -- and I never had the opportunity in

10   advance to understand what it means.

11            MS. HO:  I can tell you right now that

12   we will not be discussing that document at trial.  We

13   will not be calling a witness to discuss that document.

14   That document will not be used at trial.  And, frankly,

15   that document is irrelevant.

16            SPECIAL MASTER POPPITI:  Well, that

17   answers that question, Mr. Christenson.

18            MR. CHRISTENSON:  Yes, Your Honor, as

19   long as they are not going to rely or elicit any

20   testimony relating to TAMIS code at trial.  Obviously, we

21   reserve the right to use this document at trial.  But if

22   they are not going to make any effort to explain that

23   term or what that term means at the trial in any context,

24   then, that's fine with me, I don't need to know what it

Teleconference

Page 92

1    means.

2                    SPECIAL MASTER POPPITI:  Ms. Ho.

3                    MS. HO:  That's fine, Your Honor.

4                    SPECIAL MASTER POPPITI:  Thank you.

5    Next issue, please.

6                    MR. CHRISTENSON:  Your Honor, the next

7    issue is we are still waiting for Tatung to identify

8    which sales representatives Mr. Tse (sic) consulted for

9    purposes of his declaration that was required as a result

10   of him not being prepared for certain parts of his

11   deposition.  And at the prior hearing, I put on the

12   record the fact that we have an agreement among counsel

13   that Mr. Merideth is going to provide us with the names

14   of the people that Mr. Tse spoke to.

15                   As you may recall, his declaration was

16   very cryptic.

17                   SPECIAL MASTER POPPITI:  I remember it

18   was brief.

19                   MS. HO:  Your Honor, we will provide

20   that information.

21                   SPECIAL MASTER POPPITI:  I'm sorry.

22                   MS. HO:  We will provide the names to

23   Mr. Christenson.

24                   SPECIAL MASTER POPPITI:  Thank you.

Page 93

1                    MS. HO:  I don't think that's related to

2    the motion to compel production of documents but, in any

3    event, we will give that information.

4                    SPECIAL MASTER POPPITI:  Thank you.

5                    MR. CHRISTENSON:  Can we get any kind of

6    time frame for that?

7                    MS. HO:  Tomorrow?

8                    MR. CHRISTENSON:  That's fine.  Thank

9    you.

10                   MR. CHRISTENSON:  And the last issue,

11   Your Honor, is we requested a deadline for the

12   supplemental discovery that we are expecting from Tatung

13   Company, and I think it's important to set the deadline,

14   mindful of the fact that we have expert reports due in

15   fairly short order because some of this discovery is

16   going to be critical in order for us to use that

17   information for purposes of our expert reports.  And, for

18   example, specifically we would want to make sure that we

19   had all of the relevant sales information necessary to

20   calculate damages for the report to be prepared by our

21   damages expert.

22                   So I think it's important to set a time

23   frame.  We had proposed, in our May 8th submission, a

24   deadline of May 22nd, and Tatung responded, in their

Teleconference

Page 94

1    May 10th submission, by proposing a deadline of

2    June 29th.  I would certainly like it to be -- obviously,

3    May 22nd is gone.

4                    SPECIAL MASTER POPPITI:  We missed it.

5                    MR. CHRISTENSON:  We missed it.  So I

6    certainly don't want to wait until the end of next month.

7    Certainly it would not give us time to get our report

8    out.  And if that were the case, we would want to be

9    considering an extension on our damages report.

10                   SPECIAL MASTER POPPITI:  And I don't

11   want to be jockeying those dates.

12                   Ms. Ho, can you propose a date that is

13   different than what was originally proposed?

14                   MS. HO:  Well, here is what I propose,

15   Your Honor, with respect to the information that

16   Mr. Christenson claims or contends he needs for the

17   damages report -- and that would be the sales summary for

18   the newly accused products and -- actually that's it,

19   just the sales summaries for the newly accused

20   products -- I could produce that information before

21   June 29th.  I could produce that probably by, let's see

22   -- I'm sorry, I'm just looking at my calendar.

23                   SPECIAL MASTER POPPITI:  Okay.

24                   MS. HO:  By June 15th.

Teleconference

Page 95

1              SPECIAL MASTER POPPITI:  All right.

2    Mr. Christenson, that should be sufficient time should it

3    not?

4              MR. CHRISTENSON:  The opening report is

5    due July 16th, I believe that's the date?

6              SPECIAL MASTER POPPITI:  Yes.

7              MR. CHRISTENSON:  If we had everything

8    by June 15th, that would probably be sufficient, Your

9    Honor.

10             MS. HO:  I am referring to the documents

11   that you were talking about earlier, the sales data.

12             MR. CHRISTENSON:  If we have everything

13   we need for our purposes of that report, and the most

14   critical information is the sales data, if there is

15   anything else that we need, I will raise that with

16   Ms. Ho.

17             SPECIAL MASTER POPPITI:  Okay.

18             MS. HO:  Let me know, if there is

19   additional information that you need for the expert

20   report, please let me know and I will try to get you that

21   information sooner rather than later.

22             Now, with respect to supplementations

23   that we don't believe will be used in any of the expert

24   reports, for example, correspondence relating to the

Page 96

1    newly accused products, e-mails or presentations or

2    things like that, you know, we would require a little

3    more time to gather those documents, simply because there

4    are so many documents that we would need to go through.

5                    SPECIAL MASTER POPPITI:  Well, do you

6    want to be picking a date now or just leave the 15th on

7    the table for sales-related information, sales-related

8    documents?

9                    MR. CHRISTENSON:  Your Honor, I think my

10   understanding is, in the May 10th, they had proposed

11   June 29th or everything and now they are saying that they

12   will expedite to June 15th the sales data.

13                   SPECIAL MASTER POPPITI:  That's correct.

14                   MR. CHRISTENSON:  And I understand the

15   remainder will be produced by the end of June.

16                   SPECIAL MASTER POPPITI:  Ms. Ho, if that

17   makes sense we will just keep the June 29th date for

18   everything other than the sales data that's needed for

19   the reports and any other information that you and

20   Mr. Christenson agree to by the 15th?

21                   MS. HO:  Yes, Your Honor.  The only --

22   my only problem with that is after we submitted our

23   supplemental brief, I made vacation plans for June.  So

24   if there is a way that I could have an extra week,

Teleconference

Page 97

1   because I don't get back until the 27th of June,

2   unfortunately.  If I could have an extra week to complete

3   all of our supplementation, I would certainly appreciate

4   that.

5              SPECIAL MASTER POPPITI:  Mr.

6   Christenson.

7              MR. CHRISTENSON:  Well, I guess what I

8   would like to do, Your Honor, is to see if there is a way

9   we could try to meet that deadline.  If we need to work

10  out an extension later, we certainly could discuss that

11  with opposing counsel.  But what I am hoping is perhaps

12  there are others that can help to try to get it done in

13  what would be more than a month from today.

14             SPECIAL MASTER POPPITI:  Let's do this.

15  We'll all be working very closely together over the next

16  -- into the next week.  If Ms. Ho is in a position to

17  reach out to someone that she has been working with and

18  they can assist in getting it done by the 29th, then I

19  will know that by next Wednesday.  And if, because it's

20  important for Ms. Ho to keep hands on, it's not going to

21  get out of there for another five days to seven days, I

22  will permit that to occur.

23             But I would like the good-faith

24  representation that, Ms. Ho, you are going to be looking

Page 98

1      for others that can make the effort by the 29th.

2                     MS. HO:  Yes, Your Honor.  I will do

3      that.

4                     SPECIAL MASTER POPPITI:  Okay.  And then

5      we will write the dates more firmly into some stone on

6      Wednesday.  Okay?

7                     Will somebody, please, agenda that for

8      me on Wednesday at the end of Markman.

9                     MR. CHRISTENSON:  Yes, sir.

10                    SPECIAL MASTER POPPITI:  Okay.

11                    MR. CHRISTENSON:  That was the last

12     issue we had in our May 8th submission, Your Honor.

13                    SPECIAL MASTER POPPITI:  Good.

14                    Let me ask what everyone's druthers are.

15     There is one more matter, and I expect that it could take

16     some time to get through.  Let me just outline what it is

17     and let's see what we all come up with.  It's the May 2nd

18     application from ViewSonic.  It's a letter from Jim

19     Heisman, and the response to it is May 8th -- I'm sorry,

20     that's not correct, May 2nd.  May 8th is another piece of

21     correspondence from Mr. Heisman -- and then May the 9th

22     from Mr. Kirk.  I'm not sure we should be diving into

23     that now because I think it will take us a while.

24                    MR. CONNOR:  Your Honor, this is Cormac

Teleconference

Page 99

1   Connor.  I will be arguing on behalf of LPL for those

2   submissions and just as part of this timing

3   consideration, I do need to point out that I have to pick

4   my daughter up from day care and leave here no later than

5   5:45.

6                SPECIAL MASTER POPPITI:  Well, let me

7   ask this, then, does it make any sense to -- what time

8   are we starting Markman?  I don't have my calendar here.

9                MS. HO:  One o'clock, Your Honor.

10               SPECIAL MASTER POPPITI:  And how long do

11  we expect we are going to be?

12               MR. MILLER:  Your Honor, this is Scott

13  Miller.  I think we had originally estimated three hours

14  as to what your schedule was.

15               SPECIAL MASTER POPPITI:  Yes.  I think

16  we did, too.

17               I am just not inclined to -- I don't

18  think we are going to get through this between now and

19  the time to shoot for is a quarter to 6, as I just heard.

20  So I'm going to propose that we do this at another time.

21  Now, whether we do it in conjunction with Markman, and

22  that may not be very smart to do, or whether we do it

23  several days after.  We have got some other work ahead of

24  us on other matters that are still open.

Teleconference

Page 100

1                          And I'm wondering whether this can wait

2        for the expected December cleanup -- boy, I hope there

3        are not too many of those things.  What are your

4        thoughts, please?

5                          MR. MILLER:  Your Honor, I have no

6        objection to moving it off of today.

7                          SPECIAL MASTER POPPITI:  Okay.

8                          MR. MILLER:  The only question is if

9        Mr. Connor is going to be handling it, I don't know

10       whether it's possible to do it on the 30th before the

11       Markman Hearing.

12                         SPECIAL MASTER POPPITI:  Okay.

13                         MR. MILLER:  That morning sometime, and

14       perhaps Mr. Nelson from my office could take the lead on

15       it and you could do it by telephone, if I can't do it

16       directly.

17                         SPECIAL MASTER POPPITI:  Yes.

18                         MR. MILLER:  Or we can do it sometime

19       after Markman, whatever you prefer in terms of a

20       schedule, or trying to shoe-horn it in this weekend.  I

21       am open to all three of those choices.

22                         MR. CONNOR:  As for myself, Your Honor,

23       I'm sure there is someone else that, if necessary,

24       someone could step in, but May 30th is the date on which

Page 101

1    my wife will be having a C section to have our second

2    child.

3                    SPECIAL MASTER POPPITI:

4    Congratulations.

5                    MR. CONNOR:  I am boxed in by child-care

6    obligations here on these dates.

7                    SPECIAL MASTER POPPITI:  It's a nice box

8    seat.

9                    MR. CONNOR:  Your Honor, I don't mind if

10   you want to proceed a little and see where we can get or

11   if you want to proceed tomorrow.  But again, if the 30th

12   is a date that works, that's just a difficult time for

13   me.

14                    SPECIAL MASTER POPPITI:  All right.

15   Well, just give me one moment.  I'm going to put you on

16   hold so I can check something with respect to tomorrow.

17                    (Discussion off the record.)

18                    SPECIAL MASTER POPPITI:  Counsel, let me

19   ask this question.  I've got another hearing at 5 o'clock

20   tomorrow in another matter.  Any idea as to how long we

21   can expect this application will take?  What I'm trying

22   to do is not expect that Ellie and her team are going to

23   be running back and forth between hearings.

24                    So if it's going to take an hour or an

Teleconference

Page 102

1    hour and a half, then we can start at 3:00 or 3:30, and

2    that will still keep me clear for 5 o'clock.

3                      MR. MILLER:  Your Honor, this is Scott

4    Miller.

5                      I believe if we started at 3:00,

6    certainly we would be clear.

7                      SPECIAL MASTER POPPITI:  Okay.  Then

8    let's do it tomorrow at 3:00.  And then we can also do

9    the other housekeeping matters that we need to do on

10   December cleanup in terms of timing.  If you will all

11   discuss that between tomorrow and 3:00, offline, that may

12   be helpful in terms of selecting some dates.  And I

13   wouldn't mind if you all have some sense as to what dates

14   work for you during the course of the day tomorrow, if

15   local counsel can be in touch with Mary, she will be able

16   to figure out what dates are good for me.

17                      Does that work?

18                      MR. CHRISTENSON:  Your Honor, this is

19   Cass Christenson.

20                      Your Honor, I think that works,

21   Mr. Miller alluded to unspecified issues earlier, I'm not

22   sure what those are; but I know we have identified two

23   discrete issues that we wanted to get raised and

24   resolved.  If there are going to be additional issues

Page 103

1    from prior hearings to be addressed from ViewSonic's end,

2    we would need specific time in advance to be informed

3    about what those are.

4              SPECIAL MASTER POPPITI:  Right.  And

5    that's what I want you to discuss so we can come up with

6    some time frame as to when they should be, they should be

7    either -- No. 1, when you can discuss them.  And No. 2,

8    if you can't reach resolution when you can re-tee them

9    up.  And I sincerely apologize for anything that fell

10   through the cracks.

11             We will be on at 3 o'clock then to deal

12   with the matter that I just identified.

13             MR. CHRISTENSON:  Thank you, Your Honor.

14             SPECIAL MASTER POPPITI:  Thank you all

15   very much.

16             MR. KIRK:  Thank you, Your Honor.

17             (The teleconference concluded at 5:15

18   p.m.)

19

20

21

22

23

24

Teleconference

Page 104

1                    C E R T I F I C A T E

2

3    STATE OF DELAWARE:

4    NEW CASTLE COUNTY:

5         I, Ellen Corbett Hannum, a Notary Public within and

6    for the County and State aforesaid, do hereby certify

7    that the foregoing teleconference was taken before me,

8    pursuant to notice, at the time and place indicated; that

9    the statements of participants were correctly recorded in

10   machine shorthand by me and thereafter transcribed under

11   my supervision with computer-aided transcription; that

12   the transcript is a true record of the statements made by

13   the participants; and that I am neither of counsel nor

14   kin to any party in said action, nor interested in the

15   outcome thereof.

16        WITNESS my hand and official seal this 25th day of

17   May A.D. 2007.

18
          _Ellen Corbett Hannum_
19        Ellen Corbett Hannum, RMR, CMRS
          Notary Public - Reporter
20        Delaware Certified Shorthand Reporter
          Certification No. 118-RPR

21

22

23

24