IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

              Plaintiff,

      v.

TATUNG CO.;
TATUNG COMPANY OF AMERICA, INC.; AND
VIEWSONIC CORPORATION,

             Defendants.

CIVIL ACTION NO. 04-343-JJF

**PUBLICLY FILED
VERSION**

---

### DEFENDANT VIEWSONIC CORPORATION'S
### RESPONSE TO LPL'S EXCEPTIONS TO THE SPECIAL MASTER'S
### REPORT AND RECOMMENDATION
### REGARDING CLAIM CONSTRUCTION

---

                       CONNOLLY BOVE LODGE & HUTZ LLP

                       Jeffrey B. Bove (#998)
                       James D. Heisman (#2746)
                       Jaclyn M. Mason (#4737)
                       The Nemours Building, 8th Floor
                       1007 North Orange Street
OF COUNSEL:               Wilmington, DE  19801
Connolly Bove Lodge & Hutz LLP   (302) 658-9141
Scott R. Miller
Manuel Nelson
333 South Grand Avenue, Suite 2300   *Attorneys for ViewSonic Corporation*
Los Angeles, CA  90071
(213) 787-2500

Tracy R. Roman
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 277-0010

Dated:  July 20, 2007

TABLE OF CONTENTS

I.    INTRODUCTION...................................................................1

II.   SUMMARY OF THE ARGUMENT.....................................................1

III.  LPL'S OBJECTIONS SHOULD BE REJECTED AND THE SPECIAL
      MASTER'S CONSTRUCTION OF REAR MOUNTABLE ADOPTED BECAUSE IT IS
      CONSISTENT WITH, AND COMPELLED, BY THE INTRINSIC RECORD............3

          A.    The Special Master's Construction Of Rear Mountable Is Consistent With,
                And Compelled By, The Intrinsic Record....................................3

          B.    LPL's Proposed Amended Construction Eviscerates The Invention And
                Should Be Rejected ........................................................12

          C.    "Negative Limitations" Are Proper And Do Not Require Express
                Disclaimers ..............................................................15

IV.   CONCLUSION......................................................................18

TABLE OF AUTHORITIES

**Cases**

*Affymetrix, Inc. v. Illumina, Inc.,*
  446 F.Supp.2d 277 (D. Del. 2006) ................................................................8, 15, 17

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003) ...............................................................................12

*Cephalon, Inc. v. Barr Labs., Inc.,*
  389 F. Supp. 2d 602 (D.Del. 2005) ....................................................................15, 16

*CVI/Beta Ventures, Inc. v. Tura LP,*
  112 F.3d 1146 (Fed. Cir. 1999) ...........................................................................8, 12

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ...............................................................................14

*Omega Engineering, Inc. v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003) ...............................................................................15

*Optical Disc Corp. v. Del Mar Avionics,*
  208 F.3d 1324 (Fed. Cir. 2000) .................................................................................4

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................................4, 8, 15

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.,*
  422 F.Supp.2d 446 (D. Del. 2006) .......................................................................3, 12

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) ...............................................................................17

*Southwall Techs. Inc. v. Cardinal IG Co.,*
  54 F.3d 1570 (Fed. Cir. 1995) ...................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ...................................................................................4

*Watts v. XL Sys., Inc.,*
  232 F.3d 877 (Fed. Cir. 2000) .................................................................................11

## I.    INTRODUCTION

LPL's invention is, simply and solely, to provide a new method of mounting flat panel display devices that does not create unnecessary side space. According to the patents, only by eliminating the unnecessary side space used to mount flat panel display devices can one increase the size of the viewable display area without increasing the overall size of the consumer product. Front mounting and side mounting of flat panel display devices already existed at the time of the patents, but, as LPL criticized, both create unnecessary side space. Rear mounting was the only alternative left for the present invention. The Special Master's construction of the term "rear mountable" – which term not only defines the invention but also secured issuance of the claims – is the only construction that gives any meaning to the invention. By contrast, LPL's proposed amended construction would eviscerate the invention. Thus, the Special Master's construction should be adopted.

## II.    SUMMARY OF THE ARGUMENT

Throughout the Markman process, LPL maintained that the crux of its invention is that the fastening elements used to rear mount the flat panel display device must be located "on or inside the border of the flat display panel."[1] This feature was so important that LPL argued it is *the only way* to achieve the patents' object of eliminating unnecessary side space. In fact, this limitation was so essential that LPL (i) repeated it 46 times between its opening and supplemental briefs, underlining it many times for emphasis; and (ii) incorporated it into not one, but five of its proposed constructions.[2]

Yet, today, LPL does not object to the Special Master's refusal to incorporate this supposedly quintessential limitation into the construction of "rear mountable." Instead, LPL

---

[1] ViewSonic submits that the arguments and evidence set forth within its Corrected Opening Claim Construction Brief (D.I. 378), Supplemental Opening Claim Construction Brief (D.I. 640), Responding Claim Construction Brief (D.I. 664) and Declaration of James D. Heisman in support thereof (D.I. 665), as well as those made at the Markman hearing (the transcript of which is attached as Exhibit B to D.I. 708, which is the Declaration of Rel S. Ambrozy submitted in support of LPL's Exceptions to the Special Master's Report And Recommendation On Claim Construction) further support adoption of the Special Master's construction of the term "rear mountable" and therefore incorporates those arguments herein by reference.

[2] *See* D.I. 370, LPL's Opening Claim Construction Brief, pp. 4-18.

1

only appeals that part of the Special Master's construction that precludes the presence of front or side mounting fastening elements. ViewSonic finds it curious, to say the least, that LPL now abandons its previously unyielding position that "rear mountable" means the fastening part must be on or inside the border of the flat display panel. But more importantly, this abandonment highlights the inconsistency, and incredibility, of LPL's position.

As detailed in Section III.C. below, LPL admits that the object of the invention is to eliminate unnecessary side space. LPL's previous argument was that *the only way* to achieve that object was to locate the rear fastening part not merely on the rear surface of the display device, but within the smaller border of the flat display panel. At the same time, however, LPL asks this Court to believe the object of the invention can still be achieved even if the display device includes the side-space wasting front or side mount fastening elements contained in the prior art. LPL's proposed amended construction would cover the mere addition of one fastening element to the back of a conventional "front mountable" flat panel display device which has the side-space consuming flanges illustrated in Figs. 2 and 3 of the patents.[3]  If a fastening element is merely added to the prior art structure, no side space will be conserved. LPL's positions regarding the meaning of "rear mountable" are simply irreconcilable. Thus, the Special Master's construction should be adopted.

The Court need only review the intrinsic evidence to see the flaws in LPL's argument. This evidence demonstrates the inventors repeatedly and consistently described their invention – "rear mountable" – as the opposite of front mounting and side mounting. Nowhere do the patents say the invention is merely a modification of the front mounting method. Nor do the patents say the invention covers a display device having front or side mounting fastening elements as long as you do not use them to mount the device. Indeed, the very point of the invention was to find a "new mounting structure" that eliminates the prior art fastening elements.

---

[3] D.I. 370, LPL's Opening Claim Construction Brief, p. 15.

> To solve the above problem and to provide a large display area
> with minimal display case size, *a new mounting structure* is
> needed for the LCD device.[4]

This explains why not one single embodiment of the invention shows the presence of front or

side mounting fastening elements. As this Court made clear in *Power Integrations*, it is proper to

limit the claim in accordance with the purpose of the invention where failing to do so would

destroy the sole purpose and benefit of the invention. *See Power Integrations, Inc. v. Fairchild

Semiconductor Int'l Inc.*, 422 F.Supp.2d 446, 454 (D. Del. 2006). That is exactly what the

examiner ultimately required LPL to do by adding "rear mountable," and the Special Master's

construction is in accord.

III.   **LPL'S OBJECTIONS SHOULD BE REJECTED AND THE SPECIAL MASTER'S
       CONSTRUCTION OF REAR MOUNTABLE ADOPTED BECAUSE IT IS
       CONSISTENT WITH, AND COMPELLED, BY THE INTRINSIC RECORD**

   A.   **The Special Master's Construction Of Rear Mountable Is Consistent With,
        And Compelled By, The Intrinsic Record**

The Special Master construed "rear mountable" to mean "a flat-panel display device that

is capable of being mounted to a housing solely from the back of the first frame and that has no

front or side mounting fastening elements."[5] LPL objects only to the second portion of this

construction precluding the presence of front or side mounting fastening elements. LPL instead

wants this term to be construed to cover flat panel display devices that merely could be rear

mounted, but which could also be front mounted or side mounted. In other words, LPL contends

the invention covers a prior art side-space wasting front mountable flat panel display device that

has a fastening element capable of being used for mounting added to the back, even though this

does nothing to eliminate – or even reduce – unnecessary side space.

LPL desperately needs this construction to support its infringement claims for those

accused products that possess front mount and/or side mount fastening elements. This is not,

however, a proper basis for claim construction. *See Optical Disc Corp. v. Del Mar Avionics*, 208

---

[4] Reference is to the Joint Appendix of Exhibits in the Joint Submission of Intrinsic Evidence ("JA") (D.I. 388, 391-393) that includes the applicable intrinsic evidence cited in the parties' November 16, 2006 Joint Submission. D.I. 388, JA at Ex. A, '641 Pat., Col. 2:37-39.

[5] D.I. 708, Ambrozy Decl., Exh. A.

3

F.3d 1324, 1333 (Fed. Cir. 2000) (holding "the claim scope is determined without regard to the accused device."). Indeed, because LPL's construction is intended to read on infringement, it should be viewed with the utmost skepticism. *See Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for purposes of litigation that would alter the indisputable public record consisting of the claims, the specification, and the prosecution history, and treat the claims as a 'nose of wax.'").

LPL contends the Special Master's construction is improper because: (1) it is a "negative limitation" with no anchor in the claim language; and (2) the applicants did not clearly and unmistakably disavow front or side mounting fastening elements. Before exposing the flaws with these arguments, a thorough review of the intrinsic evidence reveals why the Special Master's construction of "rear mountable" is correct.

A claim term can be given its correct construction only within the context of "what the inventors actually invented and intended to envelop within the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). To determine the correct construction, a court should first look to the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the language of the claims, the remaining specification, and the prosecution history. While the context of both the asserted claims and the unasserted claims is instructive as to the meaning of a claim term, the significance of the specification cannot be understated. *Phillips*, 415 F.3d at 1314.

The specification explains that the purpose of these patents is to provide "a new mounting structure" that solves the problems that existed with the prior art front and side mounting methods.[6] The specification expressly describes the prior art front mounting method:

> Referring to FIG. 2 which shows conventional assembly structure of the LCD device applied to a conventional portable computer, the display case 122 has a rear case 123 and a front case or frame 121 for mounting the LCD device 130. The rear case or frame 123 has an outer surface and an inner surface and connecting ribs 123a are formed at the corners.

---

[6] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:37-39.

The LCD device 130 has an LCD panel 132, a backlight device 134 fixed to the back of the LCD panel 132, and a supporting frame 136 for assembling the LCD panel 132 and the backlight device 134 along the edge.

At the corners of the supporting frame 136, corresponding to the positions of the ribs 123a of the rear case 123, a plurality of protrusions 136a having holes are formed.

For mounting the LCD device 130 to the display case 122, the LCD device 130 is placed on the rear case 123 and the holes of the supporting frame 136 and the ribs 123a are fastened together preferably by screws 138. The front case 121 is coupled to the rear case 123.

Hereinafter, the way in which the LCD device is mounted to the case from the front toward the rear direction is defined as *the front mounting method,* and the assembled structure of the LCD device and the case formed through the front mounting method is defined as *the front mounting structure.*[7]

\*\*\*

Referring to FIGS. 3A and 3B, a conventional LCD device assembly 110 includes an LD panel 112 and a backlight device (not shown) for the LCD panel 112, and display case 122 supporting the LCD device 111. . . .

Two opposite sides of the supporting frame 114 include flanges 114a for assembling the LCD device 111 to the display case 122 . . . As shown in FIG. 3B, the fixing flanges 114a have a protruding width d2 and the mounting flanges 114b have a protruding width d1. . . .

To mount the LCD device 111, the hinge arm 126 and the mounting flanges 114b are screwed together, and the fixing flanges 114a and the ribs 122a are screwed together by bolts.[8]

The most notable features of front mounting are the presence of mounting holes and/or flanges or protrusions (*e.g.,* 136a) extending into the area beyond what would otherwise be the edge of the LCD display device. The problem with front mounting, according to the patents, is that it uses unnecessary side space, thereby minimizing the amount of display area available when mounting the device into a portable computer.

---

[7] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:35-58 (emphasis added).
[8] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:1-28.

In a portable computer, the size of the case in which a display is mounted is fixed by the overall size of the housing.[9] Using side flanges or protrusions to mount the LCD device to the case consumes space that could otherwise be used to display an image.[10] The specification explains this problem as follows:

> In the front mounting structure of the LCD device, since the protrusions 136a require additional space corresponding to the protruded width d, the display area of the LCD device is reduced in comparison to the fixed size of the display case 122.[11]

* * *

> In the mounting structure shown in FIG. 3B, the supporting frame 114 requires side spaces for the flanges 114a and 114b. Therefore, the side space D (d1+d2) results in a reduction of the display area of the LCD panel 112 relative to the display case 122.[12]

Side mounting suffers from a similar problem. One of the cited prior art references, Yun, also sought to save side space when mounting a conventional LCD device.[13] Yun's solution is to use fasteners inserted from the exterior side edge of the rear case of the portable computer and through the side edges of the two frames (called "first frame" and "second frame") that assemble the components of the LCD device.[14] This method of mounting is referred to as "side mounting." The Korean patents[15] on which the patents claim priority, and the disclosure of which is expressly incorporated by reference in the patents, expose the problem with side

---

[9] The patent confirms that there is a maximum acceptable size for a display to which the invention may be applicable. "Moreover, as the display size increases, the display case becomes undesirably large, especially for a portable computer such as a laptop computer." D.I. 388, JA at Ex. A, '641 Pat., Col. 2:34-36.

[10] D.I. 710, Declaration of James D. Heisman in Support of ViewSonic's Objections to the Special Master's Report & Recommendation Regarding Claim Construction, ("Heisman Obj. Decl."), Ex. 28.

[11] D.I. 388, JA at Ex. A, '641 Pat., Col. 1:59-63.

[12] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:29-34; *see also*, Figs. 2, 3A and 3B.

[13] D.I. 388, JA at Ex. D, Yun, Col. 1:65-2:3, Col. 2:39-44; and Col. 2:57-63; *see also* Abstract, Col. 3:6-17, Col. 3:35-50; Col. 4:31-33; Col. 4:39-5:28.

[14] *See, e.g.*, D.I. 388, JA at Ex. D, Yun, Figs. 6, 7 and 9.

[15] LPL prepared and submitted certified translations of the Korean priority applications to the UK patent office and the Patent Court and likewise had prepared and submitted to the UK court certified translations of the invention disclosure statements. D.I. 665, Declaration of James D. Heisman in Support of ViewSonic's Responding Claim Construction Brief, ("Heisman Resp. Decl."), Exs. 11-17; Ex. 18 (Cho) at 214:7-215:6; 74:5-75:12; 71:12-72:21; 94:1-94:22; 97:2-9; 176:22-179:9; 20:23-21:7; 29:3-13; 119:6-21; Ex. 19 (Kim) at 160:17-161:12; 258:6-17; 856:10-863:7; 435:20-440:15; 654:22-657:18.

mounting. As is expressly shown in Fig. 3 of the priority Korean application no. 44475, side mounting results in the use of unnecessary side space designated "t."[16]

Another of the cited prior art references, Kurihara, observed that side mounting also uses side space, although less than is used by front mounting.[17] To improve upon Yun, the Kurihara solution, best shown in its Fig. 2 (*reproduced at* VS Ex. 27), uses a "support body 13" having a rear surface 13a and a side surface 13b. The support body is mounted to the rear case behind the display and attached to tabs on the sides of the LCD display.[18] Kurihara discusses the superiority of its structure to both front and side mounting, stating "it becomes possible to reduce dead space compared with the aforementioned conventional methods."[19]

Thus, the inventors sought a "new mounting structure" that would eliminate the use of unnecessary side space when mounting an LCD device in order to maximize the size of the display viewing area:

> To solve the above problem and to provide a large display area with minimal display case size, *a new mounting structure is needed for the LCD device.*[20]

> ***

> Accordingly, the present invention is directed to a portable computer and method for mounting a flat panel display device thereon that *substantially obviates one or more of the problems due to limitations and disadvantages of the related art.*[21]

> ***

> As explained above, the structure shown in FIGS. 4A-4C has an advantage in that the side space such as width d2 for fixing flange 114a of FIG. 3B is not needed and the size ratio between the display area and the display case is improved.[22]

> ***

---

[16] D.I. 665, Heisman Resp. Decl., Exs. 11, 13, and 14.
[17] D.I. 388, JA at Ex. E, Kurihara, Col. 1:26-37, Col. 3:45-51.
[18] D.I. 388, JA at Ex. E, Kurihara, Col. 2:53-3:21, Figs. 2, 3, 3a and 4.
[19] D.I. 388, JA at Ex. E, Kurihara, Col. 3:45-58.
[20] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:37-39 (emphasis added).
[21] D.I. 388, JA at Ex. A, '641 Pat., Col. 2:42-46 (emphasis added).
[22] D.I. 388, JA at Ex. A, '641 Pat., Col. 4:38-41.

7

> As explained above, the mounting method according to the present invention does not require unnecessary side space for mounting the LCD device on the computer. Thus, the ratio of the display area of the LCD device to the display case can be improved and maximized.[23]

As the whole of the patents reveal, the only description given of rear mountable is a flat panel display device having no front or side mounting fastening elements, and that is mounted to a housing solely from the back of the first frame. Not one depiction of the rear mountable flat panel display device shows front or side mounting fastening elements. Nowhere do the patents say the flat panel display device has, or can have, front or side mounting fastening elements. As this Court has noted, "[a] claim term can be given its correct construction only within the context of 'what the inventors actually invented and intended to envelop with the claim.'" *Affymetrix, Inc. v. Illumina, Inc.*, 446 F.Supp.2d 277, 281 (D. Del. 2006), quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005); *see also CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1999) (noting need to construe claims consistent with the purpose of the invention). Here, what the inventors actually invented and intended to envelop with the claim was a completely new method of mounting that replaced front mounting and side mounting.

In fact, during the prosecution of the patents, the inventors expressly distinguished the invention from front and side mounting.[24] On January 9, 2001, counsel for LPL had a first of two personal interviews with the Examiner concerning the Patents. The Examiner later confirmed what LPL specifically told the Examiner during that interview:

> one of the key inventions of this application is to have the display device 10 fastened to the display case 21 by a fastening means at the rear surface of the display device and a fastening means on the display case as indicated in Fig. 5.[25]

Thereafter, LPL expressly distinguished the supposed invention from the prior art front mounting and side mounting. First, the inventors pointed out that the Abell prior art display

---

[23] D.I. 388, JA at Ex. A, '641 Pat., Col. 7:31-35.
[24] D.I. 388, JA at Ex. G, '641 File History, at VS5005460, VS 5005512-VS5005513, VS5005556, VS5005605, VS5005614, JA 00268-271, JA00362; Markman Hearing Transcript at 88-93.
[25] D.I. 388, JA at Ex. G, VS5005536.

8

device is front mounted and concluded it *was incapable* of providing the advantages of the invention:–

> [Abell] does not have a fastening element on a rear surface of the display device for fastening to a housing case. *Abell is directed to a computer with a front mounting technique . . . Therefore, Abell cannot provide the advantages of the claimed invention.*

Subsequently, the inventors contrasted and overcame Abell stating:

> "*in contrast*, Abell discloses a front mounted LCD display while the instant invention utilizes a rear mounted display."

These statements expressly disclaim the presence of front mounting fastening elements. The inventors also expressly admitted that the invention of asserted Claims 35 and 55 do not have side mounting fasteners as shown in the prior art Yun:

> *In contrast to Claims 35, 47 and 55, Yun is directed toward a side mounted flat panel display device* with fastening elements on the side surfaces of the frame (see elements 410a and 410b of Fig. 6 of Yun). Yun does not disclose any fastening elements on a rear surface of the frame as disclosed in claims 35, 47 and 55.[26]

These statements expressly disclaim the presence of side mounting fastening elements.

Additionally, in response to the examiner's repeated rejection of these claims as an obvious *relocation* of the fasteners LPL merely challenged the examiner for proof that it was obvious to *relocate* a fastener to the back.[27] LPL made no mention of its current contention that the invention was not, in fact, a "relocation" of a fastener but instead, the mere addition of a fastener to the back of the existing front mounted or side mounted display device.

Notably, the claims as originally filed included the limitations "a first frame having a fastening part at a rear surface of the first frame," *and* "capable of being fixed to a housing of the data processing device through the fastening part at the rear surface of the first frame."[28] This language already dictates the first part of the Special Master's construction, namely, that the flat panel display device "is capable of being mounted to a housing solely from the back of the first

---

[26] D.I. 388, JA at Ex. G, VS5005511, VS5005513. Emphasis in original and added.
[27] D.I. 388, JA at Ex. G, VS5005605.
[28] D.I. 388, JA at Ex. A, '641 Pat., Claim 35; *see also*, claims 55 and 56 and the '718 patent Claims 33 and 40.

frame." If – as LPL contends – "rear mountable" means nothing more than this – and this limitation alone were sufficient to overcome the prior art – then there would have been no need to amend the originally filed claims to include "rear mountable." The Examiner would have allowed the claims as written. In fact, LPL conceded this very point at the Markman hearing:

> What I would like to point out to your Honor is, if you were to eliminate from defendant's construction the front and side mounting limitations, all you're really left with is the original Claim 35 and all the other independent claims before it went to the rear mountable.[29]

As LPL conceded, in order to avoid rendering this claim language superfluous and to give meaning to the "rear mountable" amendment, it must include the limitation that the device has no front or side mounting fastening elements, just as the Special Master concluded.

Indeed, the understanding LPL conveyed to the Examiner with its prosecution arguments is clear: no fasteners are allowed other than fastening parts on the rear or back of the flat panel display device. The Examiner confirmed that this was his understanding during the prosecution of the Patents and why he allowed the claims to issue. In the summary of the second personal interview on February 26, 2002, the Examiner indicated:

> "independent cflaims [sic] are to be amended with limitation 'back mounted display' or the equivalent and pending further approval."[30]

This amendment was necessary because the claim language "a fastening element at a rear surface of the first frame . . . capable of being fixed to a housing of a data processing device through the fastening part at the rear surface of the first frame" was insufficient to distinguish the prior art. Instead, the claims had to disavow front and side mounting – which "rear mountable" does. In the Notice of Allowance dated April 5, 2002, the Examiner stated:

> "the best prior art of record . . . taken alone or in combination fails to teach or suggest a portable computer comprising a rear mountable display device having a fastening element at a rear surface of the rear mountable display device attached to a case through the fastening elements as claimed . . ."[31]

---

[29] D.I. 708, Transcript from Markman Hearing, Ambrozy Decl., Ex. B, at 30:19-23.
[30] D.I. 388, JA at Ex. G, '641 File History, VS5005608-VS5005610, at VS5005609.
[31] D.I. 388, JA at Ex. G, '641 File History, at VS 5005645.

The Examiner understood that the fastening elements for mounting the flat panel display device in a portable computer would be located only on the back of the flat panel display device and relied on that understanding to allow the claims. Compare *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882-3 (Fed. Cir. 2000) (including limitation where used in prosecution to distinguish over prior art).

Lest there be any doubt in his position, the same Examiner reiterated his understanding clearly and unequivocally during the prosecution of two continuation applications of the patents. On November 15, 2002, LPL submitted continuation applications for consideration by the same Examiner who had examined the asserted patents. Those applications contained a single claim, identical to Claim 1 of the '641 patent and Claim 1 of the '718 patent, with the exception that the limitation "rear mountable" was not included. The Examiner rejected each of those claims over the same prior art relied upon in the prosecution of the asserted patents.[32] The Examiner concluded that the applicant-admitted prior art (*e.g.*, Fig. 2) shows a fastening element at a rear surface of the first frame (element 136a) just as recited in the claim without the "rear mountable" limitation. Thus, the entire intrinsic evidence shows that the addition of the limitation "rear mountable" means that the flat panel display device cannot have front mounting or side mounting fastening parts.

LPL's contention to the contrary is also belied by the fact that both inventors in the patents are also identified as inventors of USPN 6,411,501 (the "'501 patent").[33] The '501 patent is directed to using the combination of back and side mounting a flat panel display device. Had the asserted patents covered both back and side mounting, LPL should have disclosed to the Examiner during the prosecution of the '501 patent that it had another patent pending which would cover the same subject matter, such that a double patenting terminal disclaimer would need to be filed. Tellingly, LPL did not make this disclosure.

---

[32] D.I. 388, JA at Ex. J, at VS5000260, and Ex. L at VS5000118. *See also* JA at Ex. G, VS5005644-VS5005648, at VS5005645.
[33] D.I. 708 - Ambrozy Decl., Exhibit E; *see also* Heisman Resp. Decl., Ex. 23.

Simply put, the intrinsic evidence expressly confirms what the patents themselves disclose – that a rear mountable flat panel display device can only have fastening parts on the back of the device (*i.e.*, cannot have front or side mounting fastening components), because devices with those fasteners "cannot provide the advantages of the present invention." Thus, the Special Master's proposed construction which requires the <u>substitution</u> of fastening elements on the back of the flat panel display device for the prior art front or side mounting fastening elements is the correct interpretation. This is the only construction that will result in the elimination, or even reduction, of unnecessary side space and a maximization of the viewing area as required for the invention of the patents to actually be an invention. Thus, this is a case where "the specification read as a whole suggests that the very character of the invention requires the limitations to be a part of every embodiment." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369 (Fed. Cir. 2003). Because it is compelled by the intrinsic evidence, the Special Master's construction should be adopted.

## B.   LPL's Proposed Amended Construction Eviscerates The Invention And Should Be Rejected

Ignoring the entire intrinsic record, LPL's construction improperly extends the claims to cover a configuration where one or more fasteners are <u>added</u> to the back of the flat panel display device <u>in addition to</u> the prior art front mount or side mount fastening elements. This construction achieves but one thing. It eliminates from the claim the sole element that supposedly differentiated the invention from the prior art. Merely adding a fastening element to the back of a flat panel display device that has the prior art side-space-wasting protruding flanges does nothing to eliminate, or even reduce, unnecessary side space. Instead it eviscerates the sole purpose of the invention. As such, it cannot be a proper construction. *See Power Integrations*, , 422 F.Supp.2d at 454; *CVI/Beta Ventures*, 112 F.3d at 1160.

In *Power Integrations*, this Court construed the claim term "frequency jittering" to include the object of the invention, "varying the switching frequency of a switch mode power supply about a target frequency *in order to reduce electromagnetic interference*." *Id.* Rejecting

the other construction as overly broad, the Court noted that "the express purpose of the invention, to reduce EMI noise, cannot be achieved if the jittering is not controlled and predetermined." *Id.* at 455. The Court further explained that the advantages of the claimed invention in reducing EMI over the prior art was due to the "fixed and controlled manner" of the jittering. *Id.* Thus, the Court construed the term in accordance with the intended purpose of the invention. As the Special Master's recommended construction recognizes, a similar result is compelled here.

LPL has admitted throughout its claim construction briefs that neither the invention nor the claims of the Patents can properly be construed in a manner which permits the claims to cover a prior art front mounted or side mounted flat panel display device. For example, in its Opening Claim Construction Brief, LPL argues:

> Thus, the problem with the prior art mounting technology is the necessity of using flanges or through holes, <u>positioned outside the border of the flat display panel</u>, because such positioning results in the creation of unnecessary side space. Thus, one novel aspect of the inventions claimed in the Patents-in-Suit results from positioning the fastening parts on the rear of the flat panel display device – thus allowing the flat panel display device to be 'rear mountable.' This rear-mounting capability significantly increases the viewing area relative to the total monitor area <u>*by eliminating the 'unnecessary side space'*</u> caused by the prior art flanges.[34]

Indeed, LPL repeatedly stated in its Opening Brief that the express purpose of the invention is to eliminate unnecessary side space and that the purpose is essential to the meaning of "rear mountable." Some other examples include:

> Any other positioning of these fastening parts, for example positioning the fastening parts outside the border of the blue colored flat display panel, would create unnecessary side space and <u>*cut against the very purpose of the invention – eliminating unnecessary side space*</u>.[35]

> Consequently, because the 'problem being solved' is the <u>*elimination of 'unnecessary side space'*</u> . . .[36]

---

[34] D.I. 370, p. 4 (emphasis in original and added); *see also* D.I. 665, Heisman Resp. Decl., Ex. 7.
[35] D.I. 370, p.5 (emphasis added).
[36] D.I. 370, p. 10 (emphasis added).

> It is clear that positioning of the fastening parts on or inside the border of the flat display panel *eliminates the unnecessary side space* . . .[37]
>
> Thus, positioning those fastening parts on or inside the border of the flat display panel achieves *the purpose of the invention – eliminating the side flanges and thus the unnecessary side space*.[38]
>
> The *purpose of the inventions* claimed in the Patents-in-Suit – *the elimination of unnecessary side space* – may guide the Court's constructions . . .[39]
>
> The only way a rear mounted flat panel display device can thus *eliminate the unnecessary side space* . . .[40]
>
> Thus, positioning those fastening parts on or inside the border of the flat display panel achieves *the purpose of the invention – eliminating the side flanges and thus the unnecessary side space*.[41]

Glaringly absent from LPL's Exceptions to the Special Master's Claim Construction, is any explanation of how this express purpose – or even the mere reduction of unnecessary side space – can be achieved if rear mountable includes the very front or side mounting fastening elements that create unnecessary side space.

LPL tries to save its construction by relying on the language "comprising" in the claims. This language, however, does not – and cannot – expand the scope of the invention beyond what is disclosed. If the specification "'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, *read without reference to the specification*, might be considered broad enough to encompass the feature in question.'" *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004). As explained above, the specification and prosecution history make clear that the invention does not include front mounting and side mounting fastening elements. LPL's expansive construction must be rejected because it improperly captures a flat panel display device having "front mounting" or "side mounting" fastening elements.

---

[37] D.I. 370, p.10 (emphasis added).
[38] D.I. 370, p. 14 (emphasis added).
[39] D.I. 370, p. 16 (emphasis added).
[40] D.I. 370, p. 17 (emphasis added).
[41] D.I. 370, p. 18 (emphasis added).

14

C.  **"Negative Limitations" Are Proper And Do Not Require Express Disclaimers**

LPL also makes much ado about "negative limitations" as though this were a long-standing taboo of claim construction. Relying on *Omega Engineering*, LPL argues that there is no anchor for this limitation. *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003). In *Omega* the Court found no express text in any claim that did not prohibit the presence of the disputed feature. *Id.* at 1322-23. By contrast, as the Special Master noted in the Markman hearing, the very term "rear mountable" is the text or "anchor" that prohibits the presence of front and side mounting fastening elements, particularly when read in light of the entire intrinsic record.[42] *Omega* is also distinguishable because, unlike here, it did not involve an amendment to the claims that were essential to their issuance. In short, *Omega* does not stand for the proposition that negative limitations are improper.[43] Indeed, as this Court knows from its own experience, construing claims to exclude certain features is not only proper – but sometimes it is the only proper result. *See, e.g., Cephalon, Inc. v. Barr Labs., Inc.*, 389 F. Supp. 2d 602 (D.Del. 2005); *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277 (D.Del. 2006).

For example, in *Cephalon*, this Court determined that a patent for a method of producing drug-containing lollipops *did not include* use of free liquid, even though the use of free liquid was not explicitly disavowed by the applicant. *Cephalon*, 389 F. Supp. 2d at 606-07. As the Court recognized, this "negative limitation" was proper because the specification consistently referred to the invention as teaching formation of the lollipops through the compression of dry or solid powders, not through free liquids. *Id.* at 606. At issue in the case were four claim phrases. The Court said the "essence of the dispute" was whether these four phrases should be construed "to require the absence of 'free liquid.'" *Id.* at 605. Opposing the negative limitation, Cephalon argued: (1) that the plain and ordinary meaning of the claim phrases did not require exclusion of free liquid; (2) neither the specification or prosecution history showed any clear disclaimer of the

---

[42] D.I. 708, Transcript of Markman Hearing, Ambrozy Decl., Ex. B at p. 26:19-27:3.

[43] It should be noted that *Omega* was decided before the Federal Circuit's decision in *Phillips v. AWH Corp*, and relies heavily on extrinsic dictionary evidence and the line of cases giving great import to dictionary evidence.

use or presence of free liquid. *Id.* Rejecting Cephalon's argument, the Court observed "both the specification and the prosecution history demonstrate that the inventions actually described and claimed by the '737 patent are a method of producing drug-containing lollipops using the compression of dry, powdered ingredients, and the products resulting from the use of that method." *Id.* at 605-06. In fact, the Court pointed out "[n]owhere in the claims, the specification, or the prosecution history do the inventors ever discuss the possibility of using a liquid as part of their invention." *Id.* at 606.

The Court also found significant the patent's statements that indicated the inventors "viewed their invention as enveloping only the dry mixing and compression powders to form the drug-containing lollipops." *Id.* at 606. The Court listed several examples, including from the Summary of invention: "the present invention teaches the combination of dry powdered ingredients by geometric dilution" and "flavorings, drugs, and other components (which may be insoluble in liquid form) are easily mixed when they exist as a dry powder"; from the General Discussion of the Preferred Embodiments: "the present invention teaches the mixing of solid powders at room temperature, as opposed to liquid components at elevated temperatures" and "because solid powders are combined together, constituents which may be chemically incompatible when in a heated solution or suspension can be mixed"; and from the Methods of Manufacture of the Preferred Embodiments: "[e]ach of the components is mixed with the other components in dry form to produce the compositions of the present invention." *Id.*

Just as LPL tries to argue here, Cephalon argued that these statements did not amount to a clear disclaimer of the use of liquid in the claimed manufacturing method. The Court found the need for an explicit disclaimer misplaced because "the consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim." *Id.* Nothing in the patent or prosecution history suggested that the inventors intended the disputed claim phrases to cover methods or articles using free liquid. *Id.*

The same facts and analysis apply here. As detailed above, the patents consistently describe the invention and rear mountable to be the contrary of the prior art space-wasting

16

mounting methods. The patents criticize the side-protruding fastening elements present in those prior art mounting structures. The very problem the patents sought to solve was the existence of these space-wasting fastening elements. All of the embodiments support the Special Master's constructions. And during prosecution the inventors used this limitation to distinguish the prior art. Thus, it is appropriate to find that this limitation is part of the definition of "rear mountable."

Another case on point is *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277 (D.Del. 2006). In that case, the Court limited the construction of the claim term "probe intensities" to those coming from labeled sample nucleic acids and that they must be associated with known probe locations, as shown in the preferred embodiments. *Id.* at 288-89. *Affymetrix* argued that since there were many ways to generate a signal indicating the extent of hybridization other than by labeling the sample sequence that hybridizes to a probe, limiting it to what the specification shows would be an improper importation from the specification. The Court explained, "this is not a case of improperly importing a limitation from the specification into the claims, but of reading a claim in light of the specification." *Id.* The specification consistently described the claim term in this manner, and all of the embodiments showed these limitations. The prosecution history revealed that the inventors pointed to these limitations to distinguish the prior art thereby limiting the scope of their claims. *Id.* In light of the intrinsic evidence and the patent's "lack of discussion of any alternative method," the Court concluded this construction of "probe intensities" was "what the inventors actually invented and intended to envelop with [their claims]." *Id.*

Again, the same analysis applies here to the Special Master's recommended construction. This is simply not a case of improperly importing limitations from the specification into the claims, but of reading the claims in light of the specification. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Special Master's construction stays true to the claim

language and the specification, and to "what the inventors actually invented and intended to envelop with the claim." It should therefore be adopted.

## IV.    CONCLUSION

For the foregoing reasons, ViewSonic respectfully requests that the Court reject LPL's exceptions and adopt the Special Master's proposed construction for "rear mountable."

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ LLP

Dated: July 20, 2007

By:  */s/  James D. Heisman*
     Jeffrey B. Bove, Esq. (#998)
     James D. Heisman, Esq. (#2746)
     Jaclyn M. Mason, Esq. (#4737)
     The Nemours Building, 8th Floor
     1007 North Orange Street
     Wilmington, DE 19801
     Telephone: (302) 658-9141
     Facsimile: (302) 658-5614

Scott R. Miller, Esq.
333 South Grand Avenue, Suite 2300
Los Angeles, CA 90071
Telephone: (213) 787-2500
Facsimile: (213) 687-0498

*Attorneys for ViewSonic Corporation*

OF COUNSEL:

Tracy R. Roman, Esq.
Raskin Peter Rubin & Simon, LLP
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 277-0010
Facsimile: (310) 277-1980

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2007, a true copy of the foregoing document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following and the document is available for viewing and downloading from CM/ECF:

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Anne Shea Gaza
Frederick L. Cottrell III
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801

I hereby certify that on July 27, 2007, I have sent by email the foregoing document to the following non-registered participants:

Cass W. Christenson
Lora A. Brzezynski
Rel S. Ambrozy
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

Tracy R. Roman
Raskin Peter Rubin & Simon
1801 Century Park East 23rd Floor
Los Angeles, CA 90067

Mark H. Krietzman
Valerie W. Ho
Frank E. Merideth, Jr.
Steve P. Hassid
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

By: _/s/ James D. Heisman_
James D. Heisman (#2746)
jheisman@cblh.com