# EXHIBIT B

080707hr.txt

1

1          ROUGH DRAFT

2

3        IN THE UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF DELAWARE

5

PHILLIPS, L.G., LCD CO., LTD, )
6             )
      Plaintiffs,     ) C.A. No. 04-343(JJF)
7             )
  v.           )
8             )
TATUNG CO., TATUNG COMPANY OF )
9  AMERICA, INC., and VIEWSONIC  )
CORPORATION,       )
10            )
      Defendants.    )
11
      Hearing of above matter taken pursuant to notice
12  before Renee A. Meyers, Registered Professional Reporter
and Notary Public, in the law offices of BLANK ROME,
13  LLP, 1201 North Market Street, Wilmington, Delaware, on
Tuesday, August 7, 2007, beginning at approximately 3:30
14  p.m., there being present:

15  BEFORE:THE HONOROABLE VINCENT J. POPPITI, SPECIAL MASTER

16  APPEARANCES:

17     THE BAYARD FIRM
     RICHARD D. KIRK, ESQ.
18      222 Delaware Avenue, Suite 900
     Wilmington, Delaware  19899
19     for Plaintiffs

20

080707hr.txt

21          CORBETT & WILCOX
         Registered Professional Reporters
22      230 North Market Street     Wilmington, DE 19899
              (302) 571-0510
23         www.corbettreporting.com
         Corbett & Wilcox is not affiliated
24      with Wilcox & Fetzer, Court Reporters


                              2


1
       APPEARANCES (Continued):
2
          MCKENNA, LONG & ALDRIDGE, LLP
3        CASS W. CHRISTENSON, ESQ.
         REL S. AMBROZY, ESQ.
4        DEREK AUITO, ESQ.
         LORI BRZEZYNSKI, ESQ.
5         1900 K Street, N.W.
          Washington, D.C.  20006
6          for Plaintiffs

7        RICHARDS LAYTON & FINGER
         FREDERICK L. COTTRELL, III, ESQ.
8        ANNE SHEA GAZA, ESQ.
          One Rodney Square
9         Wilmington, Delaware  19801
          for Defendant Tatung Co.
10
         GREENBERG TRAURIG LLP
11        FRANK MERIDETH, ESQ.
         VALERIE HO, ESQ.
12        MARK KREISMAN, ESQ.
          2450 Colorado Avenue, Suite 400E
13         Santa Monica, California  90404
          for Defendant Tatung Company of America, Inc.
14
         CONNOLLY BOVE LODGE & HUTZ LLP
15        M. EDWARD DANBERG, ESQ.
          1007 North Orange Street
16         Wilmington, Delaware  19899
                    Page 2

080707hr.txt

for Defendant Viewsonic Corporation

17

    BINGHAM McCUTCHEN LLP

18    MANUEL NELSON, ESQ.

    TRACY ROMAN, ESQ.

19     355 South Grand Avenue

    Los Angeles, California  90071-3106

20      for Defendant Viewsonic Corporation

21

22

23

24

3

1       SPECIAL MASTER POPPITI:  Mr. Kirk, please.

2        MR. KIRK:  Yes, Your Honor.  This is Richard

3   Kirk for The Bayard Firm for the plaintiff LG Phillips,

4   LCD Company, Ltd.

5      With me on the line from Washington, from

6   the firm of McKenna, Long & Aldridge, are my colleagues,

7   Cass Christenson, Lori Brzezynski, Rel Ambrozy, and

8   Derek Auito.

9       MS. GAZA:  Good afternoon, Your Honor, Anne

10   Gaza from Richards, Layton & Finger on behalf of the

11   Tatung defendants.  With me on the line is Fred Cottrell

12   as well as Frank Merideth, Valerie Ho, and Mark Kreisman

080707hr.txt

13    from the law firm of Greenberg Traurig.

14          MR. DANBERG:  Good afternoon, Your Honor.

15    Ed Danberg at Connolly, Bove.  With me is Manuel Nelson

16    and Tracy Roman.

17          SPECIAL MASTER POPPITI:  Thank you very

18    much.

19          Let us use the agenda that was sent over

20    yesterday for purposes of addressing the issues

21    contained in that agenda.  The first on the agenda is

22    the status of LPL's supplemental document production to

23    ViewSonic, and that was covered in ViewSonic's 7/27

24    submission and LPL's 8/three submission and in


4


1    ViewSonic's 8/three submission, and I have that marked

2    as D M3 seven.

3          MR. NELSON:  Your Honor, I will be

4    addressing the issues on behalf of ViewSonic.  Shall I

5    proceed?

6          SPECIAL MASTER POPPITI:  Yes, please.

7          MR. NELSON:  Just to recap, Your Honor, how

8    we got here, on June 28th, we had a long hearing where

Page 4

080707hr.txt

9    you ordered LPL to produce documents in response to

10   various requests for production of documents from

11   ViewSonic.

12          On July 13th, we had a hearing because the

13   issue of burden of all that production came up and LPL

14   proposed, as a preliminary matter, to provide a limited

15   production and to see where we'd be based upon the

16   review of that limited production and Your Honor thought

17   that was an acceptable preliminary approach.

18          We have now received approximately 3,000

19   pages of production from LPL.  But where we filed

20   ourselves, Your Honor, is that, as you can see from the

21   correspondence that's attached as exhibits to our

22   submissions of August 3rd, we have identified somewhere

23   in the order of 250 pages of drawings that are either

24   illegible or very difficult to read, on the one hand,


5


1    and No. 2, while that's not necessarily explicitly

2    stated in our submission, those drawings that are

3    legible aren't -- do not provide sufficient details

4    regarding the physical characteristics of the modules

Page 5

080707hr.txt

5    for us to be able to determine with specificity where

6    fastening elements are on the rear side or from the

7    rearview of a module.  And what I mean by that is

8    perhaps I see a little circle with a cross in it that

9    looks like a Phillips head screw, but because that

10    drawing may not have a parts lists, there is no

11    identification of that being, in fact, a screw.  Because

12    that particular image is really a two-dimensional

13    drawing from above the back, you don't know what layer

14    that screw, if it is a screw, is placed, is it actually

15    on the rear surface of the module, does it connect the

16    back light unit to the module, or is it in an embedded

17    layer?

18         So we are in a position where we actually

19    aren't able to discern the physical characteristics that

20    we need for this case.

21         So where that leads us today, Your Honor, we

22    didn't submit all of the illegible documents for the

23    August 3rd submission because we didn't think we'd waist

24    your time looking at what's not legible.

6

080707hr.txt

1          SPECIAL MASTER POPPITI:  I appreciate that.

2          MR. NELSON:  What we want to produce and

3     what we proposed to LPL is we really want our samples of

4     their products.  The reason we want samples is because

5     there is no denying what the physical characteristics of

6     that module are once we have the samples in our hand.

7     We have produced samples to LPL for inspection or

8     purpose and we have done it for somewhere in the order

9     of 150 monitors.  We are just asking that they provide

10     samples for the products that they have identified in

11     their documents.  We are going to still continue along

12     with the preliminary proposal that Your Honor accepted

13     that was made by LPL, but we'd like to add to that list

14     of what's being produced samples of the products, both

15     the prior art products and the products that were made,

16     sold, offered for sale after 1999.  And then just to tie

17     this together, I think one of the issues might be

18     whether we have actually a request for production of

19     samples and I don't know if Your Honor recalls, but

20     during the June 28th hearing, we discussed ViewSonic's

21     request for production No. 128.  And request for

22     production No. 128 actually does request samples.  At

23     the time of the June 28th hearing, you accepted LPL's

Page 7

080707hr.txt

24     objection that that request was overly broad.  However,


7


1     once we started going down the path of narrowing the

2     production because of burden on -- when we actually

3     adopted LPL's position on July 13th, in my opinion, and

4     out of fairness, we should have actually gone back and

5     revisited request for production 128, which involves the

6     request for samples because, really, without the

7     samples, we have got a lot of documents that are, A,

8     either illegible or, B, do not give us the features that

9     we need to be able to have our expert identify what are

10     the precise fastening elements or items that could be

11     fastening elements on the rear surface of the LCD

12     module.

13          That's the first part of our petition; we

14     request samples of their products.

15          SPECIAL MASTER POPPITI:  Let me ask this

16     QUESTION:  I gather, based on the communication of the

17     correspondence that I have read and I expect, based on

18     what you are telling me now, that the clarity of the

19     production, on paper, is not going to improve?  Is that

080707hr.txt

20    what I am hearing LPL say?  What you have is what you

21    have given and the clarity is not going to get any

22    better with looking at other documents?

23          MR. CHRISTENSON:  Your Honor, the answer to

24    that question is yes, in part, and no, in part.

8

1          In part, that's correct.  We have documents

2    for which we have produced the best available copies and

3    they show what they show and we cannot provide better

4    copies.  In some cases, we have been able to provide

5    better copies and we are in the process now of providing

6    additional better copies for certain pages that were

7    just recently identified by ViewSonic as being some of

8    the pages they say are not legible, and that's part of

9    the basis for them seeking module samples at this point.

10    So I think some of those issues are likely to be cured

11    but not all of those issues are likely to be cured.

12          I think it's also important to point out

13    that the documents that we have do provide -- that we

14    have produced do provide the type of information that

15    was requested in the document request, and that

Page 9

080707hr.txt

16    information relates to the parts of the modules that LPL

17    makes and how those modules are assembled.

18         SPECIAL MASTER POPPITI:  Let me make an

19    observation about that, the last statement.  I am

20    certainly not in a position, based on what I have been

21    given, to make that judgment, and nor would I expect,

22    and I could be wrong about this, that you want to be

23    sitting with me in a courtroom and literally pointing

24    and click to go show me what you have just said because


9


1    I would expect that that labor and that -- I would

2    expect it would be, No. 1, intense, and unnecessary; is

3    that a fair comment?

4         MR. CHRISTENSON:  Your Honor, I think that

5    sounds like a fair comment.  We would want to be as

6    efficient as we can be and I think your observations are

7    accurate.

8         SPECIAL MASTER POPPITI:  So let me see if I

9    understand.  You are making, and I want some definition

10   to this, you are making best efforts to give best copy?

11   And that has not -- the roll out is not complete yet?

080707hr.txt

12          MR. CHRISTENSON:  That's correct.  We have

13    produced, in some cases, we were able to go back for

14    documents identified initially by ViewSonic, we were

15    able to, essentially, reformat those documents on our

16    end and in a way that provided better resolution and

17    produce those copies.

18          Some documents are what they are.  We don't

19    have any way to improve the legibility.  Then there are

20    some additional documents recently identified that we

21    are going to reproduce in a different format that we

22    think would give better legibility.

23          SPECIAL MASTER POPPITI:  And have you all

24    taken the opportunity to go through the documents for


                              10


1     purposes of determining that category they are what they

2     are, or is that yet to be done?

3           MR. CHRISTENSON:  Your Honor, I believe that

4     those documents were identified by ViewSonic in a letter

5     dated August 2nd at page 3.

6           SPECIAL MASTER POPPITI:  Right.

7           MR. CHRISTENSON:  And those are the

                        Page 11

080707hr.txt

8    documents that we have been working to provide improved

9    copies.

10        SPECIAL MASTER POPPITI:  I expect, and tell

11   me, from ViewSonic's perspective, that that process

12   should certainly continue, and I think I just heard both

13   of you saying that it is continuing and I expect you

14   both agree it should continue?

15        MR. NELSON:  Yes.  From ViewSonic's

16   perspective, the improved legibility should continue,

17   but that doesn't foreclose our need for samples.  In

18   fact, if you could, I'd like to turn to Exhibit E of

19   LPL's August 3rd submission.

20        SPECIAL MASTER POPPITI:  Exhibit E?

21        MR. NELSON:  Yeah.  We can actually start

22   with Exhibit C if you'd like.

23        THE COURT:  Start wherever you tell me to

24   start.


11


1        MR. NELSON:  Why don't we start with Exhibit

2    C.

3        SPECIAL MASTER POPPITI:  I am at Exhibit C

                    Page 12

080707hr.txt

4       and that is correspondence dated July the 31st, 2007,

5       from Mr. Auito.

6              MR. NELSON:  Correct.  And in Exhibit C, you

7       will see that they produced replacement drawings for

8       roughly 40 pages we identified, 40 pages of drawings

9       that we identified.  They were able to provide

10       replacement drawings.  Just so Your Honor is aware, we

11       identified somewhere along the order of 77 pages of

12       drawings that needed to be replaced, but they were able

13       to replace 40 of those 77 drawings.  The rest were not

14       be able to be replaced.  That bates span, if you notice,

15       is LPL 214 five to 21187.  That's the bates scan of

16       replacement drawings, 214 five to 21187.  It will

17       include the No. 21152.

18              SPECIAL MASTER POPPITI:  I see that.

19              MR. NELSON:  If we turn to exhibit E.

20              SPECIAL MASTER POPPITI:  Okay.

21              MR. NELSON:  Exhibit E is Bates No. 21152.

22       It's one of those replacement drawings.  This is the

23       best they are going to be able to produce with respect

24       to that drawing.

080707hr.txt
12

1          SPECIAL MASTER POPPITI:  I can tell you I

2    looked at it and I can tell you it wasn't, from this lay

3    person's eye, it wasn't very helpful and I gather you

4    are telling me, from your trained eye, it's not helpful.

5          MR. NELSON:  Not only not helpful, there is

6    no date on the document, there's no model on the

7    document.  I can't tell where the screws are.  It's

8    absolutely not helpful.  The replacement documents not

9    going to save the day in this case.  And one other, if

10    you would like me to point out another example that's

11    been submitted by LPL in their exhibits, I will be glad

12    to do so.

13          SPECIAL MASTER POPPITI:  Okay.

14          MR. NELSON:  If you want to turn to Exhibit

15    F, Your Honor, the very next exhibit, on August 3rd, we

16    have been -- I don't know if Your Honor recalls, we have

17    been requesting documents that showed the assembly of

18    LPL's modules for a long time now, and that's actually

19    the crux of why we want the samples is because we can't

20    tell how these modules actually assembled from

21    two-dimensional figures.  Exhibit F is an example after

22    service manual that they have just produced on August

Page 14

080707hr.txt

23    3rd.  If we turn to what is page 10 of Exhibit F, pages

24    10 and 11.


13


1         SPECIAL MASTER POPPITI:  I am there, 10 and

2    11.

3         MR. NELSON:  010 is the best exploded view

4    document that they have ever produced.  And 11 happens

5    to be the parts list that corresponds with that exploded

6    view, so it's helpful because we get to see that item

7    No. 7 in the exploded view is actually a screw there and

8    are a couple of the screws.  So, this is actually a

9    reasonable document because it does actually break it

10    down into three dimensions and so we can tell what layer

11    that screw son.  Unfortunately, Your Honor, we have been

12    advised that they only have nine of these service

13    manuals, that they have produced all of the service

14    manuals that correspond to the top 10 products that they

15    have since 1999.  And just by simple a arithmetic, that

16    would be somewhere on the order of more than 50

17    products, so they have produced nine service manuals

18    and, of course, they don't have any service manuals for

Page 15

080707hr.txt

19    any of the products that were sold prior to 1999 so that

20    would be prior art.

21         So, this is best document I have seen in

22    LPL's production, and I only have nine of them.

23         SPECIAL MASTER POPPITI:  Okay.  Well, then,

24    let's turn to the discussion from earlier in the day,


14


1     but please remind me what the -- I am looking at the

2     transcript where the request for production 128 was

3     dealt with, and if you would point me to the page

4     reference that I have already seen today, but,

5     unfortunately, I didn't --

6          MR. NELSON:  I didn't hear the question.  If

7     I would point to the page reference?

8          SPECIAL MASTER POPPITI:  Reference to where

9     128 was.

10         MR. CHRISTENSON:  Your Honor, that should

11    be, I believe, at page 128 into 129 of the transcript.

12         MR. NELSON:  Your Honor, what you also want

13    to look at is the actual document request, itself.

14         SPECIAL MASTER POPPITI:  I have that in

080707hr.txt

15    front of me.

16           MR. NELSON:  Okay.

17           SPECIAL MASTER POPPITI:  Let me make this

18    observation.  I think it's fair to say that the context

19    of what we were doing when we were looking at the

20    theories 126, 127, and 128, it was for purposes of, No.

21    1, my making a ruling, and then it was also for the

22    purpose of you all taking those rulings, having some

23    discussion about the scope of the rulings, and coming up

24    with a path forward is No. 1; is that a fair statement


                          15


1     from your respective positions?

2            MR. CHRISTENSON:  Your Honor, yes.  On page

3     130 at the top, you clearly state, "I will require a

4     meet and confer on the scope of 126 and 127 but not with

5     respect to 128.  "

6            SPECIAL MASTER POPPITI:  Correct.

7            MR. NELSON:  Yes.

8            SPECIAL MASTER POPPITI:  And I think it's

9     also fair to say that when we were looking at 128 and

10    looking at 128 now, one 28 eight, in its preamble

                          Page 17

080707hr.txt

11    phrase, if you will, says, "All information from January

12    1, 1997," and by virtue of that language, I did make the

13    ruling that, with respect to all information, that was

14    simply too broad, it lacked precision, there was no

15    definition, and I wasn't going to entertain that.  And I

16    think that's clear from the transcript.

17          What is also clear, by virtue of it not

18    being part of the transcript, unless somebody can point

19    me to the discussion that we had, and if we had it, I

20    simply don't recall it and I didn't comb the transcript

21    for purposes of finding it, there was no discussion in

22    this transcript of the last phrase in the interrogatory

23    which says, "Including a Sam of each such flat panel

24    display device."  Is that fair?


16


1          MR. NELSON:  That's fair, Your Honor.

2          MR. CHRISTENSON:  Your Honor, I agree with

3    that as well, I think, and Mr. Miller, from ViewSonic,

4    at page 125, describes request one 28 in terms of what

5    was being sought, and he refers to information relating

6    to etcetera, etcetera.

080707hr.txt

7          SPECIAL MASTER POPPITI:  Right.

8          MR. CHRISTENSON:  It does not refer there at

9     all to samples and modules and, presumably, that's why

10     it was not addressed.

11          SPECIAL MASTER POPPITI:  Right.  So, I mean,

12     I think, for purposes of the record that I am dealing

13     with, the issue with respect to the information, that

14     is, the documents that were being sought, was squarely

15     addressed, discussed, I disposed of it by virtue of

16     issuing a ruling.  And with respect to the request for

17     the opportunity to have request samples, I didn't deal

18     with it.  It wasn't raised.  And I -- if you want to be

19     heard on that issue, in other words, why is it unfair to

20     raise the issue of samples now given the fact that what

21     we -- what I think I am faced with is not an

22     insignificant amount of documents that don't do what,

23     perhaps, each of you expect that they would do?  Why is

24     it unfair to look at the issue of samples?  And maybe


17

1     it's not.  Maybe you both agree it's not.  I know

2     ViewSonic agrees it's not.

Page 19

080707hr.txt

3          MR. CHRISTENSON:  Your Honor, from LPL's

4     perspective, I think that your premise there was that

5     both sides feel that our document production didn't do

6     what we had expected, but I respectfully disagree

7     because --

8          SPECIAL MASTER POPPITI:  How do I measure

9     that, Mr. Christenson, without sitting down with you and

10    whether, you know, whether it's going through the one

11    good one and the one that is indescribable to me, how

12    many of those do I have to see before I make a judgment

13    that we should be looking at samples here?  All of them?

14    A sampling of them?

15         MR. CHRISTENSON:  Your Honor, that is

16    actually a question that I discussed with ViewSonic:

17    What specific samples were they requesting from us?  And

18    they had stated they would clarify that.  Initially, in

19    the July 27th submission to Your Honor from ViewSonic,

20    on page 2 of that submission, they are requesting

21    samples for what they call prior art products, which are

22    the pre1999 products.

23         SPECIAL MASTER POPPITI:  Right.

24         MR. CHRISTENSON:  And, so, we had

080707hr.txt

18

1    investigated that and determined that LPL does not

2    maintain an inventory, if you will, of old modules from

3    that time period where they could provide those modules.

4    And, so, the issue that was submitted to you on the July

5    27th letter, I think, is moot because we can't provide

6    the, what they call "prior art module samples."  They

7    then, very recently, shifted gears away from that and

8    now they want us to produce samples, apparently, for all

9    the products since 1998 that are reflected in our

10   document production.  But, you know, the -- I think it's

11   telling that their initial request to Your Honor in the

12   July 27th submission was for the pre1999 modules, and

13   only when we determined we don't have those did they

14   then say they want the more recent modules.

15        MS. ROMAN:  Your Honor, this is trace roam

16   on behalf of ViewSonic.  Just to be fair, our July 27th

17   submission did make it clear that we were doing the best

18   we could to review the information that had been

19   produced at that point in time.  Naturally, our primary

20   focus from that information that had been produced was

21   to start with the prior art documents that had been

Page 21

080707hr.txt

22    produced.  And, so, what we are giving you an update for

23    in the July 27th status report fell under a heading

24    "Lack of information regarding the prior art products."


19

1    At that time, based on what we could review, we knew

2    that the documents produced for the prior art products

3    were insufficient and that we'd have to be looking at

4    samples.

5          During the meet and confer that I had with

6    Mr. Christenson, he did inquire, Well, are you just

7    limiting this to prior art products?, because it's

8    unclear from your submission, or are you talking about

9    samples for all products?  So there was an ambiguity on

10    both sides.  There was no clear understanding on their

11    part that it was only going to be prior art products.

12    And I am sorry if it communicated that but we did try to

13    make it clear in our July 27th submission that we

14    weren't able to get through everything that had been

15    produced despite how fast we were trying to go through

16    it.

17          So, during that meet and confer, I did say

Page 22

080707hr.txt

18    that I would look into that and try and clarify it

19    because I was not the one who had been reviewing the

20    documents, so it was unclear to me whether the documents

21    that had been produced relating to post patent filing

22    products were sufficient to disclose the information

23    that we needed to -- in order to resolve the issues for

24    the case.


                            20


1            SPECIAL MASTER POPPITI:  Mr. Christenson, I

2    don't see this as sandbagging.  I mean, this is

3    production that is coming at the time it's coming.  It's

4    production that I gather was difficult to get through

5    because some of it was simply not readable, whether "not

6    readable" means it was not readable or lack of

7    information or it was unclear or it was a bad copy, but

8    it falls into the category that it wasn't worth

9    anything.

10           My concern is -- there are two observations

11    I will make.  No. 1, I am satisfied that the issue of

12    samples is something that I didn't rule on.  No. 2, I am

13    inclined to -- by "inclined," I will, after I have some

080707hr.txt

14    further discussion with you, provide the opportunity to

15    receive samples, and the path forward to that, I want

16    some degree of assurance here that either I am going to

17    have to dive into the production with your respective

18    assistance so I can see for myself and I am just not

19    sure that that's a good utilization of your time, it's

20    not a good utilization of my time, and I am not sure

21    that the resources that you are going to spend on all of

22    that makes a great deal of sense.

23        I would prefer that you forming and I have

24    done this before, some agreement with respect to


21


1    samples, understanding that I will make some decision

2    with respect to that O them, and if I have to tell you,

3    on a date certain, not in a distant future, we have got

4    to gather in a courtroom and you have got to start

5    pointing and clicking for me, we are going to do that.

6    "

7        MR. CHRISTENSON:  Your Honor I think I am

8    clear on what you expect and we are still waiting to

9    hear back from LPL to determine, you know, to what

Page 24

080707hr.txt

10    extent the more recent products may exist in Sam form

11    for which we can make a production.

12         I believe, my understanding is, but I'd like

13    to confirm this, that ViewSonic is amenable to paying

14    for the costs associated with the samples that we would

15    be producing?

16         MS. ROMAN:  That is correct.  On the

17    expedite it, Cass, if you just provide cost information

18    with a list of products that are available, that would

19    help to speed things along.

20         MR. CHRISTENSON: , so Your Honor, we will

21    proceed as you suggested.  We will complete our

22    investigation to determine what is available as quickly

23    as we can and we will then promptly discuss that with

24    ViewSonic toward a resolution.


22

1         SPECIAL MASTER POPPITI:  My remaining

2    question, then, is:  Do I need to establish some date

3    parameter, some deadline, some time frames to work

4    within?  Do you all want to do that and get back to me

5    and tell me to determine a deadline or what the dates

080707hr.txt

6     forward are?

7              MS. ROMAN:  Your Honor, it's difficult for

8     me to propose a date not knowing the difficulties that

9     Mr. Christenson faces with getting the information he

10    needs from his client.  But as you are obviously well

11    aware, we have the August 28th filing for the opening

12    expert report and we do need that in advance of that so

13    our expert can do his evaluation and prepare the report.

14    So we'd certainly like it as quickly and expeditiously

15    as we can.

16             SPECIAL MASTER POPPITI:  This is what I'd

17    like to be done:  Mr. Christenson, if you could, in

18    communication with your client, discuss what we have

19    just talked about and within the next several days,

20    after having communication with your client, propose a

21    date when you believe you are going to be able to finish

22    the work, the date will be, in my view, a good faith

23    target, and if the date has to be flipped because it's

24    taking more time, then I am happy to hear that, that

23

1     it's taking more time and the date has to be flipped and

Page 26

080707hr.txt

2    I will honor that taking you at your word.  But I think

3    it's important to establish some target date going

4    forward that represents that good faith effort because

5    of the deadline for expert reports that is rapidly

6    approaching.

7        MR. CHRISTENSON:  Your Honor, I certainly

8    will proceed as you just instructed.  I think that

9    sounds similar to the approach we took last time and we

10    were able to -- I think that worked successfully.

11        Are you asking for a date right now or are

12    you asking us to --

13        SPECIAL MASTER POPPITI:  I am asking you to

14    have conversation with your client or with whomever you

15    need to talk with about the information you need to

16    gather for purposes of determining what, if any, samples

17    are available.

18        MR. CHRISTENSON:  Yes, Your Honor.  So we

19    will do that very promptly, and then we can, we will set

20    a timetable and we can make you aware of that.

21        MR. MERIDETH:  Just so it's clear, we are

22    talking about inclusive of prior art; am I correct?

23        SPECIAL MASTER POPPITI:  Thank you,

24    Mr. Merideth.

080707hr.txt

24

1        MR. CHRISTENSON:  With respect to the older

2    models, which are the 1997, 1998 models, as I stated

3    before, there is no inventory of products from which we

4    could produce samples going back that far.

5        My understanding -- and that's an issue we

6    had initially investigated when we received the July 27

7    letter.  What I don't know right now is:  I am assuming

8    there is some recent product availability of samples.  I

9    just don't know the extent of that availability or how

10    far back it goes.  But I am checking for the full time

11    period.

12        MR. MERIDETH:  I just want to make it clear

13    that the one product that we are particularly concerned

14    about, from Tatung's standpoint, is not the '97 or '98

15    product but is a 1996 product that we identified in our

16    letter of August 3, 2007, and similar products from that

17    time period.  During the testimony of Mr. Kim, he

18    indicated that there was a library of products, and I

19    assume that you are going to check or have your client

20    check in that library of products, and if stuff has been

080707hr.txt

21    disposed of we will have a log of what was diseases

22    posed of, and we need to get that.

23         Obviously, this particular module, the

24    LC56N1 is a particularly important piece of prior art.


                          25


1    We were able to obtain a so many of that, and you can

2    see from the August 3rd letter how important the Sam is

3    versus the incomplete drawing that was provided.  And we

4    are assuming that you are going to go back and find that

5    data or tell us why it can't be found and/or has been

6    disposed of.

7         SPECIAL MASTER POPPITI:  Mr. Christenson.

8         MR. CHRISTENSON:  Yes, Your Honor.  The --

9    as I said, we are going to look back for samples for the

10    entire time period.  I will reconfirm as to the earlier

11    products, and if Mr. Merideth could give us the citation

12    to the library of products that he referred to, that

13    would be helpful because I think he might be

14    misconstruing the testimony with respect to the

15    purported library products.  But we will work through

16    those issues, we will check with LPL, we will continue

080707hr.txt

17    our investigation as promptly as we can, and whatever we

18    can make available, we will try to work out with the

19    other side and reach a resolution very promptly.

20         SPECIAL MASTER POPPITI:  What I do want is

21    if there are any stumbling blocks along the way, I want

22    you to arrange for a teleconference to get me on the

23    line.

24         MR. MERIDETH:  Very well, Your Honor.


26

1         SPECIAL MASTER POPPITI:  Next.

2         MS. ROMAN:  I think the next issue flows

3    directly from this very same conversation relates to

4    whether or not the defendants will be allowed to depose

5    a 30(b)(6) witness on behalf of LPL regarding the

6    documents that have been produced and the issues that

7    arise out of those documents.

8         MR. CHRISTENSON:  Your Honor, just to be

9    clear, this is an issue that we feel is not ripe for

10    discussion today.  We don't think this is a part of the

11    document production set of issues that was submitted.

12    It's an issue that we have been trying to discuss and we

Page 30

080707hr.txt

13     are continuing to discuss with the other side, but we

14     don't think we are at the point right now where it's

15     appropriate to submit to Your Honor because it's not

16     clear to us specifically all the issues that are being

17     sought for a deposition, No. 1, from ViewSonic, and we

18     had a discussion yesterday with ViewSonic where they

19     said that there are some topics that they think they

20     want to re-pursue with LPL that were previously the

21     subject of testimony and then they also let us know

22     yesterday, for the first time, there may be additional

23     topics and additional deposition notices that they

24     intend to issue.  We haven't seen any of that

27

1     information.

2            They have agreed to provide us the topics,

3     but so far we don't have that information.  We learned

4     yesterday for the first time that Tatung apparently also

5     seeks the deposition and we don't know anything about

6     the topics that Tatung is seeking testimony on.

7            MR. MERIDETH:  I can clarify that.

8     Specifically, the topics that we feel that we are

Page 31

080707hr.txt

9    entitled the 30th B six testimony on are topic No. 8 and

10   topic No. 23 of the prior 30(b)(6) notices.

11        SPECIAL MASTER POPPITI:  And I don't have

12   that in front of me Mr. Merideth.

13        MR. MERIDETH:  It refers specifically to

14   prior art.

15        SPECIAL MASTER POPPITI:  Okay.

16        MR. MERIDETH:  And Mr. Kim and Mr. Chung

17   were unable to adequately respond to those questions,

18   and, indeed, thought that one of the items of prior art

19   or suggested that one of the items of prior art was a

20   clock radio.  And they were inadequate -- they were not

21   prepared to discuss these items and we were not in a

22   position to question them, obviously, because they

23   hadn't produced the data.

24        We now have it, and it is very clear that,


28


1    at least as to this one product, the LCO56N1, that we

2    are entitled to question about that.

3        SPECIAL MASTER POPPITI:  Let me ask this

4    question, or perhaps make this observation.  I don't

Page 32

080707hr.txt

5    think that there should be any question that the

6    production, as it is continuing, we all had this

7    conversation many, many months ago where I suggested to

8    you that I would not be surprised, No. 1, that there

9    would be a need for additional discovery, and I said

10    that I would be open to that.

11        It seems to me the best things to do, in

12    light of the deadline, is to, again, without knowing

13    what the topics are going to be other than the go that

14    were just identified, is to set a deadline for there to

15    be some definition as to what you are all talking about

16    so that if there is a dispute, I can do whatever I need

17    to do to help to resolve the dispute.

18        I don't think I have the kind of information

19    that would permit me to give other than a guidance or an

20    advisory, and I don't think that's appropriate.

21        I do think, however, that, given my

22    responsibility to manage, we should be talking about a

23    short time frame in terms of coming up with the topics,

24    of coming up with the time frame, and coming up with a

29

080707hr.txt

1    number of notices that are going to be issued.

2            MS. ROMAN:  Your Honor, I don't disagree,

3    and this is why, during the meet and confer yesterday, I

4    agreed to work as quickly as I could to get those topics

5    pulled together for Mr. Christenson.  As I did point out

6    to him, though, it's a little difficult to be all

7    inclusive about the topics with out being,

8    unfortunately, overly broad, without knowing what the I

9    will illegible documents that are going to be replaced

10    are going to looks like and what information they might

11    yield or questions they might raise.  We had two issues

12    during our meet and confer and I think the only reason

13    it was actually being discussed with you today is

14    because it seemed like we were at a stand still as to

15    whether a deposition was even appropriate, period,

16    regardless of what the topics might be.

17            We did identify categories or general

18    information topics in both our July 27 and our August

19    3rd submission, and the specific topics that we would

20    notice would fall within that scope, at least, and there

21    might be a couple of others, and those included not only

22    the issue of damages, the invalidity of the patent based

23    on the documents, potential inequitable conduct made by

Page 34

080707hr.txt

24      the documents, and the structure of products, the

30

1       knowledge of prior art, statements made to the

2       examiners, so I have been going through our previous

3       deposition notices and pulling out the topics that apply

4       to that.  But they certainly fall within the scope of at

5       least those that we have listed in there.  And during

6       our meet and confer, as I understand it, and Mr.

7       Christiana, certainly please correct me if I was wrong,

8       but if as I understood it, there was certainly an

9       objection to presenting any witness for deposition based

10       on the general topics that we had put forth in those

11       submissions.  And I am not sure providing topics that

12       fall within the scope of that going to get us any

13       further along, but I am happy to agree to provide that

14       information by tomorrow with the topics specifically

15       noticed so that we can move this issue along.

16            SPECIAL MASTER POPPITI:  Mr. Christenson.

17            MR. CHRISTENSON:  Yes.  It is helpful to see

18       what the topics are, as we had discussed, because

19       depending on topic, No. 1, without knowing the topics,

Page 35

080707hr.txt

20     it's hard for us to take a position, specifically, and

21     know what is or is not appropriate.  And furthermore,

22     some of these topics we might be able to resolve short

23     of a deposition and that's something we have indicated

24     we are willing to do, you know, an obvious example is


31

1     related to authenticity of documents.  So I think it's

2     important not to put the cart before the horses and to

3     know what are the topics specifically and then we can

4     discuss those topics and see to what extent we can

5     resolve the issues.

6          MS. ROMAN:  Well, I can provide you the

7     topics by close of business tomorrow California time.  I

8     can try to get it to you sooner, but I know that I have

9     got some people traveling that I have to communicate

10     with on this, so I will do my best to get it before

11     close of business, but certainly by close of business.

12          MR. MERIDETH:  We will cooperate with

13     Ms. Roman so we give one combined list.  I think it's

14     the easiest way to do it.

15          SPECIAL MASTER POPPITI:  That makes a great

080707hr.txt

16    deal of sense.  And turn around to me, I want, again,

17    without setting any deadline, the message has to be it

18    has to happen quickly in light of the deadlines that are

19    rapidly approaching.  Okay?

20         MS. ROMAN:  In that regard, Cass, I am

21    available any day Thursday and Friday for a meet and

22    confer regarding it, so just let me know once you have

23    had a chance to review the topics, we can make ourselves

24    available.


                                32


1          MR. CHRISTENSON:  Very good.  Thank you.

2          SPECIAL MASTER POPPITI:  The only thing you

3    may want to be considering, then, is we may want, and

4    somebody remind me of this at the end of our work

5    together today, we may want to set a date, whether it's

6    called a status date or whether, call it what we want,

7    with me so that there is something to target, if you

8    will.

9          MS. ROMAN:  Yes, Your Honor.  I believe that

10    would be appropriate, and I, unfortunately, think we

11    have to put it as early as Monday because if we are

080707hr.txt

12    going to have a deposition with a witness who is

13    overseas, we are going to be making plans and scheduling

14    things soon.

15         SPECIAL MASTER POPPITI:  Well, then, let's

16    just pause for a moment.  I can do Monday, the 13th.  It

17    would have to be later in the day and I am not going to

18    be able to do anything with whatever submittals you have

19    until after Friday.  So if there were submittals even

20    late Friday, that's fine, or if you expect they are

21    going to be, not going to be significant in terms of the

22    amount of information, if you get them to me first thing

23    our time, on the East Coast, on the 13th, then I should

24    have sufficient time to look at them and prepare for


33


1    something around 3:30 or 4:00 on the 13th.

2         MR. CHRISTENSON:  Your Honor, just so I

3    understand, working backwards; the intent, then, to try

4    to have a discussion with you scheduled for Monday --

5         SPECIAL MASTER POPPITI:  If there are issues

6    remaining, correct.

7         MR. CHRISTENSON:  And submissions, would you

Page 38

080707hr.txt

8   want short submissions or do you have a preference as to

9   that?

10        SPECIAL MASTER POPPITI:  I think a short

11   submission the morning of should be sufficient.

12        MR. CHRISTENSON:  The morning of the 13th,

13   Your Honor?

14        SPECIAL MASTER POPPITI:  Yes.  Or -- either

15   the morning of the 13th or close of business on the

16   17th.

17        MR. CHRISTENSON:  I just think it might

18   depend on when we are able to have the meet and confer

19   and when we are able to really crystalize the issues

20   which might not be until the end of this week.

21        SPECIAL MASTER POPPITI:  That's fine.

22   That's why I am saying the 13th is fine.

23        MR. CHRISTENSON:  Very well.  Thank you,

24   Your Honor.


34


1        SPECIAL MASTER POPPITI:  Why don't we do

2   this, then:  We will schedule, be on the safe side and

3   schedule it at 4:30, does that give you more than enough

Page 39

080707hr.txt

4    time, even after submissions, to try to discuss it?

5         MR. CHRISTENSON:  That's fine, Your Honor.

6    Thank you.

7         MS. ROMAN:  That time is fine for ViewSonic,

8    Your Honor.

9         SPECIAL MASTER POPPITI:  All right.  Next,

10   please.

11        MR. CHRISTENSON:  Your Honor, I don't know

12   if there are any other issues.  I think we have covered

13   the issues in ViewSonic's submission, and if that's

14   true, I can address LPL's submission concerning the OEM

15   documents.

16        MS. ROMAN:  Yes, we believe the issues have

17   been covered.

18        SPECIAL MASTER POPPITI:  Okay.  Let me just

19   move some things aside.  Give me one moment, please.  I

20   am going to put you on mute.

21        The next is the status of ViewSonic

22   production of documents from OEMs.

23        MR. CHRISTENSON:  Yes, Your Honor.  This

24   relates to the documents that ViewSonic was ordered to

080707hr.txt
35

1    produce from its OEM suppliers and the OEM suppliers, as

2    you may recall, are the companies that provide ViewSonic

3    with the display products that ViewSonic sells in the

4    United States which include various accused products

5    relevant to this case.

6         ViewSonic has taken the position that the

7    most relevant or most of the relevant documents that

8    relate to the assembly of their products and the issues

9    in this case are not in ViewSonic's direct custody, but,

10   rather, are in the possession of ViewSonic's OEMs.  And

11   in February of 2007, Your Honor concluded that, under

12   the contracts between ViewSonic and the OEMs, ViewSonic

13   has control over the documents by virtue of clear

14   contractual provision that provide ViewSonic with the

15   right to demand and obtain the documents from its OEMs.

16        Your Honor issued a ruling concluding that

17   ViewSonic should produce those documents and that was

18   appealed to the Court.

19        Recently, judge foreign has adopted Your

20   Honor's rulings, and the reasoning set forth in your

21   rulings and confirmed that those documents should be

22   produced.  The deadline for production was July 18, I

080707hr.txt

23    believe.

24            We received a very limited production

36

1    consisting of approximately 180 pages, all of which

2    related to a single OEM company, Arima, A-r-i-m-a,

3    Computer Corporation.  There were approximately 17 other

4    OEM suppliers that ViewSonic contacted for all of the

5    other suppliers; however, we have not received any

6    document production, and for only one of those OEMs did

7    we receive any response to ViewSonic's request for

8    documents, and that was a -- we noted that in a

9    footnote.  One of the OEMs sent a letter to ViewSonic

10    refusing to produce documents, saying there was no

11    operative agreement between that OEM and ViewSonic.

12            But for the other OEMs that were presumably

13    contact by ViewSonic, there is no response that we have

14    seen, at least no written response.

15            ViewSonic originally produced copies of the

16    correspondence that were not signed or dated.  They

17    subsequently produced topics of what appear to be the

18    actual correspondence between ViewSonic and the OEMs,

080707hr.txt

19    and what we have determined, reviewing that

20    correspondence, is that ViewSonic -- we think that the

21    request for documents that ViewSonic sent to the OEMs is

22    not sufficient.  There is no question, at this point,

23    that ViewSonic has a contractual right to obtain the

24    documents.  I am, in reviewing the record, it appears

37

1    clear to me that the expectation was that ViewSonic

2    would make a demand for the documents, and when we

3    reviewed the March 2007 letter, it was a form letter

4    March 2007 that ViewSonic sent.  It is simply a request.

5    It's not a true legal demand for documents.  It does not

6    refer to, specifically, the OEM agreement.  It does not

7    specifically invoke any rights under the agreement.

8    And, so, we feel -- and given the context of the letter,

9    which includes that ViewSonic was objecting, that it

10    states that the documents were due to be produced in

11    February, where is letter was dated in March, which

12    suggests it could be construed as moot, and for the

13    other reasons we set forth in our August 3rd letter to

14    Your Honor, we feel that ViewSonic has not taken

Page 43

080707hr.txt

15    sufficient steps to obtain the documents paragraph, so

16    what we are asking is for Your Honor to require

17    ViewSonic to make a more appropriate and clear demand

18    exercising the right that is they have under those

19    contracts so that we can get these very important

20    documents that ViewSonic does not have.

21         We learned yesterday from ViewSonic's

22    counsel that, apparently, ViewSonic is no N the process

23    of preparing a follow-up letter to the OEMs, but we

24    haven't seen that letter.  I am not sure if that letter


38


1    has gone out or not.  And we are very concerned, at this

2    point, with the status of the OEM production.

3         MS. ROMAN:  Your Honor, unfortunately, I did

4    indicate to Mr. Christenson, that, while I am trying to

5    confirm whether that second letter has gone out, the

6    general counsels for ViewSonic is traveling and I

7    haven't been able to get confirmation of it or not.  But

8    this was certainly one of the primary concerns at the

9    time when we discussed this at, the I believe it was the

10    January 3rd hearing, we were concerned with what was

Page 44

080707hr.txt

11    going to happen once we requested the documents and the

12    OEMs chose to ignore us, that we would be in a difficult

13    position because how do we compel production of the

14    documents from the OEMs?

15         A letter that went out to the OEMs very

16    clearly stated, "While we intend to appeal this order,

17    we must collect and prepare the requested documents for

18    production.  Accordingly, ViewSonic hereby requests that

19    you immediately provide us with copies of all responsive

20    documents for production, to wit, LPL, that relate to

21    any of the ViewSonic products set forth on the

22    accompanying lists."  We even indicated to them that the

23    documents needed to be provided in their native format

24    and include any electronic data.


                                39


1         Certainly, the letter did not reference the

2    contract, but it didn't need to.  Your Honor's order

3    clearly referenced the contract, and as Mr. Christenson

4    just pointed out, one of the OEMs did respond that he

5    had read through Your Honor's order, which was clearly

6    based on the existence of the written contract

080707hr.txt

7    compelling the production of the documents and since no

8    contract existed, they weren't going to respond.

9           So, we believe that we have complied with

10   the order as it was written and that the follow-up after

11   it, that I have mentioned to Mr. Christenson, that I

12   believe was taking place to send another letter,

13   shouldn't determine whether or not the effort that has

14   already been made is already sufficient.

15          SPECIAL MASTER POPPITI:  So you are

16   suggesting I don't need to see the second letter?

17          MS. ROMAN:  No, Your Honor.  It's my

18   understanding that the second letter was simply a

19   follow-up based on the fact that the Court had accepted

20   Your Honor's report and recommendation and it was simply

21   to remind them that this had been done and that we

22   needed these documents.

23          I don't think, honestly, that it would have

24   made a difference for the production of the documents


40


1    given the very clear instruction in our first letter

2    which said we need to collect these and you need to

Page 46

080707hr.txt

3    immediately provide us with copies of them and the lack

4    of response from the OEMs.

5         SPECIAL MASTER POPPITI:  Well, let me

6    suggest this:  I would expect that if any one of you,

7    any one of you that is involved with this teleconference

8    were asked to make the demand or the request consistent

9    with an order of the Court, that we would wind up with

10    -- and I didn't count the number of us participating --

11    we would wind up with a different product from each one

12    of us.  Some may couch it in terms of, I demanded by

13    virtue of our contractual relationship, some may couch

14    it in terms of, CAM here is the Court's order, send it

15    to me.  My concern, as articulated in the January 3rd

16    hearing, as I quoted in LPL's correspondence of August

17    3rd, and I expect it would be helpful to read it for

18    purposes of today's record, and I realize this is only a

19    part of it and I did not go back to the January 3rd

20    hearing to revisit any of other language.  If you think

21    it's important to do that, then please point out that

22    language and I will put the transcript.

23         But the language quoted in LPL's letter for

24    submittal of August 3rd, "This ends up back on my desk

080707hr.txt

41

1    with respect to the third parties abrogating their

2    responsibility under the contract.  The only thing I

3    certainly would expect I would kindly ask for is the

4    nature of the request made and the expect that the

5    nature of the request is a pure and simple request.

6    There is nothing that is in the file or the developed

7    file which would suggest that ViewSonic is standing in

8    the way of that production and/or suggesting that the

9    OEM be accountable.

10           I don't see anything in this letter of

11    ViewSonic softballing it.  I don't know that, by virtue

12    of ViewSonic adding a phrase to say, By the way, you are

13    required to do it under our contract, adds anything to

14    the letter because the order reviewed all of that.  So,

15    I am not, on the record that I have before me, I am

16    satisfied that an appropriate request was made, request,

17    demand, I don't really see that there be any difference

18    in the context of the way this is teed up.  I'd like to

19    see the second request for purposes of seeing what the

20    follow-up was.  If the follow-up is consistent in its

21    language with its first request, then I think it just

080707hr.txt

22    buttresses my view that the -- it is what it is.  It's

23    one step removed.  I expect that ViewSonic could force

24    an issue independent of this Court action somewhere

42

1    else, but I don't -- I didn't contemplate that and I

2    really don't anticipate that Judge Farnan would have

3    contemplated that by virtue of accepting my findings and

4    recommendations.

5          So, on this record, I am not convinced that

6    ViewSonic didn't make an appropriate effort to get the

7    information from the OEM.

8          I do, however, want to see the follow-up.

9          MS. ROMAN:  Your Honor, I will get the

10   follow-up, as I told Mr. Christenson, as soon as I can

11   get it.  I will produce it to him as well.  And I will

12   continue making those efforts today to get it as soon as

13   possible.  The truth; Your Honor, I don't even know if

14   the follow-up letter has even gone out.

15          SPECIAL MASTER POPPITI:  Okay.

16          MS. ROMAN:  Given the general counsel's

17   traveling, and I don't know if he has been able to

Page 49

080707hr.txt

18    authorize it being sent.

19          SPECIAL MASTER POPPITI:  I understand.  I'd

20    like to see whatever is done.

21          MS. ROMAN:  Yes, Your Honor.

22          SPECIAL MASTER POPPITI:  Just a moment.

23          Next, please.

24          MS. BRZEZYNSKI:  I believe the next issue is


                              43


1     LPL's request for a protective order relating to

2     Tatung's request for a deposition of Rebecca Rudich, an

3     attorney with the law firm of McKenna, Long & Aldridge.

4          May I proceed?

5          SPECIAL MASTER POPPITI:  Sure.

6          MS. BRZEZYNSKI:  Your Honor, LPL moves for a

7     protective order because Rebecca Rudich's proposed

8     deposition has grown from a very well limited one issue

9     deposition where Tatung initially said it was willing to

10     accept a declaration to what has essentially become a

11     fishing expedition for inequitable conduct in areas

12     where Ms. Rudich does not have any relevant information

13     at all.

080707hr.txt

14          A brief review of the history, I think, is

15    necessary here.

16          Tatung initially noticed Miss Rudich's

17    deposition on March 1st of this year relating solely to

18    its unfounded allegations that McKenna, Long & Aldridge

19    violated the protective order in this case.  As Your

20    Honor is aware, ML A, my firm, spent considerable time

21    and expense responding to those unfounded allegations

22    and providing privileged documents for in camera review.

23    That resulted in a ruling by Your Honor that ML A had

24    not violated the protective order.


44


1          During that process, ML A clearing opposed

2    the taking of Miss Rudich's deposition and Tatung

3    withdraw its subpoena of Miss Rudich.  That was clearly

4    stated by Mr. Merideth on the record and then confirmed

5    by him in his March 16th letter, which is Exhibit D to

6    Tatung's submission attached to his 8/1 letter.

7          In that March 16th letter, however, Tatung

8    did state, in the second paragraph, that it still needed

9    testimony from Rebecca Rudich on, quote, one very

080707hr.txt

10    limited issue, end quote.  The letter went on to say

11    that, quote, The testimony will be limited to only

12    classes to a specific PTO office action regarding the

13    '079 patent related to an IBM product, end quote.

14          The letter also stated that Tatung was

15    willing to accept the declaration in lieu of a

16    deposition.  Tatung offered to provide a draft

17    declaration of what it wanted and we received that draft

18    declaration on March 29th.  That draft declaration sent

19    by Mr. Merideth was based on Exhibit F to Tatung's

20    submission and Exhibit 1 to LPL's August 1st submission.

21          SPECIAL MASTER POPPITI:  I have reviewed

22    that.

23          MS. BRZEZYNSKI:  Then, as you can see, Your

24    Honor, that draft declaration was solely limited to


45


1    Ms. Rudich's response to its 2006 office action in the

2    '079 application, and identification of what Ms. Rudich

3    meant, as rear tray in an IBM 9516 product, and that's

4    it.  That declaration did not include any reference to

5    what Ms. Rudich meant by spot mounting.  In fact, there

Page 52

080707hr.txt

6      was nothing further in that draft declaration about any

7      other aspect of the '079 patent prosecution.

8            There also was never any suggestion in that

9      declaration or otherwise that Miss Rudich would be asked

10      about the prosecution of the patents in suit.  There was

11      also no suggestion or reference in that draft

12      declaration that Tatung wanted to ask her, Ms. Rudich,

13      about any potential prior art other than the IBM 9516

14      product.

15            All along, for months, a declaration was

16      only ever limited to the identification of the term

17      "rear tray" relating to the office action response and

18      '079 continuation application.

19            Even when you look at the two declarations

20      submitted by LPL, which are exhibits four and six to

21      LPL's August 1st submission, you reach the same

22      conclusion.  I will adhere that LPL does take issue with

23      the statement made by Tatung in its August 1st letter

24      that it was, quote, strung along by LPL who, apparently,

46

1      had never intention of ever agreeing to a meaningful

Page 53

080707hr.txt

2    declaration or deposition, end quote.

3          That statement cannot be anymore false and

4    it's frankly unacceptable that that sentence was

5    included in Tatung's submission given the history of LPL

6    working very quickly to submit revised declarations to

7    Tatung for its review.

8          First, LPL sent a draft declaration on April

9    23rd, after first sending comments to Tatung, which

10   Tatung then responded one day later and said that it was

11   concerned -- excuse me, three days later, on April 26th,

12   that it was concerned that LPL's initial draft contained

13   subjective observations and commentary by Ms. Rudich.

14   We then removed all subjective observations and

15   commentary at Tatung's request and sent a revised draft

16   just one day later, on April 27th.

17         Again, that is declaration, like all prior

18   declarations, focused solely on the office action

19   response and an identification of what Ms. Rudich meant

20   by "rear tray," and that's it.

21         Now, months later, after the close of

22   discovery, Tatung has increased the scope of the

23   requested deposition even though they withdrew their

24   deposition subpoena.  Their 8/1 submission requesting a

Page 54

080707hr.txt

47

1    much broader deposition is not only untimely but,

2    frankly, it is easy to dispense with.

3            As you look at the 8/1 submission, and, Your

4    Honor, for the first time Tatung seeks testimony from

5    Miss Rudich relating to the prosecution history for the

6    patents in suit.

7            Tatung has a fundamental misunderstanding.

8    Rebecca rude did not prosecute the patents in suit.

9    Tatung must have known this since at least 2005, the

10   patent prosecution history documents.  Those are public

11   records.  Their initial disclosures filed on July 29th,

12   2005, identified son junction and three other attorneys

13   or patent agents formerly with McKenna or its

14   predecessor firm in addition to Rebecca Rudich as

15   prosecuting attorneys.

16           SPECIAL MASTER POPPITI:  Did she not

17   supervise?

18           MS. BRZEZYNSKI:  No, not this.  This is what

19   she did, and I will tell you exactly what she did:  She

20   was not the supervisor for the patents in suit, Your

080707hr.txt

21    Honor.  It was Sung Jung and Tatung must have known

22    this.  If they wanted, at any time, to depose the

23    prosecuting attorney for these patents in suit, they

24    should have noticed the deposition of one of the



48


1    prosecuting attorneys and it never did so.

2         We have never represented, that Rebecca rude

3    prosecuted the patents in suit.  What she did, and we

4    went back to verify that we were actually correct, she

5    only signed three documents, in each of the patents in

6    suit, and I will tell you exactly what they were.  One

7    was a change of address form that was submitted in each

8    patent case after our merger, so that was submitted and

9    signed by her as she did for many, many cases.

10        The second was a non-substantive notice of

11    appeal filed in each of the two patent cases, patents in

12    suit.  There, she signed them for Sung Jung because the

13    deadline was engineering and son, who had directed its

14    preparation of that notice of appeal, was unavailable.

15    She did not prepare it.  She did not direct its

16    preparation.

080707hr.txt

17          The third is she signed -- she signed only

18    one son standard active document in each case, and that

19    was a primary amendment signed in March 2002.  It was

20    actually attached by Tatung to its submission.

21          As you can see, she signed that over Sung

22    Jung's signature block, because he was not available.

23    That document was either prepared by Mr. Jung or for him

24    at his direction.  Rebecca rude was not involved in the

49

1    preparation of that document at all.

2          Then we have, Your Honor, Tatung's letter of

3    8/three.  It's a second submission.  I submit to you,

4    Your Honor, that Your Honor should disregard that

5    submission as untimely.  The deadline is clearly 8/1,

6    two days earlier, although Tatung states in that letter

7    that it obtained an LPL module on or about August 2nd,

8    2007, I frankly find that terminology curious on or

9    about," that's right it received that product one day

10    earlier or they didn't.

11          Regardless of that fact, Your Honor, LPL

12    simply disputes the allegation in that 8/3 submission

Page 57

080707hr.txt

13    and disagrees that, regarding the relevance of the LPL

14    product.  Regardless, Rebecca Rudich's deposition

15    relating to that LPL product is entirely not relevant or

16    necessary.  Rebecca rude did not prosecute the

17    patents-in-suit and she never knew about that LPL

18    LC056N1 module listed in the letter.

19          We are agreeable to offering a simple

20    declaration that says that she never knew about that

21    module if that will suffice.

22          Accordingly, Tatung's request, in its August

23    3rd letter to depose Rebecca Rudich regarding, quote,

24    her knowledge of L G products that practiced the claimed

50

1    invention, any investigation that she performed and her

2    general custom and practice when prosecuting patents,

3    among other things, end quote, should be denied.  She

4    can't answer those questions if she did not prosecute

5    the patents in suit.

6          Tatung never noticed the depositions of any

7    of the prosecution attorneys and it cannot legitimate he

8    will claim that it ever intended to ask Rebecca rude

Page 58

080707hr.txt

9    about these issues.  "

10        SPECIAL MASTER POPPITI:  Let me just ask you

11   a question about process for a moment because I don't

12   have, in mind, all of the documents that you just

13   referred to in terms of what Rebecca rude did or didn't

14   do with the patent office.  If they are in front of me

15   in these applications, point me to them.

16        MS. BRZEZYNSKI:  Sure, Your Honor.  I will

17   point you to the only substantive document that Rebecca

18   ever signed rolling to the prosecution of the patents in

19   suit are attached as Exhibits B and C to Tatung's

20   submission.

21        SPECIAL MASTER POPPITI:  Let me just pause

22   and look at those for a moment.

23        MS. BRZEZYNSKI:  Sure.

24        SPECIAL MASTER POPPITI:  The submission of


51

1    August 3rd, 2007.

2        MS. BRZEZYNSKI:  Not the August 3rd, Your

3    Honor.  The August 1 submission.

4        SPECIAL MASTER POPPITI:  It's the August 1

Page 59

080707hr.txt

5      submission.  I had the August 3rd on top of it.

6              You would agree with me that, to the extent

7      that she signed that document, she was prosecuting, at

8      least, in part, the application?

9          MS. BRZEZYNSKI:  Your Honor, I can only

10     represent to you what I have been told, that she did not

11     prosecute this application.  She merely signed it on

12     son's behalf because he was not available to sign that

13     day when it was finalized.  She did not in any way

14     prepare that amendment.  She did not direct its

15     preparation.  She did not comment on its preparation.

16     She simply signed it for son because he was absent.

17         SPECIAL MASTER POPPITI:  Blue, counsel --

18         MS. BRZEZYNSKI:  That's all I can tell you.

19     She cannot offer any testimony relating to that

20     amendment, why is this drafted, why it was prepared at

21     all?

22         SPECIAL MASTER POPPITI:  Well, she may have

23     -- she may be in a position to say that, and perhaps it

24     would be better for me to be even better informed about

52

080707hr.txt

1    what a patent prosecutor does.  But I just have to

2    expect that when you sign a document, through the United

3    States patent office, is it any different from, if you

4    will, local counsel signing a document that may be

5    prepared by another office in everyone certainly

6    understands, at this Bar, that local counsel, when doing

7    that, certifies that everything in there is correct and

8    accurate, in substance, certifies that it's been read

9    and understood, and, if necessary, would be called upon

10    to answer questions about it if lead is not able to, or

11    each if lead is there.  The Court has the right to look

12    to local counsel -- and, please, my friends at the Bar,

13    tell me if you think this is inaccurate -- and say, What

14    do you mean by that?

15         MS. BRZEZYNSKI:  I understand your point,

16    Your Honor.  I can only add, based on what I understand

17    that it was represented to her that this was complete

18    and needed to be filed that day, Mr. Jung was not

19    available and she signed on his behalf.  That's all I

20    can say.

21         Stepping back from that, Your Honor, Tatung

22    has known all along that the attorneys primarily

23    prosecuting this patent -- these patents in suit, it's

Page 61

080707hr.txt

24    not Rebecca Rudich.  They can see from the patent


53

1    prosecution history that it's Mr. Jung's name as well as

2    the name of one of our former associates, Ken springer,

3    that primarily prosecuted these patents in suit and not

4    Rebecca rude.

5         This is an after the fact untimely attempt

6    by Tatung to unfairly broaden the scope of a deposition

7    request that they withdrew months and months earlier.

8         If Tatung, at some point, wanted to depose

9    the prosecuting attorney, they could have informed us,

10    they could have noticed that deposition, and requested

11    and took the deposition of the prosecuting attorney.  I

12    mean, they identified Sung Jung, as well as all the

13    other attorneys that signed documents in their initial

14    disclosures.  They were aware, Sung Jung, Kenneth

15    springer and the other attorneys --

16    SPECIAL MASTER POPPITI:  Let me ask this

17    question, and I don't want to dwell on this, but

18    somebody remind me, if you will, when I was dealing with

19    an issue involving Rebecca rude, as was described

Page 62

080707hr.txt

20    earlier, am I correct in recalling that, as part of a

21    declaration that she signed, that she described, in some

22    words, that she supervised prosecution work?

23          MS. BRZEZYNSKI:  She does generally

24    supervise prosecution work, Your Honor, but not for the


54

1    patents in suit.  We prosecute a very large number of

2    patents.

3          SPECIAL MASTER POPPITI:  Sure.

4          MS. BRZEZYNSKI:  At this firm.  She has been

5    involved in the continuation application, '079

6    continuation application.  She was not involved in the

7    prosecution of the patents in suit, however.

8          SPECIAL MASTER POPPITI:  Let's focus on the

9    fact, then, that she was -- she did prosecute a

10    continuation patent, and maybe I should be hearing from

11    Tatung's point of view, what responsibility Rebecca rude

12    has when she is prosecuting a continuation patent with

13    respect to its parent, because I don't know that that's

14    been developed in the papers.  Is that an appropriate

15    question?

080707hr.txt

16          MS. BRZEZYNSKI:  You are correct, Your

17     Honor, that has not been developed in the papers at all.

18     That also has not been requested by Tatung until its 8/1

19     submission.  Prior to that date, they only ever

20     requested information with regard to one office action

21     response and her identification of the words "rear

22     tray."  That's it.

23          SPECIAL MASTER POPPITI:  Let's take that

24     piece and let me hear from Tatung.


                              55


1          MR. MERIDETH:  Yes, Your Honor.  It is

2     correct that, initially, we indicated that the

3     deposition of Ms. Rudich would be taken with respect to

4     the IBM reference that she made with respect to the '079

5     application because, at that time, that was the only

6     item of prior art that we were aware of.

7          Since that time, two items of prior art have

8     surfaced, which is the 500 LC and, most recently, the

9     module that is attached to the August 3rd letter, the LC

10     056 N one.

11          SPECIAL MASTER POPPITI:  Right.

                         Page 64

080707hr.txt

12          MR. MERIDETH:  And it is our view that,

13   particularly the latter document, which was only

14   produced a couple of weeks ago, are ripe for

15   examination.  We happen to believe that Ms. Rudich has

16   supervised the filing of patents, she has been involved

17   in at least two substantive filings with respect to the

18   patents in suit.  She should know what the policies are

19   with respect to investigation of prior art.

20          If she is unaware of any investigation that

21   was done, if she is unaware of any policy with respect

22   to investigation, and if she doesn't know anything about

23   either the 500 LC or about the August 3 identified

24   module, then she can say so.  But I believe that we are


56

1    entitled to take her deposition because I believe that

2    that, in addition to the issue of the IBM module, is

3    crucial testimony with respect to both the infringement

4    issues and with respect to the issue of inequitable

5    conduct.

6          SPECIAL MASTER POPPITI:  Let me --

7          MR. MERIDETH:  I want to add one other

                        Page 65

080707hr.txt

8    thing, that is, within the past two weeks, Miss Rudich

9    has filed a further disclosure with respect to the '079

10   application in which she has listed other prior art that

11   we have identified in our interrogatory responses

12   including the Sharp modules which are in -- I think

13   within the past month, excuse me, which are very, very

14   similar in design to the N module, if we want to call it

15   that, and it -- except that the August 3rd pictures, as

16   you see, indicate that there is a stand off in the back,

17   the first frame of that module.

18          So, we believe that the fact that she has

19   filed this further disclosure is, again, another area

20   that we would want to inquire and to find out, for

21   example, why she disclosed the sharp modules but did not

22   disclose this particular module.

23          SPECIAL MASTER POPPITI:  Let me ask a

24   question because I, quite frankly, got a wee bit


57


1    distracted when I was reading the response to the patent

2    office action in light of the history of the

3    declarations that has been described for me.  And maybe

Page 66

080707hr.txt

4    this means nothing, and if it does, somebody tell me

5    that it doesn't mean anything, but one of the issues

6    that I think Tatung has raised is the question as it

7    relates to impeachment of LPL's position.

8        Let me ask this question: Do you find the

9    initial declaration was found to be unacceptable by LPL

10    was based on, as I understand it, the assertion that

11    Miss Rudich did not have the benefit of a device to

12    examine and was not using photographs for purposes of

13    responding to the Patent Office action; am I correct so

14    far?

15        MR. MERIDETH:  I don't believe so, Your

16    Honor.  I believe she did have photographs, and one of

17    the reasons that there was a hiatus in the exchanges of

18    the declarations was because we were provided with

19    copies of those photographs which were merely a

20    photocopy of photographs and they were black and white;

21    you couldn't make out the photograph, and Mr. Ambrozy

22    indicated that he would obtain better copies, which he

23    ultimately did, about a week before my final letter to

24    him, and, so, she did identify photographs.

080707hr.txt
58

1        SPECIAL MASTER POPPITI:  I may have been

2    mistaken.  But with respect to the device, not having

3    the opportunity to look at the device, that was part of

4    the concern; is that --

5        MS. BRZEZYNSKI:  That's absolutely correct,

6    Your Honor.  Our two concerns were Rebecca Rudich did

7    not look at any actual device in preparing office action

8    response, and the other concern was along the lines that

9    you said, she did not view the photographs that

10    Mr. Merideth had submitted with his draft declaration,

11    which were different photographs, different labels --

12        SPECIAL MASTER POPPITI:  Then I was, at

13    least I remembered something about the photographs by

14    virtue of asking the question.

15        MS. BRZEZYNSKI:  Yes.

16        SPECIAL MASTER POPPITI:  Let me tell you

17    what troubled me:  I expect you all have her remark in

18    front of you; if not, would you please put them in front

19    of you.

20        MS. BRZEZYNSKI:  By "remarks," which draft

21    declaration, Your Honor?

22        SPECIAL MASTER POPPITI:  I am looking be

Page 68

080707hr.txt

23    signed this one submission at Exhibit E and I am looking

24    at page six of the United States patent --


59

1         MS. BRZEZYNSKI:  Your Honor, you cut off.

2    Which exhibit, please?

3         SPECIAL MASTER POPPITI:  Start you at page 6

4    of that exhibit.

5         MS. BRZEZYNSKI:  Which exhibit again?

6         SPECIAL MASTER POPPITI:  "E" as in Edward.

7         MS. BRZEZYNSKI:  "E" as in Edward.  Thank

8    you.  Page 6?

9         SPECIAL MASTER POPPITI:  Are you both there?

10        MS. BRZEZYNSKI:  Yes, I am, Your Honor.

11        SPECIAL MASTER POPPITI:  Mr. Merideth?

12        MR. MERIDETH:  Yes, Your Honor.

13        SPECIAL MASTER POPPITI:  Bottom of page 6,

14    and I will just start for purposes of context with the

15    sentence that begins, "So nothing in the IBM 951 six

16    teaches or suggests the first frame being fixed to the

17    rear part of the housing.  Applicants refer the examiner

18    to the cited figure on page 9 of the IBM 951 six

Page 69

080707hr.txt

19    reference.  At best, the figure shows the screws, two,

20    go through the back cover from the back to the front.

21    There is no teaching or suggestion that there is any

22    fixing at the first frame. "

23        The next sentence reads, "And, in fact, in

24    the physical device, the fixings occur at the front

60

1    housing of the IBM 951 six."

2        If you will also look at page 7 of

3    Miss Rudich's remarks, second full paragraph, the last

4    four sentences of that paragraph virtually mirror what I

5    just read to you.  I can tell you that when I read that,

6    in the context of the -- of looking at the

7    representation that she did not have a device from which

8    to make these remarks, and I read twice, and, in fact,

9    in the physical device, there is no such fixing of the

10    rear frame to the rear portion of the housing of the IBM

11    951 six, I had to sit up and read it several different

12    times.

13        MS. BRZEZYNSKI:  Your Honor, I understand.

14    I asked Ms. Rudich that question and she says that she

Page 70

080707hr.txt

15    did not have the device, she has not seen the device,

16    she was relying solely on the reference documents, the

17    IBM 9516 reference document and also the pictures that

18    she had of the device, the pictures of the physical

19    device that she saw at the time.  "

20          SPECIAL MASTER POPPITI:  Mr. Merideth.

21          MR. MERIDETH:  I think she had the device,

22    Your Honor, as I put in the original declaration.

23          MS. BRZEZYNSKI:  Oh, come one.  We have

24    represented that she doesn't have the device.  She is


61

1    willing to sign a declaration to that effect.

2          SPECIAL MASTER POPPITI:  Counsel, "Oh, come

3    on" is not part of an argument that gets made in

4    Delaware.

5          MS. BRZEZYNSKI:  I apologize, Your Honor.

6          SPECIAL MASTER POPPITI:  Thank you.

7          MR. MERIDETH:  I think that is an issue,

8    Your Honor, which needs to be addressed.

9          SPECIAL MASTER POPPITI:  Mr. Merideth, just

10    a second.  It's one that I raised, Mr. Merideth didn't.

Page 71

080707hr.txt

11    It's one that I told you I paused over and read several

12    times.  If she didn't have the device, but whether she

13    did have the device, there is a sentence in there that

14    at least, if you say that she didn't, is unclear to me,

15    and if it is unclear and there is an issue with respect

16    to the candor of the Patent Office, and we will talk

17    about that in a moment, or if there is an issue with

18    respect to impeachment of LPL's position as it relates

19    to infringement or patent ability, she was involved in

20    the patent prosecution of this continuation patent, was

21    she not?

22          MS. BRZEZYNSKI:  She certainly was, Your

23    Honor.

24          SPECIAL MASTER POPPITI:  And that statement,


62

1    in that document, is either crystal clear, and if it's

2    crystal clear, it says to me that she is looking at a

3    device, and if it's not, she should be able to explain

4    it, shouldn't she?

5          MS. BRZEZYNSKI:  And she has attempted to do

6    so through her declaration that is she's submitted.

Page 72

080707hr.txt

7          SPECIAL MASTER POPPITI:  Then why is the

8     declaration -- I understand the whole process of wanting

9     to stream line this whole effort, but if, ultimately, a

10     declaration is not acceptable and if it's not acceptable

11     because there are issues that need to be explored, why

12     is that a problem?

13          MS. BRZEZYNSKI:  Your Honor, Tatung has

14     never indicated that it was concerned with that

15     sentence.  In fact, when Miss Rudich, in her first draft

16     declaration, included, you know, discussion as to why

17     she used certain terms, they wanted those references

18     removed from her declaration.  They didn't want her --

19          SPECIAL MASTER POPPITI:  I understand that.

20     I understand why you wouldn't want that kind of

21     information in the declaration.  You can't cross-examine

22     it.

23          MS. BRZEZYNSKI:  I understand.  So we have

24     removed that.  They have never raised this issue.  We


63

1     are willing to provide a declaration in response to any

2     questions they have relating to this office action.

Page 73

080707hr.txt

3          They only ever raised the term "rear tray,"

4    Your Honor.  They never raised anything else at all.

5          Now Mr. Merideth --

6          SPECIAL MASTER POPPITI:  That's an

7    appropriate reflection of the history, is it not?

8          MR. MERIDETH:  Your Honor, the initial draft

9    declaration that I prepared talked about her examination

10    of the physical device because I believed, based upon

11    the office action response, that she had, in fact,

12    examined the physical device.

13          One of the things that she said in response

14    to that initial declaration, or Miss Brzezynski said,

15    was that she didn't have a physical device in her

16    presence.  I find that hard to believe.  I think it is

17    at least irresponsible to make the types of

18    representation that is she made.  If she didn't have the

19    physical device in her possession, it certainly suggest

20    that is she had the physical device in her presence.

21    One of the reasons why we believe that the declaration

22    is not sufficient is because we will not have an

23    opportunity, or we would not have an opportunity to

24    cross-examine her with respect to the various statement

Page 74

080707hr.txt

64

1    that is she's made.  And I don't know what she is going

2    to say, but I believe that my client has a right to

3    cross-examine her about what she did say and about what

4    she knew at the time and what her purpose was in

5    describing the physical device and the two references

6    that you made that, certainly, brought me to that

7    conclusion, which is reflected in the original

8    declaration that I prepared.  And if she didn't look at

9    a physical device, she certainly still described

10    something that we could use to impeach the testimony.

11        SPECIAL MASTER POPPITI:  You just faded out,

12    Mr. Merideth.  I lost your last phrase.

13        MR. MERIDETH:  She says that the IBM

14    reference is a front mounted device.

15        SPECIAL MASTER POPPITI:  Yes, she does.

16        MR. MERIDETH:  And in her responsive

17    declaration, she tries to back off that position by

18    saying what she really meant was that the tray it was

19    first frame and blah, blah, blah, blah.  Well, that

20    isn't what she said.  And I believe that I have a right

21    to cross-examine her as to what she did say.  To the

Page 75

080707hr.txt

22    extent that she is going to be called upon as a witness

23    in the trial and is going to testify that she meant

24    something other than what she said or the argument is


65

1    going to be made that what she said is ambiguous, I have

2    a right, or I should have a right to cross-examine her

3    as to what exactly she said and what she meant at the

4    time because I think it's very important.

5        Now, we are going to have Mr. Bohannon

6    saying that the method that Tatung uses to mount its

7    modules infringes the patent because it's rear mounted

8    and the method that is used is virtually identical to

9    the method that she describes, that is, the screws go

10    from the back of the case through the LCD bracket, which

11    is what she calls a "tray," through the first frame and

12    into the front case or front housing.  And she says

13    that's front mounting and Mr. Bohannon says that's rear

14    mounting.  It seems to me that we are entitled to get

15    her testimony on that subject.

16        She was LPL's representative making a

17    representation under the circumstances of a patent

Page 76

080707hr.txt

18    prosecutor to a PTO.

19         MS. BRZEZYNSKI:  Your Honor, may I respond?

20         SPECIAL MASTER POPPITI:  Sure.

21         MS. BRZEZYNSKI:  First, just so the record

22    is clear, we advised Mr. Merideth on April 3rd that

23    Miss Rudich never viewed a device.  On that same day,

24    Mr. Merideth responded by e-mail, and it's that e-mail

66

1    is attached as Exhibit 3 to LPL's submission, he

2    acknowledges in that letter that he had assumed that

3    rude had an IBM 9516.  If she did not, then that needs

4    to be changed.  If she relied on photos, then we should

5    attach the photos.  We can -- I am sorry.

6         SPECIAL MASTER POPPITI:  I am reading that.

7    I see that.

8         MS. BRZEZYNSKI:  And I point that out just

9    to let you know that we informed Tatung very early that

10    she did not review a device.  Mr. Merideth did not

11    question that and we, thereafter, submitted our revised

12    declaration.

13         Now, so I don't believe was there any issue

Page 77

080707hr.txt

14    ever raised by Mr. Merideth questioning whether or not

15    Ms. Rudich had ever seen a device until today.

16            Now, putting that aside, Your Honor,

17    Miss Rudich's statements to the PTO, in connection with

18    a continuation application, are simply not relevant here

19    for infringement for several reasons.  One, because

20    Tatung's accused products also meet the claim

21    limitations of the patents in suit, it doesn't matter

22    whether the taught's method of mounting or its accused

23    products also are in common with the IBM product.

24            Second, if Tatung is attempting to assert


67

1    that Miss Rudich's statements are somehow relevant for

2    claim construction, that's already been decided by Your

3    Honor, is now on appeal, and that would be extrinsic

4    evidence.

5            Third, the claims in the '079 application

6    are different from those in the patents in suit and the

7    claim referenced in the office action response, in the

8    '079 application, is specifically not in the patents in

9    suit.

Page 78

080707hr.txt

10          So I would submit to you, Your Honor, that

11    Miss Rudich's testimony relating to her statements to

12    the PTO in its office action response in connection with

13    a continuation application, are simply not relevant here

14    or, in this case, not necessary.

15          I am also going to point out, Your Honor,

16    that the inventors of the patents in suit were deposed

17    for 11 days.

18          SPECIAL MASTER POPPITI:  I am aware of that.

19          MS. BRZEZYNSKI:  And they were asked about a

20    500 LC product referenced by Mr. Merideth earlier.  They

21    were asked, at length, about front mounting.  They were

22    also asked, at length, about whether there were any LPL

23    or LGE products that had any fastening elements on the

24    back side of the flat panel display device which is


68

1    predated the invention of rear mounting.  They also were

2    asked whether any such flat panel display disease ice

3    was submitted to the PTO.

4          The defendants have clearly asked the

5    inventors this at extreme length.  There is no need to

Page 79

080707hr.txt

6    burden Miss Rudich with a deposition on these same

7    issues especially when she did not prosecute the patents

8    in suit.

9           MR. MERIDETH:  Your Honor, I think that Miss

10    Brzezynski has really put her finger on the central

11    point here.  We did examine the inventors at great

12    length and we did ask the inventors, not only in

13    Mr. Kim, in his capacity as an inventor, but Mr. Kim in

14    his capacity as a 30(b)(6) witness for LPL, whether

15    there were any L G products which practiced rear

16    mounting, and that those topics were topics eight and 32

17    in the notice of deposition for the 30(b)(6) deposition,

18    and he testified unqualifably that there were no such

19    products.

20           If you look at our August 3 submission,

21    which shows a Gold Star product, "Gold Star" being one

22    of the names used by LG Electronics, the "LG" standing

23    for Lucky Gold Star, it's clear that Mr. Kim either was

24    not telling the truth or was misinformed in his capacity

69

1    as a 30(b)(6) witness because you can clearly see that

Page 80

080707hr.txt

2    there are only rear mounting features and there are no

3    front mounting features.

4         So, we now need to determine whether Mr. Kim

5    was telling the truth, what the prosecutors of the

6    patent knew about the prior art, and she's put her

7    finger right on the subject.  If no inquiry was made and

8    nobody knew anything about it, we need to know that.

9         If they did know something about it, we are

10   entitled to know that as well.  And it is true that we

11   raised these very questions with Mr. Kim, and, indeed,

12   showed Mr. Kim the sharp module that it appears that

13   this device, the LC 056 N one copies, and he said he had

14   never seen anything like that, before he doesn't know

15   anything about it.

16        So, but here we have a product in 1996 that

17   has rear mounting and practices rear mounting.

18        MS. BRZEZYNSKI:  Your Honor, obviously, we

19   dispute Tatung's characterization of the product

20   attached to its August 3rd submission.

21        Regardless of that, Your Honor, Miss Rudich

22   has never seen that module.  If she -- she is not in a

23   position to offer any testimony whatsoever about that

24   product at all.  It's clear Tatung has conceded they

                       Page 81

080707hr.txt

70

1    have exhausted their questioning on that issue.  They

2    asked the inventor.  The inventor said he didn't see it;

3    he had never seen a product like that.

4         MR. MERIDETH:  The 30(b)(6) witness who had

5    -- who was noticed to testify specifically on the issue

6    of any prior art, including LGE products, and he said

7    that he was unaware of any LGE product like, not only

8    the practiced rear mounting like this one or that was

9    like the sharp module that he was shown, which is

10    precisely what this is.

11         SPECIAL MASTER POPPITI:  There are two

12    things.

13         MR. MERIDETH:  If she didn't know about it,

14    we need to know why she didn't know about it.

15         SPECIAL MASTER POPPITI:  There are a couple

16    things here.  One thing that I do want some brief

17    additional development.  I do not accept the proposition

18    that Miss Rudich did not prosecute the patents in suit.

19    I understand that she may not have been considered first

20    chair, but she signed documents that suggest to me that

Page 82

080707hr.txt

21    she was prosecuting the patents in suit.  She was

22    prosecuting a continuation patent, and what I would like

23    for you to develop for me, very briefly, just point me

24    in the direction of any case law, if you have it, to

71

1    what is the impact if there is any inequitable conduct

2    with respect to the continuation patent on the patent in

3    suit.

4            Are you with me?

5            MS. BRZEZYNSKI:  Yes, Your Honor.

6            SPECIAL MASTER POPPITI:  And I'd like you to

7    do that for me as quickly as possible so that I can --

8    we have a date when we are going to reconvene, so that I

9    can have that before that date.  I don't need argument.

10    I just need -- Mr. Merideth, it's your position, if you

11    will, that it relates to inequitable conduct, and I'd

12    like to see the development of that by just point me in

13    the direction of case law.  If you need to comment on

14    it, no more than two pages.

15            MR. MERIDETH:  I will be happy to do that,

16    Your Honor.  There is one thing that I want to make

Page 83

080707hr.txt

17    clear, however, and, that is, I believe miss Rudich's

18    testimony relates to two issues.  One relates to the

19    prosecution of the patents in suit.  The other is to the

20    prosecution of the continuation patent.  But -- the

21    continuation application.

22         SPECIAL MASTER POPPITI:  Right.

23         MR. MERIDETH:  But the statements that she

24    makes don't describe the claims of the continuation


72

1    patent.  They describe a product and they describe the

2    method of mounting that product and the features of that

3    product.  I don't think the claims have anything to do

4    with it.  She describes the IBM product.  That IBM

5    product, we have obtained physical samples of.  It will

6    be in front of her, it will be in front of you, and it

7    will be in front of the jury to determine whether or not

8    the methods that are used with respect to that IBM

9    product are the same as the ones -- are those the same

10    practice that Tatung uses with respect to mounting the

11    accused product.  We believe that they are one in the

12    same and we believe that that is clearly relevant and

Page 84

080707hr.txt

13    will be at the center of the issue with regard to

14    non-infringement.

15         SPECIAL MASTER POPPITI:  And I understand

16    that.  And I -- I understand the argument; I accept the

17    argument, but I still want the issue to be developed on

18    the issue of the issue of inequitable conduct.

19         MS. BRZEZYNSKI:  I am happy to respond on

20    the that issue but I'd like to say a couple things in

21    response to Mr. Merideth's statement.  First, if

22    Mr. Merideth is intending to show the device to

23    Miss Rudich and then ask her to testify or draw

24    conclusions from that device in any way, I submit to you


73


1    that is wholly inappropriate.  It's in the nature of

2    expert testimony.  We have an agreement from Tatung and

3    ViewSonic in this case that our experts are the sole

4    witnesses as to invalidity and infringement contentions

5    and that there be no testimony taken of factual

6    witnesses.  The only testimony taken from factual

7    witnesses are simply what they knew existed before the

8    patents were filed but not why he or she contend that is

Page 85

080707hr.txt

9    a particular reference is or is not prior art.

10    SPECIAL MASTER POPPITI:  You know, I

11    hesitate to give advice and guidance, but I certainly

12    tend to agree with what you have just said.  But we

13    don't -- that's a different step in the process here.

14    MS. BRZEZYNSKI:  I agree.  I just wanted to

15    point that out, Your Honor.

16    I also wanted to quickly respond to

17    Mr. Merideth's comments earlier that Miss Rudich

18    recently submitted, in the '079 application prosecution

19    other prior art in an area that was recently identified

20    by Tatung in an interrogatory response, and I would

21    submit to you that that document was submitted to the

22    PTO because Tatung put it in issue in its interrogatory

23    answer and this firm has an obligation to put the PTO on

24    notice of asserted prior art.


74


1    LPL is not conceding that those products are

2    prior art, but we had an obligation to put the PTO on

3    notice.  That's why that submission was made.

4    SPECIAL MASTER POPPITI:  I understand.

Page 86

080707hr.txt

5          MS. BRZEZYNSKI:  Okay.  I just wanted to

6     make sure that that point was made on the record, Your

7     Honor.

8          SPECIAL MASTER POPPITI:  Okay.

9          MS. BRZEZYNSKI:  With respect to your

10     request for additional research, can we agree to

11     simultaneous requests submitted?

12          SPECIAL MASTER POPPITI:  Yes.

13          MS. BRZEZYNSKI:  By the end of the day

14     tomorrow?

15          SPECIAL MASTER POPPITI:  Mr. Merideth?

16          MR. MERIDETH:  I am sorry.  I didn't hear

17     what was said.

18          SPECIAL MASTER POPPITI:  Would you agree to

19     submit simultaneous --

20          MR. MERIDETH:  Yes, that's acceptable.

21          SPECIAL MASTER POPPITI:  End of day

22     tomorrow?  Is that acceptable as way.

23          MR. MERIDETH:  End of day California time

24     tomorrow?

75

080707hr.txt

1          SPECIAL MASTER POPPITI:  Yes, California

2    time.

3          MR. MERIDETH:  Okay.  That's fine.

4          MS. BRZEZYNSKI:  What time would that be,

5    Your Honor.

6      Q.  I just want to have a clear understanding?

7          MR. MERIDETH:  It would be 5:00 Pacific

8    time, 8:00 eastern time.

9          MS. BRZEZYNSKI:  That's fine.

10          MR. MERIDETH:  That's what I have in mind

11    anyway.

12          SPECIAL MASTER POPPITI:  That's fine.  I

13    think that that does it for purposes of today, does it

14    not?

15          MR. CHRISTENSON:  Your Honor, LPL has H just

16    a couple quick things to raise.  First of all, we are in

17    the process of confirming that we are going to have all

18    of the updated 2007 sales information from the

19    defendants that we need and we discussed that with them

20    and we are confident that that's going to be resolved to

21    the extent it's not already resolved, but if it's not

22    resolved, I would like the opportunity to address that

23    in our call on Monday because that's information we need

080707hr.txt

24    for our damages expert.


76

1        SPECIAL MASTER POPPITI:  Okay.

2        MR. CHRISTENSON:  And then the other issue

3    is something that Mr. Ambrozy wanted to address.

4        MR. AMBROZY:  Your Honor, Rel Ambrozy.  We

5    have been in contact with both Tatung and ViewSonic.  In

6    regard to Tatung, we have been seeking documents that

7    were at issue during the deposition of one of their

8    30(b)(6) witnesses and we have asked for, for example,

9    assembly instructions and some information pertaining to

10    the actual modules used in the monitors that they sell.

11    We haven't been able to reach any agreement on that, and

12    so we'd like to bring a motion to compel these documents

13    and we can do it in a few page letter on each topic to

14    Your Honor, we could have it to Your Honor by the end of

15    day tomorrow and hopefully to be held R heard on the

16    13th.  The second issue is we have approached both

17    ViewSonic and Tatung to allow us to re-inspect some of

18    the accused devices as well as the prior art devices,

19    and although our expert has seen these devices before,

Page 89

080707hr.txt

20    because of Your Honor's claim construction, in certain

21    instances, Your Honor's claim construction was neither

22    Tatung's nor ViewSonic's nor LPL's, and, therefore,

23    there was a nuance that was inserted because of your

24    claim construction that was not taken into consideration

77

1    when these instructions were done the first time, and,

2    so, that's why we would need another inspection of these

3    monitors and we were rebuffed by the defendants and we

4    would like to brief that for Your Honor on the same

5    schedule.

6        SPECIAL MASTER POPPITI:  Well, by "same

7    schedule," you mean for the 13th?

8        MR. AMBROZY:  Yes, Your Honor, we'd submit

9    or paper tomorrow.  Defendants could submit theirs by

10    Friday, and then, hopefully, we could have it heard on

11    Monday?

12        SPECIAL MASTER POPPITI:  Any reaction to

13    that, please?

14        MS. ROMAN:  Your Honor, I guess my only

15    concern would be given the lateness of the start time of

080707hr.txt

16    the hearing on the 13th and the multiple issues that

17    might need to be dealt with that we might want to put

18    that issue on for a Tuesday call, but in terms of

19    briefing the issues, I understand the need to do so.

20        SPECIAL MASTER POPPITI:  Well, then, let's

21    get the submittals accomplished as you described.  I am

22    also concerned about whether or not I am going to be

23    able to deal with everything on Monday.  I can start

24    earlier.  I was just putting a late start, expecting


78

1    that you would have the opportunity to continue to meet

2    and confer.

3        MS. BRZEZYNSKI:  Your Honor, do you

4    anticipate further argument on the Rudich deposition

5    issue, and, if so, may I request that that argument be

6    held on Friday morning, perhaps --

7        SPECIAL MASTER POPPITI:  I can't do Friday.

8    I have got an all day hearing in another patent case.

9        MS. BRZEZYNSKI:  Could you, perhaps, do

10    Thursday?  I leave on vacation this weekend.

11        SPECIAL MASTER POPPITI:  Well, what I am

080707hr.txt

12    going to need is some opportunity to look at the case

13    law that you have submitted.  I wasn't anticipating

14    doing that before the weekend, but if -- you leave

15    Saturday?

16          MS. BRZEZYNSKI:  I leave Sunday, Your Honor.

17          SPECIAL MASTER POPPITI:  I would prefer -- I

18    do anticipate final discussion, if you will, on the rude

19    deposition, and I would prefer to do it at the end of

20    the day on Friday.

21          MR. MERIDETH:  Your Honor, I am sorry, but I

22    am not going to be available on Friday.  I am going to

23    be in the air.  I apologize.

24          MS. BRZEZYNSKI:  I am sorry to make this


79


1    difficult.

2          SPECIAL MASTER POPPITI:  It's not difficult.

3    It's a matter of -- then let's look at -- just one

4    moment.  I am going to put you on mute for a moment.  I

5    just have to check schedule.  Hold on.

6          How is your schedules for Thursday, the 9th,

7    at five?

Page 92

080707hr.txt

8          MS. BRZEZYNSKI:  I can do that time, Your

9     Honor.

10          MR. MERIDETH:  That's acceptable for me,

11     Your Honor.

12          MS. BRZEZYNSKI:  Than you for accommodating

13     me, Your Honor.

14          SPECIAL MASTER POPPITI:  Wait one moment,

15     please.  That would be 5:00 my time, eastern standard

16     time.

17          MS. BRZEZYNSKI:  Yes, Your Honor.

18          MR. MERIDETH:  Yes, Your Honor.

19          SPECIAL MASTER POPPITI:  That's good.  Okay.

20     Are there any other matters, then, please?

21          MR. CHRISTENSON:  Not from LPL, Your Honor.

22          MS. ROMAN:  Nothing from ViewSonic, Your

23     Honor.

24          MR. MERIDETH:  Nothing from Tatung.


80

1          SPECIAL MASTER POPPITI:  Thank you all.

2          (The hearing was concluded at 5:35 p.m.)

3

080707hr.txt

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

080707hr.txt