# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD,  )
                                )
    Plaintiffs,                 )  C.A. No. 04-343(JJF)
                                )
v.                              )
                                )
TATUNG CO., TATUNG COMPANY OF   )
AMERICA, INC., and VIEWSONIC    )
CORPORATION,                    )
                                )
    Defendants.                 )

    Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Tuesday, August 7, 2007, beginning at approximately 3:30 p.m., there being present:

BEFORE: THE HONOROABLE VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

    THE BAYARD FIRM
    RICHARD D. KIRK, ESQ.
      222 Delaware Avenue, Suite 900
      Wilmington, Delaware  19899
      for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street    Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 2

1   APPEARANCES (Continued):
2
      MCKENNA, LONG & ALDRIDGE, LLP
3     CASS W. CHRISTENSON, ESQ.
      REL S. AMBROZY, ESQ.
4     DEREK AUITO, ESQ.
      LORA BRZEZYNSKI, ESQ.
5       1900 K Street, N.W.
        Washington, D.C. 20006
6       for Plaintiffs
7     RICHARDS LAYTON & FINGER
      FREDERICK L. COTTRELL, III, ESQ.
8     ANNE SHEA GAZA, ESQ.
        One Rodney Square
9       Wilmington, Delaware 19801
        for Defendant Tatung Co.
10
      GREENBERG TRAURIG LLP
11    FRANK MERIDETH, ESQ.
      VALERIE HO, ESQ.
12    MARK KREISMAN, ESQ.
        2450 Colorado Avenue, Suite 400E
13      Santa Monica, California 90404
        for Defendant Tatung Company of America, Inc.
14
      CONNOLLY BOVE LODGE & HUTZ LLP
15    M. EDWARD DANBERG, ESQ.
        1007 North Orange Street
16      Wilmington, Delaware 19899
        for Defendant Viewsonic Corporation
17
      BINGHAM McCUTCHEN LLP
18    MANUEL NELSON, ESQ.
      TRACY ROMAN, ESQ.
19      355 South Grand Avenue
        Los Angeles, California 90071-3106
20      for Defendant Viewsonic Corporation
21
22
23
24

Page 3

1        SPECIAL MASTER POPPITI: Mr. Kirk, please.
2        MR. KIRK: Yes, Your Honor. This is Richard
3   Kirk for The Bayard Firm for the plaintiff LG Phillips,
4   LCD Company, Ltd.
5        With me on the line from Washington, from
6   the firm of McKenna, Long & Aldridge, are my colleagues,
7   Cass Christenson, Lora Brzezynski, Rel Ambrozy, and
8   Derek Auito.
9        MS. GAZA: Good afternoon, Your Honor, Anne
10  Gaza from Richards, Layton & Finger on behalf of the
11  Tatung defendants.
12       With me on the line is Fred Cottrell as well
13  as Frank Merideth, Valerie Ho, and Mark Kreisman from
14  the law firm of Greenberg Traurig.
15       MR. DANBERG: Good afternoon, Your Honor.
16  Ed Danberg at Connolly, Bove.
17       With me is Manuel Nelson and Tracy Roman.
18       SPECIAL MASTER POPPITI: Thank you very
19  much.
20       Let us use the agenda that was sent over
21  yesterday for purposes of addressing the issues
22  contained in that agenda. The first on the agenda is
23  the status of LPL's supplemental document production to
24  ViewSonic, and that was covered in ViewSonic's 7/27

Page 4

1   submission and LPL's 8/3 submission and in ViewSonic's
2   8/3 submission, and I have that marked as DM 37.
3        MR. NELSON: Your Honor, I will be
4   addressing the issues on behalf of ViewSonic. Shall I
5   proceed?
6        SPECIAL MASTER POPPITI: Yes, please.
7        MR. NELSON: Just to recap, Your Honor, how
8   we got here, on June 28th, we had a long hearing where
9   you ordered LPL to produce documents in response to
10  various requests for production of documents from
11  ViewSonic.
12       On July 13th, we had a hearing because the
13  issue of burden of all that production came up and LPL
14  proposed, as a preliminary matter, to provide a limited
15  production and to see where we'd be based upon the
16  review of that limited production and Your Honor thought
17  that was an acceptable preliminary approach.
18       We have now received approximately 3,000
19  pages of production from LPL. But where we filed
20  ourselves, Your Honor, is that, as you can see from the
21  correspondence that's attached as exhibits to our
22  submissions of August 3rd, we have identified somewhere
23  in the order of 250 pages of drawings that are either
24  illegible or very difficult to read, on the one hand,

Page 5

1   and No. 2, while that's not necessarily explicitly
2   stated in our submission, those drawings that are
3   legible aren't -- do not provide sufficient details
4   regarding the physical characteristics of the modules
5   for us to be able to determine with certainty where
6   fastening elements are on the rear side or from the
7   rearview of a module.
8        And what I mean by that is perhaps I see a
9   little circle with a cross in it that looks like a
10  Phillips head screw, but because that drawing may not
11  have a parts lists, there is no identification of that
12  being, in fact, a screw. Because that particular image
13  is really a two-dimensional drawing from above the back,
14  you don't know what layer that screw, if it is a screw,
15  is placed; is it actually on the rear surface of the
16  module? Does it connect the back light unit to the
17  module? Or is it in an embedded layer?
18       So we are in a position where we actually
19  aren't able to discern the physical characteristics that
20  we need for this case.
21       So where that leads us today, Your Honor, is
22  we didn't submit all of the illegible documents for the
23  August 3rd submission because we didn't think we'd waste
24  your time looking at what's not legible.

Page 42

1  required to do it under our contract, adds anything to
2  the letter because the order reviewed all of that. So,
3  I am not -- on the record that I have before me, I am
4  satisfied that an appropriate request was made, request,
5  demand, I don't really see that there be any difference
6  in the context of the way this is teed up.
7       I'd like to see the second request for
8  purposes of seeing what the follow-up was. If the
9  follow-up is consistent in its language with its first
10 request, then I think it just buttresses my view that
11 the -- it is what it is. It's one step removed. I
12 expect that ViewSonic could force an issue independent
13 of this court action somewhere else, but I don't -- I
14 didn't contemplate that and I really don't anticipate
15 that Judge Farnan would have contemplated that by virtue
16 of accepting my findings and recommendations.
17      So, on this record, I am not convinced that
18 ViewSonic didn't make an appropriate effort to get the
19 information from the OEM.
20      I do, however, want to see the follow-up.
21      MS. ROMAN: Your Honor, I will get the
22 follow-up, as I told Mr. Christenson, as soon as I can
23 get it; I will produce it to him as well, and I will
24 continue making those efforts today to get it as soon as

Page 43

1  possible. The truth is, Your Honor, I don't even know
2  if the follow-up letter has even gone out --
3       SPECIAL MASTER POPPITI: Okay.
4       MS. ROMAN: -- given the general counsel's
5  traveling, and I don't know if he has been able to
6  authorize it being sent.
7       SPECIAL MASTER POPPITI: I understand. I'd
8  like to see whatever is done.
9       MS. ROMAN: Yes, Your Honor.
10      SPECIAL MASTER POPPITI: Just a moment.
11      Next, please.
12      MS. BRZEZYNSKI: I believe the next issue is
13 LPL's request for a protective order relating to
14 Tatung's request for a deposition of Rebecca Rudich, an
15 attorney with the law firm of McKenna, Long & Aldridge.
16      May I proceed?
17      SPECIAL MASTER POPPITI: Sure.
18      MS. BRZEZYNSKI: Your Honor, LPL moves for a
19 protective order because Rebecca Rudich's proposed
20 deposition has grown from a very well limited one issue
21 deposition where Tatung initially said it was willing to
22 accept a declaration to what has essentially become a
23 fishing expedition for inequitable conduct in areas
24 where Ms. Rudich does not have any relevant information

Page 44

1  at all.
2       A brief review of the history, I think, is
3  necessary here. Tatung initially noticed Miss Rudich's
4  deposition on March 1st of this year relating solely to
5  its unfounded allegations that McKenna, Long & Aldridge
6  violated the protective order in this case. As Your
7  Honor is aware, MLA, my firm, spent considerable time
8  and expense responding to those unfounded allegations
9  and providing privileged documents for in camera review.
10 That resulted in a ruling by Your Honor that MLA had not
11 violated the protective order.
12      During that process, MLA clearly opposed the
13 taking of Miss Rudich's deposition and Tatung withdraw
14 its subpoena of Miss Rudich. That was clearly stated by
15 Mr. Merideth on the record and then confirmed by him in
16 his March 16th letter, which is Exhibit D to Tatung's
17 submission attached to his 8/1 letter.
18      In that March 16th letter, however, Tatung
19 did state, in the second paragraph, that it still needed
20 testimony from Rebecca Rudich on, quote, one very
21 limited issue, end quote. The letter went on to say
22 that, quote, The testimony will be limited to her
23 responses to a specific PTO Office action regarding the
24 '079 patent related to an IBM product, end quote.

Page 45

1       The letter also stated that Tatung was
2  willing to accept the declaration in lieu of a
3  deposition. Tatung offered to provide a draft
4  declaration of what it wanted and we received that draft
5  declaration on March 29th. That draft declaration sent
6  by Mr. Merideth is both Exhibit F to Tatung's submission
7  and Exhibit 1 to LPL's August 1st submission.
8       SPECIAL MASTER POPPITI: I have reviewed
9  that.
10      MS. BRZEZYNSKI: Then, as you can see, Your
11 Honor, that draft declaration was solely limited to
12 Ms. Rudich's response to its 2006 Office action in the
13 '079 application and an identification of what
14 Ms. Rudich meant as "rear tray" in an IBM 9516 product,
15 and that's it.
16      That declaration did not include any
17 reference to what Ms. Rudich meant by spot mounting. In
18 fact, there was nothing further in that draft
19 declaration about any other aspect of the '079 patent
20 prosecution.
21      There also was never any suggestion, in that
22 declaration or otherwise, that Miss Rudich would be
23 asked about the prosecution of the patents-in-suit.
24 There was also no suggestion or reference in that draft

Page 46

1  declaration that Tatung wanted to ask her, Ms. Rudich,
2  about any potential prior art other than the IBM 9516
3  product.
4       All along, for months, a declaration was
5  only ever limited to the identification of the term
6  "rear tray" relating to the Office action response and
7  '079 continuation application.
8       Even when you look at the two declarations
9  submitted by LPL, which are Exhibits 4 and 6 to LPL's
10 August 1st submission, you reach the same conclusion.
11      I will add here that LPL does take serious
12 issue with the statement made by Tatung in its August
13 1st letter that it was, quote, strung along by LPL who,
14 apparently, had never intention of ever agreeing to a
15 meaningful declaration or deposition, end quote.
16      That statement cannot be anymore false and
17 it's frankly unacceptable that that sentence was
18 included in Tatung's submission given the history of LPL
19 working very quickly to submit revised declarations to
20 Tatung for its review.
21      First, LPL sent a draft declaration on April
22 23rd, after first sending comments to Tatung, which
23 Tatung then responded one day later and said that it was
24 concerned -- excuse me, three days later, on April 26th,

Page 47

1  that it was concerned that LPL's initial draft contained
2  subjective observations and commentary by Ms. Rudich.
3  We then removed all subjective observations and
4  commentary at Tatung's request and sent a revised draft
5  just one day later, on April 27th.
6       Again, that declaration, like all prior
7  declarations, focused solely on the Office action
8  response and an identification of what Ms. Rudich meant
9  by "rear tray," and that's it.
10      Now, months later, after the close of
11 discovery, Tatung has increased the scope of the
12 requested deposition even though they withdrew their
13 deposition subpoena. Their 8/1 submission requesting a
14 much broader deposition is not only untimely but,
15 frankly, it is easily dispensed with.
16      As you look at the 8/1 submission, and, Your
17 Honor, for the first time, Tatung seeks testimony from
18 Miss Rudich relating to the prosecution history for the
19 patents-in-suit.
20      Tatung has a fundamental misunderstanding.
21 Rebecca Rudich did not prosecute the patents-in-suit.
22 Tatung must have known this since at least 2005, the
23 patent prosecution history documents, those are public
24 records. Their initial disclosures filed on July 29th,

Page 48

1  2005, identified Sung Jung and three other attorneys or
2  patent agents formerly with McKenna, or its predecessor
3  firm, in addition to Rebecca Rudich as prosecuting
4  attorneys.
5       SPECIAL MASTER POPPITI: Did she not
6  supervise?
7       MS. BRZEZYNSKI: No, not this. This is what
8  she did, and I will tell you exactly what she did. She
9  was not the supervisor for the patents-in-suit, Your
10 Honor. It was Sung Jung and Tatung must have known
11 this.
12      If they wanted, at any time, to depose the
13 prosecuting attorney for these patents-in-suit, it
14 should have noticed the deposition of one of the
15 prosecuting attorneys and it never did so.
16      We have never represented that Rebecca
17 Rudich prosecuted the patents-in-suit. What she did,
18 and we went back to verify that we were actually
19 correct, she only signed three documents in each of the
20 patents-in-suit, and I will tell you exactly what they
21 were. One was a change of address form that was
22 submitted in each patent case after our merger, so that
23 was submitted and signed by her as she did for many,
24 many cases.

Page 49

1       The second was a non-substantive notice of
2  appeal filed in each of the two patent cases,
3  patents-in-suit. There, she signed them for Sung Jung
4  because the deadline was nearing and Sung, who had
5  directed its preparation of that notice of appeal, was
6  unavailable. She did not prepare it. She did not
7  direct its preparation.
8       The third is she signed -- she signed only
9  one substantive document in each case, and that was a
10 primary amendment signed in March 2002. It was actually
11 attached by Tatung to its submission.
12      As you can see, she signed that over Sung
13 Jung's signature block because he was not available.
14 That document was either prepared by Mr. Jung or for him
15 at his direction. Rebecca Rudich was not involved in
16 the preparation of that document at all.
17      Then we have, Your Honor, Tatung's letter of
18 8/3. It's a second submission. I submit to you, Your
19 Honor, that Your Honor should disregard that submission
20 as untimely. The deadline is clearly 8/1, two days
21 earlier. Although Tatung states in that letter that it
22 obtained an LPL module on or about August 2nd, 2007, I
23 frankly find that terminology curious "on or about,"
24 either they received that product one day earlier or