# EXHIBIT 20

082707hr1.TXT

1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF DELAWARE |
| 3 | |
| | PHILLIPS, L.G., LCD CO., LTD,  ) |
| 4 | ) |
| | Plaintiffs,  )    C.A. No. 04-343(JJF) |
| 5 | ) |
| | v.  ) |
| 6 | ) |
| | TATUNG CO., TATUNG COMPANY OF  ) |
| 7 | AMERICA, INC., and VIEWSONIC  ) |
| | CORPORATION,  ) |
| 8 | ) |
| | Defendants.  ) |
| 9 | |

10    Hearing of above matter taken pursuant to notice
before Renee A. Meyers, Registered Professional Reporter
and Notary Public, in the law offices of BLANK ROME,
11    LLP, 1201 North Market Street, Wilmington, Delaware, on
Monday, August 27, 2007, beginning at approximately
12    11:30 a.m., there being present:

13    BEFORE: THE HONORABLE VINCENT J. POPPITI, SPECIAL MASTER

14    APPEARANCES:

15        THE BAYARD FIRM
          RICHARD D. KIRK, ESQ.
16            222 Delaware Avenue, Suite 900
              Wilmington, Delaware  19899
17            for Plaintiffs

18

19                    CORBETT & WILCOX
20            Registered Professional Reporters
        230 North Market Street      Wilmington, DE 19899
21                    (302) 571-0510
                  www.corbettreporting.com
22            Corbett & Wilcox is not affiliated
            with Wilcox & Fetzer, Court Reporters
23

24

Page 1

082707hr1.TXT

♀

2

```
 1     APPEARANCES (Continued):

 2            MCKENNA, LONG & ALDRIDGE, LLP
              CASS W. CHRISTENSON, ESQ.
 3            REL S. AMBROZY, ESQ.
              LORA BRZEZYNSKI, ESQ.
 4              1900 K Street, N.W.
                Washington, D.C.  20006
 5              for Plaintiffs

 6            RICHARDS LAYTON & FINGER
              FREDERICK L. COTTRELL, III
 7            ANNE SHEA GAZA, ESQ.
                One Rodney Square
 8              Wilmington, Delaware  19801
                for Defendant Tatung Co.
 9
              GREENBERG TRAURIG LLP
10            FRANK MERIDETH, ESQ.
              VALERIE HO, ESQ.
11            MARK KREISMAN, ESQ.
              2450 Colorado Avenue, Suite 400E
12              Santa Monica, California  90404
                for Defendant Tatung Company of America, Inc.
13
              CONNOLLY BOVE LODGE & HUTZ LLP
14            JAMES D. HEISMAN, ESQ.
                1007 North Orange Street
15              Wilmington, Delaware  19899
                for Defendant ViewSonic Corporation
16
              BINGHAM McCUTCHEN LLP
17            SCOTT R. MILLER, ESQ.
                355 South Grand Avenue
18              Los Angeles, California  90071-3106
                 for Defendant ViewSonic Corporation
19
              RASKIN PETER RUBIN & SIMON LLP
20            TRACY ROMAN, ESQ.
                1801 Century Park East, 23rd Floor
21              Los Angeles, California  90071
                for Defendant ViewSonic Corporation
22

23

24
```

Page 2

082707hr1.TXT

⚥

                                                                3

1               SPECIAL MASTER POPPITI:  Mr. Kirk, please.

2               MR. KIRK:  Thank you, Your Honor.  This is

3       Richard Kirk from The Bayard Firm for the plaintiff, LG

4       Phillips LCD Co., Ltd.  With me on the line from

5       Washington are my colleagues from McKenna, Long &

6       Aldridge, Cass Christenson, Rel Ambrozy, and Lora

7       Brzezynski.

8               MS. GAZA:  Good afternoon, Your Honor.  Anne

9       Gaza from Richards, Layton & Finger.  On the phone with

10      me is Valerie Ho from Greenberg Traurig for the Tatung

11      defendants.

12              SPECIAL MASTER POPPITI:  Thank you.

13              MS. HO:  And Frank Merideth as well.

14              SPECIAL MASTER POPPITI:  Thank you.

15              MR. HEISMAN:  Good afternoon, Your Honor.

16      Jim Heisman from Connolly Bove on behalf of ViewSonic

17      Corporation.  With me on the line are Scott Miller and

18      Tracy Roman in California.

19              SPECIAL MASTER POPPITI:  Thank you.

20              I just want to make sure that everyone has

21      in front of them what we would be discussing today, and

22      that would be correspondence from Fred Cottrell dated

23      August 26th, 2007.  I also have correspondence,

24      actually, e-mail from Mr. Kirk that's dated Friday,

                            Page 3

082707hr1.TXT

⚲

15

```
 1    Cass Christenson.  Why don't I go through, if I may, and
 2    I can just sort of, starting at the beginning, I can
 3    flag any concerns that we had and we can get your input
 4    if that's acceptable.
 5              SPECIAL MASTER POPPITI:  Sure.
 6              MR. CHRISTENSON:  Some of these I don't want
 7    to revisit because I think they are acceptable given
 8    your prior guidances and instructions.  For example,
 9    topics 1B, C, D, topics 2B, C, and D, I think, are
10    within the general scope of which you had found
11    permissible.
12              SPECIAL MASTER POPPITI:  Okay.
13              MR. CHRISTENSON:  I did want to raise an
14    issue with respect to topic 1B.
15              SPECIAL MASTER POPPITI:  Yes.
16              MR. CHRISTENSON:  Topic 2B is the same for
17    purposes of this concern.
18              SPECIAL MASTER POPPITI:  It's a mirror.
19              MR. CHRISTENSON:  And that is that it's
20    framed in a way that is related to your claim
21    construction.  And, so, it's asking potential -- and we
22    discussed this with the defendants as well -- it's
23    potentially requiring the witness to talk about LPL
24    products in terms of what claim limitations they meet
```

Page 15

082707hr1.TXT

♀

16

1    under your definitions of those terms.   And we

2    previously agreed with the other side that the Rule

3    30(b)6 depositions in this case would not encompass

4    parties' positions or contentions on validity

5    infringement or enforceability, but, rather, those

6    issues would be for the expert witnesses.

7            So we don't want to be in a position where

8    the witness is going to be asked questions that would

9    fall into that expert realm and require the witness to

10   take positions related to claim construction.

11           SPECIAL MASTER POPPITI:  Mr. Miller.

12           MR. MILLER:  Your Honor, what I advised

13   Mr. Christenson of on the 22nd was that we would be --

14   consistent with our agreement, if LPL's witness says, We

15   are relying solely on expert testimony with regard to

16   those issues, that that's fine, that was our agreement.

17   But if they intend to put on a witness, a fact witness,

18   beyond their expert to testify about any of these

19   things, obviously, we are entitled to know what that

20   fact witness is going to say and all we would be looking

21   for here is if there are facts that their fact witnesses

22   intend to deal with or testify to at trial, we want to

23   know what they are.   If they are going to come in and

24   say, We are solely relying on expert testimony with

Page 16

082707hr1.TXT

⚥

17

1   regard to those issues, that will be the end of the
2   inquiry.
3           SPECIAL MASTER POPPITI:  Can I expect, then,
4   your response is really framed in sub paragraph C, D,
5   and E of each of those topics, No. 1 and No. 2?  I think
6   what happened, and, certainly, even before looking at
7   LPL's position with respect to the topic in terms of
8   arguing through it, when I looked at it, and I did turn
9   to the topics first, I certainly had the concern that
10  LPL raises.
11          It seems to me, though, that,
12  Mr. Christenson, what Mr. Miller just said was what
13  makes -- it certainly makes sense to me.  If topic B
14  gets responded to by virtue of saying, We intend to rely
15  on expert opinion, doesn't that answer the concern?
16          MR. CHRISTENSON:  It sounds like it would,
17  Your Honor.  I agree with you that the factual -- we
18  understood were the factual type questions were under
19  subparts C and D.
20          SPECIAL MASTER POPPITI:  C and D.
21          MR. CHRISTENSON:  And D, obviously, does not
22  read that way.  So, if that's the -- if the
23  understanding is that they will not attempt to make LPL
24  an expert in that regard, then I understand that and
                    Page 17

082707hr1.TXT

⚥

18

1     that resolves that concern.

2                 SPECIAL MASTER POPPITI:  Mr. Miller.

3     Mr. Miller, did you hear?

4                 MR. MILLER:  Yes.  I was speaking on mute.

5                 SPECIAL MASTER POPPITI:  That's all right.

6                 MR. MILLER:  Yes.  What I said was, Our

7     agreement originally from the beginning has been so long

8     as the parties indicates they are relying solely on

9     expert testimony, that that's the end of the inquiry.

10                 SPECIAL MASTER POPPITI:  Okay.

11                 MR. MILLER:  So we are happy to abide by

12    that.

13                 SPECIAL MASTER POPPITI:  Okay.  I expect

14    that, with that understanding, the topics and the

15    subtopics underneath of that are gone; do you agree,

16    Mr. Christenson.

17                 MR. CHRISTENSON:  We understand that your

18    expectation is, Your Honor, that those are permissible

19    subject areas, yes.

20                 SPECIAL MASTER POPPITI:  Thank you.

21                 MR. CHRISTENSON:  Thank you.

22                 Topic 1E and 2E, I think, are within the

23    scope of what you expected.  I think there is a concern

24    there that it's, you know, very broad in terms of the

Page 18

082707hr1.TXT

19

1    number of products and the way that the topic is framed,

2    but, ideally, we will be able to resolve that by trying

3    to pinpoint certain products.  And if not, we will just

4    have to deal with that topic generally, which is the way

5    that it's currently framed.

6          So, I don't think there is anything we need

7    to do today on 1E.

8          MR. MILLER:  Your Honor, on that point, in

9    our discussion on the 22nd, we indicated that,

10    obviously, if they had documents that would assist the

11    witness, we are happy to have those documents and try to

12    narrow issues and use documents in a way that will be

13    efficient.  If there are other documents they have that

14    they haven't produced, that would be great.  If there

15    aren't, then we will be able to only get the information

16    that's available.

17          SPECIAL MASTER POPPITI:  Okay.

18          MR. CHRISTENSON:  With respect to topic

19    three, and I am looking at the red-lined, which is

20    topic, actually, 3C, 3D, and 3E, these topics deal very

21    broadly with sales marketing, supply channels, product

22    distribution, customer relationships for a whole host of

23    products, and we understood, from the hearing that we

24    had with you on August 16th, that ViewSonic was going to

082707hr1.TXT

⚲

47

1    catchall inequitable conduct topic, I suspect, given
2    Your Honor's prior comments, that would be treated the
3    same as topic five and you would permit topic 7I even
4    though LPL's position is that it's really overly -- it's
5    not clear what's being requested and a more specific
6    subject matter is set forth in the preceding topics.
7            SPECIAL MASTER POPPITI:  Mr. Miller, do you
8    have anything else to add with respect to I before
9    discussing some of the other concerns raised with
10   respect to topic seven?
11           MR. MILLER:  Not as to the specifics of
12   that.  Obviously, I am happy to discuss the issues
13   relating privilege or something that might be implicated
14   which we also discussed with Mr. Christenson last week.
15           SPECIAL MASTER POPPITI:  Okay.  Then, with
16   respect to I, again, I think it's part of the way we
17   have done -- that I have hopefully assisted in getting
18   this business accomplished in terms of the way I is
19   phrased, and I will raise the same concerns and caution
20   with respect to questioning a witness using, if you
21   will, 7I.
22           So, having said that, it has to stand the
23   way it is.  And, you know, with respect to
24   attorney/client privilege and things of that nature, is
                        Page 47

082707hr1.TXT

⚥

48

1      it fair to expect that the umbrella of topic No. 7 is
2      whatever information is going to be elicited is
3      information that is non-privileged?
4                 MR. MILLER:  It would be non-privileged or
5      information about which, if they raise the privilege,
6      obviously, if they assert it, we are entitled to have
7      the assertion, and we know we won't see it at trial, but
8      that's the purpose is, if their questions would be
9      within the scope of the privilege and they assert it,
10     that's fine, we will deal with that provided it's a
11     proper assertion.
12                SPECIAL MASTER POPPITI:  I understand.
13     Mr. Christenson.
14                MR. CHRISTENSON:  Yes.  I think that
15     clarification is helpful.
16                Looking at the face of the topics, for
17     example, in topic 7C and in topic 7H, there is specific
18     reference to privileged communications within the face
19     of the topic.  So if they are now not planning to
20     address those issues in the deposition, which is what I
21     understand to be the case, it's essentially the effect
22     of amending those topics not to any longer include those
23     communications.
24                MR. MILLER:  Let's just be clear.  We are

082707hr1.TXT

⚥

60

1     think she would be the appropriate person.

2                    SPECIAL MASTER POPPITI:  I don't think I

3     framed my question very artfully.

4                         I don't see anything clearly enough to

5     suggest to me that there was a focus on anyone as a

6     30(b)(6) deponent on the issue of inequitable conduct.

7                    MR. MERIDETH:  I believe that's also

8     correct.  I don't think it is up to the Tatung

9     defendants to designate the witness that would speak for

10    McKenna.

11                   SPECIAL MASTER POPPITI:  I understand that.

12    But where is the discussion on a 30(b)(6) witness?

13                   MR. MERIDETH:   The discussion was originally

14    with respect to Miss Rudich and her knowledge with

15    respect to the prosecution of these patents which arose

16    when the issues regarding her testimony came up, I

17    think, for the second time, at which we discussed the

18    scope of her deposition that covered both the issues of

19    the '079 patent and inequitable conduct in light of the

20    recent disclosure of the Lucky Gold Star reference.

21                        If she was not the person to be able to give

22    that testimony, as we had thought she was, then we

23    believe that we should be entitled to take a 30(b)(6)

24    deposition of McKenna on the subject of this recently

                                    Page 60

082707hr1.TXT

61

1    produced prior art.

2              SPECIAL MASTER POPPITI:   Okay.   And I

3    understand your position with respect to wanting to look

4    rather squarely at this recent production of the prior

5    art.

6              I guess my question is:   In looking at the

7    subjects, or the topics, I am sorry -- let me get those

8    in front of me -- looking at topics No. 1, 2 -- No. 1

9    and 2 and all the subtopics under that, isn't it fair to

10   say that those subtopics could have been the subject of

11   a 30(b)(6) notice before fact discovery concluded?

12             MR. MERIDETH:   That's correct, except that

13   we did not have the information that we now have that

14   was just produced with respect to this Lucky Gold Star

15   product, and that creates an entirely new ball game,

16   from our vista, because we need to know what

17   considerations were taken with respect to not producing

18   other prior art references.

19             In other words, prior to having that, we

20   didn't have a basis to assert, although there were

21   general allegations in the complaint with -- I mean, in

22   the answer, that cites inequitable conduct, we didn't

23   have a specific.   Now we have a specific.   We have a

24   product that is in all fours, that is an invalidating

Page 61

082707hr1.TXT

62

1    piece of prior art, it was not produced to the patent
2    office, it was not produced to us but was intentionally
3    withheld, according to Mr. Christenson, and that was a
4    strategy that was undertaken by McKenna, and we are now
5    in a situation --
6                MR. CHRISTENSON:   That's not fair.   That's
7    not what I said.   That's not correct.
8                SPECIAL MASTER POPPITI:   Just let him
9    finish, please.
10                MR. MERIDETH:   That's the way I interpret
11    it, is that there was a decision made not to produce
12    this prior art reference.   We now have the prior art
13    reference and it raises very significant issues with
14    regard to inequitable conduct, and we think we ought to
15    be able to inquire into those issues.
16                It's not our purpose to inquire into things
17    that could have been inquired into before, except the
18    difficulty that we have is, A, we have a real for
19    instance, it's very specific, and it's the Lucky Gold
20    Star product.   There are other references that are
21    invalidating and there is going to be an issue as to
22    whether they were known of or whether they have just
23    recently been discovered.   But, in this case, it was a
24    product that was produced by LG.

Page 62

082707hr1.TXT

⚥

63

1          So, we think that we have a right to inquire
2      into that and discover why that or any other similar
3      products, from which that product may have been derived,
4      there may be some other manufacturers' products that we
5      have specifically identified, of why those were not
6      disclosed to the patent office, and, in fact, why they
7      weren't disclosed to us in discovery.
8          MS. BRZEZYNSKI:  Your Honor, may I respond?
9          SPECIAL MASTER POPPITI:  Yes, please.
10         MS. BRYEZYNSKI:  Your Honor, first of all,
11     we absolutely disagree that this Lucky Gold Star product
12     is invalidating prior art and we will address that at
13     the appropriate time.  We also disagree that any
14     improper conduct has occurred by either MLA attorneys or
15     by LPL.
16         Regardless of that, Your Honor, we believe
17     you nailed it on the head that any notice of the
18     deposition of MLA should have been served long, long
19     ago, prior to the close of fact discovery.
20         Tatung has had an inequitable conduct
21     defense since 2005.  Second, Tatung asserted wrong
22     theories of prior art relating to its inequitable
23     conduct defense in its February 2006 interrogatory
24     answers which we attached as Exhibit K to our August
                        Page 63

082707hr1.TXT

⚥

64

1    23rd submission to Your Honor.

2                    SPECIAL MASTER POPPITI:  I have looked at

3    those.

4                    MS. BRZEZYNSKI:  The same issues were raised

5    by Tatung then; therefore, it's the -- if Tatung wanted

6    to proceed with a deposition of MLA, it should have done

7    so during fact discovery.

8                    I also want to point out to Your Honor

9    another important fact.  You will notice, in their

10   August 27th letter sent less than one hour before the

11   hearing today, that Tatung also refers to an LG 500 LC

12   class.  I want to point out to you, Your Honor, that

13   Tatung and ViewSonic have already questioned John Kim,

14   one of the inventors, about that product at length in

15   March of this year.  They also questioned Mr. Bang,

16   after insisting on his deposition, at length, about that

17   product in March of this year.  They also deposed a

18   third party, LGE USA, about that product.

19                   So, once again, those issues were before

20   Tatung and raised by Tatung during fact discovery, and

21   if they wanted to proceed with a deposition of MLA, they

22   should have noticed it during fact discovery.  It is now

23   untimely and there is simply no basis for granting a

24   deposition of MLA at this time.

Page 64

082707hr1.TXT

♀

65

1             I think what we have here is an attempt by

2     Tatung to bootstrap a 30(b)(6) deposition of McKenna,

3     Long & Aldridge on a notice of deposition and subpoena

4     for Rebecca Rudich's deposition that they served in

5     February 2007.  That should not be permitted for several

6     additional reasons, including that Rebecca Rudich's

7     deposition was withdrawn, by subpoena, and then was

8     revised to one issue only, only related to the '079

9     application, which was confirmed by Mr. Merideth as late

10    as his July 9th e-mail, which is also attached to this

11    submission.

12            Second, Your Honor, Tatung says, in its

13    August 27th letter today, that they relied on the

14    Rebecca Rudich declaration when they issued the

15    subpoena, so that cannot be accurate because the

16    subpoena and deposition notice for Rebecca Rudich was

17    served by Tatung on February 27th, but Miss Rudich's

18    first declaration was not dated until March 6th, 2007.

19    So, certainly, there is no possible way that Tatung

20    could have relied on Rebecca Rudich's declaration when

21    it served its subpoena.

22            In any event, even if Tatung attempts to

23    argue that sometime after Miss Rudich's declaration,

24    Tatung relied on the language in there to suggest that

Page 65

082707hr1.TXT

♀

66

1    Miss Rudich was involved in patent prosecution of the
2    patents-in-suit, again, we argue that that's simply not
3    possible either.  That declaration was signed in 2007.
4    The language in there says that Miss Rudich works on
5    patent prosecution activity related to the
6    patents-in-suit.  The only patent prosecution activity
7    going on in 2007 was related to the continuation
8    application.  The patents-in-suit issued in 2002, and
9    there has been no patent prosecution activity after that
10   point.
11           I, therefore, suggest to Your Honor that
12   Tatung's recent attempt to obtain a deposition of
13   McKenna, Long & Aldridge is wholly inappropriate and
14   untimely and should be denied.
15           MS. HO:  Your Honor, if I may address a
16   couple of the points that Miss Brzezynski just brought
17   up?
18           SPECIAL MASTER POPPITI:  Please.
19           MS. HO:  First of all, we did not say, in
20   our submission this morning, that we had relied on
21   Miss Rudich's declaration in issuing our subpoena to
22   her.  That is not what we said.
23           We issued our subpoena to her and then we
24   received her declaration which confirmed to us that she
                         Page 66

082707hr1.TXT

⚥

67

1    was the appropriate witness.  Had we known, as it turned

2    out, that she is not the appropriate witness, then we

3    could have subpoenaed someone else.  We could have

4    subpoenaed McKenna or we could have subpoenaed someone

5    else at the McKenna firm before the close of fact

6    discovery, but we did not do that because we understood,

7    based on her declaration, that she was the appropriate

8    witness.

9              So, that's my first point.

10             My second point is that I know that Your

11   Honor was just focusing on topic No. 1, but if you turn

12   to topic No. 2, you see that those topics are really

13   limited to what's defined in the depo notice as the LPL

14   prior art products.

15             SPECIAL MASTER POPPITI:  Yes.

16             MS. HO:  And the definition of LPL prior art

17   product is the products -- includes the products

18   disclosed in the recent discovery and that were

19   conceived, made, marketed, sold, distributed, disclosed,

20   and/or offered for sale by LPL on or before December

21   31st, 1998, and that's pretty much the same definition

22   that was used in LPL's -- I am sorry, in our deposition

23   notice, supplemental deposition notice to LPL that we

24   had just talked about earlier.

082707hr1.TXT

⚥

68

1              SPECIAL MASTER POPPITI:  Yes.  That's pretty
2       much the same.
3              MS. HO:  And, so, you see that the topics in
4       -- or the subtopics in topic No. 2 are generally limited
5       to the products that were recently disclosed.
6              And then topic No. 3 has to do with the NEC
7       litigation which Your Honor has already ruled that we
8       can explore.
9              The only question is:  Why topic No. 1?
10      Well, when read in isolation, yes, topic No. 1 could
11      have been noticed before March 30th, 2007.  That's true.
12      But it would have been pointless for us, Your Honor, I
13      submit, to just notice topic No. 1 because, back in
14      March, we did not know about the LPL prior art products
15      that just recently have been produced and that we want
16      to explore in topic No. 2.  So, the two topics are
17      interrelated.
18             SPECIAL MASTER POPPITI:  I gather, and I
19      want you to speak, just very briefly, to
20      Miss Brzezynski's comments with respect to Tatung's
21      response to the respective interrogatories that were
22      identified at Exhibit K.  There, Tatung described, with
23      some factual backdrop, its -- I am just flipping through
24      it, that's why I am -- it describes some of the factual
                        Page 68

082707hr1. TXT

♀

69

1    backdrop for its assertion of inequitable conduct, and

2    it, in fact, describes some prior art, as I remember,

3    when I read it initially.

4            MS. HO:    That's correct, Your Honor.

5            MR. MERIDETH:    We do have some prior art,

6    but let me make it clear, we view taking the deposition

7    of counsel to be a serious matter that should not be

8    undertaken based upon just skepticism.

9            SPECIAL MASTER POPPITI:    Right.

10           MR. MERIDETH:    In this case, we have a

11   situation in which we were presented three weeks ago

12   with what we view, notwithstanding Miss Brzezynski's

13   position, to be a smoking gun.    That immediately brings

14   into focus the necessity to take the deposition of MLA

15   with respect to inequitable conduct with respect to that

16   reference, and it's not simply that reference in

17   isolation because, while the other references are not

18   unimportant, we did not view them, prior to receiving

19   this most recent disclosure, to be of such moment that

20   it was necessary for us to depose MLA.

21           We have a new ball game here.    We have a

22   piece of prior art that we believe was intentionally

23   withheld.    We have a right, I respectfully submit, to

24   explore that.    In the context of that area to produce

                    Page 69

082707hr1.TXT

⚥

70

1      that prior art, I think we are compelled to ask the

2      question, Well, if you withheld that piece of prior art,

3      what other prior art did you withhold?  And that

4      question would not have been appropriate prior to the

5      production of this Lucky Gold Star product.  And I don't

6      think it is appropriate to argue that, Well, just

7      because we managed to keep this Lucky Gold Star product

8      under wraps until the discovery cutoff lapsed, you don't

9      have any right to make any discovery with respect to

10     inequitable conduct.  That's fundamentally unfair.  And

11     it was the production of that particular product that

12     really brings this whole matter of inequitable conduct

13     into focus.

14             MS. BRZEZYNSKI:  Your Honor, the arguments

15     being made by Miss Ho and Mr. Merideth are inconsistent

16     with each other.  Mr. Merideth is now saying that if,

17     you know, as a result of production of the -- in

18     documents relating to Lucky Gold Star, they now want a

19     deposition of McKenna.

20             Miss Ho is saying that Tatung could have

21     subpoenaed someone else prior to the close of discovery

22     if they had known that Miss Rudich was not involved in

23     the prosecution of the patents-in-suit.

24             SPECIAL MASTER POPPITI:  It was against the

082707hr1.TXT

♀

71

1    backdrop of this late production.  That's what I

2    understood Ms. Ho's comments.

3              MS. HO:  That's correct.

4              MS. BRZEZYNSKI:  The issue, though, Your

5    Honor, is Miss Rudich's deposition was never related to

6    the patents-in-suit.  It was always limited to the '079.

7              If you read Miss Ho's argument, then you

8    also have to assume that Tatung's offer, over several

9    months, to accept a declaration from Ms. Rudich was also

10   an empty offer that they were always going to renege on.

11   Miss Rudich's deposition was always limited to the '079

12   and nothing more.

13             Now, correct me, Your Honor, Tatung had

14   previously asserted every product as prior art in

15   support of their inequitable conduct defense, including

16   an LGE product, prior to the close of discovery.  Any

17   deposition of McKenna, Long & Aldridge attorneys should

18   have been noticed prior to the close of discovery.

19             The suggestion now that the production of

20   the Lucky Gold Star information somehow raises the

21   importance of this issue and warrants a deposition is

22   simply inappropriate.

23             SPECIAL MASTER POPPITI:  Let me ask --

24             MS. BRZEZYNSKI:  They should have made these

082707hr1.TXT

♀

72

1    issues during discovery and they should have noticed
2    this deposition at that time.
3            SPECIAL MASTER POPPITI:   There is no
4    question, certainly in -- there is no question in my
5    mind that a deposition of a patent prosecutor from
6    McKenna could have been noticed before.   Mr. Miller
7    acknowledges that and I expect that Miss Ho would
8    acknowledge that as well.
9            I know, and you all know, and there is even
10   some case law out there that expresses chagrin when it
11   is done, there is some case law that suggests if you are
12   going to depose the inventor, then you shouldn't be
13   deposing the patent prosecutor -- I think I am correct
14   in stating it that way -- so, if there was a
15   determination made not to depose a McKenna, Long
16   attorney on the issue of inequitable conduct and if the
17   path forward on Rebecca Rudich was as it is and there is
18   some garble to it, I understand where we were the day
19   before there was production of Lucky Gold Star.
20           I think what I see here is, with the
21   production of -- and maybe -- let me pose this question:
22   If Lucky Gold Star were produced in isolation and it was
23   not connected to NEC litigation, would we not be having
24   a different discussion?

082707hr1.TXT

☿

73

1              MR. MERIDETH:  We very well could be, but,
2    in this case, we know that at least LG Phillips, and we
3    believe McKenna was involved in the NEC litigation, had
4    that sheet, that specification for this product in at
5    least 1999 or 2000, and, yes, it makes a lot of
6    difference.
7              MS. HO:   And, in fact, Your Honor, we were
8    able to obtain copies of the complaints in the NEC
9    matter, and the complaints identify McKenna's
10   predecessor, which I believe is McKenna -- sorry, I am
11   just trying to flip through it right now -- it's -- I am
12   sorry, it's McKenna's predecessor, Long, Aldridge &
13   Norman as the lead trial counsel in those cases.
14             SPECIAL MASTER POPPITI:  Here is where I
15   think we are:  There is no question that I expected
16   production may lead to the requirement for additional
17   discovery of whatever -- whatever that additional
18   discovery was at the time that we had that conversation
19   about the prospect of having additional discovery
20   sometime ago, and I want to say it was in the March or
21   April time frame.
22             Given the production of the Lucky Gold Star
23   asserted prior art and given the context of its
24   production, namely, the reference to NEC litigation, I
                              Page 73

082707hr1.TXT

♀

74

1    am satisfied that Tatung should be able to explore all

2    that that means with a McKenna, Long attorney.

3              Again, I will ask Mr. Merideth and Miss Ho,

4    for purposes of getting something across my desk as

5    quickly as possible, to do the form of order -- not a

6    form of order, it would be in the format of a proposed

7    recommendation to the Court, reviewed by Miss Brzezynski

8    for form only, and present it to me not later than the

9    end of the week Friday.

10              MS. BRZEZYNSKI:  Your Honor, I'd like an

11    opportunity to address their proposed -- Tatung's

12    proposed topics for examination as well.

13              SPECIAL MASTER POPPITI:  Okay.

14              MS. BRZEZYNSKI:  Tatung's proposed topics

15    are extremely broad, not limited to just the Lucky Gold

16    Star products only.  When you are looking at topic No.

17    1, they are general broad topics as to McKenna's

18    business policies and procedures and practices, and are

19    not at all related to Lucky Gold Star products or

20    anything specific to Lucky Gold Star or prosecution of

21    the patents-in-suit in NEC litigation.

22              Topic No. 1 is completely inappropriate,

23    including its two subtopics.

24              SPECIAL MASTER POPPITI:  Let's talk about

082707hr1.TXT

⚥

75

1    that for a moment.

2          Who is going to speak to that, please?

3    Mr. Miller?  Mr. Merideth or Miss Ho?

4          MR. MERIDETH:   The issue here is whether

5    McKenna, Long & Aldridge had a policy with respect to

6    requiring its clients to produce prior art or a product

7    that -- or identified product that would implicate

8    beyond cerebar (phonetic) in the process of prosecuting

9    the patent.

10          We need to determine whether or not this

11    reference to the Lucky Gold Star product was, in fact,

12    given to McKenna, Long & Aldridge, whether they had it

13    in their possession, or whether it was not disclosed to

14    them by their client, that is going to bear on how the

15    trial of this issue of inequitable conduct goes forward.

16          If the answer to the question:   Did you know

17    anything about this Lucky Gold Star product?, is, Gee, I

18    didn't know anything about it; I didn't know that there

19    was a product like that.   The next question is going to

20    be, Well, what did you do to find out about it?   And

21    that's what the question No. 1 is intended to elicit.

22    If we can't ask those questions, we are going to have

23    one arm behind our back.

24          MS. BRZEZYNSKI:  Your Honor, the problem

Page 75

082707hr1.TXT

⚥

76

1    here is that topic No. 1, as framed, is extremely broad,
2    covers McKenna's general business practices and
3    procedures relating to patent prosecution for all of its
4    clients and all of its matters and is not limited to
5    just the prosecution of the patents-in-suit.
6              MR. MERIDETH:  We need to know whether there
7    is --
8              SPECIAL MASTER POPPITI:  Are you suggesting
9    that if the topic were changed to say "patents-in-suit,"
10   that there is some policy or practice that's different
11   with respect to these patents-in-suit as opposed to
12   other work that McKenna, Long did between 1998 and 2002?
13             MS. BRZEZYNSKI:  I am not saying that there
14   is a difference.  What I am saying is the only relevant
15   information -- and, first of all, we do argue that NEC
16   deposition is appropriate.
17             SPECIAL MASTER POPPITI:  I understand that.
18             MS. BRZEZYNSKI:  But the only relevant area
19   is prosecution of the patents-in-suit.  And getting into
20   McKenna's general business practices is proprietary and
21   privileged information and it's inappropriate in this
22   context.
23             MR. MERIDETH:  I respectfully disagree.
24             SPECIAL MASTER POPPITI:  I don't know how
                        Page 76

082707hr1.TXT

77

1     there can be any development of what was done or not
2     done against what I understand to be the topic of
3     inequitable conduct if Tatung is not able to explore the
4     process as it is contemplated.
5             MS. BRZEZYNSKI:  They should be required
6     to --
7             SPECIAL MASTER POPPITI:  Would it be fair
8     for me to suggest that what I expect Mr. Merideth and
9     his colleagues would be looking for is what you would
10    all say in response to an assertion that something went
11    wrong here.  I mean, if you start describing your policy
12    and practice in the context of, We didn't do anything
13    out of the ordinary here, without Tatung having the
14    opportunity to explore that in discovery, I think there
15    is one hand tied behind their back; isn't there?
16            MS. BRZEZYNSKI:  I disagree.  Tatung can ask
17    questions relating to policies and procedures for
18    prosecuting the patents-in-suit and should not be
19    permitted to get broader than that, Your Honor.
20            We are talking about proprietary information
21    relating to McKenna's business products being asked by a
22    competitive law firm.
23            SPECIAL MASTER POPPITI:  Excuse me.  Why
24    can't these topics be framed in the context of the
                        Page 77

082707hr1.TXT

⚥

78

1     patents-in-suit?

2               MS. BRZEZYNSKI:  I am sorry.  Can you say

3     that again?

4               SPECIAL MASTER POPPITI:  Mr. Merideth, why

5     can't the topics 1A and B be framed in the context of

6     the patents-in-suit?

7               MR. MERIDETH:  They can, Your Honor, so long

8     as we are able to ask whether there is any variation on

9     the policies and procedures that are generally

10    applicable to other clients.  In other words, if they

11    say, Well, we send out a questionnaire, or we ask the

12    following specific question, or we don't ask the

13    following specific question, I think we should be able

14    to ask, Well, in general, is your practice the same or

15    different with respect to other clients?

16              SPECIAL MASTER POPPITI:  Why?

17              MR. MERIDETH:  I believe that it pinpoints

18    the issue of whether or not there has been sufficient

19    inquiry and inquiry that meets the standard of care

20    that's required under the patent laws with respect to

21    asking the patentee to disclose prior art or art that

22    would preclude patenting because of the on sale of art.

23    And if, for example, I am not suggesting that was the

24    case here, MLA simply never asked LGE or LPL for that

                       Page 78

082707hr1.TXT

♀

79

1    information, we are entitled to know that.  If it is

2    their practice to otherwise ask for that information and

3    they failed to do so in this case, I think we ought to

4    be able to develop that.

5              MS. BRZEZYNSKI:  I submit that those

6    follow-up questions do not matter and are not relevant

7    at all to this case, and any questions at all should be

8    limited to just prosecution of the patents-in-suit.

9              MR. KREISMAN:  Your Honor, if I may speak.

10             SPECIAL MASTER POPPITI:  Yes.

11             MR. KREISMAN:  I may be one of the only

12   patent prosecutors on the phone.  What I can tell you is

13   there is the issue of the McKenna firm and the attorneys

14   at the McKenna firm and their predecessor practices have

15   a tremendous amount of patent work being prosecuted on

16   behalf of LGE and LG Phillips, and if we are limited to

17   questioning LG Phillips' representative only on the

18   patents-in-suit, you can see a position we could be

19   placed in where, at trial, we will be suddenly advised

20   there was information that was given to LG Phillips, or

21   LGE, as a predecessor, about other LG patents that had

22   been worked on, and if we are not allowed to ask about

23   those other earlier practices regarding their earlier

24   portfolio, we will never know.  We will be sandbagged.

                          Page 79

082707hr1.TXT

♀

80

1           Somebody could answer, Well, for these
2    patents-in-suit, thus or such happened, and if we are
3    not allowed to follow-up with, Well, what was the
4    practice with all the hundreds of LG patents, was there
5    a policy?, it becomes very difficult for us to get any
6    of the evidence regarding intent.
7           MS. BRZEZYNSKI:  Your Honor, I am now even
8    more troubled by Mr. Kreisman's comments that they want
9    to depose a witness about earlier practices about other
10   patents.
11          SPECIAL MASTER POPPITI:  I don't think I
12   heard him say "other patents."  I thought I heard him
13   say "other policies and practice."
14          MR. KREISMAN:  That's true, Your Honor.
15          SPECIAL MASTER POPPITI:  Let's do this:  I
16   am going to permit that topics 1A and 1B, given the
17   nature of the conversation that we have just had, I do
18   not think that that involves proprietary information.
19   Your record is protected.  The document that I will look
20   to sign, I would expect, would highlight the discussion
21   that we have just had, certainly not in the detail that
22   we have had it, so that Judge Farnan can be informed, as
23   I expect he would be, given the nature of the
24   conversation that we have had.
                      Page 80

082707hr1.TXT

⚥

81

```
 1                 Is Friday, with this document, also doable,
 2     please?
 3                 MR. MERIDETH:   Yes.
 4                 SPECIAL MASTER POPPITI:   From LPL's
 5     perspective?
 6                 MS. BRZEZYNSKI:   Yes, Your Honor.   If I may
 7     just add, is my understanding correct that the topics
 8     are limited, however, to the Lucky Gold Star product and
 9     should not include any questioning related to any other
10     of the asserted prior art products by Tatung?
11                 MS. HO:   We have defined prior art LPL
12     product in the deposition notice.
13                 SPECIAL MASTER POPPITI:   Yes, you have.
14                 MS. HO:   And those --
15                 SPECIAL MASTER POPPITI:   It's all
16     supplemental.
17                 MS. HO:   Yes, Your Honor.   Well, it's all
18     supplemental and that 500 LC monitor.   Let me clarify.
19     It's the product identified in the recent discovery
20     produced by LPL plus the LG 500 LC monitor.
21                 MR. MERIDETH:   Let me explain why the 500 LC
22     is important in that context.   It has to do with the
23     supplemental information filing by LPL with respect to
24     the '079 patent in which other prior art that was
```

Page 81

082707hr1.TXT

⚥

82

1    identified by the Tatung defendants was provided to the

2    patent office, that the reference to the 500 LC was

3    omitted, and we want to know why.

4              MS. BRZEZYNSKI:  Your Honor, the LG 500 LC

5    product was raised by Tatung in March and April.  If

6    they had an issue with that product, they should have

7    raised it in a notice prior to this close of fact

8    discovery.

9              SPECIAL MASTER POPPITI:  I thought I

10   understood Mr. Merideth to say, and please correct me if

11   I am wrong or restate what you have just said to me, the

12   reason why the LG 500 LC is being raised at this time,

13   in this context, is because of information that was

14   received in supplemental production?

15             MR. MERIDETH:  Correct.

16             MR. KREISMAN:  I think I can clarify the

17   point if I may, Your Honor.

18             SPECIAL MASTER POPPITI:  Please.

19             MR. KREISMAN:  We spoke, in the earlier

20   hearings, about the '079 prosecution, and Mr. Merideth

21   mentioned an information disclosure statement, an IDS,

22   and he had mentioned that certain products were

23   appearing on that now, and Miss Brzezynski, rightly so,

24   indicated to Your Honor that it would be McKenna's

Page 82

082707hr1.TXT

☿

83

1    obligation, when references that were asserted as prior
2    art in litigation came to their attention, that they
3    would submit those in an IDS to the patent office.
4            SPECIAL MASTER POPPITI:  I remember exactly
5    what you said and I understand the obligation.
6            MR. KREISMAN:  Thank you, Your Honor.  And
7    what was our reading of the IDS is the 500 LC product,
8    which has been repeatedly identified in interrogatory
9    responses by the defendants, continues to be omitted
10   from that IDS list.
11           MS. BRZEZYNSKI:  Your Honor, I thought we
12   discussed this issue previously that if an IDS was
13   submitted in the '079 application, that that was an
14   obligation of McKenna to provide that information but
15   that it had nothing to do with the prosecution of the
16   patents-in-suit.  If it had to do with the '079, then
17   the appropriate inquiry would be of Ms. Rudich but not
18   of an MLA attorney having to do with the patent
19   prosecution of the patents-in-suit.
20           MS. HO:  The reason that the LG 500 LC
21   monitor continues to be relevant in this case, Your
22   Honor, is because, based on LPL's most recent
23   infringement contention, which was served after Your
24   Honor's claim construction rulings, we believe that this
                    Page 83

082707hr1.TXT

♀

84

1    product is an invalidating prior art reference and it

2    was not disclosed during prosecution of the

3    patents-in-suit, and based on LPL's own reading and

4    application of Your Honor's claim construction, this

5    product would have been material prior art, would be

6    invalidating prior art, and should have been disclosed.

7         So, it is the receipt of LPL's recent

8    infringement contentions that have confirmed for us that

9    this is a material reference for purposes of inequitable

10   conduct, and that is why we have included it as one of

11   the products in the definition for prior art LPL

12   products.

13        MS. BRZEZYNSKI:  If that is all, Your Honor,

14   Tatung was making those claims in March and April when

15   they deposed LPL witnesses on the LG 500 LC product.

16        SPECIAL MASTER POPPITI:  Look, I didn't

17   focus on the LG 500 issue.  I think I understand what

18   you are talking about, but, quite frankly, I want --

19        MR. AMBROZY:  Your Honor, also the

20   argument --

21        SPECIAL MASTER POPPITI:  Give me a second,

22   please.  What I want you to do, and I am sorry that I

23   have to do it this way, I just want you to focus on the

24   500 LC issue, and I want you to do it without discussing

Page 84

082707hr1.TXT

⚲

85

```
 1    it on the phone.  I want to be able to look at it and I
 2    want it in two pages and I want cross filings,
 3    simultaneous filings tomorrow, not later than 3:00 my
 4    time, so you will all have time to get it done.  And I
 5    will advise counsel sometime late tomorrow afternoon
 6    what my view of including or not including the LG 500 LC
 7    product hopefully by the end of the business day
 8    tomorrow if not first thing Wednesday morning.
 9              MS. HO:  I did not catch the time.  Did you
10    say 3:00?
11              SPECIAL MASTER POPPITI:  3:00 my time,
12    please.  That would be 12:00 your time.  And I just want
13    two short pages without having to use a magnifying
14    glass.
15              Okay?
16              MS. BRZEZYNSKI:  Yes, Your Honor.
17              SPECIAL MASTER POPPITI:  Anything else,
18    please?  Thank you all.
19              MR. CHRISTENSON:  Your Honor, just briefly
20    before we conclude, we have had some discussions
21    off-line to agree on some revisions or refinement to the
22    expert disclosure deadlines, and I don't think it would
23    impact any of the work that you are going to be doing,
24    but in the abundance of caution, and to assist you in
```

Page 85