# EXHIBIT L

080707hr1.TXT


1


1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3
      PHILLIPS, L.G., LCD CO., LTD, )
4                          )
         Plaintiffs,       )  C.A. No. 04-343(JJF)
5                          )
      v.                   )
6                          )
      TATUNG CO., TATUNG COMPANY OF )
7      AMERICA, INC., and VIEWSONIC  )
      CORPORATION,              )
8                          )
         Defendants.          )
9
         Hearing of above matter taken pursuant to notice
10    before Renee A. Meyers, Registered Professional Reporter
      and Notary Public, in the law offices of BLANK ROME,
11    LLP, 1201 North Market Street, Wilmington, Delaware, on
      Tuesday, August 7, 2007, beginning at approximately 3:30
12    p.m., there being present:

13    BEFORE:THE HONOROABLE VINCENT J. POPPITI, SPECIAL MASTER

14    APPEARANCES:

15       THE BAYARD FIRM
         RICHARD D. KIRK, ESQ.
16          222 Delaware Avenue, Suite 900
         Wilmington, Delaware  19899
17          for Plaintiffs

18

19

20

080707hr1.TXT

CORBETT & WILCOX

21      Registered Professional Reporters
        230 North Market Street    Wilmington, DE 19899
22                  (302) 571-0510
               www.corbettreporting.com
23         Corbett & Wilcox is not affiliated
         with Wilcox & Fetzer, Court Reporters
24

2

1    APPEARANCES (Continued):

2
        MCKENNA, LONG & ALDRIDGE, LLP
3        CASS W. CHRISTENSON, ESQ.
         REL S. AMBROZY, ESQ.
4         DEREK AUITO, ESQ.
         LORA BRZEZYNSKI, ESQ.
5          1900 K Street, N.W.
           Washington, D.C.  20006
6          for Plaintiffs

7         RICHARDS LAYTON & FINGER
          FREDERICK L. COTTRELL, III, ESQ.
8         ANNE SHEA GAZA, ESQ.
           One Rodney Square
9          Wilmington, Delaware  19801
           for Defendant Tatung Co.
10
         GREENBERG TRAURIG LLP
11        FRANK MERIDETH, ESQ.
          VALERIE HO, ESQ.
12         MARK KREISMAN, ESQ.
           2450 Colorado Avenue, Suite 400E
13          Santa Monica, California  90404
           for Defendant Tatung Company of America, Inc.
14
         CONNOLLY BOVE LODGE & HUTZ LLP
15        M. EDWARD DANBERG, ESQ.
          1007 North Orange Street
16         Wilmington, Delaware  19899

080707hr1.TXT
for Defendant Viewsonic Corporation

17

BINGHAM McCUTCHEN LLP
18    MANUEL NELSON, ESQ.
TRACY ROMAN, ESQ.
19    355 South Grand Avenue
Los Angeles, California 90071-3106
20    for Defendant Viewsonic Corporation

21

22

23

24

3

1        SPECIAL MASTER POPPITI:  Mr. Kirk, please.

2        MR. KIRK:  Yes, Your Honor.  This is Richard

3    Kirk for The Bayard Firm for the plaintiff LG Phillips,

4    LCD Company, Ltd.

5        With me on the line from Washington, from

6    the firm of McKenna, Long & Aldridge, are my colleagues,

7    Cass Christenson, Lora Brzezynski, Rel Ambrozy, and

8    Derek Auito.

9        MS. GAZA:  Good afternoon, Your Honor, Anne

10    Gaza from Richards, Layton & Finger on behalf of the

11    Tatung defendants.

12        With me on the line is Fred Cottrell as well

080707hr1.TXT

13    as Frank Merideth, Valerie Ho, and Mark Kreisman from

14    the law firm of Greenberg Traurig.

15          MR. DANBERG:  Good afternoon, Your Honor.

16    Ed Danberg at Connolly, Bove.

17          With me is Manuel Nelson and Tracy Roman.

18          SPECIAL MASTER POPPITI:  Thank you very

19    much.

20          Let us use the agenda that was sent over

21    yesterday for purposes of addressing the issues

22    contained in that agenda.  The first on the agenda is

23    the status of LPL's supplemental document production to

24    ViewSonic, and that was covered in ViewSonic's 7/27

4

1    submission and LPL's 8/3 submission and in ViewSonic's

2    8/3 submission, and I have that marked as DM 37.

3          MR. NELSON:  Your Honor, I will be

4    addressing the issues on behalf of ViewSonic.  Shall I

5    proceed?

6          SPECIAL MASTER POPPITI:  Yes, please.

7          MR. NELSON:  Just to recap, Your Honor, how

8    we got here, on June 28th, we had a long hearing where

Page 4

080707hr1.TXT

9    you ordered LPL to produce documents in response to

10   various requests for production of documents from

11   ViewSonic.

12        On July 13th, we had a hearing because the

13   issue of burden of all that production came up and LPL

14   proposed, as a preliminary matter, to provide a limited

15   production and to see where we'd be based upon the

16   review of that limited production and Your Honor thought

17   that was an acceptable preliminary approach.

18        We have now received approximately 3,000

19   pages of production from LPL.  But where we filed

20   ourselves, Your Honor, is that, as you can see from the

21   correspondence that's attached as exhibits to our

22   submissions of August 3rd, we have identified somewhere

23   in the order of 250 pages of drawings that are either

24   illegible or very difficult to read, on the one hand,

5

1    and No. 2, while that's not necessarily explicitly

2    stated in our submission, those drawings that are

3    legible aren't -- do not provide sufficient details

4    regarding the physical characteristics of the modules

Page 5

080707hr1.TXT

5    for us to be able to determine with certainty where

6    fastening elements are on the rear side or from the

7    rearview of a module.

8          And what I mean by that is perhaps I see a

9    little circle with a cross in it that looks like a

10   Phillips head screw, but because that drawing may not

11   have a parts lists, there is no identification of that

12   being, in fact, a screw.  Because that particular image

13   is really a two-dimensional drawing from above the back,

14   you don't know what layer that screw, if it is a screw,

15   is placed; is it actually on the rear surface of the

16   module?  Does it connect the back light unit to the

17   module?  Or is it in an embedded layer?

18         So we are in a position where we actually

19   aren't able to discern the physical characteristics that

20   we need for this case.

21         So where that leads us today, Your Honor, is

22   we didn't submit all of the illegible documents for the

23   August 3rd submission because we didn't think we'd waste

24   your time looking at what's not legible.

6

080707hr1.TXT

1        SPECIAL MASTER POPPITI: I appreciate that.

2        MR. NELSON: What we want to propose, and

3    what we proposed to LPL, is what we really want are

4    samples of their products. The reason we want samples

5    is because there is no denying what the physical

6    characteristics of that particular module are once we

7    have the sample in our hand.

8        We have produced samples of our monitors to

9    LPL for inspection or purchase and we have done it for

10    somewhere in the order of 150 monitors. We are just

11    asking that they provide samples for the products that

12    they have identified in their documents.

13        We are going to still continue along with

14    the preliminary proposal that Your Honor accepted that

15    was made by LPL, but we'd like to add to that list of

16    what's being produced samples of the products, both the

17    prior art products and the products that were made,

18    sold, offered for sale after 1999.

19        And then, just to tie this together, I think

20    one of the issues might be whether we have actually a

21    request for production of samples. And I don't know if

22    Your Honor recalls, but during the June 28th hearing, we

23    discussed ViewSonic's request for production No. 128.

Page 7

080707hr1.TXT

24    And request for production No. 128 actually does request

7

1    samples.

2        At the time of the June 28th hearing, you

3    accepted LPL's objection that that request was overly

4    broad.  However, once we started going down the path of

5    narrowing the production because of burden on -- and

6    when we actually adopted LPL's position on July 13th, in

7    my opinion, and out of fairness, we should have actually

8    gone back and revisited request for production 128,

9    which involves the request for samples because, really,

10    without the samples, we have got a lot of documents that

11    are, A, either illegible, or, B, do not give us the

12    features that we need to be able to have our expert

13    identify what are the precise fastening elements or

14    items that could be fastening elements on the rear

15    surface of the LCD module.

16        That's the first part of our petition, is we

17    request samples of their products.

18        SPECIAL MASTER POPPITI:  Let me ask this

19    question:  I gather, based on the communication of the

Page 8

080707hr1.TXT

20    correspondence that I have read, and I expect, based on

21    what you are telling me now, that the clarity of the

22    production, on paper, is not going to improve?  Is that

23    what I am hearing LPL say?  What you have is what you

24    have given and the clarity is not going to get any

8

1    better with looking at other documents?

2          MR. CHRISTENSON:  Your Honor, the answer to

3    that question is yes in part and no in part.

4          In part, that's correct.  We have documents

5    for which we have produced the best available copies and

6    they show what they show and we cannot provide better

7    copies.  In some cases, we have been able to provide

8    better copies and we are in the process now of providing

9    additional better copies for certain pages that were

10    just recently identified by ViewSonic as being some of

11    the pages they say are not legible, and that's part of

12    the basis for them seeking module samples at this point.

13    So I think some of those issues are likely to be cured

14    but not all of those issues are likely to be cured.

15          I think it's also important to point out

Page 9

080707hr1.TXT

16    that the documents that we have do provide -- that we

17    have produced do provide the type of information that

18    was requested in the document request, and that

19    information relates to the parts of the modules that LPL

20    makes and how those modules are assembled.

21        SPECIAL MASTER POPPITI: Let me make an

22    observation about that, the last statement. I am

23    certainly not in a position, based on what I have been

24    given, to make that judgment, and nor would I expect,

9

1    and I could be wrong about this, that you want to be

2    sitting with me in a courtroom and literally pointing

3    and clicking to show me what you have just said because

4    I would expect that that labor, I would expect it would

5    be, No. 1, intense, and unnecessary; is that a fair

6    comment?

7        MR. CHRISTENSON: Your Honor, I think that

8    sounds like a fair comment. We would want to be as

9    efficient as we can be and I think your observations are

10    accurate.

11        SPECIAL MASTER POPPITI: So let me see if I

080707hr1.TXT

12    understand. You are making, and I want some definition

13    to this, you are making best efforts to give best copy,

14    and the roll out is not complete yet?

15         MR. CHRISTENSON: That's correct. We have

16    produced -- in some cases, we were able to go back for

17    documents identified initially by ViewSonic, we were

18    able to, essentially, reformat those documents on our

19    end and in a way that provided better resolution and

20    produce those copies.

21         Some documents are what they are. We don't

22    have any way to improve the legibility. Then there are

23    some additional documents recently identified that we

24    are going to reproduce in a different format that we

10

1    think would give better legibility.

2         SPECIAL MASTER POPPITI: And have you all

3    taken the opportunity to go through the documents for

4    purposes of determining that category, "They are what

5    they are," or is that yet to be done?

6         MR. CHRISTENSON: Your Honor, I believe that

7    those documents were identified by ViewSonic in a letter

Page 11

080707hr1.TXT

8    dated August 2nd at page 3.

9        SPECIAL MASTER POPPITI: Right.

10        MR. CHRISTENSON: And those are the

11    documents that we have been working to provide improved

12    copies.

13        SPECIAL MASTER POPPITI: I expect, and tell

14    me, from ViewSonic's perspective, that that process

15    should certainly continue, and I think I just heard both

16    of you saying that it is continuing and I expect you

17    both agree it should continue?

18        MR. NELSON: Yes. From ViewSonic's

19    perspective, the improved legibility should continue,

20    but that doesn't foreclose our need for samples. In

21    fact, if you could, I'd like to turn to Exhibit E of

22    LPL's August 3rd submission.

23        SPECIAL MASTER POPPITI: Exhibit E?

24        MR. NELSON: Yeah. We can actually start

11

1    with Exhibit C if you'd like.

2        SPECIAL MASTER POPPITI: I will start

3    wherever you tell me to start.

080707hr1.TXT

4        MR. NELSON: Why don't we start with Exhibit

5    C.

6        SPECIAL MASTER POPPITI: I am at Exhibit C

7    and that is correspondence dated July the 31st, 2007,

8    from Mr. Auito?

9        MR. NELSON: Correct. And in Exhibit C, you

10   will see that they produced replacement drawings for

11   roughly 40 pages we identified, 40 pages of drawings

12   that we identified. They were able to provide

13   replacement drawings. Just so Your Honor is aware, we

14   identified somewhere along the order of 77 pages of

15   drawings that needed to be replaced, but they were able

16   to replace 40 of those 77 drawings. The rest will not

17   be able to be replaced.

18        That bates span, if you notice, is LPL 21145

19   to 21187. That's the bates span of replacement

20   drawings, 21145 to 21187. It will include the No.

21   21152.

22        SPECIAL MASTER POPPITI: I see that.

23        MR. NELSON: If we turn to Exhibit E.

24        SPECIAL MASTER POPPITI: Okay.

Page 13

1        MR. NELSON:  Exhibit E is Bates No. 21152.

2    It's one of those replacement drawings.  This is the

3    best they are going to be able to produce with respect

4    to that drawing.

5        SPECIAL MASTER POPPITI:  I can tell you I

6    looked at it and I can tell you it wasn't, from this lay

7    person's eye, it wasn't very helpful, and I gather you

8    are telling me, from your trained eye, it's not helpful.

9        MR. NELSON:  Not only not helpful, there is

10    no date on the document, there's no model on the

11    document.  I can't tell where the screws are.  It's

12    absolutely not helpful.  The replacement documents not

13    going to save the day in this case.

14        And one other, if you would like me to point

15    out another example that's been submitted by LPL in

16    their exhibits, I will be glad to do so.

17        SPECIAL MASTER POPPITI:  Okay.

18        MR. NELSON:  If you want to turn to Exhibit

19    F, Your Honor, the very next exhibit, on August 3rd, we

20    have been -- I don't know if Your Honor recalls, we have

21    been requesting documents that showed the assembly of

22    LPL's modules for a long time now, and that's actually

080707hr1.TXT

23    the crux of why we want the samples is because we can't

24    tell how these modules are actually assembled from

13

1    two-dimensional figures.

2         Exhibit F is an example of a service manual

3    that they have just produced on August 3rd. If we turn

4    to what is page 10 of Exhibit F, pages 10 and 11.

5         SPECIAL MASTER POPPITI: I am there, 10 and

6    11.

7         MR. NELSON: 10 is the best exploded-view

8    document that they have ever produced, and 11 happens to

9    be the parts list that corresponds with that exploded

10    view, so it's helpful because we get to see that item

11    No. 7 in the exploded view is actually a screw and there

12    are a couple of the screws. So, this is actually a

13    reasonable document because it does actually break it

14    down into three dimensions and so we can tell what layer

15    that screw is on.

16         Unfortunately, Your Honor, we have been

17    advised that they only have nine of these service

18    manuals, that they have produced all of the service

080707hr1.TXT

19    manuals that correspond to the top 10 products that they

20    have since 1999, and just by simple arithmetic, that

21    would be somewhere on the order of more than 50

22    products, so they have produced nine service manuals,

23    and, of course, they don't have any service manuals for

24    any of the products that were sold prior to 1999 so that

14

1     would be prior art.

2            So, this is best document I have seen in

3     LPL's production, and I only have nine of them.

4            SPECIAL MASTER POPPITI:  Okay.  Well, then,

5     let's turn to the discussion from earlier in the day,

6     but please remind me what the -- I am looking at the

7     transcript where the request for production 128 was

8     dealt with, and if you would point me to the page

9     reference that I have already seen today, but,

10    unfortunately, I didn't --

11           MR. NELSON:  I didn't hear the question.  If

12    I would point to the page reference?

13           SPECIAL MASTER POPPITI:  Reference to where

14    128 was.

Page 16

080707hr1.TXT

15      MR. CHRISTENSON: Your Honor, that should

16   be, I believe, at page 128 into 129 of the transcript.

17      MR. NELSON: Your Honor, what you also want

18   to look at is the actual document request, itself.

19      SPECIAL MASTER POPPITI: I have that in

20   front of me.

21      MR. NELSON: Okay.

22      SPECIAL MASTER POPPITI: Let me make this

23   observation: I think it's fair to say that the context

24   of what we were doing when we were looking at the

15

1   theories 126, 127, and 128, it was for purposes of, No.

2   1, my making a ruling, and then it was also for the

3   purpose of you all taking those rulings, having some

4   discussion about the scope of the rulings, and coming up

5   with a path forward is No. 1; is that a fair statement

6   from your respective positions?

7      MR. CHRISTENSON: Your Honor, yes. On page

8   130 at the top, you clearly state, "I will require a

9   meet and confer on the scope of 126 and 127 but not with

10   respect to 128."

080707hr1.TXT

11        SPECIAL MASTER POPPITI: Correct.

12        MR. NELSON: Yes.

13        SPECIAL MASTER POPPITI: And I think it's

14   also fair to say that when we were looking at 128, and

15   looking at 128 now, 128, in its preamble phrase, if you

16   will, says, "All information from January 1, 1997," and,

17   by virtue of that language, I did make the ruling that,

18   with respect to all information, that was simply too

19   broad, it lacked precision, there was no definition, and

20   I wasn't going to entertain that. And I think that's

21   clear from the transcript.

22        What is also clear, by virtue of it not

23   being part of the transcript, unless somebody can point

24   me to the discussion that we had, and if we had it, I

16

1   simply don't recall it and I didn't comb the transcript

2   for purposes of finding it, there was no discussion in

3   this transcript of the last phrase in the interrogatory

4   which says, "Including a sample of each such flat panel

5   display device"; is that fair?

6        MR. NELSON: That's fair, Your Honor.

080707hr1.TXT

7        MR. CHRISTENSON:  Your Honor, I agree with

8    that as well, I think, and Mr. Miller, from ViewSonic,

9    at page 125, describes request 128 in terms of what was

10    being sought, and he refers to information relating to

11    etcetera, etcetera.

12        SPECIAL MASTER POPPITI:  Right.

13        MR. CHRISTENSON:  He does not refer there at

14    all to samples of modules and, presumably, that's why it

15    was not addressed.

16        SPECIAL MASTER POPPITI:  Right.  So, I mean,

17    I think, for purposes of the record that I am dealing

18    with, the issue with respect to the information, that

19    is, the documents that were being sought, was squarely

20    addressed, discussed, I disposed of it by virtue of

21    issuing a ruling, and with respect to the request for

22    the opportunity to have request samples, I didn't deal

23    with it.  It wasn't raised.

24        And if you want to be heard on that issue,


17

1    in other words, why is it unfair to raise the issue of

2    samples now given the fact that what we -- what I think

Page 19

080707hr1.TXT

3      I am faced with is not an insignificant amount of

4      documents that don't do what, perhaps, each of you

5      expect that they would do; why is it unfair to look at

6      the issue of samples?  And maybe it's not.  Maybe you

7      both agree it's not.  I know ViewSonic agrees it's not.

8            MR. CHRISTENSON:  Your Honor, from LPL's

9      perspective, I think that your premise there was that

10     both sides feel that our document production didn't do

11     what we had expected, but I respectfully disagree

12     because --

13           SPECIAL MASTER POPPITI:  How do I measure

14     that, Mr. Christenson, without sitting down with you and

15     whether, you know, whether it's going through the one

16     good one and the one that is indescribable to me, how

17     many of those do I have to see before I make a judgment

18     that we should be looking at samples here?  All of them?

19     A sampling of them?

20           MR. CHRISTENSON:  Your Honor, that is

21     actually a question that I discussed with ViewSonic:

22     What specific samples were they requesting from us?  And

23     they had stated they would clarify that.

24           Initially, in the July 27th submission to

Page 20

080707hr1.TXT

18

1    Your Honor from ViewSonic, on page 2 of that submission,

2    they are requesting samples for what they call prior art

3    products, which are the pre 1999 products.

4           SPECIAL MASTER POPPITI: Right.

5           MR. CHRISTENSON: And, so, we had

6    investigated that and determined that LPL does not

7    maintain an inventory, if you will, of old modules from

8    that time period where they could provide those modules.

9    And, so, the issue that was submitted to you on the July

10    27th letter, I think, is moot because we can't provide

11    the, what they call "prior art module samples."

12          They then, very recently, shifted gears away

13    from that and now they want us to produce samples,

14    apparently, for all the products since 1998 that are

15    reflected in our document production. But, you know,

16    the -- I think it's telling that their initial request

17    to Your Honor in the July 27th submission was for the

18    pre 1999 modules, and only when we determined we don't

19    have those did they then say they want the more recent

20    modules.

21          MS. ROMAN: Your Honor, this is Tracy Roman

Page 21

080707hr1.TXT

22   on behalf of ViewSonic.  Just to be fair, our July 27th

23   submission did make it clear that we were doing the best

24   we could to review the information that had been

19

1   produced at that point in time.

2          Naturally, our primary focus from that

3   information that had been produced was to start with the

4   prior art documents that had been produced.  And, so,

5   what we are giving you an update for in the July 27th

6   status report fell under a heading "Lack of information

7   regarding the prior art products."

8          At that time, based on what we could review,

9   we knew that the documents produced for the prior art

10   products were insufficient and that we'd have to be

11   looking at samples.

12          During the meet and confer that I had with

13   Mr. Christenson, he did inquire, Well, are you just

14   limiting this to prior art products?, because it's

15   unclear from your submission, or are you talking about

16   samples for all products?  So, there was an ambiguity on

17   both sides.  There was no clear understanding on their

Page 22

080707hr1.TXT

18    part that it was only going to be prior art products.

19          And I am sorry if it communicated that but

20    we did try to make it clear in our July 27th submission

21    that we weren't able to get through everything that had

22    been produced despite how fast we were trying to go

23    through it.

24          So, during that meet and confer, I did say

20

1    that I would look into that and try and clarify it

2    because I was not the one who had been reviewing the

3    documents, so it was unclear to me whether the documents

4    that had been produced relating to post patent filing

5    products were sufficient to disclose the information

6    that we needed to -- in order to resolve the issues for

7    the case.

8          SPECIAL MASTER POPPITI:  Mr. Christenson, I

9    don't see this as sandbagging.  I mean, this is

10    production that is coming at the time it's coming.  It's

11    production that I gather was difficult to get through

12    because some of it was simply not readable, whether "not

13    readable" means there was a lack of information or it

Page 23

080707hr1.TXT

14   was unclear or it was a bad copy, but it falls into the

15   category that it wasn't worth anything.

16        My concern is -- there are two observations

17   I will make. No. 1, I am satisfied that the issue of

18   samples is something that I didn't rule on. No. 2, I am

19   inclined to -- by "inclined," I will, after I have some

20   further discussion with you, provide the opportunity to

21   receive samples, and the path forward to that, I want

22   some degree of assurance here that either I am going to

23   have to dive into the production, with your respective

24   assistance, so I can see for myself, and I am just not

21

1   sure that that's a good utilization of your time, it's

2   not a good utilization of my time, and I am not sure

3   that the resources that you are going to spend on all of

4   that makes a great deal of sense.

5        I would prefer that you forge, and you know

6   I have done this before, some agreement with respect to

7   samples, understanding that I will make some decision

8   with respect to them, and if I have to tell you, on a

9   date certain not in the distant future, We have got to

080707hr1.TXT

10    gather in a courtroom and you have got to start pointing

11    and clicking for me, we are going to do that.

12         MR. CHRISTENSON:  Your Honor, I think I am

13    clear on what you expect and we are still waiting to

14    hear back from LPL to determine, you know, to what

15    extent the more recent products may exist in sample form

16    for which we can make a production.

17         I believe, my understanding is, but I'd like

18    to confirm this, that ViewSonic is amenable to paying

19    for the costs associated with the samples that we would

20    be producing?

21         MS. ROMAN:  That is correct.  And to

22    expedite it, Cass, if you just provide cost information

23    with a list of products that are available, that would

24    help to speed things along.

22

1         MR. CHRISTENSON:  So, Your Honor, we will

2    proceed as you suggested.  We will complete our

3    investigation to determine what is available as quickly

4    as we can and we will then promptly discuss that with

5    ViewSonic toward a resolution.

Page 25

080707hr1.TXT

6        SPECIAL MASTER POPPITI: My remaining

7    question, then, is: Do I need to establish some date

8    parameter, some deadline, some time frames to work

9    within? Do you all want to do that and get back to me

10   and tell me to determine what deadline or what the dates

11   forward are?

12       MS. ROMAN: Your Honor, it's difficult for

13   me to propose a date not knowing the difficulties that

14   Mr. Christenson faces with getting the information he

15   needs from his client. But as you are obviously well

16   aware, we have the August 28th filing for the opening

17   expert report and we do need this in advance of that so

18   our expert can do his evaluation and prepare the report,

19   so we'd certainly like it as quickly and expeditiously

20   as we can.

21       SPECIAL MASTER POPPITI: This is what I'd

22   like to be done: Mr. Christenson, if you could, in

23   communication with your client, discuss what we have

24   just talked about, and within the next several days,


23


1    after having communication with your client, propose a

Page 26

080707hr1.TXT

2    date when you believe you are going to be able to finish

3    the work, the date will be, in my view, a good faith

4    target, and if the date has to be flipped because it's

5    taking more time, then I am happy to hear that, that

6    it's taking more time and the date has to be flipped and

7    I will honor that taking you at your word.  But I think

8    it's important to establish some target date going

9    forward that represents that good faith effort because

10   of the deadline for expert reports that is rapidly

11   approaching.

12         MR. CHRISTENSON:  Your Honor, I certainly

13   will proceed as you just instructed.  I think that

14   sounds similar to the approach we took last time and we

15   were able to -- I think that worked successfully.

16         Are you asking for a date right now or are

17   you asking us to --

18         SPECIAL MASTER POPPITI:  I am asking you to

19   have conversation with your client, or with whomever you

20   need to talk with, about the information you need to

21   gather for purposes of determining what, if any, samples

22   are available.

23         MR. CHRISTENSON:  Yes, Your Honor.  So we

24   will do that very promptly, and then we can, we will set

Page 27

080707hr1.TXT

24

1    a timetable and we can make you aware of that.

2          MR. MERIDETH:  Just so it's clear, we are

3    talking about inclusive of prior art; am I correct?

4          SPECIAL MASTER POPPITI:  Thank you,

5    Mr. Merideth.

6          MR. CHRISTENSON:  Yes.  With respect to the

7    older models, which are the 1997, 1998 models, as I

8    stated before, there is no inventory of products from

9    which we could produce samples going back that far.

10         My understanding -- and that's an issue we

11   had initially investigated when we received the July 27

12   letter.  What I don't know right now is:  I am assuming

13   there is some recent product availability of samples.  I

14   just don't know the extent of that availability or how

15   far back it goes, but I am checking for the full time

16   period.

17         MR. MERIDETH:  I just want to make it clear

18   that the one product that we are particularly concerned

19   about, from Tatung's standpoint, is not the '97 or '98

20   product but is a 1996 product that we identified in our

                              Page 28

080707hr1.TXT

21    letter of August 3, 2007, and similar products from that

22    time period.

23          During the testimony of Mr. Kim, he

24    indicated that there was a library of products, and I

25

1    assume that you are going to check or have your client

2    check in that library of products, and if stuff has been

3    disposed of, we will have a log of when it was disposed

4    of, and we need to get that.

5          Obviously, this particular module, the

6    LC56N1, is a particularly important piece of prior art.

7    We were able to obtain a sample of that, and you can see

8    from the August 3rd letter how important the sample is

9    versus the incomplete drawing that was provided. And we

10   are assuming that you are going to go back and find that

11   data or tell us why it can't be found and/or has been

12   disposed of.

13          SPECIAL MASTER POPPITI: Mr. Christenson.

14          MR. CHRISTENSON: Yes, Your Honor. The --

15   as I said, we are going to look back for samples for the

16   entire time period. I will reconfirm as to the earlier

Page 29

080707hr1.TXT

17    products, and if Mr. Merideth could give us the citation

18    to the library of products that he referred to, that

19    would be helpful because I think he might be

20    misconstruing the testimony with respect to the

21    purported library of products. But we will work through

22    those issues, we will check with LPL, we will continue

23    our investigation as promptly as we can, and whatever we

24    can make available, we will try to work out with the

26

1     other side and reach a resolution very promptly.

2          SPECIAL MASTER POPPITI: What I do want is,

3     if there are any stumbling blocks along the way, I want

4     you to arrange for a teleconference to get me on the

5     line.

6          MR. MERIDETH: Very well, Your Honor.

7          SPECIAL MASTER POPPITI: Next.

8          MS. ROMAN: I think the next issue flows

9     directly from this very same conversation relates to

10    whether or not the defendants will be allowed to depose

11    a 30(b)(6) witness on behalf of LPL regarding the

12    documents that have been produced and the issues that

Case 1:04-cv-00343-JJF Document 799-13 Filed 10/01/2007 Page 32 of 51

080707hr1.TXT

13    arise out of those documents.

14         MR. CHRISTENSON: Your Honor, just to be

15    clear, this is an issue that we feel is not ripe for

16    discussion today. We don't think this is a part of the

17    document production set of issues that was submitted.

18    It's an issue that we have been trying to discuss and we

19    are continuing to discuss with the other side, but we

20    don't think we are at the point right now where it's

21    appropriate to submit to Your Honor because it's not

22    clear to us specifically all the issues that are being

23    sought for a deposition, No. 1, from ViewSonic. And we

24    had a discussion yesterday with ViewSonic where they

27

1    said that there are some topics that they think they

2    want to re-pursue with LPL that were previously the

3    subject of testimony, and then they also let us know

4    yesterday, for the first time, there may be additional

5    topics and additional deposition notices that they

6    intend to issue. We haven't seen any of that

7    information.

8         They have agreed to provide us the topics,
                      Page 31

080707hr1.TXT

9    but, so far, we don't have that information. We learned

10   yesterday, for the first time, that Tatung apparently

11   also seeks a deposition and we don't know anything about

12   the topics that Tatung is seeking testimony on.

13              MR. MERIDETH: I can clarify that.

14   Specifically, the topics that we feel that we are

15   entitled a 30(b)(6) testimony on are topic No. 8 and

16   topic No. 23 of the prior 30(b)(6) notices.

17              SPECIAL MASTER POPPITI: And I don't have

18   that in front of me, Mr. Merideth.

19              MR. MERIDETH: It refers specifically to

20   prior art.

21              SPECIAL MASTER POPPITI: Okay.

22              MR. MERIDETH: And Mr. Kim and Mr. Chung

23   were unable to adequately respond to those questions,

24   and, indeed, thought that one of the items of prior art

28

1    or suggested that one of the items of prior art was a

2    clock radio. And they were inadequate -- they were not

3    prepared to discuss these items and we were not in a

4    position to question them, obviously, because they

                    Page 32

080707hr1.TXT

5    hadn't produced the data.

6          We now have it, and it is very clear that,

7    at least as to this one product, the LCO56N1, that we

8    are entitled to question about that.

9          SPECIAL MASTER POPPITI:  Let me ask this

10   question, or perhaps make this observation:  I don't

11   think that there should be any question that the

12   production, as it is continuing, we all had this

13   conversation many, many months ago where I suggested to

14   you that I would not be surprised, No. 1, that there

15   would be a need for additional discovery, and I said

16   that I would be open to that.

17          It seems to me the best things to do, in

18   light of the deadline, is to, again, without knowing

19   what the topics are going to be, other than the two that

20   were just identified, is to set a deadline for there to

21   be some definition as to what you are all talking about

22   so that if there is a dispute, I can do whatever I need

23   to do to help to resolve the dispute.

24          I don't think I have the kind of information

29

Page 33

080707hr1.TXT

1    that would permit me to give other than a guidance or an

2    advisory, and I don't think that's appropriate.

3         I do think, however, that, given my

4    responsibility to manage, we should be talking about a

5    short time frame in terms of coming up with the topics,

6    of coming up with the time frame, and coming up with a

7    number of notices that are going to be issued.

8         MS. ROMAN: Your Honor, I don't disagree,

9    and this is why, during the meet and confer yesterday, I

10   agreed to work as quickly as I could to get those topics

11   pulled together for Mr. Christenson. As I did point out

12   to him, though, it's a little difficult to be all

13   inclusive about the topics without being, unfortunately,

14   overly broad, without knowing what the illegible

15   documents that are going to be replaced are going to

16   look like and what information they might yield or

17   questions they might raise.

18        That said, I think we had two issues during

19   our meet and confer and I think the only reason it was

20   actually being discussed with you today is because it

21   seemed like we were at a standstill as to whether a

22   deposition was even appropriate, period, regardless of

23   what the topics might be.

Page 34

080707hr1.TXT

24        We did identify categories or general

30

1    information topics in both our July 27 and our August

2    3rd submission, and the specific topics that we would

3    notice would fall within that scope, at least, and there

4    might be a couple of others, and those included not only

5    the issue of damages, the invalidity of the patent based

6    on the documents, potential inequitable conduct raised

7    by the documents, and the structure of products, the

8    knowledge of prior art, statements made to the

9    examiners, and, so, I have been going through our

10   previous deposition notices and pulling out the topics

11   that apply to that.  But they certainly fall within the

12   scope of at least those that we have listed in there.

13        And during our meet and confer, as I

14   understand it -- and, Mr. Christenson, certainly, please

15   correct me if I was wrong -- but if as I understood it,

16   there was certainly an objection to presenting any

17   witness for deposition based on the general topics that

18   we had put forth in those submissions, and I am not sure

19   providing topics that fall within the scope of that is

Page 35

080707hr1.TXT

20     going to get us any further along, but I am happy to

21     agree to provide that information by tomorrow with the

22     topics specifically noticed so that we can move this

23     issue along.

24          SPECIAL MASTER POPPITI:  Mr. Christenson.

31

1          MR. CHRISTENSON:  Yes.  It is helpful to see

2     what the topics are, as we had discussed, because,

3     depending on topic, No. 1, without knowing the topics,

4     it's hard for us to take a position, specifically, and

5     know what is or is not appropriate.  And, furthermore,

6     some of these topics we might be able to resolve short

7     of a deposition and that's something that we have

8     indicated we are willing to do.  You know, an obvious

9     example is related to authenticity of documents.

10          So I think it's important not to put the

11     cart before the horse and to know what are the topics

12     specifically and then we can discuss those topics and

13     see to what extent we can resolve the issues.

14          MS. ROMAN:  Well, I can provide you the

15     topics by close of business tomorrow California time.  I

080707hr1.TXT

16    can try to get it to you sooner, but I know that I have

17    got some people traveling that I have to communicate

18    with on this, so I will do my best to get it before

19    close of business, but certainly by close of business.

20            MR. MERIDETH:  We will cooperate with

21    Ms. Roman so we give one combined list.  I think it's

22    the easiest way to do it.

23            SPECIAL MASTER POPPITI:  That makes a great

24    deal of sense.  And turnaround to me, I want, again,

32

1    without setting any deadline, the message has to be it

2    has to happen quickly in light of the deadlines that are

3    rapidly approaching.  Okay?

4            MS. ROMAN:  In that regard, Cass, I am

5    available any day Thursday and Friday for a meet and

6    confer regarding it, so just let me know, once you have

7    had a chance to review the topics, we can make ourselves

8    available.

9            MR. CHRISTENSON:  Very good.  Thank you.

10            SPECIAL MASTER POPPITI:  The only thing you

11    may want to be considering, then, is we may want, and

Page 37

080707hr1.TXT

12    somebody remind me of this at the end of our work

13    together today, we may want to set a date, whether it's

14    called a status date or whether, call it what we want,

15    with me so that there is something to target, if you

16    will.

17        MS. ROMAN:  Yes, Your Honor.  I believe that

18    would be appropriate.  And I, unfortunately, think we

19    have to put it as early as Monday because if we are

20    going to have a deposition with a witness who is

21    overseas, we are going to need to be making plans and

22    scheduling things soon.

23        SPECIAL MASTER POPPITI:  Well, then, let's

24    just pause for a moment.  I can do Monday, the 13th.  It

33

1    would have to be later in the day and I am not going to

2    be able to do anything with whatever submittals you may

3    have until after Friday.  So if there were submittals

4    even late Friday, that's fine, or if you expect they are

5    going to be, not going to be significant in terms of the

6    amount of information, if you get them to me first thing

7    our time, on the East Coast, on the 13th, then I should

Page 38

080707hr1.TXT

8    have sufficient time to look at them and prepare for

9    something around 3:30 or 4:00 on the 13th.

10       MR. CHRISTENSON:  Your Honor, just so I

11   understand, working backwards, is the intent, then, to

12   try to have a discussion with you scheduled for

13   Monday --

14       SPECIAL MASTER POPPITI:  If there are issues

15   remaining, correct.

16       MR. CHRISTENSON:  And submissions, would you

17   want short submissions or do you have a preference as to

18   that?

19       SPECIAL MASTER POPPITI:  I think a short

20   submission the morning of should be sufficient.

21       MR. CHRISTENSON:  The morning of the 13th,

22   Your Honor?

23       SPECIAL MASTER POPPITI:  Yes, either the

24   morning of the 13th or close of business on the 17th

34

1    (sic).

2        MR. CHRISTENSON:  I just think it might

3    depend on when we are able to have the meet and confer

Page 39

080707hr1.TXT

4    and when we are able to really crystallize the issues

5    which might not be until the end of this week.

6          SPECIAL MASTER POPPITI:  That's fine.

7    That's why I am saying the 13th is fine.

8          MR. CHRISTENSON:  Very well.  Thank you,

9    Your Honor.

10         SPECIAL MASTER POPPITI:  Why don't we do

11   this, then:  We will schedule, be on the safe side and

12   schedule it at 4:30; does that give you more than enough

13   time, even after submissions, to try to discuss it?

14         MR. CHRISTENSON:  That's fine, Your Honor.

15   Thank you.

16         MS. ROMAN:  That time is fine for ViewSonic,

17   Your Honor.

18         SPECIAL MASTER POPPITI:  All right.  Next,

19   please.

20         MR. CHRISTENSON:  Your Honor, I don't know

21   if there are any other issues.  I think we have covered

22   the issues in ViewSonic's submission, and if that's

23   true, I can address LPL's submission concerning the OEM

24   documents.

Page 40

1        MS. ROMAN:  Yes, we believe the issues have

2    been covered.

3        SPECIAL MASTER POPPITI:  Okay.  Let me just

4    move some things aside.  Give me one moment, please.  I

5    am going to put you on mute.

6        The next is the status of ViewSonic

7    production of documents from OEMs.

8        MR. CHRISTENSON:  Yes, Your Honor.  This

9    relates to the documents that ViewSonic was ordered to

10   produce from its OEM suppliers, and the OEM suppliers,

11   as you may recall, are the companies that provide

12   ViewSonic with the display products that ViewSonic sells

13   in the United States which include various accused

14   products relevant to this case.

15       ViewSonic has taken the position that the

16   most relevant or most of the relevant documents that

17   relate to the assembly of their products and the issues

18   in this case are not in ViewSonic's direct custody, but,

19   rather, are in the possession of ViewSonic's OEMs.

20       And in February of 2007, Your Honor

21   concluded that, under the contracts between ViewSonic

22   and the OEMs, ViewSonic has control over the documents

080707hr1.TXT

23    by virtue of clear contractual provisions that provide

24    ViewSonic with the right to demand and obtain the

36

1    documents from its OEMs. Your Honor issued a ruling

2    concluding that ViewSonic should produce those documents

3    and that was appealed to the Court.

4        Recently, Judge Farnan has adopted Your

5    Honor's rulings and the reasoning set forth in your

6    rulings and confirmed that those documents should be

7    produced. The deadline for production was July 18, I

8    believe.

9        We received a very limited production

10    consisting of approximately 180 pages, all of which

11    related to a single OEM company, Arima, A-r-i-m-a,

12    Computer Corporation. There were approximately 17 other

13    OEM suppliers that ViewSonic contacted for all of the

14    other suppliers; however, we have not received any

15    document production, and for only one of those OEMs did

16    we receive any response to ViewSonic's request for

17    documents, and that was a -- we noted that in a

18    footnote.

080707hr1.TXT

19          One of the OEMs sent a letter to ViewSonic

20    refusing to produce documents, stating there was no

21    operative agreement between that OEM and ViewSonic.  But

22    for the other OEMs that were presumably contacted by

23    ViewSonic, there is no response that we have seen, at

24    least no written response.

37

1           ViewSonic originally produced copies of the

2     correspondence that were not signed or dated.  They

3     subsequently produced topics of what appear to be the

4     actual correspondence between ViewSonic and the OEMs,

5     and what we have determined, reviewing that

6     correspondence, is that ViewSonic -- we think that the

7     request for documents that ViewSonic sent to the OEMs is

8     not sufficient.  There is no question, at this point,

9     that ViewSonic has a contractual right to obtain the

10    documents.

11          I, in reviewing the record, it appears clear

12    to me that the expectation was that ViewSonic would make

13    a demand for the documents, and when we reviewed the

14    March 2007 letter, it was a form letter in March 2007

080707hr1.TXT

15    that ViewSonic sent, it is simply a request.  It's not a

16    true legal demand for documents.  It does not refer to,

17    specifically, the OEM agreement.  It does not

18    specifically invoke any rights under the agreement.

19            And, so, we feel -- and given the context of

20    the letter, which includes that ViewSonic was objecting,

21    that it states that the documents were due to be

22    produced in February, whereas, the letter was dated in

23    March, which suggests it could be construed as moot, and

24    for the other reasons we set forth in our August 3rd

38

1    letter to Your Honor, we feel that ViewSonic has not

2    taken sufficient steps to obtain the documents, and, so,

3    what we are asking is for Your Honor to require

4    ViewSonic to make a more appropriate and clear demand,

5    exercising the rights that they have under those

6    contracts, so that we can get these very important

7    documents that ViewSonic does not have.

8            We learned yesterday, from ViewSonic's

9    counsel, that, apparently, ViewSonic is in the process

10    of preparing a follow-up letter to the OEMs, but we

080707hr1.TXT

11    haven't seen that letter.  I am not sure if that letter

12    has gone out or not.  And we are very concerned, at this

13    point, with the status of the OEM production.

14            MS. ROMAN:  Your Honor, unfortunately, I did

15    indicate to Mr. Christenson, that, while I am trying to

16    confirm whether that second letter has gone out, the

17    general counsel for ViewSonic is traveling and I haven't

18    been able to get confirmation of it or not.  But this

19    was certainly one of the primary concerns at the time

20    when we discussed this at the, I believe it was the

21    January 3rd hearing, we were concerned with what was

22    going to happen once we requested the documents and the

23    OEMs chose to ignore us, that we would be in a difficult

24    position because how do we compel production of the

39

1    documents from the OEMs?

2            A letter that went out to the OEMs very

3    clearly stated, "While we intend to appeal this order,

4    we must collect and prepare the requested documents for

5    production.  Accordingly, ViewSonic hereby requests that

6    you immediately provide us with copies of all responsive

Page 45

080707hr1.TXT

7    documents for production, to wit, LPL, that relate to

8    any of the ViewSonic products set forth on the

9    accompanying lists." We even indicated to them that the

10   documents needed to be provided in their native format

11   and include any electronic data.

12         Certainly, the letter did not reference the

13   contract, but it didn't need to. Your Honor's order

14   clearly referenced the contract, and as Mr. Christenson

15   just pointed out, one of the OEMs did respond that he

16   had read through Your Honor's order, which was clearly

17   based on the existence of the written contract

18   compelling the production of the documents, and since no

19   contract existed, they weren't going to respond.

20         So, we believe that we have complied with

21   the order as it was written and that the follow-up after

22   it, that I have mentioned to Mr. Christenson, that I

23   believe was taking place to send another letter,

24   shouldn't determine whether or not the effort that has

40

1    already been made is already sufficient.

2         SPECIAL MASTER POPPITI: So you are

Page 46

3    suggesting I don't need to see the second letter?

4         MS. ROMAN: No, Your Honor. It's my

5    understanding that the second letter was simply a

6    follow-up based on the fact that the Court had accepted

7    Your Honor's report and recommendation and it was simply

8    to remind them that this had been done and that we

9    needed these documents.

10        I don't think, honestly, that it would have

11   made a difference for the production of the documents

12   given the very clear instruction in our first letter

13   which said we need to collect these and you need to

14   immediately provide us with copies of them and the lack

15   of response from the OEMs.

16        SPECIAL MASTER POPPITI: Well, let me

17   suggest this: I would expect that if any one of you,

18   any one of you that is involved with this

19   teleconference, were asked to make the demand or the

20   request consistent with an order of the Court, that we

21   would wind up with -- and I didn't count the number of

22   us participating -- we would wind up with a different

23   product from each one of us.

24        Some may couch it in terms of, I demand it

080707hr1.TXT

41

1    by virtue of our contractual relationship; some may

2    couch it in terms of, Here is the Court's order, send it

3    to me.

4            My concern, as articulated in the January

5    3rd hearing, as quoted in LPL's correspondence of August

6    3rd, and I expect it would be helpful to read it for

7    purposes of today's record -- and I realize this is only

8    a part of it and I did not go back to the January 3rd

9    hearing to revisit any of other language; if you think

10   it's important to do that, then please point out that

11   language and I will pull the transcript -- but the

12   language quoted in LPL's letter for submittal of August

13   3rd, This ends up back on my desk with respect to the

14   third parties abrogating their responsibility under the

15   contract.  The only thing I certainly would expect I

16   would kindly ask for is the nature of the request made

17   and the expect that the nature of the request is a pure

18   and simple request.  There is nothing that is in the

19   file or the developed file which would suggest that

20   ViewSonic is standing in the way of that production

21   and/or suggesting that the OEM be accountable.

Page 48

080707hr1.TXT

22         I don't see anything in this letter of

23    ViewSonic soft balling it.  I don't know that, by virtue

24    of ViewSonic adding a phrase to say, By the way, you are

42

1    required to do it under our contract, adds anything to

2    the letter because the order reviewed all of that.  So,

3    I am not -- on the record that I have before me, I am

4    satisfied that an appropriate request was made, request,

5    demand, I don't really see that there be any difference

6    in the context of the way this is teed up.

7         I'd like to see the second request for

8    purposes of seeing what the follow-up was.  If the

9    follow-up is consistent in its language with its first

10    request, then I think it just buttresses my view that

11    the -- it is what it is.  It's one step removed.  I

12    expect that ViewSonic could force an issue independent

13    of this court action somewhere else, but I don't -- I

14    didn't contemplate that and I really don't anticipate

15    that Judge Farnan would have contemplated that by virtue

16    of accepting my findings and recommendations.

17         So, on this record, I am not convinced that

Page 49

080707hr1.TXT

18    ViewSonic didn't make an appropriate effort to get the

19    information from the OEM.

20        I do, however, want to see the follow-up.

21        MS. ROMAN:  Your Honor, I will get the

22    follow-up, as I told Mr. Christenson, as soon as I can

23    get it; I will produce it to him as well, and I will

24    continue making those efforts today to get it as soon as

43

1    possible.  The truth is, Your Honor, I don't even know

2    if the follow-up letter has even gone out --

3        SPECIAL MASTER POPPITI:  Okay.

4        MS. ROMAN:  -- given the general counsel's

5    traveling, and I don't know if he has been able to

6    authorize it being sent.

7        SPECIAL MASTER POPPITI:  I understand.  I'd

8    like to see whatever is done.

9        MS. ROMAN:  Yes, Your Honor.

10        SPECIAL MASTER POPPITI:  Just a moment.

11        Next, please.

12        MS. BRZEZYNSKI:  I believe the next issue is

13    LPL's request for a protective order relating to