080707hr1.TXT

14    Tatung's request for a deposition of Rebecca Rudich, an

15    attorney with the law firm of McKenna, Long & Aldridge.

16        May I proceed?

17        SPECIAL MASTER POPPITI:  Sure.

18        MS. BRZEZYNSKI:  Your Honor, LPL moves for a

19    protective order because Rebecca Rudich's proposed

20    deposition has grown from a very well limited one issue

21    deposition where Tatung initially said it was willing to

22    accept a declaration to what has essentially become a

23    fishing expedition for inequitable conduct in areas

24    where Ms. Rudich does not have any relevant information

44

1    at all.

2        A brief review of the history, I think, is

3    necessary here.  Tatung initially noticed Miss Rudich's

4    deposition on March 1st of this year relating solely to

5    its unfounded allegations that McKenna, Long & Aldridge

6    violated the protective order in this case.  As Your

7    Honor is aware, MLA, my firm, spent considerable time

8    and expense responding to those unfounded allegations

9    and providing privileged documents for in camera review.

080707hr1.TXT

10    That resulted in a ruling by Your Honor that MLA had not

11    violated the protective order.

12        During that process, MLA clearly opposed the

13    taking of Miss Rudich's deposition and Tatung withdraw

14    its subpoena of Miss Rudich. That was clearly stated by

15    Mr. Merideth on the record and then confirmed by him in

16    his March 16th letter, which is Exhibit D to Tatung's

17    submission attached to his 8/1 letter.

18        In that March 16th letter, however, Tatung

19    did state, in the second paragraph, that it still needed

20    testimony from Rebecca Rudich on, quote, one very

21    limited issue, end quote. The letter went on to say

22    that, quote, The testimony will be limited to her

23    responses to a specific PTO Office action regarding the

24    '079 patent related to an IBM product, end quote.

45

1        The letter also stated that Tatung was

2    willing to accept the declaration in lieu of a

3    deposition. Tatung offered to provide a draft

4    declaration of what it wanted and we received that draft

5    declaration on March 29th. That draft declaration sent

080707hr1.TXT

6    by Mr. Merideth is both Exhibit F to Tatung's submission

7    and Exhibit 1 to LPL's August 1st submission.

8        SPECIAL MASTER POPPITI:  I have reviewed

9    that.

10       MS. BRZEZYNSKI:  Then, as you can see, Your

11   Honor, that draft declaration was solely limited to

12   Ms. Rudich's response to its 2006 Office action in the

13   '079 application and an identification of what

14   Ms. Rudich meant as "rear tray" in an IBM 9516 product,

15   and that's it.

16       That declaration did not include any

17   reference to what Ms. Rudich meant by spot mounting.  In

18   fact, there was nothing further in that draft

19   declaration about any other aspect of the '079 patent

20   prosecution.

21       There also was never any suggestion, in that

22   declaration or otherwise, that Miss Rudich would be

23   asked about the prosecution of the patents-in-suit.

24   There was also no suggestion or reference in that draft

46

1    declaration that Tatung wanted to ask her, Ms. Rudich,

Page 53

080707hr1.TXT

2    about any potential prior art other than the IBM 9516

3    product.

4        All along, for months, a declaration was

5    only ever limited to the identification of the term

6    "rear tray" relating to the Office action response and

7    '079 continuation application.

8        Even when you look at the two declarations

9    submitted by LPL, which are Exhibits 4 and 6 to LPL's

10   August 1st submission, you reach the same conclusion.

11       I will add here that LPL does take serious

12   issue with the statement made by Tatung in its August

13   1st letter that it was, quote, strung along by LPL who,

14   apparently, had never intention of ever agreeing to a

15   meaningful declaration or deposition, end quote.

16       That statement cannot be anymore false and

17   it's frankly unacceptable that that sentence was

18   included in Tatung's submission given the history of LPL

19   working very quickly to submit revised declarations to

20   Tatung for its review.

21       First, LPL sent a draft declaration on April

22   23rd, after first sending comments to Tatung, which

23   Tatung then responded one day later and said that it was

24   concerned -- excuse me, three days later, on April 26th,

Page 54

080707hr1.TXT

47

1    that it was concerned that LPL's initial draft contained

2    subjective observations and commentary by Ms. Rudich.

3    We then removed all subjective observations and

4    commentary at Tatung's request and sent a revised draft

5    just one day later, on April 27th.

6        Again, that declaration, like all prior

7    declarations, focused solely on the Office action

8    response and an identification of what Ms. Rudich meant

9    by "rear tray," and that's it.

10        Now, months later, after the close of

11    discovery, Tatung has increased the scope of the

12    requested deposition even though they withdrew their

13    deposition subpoena. Their 8/1 submission requesting a

14    much broader deposition is not only untimely but,

15    frankly, it is easily dispensed with.

16        As you look at the 8/1 submission, and, Your

17    Honor, for the first time, Tatung seeks testimony from

18    Miss Rudich relating to the prosecution history for the

19    patents-in-suit.

20        Tatung has a fundamental misunderstanding.

Page 55

080707hr1.TXT

21    Rebecca Rudich did not prosecute the patents-in-suit.

22    Tatung must have known this since at least 2005, the

23    patent prosecution history documents, those are public

24    records. Their initial disclosures filed on July 29th,

48

1     2005, identified Sung Jung and three other attorneys or

2     patent agents formerly with McKenna, or its predecessor

3     firm, in addition to Rebecca Rudich as prosecuting

4     attorneys.

5         SPECIAL MASTER POPPITI: Did she not

6     supervise?

7         MS. BRZEZYNSKI: No, not this. This is what

8     she did, and I will tell you exactly what she did. She

9     was not the supervisor for the patents-in-suit, Your

10    Honor. It was Sung Jung and Tatung must have known

11    this.

12            If they wanted, at any time, to depose the

13    prosecuting attorney for these patents-in-suit, it

14    should have noticed the deposition of one of the

15    prosecuting attorneys and it never did so.

16            We have never represented that Rebecca

Page 56

080707hr1.TXT

17    Rudich prosecuted the patents-in-suit.  What she did,

18    and we went back to verify that we were actually

19    correct, she only signed three documents in each of the

20    patents-in-suit, and I will tell you exactly what they

21    were.  One was a change of address form that was

22    submitted in each patent case after our merger, so that

23    was submitted and signed by her as she did for many,

24    many cases.

49

1            The second was a non-substantive notice of

2    appeal filed in each of the two patent cases,

3    patents-in-suit.  There, she signed them for Sung Jung

4    because the deadline was nearing and Sung, who had

5    directed its preparation of that notice of appeal, was

6    unavailable.  She did not prepare it.  She did not

7    direct its preparation.

8            The third is she signed -- she signed only

9    one substantive document in each case, and that was a

10    primary amendment signed in March 2002.  It was actually

11    attached by Tatung to its submission.

12            As you can see, she signed that over Sung

Page 57

080707hr1.TXT

13    Jung's signature block because he was not available.

14    That document was either prepared by Mr. Jung or for him

15    at his direction. Rebecca Rudich was not involved in

16    the preparation of that document at all.

17        Then we have, Your Honor, Tatung's letter of

18    8/3. It's a second submission. I submit to you, Your

19    Honor, that Your Honor should disregard that submission

20    as untimely. The deadline is clearly 8/1, two days

21    earlier. Although Tatung states in that letter that it

22    obtained an LPL module on or about August 2nd, 2007, I

23    frankly find that terminology curious "on or about,"

24    either they received that product one day earlier or

50

1    they didn't.

2        Regardless of that fact, Your Honor, LPL

3    simply disputes the allegation in that 8/3 submission

4    and disagrees that, regarding the relevance of the LPL

5    product. Regardless, Rebecca Rudich's deposition

6    relating to that LPL product is entirely not relevant or

7    necessary. Rebecca Rudich did not prosecute the

8    patents-in-suit and she never knew about that LPL

Page 58

080707hr1.TXT

9   LC056N1 module listed in the letter.

10      We are agreeable to offering a simple

11   declaration that says that she never knew about that

12   module if that will suffice.

13      Accordingly, Tatung's request, in its August

14   3rd letter to depose Rebecca Rudich regarding, quote,

15   her knowledge of LG products that practiced the claimed

16   invention, any investigation she performed and her

17   general custom and practice when prosecuting patents,

18   among other things, end quote, should be denied.  She

19   can't answer those questions if she did not prosecute

20   the patents-in-suit.

21      Tatung never noticed the depositions of any

22   of the prosecution attorneys and it cannot legitimately

23   claim that it ever intended to ask Rebecca Rudich about

24   these issues.

51

1      SPECIAL MASTER POPPITI:  Let me just ask you

2   a question about process for a moment because I don't

3   have, in mind, all of the documents that you just

4   referred to in terms of what Rebecca Rudich did or

Page 59

080707hr1.TXT

5    didn't do with the Patent Office. If they are in front

6    of me in these applications, point me to them.

7         MS. BRZEZYNSKI: Sure, Your Honor. I will

8    point you to the only substantive document that Rebecca

9    ever signed relating to the prosecution of the

10   patents-in-suit are attached as Exhibits B and C to

11   Tatung's submission.

12        SPECIAL MASTER POPPITI: Let me just pause

13   and look at those for a moment.

14        MS. BRZEZYNSKI: Sure.

15        SPECIAL MASTER POPPITI: The submission of

16   August 3rd, 2007 --

17        MS. BRZEZYNSKI: Not the August 3rd, Your

18   Honor. The August 1 submission.

19        SPECIAL MASTER POPPITI: It's the August 1

20   submission. I had the August 3rd on top of it.

21        You would agree with me that, to the extent

22   that she signed that document, she was prosecuting, at

23   least, part, the application?

24        MS. BRZEZYNSKI: Your Honor, I can only

52

080707hr1.TXT

1     represent to you what I have been told, that she did not

2     prosecute this application.  She merely signed it on

3     Sung's behalf because he was not available to sign that

4     day when it was finalized.

5          She did not in any way prepare that

6     amendment.  She did not direct its preparation.  She did

7     not comment on its preparation.  She simply signed it

8     for Sung because he was absent.

9          SPECIAL MASTER POPPITI:  But, counsel --

10          MS. BRZEZYNSKI:  That's all I can tell you.

11     She cannot offer any testimony relating to that

12     amendment, why it was drafted, why it was prepared at

13     all.

14          SPECIAL MASTER POPPITI:  Well, she may have

15     -- she may be in a position to say that, and perhaps it

16     would be better for me to be even better informed about

17     what a patent prosecutor does.  But I just have to

18     expect that when you sign a document, through the United

19     States Patent Office, is it any different from, if you

20     will, local counsel signing a document that may be

21     prepared by another office?  Everyone certainly

22     understands, at this Bar, that local counsel, when doing

23     that, certifies that everything in there is correct and

Page 61

080707hr1.TXT

24    accurate, in substance, certifies that it's been read

53

1    and understood, and, if necessary, would be called upon

2    to answer questions about it if lead is not able to, or

3    even if lead is there. The Court has the right to look

4    to local counsel -- and, please, my friends at the Bar,

5    tell me if you think this is inaccurate -- and say, What

6    do you mean by that?

7        MS. BRZEZYNSKI: I understand your point,

8    Your Honor. I can only add, based on what I understand,

9    is that it was represented to her that this was complete

10   and needed to be filed that day, Mr. Jung was not

11   available, and she signed on his behalf. That's all I

12   can say.

13       Stepping back from that, Your Honor, Tatung

14   has known all along that the attorneys primarily

15   prosecuting this patent -- these patents-in-suit, it's

16   not Rebecca Rudich. They can see from the patent

17   prosecution history that it's Mr. Jung's name, as well

18   as the name of one of our former associates, Ken

19   Springer, that primarily prosecuted these

Page 62

080707hr1.TXT

20    patents-in-suit and not Rebecca Rudich.

21        This is an after the fact untimely attempt

22    by Tatung to unfairly broaden the scope of a deposition

23    request that they withdrew months and months earlier.

24        If Tatung, at some point, wanted to depose

54

1    the prosecuting attorney, they could have informed us,

2    they could have noticed that deposition, and requested

3    and took the deposition of the prosecuting attorney. I

4    mean, they identified Sung Jung, as well as all the

5    other attorneys that signed documents in their initial

6    disclosures. They were aware of Sung Jung, Kenneth

7    Springer, and the other attorneys.

8        SPECIAL MASTER POPPITI: Let me ask this

9    question, and I don't want to dwell on this, but

10    somebody remind me, if you will, when I was dealing with

11    an issue involving Rebecca Rudich, as was described

12    earlier, am I correct in recalling that, as part of a

13    declaration that she signed, that she described, in some

14    words, that she supervised prosecution work?

15        MS. BRZEZYNSKI: She does generally

Page 63

080707hr1.TXT

16    supervise prosecution work, Your Honor, but not for the

17    patents-in-suit. We prosecute a very large number of

18    patents --

19        SPECIAL MASTER POPPITI: Sure.

20        MS. BRZEZYNSKI: -- at this firm. She has

21    been involved in the continuation application, '079

22    continuation application. She was not involved in the

23    prosecution of the patents-in-suit, however.

24        SPECIAL MASTER POPPITI: Let's focus on the

55

1    fact, then, that she was -- she did prosecute a

2    continuation patent, and maybe I should be hearing from

3    Tatung's point of view what responsibility Rebecca

4    Rudich has when she is prosecuting a continuation patent

5    with respect to its parent because I don't know that

6    that's been developed in the papers; is that an

7    appropriate question?

8        MS. BRZEZYNSKI: You are correct, Your

9    Honor, that has not been developed in the papers at all.

10    That also has not been requested by Tatung until its 8/1

11    submission. Prior to that date, they only ever

Page 64

080707hr1.TXT

12    requested information with regard to one Office action

13    response and her identification of the words "rear

14    tray." That's it.

15         SPECIAL MASTER POPPITI: Let's take that

16    piece and let me hear from Tatung.

17         MR. MERIDETH: Yes, Your Honor. It is

18    correct that, initially, we indicated that the

19    deposition of Ms. Rudich would be taken with respect to

20    the IBM reference that she made with respect to the '079

21    application because, at that time, that was the only

22    item of prior art that we were aware of.

23         Since that time, two items of prior art have

24    surfaced, which is the 500 LC, and, most recently, the

56

1    module that is attached to the August 3rd letter, the

2    LC056N1.

3         SPECIAL MASTER POPPITI: Right.

4         MR. MERIDETH: And it is our view that,

5    particularly the latter document, which was only

6    produced a couple of weeks ago, are ripe for

7    examination. We happen to believe that Ms. Rudich has

Page 65

080707hr1.TXT

8    supervised the filing of patents; she has been involved

9    in at least two substantive filings with respect to the

10    patents-in-suit; she should know what the policies are

11    with respect to investigation of prior art.

12              If she is unaware of any investigation that

13    was done, if she is unaware of any policy with respect

14    to investigation, and if she doesn't know anything about

15    either the 500 LC or about the August 3 identified

16    module, then she can say so.  But I believe that we are

17    entitled to take her deposition because I believe that

18    that, in addition to the issue of the IBM module, is

19    crucial testimony with respect to both the infringement

20    issues and with respect to the issue of inequitable

21    conduct.

22              SPECIAL MASTER POPPITI:  Let me --

23              MR. MERIDETH:  I want to add one other

24    thing, that is, within the past two weeks, Miss Rudich

57

1    has filed a further disclosure with respect to the '079

2    application in which she has listed other prior art that

3    we have identified in our interrogatory responses,

Page 66

080707hr1.TXT

4    including the Sharp modules, which are in -- I think

5    within the past month, excuse me, which are very, very

6    similar in design to the "N module," if we want to call

7    it that, and it, except that the August 3rd pictures, as

8    you see, indicate that there is a stand off in the back,

9    the first frame of that module.

10    So, we believe that the fact that she has

11    filed this further disclosure is, again, another area

12    that we would want to inquire and to find out, for

13    example, why she disclosed the Sharp modules but did not

14    disclose this particular module.

15    SPECIAL MASTER POPPITI:  Let me ask a

16    question because I, quite frankly, got a wee bit

17    distracted when I was reading the response to the Patent

18    Office action in light of the history of the

19    declarations that has been described for me.  And maybe

20    this means nothing, and if it does, somebody tell me

21    that it doesn't mean anything, but one of the issues

22    that I think Tatung has raised is the question as it

23    relates to impeachment, if you will, of LPL's position.

24    Let me ask this question:  You find the

080707hr1.TXT
58

1    initial declaration was found to be unacceptable by LPL

2    was based on, as I understand it, the assertion that

3    Miss Rudich did not have the benefit of a device to

4    examine and was not using photographs for purposes of

5    responding to the Patent Office action; am I correct so

6    far?

7          MR. MERIDETH:  I don't believe so, Your

8    Honor.  I believe she did have photographs, and one of

9    the reasons that there was a hiatus in the exchanges of

10   the declarations was because we were provided with

11   copies of those photographs which were merely a

12   photocopy of photographs and they were black and white

13   and you couldn't make out the photograph, and

14   Mr. Ambrozy indicated that he would obtain better

15   copies, which he ultimately did, about a week before my

16   final letter to him, and, so, she did examine

17   photographs.

18         SPECIAL MASTER POPPITI:  I may have been

19   mistaken.  But with respect to the device, not having

20   the opportunity to look at the device, that was part of

21   the concern; is that fair?

22         MS. BRZEZYNSKI:  That's absolutely correct,

Page 68

080707hr1.TXT

23    Your Honor.  Our two concerns were Rebecca Rudich did

24    not look at any actual device when preparing the Office

59

1     action response, and the other concern was along the

2     lines that you said, she did not view the photographs

3     that Mr. Merideth had submitted with his draft

4     declaration, which were different photographs, different

5     labels --

6             SPECIAL MASTER POPPITI:  Then I was, at

7     least I remembered something about the photographs by

8     virtue of asking the question.

9             MS. BRZEZYNSKI:  Yes.

10            SPECIAL MASTER POPPITI:  Let me tell you

11    what troubled me:  I expect you all have her remarks in

12    front of you; if not, would you please put them in front

13    of you.

14            MS. BRZEZYNSKI:  By "remarks," which draft

15    declaration, Your Honor?

16            SPECIAL MASTER POPPITI:  I am looking

17    behind this one submission at Exhibit E and I am looking

18    at page 6 of the United States Patent --

Page 69

080707hr1.TXT

19         MS. BRZEZYNSKI:  Your Honor, you cut off.

20    Which exhibit, please?

21         SPECIAL MASTER POPPITI:  Start you at page 6

22    of that exhibit.

23         MS. BRZEZYNSKI:  Which exhibit again?

24         SPECIAL MASTER POPPITI:  "E" as in Edward.


60

1          MS. BRZEZYNSKI:  "E" as in Edward.  Thank

2     you.  Page 6?

3          SPECIAL MASTER POPPITI:  Are you both there?

4          MS. BRZEZYNSKI:  Yes, I am, Your Honor.

5          SPECIAL MASTER POPPITI:  Mr. Merideth?

6          MR. MERIDETH:  Yes, Your Honor.

7          SPECIAL MASTER POPPITI:  Bottom of page 6,

8     and I will just start, for purposes of context, with the

9     sentence that begins, "So nothing in the IBM 9516

10    teaches or suggests the first frame being fixed to the

11    rear part of the housing.  Applicants refer the examiner

12    to the cited figure on page 9 of the IBM 9516 reference.

13    At best, the figure shows the screws, two, go through

14    the back cover from the back to the front.  There is no

080707hr1.TXT

15    teaching or suggestion that there is any fixing at the

16    first frame."

17          The next sentence reads, "And, in fact, in

18    the physical device, the fixings occur at the front

19    housing of the IBM 9516."

20          If you will also look at page 7 of

21    Miss Rudich's remarks, second full paragraph, the last

22    four sentences of that paragraph virtually mirror what I

23    just read to you.  I can tell you that when I read that,

24    in the context of the -- of looking at the

61

1    representation that she did not have a device from which

2    to make these remarks, and I read twice, and, in fact,

3    in the physical device, there is no such fixing of the

4    rear frame to the rear portion of the housing of the IBM

5    9516, I had to sit up and read it several different

6    times.

7          MS. BRZEZYNSKI:  Your Honor, I understand.

8    I asked Ms. Rudich that question and she says that she

9    did not have the device, she has not seen the device,

10    she was relying solely on the reference documents, the

080707hr1.TXT

11    IBM 9516 reference document, and also the pictures that

12    she had of the device, the pictures of the physical

13    device that she saw at the time.

14         SPECIAL MASTER POPPITI:  Mr. Merideth.

15         MR. MERIDETH:  I think she had the device,

16    Your Honor, as I put in the original declaration.

17         MS. BRZEZYNSKI:  Oh, come on.  We have

18    represented that she doesn't have the device.  She is

19    willing to sign a declaration to that effect.

20         SPECIAL MASTER POPPITI:  Counsel, "Oh, come

21    on" is not part of an argument that gets made in

22    Delaware.

23         MS. BRZEZYNSKI:  I apologize, Your Honor.

24         SPECIAL MASTER POPPITI:  Thank you.

62

1         MR. MERIDETH:  I think that is an issue,

2    Your Honor, which needs to be addressed.

3         SPECIAL MASTER POPPITI:  Mr. Merideth, just

4    a second.  It's one that I raised; Mr. Merideth didn't.

5    It's one that I told you I paused over and read several

6    times.  If she didn't have the device, but whether she

080707hr1.TXT

7    did have the device, there is a sentence in there that,

8    at least if you say that she didn't, is unclear to me,

9    and if it is unclear and there is an issue with respect

10   to the candor of the Patent Office, and we will talk

11   about that in a moment, or if there is an issue with

12   respect to impeachment of LPL's position as it relates

13   to infringement or patentability, she was involved in

14   the patent prosecution of this continuation patent, was

15   she not?

16        MS. BRZEZYNSKI:  She certainly was, Your

17   Honor.

18        SPECIAL MASTER POPPITI:  And that statement

19   in that document is either crystal clear, and if it's

20   crystal clear, it says to me that she is looking at a

21   device, and if it's not, she should be able to explain

22   it, shouldn't she?

23        MS. BRZEZYNSKI:  And she has attempted to do

24   so through her declarations that she's submitted.

63

1        SPECIAL MASTER POPPITI:  Then why is the

2    declaration -- I understand the whole process of wanting

Page 73

080707hr1.TXT

3    to streamline this whole effort, but if, ultimately, a

4    declaration is not acceptable and if it's not acceptable

5    because there are issues that need to be explored, why

6    is that a problem?

7        MS. BRZEZYNSKI: Your Honor, Tatung has

8    never indicated that it was concerned with that

9    sentence. In fact, when Miss Rudich, in her first draft

10    declaration, included, you know, discussion as to why

11    she used certain terms, they wanted those references

12    removed from her declaration. They didn't want her --

13        SPECIAL MASTER POPPITI: I understand that.

14    I understand why you wouldn't want that kind of

15    information in the declaration. You can't cross-examine

16    it.

17        MS. BRZEZYNSKI: I understand. So we have

18    removed that. They have never raised this issue. We

19    are willing to provide a declaration in response to any

20    questions they have relating to this Office action.

21        They only ever raised the term "rear tray,"

22    Your Honor. They never raised anything else at all.

23        Now, Mr. Merideth --

24        SPECIAL MASTER POPPITI: That's an

Page 74

080707hr1.TXT

64

1    appropriate reflection of the history, is it not?

2        MR. MERIDETH:  Your Honor, the initial draft

3    declaration that I prepared talked about her examination

4    of the physical device because I believed, based upon

5    the Office action response, that she had, in fact,

6    examined the physical device.

7        One of the things that she said in response

8    to that initial declaration, or Miss Brzezynski said,

9    was that she didn't have a physical device in her

10    presence.  I find that hard to believe.  I think it is

11    at least irresponsible to make the types of

12    representations that she made.  If she didn't have the

13    physical device in her possession, it certainly suggests

14    that she had the physical device in her presence.

15        One of the reasons why we believe that the

16    declaration is not sufficient is because we will not

17    have an opportunity, or we would not have an opportunity

18    to cross-examine her with respect to the various

19    statements that she's made.  And I don't know what she

20    is going to say, but I believe that my client has a

21    right to cross-examine her about what she did say and

080707hr1.TXT

22    about what she knew at the time and what her purpose was

23    in describing the physical device and the two references

24    that you made that certainly brought me to that

65

1    conclusion which is reflected in the original

2    declaration that I prepared.  And if she didn't look at

3    a physical device, she certainly still described

4    something that we could use to impeach the testimony.

5         SPECIAL MASTER POPPITI:  You just faded out,

6    Mr. Merideth.  I lost your last phrase.

7         MR. MERIDETH:  She says that the IBM

8    reference is a front mounted device.

9         SPECIAL MASTER POPPITI:  Yes, she does.

10         MR. MERIDETH:  And in her responsive

11    declaration, she tries to back off that position by

12    saying what she really meant was that the tray was the

13    first frame and blah, blah, blah, blah.  Well, that

14    isn't what she said.  And I believe that I have a right

15    to cross-examine her as to what she did say.

16         To the extent that she is going to be called

17    upon as a witness in the trial and is going to testify

080707hr1.TXT

18    that she meant something other than what she said, or

19    the argument is going to be made that what she said is

20    ambiguous, I have a right, or I should have a right to

21    cross-examine her as to what exactly she said and what

22    she meant at the time because I think it's very

23    important.

24        Now, we are going to have Mr. Bohannon

66

1    saying that the method that Tatung uses to mount its

2    modules infringes the patent because it's rear mounted

3    and the method that is used is virtually identical to

4    the method that she describes, that is, the screws go

5    from the back of the case through the LCD bracket, which

6    is what she calls a "tray," through the first frame, and

7    into the front case or front housing.  And she says

8    that's front mounting and Mr. Bohannon says that's rear

9    mounting.  It seems to me that we are entitled to get

10    her testimony on that subject.

11        She was LPL's representative making a

12    representation under the circumstances of a patent

13    prosecutor to a PTO.

080707hr1.TXT

14          MS. BRZEZYNSKI: Your Honor, may I respond?

15          SPECIAL MASTER POPPITI: Sure.

16          MS. BRZEZYNSKI: First, just so the record

17    is clear, we advised Mr. Merideth on April 3rd that

18    Miss Rudich never viewed a device. On that same day,

19    Mr. Merideth responded by e-mail, and that e-mail is

20    attached as Exhibit 3 to LPL's submission, he

21    acknowledges in that letter that he had assumed that

22    Rudich had an IBM 9516. If she did not, then that needs

23    to be changed. If she relied on photos, then we should

24    attach the photos. We can -- I am sorry.

67

1          SPECIAL MASTER POPPITI: I am reading that.

2    I see that.

3          MS. BRZEZYNSKI: And I point that out just

4    to let you know that we informed Tatung very early that

5    she did not review a device. Mr. Merideth did not

6    question that, and we, thereafter, submitted our revised

7    declaration.

8          Now, so, I don't believe there was any issue

9    ever raised by Mr. Merideth questioning whether or not

Page 78

080707hr1.TXT

10    Ms. Rudich had ever seen a device until today.

11          Now, putting that aside, Your Honor,

12    Miss Rudich's statements to the PTO, in connection with

13    a continuation application, are simply not relevant here

14    for infringement for several reasons:  One, because

15    Tatung's accused products also meet the claim

16    limitations of the patents-in-suit, it doesn't matter

17    whether the Tatung's method of mounting for its accused

18    products also are in common with the IBM product.

19          Second, if Tatung is attempting to assert

20    that Miss Rudich's statements are somehow relevant for

21    claim construction, that's already been decided by Your

22    Honor, is now on appeal, and that would be extrinsic

23    evidence.

24          Third, the claims in the '079 application

68

1    are different from those in the patents-in-suit and the

2    claim referenced in the Office action response in the

3    '079 application is specifically not in the

4    patents-in-suit.

5          So I would submit to you, Your Honor, that

Page 79

080707hr1.TXT

6    Miss Rudich's testimony relating to her statements to

7    the PTO in an Office action response in connection with

8    a continuation application are simply not relevant here,

9    or, in this case, not necessary.

10        I am also going to point out, Your Honor,

11    that the inventors of the patents-in-suit were deposed

12    for 11 days.

13        SPECIAL MASTER POPPITI:  I am aware of that.

14        MS. BRZEZYNSKI:  And they were asked about a

15    500 LC product referenced by Mr. Merideth earlier.  They

16    were asked, at length, about front mounting.  They were

17    also asked, at length, about whether there were any LPL

18    or LGE products that had any fastening elements on the

19    back side of the flat panel display device which

20    predated the invention of rear mounting.  They also were

21    asked whether any such flat panel display device was

22    submitted to the PTO.

23        The defendants have clearly asked the

24    inventors this at extreme length.  There is no need to

69

1    burden Miss Rudich with a deposition on these same

Page 80

080707hr1.TXT

2    issues especially when she did not prosecute the

3    patents-in-suit.

4        MR. MERIDETH:  Your Honor, I think that Miss

5    Brzezynski has really put her finger on the central

6    point here.  We did examine the inventors at great

7    length and we did ask the inventors, not only Mr. Kim in

8    his capacity as an inventor but Mr. Kim in his capacity

9    as a 30(b)(6) witness for LPL, whether there were any LG

10   products which practiced rear mounting, and those topics

11   were topics eight and 32 in the notice of deposition for

12   the 30(b)(6) deposition, and he testified unqualifiedly

13   that there were no such products.

14       If you look at our August 3 submission,

15   which shows a Gold Star product, "Gold Star" being one

16   of the names used by LG Electronics, the "LG" standing

17   for Lucky Gold Star, it's clear that Mr. Kim either was

18   not telling the truth or was misinformed in his capacity

19   as a 30(b)(6) witness because you can clearly see that

20   there are only rear mounting features and there are no

21   front mounting features.

22       So, we now need to determine whether Mr. Kim

23   was telling the truth, what the prosecutors of the

24   patent knew about the prior art, and she's put her

Page 81

080707hr1.TXT

70

1    finger right on the subject.  If no inquiry was made and

2    nobody knew anything about it, we need to know that.

3           If they did know something about it, we are

4    entitled to know that as well.  And it is true that we

5    raised these very questions with Mr. Kim, and, indeed,

6    showed Mr. Kim the Sharp module that it appears that

7    this device, the LC056N1 copies, and he said he had

8    never seen anything like that before; he doesn't know

9    anything about it.

10          So, but here we have a product in 1996 that

11   has rear mounting and practices rear mounting.

12          MS. BRZEZYNSKI:  Your Honor, obviously, we

13   dispute Tatung's characterization of the product

14   attached to its August 3rd submission.

15          Regardless of that, Your Honor, Miss Rudich

16   has never seen that module.  If she -- she is not in a

17   position to offer any testimony whatsoever about that

18   product at all.  It's clear Tatung has conceded they

19   have exhausted their questioning on that issue.  They

20   asked the inventor.  The inventor said he didn't see it;

Page 82

080707hr1.TXT

21    he had never seen a product like that.

22        MR. MERIDETH:  The 30(b)(6) witness who had

23    -- who was noticed to testify specifically on the issue

24    of any prior art, including LGE products, and he said

71

1    that he was unaware of any LGE product like not only the

2    practiced rear mounting like this one or that was like

3    the Sharp module that he was shown, which is precisely

4    what this is.

5        SPECIAL MASTER POPPITI:  There are two

6    things.

7        MR. MERIDETH:  If she didn't know about it,

8    we need to know why she didn't know about it.

9        SPECIAL MASTER POPPITI:  There are a couple

10    things here.  One thing that I do want is some brief

11    additional development.  I do not accept the proposition

12    that Miss Rudich did not prosecute the patents-in-suit.

13    I understand that she may not have been considered first

14    chair, but she signed documents that suggest to me that

15    she was prosecuting the patents-in-suit.  She was

16    prosecuting a continuation patent.  And what I would

Page 83

080707hr1.TXT

17    like for you to develop for me, very briefly, just point

18    me in the direction of any case law, if you have it, to

19    what is the impact if there is any inequitable conduct

20    with respect to the continuation patent on the

21    patent-in-suit.

22         Are you with me?

23         MS. BRZEZYNSKI:  Yes, Your Honor.

24         SPECIAL MASTER POPPITI:  And I'd like you to


72


1    do that for me as quickly as possible so that I can, we

2    have a date when we are going to reconvene, so that I

3    can have that before that date.  I don't need argument.

4    I just need -- Mr. Merideth, it's your position, if you

5    will, that it relates to inequitable conduct, and I'd

6    like to see the development of that by just point me in

7    the direction of case law.  If you need to comment on

8    it, no more than two pages.

9         MR. MERIDETH:  I will be happy to do that,

10    Your Honor.

11         There is one thing that I want to make

12    clear, however, and, that is, I believe Miss Rudich's

Page 84

080707hr1.TXT

13    testimony relates to two issues.  One relates to the

14    prosecution of the patents-in-suit.  The other is to the

15    prosecution of the continuation patent, but as -- the

16    continuation application.

17          SPECIAL MASTER POPPITI:  Right.

18          MR. MERIDETH:  But the statements that she

19    makes don't describe the claims of the continuation

20    patent.  They describe a product and they describe the

21    method of mounting that product and the features of that

22    product.  I don't think the claims have anything to do

23    with it.  She describes the IBM product.  That IBM

24    product, we have obtained physical samples of.  It will


73


1    be in front of her, it will be in front of you, and it

2    will be in front of a jury to determine whether or not

3    the methods that are used with respect to that IBM

4    product are the same as the ones -- are those the same

5    practice that Tatung uses with respect to mounting the

6    accused product.  We believe that they are one in the

7    same and we believe that that is clearly relevant and

8    will be at the center of the issue with regard to

Page 85

080707hr1.TXT

9     non-infringement.

10        SPECIAL MASTER POPPITI:  And I understand

11    that, and I understand the argument, I accept the

12    argument, but I still want the issue to be developed on

13    the issue of inequitable conduct.

14        MS. BRZEZYNSKI:  I am happy to respond on

15    that issue but I'd like to say a couple things in

16    response to Mr. Merideth's statement.

17        First, if Mr. Merideth is intending to show

18    the device to Miss Rudich and then ask her to testify or

19    draw conclusions from that device in any way, I submit

20    to you that is wholly inappropriate.  It's in the nature

21    of expert testimony.  We have an agreement from Tatung

22    and ViewSonic in this case that our experts are the sole

23    witnesses as to invalidity and infringement contentions

24    and that there be no testimony taken from factual

74

1     witnesses.  The only testimony taken from factual

2     witnesses are simply what they knew existed before the

3     patents were filed but not why he or she contends that a

4     particular reference is or is not prior art.

Page 86

080707hr1.TXT

5         SPECIAL MASTER POPPITI: You know, I

6    hesitate to give advice and guidance, but I certainly

7    tend to agree with what you have just said. But we

8    don't -- that's a different step in the process here.

9         MS. BRZEZYNSKI: I agree. I just wanted to

10   point that out, Your Honor.

11            I also wanted to quickly respond to

12   Mr. Merideth's comments earlier that Miss Rudich

13   recently submitted, in the '079 application prosecution,

14   other prior art in an area that was recently identified

15   by Tatung in an interrogatory response, and I would

16   submit to you that that document was submitted to the

17   PTO because Tatung put it in issue in its interrogatory

18   answer and this firm has an obligation to put the PTO on

19   notice of asserted prior art.

20           LPL is not conceding that those products are

21   prior art, but we had an obligation to put the PTO on

22   notice. That's why that submission was made.

23        SPECIAL MASTER POPPITI: I understand.

24        MS. BRZEZYNSKI: Okay. I just wanted to

75

Page 87

080707hr1.TXT

1    make sure that that point was made on the record, Your

2    Honor.

3        SPECIAL MASTER POPPITI:  Okay.

4        MS. BRZEZYNSKI:  With respect to your

5    request for additional research, can we agree to

6    simultaneous requests submitted?

7        SPECIAL MASTER POPPITI:  Yes.

8        MS. BRZEZYNSKI:  By the end of the day

9    tomorrow?

10        SPECIAL MASTER POPPITI:  Mr. Merideth?

11        MR. MERIDETH:  I am sorry.  I didn't hear

12    what was said.

13        SPECIAL MASTER POPPITI:  Would you agree to

14    submit simultaneous --

15        MR. MERIDETH:  Yes, that's acceptable.

16        SPECIAL MASTER POPPITI:  End of day

17    tomorrow?  Is that acceptable as well?

18        MR. MERIDETH:  End of day California time

19    tomorrow?

20        SPECIAL MASTER POPPITI:  Yes, California

21    time.

22        MR. MERIDETH:  Okay.  That's fine.

23        MS. BRZEZYNSKI:  What time would that be,

080707hr1.TXT

24    Your Honor?  I just want to have a clear understanding.


76


1          MR. MERIDETH:  It would be 5:00 Pacific

2    time, 8:00 Eastern time.

3          MS. BRZEZYNSKI:  That's fine.

4          MR. MERIDETH:  That's what I have in mind

5    anyway.

6          SPECIAL MASTER POPPITI:  That's fine.  I

7    think that that does it for purposes of today, does it

8    not?

9          MR. CHRISTENSON:  Your Honor, LPL had just a

10   couple quick things to raise.

11          First of all, we are in the process of

12   confirming that we are going to have all of the updated

13   2007 sales information from the defendants that we need

14   and we discussed that with them and we are confident

15   that that's going to be resolved, to the extent it's not

16   already resolved, but if it's not resolved, I would like

17   the opportunity to address that in our call on Monday

18   because that's information we need for our damages

19   expert.

Page 89

080707hr1.TXT

20      SPECIAL MASTER POPPITI: Okay.

21      MR. CHRISTENSON: And then the other issue

22  is something that Mr. Ambrozy wanted to address.

23      MR. AMBROZY: Your Honor, Rel Ambrozy. We

24  have been in contact with both Tatung and ViewSonic. In

77

1  regard to Tatung, we have been seeking documents that

2  were at issue during the deposition of one of their

3  30(b)(6) witnesses, and we have asked for, for example,

4  assembly instructions and some information pertaining to

5  the actual modules used in the monitors that they sell.

6  We haven't been able to reach any agreement on that,

7  and, so, we'd like to bring a motion to compel these

8  documents and we can do it in a few-page letter on each

9  topic to Your Honor, we could have it to Your Honor by

10  the end of day tomorrow and hopefully to be heard on the

11  13th.

12      The second issue is we have approached both

13  ViewSonic and Tatung to allow us to re-inspect some of

14  the accused devices as well as the prior art devices,

15  and although our expert has seen these devices before,

Page 90

080707hr1.TXT

16    because of Your Honor's claim construction, in certain

17    instances, Your Honor's claim construction was neither

18    Tatung's nor ViewSonic's nor LPL's, and, therefore,

19    there was a nuance that was inserted because of your

20    claim construction that was not taken into consideration

21    when the instructions were done the first time, and, so,

22    that's why we would need another inspection of these

23    monitors.  And we were rebuffed by the defendants and we

24    would like to brief that for Your Honor on the same

78

1    schedule.

2           SPECIAL MASTER POPPITI:  Well, by "same

3    schedule," you mean for the 13th?

4           MR. AMBROZY:  Yes, Your Honor.  We'd submit

5    our papers tomorrow, defendants could submit theirs by

6    Friday, and then, hopefully, we could have it heard on

7    Monday?

8           SPECIAL MASTER POPPITI:  Any reaction to

9    that, please?

10          MS. ROMAN:  Your Honor, I guess my only

11    concern would be, given the lateness of the start time

Page 91

080707hr1.TXT

12    of the hearing on the 13th and the multiple issues that

13    might need to be dealt with, that we might want to put

14    that issue on for a Tuesday call, but in terms of

15    briefing the issues, I understand the need to do so.

16          SPECIAL MASTER POPPITI:  Well, then, let's

17    get the submittals accomplished as you described.  I am

18    also concerned about whether or not I am going to be

19    able to deal with everything on Monday.  I can start

20    earlier.  I was just putting a late start expecting that

21    you would have the opportunity to continue to meet and

22    confer.

23          MS. BRZEZYNSKI:  Your Honor, do you

24    anticipate further argument on the Rudich deposition


79

1    issue, and, if so, may I request that that argument be

2    held on Friday morning, perhaps --

3          SPECIAL MASTER POPPITI:  I can't do Friday.

4    I have got an all day hearing in another patent case.

5          MS. BRZEZYNSKI:  Could you, perhaps, do

6    Thursday?  I leave on vacation this weekend.

7          SPECIAL MASTER POPPITI:  Well, what I am

Page 92

8   going to need is some opportunity to look at the case

9   law that you have submitted. I wasn't anticipating

10  doing that before the weekend, but if -- you leave

11  Saturday?

12          MS. BRZEZYNSKI: I leave Sunday, Your Honor.

13          SPECIAL MASTER POPPITI: I would prefer -- I

14  do anticipate final discussion, if you will, on the

15  Rudich deposition, and I would prefer to do it at the

16  end of the day on Friday.

17          MR. MERIDETH: Your Honor, I am sorry, but I

18  am not going to be available on Friday. I am going to

19  be in the air. I apologize.

20          MS. BRZEZYNSKI: I am sorry to make this

21  difficult.

22          SPECIAL MASTER POPPITI: It's not difficult.

23  It's a matter of -- then let's look at -- just one

24  moment. I am going to put you on mute for a moment. I

80

1  just have to check schedule. Hold on.

2         How is your schedules for Thursday, the 9th,

3  at 5:00?

Page 93

080707hr1.TXT

4          MS. BRZEZYNSKI:  I can do that time, Your

5     Honor.

6          MR. MERIDETH:  That's acceptable for me,

7     Your Honor.

8          MS. BRZEZYNSKI:  Thank you for accommodating

9     me, Your Honor.

10         SPECIAL MASTER POPPITI:  Wait one moment,

11    please.  That would be 5:00 my time, Eastern Standard

12    time.

13         MS. BRZEZYNSKI:  Yes, Your Honor.

14         MR. MERIDETH:  Yes, Your Honor.

15         SPECIAL MASTER POPPITI:  That's good.  Okay.

16    Are there any other matters, then, please?

17         MR. CHRISTENSON:  Not from LPL, Your Honor.

18         MS. ROMAN:  Nothing from ViewSonic, Your

19    Honor.

20         MR. MERIDETH:  Nothing from Tatung.

21         SPECIAL MASTER POPPITI:  Thank you all.

22         (The hearing was concluded at 5:35 p.m.)

23

24

080707hr1.TXT
81

1           C E R T I F I C A T E

2    STATE OF DELAWARE:
                        :
3    NEW CASTLE COUNTY:

4           I, Renee A. Meyers, a Registered Professional

5    Reporter, within and for the County and State aforesaid,

6    do hereby certify that the foregoing teleconference was

7    taken before me, pursuant to notice, at the time and

8    place indicated; that the teleconference was correctly

9    recorded in machine shorthand by me and thereafter

10   transcribed under my supervision with computer-aided

11   transcription; that the foregoing teleconference is a

12   true record; and that I am neither of counsel nor kin to

13   any party in said action, nor interested in the outcome

14   thereof.

15          WITNESS my hand this 8th day of August A.D. 2007.

16

17

        _____
18      RENEE A. MEYERS
        REGISTERED PROFESSIONAL REPORTER
19      CERTIFICATION NO. 106-RPR
        (Expires January 31, 2008)
20

21

22

                          Page 95

080707hr1.TXT

23

24