# EXHIBIT M



081307hr.txt


1


1        IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3
       PHILLIPS, L.G., LCD CO., LTD, )
4                              )
            Plaintiffs,       ) C.A. No. 04-343(JJF)
5                              )
       v.                      )
6                              )
       TATUNG CO., TATUNG COMPANY OF )
7       AMERICA, INC., and VIEWSONIC   )
       CORPORATION,            )
8                              )
            Defendants.        )
9
            Hearing of above matter taken pursuant to notice
10        before Renee A. Meyers, Registered Professional Reporter
         and Notary Public, in the law offices of BLANK ROME,
11        LLP, 1201 North Market Street, Wilmington, Delaware, on
         Monday, August 13, 2007, beginning at approximately 4:35
12        p.m., there being present:

13        BEFORE: THE HONORABLE VINCENT J. POPPITI, SPECIAL MASTER

14        APPEARANCES:

15           THE BAYARD FIRM
             RICHARD D. KIRK, ESQ.
16              222 Delaware Avenue, Suite 900
             Wilmington, Delaware  19899
17            for Plaintiffs

18

19

20
                         Page 1

081307hr.txt

CORBETT & WILCOX
21        Registered Professional Reporters
230 North Market Street    Wilmington, DE 19899
22                (302) 571-0510
www.corbettreporting.com
23        Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters
24

2

1    APPEARANCES (Continued):

2
MCKENNA, LONG & ALDRIDGE, LLP
3    CASS W. CHRISTENSON, ESQ.
REL S. AMBROZY, ESQ.
4    LORA BRZEZYNSKI, ESQ.
1900 K Street, N.W.
5    Washington, D.C. 20006
for Plaintiffs
6
RICHARDS LAYTON & FINGER
7    FREDERICK L. COTTRELL, III
ANNE SHEA GAZA, ESQ.
8    One Rodney Square
Wilmington, Delaware 19801
9    for Defendant Tatung Co.

10    GREENBERG TRAURIG LLP
FRANK MERIDETH, ESQ.
11    VALERIE HO, ESQ.
MARK KRESIMAN, ESQ.
12    2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
13    for Defendant Tatung Company of America, Inc.

14    CONNOLLY BOVE LODGE & HUTZ LLP
JAMES D. HEISMAN, ESQ.
15    1007 North Orange Street
Wilmington, Delaware 19899
16    for Defendant ViewSonic Corporation

Page 2

081307hr.txt

17      RASKIN PETER RUBIN & SIMON, LLP
        TRACY ROMAN, ESQ.
18        1801 Century Park East, 23rd Floor
          Los Angeles, California  90071-3106
19        for Defendant ViewSonic Corporation

20

21

22

23

24

3

1          MR. KIRK:  Good afternoon, Your Honor.  This

2      is Richard Kirk from The Bayard Firm for the plaintiffs,

3      LG Phillips, LCD Co., Ltd.

4          With me today on the line are my colleagues

5      from McKenna Long & Aldridge, Lora Brzezynski, who is in

6      North Carolina, I believe.

7          MS. BRZEZYNSKI:  That's correct.

8          MR. KIRK:  And Rel Ambrozy and Cass

9      Christenson in Washington.

10          MS. GAZA:  Your Honor, this is Anne Gaza and

11      Fred Cottrell from Richards, Layton & Finger on behalf

12      of the Tatung defendants.

Page 3

081307hr.txt

13          With me is Frank Merideth, Mark Kreisman,

14    and Valerie Ho.

15          SPECIAL MASTER POPPITI:  Thank you very

16    much.

17          MR. HEISMAN:  Good afternoon, Your Honor.

18    Jim Heisman from Connolly, Bove on behalf of ViewSonic

19    Corporation.

20          With me on the phone today is Tracy Roman

21    from the Raskin Peter firm in Los Angeles.

22          SPECIAL MASTER POPPITI:  Thank you.

23          We have on the agenda only the matters

24    relating to the deposition, proposed deposition of


4


1    Rebecca Rudich.  And what I'd like to do, after dealing

2    with that, is to discuss the agenda for, hopefully, on

3    Thursday.

4          What I asked you to do the last time we were

5    together was to supplement what you had already provided

6    to me, and develop the issue on the issue of infectious

7    non-enforceability.  You have done that for me and I'd

8    like to talk about that for the moment.

081307hr.txt

9           But what I would also like to suggest is,

10    certainly, in reviewing the authorities that all of you

11    have gathered for me, there was no identification, and

12    please correct me if you think I am wrong, of how that

13    doctrine, the applicability of that doctrine to a

14    circumstance where there was, arguably, inequitable

15    conduct occurring as it relates to non-patents-in-suit,

16    even if they are part of the family of patents and

17    relating back; is that a fair statement in terms of

18    finding any case you have presented me with on all fours

19    with that analysis?

20           MS. BRZEZYNSKI:  Your Honor, I believe

21    that's correct.  We could not locate no authorities --

22    this is Lora Brzezynski by the way, excuse me.

23           SPECIAL MASTER POPPITI:  Thank you.

24           MS. BRZEZYNSKI:  We could locate no legal


5


1     authority for a claim of what's called reverse

2     infectious inequitable conduct.  The only cases we were

3     able to locate were cases in which the parent was

4     infected, and then, as a result, continuation patents or

Page 5

081307hr.txt

5    patents that ascended from that patent were then

6    infected.

7        SPECIAL MASTER POPPITI:  Any comments,

8    please, with respect to my statement from the

9    defendants, please?

10        MS. HO:  Your Honor, that proposition, in

11    general, we believe is correct in that if a patent

12    application was obtained via inequitable conduct on the

13    part of the patentee that that potentially may impact

14    the enforceability of the continuation application.

15        In general, it does not work in the reverse

16    in that inequitable conduct, in connection with the

17    child application, in general, would not impact the

18    enforceability of the parent.

19        Now, having said that, we do believe that

20    there are circumstances under which, under an unclean

21    hands theory, if the inequitable conduct is so broad as

22    to -- as to relate to the entire family of patents, that

23    that may impact the enforceability of the entire family.

24    And we could imagine circumstances in which that would

6

081307hr.txt

1    be possible; for instance, if there was such a pervasive

2    pattern of inequitable conduct in connection with the

3    child, and, in addition to that, there is some

4    relationship between what was claimed in the parent and

5    the child and what was, for example, omitted as prior

6    art, that, in that circumstance, there may be an

7    argument for unclean hands as to why the entire family

8    would not be enforceable.

9         Now, having said that, it was never our

10   position that there was inequitable conduct in

11   connection with the child application, and, as you see

12   in our submission --

13        SPECIAL MASTER POPPITI:  Counsel, let me get

14   to that with you in a moment.

15        I just wanted to clear up my understanding

16   of how you view the authority that you all referenced.

17        There is one case that I would like to

18   suggest for everyone's attention.  Just give me one

19   moment, please.  I want to give you the Federal cite to

20   it and I may have left the actual case sitting in

21   another room.  Maybe I didn't.

22        The case is, and I will have to spell it

23   because it's a strange looking, it looks strange in

Page 7

081307hr.txt

24    terms of pronunciation, it's

7

1    R-i-s-t-v-e-e-t-J-o-h-n-s-o-n, Inc., Ristveet-Johnson,

2    versus Brandt, B-r-a-n-d-t, Inc., and, unfortunately, I

3    am going to have to give you, for page purposes, the

4    West Law cite, 1992 West Law 77675, the Northern

5    District of Illinois, 1992.

6         In that case, without getting too much into

7    the specifics of it, as I understand the case, there

8    were six patents originally asserted, three of which

9    were dismissed on motions for summary judgment.

10        The defendant in the case proffered an

11    unclean hands theory, and although it was rejected

12    primarily on analysis of -- on other grounds, for

13    example, the Court found that there was no

14    unconscionable act, and also made the determination that

15    there was no immediate necessary link.

16        As an alternative holding in the case, the

17    Court had the following language, and, unfortunately, I

18    am reading from only, I am reading from "Chism," only

19    because I left the case in another room, the quote and

081307hr.txt

20    the footnote in "Chism" -- if you want that reference, I

21    am happy to provide it for you -- The alternative

22    holding was the accused infringer, quote, seems to argue

23    that a party's act of inequitable conduct should reach

24    back in time to cancel any patent protection which might

8

1    inure to that party's benefit.  No language or policy of

2    the patent act supports such a harsh penalty for

3    inequitable conduct.  In the absence of an -- and this

4    is an internal quote -- immediate and necessary, end

5    that quote, link between the allegations of misconduct

6    and the patents-in-suit, this Court cannot presume to

7    apply the unclean hands doctrine.

8            So, I think, notwithstanding the fact that

9    there isn't any analysis of the proposition that is on

10    all fours, if you will, with the facts as I am presented

11    with in this case, it seems that the teaching, to be

12    consistent with what you have provided with me, the

13    teaching wouldn't be inconsistent with the dicta, if you

14    will, of the Ristveet-Johnson case.

15            So, in terms of what I will be considering

Page 9

081307hr.txt

16    today, and I understand that Miss Ho was just about to

17    talk about what the focus is and the focus is not the

18    assertion that there was inequitable conduct with

19    respect to the '701 patent, I thought it was important

20    to bring that case to your attention and suggest I don't

21    believe that it can go backwards that way.  Okay?

22          Any questions or comments?

23          MS. BRZEZYNSKI:  We reached the, generally,

24    the same conclusion.

9

1          SPECIAL MASTER POPPITI:  Okay.  Then let's

2    go back, then, and talk about your other positions,

3    please.

4          MS. BRZEZYNSKI:  Your Honor, I would like to

5    take the opportunity to comment on Tatung's letter, if I

6    may.

7          SPECIAL MASTER POPPITI:  Which one?

8          MS. BRZEZYNSKI:  The letter dated August

9    8th, 2007.

10          SPECIAL MASTER POPPITI:  I have got it.  Go

11    ahead.

081307hr.txt

12      MS. BRZEZYNSKI: First, I would like to

13      comment on the section of that letter that references,

14      it's in Section C, that references that Miss Rudich's --

15      or statements about Miss Rudich's activities with

16      respect to the patents-in-suit, quote, appear to be

17      contradicted by LPL's own privilege log, end quote.

18          That statement by Tatung certainly leads the

19      misimpression that Miss Rudich's name is strewn

20      throughout that privilege log and, somehow, she was

21      involved in many, many written communications that were

22      listed there in that -- in the parenthetical exhibit, it

23      says Exhibit C, and then there is a listing of numerous

24      documents there. I don't know the basis for that

10

1      statement or why any of those documents were listed.

2          Certainly, if you look at the privilege log,

3      Miss Rudich's name is not listed on the privilege log

4      with respect to those documents with the exception of

5      two. Her name is listed on the privilege log only with

6      respect to 77 and 83 on that list. And when you look at

7      those documents, they are clearly privileged

Page 11

081307hr.txt

8    communications about the documents that she signed that

9    I alerted you to during our last call.

10       So, the reference that she is involved in

11   numerous communications during the time frame during

12   which the patents-in-suit were being prosecuted is

13   simply incorrect. It's not borne out by the privilege

14   log and it's also not borne out by the facts that we

15   have here.

16       Tatung states that the patents-in-suit were

17   prosecuted from '99 through 2002. I would advise Your

18   Honor that Miss Rudich did not even join our predecessor

19   firm until the end of June of 2000, and, certainly,

20   prior to that time, she was at a different firm and had

21   no involvement, of course, with the prosecution of the

22   patents-in-suit. So I wanted to bring that to your

23   attention.

24       Tatung also attempts to suggest that

11

1    Miss Rudich's prior declaration somehow calls into

2    question the statements that I made with regard to her

3    involvement, limited involvement to with the

Page 12

081307hr.txt

4    patents-in-suit.

5        I submit to you that her prior declaration

6    was completely accurate, the work that she was doing at

7    the time she signed that declaration and currently was

8    related to the patents-in-suit, it was related to the

9    continuation application. That's what Miss Rudich has

10    been involved in. We have made no secret of that. She

11    had a very, very limited role in connection with the

12    patents-in-suit as I discussed with Your Honor during

13    the last call.

14        I will also point out that, again, there is

15    another reference to the LG product. I previously

16    advised Your Honor that --

17        SPECIAL MASTER POPPITI: Where is that

18    reference again, please?

19        MS. BRZEZYNSKI: To the LG, Lucky Gold Star

20    LC056N1.

21        Tatung references that product again in its

22    8/8 letter.

23        SPECIAL MASTER POPPITI: Yes, it does.

24        MS. BRZEZYNSKI: And as I represented during

Page 13

081307hr.txt
12

1    our last call, Your Honor, Ms. Rudich was not aware of

2    that product.  Tatung also, in its 8/8 letter,

3    references to any C litigation in which that document

4    was apparently produced.  It does state that discovery

5    in that case occurred in '99 and 2000.  Again, I will

6    reference that Ms. Rudich did not even join the -- our

7    predecessor firm until the end of June, 2000.

8           So, again, Miss Rudich does not have

9    information relevant and should not be subjected to a

10   deposition relating to the patents-in-suit, certainly.

11          I will also note, when looking back at Frank

12   Merideth's, Tatung's July 9th, 2007, e-mail, which was

13   Exhibit 7 to LPL's August 1st letter, Mr. Merideth

14   clearly states, in quote, and I quote, The only subject

15   will be the office action in connection with the '079

16   application related to the IBM color display.  That was

17   the only subject of the deposition.

18          And I submit to you that if any deposition

19   is ordered by Your Honor, the deposition should be

20   limited to the continuation application only, but, as I

21   believe we just discussed, since there cannot be any

22   claim of reverse infectious conduct, even a deposition

Page 14

081307hr.txt

23    on the continuation application is irrelevant and should

24    not be permitted.

13

1      SPECIAL MASTER POPPITI:  Okay.  Thank you.

2      MS. BRZEZYNSKI:  Thank you.

3      SPECIAL MASTER POPPITI:  Who is going to

4    speak on behalf of Tatung?

5      MR. MERIDETH:  This is Frank Merideth, Your

6    Honor.

7          There were 66 references in the privilege

8    log to Ms. Rudich either sending, receiving, or

9    obtaining copies of information concerning, I can only

10    presume, the patents-in-suit.

11          There would be no reason, of course, to

12    include any references in a privilege log to activity

13    that she might have undertaken in connection with

14    another patent, even a continuation patent.

15      MS. BRZEZYNSKI:  Your Honor, if I can

16    interject?

17      SPECIAL MASTER POPPITI:  I did look at the

18    description of each of those.

Page 15

081307hr.txt

19          MS. BRZEZYNSKI:  We logged, on our privilege

20     log, documents from all the continuation applications,

21     Your Honor.

22          MR. MERIDETH:  I don't know what the

23     documents refer to because I don't have the documents.

24     I only have the privilege log.


14


1          The privilege log relates to the

2     patents-in-suit, as best I can determine.  I can't see a

3     reason why communications that don't relate to the

4     patents-in-suit would be responsive in any way, and

5     there appear to be a number of communications, 66, it

6     appears, many around the date of the office -- of the

7     document that she signed ostensibly on behalf of

8     Mr. Sung.

9          Now, I don't know the circumstances with

10    respect to that, but they are -- it certainly is

11    something that requires inquiry, from my viewpoint, on

12    behalf of my client.

13          Secondly, the issues respecting --

14          SPECIAL MASTER POPPITI:  That's my question

                        Page 16

081307hr.txt

15  with respect to that, Mr. Merideth.

16      MR. MERIDETH:  Yes, sir.

17      SPECIAL MASTER POPPITI:  It may or may not

18  be that the documents that have been identified in the

19  privilege log will point in the direction of her

20  involvement with the patents-in-suit.

21      If they do, that's one thing.  If they

22  don't, then I think our discussion today would be framed

23  differently, would it not?

24      MR. MERIDETH:  I agree with that if they


15

1  have listed -- if all the entries on the privilege log

2  do not relate to the patents-in-suit, and, again, I

3  would wonder why they would be included, but if they do

4  not relate to the patents-in-suit, I would agree then

5  the issue would be limited to the manner of her

6  supervision and her practices in connection with the

7  disclosure of information and why she wasn't aware of

8  the Lucky Gold Star module.

9      That is something that I think we have a

10  reason to inquire into.  And, of course, when I sent my

Page 17

081307hr.txt

11    letter in July alerting LG that we still needed to take

12    Miss Rudich's deposition, we were unaware of that LG

13    module.  That was only identified to us within the last

14    two-and-a-half weeks even though it appears at least

15    somebody from LPL was aware of that module at least in

16    1999 or 2000 when it was produced in the NEC litigation.

17        SPECIAL MASTER POPPITI:  And we will get to

18    that in a moment.

19        Let me ask this question:  You mentioned the

20    issue of her supervision and the question as to why

21    didn't she know.  Help me with that for a moment.

22        If she didn't know, and if you posit for me

23    the reason why she didn't know is because she didn't

24    look, she didn't dig, she didn't do whatever, isn't it

16

1    fair to say that when I am asked, or when the Court is

2    asked to look at inequitable conduct for purposes of

3    framing the issue, you have to look to the question of

4    intent, do you not?

5        MR. MERIDETH:  Yes, sir, that's correct.

6    But you also look to the issue of materiality.

Page 18

081307hr.txt

7       SPECIAL MASTER POPPITI: I understand that.

8       MR. MERIDETH: And in this particular

9    instance, you have a situation it isn't as if there was

10    a third party's product that LG and its representatives,

11    its agents, it's a matter of she didn't know that

12    company X had a product that taught rear mounting. In

13    fact, in this case, the product in question is an LGE

14    product if the invention was ostensibly made by LGE

15    employees at a time before the LGE LCD provision was

16    transferred from LGE to LPL.

17       Furthermore, at that time, somebody at LPL

18    knew about the LG module because they produced the

19    schematic of it in connection with the NEC litigation.

20       SPECIAL MASTER POPPITI: Yes.

21       MR. MERIDETH: Now, it is conceivable -- so

22    it seems to me, based upon at least our understanding

23    that, commonly, good patent prosecutors, which we

24    believe Miss Rudich to be, will send out a form letter,

17

1    if not a specific inquiry, to their client, saying, What

2    do you know about the prior art, any prior art? And,

Page 19

081307hr.txt

3    indeed, the failure, if there was a failure on the part

4    of LGE or LPL to identify its own product would be very

5    material to the issue of intent.

6          SPECIAL MASTER POPPITI:  Okay.

7          MR. MERIDETH:  May I finish?

8          SPECIAL MASTER POPPITI:  That was our court

9    reporter, Mr. Merideth.  I think she just missed your

10   statement.  There was some static on the line.

11         MR. MEREDITH:  I am sorry.

12         MS. BRZEZYNSKI:  I didn't hear his

13   statement, Your Honor.

14         SPECIAL MASTER POPPITI:  Do you want to go

15   back, Renee.  Maybe it will be helpful by telling

16   everyone where you last heard Mr. Merideth.

17         (The reporter read back as requested.)

18         MR. MERIDETH:  It is our belief that patent

19   prosecutors do, in fact, send out letters to their

20   clients.  We believe that Miss Rudich, as the supervisor

21   of not only the patents-in-suit but other patent

22   prosecutions at McKenna, will be able to confirm that

23   that is the fact, so we are left with one of two

24   options, either -- well, maybe three:  They neglected to

Page 20

081307hr.txt

18

1    sent out the letter in this case, No. 1; No. 2, even if

2    they sent -- or they sent the letter and LPL decided not

3    to disclose the information that it knew as of 1999 or

4    2000, or they didn't provide the information that they

5    were around in 1999 and 2000, and Miss Rudich, or

6    somebody else in her firm, made the decision not to

7    disclose it to the Patent Office.

8              It seems to me it has to be one of those

9    three things.

10             SPECIAL MASTER POPPITI:  Well, you would

11   agree with me that, in this stage of discovery, if I am

12   going to permit the deposition of Miss Rudich, that it

13   ends there in terms of --

14             MR. MERIDETH:  Well, I think the answer is

15   that that's correct except as to the inquiry with regard

16   to her representation with respect to front mounting.

17   That certainly is another subject that I believe that we

18   are entitled to pursue.

19             SPECIAL MASTER POPPITI:  We will get to that

20   in just a moment.

21             MS. BRZEZYNSKI:  Your Honor, may I respond?

Page 21

081307hr.txt

22         SPECIAL MASTER POPPITI:  Let me just ask

23    this question:  I have to tell you, and I think the

24    record was, I suggested this the last time we were on

19

1     record, I had not remembered precisely what

2     Miss Rudich's declaration was, and I now have that in

3     front of me by virtue of the fact that you asked me to

4     re-look at it.  And at the time that she filed the

5     declaration, her statement in the declaration was, "I

6     currently participate in direct supervised patent

7     prosecution actively related to the patents-in-suit and

8     involving flat panel display technology.  I fully

9     complied," etcetera, etcetera.  And then at paragraph

10    four, "For the past several years, I have been a senior

11    partner in charge of day-to-day activities for all of

12    the patent prosecution work.  I have and continue to

13    supervise the patent associates in our collection

14    property department who also prosecute patents involving

15    flat panel display technology and who work on patent

16    prosecution actively related to the patents-in-suit."

17    And, of course, it goes on.

Page 22

081307hr.txt

18          I mean, it is certainly appropriate for a

19    Court to rely on counsel before the Court for certain

20    representations.

21          My problem is this:  As I am hearing your

22    respective positions, Mr. Merideth is saying, This is

23    what we are now confronted with in light of

24    Miss Rudich's deposition.  The circumstances have

20

1     changed since we started to discuss a Rudich deposition

2     and what that would be focused on, and notwithstanding

3     the representations made in her declaration and your

4     comments, Miss Brzezynski, the fact remains that you

5     acknowledge that she started with the law firm June of

6     2000.  The time frame that I have just listened to takes

7     you to the end of 2000, and having someone being

8     described as hands on, it seems to me in her

9     declaration, why wouldn't it be appropriate to focus on

10    what she did or didn't do for that, whatever period of

11    time that is, six months, three-and-a-half, four months,

12    five months?  And maybe the way to at least take it a

13    step further, and I am really not reaching out for

Page 23

081307hr.txt

14    additional work on my desk, but it may be important for

15    me to look at these privilege log documents.

16            MS. BRZEZYNSKI:  Your Honor, may I respond?

17            SPECIAL MASTER POPPITI:  Yes, please.

18            MS. BRZEZYNSKI:  Your Honor, first, I will

19    note that LPL specifically argued to ViewSonic and

20    Tatung that its privilege log should only be limited to

21    the patents-in-suit, but the defendants required that

22    the continuation patent prosecution be logged, and

23    that's why we logged it.

24            So, the privilege log contains numerous

21

1    entries, numerous documents on it that are related to

2    the continuation application in which Miss Rudich has

3    been involved.

4            With respect to her declaration, Your Honor,

5    at the time she signed it in 2007 -- you know, let me

6    step back.  The patents in suit issued in 2002.

7            SPECIAL MASTER POPPITI:  Right.

8            MS. BRZEZYNSKI:  The protective order is

9    extremely broad.  It says any prosecution activity

Page 24

081307hr.txt

10    relating to flat panel display technology, you know,

11    relating to the patents-in-suit, you can't see the

12    highly sensitive confidential documents.

13            Miss Rudich was very clear in her

14    declaration, because she does prosecution activity

15    related to the patents-in-suit, the continuation

16    application, she cannot see highly confidential

17    documents and she hasn't, and that was context in which

18    she made that statement.

19            And then you have also pointed to the

20    statement that --

21            SPECIAL MASTER POPPITI:  I recall that.

22            MS. BRZEZYNSKI:  I am sorry.  Did I just

23    interrupt you?

24            SPECIAL MASTER POPPITI:  I said I certainly

22

1    recall the contents of the declaration.

2            MS. BRZEZYNSKI:  Of course, Your Honor.

3    Your Honor also points to the comments made by

4    Miss Rudich that she is a senior partner in charge of

5    day-to-day activities for all the patent prosecution

081307hr.txt

6      work. That is also an accurate statement, Your Honor,

7      but there are several partners in our office involved in

8      supervising patent prosecution activity.

9            Certainly, in the year 2000, and we are now,

10     I guess, we are dealing with the six-month period of

11     time in 2000, Miss Rudich was still an associate at that

12     time. She was not even a partner.

13            You know, so, once again, Your Honor --

14            SPECIAL MASTER POPPITI: If what you are

15     saying is that the language in the declaration that

16     references her supervision of patent prosecution

17     activity and the reference in the declaration with

18     respect to her responsibilities as senior partner are

19     not commensurate with what she was doing in June through

20     the end of the year 2000 --

21            MS. BRZEZYNSKI: That's correct, Your Honor.

22            SPECIAL MASTER POPPITI: You did reference,

23     I think, Ms. Brzezynski, you did say to me, in the

24     privilege log, there were two references to Miss Rudich

23

1      that related to the patents-in-suit?

Page 26

081307hr.txt

2       MS. BRZEZYNSKI: Yes, Your Honor, No. 77 and

3      No. 83. I went through the list that Mr. Merideth had

4      listed in his letter. One relates to the privileged

5      communication. They both have privileged communications

6      with the client relating to the documents that I

7      informed you that she had signed last week, the notice

8      of appeal and the amendment.

9      SPECIAL MASTER POPPITI: So, 77 and 83 are

10    those documents?

11     MS. BRZEZYNSKI: Correct.

12     SPECIAL MASTER POPPITI: Mr. Merideth.

13     MR. MERIDETH: Yes, sir.

14     SPECIAL MASTER POPPITI: I don't know

15    whether there is an application for me to look at the

16    document, and I understand that the declaration is

17    rather frozen at a point in time in the sense it has a

18    begin date and the language reads, "I current

19    participate in," and I now learn, from what I am

20    hearing, that at the time we are focused on, namely,

21    June of 2000 to the end of the year, her duties and

22    responsibilities were different. I am not sure what

23    they were because I haven't asked that question, I am

24    not sure that I want to create that record by putting

Page 27

081307hr.txt

24

1   Ms. Brzezynski on the line, if you will, as to what her

2   precise responsibilities were.

3          MR. MERIDETH:  Of course, we don't know what

4   her responsibilities were.  We only know what her

5   declaration says.  And as far as the privilege log is

6   concerned, we don't know what the privileged documents

7   say, of course.

8          So, there is only one way, it seems to me,

9   to test what is being represented, and that is to look

10  at the privileged documents, certainly, the ones that

11  bracket the time period in which she signed the two

12  documents.  And I don't understand -- Ms. Brzezynski,

13  last time we spoke, at least the gist of what she said

14  was that, my impression of it, was that Miss Rudich was

15  sitting in her office, Sung Jung was unavailable to sign

16  and someone brought it in and said, Hey, would you mind

17  signing this for Sung Jung, which she -- the request she

18  accommodated.

19         Now we find out that there was

20  correspondence with a client about the very documents

081307hr.txt

21    that she signed. It doesn't seem to me that it's quite

22    so clear what she did.

23            I was certainly left with the impression,

24    from Ms. Brzezynski, that it was just a professional

25

1     courtesy when she signed a document that somebody

2     brought in because the primary author was not available.

3            SPECIAL MASTER POPPITI: Well, let's do

4     this, because I think it's important for this issue to

5     be certainly framed appropriately and decided against

6     the appropriate backdrop. I want to see the

7     documents -- I don't know how long it will take to

8     gather what I am going to be asked to look at, and

9     rather than my going down through each of the documents

10    that were referenced in Tatung's letter of August 8th, I

11    think the most efficient way to approach this is to say

12    to Mr. Merideth, You tell me what documents you want me

13    to be looking at, whether it's the universe of those in

14    the August 8th correspondence or something more lean

15    than that. I will look at those documents just for the

16    purpose of making some determination as to, with respect

Page 29

081307hr.txt

17    to the representations that have been made in the

18    teleconference of last week and today's teleconference.

19        MR. MERIDETH:  Well, if the representation

20    is that Miss Brzezynski was not with the firm prior

21    to --

22        SPECIAL MASTER POPPITI:  2000, June of 2000.

23        MR. MERIDETH: -- June of 2000, then it would

24    seem to me --

26

1        MS. BRZEZYNSKI:  Ms. Brzezynski was, I was

2    at the firm.  Ms. Rudich was not.

3        MR. MERIDETH:  I am sorry, I miss poke.  If

4    Miss Rudich was not in the firm until 2000, and the

5    patents issued in 2002, it seems to me that that sort of

6    brackets the most relevant time period.

7        MS. BRZEZYNSKI:  Your Honor, I just want to

8    note for the record my objection to, once again, having

9    to submit privileged documents to Your Honor under seal.

10        SPECIAL MASTER POPPITI:  Well, you can note

11    it for the record, and if it's important for me to put

12    something in writing with respect to this path so that

Page 30

081307hr.txt

13    you can bring it to the attention of Judge Farnan, then

14    I certainly can do that, or I will direct that

15    Mr. Merideth, since he is requesting that I do this, I

16    guess at my suggestion, Mr. Merideth, I think it's a

17    fair way to characterize it, I will direct that

18    Mr. Merideth put something in writing so that I can --

19    and have approval as to form only, and you will have,

20    therefore, both a record order and a written order.

21         MS. BRZEZYNSKI:  Thank you, Your Honor.

22         MR. MERIDETH:  I can do that.

23         SPECIAL MASTER POPPITI:  Okay?

24         Let's focus on other issues with respect to


27

1    Miss Rudich as well.  I do want to bottom line each of

2    the -- the theory with respect to the total application.

3         Mr. Merideth.

4         MR. MERIDETH:  Yes.  Well, I believe there

5    is also her role with respect to being a supervisor, if

6    she had that role during the relevant time period, what

7    the practices were with regard to requesting

8    information.

Page 31

081307hr.txt

9       SPECIAL MASTER POPPITI:  Now, let me ask

10      this question:  Would it not make sense to ask that

11      Miss Rudich accomplish a declaration that specifically

12      describe her duties during the appropriate time frame?

13          MR. MERIDETH:  Yes.

14          SPECIAL MASTER POPPITI:  So if there is no

15      description of supervision, then we are talking about

16      something completely different, are we not?

17          MR. MERIDETH:  Yes.

18          SPECIAL MASTER POPPITI:  Miss Brzezynski.

19          MS. BRZEZYNSKI:  Your Honor, just to make

20      sure I understand, are you proposing that Miss Rudich

21      submit a declaration that describes her duties during

22      the time frame we have been discussing?

23          SPECIAL MASTER POPPITI:  Yes.

24          MS. BRZEZYNSKI:  I can certainly speak to

28

1       Miss Rudich about preparing such declaration.

2           SPECIAL MASTER POPPITI:  Okay.  Then we will

3       talk about time frame when we conclude.

4           Mr. Merideth, anything else, then, please?

Page 32

081307hr.txt

5        MR. MERIDETH:  Well, the issue that we began

6   with, which relates to the '079 application --

7        SPECIAL MASTER POPPITI:  Right.

8        MR. MERIDETH : -- that was important to

9   understand what her intentions and meanings were with

10   respect to that representation to the Patent Office.

11        MS. BRZEZYNSKI:  Once again, Your Honor, our

12   response is that we have offered a declaration that

13   should be sufficient in that regard as well.

14        In addition, they have the documents that

15   were submitted to the PTO and they can use those

16   documents, if necessary, in their defense during the

17   trial of this case.

18        SPECIAL MASTER POPPITI:  Well, yes.  I am

19   certainly satisfied that those documents can be used,

20   and I think I don't want to go any further than that

21   until I have in mind what Miss Rudich's responsibilities

22   were during the time frame in question.

23        Do you want to talk to me about the

24   discovery in another case, please?

29

081307hr.txt

1      MR. MERIDETH: Yes. The issue relates to

2   the NEC case and the -- and perhaps this is better

3   covered with the 30(b)(6) deposition issue that's going

4   to be discussed with you on Thursday but --

5      SPECIAL MASTER POPPITI: It may because I

6   did, understanding I wasn't going to have an opportunity

7   to get through that in a great deal of detail, I did

8   take the opportunity to skim it once all the materials

9   were collected, and I think that that may make sense to

10   do that on Thursday.

11      Does anyone disagree? And, Miss Brzezynski,

12   I don't know whether that's going to require you to be

13   interrupted again or to ask that you be interrupted

14   during the course of your vacation or whether somebody

15   else will be dealing with that issue?

16      MS. BRZEZYNSKI: It's my understanding that

17   my colleagues will be handling the argument relating to

18   the 30(b)(6) notice.

19      SPECIAL MASTER POPPITI: Okay.

20      MS. BRZEZYNSKI: I was not planning on being

21   on the call on Thursday.

22      SPECIAL MASTER POPPITI: I don't see any

23   reason for you to be.

081307hr.txt

24        MS. BRZEZYNSKI:  Thank you.


                              30

1         SPECIAL MASTER POPPITI:  Then let's talk

2    about time frame to get these materials to me, that is,

3    the declaration and the privilege log documents.

4         MS. BRZEZYNSKI:  Your Honor, can we say

5    Monday of next week?

6         SPECIAL MASTER POPPITI:  Mr. Merideth?

7         MR. MERIDETH:  That's fine with me, Your

8    Honor.

9         SPECIAL MASTER POPPITI:  Okay.  That's fine.

10    And if they come in -- I'd like them as early in the day

11    as possible because what I am going to want to do, and

12    we don't have to set the date and time now, I am

13    certainly going to need to circle back on the issue of

14    Rudich at some point.

15        MS. BRZEZYNSKI:  Your Honor, when I said

16    "Monday of next week," I am assuming it's the documents

17    that are listed in the letter by Mr. Merideth dated

18    August 8th?

19        SPECIAL MASTER POPPITI:  That's the

                          Page 35

081307hr.txt

20    universe, and if there is agreement to narrow the

21    universe of documents, that's fine.

22         MS. BRZEZYNSKI: Thank you.

23         SPECIAL MASTER POPPITI: Is there anything

24    else, then, on Rudich, please?

31

1          MS. BRZEZYNSKI: No, Your Honor.

2          MR. MERIDETH: The only other issue, Your

3     Honor, in response to the argument that the materials

4     that were filed with the Patent Office would suffice, I

5     don't believe that those documents, without

6     cross-examination of Miss Rudich, would suffice because

7     -- because I think I have heard from Miss Brzezynski

8     that the facts are different than those records would

9     indicate, that is, that Miss Rudich did not, in fact,

10    examine a IBM monitor, and, apparently, had some off the

11    record conversation with the PTO at some later date in

12    which she disclosed that fact. There would be no way to

13    have that anywhere in the record without taking her

14    deposition.

15         SPECIAL MASTER POPPITI: It's certainly a

Page 36

081307hr.txt

16     good point. It's one that I raised with respect to

17     whether she had access to a monitor or not just by

18     virtue of the language in the response to the action

19     from the Patent Office.

20          MS. BRZEZYNSKI: I understand, Your Honor.

21     The only documents referenced on the documents submitted

22     to the PTO were the IBM reference document, which is a

23     manual source of diagrams, and the photos, and that is

24     what she had. That is what she communicated to the PTO

32

1     in the written document, and that was her intent, and,

2     certainly, that's what she communicated to the examiner.

3          SPECIAL MASTER POPPITI: Would someone

4     remind me of the exhibit where that document is, please,

5     so I can look at it as we are speaking?

6          MR. MERIDETH: I don't have it in front of

7     me. I thought it was Exhibit B.

8          SPECIAL MASTER POPPITI: Exhibit B?

9          MR. MERIDETH: I think it was.

10          SPECIAL MASTER POPPITI: Yes. That's

11     exactly right. The remarks --

081307hr.txt

12       MS. BRZEZYNSKI: Exhibit "B" as in boy?

13       SPECIAL MASTER POPPITI: Yes, "B" as in boy.

14       MS. BRZEZYNSKI: The 8/8 letter,

15  Mr. Merideth?

16       MR. MERIDETH: I think the 8/8 letter --

17       MS. BRZEZYNSKI: The 8/1 letter.

18       MR. MERIDETH: Yeah. I think it's also

19  repeated as Exhibit A in the 8/8 letter, if I am not

20  mistaken. It definitely is Exhibit B to the 8/1 letter.

21       SPECIAL MASTER POPPITI: Give me a moment,

22  please.

23       MS. BRZEZYNSKI: I have Exhibit B as the

24  preliminary amendment. I believe it's Exhibit E, as in

33

1  Edward to the 8/1 letter.

2       SPECIAL MASTER POPPITI: Exhibit E to the

3  8/1 letter. I have Exhibit E. I am looking for the

4  language that I asked about during our last

5  teleconference.

6       MS. BRZEZYNSKI: Your Honor, I believe it's

7  on Exhibit E, on page 6, it's the language that you

Page 38

081307hr.txt

8    referred to.

9          SPECIAL MASTER POPPITI:  Yes.  That's

10   exactly right.  Thank you very much for doing that.

11         MS. BRZEZYNSKI:  Sure.  Of course, what's

12   not included here is the disclosure statement to the PTO

13   which listed the photos and the reference diagram as the

14   only two pieces of evidence submitted to the PTO which

15   puts into context that she was referring to the photos.

16         SPECIAL MASTER POPPITI:  I don't have that;

17   is that correct?

18         MS. BRZEZYNSKI:  That's correct, Your Honor.

19   I believe you do not have it.  It has not been

20   submitted.

21              I just wanted to add:  It puts into context

22   that she communicated, in writing, at least, that was

23   her intent, that she only had the photos and reference

24   diagrams, she never viewed the physical device, and she

34

1    confirmed that to the examiner.

2          SPECIAL MASTER POPPITI:  Mr. Merideth, if,

3    in fact, that is the case, how do you respond to that,

Page 39

081307hr.txt

4    that the question that I raised with respect to the

5    language and, in fact, in the physical device, the

6    fixing occurs at the front housing of the IBM 9516, and

7    my concern was that suggested to me that she had the

8    physical device. Now I am being told that the complete

9    document, which identifies what she had, identifies

10   drawings and photographs and not the physical device.

11         MR. MERIDETH: I think what Miss Brzezynski

12   represented in her communication was not that, but that

13   there was a subsequent communication in which an oral

14   communication was made to the Patent Office that she did

15   not have a physical sample.

16         I mean, I don't know what she did, to be

17   honest, but my memory of Miss Brzezynski's submission

18   was that, in fact, there was a subsequent oral

19   communication in which the matter of what she had

20   considered was clarified.

21         MR. KREISMAN: Your Honor, this is Mark

22   Kreisman. I hate to interrupt Mr. Merideth, but from a

23   patent prosecutor's point of view, it would not be

24   uncommon to list photographs of the actual device and

Page 40

081307hr.txt
35

1    submit them with the IBS as the Patent Office does not

2    accept the submission of the actual device, so it would

3    not be unusual that an actual physical device would not

4    be listed on IBS submitted to the PTO.

5         MS. BRZEZYNSKI:  Your Honor, that's what I

6    was turning to, the actual IBS submitted to the PTO, the

7    only information listed were the photos and the

8    reference.  There wasn't the products listed at all.

9         MR. KREISMAN:  And that's true, Your Honor,

10    and that would be unusual to list the product.  It would

11    be a more normal practice to have submitted photographs

12    of a product.

13         SPECIAL MASTER POPPITI:  Well, then, how do

14    I read the statement, And, in fact, in the physical

15    device, the fixing occurs to the front housing of the

16    IBM 9516?

17         Mr. Merideth, are you willing to take the

18    representation that she did not have the physical

19    device?  That's what we are being told.  It may very

20    well be that, were she sworn, she would say that.

21         MR. MERIDETH:  I don't know what she would

22    say if she was sworn.

081307hr.txt

23          MS. BRZEZYNSKI:  She would certainly say

24    that, Your Honor.

36

1          SPECIAL MASTER POPPITI:  And therein lies

2    dilemma.  The fact, in the physical device, I understand

3    that I am -- I am not a patent prosecutor, I am relying

4    on those of you that do patent prosecution, if any one

5    of you is on the phone, and those of you that work with

6    the patent prosecutor, once it gets turned over to

7    litigation, to teach my eyes what that means because

8    that says to me that there is a representation being

9    made to the Patent Office that, during the course of my

10    work, I am representing to the Patent Office that, in

11    the physical device, looking at the physical device.

12          MS. BRZEZYNSKI:  As seen to the photos, Your

13    Honor.

14          MR. KREISMAN:  Your Honor, as somebody who

15    has prosecuted patents and is registered at the PTO,

16    what I can add to that is it indicates to me that either

17    she saw the actual device or spoke with somebody who has

18    seen or investigated the actual device.

Page 42

081307hr.txt

19        SPECIAL MASTER POPPITI:  That's the way the

20    language looks to me.  I don't think -- we are all

21    supposed to be careful about our words in our

22    profession, and I would expect that patent prosecutors

23    are supposed to be much more careful in their

24    descriptive words, and that points me right to a

37

1     physical object where it certainly doesn't say that I

2     didn't have the product.

3            I still have the concern what that language

4     creates, and it may be that the only way to get

5     clarification of that is with the deposition of

6     Miss Rudich.

7            MR. AMBROZY:  Your Honor, it's Rel Ambrozy.

8     In regard to the prosecutions at issue, Miss Rudich's

9     statement whether the pictures aren't the device,

10     itself, she does say the actual device and that device

11     would have been captured in the pictures, but I am also

12     wondering if her statement, even in a declaration,

13     wouldn't have the same effect as if she was sworn in to

14     give the same statement?

081307hr.txt

15          MR. MERIDETH: I believe that, in

16     cross-examination, obviously, I am involved with this

17     every day and I think it's very important. We have had

18     a number of different things that have been represented

19     about what Miss Rudich would say, one of which was that

20     there was a subsequent meeting in which she clarified

21     that she didn't have the physical device. We don't know

22     anything about that. That's not set forth in any

23     declaration, proposed declaration, record with the PTO,

24     or anything else.

38

1          And if it was so clear, why did she have to

2     make that subsequent clarification? I think that's

3     something that, on behalf of my client, I am obligated

4     to explore.

5          MR. AMBROZY: I will point out that that

6     arose because we had tried to ask Mr. Merideth, several

7     times, about what was wrong with Miss Rudich's

8     declaration --

9          SPECIAL MASTER POPPITI: I understand all

10     the history, but please recall that when we last

Page 44

081307hr.txt

11    convened, and I think I am right in this, that I wanted

12    to focus on that sentence, virtually, the beginning of

13    our discussion, and it wasn't something that was raised,

14    for purposes of that discussion, by Mr. Merideth. It

15    was my concern about it.

16        MS. BRZEZYNSKI: Right. In fact, Your

17    Honor, Mr. Merideth and Tatung never raised that issue

18    with us.

19        SPECIAL MASTER POPPITI: I know. At the end

20    of all this, my responsibility is to make sure whatever

21    gets served up either for the jury or for the Court is

22    designed to search for the truth. That's why I asked

23    the question.

24        So, that's my inclination with respect to

39

1    that. I do, however, want to make sure that I have the

2    opportunity to look at her further declaration with

3    respect to her duties back in 2000, for the time frame

4    that we are talking about, and which documents.

5        I think it's going to be very important,

6    expecting that I permit the deposition to go forward, to

Page 45

081307hr.txt

7    ensure that there are appropriate parameters.

8         I know, and we all know, that objections in

9    depositions are more routine than anything unless they

10   deal with privilege, and, yet, I want to make sure if,

11   expecting this deposition goes forward, that an

12   objection that gets outside the framework of what I

13   direct is an appropriate objection, and I will even go

14   so far, for purposes of saying it today, with an

15   instruction not to go further unless you engage me in a

16   telecon. But I do want that other work to unfold so

17   that I can bottom line the whole application as it

18   relates to perspective theories.

19        Is there anything else, then, please?

20        MR. MERIDETH: No, Your Honor.

21        MS. BRZEZYNSKI: No, Your Honor.

22        SPECIAL MASTER POPPITI: I hope you are back

23   to the deck or into the water. Thank you very much,

24   Miss Brzezynski, for taking the time to work while you


40


1    are supposed to be relaxing.

2         MS. BRZEZYNSKI: You are welcome, Your

Page 46

081307hr.txt

3    Honor.

4         SPECIAL MASTER POPPITI:  I appreciate it.

5    If everyone else would stay on the line, please.

6         MS. BRZEZYNSKI:  May I be excused?

7         SPECIAL MASTER POPPITI:  Yes.  Thank you

8    very much.

9         MS. BRZEZYNSKI:  Thank you.

10        SPECIAL MASTER POPPITI:  Back to the

11   question with respect to Thursday's work, and I didn't

12   bring this up to this office with me, but let me ask the

13   question:  In the submittals dealing with the proposed

14   additional deposition, I think that the attachments, the

15   exhibits, referring me to the subjects that were

16   noticed, I think I am looking at different documents

17   from each of you.

18        MS. ROMAN:  Your Honor, this is Tracy Roman.

19   I believe that's probably correct because what ViewSonic

20   submitted today was a revised set of proposed topics.

21   We agreed, during the meet and confer on Friday, to try

22   and find ways to know the topics that originally had

23   been discussed.  Those, unfortunately, did not make it

24   to LPL in California in advance of their filing.

081307hr.txt

41

1       SPECIAL MASTER POPPITI:  Thank you for that

2   because I had to lay them side-by-side and it was clear

3   to me that there was something going on.

4       MS. ROMAN:  Just so the record is clear, the

5   topics have not been served in a notice yet.  We were

6   waiting for confirmation that we could actually proceed

7   with the deposition and to try to reach resolution on

8   the other topics.

9       SPECIAL MASTER POPPITI:  Then what do you

10  want me to do, collectively, with respect to the

11  submittals, knowing that some of the conversation on

12  paper, if you will, references a much broader advised

13  notice, if you will?

14      MR. CHRISTENSON:  Your Honor, as Miss Roman

15  said, we had not received these in advance, so we have

16  not had an opportunity, really, to determine to what

17  extent the new -- the revised proposed topics do or do

18  not narrow the scope of what was originally proposed,

19  and it would be helpful, if possible, for us to get a

20  red-lined version, if you will, that compares the

21  original proposed topics with the new revised proposed

Page 48

081307hr.txt

22    topics so that we can better understand what the current

23    proposed scope is.

24        SPECIAL MASTER POPPITI:  Miss Roman, can

42

1    that be done?

2        MS. ROMAN:  Certainly, Your Honor, I can

3    take on that effort.

4        SPECIAL MASTER POPPITI:  Okay.  And do you

5    anticipate that there will be, then, a need to fine

6    tune, supplement what you already provided to me?

7        MS. ROMAN:  Your Honor, I don't believe so.

8    The truth is that I really don't believe the parties are

9    going to reach any accord on the topics regardless of

10    the modifications we have made.  I just don't think,

11    based on our meet and confer, we are going to come to

12    any compromise on them.

13        SPECIAL MASTER POPPITI:  Okay.

14        MR. CHRISTENSON:  Your Honor, from our view,

15    I -- the answer is I don't know because I am not sure

16    what the comparison looks like.  I would be able to

17    address that more specifically once I was able to see

081307hr.txt

18    what changes, specifically, there are from the original

19    proposal.

20        SPECIAL MASTER POPPITI: Let me do this: I

21    am not going to foreclose -- because I don't know what

22    the difference is either, not having jumped into them

23    with both feet, I know there is a difference -- if there

24    is a need to provide any supplement, I'd really like it

43

1    before close of business tomorrow because I have a

2    commitment outside the office on Wednesday in an

3    argument in another case and I want to make sure that I

4    have those documents -- I have whatever you intend to

5    supplement in my hands before close of business tomorrow

6    afternoon.

7        MR. CHRISTENSON: Yes, Your Honor. And

8    assuming that we get the red-lined today, that should

9    not be a problem and we may or may not need to

10    supplement.

11        SPECIAL MASTER POPPITI: Okay. Then let's

12    talk in terms of time on Thursday. What's the best time

13    for everyone?

Page 50

14          MS. ROMAN:  Your Honor, we can be available

15   any time on Thursday, keeping, obviously, in mind, the

16   time difference.

17          MR. KREISMAN:  Also, I think I should point

18   out, I think Mr. Merideth is also out of the Continental

19   U.S. so we have got a time difference there as well.

20          MR. MERIDETH:  Yes, although that's not an

21   insurmountable problem.

22          SPECIAL MASTER POPPITI:  I guess it depends

23   on which side of the date line you are on, Mr. Merideth?

24          MR. MERIDETH:  I am on this side of the date

44

1    line about as far west as you can go.

2          SPECIAL MASTER POPPITI:  I hope the waves

3    are good.

4          MR. MERIDETH:  There is supposed to be a

5    hurricane on Wednesday, so we will see.

6          SPECIAL MASTER POPPITI:  I hope that decides

7    to go in another direction.  Why don't we look, then, at

8    3:00 or 3:30 on the 16th?  Does that work?

9          MR. CHRISTENSON:  That's fine for LPL.

Page 51

081307hr.txt

10        MR. MERIDETH: Yes, sir.

11        SPECIAL MASTER POPPITI: Then let's do 3:30

12   on the 16th.

13        MS. ROMAN: Your Honor, would you like a

14   copy of that red-line as well?

15        SPECIAL MASTER POPPITI: Please. Okay.

16   3:30 on Thursday. Is there anything else, please?

17        MS. ROMAN: Nothing from ViewSonic.

18        MR. CHRISTENSON: No, Your Honor.

19        SPECIAL MASTER POPPITI: Thank you all.

20        MR. CHRISTENSON: Thank you, Your Honor.

21        MR. KIRK: Thank you, Your Honor.

22        (The hearing was concluded at 5:43 p.m.)

23

24

45

1           C E R T I F I C A T E

2   STATE OF DELAWARE:
                      :
3   NEW CASTLE COUNTY:

4        I, Renee A. Meyers, a Registered Professional

5   Reporter, within and for the County and State aforesaid,

Page 52

081307hr.txt

6    do hereby certify that the foregoing teleconference was

7    taken before me, pursuant to notice, at the time and

8    place indicated; that the teleconference was correctly

9    recorded in machine shorthand by me and thereafter

10   transcribed under my supervision with computer-aided

11   transcription; that the foregoing teleconference is a

12   true record; and that I am neither of counsel nor kin to

13   any party in said action, nor interested in the outcome

14   thereof.

15       WITNESS my hand this 13th day of August A.D.

16   2007.

17

18

19   _____
     RENEE A. MEYERS
     REGISTERED PROFESSIONAL REPORTER
20   CERTIFICATION NO. 106-RPR
     (Expires January 31, 2008)

21

22

23

24

081307hr.txt