# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD, )
)
Plaintiffs, ) C.A. No. 04-343(JJF)
)
v. )
)
TATUNG CO., TATUNG COMPANY OF )
AMERICA, INC., and VIEWSONIC )
CORPORATION, )
)
Defendants. )

Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Monday, August 27, 2007, beginning at approximately 11:30 a.m., there being present:

BEFORE: THE HONORABLE VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

THE BAYARD FIRM
RICHARD D. KIRK, ESQ.
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 2

APPEARANCES (Continued):
MCKENNA, LONG & ALDRIDGE, LLP
CASS W CHRISTENSON, ESQ
REL S AMBROZY, ESQ
LORA BRZEZYNSKI, ESQ
1900 K Street, N W
Washington, D C 20006
for Plaintiffs

RICHARDS LAYTON & FINGER
FREDERICK L COTTRELL, III
ANNE SHEA GAZA, ESQ
One Rodney Square
Wilmington, Delaware 19801
for Defendant Tatung Co

GREENBERG TRAURIG LLP
FRANK MERIDETH, ESQ
VALERIE HO, ESQ
MARK KREISMAN, ESQ
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
for Defendant Tatung Company of America, Inc.

CONNOLLY BOVE LODGE & HUTZ LLP
JAMES D HEISMAN, ESQ
1007 North Orange Street
Wilmington, Delaware 19899
for Defendant ViewSonic Corporation

BINGHAM McCUTCHEN LLP
SCOTT R. MILLER, ESQ
355 South Grand Avenue
Los Angeles, California 90071-3106
for Defendant ViewSonic Corporation

RASKIN PETER RUBIN & SIMON LLP
TRACY ROMAN, ESQ
1801 Century Park East, 33rd Floor
Los Angeles, California 90071
for Defendant ViewSonic Corporation

Page 3

SPECIAL MASTER POPPITI: Mr. Kirk, please.

MR. KIRK: Thank you, Your Honor. This is Richard Kirk from The Bayard Firm for the plaintiff, LG Phillips LCD Co., Ltd With me on the line from Washington are my colleagues from McKenna, Long & Aldridge, Cass Christenson, Rel Ambrozy, and Lora Brzezynski.

MS GAZA: Good afternoon, Your Honor Anne Gaza from Richards, Layton & Finger. On the phone with me is Valerie Ho from Greenberg Traurig for the Tatung defendants.

SPECIAL MASTER POPPITI: Thank you.

MS. HO: And Frank Merideth as well.

SPECIAL MASTER POPPITI: Thank you.

MR HEISMAN: Good afternoon, Your Honor Jim Heisman from Connolly Bove on behalf of ViewSonic Corporation. With me on the line are Scott Miller and Tracy Roman in California.

SPECIAL MASTER POPPITI: Thank you.

I just want to make sure that everyone has in front of them what we would be discussing today, and that would be correspondence from Fred Cottrell dated August 26th, 2007. I also have correspondence, actually, e-mail from Mr Kirk that's dated Friday,

Page 4

August 24th, 2007, attaching correspondence from McKenna, Long dated August the 23rd of 2007, correspondence from Mr. Christenson dated August 23rd of 2007, and I just received correspondences from Ms Gaza dated today, August 27th, 2007.

I realize that there may be reference back to other documents, and my question is: Which would you prefer to address first?

Has there been any further discussion on any of the three topics or four topics? Not the topics in terms of the deposition topics but of the matters in issue? It appeared to me, from what I was reading, that there was ongoing conversation with respect to at least the deposition topics that --

MR. MILLER: Your Honor, we did have a discussion with regard to the deposition topics. As you may recall, we had agreed to provide to LPL our thoughts as to which of the topics we felt were within the scope of the discussions that have been had. We provided that to LPL in the form of a red-line as well as a clean version of that red-lined where we had taken the prior topics and deleted certain of them and tried to limit certain of the others in a way that would ameliorate any concerns and also encompass what we understood to be

Page 5

your directive that the parties should try to make sure that plaintiff, to make sure that the plaintiff knew the areas they wanted to have a witness prepared on so we didn't find ourselves in a situation where a witness had come 10,000 miles and in the deposition chair and hadn't realized they needed to be prepared on certain issues.

So, we placed those into that document. I believe that document, at least the red-lined form, was sent to you The copy I had of the correspondence didn't look like you got the clean version of that. I could send that to you.

SPECIAL MASTER POPPITI: What I was working with was the attachment to the August 23rd correspondence to Mr. Miller.

MR. KIRK: Yes, Your Honor. It was from Mr. Christenson to Mr Miller, and it also attached, I think, the red-lined version --

SPECIAL MASTER POPPITI: That's correct.

MR. KIRK: -- to show the most recent changes.

SPECIAL MASTER POPPITI: That's correct. That's what I was working from

MR. MILLER: And we had a conversation, then, August 22nd, with LPL, about the topics I

believe that, in that conversation, the parties had generally acknowledged that the issues that were the subject matter of the deposition notice were generally within the scopes of the items that had been identified

We were anticipating that, on August 23rd, we would get back additional markup of comments on those topics from LPL. Instead, we got Mr. Christenson's letter, which just really recited much of their side of the discussion that took place on the 22nd. So there have been no further discussions since August 23rd with regard to those topics.

SPECIAL MASTER POPPITI: Okay. Then I think what's important to do is to, and it's unfortunate that we are in this position, but I think we are, and let me make one comment before we launch into the discussion of this.

As I think I have said before, what we had been involved with over now the past couple of weeks and I believe now the third session with me, is an effort to pave the path forward on a deposition that I have suggested and agreed to permit.

Now, having said that, it seems to me that the time to take any exception to what I have suggested and permitted is when this is all done. I don't think

it makes sense otherwise because I have been involved, if you will, in your meet and confers. I think that's the only fair way to do it, unless you all arrive at a different resolution to that one issue, namely, when do you have to file the exceptions

If you agree that the exceptions with respect to the deposition itself should run from when I first indicated that that should occur, then I will, it makes sense to -- you should live by your agreement. If you can't agree, I think it would be unfair to start the time running from the moment that that iteration was made

I don't know that we need to dwell on that at this juncture, but if we should, let's do that.

MR. CHRISTENSON: Your Honor, I think it makes sense for us to talk off-line about that and see if we still have any dispute given your comments

SPECIAL MASTER POPPITI: Okay. Then let's look, or begin to look at the issues with respect to the topics And let me see if I understand what you have done here in the conversation, the one conversation that you did have with respect to the topics, themselves And let me do it by way of example.

For example, if you look at topic No. 5 just

for the moment for purposes of an example, and I realize that in Mr. McKenna's correspondence to Mr Miller, topic five is the discussion of a number of different points in that piece of correspondence.

As I read what topic five covers, even though it refers to the phrase "commercial success," I had understood that what you all were trying to accomplish with the topics and what I expected you were trying to do was to give as much detail as would permit the witness to prepare, that's your obligation, and then the witness' obligation flows from that, and, yet, at the same time, I think we were all striving to expect that the topics would not be in the traditional, Here's the topic, here are the 15 subtopics. So that when I look down at the phrase "commercial success," and we can have a discussion about whether or not that calls for some legal conclusion or not, I expect that that's a shorthand way of describing the focus of topic five.

MR. MILLER: Your Honor, that's exactly correct.

SPECIAL MASTER POPPITI: And you have done it elsewhere in the topics. So, for purposes, again, of looking at topic five as an example, assuming that, with respect to topic five, there are no other issues that

need to be resolved, or even, once those issues are resolved, my question is: Understanding, as I did, that commercial success was a shorthand way of describing what you could do in five, six, seven, eight, nine, ten subtopics, what's the issue with respect to No. 5?

MR CHRISTENSON: Cass Christenson for LPL, Your Honor. The issue, and this is something that we discussed with the defendants, the issue is that what we understand we are looking at in the prior topics, one through four, are the type of facts that we would think would fall under the umbrella of, quote, unquote, commercial success. And, therefore, our concern is that, apparently, there is some additional fact or subtopic that's intended to be encompassed in this catchall provision, but we really don't know what it is, and the defendants were not able to give us any specific examples that would fall under the topic five that's not covered under the prior topic.

SPECIAL MASTER POPPITI: That's why I picked five as an example to start with.

MR CHRISTENSON: So if there is something there, it seems like it's helpful for us to know in advance what is it that they are going to argue later, potentially, they think is relevant to commercial

success that's not set forth more specifically in prior topics.

SPECIAL MASTER POPPITI: Mr Miller.

MR. MILLER: Your Honor, we did have this discussion, as we told Mr. Christenson on the 22nd, we had gone through and tried to provide information or topics that would pick out some of the specific areas that would be relevant to commercial success, but we also didn't want to be in a situation where we were in an argument with them about whether or not something that clearly is directed to whether or not these newly produced products and the new information bears on the issue of commercial success but is outside the words that were chosen previously. And rather than go through and try to propound a request that they are, a series of requests that would have, as you said, 15 subparts, we tried to just have, you know, specific ones, and then this sort of catchall.

As we said to Mr Christenson in our call, we are trying to make sure we are not having fights. We don't have -- we are not -- we don't have a secret agenda here of somehow trying to do this, but we also don't want to be in a point of, because of the manner in which we have tried to prepare this list of information,

be in a situation where we can't ask a question that, in the normal course of events, we all would sit down and agree is a commercial success, proper commercial success question but may not fall, as I say, within the specific words that we used in front of the prior requests.

So that was the whole purpose of this, is to try to avoid arguments, taking, as I said earlier, seriously your admonitions, that we want to make sure we have enough details for the lawyers to be able to sit down and prepare their clients and for the clients to -- and for the defendants to be able to be circumscribed in their questions about the new discovery.

SPECIAL MASTER POPPITI: Mr. Christenson, with that understanding, and knowing that you can expect that I will be on the other end of the telephone call when you are doing this work, why isn't it an appropriate way to approach topic five even though the earlier topics are more specifically directed at facts that may underlie the issue of commercial success?

MR. CHRISTENSON: One concern we have, and you hit on it earlier, is that this is really a topic that's framed in terms of a legal conclusion and what we think is the appropriate way to frame the topic. Ultimately, the burden would either fall on LPL to try

to anticipate what would potentially come under this catchall topic, or the burden would fall on the defendants in advance to state, with more particularity, what it is.

SPECIAL MASTER POPPITI: I understand all that. And the reason why I mentioned "legal conclusion" was because that's one of the issues that you raised with respect to topic five, and I don't think there should be any misapprehension about legal conclusions.

Mr. Miller, do you expect that you are going to want this witness to be -- you are going to be asking legal conclusions with respect to commercial success and somebody should be in a position to answer them?

MR. MILLER: No, I don't. And, in fact, we advised Mr. Christenson on our call on the 22nd that if they wanted to -- and the kinds of the things that we thought we might get back from them on the 23rd would be a request to put in things like factual underpinning relating to commercial success. That's obviously what we are looking for. I am happy to go through the expense that there are, you know, a broad handle here like commercial success and put in the words "facts underlying" or something like that because that's clearly what we are looking for.

We are not looking for legal conclusions or expert testimony.

SPECIAL MASTER POPPITI: I would expect that with respect to both, you said with respect to commercial success and expert testimony, and it may be that those words would appropriately find their way into these topics for purposes of just answering that question.

MR. MILLER: I am happy to insert that when we are done here and we have final guidance about what we should do.

SPECIAL MASTER POPPITI: Mr. Christenson, any other discussion on five?

MR. CHRISTENSON: No, Your Honor. I think it comes down to -- I think the issue is framed and I think it just comes down to whether you believe it's appropriate to allow sort of catchall topic frames in this legal fashion rather than -- you know, in addition to the more specific topics that are set forth.

SPECIAL MASTER POPPITI: If we were having a different conversation and if the conversation was backdropped against a properly noticed deposition and that deposition was framed against topics and subtopics, there is no question we would be having a different

Page 14

conversation.

Given what I expected I was asked to do, and you both agreed that I should be participating in this fashion, I believe that the topic five does comply with both the letter and spirit of what I expect that we were doing.

I certainly do not anticipate that five, or any others that we focus on, given my guidance, if you will, on five, I certainly do not anticipate that there is going to be an effort to sandbag a witness or to waste time. And that's why I will make myself available while you are doing that work.

With those changes to five, understanding that it's not contemplated to deal with a legal analysis or an expert opinion and with the proposed language change that I suggested, I will let five stand.

That may impact on others here. I expect it would. And you all know your topics and your discussions with respect to those topics better than I, but I am happy to walk through the topics with you and make sure that what I have just done with five gets mirrored to other topics and whatever subparts exist.

Who is going to take lead, please?

MR. CHRISTENSON: Yes, Your Honor. This is

Page 15

Cass Christenson. Why don't I go through, if I may, and I can just sort of, starting at the beginning, I can flag any concerns that we had and we can get your input if that's acceptable.

SPECIAL MASTER POPPITI: Sure.

MR. CHRISTENSON: Some of these I don't want to revisit because I think they are acceptable given your prior guidances and instructions. For example, topics 1B, C, D, topics 2B, C, and D, I think, are within the general scope of which you had found permissible.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: I did want to raise an issue with respect to topic 1B.

SPECIAL MASTER POPPITI: Yes.

MR. CHRISTENSON: Topic 2B is the same for purposes of this concern.

SPECIAL MASTER POPPITI: It's a mirror.

MR. CHRISTENSON: And that is that it's framed in a way that is related to your claim construction. And, so, it's asking potential -- and we discussed this with the defendants as well -- it's potentially requiring the witness to talk about LPL products in terms of what claim limitations they meet

Page 16

under your definitions of those terms. And we previously agreed with the other side that the Rule 30(b)6 depositions in this case would not encompass parties' positions or contentions on validity infringement or enforceability, but, rather, those issues would be for the expert witnesses.

So we don't want to be in a position where the witness is going to be asked questions that would fall into that expert realm and require the witness to take positions related to claim construction.

SPECIAL MASTER POPPITI: Mr. Miller.

MR. MILLER: Your Honor, what I advised Mr. Christenson of on the 22nd was that we would be -- consistent with our agreement, if LPL's witness says, We are relying solely on expert testimony with regard to those issues, that that's fine, that was our agreement. But if they intend to put on a witness, a fact witness, beyond their expert to testify about any of these things, obviously, we are entitled to know what that fact witness is going to say and all we would be looking for here is if there are facts that their fact witnesses intend to deal with or testify to at trial, we want to know what they are. If they are going to come in and say, We are solely relying on expert testimony with

Page 17

regard to those issues, that will be the end of the inquiry.

SPECIAL MASTER POPPITI: Can I expect, then, your response is really framed in sub paragraph C, D, and E of each of those topics, No. 1 and No. 2? I think what happened, and, certainly, even before looking at LPL's position with respect to the topic in terms of arguing through it, when I looked at it, and I did turn to the topics first, I certainly had the concern that LPL raises.

It seems to me, though, that, Mr. Christenson, what Mr. Miller just said was what makes -- it certainly makes sense to me. If topic B gets responded to by virtue of saying, We intend to rely on expert opinion, doesn't that answer the concern?

MR. CHRISTENSON: It sounds like it would, Your Honor. I agree with you that the factual -- we understood were the factual type questions were under subparts C and D.

SPECIAL MASTER POPPITI: C and D.

MR. CHRISTENSON: And D, obviously, does not read that way. So, if that's the -- if the understanding is that they will not attempt to make LPL an expert in that regard, then I understand that and

Page 18

that resolves that concern.

SPECIAL MASTER POPPITI: Mr Miller. Mr. Miller, did you hear?

MR. MILLER: Yes. I was speaking on mute.

SPECIAL MASTER POPPITI: That's all right.

MR. MILLER: Yes. What I said was, Our agreement originally from the beginning has been so long as the parties indicates they are relying solely on expert testimony, that that's the end of the inquiry.

SPECIAL MASTER POPPITI: Okay.

MR. MILLER: So we are happy to abide by that.

SPECIAL MASTER POPPITI: Okay. I expect that, with that understanding, the topics and the subtopics underneath of that are gone; do you agree, Mr. Christenson.

MR. CHRISTENSON: We understand that your expectation is, Your Honor, that those are permissible subject areas, yes.

SPECIAL MASTER POPPITI: Thank you.

MR. CHRISTENSON: Thank you.

Topic 1E and 2E, I think, are within the scope of what you expected. I think there is a concern there that it's, you know, very broad in terms of the

Page 19

number of products and the way that the topic is framed, but, ideally, we will be able to resolve that by trying to pinpoint certain products. And if not, we will just have to deal with that topic generally, which is the way that it's currently framed.

So, I don't think there is anything we need to do today on 1E.

MR. MILLER: Your Honor, on that point, in our discussion on the 22nd, we indicated that, obviously, if they had documents that would assist the witness, we are happy to have those documents and try to narrow issues and use documents in a way that will be efficient. If there are other documents they have that they haven't produced, that would be great. If there aren't, then we will be able to only get the information that's available.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: With respect to topic three, and I am looking at the red-lined, which is topic, actually, 3C, 3D, and 3E, these topics deal very broadly with sales marketing, supply channels, product distribution, customer relationships for a whole host of products, and we understood, from the hearing that we had with you on August 16th, that ViewSonic was going to

Page 20

put a finer point on that type of subject so that we would be talking about marketing and advertising with respect to the relevant product features or what they believe are the relevant product features of LPL's products.

And we understood, as we say in our August 23rd letter, that, based on the hearings, those features were going to be primarily the potential fastening elements on the products, and that was discussed in the transcript on August 16th.

We see that, in topic 4B, there is that limitation, so that topic 4B now talks about sales distribution, marketing, and advertising with respect to fastening elements or mounting features --

SPECIAL MASTER POPPITI: Did you say 4B?

MR. CHRISTENSON: Yes, 4B. So, in our view, that really is the topic that was discussed on August 16 and the topic that you deemed appropriate, that we think topics 3C, D, E, which opens up that field to make it overly broad and burdensome, is not within the four categories that were discussed on August 16 and is to far afield from the relevant subject matter which is really what's already set forth under topic 4B.

So we object to topics 3C, 3D, and 3E, and

Page 21

the transcript citation where that limitation was discussed was the August 16 transcript at pages 68 through 70.

In terms of general product distributions and customer relations and the like, that was part of our two-day deposition that LPL provided previously and we feel that that discovery should not be closed.

SPECIAL MASTER POPPITI: What was the date of the transcript?

MR. CHRISTENSON: It was the August 16 transcript starting at page, I believe, 68.

MR. KREISMAN: It's Mark Kreisman joining. I apologize for my late joining, Your Honor.

SPECIAL MASTER POPPITI: Just give me a moment to pull that transcript. Hold on one second.

MR. CHRISTENSON: It looks like it starts on page 67, Your Honor.

SPECIAL MASTER POPPITI: Okay. I pulled the different binder into the room. Mr. Miller.

MR. MILLER: Well, I start with 3D, as in David. I am surprised that that's on his list today because that was in the recitated list of topics Mr. Christenson indicated before were acceptable at the last hearing. I don't remember if it was on August 16th

or 17th. I was trying to skim through the transcripts, but I know that is one of the topics they had already indicated. So we have not spent any time, obviously, looking at that one, nor did we have any other discussion with regard to it.

With regard to topics 3C and 3E, I think that 3C relates to the flat panel display products which are assembled products which LPL has taken the position consistently in discussions that they know nothing about.

SPECIAL MASTER POPPITI: Right.

MR. MILLER: In our call on August 22nd, apparently, it sounds like LPL does, in fact, have knowledge relating to fully assembled final products other than just modules, themselves, and, thus, they raised a concern about 3C.

I don't -- given the representations that have been made about their lack of knowledge, I don't know how I can do anything that would limit this. We are not, obviously, going to try to look at -- we are going to focus on things that are really important here and relevant to the issues in this case and the discovery that has been produced or, in this case, perhaps discovery that hasn't been produced. But I

don't -- I don't know how I can limit this further.

My expectation, frankly, was that we were hear -- the answer would be, We don't know anything about this given all the prior representations, and now I learn, in this meet and confer, there may be things there.

SPECIAL MASTER POPPITI: When I was looking at 3C, my reaction was certainly, if the answer is, We don't know, then that's the answer.

MR. MILLER: Correct.

SPECIAL MASTER POPPITI: And, Mr. Christenson, I don't know whether we need to discuss that. If that's going to be the answer, then that is the answer, and any concerns about a scope and burden and everything else just fly out the window.

If, in fact, during the meet and confer, and I don't believe that I had the benefit of that information, at least I hope I didn't because I don't remember it, that is the information that Mr. Miller just shared, and, that is, that there may be some knowledge. I think it's a fair line of inquiry if for no other reason than the representation, rather, as I recall it, each time we have addressed issues that implicate topics or a topics in C, and we have done it

on a number of different occasions, the answer has been, We don't do that; we don't have any information with respect to that.

Mr. Christenson.

MR. CHRISTENSON: Yes. What Mr. Miller discussed with respect to the meet and confer was not entirely, it was either not entirely accurate or not entirely clear. But, to explain, we do not make finished flat panel display products, but we do know, obviously, who LPL's customers are because they buy modules from us.

SPECIAL MASTER POPPITI: Right.

MR. CHRISTENSON: And some of those customers make finished products. So, there is some level of knowledge, Your Honor, that LPL, I think, would have, and if -- and I understand your view to be that topic 3C is appropriate to the extent that there is knowledge.

SPECIAL MASTER POPPITI: Let me ask this question in light of what you just said: Mr. Miller, if the expectation is there is going to be some discussion about the marketing, shipment, importation chain, that's not what you are looking for; correct?

MR. MILLER: What I am looking for would be,

at least at one level, one thing I would be looking for would be, if there are prior art products that we think are relevant and need to be clarified as prior art that were sold to somebody who imported those products into the United States, we would want to know. And LPL new -- for example, if LPL knew they sold a batch of product X to Dell and Dell's importation of those products would qualify that module as prior art, obviously, I would need to know that LPL sold a batch of product X products to Dell and that they were going into Dell product Y so now I can track down the information on Dell product Y.

And that's -- so, in that sense, we are looking for information that would show how you would qualify that module as prior art. And, historically, we have always been told they don't have that information. They don't know what product X that LPL makes ends up into product X, Y, or Z of company A, B, or C.

SPECIAL MASTER POPPITI: In light of what I believe I understand to be either the case with respect to information conveyed during the meet and confer or at least with respect to the issue that may have been discussed during the meet and confer, I think topic 3C is appropriate.

Does that not implicate D and E on three?

MR. CHRISTENSON: I think our concern remains with topic 3D and 3E that the scope and the breath, in just reading the topics, is excessively broad and there is really no focus It's not limited to prior art products It's not limited to -- it encompasses basically any and all aspects of any business relationship with any customer or any product that might be referenced anywhere in LPL's supplemental production which is thousands of pages

So, that's the difficulty we have with that scope, and that's, I think, why we had understood, in that August 16 hearing, that there was going to be a finer point

SPECIAL MASTER POPPITI: Yeah. There is certainly -- I am in the August 16th hearing Let's just look at that for a moment, please

Mr Miller, I don't know whether you have that in front of you, sir.

MR. MILLER: I do have the transcript, Your Honor.

SPECIAL MASTER POPPITI: 67? You said 67, Mr Christenson?

MR. CHRISTENSON: Yes. That was where I was talking about our concerns about possibly having to

testify about advertising was an example I was giving for an unspecified feature, or even a specified feature for an unspecified product, and I noted that could be hundreds of products over a 10-year time period. And then on page 68 to 69, there was further discussion I think you had pointed out that it would not make sense to anyone to have a lack of specificity because then we could have a problem with witness preparation and lack of discovery. And ViewSonic's counsel agreed and said that the case was about fastening elements and how the product is ultimately mounted.

And then there was further discussion where ViewSonic's counsel, I think, had stated that there would be discussion between ViewSonic and Tatung to try to come up with some clarity on that.

MS ROMAN: Your Honor, I must have a different numbered set of the transcript, unfortunately, I am not in the exact same place I just wanted to point out that certainly one limitation that has been added since that August 16th hearing is the narrowing of the scope of products to our previous -- or our recent meet and confers, so that's one thing that has been further provided to help narrow it.

SPECIAL MASTER POPPITI: Narrowing the scope

by virtue of the definition?

MS. ROMAN: Yes, by virtue of definition and the number of products that will be ultimately inquired into.

The second thing is that there is a certain amount of foundational facts, as Mr. Miller pointed out, that we need to inquire into in order to get to a determination whether a fastening element was or wasn't marketed. We certainly don't expect that we are going to find a great big advertisement that says, Look at this fastener on the rear of our module and it's a great way to mount your product, but there might be certain products that talk about damages that have been achieved in the product that we would want to try and relate back to the fastening elements, but we can't do that if we don't have the foundational facts that Mr. Miller described.

SPECIAL MASTER POPPITI: Let me just look at -- Miss Roman, where in the red-line does it limit the number of products?

MS ROMAN: Let me just pull it. It would be in the definitions, Your Honor

SPECIAL MASTER POPPITI: I am looking in the definitions and I certainly recall that the definitions

were modified to reference --

MR MILLER: Your Honor, I think it is in the definition, for example, of prior art product. Originally, prior art products meant any product conceived, made, marketed, or sold by LPL before December 31, 1998. And now it is the products disclosed in the recent discovery that were conceived, made, marketed, distributed before December 31, 1998.

So we have defined it by a specific subset as opposed to an unidentified subset, and I think that was a point Mr. Christenson was concerned about was any product conceived, prior to that time, all they have is this information And I think that other LPL product in paragraph 20 of the definitions was similarly restricted to products disclosed in the recent discovery

SPECIAL MASTER POPPITI: Okay And what was initially looking for, when I was listening to Ms. Roman, was a number limit, but there is no number limit. It's bounded a time limit and the description of supplemental discovery

MS ROMAN: Your Honor, I would also point out that we have had, since this -- or in our last discussion, I believe, we pointed out that the letter from Mr Kirk dated August 3rd indicated that there were

Page 30

approximately 23 prior art products that have been disclosed in the recent discovery and approximately 50 later products that have been disclosed in the recent discovery. And we had discussions about our offer to further, if possible, narrow the number of products on the other products to a smaller number if we could get information from Mr. Christenson that provided family information that allowed us to categorize products as, you know, having similar features that were at issue here.

SPECIAL MASTER POPPITI: Yeah.

MS. ROMAN: So that was sort of the number of products I was referring to, but it falls just within the scope of the recent discovery.

SPECIAL MASTER POPPITI: Okay. Well, I understand what the universe is, and I also understand and expect that you would live by your representation that if additional information is provided that permits you to family them, if you will, that you will do that.

And with that understanding, I am satisfied that the scope is appropriately defined given the nature of the production, and I don't find that it's going to be overly burdensome.

MR. CHRISTENSON: Your Honor, moving forward

Page 31

to the next issue, and that is topic 4A.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: Topic 4A refers specifically to the Georgia Pacific analysis, which, of course, is the analysis for reasonable royalty.

SPECIAL MASTER POPPITI: Yes.

MR. CHRISTENSON: And this, again, was part of -- we brought in a separate witness to address this type of information at the prior deposition, a high ranking executive from LPL, and who testified extensively over the course of two days about LPL's position with respect to reasonable royalty and the various factors that would be relevant under Georgia Pacific.

And, so, here, we object to topic 4A because it doesn't have anything to do with the specific supplemental issues related to the documents that were produced recently and a more general topic.

SPECIAL MASTER POPPITI: I am sorry. I cut you off, Mr. Christenson. I apologize.

Mr. Miller, speak to that, please, if you would.

MR. MILLER: Sure. There are aspects of the Georgia Pacific factors that look at issues concerning

Page 32

the prior art and the prior profferings and the differentiation the invention presumably injects into the marketplace. We, obviously, didn't have the opportunity to ask the witness about any other materials that are in the documents that we have now just gotten produced.

SPECIAL MASTER POPPITI: Right. That's correct.

MR. MILLER: That's what we are looking for.

SPECIAL MASTER POPPITI: And if, then, Mr. Christenson, if the boss on the language that's sitting on the page is, as I expect it was, and it certainly has to be, focused on the supplemental production, then I am satisfied that the Georgia Pacific type questions can be asked with respect to that supplemental production.

MR. CHRISTENSON: Well, my -- just reading the topic, then, Your Honor, I am not sure how to reconcile the Georgia Pacific factors with the recent production because the way this is -- the way this is worded, it's asking about general subject areas or factors under Georgia Pacific, and I really don't -- I really don't see where a specific question could relate to an LPL product that's reflected in the recent

Page 33

production.

SPECIAL MASTER POPPITI: I am happy to pose that question to Mr. Miller because it's certainly going to be important for me to make sure that whatever questions are framed are framed against supplemental production.

MR. MILLER: Your Honor, I think it will because the supplemental production, for example, on the prior art products, the issue about mounting features in the prior art, shown in the prior art products or in the supplemental production that are post prior art, clearly, will have features that are going to be compared to or that we are going to feel are appropriate to compare to features on the accused products and to be able to ascertain the impact that those have on the underlying factors. For example, one underlying factor is whether or not the invention is -- I don't have the factors in front of me to state it specifically -- but whether or not the -- there is an independent market demand, for example, for the underlying feature that is the subject matter of the invention.

SPECIAL MASTER POPPITI: Right.

MR. MILLER: And, obviously, we should be entitled to inquire into LPL for facts relating to what

market demand was there for these features that are contained in the prior art products because we believe, for example, that, to the extent there are fastening elements on the back, if there was no market demand for them then and they claimed they had a finished good sometime later, there is a market demand, we are entitled to try to impeach the later conclusion based on the earlier facts and that's what we are going to be driving at.

So I think the topic is directed to and does specifically say the materials and we can -- if Mr. Christenson wants to propose some language to make it clearer, we obviously invited that last week, but it is associated with the LPL products which is defined as the LPL other products or the LPL prior art products, or any flat panel display product, which would be a finished good of somebody using and employing the LPL products.

So, if LPL, for example, took one of its products and said, You can make a thin bezel monitor out of this product because of these features, LPL is going to want -- I suspect what we are going to see at trial is that LPL is going to say, Well, ViewSonic said thin bezel products, that's related to the practice of the

invention, and, therefore, pay us a lot of money.

We should be entitled to see, without either LPL directly or LPL's customers, as a result of the information they received from LPL, made arguments about similar promotion of products, it would impeach this conclusion they are trying to reach that the practice of the invention of the patents-in-suit is what led to these thin bezel products as opposed to some other feature.

SPECIAL MASTER POPPITI: I think with the example that you just gave, you did what we did at the beginning of this teleconference, and, that is, with respect to commercial success, you did shorthand and then you described what you were looking for.

With respect to any other relevant Georgia Pacific factor, I think what I heard Mr. Christenson say, I am not sure which ones you are focused on, and he did just that, Mr. Christenson, did he not?

MR. CHRISTENSON: Your Honor, he did. I understood everything he said. And everything that Mr. Miller said comes directly under topic 4B. And, so, I really don't have anymore clarification now than before.

4B talks specifically about any sales,

distribution, marketing, etcetera, with respect to what ViewSonic deems to be the relevant features of LPL's products. And, so, that comes right under 4B. But I don't know what comes under 4A.

MR. MILLER: Your Honor, again, I would agree -- I mean, as we said earlier, part of this is to make sure we are not in the situation where we are arguing about whether or not we have identified. We can have 14 subtopics, one for each of the 14 Georgia Pacific factors, that would track like 4B if we wanted. We didn't think that was the exercise we were trying to engage in. And, so, we tried to put it into A.

We obviously had B there because it is an issue that is more, that we are certainly going to focus on.

SPECIAL MASTER POPPITI: Would you agree with me that there are certain factors in Georgia Pacific that you are not going to focus on?

MR. MILLER: I would expect there would definitely be some factors we are not going to focus on.

SPECIAL MASTER POPPITI: Then if there is a remaining dispute, so that our discussion isn't protracted, I think the best way to do it in terms of the notice that we are talking about here and the

exercise that we have all participated in, I would ask that with respect to the call out of the Georgia Pacific factors that you are going to focus on in 4A is appropriate. Okay?

MR. MILLER: Thank you, Your Honor.

MR. CHRISTENSON: Your Honor, I don't think we need to discuss 4B any further.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: 4D is a topic that we discussed with ViewSonic and it relates to forecasts or projections since January 1, 1996. We are investigating right now to see whether that information was requested or whether that information exists at LPL, but, obviously, just as ViewSonic, for its deposition, convinced Your Honor that the deposition should not be broader than the time period for the production; in other words, there should be a mirror between the document production time period on financials and the deposition topics on financials, we would expect the same would apply to LPL.

The document request requested documents back to, and I am just taking this as an example, say 1998, it doesn't make sense for a witness to be expected to testify on documents that did not need to be produced

that go back to financials before 1998.

SPECIAL MASTER POPPITI: Mr. Miller.

MR. MILLER: Your Honor, I think -- two things. One, this came up at a hearing I know I wasn't at and I remember seeing something in the transcript where you indicated that an earlier date was appropriate in this case. We have documents that were never made available to us during the discovery period, and if we had needed to go back and revise the document requests, we obviously could have done it had they been produced timely.

But the issue here really relate to things, for example -- let me look at it -- it deals with forecast projections in 1996 that would ultimately be sales in 1997, presumably, or some period of time later. And, so, we are looking at trying to get information and we think this bears on the commercial success if LPL believed it was going to sell 10 million of these things, product X, and it only sold 500 but it wants to contend that 500 is commercial success, I think that's a piece of information the jury has the right to know about.

So, giving projections that would predate any actual sales data, I think, is completely

appropriate, and I think Your Honor has already actually addressed this in a prior hearing.

SPECIAL MASTER POPPITI: If I have addressed it, I really want to be aware of it in the context that I was addressing it.

MS. ROMAN: It was during the August 16th hearing. Mr. Miller just pointed out, and I am looking for the page, had pointed out that one of the products identified in the recent discovery were the products that dated back to 1996, and, unfortunately, on my numbered transcript, it's page 44. I am not sure if that's the same as everybody else's.

SPECIAL MASTER POPPITI: 44 at the bottom of the page or 44 in the --

MS. ROMAN: It's 44 at the top of the page.

SPECIAL MASTER POPPITI: Do you want to read the language there for a moment, Ms. Roman

MS. ROMAN: Mr. Miller was speaking and he says, "I would like to have an understanding, while we are here, and perhaps some guidance as to the relevant time period. We, obviously, believe that the discovery requests and the questions that we asked the witness, Mr. Kim, were appropriate going back at least until 1996 when this Lucky Gold Star product was manufactured."

MR. CHRISTENSON: Just to be clear, I am not objecting to the time period in general because you did address the time period in general with respect to what are prior art products. What I am saying is, more specifically, when we get into financial information, the witness should only be testifying about what was requested for production, and, obviously, if they requested it and it exists, the witness can talk about it. If they didn't request it or it doesn't exist, then there is no reason -- the witness wouldn't have the information to be available to be discussing at the deposition.

That was the same thing that we discussed with respect to ViewSonic's deposition and Your Honor agreed with ViewSonic on that point.

SPECIAL MASTER POPPITI: Let me know -- I believe I have found that portion of the transcript that Ms. Roman was referring to, and it is, on my copy, at page 38 at the bottom, page 45 of what appears to be the transcript, it begins, Mr. Merideth says, "Yes. Well, the one product that they have disclosed is the Lucky Gold Star product that is attached to one of our letters to Your Honor in one of the supplemental submissions.

"SPECIAL MASTER POPPITI: I am aware of it.

"MR. MERIDETH: Which is the 1996 Lucky Gold Star product."

Mr. Merideth goes on, I think this is where you are, Miss Roman, "We asked Mr. Kim about the previous products that it used rear mounting fastening elements, and he claims that there were none. We certainly believe now that a 30(b)(6) witness ought to be available to testify who has knowledge of the fastening elements, particularly rear mounting elements, that existed on products prior to 1999, going back at least until 1996, and if there were rear mounted products before then, those products."

Is that where you are?

MS. ROMAN: Yes, Your Honor.

SPECIAL MASTER POPPITI: My comment is, "Based on the production of the Lucky Gold Star document, I am satisfied that it should go back to 1996, and if there are other products before 1996, it should go back to identify them as well, to discuss that as well." I am just reading on so just give me one moment, please.

I expect, certainly, the context of what it looks like we were dealing with there was the production of the Lucky Gold Star documents, and what, if any,

topics or questions could be posed to the 30(b)(6) witness with respect to that product and any other product that was identified even prior to 1996.

Would everyone agree with that?

MR. CHRISTENSON: LPL agrees.

MS. ROMAN: Yes, Your Honor.

SPECIAL MASTER POPPITI: With that ruling, Mr. Christenson, how do you expect, then, that that implicates your concern as it relates to topic 4D?

MR. CHRISTENSON: I think that the context to that discussion, as you correctly noted, was with respect to the time period of prior art products and the ability of the defendant to ask questions back to that early time period because it could be relevant, based on their arguments, to their invalidity defense. But I don't think that should give them license to force us now to produce new documents, financial information, when we have had numerous hearings and made numerous efforts to provide all the financial information that was requested timely during the discovery period which went back to a certain time period. I don't think it went back to 1996. And if they didn't ask for financial information to be produced back that early when everyone knew what was or was not relevant based on the issues in

the case, then I don't think it's appropriate or fair for them to now be able to, essentially, broaden or serve new discovery requests for broader financial information.

So, I am just talking about in terms of financial information, which is what this topic addresses, for financial information, we think that the time period of the testimony should mirror the time period of the document production, which is the same conclusion that you reached with respect to -- when we deposed the defendants' witnesses.

SPECIAL MASTER POPPITI: I remember. I certainly did that. I, unfortunately, I gather none of us remembers the time period. I don't.

Mr. Miller, is it the expectation that if, for example, the time period were 1998, that given the reach back that results from the identification of Lucky Gold Star, is it your expectation that, in the context of what we are doing here, namely, a 30(b)(6) witness, that this witness needs to be preparing him or herself by going back to all forecast projections or expectations earlier than production in the case?

MR. MILLER: I guess, Your Honor, I would say, and I was trying to see if I could find the

information about the dates, but my answer to that would be, In this circumstance, where we have a party who has withheld documents that should have been produced eons ago during discovery, and we could have, obviously, propounded another request, if necessary, that we should not be foreclosed from being able to obtain discovery on what is unquestionably relevant information because the party chose not to produce those documents until after the close of discovery and now says you can't go back and amend your discovery.

SPECIAL MASTER POPPITI: I did cover that, certainly, by virtue of the questions that I asked Mr. Christenson the last time we had a teleconference and he was forthright in his response that it was a decision, it wasn't something that resulted as -- it was a result of something that couldn't be done. It was a decision that was a certification decision, if you will.

Let me question a little further. I mean, it does seem to me, and I understand exactly what you are saying, without having the framework of documents that have been already requested and already identified, therefore, and produced, it's kind of reaching into a deep hole and reaching back. And I understand that your argument is you should be able to do that, and I think

your argument is rather compelling in light of the late production.

I am just looking to a concern with respect to efficiency here where it's not a matter of saying to a 30(b)(6) witness that's going to be sitting rather, in short order, and we are going to be saying to that individual, Go look for this stuff, at this stage of the proceeding.

I am concerned about the logistics of it all in terms of getting it all done to prepare that witness to sit. Maybe I shouldn't be. That may be, and you may say this to me, That's LPL's concern and problem.

MR. MILLER: In my heart of hearts, that's how I feel. This is a problem of their own making, and I shouldn't be prejudiced in my ability to get the information. As we said earlier, if there are documents out there, we would be happy to take the production of documents to make this efficient. It's not a memory test, as we have all said on many occasions, talking about these things, it's about getting the information out that's appropriate so that the Court and jury can make their own decision. And we are in this situation not because of anything we did.

SPECIAL MASTER POPPITI: I understand the

Page 46

nature of the request. I understand what it may implicate. I understand how I have ruled in the past with respect to issues of this nature. It does reach back, but I believe it appropriately reaches back in light of the late production.

If there can be a more efficient way to do topic 4B, then I would encourage everyone to do it. But I am going to leave it stand.

MR. CHRISTENSON: We already addressed topic five.

SPECIAL MASTER POPPITI: Yes.

MR. CHRISTENSON: And topic six, we believe, falls within the scope of what you have previously concluded should be permitted in the supplemental deposition.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: So I think we already have that record and that decision from Your Honor.

SPECIAL MASTER POPPITI: Okay.

MR. CHRISTENSON: I don't think we have to revisit that.

Topic seven, we did have some concerns about topic seven.

First of all, topic 7I, which is framed as a

Page 47

catchall inequitable conduct topic, I suspect, given Your Honor's prior comments, that would be treated the same as topic five and you would permit topic 7I even though LPL's position is that it's really overly -- it's not clear what's being requested and a more specific subject matter is set forth in the preceding topics.

SPECIAL MASTER POPPITI: Mr. Miller, do you have anything else to add with respect to I before discussing some of the other concerns raised with respect to topic seven?

MR. MILLER: Not as to the specifics of that. Obviously, I am happy to discuss the issues relating privilege or something that might be implicated which we also discussed with Mr. Christenson last week.

SPECIAL MASTER POPPITI: Okay. Then, with respect to I, again, I think it's part of the way we have done -- that I have hopefully assisted in getting this business accomplished in terms of the way I is phrased, and I will raise the same concerns and caution with respect to questioning a witness using, if you will, 7I.

So, having said that, it has to stand the way it is. And, you know, with respect to attorney/client privilege and things of that nature, is

Page 48

it fair to expect that the umbrella of topic No. 7 is whatever information is going to be elicited is information that is non-privileged?

MR. MILLER: It would be non-privileged or information about which, if they raise the privilege, obviously, if they assert it, we are entitled to have the assertion, and we know we won't see it at trial, but that's the purpose is, if their questions would be within the scope of the privilege and they assert it, that's fine, we will deal with that provided it's a proper assertion.

SPECIAL MASTER POPPITI: I understand Mr. Christenson.

MR. CHRISTENSON: Yes. I think that clarification is helpful.

Looking at the face of the topics, for example, in topic 7C and in topic 7H, there is specific reference to privileged communications within the face of the topic. So if they are now not planning to address those issues in the deposition, which is what I understand to be the case, it's essentially the effect of amending those topics not to any longer include those communications.

MR. MILLER: Let's just be clear. We are

Page 49

going to ask the question and they are free to assert the privilege and that will the end inquiry if it's a proper assertion of the privilege. But we are not going to not have the -- force the assertion of the privilege at this time because, otherwise, they can raise it at trial and that's unfair to us.

SPECIAL MASTER POPPITI: Right. And I understood your clarification.

MR. CHRISTENSON: The other concern that we have, Your Honor, is that we don't want to be in a position where LPL testifies in response to some of these questions related to patent prosecution and then that testimony is used against us after the deposition to argue that there is a waiver and we should have to be further imposed on attorney/client communications.

I am not sure how to really address that on the front end, but it's a concern that we did want to raise.

SPECIAL MASTER POPPITI: Mr. Miller.

MR. MILLER: We are not seeking to compel a waiver. If they have waived it or choose to waive it, we are entitled to discovery. If they haven't and they assert the privilege, we are not.

SPECIAL MASTER POPPITI: I think that that's

all that can really be done at this juncture, Mr. Christenson.

MR. CHRISTENSON: I agree.

With respect to the topics, then, are we correct in understanding that those topics will be permitted, Your Honor?

SPECIAL MASTER POPPITI: Yes, sir.

MR. CHRISTENSON: Thank you. And then topic eight, subtopic 8B, we talked with Mr. Miller about this, and we understand, based on our discussion, that they are going to ask questions concerning, for example, whether something may be a true and correct copy or whether, you know, something may be a business record, which I think are appropriate questions. But the way the topic reads is that the witness has to be prepared to discuss whether documents produced meet the requirements of admissible evidence under the Federal Rules of Evidence.

SPECIAL MASTER POPPITI: I am happy to hear that this is not law school evidence, whatever the numbers are in the classroom.

MR. MILLER: It clearly is not and we made that point last week.

SPECIAL MASTER POPPITI: Okay. Good.

MR. CHRISTENSON: So if the issue is of authenticity and business records, we can understand that to be the topic notwithstanding the reading of 8B.

SPECIAL MASTER POPPITI: Mr. Miller, anything else on that, then, please?

MR. MILLER: Obviously, there may be other exceptions to the hearsay rule or some other issue that would make it admissible and that's what we want to be able to inquire about.

SPECIAL MASTER POPPITI: About the facts, it may implicate a rule of evidence?

MR. MILLER: Yes. Correct.

SPECIAL MASTER POPPITI: Mr. Christenson.

MR. CHRISTENSON: Those are the only two examples, I think, that we had discussed. If there are others, it would help to know in advance, but we are doing the best we can.

SPECIAL MASTER POPPITI: I would urge that if there are other examples that you know you are going delving into, it would be important to know those in advance just for purposes of the efficiency of the deposition.

MR. MILLER: That's fine, Your Honor. I am happy to point Mr. Christenson in the direction of other

rules of evidence, if appropriate.

SPECIAL MASTER POPPITI: Thank you, sir.

MR. CHRISTENSON: And then the final subtopic, Your Honor, is topic 8D, which are samples that we understand that is within the scope of what you had expected would be part of the supplemental deposition, so I don't think we have any other issues that we needed to discuss with you at this time concerning the topics.

SPECIAL MASTER POPPITI: Okay.

MR. MILLER: On that last issue, I think, at the meet and confer, Mr. Christenson indicated they were -- they believed they had some samples they were going to make available to us this week. I don't know if he has any further information on that he can share with us.

MR. CHRISTENSON: Well, I was hoping to talk to you about that on Friday, Scott, but I think you didn't want to talk. I can talk to you again earlier this week if you want. Did you get my letter on Friday?

MR. MILLER: I did get a letter from you on Friday.

MR. CHRISTENSON: So we can talk later.

MR. MILLER: Sure.

SPECIAL MASTER POPPITI: Let's just talk a little bit about logistics here. By virtue of going through what we did today, you have got my direction, and I think we can accomplish this one of two ways to make sure this is on track for purposes of anyone wanting to take exception to what I have done.

We can either -- I am just trying to think of the most efficient way for purposes of generating something that you may choose to put before Judge Farnan. Pointing him to the transcripts that we have generated over three some odd days, I am not sure is going to be the most efficient way if something is served up to him. And, yet, I want to make sure that something gets generated as quickly as possible, and, quite frankly, I am in the throws of doing a number of orders and opinions in another case that will tie me up at least through the end of the week.

So, my question is this: I think the most efficient way is for someone to prepare a form of order for my review and signature, and, hopefully, get LPL to agree to at least -- to the form, unless there is an agreement as to both form and substance, and then, of course, if there is, to form and substance, that says to me there is going to be no exceptions taken, and the

Page 54

document you have drafted, I don't even need to see because it's a so ordered, if you will, on the record.

Does that make any sense? And I realize I am throwing work back to one of you or one of your colleagues, and I know you are in the throws of an extraordinarily busy time, but I just want to get something finished, and I would propose that the finish should be by the end of the week so I can put my signature to something on Friday. It does not have to be lengthy. It can be in the nature of a, one of the shorter format orders that I have done.

I know that, Ms. Gaza, you are on the line; correct? Is Anne on the line?

MS. GAZA: Yes, Your Honor.

SPECIAL MASTER POPPITI: I am sorry.

I know that you have, or your colleagues have done it for me in the case that I am presently working on, that's the kind of order that I am thinking of, just to pull everything into one document for review by Judge Farnan, if necessary.

MS. GAZA: Okay.

SPECIAL MASTER POPPITI: Rather than having him thrash around three days' worth of transcripts now.

MS. GAZA: Understood, Your Honor. I can

Page 55

work with counsel to put that together.

SPECIAL MASTER POPPITI: And can it be done in the time frame that I get to see the final product by Friday, end of business, Eastern time?

MS. GAZA: I believe so, if that's fine for Mr. Miller and Mr. Connor.

MR. MILLER: We will make time.

SPECIAL MASTER POPPITI: And what I would need, then, it needs to be generated on your end, turned around to LPL to have their view as to form only, and then back to me by Friday. So, I mean, I'd like you to work out that kind of detail, if you would.

MS GAZA: Certainly, Your Honor. We will do something like we did in the other case that we drafted and exchanged and then get the final to you by Friday.

SPECIAL MASTER POPPITI: Okay.

Mr. Christenson, do you have any -- I am going to ask, you can tell me that you don't know and I don't need to know, do you know whether your client has made a -- is there a determination as to whether or not there is going to be exception taken or you don't know yet or you are not at liberty to say?

MR. CHRISTENSON: Your Honor, I don't know

Page 56

-- I cannot answer that one way or the other at this point.

SPECIAL MASTER POPPITI: Okay. Thank you. I appreciate the process that I have proposed and I look for something not later than end of business on Friday.

MR. CHRISTENSON: Yes, sir.

MS. GAZA: We will make sure you get that, Your Honor.

SPECIAL MASTER POPPITI: Thank you very much.

We had -- I don't know whether we actually scheduled further discussion on Rudich and a different McKenna deposition for today. If anyone was under the impression that we have not done that, then I am happy to do it other than today. But if you are all prepared to do that, then I am as well.

MS. HO: Your Honor, our understanding was that these issues would be addressed today.

SPECIAL MASTER POPPITI: Okay.

MS. BRZEZYNSKI: We have no objection to proceeding today as well.

SPECIAL MASTER POPPITI: Okay. Just give me one moment. Just hold one second, please.

I think the most recent documents, and I

Page 57

referenced them earlier, earlier this afternoon, was correspondence to Mr. Kirk dated the 23rd of August and correspondence from Ms. Gaza dated August 27.

Who is going to start, please?

MR. MERIDETH: Your Honor, I think our view is that the discovery, with respect to Ms. Rudich, should be limited in light of her most recent declaration and the information that may have been given by Ms. Brzezynski to the subject of the '079 application and her representations with regard to the IBM prior art reference.

Frankly, our view is that since she is unable to address the issues with regard to inequitable conduct that have arisen as a result of the revelation of the Lucky Gold Star product, that there be a 30(b)(6) witness from McKenna served up on the topics that we have provided which relate to inequitable conduct.

SPECIAL MASTER POPPITI: Let's speak, first, to Miss Rudich's deposition. I have reviewed and am mindful of her declaration of August 20th, 2007, and, therefore, understand the context in which Mr. Merideth is suggesting that her deposition be limited to a discussion of the '079 application.

And what I haven't done is I have not combed

Page 58

back through the transcripts of the several times that we had discussed Miss Rudich, but I think it was fairly clear in those earlier transcripts that I was going to permit the deposition on the '079 and that the question remained with respect to her broader knowledge involving the patents in issue.

Does everyone agree with that?

MR. MERIDETH: Yes, Your Honor.

MS. BRZEZYNSKI: Go ahead, Mr. Merideth.

MR. MERIDETH: I agree.

MS. BRZEZYNSKI: Certainly, we are under the impression that Your Honor was still considering these issues. LPL continues to take exception to the position that Miss Rudich must provide any testimony at all; however, we do agree that if any deposition is ordered of Miss Rudich, it has to necessarily be limited to the '079 application and the IBM prior art reference.

SPECIAL MASTER POPPITI: Okay. Then I believe that the prior -- my comments in prior transcripts reflect my view as to whether or not she should be required to offer deposition testimony only on the '079 application, and I will require that.

It seems to me, again, the most efficient way to get some document in place so that I can turn --

Page 59

so that Judge Farnan can turn to it as quickly as he can, if there is an exception taken, would be to generate the document as I have proposed earlier.

Mr. Merideth.

MR. MERIDETH: I will be happy to do that.

SPECIAL MASTER POPPITI: Miss Brzezynski, all I am looking for is approval as to form only.

MS. BRZEZYNSKI: I understand, Your Honor.

SPECIAL MASTER POPPITI: Let's turn to the other issue, and let me just ask a question: Mr. Merideth, I have not gone back through the history of Rebecca Rudich perhaps as carefully as I should for purposes of having this conversation today, but I think I know it fairly well, and what I am not sure that I see is a clear path forward to Rebecca Rudich as the 30(b)(6) deponent for purposes of your discussion of inequitable conduct.

MR. MERIDETH: I would agree with that, Your Honor. In fact, I am not proposing, based on her declaration, or on the representations made by Miss Brzezynski, that she be the 30(b)(6) witness. It doesn't appear that she has had the exposure to the patents-in-suit. I had an impression from her earlier declaration that she did have, and, as a result, I don't

Page 60

think she would be the appropriate person.

SPECIAL MASTER POPPITI: I don't think I framed my question very artfully.

I don't see anything clearly enough to suggest to me that there was a focus on anyone as a 30(b)(6) deponent on the issue of inequitable conduct.

MR. MERIDETH: I believe that's also correct. I don't think it is up to the Tatung defendants to designate the witness that would speak for McKenna.

SPECIAL MASTER POPPITI: I understand that. But where is the discussion on a 30(b)(6) witness?

MR. MERIDETH: The discussion was originally with respect to Miss Rudich and her knowledge with respect to the prosecution of these patents which arose when the issues regarding her testimony came up, I think, for the second time, at which we discussed the scope of her deposition that covered both the issues of the '079 patent and inequitable conduct in light of the recent disclosure of the Lucky Gold Star reference.

If she was not the person to be able to give that testimony, as we had thought she was, then we believe that we should be entitled to take a 30(b)(6) deposition of McKenna on the subject of this recently

Page 61

produced prior art.

SPECIAL MASTER POPPITI: Okay. And I understand your position with respect to wanting to look rather squarely at this recent production of the prior art.

I guess my question is: In looking at the subjects, or the topics, I am sorry -- let me get those in front of me -- looking at topics No. 1, 2 -- No. 1 and 2 and all the subtopics under that, isn't it fair to say that those subtopics could have been the subject of a 30(b)(6) notice before fact discovery concluded?

MR. MERIDETH: That's correct, except that we did not have the information that we now have that was just produced with respect to this Lucky Gold Star product, and that creates an entirely new ball game, from our vista, because we need to know what considerations were taken with respect to not producing other prior art references.

In other words, prior to having that, we didn't have a basis to assert, although there were general allegations in the complaint with -- I mean, in the answer, that cites inequitable conduct, we didn't have a specific. Now we have a specific. We have a product that is in all fours, that is an invalidating

piece of prior art, it was not produced to the patent office, it was not produced to us but was intentionally withheld, according to Mr. Christenson, and that was a strategy that was undertaken by McKenna, and we are now in a situation --

MR. CHRISTENSON: That's not fair. That's not what I said. That's not correct.

SPECIAL MASTER POPPITI: Just let him finish, please.

MR. MERIDETH: That's the way I interpret it, is that there was a decision made not to produce this prior art reference. We now have the prior art reference and it raises very significant issues with regard to inequitable conduct, and we think we ought to be able to inquire into those issues.

It's not our purpose to inquire into things that could have been inquired into before, except the difficulty that we have is, A, we have a real for instance, it's very specific, and it's the Lucky Gold Star product. There are other references that are invalidating and there is going to be an issue as to whether they were known of or whether they have just recently been discovered. But, in this case, it was a product that was produced by LG.

So, we think that we have a right to inquire into that and discover why that or any other similar products, from which that product may have been derived, there may be some other manufacturers' products that we have specifically identified, of why those were not disclosed to the patent office, and, in fact, why they weren't disclosed to us in discovery.

MS. BRZEZYNSKI: Your Honor, may I respond?

SPECIAL MASTER POPPITI: Yes, please.

MS. BRYEZYNSKI: Your Honor, first of all, we absolutely disagree that this Lucky Gold Star product is invalidating prior art and we will address that at the appropriate time. We also disagree that any improper conduct has occurred by either MLA attorneys or by LPL.

Regardless of that, Your Honor, we believe you nailed it on the head that any notice of the deposition of MLA should have been served long, long ago, prior to the close of fact discovery.

Tatung has had an inequitable conduct defense since 2005. Second, Tatung asserted wrong theories of prior art relating to its inequitable conduct defense in its February 2006 interrogatory answers which we attached as Exhibit K to our August

23rd submission to Your Honor.

SPECIAL MASTER POPPITI: I have looked at those.

MS. BRZEZYNSKI: The same issues were raised by Tatung then; therefore, it's the -- if Tatung wanted to proceed with a deposition of MLA, it should have done so during fact discovery.

I also want to point out to Your Honor another important fact. You will notice, in their August 27th letter sent less than one hour before the hearing today, that Tatung also refers to an LG 500 LC class. I want to point out to you, Your Honor, that Tatung and ViewSonic have already questioned John Kim, one of the inventors, about that product at length in March of this year. They also questioned Mr. Bang, after insisting on his deposition, at length, about that product in March of this year. They also deposed a third party, LGE USA, about that product.

So, once again, those issues were before Tatung and raised by Tatung during fact discovery, and if they wanted to proceed with a deposition of MLA, they should have noticed it during fact discovery. It is now untimely and there is simply no basis for granting a deposition of MLA at this time.

I think what we have here is an attempt by Tatung to bootstrap a 30(b)(6) deposition of McKenna, Long & Aldridge on a notice of deposition and subpoena for Rebecca Rudich's deposition that they served in February 2007. That should not be permitted for several additional reasons, including that Rebecca Rudich's deposition was withdrawn, by subpoena, and then was revised to one issue only, only related to the '079 application, which was confirmed by Mr. Merideth as late as his July 9th e-mail, which is also attached to this submission.

Second, Your Honor, Tatung says, in its August 27th letter today, that they relied on the Rebecca Rudich declaration when they issued the subpoena, so that cannot be accurate because the subpoena and deposition notice for Rebecca Rudich was served by Tatung on February 27th, but Miss Rudich's first declaration was not dated until March 6th, 2007. So, certainly, there is no possible way that Tatung could have relied on Rebecca Rudich's declaration when it served its subpoena.

In any event, even if Tatung attempts to argue that sometime after Miss Rudich's declaration, Tatung relied on the language in there to suggest that

Page 66

Miss Rudich was involved in patent prosecution of the patents-in-suit, again, we argue that that's simply not possible either. That declaration was signed in 2007. The language in there says that Miss Rudich works on patent prosecution activity related to the patents-in-suit. The only patent prosecution activity going on in 2007 was related to the continuation application. The patents-in-suit issued in 2002, and there has been no patent prosecution activity after that point.

I, therefore, suggest to Your Honor that Tatung's recent attempt to obtain a deposition of McKenna, Long & Aldridge is wholly inappropriate and untimely and should be denied.

MS. HO: Your Honor, if I may address a couple of the points that Miss Brzezynski just brought up?

SPECIAL MASTER POPPITI: Please.

MS. HO: First of all, we did not say, in our submission this morning, that we had relied on Miss Rudich's declaration in issuing our subpoena to her. That is not what we said.

We issued our subpoena to her and then we received her declaration which confirmed to us that she

Page 67

was the appropriate witness. Had we known, as it turned out, that she is not the appropriate witness, then we could have subpoenaed someone else. We could have subpoenaed McKenna or we could have subpoenaed someone else at the McKenna firm before the close of fact discovery, but we did not do that because we understood, based on her declaration, that she was the appropriate witness.

So, that's my first point.

My second point is that I know that Your Honor was just focusing on topic No. 1, but if you turn to topic No. 2, you see that those topics are really limited to what's defined in the depo notice as the LPL prior art products.

SPECIAL MASTER POPPITI: Yes.

MS. HO: And the definition of LPL prior art product is the products -- includes the products disclosed in the recent discovery and that were conceived, made, marketed, sold, distributed, disclosed, and/or offered for sale by LPL on or before December 31st, 1998, and that's pretty much the same definition that was used in LPL's -- I am sorry, in our deposition notice, supplemental deposition notice to LPL that we had just talked about earlier.

Page 68

SPECIAL MASTER POPPITI: Yes. That's pretty much the same.

MS. HO: And, so, you see that the topics in -- or the subtopics in topic No. 2 are generally limited to the products that were recently disclosed.

And then topic No. 3 has to do with the NEC litigation which Your Honor has already ruled that we can explore.

The only question is: Why topic No. 1?

Well, when read in isolation, yes, topic No. 1 could have been noticed before March 30th, 2007. That's true. But it would have been pointless for us, Your Honor, I submit, to just notice topic No. 1 because, back in March, we did not know about the LPL prior art products that just recently have been produced and that we want to explore in topic No. 2. So, the two topics are interrelated.

SPECIAL MASTER POPPITI: I gather, and I want you to speak, just very briefly, to Miss Brzezynski's comments with respect to Tatung's response to the respective interrogatories that were identified at Exhibit K. There, Tatung described, with some factual backdrop, its -- I am just flipping through it, that's why I am -- it describes some of the factual

Page 69

backdrop for its assertion of inequitable conduct, and it, in fact, describes some prior art, as I remember, when I read it initially.

MS. HO: That's correct, Your Honor.

MR. MERIDETH: We do have some prior art, but let me make it clear, we view taking the deposition of counsel to be a serious matter that should not be undertaken based upon just skepticism.

SPECIAL MASTER POPPITI: Right.

MR. MERIDETH: In this case, we have a situation in which we were presented three weeks ago with what we view, notwithstanding Miss Brzezynski's position, to be a smoking gun. That immediately brings into focus the necessity to take the deposition of MLA with respect to inequitable conduct with respect to that reference, and it's not simply that reference in isolation because, while the other references are not unimportant, we did not view them, prior to receiving this most recent disclosure, to be of such moment that it was necessary for us to depose MLA.

We have a new ball game here. We have a piece of prior art that we believe was intentionally withheld. We have a right, I respectfully submit, to explore that. In the context of that area to produce

Page 70

that prior art, I think we are compelled to ask the question, Well, if you withheld that piece of prior art, what other prior art did you withhold? And that question would not have been appropriate prior to the production of this Lucky Gold Star product. And I don't think it is appropriate to argue that, Well, just because we managed to keep this Lucky Gold Star product under wraps until the discovery cutoff lapsed, you don't have any right to make any discovery with respect to inequitable conduct. That's fundamentally unfair. And it was the production of that particular product that really brings this whole matter of inequitable conduct into focus.

MS. BRZEZYNSKI: Your Honor, the arguments being made by Miss Ho and Mr. Merideth are inconsistent with each other. Mr. Merideth is now saying that if, you know, as a result of production of the -- in documents relating to Lucky Gold Star, they now want a deposition of McKenna.

Miss Ho is saying that Tatung could have subpoenaed someone else prior to the close of discovery if they had known that Miss Rudich was not involved in the prosecution of the patents-in-suit.

SPECIAL MASTER POPPITI: It was against the

Page 71

backdrop of this late production. That's what I understood Ms. Ho's comments.

MS. HO: That's correct.

MS. BRZEZYNSKI: The issue, though, Your Honor, is Miss Rudich's deposition was never related to the patents-in-suit. It was always limited to the '079.

If you read Miss Ho's argument, then you also have to assume that Tatung's offer, over several months, to accept a declaration from Ms. Rudich was also an empty offer that they were always going to renege on. Miss Rudich's deposition was always limited to the '079 and nothing more.

Now, correct me, Your Honor, Tatung had previously asserted every product as prior art in support of their inequitable conduct defense, including an LGE product, prior to the close of discovery. Any deposition of McKenna, Long & Aldridge attorneys should have been noticed prior to the close of discovery.

The suggestion now that the production of the Lucky Gold Star information somehow raises the importance of this issue and warrants a deposition is simply inappropriate.

SPECIAL MASTER POPPITI: Let me ask --

MS. BRZEZYNSKI: They should have made these

Page 72

issues during discovery and they should have noticed this deposition at that time.

SPECIAL MASTER POPPITI: There is no question, certainly in -- there is no question in my mind that a deposition of a patent prosecutor from McKenna could have been noticed before. Mr. Miller acknowledges that and I expect that Miss Ho would acknowledge that as well.

I know, and you all know, and there is even some case law out there that expresses chagrin when it is done, there is some case law that suggests if you are going to depose the inventor, then you shouldn't be deposing the patent prosecutor -- I think I am correct in stating it that way -- so, if there was a determination made not to depose a McKenna, Long attorney on the issue of inequitable conduct and if the path forward on Rebecca Rudich was as it is and there is some garble to it, I understand where we were the day before there was production of Lucky Gold Star.

I think what I see here is, with the production of -- and maybe -- let me pose this question: If Lucky Gold Star were produced in isolation and it was not connected to NEC litigation, would we not be having a different discussion?

Page 73

MR. MERIDETH: We very well could be, but, in this case, we know that at least LG Phillips, and we believe McKenna was involved in the NEC litigation, had that sheet, that specification for this product in at least 1999 or 2000, and, yes, it makes a lot of difference.

MS. HO: And, in fact, Your Honor, we were able to obtain copies of the complaints in the NEC matter, and the complaints identify McKenna's predecessor, which I believe is McKenna -- sorry, I am just trying to flip through it right now -- it's -- I am sorry, it's McKenna's predecessor, Long, Aldridge & Norman as the lead trial counsel in those cases.

SPECIAL MASTER POPPITI: Here is where I think we are: There is no question that I expected production may lead to the requirement for additional discovery of whatever -- whatever that additional discovery was at the time that we had that conversation about the prospect of having additional discovery sometime ago, and I want to say it was in the March or April time frame.

Given the production of the Lucky Gold Star asserted prior art and given the context of its production, namely, the reference to NEC litigation, I

Page 74

am satisfied that Tatung should be able to explore all that that means with a McKenna, Long attorney.

Again, I will ask Mr. Merideth and Miss Ho, for purposes of getting something across my desk as quickly as possible, to do the form of order -- not a form of order, it would be in the format of a proposed recommendation to the Court, reviewed by Miss Brzezynski for form only, and present it to me not later than the end of the week Friday.

MS. BRZEZYNSKI: Your Honor, I'd like an opportunity to address their proposed -- Tatung's proposed topics for examination as well.

SPECIAL MASTER POPPITI: Okay.

MS. BRZEZYNSKI: Tatung's proposed topics are extremely broad, not limited to just the Lucky Gold Star products only. When you are looking at topic No. 1, they are general broad topics as to McKenna's business policies and procedures and practices, and are not at all related to Lucky Gold Star products or anything specific to Lucky Gold Star or prosecution of the patents-in-suit in NEC litigation.

Topic No. 1 is completely inappropriate, including its two subtopics.

SPECIAL MASTER POPPITI: Let's talk about

Page 75

that for a moment.

Who is going to speak to that, please? Mr. Miller? Mr. Merideth or Miss Ho?

MR. MERIDETH: The issue here is whether McKenna, Long & Aldridge had a policy with respect to requiring its clients to produce prior art or a product that -- or identified product that would implicate beyond cerebar (phonetic) in the process of prosecuting the patent.

We need to determine whether or not this reference to the Lucky Gold Star product was, in fact, given to McKenna, Long & Aldridge, whether they had it in their possession, or whether it was not disclosed to them by their client, that is going to bear on how the trial of this issue of inequitable conduct goes forward.

If the answer to the question: Did you know anything about this Lucky Gold Star product?, is, Gee, I didn't know anything about it; I didn't know that there was a product like that. The next question is going to be, Well, what did you do to find out about it? And that's what the question No. 1 is intended to elicit. If we can't ask those questions, we are going to have one arm behind our back.

MS. BRZEZYNSKI: Your Honor, the problem

Page 76

here is that topic No. 1, as framed, is extremely broad, covers McKenna's general business practices and procedures relating to patent prosecution for all of its clients and all of its matters and is not limited to just the prosecution of the patents-in-suit.

MR. MERIDETH: We need to know whether there is --

SPECIAL MASTER POPPITI: Are you suggesting that if the topic were changed to say "patents-in-suit," that there is some policy or practice that's different with respect to these patents-in-suit as opposed to other work that McKenna, Long did between 1998 and 2002?

MS. BRZEZYNSKI: I am not saying that there is a difference. What I am saying is the only relevant information -- and, first of all, we do argue that NEC deposition is appropriate.

SPECIAL MASTER POPPITI: I understand that.

MS. BRZEZYNSKI: But the only relevant area is prosecution of the patents-in-suit. And getting into McKenna's general business practices is proprietary and privileged information and it's inappropriate in this context.

MR. MERIDETH: I respectfully disagree.

SPECIAL MASTER POPPITI: I don't know how

Page 77

there can be any development of what was done or not done against what I understand to be the topic of inequitable conduct if Tatung is not able to explore the process as it is contemplated.

MS. BRZEZYNSKI: They should be required to --

SPECIAL MASTER POPPITI: Would it be fair for me to suggest that what I expect Mr. Merideth and his colleagues would be looking for is what you would all say in response to an assertion that something went wrong here. I mean, if you start describing your policy and practice in the context of, We didn't do anything out of the ordinary here, without Tatung having the opportunity to explore that in discovery, I think there is one hand tied behind their back; isn't there?

MS. BRZEZYNSKI: I disagree. Tatung can ask questions relating to policies and procedures for prosecuting the patents-in-suit and should not be permitted to get broader than that, Your Honor.

We are talking about proprietary information relating to McKenna's business products being asked by a competitive law firm.

SPECIAL MASTER POPPITI: Excuse me. Why can't these topics be framed in the context of the

Page 78

patents-in-suit?

MS BRZEZYNSKI: I am sorry. Can you say that again?

SPECIAL MASTER POPPITI: Mr. Merideth, why can't the topics 1A and B be framed in the context of the patents-in-suit?

MR. MERIDETH: They can, Your Honor, so long as we are able to ask whether there is any variation on the policies and procedures that are generally applicable to other clients In other words, if they say, Well, we send out a questionnaire, or we ask the following specific question, or we don't ask the following specific question, I think we should be able to ask, Well, in general, is your practice the same or different with respect to other clients?

SPECIAL MASTER POPPITI: Why?

MR MERIDETH: I believe that it pinpoints the issue of whether or not there has been sufficient inquiry and inquiry that meets the standard of care that's required under the patent laws with respect to asking the patentee to disclose prior art or art that would preclude patenting because of the on sale of art And if, for example, I am not suggesting that was the case here, MLA simply never asked LGE or LPL for that

Page 79

information, we are entitled to know that If it is their practice to otherwise ask for that information and they failed to do so in this case, I think we ought to be able to develop that.

MS BRZEZYNSKI: I submit that those follow-up questions do not matter and are not relevant at all to this case, and any questions at all should be limited to just prosecution of the patents-in-suit.

MR KREISMAN: Your Honor, if I may speak.

SPECIAL MASTER POPPITI: Yes.

MR KREISMAN: I may be one of the only patent prosecutors on the phone. What I can tell you is there is the issue of the McKenna firm and the attorneys at the McKenna firm and their predecessor practices have a tremendous amount of patent work being prosecuted on behalf of LGE and LG Phillips, and if we are limited to questioning LG Phillips' representative only on the patents-in-suit, you can see a position we could be placed in where, at trial, we will be suddenly advised there was information that was given to LG Phillips, or LGE, as a predecessor, about other LG patents that had been worked on, and if we are not allowed to ask about those other earlier practices regarding their earlier portfolio, we will never know We will be sandbagged

Page 80

Somebody could answer, Well, for these patents-in-suit, thus or such happened, and if we are not allowed to follow-up with, Well, what was the practice with all the hundreds of LG patents, was there a policy?, it becomes very difficult for us to get any of the evidence regarding intent.

MS. BRZEZYNSKI: Your Honor, I am now even more troubled by Mr. Kreisman's comments that they want to depose a witness about earlier practices about other patents.

SPECIAL MASTER POPPITI: I don't think I heard him say "other patents." I thought I heard him say "other policies and practice."

MR. KREISMAN: That's true, Your Honor.

SPECIAL MASTER POPPITI: Let's do this: I am going to permit that topics 1A and 1B, given the nature of the conversation that we have just had, I do not think that that involves proprietary information Your record is protected The document that I will look to sign, I would expect, would highlight the discussion that we have just had, certainly not in the detail that we have had it, so that Judge Farnan can be informed, as I expect he would be, given the nature of the conversation that we have had

Page 81

Is Friday, with this document, also doable, please?

MR. MERIDETH: Yes

SPECIAL MASTER POPPITI: From LPL's perspective?

MS. BRZEZYNSKI: Yes, Your Honor. If I may just add, is my understanding correct that the topics are limited, however, to the Lucky Gold Star product and should not include any questioning related to any other of the asserted prior art products by Tatung?

MS. HO: We have defined prior art LPL product in the deposition notice.

SPECIAL MASTER POPPITI: Yes, you have.

MS. HO: And those --

SPECIAL MASTER POPPITI: It's all supplemental.

MS HO: Yes, Your Honor. Well, it's all supplemental and that 500 LC monitor. Let me clarify. It's the product identified in the recent discovery produced by LPL plus the LG 500 LC monitor.

MR. MERIDETH: Let me explain why the 500 LC is important in that context. It has to do with the supplemental information filing by LPL with respect to the '079 patent in which other prior art that was

identified by the Tatung defendants was provided to the patent office, that the reference to the 500 LC was omitted, and we want to know why

MS BRZEZYNSKI: Your Honor, the LG 500 LC product was raised by Tatung in March and April. If they had an issue with that product, they should have raised it in a notice prior to this close of fact discovery

SPECIAL MASTER POPPITI: I thought I understood Mr. Merideth to say, and please correct me if I am wrong or restate what you have just said to me, the reason why the LG 500 LC is being raised at this time, in this context, is because of information that was received in supplemental production?

MR. MERIDETH: Correct.

MR. KREISMAN: I think I can clarify the point if I may, Your Honor

SPECIAL MASTER POPPITI: Please

MR KREISMAN: We spoke, in the earlier hearings, about the '079 prosecution, and Mr. Merideth mentioned an information disclosure statement, an IDS, and he had mentioned that certain products were appearing on that now, and Miss Brzezynski, rightly so, indicated to Your Honor that it would be McKenna's

obligation, when references that were asserted as prior art in litigation came to their attention, that they would submit those in an IDS to the patent office.

SPECIAL MASTER POPPITI: I remember exactly what you said and I understand the obligation.

MR KREISMAN: Thank you, Your Honor. And what was our reading of the IDS is the 500 LC product, which has been repeatedly identified in interrogatory responses by the defendants, continues to be omitted from that IDS list.

MS BRZEZYNSKI: Your Honor, I thought we discussed this issue previously that if an IDS was submitted in the '079 application, that that was an obligation of McKenna to provide that information but that it had nothing to do with the prosecution of the patents-in-suit. If it had to do with the '079, then the appropriate inquiry would be of Ms Rudich but not of an MLA attorney having to do with the patent prosecution of the patents-in-suit.

MS. HO: The reason that the LG 500 LC monitor continues to be relevant in this case, Your Honor, is because, based on LPL's most recent infringement contention, which was served after Your Honor's claim construction rulings, we believe that this

product is an invalidating prior art reference and it was not disclosed during prosecution of the patents-in-suit, and based on LPL's own reading and application of Your Honor's claim construction, this product would have been material prior art, would be invalidating prior art, and should have been disclosed.

So, it is the receipt of LPL's recent infringement contentions that have confirmed for us that this is a material reference for purposes of inequitable conduct, and that is why we have included it as one of the products in the definition for prior art LPL products.

MS. BRZEZYNSKI: If that is all, Your Honor, Tatung was making those claims in March and April when they deposed LPL witnesses on the LG 500 LC product.

SPECIAL MASTER POPPITI: Look, I didn't focus on the LG 500 issue. I think I understand what you are talking about, but, quite frankly, I want --

MR. AMBROZY: Your Honor, also the argument --

SPECIAL MASTER POPPITI: Give me a second please. What I want you to do, and I am sorry that I have to do it this way, I just want you to focus on the 500 LC issue, and I want you to do it without discussing

it on the phone. I want to be able to look at it and I want it in two pages and I want cross filings, simultaneous filings tomorrow, not later than 3:00 my time, so you will all have time to get it done. And I will advise counsel sometime late tomorrow afternoon what my view of including or not including the LG 500 LC product hopefully by the end of the business day tomorrow if not first thing Wednesday morning.

MS. HO: I did not catch the time. Did you say 3:00?

SPECIAL MASTER POPPITI: 3:00 my time, please. That would be 12:00 your time. And I just want two short pages without having to use a magnifying glass.

Okay?

MS. BRZEZYNSKI: Yes, Your Honor.

SPECIAL MASTER POPPITI: Anything else, please? Thank you all

MR. CHRISTENSON: Your Honor, just briefly before we conclude, we have had some discussions off-line to agree on some revisions or refinement to the expert disclosure deadlines, and I don't think it would impact any of the work that you are going to be doing, but in the abundance of caution, and to assist you in

your supervision of discovery, would it be a good idea to just send you the updated agreement for your review?

SPECIAL MASTER POPPITI: Say that again. I apologize. Say it again.

MR. CHRISTENSON: I was just saying: Would you like to see the dates that we agreed upon or do you want to just leave that to us?

SPECIAL MASTER POPPITI: I'd rather leave it to you. If you need me, you know where to get me.

MR. CHRISTENSON: Very well. Thank you.

SPECIAL MASTER POPPITI: Okay? Anything else, then, please? Thank you all.

(The hearing was concluded at 4:38.)

CERTIFICATE

STATE OF DELAWARE:

:

NEW CASTLE COUNTY:

I, Renee A. Meyers, a Registered Professional Reporter, within and for the County and State aforesaid, do hereby certify that the foregoing teleconference was taken before me, pursuant to notice, at the time and place indicated; that the teleconference was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the foregoing teleconference is a true record; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand this 27th day of August A.D. 2007

______________________

RENEE A. MEYERS
REGISTERED PROFESSIONAL REPORTER
CERTIFICATION NO. 106-RPR
(Expires January 31, 2008)