# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PHILLIPS, L.G., LCD CO., LTD, )
)
Plaintiffs, ) C.A. No. 04-343(JJF)
)
v. )
)
TATUNG CO., TATUNG COMPANY OF )
AMERICA, INC., and VIEWSONIC )
CORPORATION, )
)
Defendants. )

Hearing of above matter taken pursuant to notice before Renee A. Meyers, Registered Professional Reporter and Notary Public, in the law offices of BLANK ROME, LLP, 1201 North Market Street, Wilmington, Delaware, on Thursday, August 16, 2007, beginning at approximately 3:35 p.m., there being present:

BEFORE: THE HONORABLE VINCENT J. POPPITI, SPECIAL MASTER

APPEARANCES:

THE BAYARD FIRM
RICHARD D. KIRK, ESQ.
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
for Plaintiffs

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 2

APPEARANCES (Continued):

MCKENNA, LONG & ALDRIDGE, LLP
CASS W CHRISTENSON, ESQ
REL S AMBROZY, ESQ
1900 K Street, N.W.
Washington, D C 20006
for Plaintiffs

RICHARDS LAYTON & FINGER
ANNE SHEA GAZA, ESQ
One Rodney Square
Wilmington, Delaware 19801
for Defendant Tatung Co

GREENBERG TRAURIG LLP
FRANK MERIDETH, ESQ
VALERIE HO, ESQ
2450 Colorado Avenue, Suite 400E
Santa Monica, California 90404
for Defendant Tatung Company of America, Inc

CONNOLLY BOVE LODGE & HUTZ LLP
JAMES D HEISMAN, ESQ
1007 North Orange Street
Wilmington, Delaware 19899
for Defendant ViewSonic Corporation

RASKIN PETER RUBIN & SIMON LLP
TRACY ROMAN, ESQ
1801 Century Park East, 23rd Floor
Los Angeles California 90071
for Defendant ViewSonic Corporation

Page 3

MR KIRK: Yes, Your Honor Richard Kirk from The Bayard Firm for Plaintiff, LG Phillips, LCD Company, Ltd With me on the line, from Washington, are my colleagues from McKenna, Long & Aldridge, Cass Christenson and Rel Ambrozy

MR HEISMAN: Good afternoon, Your Honor This is Jim Heisman from ViewSonic Corporation I am from Connolly Bove in Wilmington

With me on the line today is Tracy Roman from the Raskin Peter firm in Los Angeles

MS HO: Your Honor, I am not sure if Anne Gaza has dialed in yet

MR MERIDETH: And Frank Merideth is also on the line for the Tatung defendants

SPECIAL MASTER POPPITI: Thank you If you could shoot Anne an e-mail

MS HO: I am sending her an e-mail right now

(Discussion off the record )

SPECIAL MASTER POPPITI: While we are waiting for Anne, I would propose that we work, saving some of the tedious for last, if you will, I have, what's marked for my purposes, No 40, and that is -- let me ask this question because it does involve Tatung:

Page 4

Does anyone object to going forward and letting Miss Gaza join us as soon as she is able to dial in?

MR MERIDETH: That's okay with us

MR CHRISTENSON: We have no objection, Your Honor

SPECIAL MASTER POPPITI: Thank you That may be -- Miss Gaza?

MS GAZA: Good afternoon, Your Honor I am very sorry for being delayed

SPECIAL MASTER POPPITI: Not at all Thank you

I was just proposing that we start with LPL's application dated August 8th, 2007, to produce assembly instructions

MR AMBROZY: Yes, Your Honor, it's Rel Ambrozy

SPECIAL MASTER POPPITI: And let's go ahead and do that

MR AMBROZY: Your Honor, what we were asking for as the assembly instructions from Tatung was, basically, a category of documents that --

SPECIAL MASTER POPPITI: Counsel, before you get too far into your presentation, I have to tell you that I am somewhat troubled with the fact that, both

Page 5

with respect to this application and another application that we will be looking at, that the meet and confer history is not fully described in your application And what I am rather specifically referring to is that, although being informed that there was a July 11, 2007, e-mail from Mr Connor to Valerie Ho requesting the production that we are about to address, and then being informed that some time went by before other correspondence was sent, I believe, and somebody correct me if I am wrong, that it was July 31st

MR AMBROZY: That's correct, Your Honor

SPECIAL MASTER POPPITI: That, low and behold, there was a teleconference that occurred July the 12th where Miss Ho conferred with Mr Connor, and that's nowhere to be found, and I gather, based on Miss Ho's representation, and I can hear her with respect to that, that the meet and confer of that date forms the sum and substance of their response to this August 10 application, unless I am missing something here?

MR AMBROZY: No, Your Honor, Your Honor I apologize for that What happened was Mr Cormac -- I mean Mr Connor did write the e-mail on the 11th, and then I just found out today, actually, that he did have

Page 6

a conference call with Miss Ho and Mr Merideth on the 12th Mr Connor had actually left for paternity leave and was out of the office for several weeks And we actually referenced in our letters, if you turn to Exhibit C, I did state in that letter, that, As you know, Cormac has been out of the office -- in Exhibit C to our letter brief, we stated in the second paragraph that, "As you know, Cormac has been out of the office, and, so, unless we missed it, we still have not received the assembly instructions "

So, Your Honor, I apologize for that I was under the impression that there had not been a discussion between Mr. Merideth and Miss Ho and Mr Connor

SPECIAL MASTER POPPITI: Okay Well, Miss Ho, is there anything else to be said about that miscommunication, if you will?

MS HO: Only that we were not aware that Mr Connor was out of the office, and it was our impression, after the meet and confer with Mr Connor, that these issues had been resolved, so we were very surprised to see these motions to compel

MR AMBROZY: So, I don't know the procedure, Your Honor We could discuss this off-line,

Page 7

but I think, even with this misunderstanding, I think we are still at, I believe we are at an impasse based on Tatung's response to our letter brief of August 8th

SPECIAL MASTER POPPITI: Well, what I'd like to understand, and I realize that we are working a little bit at a disadvantage because Mr Connor is not on the line, but let me do this: I understand the nature of the application, and I believe I understand the nature of the response, and the nature of the response is framed in terms of that conference that took place on July 11 I would like -- I am sorry, on July 12th

I would like the issue to be framed against that because that's the reality of where we are I mean, I understand that there was miscommunication, but if I am satisfied that either an understanding was reached, and there is where we are all working with, at least some of us on the phone, are working with a hand tied behind our back, or if the sum and substance of what Miss Ho is suggesting occurred at the meet and confer meets the production request, I think I should deal with it in that fashion

So, I do want to hear from Miss Ho, from her perspective, what was discussed during the course of

Page 8

that meet and confer

And I think, Mr Christenson, if I understand what you just told me --

MR AMBROZY: Mr Ambrozy, Your Honor

SPECIAL MASTER POPPITI: I am sorry, Mr Ambrozy, thank you -- that you just learned that the meet and confer occurred on July 12th, you learned of that fact today Well, I learned of that fact on August the 10th

Even if there is some, I don't know whether there will be, some disagreement as to what occurred during the course of the meet and confer, I was put on notice and you all representing LPL were put on notice on August 10 that there was a discussion on July 12th and should be prepared today to discuss the sum and substance of that meet and confer

So I'd like to hear from Miss Ho, please

MS HO: Yes, Your Honor During that meet and confer, Mr Connor, basically, raised the issues that were raised in his e-mails to me that were sent on July 11th In short, he had asked for the assembly instructions and the module specifications And at the meet and confer, we informed him that we had produced both categories of documents, and that whatever we could

Page 9

locate, we had already provided to LPL And that was the gist of the conversation with respect to the documents that are being sought in the two motions

SPECIAL MASTER POPPITI: And the only question I have is -- and you have provided me with a copy of assembly instructions; correct?

MS HO: Yes, Your Honor And these are just examples

SPECIAL MASTER POPPITI: Yes I understand that

Are the assembly instructions, as you understand them, do they form what you understand to be the request of LPL for working instructions? And what do you understand to be the difference, if any, and are there any such things that have not been produced that are called "working instructions"?

MS HO: Well, to clarify, Your Honor, there are working instructions, and those documents are Tatung America documents that have been provided to LPL long ago, back in January and February of this year

In connection with Mr Connor's request on the 11th, and LPL's motion, they are not seeking, as I understand it, working instructions They are seeking assembly instructions that were specifically referred to

in Mr Vincent Lu's deposition

SPECIAL MASTER POPPITI: Yes I am aware of the reference and I am aware that they do refer to assembly instructions

MS HO: And those are the assembly instructions that were attached, or at least we attached two samples, and those assembly instructions have been provided to LPL

MR AMBROZY: If I may, Your Honor?

SPECIAL MASTER POPPITI: Please

MR AMBROZY: The distinction we drew was specifically to the working instructions versus the assembly instructions because the assembly instructions, first of all, were for Tatung Company products, not for Tatung America And, secondly, the assembly instructions are somewhat detailed, and according to Mr Lu's deposition testimony, they are -- they basically teach the operators how to assemble the parts, and I am quoting, Teach the operators how to assemble the parts together and also the matters that they should have paid attention to

So, we took particular care to make sure that we were both on the same page, asking for assembly instructions, and it was our understanding that the

assembly instructions were different than what had already been produced

But in regard to what's been produced, there is really only six -- out of the 23 accused products, there is only six groups of accused products that we have a -- that Tatung has produced assembly instructions for And, so, that leaves 17 accused product groups without assembly instruction

SPECIAL MASTER POPPITI: Miss Ho

MS HO: Your Honor, I don't believe that's correct I don't know which accused product groups Mr Ambrozy is referring to

As Your Honor may or may not know, in LPL's recent interrogatory responses, they provided two sets of accused products One set contains products that LPL contends are infringing if Your Honor's conception of rear mountable is adopted, and that list is substantially smaller than the original list of accused products

And, in fact, there are, basically, only two categories of accused products that remain accused in light of Your Honor's claim construction And those are, one, the TLM LCD monitors which they know we do not assemble to begin with We buy those from third-party

vendors And then there are the plasma televisions, the 42-inch, 46-inch, and 50-inch, and that's it in terms of the accused products

So, I don't understand where Mr Ambrozy is getting the 26 categories of accused products

MR AMBROZY: Because it does go to the second grouping of products It encompasses both the 23 It goes to the products accused under the first constructions and then under the second appeals construction

MS HO: Well, Your Honor, first of all, we disagree that documents relating to the other products would be relevant at this point because Your Honor has issued your claim constructions and LPL has taken a position So, as far as we are concerned, there is a list of accused products and those are the TLMs and the plasmas

Having said that, from looking at the assembly instructions, and I don't have all of them in front of me, it appears that we did produce all of the assembly instructions we could find on both the LCD monitors and the plasmas, and they weren't limited to just the narrowed list of accused products that LPL recently provided

MR AMBROZY: I think that's what's troubling, Your Honor, is that, during the deposition of Mr Lu, we -- I specifically asked whether -- and he had gathered a lot of the documents, he had gathered the assembly drawings and so forth and we specifically asked whether he had gathered any of the assembly instructions, and he responded that he had not And I asked whether he was aware if anybody else had, and he responded he had not

So, all we are looking for is either Tatung to go and ask specifically for the assembly instructions for the accused products or a representation that they have asked and they don't exist

MR MERIDETH: Your Honor, we have represented, and represent again here, that, with respect to the accused TLM products, we do not assemble those, that is, Tatung does not assemble those, they buy them from a third-party vendor, and we do not have assembly instructions for those products

SPECIAL MASTER POPPITI: And that's -- go ahead I am sorry That is with respect to the products?

MR MERIDETH: That's correct With respect to the plasma products, we have produced documents

Page 14

called, quote, assembly instructions, and we have given the Bates Nos for those instructions to LPL

SPECIAL MASTER POPPITI: When were they produced?

MS HO: I believe it was before Mr Lu's deposition

SPECIAL MASTER POPPITI: Okay Thank you

MR MERIDETH: And we represented, in Mr Lu's deposition, that all of those documents have been produced We have reached agreement, we thought, with Mr Connor that they had been produced, and we attached copies of those which we produced and the ranges of bates numbers for the assembly instructions that we produced And these are documents that are titled "Assembly Instructions"

We have also produced the exploded-view documents and we have also produced the portions of the CAD CAM drawings that have been ordered by Your Honor So, we have complied in all respects, and I don't know what more we could do We have represented that we have produced all that we have in our possession We have demonstrated that we have produced them except with respect to the FLM, which we have represented we do not assemble I don't know what more we could do

Page 15

SPECIAL MASTER POPPITI: You are saying that, I think it's obvious, based on what you have just said, regardless of whether Judge Farnan adopts my findings and recommendations or whether he does something different with them?

MR MERIDETH: That's correct

SPECIAL MASTER POPPITI: Mr. Ambrozy, I don't know that you can have any more than the representation that it sounds like you have received before

I am not trying to question what Mr Connor would say or what he wouldn't say, but counsel is telling me that the same -- the representation that was just made was made to him and that they were satisfied that there would be no further discussion about it

Now, regardless of that part, it seems to me that what you have, for the record, is a representation that everything that has been requested with respect to the universe of accused products, notwithstanding what claim construction did to that universe existing the day before as opposed to the day after, you have all the information. all the production as the accused products existed the day before claim construction

I am satisfied that the application should

Page 16

be denied as moot Okay Just give me one moment, please

No 41, as I have it marked for my purposes, is LPL's application for additional inspection of prior art devices, and, as I understand it, there is a proposal that is either on the table or was on the table for discussion?

MS HO: With respect to Tatung, Your Honor?

SPECIAL MASTER POPPITI: Yes

MR AMBROZY: Your Honor, that is correct, and I actually believe that, based on that, that we might be able to come to some agreement on accomplishing the inspections, and if I could just talk to Ms Roman for one minute --

SPECIAL MASTER POPPITI: Do you want to do that off-line because I am happy to put you on hold so I don't necessarily need to participate or hear the conversation?

MR. AMBROZY: Tracy, are you there?

MS ROMAN: Yes, I am That's fine

SPECIAL MASTER POPPITI: Do you want to do it that way?

MR AMBROZY: Yes, Your Honor I think it's going to be quicker

Page 17

MR. MERIDETH: Well, on behalf of the Tatung defendants, this is another one of these failure to meet and confer situations

We indicated, in my correspondence, that if there was a compelling reason why the reexamination ought to take place, that we would be happy to consider that and nobody ever contacted us or suggested, until this motion was filed, that there was any reason

When the motion was filed, we immediately responded by saying, We would, in fact, make this stuff available consistent with our expert looking at the material

And, so, I don't see, frankly, that it's quite fair to us to have to continue to participate in wrangling over when this is going to be done It should never have been filed and reached this stage in the first place

And I don't think, you know, Well, okay, they didn't comply, now we will go off-line and discuss this, is not fair to us They have to comply with the meet and confer requirements

MR AMBROZY: We believe we did meet -- we did comply with the meet and confer requirements As we read Mr Merideth's letter, the compelling reason would

be something short of a Court order to do so, and, so, that was the reason we filed the motion We felt we were at an impasse and that also goes for ViewSonic's requirements as well

SPECIAL MASTER POPPITI: I am going to permit the conversation to occur I mean, I am troubled by how these wound up on my desk, there is no question about it At the same time, it seems to me the better path forward, in terms of the system, is to simply permit you to discuss it one more time and tell me that it's either resolved or not resolved, and then I will determine whether or not there is any relief that should be granted

MR. AMBROZY: Thank you, Your Honor

SPECIAL MASTER POPPITI: All the clocks call out a different time. It is 4:01 May somebody propose a time, please?

MR AMBROZY: I think 4:10, Your Honor, should be more than enough

SPECIAL MASTER POPPITI: All right Thank you.

(Discussion off the record )

SPECIAL MASTER POPPITI: Can I expect, then, there has been substantial agreement on what I referred

to as 41?

MR AMBROZY: There is, Your Honor

SPECIAL MASTER POPPITI: Okay Does Tatung agree?

MS HO: Yes, Your Honor

SPECIAL MASTER POPPITI: No 42 is LPL's application to compel Tatung to identify LCD modules used in each of the accused products, correlate each accused products with an LCD module

MR AMBROZY: Yes, Your Honor Again, this was, again, based on my understanding that we had not received any reply to our July 11th e-mail, and I apologize for that

SPECIAL MASTER POPPITI: Well, let me ask what the understanding was as of, for the record, as of the date of the meet and confer that I now know took place

MS HO: Your Honor, it was very similar Mr Connor inquired as to whether we had produced module specifications and we told him that we had produced all of the specifications we could locate for the accused products that were accused at the time, noting that the list has grown substantially smaller at this point, but we were going off of the broader list when the

specifications were produced

SPECIAL MASTER POPPITI: Okay Mr Ambrozy?

MR AMBROZY: Yes, Your Honor We, basically, moved to have Tatung identify the LCD modules in each of the accused products because when we took the deposition of Mr Lu, who, again, was Tatung Company's 30(b)(6) witness, he identified, or he stated for the record that when the monitors are designed, they either get the LCD module from the LCD module vendor or they get the specifications from the vendor And, so, we are -- by his testimony, it's our understanding that Tatung Company is in possession of the identification of the modules used in its products

And, so, again, we moved to have that information produced because we were unable to identify, from the production, which modules pertain to which monitors Although there were some LCD module specifications produced, without knowing, or without identification from Tatung as to which one -- which LCD module is in which monitor, the identification of the LCD module specifications really doesn't do us much good unless it's our understanding Mr Merideth's letter on August 1, where he identified all the LCD module specifications, that his understanding that that's the

universe of LCD modules in their products, then we can go with that representation

MR MERIDETH: It is not, and we have made that clear that it is not We have what I think is a basic misunderstanding and we have tried to deal with before.

One, we do not -- when you talk about LCD specifications, you are talking about something that describes the components within the LCD module Those are not matters which are of concern to our client

Our client, Tatung, wants the dimensions, and I think Mr Lu made it clear, in his deposition, that he was talking about the dimensions of the LCD module, not the internal specifications of the LCD module, which are not of concern to us, so long as the module performs in the manner that our customer specifies in its -- in its purchase order request or proposal to us

We also have always made it very clear that we will produce those specifications that we have, but they are not a matter that we have for every single product that we have produced

Third, we indicated that we produced and we have produced again, for a second time, a list of

correlations, although such correlations were never requested in any of the discovery, we did produce a list of the correlations of the products that we made in connection with the case that was brought by LPL out in California that covers the vast bulk of the LCD products

We are attempting to obtain, from our vendors, the specifications with respect to the plasma products, and I think we have some but we have not yet obtained all of the specifications, but it's not something that we normally maintain in the ordinary course of our business.

We do not correlate the specifications regarding the internal components of the module What's important to us, again, is the dimension And we have indicated that repeatedly We have provided what we have, and, indeed, this correlation that they are requesting now was never requested in any discovery

MR AMBROZY: The correlation was specifically because, it's our understanding from the record and from Mr Lu's testimony, that there is correlation that occurs A monitor is designed around a specific LCD module And, so, even if you only get the written specification and Tatung Company does not

receive the LCD module physically, there is still an identification of the module inside that monitor, and that's the information we are after

So, even if you don't have -- if Tatung Company is not in possession of the specifications for the LCD module, we at least want an identification of that LCD module and we will find the specifications ourselves

MR MERIDETH: First of all, we provided you what we have already and we don't maintain that as part of the ordinary course of our business We did generate it in connection with a prior case But, in this case, it was never requested

And we really provided it only as a courtesy because you made a request that had, in fact, requested it, if I recall correctly, from the first hearing that I attended in Delaware with Mr Kreisman, and that's where it was produced

SPECIAL MASTER POPPITI: And you say that in your response

MR MERIDETH: Yes, sir

MS HO: Just to clarify, Your Honor

MR AMBROZY: Let me finish, please

SPECIAL MASTER POPPITI: Miss Ho is

clarifying something that Mr Merideth said

MS HO: Yes, Your Honor I did want to raise the point that LPL really did not ask for this correlation data, and, in fact, when I had my meet and confer with Mr Connor, the issue of correlating the module model numbers to the product model numbers was never raised

The only issue that was raised had to do with the production of module specifications LPL never served a document request that sought correlation data, and it never sought a meet and confer regarding correlation data even after Mr Lu's deposition had been taken

MR AMBROZY: Let me point out, for the record, that Mr Lu's deposition occurred after the close on March 30th because Tatung consistently produced new documents as the new monitors that were coming on the market that should have been produced earlier

So, Mr --

SPECIAL MASTER POPPITI: Counsel, it is fair to say, we had a cleanup opportunity in terms of making applications; fair?

MR AMBROZY: In what sense, Your Honor?

SPECIAL MASTER POPPITI: I can't give you

the date, but I know that I established a date subsequent to a fact discovery where if you didn't think you had what you needed, you could make an application Somebody remind me of the date, that would be helpful

This is not cleanup If there is -- and I am satisfied, unless somebody can show me somewhere in the record where there is an application for the correlation data that you are now requesting, I am happy to look at that If you can show me some agreement, other than the agreement that was forged between Mr Merideth and Mr Kreisman, I am happy to look at that But absent that, there is nothing for me to consider other than the application, which is denied

MR AMBROZY: Your Honor, if I may I was asking Miss Ho to re-send whatever Mr Kreisman produced in Delaware so that I can make sure we are all on the same page

SPECIAL MASTER POPPITI: Miss Ho

MS HO: Sure We will be happy to do that, Your Honor

SPECIAL MASTER POPPITI: Okay Thank you

MR AMBROZY: Thank you, Your Honor

SPECIAL MASTER POPPITI: Now, let me make a comment with respect to what I have numbered 37, which

Page 26

is the defendants' request for 30(b)(6) deposition of LPL, and we will go from there

I think it's fair to say that, unless somebody takes issue with this, and I am happy to hear you on it, that, essentially, what I am being asked to do in terms of the work through this is I think I am being asked to be part of a meet and confer process in the sense there hasn't been a notice that can be tested; is that a fair comment?

MR MERIDETH: Yes, Your Honor, I believe it is

MS ROMAN: I agree that that is fair, but I would add that it's sort of --

SPECIAL MASTER POPPITI: I am not suggesting that's a problem.

MS ROMAN: Right Okay

SPECIAL MASTER POPPITI: I want to make sure everybody agrees with -- not make sure that you agree but have some understanding as to whether you agree with that initial proposition

MS ROMAN: There has been no notice served, that's correct

SPECIAL MASTER POPPITI: LPL, do you agree with my characterization of that?

Page 27

MR CHRISTENSON: Just so that I am clear, I think what you are suggesting is that there is not a formal notice that is the subject of a formal motion?

SPECIAL MASTER POPPITI: Right

MR CHRISTENSON: But, rather, we are talking about proposed deposition topics?

SPECIAL MASTER POPPITI: That's correct

MR CHRISTENSON: Obviously, we have a dispute about those topics and also about whether there should be any deposition

SPECIAL MASTER POPPITI: Correct One should be driving the other, but that's not the posture that we are really in, and what I think you are looking for is for me to be somewhat involved in these discussions except for asking me whether there should be a 30(b)(6) in the first instance; correct?

MS ROMAN: I am actually not certain I understood

SPECIAL MASTER POPPITI: Well, there is an application for a 30(b)(6) deposition That is opposed If we get beyond that, then we really are into a meet and confer or some discussion about the parameters of the 30(b)(6)

MS ROMAN: Yes, Your Honor That's

Page 28

correct

SPECIAL MASTER POPPITI: So, what I would like to do, very briefly, I'd like you to make whatever record, other than what you have made in here in paper, of the 30(b)(6) deposition and whether or not there should be one permitted to go forward

And let me ask you to frame your respective remarks against what I expect should have been relatively clear on a number of different occasions when the subject came up, what's going to happen after claim construction and what's going to happen as we see additional production that, for whatever reason, was not forthcoming earlier; is that fair? We have had that discussion before

MS ROMAN: Yes, Your Honor

MR MERIDETH: Tatung agrees as well

MR CHRISTENSON: Yes, Your Honor

SPECIAL MASTER POPPITI: And I'd like to know whether you agree with me that each time that subject was broached, I took the opportunity to say that if, depending on the circumstances, if there is a need, based on new information, based on claim construction, you make the application because I would be open to considering the application

Page 29

I don't know if they are my exact words and I really didn't think it was a good use of my time and your resources to go back and comb through the transcripts when we have broached that issue

Is that a fair characterization of what you think I suggested when we had these conversations before?

MR CHRISTENSON: Your Honor, I think I clearly agree with you, Your Honor, that you have, in the past, indicated that there would be, potentially, an issue with respect to depositions of LPL based on supplemental discovery

I do think that -- what I am not clear about is when those discussions occurred I think those discussions may have occurred after LPL had already been deposed, and the only reason I point out that timing is because, obviously, the defendants went forward, took the discovery that they took from LPL LPL went forward with the defendants' depositions and took deposition discovery that was extensive from the defendants as well, and we all did that with a, you know, with the existing document productions that we had from each other at the time of the depositions

And I think it is important to note that we

have had voluminous supplemental production from all of the defendants in this case after depositions, after the close of discovery

SPECIAL MASTER POPPITI: I am mindful of that

MR CHRISTENSON: And we have received documents that we would have used in those depositions and would have liked to have used in those depositions

I just want to make sure that that's part of the consideration here, and I think it's an important point, but there is no question, Your Honor, that you have, when this issue has surfaced, you have indicated that you would consider, at least, further deposition testimony

SPECIAL MASTER POPPITI: Okay And with that backdrop, let me hear what you have to say, please

MR CHRISTENSON: Yes, Your Honor Would you like to hear from LPL first?

SPECIAL MASTER POPPITI: No I'd like to hear from the applicant

MR CHRISTENSON: Yes, sir

MS ROMAN: Your Honor, I don't think I need to go into too much greater detail than what we have already put forth in our previous letter briefs or

status reports from I believe it was July 27th and August 3rd

The deposition goes hand-in-hand with the additional document discovery that Your Honor ordered to be produced It's effectively not a new deposition or a new discovery It goes hand-in-hand with the discovery that was already ordered as proper discovery It was simply discovery that, based on the objections that Your Honor sustained from the early on state of the discovery of this case, could not be had until after the claim construction order had been submitted

We think that the deposition that we are looking to take, regardless of the topics, but the fact that a deposition has to be taken and that it has to occur now as opposed to something that could have been covered before the claim construction was to no fault to the defendants

We certainly tried to get this information in advance of the claim construction order, but it was determined that that was not appropriate discovery at that time

SPECIAL MASTER POPPITI: And what you have done, I think, by virtue of your comments, is focused on what I think is important, and I want LPL to respond to

this, your application, although there has even been some discovery, very recently, that may form the basis of some questions that you want to ask, it is really driven by the claim construction as it presently exists?

MS ROMAN: Correct, Your Honor

SPECIAL MASTER POPPITI: And until that claim construction occurred, there were applications that impacted on the scope of some of the discovery that occurred earlier in those depositions?

MS ROMAN: Yes, Your Honor

SPECIAL MASTER POPPITI: Mr Christenson, or who is going to be dealing with it, please?

MR CHRISTENSON: Yes This is Cass Christenson for LPL, Your Honor

What issue would you like me to speak to again, please?

SPECIAL MASTER POPPITI: Just the issue as to whether a 30(b)(6) deposition should go forward in light of claim construction

MR CHRISTENSON: Your Honor, when you say, "in light of claim construction," certainly, the claim construction had not been resolved at the time of LPL's original deposition, that, of course, you know, by the same token, it had not been resolved at the time we

deposed the defendants, and I think that there was an understanding, and we have cited this in our, I think our August 14 letter, there was an argument by ViewSonic before their deposition that, during the depositions, the parties should not be asking questions that were intended to establish someone's position about claim construction, infringement, validity, or enforceability Those are really all issues for the experts And I didn't really understand that that's something that was the focus of what they wanted to do in these requested depositions of LPL

What I understood they wanted to do is to ask questions related to the documents that LPL recently has produced

MS ROMAN: Your Honor, they can't be divorced from each other The documents that were recently produced were originally not produced under objection that they shouldn't be produced before claim construction And, so, now we are faced with this issue of having to investigate issues and subjects and facts that we couldn't have known about because we didn't have access to these documents, and these documents make us inquire about additional facts, not only those pertained or contained within the four corners of the documents,

Page 34

there are questions that naturally arise from issues that are pointed out in these documents

For example, LPL had maintained, during the beginning of the case, that it didn't make any products, and it still does, I imagine, that it didn't make any products that practice the invention or that had mountable fastening elements on the back of their LPL LCD modules But, from our perspective, the documents that have just recently been produced contradict that representation

It was not a fact that we had available to us at the time of the deposition and we couldn't probe into it, and now we'd like to probe into that

SPECIAL MASTER POPPITI: Mr Christenson

MR CHRISTENSON: Yes, Your Honor So, as I understood what Ms Roman was saying, I think then, again, it is coming back to the documents that we have produced We, obviously, dispute what those documents show We don't think those documents, in any way, suggest that there was prior art that supports the defendants' positions in this case

But, again, if the question is the scope and what -- I think we are now sort of focusing on the scope and whether, what, exactly, should be included in any

Page 35

deposition But with respect to whether there should be a deposition, again, our position is that they went -- the depositions went forward as to everyone in the same time period and with partial document productions, for various reasons, that, based on various objections that all the parties made, and everybody was trying to get other documents, we were trying to get OEM documents from ViewSonic, we were trying to get discovery from Tatung, I mean, this is an issue that everyone was facing and we all took the depositions as best we could And there was no suggestion at that point that the defendants shouldn't have to depose LPL

So, we don't think it's appropriate for LPL to be singled out and re-deposed based on supplemental document production

MS HO: Your Honor, if I may comment on a couple of issues quickly?

SPECIAL MASTER POPPITI: Please

MS HO: First of all, I don't think that's an accurate representation of the discovery that has taken place in this case

What we had tried to do is to produce all of our supplemental document productions before the depositions If Your Honor will recall, we did -- some

Page 36

of our witnesses were deposed in March and April and then we postponed some other depositions until June; however, we did endeavor to collect and gather and review and produce all of the documents that LPL was seeking before those depositions took place And I think that's distinguishable from what's going on here with respect to the documents that LPL recently produced They simply chose to withhold these documents pending Your Honor's claim construction rulings

It could have produced the documents early on, but it chose to wait, and because of that, we did not get these documents until about three weeks ago And there are facts that we simply just did not know about before the discovery cutoff and at the time that we were deposing LPL's witnesses

SPECIAL MASTER POPPITI: Mr Christenson, isn't that a fair characterization of the record?

MR CHRISTENSON: Your Honor, it's not a fair characterization because LPL, in fact, produced voluminous discovery early in the case that, in many respects, we produced discovery on issues that applied to everyone before the defendants did

It's not correct, Your Honor --

SPECIAL MASTER POPPITI: I am happy to have

Page 37

a hearing on each new document that was produced and make a determination as to whether it could have been produced earlier or whether there was a choice If you want me to have that hearing, we will have it, we will have it next week, and we will have it live in the courtroom

Are you suggesting to me that these documents were unknown to you at the time when they would have been considered timely production?

MR CHRISTENSON: No, Your Honor, I am not suggesting that

What I am suggesting is we had objections that we asserted, there was motion practice, and --

SPECIAL MASTER POPPITI: I understand motion practice But I also understand choice And what I am asking you is: Were these documents -- maybe I should be more precise -- were these documents, each and every individual one of them, the subject of motion practice and the reason why you didn't produce any one or all of them because I ruled that they did not have to be produced at the time and you had the umbrella of a Court order?

MR CHRISTENSON: Your Honor, I want to make sure I understand what you are asking If what you are

asking is: Could we have produced these documents earlier than we did?, then the answer is yes

SPECIAL MASTER POPPITI: And there was no Court order that said you had an umbrella?

MR CHRISTENSON: That is true, Your Honor

SPECIAL MASTER POPPITI: So it was choice And, if you will, and I don't mean to suggest this sound as pejorative, it was strategy It's not that you couldn't get to it I think you just told me you knew they existed

MR CHRISTENSON: I understand what you are saying, Your Honor

SPECIAL MASTER POPPITI: And because of that, I am going to permit a proposed 30(b)(6) deposition

And now we will do what I think it's important to set out to do, and, that is, to get through the topics Maybe, just maybe, it may be helpful if we talk about some overarching principles here

MS ROMAN: Your Honor, that's exactly what I had in mind as well Mr Miller and I have sort of been trying to work towards that goal over the last couple of days And, if I might, I'd like to -- I mean, one thing that was clear to me from the last time --

when ViewSonic had a motion for a protective order on its deposition, LPL was very good at making it understood that even though the literal words of the topics might be written very broadly, they weren't going to waste time diving into subjects that were irrelevant for purposes of the case or waste time going over cumulative issues, and -- but that's hard to capture that when you are writing out these topics

And what we have tried to do over the last couple of days is look through the topics and the documents that have been produced to see if we could identify what are the core issues, or, like, the spirit of the deposition we are seeking And if I can -- I have come up with four of them, and if I could just put those out there for the parties, it might help to serve as, to use Your Honor's word, an "umbrella" under which these topics fall and the parameters of the topics that we have proposed

SPECIAL MASTER POPPITI: I am happy to participate in that if you all think it would be helpful to have me do that, but what has just been said is what I expect should be done

I mean, you all know that any one of us could take these topics and either, we could re-frame

them, we could sharpen them, but I don't think that that's going to serve anyone's purpose if there are some overarching principles of how this deposition should go forward

So, if you think it's going to be helpful to have me participate, I will

MS ROMAN: I think it would simply because there might be a couple of these overarching issues that we still don't have an accord on to speak to the sense of the overarching issues, so it would be helpful for you to be informed on them as well

SPECIAL MASTER POPPITI: Does anyone disagree?

MR CHRISTENSON: Your Honor, I agree with that I think that, you know, going in the logical sequence of starting with the premise that you just established, which is there will be a further deposition, I think it makes sense to have your input on the next logical issue, which is the general subject matter and scope, rather than getting into the word level, which is what Miss Roman was suggesting, or subject areas, I am not sure what they are, but I do think it would be helpful to have your input

SPECIAL MASTER POPPITI: Let's do it, then,

please

MS ROMAN: The first issue relates to the mechanical structure topics, and what we are really seeking are facts concerning the fastening elements on LPL's LCD products, or modules, as I will sometimes probably call them, such as the structure, function, and location of those fastening elements which would apply to both the products that were prior art products made before the U S patent filing date and post products And this overarching issue, I believe, hits topics one and two in our revised proposed topics, and perhaps also five

So, it's not every structure, every assembly of the module, the layers of the panel, the layers of the back light, and those issues The case is really about the fastening elements, whether they are located on the back, the front, or the side, and the structure and function of those elements regardless of whether they are used for mounting But that's the focus of the first overarching issue is the facts concerning the fastening elements on the products

The second --

SPECIAL MASTER POPPITI: Let's go one at a time

MS ROMAN: Okay

MR CHRISTENSON: Your Honor, as I understood what Miss Roman was saying, she is saying that those generally relate to topics one and two I won't get into the specifics of those topics because I understand we are going to focus right now on general categories

SPECIAL MASTER POPPITI: Yes

MR CHRISTENSON: With respect to the category, the "category" being structure, function, location with respect to fastening elements, I think that that is a relevant subject matter generally with respect to this case

We have had discussions in meet and confer about to what extent LPL may or may not be able to answer those types of questions, but I think that that, generally, the subject matter is relevant, Your Honor

SPECIAL MASTER POPPITI: Okay

MR CHRISTENSON: I think that the bigger questions become, you know, What time period is really the relevant time period and what scope of products? Those are some of the more, I think, important issues that would need to be resolved there

SPECIAL MASTER POPPITI: Well, then,

certainly with respect to the first category, why don't you talk about the two issues you just raised and see if you can either come to some resolution or if I can provide some guidance?

MR CHRISTENSON: Are you suggesting we have a meet and confer, Your Honor? I am not sure what you would like me to do

SPECIAL MASTER POPPITI: I am suggesting if you would like to do that now, please do If you think it would be better use of everyone's time to do it in a meet and confer, that's fine, but I want to be able to resolve these issues now By "now," I mean today, tomorrow, Monday kind of thing

MR CHRISTENSON: What I would prefer to do, Your Honor, would be to go through the four general subject areas since I haven't heard what they are yet I assume I know generally what they are because they probably match up to the topics that were proposed, but if we could go through the general topics and see to what extent we can agree on those If we don't agree, maybe you could tell us what the answer is

SPECIAL MASTER POPPITI: Okay

MR CHRISTENSON: And then maybe tomorrow we can have a meet and confer on those subject matters that

are probable

MR MERIDETH: I mean, I would like to have an understanding, while we are here, and perhaps some guidance, as to the relevant time periods We, obviously, believe that the discovery requests and the questions that we asked the 30(b)(6) witness, Mr Kim, were appropriate going back at least until 1996, when this Lucky Gold Star product was manufactured

If you have a disagreement with that, we ought to know about that

MR CHRISTENSON: Our feeling is, Your Honor, that the relevant time period would be -- the most relevant time period would be the time period that is before 1999 because that could potentially relate to the validity argument that the defendants are making

SPECIAL MASTER POPPITI: So you disagree with Mr Merideth in terms of prior to 19 -- you said 1996, you said before 1999 1996 is --

MR CHRISTENSON: I don't know specifically, Your Honor, when certain products were made or what, specifically, Mr Merideth had in mind, so I can't say, for a particular product, what the particular time period would be, but I think the early time period is the relevant time period

SPECIAL MASTER POPPITI: Mr Merideth

MR MERIDETH: Yes Well, the one product that they have disclosed is the Lucky Gold Star product that is attached to one of our letters to Your Honor, one of the supplemental submissions

SPECIAL MASTER POPPITI: I am aware of it

MR MERIDETH: Which is the 1996 Lucky Gold Star product

SPECIAL MASTER POPPITI: Right

MR MERIDETH: We had asked Mr Kim about the previous products that it used rear mounting fastening elements, and he claims that there were none We certainly believe now that a 30(b)(6) witness ought to be available to testify who has knowledge of the fastening methods, particularly rear mounting elements, that existed on products prior to 1999, going back at least until 1996, and if there were rear mounted products before then, those products

I will be blunt --

SPECIAL MASTER POPPITI: Based on the production of the Lucky Gold Star document, I am satisfied that it should go back to 1996, and if there are other product before 1996, it should go back to identify that as well, to discuss that as well So that

gives you the back end

MS ROMAN: Your Honor, I will speak to the front end, if I might, briefly

SPECIAL MASTER POPPITI: Please

MS ROMAN: The reason that the product's post filing of the U S application are relevant and that that location of the fastening elements on those products are relevant goes to the issues of commercial success and the calculation of the proper reasonable royalty

They are very specific factors, the impact on the market, the value on the product, the demand for products that have fasteners used for marketing and particular purposes, and one argument that's been made in previous cases by LPL is whether or not there is a cost savings associated with having a fastening element in a certain location or a mounting element in a certain location So, we need to inquire into the scope and structure and function and location of the fastening elements on those post prior art products for purposes of commercial success and damages

SPECIAL MASTER POPPITI: Mr Christenson

MR CHRISTENSON: Your Honor, I think this really, you know, brings to the floor some of the

concerns that we have about the topics, and when we talked about commercial success and damages, those are topics that were covered at length in the previous depositions I don't think there is anything in these recently produced documents that changes anything in that landscape

I think it's important to note, Your Honor, that when we were speaking to depose ViewSonic, ViewSonic took the position, in resisting testimony, that they had some 200 products, it would be burdensome to prepare a witness to testify about all those products, and the products were largely not relevant, especially if they were not accused

And now they are turning around and making the complete opposite argument, that everything is relevant because maybe it goes to commercial success Well, if it goes to commercial success, they are going to have to make an argument that that practices the invention And I don't think that -- there are very few products so far that they have identified that they are even going to argue practice the invention, yet, they want all 100 plus products to be the subject of potential testimony, and we would have to prepare a witness on all of those products, Your Honor And then,

at the deposition, what would happen, I suspect, is they would ask about two or three products that they really think are relevant

And, so, it really doesn't make sense to me to have a witness prepared on all the topics, and I think it's inconsistent with their prior position that they shouldn't have to do that

SPECIAL MASTER POPPITI: Well, whether it's -- and maybe what we are talking about is the rule of thumb that you just identified, this is not in the nature of a ruling, my question is: Can't you, for purposes of noticing and for purposes of letting the witness be prepared, narrow the scope, and if you can't, why can't you?

MS ROMAN: Your Honor, this might be one of those issues where we can look into it further over the course of the evening, but, certainly, one reason that it's difficult to narrow the scope to specific identified products, Your Honor might recall that when we dealt with the issue of trying to reduce the burden to LPL for the production of the subsequent documents for the post prior art products, we tried to come up with a scheme that gave us the top 10 percent selling products as identified by side mounting, front mounting,

or rear mounting

SPECIAL MASTER POPPITI: Yes, I remember

MS ROMAN: LPL was unable to accept that offer of compromise because they represented that they don't categorize their products that way and they would have no way of knowing whether a particular module is front or side or rear mounted I think they might have even gone so far as to represent that it was because they don't dictate the mounting but their customers do it

So, the difficulty we have is we have been produced -- instead, what we ended up with is a production of the top 10 percent selling products, period, and us going through and trying to ascertain where fastening elements are located based on that production It certainly doesn't mean that that is the full scope of products that have fasteners that are used for rear mounting or fasteners that are used for side mounting or for front mounting And to the extent that there are products that were top sellers that have rear mounting, certainly, that does go to commercial success but it might not have been swept into the production It might have been a top seller for rear mounting but it might have not fallen within the scope of the top 10

Page 50

percent of best selling products, period

For our expert to do a proper comparison of whether a product has achieved commercial success, they need to be able to compare the sales of the products that have fasteners on the back to sales of products that have fasteners on the side or the front

SPECIAL MASTER POPPITI: You would agree, would you not, that -- and I understand what you just said and what you just said makes sense to me, Mr Christenson, it does; at the same time, you, at some point in approaching the day of deposition, and this is really something that would be in the nature of forging a different agreement, you will have made some judgment as to which of the products you will be questioning the witness about; is that fair?

MS ROMAN: I think it's fair given the pure nature of time restrictions, Your Honor, yeah

SPECIAL MASTER POPPITI: So, is it not fair to consider establishing a date by which you will have made that determination in a time frame that's sufficient to say to LPL, This is what we are going to be asking about; we agree to limit ourselves to this; prepare your witness?

MS ROMAN: Your Honor, I certainly would be

Page 51

happy to look into that over the evening

The only difficulty I have with agreeing to do it specifically is that I haven't, unfortunately, been the one reviewing the recent document production I am just not certain if the quality of the documents that have been produced allow us to identify model numbers I know that's been an issue with some of the documents, and, so, to give you a specific answer to that question is a little difficult

The other concern I have is that I guess what reaching that agreement would require us to do is to agree that we are going to forego discovery beyond what we have been able to ascertain from the documents that have been produced which have already, admittedly, been limited to the top 10 percent selling products regardless of where the mounting elements happen to be located

And, so, I guess that's something that I would just, I'd ask Your Honor's permission to look into?

SPECIAL MASTER POPPITI: Absolutely What I am doing, by virtue of making this suggestion, is, certainly, the hour before you go into the deposition, you are going to know which products you are going to

Page 52

focus on That's too late for it to serve any value in terms of having a witness focused on the production that you are going to be focused on

And what I am hoping to look for is some point in time, clearly, before the deposition, when you can identify those that you will be focused on Perhaps there should be some understanding that if, during the course of further investigation, you are able to identify others, that it would be a good faith representation you couldn't do it before, and you will give that information to LPL in advance of the deposition?

MS ROMAN: Yes, Your Honor That would actually make it a little bit easier to accomplish

SPECIAL MASTER POPPITI: Mr Christenson, does that make any sense just in terms of seeing if there is some path of identification before so you can prep the witness?

MR CHRISTENSON: Your Honor, certainly, I think that makes a good deal of sense because the alternative is we end up, you know, trying to prepare someone on information that isn't going to be of any interest to anyone, and then that's going to minimize the time we have to prepare for things that they may be

Page 53

more interested in I think it's mutually beneficial to understand what, you know, what should this deposition really be about And if we know that, we can better prepare a witness

SPECIAL MASTER POPPITI: If you are both willing to do it against, you know, within that framework, understanding that it may be important to build in a safety net, if you will, knowing that safety net is not for the purpose of sandbagging, I am hoping you can do that

MS ROMAN: Yes, Your Honor I can let Mr Christenson know by tomorrow morning how soon I could get him the list of the post 1999 products that would be the focus for them to start preparing based on the information that we have available to us now

SPECIAL MASTER POPPITI: Okay

MS ROMAN: And, hopefully, I will be able to get the list of products to him shortly thereafter It's just a matter of coordinating with the other attorneys

SPECIAL MASTER POPPITI: Okay That's good Should we move onto the next issue?

MS ROMAN: Yes The next area of the deposition issue?

SPECIAL MASTER POPPITI: Yes, please

MS ROMAN: That relates to the statements that LPL or its patent agents made to the patent office regarding the existence of fasteners on the back of the LCD devices. And this is, for purposes of the deposition topics that have been submitted, it goes to topic seven

SPECIAL MASTER POPPITI: Let me just -- just give me one second, please I have certainly noted that for purposes of your seeing how I view that, that, if you will, that's a new topic; fair?

MS ROMAN: I am sorry, Your Honor, "new" as in it was not part of any deposition notices? Because I don't think that's accurate

SPECIAL MASTER POPPITI: That's not accurate

MS ROMAN: I would say that the topic, as it's been written there, I can understand LPL seeing it as potentially getting information that was part of the previous deposition

SPECIAL MASTER POPPITI: Counsel, no, I was mistaken I was looking at another topic

MS ROMAN: Okay

SPECIAL MASTER POPPITI: Thank you

MS ROMAN: So, what we are trying to do with this scope of the deposition issue is to say, We are not looking to go back over information that's already been gleaned from the previous deposition about the prosecution of the patent, but, at least from ViewSonic's view, there is this issue of statements made to the Patent Office regarding the existence or the non-existence of fasteners on the back of LCD devices that were known to LPL, particularly its own modules, and we have discovered this information about the fasteners being on the backs of these devices in light of this recent production, which is what leads to the need to inquire into that subject area

And I believe, and I will let Tatung speak to this issue, but I believe it might also relate to a couple of the topic issues that they have proposed

I am not sure if my overarching issue is broad enough to sweep that in, but that's --

MR MERIDETH: I believe it is

SPECIAL MASTER POPPITI: It looks like it would be

MS HO: And that would include on topics pertaining to the NEC litigation

SPECIAL MASTER POPPITI: Right I respect

that

Let's talk about that topic, then, from LPL's perspective

MR CHRISTENSON: Your Honor, the broad issue, as I understood it, was, quote, statements by LPL to the Patent Office, end quote, and then there is a separate issue, I think, which are their specific topics and subtopics that would have language that fall under that broad category

With respect to broad category, statements by LPL to the Patent Office, as Miss Roman predicted, our position is that, clearly, that was the subject of their original depositions, and this is a classic example, in our view, of where they are simply reopening discovery on closed issues

I mean, there is no question that they had the opportunity, and I think they exercised, at least in part, the opportunity to go through with LPL's witnesses before, things about -- things related to what were submitted to the Patent Office during the prosecution of the patents-in-suit And some of the subtopics referred to specific documents; for example, there is a reference to an amendment filed in January of 2001 You know, I mean, that amendment is what it is They have had it

all along They had the opportunity to ask about it with the witness If they didn't do that, that was for reasons they decided, but I don't see a need here or connection here to the recent document production

I think this is a -- at least if you look at the way it's worded, it's just going right back to the prior topics, and that's all the discovery that should be closed

SPECIAL MASTER POPPITI: Let me make this observation and see if this is helpful: The fact that it is, or the fact that you can draw a line to each word in the prior notices doesn't, at first blush, bother me if what you are doing is saying, With respect to those topics or subtopics, I am going to be questioning the witness with respect to those topics and subtopics that have been covered before as it relates, as each one of them relates to new production

So, if it relates to the new production, I am not troubled by the fact that it's the same topic area If it relates to the new production and if it is -- and I don't know whether it is because I haven't heard you say it this way -- if it's meant to say you said this before in light of the new production, what are you saying?

Page 58

MS ROMAN: Your Honor, I think that that does capture what I was trying to say when I offered the scope as statements made regarding the existence of fasteners on the back of LCD devices

If, in light of the new production --

SPECIAL MASTER POPPITI: Let me approach it this way I am sorry I just interrupted you

MS ROMAN: That's quite all right

SPECIAL MASTER POPPITI: Did you want to finish?

MS ROMAN: You have heard the point already.

SPECIAL MASTER POPPITI: It seems to me if you had the deponent in the chair and all of this production was at your hands at the time you first had the deponent in the chair and you discussed with the deponent the process of the prosecution history, and you got through all of that, you can certainly, I would think you would agree with me, reach into your files, pull out a document, and begin to question the witness with respect to that particular document in light of what was said about prosecution history; does anyone disagree with that?

MR CHRISTENSON: Your Honor, are you

Page 59

referring to a recently produced document?

SPECIAL MASTER POPPITI: I am suggesting that at the time that we are doing this, you got everything and you have all the production with you in the room, you have walked the witness through topics relating to prosecution history process of the patents-in-suit, and then you are going to want to talk to the deponent about a specific product, a specific document; you can do that; right?

MR CHRISTENSON: Absolutely, Your Honor If there is a relevant document or relevant question, absolutely

SPECIAL MASTER POPPITI: And my point is: The only difference is here, the document that you didn't have at the desk when you could have done that, you do have it now So long as the questions relate to that new document, I think it's permissible

MR CHRISTENSON: And Your Honor --

SPECIAL MASTER POPPITI: If you are going to go back and redo the prosecution history in a vacuum, if you will, or if are you are going to go back and redo the deposition because it wasn't done right the first time, then that's not proper And I realize, and I think I said this when we were talking about the Rudich

Page 60

deposition, usually an objection on the grounds of relevancy, you just object and you move on for the record

I think, in the context of this deposition, it's going to be important, if you agree with this approach, that I be available for a telephone call if, in fact, the deposition strays from the new production as it relates to the topics that were identified before

MR CHRISTENSON: Yes, Your Honor I think that's going to be very important I think that's appropriate so that we have the right focus

SPECIAL MASTER POPPITI: Ms Roman, do you agree or disagree?

MS ROMAN: Absolutely, Your Honor I agree with that position

SPECIAL MASTER POPPITI: And in light of that, is there agreement, then, with respect to the spirit of the deposition that we just talked about?

MR. MERIDETH: Your Honor, there is only one other point, just to be crystal clear, it not only is what was represented to the Patent Office but also what was not represented to the Patent Office in light of LPL products in particular

SPECIAL MASTER POPPITI: I understand that

Page 61

And I would expect Mr Christenson would understand that as well

MR CHRISTENSON: Yes, Your Honor Obviously, we would have -- depending on the question, if it calls, for example, for some kind of privilege, we would have whatever objections would apply, we would raise those, but I understand the subject matter and I think we can accept that.

SPECIAL MASTER POPPITI: Is that sufficient to move on?

MS ROMAN: I think, Your Honor, yes It's sufficient for ViewSonic

SPECIAL MASTER POPPITI: Okay

MR CHRISTENSON: The only other question we didn't address, Your Honor, there are, I think, a couple of subtopics that Tatung has proposed that I am not sure if they are saying those subtopics come under this --

SPECIAL MASTER POPPITI: I think H and I; correct?

MS ROMAN: Yes, Your Honor They might fall under the umbrella of my final two issues

SPECIAL MASTER POPPITI: Do you want to tell us what those are, then?

MS ROMAN: And then we can see, yes

Page 62

The next issue relates to the facts concerning the sales, marketing, advertising of LPL's LCD modules for the prior art products It's important for showing that the products qualify as prior art, whether there were instructions provided to customers or requests made by customers for mounting those products, whether any features were touted or advertised to customers as key features or not advertised to customers That requires, also, inquiring into the finished products into which the LPL modules were mounted so it can be determined how they were actually mounted

And then, for the later products, the inquiries are similar, but the reasons, as we see it, would be that these sales relate to evaluating, again, the commercial success, and, again, trying to ascertain whether that commercial success is due to the mounting structure of the products

I believe this hits topics three, four, and five

MR MERIDETH: I would add to that LG products, during the period of time that LPL was a division of LGE, which covers the 1996 through 19 -- through the fall of 1999 period, but I believe it to be

Page 63

the end of the year 1999 period, so that we don't have this problem, for example, with regard to the Lucky Gold Star product, Oh, we don't have any sales information about that because that's an LG product, when, in fact, LPL was the LG division that was responsible for that product during that time

MR CHRISTENSON: That's not correct, Your Honor And, first of all, with respect to what Mr. Merideth just said, that's a topic that's nowhere in any of the submissions before you So he is now introducing a new topic that's never been discussed with us, from our point of view, and I object to even discussing that topic

We have information --

SPECIAL MASTER POPPITI: Let's get back on track Let's focus on precisely what Miss Roman proposed Mr Merideth, I don't see that discussion in the topics We can discuss that in a moment, but let's just deal with the overarching description that Miss Roman just provided

MR CHRISTENSON: Your Honor, in response to that, the category being generally still for marketing and advertising of all of LPL's products, it's not clear to me whether we are talking about all products since

Page 64

day one or some subset of that which would at least number 100 or more products

In either event, Your Honor, the topics, on their face, are extraordinarily broad, and we cited some examples of that in our papers They don't focus on relevant features of the products They are very broad brushed and open up a witness or a deponent to questions that go to any aspects, really, of the products over this entire time period of more than 10 years

So, it's not relevant to anything, it's not reasonably calculated to lead to admissible evidence, and it's burdensome

SPECIAL MASTER POPPITI: Remember what we are doing I am not so much looking at the precise language of these topics as I am about the categories

MR CHRISTENSON: I apologize, Your Honor I was getting a little bit more into the specifics

With respect to the category, itself, we have produced sales information, sales summaries that go by product by time period for the time period that has been requested in this case

SPECIAL MASTER POPPITI: Right

MR CHRISTENSON: And that's really, you know, the information that exists If there are

Page 65

questions about those recently produced summaries, then I think that would be a relevant scope of inquiry But to go back into all the sales summaries that we have previously produced. we had a witness, Your Honor, who was a high ranking executive here for two days from Korea, Mr Kim, who was very well prepared on all these issues and testified for two days on all these issues And if they want to talk about sales summaries that we have produced supplementally, then I think that would be relevant But it's not clear to me exactly what they are saying with respect to this topic

MS ROMAN: Your Honor, perhaps I can try and shed a little bit more light on it

With respect to the later products as opposed to the prior art products, because I believe that's the products for which Mr Christenson is referring to when he says that they have produced sales summaries, as I understand it, the sales summaries, we have sales summaries that identify the product and then we have that enormous document that Your Honor had the pleasure of having provided to him, which was, I guess, referred to as the bill of materials document

SPECIAL MASTER POPPITI: I have had it bronzed

Page 66

MR. CHRISTENSON: Makes a good gift.

MS. ROMAN: Good paper weight certainly in that form.

As I understand it, though, the bill of materials and those sales summaries, together, didn't provide us the information that, in light of recent document productions or the information we might obtain through the deposition about the location of the certain fastening elements, that they are able to tie together the costs of the relevant components, such as the fastening element, as compared to the cost of the module overall or the cost associated with locating a fastening element on the back as opposed to the front or as opposed to the side.

The documents that were produced at that time, because we didn't have the technical documents and information, didn't allow us to dive into those inquiries.

SPECIAL MASTER POPPITI: Yeah.

MS. ROMAN: So, to the extent that -- we are certainly not going to go back over sales summaries and say, Okay, now, you produced this sales summary seven months ago and I just want to go through again and make sure that this product was sold on this date. We have

Page 67

that information and we certainly don't have the time right now to waste going back over that kind of information.

It would be information that we weren't able to ascertain about the sales of the products, the costs of certain features of the products, and whether or not any features that we can now point to in a document or inquire about during the deposition and say, Okay, did you advertise that feature as a specific feature that was important to the product? These are things that we weren't able to go into previously.

MR. CHRISTENSON: Your Honor, I really think that points out the difficulty here. We are talking about, Did you advertise an unspecified feature for -- or even a particular specified feature for an unspecified product right now, which could be one of hundreds or thousands of products over a more than ten-year time period, and I don't know how to prepare a deponent to answer that without knowing, in advance, what we are talking about.

SPECIAL MASTER POPPITI: Well, are we not -- I think, by virtue of what you just said, you don't disagree that the potential information is relevant? I didn't hear you say that. What you said was, We are,

Page 68

more or less, in the same boat that we were just in 10 minutes, 15 minutes ago when we were talking about how we can identify the scope of what is going to be discussed during the course of this deposition; are we not back at the same point?

MR. CHRISTENSON: We are, Your Honor.

SPECIAL MASTER POPPITI: Ms. Roman?

MS. ROMAN: Well, Your Honor, I certainly think that the scope is threaded out through, perhaps, the first overarching issue that we discussed. But I would be happy to follow-up first thing tomorrow morning just to make sure we are clear on it.

SPECIAL MASTER POPPITI: It's going to serve no one's purpose at all to contact me at some point when we have got a 30(b)(6) in the chair and say, He is not prepared to answer these questions. Where is that going to put us then? I understand where it could put us. The question could then become, Well, let's get him prepared or let's find somebody else that is prepared because it is an appropriate subject under these topics and subtopics.

At this stage of where we are, I don't think that makes any sense to anyone.

MS. ROMAN: No, Your Honor, I would agree.

Page 69

And as I said, I think, at the beginning, this case is about the fastening elements and how the product is ultimately mounted.

SPECIAL MASTER POPPITI: Well, I don't disagree that what you have suggested, by virtue of this summary topic, if you will, it is relevant, but I really would urge you, before asking me to make any judgment about this, to see if there can't be a process that you agree to that will get you to the point of identifying what you really are going to be focused on in the deposition so that LPL can, in turn, prepare their witness.

If, ultimately, the witness that they prepare with respect to anything that you identify with some degree of specificity says, you know, I can't tell you that, we just don't do that, I have no idea, that's a little bit different from saying, I am just not prepared because it was too big and I only could bite off a certain piece of this.

Is that fair?

MS. ROMAN: Absolutely, Your Honor. And if I might have until tomorrow so that I could have a chance to speak with Tatung about it off-line as well so we can try and come to some other clarity on that, that

would be helpful

SPECIAL MASTER POPPITI: Mr Merideth

MR MERIDETH: Yes, that's fine, Your Honor Although I do still wish to be heard, and I don't want to interrupt, on this issue of LG Electronics because I don't want --

SPECIAL MASTER POPPITI: We will get back to it, please

Mr Christenson, do you agree with the approach?

MR CHRISTENSON: Yes, Your Honor, I do

SPECIAL MASTER POPPITI: Is it now time to talk about LG?

MS ROMAN: I think it fits within the scope of this overarching issue, if at all, so I can reserve my last issue until we have heard on that

SPECIAL MASTER POPPITI: Please, Mr Merideth

MR MERIDETH: Your Honor, the underlying facts that were developed during the course of the 30(b)(6) witnesses are that the invention, ostensibly, was made during a period of time that the inventors were employed by LG Electronics

Later, before the U.S application was

filed, LG Electronics' LCD division, if you will, including the unit, the business unit that employed the inventors, was sold or transferred to a corporation which was a wholly-owned entity by LGE and later became a joint venture with Phillips

We have had produced in this case, as we had proceeded along, certain sales data and other information concerning products that were LG products during the time frames that we think are relevant beginning at least in 1996 Those documents, those sales records appear to be in the possession or at least accessible to LPL

We also now have the Lucky Gold Star module which was manufactured in 1996 and which was in the possession of LPL at least in 1999 and 2000 when it was produced in the NEC case

What I don't want to have, when we take these depositions, is a situation that the LPL 30(b)(6) witness says, Oh, I don't know anything about that product; that was an LGE product; we don't know anything about it

In this case, we know that they knew of the recently produced Lucky Gold Star module and we do have sales data that relates to that, so we believe they have

access to that information

We were stumped, frankly, in the deposition of Mr Kim when he claimed he didn't have a lot of information about prior art, didn't know anything about it, never heard of rear mounting prior to the time that it was invented and so forth

Now it appears, with this Lucky Gold Star module, that at least Mr Kim was ill informed We don't want to have a repetition of that situation And, so, I want to be clear that this topic includes, to the extent that LPL was a division of LGE prior to 19 -- the end of 1999, that we get that information

SPECIAL MASTER POPPITI: Let me ask this question before hearing from Mr Christenson -- and I realize this is, perhaps this whole process that we have been engaged in for the latter part of working together today is a little bit unorthodox -- it seems to me what we are looking for is, if you will, like an open book exam in the sense that there has been a representation that the defendants will make a best effort to tee up those things that are going to be the subject of the actual deposition with a good faith understanding that there may be something added, that's added, by virtue of the preparation for the deposition even in the last

days, that even that information is going to be provided to the witness

Maybe it should simply work both ways And I understand what you have just said about the history of the entities It seems to me that either the witness is prepared or the witness simply says, We don't have that and I can't prepare on something we don't have And if a witness were to be saying that, either in advance of the deposition, because there is going to be some identification and perhaps there should be a response in the context of what we are doing here now, that representation means that it's not accessible And I would take that to mean it's just not there, whether you call it -- whether you call it LG, whether you call it anywhere along the chain of how that happened I didn't say that well I am getting tired

Do I make any sense at all? If I don't, please tell me

MR MERIDETH: No, you do, Your Honor

The problem that we confronted with Mr Kim is that he, obviously -- although he was the 30(b)(6) witness, he, obviously, had less than perfect institutional knowledge because he did not have, or purported not to have any information concerning the

Page 74

Lucky Gold Star product, which, you know, LPL had, in fact, produced in the NEC litigation sometime in 1999 or 2000

SPECIAL MASTER POPPITI: We will get to that in a moment

MR MERIDETH: So, he was an imperfect witness in that regard We were, frankly, misled, and I am not attributing any fault to anybody who was involved if Mr Kim was unaware of this particular product, but somebody at LPL was aware of it because it was produced in the NEC litigation

SPECIAL MASTER POPPITI: And I think my expectation is, given what has occurred in this case, perhaps even framed by a discussion on the NEC litigation, I anticipate that this witness is going to have the breadth of the knowledge and history that you anticipate

And the best way, it seems to me, to do that, is, if everyone is in a position to do what I have suggested, you provide with as much specificity as you can what's going to be discussed, there should be some acknowledgment of that, and say, Yeah, we are ready to go with this witness and the witness is prepared.

And if, during the course of the deposition,

Page 75

there is a determination made that he isn't, we will cross that bridge when we come to it

MR MERIDETH: Okay

SPECIAL MASTER POPPITI: Mr Christenson

MR CHRISTENSON: Yes, Your Honor I think that makes sense And I understand what you are saying I don't agree with many of Mr Merideth's comments, but I don't think I need to respond to them directly

SPECIAL MASTER POPPITI: I understand they need to be framed by the comments that you both make, but I wasn't reacting, if you will, to what Mr Merideth was saying so much as accepting the fact that I understand the nature of the entity and the entities as they changed; I understand that the corporate history and the knowledge has to flow right to the person in the chair

MR CHRISTENSON: Yes, Your Honor The only comment I have on that, because it is important, is that there is no question that a Rule 30(b)6 witness is testifying on behalf of the entity and not just based on personal knowledge

SPECIAL MASTER POPPITI: Right

MR CHRISTENSON: And, therefore, you know, whatever is fairly within the scope of the company's

Page 76

knowledge needs to be investigated

SPECIAL MASTER POPPITI: Right

MR CHRISTENSON: At the same time, Your Honor, I do want to make it clear that LG -- there is a complex history there LG is a company that has many different divisions, and there is a separation between LG and LPL, and some of the -- Mr Merideth was, I am not saying intentionally, but somewhat cryptic in terms of what products he was referring to, and it's important because if they want to ask questions about products that were made as finished products, such as monitors, that is not anything that LPL or LPL's predecessor entity ever did That's a separate product

So LPL has to know about its products and it has to be including historical knowledge, but there are other entities and divisions of products that are not attributable to LPL

SPECIAL MASTER POPPITI: But, hopefully, by the time that becomes an issue, it will be a non-issue because you will have the best understanding as to what products are going to be the subject of the deposition

MR CHRISTENSON: That's true

SPECIAL MASTER POPPITI: Is there anything else that needs to be said with respect to that,

Page 77

Mr Merideth?

MR MERIDETH: No, sir

SPECIAL MASTER POPPITI: Next, please

MS ROMAN: Yes, Your Honor The last issue, and, understandably, I believe, at the deposition, it would be a short issue, relate to LPL's document and product retention policies and procedures and the efforts they made to locate the documents and products that they have produced in response to -- that they have recently produced

Just to follow-up on that, because, for example, we have talked briefly, earlier today, about the representations that were made about the lack of categorization of products or the lack of ability to identify products based on mounting features, so it's -- we'd like to just certainly follow-up and make sure we understand how documents -- how these documents were maintained, how they were located and searched for to assure that we have covered everything and received everything that properly falls within the scope of the request

And, as I said, I think that that would probably be a very short issue at the deposition, but, nonetheless, one that we'd like to make sure we close

the door on

SPECIAL MASTER POPPITI: Mr Christenson

MR CHRISTENSON: Yes, Your Honor I think, you know, given the guidance and your earlier comments, which I assume apply here as well, I don't think there is going to be a dispute on this I understand you to be saying, you know, we focused on new issues, we focused on the recently produced documents, I think that's ViewSonic's intent, from what I just heard I don't think they are going to now seek to go back and do what was or could have been done earlier

So, in that -- assuming that to be the case, then that's fine

SPECIAL MASTER POPPITI: Ms Roman

MS ROMAN: Yes, that's correct, Your Honor

SPECIAL MASTER POPPITI: Okay

MS ROMAN: That's the end of my spirit of the deposition issues

SPECIAL MASTER POPPITI: Thank you

MR CHRISTENSON: Your Honor, there was one issue that I am not sure we need to address right now, but I just want to make sure no one thinks it was resolved, and if it was, I missed it, and, that is, whether the -- the two subtopics that Tatung raised

regarding the NEC litigation

SPECIAL MASTER POPPITI: I am about to do that

MR CHRISTENSON: Okay

MS ROMAN: That actually might fall within that last issue because these documents that relate to the NEC litigation, they arise because they were the NEC litigation documents that have been produced in this recent production But I will let Mr Merideth speak to the specifics of the topic

SPECIAL MASTER POPPITI: Mr Merideth, please

MR MERIDETH: Yes The issue is a very simple one It appears that this document, which we view as very important to the issue of prior art and with respect to inequitable conduct, was a document in LPL's possession, was called for by the requests, was not produced until about three weeks ago

We believe, based upon the fact that it has an LPL NEC bates number and that that NEC litigation was in 1999 and 2000, being settled at the end of 2000 or the beginning of 2001, that that document was produced by LPL during that period of time, we want to know why it wasn't produced when it was requested initially, why

it was not produced until just three weeks ago, and whether and why not, with respect to its disclosure to the Patent Office since it appears to have been available to LPL during the crucial time period, namely, 1999 and 2000 And we think that that is a topic that is very important with respect to establishing intent with regard to inequitable conduct, among other things, and I think it does fall within the general subject matters of '03 and four that Ms Roman has raised, but we don't want -- but saying that's covered by those subjects, when, apparently, LPL disagrees, is something that we need to vet now

SPECIAL MASTER POPPITI: I agree we should vet it now, even if I consider it a subpart of what we have discussed

MR CHRISTENSON: Your Honor, as I understood, from prior meet and confers on this issue, the issue that -- the issue that Tatung wants to explore is something they feel relates to inequitable conduct, and they want to know about what was done in the NEC case with respect to collecting and producing documents and who was involved in that effort, and it's not clear to me how that could relate to the prosecution of the patents-in-suit here, but, as I understand, that's the

issue they want to explore

Our position is that whatever happened in the NEC case with respect to these documents and how they were collected and what trial counsel was involved and -- which, I, frankly, don't know the answer to that -- but who at LPL was involved, I don't see how that's going to advance the ball in this case in any direction

The issue, you know, if they want to make an argument that something in that production should have been disclosed, for whatever reason, to the Patent Office, then I guess they can make that argument But to get into issues about which people produced which documents in a case that was settled many years ago, I think, is getting far afield and would add a layer of unnecessary burden to this whole effort

SPECIAL MASTER POPPITI: Well, let me ask this question: Doesn't the -- let me just assume the facts or the conclusion that Mr Merideth wants to draw with respect to that document, and, that is, and correct me, Mr Merideth, if I am wrong, that it is prior art?

MR MERIDETH: That's correct

SPECIAL MASTER POPPITI: So, let me assume that for the moment

Page 82

And knowing, assuming that for the moment, that it was produced at a point in time when the patents-in-suit were being prosecuted, that that's not disputed; correct?

MR. CHRISTENSON: Your Honor, I don't know if -- I don't know that that's the case I am not in a position to tell you affirmatively that that's incorrect I just don't know the answer to that

SPECIAL MASTER POPPITI: Well --

MR. CHRISTENSON: I was not involved in the NEC case and I don't know that there is anything that specifically establishes that one way or the other

SPECIAL MASTER POPPITI: Mr Merideth, I think you told me that the, and I think the papers reflect, that the NEC case was -- you help me Direct me to the dates that you are referring

MR MERIDETH: Yes, sir There are two NEC cases that were related They were commenced either at the end of 1998 or early 1999, and they were settled at the -- in early, or at least the docket shows that the Court was informed that they were settled early in 2001, and they were actually dismissed, if my memory is correct, by sometime in the spring of 2001

SPECIAL MASTER POPPITI: All of that,

Page 83

accepting those dates, all of that falls into the time frame when the patents-in-suit were being prosecuted?

MR MERIDETH: That's correct And that's why we believe that it is important to figure out who, at LPL, had possession of that document in order to produce it in the NEC case, and why, if they thought it to be relevant in the NEC case, they didn't disclose it to the Patent Office?

SPECIAL MASTER POPPITI: I am satisfied that you have the right to pursue that line to see if you can draw that straight line because it is certainly relevant to the issue of intent and the overarching issue of inequitable conduct, so I am going to permit it to be part of the deposition subtopics, if you will

And I understand what it does It opens up a category of inquiry that is not insignificant

Okay How do you expect that we can close out the DM 37? Is it a matter of reporting back to me with advice that everything is worked out?

MS ROMAN: Perhaps, yes, it would be to report back to you I think that there are the issues that the timing of the deposition and the length of the deposition that remain unresolved and I am not sure how best to handle that unless we could have a call

Page 84

tomorrow, end of day, only assuming that I could report to you before then that we had provided the specifics that have been requested, and, if not, then perhaps we'd have to have it on Monday

I really hate to push this out and continue pushing this out because, as Your Honor is aware, the reason that we wanted this deposition and we have been moving to get it so rapidly is because of the August 28th pending date for the opening expert report on invalidity

I am just not sure what to do in that regard with following up with this.

SPECIAL MASTER POPPITI: It needs to be done tomorrow My concern -- let me just look at something, please I have a hearing that I am preparing for tomorrow at 3:00 in another matter, and I am hoping that that's not going to last more than an hour and a half I am inclined to say that if I need to be involved at all, it needs to be at 5:00

MR CHRISTENSON: Your Honor, I think we need to, you know, to move this process forward as quickly as possible to try to make sure we are all on the same page with what it is you expect to happen with respect to this deposition

Page 85

I also, though, need to, obviously, talk to my client and inform them of today's events, and I will need to coordinate closely with them in terms of what our position is going forward.

So, I don't know what exactly ViewSonic has in mind in terms of scheduling discussions with ViewSonic and further discussions with you I am just saying I don't know that tomorrow is the day that we would have been able to have received and discussed fully the, you know, the proposed more specific subject matters

SPECIAL MASTER POPPITI: Let me ask this question: Have you talked about dates?

MS ROMAN: We have not talked about the dates ViewSonic put in dates in the most recent correspondence, and, of course, other than to the extent that, in the previous hearing, I have mentioned that it needs to take place as far in advance of the 28th as it could

The issue of the -- and we did talk about the length of the deposition during our last meet and confer I guess I only see that as the only two issues that we would need to follow-up on because, as I understand the directive from today, and I will go back

Page 86

through the transcript just to make sure I have got it correct, that we have to identify the later products that we want to focus in on so that they can prepare on those products, and then, with respect to the sales information, we need to provide more specifics, and, as I understand it, that would include examples such as, specifically, what features and what sales information and relate it back to those same products that we have identified

SPECIAL MASTER POPPITI: Yes

MS ROMAN: And I don't know that that would require any further discussion because you have instructed us to provide the specifics

SPECIAL MASTER POPPITI: That shouldn't require any further discussion

MS ROMAN: But the length of the deposition and the date for the deposition, I think, are the only two issues that remain briefed in the parties' letters that need to be discussed

MR CHRISTENSON: Your Honor, if ViewSonic comes back and says, you know, We want the same 70 products that we identified before we started today, we really haven't -- nothing has really changed, so I am not sure I agree that there won't be any further

Page 87

discussion

I think it depends on --

SPECIAL MASTER POPPITI: I think when Ms Roman was saying "any further discussion," on the topics, the parameters, and things of that nature

Let me just make an observation about the time without getting into a specific number It seems to me, by virtue of what you have agreed to today, that you have achieved some economy here, at least I hope that's the case in terms of the focus of the witness when he or she is testifying And I think that's the case

So, I am hoping that you have some discussion as early as tomorrow about the date and time I really don't think I need to be engaged on any other detail

MR CHRISTENSON: That's fine, Your Honor

SPECIAL MASTER POPPITI: So, if you are telling me it can't possibly be done tomorrow because you are not going to be able to confer about date and time and have some discussion with your client, I am going to have to take you at your word

At the same time, I am going to anticipate, and I don't mean to be -- I am going to anticipate that

Page 88

you are all going to be spending time doing whatever you need to do with respect to this case even over the weekend

MS ROMAN: Yes, Your Honor

SPECIAL MASTER POPPITI: And if that's the case, I think it's important for me to say to you, If what I am going to be asked to focus on is the date and the time and you can't turn to it on Friday and you can turn to it on Saturday, it's not going to take 15 minutes of my time to do that

MR CHRISTENSON: Your Honor, I don't see any reason we could not have a discussion among counsel tomorrow And if there is a dispute, I don't see any problem with bringing it to your attention tomorrow rather than at a future time

There may be other -- you know, there may be facts I don't know when we have the discussion tomorrow but that may not make a difference for purposes of getting your input

SPECIAL MASTER POPPITI: I am happy to do it 5:00

MS ROMAN: That works for ViewSonic, Your Honor

MR CHRISTENSON: That's fine, Your Honor

Page 89

SPECIAL MASTER POPPITI: And if I am running late, I will -- just a moment -- I will let you know

Now, 5:00 works for everyone?

MR CHRISTENSON: Yes, Your Honor

MR MERIDETH: Yes, Your Honor

SPECIAL MASTER POPPITI: The only other issue, and I don't know whether we should make any effort to deal with this today, although we have got to deal with it soon, is your continuing conversations regarding Rudich If I mispronounce it, I apologize

MR CHRISTENSON: It's actually Rudich. Your Honor

SPECIAL MASTER POPPITI: I got it wrong The court reporter got it right

MR MERIDETH: Your Honor, we have made a proposal to LPL that would not require the production of any of the privilege log documents and which would limit Miss Rudich's testimony to the one '079 application

SPECIAL MASTER POPPITI: Right

MR MERIDETH: However, the condition to that is that, if it's necessary, based upon whatever discussion is had with the 30(b)(6) witness for LPL, and I believe that this will be required, we wish to take the deposition of a person who is knowledgeable at

Page 90

McKenna concerning the subject of the disclosures made to the Patent Office and the discussions concerning other rear mountable products We think that's reasonable

Frankly, we were led to believe, by the Rudich declaration, that she had that knowledge She didn't indicate, in her declaration, that she had only limited -- that she had only limited authority and was an associate She submitted the declaration in connection with the patents-in-suit, and we assumed, I believe reasonably, that she was talking about her participation in the process during the relevant time period of the application, not just very recently

That would eliminate any need to go through the privileged materials and it could be a very narrow further deposition as the person most knowledgeable related to the issues that are kind of keyed up by the deposition of the LPL 30(b)(6) witness

SPECIAL MASTER POPPITI: Let me see if I understand what you are saying, and I did see that proposal and you did attach some documents to it and I know that LPL hasn't had a chance to -- or hasn't filed anything with me in terms of response to what you have advised

Page 91

I mean, I understand everyone wants to finish -- we should have finished it a long time ago -- issues involving discovery, but I think what I am hearing is it really depends on what happens with the 30(b)(6) witness in terms of whether or not there is a need for someone else to be designated as a 30(b)(6) witness; correct?

MS HO: Your Honor --

MR MERIDETH: It may I think the answer is it may

SPECIAL MASTER POPPITI: It may

MR MERIDETH: For example, it could be that the 30(b)(6) witness would say, in response to questions, We were aware of the Lucky Gold Star product for whatever reason, we did not disclose it to anybody who was involved at McKenna or any of its predecessor firms with regard to the prosecution of this patent or anything else, in which event it wouldn't be necessary to ask anybody at McKenna other than to ask, Well, what were the procedures in place that ferret out this information and was any effort made in that regard?

If the testimony is, Yes, we were aware of this product, and, Yes, we did communicate it to our lawyers, then there is a different inquiry to be made.

Page 92

MR CHRISTENSON: Your Honor, I think we have really got two separate issues on the table here One set of issues relates to Miss Rudich's deposition, which we, obviously, already discussed with Your Honor

SPECIAL MASTER POPPITI: Yes

MR CHRISTENSON: The idea of taking a 30(b)(6) deposition of this law firm, McKenna, Long & Aldridge, really was suggested to us for the first time in a letter that I received on August 14th There has been no discussion among counsel on that issue

SPECIAL MASTER POPPITI: Then let's hold it Let's have the discussion, please -- I understand that the backdrop may very well be the information that's gathered as a result of the 30(b)(6) witness that we have been talking about for the past hour or so, frame the issue, and I will deal with it as quickly as it is important to deal with it But it's something that I shouldn't be dealing with today

MR CHRISTENSON: The only other thing, then, Your Honor, is I think there was, at one point, a request by Tatung for us to submit to Your Honor for in camera review certain documents on our privilege log

SPECIAL MASTER POPPITI: That should be --

MR CHRISTENSON: As I understood it, Tatung

Page 93

was going to submit a form of order specifying the documents to be submitted, but I don't think that's been done yet and I don't know if that's still something that Tatung is interested in pursuing

SPECIAL MASTER POPPITI: I think what I hear is Mr Merideth is saying, for the purpose of seeing if we can't forge some agreement here, and that may be an agreement that has to await the conclusion of the 30(b)(6) deposition, that should be forestalled; I think I am hearing that, Mr Merideth?

MR MERIDETH: Well, that's part of it, Your Honor I think the other part of it is: Up until our discussion on Monday, I was not aware of the information related by Ms Brzezynski that, during the time periods when this patent was being prosecuted, Ms Rudich was only an associate That certainly was not clear, in my view, from her declaration

SPECIAL MASTER POPPITI: I think, for my comments, I understood the declaration to be as you understood it I didn't understand, until we had our last teleconference, that her role was not as -- her role was not -- I didn't come away from her -- I came away from the declaration with a different understanding of her role

Page 94

MR CHRISTENSON: Your Honor --

MR MERIDETH: My response to that was our letter, which, basically, says, to put it in a nutshell, If she is not the person who has the information, then let's not produce all the confidential documents and go through that effort Let's find the person who is the relevant individual Let's limit the subjects that are going that are to be asked of that individual We know that it's a sensitive area that relates to the issues of privilege. We ought to approach it with a scalpel instead of a meat axe.

But it's apparent from Miss Brzezynski's comments that our conception, my conception that Miss Rudich is the appropriate person was not correct

So, I am saying, Okay, if she is not correct, why are we going to go through the requirement that confidential documents be produced and that you review them in camera to what end? It seems to me that we need to address that issue

SPECIAL MASTER POPPITI: I miss spoke when I said "forestalled " I do understand what you are saying I think what I am hearing is there needs to be additional conversation in terms of who, if anyone, I want you to have that conversation I want to be

Page 95

informed about it I am not going to give you a deadline today I want you to tell me whether you have either reached some understanding about an additional 30(b)(6) on the issue that's just been discussed, and if you can't resolve it, it's not going to take more than 15 minutes for me to resolve it for you

MR CHRISTENSON: Very well, Your Honor.

MR MERIDETH: That's fine with me, Your Honor

SPECIAL MASTER POPPITI: Okay Is there anything else, or should we wait for 6:00?

MR CHRISTENSON: I think we should wind up Your Honor

SPECIAL MASTER POPPITI: I think we should wrap it up

MS ROMAN: I agree, Your Honor

SPECIAL MASTER POPPITI: Thank you all very much

(The hearing was concluded at 5:55 p m )

Page 96

CERTIFICATE

STATE OF DELAWARE:

:

NEW CASTLE COUNTY:

I, Renee A Meyers, a Registered Professional Reporter, within and for the County and State aforesaid, do hereby certify that the foregoing teleconference was taken before me, pursuant to notice, at the time and place indicated; that the teleconference was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the foregoing teleconference is a true record; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof

WITNESS my hand this 17th day of August A D 2007

RENEE A MEYERS
REGISTERED PROFESSIONAL REPORTER
CERTIFICATION NO 106-RPR
(Expires January 31, 2008)