# EXHIBIT Q

Page 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG. PHILIPS LCD COMPANY LTD., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 04-343 (JJF) |
| v. | ) ) | |
| TATUNG COMPANY, TATUNG COMPANY OF AMERICA, INC.; and VIEWSONIC CORPORATION, | ) ) ) ) ) ) | |
| Defendants. | ) | |

　　　　Special Master's Hearing taken at the Law Offices of Blank Rome, LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware, beginning at 2:00 p.m., on Friday, September 21, 2007, before Ellen Corbett Hannum, Registered Merit Reporter.

— — —

BEFORE:　THE HONORABLE VINCENT J. POPPITI, SPECIAL MASTER

— — —

CORBETT & WILCOX
Registered Professional Reporters
The Parcels Building - 230 N. Market Street
Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated with Wilcox & Fetzer, Court Reporters

HEARING

2 (Pages 2 to 5)

Page 2

```
1   APPEARANCES:
2      THE BAYARD FIRM
       BY: RICHARD D. KIRK, ESQ., and
3          STEPHEN B. BRAUERMAN, ESQ.
           and
4      McKENNA LONG & ALDRIDGE, LLP
       BY: CASS W. CHRISTENSON, ESQ., and
5          REL S. AMBROZY, ESQ
6      (Washington, District of Columbia)
7          Counsel for LG Philips
           LCD Company Ltd.
8
9      RICHARDS LAYTON & FINGER
       BY: ANNE SHEA GAZA, ESQ.
10         and
       GREENBERG TRAURIG LLP
11     BY: FRANK E. MERIDETH, JR., ESQ.
           MARK H. KRIETZMAN, ESQ.
12     (Santa Monica, California)
13         Counsel on behalf of
           Tatung Co. and Tatung
14         Company of America
           Inc.
15
16     CONNOLLY BOVE LODGE & HUTZ, LLP
       BY: JEFFREY B. BOVE, ESQ., and
17         KRISTEN HEALY CRAMER, ESQ.
           and
18     CONNOLLY BOVE LODGE & HUTZ, LLP
       BY: SCOTT R. MILLER, ESQ.
19     (Los Angeles, California
           and
20     RASKIN PETER RUBIN & SIMON
       BY: TRACY R. ROMAN, ESQ.
21     (Los Angeles, California)
22         Counsel on behalf of
           ViewSonic Corporation
23
24     SPECIAL MASTER POPPITI: If I can find
```

Page 3

1  out who is on, please. We can do a roll call.
2         MR. BOVE: Your Honor, for ViewSonic in
3  Wilmington, Jeff Bove and Kristen Cramer.
4         SPECIAL MASTER POPPITI: Thank you.
5         MR. MILLER: In Washington, it's Scott
6  Miller and, also, Tracy Roman from the Raskin Peter firm.
7         SPECIAL MASTER POPPITI: Thank you.
8         MR. KIRK: This is Dick Kirk from The
9  Bayard Firm here in Wilmington for the plaintiff, L.G.
10 Phillips, LCD Co., Ltd., on the line should be my
11 colleagues from McKenna Long.
12        MS. GAZA: Your Honor, Anne Gaza as well
13 from Richards Layton; Frank Merideth is on the line from
14 Greenberg Traurig.
15        MR. KIRK: This is Dick Kirk again.
16 Are my colleagues from McKenna on?
17        MR. CHRISTENSON: Yes. This is Cass
18 Christenson and Rel Ambrozy.
19        SPECIAL MASTER POPPITI: Thank you.
20 Counsel, I have been through your
21 respective filings and I hope I have a good sense of what
22 messages they are trying to convey. As you know, they
23 started to come in around 10:30 this morning. So let's
24 start and see how far we go, how far we get, please.

Page 4

1         MR. MILLER: Your Honor, it's Scott
2  Miller for ViewSonic Corporation.
3         Just to try to be efficient, I don't
4  know if you want us to discuss the entire aspect of the
5  motion or just if you have particular questions you want
6  us to address.
7         SPECIAL MASTER POPPITI: Well, I guess
8  the difficulty is this -- and I thought of this as I was
9  going through it. If I had the time, I certainly would
10 have been making a running chart consistent with your
11 respective references to the transcripts. And,
12 obviously, time did not, didn't permit me to do that. I
13 really think it would be important for you to, No. 1,
14 focus on -- maybe this is just a question -- and forgive
15 me if I'm not as tightly focused as I like to think I
16 usually am with respect to these submittals.
17        Is it fair for me to understand that
18 when there was an effort to get information with respect
19 to certain model numbers, that those numbers reflect
20 information that was received as a result of the later
21 production or they reflect information that you are
22 trying to gather for earlier identified model numbers in
23 light of later production?
24        Is that a fair question? Do you

Page 5

1  understand the question?
2         MR. MILLER: I understand your question.
3  I think there was one product that we asked about where
4  we had a product document back before the recent
5  production. That's Exhibit 80. We had that document
6  previously.
7         SPECIAL MASTER POPPITI: Right. That's
8  what I thought.
9         MR. MILLER: Any of the other
10 documents -- and we had additional documents with regard
11 to the product, which is Exhibit 80, the technical
12 documents showing detailed drawings of that product were
13 produced as part of the recent production. And so it's
14 not a situation where the questions relating to Exhibit
15 80 are not tied to the recent production. In fact, the
16 detailed drawings are the subject matter of the recent
17 production.
18        SPECIAL MASTER POPPITI: And I thought
19 that. I just wanted to make sure of that and wanted to
20 make sure that the record reflected that.
21        MR. MILLER: Sure. Your Honor, if it
22 would be helpful, I can sort of walk through some points
23 to respond to the issues that were raised by LPL.
24        SPECIAL MASTER POPPITI: I think that

Page 6

1  would be helpful, and I do want you to spend some time
2  focusing on your view of what your questions were
3  designed to elicit, because I think it's fair to say --
4  and I don't mean this pejoratively in any way, looking at
5  your respective views of these things, it looked like you
6  were in two different rooms for this deposition.
7       MR. MILLER: Okay. I can understand how
8  you might come to that conclusion, Your Honor.
9       MR. CHRISTENSON: Your Honor, this is
10 Cass Christenson.
11      As a point of clarification, responding
12 to your earlier question, to make sure we are on the same
13 page, I think my understanding is there were really two
14 products that were being addressed, and one of them
15 related to Exhibit 80, which is the document that was
16 produced earlier in the case.
17      SPECIAL MASTER POPPITI: Right. Then we
18 are on the same page.
19      MR. MILLER: Your Honor, I think the
20 record shows that there were a number of products that we
21 asked about in the exhibits 76, 77, 78 all relate to
22 different products, I believe 79, as well. But moving to
23 just the substance of the issues --
24      SPECIAL MASTER POPPITI: Please.

Page 7

1       MR. MILLER: Looking at the document
2  filed by LPL -- and I will just go through in the order
3  in which they have addressed them in their presentation.
4  The first question is the issues relating to the
5  preparation for the deposition and the appropriate --
6       SPECIAL MASTER POPPITI: Did someone
7  else just join?
8       MR. KRIETZMAN: Yes. This is Mark
9  Krietzman joining. I apologize for being late, Your
10 Honor.
11      SPECIAL MASTER POPPITI: Thank you, sir.
12 That's all right.
13      MR. MILLER: In talking about the
14 understanding of the scope of the deposition and the
15 products that were going to be at issue, and what LPL has
16 done in their filing is point to a discussion during the
17 August 16th hearing where Ms. Roman indicated, in
18 response to the colloquy, that she would discuss the
19 matter with the people who had been looking at the
20 documents and see whether or not it was possible to try
21 to provide LPL with a closed universe of products that we
22 would be having as the subject matter of the deposition.
23      SPECIAL MASTER POPPITI: Right.
24      MR. MILLER: And you may recall you

Page 8

1  ordered us to have a meet and confer in advance of the
2  call the next day of August the 17th.
3       SPECIAL MASTER POPPITI: I recall that.
4       MR. MILLER: We had that meet and
5  confer. And at that discussion I explained to
6  Mr. Christenson, which I also explained to Your Honor on
7  the record on the 17th, that it simply was not possible
8  for us to have a closed end list, but we were perfectly
9  prepared to work with LPL, provided they could provide us
10 with information that they had indicated previously was
11 somewhat available to them, and namely, this whole issue
12 about the family of products. And where there is a
13 family of products that would have no difference as it
14 might relate to mounting configurations, that they could
15 provide us with a list of those products and we would be
16 able to narrow the product list down to the products that
17 would be at issue. And if you look at the transcript,
18 for example, of the August 17th hearing.
19      SPECIAL MASTER POPPITI: Now, point me
20 -- what I have done for purposes of this hearing is I
21 have used the documents and transcripts that you have
22 submitted so I have not pulled my own transcripts.
23      MR. MILLER: And I don't think we
24 submitted this because we didn't think this was going to

Page 9

1  be a controversial issue. It is in the August 17th
2  transcript, and we did not submit that transcript
3  because, as I say, we did not understand there was going
4  to be this kind of differentiation in terms of what was
5  agreed to. But I am happy to read from the transcript or
6  if the transcript is available to you or I may be able to
7  e-mail it to you in short order.
8       SPECIAL MASTER POPPITI: No. One
9  second.
10      We will pull that, but for purposes of
11 moving it along, why don't you read that to me, please.
12      MR. MILLER: In the transcript,
13 beginning on page 10 Mr. Christenson reports to the Court
14 his understanding of what transpired during the meet and
15 confer. And he says on page 11, starting at line 13:
16 "When I talked to Mr. Miller in the meet and confer, he
17 essentially reverted back to the original position of
18 ViewSonic before yesterday's hearing, which was
19 everything is in play, all of the products for which LPL
20 has produced documents should be within the scope of this
21 deposition. And then went back into the realm of, well,
22 up to perhaps 100 products being addressed."
23      And the transcript goes on from there.
24 But the colloquy then continues, starting on page 30, of

Page 10

1  the August 17th transcript, starting at line 3:
2  "SPECIAL MASTER POPPITI: Is it fair to
3  ask that you, as the path goes forward in this
4  deposition, if there is a determination made or if
5  determinations are made to carve down the 70 to a lower
6  number that you would be willing to advise of those that
7  are going to be carved out?
8  "MR. MILLER: Yes, we would. And, in
9  fact, I advised Mr. Christenson today when he raised for
10 us, for the first time in the phone call, about samples,
11 maybe that there are products that have the same mounting
12 or fastening element configurations and the difference
13 between these different models may not be relevant to
14 this case. And I advised him, as well, that we could
15 reduce the number of products at issue by the same sort
16 of calculus for products identified in drawings if they
17 could tell us which ones or if we could otherwise
18 determine on our own which ones have the same structure
19 and issues involved so we don't need to depose a witness
20 on two different products if they are identical for
21 purposes of this case."
22 SPECIAL MASTER POPPITI: Right. I
23 recall that. And that certainly related to requests
24 dealing with the family.

Page 11

1  MR. MILLER: And it went on. There was
2  some additional colloquy between yourself and
3  Mr. Christenson. And then at page 33, starting at line
4  7, the important discussion here is:
5  "SPECIAL MASTER POPPITI: I think I
6  heard two things. I think I heard that the present
7  universe is 70. I heard that there will be, when
8  judgments are made with respect to paring down the
9  universe for whatever reason, they are willing to advise
10 that a product is no longer in play. But I think I also
11 heard Mr. Miller say that if you are willing to engage
12 him in, as he described, they will in turn be in a
13 position to narrow it down even further, then they would
14 be better informed. That's at least generally what I
15 thought I heard, Mr. Miller." Mr. Miller says: Yes,
16 Your Honor. That is exactly correct.
17 "SPECIAL MASTER POPPITI: It is clearly
18 not a matter of my directing that that occur, but if we
19 are looking for efficiencies here and the burden is what
20 is in terms of the new production. I don't know how
21 long -- no one has talked to me about how long or whether
22 it is important to focus on it in this way, but how long
23 anyone could expect a witness is going to be deposed with
24 respect to each product."

Page 12

1  The colloquy goes on for a while.
2  SPECIAL MASTER POPPITI: And I do have
3  the transcripts in front of me now.
4  MR. MILLER: Okay. And I am now on page
5  34.
6  SPECIAL MASTER POPPITI: Okay.
7  MR. MILLER: Actually on -- well, the
8  colloquy continues from where we left off on page 34 and
9  goes on to page 35, starting at line 12 where
10 Mr. Christenson says: "Your Honor, I am happy to talk to
11 our client about that. It's one of the issues I was
12 planning to talk to them about. I don't know whether or
13 not we are going to be in a position to tell them the two
14 products in the same family members are, you know. I
15 guess the question would be what part of the
16 representation that they are the same for all purposes."
17 And so I think where we left this whole
18 discussion was that Mr. Christenson was going to work
19 with his clients to see whether or not there was a way
20 that they could provide us with information about product
21 families that would somehow be able to narrow the scope
22 of the deposition. And, in fact, on page 36 of the
23 transcript, starting at line 1, Mr. Christenson says:
24 "As I told Mr. Miller, if we don't already have a list of

Page 13

1  the products that are reflected on our document
2  production, that's certainly something that we can look
3  at and try to identify them so we can talk about whether
4  we can use that list to create efficiencies. Now that is
5  something I certainly will do."
6  I will just note for the record that
7  Exhibit 2 to the filing today is the first time I have
8  gotten a list from LPL of the product model numbers that
9  were involved in the recent discovery. So the fact of
10 the matter is here that this is not a situation where LPL
11 was burdened, other than by their own decisions not to
12 participate in trying to assist the defendants in
13 achieving efficiencies that might be able to be achieved.
14 Instead they, I believe, chose the path of saying, We
15 will let you find it out through discovery in the
16 deposition, which is exactly what I think we tried to do.
17 When one looks at the questions that were asked, and in
18 the five products --
19 SPECIAL MASTER POPPITI: Mr. Miller,
20 give me one moment. I know I have Exhibit 2 in front of
21 me. I just want to see the reference in LPL's filing to
22 Exhibit 2. I do see it. I was just seeing if there was
23 a reference as to when it was provided to you. And you
24 are telling me that the first time you have seen this

Page 14

1  list is in conjunction with the filing made today?
2      MR. MILLER: That's the first time I
3  have seen it.
4      SPECIAL MASTER POPPITI: Okay.
5      MR. MILLER: So we know also from the
6  August 17th hearing that Mr. Christenson acknowledged
7  that at least the one product, the -- what has been
8  referred to as the Lucky Gold Star product.
9      SPECIAL MASTER POPPITI: Yes.
10     MR. MILLER: The product LC056N1, which
11 is the subject of Exhibit 78, was clearly in controversy
12 for part of this deposition. Yet, when one looks at the
13 testimony that was given in this deposition thus far with
14 regard to the products, we get absolutely no information
15 whatsoever.
16     SPECIAL MASTER POPPITI: Why don't you
17 give me just a few examples for the record. I know you
18 have laid them out for me in your submittal, but I think
19 it would help for purposes of having this record flow.
20     MR. MILLER: Sure. Well, let me just
21 talk a little bit about the questions that were asked,
22 because there was an issue raised about whether or not
23 the questions that were asked in fact sought to elicit
24 proper information.

Page 15

1      SPECIAL MASTER POPPITI: Okay.
2      MR. MILLER: The questions that were
3  asked repeatedly asked whether or not the products as
4  sold by LPL had any kind of feature, structure, any other
5  word that we could use, including a mounting hole word,
6  which was from LPL's own document, that a customer could
7  use for purposes of attaching that product within a
8  housing structure or to any other structure.
9      What the witness attempted to -- what
10 the witness testified to, as LPL said in their letter, is
11 the witness testified that they don't know how a customer
12 does attach it. And yet, not a single one of the
13 questions that were asked sought the information about
14 how is the product actually attached by a customer. In
15 fact, it sought what structures, what features, what
16 mounting holes does LPL provide that a customer could use
17 for purposes or that is allowed, that allows a product to
18 be connected or that would allow a product to be
19 connected?
20     So, for example, if you want transcript
21 citations, there is a question: What were you told with
22 regard to any screw holes that are contained on the back
23 of the LV56ND01A product?
24     SPECIAL MASTER POPPITI: Mr. Miller,

Page 16

1  where is the reference, please?
2      MR. MILLER: That is LV --
3      SPECIAL MASTER POPPITI: No. I'm sorry.
4  Where is the reference in the transcript?
5      MR. MILLER: Page 45, line 10.
6      SPECIAL MASTER POPPITI: Which one,
7  please?
8      MR. MILLER: Volume 1.
9      SPECIAL MASTER POPPITI: Volume 1, page
10 45, line 10. Okay.
11     MR. MILLER: Asking about in his
12 conversation with the engineers: What did they tell you
13 with regard to any screw holes that were contained on the
14 back of the product model number that I've recited?
15     And the witness's response was: No.
16 And the following question:
17     "Can you answer the question?"
18     "No."
19     Then I asked the question: "What
20 questions did you ask Mr. Baek, the engineer, about how
21 the product was intended to be mounted to another
22 structure?"
23     "ANSWER: I find your question rather
24 vague, particularly as to mounting. I'm not sure what

Page 17

1  you are trying to ask about, so can you make it more
2  specific."
3      At one point in the transcript I asked
4  him, I specifically articulated -- this is at page 65,
5  starting at line 25.
6      SPECIAL MASTER POPPITI: Just a moment,
7  please. Okay.
8      MR. MILLER: "QUESTION: "Well, your
9  answer suggests that we still are not communicating, and
10 that's why I'm asking this question. I want to
11 differentiate between LPL's knowledge about how a
12 customer actually makes the connection from LPL's
13 knowledge about any feature on the product as LPL sells
14 it that a customer can use to make a connection. Do you
15 understand that distinction?"
16     Then we get an objection from
17 Mr. Ambrozy about vague and ambiguous and saying that I
18 am badgering the witness, and relates to legal
19 conclusions, none of which we believe are proper
20 objections.
21     Then the witness says: "I have
22 difficulty in understanding your question, because it is
23 rather lengthy. If you manage to shorten your question
24 and make it clearer, then that would help me answer your

HEARING

6 (Pages 18 to 21)

Page 18

1  question."
2  SPECIAL MASTER POPPITI: Let me do this
3  for purposes of framing the issue. I would like to hear
4  LPL's response to the appropriateness of the question as
5  asked, and I am specifically looking, then, at page 65
6  and 66. 65 line 25, 66, 1 through 7.
7  MR. CHRISTENSON: Your Honor, this is
8  Cass Christenson for LPL. I do have some comments, I
9  would like --
10  SPECIAL MASTER POPPITI: No. I want you
11  to answer my question, Mr. Christenson.
12  MR. CHRISTENSON: Okay. Page 65, line
13  25.
14  SPECIAL MASTER POPPITI: 65, line 25
15  through 7, that's the question. The objection is from
16  line 8 through line 17. The objection is longer than the
17  question, I would note. And I would like to know why the
18  question is not a proper question.
19  MR. CHRISTENSON: The problem with the
20  question, Your Honor, is it's asking for a
21  differentiation that LPL is not able to make. It's a
22  differentiation that ViewSonic would like to make. They
23  are trying to draw a distinction between how a product is
24  mounted using features on the module and what features

Page 19

1  could be used to perform mounting. The problem from
2  LPL's standpoint, as the witness testified, is that they
3  don't know what the -- how the customers or set makers
4  use different features to accomplish amounting.
5  SPECIAL MASTER POPPITI: I understand
6  that.
7  MR. CHRISTENSON: Your Honor, in order
8  to know what features correspond to mounting, LPL would
9  need to understand how the products are mounted. The two
10  things go together. We can't separate --
11  SPECIAL MASTER POPPITI: Counsel, they
12  may go together from your perspective, but this is
13  discovery. And how you wrap it together at the end of
14  all this, that's your theory of your case. But this is
15  discovery.
16  Why is the question inappropriate? I
17  want to walk through. Objection, vague. Why is it
18  vague? I understood it. This is not the first time that
19  Mr. Miller made the distinction between, Tell me what
20  your customers would do, as opposed to, You tell me what
21  features are part of your product that could permit your
22  customers to do certain things.
23  Tell me why -- Mr. Miller, did I
24  paraphrase your numerous questions correctly?

Page 20

1  MR. MILLER: Yes, you did, Your Honor.
2  SPECIAL MASTER POPPITI: How is that
3  inappropriate? Please walk me through your objection.
4  Why is it vague? I understood it the first time I read
5  it, and I didn't take five weeks to prepare. I know that
6  sounds facetious, and I apologize for that. But this is
7  the 30(b)(6) witness.
8  MR. CHRISTENSON: Your Honor, I
9  understand the question, and I understand the distinction
10  that Mr. Miller was trying to make. What I am trying to
11  suggest is that from LPL's perspective, they don't have
12  any more information about what features are used to
13  mount than they have about how the features are used to
14  mount.
15  SPECIAL MASTER POPPITI: That's not the
16  question, Counsel. It's not what features are used to
17  mount. It says any feature on the product that LPL sells
18  that a customer can use to make a connection.
19  MR. CHRISTENSON: And I think the
20  ambiguity, Your Honor, is with respect to making the
21  connection. There is no indication there as to what type
22  of connection they are talking about. I mean, if there
23  is an answer to the question that -- one way to construe
24  the question would be that they are asking about how you

Page 21

1  could connect to a housing, which is the only relevant
2  question.
3  SPECIAL MASTER POPPITI: With all due
4  respect, Counsel, every time this question was phrased or
5  rephrased it got shut down. There wasn't a way that
6  Mr. Miller could phrase it that it didn't get shut down.
7  Is there? Show me one.
8  Mr. Miller, if we need to take the time
9  to do this, because this is really the focus, I think, of
10  everything we have been talking about yesterday and what
11  you would like to talk about today as a practical matter.
12  MR. MILLER: As a practical matter, yes.
13  SPECIAL MASTER POPPITI: This is the
14  essence of it all.
15  MR. MILLER: This is the gatekeeper that
16  keeps us from getting anything.
17  SPECIAL MASTER POPPITI: You didn't say
18  that, I did.
19  MR. CHRISTENSON: Your Honor, there was
20  an objection to vague, in terms of the objection and the
21  question being vague --
22  SPECIAL MASTER POPPITI: Remember, we
23  are on page 66. I am sure Mr. Miller could go back to
24  the first time he made an effort to get this information.

Page 22

1  And if we need to do it that way, I am going to direct
2  that he does it that way.
3       This is not the first time, is it?
4       MR. MILLER: Your Honor, this is an
5  issue that was a recurring issue in the deposition.
6       SPECIAL MASTER POPPITI: Counsel,
7  correct me if I am wrong, my sense is with respect to
8  what your witness was either saying or not saying, and
9  what you wanted him to be permitted to say or not to say,
10 there's where the nub of the issue is here.
11      And I don't yet see, in the response
12 that you have made today, in all of the comments made
13 during the course of the deposition, that your mind is
14 meeting with where he wanted to be. He was not asking
15 about what customers would do or not do. And I would
16 like you to point me to any question in this transcript
17 where he was doing that, please.
18      MR. CHRISTENSON: Your Honor, I think
19 the difficulty is that, first of all, there are many
20 different ways, types of connecting. There is connecting
21 to circuitry, there is connecting to a housing, there is
22 connecting to a frame. And I don't think there is any
23 distinction in the question about what type of connecting
24 is being addressed. I think the witness, it seems to me,

Page 23

1  was assuming he was asking about connecting to a housing.
2       SPECIAL MASTER POPPITI: I don't know
3  what he was thinking, because he didn't get a chance to
4  respond.
5       MR. CHRISTENSON: There is no evidence,
6  Your Honor, that any of LPL's modules have ever been used
7  to directly connect at the back of the module to a
8  housing. The witness, on page 68, addressed the issue
9  and acknowledged -- and I'm looking at line 14, on page
10 68. Mr. Chao acknowledged that there were two separate
11 issues being addressed. One was the issue of how -- what
12 features could be used by the customer for mounting or,
13 as Mr. Miller said, some sort of connecting, and then the
14 actual mounting of the module as a separate question.
15      And what the witness was trying to
16 express, on page 68, as I read the testimony, was that
17 LPL -- again, you can't really unbundle those two issues,
18 because if you want to know what features could be used
19 to attach a housing to a module, you need to understand
20 how -- the different ways that customers have actually
21 mounted LPL modules into their products. And, again,
22 there is no evidence that a module made by LPL has ever
23 been directly attached at the back to a housing.
24      In fact, typically, from what we have

Page 24

1  seen in the evidence, with respect to the defendant's
2  products, a set maker will take the module, they will add
3  some type of a frame at the back of the module, and the
4  module maker, such as LPL, would never see that other
5  frame. They wouldn't know how that frame is attached to
6  the module. And then that frame that's attached to the
7  module is in some way connected to a housing.
8       So I think there is just a question --
9  fundamentally, there is obviously a question here about
10 what does LPL know and what does LPL not know? And the
11 fact of the matter is that they don't know how their
12 products are mounted, that that's something that their
13 suppliers, the set makers know about. LPL is on the
14 other end of the set maker. They come -- ViewSonic comes
15 after the set maker makes the product.
16      SPECIAL MASTER POPPITI: Let me focus
17 you on page 69, and this is Mr. Miller's question: "So,
18 just so I understand your testimony, is it your testimony
19 that LPL is not in a position to say whether any
20 structure shown in Exhibit 77 was provided so as to help
21 a customer -- strike that. So it's your testimony that
22 LPL is not in a position to say whether any feature shown
23 in Exhibit 77 could be used by a customer for purposes of
24 connecting the product that is the subject of Exhibit 77

Page 25

1  to another structure?"
2       And the question finally gets answered,
3  if I understand this, on page 72. And the answer is:
4  "That's correct. I don't believe that would be
5  possible."
6       MR. CHRISTENSON: Yes, Your Honor, I see
7  that.
8       SPECIAL MASTER POPPITI: Now,
9  Mr. Miller, do you understand the answer to that question
10 to be that -- the answer to your question is that it's
11 not possible for the witness to answer the question?
12      MR. MILLER: That's the only thing I can
13 ascertain from that answer, Your Honor, for two reasons:
14 The first is that the specifications documents, which we
15 have asked the witness about specifically, say that the
16 module must be mounted using the mounting holes.
17      SPECIAL MASTER POPPITI: And I have seen
18 that language before, right through Markman.
19      MR. MILLER: And, secondly, I have
20 trouble looking at the third page of the submission by
21 LPL this morning to Your Honor and the last paragraph and
22 the last sentence of the last paragraph which reads:
23 "This is consistent with LPL's prior testimony and with
24 the fact that each module has a variety of holes or other

### Page 26

1  elements which could be used to attach any number of
2  components or structures, most of which are unrelated to
3  rear mounting in this case and all of which are
4  determined by the set makers, not LPL."
5      They are saying, at least as I read that
6  sentence, and as their specifications say, that there are
7  ways -- we are providing you ways to mount this product.
8  Yes, the customer decides which of the screw holes to put
9  a screw into. And we have never asked them the question
10 about which -- tell us how your customers mount. We have
11 asked repeatedly: What are the features? What are the
12 screw holes? What are the mounting holes? What are the
13 structures that a customer could use to make that
14 physical connection?
15     And every time, all we got was, I don't
16 know or talk to an expert.
17     SPECIAL MASTER POPPITI: Well, let me
18 just ask another question, as you flesh this out for me.
19 When he has said repeatedly, and he has, talk to an
20 expert or part of the objection was that this is a
21 subject of expert testimony, I reviewed what I expect is
22 the agreement that was forged with respect to testimony
23 from a fact witness that would be the subject of expert
24 testimony. And let me see if I can encapsulate my

### Page 27

1  understanding of it.
2      If there is an assertion -- and I'm not
3  sure I see a clear assertion that the subject matter that
4  is being inquired into will only be addressed -- and I'm
5  going to add a paren, (in its entirety), by expert
6  testimony, that if I understood the agreement that was
7  forged, that shuts it down.
8      MR. MILLER: Your Honor, this is Scott
9  Miller.
10     I guess the question I have -- the
11 discomfort I have with that rendition of it is that the
12 agreement was not meant to be a shield to hide facts that
13 the parties have.
14     SPECIAL MASTER POPPITI: I understand
15 that.
16     MR. MILLER: It was meant to say we can
17 take discovery of facts if they are contentions about the
18 infringement, if they are contentions about validity, the
19 legal applications that an expert would do, those are
20 things that if an expert's testimony is going to be
21 provided, then the parties have agreed that they are not
22 going to try to force a lay witness at a party to be able
23 to testify to those issues.
24     SPECIAL MASTER POPPITI: To make a

### Page 28

1  commitment.
2      MR. MILLER: You have to both commit to
3  it, but it's also not a shield to stop factual discovery
4  about whether or not there are facts that underlie that
5  contention and those facts are accurate.
6      So if LPL is not in a position --
7  applying it to the circumstance here, ViewSonic could not
8  take the position that the witness would not be able to
9  testify about the structure of the product that was put
10 forward as an accused product. They would have to
11 testify about their knowledge of the structure. This
12 part is connected to that part. You know? Why is it
13 connected? Well, if they don't know that, then they
14 don't know that. Does that connection make it a first
15 frame under the patent? That's something that would be
16 in expert testimony, that relates to the contention.
17     But is Part A connected to Part B? Is
18 there a screw hole here? Can this be used to make a
19 connection to some other structure? Those are all facts,
20 none of which a party is in a position, if they have
21 factual knowledge, to say, I'm sorry, I'm not going to
22 tell you the facts I know. Go talk to the expert I've
23 hired to tell you.
24     SPECIAL MASTER POPPITI: Well, then, I

### Page 29

1  think your response to my question is you did not
2  understand the agreement to be what LPL understands the
3  agreement to be.
4      And I think that my question to LPL is:
5  If your understanding of the agreement is the way I have
6  just articulated it, then what meaning -- and we took a
7  lot of time going through these topics. What meaning, if
8  any, does Topic 1B, C, D, Topic 2B, C, D, what meaning,
9  if any, do those topics and subtopics have for this
10 30(b)(6) witness? Why did we waste all of our time?
11     MR. CHRISTENSON: Your Honor, that's a
12 very good question. Going into this deposition we were
13 very concerned, and I expressed the concerns very
14 directly, about our prior agreement that questions
15 relating to how you apply the claim terms to LPL's own
16 products, which directly relates to prior art and
17 invalidity is a subject for the expert witnesses.
18     And as Your Honor may recall at the
19 hearing, and I cited this in our letter, you expressed
20 the concern that we did, even before we had made the
21 argument, you understood that there was an issue there
22 when they were using a topic to relate specifically to
23 Your Honor's claim constructions with respect to LPL's
24 products.

Page 30

1   SPECIAL MASTER POPPITI: I understand
2   that. But that's not what we are talking about, is it,
3   Mr. Miller?
4       MR. MILLER: No, Your Honor.
5       MR. MERIDETH: Your Honor, this is Frank
6   Merideth, if I could just interject for a second from
7   Tatung's viewpoint on this issue, because I think this is
8   an important point.
9       MR. CHRISTENSON: Your Honor, I haven't
10  finished my response.
11      SPECIAL MASTER POPPITI: Let
12  Mr. Christenson finish.
13      MR. CHRISTENSON: As I understand the
14  nature of the questions that were being posed by
15  Mr. Miller, they were questions asking essentially
16  whether something could be used as a fastening element
17  or, essentially, they are going to whether LPL's products
18  are rear-mountable devices. And the purpose of that
19  obviously is to try to support their invalidity arguments
20  and to establish that these products constitute prior
21  art. And those specifically are subjects that, as I
22  understood, we had reserved for the experts in this case.
23      In addition, because of the fact that I
24  didn't understand why we had those topics in, I expressed

Page 31

1   my concerns. And at the hearing on August 16, it was
2   made -- I'm sorry, August 27th, it was made very clear
3   that an agreement was in effect, that LPL's witness would
4   not be expected to relate claim terms or claim
5   limitations to LPL's products, and then an expert witness
6   could address those issues. And I think the nature of
7   the understanding was, as posed by Your Honor, if LPL
8   invoked that agreement, then that was the end of the
9   inquiry.
10      SPECIAL MASTER POPPITI: Well, let's go
11  back to the transcript of the 27th, if you all have that
12  in front of you. I know I have an excerpt. If I need
13  more of it, I will get it. But I'm looking at the
14  transcript for August the 27th.
15      MR. MILLER: Page 15, Your Honor.
16      SPECIAL MASTER POPPITI: I'm at page 15.
17      MR. MILLER: At the bottom of the page
18  is an example of where -- we were talking about Topic 1B
19  for example, there. And I expressed my concern that it
20  was potentially requiring the witness to talk about LPL
21  products in terms of what claim limitations they meet
22  under your definitions of those terms. And I say: "We
23  previously agreed with the other side that the Rule
24  30(b)(6) depositions in this case would not encompass

Page 32

1   parties' positions or contentions on validity
2   infringement or enforceability, but, rather, those issues
3   would be for the expert witnesses."
4       SPECIAL MASTER POPPITI:
5   Mr. Christenson, I know you choose your words carefully
6   and you do say there "would not encompass parties'
7   positions or contentions on validity infringement or
8   enforceability."
9       So go ahead, please.
10      MR. CHRISTENSON: And I say: "So we
11  don't want to be in a position where the witness is going
12  to be asked questions that would fall into that expert
13  realm and require the witness to take positions related
14  to claim construction."
15      SPECIAL MASTER POPPITI: Okay.
16      MR. CHRISTENSON: And then you expressed
17  on page 17, you say certainly -- you are referring to
18  topics 1 and 2, Your Honor states: "Certainly, even
19  before looking at LPL's position with respect to the
20  topic in terms of arguing through it, when I looked at it
21  and I did turn to the topics first, I certainly had the
22  concern that LPL raises."
23      SPECIAL MASTER POPPITI: Right.
24      MR. CHRISTENSON: And then you point

Page 33

1   out, Your Honor, that if the topic gets responded to by
2   virtue of saying, We intend to rely on expert opinion,
3   doesn't that answer the concern?
4       And then Mr. Miller confirmed on page 18
5   that that was acceptable.
6       SPECIAL MASTER POPPITI: Mr. Miller.
7       MR. MILLER: I did confirm that under
8   the parties' prior agreement that would be acceptable as
9   to positions and contentions regarding application of
10  claim terms to a structure, but that's not a single
11  circumstance that is applicable to these questions. And,
12  in fact, the parties' prior agreement, which was
13  articulated before Your Honor during the March 13th, 2007
14  hearing, which we provided to you and was, again,
15  reiterated during the deposition of ViewSonic where
16  Mr. Tommy Chao was the witness, also that transcript has
17  been provided, a section of that transcript has been
18  provided, shows that the agreement between the parties is
19  as Mr. Christenson articulated it. The application of
20  the claim term and whether or not this structure meets a
21  claim term is something that a party can say, We are
22  going to rely solely and exclusively on an expert to
23  testify about that. But the underlying facts regarding
24  the structure are not ones that a party can just say, We

Page 34

1   don't have to tell you any facts.
2           And, in fact, Mr. Ambrozy, time and
3   again in taking the deposition of ViewSonic's witness,
4   acknowledged that, and during the hearing, that questions
5   about facts regarding the structure of the product were
6   fair game. Application of claim terms to a component
7   would be the subject of the agreement.
8           SPECIAL MASTER POPPITI: And if I -- I
9   am looking, again, at the transcript at page, the August
10  27th transcript at page 16, beginning at line 12, and
11  ending at page 17, line 2. Mr. Miller, if you would read
12  that into the record. They are your statements. And
13  once you read it in, I want to know whether you believe
14  that that statement is consistent with what you just
15  said.
16          MR. MILLER: I'm sorry, Your Honor,
17  where were you?
18          SPECIAL MASTER POPPITI: I'm at page 16
19  of the August 27th, 2007 transcript.
20          MR. MILLER: Okay.
21          SPECIAL MASTER POPPITI: Line 12.
22          MR. MILLER: Yes.
23          "MR. MILLER: Your Honor, what I advised
24  Mr. Christenson on the 22nd was that we would be --

Page 35

1   consistent with our agreement, if LPL's witness says, We
2   are relying solely on expert testimony with regard to
3   those issues, that that's fine, that was our agreement.
4   But if they intend to put on a witness, a fact witness,
5   beyond their expert to testify about any of those things,
6   obviously, we are entitled to know what that fact witness
7   is going to say and all we would be looking for here is
8   if there are facts that their fact witnesses intend to
9   deal with or testify to at trial, we want to know what
10  they are. If they are going to come in and say, We are
11  solely relying on expert testimony with regard to those
12  issues, that will be the end of the inquiry."
13          SPECIAL MASTER POPPITI: And those
14  issues you are referring to are the contentions on
15  validity infringement or enforceability because that's
16  what you were responding to Mr. Christenson's comments
17  which immediately preceded yours?
18          MR. MILLER: Yes. And this also clearly
19  differentiated in the prior agreement between the
20  parties.
21          MR. MERIDETH: Your Honor, this is Frank
22  Merideth again, if I could speak to this.
23          SPECIAL MASTER POPPITI: Yes, you can at
24  this point.

Page 36

1           MR. MERIDETH: From the Tatung
2   defendants' position, our interest in this 30(b)(6)
3   witness testimony relates to inequitable conduct, and to
4   suggest that somehow or another expert testimony is going
5   to solve that issue and provide facts that relate to that
6   contention are simply wrong.
7           No. 1, it was not included in the list
8   of topics that Mr. Christenson carefully listed and you
9   read, inequitable conduct is not one of those areas. No.
10  1.
11          No. 2, it would make absolutely no sense
12  to allow an LPL witness to escape questions regarding
13  inequitable conduct, i.e., what mounting structures did
14  LPL provide on its products and what did you, LPL, know
15  about those products when you made this patent
16  application? And did you disclose those features to the
17  examiner? are questions that don't have anything to do
18  with expert testimony and they are not excluded by the
19  stipulation. They are questions that we had been stymied
20  in getting the answers to.
21          And from our viewpoint, that's the
22  fundamental reason why we want to take these depositions.
23  What's happened is after the claims construction, based
24  upon a calculated decision, LPL disclosed certain prior

Page 37

1   art products which it had made the strategic decision not
2   to disclose at an earlier date. We believe that those
3   particular products demonstrate inequitable conduct on
4   the part of LPL. And we want to find out about those
5   products. We want -- we have, one of those products we
6   managed to acquire. We want no inquire about those
7   products. We want to inquire about the mounting features
8   that LPL put on the product, because that has to do --
9   that goes to the heart of the inequitable conduct
10  defense.
11          MR. CHRISTENSON: Your Honor, this is
12  Cass Christenson.
13          Going back to the question you had asked
14  earlier about what sorts of questions would be left that
15  would not be considered an expert witness question under
16  those topics? What I would have anticipated was that the
17  witness would have been shown exploded-view diagrams or
18  drawings of particular modules and asked about what a
19  certain part or component of the module is and what
20  function it performed with respect to the module.
21          SPECIAL MASTER POPPITI: And I
22  understand what you just said, and I understand at one
23  point throughout this deposition of what, I guess, was a
24  day and a quarter or a day and a half, at one point the

Page 38

1  witness said, I need to see additional documents. I
2  think that had to do with financial information and
3  marketing information. I understand that.
4         If a witness says, I need to see
5  something in order to answer the question, but that's not
6  what is going on here. This witness didn't say that.
7         MR. CHRISTENSON: Your Honor, what I
8  understood they were trying to find out here was, with
9  respect to particular products that were from before
10 LPL's formation and, therefore, if they could potentially
11 constitute prior art in this case, he was being asked
12 about what LPL could say about how those products could
13 be mounted. And, obviously, what they are trying to
14 establish is whether there is a rear-mountable --
15        SPECIAL MASTER POPPITI: And you tell me
16 why they are not entitled to ask that question.
17        MR. CHRISTENSON: Your Honor, I think
18 what happened was -- and I think this is clear in the
19 transcript -- Mr. Chao testified that he checked with, at
20 the company -- first of all, we produced documents
21 related to the products. We produced all the documents
22 we could find related to those products. And those
23 documents, in and of themselves, don't show detail about
24 how the product was or could be mounted. And that was

Page 39

1  one of the reasons, when we were in discovery, we all
2  wanted to get the devices and not just the documents,
3  because we don't think the documents show it. But
4  Mr. Chao testified, Your Honor, that he went to the
5  engineers.
6         SPECIAL MASTER POPPITI: I know that.
7         MR. CHRISTENSON: The appropriate
8  engineers, and he talked to those engineers to find out
9  if they knew, from their development of the product and
10 everything that went with that, anything about how those
11 modules were going to be used or mounted.
12        SPECIAL MASTER POPPITI: That's a
13 different question. How they are going to be used or
14 mounted, I understand, and I believe your worthy
15 opponents across the table understand that you have said,
16 rather consistently, you do not know how your customers
17 are going to mount. That's not the issue here.
18        Am I misstating that, either Mr Miller
19 or Mr. Meredith?
20        MR. MILLER: No, Your Honor. We
21 understand their position.
22        SPECIAL MASTER POPPITI: That's not
23 what's being asked for here.
24        Now, I have not gone through as

Page 40

1  carefully as I know you have gone through, because you
2  have lived it in real time and, unfortunately, even my
3  looking at the history of it doesn't permit me to get as
4  closely as I would like to the real time that it
5  occurred. I note we have been working off of page 66,
6  and I expect there are other examples where a similar
7  objection was made, a similar response was made, or there
8  are responses -- I don't know whether it relates to this
9  specific question where the witness said, I don't
10 remember. I don't know. I don't remember.
11        And I started to count the times when he
12 said, I don't remember, and I, quite frankly, stopped
13 counting so I could get through everything more
14 efficiently here. And I really have difficulty
15 understanding how a 30(b)(6) witness that has been
16 working for six weeks to prep for this answers numerous
17 times, I don't recall. Not I don't know, that's a
18 problem in and of itself if he is supposed to have the
19 knowledge. But, I don't recall. He might as well have
20 not shown up to sit in a seat and answer those specific
21 questions.
22        I would like you to answer that
23 question. How can a 30(b)(6) witness sit in a chair,
24 after having been prepped for six weeks -- and you have

Page 41

1  talked about his prep and I will accept it at face value
2  for the moment -- and say I don't recall? How can a
3  30(b)(6) witness do that?
4         MR. CHRISTENSON: I think it would
5  depend on the question, Your Honor.
6         SPECIAL MASTER POPPITI: Well, I'm going
7  to ask Mr. Miller to pull a few out for me so that I can
8  focus on what he wants to look at. But I'm very
9  concerned about the number of times he says, I don't
10 recall.
11        Mr. Miller, take the time to sift
12 through it, if you would, and pull an example.
13        MR. MILLER: I am looking, Your Honor.
14        SPECIAL MASTER POPPITI: Thank you, sir.
15        MR. MILLER: For example, turning to the
16 deposition transcript from the 20th.
17        SPECIAL MASTER POPPITI: Just one
18 moment. Is that Volume 2?
19        MR. MILLER: Volume 2.
20        SPECIAL MASTER POPPITI: Okay. Just a
21 sec. Okay.
22        MR. MILLER: On page 31.
23        SPECIAL MASTER POPPITI: Okay.
24        MR. MILLER: Actually, just to put it in

Page 42

1  context, I should start on page 30, at line 22.
2  SPECIAL MASTER POPPITI: Okay.
3  MR. MILLER: "Question: With regard to
4  that same product, the LC056N1, has that product ever
5  been the subject of any advertisements?" Mr. Ambrozy
6  makes an objection.
7  "THE WITNESS: I don't know.
8  "BY MR. MILLER: Question: Did you do
9  anything in preparation for your deposition to ascertain
10 whether or not that product had been the subject of any
11 advertisement?
12 "ANSWER: I don't know. I don't really
13 recall whether I did or not.
14 "QUESTION: Can you tell me whether any
15 of the products that are within the scope of the
16 definition of products for today's deposition were the
17 subject of any advertisements?"
18 Objection registered.
19 "THE WITNESS: I don't know.
20 "QUESTION: Did you do anything to
21 prepare yourself to be able to testify about whether any
22 of the products that are within the scope of the
23 definition of products for today's deposition have been
24 the subject of any advertisements?"

Page 43

1  He asked a question: "What specific
2  model are you referring to? Are you referring to all the
3  models?"
4  "QUESTION: I'm referring to whether you
5  took any actions to prepare yourself to be able to
6  testify about whether any of the products that are within
7  the scope of the Court's order for you to appear for your
8  deposition were the subject of any advertisements."
9  Objection by Mr. Ambrozy.
10 "THE WITNESS: I don't really recall
11 whether I did or not."
12 SPECIAL MASTER POPPITI: Thank you.
13 MR. MILLER: There are others.
14 SPECIAL MASTER POPPITI: I know. It
15 goes on for the next several pages.
16 I would like to hear a justification for
17 a 30(b)(6) witness to respond, I don't recall.
18 MR. CHRISTENSON: Your Honor, I don't
19 know why he testified that he did not recall.
20 SPECIAL MASTER POPPITI: I don't either,
21 but he is your 30(b)(6) witness. He is your corporate
22 knowledge.
23 MR. CHRISTENSON: I understand that,
24 Your Honor. I think that the -- the question, I think,

Page 44

1  is basically asking, you know, potentially about any
2  advertisements of any products.
3  SPECIAL MASTER POPPITI: It doesn't say
4  that. That's not the question, sir. It really isn't the
5  question.
6  Mr. Miller, with whatever degree of
7  frustration and whatever degree of calm he brought to
8  every one of those questions, he was doing what he had
9  the right to do, because at some point, if there is a
10 problem with it, he has got the right and obligation on
11 behalf of his client to say to somebody that is sitting
12 in assistance of the Court to say, This witness wasn't
13 prepared. And the questions that he is framing for
14 purposes of asking me to make that judgment is, Tell me
15 what you have done or -- I am referring to whether you
16 took any actions to prepare yourself to be able to -- and
17 there are at least five or six categories that fall into
18 that preamble question.
19 And with each of those, the witness
20 didn't respond one way or the other. He said, I don't
21 recall. How can I measure anything other than -- well,
22 if he doesn't recall, what information do I have to make
23 the judgment other than he is not the right witness in
24 that chair? He can't recall what he did for the past six

Page 45

1  weeks.
2  Now, I know that Mr. Ambrozy challenged
3  on a few of them saying, Point me to the topics of the
4  deposition. I know that he did that. I'm not sure he is
5  wanting to do that now, because with respect to each one
6  of those questions I can draw a thread, and it's a pretty
7  significant thick red line, actually.
8  Let me do this. I have -- just focusing
9  on that issue of preparedness and focusing on this series
10 of questions, this witness shouldn't even have been in
11 the chair, if he can't recall what he did to prepare.
12 Because he is expected to prepare, No. 1, remember what
13 he did with respect to the preparation, and be in a
14 position to say to direct questions, Yes, I can give you
15 the information because I know it. No, I don't have the
16 information because we don't have it. There is no
17 corporate knowledge here.
18 That's not what was going on during the
19 course of this deposition. So I do and will find that
20 this witness was in large not prepared and might as well
21 have not been there as a 30(b)(6) witness. Now, I don't
22 know --
23 MR. CHRISTENSON: Your Honor, in
24 fairness to LPL, I would just point out that there are

Page 46

1  many different topics, and I think the question of
2  preparation really can't even be addressed with respect
3  to many of them because there were no questions asked.
4      SPECIAL MASTER POPPITI: I will tell you
5  what, then, if you want me to be going down through each
6  of these topics and making a judgment as to whether he
7  was prepared or not prepared and have to play bumper car
8  with all of the objections that were made and, yes,
9  Mr. Ambrozy, that's exactly what I just said. I find the
10 conduct of this deposition to be game playing. You cited
11 me the McKelvie case. I read the McKelvie case. I have
12 read it ever since he wrote it. I knew he would write it
13 that way before he wrote it. And this is not appropriate
14 deposition conduct.
15     There are numerous occasions when you
16 went beyond objection, state the brief reason. There
17 were numerous occasions where there was coaching. If
18 it's important for me to point it out for the record,
19 written or otherwise, I will take the time to do that.
20     MR. AMBROZY: Your Honor, if I may
21 speak.
22     SPECIAL MASTER POPPITI: No. This
23 deposition was a complete and utter waste of time, and we
24 are going to have to figure out how to correct that.

Page 47

1  There is going to be -- well, you have got to tell me
2  where you are with respect to all the deadlines. I know
3  they are coming. I know they are on my calendar. I'm
4  not in my office. I really didn't focus on deadlines for
5  purposes of this discussion this afternoon. And I know
6  what the requests for sanctions are. And I think they
7  may be premature, other than the sanction dealing with
8  the renoticing of a 30(b)(6) deposition.
9      And, quite frankly, Counsel, this
10 witness is -- it's a step that a Court should always be
11 reluctant to take. I know that. Given the way this
12 witness, either on his own or with assistance, approached
13 this deposition, I conclude he is not the appropriate
14 witness to sit in that chair.
15     MR. CHRISTENSON: Your Honor, this is
16 Cass Christenson.
17     Given your comment, it seems clear that
18 the obvious question is who from LPL should testify and
19 how soon can we convene the deposition?
20     SPECIAL MASTER POPPITI: Well, here is
21 what I would like you to do. I would like you all to go
22 offline for 15 minutes, and when you come back online, I
23 expect there to be some definition to that. And given
24 what has occurred here, and knowing what has occurred on

Page 48

1  occasions before this deposition today and the
2  conversation and dialog that surrounded, that has
3  surrounded depositions in this case, I want to know why I
4  shouldn't be giving some serious consideration to
5  directing that these depositions occur in Wilmington,
6  Delaware, as close to the courthouse or this office as
7  possible. I do not want to waste your client's resources
8  for me to sit through the remainder of depositions in
9  this case, but I will listen to some conversation with
10 respect to that. We talked about it before. It's not a
11 new subject. Is it? That wasn't rhetorical.
12     MR. CHRISTENSON: That's correct, Your
13 Honor.
14     MR. KIRK: That's correct, Your Honor.
15     MR. MILLER: Correct, Your Honor.
16     SPECIAL MASTER POPPITI: So if you go
17 offline, please, for -- if you need until 3:30, we can do
18 that. And just dial back in.
19     MR. MILLER: Yes, Your Honor. This is
20 Scott Miller, that's fine with us.
21     SPECIAL MASTER POPPITI: Thank you all.
22     (A recess was taken from 3:07 until 4:45
23 p.m.)
24     SPECIAL MASTER POPPITI: Is that

Page 49

1  everyone?
2      MR. KIRK: Yes.
3      SPECIAL MASTER POPPITI: No one new has
4  joined, so the record will reflect that everyone has
5  rejoined.
6      SPECIAL MASTER POPPITI: Okay.
7      MR. CHRISTENSON: Your Honor, this is
8  Cass Christenson. What we had discussed offline was that
9  LPL right now -- in Korea this coming week is a major
10 holiday in Korea; it's their Thanksgiving holiday. So
11 our view was that realistically we would want to have the
12 following week for additional preparation, which is the
13 week of October 1. And then we had proposed --
14 obviously, the witnesses would be traveling from Korea to
15 the U.S., and we proposed reconvening the deposition
16 starting on Wednesday, October 10th.
17     We also then proposed concessions on
18 certain dates and deadlines that we think would be
19 impacted by that timetable. We also agreed to, that the
20 deposition could proceed in Wilmington. We did not agree
21 to the other side's request that we pay costs and
22 attorneys' fees, and we also did not think that it was
23 necessary for Your Honor to attend the deposition as it
24 is reconvened.

Page 50

1  SPECIAL MASTER POPPITI: Good. I am
2  happy for the last part.
3  MR. CHRISTENSON: That was our view.
4  They may have a different view.
5  MR. MILLER: Your Honor, this is Scott
6  Miller.
7  We did have an exchange of some dates.
8  We haven't agreed on the dates. We are, obviously,
9  willing to have the deposition go forward in Wilmington.
10 We do think that it should be in a location that would be
11 convenient for Your Honor to be able to be accessible,
12 and to have you be able to sit in at whatever you think
13 is an appropriate amount of time, either at the beginning
14 or random intervals or periodic intervals that you feel
15 necessary to be spot-checking or if you just want to be
16 on call, whatever you believe to be most efficient. And
17 we believe the costs associated with that, the additional
18 costs of Your Honor's time should be borne by the
19 plaintiff.
20 And then we also did ask that plaintiff
21 agree to reimburse us for our costs of coming here to
22 Washington for this time to participate in the deposition
23 that has gone forward so far.
24 SPECIAL MASTER POPPITI: Say what you

Page 51

1  just said again. I missed it.
2  MR. MILLER: We asked the plaintiffs to
3  agree to reimburse our clients for the costs they have
4  incurred in sending us to Washington for this deposition.
5  And they declined to be responsible for the costs of our
6  being here or the costs of your attendance at any portion
7  of the deposition that you would feel was appropriate to
8  attend.
9  And then on the date --
10 MR. CHRISTENSON: I think that's a
11 little inaccurate.
12 SPECIAL MASTER POPPITI: Go ahead. Tell
13 me.
14 MR. CHRISTENSON: We are not asking that
15 the Special Master be barred at the deposition. If the
16 Special Master feels it appropriate, that's fine; but we
17 are not asking that he attend the entire thing. That's
18 what we are objecting to.
19 MR. MILLER: All we ask is that the
20 portions that he sits in on be the responsibility of the
21 plaintiff.
22 MR. CHRISTENSON: Your Honor, this is
23 Cass Christenson.
24 Just to clarify our position, we think

Page 52

1  that -- we are fine with bringing the witness to
2  Delaware. We are fine with making arrangements for
3  accessibility. I just don't think it's necessary, at
4  this point, to schedule Your Honor's time to attend, I
5  guess as they were putting it, spot-checking the
6  deposition. I think it, obviously, will be in
7  Wilmington; if disputes arise, which we intend to make
8  every effort to avoid from happening, we understand you
9  would be involved promptly.
10 SPECIAL MASTER POPPITI: Have you landed
11 on a date yet? I understand you are looking at proposed
12 dates.
13 MR. MILLER: This is Scott Miller, Your
14 Honor.
15 The plaintiffs are proposing to resume
16 the deposition on October 10th. The problem is that that
17 impacts the expert reports, it impacts the summary
18 judgment filings, at least. And the question is: How
19 much compression can be put into the schedule? And on
20 behalf of ViewSonic, we are extremely uncomfortable in a
21 position where an expert deposition, we would have
22 essentially one week to prepare summary judgment motions
23 on the basis of expert deposition.
24 And in the current schedule we have --

Page 53

1  in the historical schedule, we have had more time.
2  MS. ROMAN: Your Honor, this is Tracy
3  Roman. Just so I can set the stage.
4  I think the impact that is proposed by
5  the dates that's the greatest is that for opening summary
6  judgment motions, rather than them taking place on
7  November 2nd, it would be November 14th. And then
8  response summary judgment motions are currently scheduled
9  and would stay scheduled for November 29th. So rather
10 than having a four-week time period between opening and
11 responding summary judgment briefs, it's now reduced to
12 two weeks.
13 MR. MILLER: And that, obviously,
14 includes the Thanksgiving holiday in the United States.
15 SPECIAL MASTER POPPITI: It does.
16 MS. ROMAN: And we understand that one
17 of the reasons for the proposal that the deposition take
18 place on October 10th is because of the Korean
19 Thanksgiving holidays occurring next week. And we are
20 reluctant to try to push anyone to miss a holiday that's
21 a national holiday, but at the same time, we are in a
22 real bind.
23 MR. CHRISTENSON: Your Honor, if I may.
24 Part of the problem with the holiday is not that we don't

Page 54

1  want them to miss their holiday, it's the fact that it is
2  a very big holiday in Korea, and Koreans have already
3  started traveling for that holiday. And it's our
4  understanding that people we need to speak with are not
5  even at work or the people that we would prep for the
6  deposition, if it could even possibly go next week, is
7  that they are not even in, at work to get a hold of and
8  get them over here. It's not that we are trying to get
9  them to give up their holiday, it's our understanding
10 they are not available.
11          MR. MILLER: Obviously, we would prefer
12 to start the week of October 1st, if possible just
13 because -- well, you know why.
14          SPECIAL MASTER POPPITI: Right.
15          Well, the problem -- and it isn't a
16 problem if you say it's not. Well, the problem with the
17 week of the 1st, in terms of my availability, is I am in
18 an all-week arbitration in New York. So if it's not
19 critically important that I be available, then we can, at
20 least, talk about that week to see if it is even doable.
21          But if there is any expectation that I
22 should either, to adopt the phrase spot-check or just
23 simply make myself available when I know the deposition
24 is occurring, that week is out, because that arbitration

Page 55

1  is due to last the entire week.
2          MR. MERIDETH: This is Frank Merideth,
3  Your Honor. I think it is very important that you be
4  available almost on an on-call basis because we have had
5  -- I mean, this is the second time we have had a problem,
6  and we don't want to have it a third time. We just don't
7  have the time to do that.
8          SPECIAL MASTER POPPITI: I understand
9  that. So then it means -- just give me a minute and a
10 half to walk the hall a minute because I don't have my
11 calendar in here with me.
12         Would you hold, please.
13         MS. ROMAN: Yes, sir.
14         (Discussion off the record.)
15         SPECIAL MASTER POPPITI: Counsel, if we
16 are looking at the week of the 8th, and if we are looking
17 at the 10th, my suggestion, in terms of availability,
18 would be to have the deposition here in my offices
19 because I have got an arbitration that I have scheduled
20 in the afternoon. It's something that I expect -- I
21 haven't looked at the file yet, but I expect it's not
22 going -- it would be easy to recess if that's necessary.
23 So if that's convenient, in terms of location for
24 everyone, then I am happy to host the room and whatever

Page 56

1  else is needed.
2          MR. CHRISTENSON: Yes, Your Honor,
3  that's fine for LPL. Thank you.
4          MR. Miller: That's fine for ViewSonic.
5          MR. MERIDETH: Fine for Tatung.
6          SPECIAL MASTER POPPITI: Tell me what
7  time you want to start.
8          MR. MILLER: We have been starting at
9  9:30 a.m.
10         SPECIAL MASTER POPPITI: And you finish
11 at what time?
12         MR. MILLER: Approximately 5:30.
13         SPECIAL MASTER POPPITI: Okay. That
14 will be the only day that will be set; correct?
15         MR. MILLER: No. I think -- we have 21
16 hours, so we needed three days.
17         SPECIAL MASTER POPPITI: Okay.
18         MR. MILLER: Three, seven-hour days, so
19 we are probably going to have to go later than 5:30.
20         SPECIAL MASTER POPPITI: Well, we have
21 got a problem. In order to accommodate proximity, and I
22 don't know that that's ultimately necessary, as opposed
23 to availability, the better time is 8, 9, 10, not 10, 11,
24 12. I am out of the office on the 11th and the 12th.

Page 57

1          MR. CHRISTENSON: Your Honor, Cass
2  Christenson for LPL.
3          Our concern with that is if the tradeoff
4  is to make sure that the witness is ready and we avoid
5  disputes versus being in your office, I would
6  respectfully suggest we are better off doing it at
7  another office near you, starting on the 10th.
8          SPECIAL MASTER POPPITI: Well, the
9  office that's going to be near me on the 11th and 12th is
10 a D.C. office.
11         MR. CHRISTENSON: I see.
12         SPECIAL MASTER POPPITI: The 10th I will
13 be in Wilmington, the 11th I will be in Washington and
14 the 12th I will be in Washington.
15         MR. CHRISTENSON: Either location is
16 fine for LPL, Your Honor. We would prefer to stay in one
17 place, whether it's D.C. or Wilmington, either one is
18 fine.
19         SPECIAL MASTER POPPITI: Anyone's
20 thoughts on that, please.
21         MR. MILLER: Your Honor, this is Scott
22 Miller.
23         Are you going to be in a position when
24 you are in Washington that you will be accessible by

Page 58

1  phone?
2       SPECIAL MASTER POPPITI: Yes. My
3  purpose for being in Washington is a partners' retreat,
4  so I will be available by phone and I can be available in
5  person.
6       MR. MILLER: Then I think we should do
7  it in Delaware, either in your office in Delaware or one
8  of our offices in Delaware, so we don't end up having to
9  move, if nobody is there, when you guys are gone. I
10 think we should say it's going to be in Delaware. And I
11 understand our office is pretty close to your office.
12      SPECIAL MASTER POPPITI: Okay.
13      MR. MILLER: So we can either move after
14 the first day or we can talk to LPL about this, if you
15 like.
16      SPECIAL MASTER POPPITI: Yes. Why don't
17 you do that, and try to figure out logistics because I
18 certainly can gather whatever papers I would need,
19 because you are going to have to put them in front of me
20 if there is a dispute on either the 11th or the 12th.
21 And we can make arrangements either with the hotel or my
22 office to make sure that I get them.
23      MR. MILLER: Okay.
24      SPECIAL MASTER POPPITI: So it's 10, 11,

Page 59

1  12.
2       MS. ROMAN: Your Honor, this is Tracy
3  Roman, it might be most useful for counsel to continue
4  over the next couple of days to discuss the impact of
5  that on the remaining days.
6       SPECIAL MASTER POPPITI: I would agree
7  with that. I think whatever you all come up with is
8  certainly something that I'm going to have no problem
9  with.
10      MS. ROMAN: Obviously, this is all
11 working within the confines of the existing trial dates.
12      SPECIAL MASTER POPPITI: That's correct.
13 I don't expect that Judge Farnan is going to want to be
14 hearing from any of us with respect to that trial date.
15 And the only question I would -- the only question I
16 would raise with respect to logistics is it may be, as I --
17 think about it, it may be more convenient to do the
18 depositions in Washington, because if it's important for
19 me to become involved, then it's easy for me to leave the
20 pleasant rooms involving retreat and go back to the
21 office and deal with whatever we have to deal with or
22 come to the deposition site. So my preference would be
23 that you do it in D.C.
24      MR. MILLER: Okay. We will pick one of

Page 60

1  the locations here in Washington, then, and make it
2  happen.
3       SPECIAL MASTER POPPITI: Okay.
4       Then what I would like to do is, I think
5  if what I hear is remaining for discussion today, there
6  is an application for LPL to assume the responsibility
7  for the expenses. And what I would like to see is an
8  affidavit that describes those fees and costs for me,
9  because I will entertain the application.
10      MR. MILLER: Thank you, Your Honor.
11      MR. CHRISTENSON: Your Honor, this is
12 Cass Christenson.
13      LPL would also like to have a chance to
14 address that.
15      SPECIAL MASTER POPPITI: Absolutely.
16      MR. CHRISTENSON: How should we do that?
17 Should we wait for the submission of ViewSonic?
18      SPECIAL MASTER POPPITI: No. Realizing
19 that this is something that need not be focused on
20 promptly, and knowing that you all have one heck of a lot
21 of work to do, then I would prefer that you offline
22 discuss when you would like to put that before me, and
23 you set the schedule.
24      MR. CHRISTENSON: Very well.

Page 61

1       MR. MILLER: Are you looking for more
2  than factual information or are you looking for a full
3  brief on the issue as well?
4       SPECIAL MASTER POPPITI: It seems to me,
5  for purposes of making the record, I need some submittal
6  from you.
7       MR. MILLER: Okay.
8       SPECIAL MASTER POPPITI: And the reason
9  why I need that is because if there becomes an issue
10 about what I propose and do, then I want to make sure
11 that there is a record for Judge Farnan.
12      MR. MILLER: That's fine, Your Honor.
13      SPECIAL MASTER POPPITI: So why don't I
14 look for no more than five pages from either side with
15 respect to the substance of the issue; namely, sanction,
16 as requested, and accompanying that request from the
17 defendants the affidavit to support the request.
18      MR. CHRISTENSON: Your Honor, Cass
19 Christenson.
20      Just to clarify, my understanding is the
21 only sanctions issue we are going to be briefing is fees
22 and costs.
23      SPECIAL MASTER POPPITI: That's correct.
24 The only other request for sanction is for my

Page 62

1 responsibility or my time standing ready, and I don't
2 think it would be appropriate for me to -- I don't want
3 to take that off the table, but I don't want to consider
4 that at this time. Let's see how the process works the
5 next time you are all at deposition.
6      MR. MERIDETH: Your Honor, this is Frank
7 Merideth.
8      I assume that the Tatung defendants also
9 may submit expenses?
10      SPECIAL MASTER POPPITI: Yes.
11      MR. MERIDETH: As well. Thank you.
12      SPECIAL MASTER POPPITI: Is there
13 anything else for business today, please?
14      MR. CHRISTENSON: Not from LPL, Your
15 Honor.
16      MR. MILLER: Not from ViewSonic.
17      MR. MERIDETH: Not from Tatung.
18      SPECIAL MASTER POPPITI: I neglected to
19 say this, the record is the order. However, it may be
20 appropriate for me to do what I have done, I guess the
21 past couple of times, is ask that there be a form of
22 order prepared, reviewed by LPL for form only.
23      And, again, I will defer to your
24 schedule, knowing that you have a lot on your plates. I

Page 63

1 would like to see it in short order, but I don't want to
2 give you a deadline because I don't think you need one.
3      MR. MILLER: Your Honor, this is Scott
4 Miller.
5      I have, I guess, one other question. Do
6 you want some sort of status report in terms of dates?
7 Ms. Roman mentioned that obviously we have to discuss
8      SPECIAL MASTER POPPITI: Yes.
9      MR. MILLER: I thought maybe we could
10 give you next Tuesday, perhaps, at the end of the day.
11      SPECIAL MASTER POPPITI: Tuesday, close
12 of business is fine. If you want to do it first thing,
13 we can do that. And I guess I should say when I say,
14 "first thing," respecting California time -- I should
15 have said that yesterday -- we can do it at 10 o'clock.
16 10 o'clock Eastern.
17      MR. MILLER: That's fine. We will give
18 you a status report on where we stand on those dates.
19      SPECIAL MASTER POPPITI: Okay.
20      MR. MILLER: Thank you, Your Honor.
21      MR. CHRISTENSON: Thank you.
22      (The hearing concluded at 4:07 p.m.)
23
24

Page 64

1      C E R T I F I C A T E
2
3 STATE OF DELAWARE:
4 NEW CASTLE COUNTY:
5      I, Ellen Corbett Hannum, a Notary Public within and
6 for the County and State aforesaid, do hereby certify
7 that the foregoing teleconference was taken before me,
8 pursuant to notice, at the time and place indicated; that
9 the statements made by participants were correctly
10 recorded in machine shorthand by me and thereafter
11 transcribed under my supervision with computer-aided
12 transcription; that the transcript is a true record of
13 the statements made by the participants; and that I am
14 neither of counsel nor kin to any party in said action,
15 nor interested in the outcome thereof.
16      WITNESS my hand and official seal this 21st day of
17 September A.D. 2007.
18
19      Ellen Corbett Hannum, RMR, CMRS
     Notary Public - Reporter
20      Delaware Certified Shorthand Reporter
     Certification No. 118-RPR
21
22
23
24